ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x

                        :

   UNITED STATES OF AMERICA

                        :    **SEALED INDICTMENT**

      - v. -

                        :    19 Cr.

   STEPHEN M. CALK,

**19 CRIM  366**

           Defendant.

                        :

- - - - - - - - - - - - - - - - - - - - x    **JUDGE SCHOFIELD**

COUNT ONE
(Financial Institution Bribery)

The Grand Jury charges:

1.    This charge is based on a senior bank official's corrupt use of his position to issue millions of dollars in high-risk loans to a borrower in exchange for a personal benefit.  Specifically, as detailed herein, between in or around July 2016 and in or around January 2017, STEPHEN M. CALK, the defendant, abused his authority as the chairman and chief executive officer of a federally-insured bank to cause $16 million in loans to be issued to a borrower whom CALK expected would, in return, assist CALK in obtaining a senior position with an incoming presidential administration.  CALK did not ultimately obtain the position and, when the borrower defaulted on the loans CALK caused to be issued, the bank suffered a multi-million dollar loss.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 2 1 2019

Relevant Individuals and Entities

2.   The "Bank" is a federal savings association headquartered in Chicago, Illinois.  At all times relevant to this Indictment, its deposits were insured by the Federal Deposit Insurance Corporation.  The Bank is owned in its entirety by the "Holding Company," a Chicago-based bank holding company.  Among other lines of business, the Bank extends residential, construction, and other commercial loans.

3.   STEPHEN M. CALK, the defendant, is the chief executive officer and chairman of the board of the Bank.  CALK is also chief executive officer, chairman, and majority owner of the Holding Company.  At all relevant times, CALK owned approximately 67% of the Holding Company.  A relative of CALK's owned approximately 29%, and three other shareholders collectively owned approximately 4%.

4.   The Bank's credit committee -- which held authority to approve or reject the types of loans relevant to this Indictment -- was comprised of (i) STEPHEN M. CALK, the defendant, (ii) the President of the Bank (the "Bank President"), and (iii) the Chief Operating Officer of the Bank (the "Bank COO").

5.   The "Loan Officer" was, at all relevant times, a loan officer of the Bank, based in New York, New York.

6.    The "Borrower" was, at all relevant times, a
lobbyist and political consultant.  Beginning in or about March
2016, the Borrower held a senior role with a presidential
campaign (the "Presidential Campaign"), and from June 2016
through August 2016, he served as chairman of the Presidential
Campaign.  After the Borrower's formal role with the
Presidential Campaign concluded in or about August 2016, the
Borrower continued to be informally involved in the campaign.
Beginning in or about November 2016, when the candidate for whom
the Borrower had been working was elected President of the
United States, the Borrower provided informal input to the
presidential transition team (the "Presidential Transition
Team").

## OVERVIEW

7.    Between in or about July 2016 and January 2017,
STEPHEN M. CALK, the defendant, engaged in a corrupt scheme to
exploit his position as the head of the Bank and the Holding
Company in an effort to secure a valuable personal benefit for
himself, namely, assistance from the Borrower in obtaining for
CALK a senior position in the presidential administration.
During this time period, the Borrower sought millions of dollars
in loans from the Bank.  CALK understood that the Borrower
urgently needed these loans in order to terminate or avoid

foreclosure proceedings on multiple properties owned by the Borrower and the Borrower's family.  Further, CALK believed that the Borrower could use his influence with the Presidential Transition Team to assist CALK in obtaining a senior administration position.  CALK thus sought to leverage his control over the Borrower's proposed loans to his personal advantage in the form of assistance obtaining a senior administration position.  Specifically, CALK offered to, and did, cause the Bank and Holding Company to extend $16 million in loans to the Borrower in exchange for the Borrower's requested assistance in obtaining various positions for CALK, including Secretary of the Treasury, Secretary of Defense, and Secretary of the Army.

8.    In approving these loans to the Borrower, STEPHEN M. CALK, the defendant, was aware of significant red flags regarding the Borrower's ability to repay the loans, such as his history of defaulting on prior loans.  Moreover, given the size of the loans, the Borrower's debt became the single largest lending relationship at the Bank.  In order to enable the Bank to issue these loans without violating the Bank's legal limit on loans to a single borrower, CALK authorized a maneuver never before performed by the Bank, in which the Holding Company --

4

which CALK also controlled -- acquired a portion of the loans
from the Bank.

