UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| - against - | Case No. 19 Cr. 366 (LGS) |
| STEPHEN M. CALK, | |
| *Defendant*. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT STEPHEN M. CALK'S MOTION TO TRANSFER VENUE**

KL3 3272686.1

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND......................................................................................................1

ARGUMENT................................................................................................................................3

    A.    Both the Defendant and Alleged Victim are Located in the Northern District of Illinois..................................................................................................5

    B.    The Majority of Trial Witnesses are Located in the Northern District of Illinois and Are Otherwise Primarily Located Outside the Southern District of New York ............................................................................................6

    C.    The Conduct Charged Largely Occurred in the Northern District of Illinois .............................................................................................................8

    D.    Defendant's Longtime Counsel Are Located in the Northern District of Illinois .............................................................................................................9

    E.    The Expense to the Parties Favors Transfer to the Northern District of Illinois ...........................................................................................................10

    F.    Defendant's Business Will Be Disrupted if the Case is Not Transferred to the Northern District of Illinois ......................................................................11

    G.    Defendant's Motion is Timely Made and Weighs in Favor of Transfer................11

CONCLUSION..........................................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Platt v. Minnesota Mining & Manufacturing Co.*,
    376 U.S. 240 (1964) ............................................................................................... *passim*

*United States v. Fiorentino*,
    No. 13-Cr-338 (SJF), 2014 WL 108415 (E.D.N.Y. Jan. 6, 2014) ........................................ 6, 9

*United States v. Layne*,
    No. 05-Cr-87 (HB), 2005 WL 1009765 (S.D.N.Y. May 2, 2005) .......................................... 12

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990) ................................................................................................. 4

*United States v. Manafort Jr.*,
    18-MC-167 (D.D.C.) ............................................................................................................ 2

*United States v. Martino*,
    No. S1 00-Cr-389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ............................... 5

*United States v. Ohran*,
    No. 99-Cr-142 (JSM), 2000 WL 620217 (S.D.N.Y. May 12, 2000) .................................... 5, 6

*United States v. Rodriguez*,
    No. 16-Cr-41-FPG-HBS, 2018 WL 2126429 (W.D.N.Y. May 8, 2018) ....................... 4, 10, 11

*United States v. Russell*,
    582 F. Supp. 660 (S.D.N.Y. 1984) ............................................................................ *passim*

*United States v. Spy Factory*,
    951 F. Supp. 450 (S.D.N.Y. 1997) ....................................................................................... 5

*United States v. Valdes*,
    No. 05-Cr-156 (KMK), 2006 WL 738403 (S.D.N.Y. Mar. 21, 2006) .............................. 4, 6, 8

**Statutes**

18 U.S.C. § 215 .................................................................................................................... 2, 3

**Other Authorities**

Fed. R. Crim. P. 21(b) .................................................................................................. *passim*

## PRELIMINARY STATEMENT

Defendant Stephen M. Calk respectfully submits this memorandum of law in support of his motion to transfer this case to the Northern District of Illinois pursuant to Federal Rule of Criminal Procedure 21(b).

Although charged in the Southern District of New York, the locus of this case is in Chicago, Illinois. As Rule 21(b) contemplates, venue in Chicago would be far more convenient to "the parties, [the] victim, and the witnesses," and would be "in the interest of justice." Mr. Calk worked in and resides in the Northern District of Illinois. The alleged victim bank is in the Northern District of Illinois. Most of Mr. Calk's alleged offense conduct occurred in the Northern District of Illinois. And the majority of the likely trial witnesses appear to reside in the Northern District of Illinois. The indictment may properly have been returned in the Southern District of New York, but this forum is inconvenient for virtually every interested party except the prosecutors. This is the rare case in which the sole defendant, the sole victim, the majority of trial witnesses and the mass of the alleged offense conduct share one location—the Northern District of Illinois—and yet the government chose to bring charges 800 hundred miles away. Accordingly, the defendant respectfully requests that the Court transfer this matter to the Northern District of Illinois pursuant to Rule 21(b).

