UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :

  UNITED STATES OF AMERICA,           :

                                       :      Case No. 19 Cr. 366 (LGS)

     - against -                 :

                                         :

  STEPHEN M. CALK,                :

                                         :

               *Defendant*.         :

                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT STEPHEN M. CALK'S PRETRIAL MOTIONS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 4

I.      The Government's Search Warrant Application................................................... 4

II.     The Fisher Affidavit............................................................................................ 5

        A.      The Subject Offenses ............................................................................... 5

        B.      Factual Narrative Presented to the Magistrate ........................................ 6

III.    The Government Interviews TFSB Witnesses .................................................... 11

IV.     The Government Obtains Additional Exculpatory Information ......................... 13

V.      The Indictment and Discovery............................................................................ 15

        A.      Documents from the Presidential Transition Team ................................. 17

        B.      Documents from the Office of the Comptroller of the Currency............ 17

ARGUMENT .................................................................................................................... 18

I.      Evidence From Mr. Calk's iPhone Should Be Suppressed................................. 18

        A.      Legal Standard ......................................................................................... 19

        B.      The Fisher Affidavit Was Misleading...................................................... 21

                1.      Honest Services Fraud .................................................................. 21

                2.      Withholding Material Information from TFSB's Loan Committee
                        and Board of Directors.................................................................. 23

                3.      Withholding Material Information from BofI.............................. 24

II.     The Government Should Be Compelled To Disclose the Grand Jury Transcript............. 25

        A.      Legal Standard ......................................................................................... 25

        B.      The Defense Has Demonstrated A Basis To Review The Grand Jury
                Transcripts................................................................................................. 26

III.    The Government Should Be Compelled To Disclose Communications with the OCC
        and the Presidential Transition Team ............................................................. 27

        CONCLUSION.......................................................................................................... 30

KL3 3272692.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Franks v. Delaware,*
    438 U.S. 154 (1978)..........................................................................................................3, 18

*Jones v. Wilhelm,*
    425 F.3d 455 (7th Cir. 2005) ..........................................................................................21 n.15

*Morse v. Fusto,*
    804 F.3d 538 (2d Cir. 2015)..................................................................................................27

*Riley v. California,*
    573 U.S. 373 (2014)................................................................................................................19

*United States v. Cellular Tel.,*
    No. 17-MC-335 (N.D. Ill. June 21, 2019) ........................................................................5 n.2

*United States v. Connolly,*
    No. 16-Cr-370 (CM), 2019 WL 2120022 (S.D.N.Y. May 2, 2019) ...............................26 n.18

*United States v. Galpin,*
    720 F.3d 436 (2d Cir. 2013)..................................................................................................19

*United States v. George,*
    975 F.2d 72 (2d Cir. 1992)....................................................................................................19

*United States v. Giffen,*
    379 F. Supp. 2d 337 (S.D.N.Y. 2004)..............................................................................27, 28

*United States v. Harding,*
    273 F. Supp. 2d 411 (S.D.N.Y. 2003)............................................................................18 n.14

*United States v. Hogan,*
    712 F.2d 757 (2d Cir. 1983)..........................................................................................25, 26 n.18

*United States v. Jacobs,*
    986 F.2d 1231 (8th Cir. 1993) .......................................................................................21 n.15

*United States v. Lahey,*
    967 F. Supp. 2d 698 (S.D.N.Y. 2013).................................................................................20

*United States v. Leon,*
    468 U.S. 897 (1984)..............................................................................................................19

*United States v. Lombardozzi,*
    491 F.3d 61 (2d Cir. 2007)...................................................................................................25

iii

*United States v. Marin-Buitrago*,
   734 F.2d 889 (2d Cir. 1984)............................................................................20

*United States v. Ordaz-Gallardo*,
   520 F. Supp. 2d 516 (S.D.N.Y. 2007)............................................................25

*United States v. Pabon*,
   871 F.3d 164 (2d Cir. 2017)...........................................................................20

*United States v. Poindexter*,
   727 F. Supp. 1470 (D.D.C. 1989) ..................................................................28

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir. 1996)....................................................................... 19-20

*United States v. Rigas*,
   258 F. Supp. 2d 299 (S.D.N.Y. 2003) ............................................................27

*United States v. Segovia*,
   800 F.2d 39 (2d Cir. 1986)......................................................................21 n.15

*United States v. Stein*,
   488 F. Supp. 2d 350 (S.D.N.Y. 2007).......................................................28, 29

*United States v. Stevens*,
   985 F.2d 1175 (2d Cir. 1993)..........................................................................28

*United States v. Urso*,
   No. 03-Cr-1382 (NGG), 2006 WL 681204 (E.D.N.Y. Mar. 6, 2006) ...................27

*United States v. Vetere*,
   663 F. Supp. 381 (S.D.N.Y. 1987) .................................................................26

*United States v. Williams*,
   504 U.S. 36 (1992)........................................................................................25

**Statutes**

18 U.S.C. § 215................................................................................................1, 15

**Other Authorities**

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) ...............................................3, 25

Federal Rule of Criminal Procedure 16(a)(1)(E)(i) ................................................27

U.S. Const. amend. IV ........................................................................................19

Defendant Stephen M. Calk respectfully submits this memorandum of law in support of his motions (i) to suppress any evidence that the government recovered from his iPhone pursuant to a search warrant; (ii) to review the transcript of the grand jury proceedings leading to his indictment; and (iii) to compel the government to produce its correspondence with the Office of the Comptroller of the Currency and the Presidential Transition Team.

## PRELIMINARY STATEMENT

On May 21, 2019, a grand jury in this District returned an indictment charging Mr. Calk with one count of "financial institution bribery," pursuant to 18 U.S.C. § 215. The prosecution's theory is that Mr. Calk corruptly agreed to cause his bank, The Federal Savings Bank ("TFSB"), to make loans to former Trump campaign chairman Paul Manafort, in exchange for a thing of value – here, Manafort's purported assistance in obtaining a position for Mr. Calk with the campaign (which was unpaid) and, later the Trump administration (which he did not get).

In June 2019, the government began disclosing to the defense an extraordinary amount of *Brady* material that was in its possession long before it obtained the indictment. In letter after letter, the government revealed that numerous participants in the relevant events made statements that clashed with the government's allegations and directly disputed its theory. A portion of it was in the government's possession prior to when the government sought a search warrant for Mr. Calk's iPhone in June 2017. And the government obtained a significant additional quantity of exculpatory information from witnesses it interviewed after obtaining but before executing the warrant. Yet the government brought none of this information – which materially undermined the probable cause showing in the government's warrant application – to the attention of the magistrate who issued the warrant. Had the government fairly presented the

facts that it knew at the time, we respectfully submit the magistrate would have not have found probable cause and the warrant application would properly have been denied.

