UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA           :

                                  :

         -v.-                    :       19 Cr. 366 (LGS)

                                  :

STEPHEN M. CALK,                 :

                                  :

                     Defendant.     :

                                  :

------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

 

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

RELEVANT FACTS ................................................................................................... 2

    A.    The Offense Conduct ................................................................................. 2

            1.    The California Refinancing and Trump Campaign Position .................... 3

            2.    The $9.5 Million Loan and Cabinet Secretary Application ...................... 4

            3.    The $6.5 Million Loans and Under Secretary of the Army Interview ........ 6

            4.    The OCC Review ...................................................................................... 7

    B.    The Investigation and the Search Warrant ............................................... 7

    C.    The Indictment and Criminal Prosecution ............................................. 10

ARGUMENT ............................................................................................................ 11

I.    THE MOTION TO SUPPRESS ALL EVIDENCE FROM THE SEARCH
    WARRANT SHOULD BE DENIED ............................................................... 11

    A.    Legal Standard ........................................................................................ 11

            1.    Review of a Magistrate Judge's Probable Cause Determination ............. 11

            2.    Omissions in a Search Warrant Affidavit ............................................... 12

    B.    The Government Did Not Omit Material Information from the Warrant Affidavit
        ...................................................................................................................... 15

    C.    The Government Was Not Required to Seek a New Warrant ................... 27

II.    INSPECTION OF THE GRAND JURY TRANSCRIPTS IS UNWARRANTED .... 31

    A.    Legal Standard ........................................................................................ 31

    B.    Calk Has Made No Showing of Any Irregularity Justifying Inspection of the
        Grand Jury Transcripts ........................................................................... 33

III.    THE GOVERNMENT'S CORRESPONDENCE WITH THIRD PARTIES IS NOT
    DISCOVERABLE UNDER RULE 16 ............................................................. 36

    A.    Legal Standard ........................................................................................ 36

    B.    The Requested Correspondence is Not Discoverable Under Rule 16 ................. 37

**IV.    THE MOTION FOR CHANGE OF VENUE SHOULD BE DENIED**...................... **40**

    A.    Legal Standard ................................................................................ 41

    B.    Discretionary Transfer of Venue is Not Appropriate ........................... 42

        1.    Residence of the Defendant ................................................... 42

        2.    Location of Witnesses............................................................ 45

        3.    Location of Events ................................................................. 47

        4.    Disruption of the Defendant's Business .................................. 49

        5.    Expenses to the Parties.......................................................... 50

        6.    Location of Defense Counsel .................................................. 52

        7.    Other Factors........................................................................ 52

**CONCLUSION** ................................................................................................... **54**

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .................................................................................. 10

*City of Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) ............................... 16

*Dennis* v. *United States*, 384 U.S. 855 (1966) .......................................................................... 32

*Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211 (1979) ............................................... 32

*Evans* v. *United States*, 504 U.S. 255 (1992)........................................................................... 36

*Franks* v. *Delaware*, 438 U.S. 154 (1978)...................................................................... 12, 13, 14

*Gerstein* v. *Pugh*, 420 U.S. 103 (1975)...................................................................................... 12

*Illinois* v. *Gates*, 462 U.S. 213, 238 (1983) .............................................................................. 12

*Lowe* v. *United States*, No. 18 Civ. 898 (LGS) (S.D.N.Y. Nov. 8, 2019) (ECF No. 36) ............. 17

*McDonnell* v. *United States*, 136 S. Ct. 2355 (2016) .................................................................. 16

*Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395 (1959) ............................................. 32

*Platt* v. *Minnesota Mining & Mfg. Co.*, 376 U.S. 240 (1964) ............................................... 42, 46

*Plew* v. *Limited Brands, Inc.*, No. 08 Civ. 3741 (LTS) (MHD), 2009 WL 1119414 (S.D.N.Y. Apr. 23, 2009)...................................................................................................................... 39

*Rivera* v. *United States*, 928 F.2d 592 (2d Cir. 1991) ............................................................... 13

*Spinelli* v. *United States*, 393 U.S. 410 (1969) ......................................................................... 12

*Texas* v. *Brown*, 460 U.S. 730 (1983)....................................................................................... 12

*United States* v. *Alfisi*, 308 F.3d 144 (2d Cir. 2002)................................................................. 16

*United States* v. *Antia*, No. 97 Cr. 733 (RJD), 1999 WL 294788 (E.D.N.Y. Mar. 22, 1999) ...... 43

*United States* v. *Aronoff*, 463 F. Supp. 454 (S.D.N.Y. 1978)..................................................... 51

*United States* v. *Awadallah*, 349 F.3d 42 (2d Cir. 2003)................................................. 12, 13, 14

*United States* v. *Brewster*, 408 U.S. 501, 526 (1972)................................................................. 36

*United States* v. *Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626 (S.D.N.Y. July 31, 2008) .... 47

*United States* v. *Brown*, 744 F. Supp. 558 (S.D.N.Y. 1990) ...................................................... 13

*United States* v. *Canale*, No. 14 Cr. 713 (KBF), 2015 WL 3767147 (S.D.N.Y. June 17, 2015) . 50

*United States* v. *Canfield*, 212 F.3d 713 (2d Cir. 2000) ................................................. 12, 15, 18

*United States* v. *Carey*, 152 F. Supp. 2d 415 (S.D.N.Y. 2001) .................................................. 50

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989) ....................................................... 33

iii

*United States* v. *Christian*, No. 12 Cr. 41 (KBF), 2012 WL 1134035 (S.D.N.Y. Apr. 2, 2012).. 44

*United States* v. *Clark*, 638 F.3d 89 (2d Cir. 2011) .................................................................. 12

*United States* v. *Conner*, No. 00 Cr. 731 (GBD), 2001 WL 114314 (S.D.N.Y. Feb. 9, 2001) .... 43

*United States* v. *Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2120022 (S.D.N.Y. May 2, 2019).. 33

*United States* v. *Culoso*, 461 F. Supp. 128 (S.D.N.Y. 1978) ........................................................ 43

*United States* v. *Datta*, 797 F. Supp. 2d 448 (S.D.N.Y. 2011) .................................................... 53

*United States* v. *Dunn*, No. 05 Cr. 127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005)... 33

*United States* v. *Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154 (S.D.N.Y. 2004)... 46, 47, 50

*United States* v. *Falso*, 544 F.3d 110 (2d Cir. 2008) ............................................................ 13, 14

*United States* v. *Feola*, 651 F. Supp. 1068, 1109 (S.D.N.Y. 1987) ............................................. 13

*United States* v. *Feola*, 875 F.2d 857 (2d Cir. 1989) .................................................................. 13

*United States* v. *Flom*, No. 14 Cr. 507 (RRM), 2015 WL 6506628 (E.D.N.Y. Oct. 27, 2015) ... 51

*United States* v. *Gallo*, 863 F.2d 185 (2d Cir. 1988) .............................................................. 35, 36

*United States* v. *Henley*, No. 94 Cr. 394 (DAB), 1995 WL 60019 (S.D.N.Y. Feb. 10, 1995) ..... 43

*United States* v. *Juncal*, No. 97 Cr. 1162 (JFK), 1998 WL 473949 (S.D.N.Y. Aug. 7, 1998) .... 46

*United States* v. *Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) ..................................................... 41

*United States* v. *Klump*, 536 F.3d 113 (2d Cir. 2008) ................................................................ 12

*United States* v. *Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ............................................. 15, 17

*United States* v. *Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411 (S.D.N.Y. Jan. 16, 2014)44, 54

*United States* v. *Layne*, No. 05 Cr. 87 (HB), 2005 WL 1009765 (S.D.N.Y. May 2, 2005) ......... 43

*United States* v. *Leung*, 40 F.3d 577 (2d Cir. 1994) .................................................................. 32

*United States* v. *Lombardozzi*, 491 F.3d 61 (2d Cir. 2007) ......................................................... 33

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ......................................... 42, 43

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) .............................. 13, 14, 18, 27

*United States* v. *Maniktala*, 934 F.2d 25 (2d Cir. 1991) ........................................................ 37, 40

*United States* v. *Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984) ................................................... 28

*United States* v. *One Residential Property Located at 8750 Duncan Road, San Diego, CA*, 312 F. App'x 8 (9th Cir. 2008) (summary order) ................................................................................. 28

*United States* v. *Pastore*, No. 17 Cr. 343 (NSR), 2018 WL 395490 (S.D.N.Y. Jan. 11, 2018) ................................................................................................................................................. passim

*United States* v. *Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ............................................................................................................................................... 49, 53

iv

*United States* v. *Perez*, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) ...................................................... 14

*United States* v. *Posner*, 549 F. Supp. 475 (S.D.N.Y. 1982)................................................. 41, 42

*United States* v. *Proctor & Gamble Co.*, 356 U.S. 677 (1958) ..................................................... 32

*United States* v. *Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005)......................................................... 42

*United States* v. *R. Enters., Inc.*, 498 U.S. 292 (1991) ..................................................... 32

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013)..................................... 14, 26, 31

*United States* v. *Reilly*, 76 F.3d 1271 (2d Cir. 1996)............................................................. 14

*United States* v. *Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ...................................... 38, 40

*United States* v. *Riley*, 296 F.R.D. 272 (S.D.N.Y. 2014)............................................................. 51

*United States* v. *Ring*, 706 F.3d 460 (D.C. Cir. 2013) .................................................................. 36

*United States* v. *Rivera*, 750 F. Supp. 614 (S.D.N.Y. 1990) ........................................................ 13

*United States* v. *Rodriguez*, No. 16 Cr. 41 (PFB), 2018 WL 2126429 (W.D.N.Y. May 9, 2018) 53

*United States* v. *Rosen*, 716 F.3d 691 (2d Cir. 2013) ........................................................... 16, 28

*United States* v. *Russell*, 582 F. Supp. 600 (S.D.N.Y. 1982) ....................................................... 43

*United States* v. *Sells Engineering, Inc.*, 463 U.S. 418 (1983)...................................................... 32

*United States* v. *Silver*, 184 F. Supp. 3d 33 (S.D.N.Y. May 3, 2016) .......................................... 36

*United States* v. *Silver*, 864 F.3d 102 (2d Cir. 2017)................................................................... 36

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) ................................................................... 12

*United States* v. *Skelos*, 707 F. App'x 733 (2d Cir. 2017) (summary order)........................ 16, 29

*United States* v. *Spy Factory, Inc.*, 951 F. Supp. 450 (S.D.N.Y. 1997)................................. passim

*United States* v. *Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ......................................... 43, 44, 47

*United States* v. *Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................................. 39, 40

*United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398 (1999) ............................. 36

*United States* v. *Swanson*, 210 F.3d 788 (7th Cir. 2000)............................................................. 13

*United States* v. *Valdes*, No. 05 Cr. 156 (KMK), 2006 WL 738403 (S.D.N.Y. Mar. 21, 2006).. 43

*United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ................................................................................................................. passim

*United States* v. *Wells*, 519 U.S. 482 (1997) ............................................................................. 29

*United States* v. *Williams*, 437 F. Supp. 1047 (W.D.N.Y. 1977) ................................................. 41

*United States* v. *Williams*, 504 U.S. 36 (1993) ................................................................... passim

*United States* v. *Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001) 44, 49, 51

## Statutes

18 U.S.C. § 1005 ........................................................................................................................ 8

18 U.S.C. § 1014 ................................................................................................................... 8, 29

18 U.S.C. § 1343 ........................................................................................................................ 8

18 U.S.C. § 1344 ........................................................................................................................ 8

18 U.S.C. § 1346 ........................................................................................................................ 8

18 U.S.C. § 1349 ........................................................................................................................ 8

18 U.S.C. § 1956 ........................................................................................................................ 8

18 U.S.C. § 1957 ........................................................................................................................ 8

18 U.S.C. § 2 ............................................................................................................................ 10

18 U.S.C. § 215(a)(2) ............................................................................................................... 10

18 U.S.C. § 3500 ................................................................................................................ 39, 40

18 U.S.C. § 371 .......................................................................................................................... 8

## Rules

Fed. R. Crim. P. 16 .......................................................................................................... 37, 39, 40

Fed. R. Crim. P. 16(a)(1)(E)(i) .............................................................................................. 36, 37

Fed. R. Crim. P. 16(a)(2) ....................................................................................................... 39, 40

Fed. R. Crim. P. 17 ....................................................................................................................... 38

Fed. R. Crim. P. 21(b) ................................................................................................................... 41

Fed. R. Crim. P. 26.2 ............................................................................................................. 39, 40

Fed. R. Crim. P. 6(e) ..................................................................................................................... 32

Local Criminal Rule 16.1 ............................................................................................................. 37

## **INTRODUCTION**

None of defendant Stephen M. Calk's pretrial motions has any merit.  His motion to suppress the results of a duly-authorized search warrant on his cellphone makes no showing of any material omissions, let alone of the required intent to deceive.  Instead, it faults the Government for not going into detail on scarcely-relevant side issues which would not have impacted the magistrate's determination of probable cause.

