# EXHIBIT A

AO 106 (REV 4/10) Affidavit for Search Warrant          AUSA Steven J. Dollear, (312) 353-5359

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:                    Case Number: **17 M 335**

The cellular telephone, further described in
Attachment A

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Carrie E. Fisher, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**F I L E D**

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

JUN 26 2017

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities **MAGISTRATE JUDGE MARY M. ROWLAND**

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 371, 1005, 1014, 1343, 1344, 1346, 1349, 1956, 1957, and 2. | (a) the making of false entries in the books and reports of a bank and conspiracy to commit such offense; (b) fraud in connection with the extension of credit and conspiracy to commit such offense; (c) wire fraud, bank fraud, honest services fraud, and conspiracy to commit these offenses; (d) money laundering and money laundering conspiracy; and conspiracy to commit such offenses |

The application is based on these facts:

**See Attached Affidavit,**

Continued on the attached sheet.

*Applicant's Signature*

CARRIE E. FISHER, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 26, 2017
City and State: Chicago, Illinois

*Judge's signature*

MARY M. ROWLAND, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Carrie E. Fisher, being duly sworn, state as follows:

### I. Introduction

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately 2004.

2. As part of my duties as an FBI Special Agent, I have investigated criminal violations relating to white collar crime, including mail, wire, and bank fraud. I have participated in the execution of multiple federal search warrants.

3. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic device specified below (the "Subject Device") for the items and information described in Attachment B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience, and advice received concerning the use of electronic devices in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Subject Device

4.      The Subject Device is particularly described as an Apple iPhone 6S with 15-digit International Mobile Equipment Identity ("IMEI") number ████████████

5.      Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.apple.com, I know that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant ("PDA").

6.      I believe that the Subject Device, which is the personal cellular phone of Stephen M. Calk, a resident of Kenilworth, Illinois, is presently located in the Northern District of Illinois, and the FBI intends to execute this warrant in the Northern District of Illinois.

## The Subject Offenses

7.      For the reasons detailed below, there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of (a) the making of false entries in the books and reports of a bank in violation of 18 U.S.C. § 1005 and conspiracy to commit that offense in violation of 18 U.S.C. § 371; (b) fraud in connection with the extension of credit in violation of 18 U.S.C.§ 1014 and conspiracy to commit that offense in violation of 18 U.S.C. § 371; (c) wire fraud, bank fraud, honest services fraud, and conspiracy to commit these offenses in violation of 18 U.S.C. §§ 1343, 1344, 1346, and 1349; and (d) money laundering and money

laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957 (the "Subject Offenses").

## II.   Probable Cause

### Probable Cause Regarding Commission of the Subject Offenses

8.     As set forth herein, there is probable cause to believe that the Subject Offenses have been committed by Stephen M. Calk (the owner of the Subject Device), who is the CEO and chairman of the Chicago-based bank The Federal Savings Bank, Inc. ("TFSB"), and Paul J. Manafort, Jr., the former campaign chairman of Donald J. Trump for President, Inc., and others known and unknown, in connection with a scheme in which Calk, causing false entries in the books and reports of TFSB and concealing material facts from TFSB's loan committee and board of directors, extended favorable loans totaling approximately $16 million to Manafort in exchange for Manafort's support for Calk's candidacy for a potential position with the Trump administration, and that evidence of the Subject Offenses may be found on the Subject Device.

9.     More specifically, there is probable cause to believe that Calk and Manafort conspired to defraud TFSB out of its intangible right to Calk's honest services by having Calk take action to process and approve the loans to Manafort in exchange for a personal benefit; that Calk and Manafort withheld material information about the loans from TFSB's loan committee and board of directors as well as the books and records of the bank (such as the records described in paragraphs 51 and 69 below); and that Calk committed a scheme to defraud another bank that

was considering underwriting one of the TFSB loans, BofI Federal Bank ("BofI"), by concealing from BofI material information regarding Manafort's creditworthiness.

· 10. The information set forth below in paragraphs 11 through 70 of this affidavit (as well as certain additional facts not relevant herein) were also set forth in an affidavit by FBI Special Agent James H. Hilliard (the "Hilliard Affidavit") submitted in support of a warrant to search an email account used by Manafort (the "Email Search Warrant"). On June 21, 2017, the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, issued the Email Search Warrant, 17 Mag. 4750, based upon a finding that the Hilliard Affidavit set forth probable cause that the email account contained evidence, fruits, and instrumentalities of the Subject Offenses. For the Court's reference, the Hilliard Affidavit is attached hereto as Exhibit 1.

### Relevant Individuals

11. Based on publicly available information, including news reports, in March of 2016, Manafort officially joined Donald J. Trump for President, Inc. (the "Trump Campaign"), the presidential campaign of Donald Trump, in order to, among other things, help manage the delegate process for the Republican National Convention. In May of 2016, Manafort became chairman of the Trump Campaign. In June of 2016, Manafort reportedly became de facto manager for the Trump Campaign with the departure of prior campaign manager Corey Lewandowski. On August 19, 2016, Manafort officially exited his post as chairman of the Trump Campaign. Based on the evidence set forth below, however, following his official

departure Manafort remained directly involved, on an informal basis, both in Trump Campaign activities and in the Trump presidential transition efforts after the presidential election.

12.    Based on publicly-available information and documents obtained from TFSB, Jeffrey Yohai is Manafort's son-in-law, and as set forth in part below, Yohai was involved in real estate investments with Manafort during the relevant time period.

13.    Based on publicly-available information and documents obtained from TFSB, Calk is the CEO and chairman of the board of TFSB, a federally-chartered bank owned by the bank holding company National Bancorp Holdings, Inc. TFSB is a Federal Deposit Insurance Corporation member bank.   According to TFSB documents, Calk owns approximately 67% of National Bancorp Holdings; Calk's brother John Calk owns approximately 29%; and three other shareholders collectively own approximately 4%.

14.    Based on documents obtained from TFSB, Dennis Raico was a senior vice president at TFSB and worked at TFSB offices at 120 Broadway in Manhattan, New York.   As set forth below, Raico served as the loan officer on loans to entities associated with Manafort.

### Manafort's Loans from Genesis Capital

15.    Based on court filings and records obtained from Genesis Capital, in February of 2016, Genesis Capital, through affiliated entity Genesis Capital Master Fund II, LLC ("Genesis Master Fund"), extended two loans to a Manafort-affiliated

entity called MC Brooklyn Holdings LLC ("MC Brooklyn Holdings") in the total amount of approximately \$5.3 million. Manafort, along with his wife Kathleen Manafort, his daughter Jessica Manafort, and Jessica Manafort's husband (Manafort's son-in-law) Jeffrey Yohai, were the members of MC Brooklyn Holdings, which owned a townhouse in the Carroll Gardens neighborhood of Brooklyn, New York located at 377 Union Street (the "Union Street Property"). MC Brooklyn Holdings originally obtained the Union Street Property in December of 2012.

16. Additionally, based on documents obtained from TFSB, in February of 2016, Genesis Capital funded approximately \$3.7 million in a refinance and construction loan secured by a property located at 2401 Nottingham Avenue, Los Angeles, California, 90027 ("2401 Nottingham Avenue"). 2401 Nottingham Avenue was owned by 2401 Nottingham Avenue LLC, which was owned by Yohai until February of 2016, at which point it became owned by Baylor Holding, LLC, a limited liability company of which Manafort and Yohai were equal partners.

## The Default on the Genesis Loans

17. Both the Genesis 377 Union Street Loans and the Genesis 2401 Nottingham Avenue Loan (along with other loans Genesis Capital extended to Yohai-related entities) went into default in 2016. Documents provided by Genesis Capital show that Genesis Capital representatives made repeated efforts to obtain payments from Yohai over a course of months in 2016 continuing into the summer of 2016. FBI agents conducting an investigation of Yohai's finances interviewed Mitch Solow, who was the Chief Risk Officer and Chief Credit Officer for Genesis Capital until October

2016. Solow stated that by spring 2016, Yohai was in default on all five loans he had from Genesis Capital for reason of non-payment.

18. On September 20, 2016, Genesis Master Fund filed an action in New York Supreme Court, Kings County (the "Foreclosure Action"), seeking foreclosure of the Genesis 377 Union Street Loans and sale of the property, naming MC Brooklyn Holdings as well as Manafort and Yohai personally as defendants. In addition to being a member of MC Brooklyn Holdings, Manafort had personally guaranteed the Genesis 377 Union Street Loans.

19. After its initiation, the Foreclosure Action was adjourned several times as Manafort and Yohai sought refinancing. On January 18, 2017, the parties entered a stipulation discontinuing the action, after the Genesis Capital loans were paid off through loans obtained by Manafort from TFSB, as set forth below.

**Manafort's Initial Contacts with TFSB and Calk**

20. Based on documents obtained from TFSB, beginning in 2016, Manafort began negotiations with TFSB for loans for several purposes, ultimately resulting in TFSB extending two sets of loans to Manafort-linked entities in the total amount of approximately $16 million. One loan (the "TFSB Summerbreeze Loan"), for approximately $9.5 million (enough to cover the outstanding balance on the Genesis 2401 Nottingham Avenue Loan), was extended on or about November 16, 2016 to a company called Summerbreeze LLC that was owned by Kathleen Manafort. A second set of TFSB loans (the "TFSB 377 Union Street Loans"), for $6.5 million, was secured on or about January 17, 2017 by the Union Street Property and was used to refinance

the Genesis 377 Union Street Loans, which terminated the Genesis Foreclosure Action. As described below, Calk, the CEO of TFSB, personally negotiated and helped obtain approval for the loans, while at the same time engaging in numerous discussions with Manafort about securing a potential position in the Trump Administration.

21.     The TFSB loan officer for both the TFSB Summerbreeze Loan and the TFSB 377 Union Street Loan was Dennis Raico, whose office was at 120 Broadway in Manhattan. In connection with an investigation into Yohai's finances, FBI agents interviewed Felix Katz, who was a loan broker who knew Raico. Katz stated that he introduced Yohai and Manafort to Raico in or around 2016, at a time when Yohai and Manafort were looking for a bank to refinance their loans with Genesis Capital.[1] Katz further stated that he tried and failed to broker a deal for Yohai and Manafort with several different banks prior to TSFB. In one such instance, Yohai and Manafort attempted to obtain a $10 million line of credit from Banc of California, but once the bank did its due diligence, it deemed Manafort too high of a risk and the bank ultimately offered only a $1 million line of credit.

> **Manafort's Appointment of Calk to Trump Economic Advisory
> Council While Seeking to Refinance the Genesis 2401
> Nottingham Avenue Loan**

22.     According to documents obtained from TFSB, on July 27, 2016, Manafort met with Raico in Manhattan (with Calk attending by videoconference) to

---

[1] Emails provided by TFSB from its corporate email system reflect that the first communications between Manafort, Calk, and Raico took place in or about late April and early May 2016.

discuss a proposed loan from TFSB to refinance the Genesis 2401 Nottingham Avenue Loan. Calk and the other members of the TFSB loan committee approved the terms of this loan the next day, leading Raico to remark by email: "Please let me know when I can anticipate a Term Sheet, I'm sure Paul and Jeff will be highly impressed to receive within 24 hours of our meeting." Based on the content of the email, I believe "Paul" is Manafort and "Jeff" is Yohai.

23.    Less than a week later, on August 3, 2016, Manafort, who at that time served as manager and chairman of the Trump Campaign, emailed Raico asking for Calk's resume, which Raico said he would forward. The next morning, Manafort followed up with Raico again asking for Calk's resume, and Raico responded that Calk would send it shortly. In that email, Raico also advised Manafort that the file for the contemplated loan to refinance the Genesis 2401 Nottingham Avenue Loan was near complete, and asked Manafort to ensure that his staff had sent outstanding bank account statements.

