UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                             :
   UNITED STATES OF AMERICA,                 :
                                             :     Case No. 19 Cr. 366 (LGS)
       - against -                           :
                                             :
   STEPHEN M. CALK,                          :
                                             :
               *Defendant*.                  :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF DEFENDANT STEPHEN M. CALK'S PRETRIAL MOTIONS AND MOTION TO TRANSFER VENUE

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.     The iPhone Evidence Should Be Suppressed ..................................................... 3

       A.     The Government's Omissions were Material to the Probable Cause
              Determination ......................................................................................... 3

              1.     Loan Terms ................................................................................... 3

              2.     James Brennan ............................................................................. 6

              3.     Jeffrey Yohai ................................................................................ 8

              4.     Knowledge of Defaults ............................................................... 10

       B.     The Government Had an Obligation to Return to Judge Rowland After it
              Acquired Additional Exculpatory Information ...................................... 11

II.    The Record Indicates That The Government May Have Misled The Grand Jury, And
       It Therefore Must Produce The Grand Jury Transcripts .................................. 15

III.   The Narrow Category of Discovery At Issue Is Material To Preparing The Defense
       And Its Disclosure Would Not Burden The Government Or Violate A Privilege .......... 18

IV.    The Touchstone of Rule 21(b) Is Convenience, Which Clearly Favors Transfer In
       This Case ........................................................................................................ 21

CONCLUSION ............................................................................................................. 25

KL3 3282064.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Matter of Balsimo*,
   68 F.3d 185 (7th Cir. 1995) ......................................................................22

*Morse v. Fusto*,
   804 F.3d 538 (2d Cir. 2015)......................................................................16

*United States v. Brooks*,
   No. 08-Cr-35 (PKL), 2008 WL 2944626 (S.D.N.Y. July 31, 2008) ......................................23

*United States v. deVegter*,
   198 F.3d 1324 (11th Cir. 1999) ..................................................................4

*United States v. Flom*,
   No. 14-Cr-507 (RRM), 2015 WL 6506628 (E.D.N.Y. Oct. 27, 2015)..................................23

*United States v. Jain*,
   93 F.3d 436 (8th Cir. 1996) ......................................................................4

*United States v. Larsen*,
   No. 13-Cr-688 (JMF), 2014 WL 177411 (S.D.N.Y. Jan. 16, 2014)......................................23

*United States v. Layne*,
   No. 05-Cr-87 (HB), 2005 WL 1009765 (S.D.N.Y. May 2, 2005)........................................23

*United States v. Lombardozzi*,
   491 F.3d 61 (2d Cir. 2007)........................................................................16

*United States v. Marin-Buitrago*,
   734 F.2d 889 (2d Cir. 1984)......................................................................12

*United States v. One Residential Prop.*,
   312 F. App'x 8 (9th Cir. 2008) ..................................................................12

*United States v. Pastore*,
   No. 17-Cr-343 (NSR), 2018 WL 395490 (S.D.N.Y. Jan. 11, 2018) ......................................24

*United States v. Paul J. Manafort, Jr.*,
   No. 17-Cr-201 (ABJ) (D.D.C. Sept. 14, 2019) ..............................................17, 18

*United States v. Paul J. Manafort, Jr.*,
   No. 18-Cr-0083 (TSE) (E.D. Va. Aug. 13, 2018)....................................................7

ii

*United States v. Posner*,
   549 F. Supp. 475 (S.D.N.Y. 1982) ...............................................................................22, 23

*United States v. Rajaratnam*,
   719 F.3d 139 (2d Cir. 2013)........................................................................................15

*United States v. Rajaratnam*,
   No. 09-Cr-1184 (LAP) (S.D.N.Y. October 7, 2010) ............................................15

*United States v. Rigas*,
   258 F. Supp. 2d 299 (S.D.N.Y. 2003)........................................................................18

*United States v. Riley*,
   296 F.R.D. 272 (S.D.N.Y. 2014) ...............................................................................25

*United States v. Rodriguez*,
   No. 16-Cr-41-FPG-HBS, 2018 WL 2126429 (W.D.N.Y. May 9, 2018)................23

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003).........................................................................................4

*United States v. Spy Factory, Inc.*,
   951 F. Supp. 450 (S.D.N.Y. 1997) .............................................................................23

*United States v. Stein*,
   488 F. Supp. 2d 350 (S.D.N.Y. 2007).............................................................18, 19, 20

*United States v. Urena*,
   989 F. Supp. 2d 253 (S.D.N.Y. 2013).................................................................19, 20

*United States v. Vilar*,
   No. S305-Cr-621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)................15

*United States v. Williams*,
   504 U.S. 36 (1992)......................................................................................................16

*United States v. Wilson*,
   No. 01-Cr-53 (DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001) .........................24

**Federal Statutes**

18 U.S.C. § 215......................................................................................................4, 16

**Rules**

Fed. R. Crim. P. 6(e)(3)(E)(ii) ...................................................................................15

Fed. R. Crim. P. Rule 21(b) .......................................................................3, 21, 22, 23

iii

Fed. R. Crim. P. 21(b), Comm. Notes on Rules—2010 Amendment (2010) ..............................22

**Other Authorities**

Andrew E. Kramer, et al., *Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief*, The New York Times (Aug. 14, 2016) ..........................................7

Maggie Haberman, et al., *Paul Manafort Quits Donald Trump's Campaign After a Tumultuous Run*, The New York Times (Aug. 19, 2016).......................................................8

KL3 3282064.1

Defendant Stephen M. Calk respectfully submits this consolidated reply memorandum in further support of his pretrial motions and motion to transfer venue, filed November 8, 2019.[1]

## PRELIMINARY STATEMENT

In its Opposition, the government acknowledges that the two loans TFSB made to Paul Manafort were secured by sufficient collateral, and claims that the Fisher Affidavit "never contended or suggested that the loans were simply sham loans offering no value to the Bank in exchange for the risk." (Gov't Br. at 17).[2]  These are remarkable concessions given the impression the government has sought to convey in its lengthy speaking indictment and press release – namely, that Mr. Calk caused TFSB to make high-risk loans, harmful to the bank, and resulting in millions of dollars of losses, in an effort to obtain a personal benefit from Manafort. Now the government has pivoted, arguing that Mr. Calk's conduct would be criminal "even were the loans entirely sound and advantageous." (*Id.* at 16).  It does so in an effort to minimize the import of its omissions from the Fisher Affidavit, but in the process calls into question its charging theory and decision to pursue this case.

