```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/12/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                            :
UNITED STATES OF AMERICA,            :
                                                            :
                                                            :     19 Cr. 366 (LGS)
                 -against-                       :
                                                            :     **OPINION AND ORDER**
STEPHEN M. CALK,                        :
                                       Defendant.  :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Defendant Stephen M. Calk seeks an order transferring this case to the Northern District of Illinois. For the reasons below, the motion is denied.

I.    **BACKGROUND**

The following summary is taken from the allegations in the Indictment filed under seal May 21, 2019, and unsealed at the request of the Government on May 23, 2019.

Defendant Calk was indicted on May 21, 2019, and charged with one count of Financial Institution Bribery, 18 U.S.C. § 215. The indictment charges Defendant with a scheme by which he allegedly "abused his authority as the chairman and chief executive officer of a federally-insured bank to cause $16 million in loans to be issued to a borrower whom [Defendant] expected would, in return, assist [Defendant] in obtaining a senior position with an incoming presidential administration."

During the relevant time frame, Defendant was chairman and CEO of the Federal Savings Bank (the "Bank"), which was headquartered in Chicago. He was also CEO, chairman and majority owner of National Bancorp Holdings, Inc. (the "Holding Company"), which owns the Bank in its entirety. The indictment alleges the following: on July 27, 2016, a meeting was held at the Bank's Manhattan office at which Paul J. Manafort, Jr. (herein "Manafort," referred to as

the "Borrower" in the indictment), then-chairman of the Donald J. Trump presidential campaign, and Manafort's son-in-law, Jeffrey Yohai, sought to refinance a construction project in California.  The meeting was attended by Bank employee Dennis Raico (the "Loan Officer"), based in the Bank's Manhattan office, and by Defendant, who participated via video conference.  At the meeting, Defendant allegedly expressed interest in participating in the presidential campaign.  The requested loan was conditionally approved the next day by the Bank's credit committee, which consisted of Defendant, Javier Ubarri (Bank President) and James Norini (Bank Chief Operating Officer).  Less than a week later, Manafort emailed the Loan Officer to obtain Defendant's resume, and then appointed Defendant to the campaign's Economic Advisory Committee.

     While reviewing Manafort's loan application and related materials, "[b]ank personnel learned of certain negative information regarding [Manafort's] ability to repay the proposed" loan, including that Manafort's prior loan on the construction project in California was in default and being foreclosed upon, that Manafort had a $300,000 credit card delinquency and that the Bank was unable to verify Manafort's professed income.  Following this, and after Manafort emailed Defendant directly on October 7, 2016, Defendant allegedly caused the amount of the proposed and approved loan to be increased by $1 million for a total of $9.2 million.

     Later in October, Manafort proposed to the Loan Officer increasing the loan by $300,000 -- to $9.5 million in total -- and changing the loan structure, including the collateral, the borrowers and the repayment source.  The Bank rejected the proposal via an email from the Bank President, who noted that "this is not an easy loan to make and is a significant exposure to the bank."  On November 10, 2016, two days after Donald J. Trump was elected President, Defendant allegedly "caused the Bank to reinitiate the process of evaluating" the loan.  The next

day, while the Bank's consideration of the loan was pending, Defendant asked the Loan Officer to call Manafort and inquire whether Defendant was in consideration for a senior administrative position. The Loan Officer did not carry out this request. The same day, the Loan Officer sent Manafort's counsel a final term sheet for the loan, with terms that were "substantially similar to the proposal the Bank had previously refused to underwrite." The next day, Defendant called Manafort directly and engaged in an approximately eighteen-minute conversation with him. Two days later, Defendant emailed Manafort a professional biography and a list of official governmental positions he desired. The Bank closed on the loan on November 16, 2016.

