UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                :

UNITED STATES OF AMERICA        :

                                :

       -v.-                  :       19 Cr. 366 (LGS)

                                :

STEPHEN M. CALK,            :

                                :

               Defendant.     :

                                :

----------------------------------------------------------------x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S MOTION FOR EXHIBIT, WITNESS, AND *BRADY* ITEMIZATION

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 2

    A.    The Offense Conduct ................................................................................ 2

    B.    This Investigation and the Special Counsel's Investigation ................................. 3

    C.    The Indictment and Criminal Prosecution ............................................... 4

        1.    The Government's Initial Discovery Productions ...................................... 5

        2.    The Special Counsel's Office Materials ................................................ 7

        3.    The March 18, 2020 Production ........................................................ 9

        4.    The Government's Efforts to Organize the Productions and Provide Guidance to the Defense ................................................................ 10

ARGUMENT ............................................................................................................... 13

I.    CALK IS NOT ENTITLED TO AN EXHIBIT OR WITNESS LIST THIS FAR IN ADVANCE OF TRIAL ........................................................................................ 13

    A.    Legal Standard .................................................................................. 13

        1.    Disclosure of Exhibit Lists ............................................................... 13

        2.    Witness Lists ................................................................................ 16

        3.    Remedies for Belated Disclosures ...................................................... 16

    B.    Calk's Request for an Exhibit List and Witness List Should be Denied ............. 18

II.    THE GOVERNMENT IS REQUIRED TO PRODUCE, NOT ITEMIZE, *BRADY* MATERIAL ........................................................................................................ 22

    A.    Legal Standard .................................................................................. 22

    B.    The Government Has Discharged and Is Discharging its *Brady* Obligations ...... 24

III.    NO CERTIFICATION IS NECESSARY ............................................................... 25

CONCLUSION .......................................................................................................... 26

## **TABLE OF AUTHORITIES**

**Cases**

*United States* v. *Ashburn*, No. 11 Cr. 303 (NGG), 2014 WL 1800409 (E.D.N.Y. May 6, 2014) 15, 18

*United States* v. *Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990) .......................................................... 17

*United States* v. *Blaszczak*, 17 Cr. 357 (LAK) ............................................................................ 16

*United States* v. *Bonventre* ("*Bonventre I*"), No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ............................................................................................................................ 15, 25

*United States* v. *Bonventre* ("*Bonventre II*"), 646 F. App'x 73 (2d Cir. 2016) (summary order) 16, 24

*United States* v. *Budovsky*, No. 13 Cr. 368 (DLC), 2016 WL 386133 (S.D.N.Y. Jan. 28, 2016) 15, 24

*United States* v. *Daugerdas*, No. 09 Cr. 581 (WHP) (S.D.N.Y. Oct. 14, 2010) .......................... 21

*United States* v. *Dupree*, No. 10 Cr. 627 (KAM), 2011 WL 5976006 (E.D.N.Y. Nov. 29, 2011) ........................................................................................................................................................ 19

*United States* v. *Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) ............................................... 14

*United States* v. *Freeman*, No. 18 Cr. 217 (KMW), 2019 WL 2590747 (S.D.N.Y. June 25, 2019) ........................................................................................................................................................ 14

*United States v. Gatto*, 17 Cr. 686 (LAK) .................................................................................... 16

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) .................................................... 15

*United States* v. *Gross*, No. 18 Cr. 14 (JLS), 2019 WL 7421961 (C.D Ca. Dec. 20, 2019) ........ 23

*United States* v. *Healey*, 860 F. Supp. 2d 262 (S.D.N.Y. 2012) ................................................... 25

*United States* v. *Lee*, 834 F.3d 145 (2d Cir. 2016) ...................................................................... 18

*United States* v. *Levin*, 15 Cr. 101 (KBF) ................................................................................... 16

*United States* v. *Manafort*, 17 Cr. 201 (ABJ) (D.D.C.) ................................................................. 4

*United States* v. *Manafort*, 18 Cr. 83 (TSE) (E.D. Va.) ................................................................. 4

*United States* v. *Mandell*, No. 09 Cr. 662 (PAC), 2011 WL 924891 (S.D.N.Y. Mar. 16, 2011) . 14

*United States* v. *Marrero*, 904 F.2d 251 (5th Cir. 1990) ............................................................. 26

*United States* v. *Marshall*, 132 F.3d 63 (D.C. Cir. 1998) ........................................................... 18

*United States* v. *Miranda*, 526 F.2d 1319 (2d Cir. 1975) ........................................................... 18

*United States* v. *Mohamed*, 148 F. Supp. 3d 232 (E.D.N.Y. 2015) .............................................. 18

*United States* v. *Monsanto Lopez*, 798 F. App'x 688 (2d Cir. 2020) (summary order) ............... 19

*United States* v. *Nachamie*, 91 F. Supp. 2d 525 (S.D.N.Y. 2000) ........................................... 13, 22

*United States* v. *Ng,* 15 Cr. 706 (VSB) ...................................................................................... 16

*United States* v. *Ohle* ("*Ohle I*"), No. 08 Cr. 1109 (JSR), 2011 WL 651849 (S.D.N.Y. Feb. 7, 2011) ....................................................................................................................... 26, 27, 28

*United States* v. *Ohle* ("*Ohle II*"), 441 F. App'x 798 (2d Cir. 2011) (summary order) ......... 26, 27

*United States* v. *Perraud*, No. 09 Cr. 60129, 2010 WL 228013 (S.D. Fl. Jan. 14, 2010) ........... 14

*United States* v. *Pineros*, 532 F.2d 868 (2d Cir. 1976) .................................................................. 19

*United States* v. *Reichberg*, No. 16 Cr. 458 (GHW), 2018 WL 6599465 (S.D.N.Y. Dec. 14, 2018) .......................................................................................................................................... 20

*United States* v. *Richards*, 659 F.3d 527 (6th Cir. 2011) ............................................................. 14

*United States* v. *Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014) ........... 14

*United States* v. *Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302 (S.D.N.Y. May 8, 2017) .... 17

*United States* v. *Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451 (S.D.N.Y. 2011) .. 25, 27, 28

*United States* v. *Russo*, 483 F. Supp. 2d 301 (S.D.N.Y. 2007) ..................................................... 17

*United States* v. *Shaw*, No. 06 Cr. 41 (CM), 2007 WL 4208365 (S.D.N.Y. Nov. 20, 2007) ....... 19

*United States* v. *Silver*, 15 Cr. 93 (VEC) .................................................................................... 17

