UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :

UNITED STATES OF AMERICA               :

            -v.-                                     :        19 Cr. 366 (LGS)

STEPHEN M. CALK,                        :

                       Defendant.         :

-------------------------------------------------------------x

## DECLARATION OF PAUL M. MONTELEONI

Paul M. Monteleoni, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury:

1. I am an Assistant United States Attorney in the Southern District of New York. I make this declaration pursuant to the Court's order at the April 23, 2020 conference in this case and subsequent written order, docket entry 71, and in opposition to defendant Stephen M. Calk's motion for suppression or a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978), docket entry 36.

2. In March of 2017, this Office initiated an investigation of Stephen M. Calk and Paul J. Manafort, Jr., among others, in connection with the Federal Savings Bank's loans to Manafort.

3. At that time, the U.S. Attorney's Office for the Central District of California was already conducting an investigation into frauds committed by Manafort's son-in-law Jeffrey Yohai not involving the Federal Savings Bank, including frauds against Genesis Capital, a lender to Manafort and Yohai (the "Yohai investigation"). The Yohai investigation was conducted

separately from this Office's investigation, with limited coordination on certain investigative steps.

4. In June of 2017, I participated in, among other things, drafting an application for a warrant to search an email account used by Manafort (the "Manafort warrant"), drafting an application for a warrant to search Calk's iPhone (the "Calk warrant"), and coordinating a series of interviews of Federal Savings Bank personnel, to be conducted by FBI personnel and an investigator from this Office. I took these steps in coordination with personnel from the Special Counsel's Office.

5. During the drafting of the application for the Manafort warrant, certain information related to Yohai was incorporated into the application. Yohai originally applied for a Federal Savings Bank loan as a co-borrower with Manafort, and the Federal Savings Bank's loans to Manafort had the effect, among other things, of refinancing certain of the Genesis Capital loans to Manafort and Yohai. Information from the Yohai investigation related to Yohai's need for financing, attempts to obtain financing from the Federal Savings Bank, and statements to Genesis Capital about why the Federal Savings Bank was offering Manafort the loans was thus all relevant to the Manafort warrant application, as it shed light on the interaction between Manafort, Yohai, and the Federal Savings Bank. Accordingly, I incorporated facts related to these matters, drawn in part from some work product of the Yohai investigation, into the Manafort warrant application, particularly paragraphs 14-15, 18-22, and 27. *See* Hilliard Aff. at 7, 10-13.[1]

---

[1] Citations to "Hilliard Aff." refer to the Manafort warrant affidavit, which was attached as an exhibit to the Calk warrant affidavit, which is itself Exhibit A to the Declaration of Paul H.

6.      Additionally, information about the frauds by Yohai against his prior lender Genesis Capital (which were part of the subject matter of the Yohai investigation) was included in the application because it was likely, given the relationship between Manafort and Yohai, that evidence relating to those frauds would be found in the Manafort email account.  Accordingly, I incorporated facts related to these frauds (the "Yohai prior fraud information"), drawn from some work product of the Yohai investigation, into the Manafort warrant application, particularly paragraphs 16-17.  *See* Hilliard Aff. at 8-10.

7.      During the course of this Office's investigation, I became aware that personnel associated with the Yohai investigation were planning to interview Yohai on June 16, 2017.  On the day of the Yohai interview, Special Agent Carmen Cacioppo (an agent in the FBI's New York Field Office, and at the time one of the case agents on this Office's investigation) sent the FBI case agent on the Yohai investigation a list of several areas to ask Yohai about.  No personnel assigned to this Office's investigation attended the Yohai interview.

8.      The Form 302 written report of Yohai's statements made at his June 16, 2017 interview reflects that the Form 302 was completed by the Yohai case agent—who was then assigned to the FBI's Los Angeles Field Office—on June 20, 2017, and was made electronically available to other FBI field offices (*i.e.*, including the agents assigned to this Office's investigation and the Calk warrant affiant) on August 3, 2017 (*i.e.*, after the issuance and execution of the Manafort warrant and the Calk warrant).

