UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
   UNITED STATES OF AMERICA,                                 :
                                                             :
                                                             :          19 Cr. 366 (LGS)
                            -against-                        :
                                                             :      **OPINION AND ORDER**
   STEPHEN M. CALK,                                          :
                                         Defendant.   :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Defendant Stephen M. Calk seeks an order (1) suppressing all evidence recovered from

Defendant's iPhone pursuant to a search warrant or, alternatively, a hearing pursuant to *Franks v.*

*Delaware*, 438 U.S. 154 (1978); (2) compelling the Government to provide the defense with a

transcript of the grand jury proceedings leading to Defendant's indictment; and (3) compelling

the Government to produce its correspondence with the Office of the Comptroller of the

Currency (the "OCC") and the Presidential Transition Team.  For the reasons below, the motions

are denied.

## I.      MOTION TO SUPPRESS

### A.      Relevant Background

#### 1.  Warrant and Supporting Affidavit

        On June 26, 2017, Magistrate Judge Mary Rowland of the Northern District of Illinois

signed a warrant authorizing the search of Defendant's Apple iPhone.

        In applying for the warrant, Special Agent Carrie Fisher ("Fisher") submitted a thirty-

seven page sworn affidavit (the "Affidavit") alleging that there was probable cause to believe the

iPhone

        contains evidence, fruits and instrumentalities of (a) the making of false entries in
        the books and reports of a bank in violation of 18 U.S.C. § 1005 and conspiracy to

commit that offense in violation of 18 U.S.C. § 371; (b) fraud in connection with the extension of credit in violation of 18 U.S.C. § 1014 and conspiracy to commit that offense in violation of 18 U.S.C. § 371; (c) wire fraud, bank fraud, honest services fraud, and conspiracy to commit these offenses in violation of 18 U.S.C. §§ 1343, 1344, 1346, and 1349; and (d) money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957 (the "Subject Offenses").

During the relevant time frame, Defendant was chairman and CEO of the Federal Savings Bank (the "Bank"), and CEO, chairman and majority owner of National Bancorp Holdings, Inc. (the "Holding Company"), which owns the Bank in its entirety. Paul J. Manafort ("Manafort") was chairman of the Donald J. Trump presidential campaign (the "Trump Campaign"). In the section of the Affidavit relating to probable cause, Fisher asserts that there is probable cause to believe that these crimes were committed as follows:

> "there is probable cause to believe that [Defendant] and Manafort conspired to defraud [the Bank] out of its intangible right to [Defendant's] honest services by having [Defendant] take action to process and approve the [favorable] loans to Manafort in exchange for a personal benefit; that [Defendant] and Manafort withheld material information about the loans from [the Bank's] loan committee and board of directors as well as the books and records of the bank . . . and that [Defendant] committed a scheme to defraud another bank that was considering underwriting one of the [Bank] loans, BofI Federal Bank [(the "Wholesale Lender")], by concealing from [the Wholesale Lender] material information regarding Manafort's creditworthiness."

The Affidavit makes the following assertions relevant to this motion:

In February 2016, a Manafort-affiliated entity that owned a townhouse in Brooklyn (the "Brooklyn Property") received loans from Genesis Capital Master Fund II, LLC, ("Genesis Capital Master Fund"), an entity affiliated with Genesis Capital, totaling approximately $5.3 million (the "Genesis Brooklyn Property Loan"). Manafort personally guaranteed these loans. At the same time, Genesis Capital also provided a different Manafort-affiliated entity approximately $3.7 million in a refinance and construction loan (the "Genesis California Property Loan") secured by a property in California (the "California Property"). By spring 2016, these loans were in default. On September 20, 2016, Genesis Capital Master Fund filed an

action in New York Supreme Court, Kings County seeking foreclosure on the Genesis Brooklyn

Property Loan (the "Foreclosure Action").  Manafort attempted to obtain a $10 million line of

credit from Banc of California prior to his introduction to the Bank Loan Officer, but was

ultimately offered only a $1 million line of credit because he was deemed too high of a risk.

In late July 2016, Manafort met with Dennis Raico (the "Loan Officer") and Defendant in

Manhattan to discuss a proposed loan from the Bank to refinance the Genesis California Property

Loan (the "First Manafort Loan").  Defendant and the other members of the Loan Committee

approved the terms of the loan the next day, leading to an email from the Loan Officer noting

"I'm sure [Manafort and his son-in-law] will be highly impressed to receive within 24 hours of

our meeting."  In early August, following correspondence between Manafort, the Loan Officer

and Defendant in which Manafort requested Defendant's resume, the Trump Campaign

announced the creation of the Trump Economic Advisory Council.  Defendant was named as one

of its 13 members.  The former Chief Risk Officer and Chief Credit Officer of Genesis Capital

told the FBI that Manafort's son-in-law told him that the Bank had agreed to refinance the

Genesis loan because "Manafort promised Calk a position on the Trump Economic Advisory

Council."

