UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

  UNITED STATES OF AMERICA,        :

                        :     Case No. 19 Cr. 366 (LGS)

       - against -          :

                        :

  STEPHEN M. CALK,           :

                        :

            *Defendant*.      :

                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT STEPHEN M. CALK'S MOTION IN LIMINE
## TO PRECLUDE PROPOSED EXPERT TESTIMONY

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................4

    I.     The Charged Offense .................................................................................4

    II.    The Manafort Loans ..................................................................................5

    III.   The January and June 2017 OCC Examinations......................................7

    IV.   The November 2017 OCC Examination and Seizure of Manafort Loan Collateral.................................................................................................9

    V.    November 2017 OCC Management Component Downgrade ..............................11

ARGUMENT ..........................................................................................................................11

    I.     Legal Standard ........................................................................................11

    II.    The Court Should Preclude Testimony by the Government's Proposed Expert Joseph P. Belanger ......................................................................15

         A.    Testimony Regarding Regulatory and Industry-Standard Underwriting Practices Should Be Precluded...........................16

         B.    Belanger's Legal Conclusions are Inadmissible .......................19

         C.    Belanger's Remaining Opinions Are Improper Government Summation Masquerading as Expert Opinion ...........................20

    III.   The Court Should Preclude Testimony by OCC Witnesses Catherine A. Aguirre and Blake J. Paulson.................................................................21

         A.    Catherine Aguirre......................................................................21

         B.    Blake Paulson.............................................................................27

    IV.   The Court Should Preclude Testimony by the Government's Proposed Expert Jeff McCutcheon ..........................................................................32

         A.    McCutcheon's Valuation of the Economic Advisory Council Position Is Inadmissible ...........................................................32

         B.    McCutcheon's Opinions About the Value of the Secretary and Undersecretary Positions Are Inadmissible..............................33

C.      McCutcheon's Opinions Regarding the Value to TFSB of Mr.
        Calk's Appointments Are Unreliable and Do Not Fit the Law ................36

CONCLUSION.................................................................................................................38

KL3 3315719.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................................................36

*Bourjaily v. United States*,
   483 U.S. 171 (1987).............................................................................................................13

*Christiansen v. Nat'l Sav. & Trust Co.*,
   683 F.2d 520 (D.C. Cir. 1982) ............................................................................................19

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)......................................................................................11, 12, 34, 36

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005)...................................................................................13, 19, 25

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..........................................................................................................36, 37

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)...............................................................................................14, 20

*In re Petitions for Relief Concerning Consent Order of Forfeiture*,
   No. 18-mc-167 (ABJ) (D.D.C.) ..........................................................................................10

*Kogut v. Cty. of Nassau*,
   894 F. Supp. 2d 230 (E.D.N.Y. 2012) ................................................................................34

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016).................................................................................34

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977).........................................................................................14, 19, 20

*MASTR Adjustable Rate Mortg. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*,
   No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015)......................................26

*New York v. Deutsche Telekom AG*,
   419 F. Supp. 3d 783 (S.D.N.Y. 2019)..................................................................................35

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)................................................................................................12

KL3 3315719.1

*Park West Radiology v. CareCore Nat'l LLC,*
   675 F. Supp. 2d 314 (S.D.N.Y. 2009) ................................................................. 36

*S.E.C. v. Tourre,*
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................. 31

*United States v. Bilotto,*
   No. SA-04-cr-343-OG, 2005 WL 5978665 (W.D. Tex. Sept. 27, 2005) ................ 25

*United States v. Bilzerian,*
   926 F. 2d 1285 (2d. Cir. 1991) ............................................................................ 14

*United States v. Manafort,*
   No. 17-cr-00201 (ABJ) (D.D.C.) ...................................................................... 9, 10

*United States v. Manafort,*
   No. 18-cr-83 (TSE) (E.D. Va.) ....................................................................... 6, 9, 10

*United States v. Manibusan,*
   529 F. App'x 818 (9th Cir. 2013) ........................................................................ 26

*United States v. Martoma*
   993 F. Supp. 2d 452 (S.D.N.Y. 2014) ............................................................. 22, 23

*United States v. Mendlowitz*
   2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .............................................. 13, 24, 25

*United States v. Payne,*
   750 F.2d 844 (11th Cir. 1985) ............................................................................ 26

*United States v. Petit*
   No. 19-cr-00850 (S.D.N.Y.) .......................................................................... 14, 18

*United States v. Riddle,*
   103 F.3d 423 (5th Cir. 1997) ................................................................. 24, 29, 30, 31

*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1988) ................................................................................ 31

*United States v. St. Pierre*
   599 F.3d 19, 22-23 (1st Cir. 2010) ................................................................. 13, 19, 25

*United States v. Zafar,*
   291 F. App'x 425 (2d Cir. 2008) ...................................................................... 12, 18

*United States v. Zhong,*
   No. 16-cr-614 (DLI), 2018 WL 6186474 (E.D.N.Y. Nov. 26, 2018) ...................... 27

iv

**Federal Statutes**

18 U.S.C. § 215 ................................................................................................................4, 36

**Rules**

Fed. R. Evid. 401 ...................................................................................... *passim*

Fed. R. Evid. 403 ...................................................................................... *passim*

Fed. R. Evid. 702 ...................................................................................... *passim*

Fed. R. Evid. 704 ................................................................................................14

**Regulations**

12 C.F.R. 160.130 ........................................................................................28, 31

**Other Authorities**

U.S. Dep't of Justice, *Crim. Resource Manual § 831*, Updated Jan. 21, 2020,
    https://www.justice.gov/archives/jm/criminal-resource-manual-831-corrupt-
    bank-officer-18-usc-215a2 ..........................................................................36

Defendant Stephen M. Calk respectfully submits this memorandum in support of his motion *in limine* to preclude the expert testimony of the government's four proposed expert witnesses.

## PRELIMINARY STATEMENT

This is a case about whether or not Mr. Calk took a bribe.  The government wants to transform it into a case about best practices in underwriting.  To prove the charge of bank bribery in the one-count indictment, the government must show that Mr. Calk corruptly received something of value from Paul Manafort with the intent to be influenced or rewarded in connection with loans made to Manafort by Mr. Calk's bank.  Based on its expert disclosures, however, that is not what the government is planning to attempt to do at trial.  Instead, it is planning to try to prove with expert testimony—from a paid expert and two government regulators—that the internal processes employed by the bank failed to comply with various non-criminal banking regulations, industry standards and "best practices."  The substitution of expert testimony about the bank's purportedly substandard procedures for actual evidence of Mr. Calk's allegedly corrupt intent is an extraordinary departure from permissible practice in a criminal case.

To fully appreciate the egregiousness of what the government is trying to do, the Court should understand the core facts that are confounding the government here.  The indisputable truth is that the loan committee at The Federal Savings Bank ("TFSB"), of which Mr. Calk was a member, conditionally approved the economic terms of loans, but did so "subject to underwriting."  This was true not just of the Manafort loans, but for all loans in TFSB's "portfolio" lending program, which offered high-interest-rate loans to borrowers who did not qualify for traditional loans.  Once the terms of a loan were conditionally approved by the loan

committee, the underwriting for the loan was conducted by the underwriting department, which ultimately produced a loan memorandum. But it was the standard practice at TFSB that the details of the underwriting process and the loan memorandum itself were not shared with Mr. Calk.

The government knows this and, for this reason, puts forward an expert, Joseph Belanger, to claim that Mr. Calk "had an obligation" to review the loan memorandum and that it was "contrary to industry practice" for him not to have done so. But the fact remains that this was the practice at TFSB and therefore no inference from corrupt intent can possibly be drawn from the fact that TFSB's standard practice was followed here. Belanger's opinions about how things are supposed to work, is just sound and fury, signifying nothing of relevance to the jury.

The second, equally improper misdirection that the government seeks to offer through expert testimony is to use hindsight to second-guess the bank's decision-making based on events that occurred only after the loans closed. Specifically, the government seeks to offer the testimony of two employees of the Office of the Comptroller of the Currency ("OCC"), Catherine Aguirre and Blake Paulson, about determinations made by the OCC long after the Manafort loans closed. For example, that many months after the Manafort loans were made, the OCC took the position that a portion of the loans should be downgraded to a "substandard" rating. The government also seeks to elicit from Aguirre that at the end of 2017 Manafort defaulted on the loans and TFSB wrote off the value of a portion of the collateral that he had posted. None of this information is relevant to determining Mr. Calk's intent in 2016 and early 2017, when the loans were made. This evidence is also highly misleading since TFSB is in the midst of litigation seeking recovery of the collateral from the government, which itself caused the loss to the bank by seizing Manafort's properties in connection with its case against

Manafort.  Had it not done so, the bank would have been made whole and protected from Manafort's default, as contemplated by the loan terms.

