UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
          -v.-                            :          19 Cr. 366 (LGS)
                                          :
STEPHEN M. CALK,                          :
                                          :
                    Defendant.            :
                                          :
--------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF THE
## GOVERNMENT'S MOTIONS *IN LIMINE*


                              AUDREY STRAUSS
                              Acting United States Attorney
                              One St. Andrew's Plaza
                              New York, New York 10007

Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................. 4

I.   THE DEFENDANT'S EXPERT SHOULD BE EXCLUDED BECAUSE HE LACKS
     REQUISITE EXPERTISE, HIS DISCLOSURE IS INADEQUATE, AND HIS
     OPINIONS ARE IRRELEVANT, FLAWED, AND UNRELIABLE .......................... 4

     A.   Factual Background ..................................................................................... 4

     B.   Applicable Law ......................................................................................... 10

          1.   Federal Rule of Criminal Procedure 16(b)(1)(C) ..................................... 10
          2.   Rule 702 ................................................................................................. 11
          3.   Rules 401-403 ........................................................................................ 12

     C.   Discussion ................................................................................................ 13

          1.   Dr. Carron Is Not Qualified to Testify as an Expert in the Underwriting
               and Origination of Commercial Loans ..................................................... 13
          2.   The Defendant's Expert Disclosure Is Woefully Inadequate .................. 16
          3.   Dr. Carron's Testimony Should Be Excluded Because His Opinions Are
               Irrelevant, Flawed, and Confusing to the Jury ......................................... 21

II.  THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE
     QUALITY OF THE LOANS, OR FRAUD AGAINST CALK, ARE DEFENSES TO
     THE CHARGED BRIBERY OFFENSE ............................................................... 31

     A.   Applicable Law ......................................................................................... 32

     B.   Discussion ................................................................................................ 34

III. EVIDENCE OR ARGUMENT ABOUT THE DEFENDANT'S PRIOR
     COMMISSION OF "GOOD ACTS" SHOULD BE PRECLUDED .......................... 37

IV.  THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING
     EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR
     SYMPATHY .................................................................................................... 38

V.   EVIDENCE OR ARGUMENT THAT THE CHARGES AGAINST THE
     DEFENDANT ARE POLITICALLY OR OTHERWISE IMPROPERLY

**MOTIVATED SHOULD BE PRECLUDED** ............................................................... **39**

**CONCLUSION** .......................................................................................................... **41**

## **TABLE OF AUTHORITIES**

### **Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .................................. 12

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)........................................... 27, 29

*Bourjaily v. United States*, 483 U.S. 171 (1987) ......................................................... 11

*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) ......................... 32, 33

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)........................................... 11, 13, 21

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................... 11, 27

*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) ............................................ 11, 12

*McDonnell v. United States*, 136 S. Ct. 2355 (2016).................................................... 32

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ............................................ 11, 14

*Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016)................................................. 14

*Rogers v. United States*, 422 U.S. 35 (1975) ........................................................... 38

*Shannon v. United States*, 512 U.S. 573 (1994)........................................................ 38

*Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202 (2d Cir.1984) ............................... 27

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................................... 33

*United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002)................................................... 32

*United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008)38

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) ........................................ 37

*United States v. Chi Ping Patrick Ho*, 17 Cr. 779 (LAP) ........................................... 25

*United States v. Concessi*, 38 Fed. App'x 866 (4th Cir.2002).................................... 17

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) ............................................. 21

*United States v. Del Rosario*, No. S1 12 Cr. 81, 2012 WL 2354245 (S.D.N.Y. June 14, 2012).. 39

*United States v. Denny*, 939 F.2d 1449 (10th Cir. 1991)........................................... 33

*United States v. Diallo*, 40 F.3d 32 (2d Cir. 1994) .................................................. 13

*United States v. Duvall*, 272 F.3d 825 (7th Cir. 2001) ............................................. 19

*United States v. Fazio*, 770 F.3d 160 (2d Cir. 2014) ............................................... 37

*United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012).... 37

*United States v. Ferguson*, 06 Cr. 137 (CFD), 2007 WL 4539646 (D. Conn. Dec. 14, 2007)10, 17

*United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .... 34

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) ........................................... 38

*United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) .............................................................. 33

*United States v. Lupton*, No. 07 Cr. 219, 2008 WL 4603336 (E.D. Wis. Oct. 16, 2008)............ 39

*United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) 10, 17

*United States v. Mann*, 161 F.3d 840 (5th Cir. 1998) .................................................................. 33

*United States v. Manton*, 107 F.2d 834 (2d Cir. 1939) ................................................................ 32

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) ........................................................ 33

*United States v. McElroy*, 910 F.2d 1016 (2d Cir. 1990) ................................................. 22, 23, 34

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ................................................. 23

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ...................................................... 34

*United States v. Orenuga*, 430 F.3d 1158 (D.C. Cir. 2005) ........................................................ 33

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) ........................................................... 38

*United States v. Quinn*, 359 F.3d 666 (4th Cir. 2004) ................................................................. 33

*United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530 (S.D.N.Y. Feb. 25, 2011) ........................................................................................................................................ 10, 20

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013) .............................................. 39, 40

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) ............................................................... 40

*United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015). 37

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) .................................................................. 32

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ............................................................... 32

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) .................................................................. 37

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) (summary order) ............................... 32

*United States v. Stewart*, No. 03 Cr. 717, 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .............. 40

*United States v. Sturman*, No. 96 Cr. 318, 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998) ........... 17

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983) ............................................. 40

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ............................................................... 40

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) ................................................................ 16

*United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015)16, 17, 18

*United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013).. 17, 19, 21

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ................................................................... 11

iv

**<u>Statutes</u>**

18 U.S.C. § 215.................................................................................................... passim

**<u>Rules</u>**

Fed. R. Crim. P. 16 ............................................................................................ passim

Fed. R. Crim. P. 16 adv. comm. n.......................................................................... 21

Fed. R. Crim. P. 16(b)(1)(C)................................................................... 10, 16, 17

Fed. R. Evid. 401 ...................................................................................................... 12

Fed. R. Evid. 403 ................................................................................................. 12, 13

Fed. R. Evid. 404(a)(2)(A)..................................................................................... 37

Fed. R. Evid. 405(a)................................................................................................. 37

## INTRODUCTION

The Government respectfully submits this memorandum of law in support of its motions *in limine*.

*First*, the Government seeks to preclude the testimony of Dr. Andrew Carron, whom the defendant intends to call as an expert witness concerning the loans that defendant Stephen M. Calk caused The Federal Savings Bank ("TFSB" or the "Bank") to extend to Paul J. Manafort, Jr. (the "Manafort loans"). As set forth below, Carron's testimony should be precluded for multiple reasons. He is an expert in mortgage securitization, not bank lending, and he lacks the requisite qualifications to rebut the opinions of the Government's expert (Joseph Belanger) or to offer any opinions regarding the underwriting and origination of the Manafort loans. Further, the defendant's expert notice falls far short of the requirements of Rule 16, leaving the Government and its witnesses no choice but to guess as to the nature, scope, and bases of Carron's purported opinions. In any event, setting aside Carron's inadequate qualifications and disclosure, his opinions should be excluded because they opine on the quality of the Manafort loans in the abstract, untethered to any analysis of the defendant's own actions or mental state. (The Government's expert, by contrast, grounds his opinions in the defendant's violations of duties imposed on him by regulatory and industry standards and Bank policy.) Moreover, even on their own terms, Carron's opinions are fatally flawed and unreliable, relying on the type of "apples-and-oranges" comparisons that have been held to justify preclusion.

*Second*, and consistent with the motion described above, the Government seeks to limit evidence and argument regarding the quality of the Manafort loans—and Calk's beliefs regarding their quality—to the one permissible purpose for such evidence: to assess whether Calk acted with corrupt intent. In particular, the Government seeks to preclude any evidence or

argument suggesting that the defendant's guilt or innocence depends on whether the loans were sound, or on whether the defendant negligently or due to being defrauded by Manafort believed they were sound. Although evidence of the quality of the Manafort loans (or lack thereof) is relevant insofar as it bears on the defendant's mental state, the law is clear that a bank official violates Section 215 if he corruptly solicits a thing of value intending to be influenced in his official actions *regardless* of whether he would have, and should have, taken the same actions in the absence of any expected personal benefit. The defendant should be precluded from suggesting the contrary, and should be precluded from attempting to turn this trial into a mini-trial over whether he was defrauded by Manafort.

