UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :

   UNITED STATES OF AMERICA,          :

                                                :      Case No. 19 Cr. 366 (LGS)

         - against -            :

                                                  :

   STEPHEN M. CALK,                :

                                                :

            *Defendant*.           :

                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**DEFENDANT STEPHEN M. CALK'S MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTIONS IN LIMINE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT .........................................................................................1

ARGUMENT .....................................................................................................................7

    I.     The Court Should Deny the Government's Motion to Preclude Dr.
Carron's Testimony ...............................................................................................7

         A.     Dr. Carron's Proposed Testimony Is Relevant and Helpful to
the Jury...................................................................................................7

         B.     The Government's Objections to Dr. Carron's Testimony Lack
Merit.....................................................................................................11

         C.     Dr. Carron Is Qualified to Offer his Opinions ...........................................13

         D.     Dr. Carron's Expert Notice Is Proper under Rule 16................................15

    II.    Evidence Regarding the Quality of the Loans to Manafort Should Not
Be Excluded.........................................................................................................19

    III.   The Defense Only Seeks to Offer Evidence of Mr. Calk's Good Acts
that Is Relevant to the Charges in this Case.........................................................23

    IV.   The Government's Remaining Arguments ............................................................24

CONCLUSION.................................................................................................................25

KL3 3318163.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ...................................................................................................13

*United States v. Bonventre*,
  No. 10-cr-228 (LTS) (S.D.N.Y. Sept. 19, 2013) ........................................................ 17 & n.13

*United States v. Campbell*,
  No. 04-cr-0424 (RWS), 2006 WL 346446 (N.D. Ga. Feb. 13, 2006) ...........................18 n.14

*United States v. Chandler*,
  66 F.3d 1460 (8th Cir. 1995) ...............................................................................................23

*United States v. Chow*,
  No. 17-cr-667 (GHW) (S.D.N.Y.) .......................................................................................16

*United States v. Day*,
  524 F.3d 1361 (D.C. Cir. 2008) ....................................................................................18 n.16

*United States v. Denny*,
  939 F.2d 1449 (10th Cir. 1991) ...........................................................................................21

*United States v. Duvall*,
  272 F.3d 825 (7th Cir. 2001) .........................................................................................19 n.17

*United States v. Finley*,
  301 F.3d 1000 (9th Cir. 2002) .............................................................................................18

*United States v. Ho,*
  No. 17-cr-779 (LAP) (S.D.N.Y.) ....................................................................................12 n.5

*United States v. Hendrickson*,
  No. 19-cr-35 (TS), 2020 WL 2476126 (D. Utah May 13, 2020) ..................................18 n.14

*United States v. Mahaffy*,
  No. 05-cr-613 (S-3) (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ...................19 n.16

*United States v. Mann*,
  161 F.3d 840 (5th Cir. 1998) ...............................................................................................21

*United States v. McClam*,
  No. 17-cr-596 (GBD) (S.D.N.Y.) ........................................................................................16

ii

*United States v. McCluskey*,
  No. 10-cr-2734 (JCH), 2013 WL 12330062 (D.N.M. June 21, 2013)............................18 n.14

*United States v. Mehta*,
  236 F. Supp. 2d 150 (D. Mass. 2002) ...................................................................................17

*United States v. Nacchio*,
  519 F.3d 1140 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d
  1234 (10th Cir. 2009)............................................................................................................17

*United States v. Rajaratnam*,
  No. S2 09-cr1184 (RJH), 2011 WL 723530 (S.D.N.Y. Feb. 25, 2011) .........................19 n.16

*United States v. Rivera*,
  No. 13-cr-149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015)...................................24

*United States v. Rogers*,
  Crim. Action No. 05-292 (RWR), 2006 WL 5249745 (D.D.C. July 17, 2006) .............18 n.14

*United States v. Ulbricht*,
  No. 14-cr-68 (KBF), 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858
  F.3d 71 (2d Cir. 2017)........................................................................................ 18 & n.16

**Federal Statutes**

18 U.S.C. § 201 ...........................................................................................................22, 23

18 U.S.C. § 215 ...................................................................................................21 n.17, 22, 23

**Rules**

Fed. R. Crim. P. 16 ....................................................................................................... *passim*

Fed. R. Civ. P. 26 ........................................................................................................... *passim*

Fed. R. Evid. 404 ............................................................................................................3, 23

Fed. R. Evid. 405 ............................................................................................................3, 24

Fed. R. Evid. 702 ...................................................................................................7, 8, 11, 12

**Other Authorities**

131 Cong. Rec. S17601-07, 1985 WL 204932 (Dec. 13, 1985).......................................23

Act of Aug. 4, 1986, Pub. L. No. 99-370, 100 Stat. 779 ................................................23

Defendant Stephen M. Calk respectfully submits this memorandum of law in opposition to the government's motions in limine.

## PRELIMINARY STATEMENT

The central question in this case is whether Mr. Calk, acting with corrupt intent, approved bank loans to Paul Manafort in exchange for, and intending to be influenced by, Manafort's assistance in obtaining positions with the Trump campaign and administration. It is not whether The Federal Savings Bank ("TFSB") complied with industry standards, regulations, or best practices in underwriting the loans, or why the Office of the Comptroller of the Currency ("OCC") downgraded the loans many months after they were made. For that reason, among others, we have moved to preclude the government from calling its three experts to testify regarding these issues. It is also why we have not proposed calling our own expert on these matters. To read the government's motion to preclude the testimony of Dr. Andrew Carron, however, one would think that we were offering Dr. Carron as such an expert. We are not. In fact, the government has completely mischaracterized the purposes for which we seek to call Dr. Carron, the nature of his anticipated testimony, and its relevance to this case. Having done so, it then erroneously impugns his qualifications, considering them against a set of opinions that the defense has never indicated he intends to give.

Dr. Carron is an expert in financial economics, with a specialty in mortgage lending. He has a Ph.D. in economics from Yale University and 40 years of experience researching and studying financial economics in the mortgage industry. At trial, Dr. Carron will explain to the jury how mortgage lenders use interest rates, loan-to-value ratios, and other metrics—the very criteria that TFSB used in this case—to measure and balance risk. The relationship among these concepts, about which the jury will hear abundant evidence from the

percipient witnesses in this case, is not self-evident and would benefit from explication by an expert.  This testimony, which is without question within Dr. Carron's area of expertise, will help the jury evaluate the decisions that Mr. Calk made, based on the information that he actually knew, in connection with the Manafort loans.  Dr. Carron does not purport—as do the government's experts—to tell the jury what to conclude about whether Mr. Calk complied with industry standards or banking regulations.  Instead, he will provide the jury with tools and information it can use to determine whether, based on the facts presented to the jury, Mr. Calk approved the loans because of a corrupt *quid pro quo* or because, based on the information he had, the loans made economic sense for his bank.

