UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA           :

                                    :

         -v.-                       :        19 Cr. 366 (LGS)

                                    :

STEPHEN M. CALK,                  :

                                    :

                   Defendant.    :

                                    :

------------------------------------------------------------x

# MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*

AUDREY STRAUSS
Acting United States Attorney
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.......................................................................................................... 1

BACKGROUND .......................................................................................................... 4

ARGUMENT ............................................................................................................... 6

I.     JOSEPH BELANGER'S EXPERT TESTIMONY SHOULD BE ADMITTED
      BECAUSE EVIDENCE OF A BREACH-OF-DUTY IS CORE TO AN
      EVALUATION OF WHETHER THE DEFENDANT ACTED "CORRUPTLY" .... 6

     A.    The Government's Proffered Expert Testimony...................................... 6

     B.    Applicable Law ...................................................................................... 9

           1.    Evidence of Breach-of-Duty to Prove That a Defendant Acted
                "Corruptly" ............................................................................. 9

           2.    Expert Testimony on Regulatory Standards, Industry Practices, and
                Fiduciary Duties ................................................................... 13

     C.    Discussion ............................................................................................ 15

II.    BLAKE PAULSON'S NON-EXPERT TESTIMONY SHOULD BE ADMITTED
      BECAUSE IT WILL PROVIDE GENERAL BACKGROUND AND CONTEXT TO
      ENABLE THE JURY TO UNDERSTAND OTHER EVIDENCE ........................... 27

     A.    The Challenged Testimony .................................................................. 27

     B.    Applicable Law .................................................................................... 29

     C.    Discussion ............................................................................................ 29

III.   CATHERINE AGUIRRE'S TESTIMONY WILL BE RELEVANT AND
      ADMISSIBLE TO REBUT ANY DEFENSE ARGUMENT THAT THE
      MANAFORT LOANS WERE SOUND, THAT CALK BELIEVED THEM TO BE
      SOUND, OR THAT THEY WERE EXTENDED USING PROPER PROCEDURES
      ................................................................................................................... 32

     A.    The Challenged Testimony .................................................................. 32

           1.    Predicate Evidence of the Defendant's Awareness of Issues With the
                Loans .................................................................................... 33

           2.    Aguirre's Testimony ............................................................ 35

     B.    Applicable Law .................................................................................... 36

C.     Discussion ......................................................................................... 37

       1.     **Aguirre's Testimony Regarding the Flaws in the Manafort Loans Will Be Relevant if the Defendant Argues that the Loans Were Sound or that He Believed Them to Be Sound** ...................................................... 37

       2.     **Aguirre's Description of Flaws in the Bank's Processes Will Be Relevant if the Defendant Relies on Those Processes to Argue the Loans Were Sound** ................................................................................... 40

**IV.     JEFFREY MCCUTCHEON'S EXPERT TESTIMONY SHOULD BE ADMITTED FOR THE NARROW PURPOSE OF ESTABLISHING THAT THE "THING OF VALUE" WAS WORTH MORE THAN $1,000** ........................................................... 44

A.     Applicable Law ................................................................................ 45

B.     Discussion ......................................................................................... 45

**CONCLUSION** ...................................................................................................... 51

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ............................................ 9

*Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369 (S.D.N.Y. 2014) .............................. 50

*Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520 (D.C. Cir. 1982) ...................................... 26

*Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501 (S.D.N.Y. 2008) ........................ 50

*Filho v. Safra Nat'l Bank of N.Y.*, No. 10 Civ. 7508 (JFK), 2014 WL 12776165 (S.D.N.Y. Mar. 11, 2014) .................................................................................................................................. 29

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012) ................................ 14, 18, 29, 31

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .............................................................................. 25

*In re Ephedra Prod. Liab. Litig.*, 393 F. Supp. 2d 181 (2005) .................................................... 47

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................ 29

*Kalaba v. United States*, 139 S. Ct. 131 (2018) .......................................................................... 14

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) ................................................. 25

*Ng Lap Seng v. United States*, No. 19-1145, 2020 WL 3492669 (U.S. June 29, 2020) ................ 9

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................................... 13

*Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009) ......... 46, 47, 50

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395 (S.D.N.Y. 2013) 14

*Rochester Gas & Elec. Corp. v. GPU, Inc.*, 355 F. App'x 547 (2d Cir. 2009) ...................... 13, 17

*Sere v. McNally Int'l Corp.*, No. 00 Civ. 8370 (KNF), 2004 WL 187126 (S.D.N.Y. Jan. 29, 2004) ........................................................................................................................................ 49

*U.S. S.E.C. v. Zwick*, 317 F. App'x 34 (2d Cir. 2008) ................................................................. 14

*U.S. S.E.C. v. Zwick*, No. 03 Civ. 2742 (JGK), 2007 WL 831812 (S.D.N.Y. Mar. 16, 2007) 14, 17

*United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 341 (2d Cir. 1961) ..................................... 10

*United States v. Bilotto*, No. 04 Cr. 343, 2005 WL 5978665 (W.D. Tex. Sept. 27, 2005) ........... 44

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ..................................................... 19, 25

*United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995) ................................................................... 10

*United States v. Brooks*, No. 06 Cr. 550 (JS), 2010 WL 291769 (E.D.N.Y. Jan. 11, 2010) .. 13, 17

*United States v. Burreson*, 643 F.2d 1344 (9th Cir. 1981) ......................................................... 21

*United States v. Galanis*, 758 F. App'x 71 (2d Cir. 2018) .................................................... 14, 18

*United States v. Gross*, 15 Cr. 769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .... passim

*United States v. Keiser*, 578 F.3d 897 (8th Cir. 2009) .................................................. 21

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) ................................................ 11

*United States v. Marmolejo*, 89 F.3d 1185 (5th Cir. 1996) ......................................... 45

*United States v. Martoma*, 993 F. Supp. 2d 452 (S.D.N.Y. 2014) .............................. 40

*United States v. McElroy*, 910 F.2d 1016 (2d Cir. 1990) ...................................... passim

*United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ................................................................................................................. 23, 24

*United States v. Mongelli*, 794 F. Supp. 529 (S.D.N.Y. 1992) .................................... 45

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ........................... 10, 16

*United States v. Murgio*, No. 15 Cr. 769 (AJN), 2017 WL 365496 (S.D.N.Y. Jan. 20, 2017) .... 11

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ....................... 9, 10, 12, 15

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) ............................................ 13, 17

*United States v. Petit*, No. 19 Cr. 850 (JSR) ............................................................. 24

*United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997) .............................................. 43

*United States v. Rivieccio*, 846 F. Supp. 1079 (E.D.N.Y. 1994) ................................ 11

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) ........................................... 10, 15

*United States v. Seabrook*, 814 F. App'x 661 (2d Cir. 2020) ................... 36, 38, 39, 40

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) ..................................... 10, 15

*United States v. Sprouse*, 517 F. App'x 199 (4th Cir. 2013) ..................................... 22

*United States v. St. Pierre*, 599 F.3d 19 (1st Cir. 2010) ............................................ 24

*United States v. Tartaglione*, 815 F. App'x 648 (3d Cir. 2020) ................................. 21

*United States v. Williams*, 585 F.3d 703 (2d Cir. 2009) ........................................... 29

*United States v. Wiseberg*, 727 F. App'x 1 (2d Cir. 2018) .................................... 14, 18

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206 (2d Cir. 2009) ..... 13

## **Statutes**

18 U.S.C. § 215 ...................................................................................................... passim

18 U.S.C. § 215(a) ...................................................................................................... 45

18 U.S.C. § 215(a)(2) .................................................................................................... 9

18 U.S.C. § 666 ........................................................................................................... 45

Bank Bribery Amendments Act of 1985 (Pub. L. 99-370, Aug. 4, 1985) .................... 12

**Other Authorities**

H.R. REP. No. 99-335, 5, 1986 U.S.C.C.A.N. 1782, 1786 (1985) .............................................. 12

OCC, *The Director's Book: Role of Directors for National Banks and Federal Savings Associations* (July 2016) ........................................................................................................ 26

**Rules**

Fed. R. Evid. 401 ....................................................................................................................... 15

Fed. R. Evid. 402 ....................................................................................................................... 15

Fed. R. Evid. 702 .................................................................................................................. 13, 47

Fed. R. Evid. 702(a) ................................................................................................................... 16

Fed. R. Evid. 704(b) ................................................................................................................... 42

**Treatises**

John K. Villa, BANKING CRIMES: FRAUD, MONEY LAUNDERING AND EMBEZZLEMENT § 5:23 ... 12, 16

## <u>INTRODUCTION</u>

The key issue in this case is whether the defendant corruptly solicited a bribe from Paul Manafort, intending to be influenced in his approval of $16 million in loans to Manafort.  The Government is not remotely interested in transforming this trial into a debate about "best practices in underwriting."  (Def. Mem. 1).  The Government bears the burden, however, of proving that the defendant acted "corruptly," and the Government therefore is entitled to put on evidence of, among other things, what the defendant's duties were in order to show that he corruptly breached them.  Such evidence is standard in bribery cases, including bank bribery cases under 18 U.S.C. § 215, unlike the inapposite cases cited by the defendant.  As detailed herein, the Government intends to limit this evidence considerably, precisely so as to avoid turing the trial into a debate about "best underwriting practices."

However, in the event that the *defendant* tries to turn this trial into a referendum on the quality of the loans, for example by falsely suggesting to the jury that the loans were sound (or that he believed them to be sound), or by misleadingly suggesting to the jury that he followed proper or standard procedures in causing The Federal Savings Bank (the "Bank") to approve the loans, the Government would then—and only then—offer expert testimony or more detailed testimony from two fact witnesses from the Office of the Comptroller of the Currency ("OCC") necessary to rebut such false claims.  The defendant's objections to this plainly relevant and helpful testimony are grounded in misapprehension of the anticipated testimony or based on wholly inapposite case law, and should be rejected.

To begin with, while the Government provided broad expert notice in an abundance of caution and in order to enable the defense to prepare their case, the Government is prepared to offer testimony that is significantly more narrow than the opinions described in its expert notices,

as described below.  In particular, the Government will not elicit *any* expert testimony that addresses the specific facts of this case or that opines as to whether the defendant or the Bank violated applicable duties—unless the defendant opens the door to such testimony by offering evidence or argument that the loans were sound or that the defendant believed them to be sound.

As narrowed, the Government thus anticipates eliciting the following:

*First*, Joseph Belanger, a veteran in bank lending whose qualifications as an expert are unchallenged, will educate the jury as to the duties (including fiduciary duties) owed by a bank chairman/CEO in the defendant's position, pursuant to regulatory standards and industry practice.  Belanger will not address the facts of this case, and will not opine as to whether the defendant violated any of his duties, but rather will testify only in general terms (unless, as noted, the defendant opens the door to more fact-specific testimony).  This testimony is relevant and admissible because expert testimony on regulatory standards, industry practice, and fiduciary duties is routinely admitted where, as here, it bears on the defendant's mental state.  Simply put, the Government bears the burden of proving that the defendant acted corruptly, and the Government therefore is entitled to put on evidence regarding the duties that the defendant owed, so that the jury can evaluate the extent to which, if at all, he breached those duties in connection with his approval of the Manafort loans.

*Second*, Blake Paulson, a senior OCC official, will be called at the outset of the trial, as a *fact* witness, who will testify to an important interaction with the defendant and also to provide necessary context and set the stage for other evidence.[1]  While Paulson will describe his job

---

[1] Although the Government provided advance notice of Paulson's testimony to facilitate the defendant's ability to prepare for trial and so that the defendant could make a motion such as the

responsibilities, including his work at the OCC, the OCC's regulatory framework and certain basic banking concepts relevant to the OCC's work and that will arise throughout the trial, he will not be asked to apply that framework or those concepts to the facts of this case. Nonetheless, this sort of background testimony is routinely and properly elicited through knowledgable fact witnesses and is critical so that the jury has a basic framework for understanding the complex issues in the case.

*Third*, Catherine Aguirre, the OCC examiner assigned to the Bank, will testify as a fact witness regarding her routine examination of the Bank in 2017—but she will only testify if the defense opens the door, that is, if she is needed to rebut misleading evidence or arguments the defense may make about the quality of the Manafort loans.  In particular, the Government does not currently intend to call her unless the defendant opens the door by offering evidence or argument falsely suggestng that the loans to Manafort were in fact sound or advantageous (or that the defendant believed them to be) or that the Bank followed proper procedures in extending them.  If the defendant does so open the door, the Government is entitled to correct that false impression for the jury by calling Aguirre to rebut these claims.  Aguirre will do so by describing her analysis—performed several months after the loans were extended and in the ordinary course of her duties as a bank examiner—and her conclusion that, as of the time the loans were originated, based on information known to the Bank at that time, Manafort had insufficient income to service the loans, and that the Bank's procedures for approving the loan were flawed. While the defendant tries to characterize this evidence as unrelated to his intent (Def. Mem. 22),

---

instant one well in advance of trial, Paulson is a fact witness and will not offer any expert testimony.

the opposite is true.  The Government has ample evidence it will present prior to calling Aguirre that the defendant was aware of serious reasons to doubt Manafort's access to reliable income—the very flaw that Aguirre relied upon in her analysis.

And *fourth*, Jeffrey McCutcheon will provide expert testimony that is narrowly tailored to proving an essential element of the crime: that the "thing of value" solicited by the defendant exceeded $1,000.[2]  McCutcheon will draw on his many years of experience in the human resources and executive compensation fields to offer his expert opinion regarding the potential monetary value of an appointment to a presidential campaign advisory post and an appointment to an executive branch position—positions that the defendant solicited Manafort's assistance in obtaining.  Although the defendant complains that the "thing of value" is Manafort's assistance, not the positions themselves, expert testimony regarding the value of the positions will enable the jury to draw inferences regarding the value of Manafort's assistance.

## BACKGROUND

This case concerns the defendant's corrupt abuse of his position as then-CEO and Chairman of the Bank, a federally-insured savings association, and its holding company National Bancorp Holdings, Inc. (the "Holding Company"), to solicit personal benefits for himself in exchange for approving millions of dollars in loans from the Bank and the Holding Company.  In particular, from approximately July 2016 to approximately January 2017, the defendant worked to extend $16 million in financing to Paul Manafort—a political consultant who for a portion of this time period was chairman of the Donald J. Trump 2016 presidential campaign and who, after

---

[2] The defendant can obviate the need for McCutcheon's testimony by agreeing to an appropriate stipulation that the "thing of value" was worth more than $1,000.

formally leaving the campaign, remained influential with the campaign and, later, presidential transition team—in exchange for Manafort's assistance with the defendant's efforts to secure prestigious high-level positions on the campaign and in the administration.  Manafort appointed the defendant to the Trump campaign's economic advisory committee and ultimately arranged for the defendant to be interviewed by the presidential transition team for a position in the administration, specifically, Under Secretary of the Army.

Meanwhile, the defendant was closely and personally involved in causing the Bank to extend the $16 million in loans during the exact time period that he was soliciting Manafort's assistance.  The defendant caused the Bank to approve the loans despite significant red flags regarding Manafort's ability to repay them, such as his history of defaulting on prior loans, looming foreclosure auctions, and uncertain cash flow.  While the defendant did not personally conduct detailed analysis showing that Manafort was unable to pay his loans and may not have been made aware of all of the specific negative information that his employees learned of, the evidence will establish that defendant *did* know and *was* aware of significant risk factors—including Manafort's history of defaults and looming foreclosure actions—regarding the loans, which represented the largest loan relationship at the Bank.  The defendant also used his position as Chairman of the Holding Company to cause the Holding Company to purchase a portion of the Manafort loans from the Bank, an unusual maneuver allowing the Bank to extend loans that would have otherwise exceeded its statutory lending limit to a single borrower.  The Manafort loans ultimately ended in default following Manafort's arrest, and the Bank sustained a multimillion dollar loss which it is currently attempting to recoup.

**ARGUMENT**

I. **JOSEPH BELANGER'S EXPERT TESTIMONY SHOULD BE ADMITTED BECAUSE EVIDENCE OF A BREACH-OF-DUTY IS CORE TO AN EVALUATION OF WHETHER THE DEFENDANT ACTED "CORRUPTLY"**

As set forth below, the Government proposes to call Joseph Belanger as an expert to provide narrow testimony regarding the duties owed by a bank director/CEO in the defendant's position under regulatory standards and industry practice. This testimony will be general in nature, focused on the applicable duties without addressing the specific facts of this case. Because the jury must determine whether the defendant acted "corruptly" under Title 18, United States Code, Section 215, and because evidence of a breach of duty is highly relevant to that determination, Belanger's testimony will be immensely helpful in educating the jury as to the nature and scope of the defendant's duties, so that the jury can evaluate the extent to which, if at all, the defendant breached those duties. Indeed, expert testimony on regulatory standards, industry practice, and fiduciary duties is routinely admitted under these circumstances, where the evidence bears on the defendant's mental state, and the cases cited by the defendant in response are plainly inapposite and easily distinguishable. Belanger's testimony will neither invade the province of the jury nor be unfairly prejudicial because Belanger will not address the specific facts of this case—and will not offer any opinion as to whether the defendant in fact violated his duties—unless the defendant opens the door to such testimony.

A. **The Government's Proffered Expert Testimony**

On June 1, 2020, the Government provided the defendant with expert notice describing Belanger's qualifications, his analysis of the $9.5 million and $6.5 million loans extended by the Bank to Manafort, and the opinions he formed based on his analysis. (*See* Dkt. 125 Ex. 1 and Ex. A attached thereto ("Belanger Rep.")). The Government previously summarized Belanger's

opinions in its memorandum of law in support of its motions *in limine*.  (*See* Dkt. 125 at 5-6).

Upon further consideration, and as noted above, the Government is prepared not to offer all of the testimony set forth in Belanger's expert notice in its case-in-chief.  Rather, the Government will offer, through Belanger, expert testimony that is narrower and more circumscribed, focused on educating the jury as to the duties owed by a bank director/CEO in the defendant's position under regulatory standards and industry practice, without addressing the particular facts of this case (or offering any opinion as to whether the defendant violated applicable duties) unless the defendant opens the door to such testimony.

Specifically, the Government intends to offer testimony at trial from Belanger covering the following topics, in sum:

- The fiduciary "duty of care" owed by a bank director/CEO serving on the bank's loan committee—as reflected in regulatory standards and industry practice—to undertake an informed review of a loan under consideration, including evaluating pertinent creditworthiness factors (such as collateral, the borrower's income and financial condition, the reliability of the borrower's financial documentation, the borrower's background and profile, and the borrower's capability to engage in the intended use of funds).  (*See* Belanger Rep. 19-23).

- The duties of a bank director/CEO involved in lending, based on regulatory standards and industry practice, to scrutinize proposed real estate development loans, including by evaluating the borrower's background and reputation as a developer.  (*See* Belanger Rep. 24).

- The duties of a bank director/CEO involved in lending, based on regulatory standards and industry practice, to analyze a prospective borrower's ability to repay a loan (*e.g.*, based on demonstrated cash flow) and willingness to repay a loan (*e.g.*, based on a track record of repaying debts when due).  (*See* Belanger Rep. 24).

- The duty of a bank CEO, based on regulatory standards and industry practice, to effectively manage risk, implement a strong risk culture and comply with laws, regulations, and internal bank policies.  (*See* Belanger Rep. 27).

- The fiduciary "duty of loyalty" owed by a bank director/CEO—as reflected in regulatory standards and industry practice—to engage in conduct that is free from conflicts, including acting in the best interest of the bank and not engaging in

official bank conduct that will directly or indirectly benefit them personally.  (*See* Belanger Rep. 27-28).

- The duty of a bank holding company director, based on regulatory standards and industry practice, to maintain the holding company as a source of financial strength for the subsidiary bank.  (*See* Belanger Rep. 18-19).

As to each of the above-referenced topics, the Government intends to elicit testimony regarding the nature, scope, and basis of the applicable duties as a general matter, but will not—except as described below—elicit testimony concerning the facts of this particular case, including any testimony about whether the defendant breached duties that he owed.[3]  However:

- If the defendant offers evidence (for example, through Calk's testimony) or argument suggesting that he in fact complied with the above-described duties, the Government reserves the right to call Belanger to rebut such evidence.

