UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                                      :

UNITED STATES OF AMERICA,           :           Case No. 19 CR 366

                                                      :

             -against-                  :

                                                      :

STEPHEN M. CALK,                       :

                                                      :

                Defendant.               :

--------------------------------------------------------:


## <u>MEMORANDUM IN SUPPORT OF THIRD PARTIES JAMES BRENNAN, THOMAS HORN, MATTHEW MACDONALD AND JAVIER UBARRI MOTION TO QUASH AND/OR MODIFY TRIAL SUBPOENAS</u>

Robert M. Andalman (*pro hac application pending*)
A&G Law, LLC
542 South Dearborn St., 10th Floor
Chicago, Illinois 60605
Tel: (312) 348-7629
randalman@aandglaw.com

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................... 3

    A.    The Illinois Witnesses' Relationship to the Case ...................................... 3

    B.    The COVID-19 Pandemic and Resulting Travel and Quarantine Requirements ... 4

    C.    The Illinois Witnesses' Circumstances .................................................. 8

        1.    James Brennan ............................................................................. 8

        2.    Thomas Horn ............................................................................... 8

        3.    Matthew MacDonald .................................................................... 9

        4.    Javier Ubarri ............................................................................... 9

ARGUMENT ......................................................................................................... 10

    A.    The Illinois Witness Subpoenas are *Ultra Vires* ................................. 10

    B.    The Subpoenas are Unreasonable and Oppressive in the Circumstances ............. 11

    C.    Two-Way Video Testimony Presents a Reasonable Alternative to Live Testimony .................................................................................. 14

CONCLUSION ...................................................................................................... 16

# Table of Authorities

## Cases

*Ciccone v. One W. 64th St., Inc.*, 69 Misc. 3d 585 (Sup. Ct., New York County 2020) .............. 15

*In re Grand Jury Matters,* 751 F.2d 13 (1st Cir. 1984) .................................................................. 12

*Stern v. United States Dist. Court*, 214 F.3d 4 (1st Cir. 2000) ....................................................... 12

*United States v. Davis*, No. 19-101-LPS, 2020 U.S. Dist. LEXIS 196624 (D. Del.
    Oct. 23, 2020) ............................................................................................................................ 15

*United States v. Donziger*, No. 19-CR-561 (LAP), 2020 U.S. Dist. LEXIS 157797
    (S.D.N.Y. Aug. 31, 2020) ...................................................................................................... 14, 15

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ................................................................... 15

*United States v. Karoly*, No. 08-592, 2009 U.S. Dist. LEXIS 55762 (E.D. Pa.
    June 29, 2009) ............................................................................................................................. 16

*United States v. Keen*, 509 F.2d 1273 (6th Cir. 1975) ................................................................... 11

*United States v. LaFuente*, 991 F.2d 1406 (8th Cir. 1993) ............................................................ 11

*United States v. Nixon*, 418 U.S. 683 (1974) ................................................................................. 12

*United States v. R. Enters., Inc.,* 498 U.S. 292 (1991) ................................................................... 12

*United States v. Rosenschein*, No. 16-4571 JCH, 2020 U.S. Dist. LEXIS 130877
    (D.N.M. July 24, 2020) ......................................................................................................... 11, 15

*United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963) ................................................. 11

*United States v. Wadlington*, 233 F.3d 1067 (8th Cir. 2000) ........................................................ 10

## Rules

Fed. R. Crim. P. 17(a) ..................................................................................................................... 10

Fed. R. Crim. P. 17(c)(2) ................................................................................................................ 12

## PRELIMINARY STATEMENT

Third-parties James Brennan, Thomas Horn, Matthew MacDonald and Javier Ubarri (collectively, the "Illinois Witnesses") seek to quash and/or modify the trial subpoenas on them in this case. The Illinois Witnesses are each employees of The Federal Savings Bank in Chicago, Illinois. In light of the worsening COVID-19 pandemic and its risk to them and their families' health and safety, they ask to be excused from testimony at the scheduled February 17, 2021 trial in this case, or else to be allowed to testify remotely by two-way video.

Since October 16, 2020, when the Court continued the trial of this case to February because of the COVID-19 pandemic, that pandemic has only gotten worse. According to data collected by the New York Times, New York City's new COVID-19 cases increased nearly ten-fold, from 656 new cases on October 16 to 6,339 new cases on January 7, 2021. This exponential increase in new cases has been accompanied by similar increases in deaths and hospitalizations from the disease. The figures in Illinois and nationally are similarly bleak, with experts forecasting additional surges in disease, hospitalizations and deaths in the coming weeks following breaches of social distancing during the holidays and New Year's celebrations.

These facts are of grave concern for the Illinois Witnesses. Messrs. Brennan and Horn have personal health issues that place them at significant additional risk from COVID, even without the risk inherent in interstate travel. Mr. MacDonald's wife has Multiple Sclerosis ("MS"), not only putting her at heightened personal risk, but also making her particularly dependent on Mr. MacDonald to care for their home and four children during this period when contact with others is severely limited because of COVID-19. Mr. Ubarri's age places him at heightened risk, too. Moreover, his responsibilities as President of The Federal Savings Bank renders his absence from work particularly damaging to both him and the bank, the putative victim in the case.

