L1Q1CALA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          19 Cr. 366 (LGS)

5  STEPHEN M. CALK,

6            Defendant.                  Oral Argument on
                                         Motions *in Limine*
7  ------------------------------x       (Via Teleconference)

8                                        January 26, 2021
9                                        2:02 p.m.

10
   Before:
11
                    HON. LORNA G. SCHOFIELD,
12
                                         District Judge
13

14                      APPEARANCES

15 AUDREY STRAUSS
       United States Attorney for the
16     Southern District of New York
   BY:  PAUL M. MONTELEONI
17     BENET J. KEARNEY
       HAGAN C. SCOTTEN
18     Assistant United States Attorneys

19 KRAMER LEVIN NAFTALIS & FRANKEL, LLP
       Attorneys for Defendant
20 BY:  DARREN A. LaVERNE, ESQ.
       PAUL H. SCHOEMAN, ESQ.
21
22 LOEB & LOEB LLP
       Attorneys for Defendant
   BY:  JEREMY MARGOLIS, ESQ.
23

24

25

L1Q1CALA

1      (Case called)

2      THE DEPUTY CLERK:  The parties' appearances have been

3 noted for the record.

4      Before we begin, I'd like to remind the parties and

5 the press and anyone else observing this proceeding that

6 recording or rebroadcasting of this proceeding is prohibited.

7 Violation of this prohibition may result in sanctions.

8      I'm also going to ask counsel to please state your

9 name before you speak each time you speak, as we have a court

10 reporter present.

11      We're here before the Honorable Lorna G. Schofield.

12      THE COURT:  Hello, everybody.  Thank you for convening

13 here remotely.

14      I just want to, as a preliminary matter, confirm with

15 Mr. Calk that he agrees to our proceeding in this way and not

16 in person.

17      THE DEFENDANT:  Yes, ma'am, I do.  Thank you.

18      THE COURT:  Okay.  And I'll just say for the record

19 that the reason we are proceeding remotely is of course because

20 we are still in the midst of a pandemic.  The pandemic has

21 required us to postpone the trial yet again.  And there are

22 matters, though, that we need to get in order so that we can be

23 ready to try the case as soon as we're able to do that, and

24 that includes the motions *in limine* concerning the parties'

25 proposed expert witnesses, and that is the purpose of our

L1Q1CALA

1    convening today.

2             So what I propose is, why don't we talk about the

3    witnesses first, and then let's talk about a trial date, to the

4    extent it's useful or possible to do that.

5             So as you know, I had asked for us to get together

6    today so that we could discuss two of the government's proposed

7    experts -- namely, Mr. Paulson and Ms. Aguirre -- and I don't

8    intend to have any prolonged discussion of the other proposed

9    witnesses, the two other government witnesses or the defense

10   proposed witness.  And I've reviewed your papers, and my plan

11   is to rule on that soon, together with the two witnesses we're

12   talking about today.

13            So just to get us on the same page, I think everybody

14   agrees -- it's one of the few things we all agree on -- that

15   the main factual issue in the case is whether or not the

16   defendant, Mr. Calk, acted corruptly in connection with the

17   Manafort loans, and so all of the expert testimony that's being

18   proffered is intended to go to that issue.  And one of the

19   things that has been sort of in the air in our discussions up

20   to now is the issue of the quality of the loans.  I think we,

21   again, all agree that whether the loans were good or bad is not

22   dispositive of the issue of whether or not Mr. Calk acted

23   corruptly.  I'm not entirely sure, but I think we all agree

24   that everybody believes that the quality of the loans can be

25   probative of the issue of whether he acted corruptly.  In other

L1Q1CALA

words, if they were terrible loans and Mr. Calk knew that and

pushed them forward anyway, one might argue that that is at

least circumstantial evidence of corrupt intent; on the other

hand -- and I know this is somewhat contrary to the

government's argument -- the opposite might be said, that if he

thought that they were good loans and that they would benefit

or be profitable to the bank and pushed them forward, that that

would also be probative of Mr. Calk's state of mind.

         But the reason I'm bringing all this up now is because

the picture I'm getting from reading the parties' papers --

and, you know, they reflect an evolution in thinking, I think,

on both sides -- is of a dog chasing its tail, and the reason I

say that is because everybody seems to be saying, well, we

don't want to get into that issue unless the other side gets

into it.  And so the government is saying, you know, we're

going to put forward our witnesses, but they're not going to

talk about the quality of the loans unless the defendant opens

the door to that issue.  And the defendant says, well, we have

this expert witness and he can talk about the quality of the

loans, but we're not going to talk about that unless the

government's witnesses are permitted to testify, I presume

including on the quality of the loans.  And to some extent, you

know, I think it's maybe a strategic question of both sides

saying who's going to go first with this issue, but unless we

have some sort of common understanding of whether this issue is

L1Q1CALA

1    in the case or not, you know, it's hard for me to rule, it's

2    hard for you to plan, so what I'm hoping is that you'll both

3    tell me a little bit about your current thinking, having read

4    the other side's papers, about what your plan is on that issue,

5    both in your case in chief and in response to the other side's

6    case.  And of course I'm mindful that the defendant doesn't

7    have to put on a case, he doesn't have to do anything at a

8    criminal trial, but why don't we have a discussion anyway.

9              So why don't I start with the government.  Who's

10   speaking for the government?