9.     During the same time period, the Borrower
provided STEPHEN M. CALK, the defendant, with valuable personal
benefits.  First, in or about the summer of 2016, during the
Presidential Campaign -- and just days after CALK and the rest
of the Bank's credit committee conditionally approved the first
of the proposed loans to the Borrower -- the Borrower appointed
CALK to a prestigious economic advisory committee affiliated
with the campaign.  And second, in or about late November and
early December 2016 -- after the presidential candidate had been
elected President, after the Borrower's first loan from the Bank
had been issued, and while a second set of loans sought by the
Borrower was pending approval by the Bank -- the Borrower
recommended CALK to the Presidential Transition Team for an
administration position.  Due to the Borrower's efforts, CALK
was given the opportunity to be formally interviewed for the
position of Under Secretary of the Army in or about early
January 2017 at the Presidential Transition Team's principal
offices in New York, New York.  CALK was not ultimately hired.

10.    To conceal the unlawful nature of his scheme,
STEPHEN M. CALK, the defendant, made false and misleading
statements to the Bank's primary regulator, the Office of the

Comptroller of the Currency ("OCC"), regarding the loans to the Borrower.  Among other things, CALK falsely stated to the OCC regulators that he had never desired a position in the presidential administration.

11.  As a result of its independent review of the Bank's loans to the Borrower, in or around July 2017, the OCC downgraded the credit quality of those loans to "substandard," concluding that the Bank's classification of them as satisfactory had been inappropriate.

## FACTUAL BACKGROUND

### CALK Solicits and Receives a Presidential Campaign Position from the Borrower While Working to Extend the Borrower a Loan

12.  In or about the spring of 2016, the Borrower and the Borrower's son-in-law (the "Relative") approached the Bank in search of financing for certain real estate projects.  The Borrower and the Relative were seeking to refinance loans issued by another lender on a number of the Relative's real estate projects (the "Prior Loans"), including loans to companies partly owned by the Borrower and a loan that was personally guaranteed by the Borrower and secured by a piece of real property owned by the Borrower and his family in Brooklyn, New York (the "Brooklyn Property").

13. On or about July 27, 2016, at the Bank's office in Manhattan, the Borrower and the Relative attended a meeting with the Loan Officer. STEPHEN M. CALK, the defendant, joined the meeting by videoconference. The purpose of the meeting was to discuss a proposed refinancing of one of the Prior Loans related to a construction project in Los Angeles (the "Prior Los Angeles Loan"). During the meeting, after discussing the ability of the Bank to provide the refinancing sought by the Borrower, CALK expressed interest in participating in the Presidential Campaign, and the Borrower, who at the time was the chairman of the Presidential Campaign, told CALK that he would get back to him.

14. The next day, on or about July 28, 2016, STEPHEN M. CALK, the defendant, and the other two members of the Bank's credit committee, the Bank President and the Bank COO, conditionally approved the refinance of the Prior Los Angeles Loan in the amount of $5.7 million.

15. Less than a week later, on or about August 3, 2016, and consistent with the request made by STEPHEN M. CALK, the defendant, to participate in the Presidential Campaign, the Borrower emailed the Loan Officer and asked for CALK's resume. When the Loan Officer did not immediately send it, the Borrower followed up the next day, at which point CALK sent his resume

7

directly to the Borrower.  The Borrower then responded to CALK, "Per our conversation, I want to add you to the National Economic Advisory Committee for [the presidential candidate]. Is that something you would be able to do?"  CALK responded, "I am happy and willing to serve."

16.  On or about August 5, 2016, the Presidential Campaign announced the creation of its Economic Advisory Council.  STEPHEN M. CALK, the defendant, was named as one of its 14 members.  Other members of the council included an individual who went on to become Secretary of the Treasury, an individual who went on to become Secretary of Commerce, additional individuals who went on to hold senior governmental positions, and an individual who went on to chair the Presidential Inaugural Committee.

<u>The Borrower Restructures the Proposed Loan, which the Bank Refuses to Extend</u>

17.  Following the July 28, 2016 conditional approval of the refinance of the Prior Los Angeles Loan, Bank personnel worked to gather documentation to allow the Bank to underwrite the proposed loan.  The loan -- which was initially to be $5.7 million but was subsequently raised multiple times -- would be repaid by, among other things, funds derived from the sale of the Los Angeles property upon completion of construction, and

would be secured initially by the Los Angeles property but was subsequently restructured to add as collateral two additional properties in which the Borrower had an interest.