## FACTUAL BACKGROUND

Apart from his active duty military service, Stephen Calk has resided in Illinois since the age of 15, completing his undergraduate studies at the University of Illinois at Urbana-Champaign and his graduate studies at Northwestern University in Evanston, Illinois. He currently lives in Northfield, Illinois, outside Chicago. It is there that Mr. Calk is currently raising his three minor children, ages 17, 15 and 12, for whom he shares custody with his ex-wife, who lives nearby in Kenilworth, Illinois.

1

Mr. Calk's entire professional career has been rooted in the greater Chicago area, working in various capacities in the mortgage banking industry.  In 1995, he founded a residential mortgage banking company, Chicago Bancorp, Inc., and in 2011, Mr. Calk and his brother founded The Federal Savings Bank ("TFSB"), establishing its headquarters in the West Loop area of downtown Chicago.  Through a Chicago-based holding company, Mr. Calk and his brother own approximately 96% of TFSB.  Up until the time of the indictment, Mr. Calk was the CEO and Chairman of TFSB.  (Ind., ¶ 3).  On May 21, 2019, the grand jury returned a single-count, single-defendant indictment charging Mr. Calk with a violation of 18 U.S.C. § 215—the "bank bribery" statute.  It alleges that from July 2016 through January 2017, Mr. Calk schemed against and victimized his own bank, TFSB, in influencing the approval of certain loans to Paul Manafort in exchange or as a reward for Manafort's assistance in seeking a position within the Trump campaign and presidential administration.  (Ind., ¶ 30).  The government alleges that TFSB, the alleged victim here, suffered a multi-million dollar loss as a result of Mr. Calk's offense.[1]

As the indictment reflects, each of TFSB's decision-makers regarding the Manafort loans is in Chicago.  In particular, those loans were reviewed and ultimately approved by TFSB underwriters and other bank officials who were based in Chicago, including the bank's

---

[1] As the indictment makes clear, TFSB's supposed "loss" was caused by events occurring *after* the alleged offense here.  When the Special Counsel's Office indicted Manafort for international money laundering and Foreign Agents Registration Act ("FARA") violations, it seized and sought to forfeit his assets, including two of the properties and a bank account constituting the collateral for TFSB's loans.  (Ind., ¶ 28).  The status of those items of collateral is currently subject to proceedings between TFSB and the government in the District Court for the District of Columbia, where TFSB has asserted its rights as a third-party lender.  *See United States v. Manafort Jr.*, 18-MC-167 (D.D.C.).  TFSB expects to recover on those loans, which were substantially over-collateralized when they were made.  (Ind., ¶ 24).

three-person credit committee, and other TFSB personnel located in Chicago. (*See, e.g.*, Ind., ¶¶ 4, 17). The members of TFSB's board of directors also all reside in the Chicagoland area.

While the loans in question were progressing through the bank's approval process, the government alleges that Mr. Calk engaged in a series of telephone and email communications with Manafort and his associates, and that Mr. Calk had numerous interactions with other TFSB personnel, in furtherance of the alleged "bribery" scheme. (*See generally* Ind., ¶¶ 13–24). The vast majority of Mr. Calk's alleged communications and interactions during the alleged seven-month scheme took place from his office in Chicago. (*Id*).

Furthermore, the indictment alleges that Mr. Calk attempted to conceal his offense conduct from TFSB's regulator, the Office of the Comptroller of the Currency. (Ind., ¶¶ 26–29). TFSB was and is regulated by the OCC's Chicago office through that agency's Chicago-based personnel. Each of the two meetings in which Mr. Calk allegedly made false statements to the OCC concerning the Manafort loans occurred in Chicago. (*Id*. ¶¶ 26, 29).