For example, prior to obtaining the search warrant, the government knew of substantial evidence that the TFSB loans to Manafort were sound loans by any objective measure, with terms that were advantageous to the bank, and which were secured by property and cash collateral amounting to significantly more than the loans themselves. Yet it omitted this information from its warrant affidavit, as well as other critical exculpatory information in its possession. And then, shortly after it obtained the warrant but before it was executed, the government interviewed numerous bank personnel whose statements significantly undermined and contradicted the facts presented to the magistrate. For example, TFSB's president and its chief operating officer both told the government that, as members (with Mr. Calk) of the TFSB loan committee, they had approved the loans, that the loans were adequately secured, and that they did not receive preferential treatment. The government also learned from other TFSB employees involved that, contrary to what was suggested in the government's warrant affidavit, they felt no pressure to close on the loans or to push them through outside normal protocols. Yet the government did not advise the magistrate judge of this information, as it was required to do, and proceeded to execute the warrant the following day.

Because the original warrant affidavit selectively omitted critical exculpatory information, and because the government intentionally or recklessly failed to advise the magistrate of the new evidence that materially undermined the probable-cause showing, the seizure and search of the iPhone violated Mr. Calk's Fourth Amendment rights. Accordingly, any evidence recovered from the phone must be suppressed. Alternatively, we seek a hearing,

pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether the government intentionally or recklessly left this information out of its warrant application.

   After executing the search warrant, the government continued to learn of exculpatory information.  For example, in September and October 2018, it interviewed Manafort, who by that time had been convicted of multiple felonies, was facing many years in prison, and was attempting to obtain leniency by cooperating with the government.  According to the government's disclosure, Manafort advised the government that there had been no corrupt bargain with Mr. Calk, and that he had recommended Mr. Calk for a position with the Trump administration because "he had worked hard for the Campaign," not for any reason of personal interest.  After interviewing Manafort multiple times, the government decided to present him as a witness in a grand jury in the District of Columbia.  In that grand jury, Manafort testified, consistent with his proffer, that he recommended Mr. Calk for a position because he thought Mr. Calk had earned it by virtue of his work on the Trump campaign.

   The defense respectfully submits that the highly unusual circumstances present here make this an appropriate case for the Court to require the government to disclose the transcripts for the grand jury proceedings leading to the indictment of Mr. Calk.  Specifically, this is a case in which we know that (1) the government presented evidence to a different grand jury, through Mr. Manafort himself, that exculpates Mr. Calk; (2) the government did not fairly present exculpatory evidence to the magistrate who signed its search warrant; and (3) there is no indication that the government presented to the grand jury in this case the abundance of information in the government's possession undermining any purported probable cause to believe Mr. Calk committed the alleged offense.  Accordingly, we respectfully request that the Court direct the government, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), to

disclose to the defense the transcript of the grand jury proceedings, so that we may determine whether the grand jury was misled.  Alternatively, we ask that the Court review the transcript *in camera* and determine whether there is a basis to provide it to the defense.

Finally, we respectfully request that the Court direct the government to produce to the defense its correspondence – including subpoenas, document requests, and responses – with the Office of the Comptroller of the Currency ("OCC") and the Presidential Transition Team ("PTT").  As set forth below, the nature of the documents that the government received from these entities and then produced to the defense strongly suggests that in certain cases the producing party withheld (or the government declined to request) information that is material to the preparation of the defense.  In other cases, without knowing what the government asked for or what the subpoenaed entities agreed to produce, we cannot determine the significance of the materials we have received.  The burden on the government to provide this information is slight and the defense is entitled to it under Rule 16.  Accordingly, we ask for an order requiring its production.

## BACKGROUND

## I.     The Government's Search Warrant Application

On June 26, 2017, the government sought a warrant to seize and search Mr. Calk's iPhone.  (*See* Application and Affidavit for a Search Warrant, *United States v. Cellular Tel.*, No. 17-MC-335 (N.D. Ill. June 26, 2017), ECF No. 1 ("Search Warrant Affidavit"; attached hereto as Ex. A to the Declaration of Paul H. Schoeman, Esq. (hereinafter "Schoeman Decl.")).  In support of its warrant application, the government presented to the Honorable Mary M. Rowland, a magistrate judge in the Northern District of Illinois, an affidavit signed by Carrie R.

Fisher, a special agent with the Federal Bureau of Investigation (the "Fisher Affidavit").[1]  (*Id.*).

On that same date, Magistrate Judge Rowland issued the warrant.[2]  (*See* Search and Seizure

Warrant, *United States v. Cellular Tel.*, No. 17-MC-335 (N.D. Ill. Aug. 2, 2017), ECF No. 4

("Warrant Returned") (Schoeman Decl. Ex. B)).

## II.     The Fisher Affidavit

### A.      The Subject Offenses

The Fisher Affidavit alleged that there was probable cause to believe that Mr.

Calk had committed certain crimes (the "Subject Offenses"), and that evidence of his

participation in these crimes would be found on his iPhone.  Specifically, the affidavit alleged

that Mr. Calk had been involved in three schemes:

- Calk and Manafort conspired to deprive TFSB of its right to Calk's honest services by having Calk take action to process and approve loans to Manafort in exchange for a personal benefit;

- Calk and Manafort withheld material information about the loans from TFSB's loan committee and board of directors, as well as the books and records of the bank; and,

- Calk participated in a scheme to defraud another lender, BofI Federal Bank ("BofI"), by concealing from BofI material information regarding Manafort's creditworthiness.

(Search Warrant Affidavit at ¶ 9 (Schoeman Decl. Ex. A)).  In connection with these three

schemes, the Fisher Affidavit alleged that there was probable cause to believe there had been

violations of the following statutes:

---

[1]  The government appended to the Fisher Affidavit an affidavit from another FBI agent, James H. Hilliard, which it had presented to the Honorable James L. Cott in this District on June 21, 2017, in support of its application to search an email account used by Manafort (the "Hilliard Affidavit").  (*See* Search Warrant Affidavit at p. 45 (Schoeman Decl. Ex. A)).  The government described the Hilliard Affidavit as setting forth the same information as in the Fisher Affidavit, as well as "certain additional facts not relevant herein."  (*Id.* at ¶ 10).

[2]  Without opposition from the government, the court unsealed the Fisher Affidavit and search warrant on June 21, 2019.  (*See United States v. Cellular Tel.*, No. 17-MC-335 (N.D. Ill. June 21, 2019); *see also* Schoeman Decl. ¶¶ 3-4).

KL3 3272692.1

- 18 U.S.C. § 1005 (making false entries in the books and reports of a bank) and 18 U.S.C § 371 (conspiracy);

- 18 U.S.C. § 1014 (fraud in connection with the extension of credit) and 18 U.S.C. § 371 (conspiracy);

- 18 U.S.C. § 1343 (wire fraud), § 1344 (bank fraud), § 1346 (honest services wire fraud), and § 1349 (conspiracy); and,

- 18 U.S.C. § 1956 (money laundering) and §1957 (engaging in monetary transactions in property derived from specified unlawful activity).