Similarly, his motion to inspect the grand jury transcripts on the grounds of a speculated failure to present supposed exculpatory material to the grand jury fails.  It is highly doubtful that this sort of claim presents any cognizable grounds for relief following the Supreme Court's decision in *United States* v. *Williams*, 504 U.S. 36, 38 (1993), but even assuming arguendo that the claim is cognizable in certain cases, here Calk has not even approached the showing necessary for such extraordinary relief.  On the contrary, the material Calk speculates may not have been disclosed to the grand jury largely pertains to side issues or is ambiguous, and none of it could possibly be considered material to the grand jury's determination.

Calk's motion seeking the Government's correspondence with the Office of the Comptroller of the Currency and the Presidential Transition Team articulates no basis for deeming the wholesale disclosure of such correspondence material to the defense, and is indeed contradicted by the main authority Calk cites in support of it.

Finally, Calk's motion for transfer of venue presents no factors justifying a departure from the general rule that a criminal prosecution should be retained in the original district where the case was charged.  Indeed, Calk—a wealthy bank owner who was eager to travel to this District in pursuit of career advancement as part of the charged offense—is far better able to bear the alleged inconveniences of being tried in this District than many defendants whose motions to

transfer have been denied.  Just like many defendants before him, Calk can and will get a fair trial here in the Southern District of New York.

## **RELEVANT FACTS**

### A.    **The Offense Conduct**

This case concerns the defendant's corrupt abuse of his position as then-CEO and chairman of a federally-insured bank to solicit personal benefits to himself in exchange for approving millions of dollars in loans from the bank.  From approximately July 2016 to approximately January 2017, Calk worked to extend $16 million in financing to Paul J. Manafort, Jr.—a political consultant who for a portion of this time period was chairman of the Donald J. Trump presidential campaign and who, after formally leaving the campaign, remained influential with the campaign and, later, presidential transition team—in exchange for Manafort's assistance with Calk's efforts to secure prestigious positions on the campaign and in the administration.  Manafort appointed Calk to the campaign's economic advisory committee and caused recommended Calk for the position of Under Secretary of the Army; although Calk was interviewed for the position as a result of Manafort's efforts, he was not ultimately selected. Calk was closely personally involved in extending the $16 million in loans during the exact time period that he was soliciting Manafort's assistance.  These loans, which were highly risky due to Manafort's deteriorating finances, ultimately defaulted following Manafort's arrest, and the bank sustained a multimillion dollar loss it is attempting to recoup.

During the relevant timeframe, Calk was chairman and CEO of the Federal Savings Bank (the "Bank"), a federal savings association headquartered in Chicago, and its holding company National Bancorp Holdings, Inc. (the "Holding Company").  Calk was the owner of

approximately 67% of the Holding Company, which in turn owned the Bank in its entirety.[1]

            1.    *The California Refinancing and Trump Campaign Position*

In the spring of 2016, Manafort and his son-in-law Jeffrey Yohai approached the Bank seeking financing for various real estate projects.  (Ind. ¶ 13).[2]  Their loan officer, Dennis Raico, worked from the Bank's branch office in Manhattan.  Manafort and Yohai's first request, for a loan relating to a real estate project in Manhattan, was made in late April and early May of 2016—at a time when Manafort was affiliated with the Trump campaign but not its chairman—and was rejected.

In July of 2016, Manafort and Yohai made a second loan application, for a loan to refinance a California construction project.  On or about July 27, 2016, Manafort and Yohai discussed this proposed California refinancing in a meeting with Raico in the Bank's office in Manhattan.  Calk participated in this meeting by videoconference.  During this meeting, after discussing the California refinancing proposal, Calk expressed interest in participating in the Trump presidential campaign.  Manafort, who at this point was the campaign chairman, told Calk he would get back to him.  (Ind. ¶ 13).

The next day, Calk and the other members of the credit committee (who were Calk's subordinates) conditionally approved the California refinancing—an unusually fast turnaround

---

[1] Following his indictment in this case, Calk's employment with the Bank and Holding Company ceased, but he retains his ownership interest in the Holding Company.

[2] Citations to "Ind." refer to the indictment in this case, Docket Entry 2.  Citations to "Transfer Mem." refer to the defendant's memorandum in support of his motion for transfer of venue, Docket Entry 33.  Citations to "Mem." refer to the defendant's memorandum in support of his other pretrial motions, Docket Entry 37.  Citations to "Schoeman Decl." refer to the declaration of Paul H. Schoeman, Esq., submitted with the defendant's pretrial motions and currently under seal pending resolution of certain redactions, *see* Docket Entry 35.  Citations to "Fisher Aff." refer to the affidavit of Special Agent Carrie E. Fisher, Schoeman Decl. Ex. A.

that led Raico to remark by email that the borrowers would be impressed to hear so quickly. Less than a week later, Manafort appointed Calk to the Trump campaign's economic advisory committee, a group consisting of a number of prominent businesspeople including those who would go on to become Secretary of the Treasury and Secretary of Commerce.  (Ind. ¶¶ 15-16).

The Bank proceeded to gather and review documentation to underwrite the proposed California refinancing, and discovered various pieces of negative information, including that Manafort and Yohai's company was in default to its prior lender.  (Ind. ¶¶ 18-19.)  Nevertheless, Calk continued to pursue the loan, approving repeated modifications which had the effect of increasing the loan amount several times, as well as adding collateral.  On or about October 7, 2016, after Calk agreed to increase the loan amount by $1 million, Manafort wrote Calk an email thanking him, writing "It means a lot to me.  You are becoming a very good friend and I look forward to building our relationship into both a deeper business and personal one."  (Ind. ¶ 37). Although Manafort had left the Trump campaign on August 19, 2016, he still retained influence with the campaign, which Calk sought to leverage.  For example, on October 12, 2016, Calk emailed Manafort to complain that he was not receiving a Trump campaign credential to enter the "spin room" as a surrogate after the third presidential debate, as he had at the first two.

2.    *The $9.5 Million Loan and Cabinet Secretary Application*

On October 20, 2016, shortly before closing on the California refinance, Manafort sent Raico a new proposed loan structure.  This new structure was entirely different from the proposed California refinance, which was abandoned; instead of being a $9.2 million loan to Manafort and Yohai secured by a California construction project and intended to be repaid from the sale of the completed construction, the new loan was for $9.5 million, did not involve Yohai, was secured principally by Manafort and his wife's personal real estate, and was to be repaid

4

solely from Manafort's income.  The Bank's president Javier Ubarri instructed Raico to reject the proposed $9.5 million loan, but Raico, with Calk's consent, explored the possibility of packaging the loan for a wholesale lender to extend instead of the Bank—a workaround that would provide financing to Manafort without exposing the Bank to the economic risk of the desired loan.

As of the date of the presidential election on November 8, 2016, the wholesale lender had not made the decision to extend the full amount of the $9.5 million loan.  On or about November 10, 2016—two days after Manafort's candidate, President Trump, won the election—Calk caused the Bank to reinitiate the process of evaluating whether the Bank should itself extend $9.5 million rather than seeking to convince the wholesale lender to extend it.

The next day, Calk asked Raico, Manafort's loan officer, to call Manafort and ask him whether Calk was in consideration for Secretary of the Treasury or other senior administration positions.  After Raico did not carry out this request, Calk contacted Manafort directly, engaging in several lengthy telephone conversations with him and sending him a list of desired senior government positions, including Secretary of the Treasury, Secretary of Commerce, and Secretary of Defense, and ambassadorships such as the United Kingdom, France, or Germany.

With Calk's approval, the Bank extended the $9.5 million loan to Manafort on November 16, 2016, and then attempted to sell the closed loan to the wholesale lender.  Throughout November, Calk corresponded with Manafort extensively to provide revised versions of his list of desired positions as well as application materials for the position of Secretary of the Army, and Manafort sent a recommendation for Calk and two other individuals for administration positions to Jared Kushner, who was performing a senior role with respect to the presidential

transition team ("PTT").

      3.    *The $6.5 Million Loans and Under Secretary of the Army Interview*

After the $9.5 million loan closed, Calk caused the Bank to extend an additional $6.5 million in loans to Manafort secured by cash and Brooklyn real estate.  These loans, as Calk was aware, were urgently needed by Manafort to refinance loans from his prior lender and to avert foreclosure proceedings on properties owned by Manafort and Yohai.  During the same time period, Calk received or was copied on urgent status requests from Manafort, making reference to the foreclosures and seeking a swift closing date, and corresponded frequently with Raico about how to extend the $6.5 million loans, even as Calk continued to solicit assistance from Manafort in seeking the positions of Secretary of the Army or Under Secretary of the Army.

At Calk's urging, the Bank extended the $6.5 million loans in January 2017.  Taking into account the previously extended $9.5 million in loans, the total $16 million in loans to Manafort was the Bank's largest loan relationship and exceeded the Bank's statutory lending limit.  To circumvent this obstacle, Calk, in his capacity as CEO of the Holding Company, transferred portions of the loans to the Holding Company in an unusual maneuver the Bank had not previously used.  At the same time as Calk was working to extend the additional loans, and as Calk was aware, Manafort made efforts on Calk's behalf that ultimately yielded an interview with the PTT.  The interview occurred at Trump Tower on January 10, 2017—after the closing documents were signed but before the loan was funded[3]—by a panel of PTT members for the position of Under Secretary of the Army.

---

[3] The delay in funding the loan was requested by Manafort.

4.     *The OCC Review*

Following the extension of the loans, Calk made false and misleading statements to the Office of the Comptroller of the Currency ("OCC"), the Bank's primary regulator.  On March 29, 2017, Calk was asked by OCC bank examiners about news reporting regarding foreclosures on Manafort properties (including reports that Manafort's prior lender was foreclosing on the Brooklyn property securing the $6.5 million loans).  Calk denied being aware of the reported foreclosure, when in fact he had at a minimum been aware that the prior loan on the Brooklyn property was in default and had accrued hundreds of thousands of dollars in penalties.  And in July of 2018, Calk met with two senior OCC supervisors and falsely claimed that he had never wanted to be hired for a position in the presidential administration.

In July of 2017, the OCC reviewed the loans to Manafort and downgraded their credit quality to "substandard," signifying a well-defined credit weakness.  Although Manafort had been making payments up until that point, he was doing so only from the proceeds he had been loaned.  Following his October 2017 indictment in the District of Columbia by the Special Counsel's Office, *see United States* v. *Manafort*, No. 17 Cr. 201 (ABJ) (D.D.C.), Manafort ceased making loan payments and the Bank wrote off over $12 million as a loss.[4]

B.     **The Investigation and the Search Warrant**

This Office began investigating Manafort and Calk in connection with these loans in March of 2017.  Ultimately, the Special Counsel investigated Manafort, including in connection with these loans, while the investigation of Calk in connection with these loans was carried out

---

[4] The Bank is currently attempting to foreclose on certain items of real property collateral for the loans that were forfeited by the Special Counsel's Office.  *See In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18 Misc. 167 (ABJ) (D.D.C.).

by this Office.