24.    Later that day, on August 4, 2016, Calk, from his TFSB account, sent his resume to Manafort, writing: "Dennis Raico reached out and asked if I would send you my professional bio and CV. Attached please find both as requested. I look forward to continuing our conversation." Manafort responded: "Per our conversation, I want to add you to the National Economic Advisory Committee for DJT. Is that something you would be able to do?" Calk responded: "I am happy and willing to serve."

25. According to publicly-available information, on August 5, 2016, the Trump Campaign announced the creation of the Trump Economic Advisory Council; Calk was named as one of its 13 members.

26. Solow, the former Chief Risk Officer and Chief Credit Officer of Genesis Capital, stated to FBI agents that in approximately the summer of 2016, after Genesis had refused to provide a cash-out refinance to Manafort on one of Manafort's properties, Yohai told Solow that TFSB had agreed to do the refinance because Manafort promised Calk a position on the Trump Economic Advisory Council.

27. TFSB emails reflect that on August 9, 2017, Anna Ivakhnik, a TFSB employee, emailed an appraisal firm and asked to set up appraisals for 2401 Nottingham Avenue and a Manafort residence in Alexandria, Virginia that was being considered as additional collateral. In this email Ivakhnik wrote: "I am working with Dennis on Paul Manafort's (Trump's campaign manager) loan, and Steve Calk wants to close this by August 15th. I am not able to order the appraisals through our system because the loan hasn't gone through the proper steps yet. Would you be able to manually set up the orders from your end while I set up the file?" In a follow-up email to the appraiser two days later, Ivakhnik wrote: "Thank [you] for moving forward with this before those came through, Myself and Dennis and Steve really appreciate it. P.S. If you find that you can incentivize the appraisers to do it faster for a little extra fee, please do."

28. Documents produced by TFSB show that on August 11, 2016, Manafort digitally signed a loan application for the proposed 2401 Nottingham Avenue

refinance that listed his income as \$275,000 per month and his personal net worth as \$17,051,676.17. As set forth below, subsequent loan applications submitted by Manafort to TFSB contained substantially different representations about Manafort's income and net worth.

29. On August 29, 2016, Yohai emailed Ivakhnik, Raico, and an associate of Yohai's, and asked: "What is the appraiser coming in at for finalized value after renovation?" Ivakhnik initially replied: "Nothing great. We need major help with the appraisal." Approximately one minute later, Ivakhnik replied again in a separate email: "We literally have to pull bunnies out of hats."

30. On September 8, 2016, Manafort's attorney transmitted to TFSB a demand letter to 2401 Nottingham LLC sent by a debt collector that demanded payoff for missed June and July payments on the Genesis 2401 Nottingham Avenue Loan, including late fees and over \$2,000 daily interest on the late fees. Raico forwarded this document to Ivakhnik, writing: "Just a fyi – looks like these guys are in default to Genesis........" Ivakhnik wrote back: "It is what it is. Let's send it off to Chicago and have it be part of the file. Ultimately Steve will make the call..."

### Calk's Willingness to Extend Loan to Manafort Despite Prior Default and Initial \$1 Million Misstatement

31. Based on documents obtained from TFSB, in late August of 2016, at approximately the time when Manafort officially left his position with the Trump Campaign, the company Summerbreeze LLC was formed, with Manafort's wife Kathleen Manafort as the sole member. TFSB records show that Summerbreeze LLC then took out a loan from a subsidiary of the real estate investment company Spruce

Capital Partners in the amount of approximately $3.5 million secured by real estate located at 174 Jobs Lane, Water Mill, NY (hereinafter "174 Jobs Lane" referring to the property and the "Spruce 174 Jobs Lane Loan" referring to the loan).

32.     Following his official exit from the Trump Campaign on August 19, 2016, Manafort continued to correspond with Calk regarding the presidential campaign in a manner that indicated Manafort remained involved with it. For example, on September 20, 2016, Calk, from his TFSB account, emailed Manafort his name, social security number, and contact information as well as that of another individual, Brigadier General Bernard Banks, "as requested." Subsequent emails between Calk and Trump Campaign officials indicate that Calk attended the first presidential debate on September 22, 2016 as a surrogate, with Banks as his guest.

33.     On September 25, 2016, Manafort emailed Calk at his TFSB account, and stated: "Text me when you get the email from the Debate Commission with the details for pick up tomorrow. As for lunch, do you want to meet around 12:15[?]" According to TFSB emails, at the lunch, Manafort and Calk discussed restructuring the contemplated TFSB loan to include a refinance of the Spruce 174 Jobs Lane Loan. During this meeting, according to Calk's notes and an email by Raico describing the meeting afterward, Manafort described the Spruce 174 Jobs Lane Loan as being for $2.5 million, when in fact it was for approximately $3.5 million.

34.     On September 27, 2016, Ivakhnik sent Calk and others at TFSB copies of mortgage statements for 174 Jobs Lane, which showed that the Spruce 174 Jobs Lane Loan was for approximately $3.5 million. James Brennan, TFSB's vice

president, replied to all recipients: "What the hell he just took the loan out at the end of August how can he be a $1,000,000 off!" Ivakhnik replied, only to Brennan (excluding Raico, Calk and others at TFSB): "He is so in debt."

35. Ivakhnik was thereafter terminated from TFSB. Other FBI agents interviewed Ivakhnik, who stated in substance, among other things, the following:

   a. She discussed the loan with TFSB vice president James Brennan in the course of her work on the loan, and Brennan expressed to her on several occasions that the proposed Manafort loan was a bad loan.

   b. There were several issues with the proposed Manafort loan. For example, when she ran Manafort's credit report in August of 2016, she saw that his credit had dropped significantly compared to his last credit report in June, due to an approximately $300,000 debt Manafort had incurred on his American Express card (which Manafort claimed was because he had allowed a friend to use it to buy New York Yankees season tickets). Additionally, a number of Manafort's assets turned out to be less valuable than expected. Two pieces of real estate considered as collateral each were appraised at over $1 million less than the expected value, and an investment account of Manafort's, which TFSB had believed would have a balance of $10 million, had a lower effective value because Manafort had taken out a $5 million line of credit against it. Ivakhnik also considered it unusual to approve a construction loan (as the proposed Manafort loan was planned to be) for borrowers who,

like Manafort and Yohai, lacked construction experience. She also considered it unusual that TFSB was willing to fund the loan despite Manafort and Yohai's default to Genesis Capital.

c. Ivakhnik stated that she believed that the Manafort loan would be approved "no matter what." According to Ivakhnik, Raico told her that he had heard from Calk that Calk wanted to be appointed as "VA Administrator," *i.e.*, Secretary of Veterans Affairs, by Trump.

d. Ivakhnik stated that, at the end of August of 2016, Brennan told her by phone to put any communications related to the Manafort loan into emails because this matter would be "investigated by the FBI." She advised that when she learned that the Spruce 174 Jobs Lane Loan was for $3.5 million (as opposed to $2.5 million), she told Brennan about this on the phone, and he advised her to put this information in an email, leading her to write the September 27, 2016 email to Calk and other recipients described in paragraph 34 above.[2]

36.     On October 7, 2016, Manafort emailed Calk and wrote: "We are getting close to closing the loan but there is a major issue. I don't know how to resolve this problem. When we had lunch, I must have had a blackout. I told you that there is a 2.5m first on the Bridgehampton property. I meant to say a 3.5m first." (Although

_____

[2] Ivakhnik stated that the official reason for her termination was failure to follow TFSB's procedures, but that she believed that she was fired for refusing sexual advances from Calk. An employment discrimination lawyer for Ivakhnik who attended the interview stated that Ivakhnik is pursuing a complaint with the New York City Committee on Human Rights.

174 Jobs Lane is in Water Mill, New York, records produced by TFSB show that it is in the Bridgehampton school district and the address is often rendered as being in Bridgehampton, New York.) Manafort further stated that he was "not able to" come up with the $1 million difference between the actual $3.5 million value of the Spruce 174 Jobs Lane Loan and the $2.5 million he previously had described, and requested a loan from TFSB to cover the full $3.5 million. Manafort added: "I look to your cleverness on how to manage the underwriting. I recognize it was my mistake at our lunch, but the situation is as described." In response, Calk told Manafort that if the increase in loan amount were possible, it would require adding a property of Manafort's in Alexandria, Virginia as additional collateral, which Manafort agreed to do. Later that day, Raico emailed Manafort and explained that the loan had been adjusted, writing: "I'm hopeful that we are taking care of your financing needs on our end. We had an 'Emergency Portfolio Committee' meeting a short while ago, and Steve actually pulled in the private board. Your loan amount has now been adjusted from $8.2 Million up to $9.2 Million." Later that day, Calk also emailed Manafort: "Consider it done. Dennis has been directed. We will close on time. Can you call my cell phone this afternoon? I need your advice

37.     The next morning, on October 8, 2016, Manafort emailed Calk's TFSB account, with subject "Sorry I missed you," and explained that he had been offline the previous afternoon and evening, and invited Calk to text him a time for a call. Manafort added: "I also want to again thank you for fixing my issue. It means a lot

to me. You are becoming a very good friend and I look forward to building our relationship into both a deeper business and personal one."

38. Four days later, on October 12, 2016, Calk emailed Manafort and complained that he was not receiving a Trump Campaign credential to enter the "spin room" as a surrogate after the third presidential debate as he had at the first two. Manafort responded: "I will work on this tomorrow, but this is not an issue of eliminating you."

### Manafort Seeks a Second Multimillion Dollar Loan from TFSB and Further Restructuring of the Original TFSB Loan

39. In early October, 2016, before Manafort and TFSB had closed on the originally contemplated refinancing of the Genesis 2401 Nottingham Avenue Loan, documents provided by TFSB show that Manafort sought a second loan from TFSB that would refinance the Genesis 377 Union Street Loans, which were the subject of Genesis Capital's Foreclosure Action filed on September 20, 2016. On October 4, 2016, Raico emailed Manafort and wrote: "I am well aware that we need to move very quickly on 377 Union Street, Brooklyn, NY. Bruce has sent me some preliminary information . . . I understand the dynamics that have evolved, and will take care of this quickly. That said, we will close Nottingham next week, and Carol Gardens directly thereafter." Based on the context of this exchange, I believe "Bruce" is Manafort's attorney Bruce Baldinger, "Nottingham" refers to the proposed refinance of the Genesis 2401 Nottingham Avenue Loan, and "Carol Gardens" refers to the proposed refinance of the Genesis 377 Union Street Loans.

40.    On October 19, 2016, shortly before the closing date for the contemplated refinance of the Genesis 2401 Nottingham Avenue Loan and the Spruce 174 Jobs Lane Loan, TFSB emails reflect that Manafort contacted TFSB to request that the loan (referred to herein as the TFSB Summerbreeze Loan) be restructured (a) to be in a higher amount ($9.5 million instead of $9.2 million); (b) not to involve Yohai as a borrower; and (c) not be secured by the 2401 Nottingham Avenue property as collateral.

41.    The next day, October 20, 2016, TFSB President Javier Ubarri emailed Raico and other TFSB personnel and characterized Manafort's reasons for the change in structure as wanting to avoid tying his business too closely to Yohai's.  Ubarri explained: "He [Manafort] doesn't want to take the 'risk' of his son in law but want[s] us to take that risk." Ubarri then forwarded this email to Calk.

42.    Following these communications, TFSB decided no longer to pursue the TFSB Summerbreeze Loan as a "portfolio" loan for which TFSB would assume all of the risk, and instead proposed the loan to BofI Federal Bank ("BofI") for underwriting.  A November 1, 2016 email from Raico to other TFSB personnel described Calk's interest in obtaining assistance from BofI: "I'm just getting a little pressure from Steve Calk as we flipped this out of Portfolio into a potential submission to B of I.  Steve is waiting on their decision on Manafort, to hop on a plane and sit with their CEO to discuss how they have been handling some of our larger loan amount transactions."