The government claims that the terms of the loans were "simply not material information" that it was required to present to Magistrate Judge Rowland. (*Id.*).  That is clearly

---

[1] The government's Opposition, filed December 6, 2019 (Docket No. 38), addressed both our pretrial motions (Docket No. 37) and our motion to transfer venue (Docket No. 34).  For the Court's convenience, we have consolidated our response to the Opposition in this single reply brief.

[2] Citations to "Gov't Br." refer to the government's memorandum in opposition to defendant's pretrial motions, Docket No. 38.  Citations to "Def. Br." refer to the defendant's memorandum in support of his pretrial motions, Docket No. 37.  Citations to "Schoeman Decl." refer to the declaration of Paul H. Schoeman, Esq., submitted with defendant's pretrial motions and currently under seal pending resolution of certain redactions, *see* Docket No. 35.  Citations to "Fisher Aff." refer to the affidavit of Special Agent Carrie E. Fisher, Schoeman Decl. Ex. A.

wrong.  Even the government, in the course of trying to articulate why the loan terms were not important to its application, concedes that the terms were relevant to proving motive and intent, which was at the heart of the probable cause determination.  If TFSB had granted to Manafort no-interest loans without security, the government would surely be arguing that this was highly relevant, material evidence that Mr. Calk caused TFSB to make the loans for improper reasons. The converse must also be true – evidence that the loan terms were sound and in the bank's interest is a strong indication that there was a perfectly legitimate and lawful explanation for the extension of the loans to Manafort.  A *Franks* hearing is necessary to determine why the government chose to leave out of its affidavit this critical information, along with an abundance of other material facts undermining its theory of probable cause.

Similarly, the government cannot explain away its failure to alert Magistrate Judge Rowland of the numerous exculpatory statements it obtained from TFSB witnesses. Statements by the bank's president and chief operating officer (neither of whom have been charged with wrongdoing), among others, directly contradicting the claims in the affidavit, were highly relevant and material to the probable cause determination.  It was for Magistrate Judge Rowland, not the government, to decide what weight to give them.  The excuses the government offers with respect to this, and other, omitted evidence, are based on unsworn, unsupported, and untested factual assertions, further underscoring the need for a *Franks* hearing.

The government's Opposition also fails to adequately address the issues raised by the defense motion to review the grand jury transcripts.  It applies the wrong legal standard, tries to minimize the import of the information it left out of its grand jury presentation, and does not convincingly explain how it could have in good faith presented testimony by Manafort – at the

time a cooperating witness – to another grand jury that contradicted the theory it presented to the grand jury in this District.

In opposing the defense's motion for production of the government's discovery correspondence with the Office of the Comptroller of the Currency ("OCC") and Presidential Transition Team ("PTT"), the government argues for an unduly narrow interpretation of Rule 16, seeking to deny the defense access to documents that would clearly help us to understand the meaning of what has been produced and identify relevant, admissible documents that were withheld by the government and remain in the possession of the OCC and PTT.

Finally, the government's Opposition to our venue transfer motion argues for a more onerous standard than Rule 21(b) and *Platt* require, in effect claiming that the Court must deny the motion unless the defense can show prejudice were the trial to be held in this District. That is not the standard. Rather, the rule and the cases interpreting it focus on convenience, including convenience to the alleged victim – here, TFSB – a factor that the government ignores. Significantly, TFSB, a regional bank based in Chicago, also happens to employ many of the key witnesses. This is the unusual case in which all of the *Platt* factors are either neutral or weigh in favor of transfer. Accordingly, we respectfully submit that the Court should exercise its discretion and transfer this case to the Northern District of Illinois, the far more logical, convenient, and economical venue.

**ARGUMENT**

**I.     The iPhone Evidence Should Be Suppressed**

      **A.     The Government's Omissions were Material to the Probable Cause Determination**

            *1.     Loan Terms*

In our opening memorandum, we described critical evidence, known to the government at the time it presented the Fisher Affidavit, that it chose to omit. Among these were

the terms of the two Manafort loans – including the fact that the loans were secured by property and cash significantly in excess of the loan amounts, carried a substantial interest rate of 7.25%, and required payment up front to the bank of three "points" on the first loan and two "points" on the second loan (*i.e.,* 3% and 2% of the loan amount).  This was basic information about the loans, self-evidently relevant, and there was no reason to keep it out of the Fisher Affidavit, other than because it undermined the government's case that there was probable cause that Mr. Calk had committed a crime.

In its Opposition, the government struggles to explain why it omitted this information.  First, it says that the loans terms were not material information "because the quality of the loans is not an element of an honest services fraud offense."  (Gov't Br. at 16).  But whether or not the soundness of the loan terms is itself an "element" of the offense,[3] the terms clearly are relevant and material to the question of whether Mr. Calk intended to defraud TFSB. Among other things, they explain why Mr. Calk, along with the other members of the loan committee, would have approved making the loans:  they believed the loans were in the bank's interest.  Indeed, the government itself concedes the relevance of the loan terms, arguing elsewhere in its brief that "the risky qualities of the loans may shed light on Calk's motive and intent in approving them," (*id.* at 16), and that the loan quality was relevant "as shedding light on

---

[3]  The cases the government cites in support of this proposition all involved bribery of public officials.  (Gov't Br. at 16).  It is not at all clear that a private-sector employee commits honest-services wire fraud (which requires a breach of the duty of loyalty, *see United States v. Rybicki*, 354 F.3d 124, 141-42 (2d Cir. 2003)), if he or she engages in a *quid pro quo* that also benefits his or her employer.  *See id*; *United States v. deVegter*, 198 F.3d 1324, 1328-29 (11th Cir. 1999); *United States v. Jain*, 93 F.3d 436, 442 (8th Cir. 1996).  Notably, the government ultimately declined to charge Mr. Calk with honest-services wire fraud (or any of the eight other Subject Offenses described in the Fisher Affidavit), instead resorting to a rarely used statute, 18 U.S.C. § 215.