After the $9.5 million loan closed, Defendant "was personally involved in causing the Bank to extend an additional $6.5 million in loans to" Manafort. As the additional loan from the Bank would have exceeded the Bank's statutory lending limit to a given customer, the Bank first engaged in unsuccessful efforts to sell the $9.5 million loan to a separate lender (the "Wholesale Lender") in November. When the Wholesale Lender refused to underwrite the full value of the loan, Defendant replied that the Wholesale Lender's position was "[f]ucking ridiculous" and that "[w]e MUST push back on this." Also in November, Defendant received or was copied on emails from Manafort referencing a foreclosure lawsuit pending against a property in Brooklyn, which had been proposed as security on the new loan, and providing paperwork indicating that Manafort had missed interest payments for the prior loan on the Brooklyn property and was in default on multiple other prior loans. Defendant also engaged in additional communication with Manafort regarding Defendant's interest in a position in the administration that resulted in Manafort sending a recommendation to the Presidential Transition Team's executive committee that Defendant be appointed to Secretary of the Army, and Defendant's name being added to a tracking spreadsheet maintained by the Presidential Transition Team.

At the end of December, Defendant directed the Loan Officer to prepare to extend the $6.5 million loan regardless of whether the Bank could sell the first loan to the Wholesale Lender, and explained that the Holding Company would acquire part of the loan exposure, noting that Manafort was "influential" with "other people and a few other situations at hand." The loan agreements were signed in early January 2017; Defendant signed agreements on behalf of the Holding Company to transfer a portion of the $6.5 million loan to the Holding Company, thereby avoiding a violation of the Bank's statutory lending limit. Defendant was interviewed for Under Secretary of the Army at the Presidential Transition Team's Manhattan offices on January 10, 2017. Manafort received the funds from the $6.5 million loan a week later and, the next day, the foreclosure lawsuit regarding the property in Brooklyn was dismissed when Manafort used the funds to pay off the prior lender.

Defendant was interviewed by bank examiners from the Office of the Comptroller of the Currency ("OCC") about the loans following a newspaper article published in March 2017. At the meeting, Defendant asserted that the Bank had been unaware of the foreclosure lawsuit pending against the property in Brooklyn. In July 2017, after conducting a review of the loans, the OCC downgraded the loans' credit quality to "substandard," which "signifies a well-defined credit weakness and is characterized by the distinct possibility that the financial institution will sustain a loss if the deficiencies are not corrected." In October 2017, Manafort was charged with federal crimes and the U.S. government sought forfeiture of his interests in the properties securing the two loans. Manafort ceased making payments on the loans, and the Bank and the Holding Company subsequently foreclosed on the cash collateral securing the loans and wrote off the remaining principal balance of over $12 million as a loss. In July 2018, Defendant met

with two senior OCC supervisors. During the meeting, Defendant asserted that he had never wanted to be hired for a position in the presidential administration.

## II. DISCUSSION

For the reasons discussed below, the relevant factors do not support transfer. Defendant's motion is denied.

### A. Standard for Transfer

"Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." FED. R. CRIM. P. 21(b). "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 74 n.5 (2d Cir. 2018). In considering transfer, a Court will consider the following non-exclusive list of factors: "(1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243—44 (1964); *accord United States v. Blondet*, No. 16 Cr. 387, 2019 WL 5690711, at *2 (S.D.N.Y. Nov. 4, 2019). The convenience of "any victim" must also be considered following the amendment of Rule 21(b) in 2010. *See* FED.R.CRIM.P. 21(b) advisory committee's note; *accord Blondet*, 2019 WL 5690711, at *2. "No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (quotations marks and

alterations omitted); *accord United States v. Pastore*, No. 17 Cr. 343, 2018 WL 395490, at *2 (S.D.N.Y. Jan. 11, 2018).  The general rule is that "a criminal prosecution should be retained in the original district."  *Kirk Tang Yuk*, 885 F.3d at 74 n.5.  "[T]o warrant a transfer from the district where an indictment was properly returned it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district."  *United States v. Larsen*, No. 13 Cr. 688, 2014 WL 177411, at *2 (S.D.N.Y. Jan. 16, 2014); *accord Blondet*, 2019 WL 5690711, at *2.