*United States* v. *Skelos*, 15 Cr. 317 (KMW) ............................................................................... 16

*United States* v. *Ulbricht*, 14 Cr. 68 (KBF) ................................................................................ 17

*United States* v. *Upton,* 856 F. Supp. 727 (1994) ........................................................................ 22

*United States* v. *Upton*, 90 Cr. 629 .............................................................................................. 22

*United States* v. *Vilar*, 530 F. Supp. 2d 616 (S.D.N.Y. 2008) ..................................................... 22

## Statutes

18 U.S.C. § 2 .................................................................................................................................. 5

18 U.S.C. § 215(a)(2) ..................................................................................................................... 5

## Other Authorities

2/26/18 Tr., *United States* v. *Reichberg*, No. 16 Cr. 468 (GHW) ................................................. 17

Bonventre Br., *United States* v. *Bonventre*, No. 14-4714, 2015 WL 4503258 (2d Cir. filed Jul. 21, 2015) ................................................................................................................................... 15

Harrington Mem., *United States* v. *Reichberg*, No. 16 Cr. 468 (GHW) ....................................... 18

Joint Working Group on Electronic Technology in the Criminal Justice System, *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases* (Feb. 2012) ............................................................................................ 21

Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (March 2019) ........................................................................... 4

**Rules**

Fed. R. Crim. P. 16 .................................................................................................. passim

Fed. R. Crim. P. 16(d)(2) ................................................................................................ 16

Fed. R. Crim. P. 16(g) adv. comm. n. ............................................................................. 17

Fed. R. Crim. P. 16.1 adv. comm. n. ............................................................................... 21

## **INTRODUCTION**

Defendant Stephen Calk seeks to require the Government to produce an exhibit list and witness list more than four months before trial, and to itemize for him exculpatory material that has already been produced by the Government—requests sharply at odds with the law and practice in this District and Circuit and wholly unwarranted on the facts of this case.[1]  Courts in this District have routinely denied requests for both types of relief, and the Second Circuit has affirmed those denials, instead setting reasonable pretrial exhibit and witness list deadlines and requiring the Government only to disclose exculpatory material, not to prepare the defense case.

The justification Calk offers for this motion is entirely inadequate to support the unprecedented relief he requests.  In particular, while all but ignoring the enormous volume of material the Government produced in the fall of 2019, productions the Government has already repeatedly informed defense counsel contain substantially all of the material likely to be used as exhibits at trial, the defendant complains principally of a single production of material—material that is beyond the scope of Rule 16 and that was produced in response to a defense request—in the spring of 2020 to claim he will be unable to prepare for a trial more than five months later.  These complaints are baseless.  The Government has provided broad and prompt discovery from its investigative files, starting shortly after indictment, completed well within the discovery timeline set by the Court, and not subject to any of the technical issues of which Calk now complaints.  Calk's objection is that the Government has also undertaken—at his request—to

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Mem." refer to the memorandum in support of Calk's motion, Dkt. 68.  Citations to "Transfer Mem." refer to the memorandum in support of Calk's motion to transfer venue, Dkt. 34.  Citations to "Pretrial Mot. Mem." refer to the memorandum in support of Calk's pretrial motions, Dkt. 37.

obtain and produce large volumes of documents from the Special Counsel's Office ("SCO"),[2] documents not gathered or created by this investigative team as part of this investigation, and the vast bulk of which are almost certainly irrelevant.  As all of the documents the Government believes it is likely to rely on at trial were produced within the Court's timeline, Calk should not be heard to complain as a result of the extraordinary measures the Government voluntarily undertook *at the defendant's request* to obtain and produce a broader range of additional materials, materials that in any event were produced well before a trial date was even set.  Just like every other similarly situated defendant in this District, Calk should receive a witness and exhibit list shortly before trial.  Particularly as the Government has informed counsel it is willing to discuss a joint schedule for mutual disclosures—and has proposed dates for portions of such a schedule—Calk's baseless motion should be denied.

## BACKGROUND[3]

### A.    The Offense Conduct

This case concerns the defendant's corrupt abuse of his position as then-CEO and chairman of the Federal Savings Bank, a federally-insured savings association, to solicit personal benefits to himself in exchange for approving millions of dollars in loans from the bank.  From approximately July 2016 to approximately January 2017, Calk worked to extend $16 million in

---

[2] While Calk repeatedly tries to suggest that this case was the result of a joint investigation by this Office and the SCO, as discussed herein, Calk greatly overstates the limited coordination between the two offices and separate investigative teams.

[3] The Government does not believe that the background information herein is of an evidentiary character, particularly given the nature of this motion and the fact that Calk did not submit a declaration or affidavit supporting his motion's background assertions, but would be prepared to supplement the record with a declaration or affidavit should the Court consider it necessary.

financing to Paul J. Manafort, Jr.—a political consultant who for a portion of this time period was chairman of the Donald J. Trump presidential campaign and who, after formally leaving the campaign, remained influential with the campaign and, later, presidential transition team—in exchange for Manafort's assistance with Calk's efforts to secure prestigious positions on the campaign and in the administration.  Manafort appointed Calk to the campaign's economic advisory committee and recommended Calk for the position of Under Secretary of the Army.[4] Calk was closely personally involved in extending the $16 million in loans during the exact time period that he was soliciting Manafort's assistance.  These loans, which were highly risky due to Manafort's deteriorating finances, ultimately ended in default following Manafort's arrest, and the bank sustained a multimillion dollar loss it is attempting to recoup.

### B.    This Investigation and the Special Counsel's Investigation

This Office began investigating Manafort and Calk in connection with the loans that give rise to the instant case in March of 2017.  Following the appointment of a Special Counsel in May of 2017, the Special Counsel was tasked with the investigation of Manafort (as to these loans and a number of other entirely separate matters) while this Office continued its investigation of Calk separately.  The SCO's investigation of Manafort resulted in charges against Manafort in the District of Columbia and the Eastern District of Virginia for tax-related, foreign agent, money laundering, and obstruction of justice offenses not related to Calk, as well as bank fraud charges based on the loans made by Calk's bank, as well as Manafort's attempts to obtain financing from other unrelated banks.  *See United States* v. *Manafort*, 17 Cr. 201 (ABJ)

---

[4] Although Calk was interviewed for the position as a result of Manafort's efforts, he was not ultimately selected.