---

Schoeman, Esq. filed in support of Calk's motion, docket number 47.  Page 1 of the Manafort warrant affidavit begins on page 46 of the combined 83-page Exhibit A file available as docket number 47-1.

9. Based on my recollection and my review of emails, calendar entries, notes, and drafts of the Manafort warrant affidavit, as well as discussions with Special Agent Cacioppo, Special Agent James Hilliard (an agent assigned to the New York Field Office, the Manafort warrant affiant and the other case agent on this Office's investigation at the time), and my supervisor at the time, I believe that the following occurred:

a. Between June 20 and 21, 2017, Special Agent Cacioppo confirmed with the Yohai case agent draft language from the warrant affidavit related to Yohai prior fraud information. This draft language roughly corresponded, in draft form, to what would become paragraphs 16(a), 16(b), 17(a), and 17(d) of the final Manafort warrant affidavit. *See* Hilliard Aff. at 8-10.

b. On June 21, 2017, I spoke with Special Agent Cacioppo, Special Agent Hilliard, or both following a conversation one or both of them had had with the Yohai case agent that day. During that conversation, in addition to confirming the accuracy of the Yohai prior fraud information included in the Manafort warrant affidavit, we discussed certain statements made by Yohai during the June 16, 2017 interview. Following a conversation between me and my supervisor, we decided not to include those statements in the affidavit because we believed that Yohai's statements to law enforcement were too unreliable. Although I do not recall the specific statements, I recall believing that the June 16, 2017 Yohai statements would have supported the issuance of the warrant if credited. I also recall believing that the decision to

4

exclude these statements was intended to be a conservative one—*i.e.*, to refrain from relying on facially helpful but questionably reliable evidence.[2]

      10.     Special Agent Cacioppo recalled speaking to the Yohai case agent to verify the draft language related to the Yohai prior fraud information, as described in paragraph 9, above. He did not believe Special Agent Hilliard was on the call, though he would have communicated anything significant to Special Agent Hilliard, particularly given that Special Agent Hilliard was to be the affiant. He did not recall the Yohai case agent telling him information about the June 16, 2017 Yohai interview, but believed it was possible that she did. He did not have notes of this call and did not believe he would have taken notes of a call such as this. He did not have any

---

[2] My handwritten notes from my conversation with my supervisor begin, in relevant part, "Yohai said PM didn't know" and then, beginning on a separate line, "PM told Yohai he was getting these loans by promising Trump admin jobs." I believe from the context that these statements reflect my recounting to my supervisor my impression of information one or both of the case agents had provided me by phone. From reviewing the draft warrant affidavit and the Form 302 of the statements in preparing to write the declaration, I believe that the phrase "Yohai said PM didn't know" in my notes refers to a claim that Manafort did not know Yohai had—as described in paragraph 17(d) of the draft affidavit, Hilliard Aff. at 9-10—forged a certain document as part of the prior fraud against Genesis Capital. I believe the phrase "PM told Yohai he was getting these loans by promising Trump admin jobs" in my notes reflects me telling my supervisor that one or both of the case agents had told me that Yohai had claimed Manafort told Yohai that Manafort was getting the Federal Savings Bank loans by promising Calk jobs in the Trump administration. I do not believe I would have written this if I had also believed that Yohai had made statements during the same interview denying this claim or significantly undermining his basis for knowledge of it. I also do not believe that if the "Yohai said PM didn't know" phrase referred to something related to the quid pro quo allegations (rather than to aspects of the prior fraud), I would have then written the phrase "PM told Yohai he was getting these loans by promising Trump admin jobs." I also do not see any statement in the Form 302 that seems plausible to interpret as a claim that Manafort (as opposed to Yohai) lacked knowledge related to a quid pro quo, further supporting my belief that the phrase "Yohai said PM didn't know" referred to the Yohai prior fraud information, not the Yohai information relevant to the quid pro quo. Additionally, based on my conversation with the agents, I entered several June 16, 2017 admissions from Yohai, exclusively related to the Yohai prior fraud information, into a draft of the warrant affidavit, but then removed them from the final draft following my conversation with my supervisor.