In August and September 2016, Bank employees determined that the Genesis California

Property Loan was in default, Manafort was in significant debt and the appraised value of

Manafort's assets was lower than expected.  In October 2016, the First Manafort Loan was

adjusted from $8.2 million up to $9.2 million following an "Emergency Portfolio Committee

meeting" in which Defendant "pulled in the private board."  The Affidavit details several emails

exchanged between Defendant and Manafort during this time regarding the Presidential

Campaign and Defendant's access thereto.  It also details statements made by Anna Ivakhnik, a

Bank employee during this period who was later terminated, asserting that it was unusual that the Bank was willing to issue the First Manafort Loan in light of the default and Manafort's financial circumstances, and that she believed that the loan would be approved "no matter what" because the Loan Officer had told her that he had heard from Defendant that he wanted to be appointed Secretary of Veterans Affairs.

Shortly before the closing date for the First Manafort Loan, Bank emails reflect that Manafort contacted the Bank to request that the loan be restructured again to, among other things, increase the loan amount from $9.2 million to $9.5 million and remove the California Property as collateral. Subsequently, the Bank decided not to pursue the First Manafort Loan as a "portfolio" loan for which the Bank would assume the risk, and instead proposed the loan to the Wholesale Lender for underwriting. In early October, Manafort also sought a second loan (the "Second Manafort Loan") from the Bank to refinance the Genesis Brooklyn Property Loan, which at that time was subject to the Foreclosure Action.

President Trump was elected on November 8, 2016. The Affidavit details several communications between Defendant and Manafort via emails, texts and telephone calls throughout November and early December regarding Defendant's interest in and potential candidacy for roles in President Trump's administration, including the Secretary of the Army. At the same time, the First Manafort Loan closed, despite the Wholesale Lender approving underwriting the loan up to $7 million only (not the full $9.5 million), because "[Defendant] stepped in and [the Bank] ended up closing [the First Manafort Loan] in Portfolio on 11/16/16." The final Bank credit approval memorandum did not mention the California Property default or the Foreclosure Action, and assigned the loan a risk factor of 4 (average).

During the month of December, Defendant, Bank employees, Manafort and Manafort's

4

counsel continued to correspond regarding the proposed Second Manafort Loan.  The Brooklyn Property was scheduled to go to auction in late December due to the Foreclosure Action. Defendant communicated to Manafort that "it looks like we will be forced to take additional cash collateral for [the Second Manafort Loan] due to our legal maximum loan amount to any one individual or entity."  Bank employee emails show that they were attempting to close the loan as quickly as possible, but could not do so until they "[got] the larger one [(i.e. the First Manafort Loan)] off [their] books" by selling it to the Wholesale Lender, and that "[Defendant was] all over [the Loan Officer] regarding these appraisals."  At the same time, Defendant and Manafort were communicating regarding Defendant's invitation to the inauguration and Defendant's candidacy for Secretary for the Army.  In late December, Defendant emailed General James Mattis, who had been announced as President Trump's prospective nominee as Secretary of Defense, stating "I believe that Steve Bannon will be speaking to you again about me today."

In early January, the Holding Company (owned 67% by Defendant, and 29% by Defendant's brother) purchased the First Manafort Loan.[1]  Days later, Defendant was informed via email that he was scheduled for an interview at Trump Tower on January 10, 2017.  On January 12, 2017, Defendant emailed General Mattis's assistant asking to set up a meeting "at the request of the Tiger Team that I interviewed with in New York at Trump Tower this week." On January 17, 2017, the Second Manafort Loan funded, paying $6.5 million to the benefit of Manafort and his wife.  The final Bank credit approval memorandum did not mention the California Property default or the Foreclosure Action against Manafort, and assigned the Second Manafort Loan a risk factor of 4 (average).

---

[1] The Wholesale Lender ultimately declined to purchase the First Manafort Loan.

The Affidavit further asserts that there is probable cause justifying the search of Defendant's iPhone because Defendant "engaged in multiple communications in which he referenced the use of the cellular phone . . . to engage in communications relevant to the Subject Offenses" and, "[l]ike individuals engaged in any other kind of activity, individuals who engage in financial crimes or illegal transactions such as quid pro quo agreements related to financing store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the Subject Device."