Finally, the government intends to offer the testimony of a fourth professed expert, Jeff McCutcheon, regarding the value of the purported bribes that Mr. Calk received from Manafort.  As alleged in the indictment there were two bribes:  (1) a volunteer position on the Trump campaign's economic council and (2) assistance applying for a job in the Trump administration that Mr. Calk did not in fact receive.  McCutcheon is a Florida-based management consultant with no background in politics or political science and very limited experience in banking.  With respect to the campaign position he offers some prose arguments, free from the constraints of data, logic or relevant experience—and even so, he concedes that the position "had no direct monetary value."  With respect to the second bribe, McCutcheon misses the point completely, using a miniscule and dubious dataset to guestimate the value of actually receiving a presidential appointment as Secretary or Undersecretary of the Army.  But Mr. Calk was never offered such an appointment.  He is charged with only with receiving <u>assistance</u> from Manafort in applying for a position.  McCutcheon does not attempt to opine as to the dollar value of that assistance and we suspect that no self-respecting expert witness ever would.

Here, rather than rely on a parade of experts, the government should be compelled to prove its case, if it can, with competent and relevant evidence, and with a minimum of confusion or delay.  We know that the government has lined up for trial numerous TFSB personnel who were percipient witnesses to the relevant events.  These include the loan officer, the head underwriter, additional members of the underwriting department, and the bank's president, who also served with Mr. Calk on the bank's loan committee.  Moreover, the government has included within its millions of pages of discovery, thousands of emails and

documents showing everything that Mr. Calk (and everyone else at the bank) did in connection with these loans.  Hundreds of pages of these documents will likely be exhibits at trial.  If, as we firmly believe, the government cannot prove its case with the facts, it should not be permitted to confuse and mislead the jury with irrelevant opinions.  Accordingly, all of the government's experts should be precluded.

**BACKGROUND**

## I.   The Charged Offense

On May 21, 2019, a grand jury in this district returned an indictment charging Mr. Calk with one count of "financial institution bribery," pursuant to 18 U.S.C. § 215.  (Indictment ¶ 30).  The indictment alleges that Mr. Calk, the chairman and CEO of The Federal Savings Bank ("TFSB"), "corruptly solicited and received from [Paul Manafort] assistance in obtaining a position with the Presidential Campaign and the incoming presidential administration, intending to be influenced and rewarded in connection with the extension of approximately $16 million in loans" to Manafort.  (*Id.* ¶ 30).

The indictment references the following instances of "assistance" allegedly provided by Manafort in return for extension of the loans:

- In August 2016, Manafort helped appoint Mr. Calk to the Trump campaign's National Economic Advisory Council ("NEAC").  (*Id.* ¶¶ 13-16).  The position was unpaid.  As a member of the Council, Mr. Calk subsequently made over 30 media appearances for the campaign.

- On or about November 30, 2016, Manafort emailed Jared Kushner with the recommendation that Mr. Calk and two other individuals be considered for positions in the Trump Administration.[1]  Kushner has told the government that he treated Manafort's recommendation of Mr. Calk as low priority, and

---

[1] The indictment states that Manafort emailed his recommendation to "Transition Official-1," but it is clear from discovery and the government's disclosures that the reference is to Kushner.  (SDNY_00041259).

4

forwarded it on without recommendation or follow-up.[2]  Manafort (who in August 2016 had been fired from his position as Campaign Manager) had no position in the Trump Administration at that time or any time thereafter.

- On or about December 15, 2016, Manafort called Anthony Scaramucci, who, allegedly agreed to arrange for Mr. Calk to be interviewed for the position of Undersecretary of the Army.[3]  The government has disclosed that Scaramucci has said that he believed the interview was "going nowhere" and that Mr. Calk was likely "essentially on a permanent waitlist."[4]  On January 10, 2017, Mr. Calk was interviewed by three members of the Presidential Transition Team but was never offered a position in the administration.

## II.    The Manafort Loans

There are two loans at issue in the case.  The first loan, known as the "Summerbreeze" loan, was for $9.5 million and closed on November 16, 2016.[5]  The second loan, known as the "Union Street" loan, was for $6.5 million and closed on January 5, 2017.[6]  Both loans were so-called "portfolio loans."  Portfolio loans, which were held on the bank's balance sheet, constituted a small fraction of TFSB's business.  The overwhelming majority of TFSB's business involved loans that the bank originated but were funded by, or sold to, investors in the secondary marketplace.  The portfolio lending program was designed for borrowers who, for any number of reasons, did not qualify for a conventional loan.  To compensate for the added risk presented by such borrowers, portfolio loans carried interest rates that were substantially higher than rates for conforming loans, and required the borrower to post more collateral.  Both

---

[2] (Oct. 15, 2019 Disclosure Ltr. at 2-3).

[3] The indictment states that Manafort contacted "Transition Official-2," but it is clear from discovery and the government's disclosures that the reference is to Scaramucci.

[4] (July 1, 2019 Disclosure Ltr. at 7).

[5] Summerbreeze LLC was the name of the corporate entity that owned the underlying property in Bridgehampton, New York.

[6] The loan was secured by, among other things, a property located at 377 Union Street, in the Carroll Gardens neighborhood in Brooklyn, New York.

KL3 3315719.1

the Summerbreeze and Union Street loans carried an initial interest rate of 7.25%, which was the

standard rate at the time for TFSB portfolio loans and were secured by cash and property

significant greater than the amount of the loans.[7]

   At TFSB, approval of a portfolio loan was a two-step process.  First, the loan

officer (in this case, a TFSB employee named Dennis Raico) made a proposal to the loan

committee, including the loan amount, the proposed terms, and basic information about the

borrower.  After reviewing the proposal, the loan committee decided, based on the information

provided by the loan officer, whether to give "conditional" approval to the loan.  If the

committee gave conditional approval, the TFSB underwriting department was tasked with

verifying the information provided in connection with the loan proposal, collecting additional

information, and evaluating the income, assets, obligations and general creditworthiness of the

borrower.  After the underwriting department completed its work (a process which, in this case,

took months), it documented its findings in a loan memorandum.  But it was standard practice at

TFSB that the loan committee did not re-review loans after the underwriting and did not receive

the loan memoranda.[8]

---

[7] The Summerbreeze loan was secured by first lien mortgages on 174 Jobs Lane, Bridgehampton, New York, which had an average appraised value of $12.25 million, and 601 N. Fairfax Lane, Unit 405, Alexandria, Virginia, which had an appraised value of $2.7 million, as well as $630,000 in additional cash collateral.  (SDNY_00266815).  The Union Street loan (which was really two component loans) was secured by a first lien mortgage on 377 Union Street, Brooklyn, New York—a property that by the loan terms needed to have an "as complete" appraisal value of at least $6.3 million—and $2.5 million cash.  (SDNY_00240601).

[8] James Brennan, TFSB's head underwriter on the Manafort loans, testified for the government at Manafort's trial that the loan committee, of which Mr. Calk was a member, did not receive or review the loan memoranda.  (Brennan Trial Tr. 2245:13-2246:4, *United States v. Manafort*, No. 18-cr-00083 (TSE) (E.D. Va. Aug. 27, 2018), ECF No. 282).

### III.     The January and June 2017 OCC Examinations

Beginning on January 3, 2017, the OCC conducted a routine "full-scope examination" of TFSB.  As part of its examination, the OCC identified a sample set of loans to review.  One of the loans selected was the $9.5 million Summerbreeze loan.  An OCC examiner performed a "credit underwriting assessment" of that loan, which included reviewing the loan memorandum created by the TFSB underwriting department in connection with that loan, and determined that the loan merited a "moderate" risk rating.  (SDNY_00175719 at SDNY_00175721).  In reaching this determination, the OCC found that Manafort and his wife had adequate repayment capacity, the loan structure was appropriate, and the loan to value ratio was less than 70%.[9]  (*Id.*).

Approximately three months later, the Wall Street Journal published an article regarding the Manafort loans.  (SDNY_00241919).  The article implied that TFSB gave Manafort a "$16 million lifeline" to save him from foreclosures on his investments because Mr. Calk was "another former Trump adviser."  (*Id.*).  It also falsely suggested that in making the loans to Manafort, TFSB had breached its legal lending limit for loans to the same borrower. (*Id.*).

According to the OCC examiner who conducted the January 2017 assessment of the Summerbreeze loan, upon reading the article, the OCC feared that TFSB had breached its lending limit and believed "it would have been embarrassing if something was missed or not properly noted during the [January OCC] exam."  (SDNY_00175680 at SDNY_00175683).  The same day the article was published, the OCC scheduled a meeting with TFSB management.

---

[9] The loan to value ratio is generated by dividing the amount of the loan by the amount of collateral posted to secure the loan.