*Finally*, the Government seeks to preclude certain evidence or argument that is wholly irrelevant to the issues at trial, and/or for which any conceivable probative value is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial, and/or prejudice to the Government. Specifically, the Government moves to preclude evidence or argument concerning Calk's alleged prior commission of "good acts"; irrelevant facts intended to elicit juror sympathy; and allegations that the charge against him is politically or otherwise improperly motivated.

## BACKGROUND

This case concerns the defendant's corrupt abuse of his position as then-CEO and chairman of TFSB, a federally-insured savings association, and its holding company National Bancorp Holdings, Inc. (the "Holding Company"), to solicit personal benefits for himself in exchange for approving millions of dollars in loans from the Bank and the Holding Company.

From approximately July 2016 to approximately January 2017, the defendant worked to extend $16 million in financing to Paul Manafort—a political consultant who for a portion of this

2

time period was chairman of the Donald J. Trump presidential campaign and who, after formally leaving the campaign, remained influential with the campaign and, later, presidential transition team—in exchange for Manafort's assistance with the defendant's efforts to secure prestigious high-level positions on the campaign and in the administration.  For example, while Manafort's loans were pending approval, the defendant provided Manafort with a ranked list of the governmental positions he desired, which started with Secretary of the Treasury, and was followed by Deputy Secretary of the Treasury, Secretary of Commerce, and Secretary of Defense, as well as 19 ambassadorships similarly ranked and starting with the United Kingdom, France, Germany, and Italy.  Manafort appointed the defendant to the Trump campaign's economic advisory committee and ultimately recommended the defendant for a position in the administration, specifically, Under Secretary of the Army.[1]

The defendant was closely and personally involved in extending the $16 million in loans during the exact time period that he was soliciting Manafort's assistance.  He caused the Bank to approve the loans despite significant red flags regarding Manafort's ability to repay them, such as his deteriorating financial condition and history of defaulting on prior loans.  The defendant also used his position as chairman of the Holding Company to cause the Holding Company to purchase a portion of the Manafort loans.  This maneuver—which the Holding Company had never before engaged in—allowed the Bank to extend loans that would have otherwise exceeded its statutory lending limit to a single borrower.  As such, this transaction did nothing to mitigate the risk to the enterprise as a whole posed by its large exposure to Manafort.  The Manafort loans

---

[1] Although Calk was interviewed for the position as a result of Manafort's efforts, he was not ultimately selected.

ultimately ended in default following Manafort's arrest, and the Bank sustained a multimillion dollar loss which it is currently attempting to recoup.

## ARGUMENT

**I.    THE DEFENDANT'S EXPERT SHOULD BE EXCLUDED BECAUSE HE LACKS REQUISITE EXPERTISE, HIS DISCLOSURE IS INADEQUATE, AND HIS OPINIONS ARE IRRELEVANT, FLAWED, AND UNRELIABLE**

### A.    Factual Background

The Indictment alleges that the defendant "abused his authority as the chairman and chief executive officer of a federally-insured bank to cause $16 million in loans to be issued to a borrower whom [the defendant] expected would, in return, assist [the defendant] in obtaining a senior position with an incoming presidential administration," in violation of 18 U.S.C. § 215(a)(2).  (Ind. ¶ 1.)  At trial, the Government expects that many key facts will not be in dispute: for instance, there cannot be any dispute that the defendant played an active role in causing the Bank and the Holding Company to approve the Manafort loans; nor can there be any dispute that, during the same time period, he was seeking Manafort's assistance in obtaining a high-level administration position.  The key issue at trial is likely to be whether the defendant acted with the requisite intent, that is, "corruptly."

Among other evidence that the Government expects to introduce at trial to prove that the defendant acted corruptly, the Government expects to offer evidence that, in approving the $16 million in loans to Manafort, the defendant violated various duties he owed the Bank under industry and regulatory standards and Bank policy.  As set forth below, such evidence is relevant and admissible because it will assist the jury in determining whether the defendant acted corruptly.  One witness whose testimony will be relevant to proving the defendant's corrupt mental state is Joseph Belanger of The Brattle Group, whom the Government presently expects

to call as an expert witness. Belanger, an industry veteran with more than three decades of bank lending experience, will describe the various regulatory and industry standards, as well as Bank policies, that imposed duties on the defendant in connection with his evaluation of the Manafort loans. Belanger will explain the multiple ways in which the defendant violated those duties, from which the jury will be able to draw critical inferences regarding the defendant's mental state.

On June 1, 2020, the Government provided the defendant with a detailed, 49-page notice describing Belanger's qualifications, analysis, opinions, and expected testimony along with a 9-page curriculum vitae ("CV") further detailing his qualifications and experience. (*See* Exhibit 1, attached hereto.) With respect to Belanger's qualifications, among other things, the notice indicated that he has worked in bank lending for approximately 30 years, including working for twelve years (1997 to 2009) as a Senior Vice President and Division Head at State Street Bank and Trust Company, including (from at least 2002) directing the company's commercial loan and related functions worldwide. (Ex. 1 at Ex. A at 2-3, 37, 42.) He thus has extensive expertise in precisely the subject matter at issue in this case: the regulatory and industry standards applicable to underwriting and originating commercial loans. Belanger's opinions are as follows, in sum:

- The Manafort loans,[2] which the defendant authorized as chair of the loan committee, were not consistent with regulatory and industry-standard lending practices, or with the Bank's lending policies. The loans posed inordinate risk to the Bank and would not have been extended if the Bank (specifically, its loan committee) were following standard practices, including because (i) Manafort had insufficient income to service his debt; his financial documentation was unreliable, contradictory, and suggestive of a deteriorating condition; and although the loans were well-collateralized, collateral alone is an insufficient basis to extend such

---

[2] These loans were described in the Indictment as the "$9.5M Loan" and "$6.5M Loan," and are described in Belanger's report as the "Summerbreeze Loan" and "Union Street Loan," respectively.

loans, (ii) Manafort was under scrutiny for his ties to foreign governments and allegedly receiving millions of dollars in undisclosed cash payments, (iii) Manafort lacked any demonstrable competency as a real estate developer, and (iv) transferring a portion of the Manafort loans from the Bank to the Holding Company, in order to avoid breaching Bank's legal lending limit, was not an effective or appropriate means of reducing overall risk to the enterprise.  (*See* Ex. 1 at Ex. A at 3-4, 6-19.)

- The defendant breached his fiduciary obligations as a member of the Bank's loan committee, including because (i) he had a responsibility to be informed of all material information reasonably available before making a loan decision, and (ii) the defendant therefore should have either rejected the loans based on Manafort's lack of qualifications as a borrower and real estate developer, or at a minimum undertaken further due diligence.  (*See* Ex. 1 at Ex. A at 4-5, 19-26.)

- The defendant violated Bank policy—and regulatory standards—concerning ethical conduct and conflicts of interest, including because (i) the Bank's Loan Policy prohibited lending officers from "mak[ing] or commit[ting] a loan . . . in which the credit will directly or indirectly benefit them personally," (ii) as an executive and director of the bank, the defendant also had a fiduciary duty to act in the best interest of the Bank and not to abuse his position for personal gain, and (iii) the defendant violated these obligations by actively participating in the process of approving the Manafort loans while simultaneously seeking Manafort's assistance in obtaining a senior position in the Trump administration.  (*See* Ex. 1 at Ex. A at 5, 27-29.)

On June 22, 2020, the defendant provided the Government with an approximately two-page notice purporting to describe the opinions of an expert, Dr. Andrew Carron, whom the defendant intends to call to rebut the testimony of Belanger, as well as a CV.  (*See* Exhibit 2, attached hereto.)  With respect to Carron's qualifications, the defendant states that Carron "worked in the securities industry including having responsibility for oversight of risk exposure relating to bond trading activities, directing fixed income research for global bonds and currencies, and managing mortgage- and asset-backed research departments."  (Ex. 2 at 1.) Neither this summary, nor his 20-page CV, reflects any experience with bank lending.  (*Id.*, Appendix A.)  With respect to Carron's opinions, the defendant's notice states the following, *in its entirety*:

6

## Summary of Opinions

1. Dr. Carron will define, from the point of view of financial economics, the concepts of risk and rate of return and will describe the relationship between those two concepts. Dr. Carron is expected to testify that there are certain financial criteria generally considered to be important in evaluating the riskiness of a residential mortgage loan, including loan-to-value, debt service coverage ratio, credit score, loan size, number of units, and owner occupancy. Dr. Carron will compare the Manaforts' reported metrics for these criteria to market benchmarks. Dr. Carron will further testify as to the market levels of mortgage interest rates in late 2016 / early 2017, based on how a borrower's numbers for these criteria compared with market norms. As a result of these analyses, Dr. Carron is expected to show that the terms of the Manaforts' loans were within the range of market conditions and that the interest rates and fees were more than sufficient to compensate The Federal Savings Bank ("TFSB") for the risks inherent in making these loans.