Contrary to the government's argument, the notice the defense served in connection with Dr. Carron's anticipated testimony (which is further described in this memorandum) complies with Federal Rule of Criminal Procedure 16(b)(1)(C).  This is a criminal case, not a civil matter, and the nature of the information that we have provided is entirely consistent with what is required by the rule; indeed, the government itself regularly provides expert notice of the same kind and in other cases has argued that the rule requires no more.

In addition to the motion to preclude Dr. Carron's testimony, the government also moves to preclude the defense from arguing that "the quality of the loans, or fraud against Calk, are defenses to the charged bribery offense."  (Gov't Mem. of Law in Supp. of Mots. In Limine ("Br.") at 31, Dkt. No. 125).  The government concedes that there is a permissible purpose for introducing such evidence: "to assess whether Calk acted with corrupt intent."  (*Id.* at 1).  That is the very purpose for which we would seek to introduce such evidence at trial, with one qualifier—what Mr. Calk contemporaneously believed about the quality of the loans, and what he knew at that time (rather than what the TFSB underwriting department or others knew), is

2

relevant to assessing why Mr. Calk approved the loans.  Evidence that Mr. Calk believed the

Manafort loans to be financially beneficial to the bank explains why he would have approved

them and provides an alternate explanation to the government's allegation that he did so as part

of a corrupt bargain.  The government's claim that it is entitled to introduce evidence that Mr.

Calk believed the loans to be substandard, yet the defense cannot introduce evidence that he

believed the contrary (or that the defense could only introduce such evidence to rebut the

government's evidence), is internally inconsistent, wrongheaded, and would deprive Mr. Calk of

a fair trial.

 Finally, the government seeks to exclude evidence or argument on a grab bag of

issues, including prior good acts, "irrelevant facts intended to elicit juror sympathy," and the

government's motivations in bringing this case.  (Br. at 38-39).  The defense knows the Federal

Rules of Evidence and will comply with them.  If it seeks, for example, to introduce evidence

regarding Mr. Calk's character, it will do so in the manner permitted by Federal Rules of

Evidence 404(a)(2)(A) and 405.  And if there are particular facts relating to Mr. Calk's

background that are relevant to defending against the government's allegations or otherwise bear

on the issues the jury must decide, we are of course entitled to elicit them.  We have no intention

of seeking to admit irrelevant evidence or make irrelevant arguments.

 Accordingly, the government's motions in limine should be denied.

## BACKGROUND

 The two loans at issue in this case—for $9.5 million and $6.5 million respectively

—were collateralized by property and cash worth significantly in excess of the loans themselves

(and as a result had low loan-to-value ratios), and each carried an initial interest rate of 7.25%, a

rate that is far higher than the standard rate for conventional mortgage loans at that time.  We

expect that the fact witnesses in the case—primarily the TFSB employees who worked on the

KL3 3318163.1

loans—will testify that the loans were made as part of TFSB's "portfolio loan" program, which extended loans to borrowers, like Manafort, who did not qualify for conventional loans that could be marketed to third-party lenders rather than held on TFSB's books.  The witnesses will likely further testify that the higher interest rates and lower loan-to-value ratios—together with the up-front "points" Manafort was required to pay[1]—were intended to offset and compensate the bank for risks inherent in extending credit to borrowers in the portfolio loan program.  The jury must understand the economic rationale for the loans in order to evaluate (and ultimately reject) the government's theory that Mr. Calk's approval of these loans was the product of a corrupt *quid pro quo*.  If the bank witnesses that the government chooses to call in its case in chief are able, either on direct or cross examination, to explain these concepts to the jury in a comprehensible manner, it may be unnecessary for the defense to call an expert witness.  But, as is always the case, the defense cannot predict these things months in advance of trial.

The government's expert notices, served on June 1, 2020, revealed that it plans to call three witnesses to opine that TFSB ignored red flags and failed to comply with industry standards and banking regulations in underwriting the Manafort loans.  Through its proposed expert Joseph Belanger, the government specifically contends that this evidence is relevant even if Mr. Calk was unaware of the facts demonstrating that the loans were unduly risky, and even when the bank's purportedly substandard practices were the same as those used by the bank in connection with other loans entirely unrelated to Manafort, as to which there is no allegation of impropriety.[2]  (*See* Belanger Disclosure Ltr. at 2, Dkt. No. 122-1 ("[E]ven assuming Calk was

---

[1]  TFSB required Manafort to pay to it a fee of 3% of the $9.5 million Summerbreeze loan, and 2% of the $6.5 Union Street loan.

[2]  TFSB was cited by the OCC for regulatory violations in connection with loans entirely unrelated to Manafort for similar issues relating to its assessment of cash flow and issues with appraisals.  (*See* SDNY_00071023 at SDNY_00071024; SDNY_00072384 at SDNY_00072403

4

unaware of certain flaws with the proposed Manafort Loans—it would be contrary to industry practice for him to approve the loans without conducting such further inquiry.").

Along with its notice for Belanger, the government served a 30-page report of the kind typically provided in a civil case pursuant to Federal Rule of Civil Procedure 26(a)(2).[3] The production of such a report in a criminal case pursuant to Federal Rule of Criminal Procedure 16, by either the government or the defense, is highly unusual, if not unprecedented. It is also (as further set forth below) not a requirement under Federal Rule of Criminal Procedure 16(b)(1)(C). Indeed, Belanger's report, both in form and substance, makes it clear that his opinions are the kind that belong in a civil lawsuit, one in which the issue is not bribery, but whether the bank as a whole acted negligently or in violation of a regulatory requirement.

On June 22, 2020, the defense provided notice to the government that Mr. Calk may call Dr. Carron as an expert witness at trial. (*See* Carron Disclosure, Dkt. No. 125-2). The notice advised that the defense would move to preclude the testimony of the government's experts, and only planned to call Dr. Carron were they permitted to testify. (*Id.* at 1). As required by Rule 16(b)(1)(C), the defense notice provided a summary of Dr. Carron's "opinions, the bases and reasons for those opinions, and [Dr. Carron's] qualifications," and attached a 20-page curriculum vitae itemizing the various matters in which Dr. Carron has previously provided reports or testimony. (*Id.* at App. A). It further indicated that Dr. Carron would take into account the testimony of the government's experts at trial, and any additional disclosures from

---

(identifying "seven instances where the appraisal review was completed untimely after the loan's closing date")).

[3] The rule in civil cases requires disclosure of a "written report" including, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2).

KL3 3318163.1

the government prior to trial, and that Dr. Carron would modify or supplement his testimony as appropriate. (*Id.* at 3).

The summary of the substance of Dr. Carron's anticipated testimony contained in the notice outlined four primary subject-matter areas. First, it explained that Dr. Carron would "define, from the point of view of financial economics, the concepts of risk and rate of return and will describe the relationship between those two concepts." (*Id.* at 2). Relatedly, it advised that Dr. Carron would describe and explain the financial criteria generally used to evaluate the riskiness of a residential mortgage loan, including the criteria that we expect the jury will hear about in this case, for example, loan-to-value and debt service coverage ratios, and loan size, among other things. (*Id.*). The notice advised that after defining these concepts and criteria, Dr. Carron would provide context for the jury to evaluate the terms of the Manafort loans, including by reviewing those terms in relation to interest rates and other market benchmarks from the relevant period, and ultimately opining that the terms of the Manafort loans were within the range of applicable market terms, effectively balancing the risks associated with the loans. (*Id.*).