- If the defendant suggests—through questioning, evidence or argument—that the Manafort loans were "good" for the Bank (*i.e.*, that they were high-quality loans, that they were well-collateralized, or that they were otherwise consistent with industry standards), or that it was reasonable for a prudent banker in the defendant's position to believe that they were good for the Bank, the Government reserves the right to call Belanger to rebut such evidence or argument.

In sum, the Government intends to call Belanger (i) to educate the jury as to the duties owed by a bank director/CEO in the defendant's position under regulatory standards and industry practice (without addressing the particular facts of this case), (ii) if applicable, to rebut any evidence offered by the defendant suggesting that he in fact complied with his duties in relation to the Manafort loans, and (iii) if applicable, to rebut any evidence or argument by the defendant suggesting that the Manafort loans were high-quality or consistent with industry standards, or

---

[3] In order to ensure that the testimony is sufficiently concrete as to be helpful to the jury, the Government may pose certain questions in hypothetical form, but will be careful to avoid posing questions that assume the truth of facts that the defendant disputes.  To the extent possible, the Government will preview these hypothetical questions with defense counsel so that any dispute may be raised with the Court in advance of Belanger's testimony.

that it was reasonable for a banker in the defendant's position to believe them to be so.

**B.     Applicable Law**

**1.     *Evidence of Breach-of-Duty to Prove That a Defendant Acted "Corruptly"***

Section 215 makes it a crime for any "officer, director, employee, agent, or attorney of a financial institution" to "corruptly solicit[] or demand[] for the benefit of any person, or corruptly accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution."  18 U.S.C. § 215(a)(2).  "When a statute uses the word 'corruptly,' the government must prove more than the general intent necessary for most crimes.  It must prove that a defendant acted 'with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.'"  *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019) (quoting *United States v. McElroy*, 910 F.2d 1016, 1021-22 (2d Cir. 1990)), *cert. denied*, No. 19-1145, 2020 WL 3492669 (U.S. June 29, 2020); *see also id.*  ("'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil" intent (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005)).

As the Second Circuit made clear in *Ng Lap Seng*, although "the 'corruptly' element of bribery does not invariably require . . . a breach of duty," evidence of such a breach is highly relevant in many cases.  *Ng Lap Seng*, 934 F.3d at 143; *see id.* at 144 n.33 (the "common thread that runs through common law and statutory formulations of the crime of bribery is the element of corruption, breach of trust, or violation of duty" (internal quotation marks omitted)).  Indeed, "a fundamental component of a 'corrupt' act [by a public official] is a breach of some official duty owed to the government or the public at large."  *United States v. Rooney*, 37 F.3d 847, 852

(2d Cir. 1994); *see also id.* ("'[B]ribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty." (quoting *United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 341 (2d Cir. 1961))); *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995) ("A person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a government agent in connection with his official duties."); *cf. United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (in bribery case, upholding admission of evidence of New York State ethics rules applicable to defendant in his capacity as a state senator).

In the context of Section 215—where the alleged bribery involves a bank official rather than a public official—evidence of a breach of duty is equally pertinent.[4]  Thus, in determining whether a bank official acted corruptly—*i.e.*, with a "bad purpose," intending to achieve "an unlawful end or result" or "a lawful end or result by some unlawful method or means," *McElroy*, 910 F.2d at 1021—it is highly relevant for the jury to consider whether the official breached duties he owed the Bank under regulatory standards, industry practice, fiduciary obligations, or Bank policy.  *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 718-20 (S.D.N.Y. 2016) (indictment sufficiently alleged that defendant acted "corruptly" in violation of Section 215 because it alleged that he "intentionally took actions that violated the duties he owed in his capacity as Chairman of the Board of [a financial institution]," and noting that Government expected also to introduce evidence that defendant violated pertinent regulations); *United States*

---

[4] Section 215 uses the same statutory term—"corruptly"—as other bribery offenses, and the Second Circuit interprets the term consistently across statutes.  *See Ng Lap Seng*, 934 F.3d at 142 (citing *McElroy*'s definition of "corruptly" under Section 215 to interpret the term in two other bribery statutes, holding it applies "[w]hen a statute uses the word 'corruptly'").

*v. Gross*, 15 Cr. 769 (AJN), 2017 WL 4685111, at *10, *33 (S.D.N.Y. Oct. 18, 2017) (evidence

at trial—which was sufficient to convict defendant federal credit union official under Section

215—included evidence that defendant "made no effort to comply with various regulations

governing how credit unions process, report, and inspect [certain] transactions" and that the

defendant's conduct "created a risk that . . . the credit union would foot the bill, and also risked

violating [applicable] regulations"; rejecting argument that defendant "received insufficient

notice relating to certain regulatory violations" that were at the "center" of the Government's

case), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) (rejecting argument

that evidence of regulatory violations was unduly prejudicial due to surprise); *see also McElroy*,

910 F.2d at 1023-24 (in Section 215 prosecution, admitting evidence that loans to defendant

violated a particular regulation because such evidence "served to explain the basis for [a relevant

bank's] lending policies and creditworthiness determinations as they related to [defendant's] loan

application" and because jury was instructed that "a violation of [the regulation] would 'not

amount to criminal conduct under federal law'").

Breaches of fiduciary duties, in particular, are highly relevant to a determination of

whether a bank official acted corruptly.  *See United States v. Murgio*, No. 15 Cr. 769 (AJN),

2017 WL 365496, at *18 (S.D.N.Y. Jan. 20, 2017) ("The Government contends that [defendants]

offered over $150,000 in bribes to [bank official] for the purpose of acquiring control of the

[bank], and that, in exchange for those bribes, [the bank official] helped them effectuate that plan

in violation of his fiduciary duties."); *United States v. Rivieccio*, 846 F. Supp. 1079, 1086

(E.D.N.Y. 1994) (defendant "was found guilty of nine counts of bribery of bank officials . . . in

violation of 18 U.S.C. § 215" resulting from his actions "knowingly participat[ing in] and

induc[ing] . . . breaches" of the "fiduciary duties owed [by the officials] to the depositors of [the bank]"); *see also* John K. Villa, BANKING CRIMES: FRAUD, MONEY LAUNDERING AND EMBEZZLEMENT § 5:23 ("Bribery is a classic breach of an employee's fiduciary duty to his employer.").

Indeed, the legislative history of Section 215 confirms that breaches of fiduciary duties are at the center of the statute's definition of "corruptly." The original version of the statute did not require that a defendant act corruptly in order to be found guilty. In the Bank Bribery Amendments Act of 1985 (Pub. L. 99-370, Aug. 4, 1985), Congress amended the statute to impose a "corruptly" *mens rea* requirement. As the House Committee on the Judiciary explained:

> The Committee . . . concluded that section 215 must be narrowed. The current law makes federal criminals out of innocent persons who are not engaged in culpable or wrongful conduct. The Committee agrees with the Department of Justice that ***the purpose of a bank bribery offense is to deter instances of corruption in the bank industry where efforts are made to undermine an employee's fiduciary duty to his or her employer***. The legislation recommended by the Committee has been drafted with this purpose in mind. Thus, section 215, as amended . . . would require for criminal liability that the person giving or receiving a bribe or reward act corruptly. The Committee believes that this approach will ***enable the Department of Justice to prosecute conduct that involves an effort to undermine an employee's fiduciary duty to his or her [bank] employer***, without stigmatizing as 'criminal' conduct that is not culpable or wrongful.

H.R. REP. No. 99-335, 5, 1986 U.S.C.C.A.N. 1782, 1786 (1985) (internal quotation marks and footnotes omitted) (emphasis added).

In sum, although the Government is not required to establish a violation of an applicable duty in order to prove that the defendant acted corruptly, *see Ng Lap Seng*, 934 F.3d at 143,

evidence of such a breach is highly relevant to a finding of corrupt intent under Section 215.

### 2. *Expert Testimony on Regulatory Standards, Industry Practices, and Fiduciary Duties*

Expert testimony is admissible when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "District courts enjoy broad discretion in admitting expert testimony, and [the Second Circuit] will reverse only for manifest error." *Rochester Gas & Elec. Corp. v. GPU, Inc.*, 355 F. App'x 547, 551 (2d Cir. 2009) (citing *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009)). Indeed, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).[5]

Courts routinely admit expert testimony regarding duties owed by defendants—whether such duties arise from regulations, industry standards, fiduciary obligations, or otherwise—in cases where such evidence will assist the jury in evaluating the defendant's mental state. *See, e.g.*, *United States v. Nouri*, 711 F.3d 129, 136, 145 (2d Cir. 2013) (evidence was sufficient to uphold commercial bribery conviction based in part on "the government's industry expert" who testified "about the legal obligations of brokers in dealing with their customers," "FINRA rules," "[i]ndustry rules," and "industry standards"); *United States v. Brooks*, No. 06 Cr. 550 (JS), 2010 WL 291769, at *4 (E.D.N.Y. Jan. 11, 2010) (denying defendant's motion *in limine* and authorizing Government's expert to testify about applicable "SEC, OTC, NASDAQ, and AMEX

---

[5] For a full description of the law applicable to expert testimony under Federal Rules of Evidence 702, 703, and 401-403, the Government respectfully refers the Court to the Government's memorandum of law in support of its motions *in limine*. (*See* Dkt. 125 at 10-13).

13

rules," "the fiduciary duties that directors and officers owe a publicly-held corporation,"

applicable "disclosure and reporting obligations," "SEC regulations concerning related party

disclosures," and a corporate executive's "responsibilities" in signing a "representation letter");

*U.S. S.E.C. v. Zwick*, No. 03 Civ. 2742 (JGK), 2007 WL 831812, at *20 (S.D.N.Y. Mar. 16,

2007), *aff'd*, 317 F. App'x 34 (2d Cir. 2008) (jury properly found that defendant acted with

requisite mental state based on expert testimony establishing that markups charged by defendant

"exceed[ed] industry standards for such markups"); *United States v. Wiseberg*, 727 F. App'x 1,

4–5 (2d Cir.), *cert. denied sub nom. Kalaba v. United States*, 139 S. Ct. 131 (2018) (evidence

was sufficient to uphold conviction for conspiring to illegally distribute prescription narcotics

based in part on Government's pharmaceutical expert who testified about the duties and

responsibilities of pharmacists under state law); *United States v. Galanis*, 758 F. App'x 71, 74

(2d Cir. 2018) (rejecting argument that district court erred in permitting Government to call a law

professor to offer "opinions about the legal standard of materiality, the requirements of

Regulation S, and the meaning of certain fiduciary duties"); *see also Gill v. Arab Bank, PLC*, 893

F. Supp. 2d 523, 537 (E.D.N.Y. 2012) (denying motion to exclude expert witness who would

testify regarding "the customs and practices—specifically, United States banking regulations—

under which the Bank operated in the United States" because "[t]he Bank's state of mind is a

central issue in this litigation" and "[t]estimony as to the content of banking industry standards

and practices—and the Bank's compliance with such standards and practices—will be valuable

to a jury likely to be unfamiliar with such topics."); *cf. Reach Music Pub., Inc. v. Warner

Chappell Music, Inc.*, 988 F. Supp. 2d 395, 402-03 (S.D.N.Y. 2013) (admitting expert testimony

regarding industry practice as circumstantial evidence of actual knowledge).

14

**C.     Discussion**

Belanger's testimony should be admitted because (i) the key disputed issue at trial is likely to be whether the defendant acted "corruptly"; (ii) evidence that the defendant violated various duties he owed the Bank, whether under regulatory standards, industry practice, or otherwise, is highly relevant to the jury's evaluation of the defendant's *mens rea*; (iii) Belanger's testimony will be immensely helpful to the jury in explaining the duties owed by a bank director/CEO in the defendant's position; and (iv) Belanger's testimony will neither invade the province of the jury nor be unfairly prejudicial because he will not address the facts of this case, or offer any opinion as to whether the defendant violated his duties, unless the defendant opens the door, in which case Belanger's testimony will address the facts of this case only insofar as is necessary to narrowly rebut specific defense arguments.

*First*, the main issue likely to be disputed at trial is whether the defendant acted "corruptly."  Accordingly, as a general matter, any evidence that "has a[] tendency to make" it "more or less probable" that the defendant acted corruptly is admissible.  Fed. R. Evid. 401, 402.

*Second*, evidence that the defendant breached his duties is highly relevant to the question of whether he acted "corruptly."  *See Ng Lap Seng*, 934 F.3d at 143, 144 n.33 (noting that although "the 'corruptly' element of bribery does not invariably require . . . a breach of duty," such evidence is germane in many cases and that "the element of corruption, breach of trust, or violation of duty" is the "common thread that runs through common law and statutory formulations of the crime of bribery" (internal quotation marks omitted)).  Such evidence is routinely admitted in cases involving public-sector bribery.  *See, e.g.*, *Rooney*, 37 F.3d at 852 ("a fundamental component of a 'corrupt' act [by a public official] is a breach of some official duty owed to the government or the public at large"); *Skelos*, 707 F. App'x at 740 (in bribery case,

15

upholding admission of evidence of New York State ethics rules applicable to defendant in his capacity as a state senator).

And evidence of a breach-of-duty is equally relevant and admissible in bribery cases involving bank officials under Section 215.  *See, e.g.*, *Murgio*, 209 F. Supp. 3d at 718-20 (indictment sufficiently alleged that defendant acted "corruptly" in violation of Section 215 because it alleged that he "intentionally took actions that violated the duties he owed in his capacity as Chairman of the Board of [a financial institution]," and noting that Government expected also to introduce evidence that defendant violated pertinent regulations); *Gross*, 2017 WL 4685111, at *10, *33; *McElroy*, 910 F.2d at 1023-24.  Indeed, as explained above, the legislative history of Section 215 makes clear that breaches of fiduciary duties are at the center of the statute's definition of "corruptly."  *See* H.R. REP. No. 99-335, 1986 U.S.C.C.A.N. at 1786 ("[T]he purpose of a bank bribery offense is to deter instances of corruption in the bank industry where efforts are made to undermine an employee's fiduciary duty to his or her employer."); *see also* John K. Villa, BANKING CRIMES: FRAUD, MONEY LAUNDERING AND EMBEZZLEMENT § 5:23 ("Bribery is a classic breach of an employee's fiduciary duty to his employer.").

In sum, evidence that the defendant breached his duties to the Bank in connection with his approval of the Manafort loans is relevant to the question of whether he acted corruptly, and is therefore admissible.

*Third*, Belanger's testimony will be helpful to the jury in explaining the duties owed by a bank director/CEO in the defendant's position.  *See* Fed. R. Evid. 702(a) (expert testimony is admissible if, *inter alia*, the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").  The Government expects to offer a wealth of evidence, through the

testimony of Bank employees, emails, and other documents, concerning the Manafort loans and the actions the defendant took with respect to them.  But while this evidence will prove what the defendant *did*, the Government must also prove—and the jury must evaluate—the defendant's mental state.  As set forth above, in determining whether the defendant acted "corruptly," a very important—albeit not dispositive—question is whether he breached his fiduciary duties or other duties to the Bank imposed by regulatory standard, industry practice, or otherwise.  Yet, in the absence of expert testimony, a lay jury will have no reliable basis for undertaking this critical analysis.  Lay jurors cannot be expected to know, for example, what fiduciary duties are, or what is required of a bank CEO serving on (or chairing) a bank's loan committee, or what duties are owed by a director of a bank holding company.  An expert like Belanger, whose unchallenged credentials include over three decades of bank lending experience, is well-positioned to provide narrow testimony to educate the jury about these duties.  Such testimony is well within the Court's "broad discretion" to admit.  *Rochester Gas & Elec. Corp.*, 355 F. App'x at 551.

Indeed, as set forth above, courts in this Circuit routinely admit expert testimony regarding duties under regulatory standards and industry practice where such testimony will assist the jury in evaluating the defendant's mental state.[6]  *See, e.g.*, *Nouri*, 711 F.3d at 136, 145 (finding evidence sufficient to uphold commercial bribery conviction based in part on Government expert who testified about industry standards, regulatory rules, and "legal obligations of brokers in dealing with their customers"); *Brooks*, 2010 WL 291769, at *4 (authorizing Government's expert to testify about applicable fiduciary duties and industry rules and regulations); *Zwick*, 2007 WL 831812, at *20 (upholding jury's determination of defendant's

---

[6] The cases cited by the defendant are easily distinguishable and inapposite, as described below.

mental state based on expert testimony about "industry standards"); *Wiseberg*, 727 F. App'x at 4–5 (Government's expert testified about duties and responsibilities of pharmacists under state law); *Galanis*, 758 F. App'x at 74 (Government called law professor to offer opinions about "the meaning of certain fiduciary duties" and the requirements of a particular regulation); *see also Gill*, 893 F. Supp. 2d at 537 (authorizing expert to testify about U.S. banking customs, practices, and regulations because "[t]he Bank's state of mind is a central issue in this litigation" and "[t]estimony as to the content of banking industry standards and practices—and the Bank's compliance with such standards and practices—will be valuable to a jury likely to be unfamiliar with such topics."). As in these cases, Belanger's testimony is admissible because it will help the jury understand the duties owed by the defendant, which, in turn, will enable the jury to draw important inferences about whether the defendant violated those duties and acted corruptly.

And *fourth*, Belanger's testimony will neither invade the province of the jury nor be unfairly prejudicial because (unless the defendant opens the door) Belanger will not address the specific facts of this case and will offer no opinion as to whether the defendant in fact violated his duties. The defendant's arguments to the contrary have no merit:

1. With respect to Belanger's opinion that the Manafort loans were not consistent with regulatory and industry-standard lending practices, the defendant argues that the opinion suffers from a "logical flaw" insofar as it "invit[es] the jury to speculate that an imprudently underwritten loan is likely to be a corrupt loan," and suffers from a "factual flaw" because "Mr. Calk was not an underwriter and was unaware of the vast majority of factors that Belanger contends were overlooked, mishandled or misunderstood by the bank's underwriting department." (Def. Mem. 16-17). However, as an initial matter, and as discussed above, the

Government will not elicit this testimony from Belanger unless the defendant opens the door to it by suggesting through questioning, evidence, or argument that the Manafort loans were high-quality, were well-collateralized, or were otherwise consistent with industry standards. Similarly, if the defendant suggests to the jury that the Manafort loans were "good" for the Bank, then the Government would offer testimony from Belanger limited to narrowly rebutting this claim. Such evidence would be relevant and admissible to ensure that the jury is not misled into believing that the loans were anything other than extremely risky and outside the realm of what a prudent lender would entertain. *See United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) ("The weighing of relevance under Rule 403 may be altered when a false impression is created by earlier testimony. That is, evidence whose probative value might not ordinarily outweigh its prejudicial effect if offered on direct examination is admiss[i]ble to rebut testimony elicited on cross examination that created a false impression.").[7]

        2.      With respect to Belanger's opinion that the defendant's decision to transfer a portion of the Manafort loans from the Bank to the Holding Company "undermined the [H]olding [C]ompany's ability to act as a source of financial strength and undermined the purpose of setting a lending limit in the first place" (Belanger Rep. 18-19), the defendant argues—in a brief footnote—that this opinion is a "non-sequitur" and purportedly conflicts with the OCC's

---

[7] In the event that the defendant opens the door to such testimony, the Government would be amenable to an appropriate limiting instruction making clear to the jury that the defendant is not charged with violating regulatory standards, industry practice, or Bank policies, and that such evidence should be considered only insofar as the jury determines that it bears on the defendant's mental state. Such a limiting instruction is more than sufficient to avoid any potential unfair prejudice. *See, e.g.*, *McElroy*, 910 F.2d at 1023-24 (upholding admission of evidence concerning regulatory violation in Section 215 prosecution because the evidence was relevant to "lending policies and creditworthiness determinations" and because court "instruct[ed] the jury that a violation of [the regulation] would 'not amount to criminal conduct under federal law'").

determination.  (Def. Mem. 18 n.14).  Once again, the Government does not anticipate eliciting an

opinion about the specific facts of the case unless and until the defendant opens the door to it.