Neither is this a case where the witnesses could lawfully just show up at the time and place of trial as indicated on the face of the subpoenas. New York is requiring out-of-state travelers to present a negative COVID test taken 3 days before arrival in New York and then quarantine in New York until they obtain another negative test to be taken no sooner than the traveler's fourth day in New York State. The traveler is free of quarantine only after results are received from the second test. This is consistent with this Court's protocol for out-of-state witnesses, which would effectively require the witnesses to be present in New York for a week before the start of trial. The witnesses would then have to wait for their turn to testify and, even then, not return home until any right to recall them expires. Once home, Illinois asks citizens to quarantine for 14 days after returning from "red zones" like New York.

In this context, the subpoenas ask too much. The multiple pre-trial medical tests and quarantine obligations in New York that the subpoenas effectively impose on the Illinois Witnesses are more than the subpoena power of Rule 17 authorizes. Combined with the obligations to remain available for recall until finally released and additional quarantine upon return home, these witnesses would be compelled by these subpoenas to give up a month or more of their lives, away from family and business responsibilities, all under circumstances that inherently place at risk the health and safety of the witnesses and their loved ones. Requiring such sacrifice and risk from third-parties is, in the circumstances, unreasonable and oppressive.

There is a simple solution to this problem: allow the witnesses to testify by two-way video. The Illinois Witnesses have suggested this, but the government will not agree. In another matter, the Chief Judge in this District recognized that the extraordinary circumstances of the pandemic support this alternative and it remains an option should trial go forward on February 17. Otherwise, the subpoenas are appropriately quashed.

## FACTUAL BACKGROUND

**A.     The Illinois Witnesses' Relationship to the Case**

This case alleges a single count of bank bribery in violation of 18 U.S.C. § 215. The gravamen of the case is that Stephen Calk influenced the approval of certain loans made by The Federal Savings Bank ("TFSB") to Paul Manafort. The government posits that Mr. Calk did so in exchange for Mr. Manafort assisting Mr. Calk to obtain a position on the 2016 Trump campaign or, after the election, in the Trump administration. Mr. Calk was the Chairman of TFSB and owned almost 70% of the shares of the bank's holding company. In August 2016, Mr. Calk was appointed to an unpaid position on the campaign's council of economic advisors. He was never offered any position with the Trump administration. TFSB is the putative victim in the case.

Each of the Illinois Witnesses is employed by TFSB. Mr. Ubarri is TFSB's President. Along with Mr. Calk, he is also on the Credit Committee that reviewed and approved the Manafort loans. Mr. Brennan is a TFSB Vice President. His responsibilities include participating in Credit Committee meetings and he served as Secretary of that committee. Mr. Brennan oversees underwriting of commercial loans and did so for the Manafort loans. Mr. Horn reports to Mr. Brennan and was involved in the underwriting of the Manafort loans, subject to Mr. Brennan's oversight. Mr. Horn's knowledge about the underlying facts is duplicative of Mr. Brennan's. Mr. MacDonald works for TFSB and does underwriting for residential loans. The Manafort loans were generally treated by TFSB as commercial, but Mr. MacDonald was asked to review Manafort's tax returns for one of the Manafort loans. He spent less than one day doing so, gave a preliminary analysis, and then played no further role in the process.

In 2018, Mr. Manafort was tried in the Eastern District of Virginia for his own conduct concerning these loans. He was convicted of making false statements to the bank during the underwriting process. Mr. Brennan is the only one of the four Illinois Witnesses whose testimony

was needed during that trial. The U.S. Attorney's Office for the Southern District of New York

has subpoenaed all four witnesses, subpoenaing each to appear to testify on February 17, 2021 at

Mr. Calk's trial. Unfortunately, in the context of the COVID-19 pandemic, compliance with these

subpoenas requires more than appearance on the date and at the time of trial.

### B.   The COVID-19 Pandemic and Resulting Travel and Quarantine Requirements

Since early 2020, the COVID-19 pandemic has ravaged the country and the world.

According to the U.S. Centers for Disease Control and Prevention (the "CDC"), more than 21

million Americans have been infected and nearly 360,000 have died in the past year from COVID-

19. *See United States COVID-19 Cases and Deaths by State, CDC COVID Data Tracker,*

https://covid.cdc.gov/covid-data-tracker/#cases_casesper100k (last visited Jan. 8, 2021).   The

steepest increases in new cases, hospitalizations and deaths have occurred since September 2020

and nationally we are currently experiencing the highest rates of infection and death of the entire

pandemic. *See Trends in COVID-19 Cases and Deaths in the United States, CDC COVID Data

Tracker,*  https://covid.cdc.gov/covid-data-tracker/#pop-factors_totalcases (last visited Jan. 7,

2021). The CDC forecasts that these rates will be maintained for the next four weeks. with nearly

5,000 new cases daily in New York City County alone, *COVID-19 Forecasts: Cases*, CDC (Dec.