11             MR. MONTELEONI:  Good afternoon, your Honor.  Paul

12   Monteleoni for the government.  With me on the line, as I think

13   has been noted, are my colleagues Hagan Scotten and Benet

14   Kearney.

15             Yes.  I think that it's hard for us to envision a

16   world in which the quality of the loans is just not an issue in

17   the case in any way.  I think that that seems very unlikely to

18   happen, both because of some aspect of the way that the

19   government is planning to put in its case, which I'll talk

20   about in a moment, then also, you know, I think it's been

21   raised by defense in a number of ways in which I would just be

22   very surprised if they sort of didn't raise it themselves.  But

23   I think the way that we can really speak to is that, you know,

24   there's a number of emails that reflect, and then there's going

25   to be a bunch of testimony from the bank personnel who were

L1Q1CALA

1   working on the loan that will reflect, that a large number of

2   bank personnel, basically, you know, the people working on the

3   loan, believed that these were bad loans.  There was, you

4   know -- I think that a little bit of that discussion came

5   before you in connection with the suppression motion.  We

6   attached some emails that sort of more relate to portions that

7   were, you know, shown to Mr. Calk, but beyond the emails that

8   went to Mr. Calk, it would be almost impossible to present the

9   story of the loans at the bank without presenting the fact that

10  they were, and were perceived to be by the bank personnel, very

11  risky, problematic loans and that most of the people working on

12  the loans believed would not have been extended if it were any

13  borrower other than Mr. Manafort but were going to be extended

14  sort of no matter what the problems were with the loans because

15  of Mr. Calk.  I think that those sort of percipient witnesses

16  and the documents that in their motion the defense says, well,

17  the government should prove its case with those, those are

18  going to describe that these loans were sort of known to the

19  people working on them to have big problems with it.  I think

20  that the issue is whether, you know -- the sort of more detail

21  on that besides the documents telling their story and the bank

22  personnel who worked on the loans telling their story is going

23  to depend a little bit on to what extent the defense is going

24  to try to argue at trial, you know, as they have in the

25  pretrial proceedings, actually, these were good loans or maybe

L1Q1CALA

1    they may not have been good loans but Mr. Calk believed they

2    were good loans.  You know, in that case I think that our view

3    is that we would need to, you know, provide the sort of

4    authoritative rebuttal that they were in fact not.  But if the

5    defense didn't really join that issue, then I could imagine

6    keeping it just to the witnesses who worked on the loans and

7    their documents.  But those will tell a story which will -- is

8    not necessarily a story of the ultimate, like, credit rating of

9    the loans, authoritatively determined by the OCC, but is

10   definitely a story of the loans being perceived by everyone in

11   the bank as extremely risky and problematic and, you know, and

12   Mr. Calk being presented with a number of red flags of that.

13            THE COURT:  Okay.  Could I hear from the defense.

14            MR. LaVERNE:  Yes, your Honor.  And this is Darren

15   LaVerne.  I'll be speaking for Mr. Calk on this issue.

16            I think your Honor framed the issue correctly.  I

17   would amend it slightly to say I think the issue of the quality

18   of the loans, or more particularly what Mr. Calk believed about

19   the quality of the loans, goes not just to whether or not he

20   acted corruptly but whether or not he intended to be influenced

21   by what the government characterizes as Manafort's offer of

22   assistance.  And I think the defense's position is that will

23   certainly be a critical issue at trial.  I think we are well

24   within our rights and intend to put on a defense that Mr. Calk

25   had a very good reason for acting as a member of the loan

L1Q1CALA

1   committee, along with the other two members, in approving these

2   loans; that is, that he believed them to be sound loans that

3   were in fact beneficial for the bank.  I expect Mr. Monteleoni

4   characterized some of the evidence, the factual evidence,

5   contemporaneous factual evidence, in a certain way.  We will

6   dispute that hotly, I expect, at trial, and the jury will make

7   its decision.

8            I think where we part ways with the government is the

9   role and the necessity for experts in this case.  And in case

10  it wasn't clear from our papers, while we have noticed an

11  expert as a rebuttal witness, we are perfectly content to try

12  this case without experts based simply on the contemporaneous

13  factual record, which includes thousands of emails from which

14  the jury can draw inferences about Mr. Calk's intent, many of

15  which the government has marked as exhibits in this case; a

16  number of bank witnesses, who the government has now included

17  in their witness list, which includes the lead underwriter at

18  the bank, who worked on these loans, the bank's president

19  Mr. Ubarri, who was another member of the loan committee, who

20  approved these loans along with Mr. Calk, in addition to

21  numerous other loan personnel and bank directors.  And

22  injecting experts into this case, it's the defense's position,

23  is going to complicate matters, confuse the jury, particularly

24  where the experts are testifying about matters that clearly

25  were not known to Mr. Calk at the time, the relevant time,

L1Q1CALA

1    which is the fall of 2016 and January of 2017.  And, you know,

2    just to bring us I guess back to the two witnesses, the two OCC

3    witnesses that the government has noticed here, Ms. Aguirre, as

4    your Honor knows from reading the papers, was not involved at

5    all with the bank during the time that the loans were approved

6    and issued.  She came into play many months afterwards, in June

7    and July of 2017, when she did an analysis of the Manafort

8    loans.  Now her analysis --

9         THE COURT:  Well, I'm going to interrupt you there,

10    because she is explicitly identified as a rebuttal witness, and

11    what I heard you say is something similar to what I heard the

12    government say, which is, we may not need to have these

13    experts, meaning the two experts we're here to talk about

14    today, and nothing either from Mr. Belanger about the quality

15    of the loans.  Sounds like we need Mr. McCutcheon regardless

16    because that's a different issue, which is the thing of value

17    issue.  But if everyone is agreed, without any ruling from the

18    Court, that we don't need to have expert testimony about the

19    quality of the loans or the credit rating of the loans, and

20    everyone is content to rely on the contemporaneous factual

21    evidence, then this is a very short conference.  But let me

22    hear from Mr. Monteleoni.

23         MR. MONTELEONI:  Yes, your Honor.  I wouldn't exactly

24    put it that way.

25         So, you know, first of all, our belief is that we

L1Q1CALA

certainly recognize that they have opinions and noticed them

and that's why we're having these motions.  We don't really

think that the two witnesses at issue here, Mr. Paulson and

Ms. Aguirre, are really experts.  We wanted to sort of provide

this in an abundance of caution.  The defense hasn't argued in

their papers that there's anything about this that requires

expertise or any issue with their qualifications.  They just

sort of said this is sort of extraneous or too much.  But I

want to get even a little more granular than that, which is, so

Mr. Paulson is very much a fact witness in that one of the

things he's going to be testifying about is a conversation that

he had with Mr. Calk, where Mr. Calk made a false statement.