18.   In the process of reviewing the Borrower's loan application and related materials, Bank personnel learned of certain negative information regarding the Borrower's ability to repay the proposed refinance of the Prior Los Angeles Loan.   For example, on or about September 8, 2016, Bank personnel first became aware that the Prior Los Angeles Loan was in default and being foreclosed upon.   Later that month, an underwriter at the Bank wrote a memorandum summarizing a number of issues with the proposed refinance of the Prior Los Angeles Loan, including an inability to verify the Borrower's professed income and a $300,000 credit card delinquency by the Borrower.   The supervising underwriter asked the Bank President to advise STEPHEN M. CALK, the defendant, of these problems in advance of a dinner between CALK, the Borrower, and the Relative.

19.   On or about October 7, 2016, the Borrower emailed STEPHEN M. CALK, the defendant, asking for the amount of the proposed loan -- which by this point was $8.2 million -- to be increased by an additional $1 million.   The Borrower stated, "I look to your cleverness on how to manage the underwriting." Later that day, CALK caused the amount of the proposed loan to

be increased by $1 million, to $9.2 million.  On or about the next day, the Borrower emailed CALK, saying, "I also want to again thank you for fixing my issue.  It means a lot to me.  You are becoming a very good friend and I look forward to building our relationship into both a deeper business and personal one."

20.  On or about October 19, 2016, shortly before the proposed refinance of the Prior Los Angeles Loan was set to close, the Borrower proposed to the Loan Officer an entirely new loan structure, under which (i) the loan amount would be increased again, this time by $300,000, from $9.2 million to $9.5 million; (ii) the loan would be secured, in addition to some cash collateral, by only two of the Borrower's properties, rather than the three properties that had most recently been proposed; (iii) the Relative would no longer be a borrower, making the Borrower and the Borrower's spouse the sole guarantors; and (iv) the repayment source for the loan would now solely be the Borrower's income -- which, as noted above, had previously raised concerns for the Bank -- unlike the prior structure which had contemplated repayment, at least in part, from the sale of the Los Angeles property.

21.  On or about October 20, 2016, the Bank President, with the consent of STEPHEN M. CALK, the defendant, rejected the restructured loan and sent an email directing the Loan Officer

to advise the Borrower that the Bank would not extend the restructured loan.  In that email, which the Bank President then forwarded to CALK, the Bank President noted that "[t]his is not an easy loan to make and is a significant exposure to the bank."

22.  The Loan Officer then, with the consent of STEPHEN M. CALK, the defendant, initiated plans to attempt to submit the restructured loan for underwriting to a different financial institution (the "Wholesale Lender"), which would carry the entire economic risk if it accepted the loan.

CALK Reverses Course Following the Presidential Election and
Approves Restructured $9.5M Loan While Seeking the Borrower's
Help in Obtaining A Senior Administration Position

23.  On or about November 8, 2016, the candidate for whom the Borrower had served as campaign chairman was elected President.  Almost immediately thereafter, despite the Bank previously having declined to underwrite the restructured $9.5 million loan, STEPHEN M. CALK, the defendant, caused the Bank to reverse course and approve the full loan amount of $9.5 million (the "$9.5M Loan").  This loan closed just days after the election, in mid-November 2016.  Before closing the $9.5M Loan for the Borrower, CALK again sought to solicit a personal benefit from the Borrower: his assistance in obtaining a senior

position in the incoming presidential administration.   In
particular:

a.   Beginning on or about November 10, 2016,
CALK caused the Bank to reinitiate the process of evaluating the
$9.5M Loan for underwriting by the Bank itself (i.e., rather
than selling the loan to the Wholesale Lender, which was still
considering whether to underwrite the loan).

b.   With the Bank's consideration of the $9.5M
Loan pending, the next day, CALK requested that the Loan Officer
call the Borrower and ask the Borrower whether CALK was in
consideration for Secretary of the Treasury or other senior
administration positions.   CALK conveyed this request through
the Loan Officer despite the fact that CALK himself was, by this
point, regularly in contact with the Borrower.   The Loan Officer
did not carry out this request.

c.   That same day, on or about November 11,
2016, with CALK's consent, the Loan Officer sent counsel for the
Borrower a final term sheet for the $9.5M Loan.   It contained
terms that were substantially similar to the proposal the Bank
had previously refused to underwrite, including that it was to
be repaid solely from the Borrower's income and not the sale of
the Los Angeles property.

d.    The next day, on or about November 12, 2016, CALK called the Borrower directly and engaged in an approximately 18-minute conversation with him, their longest telephone conversation to that date.