Mr. Calk first became aware of the government's investigation into the conduct that is the subject of the indictment in or around March 2017. The investigation originated in the Office of the Special Counsel in Washington, D.C. and the Southern District of New York was just one of the offices participating in the review. Shortly thereafter, Mr. Calk retained his current Chicago-based defense counsel to represent him in these matters. Likewise, Chicago-based counsel represent TFSB, as well as a number of TFSB's employees whom the government has indicated may be witnesses at trial. Defendant only retained counsel in New York in December 2018, in view of the government's imminent indictment in this district.

## ARGUMENT

Federal Rule of Criminal Procedure 21(b) provides that a defendant may move for a change of venue based on "the convenience of the parties, any victim, and the witnesses, and in

the interest of justice." Fed. R. Crim. Proc. 21(b).  Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court.  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990).

In exercising that discretion, district courts are guided by the list of factors set forth in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964), which inform the four considerations for transfer listed in Rule 21(b).  These factors are: (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business if the case is not transferred; (6) expenses of the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket conditions of each potential district; and (10) any other special elements which might affect the transfer.  *Id*. at 243–44.  Other special elements include, for example, the timeliness of moving to transfer.  *See, e.g.*, *United States v. Russell*, 582 F. Supp. 660, 663 (S.D.N.Y. 1984).  Although not enumerated in *Platt,* the convenience of the alleged victim (in this case, TFSB), is also an important factor specifically referenced in Rule 21(b).[2]

While no one of the *Platt* factors is dispositive, the defendant's location and timing of the motion are two factors that "carry particular weight."  *United States v. Rodriguez*, No. 16-Cr-41-FPG-HBS, 2018 WL 2126429, *7 (W.D.N.Y. May 8, 2018).  Other of these factors have become obsolete with technology, such as "location of relevant documents and records" and "relative accessibility of place of trial."  *See, e.g.*, *United States v. Valdes*, No. 05-Cr-156 (KMK), 2006 WL 738403, at *6 (S.D.N.Y. Mar. 21, 2006) ("The fourth *Platt* factor, the

---

[2] Federal Rule of Criminal Procedure 21(b) was amended in 2010—forty-six years after *Platt*— to specifically include consideration of the convenience of any victims.  Fed. R. Crim. P. 21(b), Comm. Notes on Rules—2010 Amend. (2010).

4

location of documents and records, has consistently been found to not be a major concern in these days of easy and rapid transportation . . . this factor does not favor either retaining or transferring the action") (citation and internal quotation marks omitted); *United States v. Spy Factory*, 951 F. Supp. 450, 460 (S.D.N.Y. 1997) ("The efficiency of modern air transportation renders rather sterile any argument that one forum is more accessible than the other.") (citation and internal quotation marks omitted).  Moreover, "since the passage of the Speedy Trial Act, and the switch to individual calendars, consideration of docket conditions has become largely immaterial." *Russell*, 582 F. Supp. at 662 n.2.  Accordingly, this motion will focus only on the pertinent factors under Rule 21(b), all of which weigh in favor of a change of venue to the Northern District of Illinois.

> A. Both the Defendant and Alleged Victim are Located in the Northern District of Illinois

"As a matter of policy . . . wherever possible, defendants should be tried where they reside." *Russell*, 582 F. Supp. at 662; *see also United States v. Martino*, No. S1 00-Cr-389 (RCC), 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) (citing *United States v. Ohran*, No. 99-Cr-142 (JSM), 2000 WL 620217 (S.D.N.Y. May 12, 2000)); *Spy Factory*, 951 F. Supp. at 456 (citing *Russell*, 582 F. Supp. at 662).  The preference for trying defendants where they live stems from the fundamental "unfairness and hardship to which trial in an environment alien to the accused exposes him." *Ohran*, 2000 WL 620217, at *3.  It also supports the central purpose of venue, which "our forefathers included . . . in the Constitution in both Article III and the Sixth Amendment to ensure that citizens would not be dragged to distant places to stand trial." *Id.* (quoting J. Frankfurter, *United States v. Johnson*, 323 U.S. 273, 275–76 (1944)).  Defendant's location in this case—the Northern District of Illinois—strongly favors transfer.