(*Id*. at ¶ 7).  It is telling that in drafting the indictment that was ultimately returned by the grand jury, the government abandoned the theories contained in the search warrant and, in fact, the indictment does not allege a violation of any of the statutes referenced in the warrant application.

B.  Factual Narrative Presented to the Magistrate

The Fisher Affidavit alleged that, before approaching TFSB, Manafort, along with his son-in-law Jeffrey Yohai, had borrowed money from a lender named Genesis Capital.  The loans were secured by various properties.  (*See* Search Warrant Affidavit at ¶¶ 15-16 (Schoeman Decl. Ex. A)).  The loans eventually went into default, and, in September 2016, Genesis filed a foreclosure action against one of the properties.  (*Id.* at ¶¶ 17-18).  In July 2016, Manafort met by videoconference with Mr. Calk.  Mr. Calk was the Chairman and CEO of TFSB, and, through a holding company, owned 67% of the bank.[3]  (*Id.* at ¶¶ 22, 13).  After an extended period of negotiations, TFSB agreed to make two loans to Manafort.  The first, which closed on November 16, 2016, was for $9.5 million.  (*Id*. at ¶ 20).  The second, which closed on January 17, 2017, was for $6.5 million.  (*Id.*).  The affidavit alleges that, prior to making the first loan, in October 2016, TFSB asked another bank, BofI, if it would be interested in underwriting the loan.  (*See id.*

---

[3]  Mr. Calk's brother owned 29%, and the remaining 4% was owned by other investors.  (*Id.* at ¶ 13).

at ¶¶ 41-42).  BofI subsequently advised that it could only underwrite $7 million of the $9.5 million, and ultimately did not participate in the loan.   (*Id.* at ¶¶ 50, 60 n.5).

The Fisher Affidavit did not set forth the terms of the loans extended to Manafort, including the interest rate, the value of the collateral properties securing the loans, or the fact that Manafort posted cash as additional security.  The government left this information out of the affidavit, even though it had been in possession of it since May, when the Manafort loan files were produced by TFSB in response to the government's subpoenas.  In fact, as the files in the government's possession clearly showed, the November 2016 loan (for $9.5 million) was collateralized by two properties whose combined value was assessed at $14.95 million.  TFSB charged an interest rate of 7.25%, charged 3% as an origination fee, and required that Manafort post upfront $630,000 in cash in a restricted TFSB account.  (*See* TFSB Credit Approval Form and Loan Memorandum (November 11, 2016) ("Credit Approval Form and Loan Memorandum") (Schoeman Decl. Ex. C)).  Similarly, the January 2017 loan ($6.5 million) was collateralized by property that had been assessed at a value of $6.3 million as complete, and Manafort was required to post an additional $2.5 million in cash.  TFSB charged an interest rate of 7.25% and charged 2% as an origination fee.  (*See* TFSB Loan Memorandum (January 5, 2017) ("Loan Memorandum") (Schoeman Decl. Ex. D)).

In support of its claim that there was probable cause to believe Mr. Calk defrauded TFSB, the Fisher Affidavit cited, among other things, the statements of Mitch Solow, the former Chief Risk Officer and Chief Credit Officer of Genesis Capital.  Solow purportedly told the Federal Bureau of Investigation ("FBI") that, in the summer of 2016, Manafort's son-in-law Yohai told him that, "TFSB had agreed to do the refinance because Manafort promised Calk

a position on the Trump Economic Advisory Council."[4]  (Search Warrant Affidavit at ¶ 26

(Schoeman Decl. Ex. A)).  However, the affidavit omitted to say that, on June 16, 2017, (*i.e.*, ten

days prior to seeking the warrant), the government had interviewed Yohai himself.  Yohai gave

the government a much different statement than the one attributed to him by Solow.[5]  While first

responding "yes" to a question regarding whether Manafort and Mr. Calk had entered into a

"quid pro quo," Yohai clarified that he believed that "Manafort's loan was not a return favor by

Calk as Manafort's loan terms were not very favorable and his loan was overcollateralized."

(August 2019 Disclosure Letter at 2 (Schoeman Decl. Ex. G)).  Yohai further stated that he "was

not aware of any promises made by Calk to Manafort in exchange for the cabinet position."

(*Id.*).  According to Yohai, Manafort "wanted Calk as a friend for 'speculative favors' in the

future," but he "did not know if Manafort ever actually asked Calk for any favors."  (*Id.*).  The

government did not disclose any of this information to the magistrate in the Fisher Affidavit.

The Fisher Affidavit also cited the statements of Anna Ivakhnik, whom the

affidavit describes as "a TFSB employee," without identifying her position.  (Search Warrant

Affidavit at ¶ 27 (Schoeman Decl. Ex. A)).  Until she was fired in September 2016 (*i.e.*, prior to

closing of the Manfort loans), Ivakhnik was a sales assistant, who did not work in underwriting

or risk analysis, a fact that was not disclosed in the affidavit.  The affidavit indicated that

Ivakhnik told the FBI, among other things, that James Brennan (the TFSB executive in charge of

---

[4]  While the terms for the first Manafort loan were provisionally approved, subject to diligence and underwriting, in the summer of 2016, the loan terms (including the nature and amount of collateral posted) subsequently changed, and the first loan, for $9.5 million, did not close until November 16, 2019.  (*See* Search Warrant Affidavit at ¶ 20 (Schoeman Decl. Ex. A)).

[5]  By letter dated August 16, 2019, the government disclosed the statements of Yohai to the defense.  (*See* Letter from the Southern District of New York to Paul Schoeman (August 16, 2019) ("August 2019 Disclosure Letter") (Schoeman Decl. Ex. G)).

underwriting the Manafort loans) "expressed to her on several occasions that the proposed

Manafort loan was a bad loan." (*Id.* at ¶ 35(a)).  The Fisher Affidavit omitted to say that,

subsequent to Ivakhnik's termination, Brennan signed and approved the TFSB credit approval

and loan memoranda that, rather than rejecting the loans as too risky or otherwise problematic,

found the Manafort loans to fit an "average" risk profile.  (*See* Credit Approval Form and Loan

Memorandum (Schoeman Decl. Ex. C); Loan Memorandum (Schoeman Decl. Ex. D)).  These

memoranda were in the government's possession at the time it presented the Fisher Affidavit to

Magistrate Judge Rowland – indeed, as described below, they were cited elsewhere in the

affidavit, without noting that they had been signed by Brennan.

   With regard to the Fisher Affidavit's claim that Mr. Calk knew of and helped

conceal from the TFSB loan committee and board information regarding Manafort's finances,

the affidavit focused on two Genesis loans that went into default, one of which went into

foreclosure.  The affidavit stated that two TFSB employees—Dennis Raico and his assistant,

Ivakhnik—came to learn in September 2016 that Manafort had missed two monthly payments on

a property Manafort owned with Yohai in California, with the address of 2401 Nottingham

Avenue, Los Angeles, California.[6]  (Search Warrant Affidavit at ¶ 30 (Schoeman Decl. Ex. A)).