Simultaneously, the Central District of California had been conducting an investigation of Yohai in connection with fraud committed by Yohai against other banks.  This Central District of California investigation, which resulted in a government interview of Yohai on June 16, 2016, was conducted separately from this Office's investigation, and this Office's investigative team did not participate in the California investigation or the interview of Yohai.[5]

On June 26, 2017, the Government applied for and obtained a search warrant for Calk's cellular telephone for evidence, fruits, and instrumentalities of honest services fraud, bank fraud offenses, and money laundering offenses in connection with Calk's solicitation of presidential campaign and administration positions in exchange for the loans; with suspected false information provided by Manafort to the Bank; and with suspiciously incomplete information about Manafort's financial condition contained in the Bank's records.[6]

The search warrant affidavit laid out the following suspicious facts, among others, supporting probable cause for the subject offenses:

- A number of Bank documents reflected that in late July and early August 2016, Calk and the loan committee conditionally approved the California refinance with an unusually fast one-day turnaround.  Less than a week later, Manafort asked Calk for his resume (initially through Raico, Manafort's loan officer) and appointed Calk to

---

[5] The investigative team drafting the affidavit was aware the interview had taken place and of some of the statements Yohai had made on other matters, but they did not attend the interview, did not have access at the time to the Form 302 written report of the statements, and were not aware at the time that Yohai had made the statements that Calk complains were omitted from the warrant affidavit.

[6] The suspected offenses were the making of false entries in the books and reports of a bank in violation of 18 U.S.C. § 1005; fraud in connection with the extension of credit in violation of 18 U.S.C. § 1014; conspiracy to commit those offenses in violation of 18 U.S.C. § 371; wire fraud, bank fraud, honest services fraud, and conspiracy to commit those offenses in violation of 18 U.S.C. §§ 1343, 1344, 1346, and 1349; and money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957.  (Fisher Aff. ¶ 7).

the Trump campaign's economic advisory council.  (Fisher Aff. ¶ 22, 24-25).

- Emails reflected that during the process of underwriting the proposed California refinance, Calk increased the loan amount by $1 million at Manafort's request within the span of a day, and in the email telling Manafort that he had done so, Calk asked Manafort to call Calk on his cellphone and give Calk "advice."  When Manafort wrote back to set up a call, he also wrote "I also want to again thank you for fixing my issue.  It means a lot to me.  You are becoming a very good friend and I look forward to building our relationship into both a deeper business and personal one." (Fisher Aff. ¶¶ 36-37).

- A number of emails reflect Calk personally being involved in the progress of the loans to Manafort, and Bank employees describing Calk as seeking to close the loans expeditiously.  These emails reflected, among other things, Calk personally making the decision to close the $9.5 million loan as a Bank loan even though the Bank had previously decided to reject it and the wholesale lender had not agreed to underwrite it, and Calk being sent for signature, along with his brother, the documents transferring parts of the loans to the Holding Company.[7]  (Fisher Aff. ¶¶ 27, 40-42, 50-52, 56-57, 59-61).

- A number of emails reflect Calk repeatedly soliciting Manafort for assistance in obtaining senior government positions or ambassadorships during the same time period that Manafort's loans were pending and that Calk was personally involved in pushing them forward.  These emails included Calk sending a number of lists of desired positions and application materials, asking about Manafort's involvement with the transition, and asking Manafort about the status of Calk's application and if he could arrange a meeting with the President-Elect while the President-Elect was in the Midwest for a rally.  (Fisher Aff. ¶¶ 47-49, 53-55).

- Documents reflect that on January 10, 2017, several days before the $6.5 million loans funded, Calk interviewed at Trump Tower and, later that day, emailed to thank one of his interviewers, remarking "It is easy to see why Paul Manafort has such great respect and admiration for you."  (Fisher Aff. ¶¶ 65-66).

- The Bank's credit approval memoranda for the two loans did not mention that Manafort and Yohai were in default on the prior loan on the California property, or that there was a foreclosure lawsuit pending against Manafort's Brooklyn townhouse (which was to be collateral for the $6.5 million loans).  (Fisher Aff. ¶¶ 51, 69).

- The Bank's records contained several Manafort loan applications, some signed by Manafort, containing substantially varying representations about his income and net worth.  (Fisher Aff. ¶¶ 28, 43-45).

- One former Bank employee, Anna Ivakhnik, told the FBI of several issues with Manafort's credit, that she believed the Manafort loan would be approved "no matter what," that Raico had told her that Calk wanted to be appointed Secretary of Veterans

---

[7] Calk's brother was a 29% owner of the Holding Company.

Affairs by Trump, and that at the end of August 2016, Bank vice president James Brennan told her to put any communications related to the loan in emails because this matter would be "investigated by the FBI."  (Fisher Aff. ¶ 35).[8]

- Mitch Solow, the former chief risk officer of Manafort's prior lender Genesis Capital, stated to FBI agents that in the summer of 2016, after Genesis had refused to provide a cash-out refinance to Manafort on one of Manafort's properties, Yohai told Solow that the Bank had agreed to do the refinance because Manafort promised Calk a position on the Trump campaign's economic advisory council.  (Fisher Aff ¶ 26).

## C.    The Indictment and Criminal Prosecution

On May 21, 2019, the grand jury returned Indictment No. 19 Cr. 366 (LGS), charging Calk with one count of financial institution bribery in violation of 18 U.S.C. §§ 215(a)(2) and 2. Calk surrendered on May 23, 2019 and was released on a $5 million bond on that day.

Since Calk's surrender, the Government has produced broad discovery to Calk, including not just materials in the possession of the investigative team involved in charging Calk, but also materials obtained from the Central District of California's investigation of Yohai and voluminous documents obtained from the files of the Special Counsel's Office related to the investigation of Manafort.  The Government has also made broad disclosure of statements made in connection with the investigations conducted by this Office, the Central District of California, and the Special Counsel's Office, including a number of statements that, while not believing them to be exculpatory material under *Brady* v. *Maryland*, 373 U.S. 83 (1963), or its progeny, the Government nonetheless decided to provide to Calk's counsel in an effort to assist in preparing their defense.  The Government has undertaken extensive efforts to render the discovery comprehensible, providing detailed indexes of the materials provided,[9] producing the

---

[8] The affidavit disclosed that Ivakhnik was terminated from the Bank in disputed circumstances.

[9] Due to the volume of some of the disclosures from the Special Counsel's Office, the Government's main discovery index listed most such productions under summary line items

documents in database load-ready format or in the form obtained by the Office in most cases, and re-producing a number of materials in order to include two additional categories of metadata at the defense's request.

## ARGUMENT

### I. THE MOTION TO SUPPRESS ALL EVIDENCE FROM THE SEARCH WARRANT SHOULD BE DENIED

Calk argues that the evidence from the search of his cellular phone should be suppressed because, he claims, certain facts—related largely either to the loan quality or to Yohai's opinion as to whether there was a corrupt exchange between Calk and Manafort—were not included in the warrant affidavit, and because after the warrant was issued but before it was executed, several officers and employees of the Bank generally denied irregularities in connection with the loans. (Mem. 21-25). As explained below, since none of these facts was material to the determination of probable cause, and since there is no showing whatsoever of the requisite intent to mislead, this motion should be denied.

#### A. Legal Standard

##### 1. *Review of a Magistrate Judge's Probable Cause Determination*

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a

---

describing the documents as simply documents obtained from the Special Counsel's Office. However, in the case of the more voluminous productions, the Government separately provided lengthy and detailed spreadsheets listing the source information for each document, allowing the documents to be identified, or else included this source information in the metadata for load-ready documents, allowing them to be sorted by the defense when loaded into document databases.

particular place." *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard." *Texas* v. *Brown*, 460 U.S. 730, 742 (1983).  Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States* v. *Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).  It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein* v. *Pugh*, 420 U.S. 103, 121 (1975).  Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*, 462 U.S. at 235 (internal quotation marks omitted).

### 2.    *Omissions in a Search Warrant Affidavit*

A search warrant affidavit is presumed reliable.  *See Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008).  "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  Not every statement in a warrant affidavit must be true.  *See United States* v. *Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64.  The defendant must establish both components—i.e., intent and materiality—by a preponderance of the evidence.  *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155-56, 170-71) (emphasis added)). The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are thus rare. *See United States* v. *Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *United States* v. *Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").

In reviewing a challenge to a warrant, "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States* v. *Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (citations and internal quotation marks omitted); *see also Awadallah*, 349 F.3d at 67; *United States* v. *Feola*, 651 F. Supp. 1068, 1109 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989). "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States* v. *Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (quoting *Awadallah*, 349 F.3d at 67). Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted).

13

This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks omitted).

To allow for the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States* v. *Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States* v. *Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003).

A search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68 (internal quotation marks omitted).

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)).

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States* v. *Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (internal quotation marks omitted).

**B.     The Government Did Not Omit Material Information from the Warrant Affidavit**

Calk's claim that the Government omitted material information from the warrant affidavit is without any merit. None of allegedly omitted information Calk complains of was material to the determination of probable cause, and none of the omissions were made with intent to deceive or reckless disregard for the truth.

Calk complains that the Government failed to disclose (a) the terms of the loan, (b) the fact that James Brennan, after expressing serious reservations about the loans and telling a coworker that the loans would be "investigated by the FBI," signed one of the credit approval memoranda, (c) Yohai's statements, in a separate investigation, that initially described Calk's appointment to the campaign's economic advisory council as a "quid pro quo" but then recanted that characterization, and (d) the fact that the other members of the loan committee had been informed of Manafort's default to the prior lender on the California property (but not on the Brooklyn property that was collateral for the Bank's loans). (Mem. 21-24). The first three facts are alleged to be material to the honest services fraud offense, and the fourth to the bank fraud

and false records offenses.  In fact, none of these facts is material to any of the subject offenses.

           1.     *The Loan Terms*

The terms of the loans are simply not material information, both because the quality of the loans is not an element of an honest services fraud offense and because the Bank's regulator has concluded that these loans were in fact of substandard quality.

As an initial matter, whether one commits a bribery offense does not rely on whether the acts taken in exchange for the bribe—here, extending loans—would or should have been taken absent the bribe.  *See, e.g.*, *City of Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid."); *United States* v. *Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002) (similar); *United States* v. *Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) (similar in honest services fraud case), *overruled on other grounds by McDonnell* v. *United States*, 136 S. Ct. 2355, 2371-72 (2016); *United States* v. *Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) (summary order) (citing *Alfisi* and *Rosen* in honest services fraud case).  Calk's focus on the quality of the loans is therefore misplaced.  Although the risky qualities of the loans may shed light on Calk's motive and intent in approving them, his conduct would constitute a bribery offense if it amounted to a quid pro quo even were the loans entirely sound and advantageous.  Thus, the extensive evidence of a quid pro quo set forth in the affidavit—the numerous emails showing Calk's contemporaneous, and sometimes intermingled, actions advancing Manafort's loans and soliciting assistance in obtaining campaign and government positions for himself—are not undermined at all by the interest rate of the loans or the fact that they were not undercollateralized.  Indeed, by not bringing up any deficiency with the collateral, the affidavit

effectively *did* disclose that the loans were not undercollateralized—an inadequacy in the collateral would be so patently improper that one would expect it to be mentioned if it existed. Calk's complaint then is really about not including the precise interest reate of the loans, and at a minimum, the affidavit would still amply have set forth probable cause had the interest rate been included. *Lahey*, 967 F. Supp. 2d at 711.

Moreover, the limited way in which the loan quality was relevant—as shedding light on Calk's motive and intent in showing his willingness to extend the loans despite the risks—is not contradicted by the omitted loan terms. *See, e.g.*, *Lowe* v. *United States*, No. 18 Civ. 898 (LGS), slip op. at 12 (S.D.N.Y. Nov. 8, 2019) (ECF No. 36) (finding no *Brady* violation for failure to produce document that "does not contradict" the Government's evidence). The affidavit characterized the loans as flawed because of the substantial risk of default, not because of factors having to do with interest (or, as noted above, the collateral). In particular, the affidavit stressed that the loans were favorable to Manafort because they were extended despite his risk of default and in his "hour of need," in Calk's words (Fisher Aff. ¶ 61), and the factors showing these risks such as Manafort's prior defaults and pending foreclosure action (Fisher Aff. ¶¶ 17-19, 51, 69), his inconsistent financial information (Fisher Aff. ¶¶ 28, 43-45), his urgent need for cash (Fisher Aff. ¶¶ 36, 39, 56, 58), and a separate bank's conclusion that Manafort was too high of a credit risk (Fisher Aff. ¶ 21)—are simply not undermined by the interest rate of the loans. A loan with a high interest rate is cold comfort if the borrower does not pay. And the affidavit never contended or suggested that the loans were simply sham loans offering no value to the Bank in exchange for the risk. Indeed, the affidavit noted one instance in which Calk advised the necessity of taking additional collateral (Fisher Aff. ¶ 56), and another in which Calk declined to

close until the loan was fully underwritten (Fisher Aff. ¶ 61).