## Manafort's Varying Representations in His Loan Applications

43.     Two loan applications for the TFSB Summerbreeze Loan were produced by TFSB, unsigned by Manafort but dated October 26, 2016. Both listed Manafort's income as approximately $224,846 per month. One listed the net worth of Manafort and Kathleen Manafort as co-borrowers as $21,376,722.13. The other listed the net worth of Manafort and Kathleen Manafort as co-borrowers as $6 million lower, or $15,376,722.13.[3]

44.     Two days later, on October 28, 2016, Manafort and Kathleen Manafort signed a loan application for the TFSB Summerbreeze Loan listing Manafort's income as $100,652 per month and their net worth as co-borrowers as $34,685,418.13.

45.     Three days after that application was submitted, on November 1, 2016, Manafort and Kathleen Manafort signed a loan application for the TFSB 377 Union Street Loans listing Manafort's income as $224,846 per month and their net worth as co-borrowers as $14,994,402.13.

### Calk's Application for Senior Trump Administration Positions and the Closing of the TFSB Summerbreeze Loan

46.     According to TFSB documents, as of November 8, 2016, the date that Donald Trump was elected President of the United States, neither the TFSB Summerbreeze Loan nor the TFSB 377 Union Street Loans had closed.

---

[3] As set forth above, on August 11, 2016, Manafort digitally signed a loan application in his own name (without his wife as co-borrower) listing his income as $275,000 per month and his net worth as $17,061,676.17.

47.    On November 14, 2016, Calk, from his TFSB account, emailed Manafort,
writing: "In advance of our conversation, please see the attached. Thank you for all
your guidance and assistance." Attached were a professional bio for Calk and a
document titled "Stephen M. Calk Perspective [sic] Rolls [sic] in the Trump
Administration.docx" that listed ten Cabinet-level secretary, deputy secretary, and
undersecretary positions in rank order, starting with Secretary of the Treasury,
Deputy Secretary of the Treasury, Secretary of Commerce, and Secretary of Defense.
This document also had a section titled "Ambassadorships I would like in rank order"
that listed 19 ambassadorships in order from the United Kingdom to Singapore.

48.    Less than an hour later, Calk, from his TFSB account, forwarded
Manafort a press release announcing the implementation phase of the presidential
transition team, and wrote: "Are you aiding in the transition in any type of formal
capacity?" Manafort responded later that day: "Total background but involved
directly." Calk then responded: "Awesome. Did you get my texts?," and Manafort
replied: "Got the text Going to try to work my schedule to confirm by noon if I can
do."[4]

49.    The next day, November 16, 2016, Calk emailed Manafort and wrote:
"Will you please review the attached document prepared at your request and advise
what changes and improvements I should make. My goal is to ensure you or my
designated prosper has all of the information they need to have me successfully

---

[4] Also on November 14, Calk emailed other TFSB personnel and directed them to ensure that
TFSB's security interests in the TFSB Summerbreeze Loan were "documented perfectly" and
"FULLY enforceable."

chosen by the President-Elect. I look forward to your response." Attached to Calk's email was a document titled "Stephen M. Calk – Candidate for Secretary of the Army.docx."

50. That day, BofI approved underwriting the TFSB Summerbreeze Loan up to only $7 million, not the full $9.5 million loan amount.

51. Despite the BofI underwriting shortfall, the TFSB Summerbreeze Loan closed on November 16, 2016. The final TFSB credit approval memorandum produced by TFSB did not mention the 2401 Nottingham Avenue default or the Foreclosure Action against Manafort personally, and assigned the TFSB Summerbreeze Loan a risk factor of "4 (Average)."

52. On November 17, 2016, Raico wrote to Calk with a summary of certain loans, and described the TFSB Summerbreeze Loan as a "TFSB portfolio loan," which I know from an interview of Ivakhnik and my own training and experience refers to a loan for which TFSB bears the entire risk. That same day, Calk directed Raico to work on attempting to sell the TSFB Summerbreeze Loan to BofI. In an email several weeks later, Raico gave the following explanation to another TFSB employee: "We were experiencing some delays with [BofI] in attempting to attain an approval. We have additional deals in Portfolio contingent upon this $9.5 Mil cash out occurring. That said, Steve Calk stepped in and we ended up closing this in Portfolio on 11/16/16."

### CALK's Pursuit of Senior Department of Defense Positions and Efforts to Secure the 377 Union Street Loans

53.    Three days after the TFSB Summerbreeze Loan closed, on November 19, 2016, Calk re-sent to Manafort the document titled "Stephen M. Calk – Candidate for Secretary of the Army.docx," and wrote: "I am resending the following three attachments including my professional bio, the case for me to become the 22nd Secretary of the Army and my requested list of ranked appointments by the President. I am very grateful for your assistance in supporting my appointment as Secretary of the Army."

54.    On November 25, 2016, Calk emailed Manafort and attached a different version of "Stephen M. Calk Perspective [sic] Rolls [sic] in the Trump Administration.docx" that still listed Secretary of the Army as the first choice but had a different ranking of other cabinet secretary, deputy secretary, and undersecretary positions. Calk wrote: "Please find attached an updated 'wish list' of positions that I believe I am highly qualified for and that I . . . would like to be considered for. As you know, my number one desire is to serve as Secretary of the Army. Please let me know when we may speak briefly about this list. Many thanks for your kind support and guidance." Manafort responded later that day: "I have this updated list. I am available to speak around 2:30pm EST today if that works for you."

55.    On December 5, 2016, Calk forwarded to Manafort a Trump Campaign email advising of a Trump rally in Michigan. Calk wrote: "President Elect Trump will be in Michigan on Friday. Should we arrange a meeting while he is near by? Do you think we are making any progress re: SECARMY?" Manafort replied: "He is not

doing meetings on the road on these types of matters. I will be calling you later today with updates." The next day, on December 6, 2016, Manafort emailed Calk: "Call me when you have a moment. I have tried several times but the circuits are ringing busy."

56.     On December 7, 2016, Manafort wrote to Raico, copying Calk and Manafort's attorney Bruce Baldinger, with subject line "Nervousness is setting in." Manafort wrote: "As you know, the properties go to auction on Dec 21," and indicated his concerns about the fact that no closing had been scheduled for the TFSB 377 Union Street Loans (or other loans Manafort had discussed pursuing with TFSB after the 377 Union Street Loans). Raico responded: "As you have noted, I am aware of the auction dates," and stated that TFSB was "moving as quickly as possible ensuring the appropriate due diligence."   Later that day, in response to an additional follow-up message from Manafort, Calk stated that he would like to join the next call between Raico and Manafort, and wrote: "it looks like we will be forced to take additional cash collateral for your Brooklyn deal due to our legal maximum loan amount to any one individual or entity."

57.     The next day, December 8, 2016, Calk wrote to Raico: "I still do not understand your plan to get Manafort's next loan approved and closed. What is your plan?"

58.     On December 14, 2016, Raico emailed a summary of the TFSB Summerbreeze Loan to another TFSB employee, and explained that TFSB was trying to sell this loan to BofI. Raico wrote: "They are trying to get this done ASAP, as we

are on a deadline to close another $7 Mil Portfolio for Paul on or before 12/20/16, and need to get the larger one off our books. I'm told this is strictly TFSB internal information, and should not be shared with outside individuals."

59. On December 15, 2016, Raico emailed an appraisal company to follow up on the appraisals for 377 Union Street, stating: "As previously discussed, I have our Chairman all over me regarding these appraisals."

60. On December 16, 2016, another TFSB employee forwarded Calk an email from BofI raising legal objections to the sale of the TFSB Summerbreeze Loan and stated: "Time for you to call the CEO of BofI [and] have a high level direct conversation." Calk then wrote to the President of TFSB, Javier Ubarri, and stated: "Javier, please direct the immediate preparation of all documents necessary to facilitate this loan sale PERSONALLY, today. Please oversee all appropriate documentation preparation for Paul Manafort's signature and ensure it is all correct and then call me for direction."[5]

61. On December 21, 2016, Manafort's attorney Bruce Baldinger, upon receiving the appraisals for 377 Union Street from Raico, wrote to Calk and stated: "I will speak with Paul and contact you a little later re closing." Calk responded: "Bruce, we are in no way scheduling a closing until this loan is fully structured, underwritten and approved. You must stop your presumptuous emails. We are working very hard to help find solutions to help Paul out in his hour of need."

---

[5] A representative of BofI informed me that BofI did not ultimately purchase this loan.

62.    On December 23, 2016, Calk sent an email to Manafort with the subject "Inaugural Invitees" that included several sets of names and contact information, including his own.

63.    On December 27, 2016, Calk sent an email to "Jim," which was answered by an assistant to General James Mattis, who at that time had been announced by then-President-Elect Trump as prospective nominee for Secretary of Defense. Calk wrote: "I believe that Steve Bannon will be speaking to you again about me today. My cell phone is ████████ I am the gentleman that Dell Dailey and Robert Gates spoke to you about."

64.    On January 5, 2017, TFSB vice president James Brennan emailed Calk and his brother John Calk and stated: "In order for The Federal Savings Bank to stay within its legal lending limit for the Manafort relationship[,] National Bancorp Holdings needs to buy two loan participations," and attached for their signature participations that would give National Bancorp Holdings ownership of $4.2 million of the $6.5 million amount of the TFSB 377 Union Street Loans. I believe that the use of this structure demonstrates the lengths Calk was willing to go to in order to confer a benefit on Manafort.

65.    On January 9, 2017, a presidential transition team representative using a Trump Campaign email address emailed Calk and advised Calk that he was scheduled for an interview at Trump Tower the next day, January 10, 2017. The email further advised Calk of the names of his interviewers, and directed him to return a questionnaire and various application materials. Calk, from his TFSB

account, responded later that day with the questionnaire, his resume, a photograph, and a list of bullet points in support of his candidacy for Under Secretary of the Army. Calk's attached resume identified him as having been in the United States Army Reserve from June 1985 to February 2001 as a rated combat helicopter pilot and having attained the rank of captain.

66.     On January 10, 2017, Calk emailed retired Congressman John Sweeney, one of his listed interviewers, and stated: "The purpose of this message is to thank you so very much for the opportunity to visit with you today regarding my desire to serve as Deputy Secretary of Defense or in other such capacity as the President may offer me." Calk further stated: "It is easy to see why Paul Manafort has such great respect and admiration for you." I believe Calk's use of Manafort's name when corresponding with his interviewer reflects Calk's belief that Manafort was offering active support to Calk's candidacy.

67.     On January 12, 2017, Calk wrote to General Mattis's assistant and stated: "I am following up on my request to set up a meeting with GEN Mattis at the request of the Tiger Team that I interviewed with in New York at Trump Tower this week. I know that Anthony Scaramucci and others will be reaching out on my behalf as well. My hope is to meet with the General either tomorrow the 13th or late on Friday the 20th after the inauguration and before the Inauguration Balls begin." Based on public reporting, then-President-Elect Trump announced his intent on January 12, 2017 to appoint Scaramucci to a White House position, though Scaramucci ultimately was not appointed.

68.     On January 16, 2017, Calk wrote to Scaramucci and stated: "I am looking forward to seeing you at the inauguration. Would you possible be able to give me a status on where I stand or when I may hear something on my appointment for Under SECARMY?"