Calk's motive and intent in showing his willingness to extend the loans despite the risks," (*id.* at 17). Essentially, the government is arguing that evidence it believes demonstrates the riskiness of the loans is material, but evidence undermining this claim (including the fact that the bank was protected in the event of default by a security interest in collateral worth more than the loans themselves) is not. This is an entirely disingenuous position, which should be the subject of further scrutiny at a *Franks* hearing.[4]

As a fallback, the government seeks to rely on the OCC's downgrade of the loans, which was done not only long after the loans were made but also subsequent to the issuance and execution of the warrant. The government argues that the OCC's after-the-fact determination establishes that "the omissions were therefore not material in a manner that necessitates a *Franks* hearing, because the 'hypothetical corrected affidavit' with the omitted information 'still established probable cause.'" (*Id.* at 18) (citations omitted). This is incorrect. First, the OCC's analysis could not have been considered by the magistrate, as it came in July 2017, after the execution of the search warrant. Separately, the government's description of the OCC's analysis is inaccurate. The OCC did not find that the collateral was inadequate or the interest rate was unduly low. In fact, for both loans it found that the collateral coverage was satisfactory and that the loans were "current and paying as agreed." The criticism leveled by the OCC with regard to five of the bank's loan relationships (of which Manafort was only one, the four others having nothing to do with this case), was that the underwriting department did not accurately assess cash

---

[4] Bizarrely, the government claims that, "by not bringing up any deficiency with the collateral, the affidavit effectively *did* disclose that the loans were not undercollateralized – an inadequacy in the collateral would be so patently improper that one would expect it to be mentioned if it existed." (*Id.* at 16-17). Thus, as the government would have it, lack of adequate collateral would have been highly relevant and a fact worthy of inclusion in the affidavit, but TFSB's decision to require substantial collateral was irrelevant, immaterial, and beside the point.

flow from tax returns.  In other words, the OCC found that TFSB had used a flawed methodology in calculating the cash flow of multiple loan recipients.  Given that the methodology was developed by TFSB's underwriting department and used for clients other than Manafort, the OCC's finding has no probative value with regard to Mr. Calk's intent.

### 2.    *James Brennan*

The government argues that its omissions relating to James Brennan – the TFSB underwriter in charge of analyzing the Manafort loans – were not material.  But in its affidavit, the government relied on Brennan's purported statement to TFSB sales assistant Anna Ivakhnik (as she related it to the FBI), that "the proposed Manafort loan was a bad loan."  (Fisher Aff. at ¶ 35(a) (Schoeman Decl. Ex. A)).  According to the affidavit, Brennan expressed this to Ivakhnik "on several occasions."  (*Id.*).  The government further relied on Ivakhnik's claim that Brennan told her "to put any communications related to the Manafort loan into emails because this matter would be 'investigated by the FBI'" – an assertion that the government describes in its Opposition as highly probative of Mr. Calk's "state of mind."  (Gov't Br. at 20).

Having decided to rely on this information in the Fisher Affidavit, the government was obliged to advise Magistrate Judge Rowland of information that directly undermined it.  Yet the government chose not to advise the magistrate that Brennan oversaw and approved loan memoranda contradicting what Ivakhnik claims Brennan told her.[5]  The loan memoranda recommended that, despite certain stated risks, an "average" (or 4) risk rating was appropriate

---

[5]  The government says that Brennan only signed one of the memoranda for the two loans. (Gov't Br. at 15, 18, 20).  But, as is evident on the face of the documents, he signed both, although his name was printed only on the memorandum concerning the second Manafort loan. (*See* TFSB Credit Approval Form and Loan Memorandum (November 11, 2016) ("Credit Approval Form and Loan Memorandum") (Schoeman Decl. Ex. C); TFSB Loan Memorandum (January 5, 2017) ("Loan Memorandum") (Schoeman Decl. Ex. D)).  The latter memorandum further indicates that it was "prepared by" Brennan, the first memorandum having been prepared under Brennan's supervision by his subordinate, Thomas Horn.  (*Id.*).

given, among other things, the amount of collateral posted (resulting in a low loan-to-value, or "LTV," ratio).  (*See* Credit Approval Form and Loan Memorandum at 3, 10 (Schoeman Decl. Ex. C)).[6]  This omission was compounded when the government learned from Brennan directly the day prior to execution of the warrant, (*infra* at 14), that he did not believe there was anything unusual regarding the very loan Ivakhnik claimed he said was "bad."  (*See* Letter from Southern District of New York to Daniel L. Stein (July 1, 2019) ("July 2019 Disclosure Letter") at 3 (Schoeman Decl. Ex. H)).

The omission was rendered even more egregious by the government's failure to advise Magistrate Judge Rowland of the context in which Brennan purportedly made the statement to Ivakhnik that he thought "this matter" would be "investigated by the FBI." According to Ivakhnik, Brennan made the statement to her at the end of August 2016.  As the government was aware, on August 14, 2016, *The New York Times* reported that there was a government investigation of transactions in the Ukraine involving Manafort.  (Andrew E. Kramer, et al., *Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief*, The New York Times (Aug. 14, 2016), https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html).  Five days later, *The New York Times* reported that Manafort had resigned from the Trump Campaign, attributing his resignation in part to "a wave

---

[6]  As with the OCC analysis, the government points to developments following the execution of the warrant – here Brennan's immunized testimony in Manafort's trial – as casting doubt on the materiality of its omissions.  But testimony at a trial more than two years after execution of the warrant is irrelevant to the *Franks* analysis.  And, again, the government leaves out critical information undermining its argument.  On cross-examination (which is not cited in the government's Opposition), Brennan conceded that no one on the loan committee (which included Mr. Calk) ever told him to give the loans a 4 rating.  (*United States v. Paul J. Manafort, Jr.*, No. 18-Cr-0083 (TSE) (E.D. Va. Aug. 13, 2018), ECF No. 282 at Tr. 2252:1-16).  And he was unable to answer the question of whether anyone on the loan committee had ever told him that the bank had to make the loan, claiming lack of memory.  (*Id.*).

of reports about Mr. Manafort's own business dealings with Russia-aligned leaders in Ukraine."
(Maggie Haberman, et al., *Paul Manafort Quits Donald Trump's Campaign After a Tumultuous
Run*, The New York Times (Aug. 19, 2016), https://www.nytimes.com/2016/08/20/us/politics/pa
ul-manafort-resigns-donald-trump.html).  None of this important context – which strongly
suggests that Brennan's purported reference to an FBI investigation related to Manafort's
dealings in Ukraine – was mentioned in the Fisher Affidavit (or in the government's Opposition,
where, as noted, it describes the statement as probative of Mr. Calk's state of mind).  Instead, the
affidavit misleadingly suggested that Brennan was implying to Ivakhnik that Mr. Calk would be
investigated for a corrupt *quid pro quo* relating to the Manafort loans.