      **B.**     **Location of the Defendant**

Defendant resides in the Northern District of Illinois.  This factor weighs in favor of transfer.  *See Pastore*, 2018 WL 395490, at *3 ("[T]he Supreme Court has previously cautioned against opening the door to 'needless hardship to an accused by prosecution remote from home.'") (quoting *United States v. Johnson,* 323 U.S. 273, 275 (1944)); *see also United States v. Cashin,* 281 F.2d 669, 675 (2d Cir.1960) ("Recognizing the unfairness and hardship to which trial in an environment alien to the accused exposes him, and the important policies underlying the venue provisions of the Constitution and Bill of Rights, the Supreme Court has declared that venue statutes should, whenever possible, be construed so to permit trial at the residence of the defendant." (citations and internal quotation marks omitted)).  However, "[t]he fact that [a certain district] is the main office or 'home' of the respondent has no independent significance in determining whether transfer to that district would be 'in the interest of justice[.]'"  *Platt*, 376 U.S. at 245.  This factor, alone, is not dispositive.  *See United States v. Parrilla*, No. 13 Cr. 360. 2014 WL 1621487, at *14 (S.D.N.Y. Apr. 22, 2014), *aff'd sub nom. United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) ("Because 'defendant's residence ... should not be given dispositive weight' this factor alone cannot support transfer.").

### C. Location of the Witnesses

Of forty potential trial witnesses, Defendant asserts that roughly twenty are in the Northern District of Illinois, and only eight appear to be in the New York area. Defendant also asserts that most, if not all, of the likely defense witnesses are in the Chicago area. But "[a] naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer." *United States v. Flom,* No. 14 Cr. 507, 2015 WL 6506628, at *4 (E.D.N.Y. Oct. 27, 2015); *accord United States v. Avenatti*, No. 19 Cr. 374, 2019 WL 4640232, at *3 (S.D.N.Y. Sept. 24, 2019). Defendant's "burden is to show 'specific examples of witnesses' testimony and their inability to testify because of the location of the trial.'" *United States v. Estrada*, 880 F. Supp. 2d 478, 482 (S.D.N.Y. 2012); *accord United States v. Pastore*, No. 17 Cr. 343, 2018 WL 395490, at *3 (S.D.N.Y. Jan. 11, 2018) ("Defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of trial.").

Defendant does not allege that any of the prospective witnesses will be unable to testify in this District or even that they would be significantly inconvenienced by such testimony, and the Government represents that it will pay or reimburse the travel and lodging costs of any witnesses it calls who reside outside the New York area. Based on this information, this factor does not weigh in favor of transfer. *See Parrilla*, 2014 WL 1621487, at *14 (finding, where Defendant did "not allege or attempt to show that [] witnesses [living outside New York] would be unable to testify in New York, that he would be unable to call them, or that he would be financially incapable of paying such witnesses' expenses" that "this factor has relatively little weight 'in this age of easy air travel'"); *accord Blondet*, 2019 WL 5690711, at *2.

7

### D. Location of the Events

Defendant concedes that venue in New York is legally sufficient, but he argues that the "nerve center" of the case is Chicago. A review of the indictment shows that this is not the case; Defendant is alleged to have caused the Bank to extend loans to Manafort, who was located in New York, through the Bank's New York office, in part in exchange for a position on the Trump Presidential Campaign, which was based in New York. Defendant further engaged in significant communication in pursuit of his alleged goals via email, telephone calls and video conference with individuals in New York, including the assigned Loan Officer and Manafort, and also attended two in-person meetings for these purposes in Manhattan. This is sufficient to find that the location of events does not weigh in favor of transferring the case, regardless of Defendant's residence at the time of the events, or the role played by Bank employees and executives in Chicago in approving and executing the loans. *See Avenatti*, 2019 WL 4640232, at *3–4 (finding the location of events to weigh against transfer where the defendant, based in California, "allegedly made false representations, in a fraudulent letter, to the Agent, which the Agent received in Manhattan [and p]ursuant to Defendant's fraudulent instructions, the Agent and the Publisher, both based in Manhattan, sent money to Defendant via wire transfer from Manhattan"); *United States v. Riley*, 296 F.R.D. 272, 276 (S.D.N.Y. 2014) (finding the location of events to weigh against transfer where "Defendants caused acts to occur in the Southern District of New York" and therefore "it was foreseeable . . . that securities transactions would be executed in New York . . .").