(D.D.C.); *United States* v. *Manafort*, 18 Cr. 83 (TSE) (E.D. Va.).[5]

While this Office and the SCO coordinated on a limited number of investigative steps—namely a pen register order, search warrants for Calk's phone and for an email account used by Manafort, and several subpoenas and witness interviews, including a series of interviews of Federal Savings Bank personnel in June of 2017—the investigations proceeded separately.  No member of the current Calk investigative team was ever part of the SCO Manafort investigative team and vice versa,[6] and no personnel from the Calk investigative team was involved in any charging decision made by SCO, attended any SCO grand jury presentations, or appeared in court on behalf of or with SCO.  Of particular relevance here, the Calk investigative team was not permitted to access the vast bulk of the SCO's documents, including substantially all of the materials gathered and produced at the defendant's request in this case, until after the sentencings of Manafort in March of 2019.[7]

### C.   The Indictment and Criminal Prosecution

On May 21, 2019, the grand jury returned Indictment No. 19 Cr. 366 (LGS), charging

---

[5] Manafort was convicted on several charges not related to Calk in both prosecutions, and sentenced in both cases in March 2019.  The SCO also investigated other conduct by Manafort—none related to Calk—that did not result in charges but was described in detail in the Special Counsel's report, which has been publicly disclosed in redacted form.  *See* Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (March 2019), https://www.justice.gov/storage/report.pdf.

[6] A former prosecutor from this Office tranferred to the SCO in July 2017, after having briefly supervised the early stages of this Office's investigation, but was not subsequently involved in this Office's investigation of Calk or, to this Office's knowledge, the SCO's investigation of Manafort.

[7] Calk's counsel is incorrect to state that "the two investigations even shared the same FBI case agent."  (Mem. 2).  The Government is unaware which agent Calk is referring to, and counsel has not responded to the Government's request for clarification.  Regardless, the assertion is not accurate.

Calk with one count of financial institution bribery in violation of 18 U.S.C. §§ 215(a)(2) and 2.

Calk surrendered on May 23, 2019 and was released on a $5 million bond on that day.

Since Calk's surrender, the Government has produced broad discovery to Calk, including

not just materials in the possession of the Government's investigative team, but also materials

obtained from the Central District of California's separate investigation of Manafort's son-in-law

Jeffrey Yohai and voluminous documents obtained from the files of the SCO related to its

Manafort investigation.  The Government has also made broad disclosure of statements made in

connection with the investigations conducted by this Office, the Central District of California,

and the SCO, including a number of statements that, while not exculpatory material under *Brady*

v. *Maryland*, 373 U.S. 83 (1963), or its progeny, the Government nonetheless decided to provide

to Calk's counsel in an effort to assist in preparing the defense.

    1. *The Government's Initial Discovery Productions*

On June 13, 2019, several weeks after Calk's indictment and three days after the entry of

a protective order, the Government began producing substantial discovery to the defendant,

prioritizing the contents of its own investigative files.[8]  Specfically, the Government made

productions on June 13, June 21, July 1, July 30, August 2, and August 21 totalling

approximately 1.2 million pages.  Of these, the majority—over 790,000 pages—came from a

single company, a title insurance company that handled the closings of some of the real estate at

issue, and as the Government advised the defense at the time, the Government does not believe

---

[8] The Government also prioritized the production of materials believed to be *Brady* or arguably
*Brady* material, resulting in a series of disclosure letters beginning on June 10, 2019, the day the
protective order was entered.  This motion does not question the timeliness or sufficiency of
these disclosures; indeed, Calk has commented on their extensiveness (Pretrial Mot. Mem. 15).

those aspects of the production contain any significant nonduplicative material.[9]  Instead, as the Government has long since informed the defendant, the Government believes that its June 13 and 21, 2019 productions, totaling approximately 300,000 pages, comprise the substantial majority of the documents the Government considers core to the case and from which the bulk of the documents to be used in the Government's case-in-chief will ultimately be drawn.  These materials were also accompanied by an index, and Calk does not challenge the adequacy of the index concerning any portion of these productions.

As of August 26, 2019—the date by which the Government had initially expected to substantially complete its production of discovery—the Government had in fact substantially completed its production of discoverable materials from the investigative files of the U.S. Attorney's Office for the Southern District of New York and the FBI New York field office.  As such, the Government's core Rule 16 production was substantially complete by that time.

However, as explained *infra*, the Government had not yet completed its production of materials obtained from the SCO, materials that the Government largely did not have access to prior to the spring of 2019 and which the Government undertook to produce in large part in response to defense requests.  The Government thus sought and obtained, with the defense's consent, an extension to October 15, 2019 to produce discovery.  The parties acknowledged that "the extended discovery deadline does not preclude the possibility of a small volume of materials being produced thereafter due to unanticipated contingencies."  (Dkt. 29 at 1 n.2).

---

[9] In addition to these pages, the Government also produced during this period forensic extractions of electronic devices used by Yohai from a Central District of California investigation.  These extractions do not lend themselves to ready enumeration of page counts, as defense counsel complains (Mem. 3 n.1), and their total is not included in the count.  As noted in footnote 16, below, the Government is exploring the searchability issues Calk recently raised.

2.      *The Special Counsel's Office Materials*

The Government has made extensive efforts to obtain, review, and produce voluminous

materials from the SCO's investigation of Paul Manafort and related individuals.  While some of

those efforts—focused on a limited realm of material potentially relevant to this case—began

prior to Calk's indictment, most of those efforts have been in response to expansive written

requests by the defendant for wide categories of material gathered by the SCO in its investigation

and wholly unrelated to the charges in this case.  *See* Exs. A, B.[10]  For example, notwithstanding

the fact that Manafort is not a named defendant in this case and is not a likely trial witness for the

Government, the defense has asked broadly for the entire contents of all email accounts used by

Manafort (without any restrictions based on, for example, time period or who Manafort used

these accounts to correspond with), Ex. B at 5; all documents and communications "concerning

any entities controlled directly or indirectly by, or associated with, Mr. Manafort or Mr. Yohai or

their family members," Ex. B at 4 (which would appear on its face to call broadly for every

record concerning any of Manafort's lobbying or consulting businesses throughout his entire

career and concerning every activity he conducted as part of any such business during his

career—as well as the same for, among others, Manafort's adult children); and all documents

concerning any offense by Manafort "investigated or considered" by the Government (which

would would seem to encompass virtually any document in the SCO's file if not narrowed, as

Calk's counsel never agreed to do), Ex. A. at 2, even though that material was not gathered by

---

[10] It bears mention that despite the fact that counsel for Calk had been engaged with this Office
for almost two years prior to the filing of the Indictment, which itself occurred in May 2019, the
defendant did not serve one of his expansive sets of requests—a twelve page, single spaced letter
that included approximately 80 different, broadly worded requests for material (Ex. B)—until
July 29, 2019, less than a month before the original discovery deadline.

this Office as part of this investigation and virtually none of that material has anything to do with (or was ever known to or sought by) Calk or the Federal Savings Bank.