5

recollection of having an impression of the June 16, 2017 Yohai statements at the time. He would have remembered if the Yohai case agent had told him anything that he believed would have made anything in the warrant application misleading, and did not remember anything of the kind.

11. Special Agent Hilliard did not have a specific recollection of speaking to the Yohai case agent but believed it was possible he participated in such a call. He did not have any notes of participating in such a call. He did not have any recollection of having an impression of the June 16, 2017 Yohai statements at the time. He would have remembered if he had heard that Yohai had said anything that he believed would have made anything in the warrant application misleading, and did not remember anything of the kind.

12. The Manafort warrant was issued by the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, on June 21, 2017.

13. Based on my recollection and my review of my emails, notes, calendar entries, affidavit drafts, and conversations with Special Agent Hilliard, Special Agent Cacioppo, the Calk warrant affiant, an Assistant U.S. Attorney in the Northern District of Illinois who assisted in the finalization of the Calk warrant application, and an agent from the FBI New York Field Office who assisted the Calk warrant affiant's preparation, I believe that the drafting of the Calk warrant affidavit was drawn in large part from the Manafort warrant affidavit, with two principal differences that I recall. One concerned evidence related to the use of Calk's phone in the course of the offenses and the identification of Calk's phone by Individual Mobile Equipment Identity (IMEI) number. The other was that we were not aware of any respect in which the Yohai prior fraud information was relevant to the probable cause supporting the warrant to search Calk's

phone, so the Yohai prior fraud information was removed. Additionally, the Assistant U.S. Attorney in the Northern District of Illinois performed additional review and minor edits, which I reviewed before submission, in preparation to submit the warrant application to a Northern District of Illinois magistrate judge.

14. The Calk warrant was issued by the Honorable Mary M. Rowland, United States Magistrate Judge for the Northern District of Illinois, on June 26, 2017.

15. I participated in planning and coordinating a series of interviews of Federal Savings Bank personnel on June 27, 2017. The plan was to approach a number of Federal Savings Bank personnel on the morning of June 27, interview them, and serve them with documentary and testimonial subpoenas where appropriate. One of the Federal Savings Bank personnel to be interviewed on that morning was Calk, and the agents approaching him were planning to execute the Calk warrant at that time, extract the contents of Calk's phone, and return it to him promptly.

16. The approaches were to be conducted by FBI agents from the New York Field Office and personnel from three other FBI field offices (including the case agent from the Yohai investigation), who were assisting the case agents from the New York Field Office in a supporting capacity, as well as by an in-house investigator for the U.S. Attorney's Office for the Southern District of New York. I participated, in coordination with Special Counsel's Office personnel, in planning the approaches and briefing the agents who would conduct them.

17. I recall that in advance of these approaches I believed there was a significant likelihood that some or all of the Federal Savings Bank personnel would deny impropriety in connection with the loans, particularly given that they were all at the time still employed by the

7

Federal Savings Bank; Calk was CEO of the bank; we were aware based on emails and other investigative steps that Calk had taken extensive actions to push the loans forward despite reservations expressed by other bank employees (including some of the persons to be interviewed); and that Calk had made statements to the press denying improprieties with the loans.  Given these circumstances and the evidence in the affidavit, I did not think that the probable cause set out in the Calk affidavit was in any way contingent on whether or not the persons to be interviewed denied impropriety with the loans.

18.     In advance of these approaches, the team obtained a pen register order for Calk's cellular phone, in large part in order to monitor in real time whether his pattern of telephone use once agents began approaching Federal Savings Bank employees was indicative of attempts to influence the statements given to the FBI.