### 2. Subsequent Interviews

The Government interviewed several Bank employees on June 27, 2017, after Judge Rowland signed the warrant on June 26, 2017, and before the Government seized Defendant's phone on June 28, 2017.  The interviewed employees made the following relevant statements:

James Norini, Bank Chief Operating Officer and Member of the Loan Committee, stated that there was nothing preferential about the Manafort loan; it was well secured and the Loan Committee had no concerns; Defendant never pushed a loan to be approved; the Loan Committee could deny a loan even if Defendant wanted it approved.

Javier Ubarri, President of the Bank and Member of the Loan Committee, stated that the Manafort loan may have been unusual but it was not a bad deal; the Bank does unusual deals all the time; the Bank would not make a bad loan just to accommodate one person; and the Bank would not have made the loan if it was not in the Bank's interest.

Vanessa Bartholomew, Bank senior vice president, stated that she did not find anything about the Manafort loans or their processing to be unusual; she did not believe anything improper was done to fund the loans; and she felt no pressure to close on the loans or push them through outside of normal protocols.  She further stated that she did not find the variances in the

6

net worth reported by the Manaforts in their loan applications to be unusual,[2] and that she did not believe that anyone at the Bank, including Defendant, gained anything by funding the loan.

James Brennan, Bank underwriter, stated that there did not appear to be anything unusual with respect to the First Manafort Loan; there was an adequate amount of income and collateral; and the Genesis default would not have had an impact on the Bank's loan decision.

Thomas Horn, Bank underwriter, also stated that from a collateral standpoint the First Manafort Loan "worked"; that Defendant was normally very hands-on; and Horn did not feel pressure to get the First Manafort Loan done.

Finally, Dennis Raico, the Loan Officer and Bank senior vice president, stated that he did not feel pressure to treat the Manafort loans in a special way; and that the loans went through a strict due diligence process.

### B.    Discussion

Defendant argues that the Government knew of, but selectively omitted, information that materially undermines the allegations in the Affidavit and also failed to disclose to the Magistrate Judge material information learned after the warrant was signed but before execution. For this reason, Defendant argues that the evidence obtained from the iPhone should be suppressed or, alternatively, that a *Franks* hearing be conducted.  For the following reasons, the search warrant was supported by probable cause and Defendant's motion to suppress is denied.

---

[2] At varying times throughout this process between August and November 2016, Manafort asserted on loan applications to the Bank that his income was $275,000 per month, $224,846 per month, and $100,652 per month.  On the same loan applications, Manafort also asserted that his own net worth was $17,051,676.17, and that the net worth of Manafort and his wife as co-borrowers was $21,376,722.13, $15,376,722.13, $34,685,418.13, and $14,994,402.13.

### 1.  Standard

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause

. . . ."  U.S. Const. amend. IV.  "While a search pursuant to a warrant issued by a judicial officer

upon a finding of probable cause is presumptively reasonable, that presumption can be defeated

by showing that [an affiant] (1) knowingly and deliberately, or with a reckless disregard of the

truth, procured the warrant, (2) based on false statements or material omissions, that (3) were

necessary to the finding of probable cause."  *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017)

(citation and quotation marks omitted).  To mandate a *Franks* hearing, the challenger must make

a "'substantial preliminary showing' that [(i)] a deliberate falsehood or statement made with

reckless disregard for the truth was included in the warrant affidavit and [(ii)] the statement was

necessary to the judge's finding of probable cause."  *United States v. Falso*, 544 F.3d 110, 125

(2d Cir. 2008); *accord United States v. Lambus*, 897 F.3d 368, 397 (2d Cir. 2018).  "[C]redible

and probative evidence" must be adduced that the deficiencies in the warrant application were

"designed to mislead" or were "made in reckless disregard of whether [they] would

mislead."  *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (internal quotation

marks and alterations omitted).  "To determine whether a false statement was necessary to a

finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting

any alleged misstatements from the original warrant affidavit and adding to it any relevant

omitted information."  *Ganek*, 874 F.3d at 82.  If the challenger makes the necessary showing, he

is then entitled to a *Franks* hearing only if "the untainted portions [of the application do not]

suffice to support a probable cause [or necessity] finding."  *Rajaratnam*, 719 F.3d at 146.

"The *Franks* standard is a high one."  *Rivera v. United States*, 928 F.2d 592, 604 (2d

Cir.1991); *accord United States v. Nejad*, No. 18 Cr. 224, 2020 WL 429422, at \*5 (S.D.N.Y. Jan.

28, 2020).  "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Rajaratnam*, 719 F.3d at 154.  "[M]isstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression."  *Id.* at 153 (quoting *Franks*, 438 U.S. at 171).  "[T]o mandate an evidentiary hearing[, t]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."  *Falso*, 544 F.3d at 125-26.