KL3 3315719.1

(SDNY_00175727).  At the meeting, TFSB executives explained that there was no legal lending limit violation, as the bank had sold $4.2 million of the $6.5 million Union Street loan to the bank's holding company, National Bancorp Holdings, Inc.  (*Id.* at SDNY_00175728).  Following the meeting, the OCC conducted an independent analysis and concurred with the bank that there was no legal lending limit violation.  (*Id.*).

In June 2017, the OCC conducted another examination of TFSB.  The Manafort loans were among the loans included in the OCC's loan sample.  The OCC's findings were conveyed to TFSB in a July 19, 2017 supervisory letter.  Among other things, the OCC now "identified inaccurate financial analysis in five loan relationships" at the bank, only one of which was the Manafort loan relationship.  (SDNY_00071023 at SDNY_00071024).  With regard to all five relationships, the OCC found that "the bank is not properly assessing cash flow from tax returns," including by not accounting for non-cash items and not making accurate adjustments based on information in the Schedule K-1 tax forms provided by borrowers.  (*Id.*).  According to the letter, "these inaccuracies resulted in an inaccurate risk rating" for the Manafort loans.  (*Id.*).

The supervisory letter identified other errors that the OCC claimed that TFSB's underwriting department had made in connection with the Manafort loans, including that it had only used an appraisal reflecting the "as complete" value of the Union Street property (that is, after completion of the planned renovation), and did not obtain one reflecting the "as is" value. (*Id.* at SDNY_00071030).  The letter noted that TFSB had since obtained an "as complete" appraisal and corrected the problem.  (*Id.*).  In addition to the collateral valuation exception, the supervisory letter faulted TFSB's underwriting for using "stale" financial information, making mistakes in evaluating the Manaforts' liquid assets and failing to require or follow up on certain financial reporting covenants.  (*Id.* at SDNY_00071033).  The OCC downgraded the portion of

the Manafort loans that was not secured by cash collateral from "pass" to "substandard."  (*Id.* at SDNY_00071032).

## IV.     The November 2017 OCC Examination and Seizure of Manafort Loan Collateral

In October 2017, Manafort was charged in the District of Columbia with money laundering, failing to register as a foreign agent, and other crimes.  (Indictment, *United States v. Manafort*, No. 17-cr-00201 (ABJ) (D.D.C. Oct. 30, 2017), ECF No. 13).  In connection with that indictment, the government seized the Summerbreeze and Union Street properties that served as collateral for the Manafort loans.

In November 2017, the OCC conducted another examination of TFSB. (SDNY_00074429).  As part of its review, the OCC again assessed both Manafort loans. (SDNY_00175866).  This time, the OCC determined that "[a] rating of Doubtful [was] warranted given the borrower's and guarantors' non-existent cash flow, which now stems from the freezing of all assets by the U.S. Department of Justice in response to the October 27, 2017 Federal Indictment" and that non-accrual treatment was appropriate for the same reason.  (*Id.* at SDNY_00175866).  In light of the government's seizure of the properties and the OCC's findings, TFSB subsequently decided to write off the value of the Manafort loans that remained on the bank's books, less the cash collateral that the bank was holding.

In February 2018, Manafort was charged in the Eastern District of Virginia with filing false tax returns, failing to file a report of foreign bank and financial accounts, bank fraud conspiracy, and bank fraud.  (Superseding Indictment, *United States v. Manafort*, No. 18-cr-83 (TSE) (E.D. Va. Feb. 22, 2018), ECF No. 9).  The new indictment included a charge that Manafort had defrauded TFSB by making false and fraudulent representations in order to secure loans from the bank.  (*Id.* ¶¶ 42-44).  Following a trial, Manafort was convicted on eight of the 18 counts against him but the jury could not reach agreement as to whether Manafort had

9

committed bank fraud as it related to TFSB.  (Verdict, *United States v. Manafort*, No. 18-cr-83 (TSE) (E.D. Va. Aug. 21, 2018), ECF No. 280).

Shortly thereafter, Manafort entered a guilty plea in the District of Columbia case to a superseding information that charged him with conspiring against the United States and conspiring to obstruct justice.  (Superseding Crim. Information, *United States v. Manafort*, No. 17-cr-00201 (ABJ) (D.D.C. Sept. 14, 2018), ECF No. 419; Plea Agreement, ECF No. 422). In connection with the plea, Manafort admitted that he had conspired to defraud, and had defrauded, TFSB in connection with the Summerbreeze and Union Street loans.  (Statement of the Offenses and Other Acts ¶¶ 52-54, ECF No. 423).  Manafort also agreed to forfeit, among other assets, his interest in all funds seized from his accounts at TFSB as well as the Summerbreeze and Union Street properties.  (Plea Agreement, ECF No. 422; Consent Order of Forfeiture, ECF No. 443).  The government then directed TFSB to transfer to it the $2.5 million in cash collateral that Manafort had posted as additional security for Union Street loan, a directive with which the Bank complied.

Following Manafort's plea, TFSB asserted its rights to these assets as an innocent owner under the forfeiture statute and the terms of its loan agreements with Manafort.  The bank is presently seeking to recover them in ongoing litigation with the government.  (Pet., *In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18-mc-167 (ABJ) (D.D.C. Nov. 15, 2018), ECF No. 8).  In May 2020, the court presiding over the matter authorized limited discovery but otherwise has effectively stayed the proceedings, at the government's request, pending completion of the criminal trial in this case.  (Order, *In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18-mc-167 (ABJ) (D.D.C. May 26, 2020), ECF

No. 111). If the bank's ownership of the Manafort properties is vindicated, it expects to recover the full value of the outstanding loan balances.

## V.      November 2017 OCC Management Component Downgrade

In connection with the November 2017 examination, the OCC downgraded TFSB's "Management component rating" from a 2 to a 3. (SDNY_00074429 at SDNY_00074431). While finding that the overall condition of the bank was "satisfactory," and giving the bank a 1—its highest rating—with respect to earnings (which the OCC found were "strong and more than sufficient to support operations, accrete capital, and provide for the allowance."), the OCC concluded that the TFSB Board "had not established a sound corporate risk management culture that prioritizes risk identification and sound internal controls." (*Id.* at SDNY_00074434, SDNY_00074437). Among other things, the OCC found that the bank's controls over the loan approval process were inadequate, and that "management does not follow a consistent approval process and frequently does not consider sufficient credit information." (*Id.* at SDNY_00074438). In its report, the OCC indicated that it had sampled 20 loans, and determined that "100 percent of the loan approvals were made" without using a loan presentation to guide the decision regarding the loan. (*Id.*). The OCC also identified two instances—neither related to the Manafort loans—where it alleged that insider loan approvals had occurred without proper controls to reduce the risk of self-dealing. (*Id.*). Neither instance involved allegations of bribery and only one related to Mr. Calk. (*Id.*).

## ARGUMENT

## I.      Legal Standard

The Court has a critical role to play as a gatekeeper for expert evidence, to ensure that the jury is not misled by witnesses without percipient knowledge, whose purported expertise can have an outsize influence on the fact-finding process. *See, e.g.*, *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.").  Under Federal Rule of Evidence 702, a witness who is qualified as an expert may only testify in the form of an opinion if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

Expert testimony, like all evidence, is also subject to Rules 401 and 403, and experts of course cannot testify regarding matters that are irrelevant to the case.  With regard to Rule 403, courts have recognized that the risk of undue prejudice and confusion is particularly high when experts are permitted to testify as to matters with little probative value.  *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."); *see also Daubert*, 509 U.S. at 595 (courts should "exercise[s] more control over experts than over lay witnesses" in weighing possible prejudice against probative value under Rule 403).  Courts have also been careful to prevent parties from substituting expert testimony for the evidence of percipient witnesses, and to exclude experts whose overt or disguised purpose is to suggest to the jury what the facts were.  *See, e.g., United States v. Zafar*, 291 F. App'x 425, 427 (2d Cir. 2008) (expert testimony about stock-selection software was properly excluded where there was no evidence that the defendant actually used the software, and noting that the defense was simply trying use the expert "to insinuate what had happened with respect to the

relevant stock trades, a subject on which [the expert] was not a competent witness"). The party seeking to introduce expert testimony bears the burden of demonstrating that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987).