2. Dr. Carron will perform calculations demonstrating the amount of profit or loss that TFSB would have realized on the loans under a reasonable range of assumptions for the amount and timing of loan repayment.

3. Dr. Carron will describe the concept of asset-based lending and the relationship between asset coverage and any uncertainty regarding the income of the borrower. He is expected to opine that the Manaforts' liquid and real estate assets would have mitigated concerns regarding the Manaforts' future income.

4. Contrary to what the government's expert witnesses asserted in their notices, Dr. Carron will opine that a bank's risk is reduced when its holding company takes a participation in a large loan held by the bank.

## Bases and Reasons for Opinions

Dr. Carron's opinions will be based on his training and experience as well as a review of relevant documents produced by the government setting forth information about the Manaforts' financial condition and the terms and conditions of the loans; relevant academic and industry

7

literature; OCC Call Reports and other publications, banking regulations and regulatory guidelines, government reports and banking industry publications; and market and industry data on benchmark mortgage rates and industry guidelines used to adjust these rates based on loan specifics.

We anticipate that Dr. Carron will take into account additional disclosures from the government, including the testimony of the government's expert witnesses, as well as any relevant developments that occur prior to his testimony at trial, and may modify or supplement his testimony if appropriate. The defense may call other, non-expert summary witnesses.

(Ex. 2 at 2-3.)

On July 13, 2020, the Government provided the defendant with a 15-page notice

describing the opinions of Belanger in rebuttal to the opinions of Carron. (*See* Exhibit 3,

attached hereto.) Belanger's rebuttal opinions can be summarized as follows:

- With respect to Carron's qualifications: Carron is not qualified to offer an opinion on the Manafort loans because (i) his CV reveals no experience with bank lending, (ii) he has never previously testified on bank lending customs and practices, including with respect to the origination or underwriting of commercial loans, and (iii) Carron's experience analyzing mortgage-backed securities is not relevant to an analysis of the Manafort loans because these loans were "portfolio" loans held by the Bank and were not underwritten or originated for the purpose of selling them into a secondary market for securitization. (*See* Ex. 3 at Ex. A at 9.)

- With respect to Carron's first opinion (*i.e.*, that the Manafort loans were an acceptable risk to the Bank based on the risk and return characteristics of residential mortgage loans and how the Manafort loans compared to residential mortgage benchmarks):

  - *First*, it is impossible to respond to this opinion because Carron does not explain on what basis he characterizes the Manafort loans as *residential* loans as opposed to *commercial* loans; nor does he define the relevant *type* of residential mortgage, as different types require the analysis of different metrics. (The Bank itself classified the loans as commercial loans, as the $9.5 million Summerbreeze loan was intended to be used, in large part, for "opportunistic commercial investment purposes" and the $6.5 million Union Street loans were for a commercial construction project.)

8

> o *Second*, since the Manafort loans—unlike mass-market mortgages which are typically sold into a secondary market—were "portfolio loans" intended to be held by the Bank, the underwriting process was based on the loans' unique credit characteristics, and it is impossible to compare such loans to residential mortgage market benchmarks.
>
> o *Third*, Carron fails to respond to the major thrust of Belanger's opinion— *i.e.*, that the Manafort loans were not consistent with regulatory and industry-standard lending practices, or with the Bank's lending policies— and confuses the matter by evaluating the loans based on purported market benchmarks, which have no bearing in this context.
>
> o And *fourth*, although Carron suggests that he disagrees with Belanger's opinion that Manafort's income was insufficient to service the loans from the Bank, Carron fails to provide any information about *how* he has determined that Manafort's income was sufficient.  (*See* Ex. 3 at Ex. A at 2-6.)

- With respect to Carron's second opinion (*i.e.*, that he "will perform calculations demonstrating the amount of profit or loss that the Bank would have realized on the loans under a reasonable range of assumptions for the amount and timing of loan repayment"):  This opinion is impossible to respond to because Carron has failed to provide any information whatsoever regarding this purported profitability analysis.  (*See* Ex. 3 at Ex. A at 6-7.)

- With respect to Carron's third opinion (*i.e.*, that he "will describe the concept of asset-based lending and . . . is expected to opine that the Manaforts' liquid and real estate assets would have mitigated concerns regarding the Manaforts' future income"):  It is not appropriate to describe the Manafort loans as "asset-based loans" because that term refers to loans that are backed by, and expected to be repaid by, liquid collateral such as a business's accounts receivable.  Here, the Manafort loans were largely backed by real estate holdings, which are considered to be illiquid collateral that asset-based lenders typically avoid.  Accordingly, an asset-based lending analysis is inapplicable to these loans, and is confusing because it obscures the appropriate analysis, which should be more holistic and should take into account Manafort's inadequate income and deteriorating financial condition.  (*See* Ex. 3 at Ex. A at 7-8.)

- With respect to Carron's fourth opinion (*i.e.*, "that a bank's risk is reduced when its holding company takes a participation in a large loan held by the bank"):

> o *First*, Carron fails to give any indication as to the basis for this opinion.

o *Second*, this opinion appears to be highly confusing as it focuses narrowly on the risks to the Bank without addressing the risks faced by the overall enterprise, including the Holding Company.

o And *third*, Carron's opinion fails to address Belanger's point that, pursuant to applicable regulatory standards, bank holding companies are supposed to be a source of financial strength to subsidiary banks. (*See* Ex. 3 at Ex. A at 8-9.)

### B.    Applicable Law

1.    *Federal Rule of Criminal Procedure 16(b)(1)(C)*

Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure provides in relevant part:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if . . . (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies . . . . This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

As the Advisory Committee notes to Rule 16 explain, the disclosure requirement "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Ferguson*, 06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007) (citation omitted); *see United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011). If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), a court may exclude the expert's testimony at trial. *See United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007).

2.    *Rule 702*

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76).  A district court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is, of course, whether the witness "is qualified to be an 'expert'" in the subject matter at issue.  *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).  Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable.  *Daubert*, 509 U.S. at 589-90; *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999).  Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  "*Daubert* applies to both defense and government experts."  *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

In *Joiner*, the Supreme Court explained that "[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an

11

analytical gap between the data and the opinion proffered."  522 U.S. at 146.  For example, in

*Kumho Tire*, the Court upheld the exclusion of an expert's testimony that a defect caused a tire's

tread to separate from the rest of the tire, because the expert's theories could not reliably

determine the cause of the separation in the tire at issue.  526 U.S. at 154-55; *see also*

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (district court

should undertake a rigorous examination of the facts on which the expert relies, the expert's

methodology, and the application of that methodology to the facts).

Applying Rule 702, the Court must determine whether the expert's reasoning and

methodology underlying his testimony is valid, and whether that reasoning or methodology was

applied reliably to the facts, so as to be relevant and helpful to the jury.  *See Kumho Tire*, 526

U.S. 137.  The reliability inquiry is flexible and "must be tied to the facts of a particular case."

*Id.* at 150.  The Second Circuit has emphasized that "it is critical that an expert's analysis be

reliable at every step."  *Amorgianos*, 303 F.3d at 267.  "In deciding whether a step in an expert's

analysis is unreliable, the district court should undertake a rigorous examination of the facts on

which the expert relies, the method by which the expert draws an opinion from those facts, and

how the expert applies the facts and methods to the case at hand."  *Id.*  Minor flaws with an

otherwise reliable expert opinion will not bar admission of that evidence; however, the Court

should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good

grounds' for his or her conclusions."  *Id.* (quotation marks omitted).

       3.    *Rules 401-403*

Rules 401 through 403 of the Federal Rules of Evidence state that relevant evidence is

admissible when it tends to make the existence of any fact that is of consequence more or less

probable than it would be without the evidence, but it may be excluded if its probative value is

substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

### C. Discussion

The defendant's expert, Dr. Andrew Carron, should be excluded because (i) he is not qualified to testify as an expert in the regulatory and industry standards, or bank policies and practices, applicable to bank lending, in particular concerning the underwriting and originating of commercial real estate loans, (ii) the defendant's expert notice is woefully inadequate (and must be supplemented if Carron is not excluded), and (iii) his opinions are irrelevant, flawed and unreliable, and would be unduly confusing to the jury.