Second, the defense notice advised that Dr. Carron would calculate the profit or loss that TFSB would have realized on the loans under a reasonable range of assumptions for the amount and timing of loan repayment. (*Id.*).

Third, the notice advised that Dr. Carron would describe the concept of "asset-based lending," and explain how Manafort's assets mitigated concerns regarding his future income. (*Id.*).

Fourth, the notice stated that Dr. Carron would rebut a portion of Belanger's anticipated testimony (as described in his report) by opining that a bank's risk is reduced when a holding company takes a participation in a large loan held by the bank. (*Id.*).

KL3 3318163.1

Finally, the defense notice summarized the bases and reasons for Dr. Carron's opinions, referring the government to the documents it has produced containing information about the Manaforts' financial condition and the terms and conditions of the loans, as well as academic and industry literature; OCC Call Reports and other publications, banking regulations and regulatory guidelines, government reports and banking industry publications; and market and industry data on benchmark mortgage rates and industry guidelines used to adjust these rates based on loan specifics. (*Id.* at 2-3).

The defense plans to provide further information regarding Dr. Carron's testimony when it provides its exhibits to the government, due three weeks before trial, including demonstratives and source material that he may use in connection with his testimony.

## ARGUMENT

I. **The Court Should Deny the Government's Motion to Preclude Dr. Carron's Testimony**

### A. **Dr. Carron's Proposed Testimony Is Relevant and Helpful to the Jury**

The government's motion mischaracterizes the substance and purpose of Dr. Carron's proffered testimony. Our notice did not indicate that we plan to call Dr. Carron to rebut testimony by Belanger and the OCC witnesses about underwriting standards, OCC regulations, or fiduciary duties—all of which, for the reasons set forth in our in limine motion, are irrelevant and not the proper subject of expert testimony in this case. Instead, we are calling Dr. Carron to testify regarding the concepts and loan criteria the jury will hear about in testimony from percipient fact witnesses, so that the jury can better understand how TFSB, and in particular Mr. Calk, made the decisions that they did in connection with the Manafort loans. This is an appropriate purpose for expert testimony under Federal Rule of Evidence 702(a), which requires

that an expert's opinion "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

As the government recognizes (Br. at 32, 34-35), evidence about the terms and quality of the Manafort loans is relevant to the extent it helps the jury evaluate Mr. Calk's state of mind when he, along with the two other members of the TFSB loan committee, agreed to approve the loans.  While Mr. Calk was not aware of many of the details of the underwriting process, there is a set of core loan terms about which Mr. Calk was in fact aware when he gave his approval, including the interest rate on the loans and the amount and types of collateral securing the loans.  Without Dr. Carron's testimony, the jury will not comprehend the significance of those terms.  In a vacuum, without context, the jury will not understand that, for example, the interest rate on both Manafort loans—an initial rate of 7.25%—was high for a mortgage loan collateralized by residential property of similar character in 2016 and 2017.  Nor will it have the industry-wide context or experience to compare the loan-to-value ratio for the Manafort loans (which measures the amount of the loan divided by the amount of collateral) to that for conventional residential mortgage loans from the period.  And importantly, the jury may struggle with the concept that lenders, including TFSB, use interest rates and loan-to-value ratios, among other metrics, to offset the risk associated with loans.

This is a critical point.  The evidence will show that Mr. Calk was aware of certain risks in lending money to Manafort, but believed that the high interest rate and amount of collateral, together with the up-front points charged on the loans, were sufficient to protect the bank against, and compensate it for, those risks, and that the transactions would be highly profitable for TFSB.  Dr. Carron's testimony will help the jury to evaluate whether, as we contend, these were reasonable conclusions for Mr. Calk to make, based on what he knew about

Manafort and the loan terms, and thus to assess whether they were the factors that actually drove the loan approval decision.  In addition to explaining how lenders use interest rates, collateral, and other loan criteria to balance risk, Dr. Carron will compare the Manafort loan terms and characteristics to comparable market benchmarks derived from public sources such as *Bloomberg,* reports published by financial institutions, including Standard & Poors, investment banks, and other market participants, and government sources, including Freddie Mac.[4]  Based on this comparison, Dr. Carron will opine that the Manafort loan terms—among other things, the interest rate and collateral coverage—were consistent with similar residential loans in the marketplace, *i.e.* loans that, because of higher levels of risk, also carried higher interest rates and lower loan-to-value ratios.

As described in paragraph two of the defense expert notice, Dr. Carron will walk the jury through a series of calculations designed to illustrate the profit or loss that TFSB stood to realize on the loans, using a number of different scenarios for the amount and timing of loan repayment.  (Carron Disclosure at 2, Dkt. No. 125-2).  For example, Dr. Carron will calculate the amount of interest and fees TFSB stood to earn on the loans and the amount the bank could have reasonably expected to recover from the collateral even in the event of a default.  Although included in Dr. Carron's expert notice, this aspect of the testimony will be more in the nature of arithmetic than opinion.  Doing these calculations and presenting them in a clear manner will provide information that the jury will find useful in assessing, from Mr. Calk's perspective, whether—at that time he approved the loans—it made economic sense for TFSB to extend the loans to Manafort.

---

[4] As noted, the defense will, prior to trial and together with its exhibits, provide the government with the specific source material that Dr. Carron will rely on to reach his conclusions.

KL3 3318163.1

Relatedly, Dr. Carron will address the concept of asset-based lending, which looks to the collateral securing a loan as the primary means by which a lender assesses the risk of a loan. (*Id.*). The purpose of this testimony will be to counter arguments that the government may make that Mr. Manafort's assets were not relevant to the decision to extend the loans. Whether or not TFSB conforms to Belanger's definition of an "asset-based lend[er]," the evidence will show that the bank, and Mr. Calk, considered Manafort's collateral to be a crucial factor in its decision to make the loans. As noted in paragraph three of our notice, Dr. Carron will simply describe the concept of asset-based lending and the relationship between asset coverage and uncertainty regarding the income of the borrower—namely the way in which collateral can mitigate loan risk when a borrower's expected loan income might not otherwise suffice. This relationship would not be obvious to a lay juror and is therefore a proper subject for expert testimony.