However, with respect to the general principles underlying this opinion, which the Government

does intend to elicit, the defendant's arguments are baseless.  Belanger will explain to the jury that,

based on regulatory standards and industry practice, directors of bank holding companies have a

duty to "conduct their operations in a safe and sound manner and particularly to act as a source of

financial strength to the subsidiary bank," and that transferring a loan from a subsidiary bank to its

holding company, to avoid breaching a legal lending limit, would "not serve to reduce overall risk

to the financial institution."  (Belanger Rep. 18-19 (citing industry and regulatory guidance)).  This

testimony will greatly aid the jury in evaluating whether the defendant acted corruptly, since the

jury would otherwise have no way to contextualize the defendant's conduct in light of the purpose

of bank holding companies and the duties of their directors.  Furthermore, as discussed above,

Belanger will provide this testimony without addressing the specific facts of this case, and without

opining as to whether the defendant violated his duties, unless the defendant opens the door to

such testimony.[8]

   3.  With respect to Belanger's opinion that a bank director/CEO on a bank's

loan committee owes a fiduciary "duty of care" to undertake an informed review of a loan under

---

[8] With respect to the defendant's contention that Belanger's opinion differs from that of the
OCC, assuming *arguendo* that this is true (a proposition the Government disputes (*see* Dkt. 122-
3 at 4 (Paulson opining that this practice "casues a concentration of credit" and "is in tension
with the principle that the holding company should be a source of financial strength for the
bank"))), the defendant is free to raise it on cross-examination of Belanger and OCC witnesses,
and to argue it to the jury.  At most, this point bears on the weight to be afforded to Belanger's
testimony, not its admissibility.

consideration (*see* Belanger Rep. 19-23), the defendant argues that "Belanger clearly oversteps his bounds and exceeds his expertise" because "if the law of fiduciary duty . . . is relevant to this case, it is clearly for the Court, and not an expert, to instruct the jury on what the law is."[9] (Def. Mem. 19). This argument is baseless. As an initial matter, as set forth above, evidence relating to whether the scope of the defendant's fiduciary duties in connection with his approval of the Manafort loans is unquestionably relevant because it bears on whether he acted corruptly. (*See* Section I.B.1, *supra*). Further, as also described above, courts in this Circuit routinely admit expert testimony on fiduciary and other duties when such evidence is relevant to the defendant's mental state. (*See* Section I.B.2, *supra*). Other Circuits are uniformly in accord. *See, e.g.*, *United States v. Tartaglione*, 815 F. App'x 648, 651 (3d Cir. 2020) (upholding admission of expert testimony about "the fiduciary duties of care and loyalty applicable to directors and officers of . . . organizations [such as the one run by the defendant]" and noting that "qualified experts may testify about not only business customs and practices but also applicable legal duties, especially when those non-governing laws help explain fraudulent intent" (footnote and citations omitted)); *United States v. Keiser*, 578 F.3d 897, 904 (8th Cir. 2009) (upholding admission of "expert testimony about the fiduciary duties of commodities brokers"); *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir. 1981) (upholding admission of expert testimony about "the nature and extent of the fiduciary duty of an investment management company to a fund and its investors"); *United States*

---

[9] The defendant also argues that "it is for the jury, not an expert, to determine whether a defendant violated the law." (Def. Mem. 20). As discussed above, the Government will not elicit testimony from Belanger regarding whether the defendant violated his fiduciary duties (unless the defendant opens the door to such testimony by offering evidence indicating that he complied with his fiduciary duties).

*v. Sprouse*, 517 F. App'x 199, 202, 206 (4th Cir. 2013) (reinstating fraud conviction of attorney and noting that evidence at trial included expert testimony concerning "an attorney's role and ethical duties in residential real estate transactions").[10]

        4.      With respect to Belanger's opinions that (i) based on what the defendant indisputably knew about the Manafort loans at the time they were approved, he should have undertaken further due diligence (Belanger Rep. 23-26), and (ii) the defendant violated his "fiduciary duty of loyalty" to the Bank and exhibited a conflict of interest by participating in the Manafort loan process while seeking Manafort's assistance obtaining a senior position in the Trump administration (*id.* at 27-30), the defendant argues that "these opinions are merely assertions of facts about which [Belanger] has no personal knowledge based on emails and documents spoon-fed to him by the government." (Def. Mem. 20). Though this characterization is simply wrong, the Court need not reach this issue because, as discussed above, the Government has determined not to offer this testimony unless the defendant opens the door to it. Belanger will confine his testimony on these topics to explaining the relevant duties—such as the fiduciary "duty of loyalty" to engage in conduct that is free from conflicts—without addressing the specific facts of this case or opining as to whether the defendant violated his duties (unless the defendant opens

---

[10] The defendant also claims that Belanger's opinion reflects an "outlandish view of the law." (Def. Mem. 20). It is not clear whether the defendant means that it is "outlandish" for Belanger to opine that a bank director/CEO in the defendant's position owed fiduciary duties to the bank, or that it is "outlandish" to opine that the defendant breached his fiduciary duties. To the extent it is the former, the defendant is free to challenge Belanger's views on cross-examination or with an appropriate rebuttal witness; and to the extent it is the latter, as discussed above, Belanger will not testify that the defendant in fact violated his fiduciary duties (unless the defendant opens the door).

the door, such as by arguing that it was reasonable for a prudent banker in his position to believe the loans to be sound).[11]

        5.      Finally, the cases upon which the defendant relies do not support his position.

        a.      First, the defendant cites to *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019), arguing that the court precluded expert testimony about industry practice on the ground that it was irrelevant and unfairly prejudicial. (Def. Mem. 13). However, there, the defendant was charged with fraud, and the court found that expert testimony offered by the defendant about industry standards was not relevant to the defendant's mental state, *Mendlowitz*, 2019 WL 6977120, at *7; that it would have supported an invalid argument that the defendant's conduct was "common or general practice in [the] industry," *id.* at *5; and that "the jury did not need expert testimony to understand the" familiar concepts at issue, *id.* at *6. Here, by contrast, the defendant is charged with bribery and the Government must prove he acted "corruptly," which makes it highly relevant whether the defendant acted consistently or inconsistently with his duties under regulatory standards and industry practice. (*See* Section I.B.1, *supra*). Further, the subject matter of this case—involving the duties of a bank director/CEO and bank holding company director in the context of a commercial real estate loan—is far afield from anything that would be familiar to most lay jurors.

---

[11] To be clear, even if the defendant opens the door to rebuttal testimony by Belanger, the Government will not seek to have Belanger establish any facts regarding what the defendant knew about the Manafort loans or any other subjects. Rather, the Government will establish these facts through other evidence and will ask Belanger to offer opinions by applying his expertise and analysis to certain assumed or hypothetical facts. Of course, to the extent the defendant contends that the Government has failed to establish the predicate for such testimony, he can raise such an objection at the appropriate time.

Thus, while the exclusion of the expert in *Mendlowitz* was appropriate under the unique "facts and circumstances of th[at] case," *Mendlowitz*, 2019 WL 6977120, at *3, this case is far more similar to the cases cited above, in which expert testimony on regulatory standards, industry practice, and fiduciary duties has been admitted to aid the jury in evaluating the defendant's mental state.  (*See* Sections I.B.1-2, *supra*).[12]

        b.        The defendant cites to *United States v. St. Pierre*, 599 F.3d 19, 22-23 (1st Cir. 2010), claiming that "the court excluded expert testimony 'as to the standard of care owed to [the defendant] by her accountants' to avoid confusing and misleading the jury by 'shifting the focus' to an irrelevant standard."  (Def. Mem. 13 n.10).  In fact, the court mainly found that the defendant's proposed expert testimony was "flatly irrelevant" because while the defendant, who was charged with tax evasion, sought to introduce expert testimony "as to the standard of care owed to [the defendant] by her accountants," the "[m]ere failure of the accountants to detect her under-reporting or to give [the defendant] better directions, even if negligent, would not be a defense" to the charged conduct.  *St. Pierre*, 599 F.3d at 22-23.  Here, by contrast, Belanger's testimony pertains to the duties owed by *the defendant*—not some third party on whom he ostensibly relied—and those duties are unquestionably relevant because they bear on whether the defendant acted corruptly.

---

[12] Similarly, in *United States v. Petit*, No. 19 Cr. 850 (JSR) (Dkt. 71) (cited at Def. Mem. 14-15), the Government moved to preclude the defendant's expert from testifying about the application of GAAP and revenue recognition rules to the facts of the case because such testimony was simply irrelevant.  *Id.* (Dkt. 71 at 13-16).  As in *Mendlowitz*, the defendant was charged with fraud, not bribery, and thus, unlike here, the Government did not need to prove that he acted corruptly.  Furthermore, in *Petit*, the defendant ultimately declined to offer the expert witness and the court did not rule on the motion.  The case therefore has no persuasive or precedential value.

c.      The defendant cites to several cases in which courts excluded expert testimony that "threaten[ed] to usurp the role of the court in instructing the jury on the law, or the role of the jury in applying the law to the facts."  (Def. Mem. 14-15).  But those cases are easily distinguishable.  For instance, in *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992), the court held that it was an abuse of discretion to allow an expert to testify, in an excessive use of force trial, that the defendant's conduct was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper," because such testimony effectively "[told] the jury what result to reach."  Here, by contrast, Belanger will not offer any opinions as to the ultimate issues— *i.e.*, whether the defendant acted corruptly or solicited a bribe or violated Section 215.  Rather, he will merely educate the jury as to the applicable duties owed by individuals in the defendant's position, and will not offer an opinion as to whether the defendant violated his duties (unless the defendant offers evidence which opens the door to such testimony—and even then, Belanger's testimony will not reach the ultimate issues in the case).  The other cases cited by the defendant— *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) and *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d. Cir. 1991) (*see* Def. Mem. 14 & n.11)—are distinguishable for exactly the same reason.  Notably, in *Marx & Co.*, the Circuit held that the expert permissibly testified about industry standards because it "enable[d] the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry," but held that the expert impermissibly offered "legal opinions as to the meaning of the contract terms at issue."  550 F.2d at 509.  Here, the

25

Government will ensure that Belanger stays on the permissible side of the line—educating the jury as to applicable duties as a general matter, but not offering any legal conclusions.[13]

* * *

In sum, Belanger's testimony—in its more limited fashion as described above—should be admitted because, by educating the jury as to the duties applicable to a bank director/CEO in the defendant's position, he will enable the jury to evaluate the extent to which, if at all, the defendant breached his duties to the Bank in connection with his approval of the Manafort loans, which is an important consideration in determining whether the defendant acted corruptly. Belanger's testimony will neither invade the province of the jury nor be unfairly prejudicial because he will not testify as to the ultimate issue, will not opine as to whether the defendant breached his duties, and will not even address the facts of this case, unless the defendant opens

---

[13] The defendant also relies on an out-of-circuit civil case which is completely inapposite. (*See* Def. Mem. 19 (citing *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982))). In *Christiansen*, a class of federal employees sued certain health insurers and banks claiming that the defendants' contractual relationship with the federal government gave rise to fiduciary duties that the plaintiffs could enforce. 683 F.2d at 521. The D.C. Circuit affirmed the district court's grant of summary judgment for the defendants, holding that no such fiduciary relationship existed as a matter of law. *Id.* at 533. That holding does not remotely support the defendant's position in this case. Here, the defendant indisputably owed fiduciary duties to the Bank. *See, e.g.*, OCC, *The Director's Book: Role of Directors for National Banks and Federal Savings Associations* (July 2016), at 21 ("Directors' activities are governed by common law fiduciary legal principles, which impose two duties—the duty of care and the duty of loyalty," and providing a general overview of both duties), *available at* https://www.occ.gov/publications-and-resources/publications/banker-education/files/the-directors-book.pdf. The issue here is whether expert testimony is admissible to educate the jury as to the content, nature, and scope of the defendant's duties based on regulatory standards and industry practice. *Christiansen* does not begin to address that question, but the cases cited above are directly on point and make clear that such testimony is admissible. (*See* Section I.B.1, *supra*).

the door, in which case Belanger will offer narrow testimony to rebut specific claims by the

defense.

## II.   BLAKE PAULSON'S NON-EXPERT TESTIMONY SHOULD BE ADMITTED BECAUSE IT WILL PROVIDE GENERAL BACKGROUND AND CONTEXT TO ENABLE THE JURY TO UNDERSTAND OTHER EVIDENCE

### A.   The Challenged Testimony

The Government seeks to call Blake Paulson, the Senior Deputy Comptroller and Chief

Operating Officer for the OCC, as a fact witness.[14]   As set forth in more detail below, Paulson

will offer testimony, likely at the outset of the trial, regarding the overall supervisory framework,

including general principles of bank supervision and credit risk, and will not offer opinions

specific to the Bank or to the defendant.   Paulson's testimony is highly relevant and will give the

jury the tools necessary to understand other evidence as it comes in, to assess the defendant's

intent, and to evaluate arguments the defense is likely to make.

The Government intends for Paulson (i) to testify regarding at least one conversation he

had with the defendant which is directly relevant to the facts of this case,[15] and (ii) to provide the

---

[14] As noted above, the Government provided advance notice regarding Paulson's testimony as a courtesy to the defendant and so as to facilitate motion practice based on it.   While the Government believes that all of the testimony it intends to elicit from Paulson is fact witness testimony, since the defendant seeks to exclude the testimony on grounds of relevance and prejudice rather than any argument specific to expert testimony, the Court need not resolve whether any portions of Paulson's testimony might constitute expert opinion.   (*See* Def. Mem. 27 n.18 ("[W]hether the government[] characterizes Paulson as a 'fact' or 'expert' witness, or both, his proposed testimony is irrelevant, unfairly prejudicial, confusing, and otherwise inadmissible[.]")).

[15] In particular, Paulson will offer testimony regarding a false statement that the defendant made during an annual bank examination.   (*See* Indictment ¶ 29).   However, this testimony is not challenged in the defendant's motion and the Government therefore does not address it further here.

jury with general, high-level background and context regarding the OCC and its work in regulating the banking industry.  In particular, and without offering opinions about the specific facts of this case, he will testify regarding the OCC's overall regulatory framework for financial institutions; the role of bank holding companies; legal lending limits; the practice of banks selling loan participations to their holding companies; risks arising from lending activities and the OCC's risk rating system for loans; the ways in which collateral factors into an analysis of a loan; the use of credit approval memoranda; bank capitalization requirements; and insider activities and the OCC's efforts to make bank officers aware of them.[16]

Accordingly, the topics of testimony that the Government still intends to elicit from Paulson are:

- A description of the OCC framework for supervising banks and the rationale for it.  (*Id.* at 3-4).

- An explanation of lending risks and the risk rating system the OCC uses to evaluate loans.  (*Id.* at 4-6).[17]

- A description of the OCC's standards regarding insider activities, including the fact that the OCC's regulations forbid the acceptance of things of value in exchange for loans, and a description of the OCC's efforts to ensure that bank officers are aware of the importance of adherence to these standards.  (*Id.* at 6-7).

Paulson's testimony thus will provide a framework to assist the jury in understanding the

---

[16] The Government also gave notice that Paulson might testify regarding an annual bank examination covering the period ending September 2017 (the "2017 Examination") (Dkt. 122-3 at 3), and regarding the impermissibility of a bank making loans without being guided by its loan presentations (Dkt. 122-3 at 6).  However, upon further consideration does not intend to offer this testimony through Paulson.  As discussed in Section III.B.2, *infra*, the Government intends to have Aguirre, who performed the 2017 Examination, testify about this instead, but only if the defendant opens the door to such testimony.

[17] The defendant also objects to Paulson testifying about the OCC's decision to downgrade the Manafort loans.  (Def. Mem. 27).  As noted, the Government will not offer such testimony by Paulson (and indeed, did not refer to such testimony in its notice).

evidence they will hear regarding the defendant's and the Bank's conduct in extending the

Manafort loans.  As discussed below, such testimony is relevant to give the jurors the tools

necessary to evaluate the other evidence that will come in throughout the trial, and to assess the

defendant's corrupt intent.  The testimony, particularly as the Government has determined to

narrow it, will not be unfairly prejudicial, and in any event, the Government would consent to an

appropriate limiting instruction making clear to the jury the permissible purposes for which the

testimony is being admitted.

### B.      Applicable Law

"To be relevant, evidence need only tend to prove the government's case, and evidence

that adds context and dimension to the government's proof of the charges can have that

tendency."  *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009) (internal quotation

marks omitted).  Accordingly, "evidence is often admissible to provide background for the

events alleged in the indictment," *id.* (internal quotation marks omitted).  In the context of highly

regulated industries, testimony regarding the regulatory framework is often admitted.  *See, e.g.*,

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 478 (S.D.N.Y. 2016) (admitting

testimony on "the background of the FDA, its functions, and the FDA's regulatory framework").

This is true of the banking industry, and it is not uncommon to admit testimony on the regulatory

framework, whether the testimony is expert, *see, e.g.*, *Gill*, 893 F. Supp. 2d at 537, or lay, *see,*

*e.g.*, *Filho v. Safra Nat'l Bank of N.Y.*, No. 10 Civ. 7508 (JFK), 2014 WL 12776165, at *6

(S.D.N.Y. Mar. 11, 2014) (noting witness's overview of regulations under which bank operates).

### C.      Discussion

Paulson's testimony about his work at the OCC, including the OCC's role in overseeing

and enforcing a regulatory framework relevant to the Bank is relevant because it will assist the

jury in understanding the evidence as it comes in.  The jury will be asked to assess the

defendant's intent in pushing the Manafort loans forward, and in so doing it will benefit from an

understanding regarding the regulatory landscape in which the defendant was operating.  While

the Government certainly does not intend to belabor the points or explore them in greater detail

than necessary to establish basic concepts, a jury is nonetheless unlikely to be familiar with the

manner in which loans are extended, rated and supervised and the manner in which the banking

industry and its leaders, including the defendant, are similarly subject to governing standards and

ongoing supervision and regulation.  Paulson's testimony will explain these concepts and will

provide needed context and allow the jury to assess the defendant's actions against this

backdrop.

      In order to make the case intelligible to a jury, the Government is entitled to put on

evidence allowing the jury to understand the rules under which the defendant was operating, and

their rationales, so that the jury can understand, in general terms, what the case is about and why

it matters.[18]  Moreover, concepts such as the OCC's risk rating system, its restrictions on insider

activities, and its requirement of safe and sound operations are not just helpful for the jury to

understand—they were the rules governing and known to the defendant at the time of the

conduct.  Accordingly, an understanding of this regulatory background will be of great assistance

to the jury in assessing the Government's evidence regarding the defendant's actions and the

Manafort loans themselves (evidence that the jury will hear from witnesses other than Paulson).

---

[18] The defendant objects to Paulson's discussion of the "benefits" of the OCC's regulatory
framework.  (Def.'s Mem 29-30).  This objection is misconceived.  In order to explain the
regulatory framework, Paulson will briefly explain its rationale and importance, so that the jury
understands not only what the rules are, but why they exist and why it is important for banks, and
their directors and officers, to comply with them.

One example of the need for regulatory context has already come up in pretrial proceedings and will likely recur at trial.  The defendant has extensively emphasized the supposed favorable nature of the Manafort loans, and in particular the use of a high interest rate and supposedly adequate collateral coverage to justify making the loans even given the risk of Manafort's nonpayment.  (Tr., Apr. 23, 2020, at 6-9).  The Court had questions regarding this argument (*id.* at 17), and noted that given the relevance of the loan quality to corrupt intent, the issue would likely be one for trial  (*id.* at 17-18).  Just so.  While Paulson will not testify about the Manafort loans himself, Paulson's testimony will be necessary to allow the jury to make sense of those defense arguments by, among other things, informing the jury that under the OCC's regulatory framework, adequate collateral coverage does not alone justify an otherwise high-risk loan.  *See Gill*, 893 F. Supp. 2d at 537 (admitting expert testimony regarding United States banking regulations because "[t]he Bank's state of mind is a central issue in this litigation"); *see also Gross*, 2017 WL 4685111, at *11 (endorsing Government argument that "'[T]he fact that [the defendants] ignored those rules and, thus, undermined the safety and soundness of [their credit union] as board members so that they could enrich themselves is evidence that you can consider in determining whether or not they acted corruptly.'").