28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/Consolidated-

Cases-Forecasts-2020-12-28.pdf, and approximately 1,200 daily hospitalizations in New York

State, *COVID-19 Forecasts: Hospitalizations*, CDC (Dec. 28, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/downloads/cases-updates/Consolidated-Forecasts-

Hosp-with-Reported-Data-Ensemble-UPDATED2020-12-28.pdf.

Trial in this case was originally scheduled in December 2020, but in October 2020, the

Court agreed to continue trial based on COVID-19 concerns. On the date of that continuance,

October 16, 2020, New York City experienced just 656 new cases with a 7-day average of 517. *New York City Coronavirus Map and Case Count*, The New York Times, https://www.nytimes.com/interactive/2020/nyregion/new-york-city-coronavirus-cases.html#cases (last visited Jan. 8, 2021). On January 7, 2021, that number had increased almost ten-fold, to 6,339 cases new cases with a 7-day average of 5.209. *Id.*

According to the New York State COVID-19 website, as of January 3, 2021, the State had a statewide positivity rate of nearly 8%. *Gov. Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic*, New York State (Jan. 3, 2021), https://www.governor.ny.gov/news/governor-cuomo-updates-new-yorkers-states-progress-during-covid-19-pandemic-93. Generally, 5% positivity is considered the upper threshold to consider reopening a jurisdiction. Dowdy & D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, John Hopkins (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html.

On January 7, 2021, the country marked a grim record for COVID-19 deaths in one day. *U.S. Sets Covid-19 Death Record as Researchers Point to Asymptomatic Cases as a Major Source of Infections*, The Washington Post, https://www.washingtonpost.com/health/2021/01/07/covid-death-record/. And rates of infection, hospitalization and death from COVID-19 are all expected to increase following the December and New Year's holiday season. Dr. Anthony Fauci, largely responsible for the national COVID response, warned: "We very well might see a post-seasonal – in the sense of Christmas, New Year's – surge, and as I've described it, as a surge upon a surge." Millman, *NY Hospitalizations Top 7,550 as Early Post-Holiday Data Raises Cuomo's Concern*, NBC New York (Dec. 29, 2020), https://www.nbcnewyork.com/news/coronavirus/ny-hospitalizations-hit-highest-total-since-may-10-fauci-warns-of-post-holiday-surge-upon-a-

5

surge/2801557/. In addition, there has recently been a new mutation of the virus that may be up to 70% more contagious. *New coronavirus variant: What do we know?*, BBC News, https://www.bbc.com/news/health-55388846.

Travel is a known risk factor for COVID-19 and the CDC and various states all recommend against it. The rules for individuals entering New York, like the Illinois Witnesses, are established by Executive Order 205.2 and by guidance issued by the New York Department of Health. *See Interim Guidance Travel Advisory*, NY Dept. of Health (Nov. 3, 2020), *https://coronavirus.health.ny.gov/system/files/documents/2020/11/interm_guidance_travel_advisory.pdf*. At a minimum, the State requires that such travelers obtain a negative COVID-19 test within 72 hours prior to arrival in New York <u>AND</u> then quarantine upon arrival in the State for a minimum of three days before seeking and obtaining an additional COVID-19 test. *Id.* Test results are not immediately available, so this requires at least a four-day quarantine period for travelers from Illinois to New York.

This Court's protocols for out-of-state witnesses are consistent with New York State law. The Court has adjourned in-person appearances until February 12, 2021 because of COVID. *See In re Suspension of In-Person Operations*, 20 MISC 622 (Jan. 6, 2021). When in-person proceedings are resumed, the Court's protocol for domestic travelers requires a 14-day quarantine unless the person tests negative for COVID-19 within three days (72 hours) of departure <u>AND</u> takes another COVID-19 test and tests negative on day 5 after arrival. *SDNY Protocol for Domestic Travelers*, Office of the District Court Executive (Nov. 12, 2020). This effectively requires a six-day quarantine based on at least a one-day delay in obtaining test results.

Illinois recommends a 14-day quarantine for persons returning from New York. *Travel Guidance*, IL Dept. of Public Health, https://www.dph.illinois.gov/covid19/travel-safety-guidance

(last visited Jan. 7, 2021). Indiana, where Mr. MacDonald lives, also recommends a 14-day quarantine after visiting an area, like New York, that is experiences ongoing community spread of the disease. *COVID-19 FAQ*, IN Dept. of Health (March 24, 2020), https://www.coronavirus.in.gov/files/IN-COVID-19_FAQforPublic%203.24.20.pdf. The City of Chicago, where each of the Illinois Witnesses works, advises against New York travel and requires a full 10-day quarantine upon return. *Emergency Travel Order*, City of Chicago (Dec. 29, 2020), https://www.chicago.gov/city/en/sites/covid-19/home/emergency-travel-order.html.