But he's also going to be, you know -- what I think we would

like to put on that is in the nature of opinion, but we don't

think really expert, which is evidence of the framework and the

duties that are applicable to bank personnel in Mr. Calk's

position, which, you know, whether or not he went into great

detail or had an expert analysis of the loans is critically

important to allowing the jury to ascertain whether Calk was

acting with corrupt intent.  So --

          THE COURT:  So let's stop there for a second, because

I'd like to ask a question about that.

          So you talked about evidence of the framework, which I

take to mean from your papers the regulatory framework, and the

duties applicable, which I take it is all about Mr. Belanger's

L1Q1CALA

testimony, but let's talk about each of those separately, if that's possible.

How is Paulson's testimony about the regulatory framework relevant, important, and not something that's covered by Belanger?

MR. MONTELEONI:  Those are good questions, and we may not have been as clear in our papers as we could have been.  So I think that the fact that banks operate under a conservative -- not maximally conservative, but a conservative regulatory framework, the risk rating system, and the fact that, you know, collateral alone does not justify the extension of loans is something that, you know, came up even in our pretrial suppression motion.  It is very natural for the jury to sort of think, well, if there was collateral, then maybe he could just charge a high interest rate and kind of, who cares, it would be consistent with his duties as a bank president to take this gamble.  And, you know, I think that explaining the sort of overall framework, not with respect to this loan but that that is not the rules he's operating under, that's not the rules that Mr. Calk would have been trained on and expected to know, and his deviation from that is evidence of corrupt intent.  That's one part of it.  That has some level of overlap with Mr. Belanger on the concept of duties --

THE COURT:  Let me ask you a question about that before we get to Mr. Belanger.  Doesn't that lead us right back

L1Q1CALA

1  to the quality of the loans?  I mean, doesn't that just lead to

2  ultimately saying, you know, you have to look at all these

3  other factors and then at some point somebody argues or

4  somebody else introduces evidence and says, these loans were

5  unsatisfactory because although they were hypothetically well

6  collateralized and there was a high interest rate, they still

7  weren't sound loans?  I mean, doesn't that just take us right

8  back to that issue that I thought was not supposed to be the

9  centerpiece of this?

10         MR. MONTELEONI:  Well, we certainly agree that it

11  shouldn't be the centerpiece, but I think from the government's

12  perspective, and it sounds like from the defense's perspective,

13  there is going to be evidence that bears on the quality of the

14  loans.  The question is just what type of evidence, whether

15  it's going to be an expert analysis and opinion about the

16  quality of the loans or just sort of factual evidence that

17  bears on that quality.  But what Mr. Paulson would provide

18  that's important is the context that's necessary for the jury

19  to assess that factual evidence.  The factual evidence is going

20  to be coming in -- the emails about the steps that they take,

21  the concerns that people had, people's testimony about the

22  risks that they saw in the loan.  Those are going to be issues

23  that people will be arguing and I think we'll be placing some

24  emphasis on for Mr. Calk's intent, and that comes in in a very

25  different light when the jury understands that this is supposed

L1Q1CALA

1      to be a conservative institution operating in a safe and sound

2      manner as opposed to, you know, other types of institutions

3      they might see, might be thinking about, like more speculative

4      type of institutions that aren't OCC regulated.  The same

5      factual evidence, which is coming in either way, is going to be

6      seen in a different light, based on, you know, whether the jury

7      understands the context.  And so we think this is very

8      important.

9              THE COURT:  Okay.  That's helpful.  Thank you.  So I

10     understand that.

11             I interrupted you.  You were about to get to Belanger,

12     so go ahead.

13             MR. MONTELEONI:  Right.  Well, I guess what I would

14     say is that, you know, Belanger can speak to a piece of that

15     from the perspective of a practitioner and the sort of duties

16     as a practitioner would see them.  You know, Mr. Paulson can

17     speak just to one overlapping piece of that about the duties

18     with respect to the risk rating of loans.  You know, I think

19     that we wouldn't present duplicative evidence on this issue of

20     the duties from a risk perspective, but there are reasons -- I

21     mean, Mr. Paulson is actually extremely senior.  He's currently

22     the acting comptroller of the Currency.  So he might be an

23     appropriately authoritative person to sort of set the stage for

24     that.  Or maybe we would break off that piece and have

25     Mr. Belanger just address it.  We wouldn't have the same person

L1Q1CALA

1    address the issue of duties from a risk perspective twice.  But

2    there's a different part of the duties that Mr. Paulson is best

3    positioned to talk to, which relates to the insider abuse

4    regulations.  As to that, you know, we explain a lot in our

5    papers that, you know, the evidence of breach of duty involves

6    discussion of what those duties are, and, you know, without

7    going into great detail, the basic fact that the exchange of

8    loans for things of value -- and the jury's going to get

9    instructed as to how that applies as to how those elements

10   apply in the charge -- but the fact that this is a regulatory

11   priority for the OCC that they attempt to communicate to

12   bankers and that they put a lot of emphasis on that in their

13   investigations -- or in their examinations, rather, all goes to

14   the factual question of, you know, how likely is it that

15   Mr. Calk was aware of all of this, which, of course, is

16   extremely relevant to his intent just like, you know, in a case

17   where someone was making a false statement on a form, whether

18   the form had a warning that, you know, false statements can be

19   prosecuted is relevant to the intent, just as to how much

20   notice did he have, how much was his environment preparing him

21   and training him to not do exactly what he did here.  So that's

22   something that is --

23            THE COURT:  So let me ask a question, just so I'm sure

24   that I understand.  So the reason we're getting into duties,

25   regardless of whether it's Mr. Paulson talking about duties or

L1Q1CALA

1    Belanger talking about duties, is that your argument is that

2    there were certain duties that Mr. Calk knew or must have known

3    about the duties, and the fact that he disregarded those and

4    breached those duties suggests that he was acting with bad

5    intent.  Is that the argument, basically?