e.    Two days later, on or about November 14, 2016, CALK emailed the Borrower a professional biography for CALK and a document titled "Stephen M. Calk Perspective Rolls [sic] in the [Presidential] Administration.docx," which contained a list of official governmental positions desired by CALK.   This list included 10 Cabinet secretary, deputy secretary, and undersecretary positions ranked by order of preference.   CALK's list started with Secretary of the Treasury, which was followed by Deputy Secretary of the Treasury, Secretary of Commerce, and Secretary of Defense, as well as 19 ambassadorships similarly ranked and starting with the United Kingdom, France, Germany, and Italy.

f.    Later the same day, CALK emailed the Borrower asking, "Are you aiding in the transition in any type of formal capacity?"   The Borrower responded, "Total background but involved directly."   CALK responded, in relevant part, "Awesome."

g.    The next day, on or about November 15, 2016, CALK sent the Borrower an email attaching a document titled

"Stephen M. Calk – Candidate for Secretary of the Army.docx,"
and wrote, "Will you please review the attached document
prepared at your request and advise what changes and
improvements I should make. My goal is to ensure you or my
designated prosper [sic] has all of the information they need to
have me successfully chosen by the President-Elect. I look
forward to your response." The materials listed, among CALK's
qualifications for the job of Secretary of the Army, CALK's
"loyalty" as demonstrated by his service to the Presidential
Campaign.

      h.    The next day, on or about November 16, 2016,
with CALK's approval, the Bank closed on the $9.5M Loan to the
Borrower, as specified in the final term sheet. The Bank
underwrote this loan, bearing its full economic risk.

      i.    Upon closing of the $9.5M Loan, and again at
CALK's direction, representatives of the Bank continued to
attempt to sell this closed loan to the Wholesale Lender.

      j.    Three days later, on or about November 19,
2016, CALK re-sent to the Borrower the document titled "Stephen
M. Calk – Candidate for Secretary of the Army.docx," as well as
an updated version of the document titled "Stephen M. Calk
Perspective Rolls [sic] in the [Presidential]
Administration.docx," which listed eight requested senior

governmental positions in order of preference, beginning with Secretary of the Army, Deputy Secretary of Treasury, Secretary of Commerce, and Secretary of Housing and Urban Development, as well as 18 desired ambassadorships similarly ranked and starting with the United Kingdom, France, Germany, and Italy.

### CALK Pushes to Extend an Additional $6.5 Million in Loans to the Borrower, While Continuing to Seek Senior Administration Positions

24. After the $9.5M Loan closed, STEPHEN M. CALK, the defendant, was personally involved in causing the Bank to extend an additional $6.5 million in loans to the Borrower, which the Borrower had first requested earlier in 2016 (the "$6.5M Loans"). However, extending millions of dollars in additional loans to the Borrower would have made the Borrower the Bank's single largest individual debtor, and in an amount that would have exceeded the Bank's statutory lending limit to a given customer. Concerns about the Borrower's ability to repay even the first $9.5M Loan had already been raised, as noted above, and CALK was further aware of the Borrower's dire circumstances at this time. Specifically, as CALK knew, the Borrower was in urgent need of additional financing to avert foreclosure proceedings on properties owned by the Borrower and the Relative, including foreclosure proceedings on the Brooklyn Property, which was to be part of the collateral for the $6.5M

15

Loans.  CALK nonetheless pushed forward on extending the $6.5M Loans, becoming personally involved in seeking to close them on an urgent basis for the Borrower.  At the same, CALK actively solicited the Borrower's assistance in obtaining a position in the presidential administration.   In particular:

a.   On or about November 25, 2016 -- days after the Bank closed on the $9.5M Loan (which the Bank was still attempting to sell to the Wholesale Lender), and while the Bank was still evaluating the Borrower's request for the $6.5M Loans -- CALK emailed the Borrower an updated version of the document titled "Stephen M. Calk Perspective Rolls [sic] in the [Presidential] Administration.docx," with Secretary of the Army listed as the first choice.

b.   Five days later, on or about November 30, 2016, the Borrower emailed the Loan Officer, copying CALK, asking, with respect to the $6.5M Loans, "Any sense of schedule? The clock is ticking and we are getting pressure on a number of fronts."  At this time, a foreclosure lawsuit was pending against the Brooklyn Property (*i.e.*, the proposed security on the $6.5M Loans), and as CALK knew, foreclosure auctions were scheduled on several other properties of the Borrower and the Relative in California (the "California Properties").