The government has indicated that its case-in-chief will take approximately three weeks to present.  When combined with the presentation of the defense case, jury deliberations, and the weeks before trial meeting with his counsel in preparation, Mr. Calk would be compelled to be absent from his home for a lengthy period of time if the case were to remain in this district.  This is a significant hardship for Mr. Calk during what will be the most difficult time in his life.  Courts thus accord "greater weight to the defendant's interest in being tried in the district of his residence than to any other [*Platt*] factor."  *Ohran*, 2000 WL 620217, at *3.

Moreover, Mr. Calk is actively involved in the day-to-day care of his three children, for whom he shares custody with his ex-wife.  These responsibilities further favor transfer to Chicago.  *See Valdes*, 2006 WL 738403, at *4 ("family obligations, including the care of children, militates in favor of transferring proceedings to the district in which a defendant resides"); *see also United States v. Fiorentino*, No. 13-Cr-338 (SJF), 2014 WL 108415, at *4 (E.D.N.Y. Jan. 6, 2014) ("family concerns" favored transfer where defendant assisted in the care of his infirm mother).  The potential disruption to defendant's responsibilities would be significantly reduced if this case were transferred to Chicago.

Here, *both* the defendant *and* the alleged victim—the *only* defendant and the *only* alleged victim—are located in the Northern District of Illinois.  The alleged victim, TFSB, and its parent holding company, are also both based in Chicago.  (Ind., ¶ 2).  Accordingly, for the convenience of the defendant and the victim, this case belongs in Chicago, not New York.

      B.    <u>The Majority of Trial Witnesses are Located in the Northern District of Illinois and Are Otherwise Primarily Located Outside the Southern District of New York</u>

The second *Platt* factor—location of the witnesses—similarly weighs heavily in favor of the Northern District of Illinois.  The government has preliminarily identified forty

potential trial witnesses.[3] Of those forty, twenty are in the Northern District of Illinois, while only approximately eight appear to be in the New York area. Other potential witnesses appear to be scattered amongst California, Texas, Washington, D.C. and elsewhere. In other words, there are far more prosecution witnesses in Chicago than anywhere else, and Chicago-area prosecution witnesses outnumber the New York-area prosecution witnesses by more than 2 to 1.

Moreover, the Chicago-based witnesses appear to be the witnesses at the core of the case. First, as the indictment reflects, the loans at issue were approved by a three-member credit committee that included Mr. Calk. (Ind., ¶¶ 4, 9, 14). The government has identified the other two members of the credit committee as potential trial witnesses. Both are in Chicago. Second, TFSB's seven-member board of directors, all of whom the government has identified as potential trial witnesses, reside in the Chicago area. Third, the three principle bank personnel responsible for reviewing the credit-worthiness of the loans and overseeing the underwriting are identified by the government as potential trial witnesses, and they, too, are in Chicago. Fourth, the Chief Compliance Officer and in-house counsel for the bank is identified as a potential government witness and is likewise located in Chicago. Fifth, the Government has identified six OCC personnel as potential trial witnesses, each of whom works (and presumably resides) in the greater Chicago area.

Of the likely New York-area witnesses, most are employees of TFSB's New York office, including the salesperson for the Manafort loans, who is no longer with the bank. From

---

[3] The potential witnesses were identified by the government in connection with setting the conditions of Mr. Calk's pre-trial release so as to advise Mr. Calk of the people with whom he should not have contact. The government identified these individuals as "potential witnesses," while also noting that "the inclusion of an individual's name on this list does not mean they will be or are necessarily likely to be a witness."

the point of view of the bank, it is far preferable and much less disruptive to have a small number of New York employees travel to Chicago than to have a far larger number travel to New York.