In fact, as the loan memoranda make clear, 2401 Nottingham ultimately did not serve as

collateral for any loan extended by TFSB.  (*See* Credit Approval Form and Loan Memorandum

(Schoeman Decl. Ex. C); Loan Memorandum (Schoeman Decl. Ex. D)).  In addition, at the time

---

[6]  The affidavit referenced an email from Ivakhnik regarding the defaults, in which she stated, "It
is what it is.  Let's send it off to Chicago and have it be part of the file.  Ultimately Steve will
make the call . . . ."  (Search Warrant Affidavit at ¶ 30 (Schoeman Decl. Ex. A)).  Far from
suggesting that Mr. Calk concealed the default, this email suggests that information – which was
known to and collected by other TFSB employees – was added to the Manafort loan file.

it submitted the Fisher Affidavit, the government was in possession of documents establishing that the two other members of the TFSB loan committee – Javier Ubarri and James Norini – had been advised of Genesis defaults.[7]  (*See* Email Chain re Payoff letters (September 14, 2016) ("Payoff Emails") (Schoeman Decl. Exs. E, F) (forwarding the same demand letter referenced in the email chain between Raico and Ivakhnik cited in the Fisher Affidavit)).  The government did not disclose this information to the magistrate.

The Fisher Affidavit also asserted that the default and foreclosure were omitted from the credit approval memoranda created by TFSB in connection with the two loans, implying that reference to them was intentionally left out.  (Search Warrant Affidavit at ¶¶ 51, 69 (Schoeman Decl. Ex. A)).  However, the affidavit did not allege that Mr. Calk drafted, edited, or even reviewed the credit approval memoranda.  While not stated in the affidavit, the government was aware at the time that the credit approval and loan memoranda had been written by TFSB's underwriting department, namely by TFSB employee Thomas Horn, and, as noted, supervised and approved by James Brennan.[8]

Finally, the Fisher Affidavit alleged no facts to support its third theory – that Mr. Calk concealed information from BofI.  The sole allegations in the affidavit relating to BofI were that (i) on November 1, 2016, TFSB employee Dennis Raico emailed other TFSB personnel that he was getting "pressure" from Mr. Calk, and that Mr. Calk was waiting on BofI's decision

---

[7]  In late April, TFSB produced to the government emails demonstrating that Ubarri and Norini were advised of the Genesis defaults in September 2016.  (Schoeman Decl. Exs. E, F).

[8]  TFSB produced the credit approval and loan memoranda to the government in May 2017.  The memoranda indicate that they were authored by Horn and approved by Brennan, both of whom were interviewed on June 27, 2017, as described below, at which time they provided further exculpatory information to the government.  (Schoeman Decl. Exs. C, D).

regarding whether to underwrite Manafort's loan; (ii) on November 17, 2016, "Calk directed Raico to work on attempting to sell [Manafort's loan] to BofI," and Raico informed another TFSB employee they were "'experiencing some delays'"; (iii) on December 14, 2016, Raico emailed another TFSB employee explaining that they were trying to sell the first Manafort loan to BofI before closing on Manafort's second loan; and, (iv) on December 15, 2016, another TFSB employee forwarded to Mr. Calk an email from BofI stating unspecified "legal objections" to the sale of the loan to BofI.  According to the affidavit, the employee further suggested that it was "time for [Mr. Calk] to call the CEO of BofI [and] have a high level direct conversation." (*See* Search Warrant Affidavit at ¶¶ 42, 52, 58, 60 (Schoeman Decl. Ex. A)).

## III.    The Government Interviews TFSB Witnesses

On June 27, 2017, the day after the government presented the Fisher Affidavit to Magistrate Judge Rowland but before it executed the warrant, it interviewed several TFSB executives and employees who had been involved in the process of originating, reviewing, underwriting, and approving the TFSB loans to Manafort.  During those interviews, the government learned additional exculpatory information that directly undermined the theory of probable cause set forth in the Fisher Affidavit.[9]  Below, we include certain information provided by these individuals to the government on June 27, 2017, all of which the government felt compelled to disclose to the defense post-indictment, (*see* July 2019 Disclosure Letter (Schoeman Decl. Ex. H)), but did not disclose to the magistrate:

---

[9]  The government disclosed this information to the defense by letter dated July 1, 2019.  (*See* Letter from Southern District of New York to Daniel L. Stein (July 1, 2019) ("July 2019 Disclosure Letter") (Schoeman Decl. Ex. H)).

James Norini (TFSB chief operating officer)

- There was nothing preferential about the Manafort loan. It was a standard loan. If someone with a different name came in and asked for the same loan, it would have been approved. (*Id*. at 6).

- Calk has never pushed a loan to be approved. (*Id*. at 6).

- The Manafort loans were secured by real estate and cash, and were very well secured. (*Id*. at 6).

- There were no concerns at the loan committee[10] meeting regarding the Manafort loans. (*Id*. at 6).

- The credit committee could deny a loan even if Calk wanted it approved. (*Id*. at 6).

Javier Ubarri (TFSB president)

- Ubarri did not think TFSB would make a bad loan just to accommodate a person, and Ubarri did not believe they had done so in this case. (*Id*. at 8).

- The deal was unusual, but it was not a bad deal, and TFSB does unusual deals all the time. (*Id*. at 8).

- TFSB elected to do the deal and wouldn't have done it if it were not in the bank's interest. (*Id*. at 8).

Vanessa Bartholomew (TFSB senior vice president)

- Bartholomew did not find anything about the Manafort loans or their processing to be unusual. She felt no pressure to close on the loans or push them through outside of normal protocols. (*Id*. at 2).

- Bartholomew did not find the variances in the net worth reported by the Manaforts in their loan applications to be unusual. (*Id*. at 2).

- Bartholomew did not believe that anything improper was done to fund the Manafort loans and did not believe that anyone at TFSB, including Calk, gained anything by funding the loan. (*Id*. at 3).

---

[10] The loan committee is sometimes referred to as the "credit committee." Norini, TFSB president Javier Ubarri, and Mr. Calk were members of the loan committee.

James Brennan (TFSB underwriter)

- There did not appear to be anything unusual with respect to the Summerbreeze loan.[11]  There was an adequate amount of income and collateral.  (*Id*. at 3).

- The Genesis default would not have had an impact on TFSB's loan decision.  (*Id*. at 3).

Thomas Horn (TFSB underwriter)

- From a collateral standpoint, the Summerbreeze loan worked.  (*Id*. at 4).

- Calk was normally very hands-on.  Horn did not feel pressure to get the Summerbreeze loan done.  (*Id*. at 4).

Dennis Raico (TFSB senior vice president)

- Raico did not feel pressure to treat the Manafort loans in a special way.  (*Id*. at 6).

- The process of getting the [two TFSB loans to Manafort] closed was long and went through a strict due diligence process.  (*Id*. at 7).

The government, which had not yet executed the search warrant for Mr. Calk's iPhone, did not amend and resubmit its warrant application to Magistrate Judge Rowland in light of this new information.  On June 28, 2017, the government seized Mr. Calk's iPhone to conduct its search.  (*See* Warrant Returned at 2 (Schoeman Decl. Ex. B)).