That the interest rate bore little on the loan's favorability—and thus on the probable cause determination—is further evidenced by the fact that that the OCC downgraded the loans to substandard quality shortly after issuance.  (Ind. ¶ 27).  In this examination—which took place before Manafort's arrest and default—the OCC found that he was only able to make payments from the proceeds of the loans themselves, an inherently unsustainable situation.

There is little reason to question the OCC's conclusion—having reviewed the loan terms, the credit approval memoranda, and other relevant records—that these loans were in fact of substandard quality.  Thus, even was credit quality highly relevant to the probable cause determination, which it was not, there is every reason to believe that had the full loan terms been presented in the affidavit, the magistrate judge would have come to the same conclusion as the OCC.  Accordingly, Calk has made no showing that the omitted information would have even established that the loans were of good quality, let alone counteracted the evidence bearing directly on the corrupt quid pro quo he sought from Manafort.  The omissions were therefore not material in a manner that necessitates a *Franks* hearing, because the "hypothetical corrected affidavit" with the omitted information "still establishes probable cause."  *Lahey*, 967 F. Supp. 2d at 711; *Canfield*, 212 F.3d at 718.[10]

        2.    *Brennan's Signature of the Credit Approval Memorandum*

For the same reasons, the second omission—that Brennan signed one of the credit

---

[10] This is thus a prototypical example of the sort of "conjecture about . . . matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted), which courts uniformly hold insufficient for a *Franks* hearing in light of the "element of selectivity" inherent in any warrant application, *Vilar*, 2007 WL 1075041, at *27 (internal quotation marks omitted).

approval memoranda rating the loan's credit quality as 4 (Average)—is similarly not material.
As stated above, the quality of the loans was far from central to the evidence of the corrupt quid
pro quo. That being the case, Brennan's *belief* that the loans were low quality is necessarily even
less significant. Moreover, his signature on the credit approval memorandum does extremely
little to undermine the evidence that Brennan believed the loans were low quality, given his
subordinate relationship to Calk, the omissions in the credit approval memorandum, and the
other documentary evidence of Calk's extensive involvement in pushing the loans forward.
Indeed, Brennan would go on to testify at Manafort's trial that although he signed the
memorandum rating the loan a 4 (Average), he did not in fact consider 4 to be the appropriate
rating and he believed the loan should not have been made. *See* Tr., 8/13/18, at 2246-47, *United
States* v. *Manafort*, No. 18 Cr. 83 (TSE) (E.D. Va.) (ECF No. 282).[11] Instead, due to Calk's
decision that the loan would go through, Brennan had no choice but to give the loan a rating that
would allow it to be extended. *See id.* at 2247.[12] And even based on the information available at

---

[11] Brennan testified at trial under a grant of immunity.

[12] Brennan was explicit about just the sort of improper influence by Calk suggested in the
warrant affidavit:

> THE COURT: But now you're telling us under oath that you don't believe it was a 4?
>
> THE WITNESS: I didn't at the time.
>
> THE COURT: But you still wrote down 4.
>
> THE WITNESS: Right.
>
> . . .
>
> Q. Why did you write down 4?
>
> A. Because you wouldn't make a loan that would have a higher number than a 4 and put
> it on your books.
>
> Q. And who decided that the loan was going to go through?

the time of the affidavit, the evidence that Brennan told a colleague he believed the loans would be "investigated by the FBI" (Fisher Aff. ¶ 35(d)) is far more probative of his state of mind than the fact that he signed some of the loan approval documentation.[13]  It is thus impossible to seriously imagine that including the fact that Brennan signed one of the credit approval memoranda would have changed the calculus of probable cause.

    3.  *The Yohai Statements*

   Yohai's statements in a separate investigation alternately affirming and disavowing a quid pro quo between Calk and Manafort were not material to the search warrant for Calk's phone.  The statements had several somewhat conflicting portions: Yohai (1) claimed that Calk and Manafort "entered into a 'quid pro quo' relationship" (Schoeman Decl. Ex. G at 2); (2) opined that the loans were unlikely to be a return favor from Calk as they were—in Yohai's opinion—not favorable for Manafort and were overcollateralized (*id.*); and (3) stated that he did not know if Calk made promises or if Manafort sought favors from him (*id.*).  Obviously the first portion of the statements described above—Yohai's belief in a quid pro quo relationship—tends if anything to support, not undermine, probable cause.  The second portion, Yohai's opinion that the loan terms are unfavorable, is not material for the same reason that the loan terms and

---

    A. Mr. Calk.

    Q. Did you have a choice to rate this other than a 4?

    A. No.

*Id.*

[13] Even if Brennan's willingness to continue to participate in the loan approval process had any effect of undermining his belief that the loans were bad, the affidavit already describes that Brennan participated at least to the extent of presenting Calk with the paperwork necessary to transfer the loans to the Holding Company.  (Fisher Aff. ¶ 64).

Brennan's signature on the credit approval memoranda are not material, as well as the fact of Yohai's lack of apparent expertise to render this opinion.

The third portion—Yohai's explanation of his lack of basis for knowledge—tends to diminish the importance of Yohai's opinions.  In this way, it arguably decreases the weight that should be given to Yohai's claim that there was a quid pro quo relationship, which Calk argues stands in tension with the statement related by an employee of the prior lender—which was included in the affidavit—that Yohai believed the Bank "had agreed to do the refinance because Manafort promised Calk a position on the Trump Economic Advisory Council."  (Fisher Aff. ¶ 26).[14]  But this is plainly not material information.  Yohai was a co-borrower on the initially proposed loans, and thus would have had an incentive to minimize any knowledge of a corrupt exchange with respect to that loan when talking to law enforcement (unlike in his statement to the prior lender's employee).  And here, as noted above, Yohai both minimized and admitted to the corrupt nature of the exchange in the same interview.  That equivocation could not have borne significantly on the probable cause determination.

That is particularly so given that Yohai's statement to the prior lender's employee was far from the linchpin of the warrant affidavit.  It was (as defense counsel points out, Mem. 22), double hearsay, it related only to the Trump campaign position and not to the government position, and it was far less concrete and documented than the extensive email trail forming the bulk of the warrant affidavit.

Even if Yohai's statement to law enforcement denying a basis for knowledge completely

---

[14] It also, of course, diminishes the significance of Yohai's opinion that the loans were not a return favor, by revealing his lack of basis for knowledge.

negated his statement to the prior lender's employee—which is dubious due both to his motives in talking to law enforcement and to his conflicting statements in the same interview—a "corrected affidavit" would still amply make out probable cause. *Lahey*, 967 F. Supp. 2d at 711. It would include, among other things: (a) the extreme temporal proximity between the unusually fast conditional approval of the California refinance and the Trump campaign position (Fisher Aff. ¶ 22, 24-25); (b) Calk's increase of Manafort's loan amount by $1 million together with a request for "advice" and Manafort's expression of gratitude and desire to build their "relationship into both a deeper business and personal one" (Fisher Aff. ¶¶ 36-37); (c) extensive documentation of Calk's personal involvement in pushing the loans forward using unusual legal maneuvers (Fisher Aff. ¶¶ 27, 40-42, 50-52, 56-57, 59-61); (d) extensive documentation, during the exact same time period, of Calk's repeatedly sending Manafort lists of extravagant desired positions, application materials, and status requests (Fisher Aff. ¶¶ 47-49, 53-55); (e) documentation of Calk's interview at Trump Tower within days of the funding of the final set of loans and email to one of his interviewers mentioning Manafort (Fisher Aff. ¶¶ 65-66); (f) the statement from Ivakhnik that Brennan had expressed to her his belief that the matter would be "investigated by the FBI" (Fisher Aff. ¶ 35); and (g) a statement that Yohai, in an interview, acknowledged and then cast doubt on the quid pro quo theory. The notion that this latter piece of information would have so undercut the probable cause set out in all the preceding information—with or without the loan terms and the fact that Brennan signed the credit approval memorandum—is preposterous.

      4.    *Loan Committee Members' Knowledge of Default*

The fourth omitted fact, that the other loan committee members were informed of one

default, is not material to the bank fraud or false records offenses.  Calk complains that the

affidavit did not note that Ubarri and Norini, the other loan committee members besides Calk

who approved the loans, were copied on a message circulating the notice that Manafort and

Yohai had defaulted on the prior California loan.  (Mem. 24).  This, he claims, undercuts the

Government's theory that "Calk and Manafort withheld material information about the loans

from [the Bank]'s loan committee and board of directors as well as the books and records of the

bank (such as the [credit approval memoranda]); and that Calk committed a scheme to defraud

another bank that was considering underwriting one of the TFSB loans [the wholesale lender], by

concealing from [the wholesale lender] material information regarding Manafort's

creditworthiness."  (Fisher Aff. ¶ 9).

      Whether other loan committee members were advised of the default on the California

loan is not material to whether there is probable cause to suspect fraud or false statements

offenses, which are substantially broader than just whether those particular individuals were

aware of that particular fact.  The fraud and false statement offenses were based on evidence that

(i) Manafort had submitted an array of wildly varying income figures, giving rise to suspicion

that his income was being manipulated to disguise underlying credit weakness (Fisher Aff. ¶¶ 28,

43-45) and (ii) that the Bank's credit approval memoranda omitted any mention of two

derogatory pieces of information related to Manafort and Yohai's risk of default—their prior

default on the California loan and their prior default on the Brooklyn loan and the ensuing

foreclosure lawsuit against them (Fisher Aff. ¶¶ 51, 69).  These two suspicious omissions in the

Bank's records, in the context of the numerous other indications that Calk had a corrupt motive

to approve the loans and was personally involved in causing them to be issued (Fisher Aff. ¶¶ 27,

35-37, 40-42, 47-49, 50-57, 59-61), of Manafort's desperate and urgent need for cash (e.g.,

Fisher Aff. ¶¶ 36, 39, 56-60), and of Manafort's varying income figures described above, gave

rise to probable cause to suspect that the Bank's official records were being manipulated, by

Calk or others working in concert with him, to disguise the weaknesses in Manafort's credit.

Such manipulation would have served to deceive others reviewing the loans, whether the loan

committee, the full board of directors, or the wholesale lender to which the Bank attempted to

sell one of the loans.

Accordingly, the omission Calk complains of simply does not negate probable cause as to

the fraud or false statement offenses.  The fact that one of the potentially deceived parties (the

loan committee but not the full Board or the wholesale lender) was aware of one of the defaults

(the California default but not the Brooklyn default) could not possibly dissipate probable cause

to suspect the overall fraud or false statement offenses.  A "corrected affidavit" with this fact,

*Lahey*, 967 F. Supp. 2d at 711, would still give rise to probable cause to suspect concealment of

the other default (i.e., the Brooklyn default) from the loan committee, and concealment of both

defaults from the full board of directors and the wholesale lender, to say nothing of fraud by

Manafort against the entire Bank based on his varying income figures.[15]

_____

[15] Given the evidence of the relationship between Calk and Manafort and Calk's corrupt motive
set forth in the affidavit, there was probable cause to suspect Calk's complicity in any such fraud
by Manafort against the bank.  Even fraud by Manafort alone would have been expected to result
in evidence on Calk's phone given Calk's in-depth involvement in the loan and extensive
communications with Manafort on his phone.  Ultimately, Manafort was charged by the Special
Counsel in the Eastern District of Virginia with bank fraud against the Bank based on different
false representations to the Bank in connection with his loan application.  *See United States* v.
*Manafort*, 18 Cr. 83 (TSE) (E.D. Va.).  The jury hung as to the relevant counts, but Manafort
later admitted their factual basis in connection with his plea agreement in the District of
Columbia prosecution.  *See* Statement of the Offenses and Other Acts ¶¶ 52-54, *United States* v.