69.     On January 17, 2017, the TFSB 377 Union Street Loans funded, resulting in $6.5 million being paid for the benefit of Manafort and Kathleen Manafort. The Foreclosure Action was terminated by stipulation executed the next day. The final TFSB credit approval memorandum produced by TFSB did not mention the 2401 Nottingham Avenue default or the Foreclosure Action against Manafort personally, and assigned the TFSB 377 Union Street Loans a risk factor of "4 (Average)."

70.     On March 6, 2017, Calk, from his TFSB account, emailed a "Sean" at "sms45@who.eop.gov," with the subject line "Stephen Calk-SECARMY," and stated that he had heard back from General Mattis's office and interviewed with the Secretary of Defense's chief of staff on February 7, but had not heard anything since. As of this application, I am not aware of Calk receiving any appointment with the Trump administration.

71.     Based on my training and experience, and information provided by other law enforcement agents, I am aware that many of the emails discussed above were transmitted interstate, and that the disbursement of certain loans discussed above involved wires of funds interstate.

Probable Cause Justifying Search of the Subject Device

72.   As recently as April 24, 2017, in-house counsel for TFSB wrote, in a cover letter responding to a grand jury subpoena directed at TFSB, that Calk's cellular phone number was the Subject Number.

73.   In addition to the communications described above in paragraphs 36 (in which, on October 7, 2016, Calk asked Manafort to call him at the Subject Number to provide Calk with "advice" after Calk had just taken steps to increase Manafort's loan amount by \$1 million), and 63 (in which, on December 27, 2016, Calk sent an email to "Jim" which was answered by an assistant to General Mattis, and provided his cellular phone number as the Subject Number), TFSB records reflect that Calk engaged in multiple communications in which he referenced the use of the cellular phone assigned the Subject Number to engage in communications relevant to the Subject Offenses, as set forth below:

> a.   In the September 20, 2016 email described in paragraph 32, above, in which Calk provided his contact information and that of Banks, a guest of Calk's at the first presidential debate, Calk listed his phone number as the Subject Number.

> b.   On December 7, 2016, responding to Manafort's email requesting a call with Calk described in paragraph 56, Calk wrote "I called and left you a message. Please text me when you are free at [the Subject Number]."

c. On December 8, 2016, during the time period when TFSB was attempting to sell the TFSB Summerbreeze Loan to BofI, Calk emailed the CEO of BofI, referring to BofI's request for additional collateral, and stated: "I believe that you and I can figure this out and make a business decision in a five-minute phone call. Will you please call my cell this evening at [the Subject Number]?"

d. On December 22, 2016, Calk emailed Scaramucci, provided Scaramucci with the Subject Number as his (Calk's) cellphone number, and stated: "Look forward to hearing from you soon." Calk then forwarded this email chain to Manafort. As set forth in paragraphs 67 and 68, above, Calk would later go on to identify Scaramucci, who at one point was announced as a potential White House aide but ultimately not appointed, as a reference and corresponded with Scaramucci about Calk's candidacy.

e. In the December 23, 2016 email described in paragraph 62, in which Calk provided his contact information to Manafort under the subject "Inaugural Invitees," Calk listed his phone number as the Subject Number.

f. On March 9, 2017, Calk emailed Manafort to set up a time to discuss an inquiry that a Wall Street Journal reporter had made to Calk the day before regarding the Genesis 377 Union St. Loans, and asked Manafort to call him at the Subject Number.

74. Additionally, based on the time period in which Calk provided the Subject Number as his cellular phone number and other communications during that time period in which Calk referenced engaging in cellular phone conversations and text messages, I believe the following communications also refer to the phone assigned the Subject Number as being used in connection with the Subject Offenses.

a. In the September 25, 2016 email described in paragraph 32, in which Manafort emailed Calk and asked him to text Manafort when Calk got an email from the "Debate Commission," I believe that any text Calk sent at Manafort's invitation would have been sent from the phone assigned the Subject Number.

b. In the October 8, 2016 email described in paragraph 37, in which Manafort invited Calk to text him a time for a call and thanked Calk for "fixing" his "issue," I believe that any text Calk sent at Manafort's invitation would have been sent from the phone assigned the Subject Number.

c. In the November 14, 2016 emails described in paragraph 48, above, in which Calk responded to Manafort's statement that he was "involved directly" in the presidential transition by stating "Awesome. Did you get my texts?," to which Manafort replied "Got the text," I believe that Calk and Manafort were referring to a text message or messages sent from the phone with the Subject Number.

        d.     On December 23, 2016, Calk sent an email to Manafort discussing the details regarding the signing of documents for the TFSB 377 Union St. Loans, with the subject line "Via text and email." I believe that this subject line refers to Calk sending Manafort a text message with similar substance using the phone with the Subject Number.

75.    Documents provided by AT&T list call number ▮▮▮▮▮▮▮ (the Subject Number) as subscribed to Calk since approximately January 7, 2006.

76.    Documents provided by AT&T reflect that since approximately July 1, 2016, the device assigned the Subject Number has been an Apple iPhone 6S. These documents also provide unique identifying numbers for Calk's device beginning on approximately July 1, 2016, that are either 14 or 16 digits long and all share the same first 14 digits, *i.e.,* ▮▮▮▮▮▮▮, under the heading "IMEI." Publicly available information reflects that a device's International Mobile Equipment Identification (or "IMEI") number is a 15-digit number uniquely identifying a mobile device and composed of 14 digits followed by a final "check digit" which is generated by applying the "Luhn algorithm" to the first 14 digits. A 16-digit variant of the IMEI, the International Mobile Equipment Identification Software Version number (or "IMEISV") does not include the check digit, instead consisting of the first 14 digits followed by a two-digit code reflecting the software version installed on the device.[6]

---

[6] Consistent with the final two digits of the IMEISV reflecting new software versions, the AT&T records that reflected 16-digit numbers in the "IMEI" column showed the first 14 digits

Either the 14-digit portion of the IMEI or the 16-digit IMEISV can be converted into the 15-digit IMEI by taking the first 14-digit string and applying the Luhn algorithm to generate the check digit. Publicly available internet sources describe the Luhn algorithm and provide automated calculation tools to generate the check digit based on the first 14 digits.

77. Following publicly available explanations of the Luhn algorithm, I manually calculated the check digit for the 14-digit string ▮▮▮▮▮▮ (*i.e.*, the first 14 digits in the "IMEI" field of the AT&T documents for the phone assigned the Subject Number since approximately July 1, 2016), and determined that this digit is 5, resulting in the 15-digit IMEI number of ▮▮▮▮▮. I confirmed this calculation through a publicly-available automated calculation tool. AT&T also provides an internet-accessible IMEI lookup feature, where a visitor to the AT&T website can enter a 15-digit IMEI and be informed of the device model, as well as whether this device is compatible with the AT&T network. Entering the 15-digit IMEI number into this AT&T lookup tool resulted in the AT&T website describing the device as an Apple iPhone 6S and listing it as compatible with the AT&T network, a result consistent with the AT&T records reflecting that the phone assigned the Subject Number and subscribed to by Stephen Calk was an Apple iPhone 6S.[7]

_____

being identical with each other (and with the 14-digit numbers), and the final two digits increased at sporadic intervals, presumably reflecting the installation of software upgrades.

[7] Third-party websites not affiliated with AT&T also offer IMEI lookup services. Some also report that the 15-digit IMEI ▮▮▮▮▮ corresponds to an Apple iPhone 6S, but some report that it corresponds to an Apple iPhone 6 or an Apple iPhone SE. Because the AT&T website tool reporting that it corresponds to an Apple iPhone 6S is maintained by AT&T, the company currently providing service to this device, and because the AT&T documents produced in response to a subpoena also report the same make and model, I believe that the

Accordingly, I believe that the phone assigned the Subject Number from approximately July 1, 2016 to the present is an Apple iPhone 6S with IMEI ████████████, *i.e.*, the Subject Device.

78.     Like individuals engaged in any other kind of activity, individuals who engage in financial crimes or illegal transactions such as quid pro quo agreements related to financing store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the Subject Device. Such records can include, for example, text messages or other logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; calendar entries relevant to events and meetings necessary to effect the illegal transactions; and other notes or records of the terms of the transactions themselves.   Moreover, in this case the references in TFSB emails to text message communications between Calk and Manafort make it especially likely that there will be evidence of the Subject Offenses on the Subject Device.

79.     Electronic device files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the Subject Device. Even when such files have been deleted, they can often be recovered months or years later with forensics tools, depending on how the hard drive has subsequently been used. Thus, the ability to retrieve information from the

---

AT&T website tool accurately reports that the 15-digit IMEI ███████████ corresponds to an Apple iPhone 6S.

Subject Device depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and electronic device habits.

80.     Based on the foregoing, I respectfully submit there is probable cause to believe that the Subject Offenses have been committed and that evidence of the Subject Offenses is likely to be found on the Subject Device.

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

81.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* electronic device hardware, electronic device software, electronic device-related documentation, and cellular telephones) to be processed later by a qualified electronic device expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.     Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of electronic device hardware and software available requires even electronic device experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden,

erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

82.     In order to fully retrieve data from a electronic device system, the analyst needs all storage media as well as the electronic device. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

83.     In addition, electronic storage media such as an electronic device, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

### PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

84.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the electronic device described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

85.     The review of electronically stored information and electronic storage media removed from the electronic device described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.     surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.     opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

86.     The government will return any electronic storage media described in
Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3)
of the Federal Rules of Criminal Procedure, the removed electronic storage media
contains contraband or constitutes an instrumentality of crime, or unless otherwise
ordered by the Court.

## CONCLUSION

87.     Based on the above information, I respectfully submit that there is
probable cause to believe that (a) the making of false entries in the books and reports
of a bank; (b) fraud in connection with the extension of credit ; (c) mail fraud, wire
fraud, bank fraud, honest services fraud, and conspiracy to commit these offenses; (d)
money laundering and money laundering conspiracy; and (e) bribery, and aiding and
abetting, attempt, and conspiracy to commit such offenses, in violation of Title 18,
United States Code, Sections 371, 1005, 1014, 1343, 1344, 1346, 1349, 1956, and 1957,
and 2, have been committed, and that evidence, instrumentalities, and fruits relating
to this criminal conduct, as further described in Attachment B, will be found in the
Subject Device, as further described in Attachment A. I therefore respectfully request
that this Court issue a search warrant for the Subject Device more particularly
described in Attachment A, authorizing the seizure of the items described in
Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.


Carrie E. Fisher
Special Agent
Federal Bureau of Investigation


Subscribed and sworn
before me this 26th day of June, 2017

Honorable MARY M. ROWLAND
United States Magistrate Judge

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

The cellular telephone identified as follows:

– An Apple iPhone 6S with 15-digit International Mobile Equipment Identity ("IMEI") number ███████████ .

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities and fruits concerning violation of Title 18, United States Code, Sections 371, 1005, 1014, 1343, 1344, 1346, 1349, 1956, and 1957, and 2, as follows:

1.      Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Device.

2.      Evidence concerning the locations and movements of, and communications between, Stephen M. Calk, Paul J. Manafort Jr. and Jeffrey Yohai.

3.      Evidence of any false statements, pretenses, or representations being used in connection with the extension of credit or in order to induce any transaction;

4.      Evidence of any money, financing, position or thing of value being offered or given to any public official, prospective public official, political campaign official, presidential transition team official, or bank official in order to influence any such official in such official's duties.

5.      Evidence of false reports, fraud, bribery, money laundering, and bank secrecy offenses, or other criminal conduct involving Manafort, Yohai, or Calk.

6.      Evidence establishing the motive, capability, or willingness of Manafort, Yohai, or Calk to commit false reports, fraud, bribery, money laundering, and bank secrecy offenses.