3.    *Jeffrey Yohai*

While the government now seeks to minimize the importance of the statement
attributed to Jeffrey Yohai in the Fisher Affidavit, it was the only statement in the affidavit that
directly alleged that there had been a *quid pro quo*.  According to the affidavit, Yohai told
Genesis executive Mitch Solow that, "TFSB had agreed to do the refinance because Manafort
promised Calk a position on the Trump Economic Advisory Council."  (Fisher Aff. at ¶ 26
(Schoeman Decl. Ex. A)).  The government cited the statement immediately after setting forth a
narrative that linked Mr. Calk's appointment to the Advisory Council and TFSB's decision to
conditionally approve a loan to Manafort.  Yohai's statement was thus a significant piece of
evidence that the government relied on in obtaining the warrant, and it should have disclosed
Yohai's statement to the FBI ten days earlier contradicting what he purportedly told Solow.

The government argues that Yohai's statements to the FBI that he "was not aware
of any promises made by Calk to Manafort in exchange for the cabinet position" and "did not
know if Manafort ever actually asked Calk for any favors," indicate that he had no basis to know
whether there was actually a *quid pro quo* relationship.  (Gov't Br. at 20-21).  The government

says this ostensibly in support of its claim that Yohai's statements were immaterial, but in fact this point underscores the very reason the statements should have been brought to the attention of Magistrate Judge Rowland.  If Yohai truly had no basis on which to opine whether there had been a *quid pro quo*, it was improper for the government to suggest otherwise, as it did in the Fisher Affidavit by citing his purported statement to Solow.

Finally, the government says that the investigative team drafting the Fisher Affidavit did not attend the Yohai interview, "did not have access at the time to the Form 302 written report of the statements, and were not aware at the time that Yohai had made the statements that Calk complains were omitted from the warrant affidavit."  (Gov't Br. at 8).  At the same time, the government acknowledges that the investigative team "was aware the [Yohai] interview had taken place and of some of the statements Yohai had made on other matters." (*Id*.).  The government thus suggests that its omissions regarding Yohai were merely negligent and not in bad faith.  But its excuses are unsworn (not even supported by an affidavit or declaration), untested, and must be explored at a hearing.  Moreover, the government's excuses raise more questions than they answer.  For example, how could the investigative team not have had access to the Form 302 (an FBI form) containing Yohai's statements, if Special Agent Fisher was a member of the FBI, as were other agents working on the investigative team?  Why didn't the FBI team investigating Yohai in California advise its counterparts in New York and Chicago of Yohai's exculpatory statements, given that they advised them of other information provided by Yohai?  The government relied on statements attributed to Yohai to obtain the warrant.  It cannot now pretend that the information was unimportant or skirt the issue by suggesting the omission was a mere oversight.  At the very least, any such claim must be tested at a hearing.

4.      *Knowledge of Defaults*

In our opening memorandum we noted the paucity of evidence cited in the Fisher Affidavit to establish probable cause that Mr. Calk conspired with Manafort to hide material information about the loans from the TFSB loan committee and board.  (*See* Def. Br. at 9-10, 23-24).  After securing the warrant, the government itself jettisoned this theory, declining to charge Mr. Calk with any of the Subject Offenses described in the Fisher Affidavit, or any other offenses based on the theory that he hid information from the bank.  In its Opposition, the government confirms that the only evidence supporting this allegation was that "Manafort had submitted an array of wildly varying income figures" and that the loan memoranda did not reference prior defaults and a foreclosure action.  (Gov't Br. at 23).  The government presented no evidence that Mr. Calk – the bank's CEO and Chairman – was aware of the varying income figures submitted to TFSB staff, or that he had supervised, directed, drafted, edited, or even reviewed the loan memoranda.  And it omitted from the affidavit evidence in its possession establishing that (i) the other members of the loan committee were aware of Manafort's default on his California property (2401 Nottingham Avenue), and (ii) TFSB underwriters Brennan and Horn were responsible for the content of the loan memoranda.  (*See* Email Chain re Payoff letters (September 14, 2016) (Schoeman Decl. Exs. E, F); Credit Approval Form and Loan Memorandum (Schoeman Decl. Ex. C); Loan Memorandum (Schoeman Decl. Ex. D)).

With regard to the loan memoranda, the government claims that "[w]hether other loan committee members were advised of the default on the California loan is not material to whether there is probable cause to suspect fraud or false statement offenses."  (Gov't Br. at 23).  But the Fisher Affidavit alleged that the loan memoranda were evidence of fraud because they "did not mention *the 2401 Nottingham Avenue default* [i.e., the California loan] or the Foreclosure Action against Manafort personally."  (Fisher Aff. ¶¶ 51, 69 (Schoeman Decl. Ex.

A)) (emphasis added).  Again, the government cannot have it both ways.  It alleged that there was probable cause to suspect fraud on the ground that the loan memoranda did not mention the California default, while in possession of information establishing that the two other members from whom Mr. Calk allegedly hid this information (as well as other TFSB executives, including Brennan) were fully aware of it.  We are entitled to a hearing to establish whether the government knowingly or recklessly left this information out of the affidavit.[7]

       B.      <u>The Government Had an Obligation to Return to Judge Rowland After it Acquired Additional Exculpatory Information</u>

The government's omissions from the Fisher Affidavit are enough to require a *Franks* hearing.  But, on top of this, prior to executing the warrant, the government learned of a substantial body of additional information – from the very witnesses involved in processing and approving the Manafort loans – contradicting the probable cause theory set forth in the Fisher Affidavit.  It is extraordinary and indefensible that the government did not alert Magistrate Judge Rowland of this new information prior to executing the warrant.

The government tries to minimize the import of the interviews it conducted on June 27, 2017, claiming that the statements from TFSB executives were "the sort of self-serving denials of wrongdoing that did not require revising the warrant."  (Gov't Br. at 27).  This is not an accurate characterization of the information it obtained.  The government interviewed at least six TFSB executives – including TFSB's president (Mr. Ubarri), chief operating officer (Mr. Norini), two senior vice presidents directly involved in the Manafort loans (Mr. Raico and Ms. Bartholomew), and the lead TFSB underwriters in the transactions (Mr. Brennan and Mr. Horn).