### E. Location of Counsel

Defendant is represented by both New York and Chicago counsel, and the Government is represented entirely by New York counsel. Defendant argues that his Chicago-based counsel

have represented him for over two years of government investigations, and this weighs in favor of transfer. But Defendant's counsel of record in this case include five attorneys based in New York, and two attorneys based in Chicago. Defendant makes no representation that his Chicago-based counsel will be unable to continue to represent him should the trial occur in New York. His Chicago-based counsel's law firm is national in scope, and maintains a New York office, permitting work in New York with little inconvenience. The location of counsel does not weigh in favor of transferring the case. *See United States v. Valdes*, No. 05 Cr. 156, 2006 WL 738403, at *8 (S.D.N.Y. Mar. 21, 2006) ("That Defendant has 'a mix of both New York and [Chicago]' counsel . . . would suggest this *Platt* factor does not favor transfer.'").

### F. Expense to Parties

Defendant argues that a month-long criminal trial in New York would impose substantial burden on Defendant, who currently is unemployed and living off his savings. But "[b]efore the relative cost of trial in two districts becomes a relevant consideration, the moving party must make a showing that the cost of trial in the original district would be unduly onerous to this particular defendant." *United States v. Cournoyer*, No. 12 Cr. 65, 2012 WL 6539659, at *7 (E.D.N.Y. Dec. 14, 2012); *Valdes*, 2006 WL 738403, at *7 ("Every criminal prosecution imposes expenses on defendants, but mere inconvenience and the normal burdens associated with a trial do not make the necessary showing that a transfer is warranted."). "A successful transfer motion requires more than a bald assertion that a trial out of a defendant's home district would be more expensive than if the trial were held in the defendant's home district." *Flom*, 2015 WL 6506628, at *8. Defendant has not shown that the additional expense is unduly onerous in light of his circumstances, nor that he would be unable to bear such expenses. This factor therefore does not weigh in favor of transfer. *See Parrilla*, 2014 WL 1621487, at *15

(finding the expense to the parties did not favor transfer where standing trial in New York would cause Defendant to incur additional expenses but Defendant did "not claim that he cannot pay his defense costs and other expenses for trial in New York," and a trial in the proposed venue would "increase expenses for the government").

### G. Disruption of Defendant's Business and the Convenience of the Victim

Defendant is unemployed.  The Government represents that any travel by Bank or Holding Company employees will be reimbursed, and the frequency and duration of flights between Chicago and New York make it unlikely that these witnesses would be unduly inconvenienced by appearing at the trial.  Neither the convenience of the victim nor the disruption of Defendant's business weighs in favor of transfer.  *See United States v. Percoco*, No. 16 Cr. 776, 2017 WL 6314146, at *17 (S.D.N.Y. Dec. 11, 2017) ("[D]isruption of the moving Defendants' business is a moot point because they have since resigned."); *United States v. Fiorentino*, No. 13 Cr. 0338, 2014 WL 108415, at *6 (E.D.N.Y. Jan. 6, 2014) (finding this factor not to weigh in favor of transfer where defendant was unemployed).

### H. Location of Documents and Records and Relative Accessibility

The parties agree that these factors are irrelevant to the analysis.

### III. CONCLUSION

As the location of the Defendant is the only factor that weighs in favor of transfer, and that factor is not dispositive, *Platt*, 376 U.S. at 245–46; *accord Parrilla*, 2014 WL 1621487, at *14, Defendant's motion for transfer is DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket No. 33.

Dated: February 12, 2020
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**