In response to those requests, the Government initially consulted with Calk's prior and current counsel to attempt to ascertain whether there were categories of SCO documents that could be excluded in order to expedite the process of gathering them for production and so as to avoid burdening the defense with voluminous, extraneous documents. Calk's counsel repeatedly declined to in any way limit their requests. Therefore, while informing defense counsel that the Government did not believe much if any of the requested material to be relevant (let alone material to the defense within the meaning of Rule 16), the Government nonetheless undertook extensive efforts to gather and produce large quantities of such material.[11]

First, the Government conducted targeted searches of material contained within SCO files calculated to identify information that might be relevant to this case or helpful to the defense, and through that process[12] identified documents and information which were produced on September 9, September 23, October 7, October 11, and October 15, 2019—*i.e.*, all within the agreed upon discovery schedule.

---

[11] In order to locate these records, obtain copies from the files of other offices, and ensure those copies were operable, the Government had to and did consult at length with personnel from several units in the FBI, the U.S. Attorney's Office for the District of Columbia (which assumed responsibility for several Special Counsel-related matters after the dissolution of the SCO), and former SCO detailees who had left government service.

[12] For example, the Government initially used a combination of document source information, hand review, and targeted search terms to capture communications and documents related to Calk himself or to Manafort's interaction with Calk. Later, the Government used broader search terms in a broader universe of documents to capture anything possibly related to the loan relationship (records which were overwhelmingly duplicative of other records already produced) such as "Calk," "Federal Savings," "TFSB," the Federal Savings Bank's email domain, and the addresses of the properties used as collateral on the proposed or extended loans from Calk's bank. Some results of these broader searches were produced in late October and November.

The Government also informed defense counsel, at the time, that a larger production of documents from the SCO and unrelated to this case would be forthcoming (at the defendant's request), but would take additional time to produce, and that the Government was still seeking to obtain additional SCO materials.  The defendant, through counsel, raised no objection to the Government taking additional time to gather and produce these voluminous additional materials and the parties corresponded throughout the relevant time period on the status of the Government's efforts.  Consistent with those conversations, on October 28, 29, and 31, and November 18, 2019 the Government made additional productions of nearly 7.6 million pages of material.[13]  In making these additional productions, the Government reiterated its view that it was unlikely this material contained information relevant to this case, but that it was being produced in an abundance of caution and in response to the defendant's expansive requests.

3.    *The March 18, 2020 Production*

In addition to the documents described above, the Government learned during the discovery period of the existence of additional SCO documents that, while not used by the Government to investigate or charge the case and of no known relevance to the case, were similarly within the ambit of the defendant's expansive discovery requests described above.[14]

---

[13] The Government also made a small production of less than 300 pages of SCO documents on December 17, 2019.

[14] In particular, apparently as a result of a copying error made in the process of creating archival electronic media in connection with the dissolution of the SCO, a portion of the SCO files was inadvertently not provided to this Office.  When this Office learned of the error—which was not made by any of this Office's personnel—it worked as quickly as possible with the U.S. Attorney's Office in D.C. and the FBI to identify at what stage the file copying error had occurred, locate the missing materials, and obtain them.  Throughout this process, the Government kept the defense informed in general terms that it was encountering difficulties in obtaining the full set of the SCO records, was attempting to obtain further SCO records, and

The Government was able to obtain copies of this material from the SCO's files in late

December, reviewed and deduplicated them, and, after working through processing delays

largely of a technical nature, produced them on March 18, 2020.[15]  As with all of the material

produced after October 15, 2019, the Government produced this material principally in response

to the defendant's requests and believes the documents in this production are unlikely to contain

information material to this case.

     As the Government has informed defense counsel, the Government does not anticipate

any additional productions, save for any limited volume of new material gathered or uncovered

in preparation for trial this fall.

     4.     *The Government's Efforts to Organize the Productions and Provide Guidance to the Defense*

     In addition to making the various productions described above, the Government has

undertaken extensive efforts to render the discovery comprehensible and navigable, providing

detailed indexes of the materials provided, producing the documents in database load-ready

format or in the form obtained by the Office in most cases, re-producing a number of materials in

order to include two additional categories of metadata at the defense's request, and promptly

responding to defense inquiries.[16]

----

would produce any nonduplicative new material it was able to obtain as soon as possible.

[15] As defense counsel notes (Mem. 5 n.3), this production was shipped by Federal Express due to the pandemic and apparently damaged in transit, resulting in its reproduction on April 1, 2020.

[16] A number of the complaints Calk raises in the instant motion have never been raised with the Government.  For example, Calk's counsel complains of searchability issues in several sets of documents in which .html files were used to provide an interface to voluminous electronic information seized from devices of Manafort's son-in-law Jeffrey Yohai in an investigation conducted by the Central District of California. (Mem. 3 n.1).  As an initial matter, these files are reports generated by the Forensic Tool Kit software, a widely-used data extraction tool, and

Due to the volume of some of the disclosures from the SCO, the Government's main discovery index listed most such productions under summary line items describing the documents as simply documents obtained from the SCO.  However, for each such production, the Government either separately provided lengthy and detailed spreadsheets listing the source information for each document, allowing the documents to be identified, or else included this source information in the metadata for load-ready documents, allowing them to be sorted by the defense when loaded into document databases.

As noted, the Government has also made itself available to answer any questions the defendant has had about discovery, and just recently responded to a defense inquiry regarding missing source information for certain documents gathered by the SCO during its investigation. The Government promptly located and provided the requested source information in full.[17]  And while the defendant seeks to make much of isolated anomalies in the organization of documents gathered and maintained by the SCO, the documents are on the whole coherently organized in a manner consistent with standard storage for files and data of its kind.[18]

provide indexes to the voluminous electronically stored information extracted from these devices together with hyperlinks for easy access to each file.  Moreover, these materials were provided to Calk on August 21, 2019—well before the discovery deadline and more than eight months ago— and yet Calk never raised any issue regarding the searchability of these files with the Government.  The Government is now exploring the feasibility of reprocessing these files in a different format and remains willing to discuss and attempt to resolve this or any other technical issue with the defense at counsel's convenience.