19.     On June 27, 2017, I became aware that Calk was not at the location the agents expected him to be, and that agents were attempting to find and contact him.  At some point during the day government personnel were contacted by a lawyer for Calk, and I participated in making arrangements for the agents in Chicago to meet Calk at approximately 9:45 a.m. CDT on June 28 to execute the warrant on the phone.

20.     I recall, during the process of participating in setting up an opportunity to execute the warrant, being concerned with minimizing the time before the warrant was executed in order to minimize the risk of deletions, and with minimizing the amount of time the phone was in the FBI's possession to minimize the disruption to the bank's operations.  My emails reflect that at approximately 1:31 p.m. on June 27, 2017 my supervisor sent an email to a coordinating FBI agent and a Special Counsel's Office prosecutor (and then forwarded the email to me), saying "I

spoke with Calk's counsel.  He is trying to get hold of Calk and encourage him to give us his phone.  One question he asked: If he turns over his phone, how long would it take for us to image and get it back to him?"

21.	Based on my recollection, as refreshed by my review of emails, calendar entries, and handwritten notes, as well as conversations with my supervisor at the time, I believe that between the June 27, 2017 approaches and the execution of the warrant on Calk's phone on the morning of June 28, I spoke to one FBI agent who had participated in interviewing Dennis Raico.  I also may have heard generally and secondhand during this time period that other witnesses did not describe irregularities, and may have heard generally and secondhand during this time period that James Brennan did describe irregularities, but do not recall specifically.

22.	As stated above, at some point on June 27, 2017, I had a conversation with one FBI agent who had participated in interviewing Dennis Raico.  My notes of this conversation include, in part, the phrase "thought it wasn't a buddy loan," which I believe reflects the agent telling me Raico claimed that the loans to Manafort were not unduly favorable to Manafort.  My notes also include phrases that I believe reflect the agent telling me that Raico (i) denied having been aware that Calk was seeking a position in the Trump administration; (ii) reported that Calk offered to assist in the Trump presidential campaign at the end of a call with Manafort; (iii) claimed that a statement he made in an email about steps Calk took to increase Manafort's loan amount did not describe unusual activities; (iv) expressed confusion at some of the discrepancies in loan applications submitted by Manafort but claimed that these forms can go through multiple versions; (v) claimed that the bank's automated system would show he did not personally make certain data entries; and (vi) said that he maintained handwritten notes.

9

23.     At approximately 1:00 p.m. EDT on June 28, 2017—*i.e.*, after the execution of the warrant on Calk's phone that morning, which had been scheduled for approximately 9:45 a.m. CDT due to a scheduling conflict that Calk's counsel had at 10:30 a.m. CDT—I participated in a conference call with all or most of the agents involved in conducting the interviews, as well as with my supervisor and a Special Counsel's Office prosecutor.  During this conference call, the agents described in moderate detail the results of the interviews that had been conducted.  To my recollection, this is the first time that I had heard in any detail about any interviews other than Raico's.

24.     On July 19, 2017, the Office of the Comptroller of the Currency ("OCC") issued a Supervisory Letter to the Federal Savings Bank communicating the results of the OCC's review of certain matters including the loans to Manafort.  This letter, in part, downgraded the credit quality of the Manafort loans to "substandard."  According to the Supervisory Letter, "Assets so classified must have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt.  They are characterized by the distinct possibility that the institution will sustain some loss if the deficiencies are not corrected."  A portion of the loans was secured by cash held in frozen accounts at the Federal Savings Bank.  This portion was excluded from the substandard classification, which was applied to only to the portions secured by real estate.  The Supervisory Letter stated "Loan payments are being paid as agreed; however they are paid from TFSB bank

accounts that are largely funded with the Summerbreeze LLC (Note 1) loan proceeds [*i.e.*, the proceeds of one of the Federal Savings Bank's loans to Manafort]."

I declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Dated: New York, New York
      May 7, 2020

/s/ Paul M. Monteleoni
Paul M. Monteleoni
Assistant United States Attorney
Tel.: (212) 637-2219
Email: paul.monteleoni@usdoj.gov