A determination of probable cause is made through a "totality-of-the-circumstances analysis," which requires "only the probability, and not a prima facie showing, of criminal activity."  *Illinois v. Gates*, 462 U.S. 213, 235, 238 (1983); *accord United States v. DiTomasso*, 932 F.3d 58, 66 (2d Cir. 2019) (Probable cause to search requires "a fair probability that contraband or evidence of a crime will be found in a particular place.").  "[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable . . . ."  *Ganek*, 874 F.3d at 81.  Once a warrant is issued, a magistrate's "determination of probable cause should be paid great deference by reviewing courts."  *Gates*, 462 U.S. at 236; *accord United States v. Martin*, No. 18 Cr. 1468, 2020 WL 402449, at *1 (2d Cir. Jan. 24, 2020) (summary order).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  *Gates*, 462 U.S. at 238-39 (alteration in original); *accord Martin*, 2020 WL 402449, at *1.

"[O]fficers charged with executing a warrant have a 'duty to report new or correcting information to the magistrate' if information received after the warrant has been signed, but before its execution, would be 'material to the magistrate's determination of probable cause' -- in other words, would 'cast doubt on the existence of probable cause.'"  *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017) (quoting *United States v. Marin-Buitrago*, 734 F.2d 889, 894-

95 (2d Cir. 1984)).  "The omitted information and the information in the affidavit must be considered as a whole in determining if probable cause continues to exist."  *Marin-Buitrago*, 734 F.2d at 895 (citation omitted); *accord United States v. Mandell*, 710 F. Supp. 2d 368, 374 (S.D.N.Y. 2010).

### 2.   Omissions Relating to the Alleged Honest Services Fraud

The Affidavit asserts that there is probable cause that the iPhone contains evidence that "[Defendant] and Manafort conspired to defraud [the Bank] out of its intangible right to [Defendant's] honest services by having [Defendant] take action to process and approve the loans to Manafort in exchange for a personal benefit."  Defendant identifies information omitted from the Affidavit which, he argues, rendered the Affidavit materially misleading.  "To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information."  *Ganek*, 874 F.3d at 82.  Defendant fails to make a substantial preliminary showing that these alleged omissions were material, or that they were made knowingly and deliberately, or recklessly.

Defendant argues for suppression on the ground that the Affidavit did not include the terms of the loans made by the Bank to Manafort, or the statements regarding the quality of the loans made by Bank employees on June 27, 2017.  The terms, Defendant argues, were highly advantageous to the Bank, and inclusion of the terms and the Bank employee statements would have undermined the Government's theory of wrongdoing.  But a hypothetical affidavit including this information still provides probable cause for the search because, even assuming the terms of the loans were beneficial to the Bank, the honest services doctrine does not require loss of property to the Bank.  "Even if the scheme occasioned a money or property gain for the

betrayed party . . . actionable harm [lies] in the denial of that party's right to the offender's 'honest services.'" *Skilling v. United States*, 561 U.S. 358, 400 (2010); *accord United States v. Skelos*, 707 F. App'x 733, 738-39 (2d Cir. 2017) (summary order); *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003).

Even assuming the disclosure of loan terms beneficial to the bank, the Affidavit still provided ample support for a finding of probable cause, including:

- Numerous emails showing that Manafort was receiving loans from Defendant's Bank at the same time that Manafort was facilitating a position for Defendant in then-candidate Trump's administration;

- Evidence that Manafort was receiving these loans despite having been denied a line of credit from Banc of California because he was deemed too high a risk, and despite defaults and a foreclosure on prior loans;

- The statement of Manafort's son-in-law, Jeffrey Yohai, to a senior officer at Genesis Capital that the Bank had agreed to refinance Manafort's loan because "Manafort promised [Defendant] a position on the Trump Economic Advisory Council."

The omitted information is therefore not material. *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." (quotation marks omitted)).

Additionally, Defendant fails to make a substantial preliminary showing that the omission of the loan terms was "'designed to mislead' or was 'made in reckless disregard of whether it would mislead.'" *Rajaratnam*, 719 F.3d at 154. The Affidavit included descriptions of emails in which Defendant made clear his desire that the loans go through the appropriate processes.[3] This evidence, which was arguably inconsistent with the Government's theory of guilt, suggests

---

[3] For example, the Affidavit describes an email from Defendant to Manafort's attorney in December 2016 stating, "we are in no way scheduling a closing until this loan is fully structured, underwritten and approved. You must stop your presumptuous emails. We are working very hard to help find solutions to help Paul out in his hour of need."

that any omission from the Affidavit was not designed to mislead.  *See, e.g.*, *United States v. Mirilishvili*, No. 14 Cr. 810, 2015 WL 5820966, at *12 (S.D.N.Y. Oct. 2, 2015) (where a search affidavit described the defendant's "purportedly 'legitimate' steps . . . , there is no basis for concluding that the affiants deliberately withheld that information.").[4]