Citing these principles, the government itself has objected in criminal cases to expert testimony about industry standards and practices, arguing that such evidence is irrelevant to determining whether a defendant had criminal intent, and no substitute for the evidence of percipient witnesses and contemporaneous documents. For example, in *United States v. Mendlowitz*, a wire fraud case, the defense sought to introduce expert testimony that the defendant's conduct was consistent with industry practice. No. S2-17-cr-248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019). The government moved to exclude the testimony on the ground that, among other things, it was irrelevant, and that even if relevant, "there was a likelihood of juror confusion that the standard against which Defendant's conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute." *Id*. at 3. The court precluded the testimony at trial. In denying the defendant's Rule 33 motion following trial, the court again found the proffered testimony to be irrelevant, and concluded, consistent with the government's argument, that "the risk of prejudice was high since there was a likelihood of jury confusion that the standard against which [the defendant's] conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute." *Id*. at *7.[10]

---

[10] In *United States v. St. Pierre*, the court excluded expert testimony "as to the standard of care owed to [the defendant] by her accountants" to avoid confusing and misleading the jury by "shifting the focus" to an irrelevant standard. 599 F.3d 19, 22-23 (1st Cir. 2010); *see also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (upholding exclusion of expert opinion on "business ethics" on the ground that it would "unnecessarily confuse the jury" about the "real issue in the case," namely, whether the plaintiff solicited a bribe from the defendant and the defendant understood it to be a bribe).

Expert testimony is also improper where it threatens to usurp the role of the court in instructing the jury on the law, or the role of the jury in applying the law to the facts. Under Federal Rule of Evidence 704, in a criminal case an expert witness cannot state an opinion about whether a defendant had the state of mind constituting an element of the charged offense. Fed. R. Evid. 704(b). With regard to other matters at issue in a trial, the commentary to the rule explains that courts should use Rules 701, 702, and 403 to ensure "against the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee's note. As the Second Circuit has made clear, these rules require "exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Indeed, "[e]ven if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionably by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364. The danger of admitting such testimony is that "the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely and inadmissible inference in our system of law." *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977).[11]

This bedrock principle is one that the government regularly cites in its efforts to exclude expert testimony in criminal cases. For example, earlier this month, in *United States v. Petit*, a case charging the CEO and COO of a public company with fraudulently inflating revenue, the government moved to preclude the defense expert from testifying about the proper application of Generally Accepted Accounting Principles governing revenue recognition to the

---

[11] *See also United States v. Bilzerian*, 926 F. 2d 1285, 1294 (2d. Cir. 1991) (Expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.").

facts of the case.  (Mot. at 13, No. 19-cr-00850 (S.D.N.Y. Oct. 5, 2020), ECF No. 71).  Among

other things, the government argued strenuously that these opinions were improper because they

(i) "seek to direct the jury to reach a specific conclusion as to one of the ultimate issues the jury

needs to decide" and (ii) "usurp the Court's role in instructing the jury and could lead to potential

confusion over the relevant issues in the case."  (*Id.* at 17-18).  On the latter point, the

government noted that the question of whether the defendants misstated revenue "is a question

for the jury after proper legal instruction is given by the Court, not by a defense witness."  (*Id.* at

18).

## II.     The Court Should Preclude Testimony by the Government's Proposed Expert Joseph P. Belanger

The government seeks to call Joseph P. Belanger as an expert in the underwriting

practices of the lending industry.  Belanger is employed at The Brattle Group and is being paid

for his services.  He has been given selected documents by the government and told to assume

certain facts.  The government proposes that he offer the following opinions:

1.  TFSB's extension of the Manafort loans was "not consistent with regulatory and industry-standard lending practices."

2.  Assuming Mr. Calk was unaware of red flags relating to the Manafort loans, Mr. Calk violated his "fiduciary obligation as a member of the loan committee to undertake an informed review of Manafort's loan memorandum as any reasonable person would, consistent with a duty of care."

3.  Assuming Mr. Calk had "ascribed knowledge" of the details of the credit assessment, prudence required him to "reject the loan request or, at minimum undertake further due diligence."

4.  It was a conflict of interest for Mr. Calk to participate in the review and approval process for the Manafort loans, "while seeking roles in the Trump presidential campaign and administration."

(Belanger Disclosure Ltr. at 2 (attached hereto as Exhibit A to the Declaration of Paul H.

Schoeman, Esq. (hereinafter "Schoeman Decl."); Belanger Rep. at 4, 5 (Schoeman Decl. Ex. A)).

15

The Court should exclude Belanger's testimony in its entirety.  The proffered testimony it not probative of whether Mr. Calk corruptly received a bribe from Manafort.  Instead, Belanger's opinions rest on the application of purported regulatory standards and best practices, as well as conclusions with respect to fiduciary duties that are beyond his competence and invade the Court's prerogative to instruct the jury on the law.  If permitted, his testimony would only confuse and mislead the jury regarding the government's burden of showing criminal intent, and unnecessarily prolong the trial.

> **A.** **Testimony Regarding Regulatory and Industry-Standard Underwriting Practices Should Be Precluded**

The crux of Belanger's first opinion is that "no prudent lender would entertain" the Manafort loans due to various factors he claims would be concerning to prudent underwriters.  (Belanger Rep. at 4 (Schoeman Decl. Ex. A)).  This opinion lacks any probative value at Mr. Calk's trial for at least two reasons, one logical and the other factual.

The logical flaw is that Belanger is inviting the jury to speculate that an imprudently underwritten loan is likely to be a corrupt loan.  But banks make imprudent loans all the time.  Most notably, the 2008 financial crisis was caused by trillions of dollars of imprudent loans, made by countless imprudent bankers with no connection to any bribe paid by the borrower.  Moreover this particular bank, TFSB, through its high-interest and high-fee portfolio loan program, made numerous loans that a more prudent lender might not have entertained.  And, according to the OCC, TFSB's underwriting department made many of the same errors Belanger identifies in analyzing loans other than Manafort's.[12]  The inference that the

---

[12] TFSB was cited by the OCC for regulatory violations in connection with loans entirely unrelated to Manafort for similar issues relating to its assessment of cash flow and issues with appraisals.  (*See* SDNY_00071023 at SDNY_00071024; SDNY_00072384 at SDNY_00072403

KL3 3315719.1

government would urge the jury to draw from Belanger's sermonizing on the habits of prudent bankers is, therefore, entirely specious.

The factual flaw in the proposed testimony is that Mr. Calk was not an underwriter and was unaware of the vast majority of factors that Belanger contends were overlooked, mishandled or misunderstood by the bank's underwriting department.  The underwriting issues highlighted by Belanger include:

- Appraisals:  TFSB acted imprudently and contrary to FDIC and OCC guidelines by relying on an "as complete" appraisal instead of an "as-is" appraisals for the Union Street property.  (Belanger Rep. at 7-8, ¶¶ 30-32 (Schoeman Decl. Ex. A)).

- Cash Flows:  Manafort's historic cash flows were insufficient to service the prospective debt and TFSB's underwriters omitted from their loan memoranda "any assessment of the financial performance of DMP International [Manafort's political consulting business] in 2016, as well as the outlook … [for] 2017." (*Id.* at 9, ¶¶ 36-38).

- Declining Income From Consulting:  Manafort's income from DMP International, as reflected on Schedule E in Manafort's tax returns, represented a significant percentage of his income and was "deteriorating significantly." (*Id.* at 10-11, ¶¶ 39-40).  Inconsistencies in draft income statements for DMP International required "further analysis" and there were no projections of future income.  (*Id.* at 11-12, ¶¶ 41-43, 45).  K-1 tax forms were reconciled and displayed incorrectly in the loan memoranda.  (*Id.* at 10-11, ¶¶ 39-40.).

- High Leverage From Other Debt:  Based on the mortgage and credit line information reflected in the loan memoranda, "Manafort does not display sufficient cash flow to service the existing debt." (*Id.* at 12-13, ¶¶ 47-48, 50).  And, incidentally, the UBS account assets "are listed on a pre-tax basis, and no estimate was provided as to the prospective tax due upon sale." (*Id.* at 13, ¶¶ 49).

- Inconsistencies in Documentation:  TFSB's underwriters "failed to obtain verifiable information relating to DMP International," "[t]he TFSB Loan Memoranda . . . referenced two personal financial statements from inexplicably different times," and the asset values, liabilities and net worth were different in the two memoranda.  (*Id.* at 14-15, ¶¶ 51-54).

---

(identifying "seven instances where the appraisal review was completed untimely after the loan's closing date")).

- Credit Score:  Manafort was delinquent on an American Express Bill, which caused his credit score to drop and then rebound when the bill was paid.  (*Id.* at 16, ¶¶ 58).[13]

These facts are known to Belanger because they are contained in hundreds of pages of documents that were transmitted to the underwriters but not to Mr. Calk, and/or they appear in the loan memoranda that Mr. Calk never saw.[14]  There are, of course, some facts about Manafort and the loans that were known to Mr. Calk, but what those facts were and their significance in the context of TFSB's portfolio lending program can only be established by the testimony of percipient witnesses, who will be in abundance at trial. *See Zafar*, 291 F. App'x at 427 (expert testimony could not be used "to insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert] was not a competent witness").