### 1. *Dr. Carron Is Not Qualified to Testify as an Expert in the Underwriting and Origination of Commercial Loans*

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony. . . . A district court's conclusion that an expert is not qualified to testify will be affirmed unless manifestly erroneous." *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994) (internal quotation marks and citations omitted). Carron's 20-page CV leaves no doubt that he has impressive credentials and extensive experience in certain sectors of the finance industry. However, he lacks any experience in the specific subject matter at issue here: bank lending, especially in regard to the underwriting and originating of commercial real estate loans. Notably, the defendant's summary of Carron's qualifications does not even attempt to

suggest that he has expertise in this subject matter:

> Dr. Carron worked in the securities industry including having responsibility for oversight of risk exposure relating to bond trading activities, directing fixed income research for global bonds and currencies, and managing mortgage- and asset-backed research departments. . . . Dr. Carron consults in the areas of financial products (including mortgages) and securities markets, investments, and risk management and has been qualified at arbitration hearings and at trial as an expert in the areas of financial economics, securities markets, and securities industry customs and practices. His litigation assignments include securities market practices and investments and he has conducted studies of market structure and practices for bond rating agencies, financial institutions, and individual and institutional investors.

(Ex. 2 at 1-2.)  Absent from this description is any experience relevant to bank lending generally, or to commercial real estate loans specifically.  While he may have expertise in "risk exposure relating to bond trading activities," "fixed income research for global bonds and currencies," and "managing mortgage- and asset-backed research departments" (*id.*), that does not mean he has any experience relevant to the specific conduct at issue in this case.  *See Nimely*, 414 F.3d at 399 n.13 (Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."); *see also Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (summary order) (excluding expert familiar only with foreign accounting standards,  noting that because the expert "is not qualified to opine on PCOAB standards, she has no basis for comparing them with other standards").

Carron is not qualified to offer the opinions set forth in the defendant's notice.  For example, he plans to offer an opinion that the Manafort loans were an acceptable risk to the Bank based on the risk and return characteristics of residential mortgage loans and how the Manafort

14

loans compared to residential mortgage benchmarks.  (*See* Ex. 2 at 2.)  But he has no experience analyzing, from the perspective of a bank lender, whether a particular loan should be originated based on its risk profile.  This is doubly true as to commercial loans, which appears to be a field completely outside Carron's areas of expertise.  Carron also plans to offer an opinion that "the Manaforts' liquid and real estate assets would have mitigated concerns regarding the Manaforts' future income."  (*Id.*)  But, again, he has no experience actually underwriting commercial loans and determining whether real estate collateral sufficiently mitigates concerns regarding a borrower's income.  Carron is also not qualified to opine "that a bank's risk is reduced when its holding company takes a participation in a large loan held by the bank."  (*Id.*)  Since he has no experience in underwriting or originating commercial loans, he has no basis to describe the measures that a bank can appropriately undertake to address a situation where a particular loan may cause a bank to exceed its legal lending limit.  His opinion that the Bank somehow reduced its risk by participating a portion of the Manafort loans up to the Holding Company thus appears to be based purely on abstract theoretical analysis, as opposed to real-world expertise.

As Belanger notes in his rebuttal notice:

> The only identifiable mortgage related experience Dr. Carron does have was as an analyst of mortgage-backed securities. The [Manafort] loans were portfolio loans held by TFSB and not originated for the purpose of selling the loans into the secondary market for securitization in pools of mortgages.  Dr. Carron's experience in the secondary market for securities would include securitizing and investing in the mortgage pools, none of which is relevant to whether these loans should or should not have been made to Manafort.
>
> This was a credit decision and not a securitization qualification decision.  Dr. Carron is not qualified to opine on the TFSB's credit decision to extend loans to Manafort in the manner TFSB did.

15

(Ex. 3 at Ex. A at 9.)  In other words, although Carron may be qualified to opine as to whether the Manafort loans could be sold into the secondary market for securitization—an opinion that has no relevance here—he is not qualified to opine as to the standards, practices, and policies pertinent to the Bank in underwriting and originating those loans.  In sum, because Carron is not qualified to offer the opinions set forth in his disclosure, his testimony should be excluded.

### 2.      *The Defendant's Expert Disclosure Is Woefully Inadequate*

As set forth above, when the Government disclosed its intention to call Belanger as an expert, the Government provided the defense with a detailed, 49-page notice describing Belanger's qualifications, analysis, opinions, and expected testimony.  (*See* Ex. 1.)  In response, the defendant provided expert notice that spans barely two pages and is utterly devoid of the sort of detail necessary for the Government or its witnesses to evaluate Carron's purported opinions or to formulate a response.  (*See* Ex. 2.)  "Proper expert disclosures are not a mere technicality with which compliance may be made or not—they are required by Rule 16 of the Federal Rules of Criminal Procedure" and the requirements "do not only apply to one side and not the other." *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413318, at *2 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858 F.3d 71 (2d Cir. 2017).  In particular:

> Rule 16 requires that the defendant *must* provide a "written summary of any testimony that the defendant intends to use," which "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C).
>
> The Advisory Committee notes to Rule 16 explain that the disclosure requirement "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

16

> Courts' application of these rules in specific cases has led to
> the development of a substantial and consistent body of law
> governing the admissibility of expert testimony.  In a criminal
> case, the first question is whether the appropriate Rule 16
> disclosures have been made. . . .  [A] failure to provide the
> required level of detail as to the expert's opinions and the
> bases, reasons, and sources of those opinions can . . . lead to
> preclusion.  For instance, preclusion is justified when the
> expert disclosures merely list general topics about which the
> expert will testify.  *E.g.*, *United States v. Concessi*, 38 Fed.
> App'x 866, 868 (4th Cir.2002); *United States v. Valle*, No. 12
> Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2,
> 2013); *United States v. Ferguson*, No. 3:06CR137 (CFD),
> 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007); *United
> States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738,
> at *3 (E.D.N.Y. Apr. 24, 2007).  Courts have also precluded
> expert testimony when the Rule 16 disclosures fail to specify
> the expert's bases, reasons, and sources for their opinions.
> *E.g.*, *Concessi*, 38 Fed. App'x at 868; [*United States v.*]
> *Wilson*, 493 F. Supp. 2d [484 ,]487 [(S.D.N.Y. 2006)]; *see
> also United States v. Sturman*, No. 96 Cr. 318, 1998 WL
> 126066 (S.D.N.Y. Mar. 20, 1998) (a "general description of
> possible bases" does not meet the requirements of Rule
> 16(b)(1)(C)).
>
> This is both sensible and fair.  It is sensible because without
> the appropriate detail, a Court cannot possibly assess
> admissibility, an opposing party cannot prepare a response or
> for proper cross-examination, and a trial devolves into jungle
> warfare by ambush.  The various rules and the case law
> interpreting them are designed to avoid that outcome.

*Ulbricht*, 2015 WL 413318, at *5-6.

The defendant's expert disclosure falls far short of the applicable standards.  As an initial

matter, the defendant suggests that Carron will be seeking to rebut Belanger's opinions, yet his

expert disclosure reveals *nothing* about what opinions, if any, Carron has regarding the subjects

set forth in Belanger's disclosure.  As set forth above, the main thrust of Belanger's expected

testimony is that (i) the $16 million in loans extended to Manafort with the defendant's approval

were not consistent with regulatory and industry-standard lending practices, or with the Bank's

17

lending policies, (ii) the defendant breached his fiduciary obligations as a member of the Bank's loan committee, and (iii) the defendant violated Bank policy—and regulatory standards—concerning ethical conduct and conflicts of interest.  (*See supra* Section I.A.)  The defendant's expert disclosure is completely silent as to these matters (perhaps in part because Carron is not qualified to render an opinion as to them).  Carron should therefore be precluded from testifying in rebuttal to any opinions offered by Belanger on these subjects.