Paragraph four of Dr. Carron's notice advises that, contrary to Belanger, he will testify that a bank's risk is reduced when its holding company takes a participation in a large loan held by the bank. (Carron Disclosure at 2, Dkt. No. 125-2). Here, we offer Dr. Carron's testimony simply to rebut Belanger's proffered testimony, described in five sentences in his report, (Belanger Rep. at 18-19, ¶ 66, Dkt. No. 122-1), that TFSB's decision to have its holding company, National Bancorp Holdings ("NBH"), assume a portion of the Union Street loan, "did not serve to reduce overall risk to the financial institution." (*Id.*). Belanger's testimony is totally irrelevant to the case because, among other reasons, the OCC concedes that TFSB's decision to participate a portion of the loan to NBH did not violate any regulation and TFSB remained within its legal lending limit. (Paulson Disclosure Ltr. at 4, Dkt. No. 122-3 ("Banks are legally permitted to sell loan participations to their holding companies so that they do not violate their

legal lending limits."); SDNY_00175727 at SDNY_00175728 ("Legal Lending Limit

Calculation. . . . There is no 12 USC 84 violation as suggested in the WSJ article.")).  Nor has

any regulator, or anyone else, ever suggested that NBH acted improperly, until Belanger, more

than three years after the fact, was retained by the government and served his report in

connection with this litigation.  But surely, if Belanger is permitted to offer this opinion, Dr.

Carron is entitled to rebut it by opining that what matters in this context is the risk to TFSB, and

that Belanger has pointed to no facts demonstrating that the amount of the loan assumed by NBH

was enough to jeopardize the safety or soundness of the enterprise.  Indeed, the financial health

of TFSB and NBH is stronger than ever, notwithstanding that the government seized the

Manafort collateral and has prevented the bank from recovering on the loans.

### B.   The Government's Objections to Dr. Carron's Testimony Lack Merit

Instead of addressing the actual nature and purpose of Dr. Carron's testimony, the

government directs its criticism against a strawman, making a number of irrelevant arguments in

its motion.  It complains, for example, that, in contrast to Belanger's proposed testimony, Dr.

Carron's opinions do not reference Mr. Calk's "duties under applicable regulatory and industry

standards, his duties under applicable Bank policies, and his involvement in approving these

loans while seeking Manafort's assistance in obtaining an administration positon," and cites

cases it claims supports the relevance of Belanger's testimony.  (Br. at 24-31).  Neither Rule 702

nor any other rule requires that the defense's experts testify on the same subjects, or use the same

methodology, as the government's experts.  As set forth above and in our October 23, 2020

motion in limine, Dr. Carron is not testifying about these matters because they are, on the facts of

this case, far removed from the issue of Mr. Calk's state of mind in approving the Manafort loans

and not the proper subject of expert testimony.  As demonstrated above, Dr. Carron's testimony

is proper under Rule 702 because it is designed to assist the jury, through the explication of

matters relating to mortgage loans outside its knowledge, in evaluating Mr. Calk's state of mind

when he approved the Manafort loans.[5]

The government also criticizes Dr. Carron for describing the Manafort loans as

"residential," rather than "commercial," and on this basis argues that he is making "apples-to-

oranges" comparisons.  (Br. at 27, 29).  But the Manafort loans were not "commercial" loans, as

the government contends; they were residential loans.[6]  Indeed, the OCC's own guidelines make

clear that the modifier "commercial" or "residential" refers to the type of property collateralizing

the loan, not the purpose to which the proceeds are put, as the government asserts.  (Br. at 29-

30).  The OCC's Comptroller's Handbook describes "residential real estate (RRE) lending" as

comprising "loans for purchasing RRE (properties designed to house one-to-four families),

refinancing loans used to purchase RRE, and extending closed-end loans or open-end lines of

credit secured by the borrower's equity in RRE."[7]  The Manafort loans, which were primarily

---

[5]   The government cites a bench ruling in Conf. Tr. 57:1-58:24, *United States v. Ho*, 17-cr-779 (LAP) (S.D.N.Y. Nov. 27, 2018), ECF No. 193, for the proposition that Dr. Carron's opinions would not be helpful to the jury on the question of intent.  In *Ho*, the defense sought to call an expert on foreign policy to establish that the defendant's payments to the Chinese government were charitable contributions to further certain foreign policy goals, rather than bribes.  The court precluded the expert's testimony after finding "this case is not a policy or a political debate. . . The question for the jury is whether the defendant agreed to and did offer bribes, not whether those bribes were in furtherance of some alleged [Chinese] state agenda." *Id.* at 57:2-11.  The case has no bearing on the admissibility of Dr. Carron's testimony, which relates directly to the jury's task of determining whether Mr. Calk approved the Manafort simply because he believed they were good business, or, as the government contends, he was corruptly influenced by Manafort's offer of assistance.

[6]   The government variously describes the loans at issue in this matter as "commercial loans" or "commercial real estate loans."  (Br. at 5, 8, 15, 18, 23-24 (commercial loans); *id.* at 13-14, (commercial real estate loans)).  These two terms refer to different instruments.  Dr. Carron will explain that commercial real estate loan is collateralized by a lien on real property, but a commercial loan is not.  As noted below, the Manafort loans were neither.

[7] OCC, *Comptroller's Handbook: Residential Real Estate, Version 1.0 June 2015*, at 1.

secured by residential property designed to house one-to-four families,[8] were accordingly residential mortgage loans, regardless of the uses to which the loan funds were to be put. This is why, in its Call Reports[9] filed with the OCC during the relevant period, TSFB reported the Manafort loans as residential loans.[10] And it is why Dr. Carron's decision to benchmark the Manafort loans against other residential loans in the marketplace is appropriate. If the government nonetheless believes that the comparables and benchmarks selected by Dr. Carron are inapposite for this or some other reason, it is certainly entitled to cross-examine him on that subject at trial. But it has not pointed to anything suggesting that Dr. Carron should not be permitted to testify regarding these matters. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (expert testimony inadmissible if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison,'" while "other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony'" (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992)).

### C.  Dr. Carron Is Qualified to Offer his Opinions

The government asserts that "[Dr. Carron] lacks any experience in the specific subject matter at issue here: bank lending, especially in regard to the underwriting and

---

[8] The first loan was collateralized primarily by the Summerbreeze property, an eight-bedroom single family residence located at 174 Jobs Lane, Water Mill, NY, and secondarily by a residential condominium in Alexandria, VA, as well as $630,000 cash. (SDNY_00175697 at SDNY_00175700-01). The second loan was collateralized by residential property at 377 Union Street, Brooklyn, NY, which Manafort intended to renovate, and $2.5 million cash. (SDNY_00071170 at SDNY_00071170, SDNY_00071178).

[9] A so-called "Call Report" is the Consolidated Report of Condition and Income that lenders like TFSB are required to file on a quarterly basis with the OCC.

[10] *See* TFSB Call Reports, Schedule RC-C Part 1 – Loans and Leases, Loans secured by real estate: Secured by 1-4 family residential mortgages, 9/30/2016, 12/31/2016, 3/31/2017.

KL3 3318163.1

originating of commercial real estate loans." (Br. at 13). But as explained above, Dr. Carron is not planning to testify about the underwriting or origination of commercial real estate loans, and the government's criticism of his qualifications once again misses the point.