Accordingly, Paulson's testimony on the regulatory background is crucial for allowing the jury to understand the context of the defendant's lending decisions and ultimately, based on the other evidence that will be presented at trial, to assess his intent.  This testimony will not be unfairly prejudicial (particularly if accompanied by an appropriate limiting instruction, which the Government would of course consent to).  As discussed above, evidence of bank regulations is frequently offered in Section 215 cases.  *See, e.g.*, *McElroy*, 910 F.2d at 1023-24 (upholding

31

admission of evidence concerning banking regulation in Section 215 prosecution as relevant to lending decisions, where court "instruct[ed] the jury that a violation of [the regulation] would 'not amount to criminal conduct under federal law'"); *Gross*, 2017 WL 4685111, at *11 (relying in part on evidence of regulatory violations to uphold Section 215 conviction).

III. **CATHERINE AGUIRRE'S TESTIMONY WILL BE RELEVANT AND ADMISSIBLE TO REBUT ANY DEFENSE ARGUMENT THAT THE MANAFORT LOANS WERE SOUND, THAT CALK BELIEVED THEM TO BE SOUND, OR THAT THEY WERE EXTENDED USING PROPER PROCEDURES**

A. **The Challenged Testimony**

The Government gave notice that it may call Catherine Aguirre, the OCC bank examiner assigned to the Bank following the issuance of the Manafort loans, who had occasion to review the loans in the course of her duties.[19]  In July 2017, several months after the Manafort loans were made, Aguirre analyzed the loans and downgraded their credit quality (apart from the portions secured by cash) to *substandard at origination* due to serious weaknesses in Manafort's income.  Several months later, Aguirre conducted an annual bank examination covering the period ending September 2017 (the "2017 Examination"), which found flaws with the Management component of the Bank, including process failures at the Bank that contributed to the issuance of the Manafort loans.  The Government does not intend to offer Aguirre's testimony unless the defendant opens the door by introducing evidence or argument falsely

---

[19] The Government submits that Aguirre's testimony, which relates entirely to examinations she performed in the ordinary course of her duties and not at the direction of the Government, is fact testimony, not expert testimony, although she would be describing the conclusions she reached based on her analysis of the Manafort loans.  However, as with Paulson, the Court need not decide whether any portion of her opinions constitutes expert testimony, since the defense urges its exclusion on grounds of relevance and prejudice, not based on its status as expert testimony. (*See* Def. Mem. 21 n.16 ("Whether the government calls it 'fact' or 'opinion' does not alter the analysis set forth below.")).

suggesting that the Manafort loans were actually sound and advantageous (or that he believed them to be), or intends to make misleading arguments based on evidence that the Bank followed its normal procedures in originating, underwriting, and approving the loans.

### 1. Predicate Evidence of the Defendant's Awareness of Issues With the Loans

Independent of Aguirre's testimony, the Government intends to prove that the defendant, though not aware of every detail regarding the flaws in the Manafort loans, was aware of significant risk factors suggesting that Manafort's ability to generate income to service the debt was highly uncertain at best, and that the loans represented an unusually significant exposure and risk to the Bank. In addition to circumstantial evidence of the defendant's awareness of significant issues with the loans based on his roles as CEO of the Bank and chair of the loan committee, and his detailed personal involvement in the extension of the loans,[20] there is direct evidence that the defendant was aware of facts including the following:

- defaults to the prior lender on multiple Manafort properties, including proposed Bank collateral (*see, e.g.*, Ex. 1 (Calk receiving email with payoff notices showing defaults));

- the fact that the prior lender was pursuing foreclosure and that the Bank's financing was urgently needed in advance of scheduled foreclosure auctions (*see, e.g.*, Ex. 2 (Calk receiving December 8 email from Manafort with subject line "Nervousness is setting in" and saying "[a]s you know, the properties go to auction on Dec 21"); Ex. 3 (Calk writing "We are working very hard to help find solutions to help Paul out in his hour of need."));

- the fact that Manafort erroneously understated the amount of prior financing on one of his properties and was "not able to" cover the difference himself (Ex. 4);

- the Bank's president had previously rejected the first of the Manafort loans (*See, e.g.*,

---

[20] The defendant's involvement with the Manafort loans was surprisingly granular; for example, at one point he reviewed signed account opening paperwork for a bank account Manafort set up in connection with the loan and inquired whether it had signatures in all the right places. *See* Ex. 6 (Calk asking Bank employee "Does he need to sign by the other 'x' for withholdings?").

Ex. 5 (Calk receiving email from Bank's president rejecting the loan and saying it is "not an easy loan to make and is a significant exposure to the bank")).[21]

Beyond these general facts bearing on Manafort's cash-flow problems, the defendant was specifically aware of questions regarding Manafort's reported income, and aware that they had been addressed only superficially by Bank personnel.  In particular, the defendant was copied on emails showing that the Bank's president had asked a different underwriter to examine Manafort's 2015 tax returns.  (Ex. 7).  That different underwriter gave an assessment which was conditionally favorable to the loan, but the defendant was aware that (in addition to the inherent limitations of an analysis of a single year's tax returns alone): (i) this favorable assessment was conditional on assuming (contrary to typical practice) that Manafort did not have to contribute capital back to his companies, an assumption which would have to be verified by a letter from his accountant (Ex. 7 at 1 (noting that capital calls worth over half of Manafort's stated income would "typically" have to be deducted, but recommending against deducting them "if we can get a CPA letter" verifying the capital calls were not required)), (ii) this underwriter "did not have the ability to finish the underwrite today" but offered to complete his analysis next week (*id.*), and (iii) the Bank's president told this underwriter not to do "any more work until we get some direction from Steve" (Ex. 8 at 1).  The defendant never authorized the follow-up work and the accountant letter—which the defendant had been informed was necessary in order to avoid deducting millions of dollars from Manafort's income—was never obtained.[22]

---

[21] The defendant was also aware of other facts that raised questions about Manafort's competence in managing a construction project, such as the knowledge that the contractor for a California project the Bank had considered refinancing had previously declared bankruptcy (Ex. 9 (Calk forwarding email regarding contractor bankruptcy to loan officer)).

[22] Moreover, the defendant was aware of news reporting on Manafort's controversial overseas consulting, and that Manafort had been fired as the Trump campaign's chairman following these

2.     *Aguirre's Testimony*

As set forth in more detail in its notice (Dkt. 122-2), the Government expects Aguirre—if necessary to rebut defense evidence or arguments—to testify based on her evaluation of the Manafort loans and their downgrade on July 19, 2017 and her subsequent evaluation of the Bank's management in connection with the 2017 Examination.  The specific testimony the defendant challenges is:

- The Manafort loans were of substandard quality as of their origination, for reasons principally involving the Bank's flawed and materially inaccurate analysis of Manafort's financial situation, which among other things failed to account for Manafort's deteriorating and (in 2014 and 2015) outright negative cash flow.  (Dkt. 122-2 at 2-3).

- Although Aguirre initially assessed that the Manafort loans were secured by adequate collateral, this conclusion may have changed if she was aware of two facts (one known to Bank personnel at the time of the loan, one shortly after) casting doubt on the value of one of the pieces of collateral, a townhouse on Union Street in Brooklyn under renovation (the "Union Street Property").  (*Id.* at 3).

- Making loan decisions without being guided by the content of loan presentations is an unsafe and unsound practice.  (*Id.* at 4).[23]

- The Bank's board of directors and management team "did not provide a credible challenge to Calk," which was a factor in the OCC's decision to downgrade the Bank's management component rating in the 2017 Examination.  (*Id.* at 3).[24]

---

news reports.  (*See, e.g.*, Ex. 10 (Calk receiving campaign talking points responding to news article suggesting Manafort wrongdoing in connection with foreign consulting).

[23] A credit approval memorandum, such as used by the Bank, is a form of loan presentation.

[24] The defendant also challenges Aguirre's opinions that certain information should have been included in the credit approval memorandum (Def. Mem. 21 (citing Dkt. 122-2 at 3-4)), but the Government is not planning on offering this opinion.  Similarly, the defendant challenges Aguirre's testimony that the Bank charged off the value of the Manafort loans in late 2017 (Def. Mem. 22 (citing Dkt. 122-2 at 4), *id.* at 26-27), but the Government does not plan to introduce evidence of this charge-off unless the defendant opens the door to it.  The defendant also challenges Aguirre's opinions concerning insider abuse (Def. Mem. 22 (citing Dkt. 122-2 at 4)), but the Government presently intends to offer testimony on those matters only through Paulson, not through Aguirre.  Should that expectation change, the Government will nevertheless not offer

As noted above, the Government does not intend to offer these opinions unless the defendant opens the door by presenting evidence or argument suggesting that the Manafort loans were actually sound and advantageous (or that the defendant believed them to be) or that the Bank's following its procedures in extending the loans constitutes evidence of their soundness.

### B.     Applicable Law

Evidence of a defendant's breach of duty, including evidence regarding banking regulations, is highly relevant to assessing corrupt intent in bribery cases, including bank bribery cases under Section 215.  (*See* Section I.B.1, *supra*).  Similarly, evidence of risky banking practices can be used to prove circumstantially a defendant's corrupt intent for a Section 215 charge.  *See Gross*, 2017 WL 4685111, at *11 (relying on Government evidence of regulatory violations and unsafe volumes of transactions in order to prove corrupt intent).

More broadly, subsequent loss to a financial instrument can be used to show its riskiness for the purpose of proving the corrupt intent of a defendant who promoted it.  In *United States v. Seabrook*, 814 F. App'x 661 (2d Cir. 2020) (summary order), the defendant, a union leader, was charged with accepting a bribe in exchange for steering his union's funds into a risky investment, which subsequently suffered a loss.  *Id.* at 662.  The Second Circuit affirmed the admission of this evidence (*i.e.*, the investment loss) to show the defendant's corrupt intent, noting the evidence that the defendant was aware of risks in the investment and holding that the subsequent default "tended to show that [the defendant] intended to subject the organization to a risky investment in order to enrich himself."  *Id.*

---

duplicative testimony.

### C.      Discussion

#### 1.      *Aguirre's Testimony Regarding the Flaws in the Manafort Loans Will Be Relevant if the Defendant Argues that the Loans Were Sound or that He Believed Them to Be Sound*

Should the defendant open the door by suggesting that the Manafort loans were actually sound or that he believed them to be, Aguirre's testimony will be relevant to rebut this suggestion and prevent the defendant from misleading the jury.[25]

As the Court is aware, the quality of the loans is not an element of the Government's case, although it may bear on the defendant's intent.  (*See* Dkt. 92 at 10-11; Tr., Apr. 23, 2020, at 17-19).  The Government accordingly intends to focus its evidence on proving that the defendant corruptly solicited a *quid pro quo*, but will call Bank witnesses and will introduce emails and other documents to tell the full story of the Bank's evaluation and ultimate approval of the Manafort loans, including the various points at which Bank employees discovered negative information or raised concerns about the loans.  (*Cf.* Def. Mem. 3-4 (noting relevance of such evidence)).  However, if the defendant attempts to suggest that the Manafort loans were actually sound or that he believed them to be,[26] the Government will respond with Aguirre's assessment in her official capacity as an OCC examiner assigned to review the loans (made several months after the loans were originated and in the course of her ordinary duties) that they were of substandard quality at the time they were made.

The Government does not intend to prove that the defendant directly performed the

---

[25] If the defendant does not suggest, implicitly or explicitly, that the fact that the Manafort loans were actually sound or he believed them to be, then the Government would not call Aguirre for this purpose.

[26] The defendant has made such arguments in pretrial proceedings.  (*See* Dkt. 37 at 21-22; Dkt. 48 at 3-6; Tr., Apr. 23, 2020, at 6-9).

detailed financial analysis that Aguirre did, but will introduce evidence that the defendant was aware of significant red flags pointing to the same flaw Aguirre identified: Manafort's lack of income.  (*See* Section III.A.1, *supra*).  Given the defendant's awareness of risks as to Manafort's lack of income, Aguirre's analysis that Manafort actually lacked demonstrated income is relevant to prove the defendant's corrupt exposure of the Bank to risk.  In *Seabrook*, where the defendant caused his organization to make an investment notwithstanding awareness of the "risk of losing the investment," the Second Circuit held that the fact that "this concern materialized" in the form of subsequent loss of the investment "tended to show that [the defendant] intended to subject the organization to a risky investment in order to enrich himself," obviously without any need to prove that the defendant could see into the future and predict with certainty that the default would occur.  *Seabrook*, 814 F. App'x at 662.  Similarly here, where the defendant was aware of factors at least raising risks that Manafort had insufficient income, the fact that "this concern materialized," *id.*, in the form of analysis showing that Manafort had insufficient income, "tend[s] to show that [Calk] intended to subject the organization to a risky investment in order to" obtain a personal benefit for himself, *id.*; *see also, e.g.*, *Gross*, 2017 WL 4685111, at *10-11 (in Section 215 case, noting relevance of risky banking practices and regulatory violation to prove that defendant was "acting under the influence of bribes, rather than in the best interest of the credit union").

The defendant's first argument, that the analysis is irrelevant because it was made several months after the loan was extended, is easily dispensed with. While Aguirre's analysis was done after the loan was originated, it was not "[h]indsight" (Def. Mem. 23)—to the contrary, it was based entirely on information known to the Bank at the time of origination, and thus the crux of

her testimony will be that the loans were substandard *at origination*. (Dkt. 122-2 at 2).

The defendant's second claim, that the analysis is not relevant because he may not have known all the bases for the OCC's downgrade, also misses the mark.  As noted above, the Government will introduce evidence that the defendant was aware of significant risks as to Manafort's lack of income and that Aguirre identified Manafort's lack of income as the key flaw in the loans.  Her testimony would be relevant to correct a misimpression with the jury that, based on what the Government will prove Calk was aware of at the time of origination, the loans were sound.  They were not.  Given this, and that the Government does not intend to introduce Aguirre's testimony unless the defendant opens the door by arguing that the loans were sound or that he believed them to be, Aguirre's analysis is relevant to prevent the jury from being misled.  The fact that Calk may not have been aware of every piece of evidence that Aguirre analyzed does not make her testimony irrelevant or unfairly prejudicial, because Calk was aware of the risk of the key infirmity Aguirre identified: Manafort's lack of income.  Yet the defendant proceeded with the unusually risky loans, which were so large that they nearly caused the Bank to breach its legal lending limit.  Here, as in *Seabrook*, where the defendant is aware of a serious risk bearing on his corrupt intent to "subject the organization to a risky investment" for personal benefit, evidence that the risks "materialized" is relevant to show that intent.  *Seabrook*, 814 F. App'x at 662.

In light of this evidence of the defendant's knowledge of risks regarding the flaws identified by Aguirre, her testimony that from her regulatory perspective the loans were substandard and should not have been approved at the time of origination is squarely relevant to the defendant's intent in approving the loans.  This case is thus nothing like *United States v.*

*Martoma*, 993 F. Supp. 2d 452 (S.D.N.Y. 2014), cited by the defendant, in which the court

concluded that an expert's later analysis of the price of a stock at the time of alleged insider

trading was not relevant to the defendant's state of mind.  *Id.* at 456-57.  In that case, there was

no evidence that the defendant was aware of any similar analysis of the stocks at the time, and

indeed the Court noted that evidence tying the analysis to the defendant's state of mind *would*

render the analysis relevant.  *See id.* at 456 ("Evidence that [the defendant] conducted an analysis

in July 2008 similar to what [the expert] has done in 2014, or that [the defendant] was reading

analyses in 2008 similar to what [the expert] has done in 2014, would be probative of [the

defendant's] state of mind.").  Here, where there is such evidence—that the defendant was aware

of significant red flags regarding Manafort's income, the principal flaw that Aguirre identified—

the flaws are relevant to showing the defendant's corrupt intent.  *See Seabrook*, 814 F. App'x at

662; *Gross*, 2017 WL 4685111, at *10.  Moreover, Aguirre's analysis was performed several

months—not five and a half years—after the loans were extended, and in the course of her

ordinary duties, not as an expert retained for the purpose of the litigation.   And finally, unlike in

*Martoma*, here the Government will only offer this testimony if the defendant opens the door to

this very issue.  As a result, *Martoma* is simply not on all fours with the facts of this case.

Accordingly, although the Government does not intend to present Aguirre's testimony

unless the defense opens the door, her testimony regarding the flaws in the Manafort loans will

be highly relevant to rebut any suggestion that the Manafort loans were actually sound or that he

believed them to be.

### 2.    *Aguirre's Description of Flaws in the Bank's Processes Will Be Relevant if the Defendant Relies on Those Processes to Argue the Loans Were Sound*

The Government does not intend to call Aguirre to testify regarding flaws in the Bank's

processes unless the defendant opens the door by arguing that the fact that the Manafort loans passed through the Bank's processes shows that the loans were sound.  If the defendant makes such an argument, it will be appropriate for Aguirre to explain that the Bank's processes were significantly flawed and did not provide a check against unsound loans (a fact the defendant took advantage of to corruptly extend the Manafort loans) to correct any misimpression with respect to the soundness of the Bank's processes as they relate to the defendant's intent.[27]

If needed to respond to any argument by the defense that its processes provided evidence of the soundness of the Manafort loans, Aguirre will testify that one key aspect of the Bank's processes—the use of credit approval memoranda documenting the loan decision—was fundamentally flawed in a manner directly bearing on the defendant's intent.[28]  The credit approval memoranda, despite containing the Bank's official rationale for extending loans such as the Manafort loans, were not actually reviewed by the credit committee.  (*See, e.g.*, Def. Mem. 2).  As a result, an important check on abusive or corrupt loans was not actually being followed, creating a situation in which the defendant had the opportunity to approve the loan for corrupt reasons.[29]  Absent Aguirre explaining that these practices deviated from accepted banking

---

[27] If the defendant does not suggest, implicitly or explicitly, that the fact that the Manafort loans went through the Bank's processes is a reason to conclude the defendant lacked corrupt intent, then the Government would not call Aguirre for this purpose.

[28] As noted in Section II.A.1, *supra*, Paulson could also offer testimony regarding these matters but the Government presently expects to offer it through Aguirre instead.  Even if that expectation changes, the Government does not propose to offer duplicative testimony.

[29] Of course, given that these flaws in the Bank's processes affected other, non-corruptly motivated loans as well, the Government does not propose to introduce this evidence unless the defendant opens the door.  The Government will present evidence that the defendant gave highly unusual special treatment to Manafort, both in terms of his level of personal involvement and in terms of the enthusiasm for pushing the loans forward despite their risks.  These actions, the Government's evidence will show, were not at all common.  Evidence of the flaws in the Bank's

practices, the jury could easily be misled into believing that the Bank's processes provided an adequate safeguard against corruptly motivated loans. *See Gross*, 2017 WL 4685111, at *10 (in Section 215 case, relying on trial evidence that credit union employee supervised by defendant "made no effort to comply with" various regulations and that credit union engaged in unsafe volumes of transactions).

Similarly, the fact that the OCC concluded that issues regarding the approval of the Manafort loans contributed to the OCC's decision to downgrade the Bank's management rating would be relevant to rebut the suggestion that the loans were of sound quality or that the Bank's processes safeguarded against corrupt loans. The defendant tries to escape this conclusion by noting that the issues with the Manafort loans were only a relatively small portion of the reason for the downgrade, but the fact that they contributed at all is still highly significant to rebut the suggestion that the Bank's ordinary loan approval practices provided a safeguard against corrupt lending. Similarly, the defendant emphasizes that the OCC findings did not involve corruption (Def. Mem. 23), but this misses the point for two reasons. *First*, the OCC did not examine the internal Bank communications that would have shown corruption. But *second*, and more fundamentally, testimony regarding the OCC's downgrade is not intended to prove directly that the defendant acted corruptly,[30] but instead to rebut any defense suggestion that the Bank's loan approval processes provided a sufficient safeguard to assure that the Manafort loans were of high

---

processes, by contrast will be relevant only if the defendant seeks to attempt to counter the Government's evidence by giving the false impression to the jury that the Bank's processes provided a safeguard against poor loans and gave reason to believe the Manafort loans were sound.

[30] In addition to the fact, as discussed in footnote 29, above, that the process failures were not unique to the Manafort loans, an opinion that Calk had corrupt intent would of course be inadmissible under Federal Rule of Evidence 704(b) in any event.

quality.