Some individuals are at particular risk of serious illness (requiring hospitalization or intensive care) or even death from COVID-19. Persons 50-64 years-old, for example, have a four times greater chance of hospitalization and a 30 times greater chance of death than adults aged 18-29. *COVID-19, People at Increased Risk: Older Adults*, CDC (Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. Heart disease, obesity and diabetes have further been identified as risk factors for more serious illness, hospitalization or death from COVID-19. *COVID-19, People at Increased Risk: People with Certain Medical Conditions*, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Asthma, hypertension, high blood pressure, neurologic and immune diseases have also been identified as potentially putting individuals at greater risk of disease and/or death. *Id.* All of these factors are implicated by the subpoenas for the Illinois Witnesses and their families with whom they live.

### C.      The Illinois Witnesses' Circumstances

There is inherent risk for any witness compelled to use public transportation, move through crowded airports, travel by airplane and then stay at a hotel (including quarantine at a hotel). In addition, each individual Illinois Witness has risks and risk factors unique to him.

#### 1.      James Brennan

Mr. Brennan is 62 years old. Decl. of James Brennan ¶ 3, attached as Exhibit 1 here. He is overweight and has been diagnosed with both asthma and high blood pressure. *Id.* He lives with his wife, who is 61 years old. *Id.* ¶ 2. She has been diagnosed with diabetes and high-blood pressure. *Id.* ¶ 3. In addition, she has a history of heart disease and has had by-pass surgery on her heart. *Id.* The Brennans have taken strict precautions during the pandemic. Mr. Brennan typically works in the TFSB Chicago office, but has physically been to the office fewer than a half dozen times since March 2020. *Id.* ¶ 4. When he has gone to the office, he has tried to go on weekends, when it is least likely that other people are there. *Id.* Mr. Brennan's wife works from home. *Id.* ¶ 5. When the Brennans' adult children visit them, they socially distance and wear masks. *Id.* ¶ 6.

#### 2.      Thomas Horn

Mr. Horn is 51 years old. Decl. of Thomas Horn ¶ 1, attached as Exhibit 2 here. He has been diagnosed as obese and pre-diabetic. *Id.* ¶ 3. He suffers from high blood pressure. *Id.* Mr. Horn has limited in-person interactions since the pandemic began in earnest in March 2020. *Id.* ¶ 4. Together, Mr. Horn and Mr. Brennan comprise their department at TFSB. Some of their work requires working with original signed documents, a task for which Mr. Horn has taken responsibility. *Id.* ¶ 4. If both he and Mr. Brennan were unavailable, these and other bank functions simply would not be done, including underwriting for certain types of loans. *Id.* ¶ 1.

### 3.    Matthew MacDonald

Matthew MacDonald has worked as an underwriting manager at TFSB since February 2016. Decl. of Matthew MacDonald ¶ 1, attached as Exhibit 3 here. He lives in Munster, Indiana but his office is at TFSB's Chicago office. *Id.* ¶¶ 1-2. Mr. MacDonald lives with his wife and four children, ages 8 through 16. *Id.* ¶ 2. Mr. MacDonald's wife has Multiple Sclerosis ("MS"), which puts her at additional risk for COVID. *Id.* ¶ 4. A symptom of her disease is that she is easily fatigued and her body sometimes seizes up and she cannot move her limbs. *Id.* Consequently, she requires Mr. MacDonald's presence and assistance around the house and with the children, including to do housework and cook. *Id.* ¶¶ 4-6. As a result, since the COVID-19 pandemic began, Mr. MacDonald has been working primarily from home. *Id.* ¶ 3. After the spike in COVID cases at the end of 2020, Mr. MacDonald shifted to working almost exclusively from home. *Id.* That work has consistently been extremely busy and Mr. MacDonald is often required to work nights and weekends to do his work and also support his wife and children around the house. *Id.* Mr. MacDonald has not traveled by airplane since March 2020. *Id.* ¶ 6.

### 4.    Javier Ubarri

Javier Ubarri is 54 years old. Decl. of Javier Ubarri at ¶ 1, attached as Exhibit 4 here. He is President of TFSB and is responsible for overseeing all of the day-to-day operations of the bank concerning regulatory and audit and compliance issues, as well as construction lending and consumer finance initiatives. *Id.* Though he has taken steps to limit the number of persons at the bank and then to further limit proximity to the skeleton crew that is there in person, Mr. Ubarri's responsibilities have made it impossible for him to shift completely to remote work. *Id.* ¶ 3. Mr. Ubarri's presence at the bank is required through March 2021 to deal with annual audits by the banking regulators and a third-party audit firm. *Id.* ¶ 5. He is also coordinating the onboarding of

500 new employees who the bank has hired in the past four months to cope with surge of business that has accompanied reduced interest rates. *Id.*

## ARGUMENT

The subpoena power granted pursuant to Rule 17 of the Federal Rules of Criminal Procedure does not extend to what is required of the Illinois witnesses here. It does not permit requiring third-party witnesses to undergo multiple medical procedures and then travel to a secure location across the country from their homes at least a week in advance of testimony to quarantine consistent with state law and the Court's own protocol. Neither is it reasonable to compel witnesses to travel to New York in these circumstances, putting their health and safety at risk, as well as the health and safety of their families. To the contrary, such a result would be oppressive. This is all the more so when two-way video testimony presents a reasonable alternative that has been approved by the Chief Judge. For these reasons, the subpoenas to the Illinois witnesses are properly quashed or else modified to provide for two-way video testimony.