6           MR. MONTELEONI:  Yes, your Honor.

7           THE COURT:  Okay.  And let me just say, before I hear

8    from the defense, I mean, one of the things, frankly, that

9    bothered me about these two witnesses from the OCC is that, you

10   know, just like the prosecutors, to some extent they're wrapped

11   in the flag, and I don't want the jury to have the impression

12   that the government's case has the imprimatur of people at the

13   highest levels in the regulatory agency that are overseeing the

14   bank, because of course the regulatory issues are separate from

15   whether someone is criminally liable for his actions.  And so

16   the 403 issues seem to me very real, given who the witnesses

17   are.  I think that's cured, to some extent, by your saying that

18   Mr. Paulson, for example, will just talk about the regulatory

19   framework and not apply any of that to the facts of this case,

20   but it's still a concern of mine.

21          So let me hear from the defense.

22          MR. LaVERNE:  Thank you, your Honor.  This is Darren

23   LaVerne again.

24          I think that is an excellent point and really

25   highlights the issue, particularly with respect to Mr. Paulson,

L1Q1CALA

who Mr. Monteleoni noted was -- I think he's now the number two

official at the OCC, so obviously the impact of his words are

significant.  On Mr. Paulson, I think it's useful to sort of

separate out two pieces of what I understand to be his proposed

testimony, which, respectfully to Mr. Monteleoni, I think got

sort of mushed together in his recitation.  There's the

question of duty, which I think they've also proposed

Mr. Belanger to testify to, but then there's a whole other sort

of section of his testimony, and I'm just reading here from the

government's disclosure letter.  They propose that he be able

to testify that, for example:  The OCC system of regulation

benefits the entire financial system and, accordingly, the

entire economy.  The roles of the OCC in effectively

supervising institutions collectively provide confidence in the

banking system.  That's one example.  Another is:  Insider

abuse creates undue risk and could undermine the public's

confidence in the institution and the banking system.  Your

Honor, you know, we would submit, you know, particularly in

light of the concern you just highlighted, that testimony

really has no place in this case.  It's completely irrelevant

and, respectfully, you know, just seems designed to inflame the

jury and try to convince them that, you know, reaching a guilty

verdict here somehow has importance to the larger economy.  So

we certainly would object to that.

          On the questions about the risk rating system and the

L1Q1CALA

1    OCC's regulatory structure, that's all irrelevant if

2    Ms. Aguirre's testimony on risk rating in 2017 -- which, again,

3    is after the fact and has no bearing on Mr. Calk's intent -- is

4    not coming into evidence.  So I see no relevance there, and

5    again, I see a very high risk of prejudice, unfair prejudice,

6    so we object on those grounds.

7             Just to circle back to the question of duty, which the

8    government again has sort of raised in the context of trying to

9    establish corrupt intent here, again, I would just note that,

10   you know, the contemporaneous record -- if the government wants

11   to put on evidence, for example, that Mr. Calk was aware of

12   particular facts at the time, for example, I note that the

13   government marked in their exhibits the bank's conflict of

14   interest policy.  Now we will have a debate, I'm sure, at trial

15   about whether or not Mr. Calk, you know, violated that policy,

16   but if part of their theory of the case is that he knowingly

17   did something that was against the bank's own procedures or

18   regulations, they can try to draw in the contemporaneous record

19   to do that.  They don't need a paid expert to come in and

20   explain that concept to the jury -- it's not a particularly

21   difficult concept -- or read the regulation to the jury.  And,

22   you know, particularly with regard to Mr. Paulson, again, it

23   gives the imprimatur of something much more significant than it

24   actually is.  So I really do feel like, you know, that

25   testimony is extraneous, irrelevant, and just risks a great

L1Q1CALA

1      deal of prejudice to Mr. Calk in this case.

2                 THE COURT:  Okay.

3                 MR. MONTELEONI:  Your Honor, may I be heard?

4                 THE COURT:  Yes.  Mr. Monteleoni.

5                 MR. MONTELEONI:  Yes.  I apologize.  It's

6      Mr. Monteleoni.

7                 So with respect to this issue of, well, talking about

8      the significance of the regulations, is that, you know,

9      inflammatory or prejudicial, you know, I think that this might

10     be something that -- this was never something that we were

11     intending to really pound the table on or, you know, hit very

12     heavily.  And if that is the issue, I would think that we could

13     work out ways of sort of presenting the evidence so that it

14     wasn't unduly emphatic or prejudicial, but I would say that the

15     fact that these are regulations to which the OCC attaches

16     importance and that the regulatory scheme attaches importance

17     to has some significance because, you know, if you imagine that

18     the regulations that Mr. Calk violated were, like, that he tore

19     a tag off a mattress when, you know, you're not supposed to

20     tear a tag off a mattress, or some real obscure or technical

21     thing that no one really cares about or no one is expected to

22     know about, that stands in a very different posture to him

23     violating duties that, you know, the bank regulator gives a lot

24     of attention to, and I think that the latter fact would be --

25                 THE COURT:  Why is that fact relevant?

L1Q1CALA

1          MR. MONTELEONI:  Well, because the fact that he's

2     willing to breach important duties that he definitely knows

3     about as opposed to sort of technical and obscure duties that

4     maybe he's less likely to know about or maybe he's less likely

5     to think anyone cares about, you know, really matters.  If

6     there was some evidence that, oh, yeah, that's on the books but

7     no one cares about that, that never comes up, people don't pay

8     attention to it, I would imagine that the defense would want to

9     put that evidence in.  And I think that what we envisioned was

10    just a little bit, you know, on the opposite direction of that,

11    like, no, these are important rules, they're looked into,

12    they're things that are, you know, sort of examined at the

13    periodic exams and that bank officials understand they're going

14    to be.  So not to pound the table or wrap anything in the flag,

15    but just to sort of explain this isn't some dusty arcana that

16    maybe doesn't really matter but this is stuff that would be

17    important, so the jury can draw inferences as to what his

18    motive really was when he violated them.