c.    On or about the same day that he told CALK that "the clock is ticking," the Borrower sent a recommendation to a senior member of the Presidential Transition Team's executive committee ("Transition Official-1") that CALK be appointed Secretary of the Army.  The next day, Transition Official-1 forwarded this recommendation to three other representatives of the Presidential Transition Team, recommending that CALK be considered.  As a result, CALK's name was entered into a tracking spreadsheet maintained by the Presidential Transition Team, with information regarding CALK's background copied from the Borrower's recommendation and with the Borrower listed as the person who had recommended CALK.

d.    Less than a week later, on or about December 5, 2016, CALK emailed the Borrower regarding a potential meeting with the President-Elect and asking if "we are making any progress re: SECARMY."  The Borrower responded that the President-Elect was not taking meetings of this sort while traveling but that the Borrower would be calling CALK later that day with an update.

e.    Two days later, on or about December 7, 2016, the Borrower emailed the Loan Officer, copying CALK, with subject line "Nervousness is setting in."  The Borrower wrote, "As you know the [California Properties] go to auction on Dec

21," and asked for an update on the $6.5M Loans. CALK then emailed the Loan Officer, without copying the Borrower, regarding the status of the Bank's efforts to sell the $9.5M Loan to the Wholesale Lender, which would have allowed the Bank to extend the $6.5M Loans without violating its legal lending limit. The Loan Officer responded that the Wholesale Lender was still refusing to underwrite the full value of the $9.5M Loan, to which CALK replied that the Wholesale Lender's position was "[f]ucking ridiculous" and that "We MUST push back on this."

      f.    Later the same day, the Borrower emailed the Loan Officer, copying CALK, attaching paperwork indicating that the Borrower had missed interest payments for the prior loan on the Brooklyn Property (the "Prior Brooklyn Loan") for the previous six months, and that various of the Borrower and Relative's California properties were in foreclosure as a result of defaults on multiple of the other Prior Loans. Despite these red flags -- and despite the fact that the Wholesale Lender was continuing to refuse to underwrite the original $9.5M Loan -- CALK continued to press forward on underwriting the additional $6.5M Loans.

      g.    Later the same day, CALK informed the Borrower, by e-mail, that the Bank might be required to take additional cash collateral as a result of its legal lending

limit, writing, "Although it is not ideal, it may be our only option given the short time until foreclosure on your investments."

  h. On or about December 21, 2016, after a lawyer for the Borrower emailed CALK to schedule a closing on the $6.5M Loans, CALK responded that they were not scheduling a closing until the loan was fully approved, adding, "We are working very hard to find solutions to help [the Borrower] out in his hour of need."

  i. The next day, on or about December 22, 2016, CALK called the Loan Officer and directed him to prepare to extend the $6.5M Loans whether or not the Wholesale Lender would buy the $9.5M Loan.  CALK explained to the Loan Officer that the Bank could fund the $6.5M Loans by causing the Holding Company to acquire part of the loan exposure (thereby allowing the Bank to extend the $6.5M Loans without breaching its legal lending limit).  In the course of this conversation, CALK stated, in substance and in part, that the Borrower was "influential" with "other people and a few other situations at hand."

<u>CALK Interviews for an Administration Position as the $6.5M<br>Loans Close</u>

  25. During the same time period in which STEPHEN M. CALK, the defendant, caused the $6.5M Loans to be approved, and

as a result of the Borrower's efforts on CALK's behalf, CALK was interviewed at the Manhattan offices of the Presidential Transition Team for the position of Under Secretary of the Army. In particular:

a.    On or about December 15, 2016, while the Borrower's application for the $6.5M Loans was still pending, the Borrower contacted a second representative of the Presidential Transition Team's executive committee ("Transition Official-2") and asked Transition Official-2 to arrange an interview of CALK for Secretary of the Army.  Transition Official-2 advised the Borrower that another candidate was likely to be nominated for Secretary of the Army, but agreed to arrange for CALK to be interviewed for Under Secretary of the Army.  The Borrower did not disclose to Transition Official-2 that CALK had recently caused the Bank to extend the $9.5M Loan to the Borrower or that the Borrower was currently seeking CALK's approval for the $6.5M Loans.

b.    On or about January 4, 2017, with CALK's approval, the Bank presented the Borrower with final documents for the $6.5M Loans.  The Borrower signed them, as did representatives of the Bank.

c.    The next day, on or about January 5, 2017, CALK, acting on behalf of the Holding Company, signed agreements

which transferred a portion of the $6.5M Loans from the Bank to the Holding Company, thereby avoiding a violation of the Bank's statutory lending limit. The Holding Company was not in the ordinary business of acquiring loans from the Bank, and had never done so before.