Finally, we note that in addition to the twenty witnesses that the government identified who are Chicago-based, most if not all of the likely defense witnesses, including character witnesses, are in the Chicago-area. While not controlling, "the availability and convenience of these [character] witnesses . . . should be given considerable weight." *Russell*, 582 F. Supp. at 663.

Given the location of half of the government witnesses, as well as the foreseeable witnesses for the defense, this factor overwhelmingly favors transfer to the Northern District of Illinois.

C.  The Conduct Charged Largely Occurred in the Northern District of Illinois

Like the defendant, the alleged victim, and the majority of likely trial witnesses, the location of events likely to be in issue strongly favors transfer. Chicago is the "nerve center" of the alleged misconduct, and, therefore, the most significant location with respect to the trial venue. *See Valdes*, 2006 WL 738403, at *5–6 ("[t]he location of where the events in issue took place carries considerable weight. . . . For instance, while venue may attach in one district, when the 'nerve center' of the events at issue occurred in another district, transfer has been found appropriate") (internal citations omitted).

The events relevant to the government's charge have a pronounced connection to Chicago. As described above, the loan committee that approved the Manafort loans acted from Chicago, as did the underwriters of those loans, the key bank executives, and the members of the bank's board of directors. From Chicago, these actors engaged in the most relevant activity underlying the allegations in the indictment. For example, virtually all of TFSB's due diligence and underwriting is alleged to have taken place in Chicago. (*See* Ind., ¶¶ 14, 18, 21, 23).

8

Further, the indictment alleges a number of communications between Mr. Calk and Manafort in furtherance of the alleged "bribery" scheme, for most of which Mr. Calk was in Chicago. (*Id.* ¶¶ 19, 23). And Mr. Calk's alleged efforts to conceal the offense from the bank's regulator, the OCC, are all said to have occurred in meetings in Chicago with Chicago-based OCC personnel. (*Id.* ¶¶ 26–29).

None of this is to suggest that the alleged offense has *no* connection to this district or that there were no acts allegedly in furtherance of the offense that occurred here. Otherwise, the government's indictment would be in violation of Rule 18, which is not the basis for this motion. Most notably, the bank maintained a small office in the Wall Street area, where employees who worked on the loans were employed. However, the indictment alleges only a single act in New York during the period of the alleged scheme—an interview in January 2017 at Trump Tower in Manhattan. (*See* Ind., ¶¶ 9, 25). We are otherwise aware of only one additional instance in which Mr. Calk is alleged to have engaged in offense conduct in New York: a meeting with Manafort in September 2016.

Where, as here, a Chicago-based defendant is charged with victimizing his own Chicago-based bank, it comes as no surprise that Chicago is the "nerve center" of the offense. The surprise is that the government chose to charge this case in New York.

        D.      <u>Defendant's Longtime Counsel Are Located in the Northern District of Illinois</u>

Chicago-based counsel have represented the defendant throughout the two-plus years of government investigations preceding the indictment. Their familiarity with the case and their close relationship with and proximity to the defendant weighs strongly in favor of transfer, even though the government's choice of venue required Mr. Calk to retain local counsel in the later stages of the investigation. *See Fiorentino*, 2014 WL 108415, at *6–7 (given defense

9

counsel's "familiarity with the case and the fact that she . . . reside[d] in [the state to which defendant sought to transfer venue] where the bulk of the alleged misconduct took place, this factor weigh[ed] in favor of transfer"). Furthermore, many of the individuals the government is likely to call as witnesses (e.g., the Chicago-based bank personnel) are already represented by Chicago-based counsel.

To be sure, the government's current team is based in this district. While it is concededly less convenient for them to try this case in Chicago, the Northern District of Illinois has a top-flight U.S. Attorney's Office of its own that could support (or even substitute for) their colleagues from New York if the case is transferred.