## IV.    The Government Obtains Additional Exculpatory Information

Following execution of the warrant, the government continued its investigation and continued to learn substantial information undermining a probable cause showing.  For example, it interviewed TFSB president Javier Ubarri on two additional occasions, in November 2017 and November 2018.  (*See* July 2019 Disclosure Letter at ¶ 9-13 (Schoeman Decl. Ex. H)).

---

[11]  "Summerbreeze loan" was a reference to the $9.5 million loan extended by TFSB to Manafort on November 16, 2016.

During these interviews, the government learned, among other things, the following exculpatory information, which the government disclosed to the defense post indictment:

- Referring to the decision to make the [November 2016] loan, Ubarri stated that "the Credit Committee owns this." (*Id*. at 10).

- Ultimately, the Credit Committee made the decision to approve this loan and the vote was unanimous. (*Id*. at 10).

- TFSB elected to move forward on the loan to Manafort after the changes Manafort requested because the cash flow and [loan-to-value] analysis performed by the underwriters Horn and Brennan were favorable to support the funding of the loan. Additionally, the borrower's collateral and substantial net worth were sufficient for Calk's overall approval. (*Id*. at 11).

In September and October 2018, the government interviewed Manafort, who in August 2018 had been convicted at trial and subsequently pleaded guilty to additional crimes, and was proffering in an effort to cooperate with the government and gain leniency at sentencing. (*See* Letter from Southern District of New York to Daniel L. Stein (June 10, 2019) ("June 2019 Disclosure Letter") (Schoeman Decl. Ex. I)). According to the government's letter, in one session, Manafort "denied engaging in a quid pro quo with Calk." (*Id*. at 2). In a subsequent session, Manafort "delinked his helping Calk get a position in the Administration with Manafort getting a loan." (*Id*. at 5). Manafort further stated, "As friends, [he and Mr. Calk] would help each other, which included Manafort helping Calk get a job in the Administration." (*Id*.). According to Manafort, he recommended Mr. Calk for a position in the Trump administration because Mr. Calk "had worked hard for the Campaign" and "showed his ability and experience in building his bank." (*Id*. at 3). Manafort told the government that he "did not recommend Calk for any reason of Manafort's personal interest." (*Id*.).

Having interviewed Manafort at least three times, the government decided in late October 2018 to call him as a witness before a grand jury in the District of Columbia. (*Id*. at 6). Upon questioning by the government, Manafort testified that he had recommended Mr. Calk for

a position in the Trump administration because he "felt that Mr. Calk had earned this on his own activity – his resume but more importantly the work he had done for the campaign in the – in 2016." (*Id.* at 9). Manafort told the grand jury, "That was the basis upon which I made the recommendation." (*Id.*).

In December 2018, the government interviewed Jared Kushner, resulting in additional exculpatory information with respect to Mr. Calk. (*See* Letter from the Southern District of New York to Paul Schoeman (October 15, 2019) ("October 15, 2019 Disclosure Letter") (Schoeman Decl. Ex. J)). Kushner stated that he "received thousands of recommendations during the Transition period," which he grouped into four categories according to their priority. (*Id.* at 2). The first group was for people who merited "serious consideration," regarding which Kushner personally followed up. (*Id.*). The second group were those recommended by an "influential or respected person," as to which Kushner forwarded to the Transition Team with the request for an interview. (*Id.* at 2-3). Kushner treated Manafort's recommendations as part of the third group – which he merely forwarded on without any recommendation or follow-up. (*Id.* at 3). The fourth category of recommendations were deleted. (*Id.*)

Although the government has, as it must, disclosed this very significant and highly unusual amount of exculpatory material in discovery, it has not indicated whether any exculpatory information was presented to the grand jury that indicted Mr. Calk.

## V.    The Indictment and Discovery

On May 21, 2019, a grand jury in this District returned an indictment charging Mr. Calk with one count of financial institution bribery pursuant to 18 U.S.C. § 215 – which is not one of the Subject Offenses identified in the Fisher Affidavit.

To date, the government has produced approximately 853,000 documents in discovery, equating to over 9,000,000 pages.  In advance of the first discovery cutoff set by the Court, August 26, 2019, (*see* Dkt. No. 11), the government made six productions totaling approximately 90,000 documents (approximately 1,265,000 pages).[12]  After the Court extended the deadline at the government's request to October 15, the government made an additional eight productions containing approximately 128,000 additional documents (approximately 309,000 pages).  The government has continued to produce documents after the October 15 deadline, up until as recently as last week.  Indeed, on October 28 and 29, the government made its largest productions to date, totaling approximately 635,000 documents, or 7,516,000 pages.[13]  The government has advised that is continues to search its files for additional discovery materials.

The volume of documents produced by the government presents challenges for the defense, but not all the challenges arise because of the quantity.  The small productions from the OCC and the PTT that are the subject of this motion present roadblocks for the defense precisely because they are so inexplicably circumscribed.

---

[12]  The government produced a set of six "documents" in its sixth production set that include internal hyperlinks to numerous additional materials.  The defense is unable to calculate the actual number of documents or pages reflected in this set and excludes it from the final tally.

[13]  The overwhelming majority of the documents that have been produced are identified as "Documents obtained from the files of the Special Counsel's Office."  The vast majority of the SCO documents were produced following the October 15 deadline.  Because of the volume, the documents take significant time to process after they are received by the defense and a large percentage only recently became available for review.  Once we have had a chance to understand what is in the production, we will be in a position to engage with the government about any issues, questions or concerns.  We respectfully reserve the right to seek additional relief from the Court in the event that the contents of the government's late productions give rise to a dispute that the parties are not able to resolve.

A.      Documents from the Presidential Transition Team

Although events relating to the Trump campaign and the Presidential Transition

Team are critical to the government's theory of prosecution, there are only 57 documents (many

of them news articles) included in the government's production of "Records produced by the

Presidential Transition Team and associated persons."  Within the modest production are a series

of Excel files stripped of any context and that were 99% redacted by the PTT before being

produced to the government.  There are no emails or other documents indicating the source or

significance of the Excel documents produced.  Nor is there an explanation for the nearly total

redactions.  At our request, the government produced a privilege log prepared by the PTT, but

the log raises far more questions than it answers.  Although some entries on the log reflect a

claim of attorney-client privilege, the nature of the privilege is left blank for many entries.  And

where attorney-client privilege is claimed, it is not clear who the relevant attorney is or how, if at

all, the elements required to support the privilege are satisfied.

B.      Documents from the Office of the Comptroller of the Currency

The government's discovery with respect to the OCC is similarly modest and

inscrutable.  There are 173 documents included in the set of "Grand jury subpoena returns from

the Office of the Comptroller of the Currency."