Calk complains that the affidavit does not lay out that Calk was personally involved in drafting or reviewing the credit approval memoranda (Mem. 23-24), or the circumstances in which this information would need to be presented to the full board of directors (Mem. 24 n.17), but these complaints are both strained.  There was certainly probable cause to infer basic principles such as the responsibilities of the directors to ensure the soundness of the Bank's loans and of Bank officers to keep accurate records.  And as to Calk's involvement in the credit approval memoranda, there was obviously probable cause to suspect that the CEO of the Bank was responsible for the Bank's official documentation of the justification of the loans, particularly given Calk's personal involvement in the loans and particularly given that the loans were so large that they exceeded the Bank's legal lending limit.  Whether or not Calk wrote the words on the memoranda, or reviewed those documents themselves, is beside the point—it is entirely reasonable to suspect that he caused, in some form or another, these failures of documentation, or was culpably willfully blind to others doing so.  The idea that these deficiencies in documentation came about without his involvement or awareness, and that that lack of awareness was innocent, is perhaps *possible*, but there was plainly probable cause to suspect the opposite.  Ultimately the fact that the official documentation of the largest loans of the Bank omitted mention of two serious credit risk factors for the borrower, in circumstances where the CEO of the Bank had unusual and extensive personal involvement in extending the loans and a clear corrupt motive to do so, created probable cause that these omissions were

---

*Manafort*, 17 Cr. 201 (ABJ) (D.D.C.) (ECF No. 423).  This resolution underscores that the circumstances set forth in the affidavit were highly suspicious and suggestive of bank fraud.

culpable, not accidental. [16]

5.      *Lack of Intent*

Even if any of this information were material, a *Franks* hearing would still be

inappropriate because of the lack of any showing that its omission "was 'designed to mislead' or

was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154.

Indeed, a search warrant affiant "does not necessarily act with 'reckless disregard for the truth'

simply because he or she omits certain evidence that a reviewing court, in its judgment,

considers to be 'clearly critical.'" *Id.*; *see also id.* at 155 (finding no intent where drafting team

"just didn't really think about" including omitted information); *Vilar*, 2007 WL 1075041, at *29

(finding no intent where affiant "never thought of" including omitted information).  Rather, the

defendant must "prove that the affiant in fact entertained serious doubts as to the truth of his

allegations." *Rajaratnam*, 719 F.3d at 154.  Calk has set forth no reason for the Court to believe

as much, particularly in light of the marginal—if any—relevance of the omitted information to

probable cause.

Indeed, far from showing any intent to mislead or reckless disregard, the circumstances

show the opposite.  As noted above, the affidavit included instances where Calk sought

additional collateral or refused to close the loan until the approval process was complete.  (Fisher

Aff. ¶¶ 56, 61).  This alone fatally undercuts the notion that the Government intentionally or

---

[16] Of course, even if the warrant had been defective as to the false statements or fraud offenses, which it was not, any evidence of these offenses would have also been within the scope of the warrant as to the honest services fraud offense, given the relevance of irregularities with the loan to Calk's corrupt intent.  Accordingly, any evidence supporting these fraud theories would have been subject to inevitable discovery as to the honest services fraud offense alone.

recklessly deceived the magistrate judge into thinking the loan offered no benefits to the Bank.[17]

It further shows that the affiant had no intent to shield information that arguably inured to Calk's

benefit. *See Vilar*, 2007 WL 1075041, at *27 (because "all storytelling involves an element of

selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem

significant"); *see also Mandell*, 710 F. Supp. 2d at 376 ("[A]llegations of omission potentially

open officers to endless conjecture about investigative leads, fragments of information, or other

matter that might, if included, have redounded to defendant's benefit." (internal quotation marks

omitted)).

### C.    The Government Was Not Required to Seek a New Warrant

Calk's claim that the Government was required to seek a new warrant because of self-

serving statements made by several witnesses in the brief period between obtaining and

executing the warrant is unpersuasive.  The statements, all by then-employees of the Bank who

were involved to some extent in the issuance of the loans, were the sort of self-serving denials of

wrongdoing that did not require revising the warrant, and largely concerned issues collateral to

the core evidence of a quid pro quo or false information.

All of the individuals who gave the complained-of statements on June 27, 2017 were

---

[17] While even an affirmative decision not to include information is not made with "intent" under
the legal standard unless designed to mislead or in reckless disregard of whether it would
mislead, the Government believes that several of these omissions concerned information of
which the investigative team was not even aware.  For example, Yohai's statements were made
in connection with a separate investigation that this Office did not participate in.  As noted
above, although the investigative team drafting the affidavit was aware the interview had taken
place and of some of the statements Yohai had made on other matters, they did not attend the
interview, did not have access at the time to the Form 302 written report of the statements, and
were not aware at the time that Yohai had made the statements that Calk complains were omitted
from the warrant affidavit.

employees or officers of the Bank who were involved in the processing of the loans, and thus had an obvious motive to minimize any improprieties or irregularities associated with the processing of the loans.  Such self-serving remarks have been held not to require resubmission of a duly issued warrant.  *See, e.g.*, *United States* v. *Marin-Buitrago*, 734 F.2d 889, 895-96 (2d Cir. 1984) (holding "as a matter of law" that a suspect's denial of identity did not require resubmission of a warrant because of the possibility of aliases and false identification documents, and because the new information "did not affect the veracity of the majority of the statements made in the affidavit"); *United States* v. *One Residential Property Located at 8750 Duncan Road, San Diego, CA*, 312 F. App'x 8, 10 (9th Cir. 2008) (summary order) (suspect's "self-serving statement to the searching officers that he no longer had the weapon for which police were searching" did not require resubmission of warrant).  Were it otherwise, the courts would be burdened with numerous resubmissions just to confirm that probable cause is not defeated by a bare denial of wrongdoing from an interested party.

Most of the remarks made in the interviews on June 27, 2017 concerned issues that bore little or no relevance to probable cause, such as Bank employees vouching for the quality of the loans, or claiming not to have observed pressure from Calk when there is no basis for suspecting that they would have necessarily been in a position to observe pressure.  While Raico's claim not to have felt pressure is relevant to the extensive emails showing Calk's determination to extend the loan, that does little to undermine that paper trail laid out in the affidavit, and in any case is not decisive as to the core issue of a corrupt quid pro quo.  Put simply, even if Calk had exerted no pressure whatsoever on his subordinates to close the loans, it would have been equally corrupt for Calk to solicit and accept things of value in exchange for the loans.  *See Rosen*, 716 F.3d at

28

701 ("Payments to State legislators may constitute bribes even if the legislator's resulting actions are otherwise 'routine'[.]"); *Skelos*, 707 F. App'x at 739 (citing *id.*).

Similarly, the new information would not have dissipated probable cause as to the bank fraud offenses. Calk notes that Brennan, one of the Bank officers involved in the loan approval process, told the FBI that Manafort's default on the prior California loan would not have affected the loan decision. (Mem. 13, 24). Since a portion of the fraud and false statement offenses was based on the fact that the credit approval memoranda omitted mention of this default, *see supra* Section I.B.4, Calk claims that Brennan's statement downplaying the significance of this default would have negated probable cause as to these offenses. (Mem. 24). But this is a non sequitur. First, Brennan's statement concerned just one of the suspicious omissions from the credit approval memorandum (the California default), and there is good reason to believe that the other omission (the Brookyln default and foreclosure action) would have been more significant, both since the filing of a lawsuit is a more serious step and since—unlike the California default—it concerned collateral used by the Bank in its loans. Second, Brennan's statement that this omission would not have had an impact on the loan decision is not relevant to at least the fraud in connection of the extension of credit offense specified in 18 U.S.C. § 1014, which does not require materiality. *See, e.g.*, *United States* v. *Wells*, 519 U.S. 482, 484 (1997) (holding materiality of falsehood is not an element of a Section 1014 violation).[18]

More fundamentally, Brennan's claim that this omitted information would not have impacted the loan decision does not negate probable cause that this information is material.

---

[18] It is also, of course, irrelevant to the honest services fraud offenses, which again would have led to the inevitable discovery of the same evidence in any case.

Brennan's views as someone involved in the loan process are perhaps relevant, but are hardly dispositive given that he was not a member of the credit committee or a director of the bank, and had a clear motive to minimize irregularities in talking to law enforcement.  Indeed, at Manafort's trial Brennan ultimately testified that he considered this information highly material. *See* Tr., 8/13/18, at 2196-97, *United States* v. *Manafort*, No. 18 Cr. 83 (TSE) (E.D. Va.) (ECF No. 282).[19]  This subsequent testimony just underscores how little weight his initial self-serving statements carried.  Given the number of additional suspicious factors concerning the loans such as Manafort's urgent need for money, wildly varying income figures, and Calk's noteworthy personal involvement and motive to close the loan by any means necessary (Fisher Aff. ¶¶ 27-28, 35-37, 39-45, 47-49, 50-61), Brennan's self-serving statement downplaying the significance of one of the omissions simply did not nullify probable cause.

Moreover, even were these statements material, any showing of intent is wholly absent. The context for these statements was a coordinated and multistate effort to interview a number of witnesses, and an unanticipated one-day delay in the execution of the warrant, which would

---

[19] Brennan's testimony that this information was highly significant to a lender was explicit and consistent with common sense:

> A. The [California] loan was in default at that time, and also we were to later find out that the [Brooklyn] loan was also in default.

> Q. Would that have been relevant information in your decision with respect to Mr. Manafort's loans if he had been in default with respect to other properties?

> A. Yes, it would be.

> Q. Why?

> A. Again, it goes to the ability of the borrower to service his debt.

*Id.*

otherwise have been executed concurrently with the statements.[20]  There may be some cases in which, even during complex and fluid circumstances of this sort, it could still be deliberately or recklessly misleading for law enforcement officers not to immediately assimilate such information and resubmit a warrant—for example if an unbiased witness credibly established mistaken identity or some other fatal flaw.  The statements at issue here, however, involving whether the declarants observed irregularities at different points in a set of complex commercial transactions, are not of the plainly exculpatory or material variety that required law enforcement to synthesize and analyze them overnight before executing the warrant the next day.  At a minimum, the circumstances evince a glaring lack of bad intent.  *Cf. Rajaratnam*, 719 F.3d at 155 (finding no intent where drafting team "just didn't really think about" including omitted information); *Vilar*, 2007 WL 1075041, at *29 (finding no intent where affiant "never thought of" including omitted information).

## II.    INSPECTION OF THE GRAND JURY TRANSCRIPTS IS UNWARRANTED

Calk seeks the extraordinary relief of inspection of the grand jury transcripts to see whether the Government disclosed allegedly exculpatory information to the grand jury.  (Mem. 25-27).  Because the Supreme Court has squarely held this is not a ground for relief, and because the information he speculates may not have been presented is not material exculpatory information in any case, this motion should be denied.

### A.    Legal Standard

The bar for obtaining disclosure of grand transcripts is exceedingly high, and such relief

---

[20] The agents had planned to execute the warrant on the morning of June 27, 2017, concurrently with the interviews of the other bank employees.  However, they were unable to locate Calk at that time and made arrangements to meet him the next day to execute the warrant.

is never granted absent extraordinary circumstances.  That is because grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process."  *United States* v. *R. Enters., Inc.*, 498 U.S. 292, 301 (1991).

The "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211, 218 (1979).  Indeed, "[s]ince the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye.  The rule of grand jury secrecy . . . is an integral part of our criminal justice system."  *Id.* at 218 n.9.  This fundamental presumption of grand jury secrecy is now embodied in Rule 6(e) of the Federal Rules of Criminal Procedure.  A party seeking disclosure of grand jury material under Rule 6(e) must make "a strong showing of particularized need" for the material sought.  *United States* v. *Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983); *see also Dennis* v. *United States*, 384 U.S. 855, 870 (1966); *Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395, 400 (1959); *United States* v. *Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958).  A review of grand jury transcripts "should not be permitted without concrete allegations of Government misconduct."  *United States* v. *Leung*, 40 F.3d 577, 582 (2d Cir. 1994).