7.     Evidence of the identities or locations of any coconspirators with Manafort, Yohai, or Calk.

8.     Evidence identifying any other accounts capable of storing electronic data, financial accounts, or locations where any physical items may be stored under the control of Manafort, Yohai, or Calk, or any coconspirators, along with any password, account name or number, or other means of access to such accounts or locations.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the electronic device described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the electronic device described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the electronic device described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the

removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

# 1 7 MAG   4750

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Account
pmanafort@dmpint.com Maintained at
Premises Controlled by Rackspace US,
Inc., USAO Reference No.
2017R00368.

--------------------------------------------------

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant**
**for Stored Electronic Communications**

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

JAMES H. HILLIARD, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and states:

## I.  Introduction

### A.  Affiant

1. I am a Special Agent at the Federal Bureau of Investigation ("FBI"). I have been a

Special Agent at the FBI for approximately 26 years. Since 2013, I have been assigned to a group

at the FBI that focuses on the investigation of complex frauds. I have investigated numerous

financial crime and mortgage fraud offenses. In the course of my duties, I have participated in the

execution of search warrants involving electronic evidence and the review of electronic evidence

obtained pursuant to search warrants.

### B.  The Provider, the Subject Account and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18

U.S.C. § 2703 for all content and other information associated with the email account

pmanafort@dmpint.com (the "Subject Account"), maintained and controlled by Rackspace US,

Inc. (the "Provider"), headquartered at 1 Fanatical Place, City of Windcrest, San Antonio, TX 78218. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3. As detailed below, there is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of (a) the making of false entries in the books and reports of a bank in violation of 18 U.S.C. § 1005; (b) fraud in connection with the extension of credit in violation of 18 U.S.C. § 1014; (c) mail fraud, wire fraud, bank fraud, honest services fraud, and conspiracy to commit these offenses in violation of 18 U.S.C. §§ 1341, 1343, 1344, 1346, and 1349; (d) money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957; and (e) bribery in violation of 18 U.S.C. § 201 and 203, and aiding and abetting, attempt, and conspiracy to commit such offenses in violation of 18 U.S.C. §§ 371 and 2 (the "Subject Offenses"), among other statutes. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Provider**

4. I have learned the following about the Provider:

a. The Provider offers email services to the public. In particular, the Provider allows a subscriber to maintain email accounts under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "xyzbusiness.com," the Provider enables the subscriber to host any email address under this domain name (*e.g.*, "john@xyzbusiness.com")

2

6.21.2017

on servers operated by the Provider. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.

b. The Provider maintains the following records and information with respect to every subscriber account:

i. *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii. *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number. In circumstances where the Provider's services are accessed through a reseller, the subscriber and billing information may be that of the reseller

3

instead of the ultimate subscriber, but such information regarding the ultimate subscriber may be present in the content of the email account.

      iv.   *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

      v.   *Customer correspondence.* The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account. In circumstances where the Provider's services are accessed through a reseller, the correspondence may be that of the reseller instead of the ultimate subscriber, but such information regarding the ultimate subscriber may be present in the content of the email account.

      vi.   *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D.  Jurisdiction and Authority to Issue Warrant**

    5.  Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.21.2017

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8. As set forth herein, there is probable cause to believe that the Subject Offenses have been committed by PAUL J. MANAFORT, JR., the former campaign chairman of Donald J. Trump for President, Inc., and STEPHEN M. CALK, the CEO and chairman of the Chicago-based bank The Federal Savings Bank, Inc. ("TFSB"), and others known and unknown, in connection with a scheme in which CALK extended favorable loans totaling approximately $16 million to MANAFORT in exchange for MANAFORT's support for CALK's candidacy for a potential position with the Trump administration, and that evidence of the Subject Offenses may be found in the Subject Account.

9. More specifically, there is probable cause to believe that CALK and MANAFORT conspired to defraud TFSB out of its intangible right to CALK's honest services by having CALK take action to process and approve the loans to MANAFORT in exchange for a personal benefit; that CALK and MANAFORT withheld material information about the loans from TFSB's loan committee and board of directors; and that CALK committed a scheme to defraud another bank

5

that was considering underwriting one of the TFSB loans, BofI Federal Bank ("BofI"), by concealing from BofI material information regarding MANAFORT's creditworthiness. There also is probable cause to believe that MANAFORT's son-in-law JEFFREY YOHAI committed fraud on a different lender, Genesis Capital Corporation ("Genesis Capital"), and that evidence of this fraud may be found in the Subject Account due to YOHAI's communications with MANAFORT during the time period of the fraud.

## 1. Relevant Individuals

10. Based on publicly available information, including news reports, in March of 2016, MANAFORT officially joined Donald J. Trump for President, Inc. (the "Trump Campaign"), the presidential campaign of Donald Trump, in order to, among other things, help manage the delegate process for the Republican National Convention. In May of 2016, MANAFORT became chairman of the Trump Campaign. In June of 2016, MANAFORT reportedly became de facto manager for the Trump Campaign with the departure of prior campaign manager Corey Lewandowski. On August 19, 2016, MANAFORT officially exited his post as chairman of the Trump Campaign. Based on the evidence set forth below, however, following his official departure MANAFORT remained directly involved, on an informal basis, both in Trump Campaign activities and in the Trump presidential transition efforts after the presidential election.

11. Based on publicly-available information and documents obtained from TFSB, JEFFREY YOHAI is MANAFORT's son-in-law, and as set forth in part below, YOHAI was involved in real estate investments with MANAFORT during the relevant time period.

12. Based on publicly-available information and documents obtained from TFSB, CALK is the CEO and chairman of the board of TFSB, a federally-chartered bank owned by the bank holding company National Bancorp Holdings, Inc. TFSB is a Federal Deposit Insurance Corporation member bank. According to TFSB documents, CALK owns approximately 67% of

6

National Bancorp Holdings; CALK's brother John Calk owns approximately 29%; and three other shareholders collectively own approximately 4%.

13. Based on documents obtained from TFSB, Dennis Raico was a senior vice president at TFSB and worked at TFSB offices at 120 Broadway in Manhattan, New York. As set forth below, Raico served as the loan officer on loans to entities associated with MANAFORT.

### 2. MANAFORT's Loans from Genesis Capital

14. Based on court filings and records obtained from Genesis Capital, in February of 2016, Genesis Capital, through affiliated entity Genesis Capital Master Fund II, LLC ("Genesis Master Fund"), extended two loans to a MANAFORT-affiliated entity called MC Brooklyn Holdings LLC ("MC Brooklyn Holdings") in the total amount of approximately $5.3 million. MANAFORT, along with his wife Kathleen Manafort, his daughter Jessica Manafort, and Jessica Manafort's husband (MANAFORT's son-in-law) JEFFREY YOHAI, were the members of MC Brooklyn Holdings, which owned a townhouse in the Carroll Gardens neighborhood of Brooklyn, New York located at 377 Union Street (the "Union Street Property"). MC Brooklyn Holdings originally obtained the Union Street Property in December of 2012.

15. Additionally, based on documents obtained from TFSB, in February of 2016, Genesis Capital funded approximately $3.7 million in a refinance and construction loan secured by a property located at 2401 Nottingham Avenue, Los Angeles, California, 90027 ("2401 Nottingham Avenue"). 2401 Nottingham Avenue was owned by 2401 Nottingham Avenue LLC, which was owned by YOHAI until February of 2016, at which point it became owned by Baylor Holding, LLC, a limited liability company of which MANAFORT and YOHAI were equal partners.

6.21.2017

### 3. YOHAI's Diversion of Genesis Capital Construction Loans to Non-Construction Purposes

16. Based on documents obtained from Genesis Capital, the construction loan portion of the funding issued by Genesis Capital on 2401 Nottingham Avenue (the "Genesis 2401 Nottingham Avenue Loan") totaled $640,000. A substantial portion of that amount appears to have been diverted by YOHAI to pay for personal and other non-construction expenses as follows:

     a. Between March 2015 and November 2015, YOHAI made six requests for draws from the construction loan totaling $640,000. For each request, YOHAI submitted via email to Genesis Capital an itemized list of construction expenses purportedly incurred to date as justification for the draw amount. Once approved by Genesis Capital, construction funds were wired to an account at UBS in the name of 2401 Nottingham LLC, which as set forth above was an entity owned by YOHAI, which subsequently became owned by YOHAI and MANAFORT jointly.

     b. UBS records for the 2401 Nottingham LLC account show six incoming wire transfers from Genesis Capital totaling $640,000 between March 2015 and November 2015. An FBI Special Agent investigating YOHAI ("Agent-1") has informed me that her analysis of the bank records and other documentation shows that more than $480,000 of the $640,000 received from Genesis Capital was spent not on construction expenses but instead to pay YOHAI's personal debts, invest in other businesses, help purchase and/or pay mortgages on unrelated properties, make car payments, and pay other personal living expenses.

17. Based on documents obtained from Genesis Capital, the construction loan portion of the funding issued by Genesis Capital to MC Brooklyn Holdings on the Union Street Property (the "Genesis 377 Union St. Loans") totaled $1,403,532. A substantial portion of that amount also

8

appears to have been diverted by YOHAI for personal and other non-construction expenses as follows:

    a.  Between March 8, 2016 and June 2, 2016, YOHAI made six requests for draws from the construction loan totaling just over $526,000. For each request, YOHAI submitted to Genesis Capital via email an itemized list of construction expenses purportedly incurred to date as justification for the draw amount. Once approved by Genesis Capital, construction funds were wired to an account at UBS in the name of MC Brooklyn Holdings (the "UBS MC Brooklyn Holdings Account").

    b.  UBS records for the UBS MC Brooklyn Holdings Account show six incoming wire transfers from Genesis Master Fund totaling more than $526,000 between March 8, 2016 and June 2, 2016. Agent-1 has informed me that her analysis shows that more than $273,000 of the $526,000 received from Genesis Master Fund during this time period was spent not on construction expenses but instead on payments to satisfy YOHAI's personal debts and to help purchase and/or pay mortgages on unrelated properties owned and/or controlled by YOHAI.

    c.  For example, the bank records reflect that on June 2, 2016, the UBS MC Brooklyn Holdings Account received a wire transfer of $208,467.42 from Genesis Master Fund, and on that same day almost the entire amount—$208,000—was transferred to a YOHAI-controlled limited liability company, whereas previous draws had been transferred directly from the UBS MC Brooklyn Holdings Account to contractors engaged in construction on 377 Union Street.

    d.  Agent-1 informed me that documents obtained from a search warrant of an email account used by Darryl Johnson, who, based on interviews with YOHAI's former

9

employees was employed by YOHAI at the time, show that on June 16, 2016,
Johnson submitted via email a seventh draw request to Genesis for more than
$323,000 of the Genesis 377 Union St. Loans. Johnson's email to the Genesis
construction manager contained information regarding costs incurred on a
document called a Schedule of Value ("SOV"). An SOV found in Johnson's email
account made it appear that YOHAI had incurred costs equal to the June 16, 2016
draw request amount. Agent-1 informed me that in fact, however, a different
employee of YOHAI admitted to the FBI that YOHAI had directed him to create a
falsified SOV which YOHAI intended to submit to Genesis Capital for payment.

**4. The Default on the Genesis Loans**

18. Both the Genesis 377 Union Street Loans and the Genesis 2401 Nottingham Avenue
Loan (along with other loans Genesis Capital extended to YOHAI-related entities) went into
default in 2016. Documents provided by Genesis Capital show that Genesis Capital
representatives made repeated efforts to obtain payments from YOHAI over a course of months in
2016 continuing into the summer of 2016. FBI agents conducting an investigation of YOHAI's
finances interviewed Mitch Solow, who was the Chief Risk Officer and Chief Credit Officer for
Genesis Capital until October 2016. Solow stated that by spring 2016, YOHAI was in default on
all five loans he had from Genesis Capital for reason of non-payment.