---

[7]  With regard to the Foreclosure Action, the government cited no evidence that Mr. Calk was aware of it, much less directed Brennan or Horn to keep it out of the loan memoranda.  Likewise, there is no evidence in the affidavit indicating that Mr. Calk concealed the California default or the Foreclosure Action from the TFSB board or BofI, the other lender the government alleged was defrauded.

In the three and a half years since the interviews, none of the individuals has been charged with conspiring with Mr. Calk, or, for that matter, lying to the FBI.

The witness statements the government received on June 27 were not at all akin to the statements at issue in the cases cited in the government's Opposition.  In *United States v. Marin-Buitrago*, the court found that the government was not required to advise the magistrate of the denial by the target of the government's drug investigation that he was the individual the government believed him to be.  The court's decision rested on its findings that (i) "[n]arcotics traffickers commonly use aliases and carry false identification," (ii) the individual at issue was "known to use aliases," and (iii) the physical differences between the target and the individual the government believed him to be "were too slight to be material."  *United States v. Marin-Buitrago*, 734 F.2d 889, 895-96 (2d Cir. 1984).  Here, the government received exculpatory information from at least six different witnesses, none of whom was the target of the investigation, and there were no circumstances, as in *Marin-Buitrago*, seriously undermining the credibility or import of their statements.  In fact, this is a case where the government has done precisely what the Second Circuit in *Marin-Buitrago* cautioned that it must not do, namely, to arrogate to itself the power to decide what weight to give newly obtained information.[8]  *See Marin-Buitrago*, 734 F.2d at 894 ("when a definite and material change has occurred in the facts

---

[8]  The other decision the government cites is a non-precedential summary order from the Ninth Circuit, *United States v. One Residential Prop.*, 312 F. App'x 8 (9th Cir. 2008).  In that case, a witness alleged that Harris, a convicted felon with a history of violence, had stolen her gun and beaten her with it.  After the police obtained the warrant, but before they executed it, Harris told the police that he no longer had the weapon.  The court held that Harris' "self-serving statement" was immaterial, with no further explanation.  The case is of no help to the government here, given that it involved a single denial by the very target of the investigation, rather than numerous exculpatory statements by six witnesses.  (*See* Def. Br. at 12-14).

12

underlying a magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists").

In a further effort to explain away the exculpatory statements from six different witnesses, the government claims that the statements "largely concerned issues collateral to the core evidence of a quid pro quo or false information." (Gov't Br. at 27). This, too, is belied by the record. The government of course interviewed these executives because it believed they had information that was material to its investigation. In fact, they were all directly involved in either originating, underwriting, or approving the Manafort loans. The government relied in the Fisher Affidavit on the emails or statements of three of the witnesses – Brennan, Raico, and Ubarri. (*See Fisher* Aff. at ¶¶ 22-23, 30, 34-36, 39, 41-42, 52, 56, 58-59, 61, 64 (Schoeman Decl. Ex. A)). And the substance of the June 27 statements was hardly "collateral." For example, the very first bullet point in the government's list of "suspicious facts" that it contends supported a probable cause finding is that "Calk and the loan committee conditionally approved the California refinance with an unusually fast one-day turnaround." (Gov't Br. at 8). But Ubarri told the government on June 27 that "[i]t was not unusually fast or otherwise remarkable . . . that the proposed 2401 Nottingham loan [i.e., the California refinance] was conditionally approved by the credit committee within one day or so of the initial meeting with the client." (July 2019 Disclosure Letter at 8 (Schoeman Decl. Ex. H)). Ubarri's statement thus directly contradicted the evidence relied on by the government in the affidavit, and made clear that the "approval" of the loan was conditioned upon satisfactory underwriting – a process that would take weeks to complete.

Similarly, the government relied on emails in its affidavit that it describes as "reflect[ing] Calk personally being involved in the progress of the loans to Manafort, and Bank

13

employees describing Calk as seeking to close the loans expeditiously."  (Gov't Br. at 9).  But

Norini, TFSB's chief operating officer at the time, told the government that "TFSB's claim to

fame was that they could turn around a loan in days," and that he "did not recall a rush to

complete the Manafort loans."  (July 2019 Disclosure Letter at 6 (Schoeman Decl. Ex. H)).

Bartholomew stated that she "did not find anything about the Manafort loans or their processing

to be unusual," and that she "felt no pressure to close on the loans or push them through outside

of normal protocols."  (*Id.* at 2).  Brennan advised the government that "[w]hether a loan was

approved slowly or quickly was not an indication of anything in particular" and that he had

"observed other deals close in as quickly as two days."  (*Id.* at 3).  Horn, who worked for

Brennan, stated "Calk was normally very hands-on" and that he "did not feel pressure to get the

Summerbreeze loan done."  (*Id.* at 4).

   It is remarkable that the government did not bring *any* of this information (or the

information described in further detail at pages 12-14 of our opening brief) to the attention of

Magistrate Judge Rowland prior to searching Mr. Calk's iPhone.  In an effort to avoid a *Franks*

hearing, the government claims that, "even were these statements material, any showing of intent

is wholly absent."  (Gov't Br. at 30).  As with Yohai's statements, it suggests that its failure to

return to the magistrate was merely negligent, arguing that the statements came in the context of

a "coordinated and multistate effort to interview a number of witnesses, and an unanticipated

one-day delay in the execution of the warrant," and "required law enforcement to synthesize and

analyze them overnight before executing the warrant the next day."[9]  (Gov't Br. at 30-31).  These

---

[9]  There was no exigency with respect to this search.  On June 27, 2017, the government
contacted Mr. Calk's attorney, who, after being advised that the government had obtained a
warrant, agreed to surrender the iPhone to the government the following day.  After securing the
phone, the government could have returned to Magistrate Judge Rowland at any time, rather than
immediately searching the phone, as it did.

unsworn assertions underscore the need for a *Franks* hearing, where the government personnel involved in interviewing the witnesses, submitting the affidavit, and executing the warrant can be heard under oath and examined by the Court and the defense.