[17] Much as with the issue described in note 13, above, the defense has never raised with the Government issues regarding some documents not being text searchable or the other new issues they discuss on page 7 of their memorandum of law.  The Government does not know to which files these issues relate, but the Government has in almost all instances produced documents in the form in which they were obtained.

[18] The supposed anomalies cited by the defense are hardly confounding.  In most cases they are not anomalies at all but simply indicate that the files are organized by custodian, a common—

11

Finally, in advance of the filing of this motion, the Government had already indicated its agreement to developing a joint schedule for pretrial disclosures and, in particular, its willingness to discuss a schedule whereby the Government provided an exhibit or witness lists approximately 4 to 6 weeks before trial (Mem. 8 n.6).  Moreover, substantial information about likely witnesses and exhibits is already available to the defense.  With respect to the former, on May 29, 2019—less than two weeks after Calk's indictment, and almost eleven months ago—in connection with conditions of Calk's bail, the Government provided to the defense a list of potential witnesses.[19]  With respect to the latter, in its discussions with defense counsel, the Government has already advised defense counsel that it anticipates the majority of the documents the Government is likely to rely on will be drawn from the productions from the Federal Savings Bank (many of which Calk's current defense counsel participated in producing to the Government during its investigation) and the Office of the Comptroller of Currency, which were produced to the defense no later than August 21, 2019 (*i.e.*, approximately eight months ago and over a year before trial).  While the Government has not yet determined the set of materials it intends to rely on at trial—let alone prepared an exhibit list—the Government still believes the majority of the documents it is likely to rely on at trial will be from those sources,

---

perhaps the most common—means of organizing data in productions.  The only other example cited by the defendant—a classification of OCC documents as within a "2017.05.02 The Federal Savings Bank" path—evidently represents an OCC production *pertaining* to The Federal Savings Bank and not *by* Federal Savings Bank.  It is hard to see how this deviation from organization by custodian could possibly have caused the experienced defense team significant confusion; this Office neither initially received this production from the OCC nor named the file path, but the undersigned counsel was able to apprehend the provenance of the documents in minutes by inspecting them.

[19] Calk relied on this list, in part, in arguing that the case should be transferred to the Northern District of Illinois.  (*See* Transfer Mem. 7 n.3).

and is presently unaware of any documents it intends to rely on at trial that were produced after

the October 15, 2019 discovery deadline (*i.e.*, over six months ago).

## ARGUMENT

### I.    CALK IS NOT ENTITLED TO AN EXHIBIT OR WITNESS LIST THIS FAR IN ADVANCE OF TRIAL

Calk's request for an exhibit and witness list over four months before trial conflicts with

the established practice in this District and is neither warranted nor practical.  It should be denied.

#### A.    Legal Standard

##### 1.    *Disclosure of Exhibit Lists*

Although the Federal Rules of Criminal Procedure do not require parties to disclose the

documents they intend to rely on at trial, *see, e.g.*, *United States* v. *Nachamie*, 91 F. Supp. 2d

565, 569-70 (S.D.N.Y. 2000), several courts have imposed such a requirement—or, more

commonly, a schedule for pretrial exhibit list disclosure—based on their inherent authority.

When courts in this circuit exercise their inherent authority to order the early disclosure

of exhibits, the overwhelming practice has been to do so several days or, at most, several weeks

in advance of trial.  *See United States* v. *Ferguson*, 478 F. Supp. 2d 220, 243-44 (D. Conn. 2007)

(even for cases that order pretrial disclosure of documents government intends to rely on, "a

majority of those courts only ordered the government to disclose its case in chief documents a

given period of time before trial" (collecting cases)).  This practice holds in complex and

document-intensive cases.[20]  *See, e.g.*, *United States* v. *Freeman*, No. 18 Cr. 217 (KMW), 2019

---

[20] Other courts, as well, have rejected claims that the volume of discovery entitles a defendant to the identification of documents to be used at trial well in advance of the trial date.  *See, e.g.*, *United States* v. *Richards*, 659 F.3d 527, 545 (6th Cir. 2011) (affirming denial of identification of the documents to be relied on in case in chief); *United States* v. *Perraud*, No. 09 Cr. 60129,

WL 2590747, at *4 (S.D.N.Y. June 25, 2019) (in four-defendant case where "complex nature" and "large volume of documents produced by the government" justified early exhibit lists, ordering preliminary exhibit lists 30 days before trial, and rejecting defense request for 90-day disclosure as "unwarranted"); *United States* v. *Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440, at *1 (S.D.N.Y. Jan. 7, 2014) (noting ordering of exhibit lists approximately 6 weeks before trial, over defense request for longer period, in case involving an estimated 1 million pages of documents); *United States* v. *Mandell*, No. 09 Cr. 662 (PAC), 2011 WL 924891, at *7 (S.D.N.Y. Mar. 16, 2011) (exhibit list 3 weeks before trial in prosecution of 8-year-long international securities fraud scheme with "substantial" volume of discovery).  Indeed, an approximately 60-day time period for an exhibit list was employed in a prosecution that involved a "massive" discovery production that was "one of the largest productions in any prosecution in this district." *United States* v. *Budovsky*, No. 13 Cr. 368 (DLC), 2016 WL 386133, at *12 (S.D.N.Y. Jan. 28, 2016); *see also id.* at *6, *14 (denying defense request for adjournment of trial); *see also, e.g.*, *United States* v. *Ashburn*, No. 11 Cr. 303 (NGG), 2014 WL 1800409, at *13 (E.D.N.Y. May 6, 2014) (denying request for exhibit and witness lists as premature since no trial date set).[21]

Notably, in the five-month trial of five defendants for participating in the decades-long Bernard Madoff fraud scheme—arguably the most extensive criminal scheme prosecuted in this District—the district court ordered production of exhibit lists 60 days before trial.  *United States*

---

2010 WL 228013, at *1, *9, *12 (S.D. Fl. Jan. 14, 2010) (ordering production of exhibit list 10 days before the start of trial where defense complained the Government had produced "over 3 million mostly irrelevant and immaterial documents").