Defendant argues for suppression on the additional ground that, while the Affidavit included a statement by former Bank-employee Anna Ivakhnik that Bank vice president James Brennan told her that the Manafort loan was a bad idea,[5] the Affidavit did not mention that Brennan was in charge of overseeing the underwriting of Manafort's loans and that he subsequently signed and approved the loan memoranda, assigning both loans an "average" risk profile.  The Affidavit also omits Brennan's statement to the Government in his June 27, 2017, interview that there did not appear to be anything unusual with respect to the First Manafort Loan.  This information is not material to the finding of probable cause where Brennan's later statements do not directly contradict his previous statements, Brennan was subordinate to Defendant when he signed the loan memoranda, and his contemporaneous statements to a coworker may be more probative than statements made months later to law enforcement.  Even assuming Brennan's subsequent statements negate the prior statements attributed to him, the

---

[4] For the same reason, Defendant's argument that the terms of the loan are material because they suggest that he lacked intent is rejected, since the Affidavit included information arguably weighing against intent.

[5] Defendant emphasizes more than once the "double-hearsay" nature of certain statements in the Affidavit.  "[P]robable cause may be founded upon hearsay," as long as the statements are "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  *Franks v. Delaware*, 438 U.S. 154, 165 (1978); *accord United States v. Morgan*, No. 17 Cr. 354, 2017 WL 4621632, at *5 (S.D.N.Y. Oct. 12, 2017).  The "double hearsay" nature of these statements was fully disclosed and evident to the Magistrate Judge who found probable cause based on the Affidavit.

evidence in the Affidavit unrelated to Brennan was sufficient to support a finding of probable cause.

Also, the omissions do not warrant suppression because there is no evidence that the omission of the information gathered in the June 27, 2017, interviews was a deliberate attempt to mislead. *Rajaratnam*, 719 F.3d at 154. According to the declaration of Paul M. Monteleoni, Assistant United States Attorney for the Southern District of New York, filed in support of the Government's opposition to Defendant's motions (the "Monteleoni Declaration"), the original plan was to conduct the interviews on the same day the warrant was executed (i.e. June 27, the day after Judge Rowland signed the warrant), but the execution of the warrant was delayed to June 28 because Defendant was not at the expected location.

Third, Defendant argues for suppression on the ground that the Affidavit was not updated with statements made by Bank employees after the warrant was signed by Judge Rowland but before the warrant was executed. The omitted statements, in addition to those discussed above, were made by three bank employees (Vanessa Bartholomew, Thomas Horn and Dennis Raico) who in substance said that they felt no pressure from Defendant or otherwise concerning the Manafort loan. A hypothetical affidavit including these statements also would have included inculpatory evidence that Defendant *did* pressure Bank employees to move forward with the loans, including:

- Emails from Dennis Raico, the Loan Officer, stating that he was "getting a little pressure from [Defendant]," and stating that "I have our Chairman all over me regarding these appraisals."

- Anna Ivakhnik's statements that she believed the loan would be approved "no matter what."

- The personal efforts of Defendant to ensure the loans were issued, for example,

- o the Bank had an "'Emergency Portfolio Committee' meeting . . . and [Defendant] actually pulled in the private board";

- o Defendant "stepped in" following delays from the Wholesale Lender;

- o Defendant wrote to the President of the Bank asking him to "direct the immediate preparation of all documents necessary to facilitate this loan sale PERSONALLY, today.  Please oversee all appropriate documentation preparation for Paul Manafort's signature and ensure it is all correct and then call me for direction."; and

- o the Holding Company -- majority owned by Defendant and his brother -- purchased the First Manafort Loan.

Even if the "hypothetical corrected affidavit paints a more complicated picture" of Defendant's actions, statements made months after the events by employees who may have had concerns about their own culpability do not undermine probable cause supported by contemporaneous emails.  *See Rosario v. United States*, No. 17 Cr. 0027, 2019 WL 5260784, at *5 (S.D.N.Y. Oct. 17, 2019) ("Mr. Rosario's candid statements about his ability to understand English made contemporaneously with the proceedings at issue are inherently more reliable than the self-serving statements he offers now, which are made after-the-fact.").