Even if Belanger's musings on prudent lending practices had some probative value, that value would be far outweighed by the danger of unfair prejudice and juror confusion.[15]  Confronted with extensive evidence about prudent lending requirement and

---

[13] Belanger also contends that The Union Street loan was "poorly structured" because, he believes, the prior lender retained a $300,000 second mortgage on the property.  Here, Belanger admits he has no idea what the relevant facts are, stating only "[f]urther analysis is required to determine whether and when [the prior lender] placed a mortgage filing behind the two loans from TFSB."  (Belanger Rep. at 18, ¶ 62 (Schoeman Decl. Ex. A)).

[14] One factor set forth by Belanger that is not an underwriting issue is that TFSB's holding company acquired a portion of the Union Street loan so that the loan retained by TFSB did not violate TFSB's lending limit for a single borrower.  (Belanger Rep. at 18-19 (Schoeman Decl. Ex. A)).  With respect to Belanger's opinion, this is a non-sequitur, since Belanger merely contends that the transfer of risk "does not alter the analysis."  (*Id.*).  If it does not alter the analysis, it has no relevance to his opinion.  But, in any event, we note that the OCC specifically determined that there was nothing wrong with this arrangement.

[15] In *United States v. Petit*, cited above, the government made the same point in seeking to preclude the defense from offering expert testimony on the "respective roles and expertise of executives and others and their level of financial expertise and training on revenue recognition."  (Mot. at 3).  According to the government, the defense offered this testimony as "a proxy for the defendants' state of mind, including their purported lack of familiarity with revenue recognition rules," among other things.  (*Id.* at 9).  Citing *Zafar*, the government noted that "expert testimony is inadmissible when, as here, it is calculated primarily to insinuate what must have happened in

banking regulations, the jury would understandably believe that Mr. Calk could be convicted for a violation of those standards.  As courts have repeatedly recognized, and as the government itself has argued, it is improper for an expert to measure a defendant's conduct by a standard different from the one at issue at trial, and to present that standard to the jury through expert testimony.  *See DiBella*, 403 F.3d at 121 (in defamation case, upholding exclusion of defense expert who would testify as to business ethics of the plaintiff); *St. Pierre*, 599 F.3d at 22-23 (in tax evasion case, upholding exclusion of opinion that defendant's accountants violated industry standards).

Accordingly, Belanger's opinions with respect to prudent lending standards should be precluded.

### B.    Belanger's Legal Conclusions are Inadmissible

Belanger's second opinion assumes—correctly—that Mr. Calk played no role in the underwriting of the Manafort loans, never saw the loan memoranda and had no clue about the errors discussed above.  Since those are the facts, Belanger falls back on a claim that Mr. Calk had a fiduciary duty of care as a member of the loan committee to learn about all of the things he did not in fact know.  Here, Belanger clearly oversteps his bounds and exceeds his expertise. First, if the law of fiduciary duty (whether in Illinois or some other jurisdiction, the government does not say) is relevant to this case, it is clearly for the Court, and not an expert, to instruct the jury on what the law is.  *See, e.g., Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (excluding a board of directors' opinion that the company's trustees occupied a fiduciary relationship to the corporation and its subscribers as an inadmissible "lay legal conclusion[]"); *Marx & Co.*, 550 F.2d at 509-10 ("It is not for witnesses to instruct the jury as to

---

this case on trial and therefore attempts to substitute for fact witnesses concerning what actually did happen."  (*Id.*).

applicable principles of law, but for the judge.").  Second, it is for the jury, not an expert, to

determine whether a defendant violated the law.  *See Hygh*, 961 F.2d at 363-64 (expert opinion

was inadmissible because it "merely [told] the jury what result to reach" (quoting Fed. R. Evid.

704 advisory committee's note)); *Marx & Co.*, 550 F.2d at 510 ("It is for the jury to evaluate the

facts in the light of the applicable rules of law.").  Third, we note that the only authority that

Belanger, a non-lawyer, cites for his outlandish view of the law is a PowerPoint presentation

given by a lawyer to a banking industry group in Maryland in 2012, which says no such thing

and does not even purport to talk about loan committees.  (Belanger Rep. at 20 nn.44-46 (citing

Lawrence M.F. Spaccasi, Esq., *Fiduciary Duties, Liability and Best Practices For Bank*

*Directors and Officers*, Maryland Bankers Association, June 2012,

https://www.luselaw.com/wp-content/uploads/2017/04/00165462.pdf) (Schoeman Decl. Ex. A)).

C.     **Belanger's Remaining Opinions Are Improper Government Summation Masquerading as Expert Opinion**

Belanger's third and fourth opinions are each a toxic combination of everything

that expert testimony should not be.  For the most part, the bases for these opinions are merely

assertions of facts about which he has no personal knowledge based on emails and documents

spoon-fed to him by the government.  One opinion adopts a narrative based on the government's

hopes about what it will prove Mr. Calk knew about Manafort's financial condition.  The other

incorporates an embellished narrative that Mr. Calk "actively lobbied Manafort and others" for a

position on the Trump campaign and "petitioned for high-level" positions within the Trump

administration.  If these facts are true, the government must try to prove them through witnesses

with personal knowledge and admissible documents.  The Federal Rules of Evidence do not

contemplate an expert whose "expertise" is reading emails and telling the jury what they say.  To

make this obviously improper use of expert testimony sound a little more "experty," Belanger

KL3 3315719.1

sprinkles these opinions with references to "prudent lenders," "ethical conduct" and the "duty of loyalty." But for the reasons set forth above, these are exactly the wrong standards to be put before the jury and certainly cannot transform Belanger's mish-mash of assumed facts into competent expert testimony that will be of assistance to the jury, as required by Federal Rule of Evidence 702.

### III. The Court Should Preclude Testimony by OCC Witnesses Catherine A. Aguirre and Blake J. Paulson

#### A. Catherine Aguirre

Aguirre is an OCC examiner who was involved in the June and November 2017 examinations of TFSB. She did not become involved with oversight of TFSB until after the bank closed on the Manafort loans. According to the government's notice, Aguirre may testify "regarding her review of the credit quality of [the Manafort loans], her full-scope examination of the Bank . . . and several other matters related to her supervision of the Bank."[16] (Aguirre Disclosure Ltr. at 1 (Schoeman Decl. Ex. B)). More specifically the government's notice indicates that it plans to elicit testimony from Aguirre regarding numerous matters, including:

- The OCC's decision to downgrade the Manafort loans in July 2017. (*Id.* at 1, 3).

- Aguirre's opinion that TFSB's Board and management team "did not provide a credible challenge to Calk," and Mr. Calk's relationship with the Board and management team was a factor in the OCC's decision to downgrade TFSB's Management component rating. (*Id.* at 3).

- Aguirre's opinion that Manafort's default on certain prior loans should have been included in the TFSB loan memoranda because they "bore on the Bank's risk analysis of the loan portfolio." (*Id.*).

---

[16] The government's notice states that it may call Aguirre as a fact witness or that she may "offer opinions based principally on her own perception of facts and events giving rise to her testimony." (Aguirre Disclosure Ltr. at 1 (Schoeman Decl. Ex. B)). However the government characterizes Aguirre's proposed testimony, it cannot elicit from her testimony that is irrelevant, confusing, and unfairly prejudicial. Whether the government calls it "fact" or "opinion" does not alter the analysis set forth below.

21

- Aguirre's opinion that making loan decisions without being guided by the loan memoranda was an "unsafe and unsound practice." (*Id.* at 4).

- Aguirre's opinion that insider abuse is an unsafe and unsound practice and is "very concerning" to the OCC even if it does not push a bank into failure or have a severe financial effect on a bank. (*Id.*).

- TFSB's decision to write off the value of the Manafort loans in [December] 2017, and her claim that the write-off "eliminated more than 100% of the bank's earnings for the quarter, or over 50% of the bank's earnings for the year." (*Id.*).

    1.    <u>Testimony about the OCC's Decision to Downgrade the Manafort Loans Is Irrelevant and Prejudicial</u>

Aguirre is planning to testify about the OCC's decision in July 2017 (*i.e.* long after the bank made the loans) to downgrade the Manafort loans from pass to pass/substandard. (Aguirre Disclosure Ltr. at 1, 3 (Schoeman Decl. Ex. B)). Testimony and any related evidence or argument about what the OCC knew and determined after the fact is not relevant and should be excluded under Federal Rule of Evidence 401 and/or 403. What matters in this case is Mr. Calk's subjective intent—i.e., whether he caused TFSB to make the loans to Manafort corruptly with the intention to be influenced or rewarded in connection with these loans. The OCC's opinion regarding these loans—rendered in July 2017, months after the loans were closed—does not make it any more likely that Mr. Calk violated the bank bribery statute in November 2016 and January 2017 when the Manafort loans were extended.