Carron's disclosure is also inadequate as to the opinions actually set forth therein.  With respect to Carron's first opinion (*i.e.*, concluding that the Manafort loans were an acceptable risk to the Bank based on the risk and return characteristics of residential mortgage loans and how the Manafort loans compared to residential mortgage benchmarks):  As explained in Belanger's rebuttal disclosure, Carron's opinion is impossible to evaluate or respond to for multiple reasons.  (*See* Ex. 3 at Ex. A at 2-6.)  Carron does not explain on what basis he characterizes the Manafort loans as *residential* loans as opposed to *commercial* loans (the Bank itself classified the loans as commercial real estate loans, and the $9.5 million Summerbreeze loan, for example, was intended to be used, in large part, for "opportunistic commercial investment purposes"); nor does he define the relevant *type* of residential mortgage, as different types require the analysis of different metrics.  (*See Id.* at Ex. A at 2-3.)  Carron also does not explain the basis for choosing and quantifying the metrics which he selects as relevant market benchmarks.  (*Id.*)

More fundamentally, since the Manafort loans were originated as "portfolio" loans to be held on the Bank's books rather than sold into the secondary market for securitization, Carron should—but fails to—explain why his mode of analysis is relevant or appropriate at all, as opposed to analyzing whether the underwriting and origination of the loans were consistent with

industry standards and Bank policy. (*Id.*) *See Ulbricht*, 2015 WL 413318, at *6 (The defense "has not set forth the bases, reasons, and sources with anything close to the requisite specificity—merely asserting that [the expert] will provide this opinion based on some unspecified method of analyzing market forces and liquidity, based on data from unspecified sources, does not suffice.").

 With respect to Carron's second "opinion" (*i.e.*, that he "will perform calculations demonstrating the amount of profit or loss that the Bank would have realized on the loans under a reasonable range of assumptions for the amount and timing of loan repayment"): The disclosure does not even hint at his actual opinions. It is literally impossible to respond to this opinion because Carron has failed to provide any information whatsoever regarding this purported profitability analysis. (*See* Ex. 3 at Ex. A at 6-7.) He does not even identify how much profit or loss he is expecting to project, rendering it impossible—short of simply speculating that a retained defense expert will testify favorably for the defense—for the Government to know what Carron's opinions are or whether its witnesses agree or disagree with them, or why. (*Id.*) Moreover, on top of not setting forth Carron's conclusions, the disclosure says nothing at all about the assumptions they are based on, why these assumptions are reasonable, or how they factor into his calculation. (*Id.*) *See, e.g.*, *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics.").

 Even if the Government could divine what Carron's opinions are, there is no explanation

19

as to *why* this mode of analysis is reasonable in the first place.  As explained below, it is not helpful to the jury to analyze whether the Manafort loans might have been profitable given certain assumptions—an abstract analysis utterly untethered to the defendant's mental state. Rather, what is relevant is whether the defendant's approval of the loans was consistent with applicable standards and policies.

With respect to Carron's third opinion (*i.e.*, that he "will describe the concept of asset-based lending and . . . is expected to opine that the Manaforts' liquid and real estate assets would have mitigated concerns regarding the Manaforts' future income"):  Carron fails to explain why it is appropriate to analyze the Manafort loans as "asset-based loans," since that term is generally understood in the industry to refer to loans backed by, and expected to be repaid by, liquid collateral such as a business's accounts receivable, whereas the Manafort loans were largely backed by illiquid real estate holdings.  (*See* Ex. 3 at Ex. A at 7-8.)

With respect to Carron's fourth opinion (*i.e.*, "that a bank's risk is reduced when its holding company takes a participation in a large loan held by the bank"):  Carron's one-sentence conclusory assertion fails to give any indication as to the basis for this opinion.  More importantly, Carron's disclosure fails to explain why the Bank participating a portion of the Manafort loans up to the Holding Company was an appropriate way to manage *enterprise* risk and avoid breaching its legal lending limit.  (*See* Ex. 3 at Ex. A at 8-9.)

In sum, the defendant's expert disclosure fails to comply with the requirements of Rule 16.  These requirements exist to allow opposing counsel the opportunity to challenge the admissibility of testimony, adequately prepare for cross-examination, and decide whether to retain and prepare rebuttal witnesses.  *See, e.g.*, *Rajaratnam*, 2011 WL 723530, at *3 ("[T]he

purpose of reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R. Crim. P. 16 Advisory Committee's Note)); *Valle*, 2013 WL 440687, at *5 (same); *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same). Carron's testimony should be excluded for all the reasons set forth in this brief; but at a minimum, the defendant should be ordered to significantly supplement his disclosure.

### 3.   *Dr. Carron's Testimony Should Be Excluded Because His Opinions Are Irrelevant, Flawed, and Confusing to the Jury*

Even if Carron were qualified to testify as an expert in bank lending (which he is not), and even if the defendant's disclosure were supplemented, Carron's testimony should still be excluded because his opinions are irrelevant, deeply flawed and unreliable, and because they would confuse the jury.  To be admissible, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.  Carron's opinions are not helpful to the jury because they are not tied to duties owed by the defendant under applicable regulatory standards and Bank policies, and thus will not aid the jury in deciding the only key issue likely to be in dispute: whether the defendant acted corruptly.  Rather, Carron intends to engage in a *post hoc* evaluation of the Manafort loans in the abstract, which would amount to a freewheeling academic exercise with virtually no likelihood of aiding the jury.[3]

---

[3] Moreover, there will be extensive evidence concerning the quality of the Manafort loans from the documentary record and from witnesses, including Bank employees and Office of

As set forth above, Belanger's opinions concern (i) the extent to which the Manafort loans, which the defendant personally approved, were consistent with regulatory and industry-standard lending practices, and with the Bank's lending policies, (ii) whether the defendant breached his fiduciary duties in his capacity as a member of the Bank's loan committee, and (iii) whether the defendant violated Bank policy (and regulatory standards) concerning ethical conduct and conflicts of interest due to his involvement in the Manafort loans while seeking Manafort's assistance obtaining a position in the presidential administration. *See supra* Section I.A. These opinions are all relevant and helpful to the jury because they bear directly on the defendant's mental state, that is, whether he acted "corruptly."

In the context of Section 215, "corruptly" refers "to acts done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another." *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) (internal quotation marks omitted). Thus, in determining whether the defendant acted with a "bad purpose" and intended to achieve "an unlawful end or result" or "a lawful end or result by some

---

Comptroller of the Currency ("OCC") examiners, who analyzed the loans in the course of their daily responsibilities. Expert testimony on the same point would be cumulative, prejudicial, and confusing to the jury, as it would lend the imprimatur of an expert to a subject matter that is more than sufficiently covered by other witnesses. By contrast, where experts can offer testimony that would be non-cumulative and would assist rather than confuse the jury is by (i) educating the jury on the regulatory and industry standards, and Bank policies, that imposed duties on Bank personnel, including Calk, in connection with their evaluation of the Manafort loans, and (ii) relating those standards and policies to Calk's conduct with respect to the Manafort loans. Such testimony—which Carron does not propose to offer—would be narrowly tailored to the only key issue likely to be in dispute: whether Calk acted corruptly.

unlawful method or means," *id.*, it is highly relevant for the jury to consider whether the defendant knowingly breached duties he owed the Bank under regulatory standards or Bank policy. *See United States v. Murgio*, 209 F. Supp. 3d 698, 718-20 (S.D.N.Y. 2016) (indictment sufficiently alleged that defendant acted "corruptly" in violation of Section 215 because it alleged that he "intentionally took actions that violated the duties he owed in his capacity as Chairman of the Board of [a financial institution]," and noting that Government would also introduce evidence that defendant violated pertinent regulations); *see also McElroy*, 910 F.2d at 1023-24 (in prosecution under Section 215, admitting evidence that loans to defendant violated a particular regulation because such evidence "served to explain the basis for [a relevant bank's] lending policies and creditworthiness determinations as they related to [defendant's] loan application" and because jury was instructed that "a violation of [the regulation] would 'not amount to criminal conduct under federal law'").

In contrast to Belanger's opinions—which relate specifically to violations of duties pertinent to the defendant's mental state—Carron's opinions do not involve any duties, policies, or standards of the Bank, and (by classifying the loans into different categories than the Bank did) do not even employ the same mode of analysis used by the Bank. As such, they are entirely disconnected from the defendant's mental state and therefore not helpful to the jury. The opinions are also deeply flawed because they are premised on the notion that the loans were residential mortgages sold into a secondary market (when in fact they were commercial loans held on the Bank's own books) and that they were "asset-based loans" (when in fact they did not qualify as asset-based loans because they were backed by illiquid real estate collateral, not liquid collateral like an account receivable).

a)      Carron's First and Second Opinions

Carron's first opinion is that "the terms of the Manaforts' loans were within the range of market conditions and that the interest rates and fees were more than sufficient to compensate [the Bank] for the risks inherent in making these loans," and his second opinion will involve "demonstrating the amount of profit or loss that [the Bank] would have realized on the loans under a reasonable range of assumptions." (Ex. 2 at 2.)[4]  The analysis of commercial loans under residential loan benchmarks in Carron's first opinion is not helpful to the jury, both because the Manafort loans were not in fact residential loans and because the Bank did not analyze them as residential loans.  Similarly, both opinions are unhelpful because they are entirely divorced from the issue that the jury must resolve: the defendant's mental state.