Dr. Carron is a financial economist with particular expertise in mortgage lending. He has degrees in economics from Harvard and Yale (including a Ph.D. from the latter), and worked for financial institutions for over a decade, serving as, among other things, the Director of Global Risk Management and Manager of Mortgage Research at Credit Suisse, and Senior Vice President and Manager of Mortgage Research at Lehman Brothers. After leaving Credit Suisse, Dr. Carron spent two decades at NERA Economic Consulting where he eventually rose to be President and Chairman. Dr. Carron's research has focused on mortgage lending, he has testified three times before the House and Senate Banking Committees on mortgage lending, and he has served as an expert numerous times, in federal and state courts, regarding mortgage lending, as concerns both residential and commercial mortgage loans. (App. A to Carron Disclosure at 3-16, Dkt. No. 125-2).[11] He has also authored two peer-reviewed studies on thrift banks, at the time the predominant institutions for portfolio mortgage lending, *i.e.* the kind of lending at issue in this case. (*Id.* at 17 (listing *The Plight of the Thrift Institution* (Brookings Institution, 1982) and *The Rescue of the Thrift Industry* (Brookings Institution, 1983))).

---

[11] Of particular relevance here, in *In re First Alliance Mortgage Company* (C.D. Cal.), Dr. Carron testified at trial on the relationship between risk and interest rates on risky (subprime) home equity mortgages and in *George L. Miller, Chapter 7 Trustee of the bankruptcy estates of American Business Financial Services, Inc. v Santilli* (Pa. Ct. Com. Pl.), Dr. Carron opined on the valuation of certain residential mortgages. Also included on his CV are three matters involving commercial mortgages in which he served as an expert: *CESC Plaza Ltd. P'ship v. United States* (Fed. Cl.); *LaSalle Nat'l Bank v. Metro. Life Ins. Co.* (Ill. Cir. Ct. Ch.); and *Walton St. Cap. L.L.C. v. Ocwen Asset Inv. Corp* (Ill. Cir. Ct. Law Div.).

The government argues that Dr. Carron's "experience analyzing mortgage-backed securities is not relevant to an analysis of the Manafort Loans because these loans were 'portfolio' loans held by the Bank and were not underwritten or originated for the purpose of selling them into a secondary market for securitization." (Br. at 8). But the "purpose" of the origination and underwriting of the Manafort loans has nothing to do with Dr. Carron's testimony. As noted, Dr. Carron will testify regarding the characteristics of the Manafort loans, with particular attention to the manner in which the loan terms balanced the risks associated with the loans. Dr. Carron's experience studying the risk characteristics of mortgage-backed securities (which the government does not question) is directly relevant to that issue, as the credit analysis of a mortgage-backed security focuses on the risk characteristics of the underlying loans. Central to Dr. Carron's expertise is a sophisticated understanding of interest rates, loan-to-value ratios, and the mitigation of loan risk—precisely the issues that he will testify about at trial. The government's criticisms of Dr. Carron's qualifications are accordingly baseless.

### D. Dr. Carron's Expert Notice Is Proper under Rule 16

The government calls the defense's expert notice "woefully inadequate," comparing it to the civil-style expert report it provided in connection with Belanger's testimony, and seeking to graft onto Rule 16 a set of requirements that simply do not exist in the criminal context. (Br. at 16). Rule 16(b)(1)(C) calls for a "summary." It does not require production of the kind of "written report" described in Federal Rule of Civil Procedure 26(a)(2), which, by the terms of that rule, must include "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as the facts or data considered by the witness in forming them, and exhibits used to support them. Fed. R. Civ. P. 26(a)(2)(B). The defense notice advising the government of Dr. Carron's anticipated testimony, which we will supplement

15

with any exhibits and source material to be used closer to trial, complies with the criminal rule as interpreted by the courts and by the government itself in other cases in this District.

To demonstrate how far Belanger's report is from the norm—and that our notice is entirely consistent with the practice in this District—we attach the government's own expert notices in two other recent criminal cases, *United States v. Chow* (S.D.N.Y.) and *United States v. McClam* (S.D.N.Y.). In both of these cases, the government's notices provided far less information that we have provided in this case. In *Chow*, a securities fraud case, the government's notice was less than two pages, in which it gave notice regarding *four* proposed experts.[12] (Gov't Expert Notice, *United States v. Chow*, No. 17-cr-667 (GHW) (S.D.N.Y. Feb. 16, 2018), ECF No. 52-3, attached hereto as Exhibit A). In *McClam*, the government provided a two-page notice with regard to three proposed experts. (Gov't Expert Notice, *United States v. McClam*, No. 17-cr-596 (GBD) (S.D.N.Y. Sept. 8, 2020), ECF No. 133-1, attached hereto as Exhibit B). As to one of them, an expert on cell-site technology, the government provided a one-sentence description regarding the content of the expert's testimony, and advised simply that his opinions were "based on his training and experience, as well as records provided by the service providers for the cellular telephones." (*Id.* at 4).

Indeed, the government has made the very distinction that we make here between the criminal and civil expert rules, defending its summary expert notices under Rule 16 as the

---

[12] As to one of the experts, the entirety of the disclosure amounted to five sentences, which in addition to identifying the expert and referring the defense to his CV, advised that he would "provide general testimony regarding the fiduciary duties that investment advisors operating in the United States owe to their advisees, including the duty to refrain from using confidential information acquired in their work as investment advisors to benefit themselves and/or their friends." (Gov't Expert Notice at 2, *Chow*, ECF No. 52-3). As to another expert, the government simply listed four topic areas that it anticipated the expert would testify about. (*Id.* at 1-2).

kind of disclosure contemplated by the rule.  In *United States v. Bonventre*, a fraud case arising out of the Madoff scandal, the government served a paragraph-long notice regarding an expert it intended to call to testify about the application of GAAP and certain other accounting matters relating to broker-dealers.[13]  After the defendant filed a motion claiming that the disclosure was inadequate, the government opposed, arguing that Rule 16(a)(1)(G) "does not contemplate a complete recitation of each and every opinion expected to be offered by a witness, nor does it require an expert in a criminal trial to index the materials he or she relied upon."  (Gov't Supp. Mem. of Law in Opp'n to Defs.' Mots. In Limine at 6, *United States v. Bonventre*, No. 10-cr-228 (LTS) (S.D.N.Y. Sept. 19, 2013), ECF No. 438).  In making this argument, the government pointed out that its "expert disclosure obligations under Rule 16 stand in stark contrast to, for example, the expert disclosures contemplated by the Federal Rules of Civil Procedure."  (*Id.*).

   Time and again, the courts have made clear that a brief summary of an expert's opinions and basis for those opinions is all that is required under Rule 16, often drawing the same distinction between the criminal and civil rules.  *See, e.g.*, *United States v. Nacchio*, 519 F.3d 1140, 1152 (10th Cir. 2008) ("Unlike under the civil rules, an expert in a criminal case is not required to present and disclose an expert report in advance of testimony."), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009); *United States v. Finley*, 301 F.3d 1000, 1017 (9th Cir. 2002) (holding disclosure that "supplied the government with sufficient notice of the general nature of [the expert's] testimony" was sufficient); *United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass. 2002) ("While Fed.R.Civ.P. 26(a)(2) requires a

---

[13] On the defendant's request, the government subsequently provided a supplemental disclosure consisting of six additional sentences describing the expert's testimony.  (Gov't Supp. Mem. of Law in Opp'n to Defs.' Mots. In Limine at 4, *United States v. Bonventre*, No. 10-cr-228 (LTS) (S.D.N.Y. Sept. 19, 2013), ECF No. 438).