The Government of course does not intend to suggest that the defendant could be convicted for his bank following banking practices disapproved of or forbidden by the OCC, and would expect any testimony by Aguirre to be accompanied by an appropriate limiting instruction. *See, e.g.*, *McElroy*, 910 F.2d at 1023-24. However, to the extent that the Bank's approval of the loan through ordinary processes is a point of emphasis by the defendant, the fact that these processes involved significant gaps that failed to provide a safeguard against corruptly motivated loans is highly relevant to rebut this argument and correct any misimpression on behalf of the jury about the soundness of the bank's processes. The defendant's argument that this evidence would be unduly prejudicial is unpersuasive. The defendant cites *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997), for the proposition that evidence of regulatory violations should be excluded here, but that case involved evidence nothing like the proposed testimony here. In that case, the government sought to offer evidence of reports of an entity's "general health and its failure to comply with regulations from its inception to its demise," including numerous unrelated violations well after the time period of the offense. *Id.* at 431. Here, the evidence is not a wide-ranging attempt to parade unrelated violations before the jury,[31] but instead narrowly tailored to expose flaws in the process for the approval of the very loans that were the subject of the corrupt quid pro quo, and only—if at all—to respond to the defendant's reliance on those processes.[32]

----

[31] The OCC's examinations of the Bank have various unrelated findings that the Government does not propose to present to the jury.

[32] The defendant also cites to *Mendlowitz*, which as explained in Section I.C, *supra*, involved a very different context not involving allegations of corrupt intent. The defendant's citation to

43

IV.   **JEFFREY MCCUTCHEON'S EXPERT TESTIMONY SHOULD BE ADMITTED FOR THE NARROW PURPOSE OF ESTABLISHING THAT THE "THING OF VALUE" WAS WORTH MORE THAN $1,000**

As set forth in its July 1, 2020 notice, the Government proposes to call Jeffrey McCutcheon as an expert to provide testimony regarding the potential monetary value of (i) an appointment to the Trump presidential campaign's Economic Advisory Council, and (ii) an executive branch appointment to Secretary of the Army or Undersecretary of the Army.  (*See* Dkt. 122 Ex. D and Ex. B attached thereto ("McCutcheon Rep.")).[33]  Specifically McCutcheon opines that each appointment has an intangible value in excess of $1,000, due to their potential to grow the appointee's human capital through, among other things, enhanced credentials, increased public visibility and recognition, and an expanded personal and professional network.  This testimony is directly relevant to a key element of the crime, which the Government bears the burden of proving beyond a reasonable doubt: that the "thing of value" solicited by the defendant exceeded $1,000.

McCutcheon's opinions are based on his more than thirty-seven years of experience in the human resources and compensation fields, including more than fifteen years of experience serving as an advisor to boards of directors and investor groups regarding issues relating to

---

*United States v. Bilotto*, No. 04 Cr. 343, 2005 WL 5978665 (W.D. Tex. Sept. 27, 2005), is also entirely inapposite, as the enforceability of contracts under Texas law was simply irrelevant to the fraud statute.  Here, by contrast, the testimony will only be offered if relevant to rebut a suggestion that the Bank's processes provided evidence of the quality of the very loans at issue here.

[33] McCutcheon's report addresses the potential value of these appointments to the defendant both directly, through their effect on his human capital, and indirectly, through the defendant's ownership interest in the Bank and the Holding Company.  Upon further consideration, the Government has determined to offer McCutcheon's testimony regarding only the appointments' potential value to the defendant directly.

executive and board member compensation, and his familiarity with the ways in which a candidate's skills and experience affect his employment opportunities and market value.  The defendant does not quibble with McCutcheon's qualifications.  Rather, he seeks to preclude McCutcheon's testimony on the grounds that McCutcheon has offered "no data and no computations."  (Dkt. 123 at 32).  The defendant's criticism is misplaced and does not offer compelling grounds for precluding McCutcheon's expert testimony.

      **A.**      **Applicable Law**

In order to prove a felony violation of Section 215, the Government must prove that the "the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted" exceeds $1000.  18 U.S.C. § 215(a).  Courts "look to traditional valuation methods" to determine whether the monetary thresholds in similar statutes have been met.  *United States v. Marmolejo*, 89 F.3d 1185, 1194 (5th Cir. 1996) (considering $5000 threshold for valuing bribe under 18 U.S.C. § 666).  Such methods may involve evaluating the amount that is exchanged for the thing of value, evaluating the amount of income that could be generated by the thing of value, or evidence of its actual value to the defendant.  *See United States v. Mongelli*, 794 F. Supp. 529, 531 (S.D.N.Y. 1992) (listing these three approaches to valuing licenses for which bribes were offered in Section 666 case).  Courts can estimate such values for intangibles "in the same way that an appraiser would value an asset—by looking at how much a person in the market would be willing to pay for them."  *Marmolejo*, 89 F.3d at 1194.

      **B.**      **Discussion**

The defendant argues that McCutcheon's analyses of the value of an appointment to the Economic Advisory Council and of an appointment to Secretary or Undersecretary of the Army is inadmissible because they do not "fit" the facts of the case and are "based on insufficient facts

45

and data." (Dkt. 123 at 32). This argument though, requires the defendant to engage in semantic contortions and ignore the nature of the expertise and opinion that McCutcheon offers.

First, the defendant asserts that McCutcheon's analysis is inadmissible because it values the *appointment* to the positions of Secretary and/or Undersecretary of the Army, rather than Manafort's assistance in obtaining such a position. This parsing goes to the weight of McCutcheon's opinion, not its admissibility. The Indictment and the expected trial evidence will make clear that the defendant's ultimate goal—and what he sought from Manafort—was the position itself. And the evidence shows that the defendant clearly believed Manafort was able to exercise substantial influence in obtaining the position itself, even if it was not a guarantee. Manafort certainly informed the defendant of his influence,[34] and the defendant himself plainly believed it, remarking to the loan officer—in the course of directing the loan officer to close the second loan, and while the defendant's candidacy was pending with Manafort's support—that Manafort was "influential" with "other people and a few other situations at hand." (Indictment ¶ 24(i)). But all of this plainly goes to the weight to be placed on McCutcheon's analysis, not its admissibility. Even if the defendant wishes the jury to apply a significant discount to the value of the position to reflect the uncertainty of obtaining the position, the first step in that analysis is valuing the position itself, which is exactly what McCutcheon does.[35] *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 329 (S.D.N.Y. 2009) ("To the extent Defendants

---

[34] Indeed, on or about November 14, 2016, two days before the first Manafort loan closed, the defendant emailed Manafort to ask if he was "aiding in the transition in any type of formal capacity." Manafort informed the defendant that he was "involved directly," to which the defendant replied "[a]wesome." (Indictment ¶ 23(f)).

[35] In other words, in order for the jury to evaluate the value of Manafort's assistance in obtaining the position, the jury must understand the value of the position itself.

believe [the expert's] conclusions are not applicable to . . . the issues raised in this case, they will be able to raise these arguments on cross-examination.").

The defendant is no more persuasive when it comes to the merits of McCutcheon's opinion, because he simply fails to acknowledge the nature of the expert opinion that McCutcheon offers. He seeks to require that McCutcheon's opinion be the result of proven mathematical calculation. This, however, is not the law. Under Rule 702, permissible topics for expert testimony go well beyond those that require scientific precision, including those based on an expert's own specialized experience and observation. *See Park W. Radiology*, 675 F. Supp. 2d at 329 (permitting expert testimony when the expert's "conclusions are based on sufficient data and experience gleaned from working as a consultant to [outpatient diagnostic imaging facilities] on financial matters for many years"). Indeed, "[u]nder Rule 702, federal courts routinely permit witnesses with 'technical or other specialized knowledge' to state opinions on matters where the data falls short of proving the witness's conclusion. For example, an art appraiser testifying about a painting's authenticity might state an opinion based in part on scientific analysis, but the ultimate conclusion would come from the witness's specialized knowledge, training and experience. *In re Ephedra Prod. Liab. Litig.*, 393 F. Supp. 2d 181, 188 (2005). Here, McCutcheon's opinions regarding the value of an appointment to the Economic Advisory Council or to Secretary or Undersecretary of the Army are based on decades of experience advising boards of directors regarding executive and board member selection and compensation (McCutcheon Rep. at 1), and factors that, in his experience, make a candidate more valuable to a hiring body, including "social status and affiliation" (*id.* at 8).

Accordingly, the defendant's objection to McCutcheon's valuation of his campaign advisory position misses the mark.  It is surely permissible for a longtime executive compensation expert to make qualitative judgments about the value of prestigious positions based on his experience in evaluating candidates and formulating compensation packages.  This is doubly true when the opinion offered is as straightforward as opinining that the value of appointment to an advisory committee for the presidential campaign of a major party nominee—where that committee is staffed with highly prominent businesspeople including the future Secretary of the Treasury and Secretary of Commerce, among others—exceeds the relatively low threshold of $1,000.

Similarly, McCutcheon's valuation of potential appointment to the position of Secretary or Under Secretary of the Army is well within the realm of his expertise.  He is surely qualified to assess, based on his decades of industry experience, that senior Defense Department leaders have "responsibilities and impacts comparable to CEO and COO roles running the largest corporations in the United States, providing the appointees with unique experience and allowing exceptional career flexibility and opportunity upon conclusion of the service."  (McCutcheon Rep. 3).  It is similarly well within McCutcheon's expertise to compare the compensation of such comparable CEO and COO positions to the defendant's actual current position and conclude that the experience given by the Defense Department roles would significantly enhance the defendant's earning capability.[36]  Similarly, his decades of evaluating board and executive candidates surely make McCutcheon qualified to assess that senior Defense Department

---

[36] In this way the defendant is simply wrong when he claims that McCutcheon provides "no indication" as to whether post-governmental positions would be more lucrative than the defendant's current position.  (Def. Mem. 35).

positions would make the defendant a candidate for lucrative part-time board of director positions that could further supplement whatever compensation the defendant received from his subsequent employment, even if he returned to his bank.  (McCutcheon Rep. 4).

The defendant's challenge to the more quantitative portion of McCutcheon's analysis also fails.  (Def. Mem. 34-35).  McCutcheon's method of analysis is a common one— comparison to other individuals who have held the positions that the defendant sought.  *Cf. Sere v. McNally Int'l Corp.*, No. 00 Civ. 8370 (KNF), 2004 WL 187126, at *2 (S.D.N.Y. Jan. 29, 2004) (expert witness testified that she determined the fair market value of a particular item by searching "auction house catalogues and the Internet for comparable works of art").  Indeed, with respect to the Secretary and Undersecretary of the Army positions, the defendant does not take issue with the method of comparison.  Nor does he assert that that dataset that McCutcheon used was weighted in any way so as to produce a skewed result.  Rather, he argues (a) that the individuals analyzed by McCutcheon are not sufficiently similarly situated to himself and (b) that the number of individuals in the pool that was analyzed was too small to produce a meaningful result.

The defendant's attempt to find fault with McCutcheon's comparisons are misconceived. The comparisons are illustrative and supportive of McCutcheon's overall conclusion, based on his decades of experience, that such positions can significantly enhance the post-employment earnings of individuals similarly situated to the defendant.  The defendant's criticism of McCutcheon's conclusions are not grounds to preclude his testimony, but potential avenues for cross examination.  *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Beastie Boys v. Monster Energy Co*., 983 F. Supp. 2d 369, 377 (S.D.N.Y. 2014) (the defendant "also argues that three endorsement deals . . . which form a basis for [the expert's] conclusion . . . are not comparable to the implied endorsement at issue here.  But those differences, which the parties concisely summarize in their briefs, are simple enough to present and understand that they can be readily addressed during cross-examination and considered by the jury in evaluating the credibility of [the expert's] testimony"); *Park W. Radiology*, 675 F. Supp. 2d at 326 ("To the extent the Defendants have any questions about the weight or the sufficiency of the evidence upon which [the expert] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination."); *Discover Fin. Servs. v. Visa U.S.A., Inc*., 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008) ("Whether [the expert] drew proper inferences and conclusions from these sources is certainly a question that is open to dispute. Defendants are fully able, however, to contest [the expert's] statements through the testimony of their own expert witnesses and through cross-examination of [the expert].").

Ultimately it is the defendant, not McCutcheon, who is making an apples-to-oranges comparison in this motion.  Hairsplitting about the sample size and variance would make more sense if McCutcheon were a statistician with no relevant area expertise simply evaluating data points in a vacuum, but such criticism fundamentally does not fit McCutcheon's analysis, which is based on his unchallenged subject matter expertise and decades of experience and is admissible to assist the jury in valuing the benefits the defendant corruptly sought from Manafort.

## **CONCLUSION**

For the reasons set forth above, the defendant's motions *in limine* should be denied.

Dated: New York, New York
November 13, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:   /s/
Paul M. Monteleoni
Douglas S. Zolkind
Benet J. Kearney
Assistant United States Attorneys
Tel.: (212) 637-2219/2418/2260
E-mail: paul.monteleoni@usdoj.gov
          douglas.zolkind@usdoj.gov
          benet.kearney@usdoj.gov

Exhibit 1

**To:** Dennis Raico ████████████████████████████████████, Bruce Baldinger ████████████, Felix
Katz ███████████████████████████; Alan Fetzer █████████████████
**Cc:** Steve Calk
**From:** Paul Manafort
**Sent:** Wed 12/7/2016 5:34:30 PM (UTC)
**Subject:** ALL GENESIS Loan Pay Off Amounts

377 Union Demand 12-15-2016.pdf
779 Stradella DEMAND 12-15-2016.pdf
1550 Blue Jay  DEMAND 12-15-2016.pdf
2401 Nottingham  DEMAND 12-15-2016.pdf
2521 Nottingham  DEMAND 12-15-2016.pdf

Dennis
I assume you have this information since John indicates that he has supplied it to you. I am forwarding to you in case you have not received it yet.
Based on what you have said to me, this information completes the file.
We stand ready to move to closing dates.
Thank you so much for your focus.
Paul

---

-------- Forwarded Message --------
**Subject:** RE: Loan Pay Off Amounts
**Date:** Wed, 7 Dec 2016 07:56:24 +0000
**From:** John Day ███████████████████████████
**To:** Alan Fetzer ████████████████ Scott Sawyer ████████████████████████
**CC:** Bruce Baldinger ███████████████████ Bruce Baldinger ████████████████████ Jeff Yohai ████████████████████

```
Alan, these were previously provided to Dennis Raico/Federal Savings Bank, but see attached.  They have
been set up for a 12/15 payoff.  Scott, can you advise what the payoffs would be for 12/12?Thanks.


John C. Day
Chief Risk Officer & Chief Legal Officer
21650 Oxnard Street, Suite 1700
Woodland Hills, CA 91367
████████████████████████████
jday@genesiscapital.comwww.genesiscapital.com



-----Original Message-----
From: Alan Fetzer ██████████████████████
Sent: Tuesday, December 06, 2016 4:08 PM
To: Scott Sawyer ████████████████████████; John Day ████████████████████████████
Cc: Bruce Baldinger ██████████████████████; Bruce Baldinger ██████████████████
Subject: Loan Pay Off Amounts


Gentlemen:

We continue to move forward with our portfolio restructuring plan. To conclude the first set of
transactions, we require loan pay off figures for the following properties as of 12/12/2016.

MC Brooklyn LLC (377 Union Street)
2401 Nottingham LLC
MT Yohai LLC

Please provide a daily per diem figure in the event that our schedule slips a day or two.

I will provide pay off dates for the other properties in due course.

Thanks very much for your assistance with this matter.

Best regards,

Alan
```

SDNY_00240239

This email message is intended only for the personal use of the recipient(s) named above. This message may contain information that is confidential or proprietary to the sender and/or the recipient(s) named above, and its use and/or retention by any unintended recipient is strictly prohibited by applicable law. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message.

This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged

SDNY_00240240

# FCI Lender Services, Inc.

Customer Service: **(800) 931-2424**   Fax: **714-282-2429**
Customer Information: www.trustfci.com NMLS #4920, BRE #01022780

Statement Date: 11/29/2016

**Demand Loan Pa**
From Borrow

| Borrower | | Servicer | |
|---|---|---|---|
| | MC BROOKLYN HOLDINGS LLC | | FCI Lender Services, Inc. |
| | 779 Stradella Rd. | | PO Box 27370 |
| | LOS ANGELES CA 90077 | | Anaheim CA 92809-0112 |
| | Account: ▮▮▮▮▮ | | 800-931-2424 |

You are authorized to use the following amounts to payoff the above-mentioned loan. All necessary legal documents will be forwarded to the trustee for Full Reconveyance upon receipt of payment in full.

**Payoff date : 12/15/2016**

| | |
|---|---|
| Maturity Date : | 03/01/2017 |
| Next Payment Due : | 06/01/2016 |
| Interest Rate : | 9.9900% |
| Current Rate : | 24.0000% |
| Interest Paid to Date : | 05/01/2016 |
| | |
| Unpaid Principal : | $4,425,776.62 |
| Deferred Unpaid Principal : | $0.00 |
| Accru. Int. Balance from 05/01/2016-12/15/2016 : | $589,441.91 |
| Unpaid Interest : | $110.93 |
| Deferred Unpaid Interest : | $0.00 |
| Unpaid Fees: | $0.00 |
| Acc. Late Charges(Calculated through Payoff Date): | $1,877.56 |
| Unpaid Late Charges : | $0.00 |
| Deferred Unpaid Late Charges : | $0.00 |
| Unpaid Charges: | $96.00 |
| Other Fees: | $8,126.42 |
| Reserve Balance: | $0.00 |
| Impound to Use: | $0.00 |
| Prepayment Penalty : | $0.00 |
| Principal Credit : | $0.00 |
| Interest Credit : | $0.00 |
| Unpaid Charges Credit : | $0.00 |
| Late Charges Credit : | $0.00 |
| Impound Credit : | $0.00 |
| Prepay Credit : | $0.00 |
| Unpaid Fees Credit : | $0.00 |
| **To Payoff Your Loan , Please Pay:** | $5,025,429.44 |
| | |
| Daily Interest Amount (After 12/15/2016) | $2,910.10 |

**\* Based on unpaid balance and unpaid charges combined.**

\*\*\* If a payment or payoff is not received during the payment grace period, a late charge will be included in payoff of the loan,

**PLEASE CALL TO VERIFY PAYOFF AMOUNT AND FEES DUE, PRIOR TO ISSUING PAYMENTS.**

We reserve the right to amend this demand should any changes occur that would increase the total amount po this demand expires 12/15/2016 at which time you are instructed to contact this office for additional in DEMAND FORWARDING FEES ARE DUE EVEN UPON CANCELLATION OF YOUR ESCROW).

Please make your disbursement payable to **FCI Lender Services, Inc.**
**(Only Certified funds, wire transfer or title company check will be accepted)**

Sincerely,
TR Hansen
FCI Lender Services, Inc.