### A.   The Illinois Witness Subpoenas are *Ultra Vires*

The subpoenas to the Illinois Witnesses are *ultra vires* to the extent lawful compliance with them demands so much more than presence at the time and date of trial. This is not to impugn any bad faith on the government. It is a direct consequence of the pandemic and the laws and protocols in place to protect the public health.

Rule 17 provides only for subpoenas to "command the witness to attend and testify at the time and the place the subpoena specifies." Fed. R. Crim. P. 17(a). Though the current circumstances are unique, in other cases when subpoenas have required more than appearance at trial or hearing, the subpoenas have been quashed. The typical case is one in which a subpoena purports to require witnesses to appear before trial for interviews or for pre-trial conferences. *E.g., United States v. Wadlington*, 233 F.3d 1067, 1075 (8th Cir. 2000) (improper to use subpoenas to summon witnesses

10

for informal questioning the day before grand jury proceedings at which testimony was to be provided); *United States v. LaFuente*, 991 F.2d 1406, 1411 (8th Cir. 1993) (improper to use subpoenas to require witnesses to be present for pre-trial conferences); *United States v. Keen*, 509 F.2d 1273, 1274-75 (6th Cir. 1975) (improper to use subpoenas to require presence of witnesses for interviews "miles from the place of trial"). But the general rule applied in these cases applies fully here: Rule 17 "does not authorize the government or the defense to subpoena a witness and require him to report at some place other than where the trial is to be held." *United States v. Standard Oil Co.*, 316 F.2d 884, 897 (7th Cir. 1963).

The subpoenas served on the Illinois Witnesses require them to "report at some place other than where trial is to be held." The place is not specified, but in order to comply with New York State law and the Court's protocol, the witnesses are required to: (a) take a COVID test within 72 hours of their departure for New York; (b) report to New York for quarantine at least seven days before trial in order to provide time to get results from (c) a second COVID test required on the fifth day after arrival. The unique circumstances of the current subpoenas thus require more than Rule 17 allows. The subpoenas are, in this respect, *ultra vires* and properly quashed.

## B. The Subpoenas are Unreasonable and Oppressive in the Circumstances

Compliance with the subpoenas to the Illinois Witnesses is further unreasonable and oppressive in the context of the pandemic. As various courts have ruled when faced with this issue, "[r]oughly the same standard applies to subpoenas compelling the attendance of witnesses, *i.e.*, subpoenas *ad testificandum*" pursuant to Rule 17(a), as applies to subpoenas *duces tecum* pursuant to Rule 17(c): *i.e.*, "the proponent of a subpoena … bears the burden of proving that it is not 'unreasonable or oppressive.'" *United States v. Rosenschein*, No. 16-4571 JCH, 2020 U.S. Dist. LEXIS 130877, at *2 (D.N.M. July 24, 2020), citing *United States v. Nixon*, 418 U.S. 683,

698-99 (1974) and *Stern v. United States Dist. Court*, 214 F.3d 4, 17 (1st Cir. 2000) ("Although Rule 17(a), which governs such subpoenas, does not provide explicitly for quashal or modification, courts routinely have entertained motions seeking such relief and decided them by reference to comparable principles."); *see also* Fed. R. Crim. P. 17(c)(2) ("On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.").

The Illinois Witnesses do not ask the Court to rule here that the subpoenas directed to them are unreasonable based on relevance or specificity, as is often the case when Rule 17 subpoenas are challenged and evaluated under the standard the Supreme Court explained in the *Nixon* case, *supra.* Instead, they object that the pandemic and their individual circumstances render compliance with the subpoenas unreasonable and oppressive. It is well within this Court's discretion to quash the subpoenas on this basis. *See In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984) (affirming District Court's broad supervisory power under Rule 17 and affirming decision to quash "subpoena whose enforcement at the particular moment seemed to [the District Court] likely to entail consequences more serious than even severe inconveniences occasioned by irrelevant or overbroad requests for records"); *see also United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991) (recognizing that respondents may object to a subpoena not only based on relevance or specificity but also because "compliance would be overly burdensome").