19          THE COURT:  And then let me get clear on something

20    else related to Mr. Paulson, and that is, assuming that the

21    defense either makes argument in their opening or through

22    cross-examination raises the issue about the quality of the

23    loans or about the duties that Mr. Paulson would talk about,

24    would it be then your intent to call Mr. Paulson back in

25    rebuttal to say, oh, and Mr. Calk violated these duties in the

L1Q1CALA

following ways?

            MR. MONTELEONI:  So first of all, I think there's a
real prospect that if the defense is emphasizing any of this,
that they're likely to do it in their opening statement, but
maybe they won't.  I think that Mr. Paulson we were never
thinking of as addressing these particular facts of the case.
He didn't himself examine the loan in the way that Ms. Aguirre
did.  You know, he had a particular fact interaction with the
defendant, which he has to talk about, but beyond that, his
testimony is going to be about the principles, and whatever
doors the defendant opens, his testimony is going to stay about
the principles.  The people who will be sort of offering an
opinion about the loans themselves, either from a regulatory
perspective or from a practitioner perspective, would be
Belanger and/or Aguirre, and again, if that door is opened, we
wouldn't do it in a duplicative way, but, you know, there are
things that each of them bring to the table that the other
doesn't, so it might sort of depend in which way the door is
opened.  But we wouldn't anticipate bringing Mr. Paulson back
for specifics about the loans.  The only specifics would be
about his fact conversation with Mr. Calk, which we would be
bringing out in the beginning anyway.

            THE COURT:  Okay.  So that's --

            MR. LaVERNE:  Your Honor?

            THE COURT:  Yes.  Mr. LaVerne?

L1Q1CALA

1          MR. LaVERNE:  I'm sorry.  It's Darren LaVerne.

2          I just want to make sure it's clear, the defense does

3    not plan to argue in any way, shape, or form that somehow the

4    regulations at issue here or the laws are unimportant and seek

5    some sort of verdict on that basis.  I just think it's totally

6    improper for either side to be putting on that kind of

7    evidence, and while Mr. Monteleoni was sort of trying to

8    downplay it and saying they're not going to pound the table, it

9    just has no place in the case, particularly when we're talking

10   about the number two official in the OCC coming in to testify

11   in court.

12          THE COURT:  Okay.  So let's talk about Ms. Aguirre.

13   And so it sounds like her testimony really is just geared at

14   the loan and the downgrading of the loan, and even though she

15   was there after the fact, my understanding is that she

16   downgraded it essentially as of the time that it was issued,

17   and again, my impression is that she was just a rebuttal

18   witness, but now I'm not so sure, and I'm even more concerned

19   in some ways about her and her coming in and saying, I speak

20   for the OCC and these were bad loans, and, you know, anybody

21   would have known that.

22          So let me hear from Mr. Monteleoni about Ms. Aguirre.

23          MR. MONTELEONI:  Well, your Honor, I obviously

24   certainly apologize for any confusion.  There is potential --

25   we don't view her as really an expert but just someone who sort

L1Q1CALA

1    of observed and reviewed these loans shortly after and then

2    also observed a sort of telling reaction from the bank

3    personnel who she communicated these problems to shortly after,

4    so a little bit of further fact testimony that she may be

5    offering about the aftermath of them.  You know --

6           THE COURT:  Say that again.  I'm sorry.  I didn't

7    quite understand that.  Say that again, or explain what you

8    mean.

9           MR. MONTELEONI:  I apologize.

10          THE COURT:  Reaction from bank personnel?

11          MR. MONTELEONI:  Yes.  So she communicated her

12   findings to the bank personnel at a meeting, and they reacted

13   in an atypical way, which I think, you know, the jury will be

14   able to draw their inferences for, but I think that we think

15   that sort of their reaction to her explaining that she thought

16   that the loan -- that she saw these problems with the loan was

17   sort of evidence that they believed that the loan was

18   problematic and that they were uncomfortable with it, so it's

19   sort of circumstantial evidence.

20          THE COURT:  And what do you mean they reacted in an

21   atypical way?  Are you talking about statements that

22   potentially are hearsay or something different?

23          MR. MONTELEONI:  Well, sorry.  So their lack of

24   response, that is.  She had a type of meeting where, you know,

25   she has a lot of these meetings, and typically when she sort of

L1Q1CALA

1    sets up the meeting, she says, we're going to discuss this

2    loan, and that happens for loans the OCC has sort of found

3    issues with, and so the bank personnel that she meets with,

4    typically, they're sort of prepared to respond or to argue

5    about what the problem is with the loan and, you know, so they

6    all come in sort of loaded for bear, and what happened this

7    time is when she sort of set up the meeting and showed up that

8    time, there was just a silent reaction, where no one sort of

9    said any words to her, and that was, you know, an unusual thing

10   that we think is going to suggest the defendant's intent.  So

11   we don't think it's really hearsay.  But also, I would note

12   that even if there were a statement to be made, that these were

13   all employees of the defendant within the scope of their

14   employment.  That's probably an issue that we might raise with

15   respect to a number of documents, but, you know, we think that

16   even if they had made statements, those would be admissible

17   just as sort of fact testimony of what the bank personnel, you

18   know, believed.  But I didn't mean to get too sidetracked about

19   what she would principally say, which is that I believe that

20   she would be explaining that the documentation that she

21   reviewed that were dated from the time that the loans were

22   originated led her to the conclusion that the loans were of

23   substandard quality at origination because of Manafort's

24   insufficient cash flow and that it is very unusual, you know,

25   in her experience to have to reclassify a loan to substandard

L1Q1CALA

1    at the time of origination.

2            And again, the red flags that we would first be

3    explaining that Mr. Calk was aware of all go to indications

4    that he has cash flow problems and that this is sort of the

5    fruition of a risk that he was aware of, just like in the

6    *Seabrook* case, the Second Circuit found that the fruition after

7    a bribe of a risk to a risky investment bore on the defendant's

8    intent and the defendant was aware of risk.  So similarly here,

9    Mr. Calk is aware of risk.  The evidence of their fruition

10   would, you know, be relevant for the same reasons that it was

11   in that case, which we cite in our memo of law.