        d.   After the $6.5M Loans closed, as arranged by Transition Official-2, CALK interviewed for Under Secretary of the Army. The interview took place on or about January 10, 2017 and was conducted by three representatives of the Presidential Transition Team at the transition team's Manhattan offices. Following the interview, CALK emailed one of his interviewers, writing, among other things, "It is easy to see why [the Borrower] has such great respect and admiration for you."

        e.   On or about January 17, 2017, funds were transferred pursuant to the $6.5M Loans. The next day, the foreclosure lawsuit regarding the Brooklyn Property was dismissed due to the Borrower using funds from the $6.5M Loans to pay off the prior lender.

## CALK Makes False and Misleading Statements to the OCC; the OCC Downgrades the Loan Quality

        26.   On or about March 29, 2017, a newspaper published an article regarding the $16 million in loans extended by the Bank to the Borrower. In response to the report, and given the

size of the loans, OCC bank examiners scheduled an immediate on-site meeting with STEPHEN M. CALK, the defendant, and other Bank personnel. At that meeting, the OCC examiners asked CALK about the reporting, which had included that the Brooklyn Property which was securing the $6.5M Loans had been in foreclosure. CALK responded that the Bank had not been aware of the foreclosure. In truth and in fact, as referenced above, prior to the Bank's issuance of the $6.5M Loans, CALK well knew that the Prior Brooklyn Loan had been in default and accrued hundreds of thousands of dollars in penalties.

27. The OCC subsequently conducted a review of the $9.5M Loan and the $6.5M Loans, and in July 2017 downgraded their credit quality to "substandard." A substandard quality classification signifies a well-defined credit weakness and is characterized by the distinct possibility that the financial institution will sustain a loss if the deficiencies are not corrected.

28. In or about October 2017, the Borrower was charged with federal crimes and the U.S. Government sought the forfeiture of the Borrower's interests in properties securing the $9.5M Loan and $6.5M Loans. The Borrower subsequently ceased making loan payments to the Bank, and the Bank and the Holding Company foreclosed on the cash collateral securing the

loans and have currently written off the remaining principal balance -- totaling over $12 million -- as a loss.

29. In or about July 2018, STEPHEN M. CALK, the defendant, met with two senior OCC supervisors. In the course of this meeting, CALK brought up the subject of the Bank's loans to the Borrower and asserted that CALK had never wanted to be hired for a position in the presidential administration. As set forth above, this statement was false, as CALK had expressly and repeatedly sought the Borrower's assistance in obtaining such positions as Secretary of the Treasury, Secretary of Defense, Secretary or Under Secretary of the Army, and various ambassadorships.

## STATUTORY ALLEGATIONS

30. From at least in or about July 2016, up to and including in or about January 2017, in the Southern District of New York and elsewhere, STEPHEN M. CALK, the defendant, as an officer, director, employee, and agent of a financial institution, did corruptly solicit and demand for the benefit of any person, and did corruptly accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with business and transactions of such institution, to wit, CALK, the chairman and chief executive officer of the Bank and the Holding Company, corruptly solicited

23

and received from the Borrower assistance in obtaining a

position with the Presidential Campaign and the incoming

presidential administration, intending to be influenced and

rewarded in connection with the extension of approximately $16

million in loans from the Bank and the Holding Company to the

Borrower.

(Title 18, United States Code, Sections 215(a)(2) and 2.)

## FORFEITURE ALLEGATION

31.   As a result of committing the offense alleged in

Count One of this Indictment, STEPHEN M. CALK, the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982(a)(2)(A), all property, real and

personal, constituting, or derived from, proceeds the defendant

obtained directly or indirectly, as a result of the commission

of said offense, including but not limited to a sum of money in

United States currency representing the amount of proceeds

traceable to the commission of said offense.

### Substitute Asset Provision

32.   If any of the above-described forfeitable

property, as a result of any act or omission of STEPHEN M. CALK,

the defendant:

a.    cannot be located upon the exercise of due

diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

          (Title 18, United States Code, Section 982;
        Title 21, United States Code, Section 853; and
          Title 28, United States Code, Section 2461.)


FOREPERSON

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

STEPHEN M. CALK,

Defendant.

## INDICTMENT

19 Cr. _____

(Title 18, United States Code, Sections 215(a)(2) and 2.)

_____

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515.

*Filed Sealed Indictment.*

*USMJ, Debra Freeman*