### E. The Expense to the Parties Favors Transfer to the Northern District of Illinois

In weighing the expense to the parties, "[c]ase law from courts within this Circuit demonstrates a balancing of the expenses expected for the Government and the Defendants." *Rodriguez*, 2018 WL 2126429, at *5. A month-long criminal trial in the Southern District of New York would impose substantial costs on the defendant, who is currently unemployed and living off his savings. In addition to the costs he bears in retaining his long-standing Chicago counsel and his more recently retained local counsel, he will have to absorb the costs of traveling to and from this district to prepare for trial, as well as relocation costs for the duration of the trial. *See Russell*, 582 F. Supp. at 663-64 (granting motion to transfer venue where defendant had hired out-of-state attorneys in connection with earlier investigation and requiring attorneys to travel for trial would escalate costs considerably). These costs will be significantly reduced if the case is transferred to Chicago.

While the government will also incur costs if the case is transferred, they will be significantly reduced by the availability of office space and support from the Chicago U.S.

10

Attorney's Office, and offset by the savings from not having to fly the bulk of their witnesses to New York.

### F. Defendant's Business Will Be Disrupted if the Case is Not Transferred to the Northern District of Illinois

As a result of the indictment, Mr. Calk is no longer working at TFSB and he is not otherwise currently employed.  But he remains an owner of TFSB through its holding company and therefore has a significant interest in limiting disruption to the bank.  The bank's operations will be significantly more disrupted if its most senior officers, directors and employees are called upon to travel to New York rather than to the nearby courthouse in Chicago.

### G. Defendant's Motion is Timely Made and Weighs in Favor of Transfer

In addition to the *Platt* factors enumerated above, the timeliness of defendant's request also carries "particular weight" when analyzing a Rule 21(b) motion to transfer.  *See Rodriguez*, 2018 WL 2126429 at *7; *Platt*, 376 U.S. at 243-44.  Here, there has been no delay in moving to transfer.  By letter dated July 19, 2019, Mr. Calk sought leave to file this motion in advance of any pretrial briefing and prior to the completion of discovery, a position that the government opposed. (Dkt. No. 23).  This motion is now being filed on the motion date set by the Court.  Mr. Calk's discovery-related motions are, as directed by the Court, also being filed today.  If the Court grants this motion it may choose not to decide the other motions and leave them to the transferee court to address.  As a result, there is no risk that a new judge will be required to duplicate the efforts made by this Court to become familiar with the case, nor be bound by substantive decisions already made by this Court.  *See Rodriguez*, 2018 WL 2126429,

at *6 (citing *Spy Factory, Inc.*, 951 F. Supp. at 463).  Accordingly, this factor, too, favors transfer to the Northern District of Illinois.

## CONCLUSION

The standard for a Rule 21(b) motion looks to balance the convenience of the parties (especially the defendant), the victim, and the witnesses between two venues that may both be proper.  Trying the case in this district would primarily benefit the New York-based prosecutors to the detriment of virtually every other interest enumerated in Rule 21(b).  *All* of the pertinent *Platt* factors counsel in favor of transfer to the Northern District of Illinois.  Under these circumstances, transfer is clearly warranted.  *See United States v. Layne*, No. 05-Cr-87 (HB), 2005 WL 1009765, at *7 (S.D.N.Y. May 2, 2005) (granting a change of venue where six of the *Platt* factors weighed in favor of transfer and the remaining four were neutral).

Dated: New York, New York  
November 8, 2019

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Paul H. Schoeman  
Paul H. Schoeman  
Darren A. LaVerne  
1177 Avenue of the Americas  
New York, NY 10036  
Telephone: 212.715.9100

LOEB & LOEB LLP

Jeremy Margolis  
Joseph J. Duffy  
321 N. Clark Street  
Chicago, IL 60654  
Telephone: 312.464.3100

*Attorneys for Defendant Stephen M. Calk*