The materials we have from the OCC files are clearly a subset of a much larger

set of materials in the OCC's files.  We understand that the OCC, which for years has been

TFSB's primary regulator, conducted at least four reviews of TFSB in 2017 alone.  Critically, the

OCC reviewed and signed off on the terms of the first of the Manafort loans in January 2017.

The OCC then returned in March 2017 to conduct an ad hoc review of the bank following

publication of a *Wall Street Journal* article speculating about the Manafort loans.  The

newspaper wrongly claimed that the bank had breached its lending limit.  Shortly thereafter the

OCC determined there was in fact no lending limit violation.  Despite the significance of these events, there are only a handful of internal emails and limited notes files reflected in the production sets.  Moreover, some of the materials produced relating to the OCC are collections of emails that had attachments but for which not all of the attachments appear to have been produced.  There are various combined PDFs of bank documents, some with unknown handwriting on them, as well as spreadsheets of unexplained origin and authorship.

The government has declined the defense's requests for production of any grand jury subpoenas or responsive correspondence.

## ARGUMENT

### I.   Evidence From Mr. Calk's iPhone Should Be Suppressed

At the time the government presented the Fisher Affidavit to the magistrate, it knew of, but selectively omitted, information that materially undermined the allegations in the affidavit.  Further, after presenting the affidavit to the magistrate but prior to executing the search warrant for Mr. Calk's iPhone, the government learned additional information that it was obliged to disclose to the magistrate, yet failed to do so.  For these reasons, the Court should suppress any evidence obtained from the iPhone.  Alternatively, we respectfully request that the Court hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the government intentionally or recklessly misled the magistrate, given all of the facts in its possession at the time it submitted the Fisher Affidavit and then executed the warrant.[14]

---

[14]  Pursuant to *Franks v. Delaware*, a defendant is entitled to a hearing on these issues where he makes a substantial preliminary showing that (i) "the claimed inaccuracies or omissions in the search warrant affidavit are the result of the affiant's deliberate falsehood or reckless disregard for the truth"; and, (ii) "the alleged falsehoods or omissions were necessary to the judge's probable cause finding."  *United States v. Harding*, 273 F. Supp. 2d 411, 425-26 (S.D.N.Y. 2003).

KL3 3272692.1

A.      <u>Legal Standard</u>

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects" against "unreasonable searches and seizures."  U.S. Const. amend. IV.  Generally, "reasonableness" requires law enforcement to obtain a warrant to search a person's cell phone for evidence of criminal wrongdoing.  *Riley v. California*, 573 U.S. 373, 381, 401 (2014).  "[T]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'"  *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).

Under the so-called "'good faith' exception" to the exclusionary rule, "evidence seized in objectively reasonable reliance on a warrant subsequently declared invalid" will generally not be excluded at trial.  *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992).  However, this exception does not apply where "the officer[s] will have no reasonable grounds for believing that the warrant was properly issued."  *United States v. Leon*, 468 U.S. 897, 923 (1984).  These include when (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his judicial role"; (3) the warrant [is] based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or, (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."  *Id.* (internal quotation marks and citations omitted).

The same rule applies to material omissions in search warrant affidavits, and "[t]he good faith exception . . . does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge."  *United States v. Reilly*, 76 F.3d 1271, 1280

(2d Cir. 1996).  To require suppression in this context, "a movant must demonstrate, by a preponderance of the evidence, both the affiant's *intent* to mislead the issuing judge and the *materiality* of the affiant's falsehoods or omissions."  *United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y. 2013) (citing *United States v. Rajaratnam*, 719 F.3d 139, 145-46 (2d Cir. 2013)).  A defendant may meet the "intent" requirement by "demonstrating that the misrepresentations or omissions in the search warrant affidavits were the result of the affiant's deliberate falsehood or reckless disregard for the truth."  *Id*. (internal quotation marks omitted).  To assess whether omissions were made with reckless disregard for the truth, the court considers both "whether the omitted information was clearly critical to assessing the legality of the search," *id*. at 710 (internal quotation marks omitted), and whether there is "credible and probative evidence that the omission of information in an application was designed to mislead or was made in reckless disregard of whether it would mislead."  *Id*. (citation, internal quotation marks, and alterations omitted).  To determine whether omissions from a warrant affidavit are material, the court "corrects the errors" in the affidavit by inserting the omitted information into a "hypothetical corrected affidavit" and determining whether the hypothetical affidavit "still establishes probable cause."  *Id*. at 711 (citation omitted).

Finally, law enforcement is not entitled to rely on a warrant after it becomes aware of facts dissipating probable cause.  "[W]hen a definite and material change has occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists."  *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) (emphasis omitted).  In such circumstances, "the magistrate must be made aware of any material new or correcting information" before the warrant is executed.  *Id*; *see also United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017)

(citing *Marin-Buitrago* standard and applying it in the context of a warrantless arrest).[15]   New

facts not contained in the warrant affidavit are material if they "cast doubt on the existence of

probable cause" when "considered as a whole" with the information in the affidavit.  *Id.* at 895.

> B.    The Fisher Affidavit Was Misleading

The Fisher Affidavit alleged that there was probable cause to believe that Mr.

Calk was involved in three criminal schemes:  (i) a conspiracy with Manafort to deprive TFSB of

its right to Mr. Calk's honest services "by having Calk take action to process and approve the

loans to Manafort in exchange for a personal benefit;" (ii) a scheme with Manafort to withhold

material information about the loans from TFSB's loan committee and board of directors, as well

as the books and records of TFSB; and (iii) a scheme to defraud BofI by concealing from BofI

material information regarding Manafort's creditworthiness.  (Search Warrant Affidavit at ¶ 9

(Schoeman Decl. Ex. A)).  With regard to each of these schemes, the government intentionally or

recklessly omitted key information in its possession undermining a probable-cause finding.

> 1.    *Honest Services Fraud*

Critical to demonstrating probable cause to believe that Mr. Calk defrauded TFSB

by causing it to make loans to Manafort in exchange for a personal benefit was proof that TFSB

would not otherwise have made the loans and, relatedly, that the loans were not in TFSB's

financial interest.  Yet the government did not disclose the loan terms in the Fisher Affidavit.

The government indisputably knew what the loan terms were – documents in the government's

---

[15]   *Accord United States v. Segovia*, 800 F.2d 39, 42 (2d Cir. 1986) (law enforcement must report
back new or correcting information to the magistrate when that information is material to the
determination of probable cause); *Jones v. Wilhelm*, 425 F.3d 455, 464 (7th Cir. 2005) ("Where
an officer executing a warrant knows or should have known that a warrant, which was valid
when issued, now lacks the necessary particularity, then that officer cannot legally execute the
warrant."); *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) ("The officers could not
simply rest on a warrant they had already received when [new information undermining the
magistrate's probable cause determination] came to light.").

possession established that both loans to Manafort carried a 7.25% interest rate and required the upfront payment of 3 points on the first loan and 2 points on the second (i.e., 3% and 2% of the loan amounts) – terms that were highly advantageous to the bank.  (*See supra* at 7).  The first loan, which was for $9.5 million, was secured by properties valued at $14.95 million and a cash deposit of $630,000; the second loan, for $6.5 million, was secured by property valued at $6.3 million as complete and a $2.5 million cash deposit.  (*Id.*).  Inclusion of this information in the affidavit would have undermined its theory of wrongdoing and made it unlikely that the magistrate would have issued the warrant.