In *United States* v. *Williams*, the Supreme Court rejected a defense request to dismiss an indictment over the Government's alleged failure to disclose "substantial exculpatory evidence" that lower courts had found "rendered the grand jury's decision to indict gravely suspect," 504 U.S. 36, 38-39 (1993), holding instead the Government does not have a "legal obligation to present exculpatory evidence" to the grand jury, *id.* at 52.  Second Circuit cases prior to *Williams*

32

held that an indictment could be dismissed for failure to present to a grand jury exculpatory

evidence that was "substantial" and "might reasonably be expected to lead the [grand] jury not to

indict." *United States* v. *Casamento*, 887 F.2d 1141, 1183 (2d Cir. 1989) (internal quotation

marks omitted). These cases were overruled by *Williams*. *See United States* v. *Dunn*, No. 05 Cr.

127 (KMK), 2005 WL 1705303, at *4 n.7 (S.D.N.Y. July 19, 2005) (noting overruling of

*Casamento*, remarking "*Williams*, however, explicitly rejected such a rule.").[21]

　　An indictment may be dismissed where a prosecutor's conduct amounts "to a knowing or

reckless misleading of the grand jury as to an essential fact," *United States* v. *Lombardozzi*, 491

F.3d 61, 79 (2d Cir. 2007), but if this rule can be violated by the failure to present exculpatory

evidence at all, such a failure must necessarily be more egregious than the allegation in *Williams*.

### B.　Calk Has Made No Showing of Any Irregularity Justifying Inspection of the Grand Jury Transcripts

　　Calk's motion falls far short of the standard required for the extraordinary relief he seeks.

Even under the old standard before the Supreme Court's decision in *Williams*, there is no

showing whatsoever that the government failed to present "substantial" exculpatory evidence

that "might reasonably be expected to lead the [grand] jury not to indict," *Casamento*, 887 F.2d

at 1183. This court need not decide whether there are any circumstances in which some form of

legal duty to present exculpatory evidence to the grand jury could survive *Williams*, because on

any such standard Calk has made no showing of any likelihood of a violation.

　　Calk's motion can be disposed of simply by comparing the evidence he speculates may

---

[21] A district court recently cited this old line of cases, *see United States* v. *Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2120022, at *4 (S.D.N.Y. May 2, 2019), but this citation was dicta, as that case did not involve any failure to present exculpatory evidence of that character.

not have been presented to the grand jury to the pre-*Williams* legal standard.  The supposedly exculpatory information Calk cites largely relates to secondary issues such as the quality of the loans (Mem. 14), or the significance of Jared Kushner's recommendation of Calk (Mem. 15).  As to the loan quality issues, as discussed above, these issues are far from central to probable cause in the first place, and let alone so plainly material that they would have led the grand jury not to indict.  And as to the strength of Kushner's recommendation, that was not alleged to be the cause of Calk's Trump Tower interview (*compare* Ind. ¶ 24(c) *with* Ind. ¶ 25(a), (d)) or, of course, the campaign position, so this could hardly be expected to have affected the grand jury's decision to indict one way or the other.

Calk further claims there is reason to believe the grand jury was not informed that Manafort denied engaging in a quid pro quo with Calk.  As an initial matter, Manafort's statements themselves are more ambiguous than Calk's summary indicates.  Calk relates Manafort claiming that he "delinked his helping Calk get a position in the Administration with Manafort getting a loan" (Mem. 14), but neglects to include Manafort's subsequent statement that he "never discussed with Calk his belief that the actions were not linked" (Schoeman Decl. Ex. I at 6), or any of Manafort's statements suggesting that in fact the two items were more linked in his mind, such as Manafort's statement that "[e]arly on, Manafort and Calk discussed how their relationship could be mutually beneficial.  Calk could help Manafort with his loans and help on the Campaign.  Manafort could get Calk into the Administration, could serve[] on his Board, and could bring Calk other business."  (Schoeman Decl. Ex. I at 3-4).

Similarly, Calk fails to relate that Manafort made a comment expressing his view that in *Calk's* mind the loans and Calk's candidacies were linked: in that same interview, Manafort

claimed that he exaggerated his influence with the PTT (when he claimed in an email to have been "involved directly" with the PTT) in part "because Calk was considering Manafort for a loan." (Schoeman Decl. Ex. I at 3). In other words, Manafort claimed that he believed that Calk would be more likely to extend Manafort loans if Calk thought that Manafort could get him a government position. Indeed, Manafort also stated that he did not "believe that he would have received the loans anywhere else at the time. At a minimum, it would have been more complicated." (Schoeman Decl. Ex. I at 3). This remark, if credited, is also evidence of Calk's motive and intent.

Of course, there is good reason to doubt whether Manafort's remarks—both those denying a quid pro quo and those tending to admit at least his belief that Calk had corrupt intent—would have been credited, given that Manafort was found to have breached his cooperation agreement by providing false information to the Special Counsel's Office during the course of his cooperation. *See United States* v. *Manafort*, No. 17 Cr. 201 (ABJ) (D.D.C. Feb. 13, 2019) (ECF No. 509). Such credibility issues further undermine the idea that a grand jury's decision whether to indict Calk would turn on whether Manafort's statements were disclosed to them.

But more fundamentally, even if Manafort were entirely innocent with respect to these loans, and only the exculpatory portions of his statements were credited, Calk would still be guilty based on the evidence of *Calk's* intent. Calk committed the offense when he solicited the things of value, whether or not Manafort even understood that Calk had corrupt intent. *See, e.g.*, *United States* v. *Gallo*, 863 F.2d 185, 189 (2d Cir. 1988) (considering section 201 bribe offering charge, noting that "[t]o find such intent [i.e., the bribe offeror's intent to influence], the public

35

official who is the target of the bribe *need not be aware of the bribe*" (emphasis added)); *see also, e.g.*, *Evans* v. *United States*, 504 U.S. 255, 257, 268 (1992) (affirming extortion conviction in undercover operation where putative bribe payor was actually a law enforcement officer and thus lacked criminal intent).[22]  It is thus impossible to imagine how the grand jury's decision to indict could turn on these statements at all, and therefore how even under the pre-*Williams* standard—which is no longer applicable—there would be any basis for inspecting the grand jury minutes.

### III.   THE GOVERNMENT'S CORRESPONDENCE WITH THIRD PARTIES IS NOT DISCOVERABLE UNDER RULE 16

Calk seeks the wholesale discovery of the Government's investigatory correspondence with third parties, claiming vaguely that these documents will help him understand the discovery that has been produced in some way.  (Mem. 27-30).  Because he has not articulated any valid respect in which this correspondence is material, this request should be denied.

### A.    Legal Standard

Federal Rule of Criminal Procedure 16(a)(1)(E)(i) requires the government to permit the defendant to inspect and copy documents within the government's possession, custody or control

---

[22] For these purposes, courts apply a similar standard whether considering the intent to offer a bribe (such as in *Gallo*), or the intent to receive or solicit a bribe (such as here).  *See, e.g.*, *United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999) (requiring "a specific intent to *give or receive* something of value *in exchange* for an official act" (first emphasis added)); *United States* v. *Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) (citing bribe-acceptance discussion in *United States* v. *Brewster*, 408 U.S. 501, 526 (1972), to aid in interpreting bribe-offering element); *see also, e.g.*, *United States* v. *Silver*, 184 F. Supp. 3d 33, 46 n.5 (S.D.N.Y. May 3, 2016) (citing *Ring*, holding that for honest services fraud charge "[t]he Government must only prove that Silver—not the bribe giver—understood that, as a result of the bribe or kickback, he was expected to exercise official influence or make official decisions for the benefit of the giver"), *rev'd on other grounds*, 864 F.3d 102 (2d Cir. 2017).

if they are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indiction that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States* v. *Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted). It is the defendant's burden to establish materiality to prevail on a motion for discovery. *Id.*

### B.     The Requested Correspondence is Not Discoverable Under Rule 16

In this motion, Calk seeks, not factual information obtained from the OCC and the PTT, but correspondence regarding its production. While the Government is aware of its obligations to produce evidence that meets Rule 16's materiality test and is complying with it, requiring wholesale production of correspondence with third-party witnesses goes well beyond Rule 16's materiality standard.

None of the purposes for which Calk seeks these documents would enable him "significantly to alter the quantum of proof in his favor." *Maniktala*, 934 F.2d at 28 (internal quotation marks omitted). Calk claims to have difficulty understanding materials produced by the OCC and PTT, and claims that the Government's subpoenas or requests for information will assist in this comprehension. The Government is unaware precisely what problems Calk has in understanding these documents (besides that the productions are "small," Mem. 28), or why he believes the Government's correspondence will "answer many of [his] questions" (Mem. 28), but it almost certainly will not. If there are specific documents that Calk has questions about, he can engage with the Government through the good-faith negotiation process contemplated by Local Criminal Rule 16.1. The Government has been engaging in that process by identifying for the

37

defense the location of certain items in our production, explaining the source of redactions in the

documents the PTT produced to us, providing Calk with the privilege log we received, and

identifying for them the PTT's counsel to direct further inquiries.[23]  We are unaware of what

other issues counsel has identified, let alone why those issues require the Government's

correspondence with the OCC, but stand ready to confer with counsel in an attempt to answer

any of their questions.[24]

      Calk's other claimed basis for seeking such materials is that he believes they will help

him frame a Rule 17 subpoena.  This is puzzling, and also not a basis to require production under

Rule *16*.  To the extent Calk believes he has a basis for a subpoena to either the OCC or the PTT

for discoverable evidence, he can seek one regardless of what correspondence the Government

has had with these bodies.

      In any event, reasons such as Calk urges do not make documents "material to the

defense."  When defendants ask to see third-party documents in order to "save them time in

sifting through discovery," *United States* v. *Rigas*, 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003),

such requests are denied, *see id.* at 307. "Material" in the meaning of Rule 16 is not simply a

synonym for anything that a defense counsel might want to make some sort of use of.  *See id.*

(rejecting defense "attempt to equate 'material' with 'useful'" and denying motion for disclosure

of third-party documents relating to subject matter of case).[25]

---

[23] For example, Calk objects that some of the privilege log entries provide insufficient
information.  (Mem. 17).  Any such questions should more properly be directed to the PTT's
lawyer, who prepared the log, than to the Government's file of correspondence.

[24] Calk has not identified to the Government the materials he believes are missing attachments,
or the materials whose provenance he seems to question.  (Mem. 17-18).

[25] Calk is also wrong to claim that there is no reason not to order the production of this material.

The support Calk adduces for his request actually demonstrates its impropriety.  Calk relies principally on a decision by Judge Kaplan in *United States* v. *Stein*, requiring the disclosure of some correspondence between an auditing firm and the Government.  (Mem. 29).  But what the court ordered in *Stein* is far removed from Calk's request.  In addition to a white paper prepared by KPMG, an accounting firm cooperating with the government, and draft statements of facts between KPMG and the government, the defendant requested correspondence "relating to the underlying facts, KPMG's cooperation with the USAO's investigation, and related matters."  *United States* v. *Stein*, 488 F. Supp. 2d 350, 357 (S.D.N.Y. 2007).  The court examined the white paper and found that a portion of it—setting forth a factual narrative of a portion of the conduct charged in the indictment—was material to the defense for the straightforward reason that it set forth an explanatory narrative of the charged events.  *Id.* at 359.  Similarly, the court found the drafts of the statements of facts shed light on the underlying factual matters at issue.  *Id.*  As to the correspondence, he ordered the portions "that relate to the facts at issue in this indictment" produced as plainly material, but *rejected* the request to produce the rest.  *See id.* ("To the extent that this category sweeps more broadly, however, the Court is

---

(Mem. 28).  In fact, there is every reason to apply Rule 16 according to its terms and not to stretch it into such materials.  In a civil case, correspondence with a witness (at least one who would not be expected to disclose the correspondence to a litigation adversary) would be squarely covered by the work product protection.  *See, e.g.*, *Plew* v. *Limited Brands, Inc.*, No. 08 Civ. 3741 (LTS) (MHD), 2009 WL 1119414, at *2 (S.D.N.Y. Apr. 23, 2009) (upholding protection as to emails with non-party).  Under the criminal rules, the mechanisms for protecting such work product are different (operating partly through the explicit carve-out in Rule 16(a)(2), partly through Rule 26.2, and partly through the definition of discoverable information in Rule 16(a)(1)(E)) and the scope of the protection is somewhat different in ways that do not matter here (for example, protected witness statements may be discoverable in a criminal case under 18 U.S.C. § 3500), but this simply underscores the importance of applying the criminal rules according to their terms and not ordering wholesale disclosure.

unpersuaded that it seeks material disclosure."). In particular, in rejecting the request insofar as it related to "KPMG's cooperation with the USAO's investigation," *id.* at 357, the *Stein* court rejected a request for materials roughly analogous to what Calk seeks here—correspondence not about the facts themselves but about the document production.[26] Indeed, even some of the materials the *Stein* court ordered produced would appear most naturally to be witness statements covered by 18 U.S.C. § 3500, and not Rule 16 material. *Cf. Rigas*, 258 F. Supp. 2d at 307 (finding that results of corporate internal investigation are not material to the defense and not discoverable unless they contain *Brady* or Jencks Act material, citing *United States* v. *Reddy*, 190 F. Supp. 2d 558 (S.D.N.Y. 2002)).