19. On September 20, 2016, Genesis Master Fund filed an action in New York Supreme
Court, Kings County (the "Foreclosure Action"), seeking foreclosure of the Genesis 377 Union
Street Loans and sale of the property, naming MC Brooklyn Holdings as well as MANAFORT
and YOHAI personally as defendants. In addition to being a member of MC Brooklyn Holdings,
MANAFORT had personally guaranteed the Genesis 377 Union Street Loans.

6.21.2017

20. After its initiation, the Foreclosure Action was adjourned several times as MANAFORT and YOHAI sought refinancing. On January 18, 2017, the parties entered a stipulation discontinuing the action, after the Genesis Capital loans were paid off through loans obtained by MANAFORT from TFSB, as set forth below.

### 5. MANAFORT's Initial Contacts with TFSB and CALK

21. Based on documents obtained from TFSB, beginning in 2016, MANAFORT began negotiations with TFSB for loans for several purposes, ultimately resulting in TFSB extending two sets of loans to MANAFORT-linked entities in the total amount of approximately $16 million. One loan (the "TFSB Summerbreeze Loan"), for approximately $9.5 million (enough to cover the outstanding balance on the Genesis 2401 Nottingham Avenue Loan), was extended to a company called Summerbreeze LLC that was owned by Kathleen Manafort. A second set of TFSB loans (the "TFSB 377 Union Street Loans"), for $6.5 million, was secured by the Union Street Property and was used to refinance the Genesis 377 Union Street Loans, which terminated the Genesis Foreclosure Action. As described below, CALK, the CEO of TFSB, personally negotiated and helped obtain approval for the loans, while at the same time engaging in numerous discussions with MANAFORT about securing a potential position in the Trump Administration.

22. The TFSB loan officer for both the TFSB Summerbreeze Loan and the TFSB 377 Union Street Loan was Dennis Raico, whose office was at 120 Broadway in Manhattan. In connection with an investigation into YOHAI's finances, FBI agents interviewed Felix Katz, who was a loan broker who knew Raico. Katz stated that he introduced YOHAI and MANAFORT to Raico in or around 2016, at a time when YOHAI and MANAFORT were looking for a bank to refinance their loans with Genesis Capital.[1] Katz further stated that he tried and failed to broker a

---

[1] Emails provided by TFSB from its corporate email system reflect that the first communications between MANAFORT, CALK, and Raico took place in or about late April and early May 2016.

deal for YOHAI and MANAFORT with several different banks prior to TSFB. In one such instance, YOHAI and MANAFORT attempted to obtain a $10 million line of credit from Banc of California, but once the bank did its due diligence, it deemed MANAFORT too high of a risk and the bank ultimately offered only a $1 million line of credit.

### 6. MANAFORT's Appointment of CALK to Trump Economic Advisory Council While Seeking to Refinance the Genesis 2401 Nottingham Avenue Loan

23. According to documents obtained from TFSB, on July 27, 2016, MANAFORT met with Raico in Manhattan (with CALK attending by videoconference) to discuss a proposed loan from TFSB to refinance the Genesis 2401 Nottingham Avenue Loan. CALK and the other members of the TFSB loan committee approved the terms of this loan the next day, leading Raico to remark by email: "Please let me know when I can anticipate a Term Sheet, I'm sure Paul and Jeff will be highly impressed to receive within 24 hours of our meeting." Based on the content of the email, I believe "Paul" is MANAFORT and "Jeff" is YOHAI.

24. Less than a week later, on August 3, 2016, MANAFORT, who at that time served as manager and chairman of the Trump Campaign, emailed Raico from the Subject Account asking for CALK's resume, which Raico said he would forward. The next morning, MANAFORT followed up with Raico from the Subject Account again asking for CALK's resume, and Raico responded that CALK would send it shortly. In that email, Raico also advised MANAFORT that the file for the contemplated loan to refinance the Genesis 2401 Nottingham Avenue Loan was near complete, and asked MANAFORT to ensure that his staff had sent outstanding bank account statements.

25. Later that day, on August 4, 2016, CALK, from his TFSB account, sent his resume to MANAFORT at the Subject Account, writing: "Dennis Raico reached out and asked if I would send you my professional bio and CV. Attached please find both as requested. I look forward to

continuing our conversation." MANAFORT responded: "Per our conversation, I want to add you to the National Economic Advisory Committee for DJT. Is that something you would be able to do?" CALK responded: "I am happy and willing to serve."

26. According to publicly-available information, on August 5, 2016, the Trump Campaign announced the creation of the Trump Economic Advisory Council; CALK was named as one of its 13 members.

27. Solow, the former Chief Risk Officer and Chief Credit Officer of Genesis Capital, stated to FBI agents that in approximately the summer of 2016, after Genesis had refused to provide a cash-out refinance to MANAFORT on one of MANAFORT's properties, YOHAI told Solow that TFSB had agreed to do the refinance because MANAFORT promised CALK a position on the Trump Economic Advisory Council.

28. TFSB emails reflect that on August 9, 2017, Anna Ivakhnik, a TFSB employee, emailed an appraisal firm and asked to set up appraisals for 2401 Nottingham Avenue and a MANAFORT residence in Alexandria, Virginia that was being considered as additional collateral. In this email Ivakhnik wrote: "I am working with Dennis on Paul Manafort's (Trump's campaign manager) loan, and Steve Calk wants to close this by August 15th. I am not able to order the appraisals through our system because the loan hasn't gone through the proper steps yet. Would you be able to manually set up the orders from your end while I set up the file?" In a follow-up email to the appraiser two days later, Ivakhnik wrote: "Thank [you] for moving forward with this before those came through, Myself and Dennis and Steve really appreciate it. P.S. If you find that you can incentivize the appraisers to do it faster for a little extra fee, please do."

29. Documents produced by TFSB show that on August 11, 2016, MANAFORT digitally signed a loan application for the proposed 2401 Nottingham Avenue refinance that listed his

6.21.2017

income as $275,000 per month and his personal net worth as $17,051,676.17. As set forth below, subsequent loan applications submitted by MANAFORT to TFSB contained substantially different representations about MANAFORT's income and net worth.

30. On August 29, 2016, YOHAI emailed Ivakhnik, Raico, and an associate of YOHAI's, and asked: "What is the appraiser coming in at for finalized value after renovation?" Ivakhnik initially replied: "Nothing great. We need major help with the appraisal." Approximately one minute later, Ivakhnik replied again in a separate email: "We literally have to pull bunnies out of hats."

31. On September 8, 2016, MANAFORT's attorney transmitted to TFSB a demand letter to 2401 Nottingham LLC sent by a debt collector that demanded payoff for missed June and July payments on the Genesis 2401 Nottingham Avenue Loan, including late fees and over $2,000 daily interest on the late fees. Raico forwarded this document to Ivakhnik, writing: "Just a fyi – looks like these guys are in default to Genesis........" Ivakhnik wrote back: "It is what it is. Let's send it off to Chicago and have it be part of the file. Ultimately Steve will make the call..."

### 7. CALK's Willingness to Extend Loan to MANAFORT Despite Prior Default and Initial $1 Million Misstatement

32. Based on documents obtained from TFSB, in late August of 2016, at approximately the time when MANAFORT officially left his position with the Trump Campaign, the company Summerbreeze LLC was formed, with MANAFORT's wife Kathleen Manafort as the sole member. TFSB records show that Summerbreeze LLC then took out a loan from a subsidiary of the real estate investment company Spruce Capital Partners in the amount of approximately $3.5 million secured by real estate located at 174 Jobs Lane, Water Mill, NY (hereinafter "174 Jobs Lane" referring to the property and the "Spruce 174 Jobs Lane Loan" referring to the loan).

14

33. Following his official exit from the Trump Campaign on August 19, 2016, MANAFORT continued to correspond with CALK regarding the presidential campaign in a manner that indicated MANAFORT remained involved with it. For example, on September 20, 2016, CALK, from his TFSB account, emailed MANAFORT, at the Subject Account, his name, social security number, and contact information as well as that of another individual, Brigadier General Bernard Banks, "as requested." Subsequent emails between CALK and Trump Campaign officials indicate that CALK attended the first presidential debate on September 22, 2016 as a surrogate, with Banks as his guest.

34. On September 25, 2016, MANAFORT, from the Subject Account, emailed CALK at his TFSB account, and stated: "Text me when you get the email from the Debate Commission with the details for pick up tomorrow. As for lunch, do you want to meet around 12:15[?]" According to TFSB emails, at the lunch, MANAFORT and CALK discussed restructuring the contemplated TFSB loan to include a refinance of the Spruce 174 Jobs Lane Loan. During this meeting, according to CALK's notes and an email by Raico describing the meeting afterward, MANAFORT described the Spruce 174 Jobs Lane Loan as being for $2.5 million, when in fact it was for approximately $3.5 million.

35. On September 27, 2016, Ivakhnik sent CALK and others at TFSB copies of mortgage statements for 174 Jobs Lane, which showed that the Spruce 174 Jobs Lane Loan was for approximately $3.5 million. James Brennan, TFSB's vice president, replied to all recipients: "What the hell he just took the loan out at the end of August how can he be a $1,000,000 off!" Ivakhnik replied, only to Brennan (excluding Raico, CALK and others at TFSB): "He is so in debt."

15

36. Ivakhnik was thereafter terminated from TFSB. I and other FBI agents interviewed Ivakhnik, who stated in substance, among other things, the following:

    a. She discussed the loan with TFSB vice president James Brennan in the course of her work on the loan, and Brennan expressed to her on several occasions that the proposed MANAFORT loan was a bad loan.

    b. There were several issues with the proposed MANAFORT loan. For example, when she ran MANAFORT's credit report in August of 2016, she saw that his credit had dropped significantly compared to his last credit report in June, due to an approximately $300,000 debt MANAFORT had incurred on his American Express card (which MANAFORT claimed was because he had allowed a friend to use it to buy New York Yankees season tickets). Additionally, a number of MANAFORT's assets turned out to be less valuable than expected. Two pieces of real estate considered as collateral each were appraised at over $1 million less than the expected value, and an investment account of MANAFORT's, which TFSB had believed would have a balance of $10 million, had a lower effective value because MANAFORT had taken out a $5 million line of credit against it. Ivakhnik also considered it unusual to approve a construction loan (as the proposed MANAFORT loan was planned to be) for borrowers who, like MANAFORT and YOHAI, lacked construction experience. She also considered it unusual that TFSB was willing to fund the loan despite MANAFORT and YOHAI's default to Genesis Capital.

    c. Ivakhnik stated that she believed that the MANAFORT loan would be approved "no matter what." According to Ivakhnik, Raico told her that he had heard from

> CALK that CALK wanted to be appointed as "VA Administrator," *i.e.*, Secretary
> of Veterans Affairs, by Trump.
>
> d. Ivakhnik stated that, at the end of August of 2016, Brennan told her by phone to
> put any communications related to the MANAFORT loan into emails because this
> matter would be "investigated by the FBI." She advised that when she learned that
> the Spruce 174 Jobs Lane Loan was for $3.5 million (as opposed to $2.5 million),
> she told Brennan about this on the phone, and he advised her to put this information
> in an email, leading her to write the September 27, 2016 email to CALK and other
> recipients described in paragraph 35 above.[2]

37. On October 7, 2016, MANAFORT emailed CALK from the Subject Account and wrote: "We are getting close to closing the loan but there is a major issue. I don't know how to resolve this problem. When we had lunch, I must have had a blackout. I told you that there is a 2.5m first on the Bridgehampton property. I meant to say a 3.5m first." (Although 174 Jobs Lane is in Water Mill, New York, records produced by TFSB show that it is in the Bridgehampton school district and the address is often rendered as being in Bridgehampton, New York.) MANAFORT further stated that he was "not able to" come up with the $1 million difference between the actual $3.5 million value of the Spruce 174 Jobs Lane Loan and the $2.5 million he previously had described, and requested a loan from TFSB to cover the full $3.5 million. MANAFORT added: "I look to your cleverness on how to manage the underwriting. I recognize it was my mistake at our lunch, but the situation is as described." In response, CALK told

---

[2] Ivakhnik stated that the official reason for her termination was failure to follow TFSB's procedures, but that she believed that she was fired for refusing sexual advances from CALK. An employment discrimination lawyer for Ivakhnik who attended the interview stated that Ivakhnik is pursuing a complaint with the New York City Committee on Human Rights.