To support its claim that it did not intentionally or recklessly decline to supplement its affidavit, the government cites *United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013).  (Gov't Br. at 31).  But in *Rajaratnam* the district court in fact held a *Franks* hearing before concluding that the government's omissions were not in bad faith.  The court heard directly from the AUSA and the FBI agent involved, who gave sworn testimony that the omissions were not intentional.  *Rajaratnam* thus undermines the government's position here and provides further reason to hold a *Franks* hearing.  *See United States v. Rajaratnam*, No. 09-Cr-1184 (LAP) (S.D.N.Y. October 7, 2010).  The same is true of the other case cited by the government, *United States v. Vilar*, No. S305-Cr-621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007), where the court, prior to deciding the defendant's suppression motion, also held a hearing and heard testimony from the affiant for the government's warrant application.

## II.     The Record Indicates That The Government May Have Misled The Grand Jury, And It Therefore Must Produce The Grand Jury Transcripts

The government constructs a strawman in responding to the defense motion to review (or for the Court to review *in camera*) the grand jury transcripts, arguing essentially that the defense has failed to adduce enough proof to justify dismissing the indictment.  In order to review the transcripts, however, the defense is simply required to show, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(ii), that a ground "may" exist to dismiss the indictment.  We respectfully submit that this is a standard we have met, given the misleading manner in which the government presented its evidence to Magistrate Judge Rowland, the abundant additional exculpatory evidence it identified during the months leading up to indictment, and its

presentation to a separate grand jury of testimony from Manafort contradicting its claims here.[10] We cannot know more or meet the standard for dismissal, of course, without the grand jury transcripts.  The government fails to identify any prejudice it would suffer by providing the transcripts to the Court.

As discussed above, the evidence that the government failed to present to Magistrate Judge Rowland was, contrary to the government's claims, highly relevant and material to whether Mr. Calk had committed a crime.  If it did not present this same information to the grand jury – including the loan terms – it misleadingly suggested that there was no appropriate financial reason for TFSB to make the loans and left the grand jury to conclude that Mr. Calk had "corruptly" solicited or accepted something of value from Manafort, as 18 U.S.C. § 215 requires.

The government also fails to address at all the additional information it obtained from TFSB president Ubarri during proffer sessions in November 2017 and November 2018, disclosed to the defense in its July 1, 2019 letter.  (Def. Br. at 12-14; July 2019 Disclosure Letter at 8, 10-11 (Schoeman Decl. Ex. H)).  While it now dismisses as immaterial Jared Kushner's statements making clear how little value Manafort's recommendation had to the Trump Transition Team, (Gov't Br. at 34), in the indictment it presented to the grand jury the

---

[10]  The government argues that failure to disclose exculpatory evidence cannot be a ground for dismissal, citing *United States v. Williams*, 504 U.S. 36 (1992).  But, after *Williams*, the Second Circuit has continued to recognize that an indictment may be dismissed (even after conviction) where the prosecutor's conduct amounts to "a knowing or reckless misleading of the grand jury as to an essential fact."  *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (internal quotation marks and citations omitted).  In *Morse v. Fusto*, which the government does not address, the Second Circuit held that "[i]nformation may be 'false' if material omissions render an otherwise true statement false," and that a defendant has a constitutional right not to be deprived of his liberty where the government has knowingly made such omissions before a grand jury.  804 F.3d 538, 547-48 (2d Cir. 2015).

government in fact relied on and referenced Manafort's recommendation to Kushner, (Ind., ¶ 24(c)).

The government's efforts to minimize the import of Manafort's post-conviction statements to the FBI and testimony before the grand jury in the Eastern District of Virginia are similarly not persuasive.  Based on the government's disclosure regarding Manafort's September 2018 proffer session, Manafort "denied engaging in a quid pro quo with Calk;" the disclosure does not note any equivocation on that point.  (*See* Letter from Southern District of New York to Daniel L. Stein (June 10, 2019) ("June 2019 Disclosure Letter") at 2 (Schoeman Decl. Ex. I)).  The government agreed to enter into a cooperation agreement with Manafort on September 14, 2018.  (*See United States v. Paul J. Manafort, Jr.*, No. 17-Cr-201 (ABJ) (D.D.C. Sept. 14, 2019), ECF No. 422).  During a proffer session on October 5, 2018, Manafort stated he recommended Mr. Calk for a position "because he had worked hard for the Campaign" and "showed his ability and experience in building his bank," further explaining that he "did not recommend Calk for any reason of Manafort's personal interest." (June 2019 Disclosure Letter at 3 (Schoeman Decl. Ex. I)).  Significantly, just eleven days later, having proffered Manafort at least three times, the government called him as a witness before the grand jury in Virginia.  The government would not have done so if it believed Manafort, at that time a cooperating witness, was lying.  And the testimony Manafort gave was consistent with what he told the government while it was vetting him as a witness:  He testified that he recommended Mr. Calk because he had earned it based on his resume and the work he had done on the Trump campaign.  (*Id*. at 9).  Having presented Manafort to the Virginia grand jury knowing this to be his testimony, it would have been improper for the government to suggest to a grand jury in this District that Manafort promised or

17

provided assistance to Mr. Calk in exchange for loans.[11]  We are entitled to learn whether the government in fact did so.

### III.     The Narrow Category of Discovery At Issue Is Material To Preparing The Defense And Its Disclosure Would Not Burden The Government Or Violate A Privilege

The government mischaracterizes our discovery motion, which seeks a very limited category of material.  We are not seeking "wholesale discovery of the government's investigatory correspondence with third parties."  (Gov't Br. at 36, 37).  Nor are we seeking the work product of cooperating parties' internal investigations, which was the issue in *United States v. Rigas,* 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003), and in the portion of *United States v. Stein*, 488 F. Supp. 2d 350, 357 (S.D.N.Y. 2007), on which the government relies.  (Gov't Br. at 38-40).  On the contrary, we seek only the discovery-related correspondence with two critical parties – the PTT and the OCC.