[21] This practice has also been employed when the productions involve large volumes of paper documents.  *See, e.g.*, *United States* v. *Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (exhibit lists ordered 30 days before trial, despite defense request for longer period, where discovery consisted of over 1 million pages of documents in "450 boxes").

v. *Bonventre* ("*Bonventre I*"), No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May

28, 2013) (ordering exhibit lists 60 days before trial in light of "the fact that the charges in the

Indictment span decades, the sheer volume of documents at issue in th[e] case, the number of

Defendants allegedly involved and the difficulty for the Defendants in determining which

Defendants is alleged to have produced, or been involved in producing, each document"); *see*

*also United States* v. *Bonventre* ("*Bonventre II*"), 646 F. App'x 73, 79 (2d Cir. 2016) (summary

order) (60-day disclosure period "adequately addressed" concerns about the "volume of

discovery," rendering the provision of a bill of particulars unnecessary).[22]

       Consistent with these opinions, providing an exhibit list several weeks before trial is a

standard practice in complex and high-profile public corruption cases in this District.  *See, e.g.*,

*United States* v. *Gatto*, 17 Cr. 686 (LAK) (four-week, three-defendant honest services fraud trial;

exhibit and witness lists approximately 30 days before trial); *United States* v. *Blaszczak*, 17 Cr.

357 (LAK) (five-week, four-defendant insider trading trial; exhibit and witness lists

approximately 30 days before trial); *United States* v. *Ng,* 15 Cr. 706 (VSB) (five-week bribery

trial; exhibit list on rolling basis beginning four weeks before trial and completed two weeks

before trial; witness list two weeks before trial); *United States* v. *Skelos*, 15 Cr. 317 (KMW)

(two-defendant, month-long bribery trial; exhibit list approximately four weeks before trial);

*United States* v. *Levin*, 15 Cr. 101 (KBF) (two-defendant, three-plus week fraud trial; exhibit list

six weeks before trial; witness list three and a half weeks before trial); *United States* v. *Silver*, 15

Cr. 93 (VEC) (month-long bribery trial; exhibit and witness lists approximately three weeks

---

[22] On appeal, the defendants complained that the discovery involved "millions of documents,"
Bonventre Br. at 104, *United States* v. *Bonventre*, No. 14-4714, 2015 WL 4503258 (2d Cir. filed
Jul. 21, 2015), and the *exhibits themselves* totaled "millions of pages," *id.* at 110.

before trial); *United States* v. *Ulbricht*, 14 Cr. 68 (KBF) (three-week cybercrime and narcotics trial; exhibit and witness lists approximately one month before trial).

### 2. *Witness Lists*

Federal Rule of Criminal Procedure 16 "does not require the Government to furnish the names and addresses of its witnesses." *United States* v. *Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). Thus, "'[i]n the absence of a specific showing that disclosure [of a witness list] [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case,' the request for a witness list should be denied." *United States* v. *Russo*, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007) (quoting *Bejasa*, 904 F.2d at 139-40).

As this Court has recognized, "Courts in the Second Circuit typically deny motions for the early disclosure of witness lists where, as here, Defendants have not made a specific showing of need." *United States* v. *Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017). The claim that "given the complexity of the case, disclosure of the government's witness list will level the playing field" amounts to an "abstract statement of need" that does not justify provision of a witness list. *Russo*, 483 F. Supp. 2d at 309.

Much as with exhibit lists, it is common practice in high-profile and complex cases in this District to provide witness lists several weeks before trial. *Cf. United States* v. *Mohamed*, 148 F. Supp. 3d 232, 247 (E.D.N.Y. 2015) ("It is unclear to the Court why the Defendant requires immediate disclosure when no trial date has been set."); *Ashburn*, 2014 WL 1800409, at *13 (denying request for exhibit and witness lists as premature since no trial date set).

### 3. *Remedies for Belated Disclosures*

Rule 16(d)(2) of the Federal Rules of Criminal Procedure give the Court "broad discretion in fashioning a remedy" for insufficient or belated disclosures. *United States* v. *Lee*,

16

834 F.3d 145, 158 (2d Cir. 2016); *see also United States* v. *Miranda*, 526 F.2d 1319, 1324 (2d Cir. 1975) ("Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the prejudice which resulted, on the other.").  The typical remedy for a belated disclosure is an adjournment where necessary to allow the other party time to respond to the new material.  *See, e.g.*, *United States* v. *Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998) (noting that exclusion is rarely appropriate where the delay did not result from bad faith and a continuance could remedy prejudice); *United States* v. *Pineros*, 532 F.2d 868, 871 (2d Cir. 1976) (the court should consider, inter alia, "'the feasibility of rectifying [any] prejudice by a continuance'" (quoting Advisory Committee Notes on Rule 16(g)).

The touchstone in analyzing the need for a remedy for belated discovery productions is the prejudice to the defendant.  *United States* v. *Monsanto Lopez*, 798 F. App'x 688, 690 (2d Cir. 2020) (summary order) (affirming refusal to preclude evidence disclosed one month before start of trial even if it was produced untimely after government had represented its production was complete); *United States* v. *Dupree*, No. 10 Cr. 627 (KAM), 2011 WL 5976006, at *9-11 (E.D.N.Y. Nov. 29, 2011) (rejecting defense request to preclude a witness based on a hard drive and several USB drives being turned over to the defense several weeks before trial); *United States* v. *Shaw*, No. 06 Cr. 41 (CM), 2007 WL 4208365, at *5 (S.D.N.Y. Nov. 20, 2007) ("Campbell has not suffered any prejudice as a result of this delay.  No trial date has yet been set in this case.").  Even in situations where Government discovery productions are voluminous and protracted, the immediate production of trial exhibits has been rejected.  *See, e.g.*, 2/26/18 Tr. at 149-50, *United States* v. *Reichberg*, No. 16 Cr. 468 (GHW) (ECF No. 140) (setting deadline for

17

exhibit list three weeks prior to trial despite defense motion for immediate production).[23]

**B.      Calk's Request for an Exhibit List and Witness List Should be Denied**

Neither Calk's complaints regarding the volume of discovery nor the timing of disclosure justify the relief he seeks or a substantial departure from the routine practice in this District.

First, as noted above, all core Rule 16 material—including the material the Government has repeatedly told defense counsel will be likely to include substantially all of the Government's trial exhibits—was provided on or before the October 15, 2019 deadline.  The defendant hardly disputes as much.  Indeed, he essentially ignores these very substantial productions in their entirety.  Second, with respect to the voluminous SCO materials which the Government gathered at the defendant's request of which he now complains, nearly 8 million pages responsive to those requests were produced in October and November of 2019, as much as 10 months before trial.