There is also no evidence that the omissions were made deliberately to mislead or with reckless disregard for the truth.  According to the Monteleoni Declaration, the only June 27 interview on which Monteleoni was briefed prior to the execution of the search warrant was the interview of Dennis Raico, and Monteleoni's notes reflect that he was told, in relevant part, that Raico did not believe the Manafort loans were "buddy loan[s]," and "claimed that a statement he made in an email about steps Calk took to increase Manafort's loan amount did not describe unusual activities."  Monteleoni further attests that he "may have heard generally and secondhand during this time period that other witnesses did not describe irregularities, and may have heard generally and secondhand during this time period that James Brennan did describe

14

irregularities, but do[es] not recall specifically."  The Declaration states that, prior to the

interviews, Monteleoni:

> believed there was a significant likelihood that some or all of the Federal Savings
> Bank personnel would deny impropriety in connection with the loans, particularly
> given that they were all at the time still employed by the Federal Savings Bank;
> Calk was CEO of the bank; we were aware based on emails and other
> investigative steps that Calk had taken extensive actions to push the loans forward
> despite reservations expressed by other bank employees (including some of the
> persons to be interviewed); and that Calk had made statements to the press
> denying improprieties with the loans.

"Given these circumstances and the evidence in the affidavit," Monteleoni states that he "did not

think that the probable cause set out in the Calk affidavit was in any way contingent on whether

or not the persons to be interviewed denied impropriety with the loans."  Defendant's argument

that the Government "prejudge[d] and discount[ed]" the evidence from the June 27 interviews

and "was at least reckless" in failing to amend the Affidavit is unpersuasive.  That Monteleoni

evaluated the possibility that employees would deny impropriety in their interviews and

determined that such denials would not be material to probable cause, and on that basis did not

amend the Affidavit upon learning that some employees -- but not all -- may have or did deny

improprieties, does not amount to a "substantial preliminary showing," that the omissions were

made with "reckless disregard for the truth."  *Falso*, 544 F.3d at 125; *see, e.g.*, *United States v.*

*Maisonet*, No. 12 Cr. 829, 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013) (holding that an

omission about the victim's failure to identify defendants was not indicative of a "knowing[ ]

and intentional[ ], or . . . reckless disregard for the truth" because the affiant "was not required to

include all potentially exculpatory information in seeking the search warrant.").

Finally, Defendant argues for suppression because the Affidavit included the alleged

statement made by Manafort's son-in-law, Jeffrey Yohai, to a third party that the Bank had

agreed to refinance the loan because "Manafort promised Calk a position on the Trump

Economic Advisory Council," but the Affidavit did not include a statement later made by Yohai to the Government during its investigation in the Central District of California that Yohai believed that "Manafort's loan was not a return favor by [Defendant] as Manafort's loan terms were not very favorable and his loan was overcollateralized."

According to the Monteleoni Declaration, the Form 302 written report of Yohai's interview statements was not "made electronically available to other FBI field offices" until August 3, 2017, and the information that was shared with Monteleoni prior to the drafting of the Affidavit "would have supported the issuance of the warrant if credited" and was excluded "to refrain from relying on facially helpful but questionably reliable evidence."[6]  There is therefore no indication that the omission was designed to mislead or made with reckless disregard for the truth.  Even were Yohai's statements from that interview included, they would not negate probable cause.  Yohai stated in that interview, prior to the above-mentioned statement, that Defendant and Manafort had a quid pro quo relationship, and that he did not know if Defendant made promises or if Manafort sought favors from him.  Yohai's expressed lack of knowledge combined with the internal inconsistencies in his statements is reason to place less weight on the interview statements.  Finally, his contemporaneous statement may be more probative than subsequent statements made in a governmental interview.  Even if Yohai's statements to the Government negated his statement included in the Affidavit, the Affidavit is still sufficient to support probable cause for all the reasons set out above.

---

[6] Defendant argues that, since the Government was aware that the interview had occurred, it was obligated to fully inform itself of Yohai's statements before submitting the Affidavit.  But the Government's decision to exclude "facially helpful" statements from the Affidavit because there were questions as to their reliability precludes any finding of an intent to mislead.

### 3. Omissions Relating to the Alleged Withholding of Information from the Loan Committee, the Board of Directors and the Wholesale Lender

The Affidavit asserts that there is probable cause to believe the iPhone contains evidence that "[Defendant] and Manafort withheld material information about the loans from [the Bank's] loan committee and board of directors as well as the books and records of the bank . . . and that [Defendant] committed a scheme to defraud another bank that was considering underwriting one of the [Bank] loans, [the Wholesale Lender], by concealing from [the Wholesale Lender] material information regarding Manafort's creditworthiness." Defendant argues that the Affidavit fails to establish probable cause to believe that Defendant committed these crimes. He also argues that, had omitted information been included in the Affidavit, Judge Rowland could not have found probable cause. Specifically, Defendant alleges the following omissions were material: (1) Defendant did not draft the loan memoranda, and the person who signed the loan memoranda, Brennan, stated in an interview with the Government on June 27, 2017, that "[t]he Genesis default would not have had an impact on [the Bank's] loan decision"; and (2) the members of the Loan Committee, Norini and Ubarri, were aware of Manafort's California Property default. These omissions are not material to the finding of probable cause, and Defendant makes no showing that they were deliberately designed to mislead.