*Post hoc* conclusions by experts that are detached from what the defendant actually knew, as is the case here, are not relevant and should be excluded under Federal Rule of Evidence 401. For example, in *United States v. Martoma*, Judge Gardephe held that an expert's opinion in 2014 about whether the market for certain stock was inflated in 2008 was not probative of the defendant's state of mind. 993 F. Supp. 2d 452, 455-56 (S.D.N.Y. 2014). The court explained that the proffered expert testimony would tell the jury why investors should have

regarded the stock as "overheated" or inflated in 2008 but "that testimony would not assist the jury in determining whether [the defendant] himself believed that the stock was overheated at that time." *Id.* at 456.

The irrelevance of the testimony is underscored by the fact that the OCC's decision to downgrade the loans ostensibly had nothing to do with Mr. Calk's alleged receipt of a bribe, but rather with the TFSB underwriting department's analysis of the loan.  (*See* SDNY_00071023).  According to Aguirre, "[t]he most troubling aspect of the Bank's decision to extend credit to Manafort concerned the bank's flawed and materially inaccurate analysis of Manafort's financial situation."  (Aguirre Disclosure Ltr. at 3 (Schoeman Decl. Ex. B)).  The OCC's June 19, 2017 supervisory letter in fact claims that the underwriting department made the same error with respect to other loans, having nothing to do with Manafort.  (*See* SDNY_00071023 at SDNY_00071024 ("[W]e identified inaccurate financial analysis in five loan relationships ([REDACTED] *and Summerbreeze LLC/Manafort)* as the bank is not properly assessing cash flow from tax returns.")).

Hindsight opinions such as these are prejudicial because they risk misleading the jury and should therefore be excluded under Federal Rule of Evidence 403.  For example, the court in *Martoma* held that "[i]n addition to not being probative of Martoma's state of mind, [the expert's] proposed testimony [about the stock being inflated] presents a significant risk of confusing the jury."  *Martoma*, 993 F. Supp. 2d at 456.  The court explained that were the testimony on this point to be admitted, "the jury might well conclude that what matters here is whether—in January 2014—it can be determined that the price of [the] stock was inflated in July 2008.  The issue as to state of mind, however, is whether Martoma caused [certain] stock to be sold based on the [material non-public] information he allegedly obtained" or "whether he sold it

KL3 3315719.1

based on his own research, on others' analyses that the stock was overpriced, or for some other reason." *Id.* at 456-57.  If Aguirre is permitted to testify about the OCC's conclusions, there is a very substantial risk that the jury will substitute what the OCC believed in July 2017 for what Mr. Calk knew at the time the Bank extended the loans to Manafort.  This testimony and any related evidence should accordingly be excluded.

       2.     Testimony Regarding the OCC's Opinion of TFSB's Loan Practices Is Prejudicial

Aguirre is planning to testify about the OCC's opinion of TFSB's loan practices, including the OCC's position that making a loan decision without being guided by the content of the loan presentation is an unsafe and unsound practice.  (Aguirre Disclosure Ltr. at 3-4 (Schoeman Decl. Ex. B)).  As set forth above in connection with Belanger's proposed testimony, TFSB's loan practices are not at issue in this case, and the OCC's views about them have no probative value.  If the jury is presented with Aguirre's opinions as to TFSB's violations of regulatory or other industry standards, there is a substantial risk that they will be confused or misled into thinking Mr. Calk can be convicted of bank bribery for these violations.  *See United States v. Riddle*, 103 F.3d 423, 431 (5th Cir. 1997) (holding that district court abused its discretion in allowing government to admit "extensive evidence about the OCC's appraisal of [the bank's] general health and its failure to comply with regulations" and explaining that the OCC reports "put [the defendant] at the center of a spectacular bank failure" but the defendant "was not on trial for being an ineffective or even a corrupt banker.  He was on trial for using his position as a [bank] officer to convince the [bank] board to purchase participations . . . that would help him personally and disregarding his duty to disclose his personal interest in the deal"); *see also Mendlowitz*, 2019 WL 6977120, at *7 (excluding expert testimony on industry practices where "the risk of prejudice was high since there was a likelihood of jury confusion

that the standard against which [the defendant's] conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute"); *United States v. Bilotto*, No. SA-04-cr-343-OG, 2005 WL 5978665, at *2 (W.D. Tex. Sept. 27, 2005) (in a federal mail fraud case, excluding the defense expert's opinions about whether the policies defendant obtained were "valid" or legally enforceable" under Texas law as they would "simply confuse the jury" about the proper legal standard). This risk is particularly acute where, as here, the jury would be told by a government official that TFSB's conduct violated regulatory standards.

Accordingly, the Court should preclude Aguirre's proffered opinion testimony on TFSB's lending practices in its entirety.

3.      Testimony about the OCC's View that "Insider Abuse" Is an Unsound Practice Is Irrelevant and Prejudicial

Aguirre plans to testify about the OCC's rules regarding a bank's insider activities. (Aguirre Disclosure Ltr. at 4 (Schoeman Decl. Ex. B)). The proffered testimony, which is wholly unconnected to TFSB, should be excluded in its entirety under Federal Rules of Evidence 401 and/or 403 as it is irrelevant and prejudicial.

OCC rules regarding insider activities and the fact that insider abuse is "very concerning to the OCC" are not relevant to Mr. Calk's intent or any other fact of consequence in the case. (*See id.*) This testimony will only confuse the jury as to the core issue it must decide, *i.e.*, whether Mr. Calk violated the bank bribery statute. As previously discussed, courts routinely exclude expert opinions that speak to irrelevant professional standards or practices on the grounds that admission of this evidence is prejudicial and risks juror confusion. *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *7; *St. Pierre*, 599 F.3d at 22-23; *DiBella*, 403 F.3d at 121. Aguirre's proffered testimony should therefore be excluded as both irrelevant and prejudicial.

25

4.     Testimony Regarding the Loss to the Bank From the Manafort Loans Is Irrelevant and Highly Misleading

Aguirre is planning to testify about the loss to the bank and its holding company from the write-off of the Manafort loans.  (Aguirre Disclosure Ltr. at 4 (Schoeman Decl. Ex. B)). This testimony, too, is inadmissible under Rules 401 and 403.  Courts have consistently held that the ultimate default of a loan has no bearing on whether a loan should have been made in the first instance.  *See, e.g.*, *United States v. Manibusan*, 529 F. App'x 818, 820 (9th Cir. 2013) (holding that whether defendant defaulted on the loan was not relevant to whether defendant committed bank fraud); *United States v. Payne*, 750 F.2d 844, 857 n.14 (11th Cir. 1985) (rejecting government's argument that the borrowers were not creditworthy borrowers based on the fact that they "eventually ended up in default" and holding that "the use of hindsight is inappropriate in determining whether or not the making of a loan constitutes misapplication of bank funds"); *see also MASTR Adjustable Rate Mortg. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665, at *10 (S.D.N.Y. Jan. 9, 2015) ("A post-closing default on a loan does not prove a breach of representation or warranty at the time of closing.  Hindsight is not the standard.").

The fact that TFSB wrote off the Manafort loans, almost a full year after they were made, does not make it any more or less likely that Mr. Calk accepted a bribe from Manafort.  How the loan turned out is not relevant to what Mr. Calk believed regarding the quality of the loan in the first place.  This is particularly the case here, where the loans were written off as a consequence of the government's indictment of Manafort and seizure of the collateral securing the loans.  (Indictment ¶ 28).  If, however, the Court were to allow evidence of the write-off, fairness would require that the defense be permitted to demonstrate that the harm to the bank is entirely due to the government's unreasonable seizure of the collateral, which

26

the bank is vigorously contesting in litigation.[17]   A mini-trial on this issue would substantially

prolong and complicate the trial.  *See, e.g., United States v. Zhong*, No. 16-cr-614 (DLI), 2018

WL 6186474, at *10 (E.D.N.Y. Nov. 26, 2018) (holding that "if [d]efendant were to introduce

evidence of PRC law, the government may respond, creating a diversionary 'trial within a trial'

as to whether Defendant violated PRC law, leading to possible confusion and undue delay").

Accordingly, Aguirre's proposed opinion testimony should be precluded.

### B.   Blake Paulson

During the relevant period, Paulson was Deputy Comptroller for the OCC's

Central District in Chicago.  The government's notice states that Paulson will testify regarding

the "OCC's regulatory and bank supervision framework as it pertains to the facts of this case and

the supervision of the Bank."[18]   (Paulson Disclosure Ltr. at 1 (Schoeman Decl. Ex. C)).  Among

other things, Paulson's anticipated testimony includes the following matters:

- The OCC's decision to downgrade TFSB's Management component rating in December 2017, including Paulson's view that "process failures" involving the Manafort loans were a relatively minor contributing factor to that decision.  (*Id.* at 3).

- The OCC's rating system for loans and its decision in July 2017 to downgrade the Manafort loans.  (*Id.* at 5).