Although the defendant's sparse disclosure makes it very difficult to know exactly how Carron plans to testify, it appears that he intends to engage in an academic explication of "the concepts of risk and rate of return," the "financial criteria generally considered to be important in evaluating the riskiness of a residential mortgage loan," the "Manaforts' reported metrics" and how they compare to "market benchmarks," and "the amount of profit or loss that [the Bank] would have realized on the loans under a reasonable range of assumptions." (Ex. 2 at 2.)  Absent from this description is any reference to the defendant himself, his duties under applicable regulatory and industry standards, his duties under applicable Bank policies, and his involvement in approving these loans while seeking Manafort's assistance in obtaining an administration position.  Yet these are the only factors that bear on whether the defendant acted corruptly.  To

---

[4] As noted in Section I.A.2, above, the Government is not aware of what Carron's second opinion actually is, only that it will involve this subject matter.

be helpful to the jury, the testimony must help the jury weigh *the defendant's* contemporaneous knowledge, intent, and/or motive concerning *his* actions in this case.

For instance, in *United States v. Chi Ping Patrick Ho*, 17 Cr. 779 (LAP)—a recent corruption trial in this District—the defendant sought to introduce expert testimony that he claimed would show that his conduct (including payments alleged by the Government to be bribes) benefited his company and furthered important policy objectives of the Chinese state, with which his company was closely connected. *See Ho*, 17 Cr. 779 (Dkt. 137 at 23-25). As Judge Preska explained in granting the Government's motion to preclude such testimony:

> [T]he proffered testimony is inadmissible. First, it is wholly irrelevant to the issues on trial. Despite the defendant's repeated suggestions to the contrary, this case is not a policy or a political debate. . . . The question for the jury is whether the defendant agreed to and did offer bribes, not whether those bribes were in furtherance of some alleged [Chinese] state agenda. Secondly, [the expert's] proffered opinions are insufficiently connected to what the jury has to decide. Expert testimony is admissible only where it will help the trier of fact to understand the evidence or to determine a fact issue. In short, there must be a fit between the proffered testimony and the facts of this case. There is no such fit here.

*Id.* (Tr., Nov. 14, 2019 final pretrial conf., at 57).[5] So too here. Expert testimony on whether the Manafort loans benefited the Bank—divorced from any analysis of the defendant's own conduct and how he acted consistently or inconsistently with his duties under regulatory and industry standards and Bank policy—will not "help the trier of fact to understand the evidence or to determine a fact in issue" under Rule 702.

Even if there were some marginal relevance to these opinions, they should be excluded

---

[5] Notably, the court also excluded the expert testimony because the defendant's notice was inadequate. *Id.* (Tr., Nov. 14, 2019 final pretrial conf., at 55-56).

under Rule 403 because their probative value is substantially outweighed by the danger of confusing the issues and misleading the jury.  Fed. R. Evid. 403.  It is critical that the jury not be misled into believing that the defendant's guilt or innocence depends on whether the Manafort loans were "good" or "bad" in terms of their risks and potential profits for the Bank.  Yet, that appears to be exactly the goal of Carron's first and second opinions.  Such testimony would risk seriously confusing the jury into believing that if the loans were reasonably likely to be profitable—or were "within the range of market conditions" (Ex. 2 at 2)—then the defendant cannot be guilty.  That is emphatically not the law.  As described in Section II.A, *infra*, the defendant would be equally guilty even if he would have, and should have, approved the loans in the absence of any expected personal benefit to himself.  The question is whether the defendant acted corruptly, not whether the loans were good or bad or similar or dissimilar to other loans in the market.  Thus, even if Carron's opinions—despite being wholly divorced from any analysis of the defendant's actions and his compliance, or lack thereof, with applicable duties—were marginally relevant, his testimony should nonetheless be precluded under Rule 403.

Finally, Carron's first and second opinions are also deeply flawed as a matter of sheer analytical rigor and should be excluded because they are not "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702(c), (d).  Carron proposes to analyze the Manafort loans by (in his first opinion) comparing their metrics to general market benchmarks for residential mortgage loans, and (in his second opinion, as far as the Government can understand) calculating how much profit the Bank would have realized on the loans based on various assumptions about the residential mortgage market.  (*See* Ex. 2 at 2.)  But as Belanger explains in his rebuttal notice, Carron's mode of analysis fails for

two reasons: *First*, the Manafort loans were not residential mortgage loans, they were commercial loans.  (*See* Ex. 3 at Ex. A at 2-4.)  And *second*, the Manafort loans were portfolio loans underwritten and originated to be held on the Bank's books, not sold into a secondary market for securitization.  (*Id.*)  "The risks related to portfolio loans must be evaluated in terms of compliance with the bank's credit policies and banking regulation, not market benchmarks. Credit decisions are based on a variety of factors.  It is not the formulaic process that is the basis for meeting securitization requirements."  (*Id.* at Ex. A at 4.)  "There is no comparable pool of mortgage loans with the same credit risk characteristics [as the Manafort loans].  A credit decision is reached based on each loan's unique credit risk characteristics as presented during the approval process and judged through the lens of the bank's credit policy and regulatory guidance."  (*Id.* at Ex. A at 5.)

Simply put, one cannot usefully or reliably compare commercial loans held within the Bank's own portfolio to residential mortgages sold into a secondary market.  It is like comparing "apples and oranges."  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an 'apples and oranges comparison'" (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984))); *see also Joiner*, 522 U.S. at 146 (expert testimony should be excluded where "there is simply too great an analytical gap between the data and the opinion proffered").

In sum, Carron's first and second opinions should be excluded because (1) they are not helpful to the jury since they concern inapposite metrics and are not linked to the defendant's own actions and his own compliance, or lack of compliance, with applicable duties under regulatory standards and Bank policy, (2) they are prejudicial and likely to confuse the jury into

27

believing that the defendant's guilt depends on whether the loans were beneficial to the Bank as opposed to whether the defendant acted corruptly, and (3) they are the product of a flawed and unreliable analysis comparing commercial loans to residential mortgages, and comparing loans held on the Bank's own books to those sold into a secondary market for securitization.

       b)  <u>Carron's Third Opinion</u>

   Carron's third opinion is to "describe the concept of asset-based lending" and explain "that the Manaforts' liquid and real estate assets would have mitigated concerns regarding the Manaforts' future income." (Ex. 2 at 2.) This testimony should be precluded for the same reasons set forth above as to Carron's first and second opinions: this opinion is not helpful to the jury, is prejudicial, and is flawed.

   Carron's third opinion is not helpful to the jury because, as with his first and second opinions, it is completely divorced from the defendant's own conduct and his own compliance with, or violation of, duties imposed on him by regulatory standards and Bank policy. It is not relevant how the loan would have been analyzed were it an asset-based loan, because it was not an asset-based loan as that term is understood in the industry. And it is not relevant whether the collateral underlying the Manafort loans "would have mitigated concerns regarding the Manaforts' future income" in some abstract sense divorced from industry standards and the Bank's and regulators' policies and guidelines for making lending decisions. As Belanger explains—with extensive citation to applicable policies and guidance—it was inconsistent with regulatory standards and Bank policy to approve the Manafort loans based solely on the collateral. (*See* Ex. 1 at Ex. A at 6-8; Ex. 2 at Ex. A at 7-8.) There is no value in an abstract analysis that will not aid the jury in evaluating the extent to which, if at all, the defendant complied with his duties as an executive of the Bank and member of the loan committee. And

even if there were some marginal relevance to such an opinion, it should be excluded under Rule 403 because it would risk seriously confusing the jury into believing that their job is to decide whether the loans were well-collateralized, when in fact their job is to decide if the defendant acted corruptly.