KL3 3318163.1

'complete statement' of the expert's opinion, the criminal rule requires only a 'summary of testimony.'").[14]

   The defense notice in this case provides a summary description of Dr. Carron's opinions, the bases and reasons for them, and his qualifications.  That is all that is required.  Tellingly, the government is unable to find a single case where a court has found a notice to be improper where it was provided months before trial, as here, and including a description akin to that contained in Dr. Carron's notice.  Indeed, the cases cited by the government demonstrate the sufficiency of the notice here, as the notices rejected in those cases were either served late or contained far less information than we have provided, or both.  For example, in *United States v. Ulbricht*, the court found that the defense had been dilatory (the notice was served *during* trial), was purposefully skirting the rules, and the disclosures—which contained only a list of topics and no opinions—were completely deficient.[15]  *Ulbricht*, 2015 WL 413318, at *6.[16]

---

[14] *See also United States v. Hendrickson*, No. 19-cr-35 (TS), 2020 WL 2476126, at *1 (D. Utah May 13, 2020) (holding that Rule 16 requires a "written summary" of the expert's testimony but no written expert report); *United States v. McCluskey*, No. 10-cr-2734 (JCH), 2013 WL 12330062, at *3 (D.N.M. June 21, 2013) ("Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules."); *United States v. Campbell*, No. 04-cr-0424 (RWS), 2006 WL 346446, at *1 (N.D. Ga. Feb. 13, 2006) ("Rule 16 does not mandate a comprehensive recitation of every nuance and detail that will make up an expert's testimony, or which may be drawn out on cross-examination."); *United States v. Rogers*, Crim. Action No. 05-292 (RWR), 2006 WL 5249745, at *4 (D.D.C. July 17, 2006) (holding disclosure adequate where it included more than a list of topics and noted the expert's education, training, and experiences as the expert's basis for his testimony).

[15] The court found: "Here, the defense made a choice to delay its Rule 16 disclosures until the trial had commenced and then to delay the second by another week.  The prejudice of this delay was compounded by the total lack of adherence to the basic prescriptions of the level of content required Rule 16."  *United States v. Ulbricht*, No. 14-cr-68 (KBF), 2015 WL 413318, at *6 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858 F.3d 71 (2d Cir. 2017).

[16] *See also United States v. Day*, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008) (noting that expert notice did not include the expert's conclusions); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The government's notice provided a list of the general subject matters to be

Dr. Carron's disclosure is fully consistent with Rule 16 and the practice in this District, and the government's application for supplementary disclosure should be denied.

## II.   Evidence Regarding the Quality of the Loans to Manafort Should Not Be Excluded

In addition to seeking to preclude Dr. Carron's testimony, the government moves to preclude the defense "from introducing evidence or argument suggesting that the quality of the loans—or the defendant's belief in their quality, whether fraudulently or innocently induced—is a defense to the charged crime of financial institution bribery."  (Br. at 31).  As the Court can see from this sentence, the government unhelpfully conflates the relevance of evidence, the permissibility of arguments and the correctness of legal instructions.  With respect to the soundness and quality of the Manafort loans, the defense only seeks to introduce relevant evidence, make logical and fair arguments based on the evidence, and seek correct legal instructions from the Court.  To extent the government's motion seeks to preclude the defense from doing any of these things, it should be denied.

The government recognizes that it has the burden of proving the defendant's corrupt intent, that "corrupt intent is established by proof of a corrupt *quid pro quo*," and that "a genuine belief in the soundness of the loans…may be relevant to an evaluation of corrupt intent." (Br. at 33-34).  There is, therefore, no dispute that both the defense and the government may introduce evidence that is probative of Mr. Calk's beliefs about the soundness of the Manafort loans.  Just as the government would argue that evidence, if it existed, that Mr. Calk believed the

---

covered, but did not identify what opinion the expert would offer on those subjects."); *United States v. Rajaratnam*, No. S2 09-cr-1184 (RJH), 2011 WL 723530, at *1 (S.D.N.Y. Feb. 25, 2011) (defense did not provide any expert disclosure at all and took the position they were not required to do so); *United States v. Mahaffy*, No. 05-cr-613 (S-3) (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (court precluded defense expert from testifying "due to his late submission" and noted that notwithstanding the lateness, "[t]he testimony would also be excluded because the disclosure statement only proffered general topics and did not describe any opinions that would be offered by the witness on these topics").

loans were unsound but approved them anyway supports an inference of corrupt intent, the
defense must be free to argue the converse.

      Although the government concedes that evidence about the quality or soundness
of the loans is relevant to refute corrupt intent, it tries to cabin this evidence by suggesting that
evidence of the loans' good quality, or of Mr. Calk's belief in their good quality, is relevant only
to the extent it directly and specifically rebuts the government's evidence of the loans' purported
low quality or of Mr. Calk's concerns that they were bad loans.  (*See* Br. at 34-35 ("[E]vidence
and argument regarding arguably positive aspects of the loans should be limited to that necessary
to rebut the Government's evidence of flaws in the loans."); *id.* at 35 ("[E]vidence or argument
that the defendant was deceived or mistaken about flaws in the loans, or other facts related to
Manafort, should be limited to that necessary to rebut the Government's evidence of the
defendant's knowledge of flaws or concerning factors in the loan relationship.")).  The
government cites no support for its unusual argument.  If evidence is relevant and probative of
the defendant's lack of the requisite criminal intent, it is admissible regardless of what the
government chooses to present.  By analogy, in a murder case a defendant would be entitled to
show that the victim was a good friend, even if the government did not attempt to show that the
two were enemies.  Similarly, evidence here that shows Mr. Calk was motivated by the bank's
best interest, and not any alleged bribe from Manafort, is admissible regardless of the specific
evidence the government introduces at trial.

      Contrary to the government's contention, this Court's comments during the
argument on Mr. Calk's earlier motion to suppress evidence did not suggest that evidence that
the loans were highly favorable to the bank would be irrelevant or inadmissible at trial.  (Br. at
35).  The Court instead indicated that the economically favorable terms of the loans for the bank

20

KL3 3318163.1

did not preclude a finding of probable cause.  (Opinion and Order at 10-11, Dkt. No. 92).  But

the Court did not gainsay the relevance of that evidence or suggest that it would not be material

to a jury deciding whether the government had proved the defendant's corrupt intent beyond a

reasonable doubt.[17]

       The remaining arguments that the government makes in this motion relate not so

much to admissibility of evidence as to jury instructions.  The Court may choose to defer

consideration of such arguments until the parties have actually submitted requests to charge.  But

we can note here that the points that the government makes based on two cases that interpret the

bank bribery statute are not applicable here.  (Br. at 32-34).  In *United States v. Denny*, 939 F.2d

1449, 1451 (10th Cir. 1991), the court held that the government was not required to show the

bank ultimately suffered a loss to prove a violation of law.  The defense does not contend

otherwise.  In *United States v. Mann,* 161 F.3d 840, 855 (5th Cir. 1998), the court held that a

violation of Section 215 does not require proof that the transaction that was the subject of the

bribe was consummated.  Again, there is no dispute on this issue, although it has no relevance

here.