SDNY_00240241

| Payment Due Date | Note Rate | Payment Amount | Principal | Interest | Reserve | Impound | Other | Unp. Int. | Acc Late Chg | Unpaid Int Balance | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/20/2016 | - - - | -$ 170,495.59 | -$ 170,495.59 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,217,309.20 |
| 06/01/2016 | 9.9900% | $ 34,895.80 | $ 0.00 | $ 34,895.80 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,877.56 | $ 110.93 | $ 4,217,309.20 |
| 06/02/2016 | - - - | -$ 208,467.42 | -$ 208,467.42 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 06/12/2016 | 9.9900% | $ 13,267.56 | $ 0.00 | $ 13,267.56 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 07/01/2016 | 24.0000% | $ 55,291.89 | $ 0.00 | $ 55,291.89 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 08/01/2016 | 24.0000% | $ 90,213.09 | $ 0.00 | $ 90,213.09 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 09/01/2016 | 24.0000% | $ 90,213.09 | $ 0.00 | $ 90,213.09 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 10/01/2016 | 24.0000% | $ 87,302.99 | $ 0.00 | $ 87,302.99 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 11/01/2016 | 24.0000% | $ 90,213.09 | $ 0.00 | $ 90,213.09 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 12/01/2016 | 24.0000% | $ 87,302.99 | $ 0.00 | $ 87,302.99 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| 12/15/2016 | 24.0000% | $ 40,741.41 | $ 0.00 | $ 40,741.41 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 110.93 | $ 4,425,776.62 |
| | | $ 589,441.91 | $ 0.00 | $ 589,441.91 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,877.56 | | |

** This transaction was already accomplished by the borrower.

* Using Default Interest Rate

| Itemization of Other Fees | |
|---|---|
| Description | Amount |
| Demand Fee | $0.00 |
| Recording Fee | $52.00 |
| Reconveyance Fee | $75.00 |
| [ ACCUMULATED ] | $7,999.42 |
| | $8,126.4 |

| Itemization of Unpaid Charges | | | | | |
|---|---|---|---|---|---|
| Date | Description | Interest Rate | Unpaid Balance | Accrued Interest | Total Due |
| 06/17/2016 | NSF Payment Charge | 0.000% | $20.00 | $0.00 | $20.00 |
| 07/11/2016 | [ CBP ] VCheck Confirmation 16193001078 | 0.000% | $18.00 | $0.00 | $18.00 |
| 07/22/2016 | [ CBP ] VCheck Confirmation 16204001416 | 0.000% | $18.00 | $0.00 | $18.00 |
| 07/20/2016 | NSF Payment Charge | 0.000% | $20.00 | $0.00 | $20.00 |
| 08/02/2016 | NSF Payment Charge | 0.000% | $20.00 | $0.00 | $20.00 |
| | | | | | $96.00 |

| Property List |
|---|
| 377 UNION STREET, BROOKLYN NY 11231 |

SDNY_00240242

| **California TD Specialists**<br>**8190 East Kaiser Blvd.**<br>**Anaheim Hills, California 92808**<br>**(714) 283-2180** | Prepared: 12/5/2016 |
| --- | --- |

**\*\* ONCE FUNDS ARE RECEIVED IN OUR OFFICE WE WILL ISSUE THE FULL RECONVEYANCE DEED\*\***

# DEMAND FOR PAYOFF

Borrower:   779 STRADELLA, LLC
Re: TS#:   ██████         Loan#:   ████████
Property Address:   779 STRADELLA ROAD, LOS ANGELES CA 90077

**IMPORTANT NOTICE: IF YOU OR YOUR ACCOUNT ARE SUBJECT TO PENDING BANKRUPTCY PROCEEDINGS, OR IF YOU RECEIVED A BANKRUPTCY DISCHARGE ON THIS DEBT, THIS STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT.  IF YOU ARE NOT IN BANKRUPTCY OR DISCHARGED OF THIS DEBT, BE ADVISED THAT CALIFORNIA TD SPECIALISTS IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

The amount to pay off the above referenced loan as of **12/15/2016** is as follows:

| | |
| --- | --- |
| Unpaid Principal Balance: | $5,950,000.00 |
| Interest on Unpaid Principal Balance: | $667,887.94 |
| Total Late Charges: | $60,987.48 |

### Interest Details

| From | Through | Late Charge | Rate | Interest on UPB | Per Diem |
| --- | --- | --- | --- | --- | --- |
| 5/1/2016 | 5/31/2016 | $4,462.50 | 9% | $46,112.50 | 1487.5 |
| 6/1/2016 | 12/15/2016 | $9,420.83 | 19% | $621,775.44 | 3140.28 |

| | |
| --- | --- |
| Advances: | $25,963.82 |

### Advance Details

| From | Through | Advance | Rate | Amount | Int. on Advance | Per Diem |
| --- | --- | --- | --- | --- | --- | --- |
| 06/17/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/11/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 07/20/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/22/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 08/02/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 08/15/2016 | 12/15/2016 | Interest on advances () | 0% | $829.20 | $0.00 | $0.00 |
| 11/17/2016 | 12/15/2016 | Attorney Fees () | 0% | $25,023.62 | $0.00 | $0.00 |

| | |
| --- | --- |
| **Total Foreclosure Fees & Expenses:** | $15,270.53 |
| **Payoff Amount as of 12/15/2016:** | **$6,720,109.77** |
| **Daily Interest on UPB and Advances:** | **$3,140.28** |

## Sale Date Scheduled: 12/21/2016

IN THE EVENT PAYMENT HAS NOT BEEN MADE ON OR PRIOR TO **12/15/2016**, THIS DEMAND WILL BE NULL AND VOID. WE ARE TO BE AT NO EXPENSE IN THIS MATTER AND RESERVE THE OPTION TO CANCEL THIS DEMAND AND WITHDRAW SAID DOCUMENT AT ANY TIME.



81611



TS-DLTR        Payoff Statement        150220

SDNY_00240243

Please submit your **cashier's check**, payable to:

**_California TD Specialists, ATTN: Patricio S. Ince', Vice President_**
**_8190 East Kaiser Blvd., Anaheim Hills, California 92808_**

**Please be advised that this figure is subject to change due to escrow disbursements and advances.  Please contact this office to verify that these figures have not changed.**

Thank you,                                                                LENDER AGREES WITH THE AMOUNT ABOVE

_____                    _____
Patricio S. Ince', Vice President                                  GENESIS CAPITAL MASTER FUND III A, LLC

SDNY_00240244

| California TD Specialists<br>8190 East Kaiser Blvd.<br>Anaheim Hills, California 92808<br>(714) 283-2180 | Prepared: 12/5/2016 |
|---|---|

**\*\* ONCE FUNDS ARE RECEIVED IN OUR OFFICE WE WILL ISSUE THE FULL RECONVEYANCE DEED\*\***

# REVISED DEMAND FOR PAYOFF

Borrower:   <u>1550 BLUEJAY WAY, LLC</u>
Re: TS#: ▮▮▮▮▮        Loan#: ▮▮▮▮▮▮
Property Address:    1550 BLUEJAY WAY, WEST HOLLYWOOD AREA, LOS ANGELES CA 90069

**IMPORTANT NOTICE: IF YOU OR YOUR ACCOUNT ARE SUBJECT TO PENDING BANKRUPTCY PROCEEDINGS, OR IF YOU RECEIVED A BANKRUPTCY DISCHARGE ON THIS DEBT, THIS STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT. IF YOU ARE NOT IN BANKRUPTCY OR DISCHARGED OF THIS DEBT, BE ADVISED THAT CALIFORNIA TD SPECIALISTS IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

The amount to pay off the above referenced loan as of **12/15/2016** is as follows:

| | |
|---|---:|
| Unpaid Principal Balance: | $4,850,000.00 |
| Interest on Unpaid Principal Balance: | $529,391.52 |
| Total Late Charges: | $49,712.47 |

### Interest Details

| From | Through | Late Charge | Rate | Interest on UPB | Per Diem |
|---|---|---|---|---|---|
| 2/1/2016 | 2/29/2016 | $4,243.75 | 10.5% | $41,022.82 | 1414.58 |
| 3/1/2016 | 12/15/2016 | $5,052.08 | 12.5% | $488,368.70 | 1684.03 |

| | |
|---|---:|
| Advances: | $49,897.12 |

### Advance Details

| From | Through | Advance | Rate | Amount | Int. on Advance | Per Diem |
|---|---|---|---|---|---|---|
| 06/17/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 06/29/2016 | 12/15/2016 | Extension Fee () | 0% | $24,250.00 | $0.00 | $0.00 |
| 07/11/2016 | 12/15/2016 | VCheck Confirmation x 2 () | 0% | $36.00 | $0.00 | $0.00 |
| 07/20/2016 | 12/15/2016 | NSF fees x 2 () | 0% | $50.00 | $0.00 | $0.00 |
| 07/22/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 08/02/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 10/21/2016 | 12/15/2016 | Attorney Fees () | 0% | $25,023.63 | $0.00 | $0.00 |
| 11/18/2016 | 12/15/2016 | Interest on advances () | 0% | $469.49 | $0.00 | $0.00 |

| | |
|---|---:|
| **Total Foreclosure Fees & Expenses:** | $16,407.54 |
| **Payoff Amount as of 12/15/2016:** | **$5,495,408.65** |
| **Daily Interest on UPB and Advances:** | **$1,684.03** |

## Sale Date Scheduled: 12/23/2016

IN THE EVENT PAYMENT HAS NOT BEEN MADE ON OR PRIOR TO **12/15/2016**, THIS DEMAND WILL BE NULL AND VOID. WE ARE TO BE AT NO EXPENSE IN THIS MATTER AND RESERVE THE OPTION TO CANCEL THIS DEMAND AND WITHDRAW SAID DOCUMENT AT ANY TIME.



81616



TS-DLTR        Payoff Statement        150220

SDNY_00240245

Please submit your **cashier's check**, payable to:

  *California TD Specialists, ATTN: Patricio S. Ince', Vice President*
  *8190 East Kaiser Blvd., Anaheim Hills, California 92808*

**Please be advised that this figure is subject to change due to escrow disbursements and advances.  Please contact this office to verify that these figures have not changed.**

Thank you,                                              LENDER AGREES WITH THE AMOUNT ABOVE

_____                        _____

Patricio S. Ince', Vice President                      GENESIS CAPITAL MASTER FUND III A, LLC

SDNY_00240246

| | |
|---|---|
| **California TD Specialists**<br>**8190 East Kaiser Blvd.**<br>**Anaheim Hills, California 92808**<br>**(714) 283-2180** | Prepared: 12/5/2016 |

**\*\* ONCE FUNDS ARE RECEIVED IN OUR OFFICE WE WILL ISSUE THE FULL RECONVEYANCE DEED\*\***

# REVISED DEMAND FOR PAYOFF

Borrower:   2401 NOTTINGHAM, LLC
Re: TS#:   ███                                Loan#:   ████████
Property Address:   2401 NOTTINGHAM AVENUE, LOS ANGELES CA 90027

**IMPORTANT NOTICE: IF YOU OR YOUR ACCOUNT ARE SUBJECT TO PENDING BANKRUPTCY PROCEEDINGS, OR IF YOU RECEIVED A BANKRUPTCY DISCHARGE ON THIS DEBT, THIS STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT. IF YOU ARE NOT IN BANKRUPTCY OR DISCHARGED OF THIS DEBT, BE ADVISED THAT CALIFORNIA TD SPECIALISTS IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

The amount to pay off the above referenced loan as of **12/15/2016** is as follows:

| | |
|---|---|
| Unpaid Principal Balance: | $3,737,100.00 |
| Interest on Unpaid Principal Balance: | $443,024.29 |
| Total Late Charges: | $34,238.09 |

### Interest Details

| From | Through | Late Charge | Rate | Interest on UPB | Per Diem |
|---|---|---|---|---|---|
| 5/1/2016 | 5/31/2016 | $3,111.14 | 9.99% | $32,148.55 | 1037.05 |
| 6/1/2016 | 12/15/2016 | $6,225.39 | 19.99% | $410,875.74 | 2075.13 |

| | |
|---|---|
| Advances: | ($4,121.89) |

### Advance Details

| From | Through | Advance | Rate | Amount | Int. on Advance | Per Diem |
|---|---|---|---|---|---|---|
| 06/17/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/11/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 07/20/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/22/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 08/02/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 08/15/2016 | 12/15/2016 | Suspense balance () | 0% | ($30,000.00) | $0.00 | $0.00 |
| 11/17/2016 | 12/15/2016 | Attorney Fees () | 0% | $25,023.62 | $0.00 | $0.00 |
| 11/28/2016 | 12/15/2016 | Special Assessment-Wire () | 0% | $146.30 | $0.00 | $0.00 |
| 12/01/2016 | 12/15/2016 | Interest on advances () | 0% | $597.19 | $0.00 | $0.00 |

| | |
|---|---|
| **Total Foreclosure Fees & Expenses:** | $14,477.28 |
| **Payoff Amount as of 12/15/2016:** | **$4,224,717.77** |
| **Daily Interest on UPB and Advances:** | **$2,075.13** |

IN THE EVENT PAYMENT HAS NOT BEEN MADE ON OR PRIOR TO **12/15/2016**, THIS DEMAND WILL BE NULL AND VOID. WE ARE TO BE AT NO EXPENSE IN THIS MATTER AND RESERVE THE OPTION TO CANCEL THIS DEMAND AND WITHDRAW SAID DOCUMENT AT ANY TIME.


81610


TS-DLTR          Payoff Statement          150220

SDNY_00240247

Please submit your **cashier's check**, payable to:

   *California TD Specialists, ATTN: Patricio S. Ince', Vice President*
   *8190 East Kaiser Blvd., Anaheim Hills, California 92808*

**Please be advised that this figure is subject to change due to escrow disbursements and advances.  Please contact this office to verify that these figures have not changed.**

Thank you,                                              LENDER AGREES WITH THE AMOUNT ABOVE

_____                              _____
Patricio S. Ince', Vice President                      GENESIS CAPITAL MASTER FUND III A, LLC

| **California TD Specialists**<br>**8190 East Kaiser Blvd.**<br>**Anaheim Hills, California 92808**<br>**(714) 283-2180** | Prepared: 12/5/2016 |
|---|---|

**\*\* ONCE FUNDS ARE RECEIVED IN OUR OFFICE WE WILL ISSUE THE FULL RECONVEYANCE DEED\*\***

# REVISED DEMAND FOR PAYOFF

Borrower:   MT YOHAI, LLC
Re: TS#:   ▮▮▮▮▮                         Loan#:   ▮▮▮▮▮▮▮▮
Property Address:   2521 NOTTINGHAM AVENUE, LOS ANGELES CA 90027

**IMPORTANT NOTICE: IF YOU OR YOUR ACCOUNT ARE SUBJECT TO PENDING BANKRUPTCY PROCEEDINGS, OR IF YOU RECEIVED A BANKRUPTCY DISCHARGE ON THIS DEBT, THIS STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT.  IF YOU ARE NOT IN BANKRUPTCY OR DISCHARGED OF THIS DEBT, BE ADVISED THAT CALIFORNIA TD SPECIALISTS IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

The amount to pay off the above referenced loan as of **12/15/2016** is as follows:

| | |
|---|---|
| Unpaid Principal Balance: | $715,000.00 |
| Interest on Unpaid Principal Balance: | $53,300.45 |
| Total Late Charges: | $4,881.64 |

### Interest Details

| From | Through | Late Charge | Rate | Interest on UPB | Per Diem |
|---|---|---|---|---|---|
| 5/1/2016 | 5/31/2016 | $595.24 | 9.99% | $6,150.71 | 198.41 |
| 6/1/2016 | 12/15/2016 | $714.40 | 11.99% | $47,149.74 | 238.13 |

| | |
|---|---|
| Advances: | $29,113.94 |
| Interest on Advances: | $5.58 |

### Advance Details

| From | Through | Advance | Rate | Amount | Int. on Advance | Per Diem |
|---|---|---|---|---|---|---|
| 06/09/2016 | 12/15/2016 | Extension Fee () | 0% | $3,575.00 | $0.00 | $0.00 |
| 06/17/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/11/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 07/20/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 07/22/2016 | 12/15/2016 | VCheck Confirmation () | 0% | $18.00 | $0.00 | $0.00 |
| 08/02/2016 | 12/15/2016 | NSF fees () | 0% | $25.00 | $0.00 | $0.00 |
| 08/17/2016 | 12/15/2016 | Wire () | 11.99% | $140.80 | $5.58 | $0.05 |
| 11/17/2016 | 12/15/2016 | Attorney Fees () | 0% | $25,023.63 | $0.00 | $0.00 |
| 11/18/2016 | 12/15/2016 | Interest on advances () | 0% | $220.51 | $0.00 | $0.00 |

| | |
|---|---|
| **Total Foreclosure Fees & Expenses:** | **$5,612.29** |
| **Payoff Amount as of 12/15/2016:** | **$807,913.90** |
| **Daily Interest on UPB and Advances:** | **$238.18** |

# Sale Date Scheduled: 12/21/2016

IN THE EVENT PAYMENT HAS NOT BEEN MADE ON OR PRIOR TO **12/15/2016**, THIS DEMAND WILL BE NULL AND VOID. WE ARE TO BE AT NO EXPENSE IN THIS MATTER AND RESERVE THE OPTION TO CANCEL THIS DEMAND AND WITHDRAW SAID DOCUMENT AT ANY TIME.



81617



TS-DLTR          Payoff Statement          150220

SDNY_00240249

Please submit your **cashier's check**, payable to:

> ***California TD Specialists, ATTN: Patricio S. Ince', Vice President***
> ***8190 East Kaiser Blvd., Anaheim Hills, California 92808***

**Please be advised that this figure is subject to change due to escrow disbursements and advances.  Please contact this office to verify that these figures have not changed.**

Thank you,                                                      LENDER AGREES WITH THE AMOUNT ABOVE

_____                    _____
Patricio S. Ince', Vice President                          GENESIS CAPITAL MASTER FUND III A, LLC

SDNY_00240250

# Exhibit 2

**To:** Dennis Raico
Case 1:19-cr-00366-LGS   Document 133-2   Filed 11/13/20   Page 2 of 4
**From:** Steve Calk
**Sent:** Wed 12/7/2016 5:17:35 PM (UTC)
**Subject:** RE: Nervousness is setting in

Fucking ridiculous. This is why we cant rely on them as partners. We MUST push back on this. The equity is what it is. The cash at TFSB is committed to finish the project in California as planned. Will call you soon.

*Steve*

Stephen M. Calk
**Chairman and Chief Executive Officer**
**National Bancorp Holdings**



300 N. Elizabeth Street
Floor 3E
Chicago, IL 60607

▮▮▮▮  Direct
      Office
      Private Fax
▮▮▮▮▮▮▮▮

www.TheFederalSavingsBank.com

---

**From:** Dennis Raico
**Sent:** Wednesday, December 7, 2016 10:37 AM
**To:** Steve Calk ▮▮▮▮▮▮▮▮
**Subject:** RE: Nervousness is setting in

Hi Steve,

I was just going to call you. Yes – we did receive the approval from B or I. As usual, they challenged the appraisal values, and want additional equity. They have requested $3 Mil equity pledge. This can be accomplished while still keeping the deposit in TFSB. Let me know when you are available to discuss. Thanks!

 

Dennis Raico, *Senior Vice President*

**The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271

**direct:** ▮▮▮▮▮▮

**fax:** ▮▮▮▮▮

**cell:** ▮▮▮▮▮

**email:** ▮▮▮▮▮▮▮▮

**web:** www.thefederalsavingsbank.com/dennisraico

*NMLS# 1186262*

SDNY_00241672

 

**From:** Steve Calk
**Sent:** Wednesday, December 7, 2016 11:30 AM
**To:** Dennis Raico ███████████████████████
**Subject:** RE: Nervousness is setting in

Dennis,
Please update me on the refinance we discussed yesterday afternoon for Manafort.  Did you get the approval from B of I?

*Steve*

Stephen M. Calk
**Chairman and Chief Executive Officer**
**National Bancorp Holdings**



300 N. Elizabeth Street
Floor 3E
Chicago, IL 60607
██████ Direct
Office
Private Fax
█████████████████████████

www.TheFederalSavingsBank.com

---

**From:** Dennis Raico
**Sent:** Wednesday, December 7, 2016 10:22 AM
**To:** Paul Manafort ████████████████████
**Cc:** Steve Calk ██████████████████████; Bruce Baldinger ████████████████████
**Subject:** RE: Nervousness is setting in

Hi Paul,

As you have noted, I am aware of the auction dates, and have been in consistent communication with John Day from Genesis.  Thank you for acknowledging that additional processing is occurring.  We are moving as quickly as possible ensuring the appropriate due diligence, and I will be connecting with you later today with an update.  Thank you!

Best Regards,

  

Dennis Raico, *Senior Vice President*

**The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271

**direct:** ███████████

**fax:** █████████

SDNY_00241673

**email:** ███████████████████████

**web:** www.thefederalsavingsbank.com/dennisraico

*NMLS# 1186262*

 

---

**From:** Paul Manafort ████████████████████████
**Sent:** Wednesday, December 7, 2016 11:02 AM
**To:** Dennis Raico ██████████████████████████
**Cc:** Steve Calk ██████████████████████; Bruce Baldinger ████████████████████████
**Subject:** Nervousness is setting in

Dennis
As you know, the properties go to auction on Dec 21.
I am concerned that we have no closings scheduled on any of the loans that you indicated we would close "this week or the beginning of next week".
As you know we are talking about 3 properties and a Line of Credit.
While I believe, based on our conversations, that the files are complete I recognize that there is processing that must occur. Have you engaged the Title Company? Is there any form you need from me on any of the matters? Are you closing attorneys in communication with Bruce Baldinger?
Pls let me know if there is anything I need to be focusing on while you are processing the file and preparing the closing.
Paul

SDNY_00241674

Exhibit 3

**To:** Bruce Baldinger ▮▮▮▮▮▮; Paul Manafort ▮▮▮▮▮▮
**Cc:** Dennis Raico ▮▮▮▮▮▮
**From:** steve@thefederalsavingsbank.com
**Sent:** Wed 12/21/2016 6:35:57 PM (UTC)
**Subject:** Re: Manafort Appraisals - 377 Union St., Brooklyn, NY

Bruce, we are in no way scheduling a closing until this loan is fully structured, underwritten and approved. You must stop your presumptuous emails. We are working very hard to help find solutions to help Paul out in his hour of need. It is not helpful when you choose words that are misleading to everyone. Please stop this behavior. It is most destructive to our relationship.