In this case, to comply with New York State law and this Court's protocols, each witness would have to:

- Submit to a COVID test within 72 hours of departing for New York;

- Travel to New York and arrive by February 10, traversing airport transportation, security and busy airports in Chicago and New York City;

- Quarantine somewhere in New York City;

- On the fifth day after arrival, find a testing center and submit to an additional COVID test before awaiting results over the following two days;

- Be available for up to three weeks in New York City while awaiting his turn to testify and until he is released and no longer subject to recall in the case;

- Traverse the transportation system again back to Illinois or Indiana;

- Quarantine for an additional two weeks at home to comply with home-state guidance and for their families' and the public's safety.

All this would consume a complete month or more of each witness's life for the sake of a few hours on the witness stand. Neither is the burden limited to impositions on the witnesses' time.

Messrs. Brennan and Horn are both in multiple high-risk categories for COVID and both face potentially deadly consequences should they contract the disease. Mr. Brennan's wife, to whom he would return, is further at high-risk based on her age and medical condition, including her history of heart disease. Mr. MacDonald's family would face particular burdens from his absence. His wife's MS puts both her and their children in a peculiarly dependent position on him, at times rendering her physically unable to use her limbs and in need of his assistance. This neurologic condition puts her at additional risk from COVID itself, too. Mr. Ubarri is also in a high-risk category for COVID based on his age. Furthermore, his responsibilities as President of TFSB could not be fulfilled if he were compelled to be absent for weeks while in quarantine and awaiting testimony in New York – risking significant harm to the bank that is the putative victim in the case. Mr. Ubarri's responsibilities at the bank between now and March 2021 include overseeing the bank's response to annual regulatory audits and coordinating the on-boarding of 500 new employees.

Moreover, given the prevalence of the pandemic at this moment, including in New York, there exists a real and present probability that any trial begun will be interrupted by a positive COVID test by a trial participant, venire member or counsel, raising the risk of additional delays or even a complete re-trial at some future time after COVID vaccines (already being distributed) have been made more broadly available. No witness should be compelled by subpoena to put his health and safety, and that of his family, at risk. The fact is that those risks have only increased since October when the Court first continued the trial in this case based on concern about COVID. Requiring compliance with these subpoenas at this juncture would be unreasonable and oppressive.

### C.    Two-Way Video Testimony Presents a Reasonable Alternative to Live Testimony

In the alternative, the subpoenas could be modified to require testimony by two-way live video link. Judge Preska recently adopted this solution in a similar case, *United States v. Donziger*, No. 19-CR-561 (LAP), 2020 U.S. Dist. LEXIS 157797 (S.D.N.Y. Aug. 31, 2020). There, the government moved to permit live two-way video testimony of a government witness who feared travel because of the COVID-19 pandemic. *Id.* at *1-*3 (witness's physician advised him not to travel "given [the witness's] age, which puts him at an 'increased risk of significant morbidity or even mortality should [he] contract COVID" and witness's medical condition that "places him 'at significantly increased risk of being hospitalized or dying if [he] contract[s] COVID.'"). The government's motion in *Donziger* was further based on the New York State quarantine obligations. *Id.* at *3. While the defense objected, invoking the Constitution's Confrontation Clause, Judge Preska granted the motion to allow the video testimony. *Id.* at *4.

As the Court explained: "While the Sixth Amendment's Confrontation Clause gives defendants the right 'to be confronted with the witnesses against [them],' U.S. Const. amend. VI, the Supreme Court made clear in *Maryland v. Craig*, 497 U.S. 836 (1990), that it does not

14

'guarantee[]' defendants 'the <u>absolute</u> right to a face-to-face meeting' with accusatory witnesses." *Id.* at *4 (emphasis in original). The Court went on to order the two-way video link proposed in lieu of live testimony. *Id.* at *7 n.4  (noting "the Court has used video technology in several other criminal matters, and it has proven to be 'highly-effective' in allowing viewers to 'observe the speaker in real-time and visually assess his or her demeanor'"); *see also, e.g., Ciccone v. One W. 64th St., Inc.*, 69 Misc. 3d 585, 592 (Sup. Ct., New York County 2020) (citing *Donziger* and similar decisions, concluding that video trial was appropriate in civil matter, including based on "advances in technology" and "the 'near-instantaneous transmission of video testimony'" that "permits the court 'to see the live witness along with his hesitation, his doubts, his variations of language, his confidence or precipitancy, and his calmness or consideration") (citation omitted). Judge Preska relied on the Second Circuit's decision in *United States v. Gigante*, 166 F.3d 75, 80 (2d Cir. 1999), in which the Court of Appeals concluded that a two-way video link "preserved all of these characteristics of in-court testimony" and did not violate the Confrontation Clause.