12           With respect to the prejudice --

13           THE COURT:  Wait, wait.  Let me ask this question too.

14   I mean, I asked it about Mr. Paulson.  I understand that

15   Mr. Belanger is at least prepared to testify about the

16   soundness of the loan, and it sounds as though it is the same,

17   but potentially less prejudicial.  I know you were going to get

18   to the issue of prejudice.  So why not just rely on

19   Mr. Belanger so we don't have that issue?

20           MR. MONTELEONI:  If your Honor feels that we should be

21   responding to it only with Mr. Belanger, if at all, then we

22   would abide by the Court's ruling on that.  The fact that she

23   did this in the ordinary course of her job responsibilities,

24   not as a paid expert for us and, you know, and we think not

25   really as an expert, just as a trained sort of layperson, I

L1Q1CALA

1    think makes her testimony comprehensible and makes it credible.

2    We don't think that -- I mean, we think that that's sort of the

3    good kind of prejudice in that she doesn't have an arguable

4    motive to shade things.  I mean, I think that we could

5    potentially address issues that, you know, just her being a

6    government official, you know, gives too much of an imprimatur

7    with an appropriate limiting instruction.  We certainly expect

8    that the jury would be informed that any of these regulatory

9    issues or regulatory violations are not themselves bases for

10   criminal liability, just as this type of evidence is admitted

11   in the *Gross* case or in the *McElroy* case with these

12   instructions; you know, we think that that satisfies prejudice.

13   Of course if your Honor feels that that just can't be done, you

14   know, we can offer the testimony of Mr. Belanger.  But the fact

15   that she sort of did this just in the course of her job, not

16   because we were hiring her, and also because she had this

17   factual interaction with them in the course of her review

18   shortly after, we think that she does have something to offer,

19   and I guess we would request that, you know, if you're inclined

20   to rule in that direction, you sort of preserve the possibility

21   of revisiting this if there's an aspect of relevance that we,

22   you know, really feel like the defense raises and we can best

23   address through her.

24           THE COURT:  Okay.  Could I hear from the defense.

25           MR. LaVERNE:  Yes.  Thank you, your Honor.  And this

L1Q1CALA

1    is Darren LaVerne again.

2            Again, I think there were a few things kind of

3    conflated together there.  And the details are actually sort of

4    important to understand in assessing Ms. Aguirre's testimony.

5            First of all, on the issue of the meeting

6    Mr. Monteleoni was describing and some supposed nonreaction,

7    frankly, I have not heard anything about that before from the

8    government.  It was not something covered in their extensive --

9    otherwise extensive write-up of what Ms. Aguirre's expected

10   testimony was, so I'm not quite sure what to do with that other

11   than to say that it sounds, at least right now, like some form

12   of hearsay, and I expect we'll have a separate debate on that.

13           With respect to the sort of core part of what I

14   understand to be Ms. Aguirre's proposed testimony, which is the

15   rating downgrade and her opinion in June and July of 2017 that

16   these were substandard loans, the key point, your Honor, is

17   really to understand the basis for that finding.  And the basis

18   for Ms. Aguirre's finding, as she stated in her report, was

19   that the bank underwriting department was not properly

20   accounting for noncash items and making accurate adjustments

21   based on information in tax returns.  There is no evidence that

22   I'm aware of that the government has put forth that Mr. Calk

23   was aware that the underwriting department was making this sort

24   of mistake and error in its underwriting analysis, with respect

25   to Mr. Manafort or anyone else.  So her finding in that regard

L1Q1CALA

1    really has no bearing, zero bearing, on what Mr. Calk's intent

2    was in this case, and that's the key issue, again.

3            Separately, it's clear from Ms. Aguirre's report that

4    she made that finding -- that is, that the underwriting

5    department was essentially doing an inaccurate analysis of tax

6    returns -- she made that finding with respect to four other

7    loans in addition to the Manafort loan, that had nothing to do

8    with Mr. Manafort.  Apparently what she found was that the

9    underwriting department, as a sort of, you know, loanwide

10   problem, was inaccurately accounting for information in tax

11   returns.  So it really, again, is very attenuated when you look

12   at the details as to the key question, which I think we have to

13   remain focused on, which is whether or not Mr. Calk intended to

14   be influenced corruptly here.

15           So this is set out in further detail in our papers,

16   but I really think it's important to focus on that issue when

17   we're talking about Ms. Aguirre.

18           THE COURT:  Okay.

19           MR. MONTELEONI:  May I be heard just briefly on the

20   last point?

21           THE COURT:  Yes.  Mr. Monteleoni.

22           MR. MONTELEONI:  I apologize for the serial nature.

23   Just the last issue that Ms. Aguirre's findings, you know, that

24   there were somewhat related findings for other loans.  I think

25   that there will be plenty of evidence that Mr. Calk's level of

L1Q1CALA

1      personal involvement in these loans in particular was unique

2      and unusual and changes the significance of the underwriting

3      because this is something that he should have been aware of.

4      But, you know, I guess we would just ask, if the issue is that,

5      you know, Ms. Aguirre, the Court finds, is not the proper

6      vehicle to put forward any of this, if the door is opened,

7      that, you know, at least commensurate limits on the ways in

8      which they could be, you know, impeaching Mr. Belanger if we

9      have to put in Mr. Belanger, because we don't need

10     Ms. Aguirre -- if we don't need Ms. Aguirre because, you know,

11     we have Mr. Belanger, then we would ask that he not be able to

12     be impeached in the ways that Ms. Aguirre couldn't.  But I

13     mean, we could deal with that down the line.