The government also failed to advise Magistrate Judge Rowland of the fact that it had interviewed Manafort's son-in-law and business partner Yohai ten days prior to presenting the Fisher Affidavit.  Yohai told the government that he believed "Manafort's loan was not a return favor by Calk as Manafort's loan terms were not very favorable and his loan was overcollateralized."  (August 2019 Disclosure Letter at 2 (Schoeman Decl. Ex. G)).  This omission is particularly striking, and strong evidence of at least recklessness, given that, in support of its honest services fraud theory, the government relied in the Fisher Affidavit on the purported double-hearsay statement made by Yohai to Solow.  (*Supra* at 8).  It was wrong and misleading for the government to include the statement it believed advanced its case, yet to omit a statement by the same witness that materially undermined it.

Similarly, the government relied on the double-hearsay statement of TFSB executive James Brennan, as related to the FBI by Ivakhnik, claiming that he told her that "the proposed Manafort loan was a bad loan."  (*Supra* at 9).  But the affidavit omitted to mention another critical fact known to the government that would have cast further doubt on Ivakhnik's claims – Brennan was in charge of overseeing the underwriting of the Manafort loans at TFSB,

22

and he had in fact signed and approved the loan memoranda that assigned both loans an "average" risk profile.  (*Supra* at 9).

These selective omissions, taken together, were enough to render the Fisher Affidavit materially misleading when it was presented to Magistrate Judge Rowland.  But, as noted, the government learned even more information undermining its honest services fraud theory the following day when it interviewed the TFSB executive and employees who were involved in issuing the Manafort loans.  The statements of Ubarri, Norini, Brennan, Bartholomew, Horn, and Raico – described in detail above – directly contradicted the assertions in the Fisher Affidavit.  (*See supra* at 12, 13).  These witnesses advised the government that they did not believe the loans had been pushed through improperly by Mr. Calk and that the loans were adequately secured.  Under *Marin-Buitrago* and the other cases cited above, it was incumbent on the government to bring this information to the attention of the magistrate before executing the search warrant.

> 2.   *Withholding Material Information from TFSB's Loan Committee and*
>       *Board of Directors*

On its face, the Fisher Affidavit failed to establish probable cause to believe that Mr. Calk conspired with Manafort to withhold material information about the loans from the TFSB loan committee and board.  The government's theory, presented in the Fisher Affidavit, was that Mr. Calk was aware of the Genesis defaults and hid that information from both the board and the two other members of the loan committee.  But the sole allegation supporting that theory was that the Genesis defaults were not mentioned in the loan memoranda – and the government did not proffer any facts indicating that Mr. Calk was responsible for drafting, editing, or reviewing those memoranda.  Indeed, as noted, the government knew at the time it submitted the Fisher Affidavit that the loan memoranda had been created by TFSB employee

23

Thomas Horn and approved by Brennan.  The day prior to executing the warrant, the government spoke to Horn and Brennan.  Brennan told the government that "[t]he Genesis default would not have had an impact on TFSB's loan decision," which would explain why he chose not to mention it in the loan memoranda.  (*See* July 2019 Disclosure Letter at 3 (Schoeman Decl. Ex. H)).  The government was also in possession of documents demonstrating that the two other members of the loan committee – Ubarri and Norini – had in fact been advised of the Genesis defaults.[16]  (*See* Payoff Emails (Schoeman Decl. Exs. E, F)).  The government was at least reckless in failing to bring these facts to the attention of Magistrate Judge Rowland, who, had she been aware of this information, could have not have found probable cause to believe the Mr. Calk had withheld material information from the loan committee or board.[17]

### 3. Withholding Material Information from BofI

Finally, the Fisher Affidavit failed to set forth probable cause to believe that Mr. Calk "committed a scheme to defraud [BofI] by concealing from BofI material information regarding Manafort's creditworthiness."  (Search Warrant Affidavit at ¶ 9 (Schoeman Decl. Ex. A)).  As noted above, the affidavit is devoid of any facts indicating that Mr. Calk withheld information from BofI.  The government essentially relied on its claim that Mr. Calk withheld information from TFSB to support its claim that he also defrauded BofI.  Had it disclosed to Magistrate Judge Rowland all of the information identified above regarding the former claim, she would have had no basis to find probable cause as to the latter claim either.

---

[16]  The day prior to executing the search warrant, Ubarri advised the government that he was aware that Manafort and Yohai "were 'technically in default of an agreement'" with Genesis. (July Disclosure Letter at 8 (Schoeman Decl. Ex. H)).

[17]  The Fisher Affidavit does not allege any facts showing that Mr. Calk withheld material information from the TFSB board, or, that he was required to disclose information about the Manafort loans to the board in the first place.

Accordingly, we respectfully submit that the warrant for Mr. Calk's iPhone is invalid and the fruits of the search should be suppressed.  At a minimum, the Court should conduct a *Franks* hearing.

## II.     The Government Should Be Compelled To Disclose the Grand Jury Transcript

Given that the government intentionally or recklessly misled Magistrate Judge Rowland, and given the amount and nature of the *Brady* material information in its possession by the time it indicted this case, there is reason to believe that it may have also misled the grand jury.  The Court should accordingly direct the government to produce the grand jury transcript to the defense, so that we may determine whether it engaged in misconduct.  At the very least, the government should provide the grand jury transcript to the Court, so that it may review the transcript *in camera* and determine whether there is a basis to provide it to the defense.

### A.     Legal Standard

The Court may authorize disclosure of grand jury matters to "a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  To obtain disclosure, the defendant must demonstrate "a particularized need" for the materials.  *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007).  One ground for dismissal of an indictment is prosecutorial misconduct with respect to the presentation of evidence.  *See, e.g., United States v. Hogan*, 712 F.2d 757, 761-62 (2d Cir. 1983).  While the Supreme Court has found that prosecutors have no "legal obligation to present exculpatory evidence" to a grand jury, *see United States v. Williams*, 504 U.S. 36, 52 (1992), dismissal may still be warranted if "the prosecutor's conduct" before the grand jury "amount[ed] to a knowing or reckless misleading of the grand jury as to an essential fact," *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (quoting *United States v.*

*Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989)).[18]  Indeed, a prosecutor who intentionally or recklessly misleads the grand jury "impair[s] . . . the grand jury's independent role." *United States v. Vetere*, 663 F. Supp. 381, 386 (S.D.N.Y. 1987) (*quoting Hogan*, 712 F.2d at 761).