The Government is aware of its obligations to produce material relating to the facts to be proven at trial, either as Rule 16 discovery or as witness statements covered by 18 U.S.C. § 3500 and Rule 26.2, *see* Fed. R. Crim. P. 16(a)(2) (exempting such material from Rule 16 discovery). But there is no justification for ordering the production to Calk of categories of investigatory correspondence, in the absence of any persuasive showing that they will "alter the quantum of proof in his favor" in any way. *Maniktala*, 934 F.2d at 28; *see also id.* ("[I]t is incumbent upon a defendant to make a *prima facie* showing of materiality[.]" (internal quotation marks omitted)).

## IV.    THE MOTION FOR CHANGE OF VENUE SHOULD BE DENIED

Calk seeks to transfer this case to the Northern District of Illinois where he resides. (Transfer Mem. 3-11). Because Calk identifies no factors warranting this transfer besides his bare preference to be tried in his district of residence—which is insufficient under the law even

---

[26] Calk also cites an order from the District of New Jersey directing production of correspondence (Mem. 29-30 & Schoeman Decl. Ex. K). Without any supporting reasoning, this terse order is not persuasive.

for defendants less able than Calk to bear the inconvenience of a trial in this district—this motion should be denied.

### A.   Legal Standard

"As a general rule a criminal prosecution should be retained in the original district" where the case was charged.  *United States* v. *Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982); *accord United States* v. *Kirk Tang Yuk*, 885 F.3d 57, 74 n.5 (2d Cir. 2018).  Discretionary transfers of venue are governed by Federal Rule of Criminal Procedure 21(b), which provides that, "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district."  Fed. R. Crim. P. 21(b).  The "burden is on the moving defendant to justify a transfer under Rule 21(b)."  *United States* v. *Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (Sotomayor, J.) (quotation marks omitted).  Furthermore, the moving defendant must provide "factual substantiation" for his contentions that a transfer is in the interests of justice.  *United States* v. *Williams*, 437 F. Supp. 1047, 1051 (W.D.N.Y. 1977); *see also Spy Factory*, 951 F. Supp. at 456 ("the court must rely on 'concrete demonstrations'" of fact).

In *Platt* v. *Minnesota Mining and Manufacturing Co.*, the Supreme Court introduced a list of factors that courts routinely consider in analyzing a defendant's motion to transfer venue: (1) location of defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district involved; and (10) any other special elements which might affect the transfer.  *Platt* v. *Minnesota Mining & Mfg. Co.*,

41

376 U.S. 240, 243-44 (1964).  "No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (quotation marks and brackets omitted).

Generally speaking, the trend has been to deny such motions.  *See United States* v. *Quinn*, 401 F. Supp. 2d 80, 85-86 (D.D.C. 2005) (citing cases and treatises).  This trend recognizes that, since the time that *Platt* was decided in 1964, "the massive expansion of technology and the relative decline in costs for long-distance travel over the past few decades" have greatly reduced the circumstances where transfer is justified.  *Id.* at 86.

**B.      Discretionary Transfer of Venue is Not Appropriate**

In this case, the relevant factors do not justify deviation from the "general rule" that "a criminal prosecution should be retained in the original district" where the case was charged, *Posner*, 549 F. Supp. at 477.  While a trial outside the defendant's district of residence will impose some inconvenience for Calk, as it does for any defendant, this factor standing alone is insufficient and indeed the defendant, who is wealthier than most defendants, is far better able to bear this inconvenience than are numerous defendants for whom motions to transfer are denied. As all of the other factors are neutral or weigh against transfer, this motion should be denied as well.

**1.      *Residence of the Defendant***

While there is no dispute that Calk currently resides in the Northern District of Illinois, that fact alone does not justify transfer.

It is well established "that inconvenience of the defendant or his business is not, by itself, a sufficient basis for a transfer," *United States* v. *Conner*, No. 00 Cr. 731 (GBD), 2001 WL

114314, at *3 (S.D.N.Y. Feb. 9, 2001) (quoting *United States* v. *Culoso*, 461 F. Supp. 128, 136 (S.D.N.Y. 1978)); *United States* v. *Antia*, No. 97 Cr. 733 (RJD), 1999 WL 294788, at *2 (E.D.N.Y. Mar. 22, 1999), and a defendant's residence, standing on its own, "has no independent significance in determining whether transfer to [a different] district would be 'in the interest of justice." *United States* v. *Stein*, 429 F. Supp. 2d 633, 645-46 (S.D.N.Y. 2006) (denying transfer to another district in multi-defendant case where some defendants were from Texas and California). In fact, the law is clear that "[a] Court should not give any factor preeminent weight . . . ." *Spy Factory*, 951 F. Supp. at 455 (citing *Maldonado-Rivera*, 922 F.2d at 966 ("No one of these considerations [the *Platt* factors] is dispositive")). While it is true that courts should give consideration to trying defendants where they reside, *United States* v. *Russell*, 582 F. Supp. 600, 662 (S.D.N.Y. 1982), courts have noted that this "policy" of trying defendants in their district of residence is "in tension with the more general presumption that a criminal prosecution should be retained in the original district." *Spy Factory*, 951 F. Supp. at 464.

Accordingly, a defendant's desire to litigate the case in the district of his residence is not, in itself, sufficient to warrant transfer. *See United States* v. *Valdes*, No. 05 Cr. 156 (KMK), 2006 WL 738403, at *4 (S.D.N.Y. Mar. 21, 2006) . Such a rule recognizes that "a defendant would always like to be close to his loved ones," *Valdes*, 2006 WL 738403, at *4 (quoting *United States* v. *Layne*, No. 05 Cr. 87 (HB), 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005)), and that such a consideration must be counterbalanced against the presumption that a criminal case is to be tried where it is brought.

"'Every life is significantly disrupted during a trial no matter where it is held. Besides the need to be in court every day, the evenings and weekends are usually consumed analyzing

the evidence that has been admitted and preparing for the remainder of trial.'" *United States* v. *Christian*, No. 12 Cr. 41 (KBF), 2012 WL 1134035, at *1 (S.D.N.Y. Apr. 2, 2012) (quoting *United States* v. *Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *1 (S.D.N.Y. July 13, 2001)); *see also United States* v. *Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411, at *3 (S.D.N.Y. Jan. 16, 2014) (quoting *Wilson*).

The duration of any disruption here—which would occur regardless of where Calk is tried—is not nearly so long as in other cases where motions to transfer have been denied.  The Government anticipates the trial in this matter may last approximately three to four weeks.  In *United States* v. *Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006), for example, Judge Kaplan denied a motion to transfer for the convenience of the defendants where trial was anticipated to last between six and eight months.  *Id.* at 645; *see also Wilson*, 2001 WL 798018, at *3 (denying motion to transfer where trial was estimated to last six to eight weeks notwithstanding the burden on the defendant's family).

Moreover, the defendant here is better positioned to bear any inconvenience than many defendants for whom motions to transfer are denied.  The defendant, who was released on a $5 million bond and owns two-thirds of the Holding Company (which owns the entirety of the Bank), is extremely wealthy and is not currently employed.  He therefore has more resources than most to make arrangements to mitigate the undoubted inconvenience of a trial in this District, and as noted below the trial will not at all impact, let alone substantially, his business or employment.  *See, e.g.*, *Larsen*, 2014 WL 177411, at *3 (denying transfer where indigent defendant lived in another state and would be unable to care for his children or attend his job at pizzeria during trial).  Indeed, during the pendency of the case, defense counsel attempted to

secure the Government's consent for Calk to travel internationally with his family for approximately two weeks this October.[27]  While of course a trial in this District—or any district—will impose some inconvenience on the defendant and his family, his willingness to travel for a substantial period underscores his ability to mitigate this inconvenience.  It should also be noted that in the course of this offense, Calk willingly traveled to this District on several occasions, and that the entire thrust of his offense was an attempt to obtain senior governmental positions for which he would necessarily have to relocate to the Washington, D.C. area.  He cannot be heard to claim that relocation to the East Coast would be worth his while for a job but not for his criminal trial.  This is thus not a case where the defendant's interests in a trial near his residence are unusually strong due to an extraordinary circumstance; rather, the interests here are weaker than the usual case.

2.     *Location of Witnesses*

The location of witnesses who are likely to be called at trial does not weigh in favor of transfer.  Calk does not show, as required, that any Government or defense witness would be unable to attend trial in this District, and several critical witnesses reside in the New York area.  In these circumstances, courts repeatedly find that this factor does not favor transfer.

A defendant claiming that the location of witnesses warrants a transfer of venue bears the burden of offering the Court "specific examples of witnesses' testimony and *their inability to testify* because of the location of trial."  *Spy Factory*, 951 F. Supp. at 456 (emphasis added).  The "naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not

---

[27] The Government refused to consent, and the defendant did not ultimately seek permission from the Court to make such a trip.

suffice for transfer." *Id.*; *see also United States* v. *Juncal*, No. 97 Cr. 1162 (JFK), 1998 WL

473949, *5 (S.D.N.Y. Aug. 7, 1998) ("there is no basis to grant the motion to transfer" where

defendant fails to make "a specific proffer of testimony from specific witnesses to allow the

court to make an informed decision about the importance of these witnesses to [the defendant's]

case").  Rather, "the court must rely on concrete demonstrations of the proposed testimony." *Spy*

*Factory*, 951 F. Supp. at 456 (quotations and citations omitted).  Moreover, "in this age of easy

air travel, this factor is generally much less relevant than it was in 1964, when the Supreme

Court decided *Platt*." *United States* v. *Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154, at *1

(S.D.N.Y. 2004).

Here, Calk identifies approximately 20 potential Government witnesses in the Northern

District of Illinois and approximately 8 in the New York area, and also claims that an unspecified

number of defense witnesses, apparently principally or entirely character witnesses, will be from

the Chicago area.  (Transfer Mem. 7-8).  While the decisions of precisely which witnesses to call

will be made closer to trial, his figure of 20 witnesses from the Northern District of Illinois is

likely considerably higher than those the Government will ultimately call.  Even accepting this

count, however, this falls far short of a showing justifying transfer.  Many of the witnesses reside

in the New York area, and in any event Calk makes no claim that any witnesses would be unable

to attend trial in this district.  The Government expects to pay or reimburse the travel and lodging

costs of the witnesses it calls in its case-in-chief who reside outside of the New York area.

In these circumstances, courts repeatedly find that this factor does not weigh in favor of

transfer. *See, e.g.*, *United States* v. *Pastore*, No. 17 Cr. 343 (NSR), 2018 WL 395490, at *3-4,

(S.D.N.Y. Jan. 11, 2018) (location of witnesses did not favor transfer where Government would

assume travel costs of key out-of-district witnesses, and one law enforcement witness resided in New York area); *United States* v. *Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008) ("bare assertion" of hardship was insufficient to tip this factor in favor of transfer); *Stein*, 429 F. Supp. 2d at 645-46 (location of the witnesses did not support transfer where defendants failed to put forward any evidence that potential defense witnesses would be unable or unwilling to travel to the Southern District of New York); *Ebbers*, 2004 WL 2346154, at *1 (defendant did not allege that "witnesses would be unable to testify in New York, that he would be unable to call them, or that he would be financially incapable of paying such witness' expenses").  So too here.