17

MANAFORT that if the increase in loan amount were possible, it would require adding a property of MANAFORT's in Alexandria, Virginia as additional collateral, which MANAFORT agreed to do. Later that day, Raico emailed MANAFORT at the Subject Account and explained that the loan had been adjusted, writing: "I'm hopeful that we are taking care of your financing needs on our end. We had an 'Emergency Portfolio Committee' meeting a short while ago, and Steve actually pulled in the private board. Your loan amount has now been adjusted from $8.2 Million up to $9.2 Million." Later that day, CALK also emailed MANAFORT at the Subject Account: "Consider it done. Dennis has been directed. We will close on time. Can you call my cell phone this afternoon? I need your advice. ▮▮▮▮▮▮▮"

38. The next morning, on October 8, 2016, MANAFORT, at the Subject Account, emailed CALK's TFSB account, with subject "Sorry I missed you," and explained that he had been offline the previous afternoon and evening, and invited CALK to text him a time for a call. MANAFORT added: "I also want to again thank you for fixing my issue. It means a lot to me. You are becoming a very good friend and I look forward to building our relationship into both a deeper business and personal one."

39. Four days later, on October 12, 2016, CALK emailed MANAFORT at the Subject Account and complained that he was not receiving a Trump Campaign credential to enter the "spin room" as a surrogate after the third presidential debate as he had at the first two. MANAFORT responded: "I will work on this tomorrow, but this is not an issue of eliminating you."

### 8. MANAFORT Seeks a Second Multimillion Dollar Loan from TFSB and Further Restructuring of the Original TFSB Loan

40. In early October, 2016, before MANAFORT and TFSB had closed on the originally contemplated refinancing of the Genesis 2401 Nottingham Avenue Loan, documents provided by TFSB show that MANAFORT sought a second loan from TFSB that would refinance the Genesis

18

377 Union Street Loans, which were the subject of Genesis Capital's Foreclosure Action filed on September 20, 2016. On October 4, 2016, Raico emailed MANAFORT at the Subject Account and wrote: "I am well aware that we need to move very quickly on 377 Union Street, Brooklyn, NY. Bruce has sent me some preliminary information . . . I understand the dynamics that have evolved, and will take care of this quickly. That said, we will close Nottingham next week, and Carol Gardens directly thereafter." Based on the context of this exchange, I believe "Bruce" is MANAFORT's attorney Bruce Baldinger, "Nottingham" refers to the proposed refinance of the Genesis 2401 Nottingham Avenue Loan, and "Carol Gardens" refers to the proposed refinance of the Genesis 377 Union Street Loans.

41. On October 19, 2016, shortly before the closing date for the contemplated refinance of the Genesis 2401 Nottingham Avenue Loan and the Spruce 174 Jobs Lane Loan, TFSB emails reflect that MANAFORT contacted TFSB to request that the loan (referred to herein as the TFSB Summerbreeze Loan) be restructured (a) to be in a higher amount ($9.5 million instead of $9.2 million); (b) not to involve YOHAI as a borrower; and (c) not be secured by the 2401 Nottingham Avenue property as collateral.

42. The next day, October 20, 2016, TFSB President Javier Ubarri emailed Raico and other TFSB personnel and characterized MANAFORT's reasons for the change in structure as wanting to avoid tying his business too closely to YOHAI's. Ubarri explained: "He [MANAFORT] doesn't want to take the 'risk' of his son in law but want[s] us to take that risk." Ubarri then forwarded this email to CALK.

43. Following these communications, TFSB decided no longer to pursue the TFSB Summerbreeze Loan as a "portfolio" loan for which TFSB would assume all of the risk, and instead proposed the loan to BofI Federal Bank ("BofI") for underwriting. A November 1, 2016 email

19

from Raico to other TFSB personnel described CALK's interest in obtaining assistance from BofI: "I'm just getting a little pressure from Steve Calk as we flipped this out of Portfolio into a potential submission to B of I. Steve is waiting on their decision on Manafort, to hop on a plane and sit with their CEO to discuss how they have been handling some of our larger loan amount transactions."

### 9. MANAFORT's Varying Representations in His Loan Applications

44. Two loan applications for the TFSB Summerbreeze Loan were produced by TFSB, unsigned by MANAFORT but dated October 26, 2016. Both listed MANAFORT's income as approximately $224,846 per month. One listed the net worth of MANAFORT and Kathleen Manafort as co-borrowers as $21,376,722.13. The other listed the net worth of MANAFORT and Kathleen Manafort as co-borrowers as $6 million lower, or $15,376,722.13.[3]

45. Two days later, on October 28, 2016, MANAFORT and Kathleen Manafort signed a loan application for the TFSB Summerbreeze Loan listing MANAFORT's income as $100,652 per month and their net worth as co-borrowers as $34,685,418.13.

46. Three days after that application was submitted, on November 1, 2016, MANAFORT and Kathleen Manafort signed a loan application for the TFSB 377 Union Street Loans listing MANAFORT's income as $224,846 per month and their net worth as co-borrowers as $14,994,402.13.

---

[3] As set forth above, on August 11, 2016, MANAFORT digitally signed a loan application in his own name (without his wife as co-borrower) listing his income as $275,000 per month and his net worth as $17,061,676.17.

6.21.2017

10. **CALK's Application for Senior Trump Administration Positions and the Closing of the TFSB Summerbreeze Loan**

47. According to TFSB documents, as of November 8, 2016, the date that Donald Trump was elected President of the United States, neither the TFSB Summerbreeze Loan nor the TFSB 377 Union Street Loans had closed.

48. On November 14, 2016, CALK, from his TFSB account, emailed MANAFORT at the Subject Account, writing: "In advance of our conversation, please see the attached. Thank you for all your guidance and assistance." Attached were a professional bio for CALK and a document titled "Stephen M. Calk Perspective [*sic*] Rolls in the Trump Administration.docx" that listed ten Cabinet-level secretary, deputy secretary, and undersecretary positions in rank order, starting with Secretary of the Treasury, Deputy Secretary of the Treasury, Secretary of Commerce, and Secretary of Defense. This document also had a section titled "Ambassadorships I would like in rank order" that listed 19 ambassadorships in order from the United Kingdom to Singapore.

49. Less than an hour later, CALK, from his TFSB account, forwarded MANAFORT, at the Subject Account, a press release announcing the implementation phase of the presidential transition team, and wrote: "Are you aiding in the transition in any type of formal capacity?" MANAFORT responded later that day: "Total background but involved directly." CALK then responded: "Awesome. Did you get my texts?," and MANAFORT replied: "Got the text Going to try to work my schedule to confirm by noon if I can do."[4]

50. The next day, November 16, 2016, CALK emailed MANAFORT at the Subject Account and wrote: "Will you please review the attached document prepared at your request and

---

[4] Also on November 14, CALK emailed other TFSB personnel and directed them to ensure that TFSB's security interests in the TFSB Summerbreeze Loan were "documented perfectly" and "FULLY enforceable."

6.21.2017

advise what changes and improvements I should make. My goal is to ensure you or my designated prosper has all of the information they need to have me successfully chosen by the President-Elect. I look forward to your response." Attached to CALK's email was a document titled "Stephen M. Calk – Candidate for Secretary of the Army.docx."

51. That day, BofI approved underwriting the TFSB Summerbreeze Loan up to only $7 million, not the full $9.5 million loan amount.

52. Despite the BofI underwriting shortfall, the TFSB Summerbreeze Loan closed on November 16, 2016. The final TFSB credit approval memorandum produced by TFSB did not mention the 2401 Nottingham Avenue default or the Foreclosure Action against MANAFORT personally, and assigned the TFSB Summerbreeze Loan a risk factor of "4 (Average)."

53. On November 17, 2016, Raico wrote to CALK with a summary of certain loans, and described the TFSB Summerbreeze Loan as a "TFSB portfolio loan," which I know from my interview of Ivakhnik refers to a loan for which TFSB bears the entire risk. That same day, CALK directed Raico to work on attempting to sell the TSFB Summerbreeze Loan to BofI. In an email several weeks later, Raico gave the following explanation to another TFSB employee: "We were experiencing some delays with B of I in attempting to attain an approval. We have additional deals in Portfolio contingent upon this $9.5 Mil cash out occurring. That said, Steve Calk stepped in and we ended up closing this in Portfolio on 11/16/16."

## 11. CALK's Pursuit of Senior Department of Defense Positions and Efforts to Secure the 377 Union Street Loans

54. Three days after the TFSB Summerbreeze Loan closed, on November 19, 2016, CALK re-sent to MANAFORT at the Subject Account the document titled "Stephen M. Calk – Candidate for Secretary of the Army.docx," and wrote: "I am resending the following three attachments including my professional bio, the case for me to become the 22nd Secretary of the Army and my

requested list of ranked appointments by the President. I am very grateful for your assistance in supporting my appointment as Secretary of the Army." The attached materials listed CALK's Trump Campaign activities as a qualification for the job because they demonstrated his "loyalty."

55. On November 25, 2016, CALK emailed MANAFORT at the Subject Account and attached a different version of "Stephen M. Calk Perspective Rolls in the Trump Administration.docx" that still listed Secretary of the Army as the first choice but had a different ranking of other cabinet secretary, deputy secretary, and undersecretary positions. CALK wrote: "Please find attached an updated 'wish list' of positions that I believe I am highly qualified for and that I . . . would like to be considered for. As you know, my number one desire is to serve as Secretary of the Army. Please let me know when we may speak briefly about this list. Many thanks for your kind support and guidance." MANAFORT responded later that day: "I have this updated list. I am available to speak around 2:30pm EST today if that works for you."

56. On December 5, 2016, CALK forwarded to MANAFORT at the Subject Account a Trump Campaign email advising of a Trump rally in Michigan. CALK wrote: "President Elect Trump will be in Michigan on Friday. Should we arrange a meeting while he is near by? Do you think we are making any progress re: SECARMY?" MANAFORT replied: "He is not doing meetings on the road on these types of matters. I will be calling you later today with updates." The next day, on December 6, 2016, MANAFORT emailed CALK from the Subject Account: "Call me when you have a moment. I have tried several times but the circuits are ringing busy."

57. On December 7, 2016, MANAFORT, from the Subject Account, wrote to Raico, copying CALK and MANAFORT's attorney Bruce Baldinger, with subject line "Nervousness is setting in." MANAFORT wrote: "As you know, the properties go to auction on Dec 21," and indicated his concerns about the fact that no closing had been scheduled for the TFSB 377 Union

Street Loans (or other loans MANAFORT had discussed pursuing with TFSB after the 377 Union Street Loans). Raico responded: "As you have noted, I am aware of the auction dates," and stated that TFSB was "moving as quickly as possible ensuring the appropriate due diligence." Later that day, in response to an additional follow-up message from MANAFORT, CALK stated that he would like to join the next call between Raico and MANAFORT, and wrote: "it looks like we will be forced to take additional cash collateral for your Brooklyn deal due to our legal maximum loan amount to any one individual or entity."

58. The next day, December 8, 2016, CALK wrote to Raico: "I still do not understand your plan to get Manafort's next loan approved and closed. What is your plan?"