The government's Opposition suggests that the materials the defense seeks, which include production cover letters, are closely guarded secrets.  But the materials that the government produced from the files of the Special Counsel's Office ("SCO") contain over 150 production letters from producing parties.  Had the SCO, rather than the U.S. Attorney's office, been the party that subpoenaed the OCC and PTT documents at issue here, we are confident that the letters would have been produced in the normal course.  The production also contains copies

---

[11]  In its Opposition, the government notes that subsequently Manafort breached his cooperation agreement by providing false information to the Special Counsel's Office.  (Gov't Br. at 35).  But it does not say he lied about the Calk matter.  A review of the partially redacted filings in the D.C. district court where Manafort was sentenced (including those as late as February 2019, just three months before this case was presented to the grand jury) suggests that the government never alleged that Manafort had lied about his dealings with Mr. Calk (and the Court never found that he had), an allegation that the government surely would have pressed if it believed Manafort's testimony to have been false.  (*See United States v. Paul J. Manafort, Jr*., No. 17-Cr-201 (ABJ) (D.D.C. Jan. 15, 2019), ECF No. 476; *United States v. Paul J. Manafort, Jr*., No. 17-Cr-201 (ABJ) (D.D.C. Feb. 13, 2019), ECF No. 509; *United States v. Paul J. Manafort, Jr*., No. 17-Cr-201 (ABJ) (D.D.C. Feb. 15, 2019), ECF No. 514).

KL3 3282064.1

of at least two grand jury subpoenas issued by the U.S. Attorney's Office to other third parties. The fact of these disclosures shows the absurdity of the government's position, particularly its suggestion that such documents are shielded from production as "work product." (Gov't Br. at 38-39 n. 25). The government clearly does not believe that correspondence from third parties accompanying the production of documents is protected work product, having produced over one hundred and fifty letters falling into this category.[12]

The government pretends that it is "unaware precisely what problems" the defense has in understanding the OCC and PTT productions. The problems are identified in our opening brief. (Def. Br. at 17-18). For the PTT, the problems include spreadsheets that are 99% redacted and therefore meaningless, the absence of relevant emails, and an inscrutable and incomplete privilege log. For the OCC, the issue is that the 173 documents, which include emails stripped of attachments, are clearly a subset of much more voluminous records maintained by TFSB's primary regulator. The most logical and efficient place to find an explanation of what these documents represent are the subpoenas calling for their production and the related correspondence, including any descriptions of the contents of the productions, or objections to the government's requests.

The government claims to be confused by the interplay between Rule 16 discovery and Rule 17 subpoenas. The connection is clear. Discovery is material to the defense if it "will lead the defense to pursue other investigative leads as it readies for trial." *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013); *see also Stein*, 488 F. Supp. 2d at

---

[12] The government's production in fact contains one cover letter from the OCC – a letter for a supplementary production – although the government has apparently withheld the initial production letter.

356-57 (information is material if it will play "an important role in uncovering admissible evidence").[13]  Seeing what the OCC and PTT were asked to produce and what they did or did not produce in response to those requests, will make it possible for the defense to determine what additional material may be worth seeking by subpoena or other means as we prepare for trial.

The government also misses the point of our citation to *United States v. Stein*. Although the particular documents in dispute were case-specific, Judge Kaplan found that the correspondence and presentations that a third-party provided to the government, and not merely original source documents, had to be produced if the information in the former would play "an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Stein*, 488 F. Supp. 2d at 356-57.  Applying this principle, Judge Kaplan also found that draft sections of a non-prosecution agreement were material and therefore must be disclosed because "[d]isclosure of the give and take as to what KPMG was prepared to admit and what the government unsuccessfully sought is likely to shed light on matters at issue in this case." *Id.* at 359.  We respectfully submit that the same principle should apply here.

Finally, we note that this is not an instance in which a defendant's discovery motion is interposed to harass the government or send it off on a wild goose chase.  Our request is targeted so as to be minimally burdensome on the government.  The government undoubtedly has in its files copies of the subpoenas sent to the OCC and PTT and the responsive correspondence.  Given the limited volume of each party's production, it seems likely that the

---

[13]  Contrary to the government's suggestion, demonstrating materiality "is not a heavy burden," *Stein*, 488 F. Supp. 2d at 356 (internal quotation marks and citation omitted), and courts have found that the government "should interpret the language of Rule 16 broadly to ensure fairness to the defendant." *Urena*, 989 F. Supp. 2d at 261 (internal quotation marks and citation omitted).

correspondence totals less than 50 pages, and possibly much less than that.  The effort the government has already expended in denying the defense access to this information far exceeds the likely burden of producing it.  If, as the government maintains, the documents are not material to the defense, they will join the millions of other immaterial documents the government has voluntarily produced.  If, however, they are material, their production is required (and the defense's motion will have saved the government from a discovery violation).

## IV.     The Touchstone of Rule 21(b) Is Convenience, Which Clearly Favors Transfer In This Case

The government's Opposition to our venue motion misconstrues the legal issue and cites an outdated version of the applicable rule.  Under Federal Rule of Criminal Procedure 21(b), the question is what would be the most convenient and economical district for trial.  The answer in this case is clearly the Northern District of Illinois.

This case presents a rare confluence of circumstances that weigh strongly in favor of transfer.  First, this is a one-defendant case, where both the defendant and his longtime counsel throughout the two-year investigation reside in another part of the country.  Second, this is a one-victim case, where the alleged victim, The Federal Savings Bank of Chicago, is headquartered in the same district as the defendant.  Third, that same district is the location of the large majority of the defendant's offense conduct *and* the clear plurality of the likely trial witnesses.  Fourth, and very importantly, this is not a case in which the question of venue was raised late in the prosecution in an effort to escape a pending trial date or effectuate severance from a co-defendant.  On the contrary, the defense, on behalf of the one and only defendant, raised the question of venue with the government and then with the Court before any substantive post-arraignment proceedings had occurred.

In opposing our motion, the government suggests that a defendant must establish something more than convenience, effectively amounting to prejudice. But the right to a transfer under Rule 21(b) is explicitly based on convenience, not a showing that venue in the government's chosen district is either legally unfounded or prejudicial. *See Matter of Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) (granting writ of mandamus where district court required defendant seeking transfer to show "truly compelling circumstances" and holding that it is sufficient under Rule 21(b) that the case would be "better off transferred to another district"). Thus, while the leading decisions on this topic note the "general rule a criminal prosecution should be retained in the original district" and that the burden is on the defendant to justify transfer, they also make clear that transfers should be granted when trial in the transferee district would be "less burdensome." *United States v. Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982) (citing *United States v. U.S. Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964)). In other words, Rule 21(b) permits the Court to decide that a trial in the original district would be unduly burdensome because there is another district where trial, although always a burden on all concerned, would, on the whole, be more convenient.