Second, with respect to the March 18 production, as noted above—and leaving aside the fact that the Government has repeatedly informed defense counsel that it does not believe that production is likely to contain anything relevant to this trial[24]—the defense nonetheless has that material more than five months in advance of trial.  The defense offers absolutely no argument as to how or why that time period is insufficient to permit him to review that material for trial.  Indeed, aside from several conclusory assertions, the defense brief is silent as to how the March

---

[23] The defense had asked for an immediate exhibit list deadline due to the large volume of evidence produced over a long period.  Harrington Mem. at 43-44, *United States* v. *Reichberg*, No. 16 Cr. 468 (GHW) (ECF No. 93); *see also United States* v. *Reichberg*, No. 16 Cr. 458 (GHW), 2018 WL 6599465, at *2-3 (S.D.N.Y. Dec. 14, 2018) (describing productions).

[24] Calk complains that the Government does not rule out later deciding to use later-disclosed materials at trial.  (Mem. 8).  But this is itself not a basis to warrant relief.  Having gathered and reviewed this material at the defendant's request, the Government has simply reserved the same right to use this material as the defense now has.  *See, e.g.*, *Marshall*, 132 F.3d at 70.

18 production has prejudiced a defense team that includes at least six counsel of record who will have had over five months to prepare for trial since receiving the material.  Tellingly, in his pretrial motions, Calk's counsel appeared to share the Government's view of the tangential relevance of the large SCO productions.  (*See* Dkt. 48 at 21 (defense referring to the "millions of *immaterial* documents the government has voluntarily produced" (emphasis added))).[25]

Cases relied upon by Calk are not to the contrary.  For example, in *United States v. Daugerdas*, Judge Pauley ordered disclosure of a witness list somewhat over three months before trial—a shorter period of time than Calk's request here—and did so because that case involved a Government production of "more than 23 million pages," including the belated production of 110 boxes of paper documents which were far more time consuming to review than the electronic records produced here.  *United States* v. *Daugerdas*, No. 09 Cr. 581 (WHP), slip op. at 4 (S.D.N.Y. Oct. 14, 2010) (ECF No. 180).  Similarly, in *United States* v. *Vilar*, the court ordered disclosure of exhibit and witness lists 60 days before trial, where the conduct spanned *19 years* and the exhibit list could facilitate litigation of complex taint issues, factors obviously not present here. 530 F. Supp. 2d 616, 638, 639-40 (S.D.N.Y. 2008).

Of the cases Calk cites to justify his extraordinary request, only one—*United States* v. *Upton*—ordered the disclosure of documents to be relied on at trial before the setting of a trial date.  *United States* v. *Upton*, 748 (S.D.N.Y. 1994).  But *Upton* is an outlier, has been criticized for flaws in its analysis of the Federal Rules and the cases it cites, *see, e.g.*, *Nachamie*, 91 F.

[25] Calk's bare claim to have found material information in the SCO productions—without any detail about what this information is, when it was produced by the Government, and whether it is duplicative of other material produced in discovery—shows little.

Supp. 2d 569-70, and is contrary to the overwhelming legal authority and typical practice in cases as complex as this or more, *see supra* Section I.A.1.[26]  There is thus every reason to treat this case consistently with the many complex cases in this District cited above.

Finally, the defendant's assertion that the Government "cavalierly ignored" this Court's discovery schedule (Mem. 11) is simply wrong.  As detailed above, the Government produced everything within its own investigative file that constitutes Rule 16 material by the Court's deadline.  Moreover, it produced nearly 8 million pages of additional SCO documents gathered in response to requests by the defense before or very shortly after the deadline.  The March 18 production—which was primarily the result of file copying errors made by personnel outside this Office—is hardly indicative of bad intent on the part of the Government, and the defense does not seriously allege otherwise.  That is particularly true given that the Government consistently informed the defendant that it was continuing to attempt to obtain such files and never—until the filing of the instant motion—heard objections from defense counsel who, as summarized above, had a very substantial amount of material to review already.

Similarly, Calk's complaints that the documents are "disorganized" are misplaced.  Critically, Calk does not and cannot complain about the organization of materials gathered by this Office as part of this investigation—*i.e.*, the documents produced in advance of the discovery deadline and which the Government expects to form the core of its evidence at trial— but instead complains about how materials gathered by the SCO as part of its investigation were

---

[26] Additionally, even *Upton* did not order disclosure of exhibit lists.  Instead, it directed the identification of documents to be relied on at trial, a task calling for substantially less particularization.  *See Upton*, 856 F. Supp. at 748.  Indeed, the disclosure of actual trial exhibits in *Upton* appears to have taken place several weeks before the trial.  *See United States* v. *Upton*, 90 Cr. 629 (ECF Nos. 62-64).

stored and organized.  The Government can hardly be expected to not only obtain and produce

but *reorganize* compilations of documents produced by other bodies over which it had no

control.  *See United States* v. *Gross*, No. 18 Cr. 14 (JLS), 2019 WL 7421961, at *4 (C.D Ca.

Dec. 20, 2019) ("[T]o the extent that the Government produces ESI from third parties in the

same format it was received, its duty of production is discharged.").[27]  And the Government has

made extensive efforts to assist the defense by providing detailed indices and offering to work

with defense counsel to further assist wherever possible.[28]

     Moreover, as detailed above, the Government has repeatedly provided Calk with

guidance regarding which categories of documents, and which productions, it considered most

relevant to the case at hand.  And even as to the SCO documents, which the Government did not

generate and the vast bulk of which are not likely to be relevant to this case, the Government has

referred Calk to the District of Columbia and Eastern District of Virginia charging instruments

and the publicly released Special Counsel report, collectively presenting an extraordinary and

unusual roadmap to the late-produced documents.

     The Government shares Calk's desire to begin trial promptly upon the resumption of

normal operations, but there is still ample opportunity to review the new productions before the

---

[27] This principle is reflected in a joint working group report cited as an authority in the advisory committee notes on the new Rule 16.1.  Joint Working Group on Electronic Technology in the Criminal Justice System, *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases* at 2 (Feb. 2012) (principle 5), *available at* https://www.justice.gov/archives/dag/page/file/913236/download; *see also* Fed. R. Crim. P. 16.1 adv. comm. n. (citing *id.*).

[28] The main index is attached hereto.  *See* Ex. C.  Since the index describes grand jury and other confidential investigative material, the Government in a separate letter respectfully requests that it be filed in redacted form.  The spreadsheets are voluminous but available for the Court's inspection on request.