First, the Affidavit provides information sufficient to find probable cause to believe that Defendant conspired with Manafort to withhold material information about the loans from the Bank Loan Committee and Board of Directors, and from the Wholesale Lender, including the following:

- Manafort was in substantial debt and had defaulted on multiple large loans, resulting in a Foreclosure Action against him in his personal capacity;

- Manafort had been refused a large loan from at least one other bank due to his high risk;

17

- Manafort's representations to the Bank regarding his income and net worth were inconsistent with his represented income, varying by over a hundred thousand dollars per month;

- Despite this, the Bank issued Manafort two large loans in rapid succession in November 2016 and January 2017;

- Defendant was heavily involved in the process by which Manafort received these loans;

- Defendant was aware that Manafort had defaulted on multiple large loans, resulting in a Foreclosure Action. The final Bank credit approval memoranda relating to the Manafort loans did not mention Manafort's defaults or the Foreclosure Action;

- Defendant personally sought to have a Wholesale Lender purchase the First Manafort Loan. Although these efforts were unsuccessful, the Wholesale Lender approved underwriting the Genesis California Property Loan up to $7 million;

- Providing Manafort these loans required the Holding Company to purchase one of the two loans to allow the Bank to stay within its legal lending limit for Manafort. Defendant owned 67% of the Holding Company, and his brother owned 29% of the Holding Company;

- Simultaneously to the loan processes, Defendant was engaged in extensive communication with Manafort that resulted in an appointment to then-candidate Trump's Economic Advisory Council and interviews for positions in President Trump's administration.

This information provides a substantial basis for Judge Rowland's finding of probable cause to believe that Defendant's iPhone contained evidence that he withheld material information from the Bank Loan Committee, Board of Directors and the Wholesale Lender. *See Gates*, 462 U.S. at 238-39 ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." (alteration in original)).

The omission of the fact that Defendant himself did not draft the loan memoranda is not material because it is not assumed in its absence that Defendant, CEO and Chairman of the Bank drafted the memoranda himself. The more natural inference is that Defendant influenced the information included in the loan memoranda. The finding of probable cause is also unaffected by Brennan's subsequent statement that "[t]he Genesis default would not have had an impact on

[the Bank's] loan decision."  A single statement by an employee regarding a hypothetical scenario is not sufficiently significant to affect the finding of probable cause.

Similarly, the omission from the Affidavit that the members of the Loan Committee, Norini and Ubarri, were aware of Manafort's California Property loan default is not sufficiently material to negate probable cause.  Their knowledge of the California Property default does not indicate that Defendant made the Board of Directors or the Wholesale Lender aware of this information, or that Defendant made the Loan Committee, the Board of Directors, or the Wholesale Lender aware of the *Brooklyn* Property loan default or Foreclosure Action.  Probable cause requires "only the probability, and not a prima facie showing, of criminal activity."  *Gates*, 462 U.S. at 235.  Considered alongside the rest of the information in the Affidavit, this information does not cast doubt on the existence of probable cause.

Even if these omissions were materially misleading, there is no evidence that the omissions were made with intent to mislead or with reckless disregard for the truth.  Defendant's motion to suppress or in the alternative for a *Franks* hearing is denied.  *See, e.g., United States v. Okparaeke*, No. 17 Cr. 225, 2018 WL 4003021, at *9 (S.D.N.Y. Aug. 21, 2018); *United States v. Robinson*, No. 16 Cr. 545, 2018 WL 5928120, at *10 (E.D.N.Y. Nov. 13, 2018).

## II.    MOTION TO COMPEL

### A.    Motion to Compel the Government to Disclose the Transcript of the Grand Jury Proceedings

#### 1.    Standard

"Grand jury proceedings carry a 'presumption of regularity.'"  *United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990), *abrogated on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)).  "Grand jury proceedings are presumptively secret, and a defendant seeking the

disclosure of grand jury materials bears a heavy burden." *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (summary order) (citing *In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997)). "A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *Torres*, 901 F.2d at 233; *accord United States v. Nikas*, No. 19 Cr. 716, 2019 WL 6838673, at *3 (S.D.N.Y. Dec. 13, 2019). The movant must establish a "particularized, . . . discrete showing of need." *Matter of Fed. Grand Jury Proceedings*, 760 F.2d 436, 439 (2d Cir. 1985).