- A long list of Paulson's opinions regarding the role of the OCC and its importance in maintaining the integrity of the U.S. financial system.  For example, the government intends to elicit from Paulson his opinion that the "OCC's system of regulation benefits the entire financial system, and accordingly the entire economy."  (*Id.* at 4).

---

[17] As previously noted, TFSB has asserted its rights to the collateral as a third-party lender and expects to recover on those loans, which were substantially over-collateralized when they were made (*see* Indictment ¶ 24).

[18] The notice states that the government may call Paulson as a fact witness or may "seek to qualify Mr. Paulson as an expert and elicit expert testimony regarding the OCC's regulatory and bank supervision framework." (Paulson Disclosure Ltr. at 1 (Schoeman Decl. Ex. C)).  As with Aguirre, whether the government's characterizes Paulson as a "fact" or "expert" witness, or both, his proposed testimony is irrelevant, unfairly prejudicial, confusing, and otherwise inadmissible for the reasons set forth below.

- Paulson's opinion that if a bank was writing loan presentations but not actually using them to guide its loan approval process, that would be a serious concern for the OCC and would likely be an unsafe and unsound practice. (*Id.* at 6).

- A long list of Paulson's opinions on "insider-related" loans, including that they can create undue risk and harm to the banking system, and his opinion that "bankers understand that this is one of the most important areas of compliance" and "very important for them to understand." (*Id.* at 7).

- Paulson's views regarding what is permissible under the banking regulations. For example, the government plans to elicit from Paulson that it "is not permissible for someone involved in making a loan to accept a thing of value in exchange for the loan," and that "a bank officer or director accepting a thing of value from a borrower in exchange for a loan would violate 12 C.F.R. 160.130." (*Id.*).

1. Testimony about the OCC's December 2017 Decision to Downgrade TFSB's Management Component Rating Is Irrelevant and Prejudicial

Paulson plans to testify about the OCC's management rating system for banks, the OCC's downgrade of TFSB's management component rating, and that the process failures involving the Manafort loans were a relatively minor contributing factor in that downgrade. (Paulson Disclosure Ltr. at 3 (Schoeman Decl. Ex. C). The proffered testimony is irrelevant and prejudicial and should be excluded under Federal Rules of Evidence 401 and/or 403.

The OCC's decision to downgrade the bank's management component rating occurred nearly one year after the Manafort loans were extended. Accordingly, this evidence tells the jury nothing about whether, at the time the loans were made, Mr. Calk had corrupt intent and intended to be influenced or rewarded in connection with the loans. Moreover, according to Paulson's own proposed testimony, the OCC downgrade had only a tenuous connection to the Manafort loans. (*See* Paulson Disclosure Ltr. at 3 ("[T]he process failures involving [the Manafort] loans were a relatively minor contributing factor" to the OCC's decision to downgrade the management component rating) (Schoeman Decl. Ex. C)). Further, because the downgrade is

irrelevant, there is no reason for any witness, expert or otherwise, to testify about the OCC's management rating system or its purpose.

Introducing evidence of the downgrade serves only one purpose—to improperly suggest that because the OCC found that there were process failures at the bank, Mr. Calk must have had corrupt intent and intended to be influenced or rewarded in connection with the Manafort loans. That argument is specious and therefore the evidence should be excluded under Rule 403. S*ee, e.g.*, *Riddle*, 103 F.3d at 431 (excluding OCC reports relating to the general health of the bank where an individual bank officer was charged with misapplication of bank funds).

### 2. Testimony about the OCC's Rating System for Loans Is Irrelevant

Paulson plans to testify about the OCC's system for rating loans. (Paulson Disclosure Ltr. at 5 (Schoeman Decl. Ex. C)). As discussed *supra* at pages 22-24 with respect to Aguirre, the fact that the OCC downgraded the Manafort loans is irrelevant to the question in this case —i.e. whether Mr. Calk had corrupt intent and intended to be influenced or rewarded in connection with the Manafort loans. Testimony on this issue would be a waste of time and confuse the jury. It should therefore be excluded pursuant to Federal Rules of Evidence 401 and/or 403.

### 3. Testimony about the Importance of the OCC and Regulation to the Banking System Is Irrelevant and Will Waste the Jury's Time

Paulson plans to offer a number of opinions regarding the benefits of the OCC's regulatory and supervision framework. (Paulson Disclosure Ltr. at 3-4 (Schoeman Decl. Ex. C)). Evidence of the purported benefits of the OCC's role in the banking system does not bear on any issue in this case. This testimony is simply designed to bolster the government's improper argument that Mr. Calk and TFSB violated banking regulations, and accordingly must have

taken a bribe from Manafort.  The proposed testimony is irrelevant, prejudicial to Mr. Calk, and will waste the jury's time.  It should therefore be excluded under Federal Rules of Evidence 401 and/or 403.

<blockquote>

4.   Testimony that Loan Presentations Should Guide a Bank's Approval Process Is Irrelevant and Prejudicial

</blockquote>

Paulson plans to testify that if a bank was creating loan presentations but not actually using them to guide its loan approval process that would be a serious concern for the OCC and would likely be an unsafe and unsound practice.  (Paulson Disclosure Ltr. at 6 (Schoeman Decl. Ex. C)).

This testimony is, again, irrelevant to the issues in this case.  The fact that the bank may have engaged in a practice that was of "serious concern" to the OCC makes it no more or less likely that Mr. Calk accepted a bribe from Manafort, especially because Paulson's proposed testimony concerns a general practice at the bank and is not specific to the Manafort loans.  *See supra* at 24-25.   Any conceivable probative value is outweighed by the undue prejudice to the defendant.  *See Riddle*, 103 F.3d at 431 (holding that OCC reports about the general health of the bank and testimony about them "were of little probative value . . . in comparison to the danger of prejudicing, confusing, or misleading the jury").  This testimony should therefore be excluded under Federal Rules of Evidence 401 and/or 403.

<blockquote>

5.   Testimony about the OCC's Views Regarding Insider Activity Is Irrelevant

</blockquote>

Like Aguirre, Paulson plans to testify about the OCC's views regarding insider activity.  (Paulson Disclosure Ltr. at 6-7 (Schoeman Decl. Ex. C)).  Paulson's proposed testimony is unconnected to the Manafort loans, or even TFSB, and sheds no light on whether Mr. Calk accepted a bribe from Manafort.  As discussed above, evidence of civil regulatory violations or unethical conduct should be excluded where, as here, it risks suggesting to a jury

that a violation of a civil regulation means the defendant violated the criminal statute.  *See Riddle*, 103 F.3d at 431 (finding that it was improper to provide the jury with evidence of regulatory violations).

Further, Paulson's proposed testimony should be excluded because it contains baseless speculation that will be highly prejudicial to Mr. Calk.  For example, the government proposes that Paulson be permitted to opine that "bankers understand that this in one of the most important areas of compliance" and "very important for them to understand."  (Paulson Disclosure Ltr. at 7 (Schoeman Decl. Ex. C)).  This is an inappropriate effort to substitute what Paulson postulates Mr. Calk *should have know*n for what he actually knew.  And even if the government could prove he did have this understanding, it does not make it any more or less likely that he accepted a bribe from Manafort.  This testimony should therefore be excluded under Federal Rules of Evidence 401 and/or 403.

### 6.    Testimony about What the Law Permits Is Improper

Finally, Paulson plans to testify that "[a] bank officer or director accepting a thing of value from a borrower in exchange for a loan would violate 12 C.F.R. 160.130" and "[a] Bank Bribery Act violation is viewed as a form of insider abuse."  (Paulson Disclosure Ltr. at 7 (Schoeman Decl. Ex. C)).

For the reasons previously discussed, whether the bank or Mr. Calk violated OCC regulations is irrelevant and will prejudice the jury.  *See supra* pages 24-25.  Also, it is improper under Federal Rule of Evidence 702 for an expert to tell the jury what the law is.  *See United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." (internal quotation marks omitted)); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Expert testimony may not usurp the province of the judge to instruct on the law.").

31

Accordingly, Paulson's opinion testimony should be precluded.

## IV.   The Court Should Preclude Testimony by the Government's Proposed Expert Jeff McCutcheon

The government seeks to call Jeff McCutcheon, a retained expert from a management consulting firm to testify as to the value of (i) "an appointment to the Trump presidential campaign's Economic Advisory Council" and (ii) "a position as Secretary of the Army or Undersecretary of the Army." (McCutcheon Disclosure Ltr. at 2 (Schoeman Decl. Ex. D)). McCutcheon's opinions are plainly inadmissible under Federal Rule of Evidence 702. The opinions are based on insufficient facts and data and do not "fit" the facts or law of this case. Moreover, McCutcheon's methods are, at best, unreliable and, more often than not, totally illusory.