Carron's third opinion should also be excluded because it is flawed and unreliable.  Just as his first and second opinions seek to engage in improper "apples to oranges" comparisons—comparing commercial loans to residential loan benchmarks, and comparing loans held on the Bank's books to those sold into the secondary market—his third opinion suffers from the same flaw.  *See Boucher*, 73 F.3d at 21 ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an 'apples and oranges comparison'" (citation omitted)).  Specifically, Carron premises his opinion on the notion that the Manafort loans were "asset-based" loans.  (*See* Ex. 2 at 2.)  But as Belanger explains—with detailed citations to governing authority—this categorization is improper:

> [T]hese were not asset-based loans as that term is understood in banking.  The mere presence of collateral does not make a loan asset-based.  The most common form of asset-based lending is when a bank provides a working capital line of credit against the value of accounts receivable and inventory.  The principal source of repayment is the conversion of this collateral into cash over a company's monthly business cycle.
>
> Unlike the liquid asset-based collateral of receivables and inventory, real estate is generally considered illiquid collateral that asset-based lenders are advised to avoid.  A more thorough credit analysis is required when lending against illiquid assets, which again suggests that relying on market metrics is inappropriate.  Residential real estate lenders are also advised specifically to avoid extending high-risk loans against real estate when the primary source of repayment is the liquidation of the real estate collateral or when the borrower lacks sufficient income to service the debt.  The Manafort loans displayed these and other high-risk

29

characteristics.

(Ex. 3 at Ex. A at 7-8 (footnotes omitted).)[6]  It is thus not appropriate to analyze the Manafort

loans within the context of "asset-based loans."  Because such testimony would not be the

"product of reliable principles and methods" that are "reliably applied . . . to the facts of the

case" it should be excluded under Rule 702.

c)    <u>Carron's Fourth Opinion</u>

Carron's fourth opinion is: "Contrary to what the government's expert witnesses asserted

in their notices, Dr. Carron will opine that a bank's risk is reduced when its holding company

takes a participation in a large loan held by the bank."  (Ex. 2 at 2.)  Although the Government

has no objection to the defendant eliciting expert testimony in rebuttal to Belanger's opinions,

this opinion suffers from the same flaw discussed above:  It is totally divorced from the

defendant himself, and the duties imposed upon him by regulatory standards and Bank policies.

Belanger's opinion was not merely that the Bank failed to reduce its risk by participating

a portion of the Manafort loans up to the Holding Company.  Rather, his opinion was that by

authorizing such an unusual maneuver, the defendant undermined the ability of the Holding

Company to "conduct [its] operations in a safe and sound manner and particularly to act as a

source of financial strength to the subsidiary bank" as required by applicable regulations.  (Ex. 1

at Ex. A at 18; *see also* Ex. 3 at Ex. A at 8-9.)  To properly respond to this opinion, Carron

would need to analyze the extent to which a bank official, in participating a bank's loan up to the

holding company purportedly to reduce risks to the bank, is acting in accordance with regulatory

---

[6] These opinions were based directly on regulatory guidance.  *See* Ex. 3 at Ex. A at 7 n.18
(quoting OCC asset-based lending handbook specifying that asset-based loans should have
"minimal reliance on illiquid collateral").

30

standards and applicable policies and industry practice.  To simply assert, in the abstract, that

such a transaction "reduce[s]" a "bank's risk" (Ex. 2 at 2)—when it merely shifts that risk to the

holding company—is totally irrelevant.  Further, as discussed above, even if such an opinion

were marginally relevant, it should still be excluded under Rule 403.  Such testimony would risk

seriously misleading the jury into believing that the relevant question is whether the defendant,

in approving this transaction, reduced risks to the Bank, when the only relevant question is

whether he acted corruptly.

Finally, Carron's fourth opinion should also be excluded because it is flawed and

unreliable.  It appears that Carron intends to focus narrowly on the risks facing the Bank alone,

without considering the enterprise as a whole, including the Holding Company.  As Belanger

explains, "Dr. Carron's opinion does not address the overall risk to the enterprise . . . . In this

case, the portion of the loan that exceeded the bank's lending limit was transferred within the

enterprise and therefore does not reduce enterprise risk."  (Ex. 3 at Ex. A at 8.)  By analogy, if a

skydiver were carrying a package that caused him to exceed the permissible weight limit, it

would hardly make sense to move the package to the top of his parachute.  Yet, the thrust of

Carron's opinion seems to be that the Bank reduced its risk by doing essentially the same thing.

Such reasoning is flawed and unreliable and should be excluded.

## II.    THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE QUALITY OF THE LOANS, OR FRAUD AGAINST CALK, ARE DEFENSES TO THE CHARGED BRIBERY OFFENSE

The defendant should be precluded from introducing evidence or argument suggesting

that the quality of the loans—or the defendant's belief in their quality, whether fraudulently or

innocently induced—is a defense to the charged crime of financial institution bribery.  In order to

convict the defendant at trial, the Government must prove that he acted with corrupt intent.  The

jury can find that the defendant acted corruptly, and can render a guilty verdict, even if they believe that the Manafort loans were of high quality, or that the defendant believed them to be of high quality. The law is clear that a bank official violates Section 215 even if he would have, and should have, taken the exact same action in the absence of any expected personal benefit. Thus, while evidence of the good or poor quality of the loans may be relevant to establishing or refuting corrupt intent, it is not dispositive. Nor is it a defense that the defendant erroneously believed the loans to be sound because he was defrauded by Manafort. The defendant should be precluded from introducing evidence or argument suggesting the contrary, or from turning this trial into a mini-trial over whether he was defrauded by Manafort.

### A.      Applicable Law

As a general principle, bribery offenses requiring corrupt intent do not depend on the merits or lack of merits of the action to be performed by the bribe recipient. Thus, an official "is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991); *see also, e.g.*, *United States v. Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002) (similar); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) (similar in honest services fraud case), *overruled on other grounds by McDonnell v. United States*, 136 S. Ct. 2355, 2371-72 (2016); *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) (summary order) (citing *Alfisi* and *Rosen* in honest services fraud case); *United States v. Rybicki*, 354 F.3d 124, 141 (2d Cir. 2003) (noting that in cases of honest services fraud based on bribery or kickback theories, there is no requirement that "the defendant's behavior must . . . cause, or at least be capable of causing, some detriment—perhaps some economic or pecuniary detriment—to the employer"); *United States v. Manton*, 107 F.2d 834, 845-46 (2d Cir. 1939) (rejecting claim that judge is not

32

guilty of bribery if his decisions were correct).  (*See also* Dkt. 92 at 10-11 ("Even if the scheme

occasioned a money or property gain for the betrayed party . . . actionable harm [lies] in the

denial of that party's right to the offender's 'honest services.'" (quoting *Skilling v. United States*,

561 U.S. 358, 400 (2010))).)[7]

Cases of financial institution bribery under Section 215, which similarly requires corrupt

intent, are treated the same.  Accordingly, a defendant can be guilty of bank bribery for taking

actions that cause no loss to a bank or even benefit it.  *See, e.g.*, *United States v. Denny*, 939 F.2d

1449, 1452 (10th Cir. 1991) ("The statute does not require establishing that the bank suffered a

loss.  In the case before us, the bank was paid a commission and theoretically made a profit on

each trade.  This is legally insignificant."); *United States v. Mann*, 161 F.3d 840, 855 (5th Cir.

1998) (upholding Section 215 conviction against bank owner for unconsummated transaction

without relying on any evidence it would have resulted in a loss).

Similarly, a defendant's lack of knowledge that taking an action would harm a financial

institution is not a defense to a bank bribery charge; corrupt intent is established by proof of a

corrupt *quid pro quo*, without any further requirement that the object of the *quid pro quo* be

---

[7] The rule is the same in other circuits.  *See, e.g.*, *United States v. Orenuga*, 430 F.3d 1158, 1165-66 (D.C. Cir. 2005) (proper to charge jury that "[i]t is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act" (internal quotation marks omitted)); *United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) ("it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"); *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) ("it is neither material nor a defense to bribery that had there been no bribe, the [official] might, on the available data, lawfully and properly have made the very recommendation that [the briber] wanted him to make" (internal quotation marks omitted)); *United States v. McDonough*, 727 F.3d 143, 159-60 (1st Cir. 2013) (citing *Omni Outdoor Advertising*).

known to be unlawful.  *See United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at

*26 (S.D.N.Y. Oct. 18, 2017) (affirming conviction of defendant who accepted bribes in

exchange for appointing credit union directors, noting that "to show corruption, it was not

necessary to prove that [defendant] accepted money with the intent to accomplish an inherently

unlawful purpose—it was enough to show that, as the head of a federal credit union, [defendant]

accepted money with the intent to be influenced in his decision-making—i.e. to accomplish a

potentially lawful end via illegal *means*.").[8]

## B.    Discussion

While the Government expects that evidence of the quality of the loans, or of the

defendant's awareness of issues with the loan quality, will be relevant at trial, the defendant

should be precluded from suggesting to the jury that the soundness of the loans (or his belief in

their soundness) would be a defense to the charged bribery offense.  At the appropriate time, the

Government will request that the jury be instructed that the soundness of the loans, or a genuine

belief in the soundness of the loans, is not a defense to the charged crime, but may be relevant to

an evaluation of corrupt intent.  The Government moves now to preclude the introduction of

evidence or argument that would only serve to undermine the jury's ability to follow such

instructions.