       The government also argues, without legal support, that it is not a "defense that

the defendant erroneously believed the loans to be sound because he was defrauded by

Manafort."  (Br. at 32)  It is beyond dispute that Manafort committed fraud against Mr. Calk and

his bank—the government has charged it and Mr. Manafort has admitted it.  (Br. 39 & n.9).  In

bringing this case, the government has taken upon itself the task of proving that Manafort bribed

Mr. Calk at the same time that Manafort was defrauding Mr. Calk.  If what the government

---

[17] As the Court will recall, the statute charged in the indictment, bank bribery under 18 U.S.C. § 215, is different from the statutes references in the search warrant, all of which hinged on legal theories that the government has abandoned.

means to argue in its motion is that proof of Manafort's fraud would not be a complete defense for Mr. Calk, *i.e.*, if proven it would not require that the jury acquit the defendant, the defense does not disagree.  But the fact that Manafort deceived Mr. Calk about his creditworthiness and provided the bank with false information is relevant to Mr. Calk's state of mind.  And the jury is entitled to consider the argument that Manafort is unlikely to have gone to the trouble of perpetrating bank fraud against TFSB if he had secured Mr. Calk's approval of the loans by means of a corrupt *quid pro quo*.

Finally, the government contends that "the soundness of the loans, or [Mr. Calk's] belief in their soundness" is not "a complete defense to the charged offense."  (Br. at 36).  The government's argument suffers from two flaws.  First, the government is not being precise enough.  The defense does not plan to argue to the jury that Mr. Calk's guilt depends on whether the loans were "sound" or "unsound" or whether he believed them to be either of those things. Instead, the defense may argue, based on the elements of a violation of Section 215, that the government is required to prove beyond a reasonable doubt that Mr. Calk acted (1) "corruptly" and (2) "with the intent to be influenced or rewarded" in connection with the Manafort loans. The fact that Mr. Calk believed that the loans were in the best interests of the bank and that he would have approved them regardless of the purported non-monetary benefits he received from Manafort shows the absence of the specific criminal intent required by the statute.

The second flaw in the government's argument is that it misreads the relevant statute and the case law.  The government wrongly urges the Court to assume that the jury instruction on the element of intent for a violation of Section 215 would essentially be identical to a violation of 18 U.S.C. § 201, which relates to bribery of <u>public</u> officials.  It is true that courts have held that it is not a defense to a violation of Section 201 that the public official would have

taken the action in question regardless of the bribe.  (Br. at 32-33 and n.7).  But the government

cites no case applying that instruction to a violation under Section 215.  There is a good reason

for that.  What the government misses is that although Sections 201 and 215 both use the word

"corruptly," Section 215, unlike Section 201, specifically requires as an additional element that

the recipient of the purported bribe acted "with [the] intent to [be] influence[d] or reward[ed]."

This statutory language was the subject of an amendment enacted in 1986.  *See United States v.*

*Chandler*, 66 F.3d 1460, 1470 (8th Cir. 1995); Act of Aug. 4, 1986, Pub. L. No. 99-370, 100

Stat. 779.  The very purpose of the added language was to cure the statute of the overbreadth that

the government urges here.  *See* 131 Cong. Rec. S17601-07, 1985 WL 204932 at *2 (Dec. 13,

1985) ("Unless modified, this statute threatens to chill legitimate interaction between financial

institution employees, customers, and professionals who serve these institutions.").  It would be

contrary to the plain text of the statute and to the evident legislative purpose to omit the "intent to

[be] influence[d]" requirement from Section 215, just as it would be counter-textual to insert it

into Section 201.

Accordingly, the government's motion to limit the defense's evidence and

arguments with respect to the soundness and quality of the Manafort loans should be denied.

### III.   The Defense Only Seeks to Offer Evidence of Mr. Calk's Good Acts that Is Relevant to the Charges in this Case

The government unnecessarily moves to preclude the defense from offering

extrinsic evidence of Mr. Calk's "good acts" to prove his good character.  We do not intend to do

so.  If the defense intends to introduce evidence regarding Mr. Calk's character, it will do so in

the manner permitted by Federal Rules of Evidence 404(a)(2)(A) and 405.

However, as one of the cases cited by the government makes clear, evidence of

specific "good acts" is admissible if the conduct is relevant to the charges in the case.  *See, e.g.,*

*United States v. Rivera,* No. 13-cr-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving except "to the extent that evidence of good conduct is relevant to the charged conduct").  Here, a specific aspect of what could be considered Mr. Calk's substantial history of good acts are relevant to the charged conduct.  Mr. Calk served in the United States Army in active duty and as a reservist for 16 years.  As a private citizen he has dedicated himself to promoting the best interests of the men and women of the armed services by, for example, serving on the board of the USO of Illinois, making a point of hiring veterans to work at his bank and focusing the bank's strategy on making loans to veterans.  Activities such as these, which evidence Mr. Calk's passion for the military and desire to serve, led Mr. Calk to believe that he was qualified to apply for a position as Secretary or Undersecretary of the Army.  Given his qualifications, Mr. Calk did not believe that assistance from Manafort in applying for the jobs was a *quid pro quo* for approving the loans.  Since Mr. Calk's intent in receiving assistance from Manafort is at the center of this case, the defense should be permitted to present that evidence and make that argument to the jury.  Doing so does not run afoul of the bar on proving "good character" by specific instances of conduct.

## IV.    The Government's Remaining Arguments

The government seeks to exclude evidence or argument on a handful of other issues that do not appear to be relevant.  These motions should be denied as moot.

First, it argues that Mr. Calk should be precluded from introducing evidence of otherwise irrelevant facts intended to elicit juror sympathy and evidence or argument concerning punishment or consequences he faces if convicted.  (*See* Br. at 38).  The defense knows the Federal Rules of Evidence and will comply with them.

24

Second, the government asks the Court to preclude Mr. Calk from offering any evidence or argument to the jury asserting that this prosecution is politically motivated.  (*See* Br. at 39).  The defense does not intend to do so.

## CONCLUSION

For the foregoing reasons, Mr. Calk respectfully requests that the Court should deny each of the government's motions in limine.

Dated:   New York, New York
         November 13, 2020

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: */s/ Paul H. Schoeman*
     Paul H. Schoeman
     Darren A. LaVerne
     1177 Avenue of the Americas
     New York, NY 10036
     Telephone: 212.715.9100

LOEB & LOEB LLP

     Jeremy Margolis
     Joseph J. Duffy
     321 N. Clark Street
     Chicago, IL 60654
     Telephone: 312.464.3100

*Attorneys for Defendant Stephen M. Calk*

KL3 3318163.1

# EXHIBIT A

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 7, 2018

**BY ELECTRONIC MAIL**
George S. Canellos, Esq.
Katherine R. Goldstein, Esq.
Adam Fee, Esq.
Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005

   Re:  <u>United States</u> v. <u>Benjamin Chow</u>,
       **17 Cr. 667 (GHW)**

Dear Counsel:

   Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the Government hereby provides notice and a written summary of expert testimony it may offer at the trial of this matter.