Steve

    Stephen M. Calk
    Chairman and CEO
    National Bancorp Holdings
    The Federal Savings Bank
    300 N. Elizabeth Street
    Floor 3E
    Chicago, IL 60607
    ▮▮▮▮ direct
    ▮▮▮▮ main
    ▮▮▮▮ private Fax
    www.TheFederalSavingsBank.com
    ▮▮▮▮▮▮▮▮▮▮

On Dec 21, 2016, at 11:40 AM, Bruce Baldinger ▮▮▮▮▮▮▮▮ wrote:

> Thanks Dennis. I will speak with Paul and contact you a little later re closing.
>
> Sent from my iPad
>
> On Dec 21, 2016, at 11:25 AM, Dennis Raico ▮▮▮▮▮▮▮▮▮ wrote:
>
> > Gentlemen,
> >
> > Pursuant to Steve's direction, attached are the two appraisals just received for 377 Union Street, Brooklyn, NY.  The values are $6.3 Million and $6.4 Million respectively.  Thank you.
> >
> > <image002.jpg>   <image003.jpg>
> >
> > Dennis Raico, *Senior Vice President*
> >
> > **The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271
> >
> > **direct:** ▮▮▮▮▮▮
> >
> > **fax:** ▮▮▮▮▮▮
> >
> > **cell:** ▮▮▮▮▮
> >
> > **email:** ▮▮▮▮▮▮▮▮▮
> >
> > **web:** www.thefederalsavingsbank.com/dennisraico

SDNY_00239562

**From:** Elizabeth Cholakis
**Sent:** Wednesday, December 21, 2016 10:51 AM
**To:** Dennis Raico █████████████████████████
**Subject:** Manafort Appraisals

Hi Dennis,

Attached are both appraisals for 377 Union St. Let me know if you need any other supporting docs.

<image001.png>
**Elizabeth Cholakis** *Junior Analyst*
**The Federal Savings Bank** | 120 Broadway, Suite 2950 | New York, NY 10271 | USA
**Phone:** █████████████
**Fax:** █████████████████████
**Email:** ████████████████████████████
**Web:** www.thefederalsavingsbank.com


<Second Appraisal Report-377 Union St..pdf>

<Appraisal Report-377 Union St..pdf>

Exhibit 4

**To:** Steve Calk █████████████████
**From:** Dennis Raico
**Sent:** Fri 10/7/2016 4:59:06 PM (UTC)
**Subject:** RE: Closing on Nottingham & Bridgehampton loans

Hi Steve,

Just a quick FYI – we are already positioned take the VA property, as the Hampton property just appraised for $14 Mil.  Let me know if you need any further information.  Thanks.


Best Regards,

 

Dennis Raico, *Senior Vice President*

**The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271

**direct:** ██████████

**fax:** ████████

**cell:** ████████

**email:** ████████████████████

**web:** www.thefederalsavingsbank.com/dennisraico

*NMLS# 1186262*

    

---

**From:** Steve Calk
**Sent:** Friday, October 7, 2016 12:56 PM
**To:** Paul Manafort ████████████████████
**Subject:** RE: Closing on Nottingham & Bridgehampton loans

Paul,
I will look into this right away and give you a call back.  If I can do this, we will be required to take the Virginia property due to the increase in loan amount and the low appraisal on the Hamptons property.  If that is acceptable, please let me know and I will take it to the board today.
Warm regards,

*Steve*

Stephen M. Calk
Chairman and Chief Executive Officer
National Bancorp Holdings

SDNY_00239171

THE FEDERAL SAVINGS BANK

300 N. Elizabeth Street
Floor 3E
Chicago, IL 60607

██████████ Direct
██████████ Office
██████████ Private Fax
█████████████████████

www.TheFederalSavingsBank.com

---

**From:** Paul Manafort ████████████████
**Sent:** Friday, October 7, 2016 11:52 AM
**To:** Steve Calk ████████████████
**Subject:** Closing on Nottingham & Bridgehampton loans

Steve
We are getting close to closing the loan but there is a major issue. I don't know how to resolve this problem.
When we had lunch, I must have had a blackout. I told you that there is a 2.5m first on the Bridgehampton property. I meant to say a 3.5m first.
The loan that Dennis is prepared to execute is for the Nottingham first and 2.5m of the BH first. He is expecting me to come up with the difference. At this time, I am not able to do so.
If we can do the loan for 3.5m I can repay the difference if required in about 6 months, although I would prefer not to do so.
I look to your cleverness on how to manage the underwriting. I recognize it was my mistake at our lunch, but the situation is as described.
Paul

SDNY_00239172

Exhibit 5

**From:** Javier Ubarri
**Sent:** Thur 10/20/2016 1:21:53 PM (UTC)
**Subject:** FW: manafort loan

Sent this to Dennis this morning.



**THE FEDERAL SAVINGS BANK**

Javier Ubarri, *President*
**The Federal Savings Bank** | 300 N. Elizabeth Street, Suite 3E, Chicago, IL   60607 | USA
**direct:** ███████████
**fax:** ███████████
**email:** ███████████
**web:** www.thefederalsavingsbank.com

---

**From:** Javier Ubarri
**Sent:** Thursday, October 20, 2016 8:21 AM
**To:** Dennis Raico ███████████        Jim Brennan ███████████
**Subject:** manafort loan

Dennis
As I had some time to think about this here are my thoughts:
-It's important that Paul knows that these loans are very important to us, and that we value the relationship that he has with Steve immensely.  However, he (and his attorneys) may feel like we are negotiating but we are not.
-we said from the beginning what we would do and we are doing what we said. We are not changing the deal.
-This should be a short conversation.  Let's all stay friends, move on and go our own way.
-we gave this loan priority over everything that we were doing but we cannot put any more time on this loan.  Jim and his team has two other big closings that we need to do this month and we need to move on.  if he needs to think about it that's fine.  Then, the loan will not close this month.
-Paul's statement that he doesn't want to depend on his son in law to dictate what he can or cannot do in his business is very telling.  He doesn't want to take the "risk" of his son in law but want us to take that risk.  We were very clear from the beginning that we were not going to do that.  Paul need to have skin in the game and we need it to stay there.

Let's make sure that we settle all legal bills for the loan docs etc. and go after the next one.  If we move forward with the loan let's make sure that we don't assign the cash deposits ($500,000 plus the $200,000) to any specific loan.  That is part of the general collateral.  We came up with those numbers based on PITI for portions of the loan but that was just the thought process incoming up with the amounts.

I know that you have worked very hard on this loan and we appreciate all your hard work. This is not an easy loan to make and is a significant exposure to the bank and we want to make sure that we do it right.

Javier



**THE FEDERAL SAVINGS BANK**

Javier Ubarri, *President*
**The Federal Savings Bank** | 300 N. Elizabeth Street, Suite 3E, Chicago, IL   60607 | USA
**direct:** ███████████
**fax:** ███████████
**email:** ███████████
**web:** www.thefederalsavingsbank.com

SDNY_00239244

Exhibit 6

**To:** Steve Calk ████████████████
**From:** Jackie Katz
**Sent:** Fri 12/23/2016 11:11:48 PM (UTC)
**Subject:** RE: securemail New Account Documentation

Yes, I resent it to Paul and highlighted the area where he missed signing.

---

**From:** Steve Calk
**Sent:** Friday, December 23, 2016 4:58 PM
**To:** Jackie Katz ████████████████████
**Subject:** FW: securemail New Account Documentation

Jackie,
Does he need to sign by the other "x" for withholdings?

*Steve*

Stephen M. Calk
**Chairman and Chief Executive Officer**
**National Bancorp Holdings**



300 N. Elizabeth Street
Floor 3E
Chicago, IL 60607
████████ Direct
████████ Office
████████ Private Fax
████████████████
www.TheFederalSavingsBank.com

---

**From:** Paul Manafort ████████████████████
**Sent:** Friday, December 23, 2016 4:56 PM
**To:** Jackie Katz ████████████████████
**Cc:** Dennis Raico ████████████████████; Celestina Kwiecien ████████████████████
**Subject:** Re: securemail New Account Documentation

Jackie
I have attached the new Joint Account form signed by Kathy and me.
Paul Manafort

---

**From:** Jackie Katz ████████████████████
**Date:** Friday, December 23, 2016 at 10:32 AM
**To:** Paul Manafort ████████████████████
**Subject:** securemail New Account Documentation

You've received an encrypted message from ████████████████████
**To view your message**
Save and open the attachment (message.html), and follow the instructions.
Sign in using the following email address: ████████████████

This email message and its attachments are for the sole use of the intended recipient or recipients and may contain confidential information. If you have received this email in error, please notify the sender and delete this message.

SDNY_00240612

SDNY_00240613

Exhibit 7

**From:** Matthew MacDonald
**Sent:** Friday, November 11, 2016 3:22 PM
**To:** Dennis Raico; Javier Ubarri; Jim Brennan; Eric Buteyn
**Cc:** Steve Calk
**Subject:** RE: Manafort $9.5 Mil, encompass file █████████
**Attachments:** Manafort.xlsx

Dennis,

Per our conversation, I was able to review Mr. and Mrs. Manafort's tax returns. I added all the distributions from each K-1 which approximates to $4.6MM for 2015. Paul also has capital calls in the amount of $2.4MM that typically would need to be deducted from distribution income. However, if we can get a CPA letter to verify that the client is not required to make cap calls then I would recommend we do not deduct from his income calculation.

I do not have the ability to finish the underwrite today but I would feel confident in issuing a term sheet or a commitment to the borrower. Back end ratios are in the 20% range. Please let me know if you have any questions otherwise I will have Eric work this up early next week.

| | | | | | | |
|---|---|---|---|---|---|---|
| IC Soho Holdings, LLC Paul | $  1,500 | $  - | 432,393 | $  433,809 | |
| OTALS | $  4,662,037 | 5474756 | 3055674 | $  2,397,404 | |
| | | | | | |
| Monthly K-1 income | $  388,503 | | | | |
| | | | | | |
| chedule C income | $  14,583 | | | | |
| | | | | | |
| Monthly capital calls | $  (199,784) | | | | |

Regards,



Matt MacDonald, *Underwriting Manager*
**The Federal Savings Bank** | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607
**direct:** ███████████
**email:** ████████████████████████
**web:** www.thefederalsavingsbank.com
*NMLS# 1254803*




1

**From:** Dennis Raico
**Sent:** Thursday, November 10, 2016 4:34 PM
**To:** Javier Ubarri ██████████████; Jim Brennan ████████████████████; Eric Buteyn ████████████████████; Matthew MacDonald ██████████████████
**Subject:** RE: Manafort $9.5 Mil, encompass file ████████

Javier,

Sounds good – let me know if you received my last e-mail to you and Jim, which included the income analysis from the MD Ops.  Thanks!



Dennis Raico, *Senior Vice President*
**The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271
**direct:** ████████
**fax:** ████████
**cell:** ████████
**email:** ████████████████
**web:** www.thefederalsavingsbank.com/dennisraico
NMLS# 1186262

  

---

**From:** Javier Ubarri
**Sent:** Thursday, November 10, 2016 5:24 PM
**To:** Jim Brennan ████████████████████; Dennis Raico ██████████████████; Eric Buteyn ████████████████; Matthew MacDonald ██████████████████
**Subject:** RE: Manafort $9.5 Mil, encompass file # ████████

If we are considering this as a portfolio loan its important that Matt or Eric looks at it.
Javier

Javier Ubarri, *President*
**The Federal Savings Bank** I 300 N. Elizabeth Street, Suite 3E, Chicago, IL   60607 I USA
**direct:** ████████
**fax:** ████████
**email:** ████████████████
**web:** www.thefederalsavingsbank.com

---

**From:** Jim Brennan
**Sent:** Thursday, November 10, 2016 2:28 PM

**To:** Dennis Raico ████████████████████████
**Cc:** Javier Ubarri ████████████████
**Subject:** RE: Manafort $9.5 Mil, encompass file # ████████

Dennis,

The correct Encompass number is ████████.  There no Underwriting Loan Decision in the file.

 

Jim Brennan, *Vice President,*
**The Federal Savings Bank** | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607
**direct:** ████████
**fax:** ████████████████
**email:** ████████████████
**web:** www.thefederalsavingsbank.com



This electronic communication and any files transmitted with it, or attached to it, are confidential and are intended solely for the use of the individual or entity to who it is addressed and may contain information that is confidential, legally privileged, protected by privacy laws, or otherwise restricted from disclosure to anyone else.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error, and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this information in error, please notify us.

**From:** Dennis Raico
**Sent:** Thursday, November 10, 2016 1:21 PM
**To:** Jim Brennan ████████████████████
**Cc:** Javier Ubarri ████████████████████
**Subject:** Manafort $9.5 Mil, encompass file # ████████

Please call me with any questions or concerns.  Thanks!

 

Dennis Raico, *Senior Vice President*
**The Federal Savings Bank** | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271
**direct:** ████████
**fax:** ████████████
**cell:** ████████
**email:** ████████████████
**web:** www.thefederalsavingsbank.com/dennisraico
*NMLS# 1186262*




| Entity Name | distributions | beginning cap acct | ending capital acct | capital contributed through year | Final K-1 |
|---|---|---|---|---|---|
| Alliance Holding | $ 2,501 | $ - | $ 41,239 | $ 45,422 | |
| Cedar Fair | $ 1,654 | $ - | $ 42,260 | $ 45,829 | |
| JT Energy Exchange | $ 1,500 | $ - | $ 74,089 | $ 78,986 | |
| Energy Transfer Partners | $ 7,024 | $ 37,021 | $ 87,493 | $ 63,791 | |
| Enterprise Production Partners | $ 2,044 | $ - | $ 55,854 | $ 63,008 | |
| Locust Wood Capital | $ - | $ 513,599 | $ 515,257 | $ - | |
| Nustar GP Holdings | $ 654 | $ - | $ 20,734 | $ 22,292 | |
| Suburban Propane partners | $ 2,063 | $ - | $ 28,607 | $ 33,558 | |
| Teekay Partners | $ 1,435 | $ - | $ 38,118 | $ 40,803 | |
| Western Gas equity Partners | $ - | $ - | $ 33,821 | $ 34,466 | |
| Western Gas Partners | $ 4,291 | $ 121,137 | $ 124,134 | $ 49,887 | |
| Daisy manafort LLC-Kathleen | $ - | $ 20,307 | $ 20,307 | $ - | |
| DMP International, LLC Kathleen | $ 246,913 | $ 497 | $ 7,808 | $ - | |
| John Hannah LLC-Kathleen | $ 1,531,022 | $ 1,531,346 | $ 324 | $ - | |
| Lilred, LLC Kathleen | $ 540,000 | $ 820,285 | $ 3,942 | $ - | |
| Lola Partners Kathleen | $ - | $ - | $ 506,012 | $ 506,012 | |
| MC SOHO Holdings LLC Kathleen | $ 1,500 | $ - | $ 432,594 | $ 453,669 | |
| Wandering Minstrel | $ - | $ 67,113 | $ 61,427 | $ - | |
| Daisy manafort LLC-Paul | $ - | $ 20,311 | $ 20,312 | $ - | |
| DMP International, LLC Paul | $ 246,913 | $ 498 | $ 7,811 | $ - | |
| Fairfax Street Partnership | $ - | $ (8,990) | $ (9,338) | $ - | |
| John Hannah LLC Paul | $ 1,531,023 | $ 1,531,350 | $ 327 | $ - | |
| Lilred, LLC Paul | $ 540,000 | $ 820,282 | $ 3,937 | $ - | |
| Lola Partners Paul | $ - | $ - | $ 506,012 | $ 506,012 | |
| MC Soho Holdings, LLC Paul | $ 1,500 | $ - | $ 432,593 | $ 453,669 | |
| TOTALS | $ 4,662,037 | $ 5,474,756 | $ 3,055,674 | $ 2,397,404 | |

Monthly K-1 income          $ 388,503

schedule C income          $ 14,583.33

Monthly capital calls          $ (199,784)

|  |  |  |  |  | Final K-1 |
|---|---|---|---|---|---|
| Crestwood equity | 1515 | 0 | 0 | 37188 | X |
| Crestwood Midstream | 1210 | 0 | 0 | 24429 | X |

Exhibit 8

**To:**    Javier Ubarri ████████████████████████

**From:**  Matthew MacDonald

**Sent:**  Fri 11/11/2016 8:38:37 PM (UTC)

**Subject:** RE: Manafort $9.5 Mil, encompass file #██████

No problem.

Regards,

Matt MacDonald, Underwriting Manager

The Federal Savings Bank | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607

direct: ████████████

email: ██████████████████████████

web: www.thefederalsavingsbank.com

NMLS# 1254803

-----Original Message-----

From: Javier Ubarri

Sent: Friday, November 11, 2016 2:36 PM

To: Matthew MacDonald ████████████

Cc: Dennis Raico ████████████████████████ Jim Brennan
████████████████████ Eric Buteyn ██████████████████████████████ ; Steve Calk ████████████████████

Subject: Re: Manafort $9.5 Mil, encompass file #██████

Mathew

Thank you for your help with this.  Dennis is waiting to hear from Bank of the Internet.  Please don't do any more work until we get some direction from Steve

Thank you again
Javier

Sent from my iPhone

> On Nov 11, 2016, at 3:22 PM, Matthew MacDonald ████████████████████████ wrote:

>

> Dennis,

>

> Per our conversation, I was able to review Mr. and Mrs. Manafort's tax returns.  I added all the distributions from each K-1 which approximates to $4.6MM for 2015.   Paul also has capital calls in the amount of $2.4MM that typically would need to be deducted from distribution income.  However, if we can get a CPA letter to verify that the client is not required to make cap calls then I would recommend we do not deduct from his income calculation.

>

> I do not have the ability to finish the underwrite today but I would feel confident in issuing a term sheet or a commitment to the borrower.  Back end ratios are in the 20% range.   Please let me know if you

have any questions otherwise I will have Eric work this up early next week.
>
> [cid:image007.png@01D23C26.F0161AD0]
>
>
>
> Regards,
>
> [Matthew MacDonald]
>
> [Home Page]
>
>
>
>
> Matt MacDonald, Underwriting Manager
>
>
>
> The Federal Savings Bank | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607
>
>
>
> direct: ██████████
>
>
>
> email:
████████████████████████████████████████████████████
>
>
>
> web: www.thefederalsavingsbank.com<http://www.thefederalsavingsbank.com/>
>
>
>
> NMLS# 1254803
>
>
>
> [Member FDIC | Equal Housing Lender]
>
>
>
>
>
> From: Dennis Raico
> Sent: Thursday, November 10, 2016 4:34 PM
> To: Javier Ubarri ████████████████████ Jim Brennan
███████████████ ; Eric Buteyn ████████████████████████>; Matthew MacDonald
> Subject: RE: Manafort $9.5 Mil, encompass file # ██████████████
>
>
> Javier,
>

> Sounds good – let me know if you received my last e-mail to you and Jim, which included the income analysis from the MD Ops.  Thanks!
>
>
>
> [Dennis Raico]
>
> [Home Page]
>
>
> Dennis Raico, Senior Vice President
>
> The Federal Savings Bank | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271
>
> direct: █████████████
>
> fax: ████████████
>
> cell: ████████████
>
> email: ████████████████████████████████████████████
>
> web: www.thefederalsavingsbank.com/dennisraico<http://www.thefederalsavingsbank.com/dennisraico>
>
> NMLS# 1186262
>
> [Member FDIC | Equal Housing Lender]
>
>
>
> From: Javier Ubarri
> Sent: Thursday, November 10, 2016 5:24 PM
> To: Jim Brennan
███████████████████████████████████████████ Dennis Raico
███████████████████████████████████████; Eric Buteyn
███████████████; Matthew MacDonald
███████████████████████████████████████████████
> Subject: RE: Manafort $9.5 Mil, encompass file # ██████████
>
> If we are considering this as a portfolio loan its important that Matt or Eric looks at it.
> Javier
>
>
> [cid:image002.png@01CF9F56.4F1E8DC0]
> Javier Ubarri, President
> The Federal Savings Bank I 300 N. Elizabeth Street, Suite 3E, Chicago, IL   60607 I USA
> direct: ████████████████
> fax: ████████████
> email: ██████████████████████████████████
> web: www.thefederalsavingsbank.com<http://www.thefederalsavingsbank.com/>
>
> From: Jim Brennan
> Sent: Thursday, November 10, 2016 2:28 PM
> To: Dennis Raico ███████████████████████████████████

SDNY_00277345

> Cc: Javier Ubarri ███████████████████████████████████████████████████

> Subject: RE: Manafort $9.5 Mil, encompass file # ██████████

>

> Dennis,

>

> The correct Encompass number is ██████████. There no Underwriting Loan Decision in the file.