Judge Preska's solution was followed in *United States v. Davis*, No. 19-101-LPS, 2020 U.S. Dist. LEXIS 196624, at *12-13 (D. Del. Oct. 23, 2020). There, the court rejected an objection to video testimony, stating "[t]he Court is confident that the procedures it will use for testimony via remote videoconferencing technology will adequately and appropriately preserve the essential characteristics of the face-to-face confrontation of a witness that occurs during live testimony in a courtroom." *Id.*; *see also Rosenschein*, 2020 U.S. Dist. LEXIS 130877, at *6-*7 (where witness objected "the subpoena should be quashed because he lives out-of-state and it is unsafe to travel due to the COVID-19 pandemic," court conducted hearing via Zoom and concluded the quashal was moot because witness could "testify from the safety of his own home or office.") This is consistent with other circumstances in which a witnesses health or circumstances render travel for

live testimony unsafe. *See United States v. Karoly*, No. 08-592, 2009 U.S. Dist. LEXIS 55762, at *5-6 (E.D. Pa. June 29, 2009) (deposition testimony allowed of elderly witness based on concerns for her health and the stress and risks of travel). Here, live two-way video testimony is available, as in *Donziger*, and would address the Illinois Witness's concerns.

## **CONCLUSION**

The Illinois Witnesses appreciate the gravity of any criminal proceeding, including this one. They do not here assert the government is not entitled to their testimony, though by no means is it clear each of their testimony is truly necessary. They do contend the subpoena power of Rule 17 does not extend to requiring them to submit to medical procedures; quarantine for days or weeks; and place themselves and their families at risk of sickness, hospitalization or even death. This is particularly true when there are alternatives, whether to simply continue trial until vaccines are more broadly available (only months away now) or to provide for two-way video testimony. Absent such compromise, however, compliance with the subpoenas in this case, in the unique circumstances at bar, is unreasonable and oppressive and the subpoenas are properly quashed.

Respectfully submitted,

**James Brennan**
**Thomas Horn**
**Matthew MacDonald**
**Javier Ubarri**

/s/ Robert M. Andalman
One of their attorneys

Robert M. Andalman (*pro hac vice* pending)
A & G Law LLC
542 S. Dearborn Street
Suite 1100
Chicago, IL 60605
Phone: (312) 348-7629
randalman@AandGlaw.com

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 366 (LGS) |
| | ) | |
| STEPHEN M. CALK, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DECLARATION OF JAMES BRENNAN IN SUPPORT OF MOTION TO QUASH</u>**
**<u>AND/OR MODIFY TRIAL SUBPOENAS</u>**

My name is James Brennan and I have personal knowledge of the following facts:

1.      I am employed as a Vice President at The Federal Savings Bank in Chicago, Illinois (the "Bank"). My responsibilities at the Bank include participation in Credit Committee meetings that review proposed commercial loans at the Bank. Previously, I served as Secretary of that committee. I am also responsible for construction loan administration for residential loans and I oversee underwriting for commercial loans. I have been employed at the Bank since 2015.

2.      I live at 209 North Derbyshire Ave. in Arlington Heights, Illinois. I live there in a house with my wife and youngest son, aged 20. I have six other children who no longer live with us. My office is in the Bank's Chicago, Illinois office.

3.      I am 62 years old and have a number of health issues that have made the current COVID-19 pandemic particularly difficult for me. Specifically, in addition to my age, I am overweight and have been diagnosed with asthma and high blood pressure. My wife, with whom I live, is also at heightened risk. She is 61 years old and has been diagnosed with diabetes and high-blood pressure. She also has a history of heart disease and has had stent surgery.

4.      Since the start of the pandemic, I have taken every precaution to quarantine and avoid exposure to the disease. I have been to my office in Chicago no more than a half dozen times since March of 2020. When I have gone to the office, I have tried to do so on the weekends, when my chance of seeing other people would be reduced.

5.      My wife is a high school special education teacher and she has worked exclusively remotely since the COVID-19 pandemic began.

6.      Even when our children visit our home, we maintain social distance and insist that everyone where a mask. We simply cannot take the risk that either of us is infected.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6, 2021

James Brennan

James Brennan
Digitally signed by:
James Brennan
DN: CN = James
Brennan email =
jbrennan@thefeder
alsavingsbank.com
C = AD O = The
Federal Savings
Bank OU = Loan
OPS Credit Adm
Date: 2021.01.06
17:43:22 -06'00'

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA    )
    )
    )
v.    )    Case No. 19 CR 366 (LGS)
    )
STEPHEN M. CALK,    )
    )
    Defendant.    )

## DECLARATION OF THOMAS HORN IN SUPPORT OF MOTION TO QUASH AND/OR MODIFY TRIAL SUBPOENAS

My name is Thomas Horn and I have personal knowledge of the following facts:

1.    I am 51 years old and employed as a Vice President and Commercial Underwriter at The Federal Savings Bank in Chicago, Illinois (the "Bank"). My responsibilities in that capacity are primarily to underwrite commercial loans. I report to James Brennan, who oversees my work. I have worked for the Bank since November 2015. Together, Mr. Brennan and I comprise our department. If we were both unavailable, underwriting for certain loans and other bank functions would not be done.