14             THE COURT:  But let me do this, just so that we have

15     something to show for all of this discussion.  With respect to

16     Ms. Aguirre, I think it is more clear.  I would preclude her

17     testimony about the downgrading of the loans as potentially

18     confusing to the jury, because my fear is that they would think

19     that the OCC's finding that the loans were of poor quality at

20     the outset, even though it was later and for whatever reason it

21     was, that they would somehow be confused into believing that

22     because of that downgrading and the official nature of the

23     downgrading, that it somehow carries more weight and therefore

24     that she was, again, blessing the government's case and at the

25     very least blessing their argument about what Mr. Calk should

L1Q1CALA

1    have known and what the quality of the loan was as opposed to

2    looking at the merits of those arguments.  And so I'm going to

3    preclude her testimony.  Of course you can bring out those

4    issues about the quality of the loan -- not the downgrading but

5    just the quality of the loans -- through Mr. Belanger, and I'd

6    ask you to talk to each other to work out the appropriate scope

7    of cross and impeachment so that the government isn't

8    prejudiced by my ruling in the way that I have as to

9    Ms. Aguirre.

10           And then with respect to Mr. Paulson, I will allow the

11   testimony of Mr. Paulson, understanding that it is providing

12   background information about the regulatory framework and that

13   it is not addressed to the particular facts at all, and I would

14   like the parties to confer about an appropriate limiting

15   instruction for Mr. Paulson's testimony so that the jury isn't

16   unduly influenced and understands that it's just background.

17   And --

18           MR. LaVERNE:  Your Honor?

19           THE COURT:  Yes.

20           MR. LaVERNE:  I'm sorry.  It's Darren LaVerne.  I just

21   wanted to clarify --

22           THE COURT:  Yes, Mr. LaVerne.

23           MR. LaVERNE:  I just wanted to clarify on Mr. Paulson.

24   Was your Honor precluding testimony about his opinion of the

25   importance of regulations and the issues at stake here in this

L1Q1CALA

1    case?  Leaving aside the regulatory context.

2              THE COURT:  Thank you for reminding me.  I hadn't

3    addressed that one way or the other, but it seems to me that

4    suggesting that this regulatory scheme and therefore the case

5    are somehow critical to the health and well-being of the

6    economy is a bit much.  My impression also is that the

7    government doesn't intend to do that.  So if you could confer

8    on that as well and try to come up with something more

9    concrete, I think everybody understands your concern, and I

10   agree that that shouldn't be a part of the case.  On the other

11   hand, I understand the government's argument that the

12   regulations in question are not trivial and therefore Mr. Calk

13   should have or likely would have known about them.  I think

14   that's something that is appropriate.  So if you could try to

15   work that out.  And to the extent you can't work it out, if you

16   would come back to me with a letter that includes, in a single

17   letter, sort of your competing proposals, both what you agree

18   on and what you don't agree on, and then I can resolve whatever

19   the difference is.

20             MR. LaVERNE:  Thank you, your Honor.

21             MR. MONTELEONI:  Thank you, your Honor.

22             THE COURT:  With respect to Mr. Belanger, as I

23   understand it, he's now talking about the duties owed by a bank

24   director and CEO in the defendant's position, both with regard

25   to regulatory standards and industry practice.  My

L1Q1CALA

1    understanding further is that it won't be cumulative of

2    anything Mr. Paulson says.  The trial's going to be long

3    enough.  Please don't put in any cumulative testimony,

4    particularly by way of background.  And so I will allow that.

5    I would like a joint instruction about his testimony, in

6    substance, that the defendant is not charged with and can't be

7    convicted for violating regulatory or legal or industry

8    standards and that the evidence should be considered, if at

9    all, only to the extent the jury determines that it bears on

10   the defendant's state of mind.  That's not even a suggestion.

11   The two of you should come up with something together and then

12   propose it to me.

13            And also, with respect to those duties, as I

14   understand it, Mr. Belanger is not supposed to be talking about

15   the breach of those duties, only that those duties are there,

16   so the government may present evidence identifying those duties

17   but should not talk about the consequences of breaching them,

18   so shouldn't suggest that there was a breach of fiduciary duty

19   for which there could be civil liability, or of regulatory

20   duties, the violation of which would result in some penalty.

21   He should just simply talk about the duties and not the

22   consequences.

23            And then with respect to the fourth witness,

24   Mr. McCutcheon, I would allow his testimony.  It appears to be

25   based on his experience, and he appears qualified to give it.

L1Q1CALA

1    And so I will allow that.  To the extent there are objections

2    to the qualifications of any witness -- whether Mr. Carron on

3    the defense side or Mr. McCutcheon on the government's side --

4    I think it goes to weight and not admissibility, so I will

5    allow those witnesses.  And I will allow Mr. Carron's testimony

6    also.  I think the objections go to the weight and not

7    admissibility.

8              As to the other issues, which I think of as the sort

9    of miscellaneous issues raised by the government, evidence or

10   argument about the defendant's good acts, or evidence intended

11   to elicit sympathy, my understanding from the defense is that

12   they don't intend to offer any such evidence except to the

13   extent that it's directly relevant to matters in the case.  So

14   for example, his experience in the armed forces as it relates

15   to the prospect of acting as Secretary of the Army, that would

16   be admissible.

17             And the argument about the charges being politically

18   motivated, the defense has said that it doesn't intend to make

19   any such argument, and therefore that objection or application

20   on the part of the government is moot.

21             So I think that takes care of the motions *in limine*.

22   And what we should talk about then is the trial date.  And of

23   course, you know, that requires to some extent a crystal ball,

24   which I don't have.  So --

25             MR. MONTELEONI:  Your Honor, might I raise one --

L1Q1CALA

1          THE COURT:  Yes.  Who is this?

2          MR. MONTELEONI:  Paul Monteleoni.

3          THE COURT:  Yes, Mr. Monteleoni.

4          MR. MONTELEONI:  One aspect of our motion with respect

5     to Mr. Carron was that if his testimony was to be admitted, as

6     we understand your Honor has ruled that it is, that a

7     supplemental disclosure be ordered, at least with respect to

8     his projections of profit and loss under reasonable

9     assumptions.  We honestly have no idea what those projections

10    are or whether we agree with them because we don't know what

11    the assumptions are and what the projections are.