B.    <u>The Defense Has Demonstrated A Basis To Review The Grand Jury Transcripts</u>

The record reflects that the government intentionally or recklessly misled Magistrate Judge Rowland in an effort to obtain a search warrant, including by, among other things, relying on the double-hearsay statement of Yohai while failing to disclose that Yohai had made materially contradictory statements directly to the FBI ten days prior to submission of the Fisher Affidavit.  (*Supra* at 8).  It further reflects that prior to presenting the case to the grand jury for indictment, the government obtained additional evidence indicating that Mr. Calk did not cause TFSB to extend loans to Manafort in return for a thing of value.  This included evidence from Manafort himself, whom the government called to testify before a grand jury in Washington, D.C. in December 2018.  Upon questioning by the government, Manafort gave testimony that, consistent with his prior proffer to the government, totally contradicted the theory of the case contained in the indictment presented to the grand jury in this District.  (*See supra* at 14, 15).

While we cannot know, without reviewing the transcripts, what evidence was presented to or withheld from the grand jury, there is reason to believe that the government may have been so selective in its presentation of the evidence that it materially misled the grand jury.

---

[18]  *See also United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983) (dismissing an indictment where the failure to disclose the hearsay nature of grand jury testimony "added a false aura of factual support to the government's case and may well have deceived the grand jurors"); *United States v. Connolly,* No. 16-Cr-370 (CM), 2019 WL 2120022, at *4 (S.D.N.Y. May 2, 2019) ("In general a prosecutor is not required to present exculpatory evidence to the grand jury [citing *Williams*, 504 U.S. at 52], unless such evidence is 'substantial' and 'might reasonably be expected to lead the jury not to indict [citing *Casamento*, 887 F.2d at 1183].").

The Second Circuit has found that "information may be 'false' if material omissions render an otherwise true statement false," and concluded that law enforcement may be held liable for violating a defendant's constitutional rights by "fabricating evidence [presented to a grand jury] through false statements *or omissions* that are made knowingly." *Morse v. Fusto*, 804 F.3d 538, 547-48 (2d Cir. 2015) (emphasis added). The Court accordingly should direct the government to disclose the grand jury transcript to the defense. In the alternative, the Court should review the transcript *in camera* to determine whether there is a basis for dismissing the indictment or providing the transcript to the defense. *See United States v. Urso,* No. 03-Cr-1382 (NGG), 2006 WL 681204, at *5 (E.D.N.Y. Mar. 6, 2006) (considering request to dismiss indictment after *in camera* review of transcript).

### III.   The Government Should Be Compelled To Disclose Communications with the OCC and the Presidential Transition Team

Rule 16's mandate is simple:  "[d]ocuments that the Government has reviewed or has access to must be provided to aid a defendant in preparing his defense." *United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004); *see also United States v. Rigas,* 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003) ("Rule 16(a)(1)(E)(i) entitles a defendant to documents or other items that are material to preparing arguments in response to the prosecution's case-in-chief."). Federal Rule of Criminal Procedure 16(a)(1)(E)(i) requires the government to "permit the defendant to inspect and to copy . . . papers, documents, [and] data . . . or copies or portions of any of those items, if the item is within the government's possession, custody or control and the item is material to preparing the defense." Here, there is no dispute that the subpoenas and discovery-related correspondence are within the government's possession, custody, or control.

Courts interpret the scope of Rule 16 broadly to ensure that the defense has a fair opportunity to prepare for trial. A document is material if "it could be used to counter the

government's case or to bolster a defense." *United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir. 1993); *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989) ("The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case.").  Accordingly, the "materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Stein*, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (*quoting United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal quotation marks and citations omitted); *see also Giffen*, 379 F. Supp. 2d at 342 (explaining that Rule 16 adopts an "anti-withholding" policy towards government disclosures in a criminal prosecution).

    The materials we are seeking fall squarely within Rule 16 and should be produced without further delay.  With respect to a critical aspect of the government's case, the discovery we have is paltry and we cannot makes heads or tails of what we have without seeing the requests and responses that ultimately resulted in these small productions from the PTT and OCC.  There is no rationale for keeping us in the dark.  The subpoenas that the government sent to the PTT and OCC and the responsive correspondence will undoubtedly answer many of our questions.  These materials are in the government's possession, they are not themselves privileged, and the government has the benefit of the information they contain.  So should we.

    The subpoenas and discovery-related correspondence are also necessary to the defense's evaluation of the need for, and scope of, potential Rule 17(c) subpoenas directed to third parties that previously produced documents.  Without these materials, we are unable to

determine whether certain documents, including potentially exculpatory materials, were requested and determined not to exist, or were never requested at all.  As a result, the defense will be forced to make applications for Rule 17(c) subpoenas that may seek the very same documents as those subpoenaed by the government.

Judge Kaplan's ruling in *Stein* is squarely on point.  There, Judge Kaplan ordered the government to provide similar information to the defense.  Defendants sought production of all communications between the government and KPMG (the defendants' former employer) relating to any of the events alleged in the indictment, as well as "[d]ocuments relating to communications between KPMG and the government regarding the production of documents, waiver of the attorney-client privilege, or the [] events here at issue, including privilege logs." *Stein*, 488 F. Supp. 2d at 355, 357.  As Judge Kaplan explained, the documents sought specifically encompassed "[c]orrespondence between KPMG and the USAO and the Justice Department…a so-called White Paper and appendices…drafts of the Statement of Facts,…letters and e-mails relating to the underlying facts, KPMG's cooperation with the USAO's investigation, and related matters."  *Id*. at 357.  Judge Kaplan granted the request, among others, pursuant to Rule 16, finding that the communications and correspondence between the government and KPMG "plainly are material to the defense" and likely to "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting in impeachment or rebuttal."  *Id*. at 358-359.  Accordingly, he ordered production of all communications between the government and KPMG related to the facts at issue in the indictment.  *Id*. at 359.

Similarly, in *United States v. Blumberg*, No. 14-CR-458 (JLL) (D.N.J. Jan. 26, 2015), the district court ordered the government to produce all "non-privileged communications

directed to third parties (including but not limited to subpoenas) wherein the Government is requesting specific documentation or information" and "the third party's written response regarding the Government's request for documents."  (Schoeman Decl. Ex. K).  The same result should apply here.

For the foregoing reasons, the defense respectfully requests that the Court order the government to comply with its obligations under Rule 16 by producing the grand jury subpoenas and related correspondence concerning the OCC and PTT.

## CONCLUSION

For the foregoing reasons, Mr. Calk respectfully requests that the Court grant his pretrial motions.


Dated:   New York, New York                    Respectfully submitted,
         November 8, 2019

                                               KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                               By:  /s/ Paul H. Schoeman
                                                    Paul H. Schoeman
                                                    Darren A. LaVerne
                                                    1177 Avenue of the Americas
                                                    New York, NY 10036
                                                    Telephone: 212.715.9100

                                               LOEB & LOEB LLP

                                                    Jeremy Margolis
                                                    Joseph J. Duffy
                                                    321 N. Clark Street
                                                    Chicago, IL 60654
                                                    Telephone: 312.464.3100

                                               *Attorneys for Defendant Stephen M. Calk*