3.    *Location of Events*

The location of the charged events—in which Calk used loans extended by his bank's Manhattan office, including on a property a few miles from Manhattan, to a borrower who was for part of the time managing a presidential campaign headquartered in Manhattan, to corruptly solicit assistance in obtaining an appointment from the Manhattan-based campaign and an interview in Manhattan with the PTT—weigh strongly against transfer.  The conduct described in the indictment occurred both in this District and in the Northern District of Illinois, as Calk acknowledges in not contesting a basis for venue (Transfer Mem. 9), but the conduct was squarely directed at this District, and this factor does not warrant transfer.

In his motion, Calk seriously understates the number and the significance of the acts that took place in this District.  Calk's first solicitation of a position from Manafort took place during a meeting between Manafort and Raico in Manhattan, in which Calk participated by videoconference—transmitting by video his request to Manafort in Manhattan.  (Ind. ¶ 13).  Calk and his subordinates on the Bank's credit committee then conditionally approved the California

47

refinance and transmitted the terms to Raico, in Manhattan, to communicate to Manafort on an unusually fast one-day turnaround.  (Ind. ¶ 14).  Manafort, who was at the time the chairman of the Manhattan-based Trump presidential campaign, then solicited Calk's resume—first from Raico, who was based in Manhattan—and swiftly appointed Calk to a prestigious advisory committee.  (Ind. ¶¶ 15-16).

The offense conduct continued to take place in this District through the process of underwriting and modifying the loan.  During this period, the Manhattan-based Raico was Manafort's principal point of contact for the loan, although Calk also had regular contacts with Manafort and met him in New York for a meeting in September 2016 to discuss a restructuring of the loan (while Calk was in town to attend the presidential debate in his capacity as a Trump campaign surrogate).  Calk's later decision to extend the loans following the presidential election also involved frequent contacts with the New York-based Raico.

Calk's solicitation of assistance in obtaining a government position following the election was also directed at New York.  Notably, in one of the most nakedly corrupt acts making up the offense, Calk called Raico and asked him to ask Manafort if Calk was in consideration for Secretary of the Treasury—an extraordinary request to channel through Manafort's loan officer, particularly given that Calk and Manafort were in regular direct contact—while Raico was working in Manhattan.  (Ind. ¶ 23(b)).  And of course Manafort's assistance secured for Calk an interview at Trump Tower, in Manhattan, for Under Secretary of the Army, near the time of the closing of the final loans.  (Ind. ¶ 25(d)).

Accordingly, while Calk was in Chicago for much of this conduct, and other Bank employees performed loan-related functions there, the conduct was repeatedly and deliberately

48

directed at this District as well, including the acts making up the core actus reus of the offense—

the solicitation of things of value in a corrupt quid pro quo—all with the deliberate aim of

corruptly receiving benefits extended, in significant part, in this District.  *See, e.g.*, *Wilson*, 2001

WL 798018, at *2 (denying transfer even where the "principal activities in connection with the

alleged scheme" took place in other districts, where there were meetings and conference calls

with individuals based in New York and scheme had impacts in New York); *Pastore*, 2018 WL

395490, at *4 (where most criminal activity took place in other district but defendant withdrew

and spent fraudulently obtained money in New York, venue was "equally proper" in both

districts and this factor was "neutral").  This factor, therefore, weighs against transfer or at a

minimum is neutral.

### 4.  *Disruption of the Defendant's Business*

Given that Calk is currently unemployed, this factor does not support transfer.  *See*

*United States* v. *Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *18 (S.D.N.Y. Dec. 11,

2017) ("[D]isruption of the moving Defendants' businesses is a moot point because they have

since resigned.").  The disruption in the Bank's business caused by witness travel to New York

could not possibly be expected to have more than a de minimis impact on Calk's share in the

Holding Company.  This is the case not merely because the Government expects to be able to

reimburse its witness travel expenses, or because a bank with hundreds of millions of dollars in

business is to be expected to have a handful of executives traveling domestically from time to

time in the regular course of business, but also because the Bank currently maintains an office in

this District within walking distance of the courthouse.  *See* The Federal Savings Bank, *Our*

*Locations: New York, New York*, https://www.thefederalsavingsbank.com/about/our-

locations/new-york---new-york.  This factor obviously does not favor transfer.

5.      *Expenses to the Parties*

The expenses to the parties weigh against transfer.  Calk does not dispute that the Government will bear significant costs in relocating the trial and investigative team to the Northern District of Illinois.  (Transfer Mem. 10-11).  Courts in this District have repeatedly denied transfer motions in part because the expense of transfer to the Government was too significant to warrant transfer.  *See, e.g.*, *United States* v. *Canale*, No. 14 Cr. 713 (KBF), 2015 WL 3767147, at *4 (S.D.N.Y. June 17, 2015) (denying transfer where it "would require the Government to transport and house two prosecutors, as well as a paralegal and several case agents"); *Ebbers*, 2004 WL 2346154, at *2 ("It would impose an enormous burden on the government to move the prosecutors, investigators, support staff, court staff, and others familiar with the case . . . to another jurisdiction"); *United States* v. *Carey*, 152 F. Supp. 2d 415, 422-23 (S.D.N.Y. 2001) (denying transfer motion on the basis that "if venue is transferred to the District of Columbia, the effect is merely to shift the economic burden to the government").

Weighed against these costs and the presumption that a case should be tried in the original district, Calk does not identify any impact on him sufficient to tip this factor towards transfer.  In deciding whether to transfer a case for convenience, courts in this District focus on whether the expenses that the defendant will incur trying a case in Manhattan will affect his ability to mount a defense.  Where courts have found that the expense of a trial in New York City, no matter how significant, will not prejudice a defendant's ability to defend himself, courts have denied transfer motions.  *See Spy Factory*, 951 F. Supp. at 459 (holding that factor of expenses did not weigh in favor of the defendants where "defendants Kimball and Spy Factory, Inc. have not demonstrated that they are financially incapable of funding their defense"; motion for transfer denied); *see, e.g.*, *Canale*, 2015 WL 3767147, at *4 ("The 'expense' factor also

weighs against transfer: While defendant has represented that it would cost substantially more to defend this case in New York . . . , he has not estimated his projected expenses and has not alleged that he has insufficient funds to cover them."); *Wilson*, 2001 WL 798018, at *2 (denying transfer motion where one defendant was paying for wife and two sons to relocate to New York); *United States* v. *Aronoff*, 463 F. Supp. 454, 460-61 (S.D.N.Y. 1978) (denying transfer motion where defendant "does not state that he would be financially unable to either return to Detroit periodically during trial, or to bring his family with him.").

Here, Calk is far more able than most defendants to absorb the expense of trial in New York. *See United States* v. *Flom*, No. 14 Cr. 507 (RRM), 2015 WL 6506628, *7 (E.D.N.Y. Oct. 27, 2015) ("[T]he focus of this factor is the defendant's ability to pay, not the size of the expense."); *United States* v. *Riley*, 296 F.R.D. 272, 277 (S.D.N.Y. 2014) (expense factor generally afforded serious weight only in cases involving indigent defendants). Indeed, this factor does not count in favor of even *indigent* defendants if they cannot show concretely that the expense would disrupt their trial preparation. *See Pastore*, 2018 WL 395490, at *4 (finding that expense did not justify transfer where indigent defendant did not identify specific trial preparation he could not undertake without transfer). Calk, by contrast, is wealthy enough to be released on a $5 million bond and owns two-thirds of the equity of the Holding Company, which owns the Bank. Calk here offers nothing more than "a bald assertion that a trial out of a defendant's home district would be more expensive than if the trial were held in the defendant's home district." *Valdes*, 2006 WL 738403, at *7. He makes no showing of how the expense of a trial in the Southern District of New York might prejudice the quality of his defense, nor is any such showing plausible in light of his resources. In sum, Calk has not met his burden of showing

that any added expense of trying this case in this District warrants a transfer of this case in the interests of justice.

### 6.    *Location of Defense Counsel*

This factor does not weigh in favor of transfer.  Although Calk continues to be represented by counsel in Chicago, he is also represented by highly respected New York counsel.  And because the defendant and his Chicago counsel are located in the same area, there will be no inconvenience to either in working together to prepare for trial.  The only potential inconvenience would be their appearance for the trial in New York, which hardly is an undue burden.

The defendant's interest in a more convenient venue for his counsel "must be balanced against numerous countervailing considerations," including that "a change of venue would burden the Government, whose attorneys are based in New York."  *Pastore*, 2018 WL 395490, at *5.  Indeed, though Calk points to the fact that the Northern District of Illinois maintains a U.S. Attorney's Office (a fact that is of course present in any motion to transfer to any judicial district in the country), his Chicago's counsel's law firm, Loeb & Loeb LLP, maintains a branch office in New York that could likewise "support (or even substitute for) their colleagues from [Chicago] if the case is [not] transferred."  (Transfer Mem. 10; *see* Loeb & Loeb LLP, *Locations: New York*, loeb.com/en/locations/new-york ("[O]ur Park Avenue office is one of the firm's largest[.]")).  With three of the defendant's five current counsel of record located in New York according to the docket (and, as noted above, all of the Government's counsel located in New York), the location of defense counsel does not support transfer.

### 7.    *Other Factors*

Calk admits that the factors of the location of relevant documents, relative accessibility of place of trial, and docket conditions are nearly obsolete and do not weigh in favor of transfer

52

(Transfer Mem. 4-5).  He identifies no additional special factors warranting a change of venue.[28]

In sum, the circumstances here strongly favor denial of the motion to transfer the case. Even in cases where some of the *Platt* factors "favor or perhaps favor transfer," *United States* v. *Datta*, 797 F. Supp. 2d 448, 450 (S.D.N.Y. 2011), courts will deny such motions where defendants do not meet their burden of overturning the presumption that a trial shall be held in the initial district.  *See Datta*, 797 F. Supp. 2d at 450 (denying motion to transfer even while noting "[i]t appears that more of the events pertinent to the indictment occurred in Texas than here, defendant's business is centered there, and the defendant's family now resides in Texas" and that "it may be that more trial witnesses ultimately will prove to be Texas rather than New York area residents"); *Pastore*, 2018 WL 395490, at *5 (denying transfer where two of the *Platt* factors—residence of defendant and location of counsel—favored transfer and the others were neutral or militated against transfer); *Percoco*, 2017 WL 6314146, at *18 (denying transfer despite location of defendants, a number of witnesses, and a number of relevant events in other

---

[28] Likewise, the Government does not contend that this motion is made untimely; however, this is simply a neutral factor.  Though an *untimely* motion strongly counsels against transfer due to the waste of judicial resources, *see Spy Factory*, 951 F. Supp. at 461 ("[O]ne of the factors to which the Second Circuit has paid special attention is a defendant's delay in moving to transfer the case."), a *timely* motion does not strongly counsel in favor of transfer; it is simply neutral. While the majority of cases that addressed timing did so because it was a factor weighing against transfer, defendant has cited one case, *United States* v. *Rodriguez*, in which the Western District of New York listed timing as a factor that carried particular weight and noted that in that case it weighed in favor of transfer.  No. 16 Cr. 41 (PFB), 2018 WL 2126429, at *7 (W.D.N.Y. May 9, 2018).  But in that case the majority of the *Platt* factors favored transfer in any event, and in analyzing the timing issue, the court simply addressed a number of cases where motions were untimely and found they did not apply.  *See id.* at *6.  It did not explain why simply filing a timely motion should be a factor favoring the transfer of the case, or how such analysis would be consistent with the presumption of retaining a criminal prosecution in the original district. *Rodriguez* is best regarded, then, as observing that in a case where a number of factors counseled in favor of transfer, a timely request eliminated what could otherwise have been an obstacle of particular weight.

district); *Larsen*, 2014 WL 177411, at *3 (denying transfer despite indigent defendant's residence, job and child care responsibilities supporting motion where other factors were opposed or neutral).

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the defendant's pretrial motions be denied in their entirety.

Dated:  New York, New York
      December 6, 2019

                          Respectfully submitted,

                          AUDREY STRAUSS
                          Attorney for the United States
                          Acting Under Authority Conferred by
                          28 U.S.C. § 515

         By:    /s/ Paul M. Monteleoni
                Paul M. Monteleoni
                Douglas S. Zolkind
                Benet J. Kearney
                Assistant United States Attorneys
                Tel.: (212) 637-2219/2418/2260
                E-mail: paul.monteleoni@usdoj.gov
                         douglas.zolkind@usdoj.gov
                          benet.kearney@usdoj.gov