59. On December 14, 2016, Raico emailed a summary of the TFSB Summerbreeze Loan to another TFSB employee, and explained that TFSB was trying to sell this loan to BofI. Raico wrote: "They are trying to get this done ASAP, as we are on a deadline to close another $7 Mil Portfolio for Paul on or before 12/20/16, and need to get the larger one off our books. I'm told this is strictly TFSB internal information, and should not be shared with outside individuals."

60. On December 15, 2016, Raico emailed an appraisal company to follow up on the appraisals for 377 Union Street, stating: "As previously discussed, I have our Chairman all over me regarding these appraisals."

61. On December 16, 2016, another TFSB employee forwarded CALK an email from BofI raising legal objections to the sale of the TFSB Summerbreeze Loan and stated: "Time for you to call the CEO of BofI [and] have a high level direct conversation." CALK then wrote to the President of TFSB, Javier Ubarri, and stated: "Javier, please direct the immediate preparation of all documents necessary to facilitate this loan sale PERSONALLY, today. Please oversee all

appropriate documentation preparation for Paul Manafort's signature and ensure it is all correct and then call me for direction."[5]

62. On December 21, 2016, MANAFORT's attorney Bruce Baldinger, upon receiving the appraisals for 377 Union Street from Raico, wrote to CALK and stated: "I will speak with Paul and contact you a little later re closing." CALK responded: "Bruce, we are in no way scheduling a closing until this loan is fully structured, underwritten and approved. You must stop your presumptuous emails. We are working very hard to help find solutions to help Paul out in his hour of need."

63. On December 23, 2016, CALK sent an email to MANAFORT at the Subject Account with the subject "Inaugural Invitees" that included several sets of names and contact information, including his own.

64. On December 27, 2016, CALK sent an email to "Jim," which was answered by an assistant to General James Mattis, who at that time had been announced by then-President-Elect Trump as prospective nominee for Secretary of Defense. CALK wrote: "I believe that Steve Bannon will be speaking to you again about me today. My cell phone is ███████. I am the gentleman that Dell Dailey and Robert Gates spoke to you about."

65. On January 5, 2017, TFSB vice president James Brennan emailed CALK and his brother John Calk and stated: "In order for The Federal Savings Bank to stay within its legal lending limit for the Manafort relationship[,] National Bancorp Holdings needs to buy two loan participations," and attached for their signature participations that would give National Bancorp Holdings ownership of $4.2 million of the $6.5 million amount of the TFSB 377 Union Street

---

[5] A representative of BofI informed me that BofI did not ultimately purchase this loan.

6.21.2017

Loans. I believe that the use of this structure demonstrates the lengths CALK was willing to go to in order to confer a benefit on MANAFORT.

66. On January 9, 2017, a presidential transition team representative using a Trump Campaign email address emailed CALK and advised CALK that he was scheduled for an interview at Trump Tower the next day, January 10, 2017. The email further advised CALK of the names of his interviewers, and directed him to return a questionnaire and various application materials. CALK, from his TFSB account, responded later that day with the questionnaire, his resume, a photograph, and a list of bullet points in support of his candidacy for Under Secretary of the Army. CALK's attached resume identified him as having been in the United States Army Reserve from June 1985 to February 2001 as a rated combat helicopter pilot and having attained the rank of captain.

67. On January 10, 2017, CALK emailed retired Congressman John Sweeney, one of his listed interviewers, and stated: "The purpose of this message is to thank you so very much for the opportunity to visit with you today regarding my desire to serve as Deputy Secretary of Defense or in other such capacity as the President may offer me." CALK further stated: "It is easy to see why Paul Manafort has such great respect and admiration for you." I believe CALK's use of MANAFORT's name when corresponding with his interviewer reflects CALK's belief that MANAFORT was offering active support to CALK's candidacy.

68. On January 12, 2017, CALK wrote to General Mattis's assistant and stated: "I am following up on my request to set up a meeting with GEN Mattis at the request of the Tiger Team that I interviewed with in New York at Trump Tower this week. I know that Anthony Scaramucci and others will be reaching out on my behalf as well. My hope is to meet with the General either tomorrow the 13th or late on Friday the 20th after the inauguration and before the Inauguration

6.21.2017

Balls begin." Based on public reporting, then-President-Elect Trump announced his intent on January 12, 2017 to appoint Scaramucci to a White House position, though Scaramucci ultimately was not appointed.

69. On January 16, 2017, CALK wrote to Scaramucci and stated: "I am looking forward to seeing you at the inauguration. Would you possible be able to give me a status on where I stand or when I may hear something on my appointment for Under SECARMY?"

70. On January 17, 2017, the TFSB 377 Union Street Loans funded, resulting in $6.5 million being paid for the benefit of MANAFORT and Kathleen Manafort. The Foreclosure Action was terminated by stipulation executed the next day. The final TFSB credit approval memorandum produced by TFSB did not mention the 2401 Nottingham Avenue default or the Foreclosure Action against MANAFORT personally, and assigned the TFSB 377 Union Street Loans a risk factor of "4 (Average)."

71. On March 6, 2017, CALK, from his TFSB account, emailed a "Sean" at "sms45@who.eop.gov," with the subject line "Stephen Calk-SECARMY," and stated that he had heard back from General Mattis's office and interviewed with the Secretary of Defense's chief of staff on February 7, but had not heard anything since. As of this application, I am not aware of CALK receiving any appointment with the Trump administration.

### B. Probable Cause Regarding the Subject Account

72. For the reasons set forth above, there is probable cause to believe that MANAFORT, CALK, YOHAI and others known and unknown committed the Subject Offenses by, among other things, conspiring to defraud TFSB of its right to CALK's honest services and to commit bribery through an attempted *quid pro quo* agreement in which CALK extended favorable loans to MANAFORT in exchange for MANAFORT assisting CALK's efforts to obtain a senior Trump administration position; conspiring to conceal the Foreclosure Action and MANAFORT's prior

27

default from BofI; conspiring to defraud TFSB by withholding material information from TFSB's board of directors and loan committee and/or by manipulating the income and net worth representations in MANAFORT's loan applications; and conspiring to launder the proceeds of these frauds; and that YOHAI committed fraud on Genesis Capital in connection with properties in which he jointly invested with MANAFORT.

73. There is probable cause that the Subject Account contains evidence, fruits, or instrumentalities of the Subject Offenses. As set forth in detail above, MANAFORT used the Subject Account in numerous communications with CALK and other TFSB personnel relevant to the apparent attempted *quid pro quo* exchange. Indeed, it is likely that the Subject Account contains evidence of communications with others that constitute evidence of the Subject Offenses, including MANAFORT's communications with the Trump Campaign, presidential transition team, or administration representatives. Moreover, because the Subject Offenses continued until recently, it is likely that information still remains in the Subject Account (or, if information was deleted from the account, that fact also would be evidence of the Subject Offenses). A preservation request pursuant to 18 U.S.C.§ 2703(f) was sent to the Provider on May 25, 2017.

74. Moreover, there is probable cause that the Subject Account contains communications between YOHAI and MANAFORT that may serve as evidence, fruits, or instrumentalities of YOHAI's fraud on Genesis Capital because (a) multiple emails produced by TFSB reflect that MANAFORT (using the Subject Account) and YOHAI were both copied on communications involving TFSB, or were engaged in communications with one another subsequently forwarded to TFSB, and (b) as described above, MANAFORT and YOHAI were effectively co-owners of 2401 Nottingham Avenue and 377 Union Street, which were used as collateral for loans obtained from Genesis Capital that were the subject of YOHAI's fraud.

6.21.2017

## C. Evidence, Fruits and Instrumentalities

75. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

76. In particular, I believe the Subject Account is likely to contain the following information:

- evidence of the Subject Offenses (such as discussions of fraudulent conduct or efforts undertaken by MANAFORT or others evidencing the potential *quid pro quo* agreement between MANAFORT and CALK)

- communications constituting the Subject Offenses (such as emails containing fraudulent representations);

- preparation for the Subject Offenses (such as the preparatory steps that MANAFORT used to secure financing or to conceal YOHAI's fraud);

- state of mind (such as emails between coconspirators or communications relevant to MANAFORT's finances and his motives for seeking financing in this manner);

- geographic location of user, computer, or device (such as, through content or header information, establishing MANAFORT's whereabouts at different times during the scheme, which may be relevant to proving the existence of meetings, demonstrating MANAFORT's intent, or corroborating other evidence)

- identities and locations of co-conspirators (such as through communications that reveal that other persons were aware of or participated in the Subject Offenses)

6.21.2017

- location of other evidence (such as emails reflecting registration of other online accounts potentially containing relevant evidence); and

- passwords or other information needed to access user's computer or other online accounts (particularly if any such accounts, such as messaging accounts, are protected by encryption).

## III. Review of the Information Obtained Pursuant to the Warrant

77. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

78. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods

30

are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Request for Non-Disclosure and Sealing Order

79. The scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, given that targets of the investigation are known to use computers and electronic communications in furtherance of their activity, the targets could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. Additionally, given the highly sensitive nature of the investigation, including the nature of MANAFORT's prior public position and history, this case presents heightened risks of flight or intimidation to persons if it is fully disclosed.

80. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of 180 days from issuance, subject to extension upon application to the Court, if necessary.

31

6.21.2017

81. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V. Conclusion

82. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.


James H. Hilliard
Special Agent
Federal Bureau of Investigation


Sworn to before me this
21st day of June, 2017

S/James L. Cott

HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

6.21.2017

AO 93 (Rev. 11/13) Search and Seizure Warrant                    AUSA Steven J. Dollear, (312) 353-5359

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

Case Number:

The cellular telephone, further described in                    **17 M 335**
Attachment A

## SEARCH AND SEIZURE WARRANT

To: Carrie E. Fisher and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of

the following person or property located in the Northern District of Illinois:

### See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person

or property described above, and that such search will reveal:

### See Attachment B

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before July 10, 2017 in the daytime (6:00
a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate
Judge.

Date and time issued: June 26, 2017        5 ·05 PM

_____
*Judge's signature*

City and State: Chicago, Illinois          MARY M. ROWLAND, U.S. Magistrate Judge
                                           *Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF ITEM TO BE SEARCHED

The cellular telephone identified as follows:

– An Apple iPhone 6S with 15-digit International Mobile Equipment Identity
("IMEI") number ███████████ .

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence, instrumentalities and fruits concerning violation of Title 18, United States Code, Sections 371, 1005, 1014, 1343, 1344, 1346, 1349, 1956, and 1957, and 2, as follows:

1.  Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Device.

2.  Evidence concerning the locations and movements of, and communications between, Stephen M. Calk, Paul J. Manafort Jr. and Jeffrey Yohai.

3.  Evidence of any false statements, pretenses, or representations being used in connection with the extension of credit or in order to induce any transaction;

4.  Evidence of any money, financing, position or thing of value being offered or given to any public official, prospective public official, political campaign official, presidential transition team official, or bank official in order to influence any such official in such official's duties.

5.  Evidence of false reports, fraud, bribery, money laundering, and bank secrecy offenses, or other criminal conduct involving Manafort, Yohai, or Calk.

6.  Evidence establishing the motive, capability, or willingness of Manafort, Yohai, or Calk to commit false reports, fraud, bribery, money laundering, and bank secrecy offenses.

7.    Evidence of the identities or locations of any coconspirators with Manafort, Yohai, or Calk.

8.    Evidence identifying any other accounts capable of storing electronic data, financial accounts, or locations where any physical items may be stored under the control of Manafort, Yohai, or Calk, or any coconspirators, along with any password, account name or number, or other means of access to such accounts or locations.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the electronic device described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the electronic device described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.  examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.  opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the electronic device described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the

removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.