Significantly, the government relies on the old version of Rule 21(b), which, as we noted in our opening brief, was amended in 2010 to require consideration of the interests of the alleged victim. *See* Fed. R. Crim. P. 21(b), Comm. Notes on Rules—2010 Amend. (2010). The purported victim in this case is The Federal Savings Bank. It is headquartered in Chicago, as are the underwriters and the loan committee members who approved the loans in question. As set forth in the attached declaration of TFSB Executive Vice President and Chief Operating Officer Daniel Semenak, given the number of potential witnesses who are bank personnel (including the bank's president, Javier Ubarri, and the two lead underwriters on the Manafort

loans, James Brennan and Thomas Horn), a trial in Chicago would be far less disruptive to the bank's operations.

In this case, the interests of the alleged victim overlap with those of the witnesses, since many of the witnesses are bank employees or board members whose travel to New York would create a disruption for the bank.  The government, having misquoted the Rule, misses this point in arguing that the location of witnesses is only relevant if the defense demonstrates that witnesses will be unable to travel to the government's preferred venue.  Similarly, the government overstates the point the court in *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997), was making in its analysis of witness location.  The decision in *Spy Factory* suggests that transfer might only be *required* where witnesses were unable to testify in a given district.  The court did not hold that inconvenience to witnesses cannot be considered as a factor to be weighed, as it routinely is by courts deciding Rule 21(b) motions.  *See, e.g., Posner*, 549 F. Supp. at 477-78 (granting transfer from New York to Miami where "[t]he factor of location of witnesses strongly favors transfer"); *United States v. Layne*, No. 05-Cr-87 (HB), 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005) (granting transfer where it "appears that fewer witnesses will be inconvenienced" by a trial in the transferee district).[14]

---

[14]  In support of its motion, the government cites cases where the majority of the government's witnesses were located in the original district in which the prosecutors filed the case, a factor that weighed in favor of keeping the case in the original district.  *See, e.g., United States v. Brooks*, No. 08-Cr-35 (PKL), 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008); *United States v. Flom*, No. 14-Cr-507 (RRM), 2015 WL 6506628 (E.D.N.Y. Oct. 27, 2015); *see also United States v. Larsen*, No. 13-Cr-688 (JMF), 2014 WL 177411 (S.D.N.Y. Jan. 16, 2014) (two of the victims resided in the district where the case was brought while none appeared to live in or near the district to which defendant sought to transfer).  These cases actually support our motion to transfer, given that most of the government's potential witnesses in this case are located in the Northern District of Illinois.  *See United States v. Rodriguez*, No. 16-Cr-41-FPG-HBS, 2018 WL 2126429, at *4 (W.D.N.Y. May 9, 2018) ("the Court finds that this factor supports transfer based on the Government's witness list").

In its analysis, the government does not accurately define the "location" of events for purposes of Rule 21(b).  The location of events is the place where they happened.  In this case, Mr. Calk is charged with committing a crime by himself.  There is no conspiracy charged and the indictment does not say Mr. Calk acted "together with others," as indictments often do.  Accordingly, the only alleged criminal conduct in this case is Mr. Calk's conduct.  The location of that conduct is where Mr. Calk was at the time he engaged in it.  The fact that Mr. Calk, while in Chicago, may have been on the phone or on a video conference with people in New York does not make the location of that conduct New York.  Nor does the fact that Mr. Calk, while in Chicago, considered loans that involved properties in New York (as well as California and Virginia) make the location of his conduct anywhere other than Chicago.[15]

The cases the government cites on this issue do not support its position.  In *United States v. Pastore*, No. 17-Cr-343 (NSR), 2018 WL 395490, at *4 (S.D.N.Y. Jan. 11, 2018), the location of the defendant's crime was clearly New York, even though he committed other acts in Florida ("[T]he charge against Mr. Pastore is based on his allegedly willful and conscious decision to withdraw and spend the fraudulently obtained money in this District.").  *United States v. Wilson*, No. 01-Cr-53 (DLC), 2001 WL 798018, at *2 (S.D.N.Y. July 13, 2001), involved a sprawling, multi-defendant, multi-count accounting fraud at a NYSE-listed company whose board met in New York.  In determining that the "location of events" was a neutral factor, the court observed, "While significant criminal activities are alleged to have occurred in San Francisco, this was not a crime whose planning, execution, or impact was limited by

---

[15]  The only offense conduct that the indictment alleges took place in New York was an interview that Mr. Calk attended in Trump Tower in January 2017.  (*See* Ind., ¶¶ 9, 25).  The government in its brief points to a meeting between Mr. Calk and Manafort in New York in September 2016, but that meeting lacked sufficient significance to be included in the allegations in the indictment.

geography." *Id.* Thus, the government is unable to find a case in which facts resembling those present here were found to weigh against transfer.

Finally, the government is wrong to imply that a venue's convenience to the defendant has relevance only where the defendant is indigent. (Gov't Br. at 51). For example, it cites *United States v. Riley*, 296 F.R.D. 272, 277 (S.D.N.Y. 2014), for the proposition that the "expense factor [is] generally afforded serious weight only in cases involving indigent defendants." But the cited passage is merely the court's quotation of the government's argument. Ultimately, the court found that this convenience factor weighed in favor of transfer though the defendants had not shown they were financially incapable of funding their defense. *Id.* at 277 & n. 4. The question for the Court is whether Chicago or New York is the more or less burdensome location for trial, not whether Mr. Calk is better able to bear that burden than an indigent defendant.

This is thus a case in which every factor either weighs in favor of transfer or is neutral. No matter how such factors are weighed relative to each other, the result of the analysis strongly favors transfer.

## CONCLUSION

For the foregoing reasons, Mr. Calk respectfully requests that the Court grant his pretrial motions and motion to transfer venue.

Dated:   New York, New York               Respectfully submitted,
         December 20, 2019

                                          KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                          By: /s/ Paul H. Schoeman
                                              Paul H. Schoeman
                                              Darren A. LaVerne
                                              1177 Avenue of the Americas
                                              New York, NY 10036
                                              Telephone: 212.715.9100

KL3 3282064.1

LOEB & LOEB LLP

Jeremy Margolis
Joseph J. Duffy
321 N. Clark Street
Chicago, IL 60654
Telephone: 312.464.3100

*Attorneys for Defendant Stephen M. Calk*

KL3 3282064.1