September 8 trial.  Moreover, the Government's proposed timeline—providing such information approximately a month before trial—is more than sufficient to permit the defense to prepare. Indeed, if production of exhibit and witness lists several weeks before trial was adequate to allow the Madoff Securities defendants to assess the millions of documents in discovery (and millions of pages of *exhibits*), *Bonventre II*, 646 F. App'x at 79, the *Budovsky* defendant to assess "one of the largest productions in any prosecution in this district," *Budovsky*, 2016 WL 386133, at \*12; or numerous other high-profile defendants to prepare for their complex cases, a similar period suffices for Calk.  This is particularly the case given that the conduct in his case spanned a period of months, not years, *cf. Bonventre I*, 2013 WL 2303726, at \*7; that he was charged alone and in one count, not in conjunction with codefendants, *cf. id.*; that he has been provided with a list of 40 potential Government witnesses almost eleven months ago; and that the large majority of the documents likely to be presented at trial were kept by the bank he owns and ran, and were produced to the Government by his current cocounsel.  These are hardly circumstances warranting the extraordinary relief Calk seeks.

## II.   THE GOVERNMENT IS REQUIRED TO PRODUCE, NOT ITEMIZE, *BRADY* MATERIAL

Calk's request for an order requiring the Government not only to produce *Brady* material but to pick out and identify it as such is unwarranted and contrary to the law of this circuit.

### A.   Legal Standard

Courts in this District recognize that "[i]n the *Brady* context, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous . . . ."  *United States* v. *Healey*, 860 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (internal quotations marks and citation omitted); *see also, e.g.*, *United States* v.

22

*Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 457 (S.D.N.Y. 2011) ("The Government is under no general obligation to identify or sort *Brady* material within even an extremely voluminous disclosure[.]"); *United States* v. *Ohle* ("*Ohle I*"), No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) (While "'the Government may not properly conceal exculpatory evidence from a defendant, [the rule] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case.'" (quoting *United States* v. *Marrero*, 904 F.2d 251, 261 (5th Cir. 1990))).

In *United States* v. *Ohle*, the Second Circuit rejected the arguments that Calk presses here. *See United States* v. *Ohle* ("*Ohle II*"), 441 F. App'x 798, 804 (2d Cir. 2011) (summary order).  In that case, the district court considered at length a defense argument—supported by some of the same cases Calk relies on here—that materials presented to the defense in discovery (in connection with the related *Daugerdas* case) had not been adequately disclosed under *Brady* because they were not identified within the Government's voluminous productions.  *See Ohle I*, 2011 WL 651849, at *3.  The district court squarely rejected this argument, holding that "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," *id.* at *4, and that although "the Government may not properly conceal exculpatory evidence from a defendant, [*Brady*] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case."  *Id.* (internal quotation marks omitted).  On appeal, the Second Circuit rejected the same arguments, citing the district court's "thoughtful and meticulous opinion."  *Ohle II*, 441 F. App'x at 804.

Consistent with *Ohle II*, courts in this District recognize that "prosecutors may satisfy their *Brady* obligations through . . . disclosures of exculpatory or impeachment materials within large

23

productions of documents or files." *Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 455.  Absent "prosecutorial misconduct—bad faith or deliberate efforts to knowingly hide *Brady* material," even "voluminous" disclosures will be held to satisfy *Brady*.  *Id.*; *see also Ohle I*, 2011 WL 651849, at *4  (noting possibility of *Brady* violation if Government "deliberately hid" documents or "purposefully confounded" defendant).  Courts have thus rejected demands for *Brady* identification where the Government takes steps to facilitate defense review of the Government's productions, such as providing searchable electronic productions, indices, and metadata.  *See Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 457; *Ohle I*, 2011 WL 651849, at *4.

### B.  The Government Has Discharged and Is Discharging its *Brady* Obligations

Calk's request is contrary to the decisions of the district courts and the Second Circuit and should be denied.  Absent evidence of bad-faith attempts to obscure *Brady* material, the Government's production of such material to the defense satisfies its obligations under *Brady*. No showing of bad faith has even been attempted here, nor is one plausible.  To the contrary, the Government's efforts to assist the preparation of the defense show it has been providing discovery in good faith.  The Government has made numerous and lengthy disclosures of arguably *Brady* or non-*Brady* materials to assist the defense, occasioning defense pretrial motions that even commented on the extensiveness of these disclosures.  (*See* Pretrial Mot. Mem. 15; *see also* Dkt. 47-7 to -10 (disclosure letters)).

As to the documents the defense now wishes the Government to itemize, the Government's production of the documents in searchable electronic form (together with database load files where available), preparation of detailed indices supplemented by voluminous reference spreadsheets, provision of document metadata, and informal discussions with the defense about which productions contained the most relevant documents shows that the

24

Government has operated in good faith and discharged its *Brady* obligations. *See*

*Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 457 (*Brady* satisfied by production of voluminous

discovery in "searchable electronic productions" with "indices" and "metadata"); *Ohle I*, 2011

WL 651849, at *4 ("Placing a higher burden on the Government to uncover such evidence would

place prosecutors in the untenable position of having to prepare both sides of the case at once.").

## III.   NO CERTIFICATION IS NECESSARY

The Government's search for discoverable material in its possession, and its production

based on that search, is complete. Similarly, the Government believes that it has now concluded

its production of material gathered from the files of the SCO in response to the defense

requests.[29] But, of course, as in virtually every case in this District, it is hardly uncommon for

the Government to learn of and gather additional material as it prepares for trial, and to the extent

the Government comes into possession of or becomes aware of other discovery, the Government

will promptly produce it. Calk cites no authority supporting his request that the Government be

required to "certify, subject to further sanction" that discovery is complete (Mem. 14), and the

Government is not aware of any, or of any need for the certification.

---

[29] The Government informed Calk, prior to his filing this motion, of its willingness to make these
representations to the Court, rendering this aspect of Calk's motion particularly puzzling.

## CONCLUSION

In sum, because the Governemnt has already offered to negotiate a schedule for joint disclosures with defense counsel that would entail production of a witness and exhibit list approximately one month before trial, and because the Government has satisfied its *Brady* obligations, the Government respectfully requests that the defendant's motions for exhibit, witness, and *Brady* identification be denied in their entirety.

Dated:  New York, New York
       April 27, 2020

                         Respectfully submitted,

                         AUDREY STRAUSS
                         Attorney for the United States
                         Acting Under Authority Conferred by
                         28 U.S.C. § 515

By:    /s/ Paul M. Monteleoni
          Paul M. Monteleoni
          Douglas S. Zolkind
          Benet J. Kearney
          Assistant United States Attorneys
          Tel.: (212) 637-2219/2418/2260
          E-mail: paul.monteleoni@usdoj.gov
                   douglas.zolkind@usdoj.gov
                   benet.kearney@usdoj.gov