Here, Defendant argues that the Government may have materially misled the grand jury through the selective presentation of evidence. To support this assertion, Defendant points to the information that was not included in the Affidavit and the additional allegedly exculpatory evidence that arose prior to the Government presenting its case to the grand jury, including testimony by Manafort before a separate grand jury that allegedly "totally contradicted the theory of the case contained in the indictment presented to the grand jury."

"[T]he government ha[s] no duty to present exculpatory evidence to the grand jury." *United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1274 (2019). Defendant's speculation regarding what evidence the Government may or may not have presented to the grand jury is insufficient to meet his burden to overcome the presumption of regularity. *See, e.g.*, *Schlegel*, 687 F. App'x at 30 (affirming denial of motion to compel production of grand jury minutes where the defendant "merely speculate[d] that the Government may not have presented to the second grand jury evidence regarding her conduct"); *Nikas*, 2019 WL 6838673, at *3. Defendant's motion to compel the production of the grand jury transcript is denied.

### B.   Motion to Compel the Government to Produce its Correspondence with the OCC and the Presidential Transition Team

Defendant moves to compel the Government to disclose its communications with the OCC and the Presidential Transition Team.  The Government has provided discovery to Defendant that includes documents produced by these two entities.  However, Defendant asserts that the discovery is "paltry" and he "cannot make[] heads or tails of what [he has] without seeing the requests and responses that ultimately resulted in these small productions."  Defendant also argues that the Government's subpoenas to these entities and the discovery-related correspondence is necessary to Defendant's evaluation of the need for, and scope of, potential Rule 17(c) subpoenas because, without the requested materials, Defendant cannot know what documents were requested by the Government.  This argument is unpersuasive, and Defendant's motion is denied.

Rule 16(a)(1)(E) requires the Government in part to "permit the defendant to inspect and to copy . . . documents" that are (1) "within the government's possession, custody, or control" and (2) "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case.  There must be some indication that the pretrial disclosure of the disputed evidence [will] enable[] the defendant significantly to alter the quantum of proof in his favor."  *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991); *accord United States v. Messina*, No. 11 Cr. 31, 2011 WL 3471511, at *1 (E.D.N.Y. Aug. 8, 2011).  Evidence qualifies as material only if it "could be used to counter the government's case or to bolster a defense."  *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017) (overruled on other grounds by *Carpenter v. United States*, 138 S. Ct. 2206 (2018)).  "'Defense' means 'the defendant's response to the Government's case in chief,' encompassing only items 'which refute the Government's

21

arguments that the defendant committed the crime charged.'" *United States v. Armstrong*, 517 U.S. 456, 462 (1996) (interpreting predecessor to Fed. R. Crim. P. 16(a)(1) (E)); *accord United States v. Defreitas*, No. 07 Cr. 543, 2011 WL 317964, at *9 (E.D.N.Y. Jan. 31, 2011), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013), and *aff'd sub nom. United States v. Ibrahim*, 529 F. App'x 59 (2d Cir. 2013).

"It is defendant's burden to [show] that the documents sought are material to preparing his defense." *United States v. Giffen*, 379 F. Supp. 2d 337, 342 (S.D.N.Y. 2004) (citation omitted); *accord United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013).  But, "[t]he materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Stein,* 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (alteration in original); *accord United States v. Gatto*, No. 17 Cr. 0686, 2018 WL 4660352, at *3 (S.D.N.Y. Sept. 5, 2018).

Here, Defendant does not meet his burden of showing that the documents sought are material to preparing his defense.  Although the subpoenas and correspondence requested would perhaps assist Defendant in preparing his own subpoena, Defendant cites no authority that this purpose would be material to his defense.  While the requested documents may shed light on why certain produced documents were provided or redacted, there is no reason to believe that a review of such documents would "significantly alter the quantum of proof in [Defendant's] favor," *Maniktala*, 934 F.2d at 28, or "play an important role in uncovering admissible evidence." *Stein*, 488 F. Supp. 2d at 356.  The documents are therefore not material, and Defendant's motion is denied.  *See, e.g.*, *United States v. Lange*, No. 10 Cr. 968, 2012 WL

511448, at *2-3 (E.D.N.Y. Feb. 15, 2012) (holding, where defendant sought discovery of communications between the Government and its agents, that "Defendant's conclusory allegation that the communications may contain information about possible witnesses [was] insufficient to show the materiality of the communications to the presentation of his defense"); *United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003) (denying disclosure where "at bottom Defendants attempt[ed] to equate 'material' with 'useful' in order to meet their burden under Rule 16(a)(1)(E)(i).").

## III.    CONCLUSION

For the foregoing reasons, Defendant's motions are DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket No. 36.

Dated: July 1, 2020
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**