### A.   McCutcheon's Valuation of the Economic Advisory Council Position Is Inadmissible

McCutcheon's methods for quantifying the value of a position on the Economic Advisory Council are a mystery wrapped in an enigma. He offers no data and no computations. He concedes that the position "does not have any direct monetary value" but then assigns it a monetary value of "well in excess of $1,000." (McCutcheon Rep. at 8 (Schoeman Decl. Ex. D)).

In one line of argument, he contends that the "value of social status and affiliation can be determined by the inferred purchase price—what someone would pay to acquire them." (*Id.*). By that reasoning, the value of the NEAC position must be zero, since there is no evidence that any member of the council paid even a penny to obtain their position. But McCutcheon instead veers in an unexpected direction, comparing work on a campaign to joining a country club or a charity board: "In comparison to the premiums paid for country clubs and for appointment to charitable boards, the appointment to candidate Trump's Economic Advisory

Council would alone seem more valuable than $1,000." (*Id.*).  If there is logic or method to that statement, we cannot find it.  And there is no data to support it.

In another argument, McCutcheon contends that "[t]he value of the unpaid role can be defined by the time and expense incurred by the appointees for their participation." (*Id.*). On its face, this is a highly dubious approach to valuing public service and McCutcheon provides no support for it.  Everyone from a lawyer serving on a bar committee to a little league coach would dispute it.  But even if the premise were correct, McCutcheon fails to apply it to any facts. He does not even claim to know what time or expense Mr. Calk incurred, if any, for his participation on the council.  Thus, his claim that "[u]sing simple math" the value was in excess of $1,000, (*id.*), is only half right: it is simple but it is not math (or anything else that would qualify as expert opinion).

## B.   McCutcheon's Opinions About the Value of the Secretary and Undersecretary Positions Are Inadmissible

McCutcheon's opinions about the value of the Secretary and Undersecretary positions are unhelpful and methodologically unsound because they attempt to quantify the value of something Mr. Calk was not offered and did not receive: a position in the Trump administration.  The "thing of value" Mr. Calk allegedly received from Manafort was not the position itself.  Rather, Mr. Calk is charged with receiving Manafort's "recommend[ation] . . . to the Presidential Transition Team for an administration position" and "the opportunity to be formally interviewed for the position of Under Secretary of the Army," a position for which he "was not ultimately hired."  (Indictment ¶ 9).  Accordingly, the relevant "thing of value" in this case something far less than the position itself.  It was simply assistance applying for the position.  Manafort, the disgraced former campaign manager, had no position on the transition team and no ability to offer Mr. Calk any position in the Trump administration.  McCutcheon's

testimony therefore does not fit the facts of this case.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotation marks omitted); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,* 209 F. Supp. 3d 612, 642 (S.D.N.Y. 2016) (excluding expert opinion that was "a mismatch for the facts of th[e] case[]").

Even if McCutcheon's conceptual error—valuing the wrong thing—could be overcome, his opinion about the value of the job itself would be inadmissible because his methodology is totally lacking in rigor.  McCutcheon attempts to value an appointment as Secretary or Undersecretary of the Army based on the salaries earned by former occupants of those offices after leaving government service.  (McCutcheon Rep. at 4 (Schoeman Decl. Ex. D)).  On this basis, he concludes that the position would be worth approximately $100,000 in annual future earnings, although he does not explain how he arrived at that number.  (*Id.* at 9). The putative support for his claim can be found in two tables showing the "[e]stimated [c]ompensation" and positions held for eight individuals who served either as Secretary or Undersecretary of the Army, both before and after their service in those roles.[19]  (*Id.* at 5). Because so many of the compensation entries are listed as "[u]nknown," the table only contains complete information (*i.e.*, compensation for positions held both pre- and post- government service) for <u>two</u> of these eight individuals.  (*Id.*).  Such a small sample size is inherently unreliable for this kind of quantitative analysis.  *See Kogut v. Cty. of Nassau*, 894 F. Supp. 2d 230, 240-41 (E.D.N.Y. 2012) (rejecting expert's reliance on studies with overly small sample sizes).

---

[19] Eric Fanning and Peter Geren held both the Secretary and Undersecretary positions and are both listed twice.  (*Id.* at 5).

McCutcheon's analysis is also rife with other logical and methodological problems.  For example, Mr. Calk, unlike any of members of the tiny dataset, was already Chairman and CEO of his own highly profitable bank.  A majority of the prior officeholders came from other public service positions including the only two people for whom McCutcheon found both pre- and post-service salary data: Eric Fanning, a former Department of Defense staffer; and Peter Geren, a former congressman.  (McCutcheon Rep. at 5 (Schoeman Decl. Ex. D)).  The fact that these individuals earned more money in the private sector than they did in their prior government jobs tells us nothing at all about Mr. Calk's future earning potential.  In fact, the absence of any effort to control for the influence of other factors on the (dimly) observed data (2 people) renders the entire exercise worthless and the resulting opinion inadmissible.  *See New York v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 790 (S.D.N.Y. 2019) (rejecting expert methodology that selected a small data set using a method that lacked "the sort of rigorous analysis or carefully considered methodology that courts would normally expect of an expert").

McCutcheon also offers untethered speculation that Mr. Calk could choose to parlay the Secretary or Undersecretary position into a position as a lobbyist or work at a think tank, but gives no indication as to whether either position would be more lucrative to Mr. Calk than his position as the CEO and majority owner of his own bank.  (*See* McCutcheon Rep. at 6 (Schoeman Decl. Ex. D)).  Moreover, he notes that Mr. Calk would obtain social status, networking with corporate and government leaders, "responsibility in addressing global challenges," and that, "like knighthood, protocol dictates" that former Secretaries of the Army be addressed in public as "Mr. Secretary," (*id.* at 7).  But again, McCutcheon fails to explain how

any of this would actually improve Mr. Calk's earnings potential and there is no data to support his musings.

This Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Indeed, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*  "[W]hen an expert opinion is based on . . . a methodology" that is "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *see also Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 328 (S.D.N.Y. 2009) (excluding opinion because it was "hard to determine what methodology or data, if any, [the expert] use[d] to form his conclusions").

### C.    McCutcheon's Opinions Regarding the Value to TFSB of Mr. Calk's Appointments Are Unreliable and Do Not Fit the Law

McCutcheon also proposes to value the volunteer campaign position and administration position (neither offered nor obtained) by looking to the value Mr. Calk's appointments would have for TFSB itself.  These opinions are factually and methodologically unsound and do not conform to the law of bank bribery.

A bank executive who agrees to cause the bank to extend a loan in return for a benefit *to the bank* does not commit bank bribery.  It is the job of a banker to extend loans that benefit the bank.  Indeed, the Justice Department's Criminal Resource Manual section on 18 U.S.C. § 215 advises prosecutors that the bribe "can be for the benefit of the official or of any other persons or entity (*other than the financial institution*)."  U.S. Dep't of Justice, *Crim. Resource Manual § 831*, Updated Jan. 21, 2020, https://www.justice.gov/archives/jm/criminal-resource-manual-831-corrupt-bank-officer-18-usc-215a2 (emphasis added).  To the extent

KL3 3315719.1

McCutcheon is valuing the benefit to the bank of Mr. Calk's public service, he is not valuing the "bribe," which is what he is supposed to be doing.

Even if the benefit-to-the-bank concept had any relevance, McCutcheon's methodology would not pass muster.  He does not explain how he determines the monetary value to TFSB of such abstract benefits as "brand and marketing enhancement," (McCutcheon Rep. at 9 (Schoeman Decl. Ex. D)), "increased publicity surrounding the inferred caliber of Bank management," (*id.* at 6), or "enhanced . . . perceived competence" of the bank, (*id.* at 8).  Nor does McCutcheon explain how he determined what portion, if any, of the economic benefit to the bank would flow to Mr. Calk personally.  As such, his assertion that value to the bank equates to over $1,000 in value to Mr. Calk is connected to the facts of the case only by McCutcheon's *ipse dixit*, as is inadmissible under Rule 702.  *See Joiner*, 522 U.S. at 146 (holding a court shall not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert").

Accordingly, McCutcheon's proposed testimony fails to qualify as expert opinion and should be precluded.

KL3 3315719.1

## CONCLUSION

For the foregoing reasons, Mr. Calk respectfully requests that the Court preclude the government's proposed expert testimony.

Dated:   New York, New York           Respectfully submitted,
         October 23, 2020

                                      KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                      By: */s/ Paul H. Schoeman*

                                          Paul H. Schoeman
                                          Darren A. LaVerne
                                          1177 Avenue of the Americas
                                          New York, NY 10036
                                          Telephone: 212.715.9100

                                      LOEB & LOEB LLP

                                          Jeremy Margolis
                                          Joseph J. Duffy
                                          321 N. Clark Street
                                          Chicago, IL 60654
                                          Telephone: 312.464.3100

                                      *Attorneys for Defendant Stephen M. Calk*

KL3 3315719.1