Accordingly, evidence and argument should be limited to the legally relevant purposes of

elucidating the defendant's mental state.  For example, evidence and argument regarding

---

[8] The fact that Section 215 is interpreted consistently with other bribery offenses is unsurprising, given that it uses the same statutory term—"corruptly"—as other offenses.  *See, e.g.*, *United States* v. *Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019) (citing *McElroy* definition of "corruptly" under Section 215 to interpret term in two other statutes, holding it applies "[w]hen a statute uses the word 'corruptly'").

arguably positive aspects of the loans should be limited to that necessary to rebut the Government's evidence of flaws in the loans.  Similarly, evidence or argument that the defendant was deceived or mistaken about flaws in the loans, or other facts related to Manafort, should be limited to that necessary to rebut the Government's evidence of the defendant's knowledge of flaws or concerning factors in the loan relationship.  In other words, the defendant is on trial, not Manafort, and the issue of whether Manafort defrauded the defendant is not for this jury to decide, except in the limited way it may bear on the defendant's mental state.

The Government expects to introduce evidence that the loans were unsound investments and that the defendant was aware of sufficient issues with the loans to render his decision to proceed with them suspicious and commercially unreasonable.  This evidence will be relevant as part of (though hardly the entirety of) the Government's proof of the defendant's intent and motive.  The Government acknowledges that evidence tending to negate these facts would be relevant for that specific purpose—*i.e.*, rebutting the Government's evidence—if otherwise admissible.  But as the Court has recognized in the context of the defendant's motion to suppress the fruits of the search warrant of his phone, while evidence about the loan quality may be relevant to intent, it is not an element of the offense and thus even favorable evidence about the loan would not negate other evidence of corrupt intent.  (*See* Tr., Apr. 23, 2020, at 18 (quality of the loan "certainly bears on intent but I don't think it has the weight that I think the defendant[] would like to place on it"); Dkt. 92 at 11 (finding that even "loan terms beneficial to the bank" would not negate probable cause as to honest services fraud in light of other evidence of corrupt intent)).

Accordingly, even if the defendant proffers competent evidence going to his intent, such

evidence would not establish a defense or be relevant for any purpose other than seeking to rebut the Government's evidence concerning the defendant's mental state. For example, if the defendant sought to prove that Manafort fraudulently concealed certain derogatory credit information from the Bank, this might be relevant to the extent that it rebutted the Government's evidence that the defendant was aware of that specific derogatory information. It would not, however, be relevant to rebut evidence that the defendant was aware of *other* derogatory credit information. And it would certainly not be relevant to rebut evidence of the defendant's corrupt intent unrelated to the quality of the loans, such as the evidence of the defendant's intermingling of the loan processes with his requests from Manafort (*see, e.g.*, Ind. ¶¶ 13-16, 23), or the defendant's contemporaneous remarks about Manafort's "influence" to Bank personnel (*see* Ind. ¶ 24.i). Accordingly, to the extent that evidence submitted by the defendant responds only to evidence or argument the Government is not introducing, it should be precluded. To do otherwise would be to permit the defendant to attack a straw man by "refuting" claims not being made. It would also risk seriously confusing the jury and wasting its time with a mini-trial over whether Manafort perpetrated a fraud against the defendant, disconnected from the question of whether the defendant had corrupt intent.

Similarly, the defendant should be precluded from making arguments suggesting that the soundness of the loans, or his belief in their soundness, would be a complete defense to the charged offense (or, put differently, that his guilt depends on proof that the loans were unsound, or that he believed them to be). Such arguments would only confuse the jury and make it more difficult for them to follow the Court's instructions regarding the Government's burden to prove corrupt intent.

### III.    EVIDENCE OR ARGUMENT ABOUT THE DEFENDANT'S PRIOR COMMISSION OF "GOOD ACTS" SHOULD BE PRECLUDED

To the extent that the defendant may seek to present evidence or argument concerning his prior commission of "good acts," including alleged philanthropic giving, volunteer service, or other good deeds, or to offer proof of his non-criminal activities to seek to disprove his guilt of the crimes charged, he should be precluded from doing so.  Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions."  *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990).  Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait of character," or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense.  *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (defense-proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence.").

The defendant should accordingly be precluded from offering evidence or argument, including in his opening statement, concerning any specific instance or instances of prior good acts, or the lack of commission of other bad acts.

## IV. THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR SYMPATHY

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning his family background, health, age, or any other similar factors, or the consequences of his indictment, including the fact that, as a result of an OCC enforcement action based on the Indictment, he has been barred from the banking industry, including from participating in the management of the Bank and the Holding Company.  (*See, e.g.,* Dkt. 68 (the allegations in the Indictment have, "among other things, damaged [the defendant's] reputation and forced him to take a leave of absence from the bank that he built and has led since 2011").)  He should be precluded from doing so, and from mentioning such subjects in his opening statement, absent a showing that such a factor bears on his guilt.  *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted.  Where the jury has no role at

38

sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  *Id.*  As a result, "'[c]ourts have routinely precluded evidence of possible punishment,'" *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (quoting *United States v. Del Rosario*, No. S1 12 Cr. 81, 2012 WL 2354245, at *2 (S.D.N.Y. June 14, 2012)), as well as other "arguments aimed at jury nullification," *Reese*, 933 F. Supp. 2d at 583.  The Court should do likewise here.

## V.   EVIDENCE OR ARGUMENT THAT THE CHARGES AGAINST THE DEFENDANT ARE POLITICALLY OR OTHERWISE IMPROPERLY MOTIVATED SHOULD BE PRECLUDED

The Court should preclude the defendant from offering any evidence or argument asserting that this prosecution is politically motivated.  As the Court is aware, Manafort was prosecuted for, among other things, bank fraud in connection with misrepresentations he made to the Bank in seeking and obtaining the Manafort loans.[9]  Those charges were investigated and prosecuted in the Eastern District of Virginia by the Special Counsel's Office, which has been the subject of accusations of political motivation.  Defense counsel has not made accusations of this nature regarding this prosecution, but has publicly claimed that the Government's litigation position "calls into question its charging theory and decision to pursue this case" (Dkt. 48), and

---

[9] The jury hung as to the relevant counts, but Manafort later admitted their factual basis in connection with his plea agreement in a prosecution by the Special Counsel's Office in the District of Columbia for other offenses.

the defendant has previously made accusations that bank examiners investigating the Manafort loans were politically motivated.

"District courts have routinely barred defendants from submitting evidence of prosecutorial motivation or misconduct to the jury (even when the case involves possible political overtones)." *United States v. Lupton*, No. 07 Cr. 219, 2008 WL 4603336, at *3 (E.D. Wis. Oct. 16, 2008) (citing cases); *see also United States v. Stewart*, No. 03 Cr. 717, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *see generally United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to 'render a true verdict *according to the law and the evidence*.' We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." (internal citation omitted; emphasis in original)).

The jury must determine whether the Government has sustained its burden of proving beyond a reasonable doubt that the defendant solicited or received personal benefits from Manafort in exchange for the extension of the Manafort loans. The origin of or motivation behind the prosecution is not for the jury's consideration. *See Reese*, 933 F. Supp. 2d at 583-84 ("[A] defendant may not argue before the jury issues relating to the overall propriety of the

Government's investigation in this case." (internal quotation marks omitted)).[10]  Evidence of such would serve no purpose other than to seek to distract the jury from evidence of the defendant's guilt or to encourage jury nullification.  It therefore should be precluded.

## **CONCLUSION**

For the reasons set forth above, the Government's motions in limine should be granted.

Dated:  New York, New York
        October 23, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:  /s/

Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
Tel.: (212) 637-2219/2418/2260
E-mail: paul.monteleoni@usdoj.gov
        douglas.zolkind@usdoj.gov
        benet.kearney@usdoj.gov

---

[10] Even if Calk alleged that this were a selective prosecution – which he has not – such a motion would be would be for the Court alone, not an arugment to be presented to the jury.  *See United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

41