   First, the Government may offer testimony from Peter J. Melley, the Director of the Criminal Prosecution Assistance Group at the Financial Industry Regulatory Authority ("FINRA"). A *curriculum vitae* for Mr. Melley is attached.

The Government intends to call Mr. Melley to testify about the following subjects:[1]

1) Background and explanatory information on securities trading, including markets and exchanges, public companies, stocks (equity), bonds (debt), trading volume, brokerage and margin accounts, and relevant trading concepts such as long purchases, short sales, options, and hedges;

2) Securities and Exchange Commission filing requirements for public companies, including 10-K reports, 10-Q reports, 8-K reports, quarterly and annual earnings announcements and guidance;

---

[1] The Government does not intend to elicit any opinion testimony from Mr. Melley but nevertheless provides this expert disclosure in the event that the Court or the parties construe any portion or aspect of his proffered testimony to be considered expert testimony.

3) Background information on corporate finance and major corporate events, including mergers, acquisitions, spinoffs, initial public offerings, and the relevant regulatory filings for such events;

4) Summary exhibits and charts relating to transactions referenced in the Indictment, including Michael Yin's trading in the stock of Lattice Semiconductor Corporation, as well as the price and trading volume of Lattice, including the percentage of daily trading volume in that stock by Mr. Yin and others.

Second, the Government may call Professor Arthur Laby, of Rutgers Law School, to provide expert testimony regarding the fiduciary obligations of investment advisers to their advisory clients, including duties of confidentiality. A copy of Professor Laby's *curriculum vitae* is attached. Professor Laby will not discuss or opine on the defendant's conduct or whether the defendant breached any such duties. Rather, he will provide general testimony regarding the fiduciary duties that investment advisors operating in the United States owe to their advisees, including the duty to refrain from using confidential information acquired in their work as investment advisors to benefit themselves and/or their friends. We anticipate that Laby will testify that such fiduciary obligations exist irrespective of whether an advisor is registered with the SEC.

Third, subject to the parties' stipulating to the accuracy of English translations of written and spoken communications that originally occurred in Mandarin, the Government may call an individual qualified to interpret and/or translate from Mandarin to English. This individual would certify the accuracy of the Government's written translations, as well as provide expert testimony regarding nuances of the Mandarin dialect.

Fourth, subject to the possibility of a stipulation among the parties, the Government may call an expert in cellphone and computer forensics. This individual would testify regarding the procedures used to extract forensic data from the electronic devices that were searched by the Government in this matter, to authenticate the results of those searches, and to interpret the results.

Finally, the Government may call additional summary witnesses who will not provide expert testimony but will only testify about summary charts and exhibits.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: /s/_____ _ ___
    Elisha Kobre
    Scott Hartman
    Assistant United States Attorneys
    (212) 637-2289 / 2357

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 18, 2020

**BY EMAIL**

Aaron J. Mysliwiec, Esq.
Miedel & Mysliwiec LLP
80 Broad Street – Suite 1900
New York, NY 10004

     Re:    ***United States v. Tony McClam**, 17 Cr. 596 (GBD)*

Dear Mr. Mysliwiec:

     Based on your request, this letter provides notice, pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."), of certain expert testimony that the Government intends to offer during its case-in-chief at trial. The Government reserves the right to call additional expert witnesses, and will promptly provide notice if the Government elects to do so.

    **I.   Disclosure By the Government**

      **a.  Cellular Telephone Records and Cell Site Location Information**

     The Government expects to offer testimony from Reginald Donaldson, an Investigative Analyst with the United States Attorney's Office for the Southern District of New York. Mr. Donaldson has received specialized training in analyzing cellular telephone records, including in interpreting data regarding the locations of communications towers used to transmit cellular voice, text, and data communications ("cell site location information"). Mr. Donaldson has previously been qualified to offer expert testimony on cell site location information on multiple occasions.

     The Government expects that Mr. Donaldson would testify as to his analysis of the defendant's cellular telephone records and those of Raymundo Leal, as well as his opinion regarding the use and/or location of the defendant's and Leal's telephones, including but not limited to the use and/or location of those telephones in the vicinity of the drug transaction that occurred on May 31, 2017 in and around the Vince Lombardi service area in Ridgefield, NJ, and on the day preceding the transaction. Mr. Donaldson's opinions are based on his training and experience, as well as records provided by the service providers for the cellular telephones. The

Aaron Mysliwiec, Esq.
August 18, 2020
Page 2 of 2

relevant records were previously produced to you under Bates numbers McClam_000978 and McClam_000100.

Attached are (i) Mr. Donaldson's curriculum vitae; (ii) copies of Mr. Donaldson's training certifications; and (iii) a list of certain prior cases in which Mr. Donaldson provided expert testimony. Please note that this list is a representative sample and may not be comprehensive.  It is provided as a courtesy in the event you wish to obtain transcripts of this testimony.

### b.  Forensic Chemist – Controlled Substance Analysis

The Government expects to offer testimony from Noel R. Vadell, a forensic chemist with the Drug Enforcement Administration ("DEA").  Mr. Vadell is expected to testify regarding the controlled substance analysis he performed in connection with the seizure of the substance reflected in the lab report produced under Bates number McClam_000045, and the conclusion he reached that the substance contained cocaine.  Mr. Vadell's opinions are based on his training and experience, as well as his review of data from tests he performed.  Mr. Vadell's curriculum vitae is attached, which describes his education, training, and experience.

### c.  Canine Handler – Narcotics Detection Canine

The Government expects to offer testimony from Frank Aresta, a Task Force Officer with the DEA.  TFO Aresta is expected to testify about the canine search he conducted with his German Shepard partner "Cedo" on May 31, 2017 and the canine's positive indication for the presence of narcotics odor.  The relevant investigative report detailing Cedo's deployment was previously produced to you under Bates number 3502-07.  Attached are Cedo's certification records.

### II.        Demand for Reciprocal Expert Notice

In light of your request for the foregoing notice, the Government hereby requests reciprocal notice under Fed. R. Crim. P. 16(b)(1)(C).  In addition, the Government reiterates its request, dated November 6, 2017, for reciprocal disclosure of any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

The Government also reiterates its request that the defendant disclose prior statements of witnesses he will call to testify, including expert witnesses.  *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975).  We request that such material be provided on the same basis upon which we agree to supply the defendant with 3500 material relating to Government witnesses.

Aaron Mysliwiec, Esq.
August 18, 2020
Page 2 of 2

Very truly yours,

AUDREY STRAUSS
Acting United States Attorney

By: _____/s/_____
Dominic A. Gentile
Brett Kalikow
Assistant United States Attorneys
(212) 637-2567/2220