>

> [Jim Brennan]

>

> [Home Page]

>

>

> Jim Brennan, Vice President,

>

> The Federal Savings Bank | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607

>

> direct: ████████████

>

> fax: ████████████

>

> email: ████████████████████████████████████████████████

>

> web: www.thefederalsavingsbank.com<http://www.thefederalsavingsbank.com/>

>

> [Member FDIC | Equal Housing Lender]

>

>

> This electronic communication and any files transmitted with it, or attached to it, are confidential and are intended solely for the use of the individual or entity to who it is addressed and may contain information that is confidential, legally privileged, protected by privacy laws, or otherwise restricted from disclosure to anyone else.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error, and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this information in error, please notify us.

>

> From: Dennis Raico

> Sent: Thursday, November 10, 2016 1:21 PM

> To: Jim Brennan

> ██████████████████████████████████████████████████

> Cc: Javier Ubarri ███████████████████████████████████████████████

> Subject: Manafort $9.5 Mil, encompass file # ██████████

>

>

> Please call me with any questions or concerns.  Thanks!

>

>

>

> [Dennis Raico]

>

> [Home Page]

>

>

> Dennis Raico, Senior Vice President

>

> The Federal Savings Bank | 120 Broadway, 29th Floor, Suite 2950, New York, NY 10271

>

SDNY_00277346

> direct: █████████

>

> fax: ███████

>

> cell: █████████

>

> email: ████████████████████████████████████

>

> web:

www.thefederalsavingsbank.com/dennisraico<http://www.thefederalsavingsbank.com/dennisraico>

>

> NMLS# 1186262

>

> [Member FDIC | Equal Housing Lender]

>

>

>

> <image001.jpg>

> <image002.jpg>

> <image003.jpg>

> <image004.jpg>

> <image005.png>

> <image006.jpg>

> <Manafort.xlsx>

> <image007.png>

Exhibit 9

**To:**      Paul J. Manafort
**From:**    steve@thefederalsavingsbank.com
**Sent:**    Thur 10/13/2016 3:51:05 PM (UTC)
**Subject:** Fwd: Roman James

001_CSC Documents.pdf
ATT00001.htm
rsltrpt1476206688.pdf
ATT00002.htm
rsltrpt1476206465.pdf
ATT00003.htm
rsltrpt1476206549.pdf
ATT00004.htm

As discussed. Read below

Steve

    Stephen M. Calk
    Chairman and CEO
    National Bancorp Holdings
    The Federal Savings Bank
    300 N. Elizabeth Street
    Floor 3E
    Chicago, IL 60607
    ████████ direct
    ████████ main
    ████████ private Fax
    www.TheFederalSavingsBank.com
    ████████████████

    Begin forwarded message:

        **From:** "Jim Brennan" ████████████████
        **To:** "Steve Calk" ████████████████
        **Subject: Roman James**

        Steve,

        Attached find a link to the Forbes Article discussing the 2009 Bankruptcy.  I have also attached the lien and judgment searches showing he is clean since that incident.

        http://www.forbes.com/2009/11/16/henry-nicholas-roman-james-fraud-tax-evasion-business-billionaires-wealth.html




        Jim Brennan, *Vice President,*

        **The Federal Savings Bank** | 300 N Elizabeth Street, STE 3E, Chicago, IL 60607

        **direct:** ████████████

SDNY_00239214

**fax:** ████████████

**email:** ████████████████████

**web:** www.thefederalsavingsbank.com



This electronic communication and any files transmitted with it, or attached to it, are confidential and are intended solely for the use of the individual or entity to who it is addressed and may contain information that is confidential, legally privileged, protected by privacy laws, or otherwise restricted from disclosure to anyone else.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error, and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this information in error, please notify us.

SDNY_00239215

**CORPORATION SERVICE COMPANY**
www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-2 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

| | |
|---|---|
| **Subject:** | **ROMAN JAMES** |
| **Jurisdiction:** | **CA - SECRETARY OF STATE** |
| **Request for:** | **Local Judgment Search** |
| **Thru Date:** | **September 29, 2016** |
| **Result:** | **Certified clear result retrieved** |

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Susan Enstrom

█████████████████

**Corporation Service Company(R) Terms and Conditions**
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-2 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

| | |
|---|---|
| **Subject:** | **ROMAN JAMES** |
| **Jurisdiction:** | **CA - SECRETARY OF STATE** |
| **Request for:** | **Federal Tax Lien Search** |
| **Thru Date:** | **September 29, 2016** |
| **Result:** | **Certified clear result retrieved** |

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Susan Enstrom

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-2 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

| | |
|---|---|
| **Subject:** | **ROMAN JAMES** |
| **Jurisdiction:** | **CA - SECRETARY OF STATE** |
| **Request for:** | **UCC Debtor Search** |
| **Thru Date:** | **September 29, 2016** |
| **Result:** | **Certified clear result retrieved** |

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Susan Enstrom

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

SDNY_00239218

**CORPORATION SERVICE COMPANY**
www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-2 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

|  |  |
|---|---|
| **Subject:** | **ROMAN JAMES** |
| **Jurisdiction:** | **CA - SECRETARY OF STATE** |
| **Request for:** | **State Tax Lien Search** |
| **Thru Date:** | **September 29, 2016** |
| **Result:** | **Certified results retrieved** |
| **No. of judgments included:** | 1 |

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Susan Enstrom

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

SDNY_00239219



**SECRETARY OF STATE**
**STATE OF CALIFORNIA**

**Search Certificate**

SEARCH REQUESTED ON:                                                    10/11/2016
Individual Debtor:   **JAMES ROMAN**

Address:  **NOT SPECIFIED**
Date Range From:  **NOT SPECIFIED**
Search:  **UNLAPSED**

**\* Indicates Filings that have been accepted after the Certification Date.**

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| **10-7219555499** | **State Tax Lien** | **01/11/2010** | **17:00** | **01/11/2020** | **1** |

**Debtor:**
**Individual:**     JAMES R. MICHAEL

███████████████████████████████████

**Secured Party:**
**Organization:**     BOARD OF EQUALIZATION
PO BOX 942879, SACRAMENTO CA US, 94279 0001

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| **12-7320061395** | **State Tax Lien** | **07/06/2012** | **17:00** | **07/06/2022** | **1** |

**Debtor:**
**Individual:**     JAMES R. MICHAEL

███████████████████████████████████

**Secured Party:**
**Organization:**     BOARD OF EQUALIZATION
PO BOX 942879, SACRAMENTO CA US, 94279 0001

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|
| **13-73840797** | **Termination** | **10/28/2013** | **17:00** | | **1** |

SDNY_00239220

**Total Pages:**     **3**

The undersigned Filing Officer hereby certifies that the above listing is a record of all presently active financing statements, tax liens, attachment liens and judgement liens, including any change documents relating to them, which name the above debtor, subject to any above-stated search qualifiers and are on file in my office as of  **09/29/2016 at 1700 hours**.

The search results herein reflect only the specific information requested. The results of this Debtor search will not reflect variances of this name. If the Debtor is known under other personal names, trade names, business entities, or addresses, separate searches of these names will have to be requested and conducted. The Secretary of State, his officers and agents disclaim any and all liability for claims resulting from other filings on which the name of the Debtor can be found in any other form than which was requested.

Alex Padilla
Secretary of State

Document Number:   57614630003          Page 2 of 2

SDNY_00239221

RECORDING REQUESTED BY

**STATE OF CALIFORNIA
BOARD OF EQUALIZATION**

AND WHEN RECORDED MAIL TO:

**STATE BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO, CALIFORNIA 94279-0055**



**10-7219555499**

**01/11/2010 17:00**

**FILED**

CALIFORNIA
SECRETARY OF STATE

**SOS**



**23595550009** UCC 1 FILING

## NOTICE OF STATE TAX LIEN

Chapter 14 (Commencing with
section 7150 of Division 7 of
Title 1 of the Government Code)

SECRETARY OF STATE
95

**Certificate No. BE- 1248578**

**Account No.** ████████████████

The State Board of Equalization of the State of California, hereby certifies that the following named taxpayer(s)
R. MICHAEL JAMES (XXX-XX-████

whose last known address was 1148 SOQUEL AVE, SANTA CRUZ, CA 95062-2106
is (are) liable to the State of California for amounts due from and required to be paid by said taxpayer(s) and duly levied and
determined under the provisions of the California Sales and Use Tax Law, Part 1, 1.5 and where applicable, Part 1.6.

| PERIOD | ASSESSMENT | TAX | INTEREST | PENALTY | TOTAL |
|---|---|---|---|---|---|
| 10/01/07 09/30/08 | 05/23/09 | $125,477.28 | $18,982.38 | $23,043.70 | $167,503.36 |
| **TOTAL** | | **$125,477.28** | **$18,982.38** | **$23,043.70** | **$167,503.36** |

Additional interest accrues after January 31, 2010 _____ . at the modified adjusted rate established pursuant to section 6591.5 of the
Revenue and Taxation Code. Additional penalties may accrue by operation of law.

The State Board of Equalization further certifies that it has complied with all of the provisions of the above-cited law, act, or
ordinance in its determination of the amounts required to be paid.

The liability above set forth is a lien upon all personal property and rights to such property, including all after-acquired property and
rights to property belonging to the above-named taxpayer(s).

Dated January 07, 2010
*At Sacramento, California*

BOE-426 (S1) REV. 14 (4-05)

The State Board of Equalization has caused this
Notice to be issued in its name by its representative
thereon duly authorized by resolution of said Board.

The agency has adopted the use of a facsimile signature as shown below:

By *Gina Fong*

G. Fong, Authorized Representative

SDNY_00239222

**CORPORATION SERVICE COMPANY**
www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-2 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

**Subject :** **ROMAN JAMES**

**Jurisdiction :** **CA-LOS ANGELES COUNTY**

**Request for :** **UCC Debtor Search**
Thru Date : October 01, 2016

**Result :** Clear

**Request for :** **Federal Tax Lien Search**
Thru Date : October 01, 2016

**Result :** Clear

**Request for :** **State Tax Lien Search**
Thru Date : October 01, 2016

**Result :** Clear

**Request for :** **Local Judgment Search**
Thru Date : October 01, 2016

**Result :** Clear

**Followup :** Please note there is a misindexed Judgment against the subject name. The Judgment is for "Rowan". The clerk has been informed of this error.

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

SDNY_00239224

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal,  please feel free to contact us.

Susan Enstrom

███████████████

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

SDNY_00239225

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-1 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

**Subject :**             **ROMAN JAMES DESIGN BUILD**

**Jurisdiction :**             **CA-SECRETARY OF STATE**

**Request for :**             **UCC Debtor Search**
     Thru Date :             September 28, 2016

**Result :**             Clear

**Request for :**             **Federal Tax Lien Search**
     Thru Date :             September 28, 2016

**Result :**             Clear

**Request for :**             **State Tax Lien Search**
     Thru Date :             September 28, 2016

**Result :**             Clear

**Request for :**             **Local Judgment Search**
     Thru Date :             September 28, 2016

**Result :**             Clear

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal,  please feel free to contact us.

Susan Enstrom

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

**Corporation Service Company(R) Terms and Conditions**
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

SDNY_00239228

**CORPORATION SERVICE COMPANY**
www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 325042-1 |
| **Project Id :** | | **Order Date** | 10/10/2016 |
| **Additional Reference :** | NOT PROVIDED | | |

**Subject :**  **ROMAN JAMES DESIGN BUILD**

**Jurisdiction :**  **CA-LOS ANGELES COUNTY**

**Request for :**  **UCC Debtor Search**
    Thru Date :  October 01, 2016

**Result :**  Clear

**Request for :**  **Federal Tax Lien Search**
    Thru Date :  October 01, 2016

**Result :**  Clear

**Request for :**  **State Tax Lien Search**
    Thru Date :  October 01, 2016

**Result :**  Clear

**Request for :**  **Local Judgment Search**
    Thru Date :  October 01, 2016

**Result :**  Clear

Ordered by THOMAS HORN at THE FEDERAL SAVINGS BANK

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal,  please feel free to contact us.

Susan Enstrom
█████████████

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

**Corporation Service Company(R) Terms and Conditions**
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

SDNY_00239231

# Exhibit 10

| | |
|---|---|
| **From:** | MAGA Messaging ███████████████ |
| **Sent:** | Thursday, August 18, 2016 10:25 AM |
| **To:** | Rick Gates; Jason Miller; Bryan Lanza; Hope Hicks |
| **Subject:** | Daily Trump Talkers 8/18 |

Today, Donald Trump will be giving a speech in Charlotte, NC at 7:30 tonight. He will continue to highlight the need for law and order, and a new approach to our foreign policy that will destroy radical Islamic terror. Please refer to the following talking points for today.

It has been 257 days since Hillary Clinton has held a press conference.

# TOP DAILY STORIES

## The Iranian Ransom Payment Has Been Confirmed

- What has long been suspected has finally been confirmed, as *The Wall Street Journal* reported that Iranians held the American hostages until the $400 million in cash was transferred into Iranian hands.
- This breaks the long held American tradition of never negotiating with terrorists. And put a price on every American's head traveling abroad.
- It was also reported that the Iranians were paid the remaining $1.3 billion of their agreement with the Obama administration during the previous 6 months secretly.
- As the world's largest state sponsor of terror, there is strong possibility that Iran's newfound money has already funded terrorist activities among the Iranians and radical Islamic terror groups.
- This is another example of terrible leadership from Obama and Clinton. While Clinton continues to pump this awful deal on the campaign trail it is clear that Iran has become the only beneficiary of it.
- Mr. Trump will rip up the Iran Deal on Day One of his presidency and work to ensure a deal can be made that will be beneficial to America, and ensure that Iran does not become a nuclear power.

## Mr. Trump's Comments On American Intelligence Gathering

- America has seen the disastrous consequences of misinformation that has been gathered by our intelligence community, it is safe to say with the proper information gathered the Iraq War would have never occurred.
- Mr. Trump wants to ensure that the most talented individuals are part of the intelligence community. He doesn't want to repeat the mistakes of the past, and have America involved in another foreign quagmire.
- Mr. Trump also wants to assure that our intelligence services all the tools and access to information to ensure the safety of all Americans. The Obama-Clinton era has hamstrung our intelligence agents, which has lead to gaps in information that has compromised our safety.

## The Trump Campaign Continues To Expand Its Team

- The Trump campaign is broadening our team for the final stretch of the general election.
- These newest additions will bring much needed experience and knowledge, overall an extremely positive development for the future of our campaign.
- Kellyanne Conway, the new Campaign Manager, will be working with the team to develop the messaging and strategy to allow Mr. Trump to expand his coalition into a winning coalition.
- Steve Bannon, CEO, will be handling the day to day operations of our campaign and will ensure the campaign is on track to succeed every step of the way.
- Paul Manafort is retaining his role as Campaign Chairman and Strategist, focused on the long term vision of this election and beyond.
- All will have separate roles and responsibilities, but will be working closely to ensure a winning campaign.

**More Media Spin Attacking The Trump Campaign**

- Tony Podesta, Chairman of the Podesta Group and brother of Clinton Campaign Chairman John Podesta, denied Paul Manafort was involved in any wrongdoing that *The Associated Press* is trying to insinuate.
- *The Associated Press* is relying on anonymous sources to unfairly smear the Trump campaign, while those who spoke on the record confirmed that Paul Manafort and Rick Gates acted legally.
- This anonymous smear is distraction created by the Clinton campaign to shift attention away from the 33,000 deleted emails and impending release of the FBI interview notes from Clinton's criminal investigation.

# TRUMP'S LATEST SPEECHES

## Mr. Trump's Plan To Combat Radical Islamic Terror In The 21st Century

- Mr. Trump's speech on combating radical Islamic terror was well-received; pundits described it as "spot-on," "effective," and "tough." Something the Obama administration's approach has sorely lacked.
- Over 33,000 deaths can be attributed to ISIS and its predecessor groups since 2002, 80% of these deaths have occurred since the founding of ISIS in April of 2013.
- Hillary and Obama caused the destabilization that allowed the rise of ISIS, and their refusal to identify the ultimate threat has created vacuums for ISIS to grow and thrive in Iraq, Syria, Libya and Egypt.
- Mr. Trump's speech focused on destroying ISIS, not regime change. Any country that shares these goals of defeating radical Islamic terror will have a partner in the United States.
- ISIS openly targets women, gays, Christians, Jews, nonbelievers and others. Mr. Trump wants to make clear he will work with all moderate Muslim reformers in working to defeat not only terrorism, but the ideology behind it.
- Mr. Trump's immigration policy will include a geographically-focused immigration suspension in places with a history of exporting terrorism and where adequate screening cannot be performed, and a new screening test to admit only those who support US laws and values must be implemented.
- Finally Mr. Trump will work with federal and local law enforcement to establish new protocols to identify signs of radicalization, including working with moderate Muslim reformers.
- Donald Trump says the things that people at home are thinking, but the politicians in Washington are too chicken to say.

**Mr. Trump's Plan To Create A Better Future For Our Inner Cities**

- In what has been called his best speech of the campaign, Mr. Trump laid out a comprehensive and concise plan to fix the skyrocketing crime rates in our nation's inner cities.
- The war on police must end now, while Hillary Clinton wants to continue to protect the offender, Mr. Trump will fight for the victims: The many men, women, and children living in fear of criminals on the street.
- The Democrat's policies have failed our nation's inner cities, and Hillary Clinton will only continue advocating for those broken policies.
- Mr. Trump will impose a ban on his advisors' spouses from giving paid speeches during their time in power.  Mr. Trump sees this as a necessary step in order to put an end to the corrupt "pay to play" habits of the D.C. establishment – something Hillary Clinton is complicit in promoting and participating in.
- Mr. Trump will ensure all Americans are able to live safely in their neighborhoods and he will Make America Great Again.

## CLINTON'S LATEST TAX SPEECH

### Clinton's Cleveland Tax Speech Robs Americans Of Jobs

- Yesterday in Cleveland, Hillary Clinton gave a policy speech detailing her tax plan, but what she highlighted the same old, failed liberal ideas she has been pushing all cycle.
- The non-partisan Tax Foundation found Clinton's economic plans would lead to job losses and a reduced growth.
- Clinton's tax plan would raise taxes on all Americans, even the struggling middle-class Americans who have taken the biggest hit under the Obama economy.
- Her doubling down on the far-reaching, and job-crushing regulatory regime, that is costing American businesses $743 billion annually.
- Donald Trump has unveiled a far-reaching, pro-growth economic plan that will increase wages and create jobs, especially for middle class Americans.

## CLINTON NEWS OF NOTE

### Clinton's FBI Interview Notes

- While Congressional Republicans await the release of Clinton's interview notes, it is important to highlight that Clinton has habitually lied to the American public about her secret server.
- Clinton deleted 33,000 emails (Over 50% of her total server) to hide the evidence of her improper behavior as Secretary of State. The FBI chose to overlook this fact, and let her off scot-free.
- Clinton's continued habitual lying concerning her email server disqualifies her from running for public office, let alone commander-in-chief.