2.    I live at 3475 Summit in Highland Park, Illinois. My office is in the Bank's Lake Forest, Illinois office but I also do work in the Chicago office.

3.    I have a number of health conditions that place me in a high-risk category with regard to COVID. I have been diagnosed as obese and pre-diabetic. I also suffer from high blood pressure.

4.    Because of these risk factors, I have limited in-person interactions. My job does require that I sometimes deal with "wet" documents that are signed in-person, I have had to go physically to the office from time to time since March 2020. However, I do so as little as possible

consistent with my job responsibilities. I have not traveled by airplane outside of Illinois during the entirety of the pandemic and I have only left Illinois one time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2021

Thomas Horn

2

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 366 (LGS) |
| | ) | |
| STEPHEN M. CALK, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF MATTHEW MACDONALD IN SUPPORT OF MOTION TO
QUASH AND/OR MODIFY TRIAL SUBPOENAS**

My name is Matthew MacDonald and I have personal knowledge of the following facts:

1.      I am employed as an Underwriting Manager for residential loans at The Federal Savings Bank in Chicago, Illinois (the "Bank"). I have been employed at the Bank since February 2016.

2.      I live at 1036 Azalea Drive, Munster, Indiana 46321. I live with my wife and four children, ages 8, 12, 15 and 16 years old.

3.      Since the COVID-19 pandemic arose earlier this year, I have been working remotely from home on most days. As recently as October, I was going into the office three days a week. However, after a subsequent spike in COVID cases, I have been working almost exclusively from home. My work is intensely busy right now and has been consistently throughout 2020, often requiring me to work at night and on weekends.

4.      My wife is diagnosed with Multiple Sclerosis, or MS. As a result, she requires my assistance in and around the home. There are times when her body seizes up and she cannot move her limbs. She also gets fatigued easily and requires my help around the house. This includes my doing housework, cooking and caring for our children.

5.     My wife was out of the work force for 15 years. Recently, within the last three months, she took a job that allows her to work from home. My children, who range from second grade to high school, attend school in person. School buses are unavailable, so I share the responsibility of getting them to and from school, as necessary. My wife would be unable to do these things by herself if I were not available.

6.     The COVID-19 pandemic has been particularly difficult for my family because of my wife's MS. Infection with COVID could be deadly for her. For that reason, me and my children limit our exposure to third parties as much as possible. I have not traveled by airplane since March of 2020. I would be afraid to do so now to come to New York for the trial in this case for the sake of my wife's health and the stability and well-being of our family. My wife is in no position to care for four children by herself, never mind in addition to her new work responsibilities. This would be made worse because I would be required, consistent with Indiana's current guidance and my wife's health, to quarantine for at least two weeks after any return from out of state before I could take up my home responsibilities again.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2021

*Matthew MacDonald*

Matthew MacDonald

2

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 366 (LGS) |
| | ) | |
| STEPHEN M. CALK, | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF JAVIER UBARRI IN SUPPORT OF MOTION TO QUASH AND/OR MODIFY TRIAL SUBPOENAS

My name is Javier Ubarri and I have personal knowledge of the following facts:

1.      I am 55 years old and employed as President at The Federal Savings Bank in Chicago, Illinois (the "Bank"). My responsibilities in that capacity are to oversee all of the day-to-day operations of the Bank with regard to regulatory and audit and compliance issues. I also oversee the Bank's portfolio lending, construction lending and consumer finance initiatives. I have been employed at the Bank since 2011.

2.      I live at 2927 Chestnut Avenue in Glenview, Illinois. I live there in a house with my wife and son, aged 19 and my daughter, aged 16. My office is in the Bank's Chicago, Illinois office.

3.      Since the start of the pandemic, I have limited any interaction with persons outside of my family and as necessary at the office. Because of my responsibilities at the Bank, I have not been able to work entirely remotely. For example, I have to sign checks and other documents. In order to limit in-person interactions, however, the Bank maintains only a skeletal crew in the office. Even then, to avoid COVID, we have no staff or group meetings in person and I have very little interaction in the same room as another person, even when I am at work.

4.      My wife is not currently working and she primarily stays in the home to avoid other people and the risk of COVID.

5.      The Bank is currently preparing for an Office of the Comptroller of the Currency (OCC) exam and will be doing so between now and March of 2021. We refer to this as the Bank's annual exam and it involves near daily interaction with auditors from the OCC. At the same time, the Bank is working with its third-party auditors as part of the annual financial audit that the Bank does each year. I am primarily responsible for overseeing both of these efforts. In addition, on the mortgage side of the business, because of reduced interest rates, there is an unprecedented level of business in that regard within the Bank. To cope with that increased business, the Bank has hired approximately 500 new employees in the past two quarters. My responsibilities include coordinating the Bank's work to ensure that the infrastructure is present to accommodate these new employees and monitor their work. It would be nearly impossible for me to do my job, and the Bank would suffer, if I had to be away from the office in quarantine or otherwise for a period of weeks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2021

Javier Ubarri

2