12         THE COURT:  Thank you for raising that, because I

13    wanted to give the defense an opportunity to revise their

14    disclosure, which is something separate from what you're asking

15    for at the moment.  And the reason I say that is because the

16    government's disclosures about their witnesses --

17    understandably this happens in the course of preparing for

18    trial -- have somewhat evolved from the time they made their

19    initial disclosures and the defense expert was intended to be a

20    rebuttal expert, as I understood it, but, you know, to some

21    extent is rebutting a moving target.  So now that it's I think

22    relatively clear and fixed what the government's case is, to

23    the extent that the defense wants to supplement its disclosure

24    to offer new rebuttal opinions to address things that we heard

25    in the government's papers, responsive papers on the motions *in*

L1Q1CALA

1    *limine* or in the argument, you can do that.  But I'd ask that

2    you do it in the next, let's say, two weeks, just so it doesn't

3    get too stale.

4            And then in addition, I had understood that the

5    defense had intended to make disclosures of the sort that

6    Mr. Monteleoni was asking for but perhaps not on the timetable,

7    since the trial has been pushed out, that necessarily makes

8    sense anymore.

9            So let me hear from Mr. LaVerne.  When would you be

10   prepared to make additional disclosures about the details of

11   your expert's testimony that have already been disclosed?

12           MR. SCHOEMAN:  With respect to Mr. LaVerne, this is

13   Mr. Schoeman, and I think the division of labor here puts this

14   one on my court.  And --

15           THE COURT:  Okay.  Mr. Schoeman.

16           MR. SCHOEMAN:  Judge, we'd be happy to do as the Court

17   is directing and within two weeks will, if we have a revised

18   notice in response to what's transpired, and we'll at that time

19   also provide the details of the calculations, most of which is

20   just arithmetic on that particular issue, but we can provide

21   something in two weeks.

22           THE COURT:  Okay.  I mean, it matters what it is

23   you're adding and subtracting, so I'm sure the government would

24   appreciate that.

25           All right.  Let's talk about the trial date.  And I'm

L1Q1CALA

1   not even sure how to do this, because of course at the moment

2   jury trials in the Southern District of New York are at a

3   standstill, and then once they revive, we will have to make an

4   application, and although we will be near the front of the

5   line, all the people who are incarcerated and waiting for trial

6   will be before us.  So what I'm suggesting is that we just pick

7   a date in the second quarter.  I'll apply for it, and we'll

8   hope for the best.  And I don't think we can do more.  The

9   other option is just to say the heck with the second quarter,

10  maybe everybody's healthy by the third quarter, we just pick a

11  date and do it, but, you know, of course I don't know that

12  either.

13          So any thoughts from anyone?

14          MR. SCHOEMAN:  Sure.  I'll go first.  This is

15  Mr. Schoeman again.

16          So we appreciate the situation we all find ourselves

17  in, and we wish we had the same crystal ball.  And just to be

18  clear, having done the trial a couple of times, obviously

19  Mr. Calk continues to want a trial at the soonest opportunity

20  but also very much feels strongly that the trial that occurs

21  should include live witnesses as opposed to video witnesses.

22  And just to be clear with the Court, and I've been clear with

23  the government, we would prefer a trial -- we would object to a

24  trial, a sooner trial that had video witnesses and would prefer

25  a slightly later trial that had live witnesses.  But we agree

L1Q1CALA

1   with the Court that how to get there in the current environment

2   is difficult and it would require seeing into the future.  So

3   we have no problem and would appreciate being put in for a

4   trial date in the second quarter, but we do want just to be

5   clear with the Court, that should the issue present itself

6   again where we would be potentially put to the question of,

7   would you prefer a trial sooner with video witnesses or

8   slightly later with live witnesses, our very strong preference,

9   based on what we perceive to be significant prejudice to the

10   defendant, would be to have live witnesses.

11          THE COURT:  Okay.  So --

12          MR. MONTELEONI:  And we don't --

13          THE COURT:  Go ahead.  Mr. Monteleoni?

14          MR. MONTELEONI:  Sorry.  This is Paul Monteleoni for

15   the government.

16          We don't object to proceeding in that fashion.  I

17   guess we would just note that the second quarter includes some

18   dates that are pretty soon and then some dates that are less

19   soon, and I think in the interest of avoiding sort of serial

20   adjournments where we're all sort of gearing up for a trial in

21   short periods of time, I think we would want the date to be

22   towards the back of the second quarter, maybe, you know, I'd

23   say, certainly no less than 90 days from now.  But other than

24   that, we have no objection.

25          THE COURT:  Okay.  What about end of June?

L1Q1CALA

1          MR. MONTELEONI:  That's fine for the government.

2          THE COURT:  Okay.  And Mr. Schoeman?

3          MR. SCHOEMAN:  Yes.  So I think that that's fine for

4     the defense.  Because we're all in different places, I'm going

5     to give a few seconds for people to let me know electronically

6     if middle or end of June is a problem, but assuming -- or they

7     could speak up on the phone.  But I think a date in middle of

8     June or so would be fine.

9          MR. LaVERNE:  This is Darren LaVerne.  I think we're

10    all good on the June date.

11         MR. MARGOLIS:  Jeremy Margolis.  We're good in June.

12         THE COURT:  Okay.  Anyone else want to chime in?

13         So let's set it for June 28th, on the theory that

14    maybe we will have a very good chance by then of actually going

15    forward and not have to sort of prepare and shut down again.

16         And I'll issue a brief order that summarizes my

17    rulings on the experts and also a trial scheduling order, and

18    we'll go from there.

19         Is there anything else we should talk about?

20         MR. MONTELEONI:  We would request that time be

21    excluded in the interest of justice and due to the complexity

22    of the case, as the last exclusion was done.

23         THE COURT:  Okay.  Any objection to that?

24         MR. SCHOEMAN:  We would consent to the exclusion of

25    time based on the conditions of the COVID pandemic.

L1Q1CALA

1          THE COURT:  Okay.  So what I'll do is I will include

2     in my written order from our conference today a formal

3     exclusion of time between now and the new trial date, which is

4     June 28th, based on the current conditions, meaning the

5     pandemic.

6          All right.  I take it there's nothing else.  I think

7     this was productive.  Thank you very much.  And I'll hear from

8     you all soon.

9          Thank you.  We're adjourned.

10          ALL COUNSEL:  Thank you, your Honor.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25