

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 1, 2021

**BY ECF**
The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

     Re:    *United States v. Stephen M. Calk*, S1 19 Cr. 366 (LGS)

Dear Judge Schofield:

     Pursuant to the Court's Order (Dkt. 185), the Government respectfully files the parties' joint letter explaining their arguments concerning the admission of certain exhibits.

## I.    Exhibits on which the Court Need Not Rule at this Time

     The parties respectfully request that the Court not rule on objections to the following exhibits at this time, because the parties are unlikely to offer the exhibits absent developments at trial that will significantly bear on their admissibility: GXs 608, 1001-1003, 1007, 1008, and 1151; and DXs 138, 140, 211, and 214. Should those developments arrive the parties will notify the opposing party the day prior to offering them (unless the exhibit is properly offered as impeachment during cross-examination of a witness after meeting the requirements of doing so). The parties also withdraw their objections to GXs 451-454 (as redacted) and 854 (same), and DXs 200 and 200A.

     The parties further request that consideration of the following exhibits, which the defense intends to offer in its case, be deferred until at or near the time that the defense case begins: DX 101 and DXs 239-242 (emails between Mr. Calk and a defense witness, Retired Brigadier General Bernard Banks); DX 50 (a composite video of Mr. Calk's media appearances on behalf of the Trump campaign).

## II.    Defense Objections to Government Exhibits

### A.    Raico's Handwritten Notes Are Hearsay

     **1.  Defense Objection:** The Government is seeking to introduce the handwritten notes from a journal kept by one of its witnesses, Dennis Raico. *See* GX 51-1; GX 51-2; GX 51-3; GX 51-4. The notes were produced to the Government in response to a subpoena to Raico and were

not part of the Bank's files.[1]  The contents of these notes are classic out-of-court statements, which are not admissible for their truth.  If Raico testifies and the Government lays an appropriate foundation, the notes may be used to refresh Raico's recollection or read as a recorded recollection pursuant to Fed. R. Evid. 803(5), but the notes themselves are not admissible in evidence if offered by the Government.

The Court should reject the Government's effort to improperly shoehorn these notes into Fed. R. Evid. 801(d)(2)(D).  While Raico, when acting within the scope of his employment, may have been an agent of the Bank, he was not acting as *Mr. Calk*'s agent in writing these notes, and the Government has laid no foundation demonstrating otherwise.  The Bank has hundreds of employees in 37 offices across 18 states around the country.  It is not consistent with either the text or the spirit of the rule that the statements of any of these employees (much less the handwritten notes in their journals) could be used in a criminal case brought against a CEO in his personal capacity.  Moreover, Mr. Calk, was not the direct supervisor of Raico, who was based in New York and was one of many salesmen working on commission at the Bank.  The cases cited by the Government do not support its position.  *Pappas* was a slip-and-fall negligence action where the statements of an employee were introduced against the defendant management company that employed him, not the company's CEO.  *See Pappas* v. *Middle Earth Condominium Ass'n*, 963 F.2d 534, 537-38 (2d Cir. 1992).  *Lauersen* involved the statements of a nurse who worked directly for and under the supervision of a doctor, and the issue was whether her statements were within the scope of her employment, not whether the doctor qualified as her principal for purposes of the rule.  *See United States* v. *Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003) ("[B]ecause nurses in Lauersen's office were responsible for helping maintain patient files, the condition and content of a patient's file were subjects properly within the 'scope of employment' for the purpose of this rule.").  The two other in-circuit cases cited by the government, *Rioux* and *In re Reserve Fund*, are similarly distinguishable.  *Rioux*, on which *In re Reserve Fund* relied, permitted the government to introduce the statements of the defendant sheriff's deputies against him, but only after finding that the deputies were "hand-picked" by the defendant, "served at his pleasure," and "received their instructions" through the sheriff himself or the chief supervisory special deputy sheriff, a position created by the defendant.[2]  *United States* v. *Rioux*, 97 F.3d 648, 660 (2d Cir. 1996).

[1]    This was made clear to the Government in the transmittal email from the Bank's counsel dated November 27, 2017.

[2]   The government cites three out-of-circuit cases, none of which supports the expansive use of Rule 801(d)(2)(D) it seeks here.  For example, in *Agne*, the First Circuit found that the district court did not err in admitting the statements of a company executive against the defendant, who was the *sole proprietor* of the company.  *United States v. Agne*, 214 F.3d 47, 55 (1st Cir. 2000).  It did so only after finding that the requisite agency relationship could be established by evidence that the declarant "is directly responsible to the defendant," "reports directly to the defendant who owns an overwhelming majority of stock in the company," "was hired by the defendant and worked on matters in which the defendant was actively involved," or was directed by the defendant "on a continuing basis."  The government ignores cases from the Third and Tenth Circuits, similarly requiring a showing that the defendant "controlled the daily performance" of the employee or "directed [the employee's] work on a continuing basis."  *Boren v. Sable*, 887 F.2d 1032, 1040-41 (10th Cir. 1989); *accord Lippay v. Christos*, 996 F.2d 1490, 1498 (3d Cir. 1993) (same).

**2. Government Response:**  Raico—the loan officer on the Manafort loans—created the notes while working at the Bank, and they were kept in his files.[3]  The notes record various developments during the extension of the loans, such as "Manafort 2nd Appraisal came in at \$11 Mil" and "Steve [Calk]: Trump Executive Council Secretary of the Treasury Check w/ Paul [Manafort]."  (GXs 51-3, 51-2).  The statements in the notes are thus admissible under Federal Rule of Evidence 801(d)(2)(D), which provides that a statement is not hearsay if "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

Raico was plainly Calk's employee and agent at the time he made the notes:  Raico worked for Calk—the Bank's majority owner and chairman—and both these notes and other emails show Raico acting as Calk's agent in managing the Manafort relationship.  (*See, e.g.*, GX 182 (Calk emailing Manafort, "Consider it done.  Dennis [Raico] has been directed")).  For the statements to fall within the scope of that relationship, they need only "relate[] to a matter within the scope of the agency."  *Pappas* v. *Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).  "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate."  *Id.* at 537.  Thus, the Circuit has explained that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within scope of her work, even if "file purging" was not.  *United States* v. *Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003).  Because the statements in the notes similarly relate to the scope of Raico's work for Calk, they are similarly admissible against Calk.[4]

Calk claims that Rule 801(d)(2)(D) does not apply because Raico was formally employed by the Bank Calk owns, rather Calk personally, and although Calk supervised Raico's involvement with Manafort, Calk was not officially Raico's immediate supervisor.[5]  This argument is without basis in the law.  "Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d) (2)(D), and his statements are admissible against that individual defendant."  *In re Reserve Fund Secs. & Derivs. Litig.*, 2012 WL 12354233, at \*7 (S.D.N.Y. Oct. 3, 2012) (citing *United States* v. *Rioux*, 97 F.3d 648, 660 (2d Cir. 1996)).  Courts thus routinely hold that where, as here, employees take their orders from the defendant, this Rule applies.  *See, e.g.*, *Rioux*, 97 F.3d at 660-61; *United States v. Agne*, 214 F.3d 47, 54 (1st Cir. 2000) (admitting statements of

---

[3]  The relevant subpoena was addressed to Raico in his capacity as corporate custodian and called only for records kept in that capacity, and the records were produced to the Government by counsel for the Bank, not by Raico's separate counsel.

[4]  In addition, if Calk claims that Raico has engaged in fabrications based on a motive that Calk posits arose after the notes were taken—such as a desire to ingratiate himself with law enforcement—any notes on that subject will also likely become admissible as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B)(i).

[5]  In fact, Calk closely and personally supervised these loans throughout, down to correcting perceived typographical errors and reviewing account opening paperwork for the requisite number of signatures.  (*See, e.g.*, GXs 298, 308).

employee against senior corporate officer); *United States v. Paxson*, 861 F.2d 730, 734 (D.C. Cir. 1988) (same, rejecting "hyper-technical construction of the rule" limiting it to corporate employers); *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988) (admitting statements of employees against part owner and senior corporate officer).

### B.  The Government Seeks to Introduce TFSB Emails Containing Hearsay for their Truth and Cannot Establish that an Exception Applies

**1.  Defense Objection:**  The defense objects to the admission of GX 129, 136, 165, 167, 177, 185, 194, 209, 218, 223, 227, 273, 277, 285, 315, 326, and 359.  The defense does not contest the authenticity of these exhibits, which are a small subset of the many emails produced by The Federal Savings Bank.  In most cases, the TFSB emails offered by both the Government and the defense clearly relate to the Manafort loans and are relevant.  Although many of those emails contain some incidental hearsay, the defense has generally not objected on that ground.  However, the defense does object to the exhibits listed above on hearsay grounds because the Government appears to be offering a hearsay statement for its truth, rather than for a valid non-hearsay purpose.  The defense has also objected on relevance and/or Rule 403 grounds to two of these emails, GX 129 and GX 359.  GX 129 is a hearsay statement discussed further below in Section II.J.1.  GX 359 is an after-the-fact email sent to regulators in December 2017, which is hearsay if offered for its truth, and irrelevant and prejudicial if offered to establish or hint at post hoc regulatory scrutiny.

With respect to the hearsay objection, GX 136 provides a good example.  It is an email from Dennis Raico to Anna Ivakhnik dated August 4, 2016, Subject: Manafort Liquid Assets.  Raico writes, "<u>Just a heads-up. Jim and Tom called late last night and were in a state of panic on Paul's margin account. They indicated that there was only roughly $200K liquid in the entire account. I rejected their theory and they said they would send verification today. That said, we need as much liquidity as possible.</u> Please tell me that Jeff made the $2 Mil deposit into TFSB. If not, do you know the status, and how can we facilitate? Thanks!"

The underlined portion of the email is inadmissible hearsay if offered for its truth.  Indeed, it is double-hearsay – the out-of-court statements of one declarant, Raico, describing out-of-court statements by two other declarants, Jim Brennan and Tom Horn.  To the extent the Government wants to prove the truth of facts set forth in emails, it should elicit those facts from the numerous Bank employee witnesses on its witness list (which include Raico, Brennan, and Horn).  As noted above in Section II.A.1, the Government cannot properly introduce these emails as admissions against Mr. Calk pursuant to Fed. R. Evid. 801(d)(2)(D).

**2.  Government Response:**  The statements in these emails are, like Raico's notes, important evidence of the facts making up the charged conduct, of the sort routinely admitted under Rule 801(d)(2)(D).  Taking Calk's example, GX 136, Raico emailed his assistant, Ivakhnik, about Manafort's assets, relating the concerns of two of Calk's underwriters on the Manafort loans, Brennan and Horn.  Each declarant plainly worked for Calk at the time and had the authority to take actions regarding loans.  *See, e.g.*, GX 171 (email chain between these declarants and Calk on Manafort loan developments).  Their statements are thus admissible against Calk under Rule 801(d)(2)(D).  And Calk's claim that the facts in these emails must instead be elicited through testimony nearly five years after the fact is plainly wrong: The value of candid, contemporaneous emails by Calk's employees is obvious, which is why the "Second Circuit has emphasized the

'liberal' standard of admissibility applicable under F.R.E. 801(d)(2)."  *In re Reserve Fund Secs. & Derivs. Litig.*, 2012 WL 12354233, at *7 (quoting *Pappas*, 963 F.2d at 538).

GX 359 is relevant because it shows that the Manafort loans were the only occasion during an approximately two-year period when the Bank's holding company—of which Calk was also the majority owner—funded part of a loan, further illustrating the exceptional nature of the Manafort loans and that they would not have been approved but for Calk's intervention.

## C.  The Government Seeks to Introduce a *Wall Street Journal* Article that Contains Hearsay and False, Prejudicial, and Irrelevant Information

**1.  Defense Objection:**  The defense objects to the admission of GX 347, which is a *Wall Street Journal* article dated March 29, 2017.  The article is inflammatory, even as redacted by the Government, and inadmissible under Rules 403 and 802.  In addition to being rife with hearsay, it contains false and prejudicial arguments that would unfairly suggest that the WSJ (which got many of the facts wrong) agrees with the Government's allegations.  (*See, e.g.*, GX 347 at 2 ("The loans show how Mr. Manafort . . . continued to tap connections from Mr. Trump's circle").  If the Government wishes to elicit testimony about reactions to the article, the fact of its publication, or the impetus for the meeting it describes below, it can do so without placing the article itself in evidence.  Of course, if needed and an appropriate foundation is established, the article can be used, by either side, to refresh a witness's recollection pursuant to Rule 612.

**2.  Government Response:**  A redacted version of GX 347 is admissible for its effect on Calk.  The Bank's President forwarded GX 347 to Calk (*see* GX 346), shortly before Calk attended the emergency meeting with the OCC on March 29, 2017.  An OCC witness is expected to testify that GX 347 was the impetus for the meeting.  At the meeting, Calk denied knowing that the Manafort properties were in foreclosure even though Bank emails in fact show that he was well aware.  (GX 279, 281, 297).  These false exculpatory statements plainly bear on Calk's consciousness of guilt.  *See United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995).  And to understand the import of Calk's lies at the OCC meeting, the jury must understand the accusation to which he was responding—here, the article's implication that Calk had done exactly what he is charged with doing in this case.  The article is thus offered not for its truth, but solely as necessary context for the defendant's statements.  *See United States v. Arline*, 660 F. App'x 35, 41 (2d Cir. 2016).  The Government consents to a limiting instruction to that effect.

## D.  The Government's Heavily Redacted Excerpts from Mr. Calk's iPhone are Improper

**1.  Defense Objection:**  The defense objects to the admission of GX 501-1 and 501-3, which are heavily redacted excerpts from Mr. Calk's iPhone.  The defense does not object to the Government's use of an unredacted version of GX 501-1.  The unredacted version makes clear that the very same day (December 8, 2016) a note was created in Mr. Calk's phone regarding Manafort's properties (which the Government has left unredacted), another note was created (which the Government has redacted) concerning contacts, other than Manafort, who could be of assistance in helping Mr. Calk serve in the Trump Administration.  (The import and admissibility of evidence regarding Mr. Calk's outreach to these other contacts – which, contrary to what the

government suggests below, are not prior statements being offered for a hearsay purpose – is addressed in the defense's response to the Government objections, Section III.C.2.)   The Government should not be permitted to conceal from the jury the latter entry, while offering the former.

As to GX 501-3, it is not clear from the exhibit to whom the text message displayed was sent.  The Government's claim, below, that it was sent to Manafort is speculation, given that the Government has not offered any evidence that Manafort was discussed during the referenced interview at Trump Tower,[6] and the email it cites (GX 330) was sent four hours after this text message.  The Government has also redacted the surrounding texts, which also concern the meeting.  It has done so presumably because it believes they are harmful to its case and/or provide context that the Government prefers the jury not know.  For example, in one of the other texts, sent five minutes after the text left unredacted, Mr. Calk indicates that he was told, regarding his Trump Tower interview, "it was their longest interview for a Senior appointment yet."  We do not believe the Government has or can establish a basis to admit this exhibit as relevant, nor to do so in redacted form.

**2.  Government Response:**  GX 501-1 consists of two unrelated notes saved on Calk's iPhone.  The Government has redacted a separate, third note, which is found on the same page of the iPhone extraction report but is otherwise unrelated, meaning that if viewed in its original format on the iPhone itself, it would be its own freestanding item, completely separate from the notes which the Government seeks to introduce. This third note contains self-serving inadmissible hearsay when offered by the defendant, in which he touts his purported connections to military personnel, among other things.[7]  The defense does not even attempt to show that this message meets the standard for admission under the rule of completeness, which it does not.  *See generally United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007).  And Calk's belief that the redacted material would help his case is immaterial.  It is a basic principle of law that a defendant's prior statements can be offered against him, but he cannot—for obvious reasons—offer those statements in his own defense.  *See infra*, at 16.

GX 501-3 is a text message sent from Calk's iPhone shortly after his interview at Trump Tower, identifying his interviewers as including "Congressman John E. Sweeney" and stating, "I gave Sweeney your regards."  Although the text does not specify to whom Calk sent this message, GX 330 is an email Calk sent to Sweeney on the same day, thanking Sweeney for the interview and stating, "It is easy to see why Paul Manafort has such great respect and admiration for you."  Because that email "name drops" Sweeney and no one else, the clear inference is that GX 501-3 was sent to Manafort.  That more than suffices for admission.  *See, e.g., United States v. Ortiz-*

---

[6]   Indeed, the Government has produced the notes of the interview taken by one of Mr. Calk's interviewers, *see* GX 52, which make no reference to Manafort.

[7]   The redacted portions, with line breaks removed, read: "Robert Gates 2:45-3:03 on 12-8-16Ryan McCarthy under SecSteve Smith COS[] Legislative Asst (ask Steve)[] If anyone asks[] Will serve as a reference[] Priebus, Flynn, Trump, Mattis [] Dell Dailey, Mark Millie, Jack Sheehan, Randy Rigby[] Keep it lien[] Robert[] Christian & Ryan[] Team is compatible."

*Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987) (discussing low standard for pre-admitting evidence that may become relevant when combined with other evidence).

**E.   The Government's Use of a Standalone Calendar Entry is Improper**

   **1.   Defense Objection:**   The defense objects to the admission of GX 552, which is a calendar invitation for a meeting between Paul Manafort and Jared Kushner on August 4, 2016. As we understand it, there will be no testimony establishing what was discussed at the meeting, or that it even took place as scheduled.  The Government has indicated that it does not intend to call Manafort or Kushner as witnesses, despite having interviewed both of them during its investigation.  It is improper for the Government to invite the jury to speculate as to what happened at this meeting or whether it even occurred.  Without this foundation, the exhibit is inadmissible and has no bearing on venue.

   **2.   Government Response:**   As an initial matter, GX 552 is admissible to establish that venue is proper, because it shows that Manafort had a meeting scheduled with Kushner in Manhattan, on August 4, 2016, which was on the same day that Manafort emailed Calk an offer to join the Trump Campaign's Economic Advisory Council, a matter in which Kushner was also involved (*see* GXs 113-19).  In addition, the Government will establish that Kushner played a role in pushing forward Manafort's recommendation that Calk be interviewed for Secretary of the Army.  (*See, e.g.*, GXs 562, 602).  Thus, this exhibit shows Manafort's personal contact and influence with Kushner during the charged conduct.

**F.   The Defense Objects to the Authenticity of the Government's "600 Series – PTT Documents" as well as the Relevance of Certain Exhibits within this Series**

   **1.   Defense Objection:**   The defense objects to GX 601 through 611.  The defense advised the Government many months ago that it would not stipulate to the authenticity of documents purportedly produced by the Presidential Transition Team.   The defense repeatedly sought clarification from the Government regarding these materials, including by motion filed in November 2019 (*see* Dkt No. 37; *see also* Dkt No. 48), which the Government opposed, (Dkt No. 38).  Absent explanation from a witness with knowledge, the defense cannot determine the authenticity of these documents, nor can it confirm that the production was completed in a manner that was not misleading.  The very limited size of the production and the heavy redactions make the defense concerned that the materials that the Government permitted the producing party to withhold or redact contain potentially exculpatory information.

   Exhibits GX 601-A, GX 602, and GX 608 are almost entirely redacted spreadsheets and a presentation deck.  Neither the defense nor the jury can determine their significance, and the Government should not be permitted to encourage prejudicial speculation.

   The exhibits that are text messages involving Anthony Scaramucci, who is on the Government's witness list, may be authenticated by him if he testifies.  Scaramucci's text messages with Manafort (GX 610 and 611) contain hearsay statements the Government appears to be seeking to offer, in part, for their truth.  To the extent that the Government's wishes to establish these facts, it can do so through Scaramucci's testimony, rather than improperly relying on the hearsay in the text messages.

**2. Government Response:** The Government will call a custodian of records to authenticate these exhibits. Calk's purported desire to ascertain whether the custodian's employer also possesses files that would help Calk has nothing to do with authenticity. It is also not a proper subject of cross-examination. *See United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989) (Federal Rule of Evidence "611(b) provides that 'cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.'"). The custodian for these records will authenticate them—period—and the Court should confine cross-examination into any good faith basis to question the records' authenticity. If Calk believed that the Presidential Transition Team had additional materials helpful to his defense, he should have sought a subpoena for them—as was clear from the Court's order denying his earlier motion on these grounds well over a year ago. (*See* Dkt. 92 at 21-23).

GXs 601-A and 602 speak for themselves. Even viewing the exhibits in isolation, knowing only that they were files from the Presidential Transition Team records (as the custodian will testify), these exhibits show that Calk was a candidate for Secretary of the Army and other positions and had been referred by Manafort. Moreover, the exhibits will be offered after Anthony Scaramucci testifies about Calk's candidacy and Manafort's role in it, a point further made clear by other documents, such as emails and text messages involving Calk, Manafort and Scaramucci.

The Manafort-Scaramucci texts (GXs 610 and 611) are offered to show that Manafort lobbied Scaramucci on Calk's behalf. The operative texts are generally not statements, but rather questions ("Any progress on Stephen Calk?" "Is Steve G[oin]g to be called in to meet[?]") or imperatives ("Steven Calk . . . Undersecretary of Army or Undersecretary of Personnel and Management DOD"), and thus by definition not hearsay. *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement."). The few statements in these texts are not offered for their truth. For example, the significance of Manafort telling Scaramucci that Calk would accept appointment to Undersecretary of the Army is not to show that Calk would take the job—Calk's own emails requesting the position indisputably prove that. (*See, e.g.*, GX 266). Rather, their significance is again in showing Manafort's actions seeking to get Calk a government position.[8]

## G. The Defense Objects to the Authenticity of the Government's "650 Series – DJTFP Documents"

**1. Defense Objection:** As with the Government's 600 Series documents, here too, the defense advised the Government many months ago that it would not stipulate to the authenticity of documents purportedly produced by the Trump campaign. Again, absent explanation from a witness with knowledge, the defense cannot determine the authenticity of these documents or that they can be relied on to be what they purport to be.

**2. Government Response:** The Government will call a custodian to authenticate these exhibits. As above, Calk should not be permitted to use a dubious claim that he questions their

---

[8] In addition, although not offered for that purpose here, Manafort's statements would be admissible for their truth as the statement of a co-conspirator. *See infra* at 11-12.

authenticity as a springboard into cross-examination beyond the scope of direct, or an attempt to re-litigate the Court's prior denial of his motion on this subject.

### H. The Defense Objects to the Pre-Admission of all Phone Records Without a Showing of Relevance Regarding the Calls the Government Intends to Use

**1. Defense Objection:** The defense objects to the Government's "900 Series – Phone Records." The exhibits comprise tens of thousands of pages of phone records. The bulk of these exhibits are irrelevant and would not be meaningfully accessible to the jury at trial. The defense does not object to the authenticity of these records and understands that some of them contain relevant information. However, the defense is preserving a relevance objection, as it does not know at this stage which of the many phone calls reflected in these records the Government plans to introduce or the purpose for which it plans to introduce them. Once these matters become clear at trial, the defense may withdraw its objection to some or all of the records. As the Government has not provided to the defense the summary chart referenced below, it has no basis to determine whether the particular calls it seeks to summarize are relevant.

**2. Government Response:** The Government will prepare a chart summarizing the relevant portion of these records—such as the calls between Calk and Manafort during the charged conduct—as is routinely done under Federal Rule of Evidence 1006. That Rule, however, also requires that the underlying records be placed into evidence. *See United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010). The entirety of the records are relevant, because they are the basis on which the accuracy of the summary chart can be confirmed. *See id.* For example, to know that Manafort and Calk exchanged X number of calls—and only X number of calls— between two dates requires reviewing all the records between those dates. If, however, the defense identifies some specific part of the records that it believes should not be admitted, the Government will discuss redacting those records, or entering the summary chart by stipulation in order to avoid the need for the underlying records.

### I. The Government's "950 Series – Gates Documents" Contain Hearsay and are Irrelevant and Prejudicial

**1. Defense Objection:** The defense objects to GX 953 through 959, which are email chains involving Rick Gates and sometimes including Manafort, neither of whom will testify at trial, despite having been interviewed by the Government (indeed, Gates has a cooperation agreement with the Government and has previously testified on its behalf). The emails contain a variety of statements on many topics, all of which would be hearsay if offered for the truth. In addition, in many instances, the emails are not self-explanatory and therefore the jury would only be speculating about their meaning and significance. They involve the inner workings of a presidential campaign, which is not within the ken of the average juror, and the Government is conspicuously avoiding calling any witness who could explain what is going on and whether it is at all unusual or otherwise worthy of the juror's time and attention.

**2. Government Response:** These emails reflect Manafort, Gates, and other Manafort associates responding to Calk's requests for various favors, specifically attendance at various Trump campaign events (GX 953, 954, 955, 956), consideration for Secretary of the Army (GX 957, 958), and appointment to the campaign's Economic Advisory Council (GX 959). The

importance of the statements they contain is thus not for their truth, but rather for showing the efforts of Manafort and his team to please Calk, thereby keeping up Manafort's end of the quid pro quo. For example, in GX 956, Calk complains to Manafort that he was not invited to a Trump media "spin room," Manafort emails Gates "Can you fix this? It is important," then Gates emails Manafort an explanation for the lack of invitation. The import of these statements is obviously not for their truth—no one is attempting to prove that Calk's presence in a spin room was "important," or why he did not get invited—and their probative value in showing Manafort's actions and state of mind in doing political favors for Calk is equally clear. Nor does it take any specialized knowledge to read these messages and understand that Manafort is helping Calk with a political matter.

The argument that these emails are not "self-explanatory" is frivolous. There is no requirement that each piece of evidence explain itself—as the Circuit often notes, "[g]uilt beyond a reasonable doubt may be established entirely by circumstantial evidence, and this evidence must not be reviewed piecemeal, but rather as a whole." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (citation omitted). Because witnesses and other emails will explain the identity of the emails' authors, the relationship between Calk and Manafort, and the events surrounding these emails, their meaning—and direct bearing on the defendant's guilt—will be abundantly clear.

### J. The Government is Improperly Seeking To Introduce Hearsay through Public News Articles with No Foundation that Any Witness or Mr. Calk Read Them

**1. Defense Objection:** The defense objects to GX 1001, 1002, 1002-A, 1003, 1005, 1007, 1008, and 1013, which are assorted newspaper articles containing hearsay and inflammatory statements. Absent foundation that would establish a witness read these news articles, they are not relevant. Furthermore, even if relevance could be established, the articles themselves are hearsay and prejudicial. Where a witness's knowledge of or reaction to an article is relevant, the witness can simply testify about the relevant events. We know of no evidence that Mr. Calk read the articles in question. With regard to GX 129, referenced below (and to which the defense has separately objected, *see* Section II.B.1 above), the Government should simply call Horn (who has met with the Government, testified in the grand jury, and is on its witness list) and ask him what he knew or did not know and whether he communicated anything in the article to Mr. Calk. There is no reason to introduce this prejudicial hearsay.

**2. Government Response:** The Government asks the Court to admit only GXs 1005 and 1013, the print and online versions of an article publicizing Manafort's receipt of illicit payments from a Ukrainian political party. This article is directly referenced in GX 129, an email asking Horn, one of the underwriters on the Manafort loans, whether he gave the article to his CEO—meaning Calk. Horn replies that it is "surreal" to be involved with Manafort's loan "as all this is coming out" but, "We are charging ahead!" That one of Calk's underwriters knew the grave reputational and repayment risks posed by lending to Manafort while he was embroiled in this scandal, yet the Bank was "charging ahead" with the loans, when combined with other evidence, further proves that the defendant's unusual influence was necessary to the extension of these loans. Calk's claim that this evidence must instead come through testimony has no foundation in the Rules of Evidence, and this Court has already explained the probative value of contemporaneous

statements as opposed to those made after the fact.  *See United States v. Calk*, 2020 WL 3577903, at *6 (S.D.N.Y. July 1, 2020).

**K.  The Government's "1150 Series – Yohai Documents" Contain Hearsay and the Government Cannot Establish that the Coconspirator Exception Applies**

**1.  Defense Objection:**  The defense objects to GX 1151 and 1152, which are emails containing out of court statements from Paul Manafort and are not admissible for their truth.  The Government has not established that either GX 1151 or GX 1152 would be admissible as a co-conspirator statement.  To qualify as a co-conspirator statement it would be the Government's burden to establish the existence of a conspiracy between Manafort and Mr. Calk, that the statement was made during the course of that conspiracy, and that the statement was made in furtherance of the conspiracy.  *See United States v. Coplan*, 703 F.3d 46, 82 (2d Cir. 2012).  The Government has not met its burden and has, in fact, stipulated that Manafort was part of a different conspiracy.  In the Government's prosecution of Manafort, the Government and Manafort specifically agreed that Manafort was part of a conspiracy with others to defraud Mr. Calk and his bank.  *See* Statement of the Offenses and Other Acts, *United States v. Paul J. Manafort*, No. 17-Cr-201 (ABJ) (D.D.C. Sept. 14, 2018), ECF No. 423 at 22-23.

Contrary to what the Government claims below, no part of these emails constitute admissions by Mr. Calk such that they are admissible under Rule 801(d)(2)(A).  An out-of-court statement by Manafort purporting to report what Mr. Calk said is hearsay, unless Manafort's email itself is subject to an exception, which it is not.  Moreover, we note that if the Government is permitted to introduce Manafort's statements under the co-conspirator exception, the defense would be permitted to impeach Manafort's credibility "by any evidence that would be admissible for those purposes if the declarant had testified as a witness."  *See* Fed. R. Evid. 806.  As the Government well knows, had Manafort testified in person, at this trial or at his own trial, the cross examination regarding his credibility could go for days without even scratching the surface of Manafort's lies and deceptions.  On top of the information previously produced, days ago on May 27, 2021, the defense received new information about Manafort that the Government only recently declassified and which the defense has not even had an opportunity to understand and develop.  These considerations weigh heavily in favor of precluding these emails pursuant to Rule 403.

**2.  Government Response:**  GX 1152 is an email Manafort sent the morning after the 2016 presidential election, that provides direct and important evidence of the charged crimes.  In the email, Manafort forwarded Calk's statements to Bruce Baldinger, Manafort's lawyer on the loan, and Jeffrey Yohai, Manafort's son-in-law, who would benefit from the loan along with Manafort.  In substance, Calk congratulated Manafort on Trump's victory, told Manafort his loan would soon be approved, and indicated his willingness to serve Trump.  The defendant's own words—meaning all of GX 1152 except the subject line and "Got this from Steve last night"—are admissible against Calk under Federal Rule of Evidence 801(d)(2)(A).

Manafort's statement that Calk sent the remainder of GX 1152 "last night" is admissible as the statement of a co-conspirator during and in furtherance of the conspiracy under Rule 801(d)(2)(E).  In short, the Government expects that the evidence will show Manafort conspired with Calk to exchange Calk's influence on the Bank's lending for Manafort's influence on Calk's political prospects, as charged in Count Two.  This statement furthered that conspiracy, because,

among other reasons, Manafort directed it to fellow participants in seeking the loans, in order to advance the endeavor.  For example, less than six hours after this email, Baldinger told a Bank employee that he understood that Manafort and "Steve" had spoken, and that based on those communications the loan would close shortly.  *See United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (statements "communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals" further the conspiracy and are admissible under Rule 801(d)(2)(E)).

The defendant's argument that the Government has not yet proved the charged conspiracy is irrelevant.  That will be done at trial, which is why the Circuit has made clear that "statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.  *United States* v. *Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States* v. *Geaney*, 417 F.2d 116, 1120 (2d Cir. 1969)).  That Manafort also conspired to defraud the Bank is equally irrelevant, because a declarant can of course participate in multiple conspiracies.  *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 247 (2d Cir. 2012) (declarant participated in two conspiracies, one of which served as basis for admission under Rule 801(d)(2)(E)).  Moreover, the defense claim that Manafort conspired "with others to defraud Mr. Calk and his bank" is misleading at best.  The cited document states that Manafort conspired to defraud the Bank—not Calk.  *United States v. Manafort*, No. 17-Cr-201 (ABJ) (D.D.C. Sept. 14, 2018), ECF No. 423 at 22-23.  That makes sense, given that the same Special Counsel's Office cases that Calk relies on here maintained that Calk was a party to the conspiracy to defraud the Bank.  *See infra* at 22 n.14.

Calk has identified no legal mechanism under which his right to impeach Manafort's statements under Rule 806 becomes a right to exclude those statements under Rule 403.  That failure is especially notable given that he has stonewalled the Government's offer to stipulate on this matter—made over five weeks ago—and provided the Court no explanation why voluminous impeachment would be justified for a statement which Manafort had no plausible motive to fabricate.

**L.  Mr. Calk's Military Service Records**

**1.  Defense Objection:**  The defense objects to GX 1102, which consists of records of Mr. Calk's military service.  The Government has indicated that it intends to use the records as the basis for an argument that Mr. Calk lied about his military service when applying for a position in the Trump administration.  Even if this claim were true, which it is not, the evidence should be precluded under Rules 404(b) and 403.

Mr. Calk's military records show that he attended a military prep school (GX 1102 at 34), enrolled in ROTC in college (*id*. at 39), was commissioned in the Army Reserves in 1985 (*id.* at 18), attended flight school as a helicopter pilot (*id.* at 2-3, 22), and had various postings as an Army Reserve officer until 1990, (*id.* at 39).  At that time, Mr. Calk was transferred to the Individual Ready Reserve ("IRR") and remained in that status until his honorable discharge as a Captain in 2001.  (*Id*. at 39, 42).  According to the website for the U.S. Army Reserve, members of the IRR "are trained soldiers who may be called upon, if needed, to replace soldiers in active duty and Army Reserve units."  (*See* <u>Individual Ready Reserve</u>, U.S. Army Reserve, https://www.usar.army.mil/IRR/).  IRR soldiers "must also attend muster duty when ordered" and

"may also be involuntarily mobilized in time of national crisis, as seen in support of the Global War on Terror." (*Id*.) Although the Government has not provided the formal notice required by Rule 404(b), it has indicated that it intends to argue that Mr. Calk lied by claiming to have been an Army Reserve officer for over 15 years. According to the Government, Mr. Calk should not have included his time on IRR status as part of his military service.

Any evidence that Mr. Calk lied about his military service is highly inflammatory and its principal impact would be to attack Mr. Calk's character in the manner prohibited by Rule 404(a). The Government has indicated that it will argue that the alleged lie is admissible under Rule 404(b) because it is probative of Mr. Calk's intent with respect to the bribes alleged in the indictment. But evidence that Mr. Calk misstated his military record does not tend to prove that Mr. Calk thought Manafort's assistance would secure him a position in the administration or that Mr. Calk would corruptly provide bank loans in exchange for that assistance. Nor can the Government plausibly argue that Mr. Calk believed that he lacked sufficient qualifications to apply for a position as Undersecretary of the Army, since there is no evidence that any particular qualifications were required – much less that serving 16 years in the active reserves, rather than six years in the active reserves and ten years in the IRR, would have had any bearing on his application. On the contrary, if the Government were to go down this road, the defense would be entitled to prove that President Trump deliberately filled numerous positions in his administration with appointees who lacked any obvious qualifications other than supporting Trump. In short, even if the Government could establish that Mr. Calk deliberately lied about his qualifications, the chain of inferences required to connect that fact to existence of a *quid pro quo* with Manafort is long and tenuous, such that the probative value of the evidence is far outweighed by its unfair prejudice and the risk of juror confusion about the real issues in the case.

The foregoing analysis assumes that the Government could prove that, in fact, Mr. Calk intentionally lied about his record. Here again, the Government's argument is baseless. The military records themselves show that Mr. Calk was commissioned as a Reserve Officer in 1985 and honorably discharged in 2001. Those dates are consistent with Mr. Calk's resume and his claim to have served over 15 years in the Reserves. Thus, even if the records themselves were admitted into evidence, there would be no basis for the jury to conclude that Mr. Calk engaged in deliberate deception. To cure this defect in its theory, the Government has advised that it will call a military paralegal as a witness to express an opinion that, in substance, Mr. Calk was wrong to include his time in the IRR as part of his military service. The Government has not provided expert notice with respect to this witness's qualifications or opinions and the deadline for doing so was more than a year ago. Moreover, it is unclear what expertise, if any, this person could have with respect to the proper way for a bank CEO applying for a position in the Trump administration in 2017 to describe military service from which he was discharged sixteen years earlier. We respectfully submit that the highly dubious nature of such testimony, combined with the absence of proper notice, the meager probative value and high likelihood of unfair prejudice, should preclude it from this case.

**2. Government Response:** In promoting himself for Secretary of the Army through Manafort, Calk claimed that he "served in both active and reserve status as a combat tactical helicopter pilot for over 16 years" and had "16 years of active and reserve military experience." (GXs 254, 551). In fact, Calk's records show that he served for eight months in 1983 and as a reservist from 1985 to 1990. (GX 1101). After 1990, Calk had no job in the military, performed

no military duties, and accumulated no military experience. (*Id.*). The records also show that he never served in combat. (*Id.*).

Calk's gross exaggeration of his military experience in campaigning for Secretary of the Army goes directly to his state of mind: That Calk knew his actual credentials would not suffice helps show why he would need to corruptly secure Manafort's backing. As this Court has explained, although the quality of loans in this case is not material, Calk's belief about their quality is relevant, because it bears on why he approved them (1/26/2012 Tr. at 3). If Calk's underwriters warned him that the loans were terribly flawed—as the evidence will show—that suggests Calk had a corrupt motive in lending to Manafort anyway. Support in seeking senior defense positions was the other half of the quid pro quo. Thus, Calk's belief that his actual qualifications were lacking when he made his deal with Manafort, as demonstrated by Calk's lies about his own qualifications, goes directly to the charges on the same logic.

In a bid to keep out this obviously probative evidence, Calk makes several claims:

*First*, Calk says that "The government has indicated that it will argue that the alleged lie is admissible under Rule 404(b)." That is simply false. The Government never said any such thing. Which makes sense, because this is obviously not 404(b) evidence, given that Calk made the exaggerations to and through Manafort, as part of the charged conduct. *See United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (uncharged bad acts that are "part of the very act charged, or, at least, proof of that act" not subject to Rule 404(b)).

*Second*, Calk portrays whether he "served" for 16 years, gaining that amount of "military experience," as debatable. To start, that is a factual question for the jury, not a question of admissibility the Court must resolve. And there is nothing ambiguous about Calk's misstatements: For 10 of the 16 years he claims, he did quite literally nothing in the military. A juror can readily conclude that no one would mistakenly call that "service" or "experience" given the common understanding of those words. *See, e.g.*, https://www.merriam-webster.com/dictionary (defining "service" as "the occupation or function of serving" and "experience" as "direct observation of or participation in events as a basis of knowledge").

*Third*, Calk claims that the Government will call a witness to "express an opinion" about Calk's characterization of his service. That is again simply false—the Government directly informed defense counsel it would elicit no such opinion from this witness, nor ask him about Calk's statements. The witness, a paralegal who helps maintain the Army's personnel records, will merely explain the words and phrases in the records, which contain many abbreviations and military terms, just as a phone company custodian can explain the terminology in phone records from personal knowledge, without being qualified as an expert.[9]

*Finally*, Calk argues that this evidence requires a broader debate about the qualifications of Trump administration officials. This trial no more requires a debate about the qualifications of

---

[9]   To answer Calk's argument that he might have honestly mistaken his ten years in IRR status performing no service for service, the Government has also indicated that it may ask the witness, who has 38 years of actual service with the Army as a soldier and a civilian, whether he had ever heard any soldier refer to IRR status as service. That too is plainly a question based on personal knowledge—not expertise—and even if it were otherwise, the proper remedy would be to object to the question, not the exhibit.

other officials than a debate about the qualifications of other Bank borrowers. Calk's misrepresentation of his military experience while carrying out a corrupt bargain to become a senior military official goes to his state of mind, regardless of anyone else's qualifications. Because it is so strongly probative of the charged conduct, it should be admitted. *See, e.g.*, *United States v. Eisner*, 59 F. App'x 379, 382 (2d Cir. 2003) (evidence of defendant's lies in deposition properly admitted over defense objection that it demonstrated propensity to lie, because it bore upon the charged conduct and "if this was prejudice . . . it was not unfair").

## III.   Government Objections to Defense Exhibits.

### A. Bank Documents Showing Undisputed and Routine Matters

**1. Government Argument:** Calk seeks to offer 48 exhibits reflecting Bank employees performing routine actions, such as requesting appraisals, holding meetings, and processing paperwork concerning the Manafort loans.[10] These exhibits appear geared to show that the Bank followed its normal course of business during many aspects of considering these loans. That is not a proper purpose, because "evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." *United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003). That Calk took certain routine actions with respect to the loans—such as discussing them with the Bank's credit committee or directing paperwork to be completed—has no bearing on whether he also committed the charged crimes. *See United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."). Evidence of non-criminal acts by the defendant's employees—such as an underwriter requesting an appraisal—has even less conceivable relevance to the defendant's conduct, and serves only to confuse matters. *See, e.g.*, *United States v. Chambers*, 800 F. App'x 43, 45 (2d Cir. 2020) (affirming district court's exclusion of evidence of lawful conduct by defendant's employee, offered to show defendant's "legitimate law practice").

Below, Calk assures the Court that he is not offering these emails for the truth of what they assert "or any other improper purpose," and that they are "important." That does not suffice to admit an exhibit. Calk must identify the specific non-hearsay purpose for which he offers an exhibit, so that the Court can determine whether it is relevant and whether "the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994). As the party offering the exhibits, Calk bears the burden to make that showing. *See, e.g.*, *United States* v. *Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). Because the defendant has declined to identify the non-hearsay purpose of any particular exhibit, he has deprived the Court of the ability to rule on their admissibility. The Court should thus not pre-admit these emails, but rather wait until the defendant proffers a relevant non-hearsay purpose, then meets his burden to show that the purpose outweighs any Rule 403 concerns.

Calk also claims that abstaining from similar objections to the Bank emails offered by the Government proves him reasonable. This argument may appear superficially appealing, but it is

---

[10]   These exhibits are DX 10-18, DX 102, 103, 111-19, 126, 128, 129, 132, 134-37, 139, 153, 165, 171, 174, 176-78, 182, 188-90, 196-97, 201, 202, 213, 216, 221, 243, 244.

in fact deeply misleading.  Calk has no colorable objection to the Government exhibits, because the statements of his employees and agents are admissible for their truth when offered against him under Rule 801(d)(2)(D).  *See supra* at 1-5.  It is thus perfectly normal for the Government to use statements admitted under Rule 801, and so declining to object to that neither renders a defendant particularly reasonable nor gives him an equivalent ability to offer the same evidence.  *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) ("[W]hile the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own.").

    **2.  Defense Response:**  The exhibits at issue here (other than DX 10-18, which we address separately below) are internal Bank emails that show the consideration, review and approval of the Manafort loans.  They relate to the facts that are at the core of this case and which appear to be in dispute, based on the indictment, the 3500 material and the Government's exhibits.  Just as the Government has marked as exhibits approximately 250 Bank emails (to which the defense has mostly not objected) that it presumably believes provide evidence of its version of events, the defense has marked emails that show the defense's version.  The defense is not offering any of the emails for the truth of the matter asserted therein or for any other improper purpose, and the Government has not identified any undue prejudice it would suffer as a result of these exhibits.  Contrary to what the Government claims, none of the defense's exhibits are being offered merely to show that the Bank followed "normal" procedures, as the Government postulates.  Whether the Government realizes it or not, each of the exhibits is important to contradicting the version of events that the defense anticipates the Government will present at trial.  Depending on the Government's case and the testimony of its witnesses, the defense may not seek to publish every one.  But the defense understands the Court's goal in pre-admitting exhibits and addressing objections in advance is to streamline trial and avoid delay where possible.  The defense has tried to be judicious with regard to its own objections and has not objected where there is no discernable prejudice from the Government's exhibits, even where the purpose of the exhibit may become clearer at trial based on witness testimony.  The defense exhibits in this category are entirely unobjectionable and should be admitted in advance of trial per the Court's practice.

    The cases cited by the Government are obviously inapposite because they address arguments that the defense is not making about the relevance of conduct that is concededly unrelated to the charged crime.  *Boykoff* involved a tax preparer's request for discovery of IRS internal files concerning tax returns not at issue in the case.  67 F. App'x at 20-21.  *Williams* involved a drug smuggler who sought to show that not all his trips to Jamaica involved drug smuggling.  205 F.3d at 34.  *Chambers* involved an undercover agent's meeting with the defendant's wife at which the wife acted innocently.  800 F. App'x at 45.  These cases could only be of any relevance if the defense here was making an argument that the absence of corrupt conduct in *other* loans would provide a basis to infer an absence of corruption in the Manafort loans.  We are not making that argument.  The exhibits here are all part of the core factual narrative with respect to the Manafort loans themselves.

    DX 10-18, which the Government has included in this category, are regular reports of the Bank's credit committee.  They show how the Manafort loans were tracked and reviewed within the Bank.  The evidence rebuts arguments that the Government appears ready to make that the Manafort loans were kept hidden.  Just as the Government would argue that secrecy is consistent

with corrupt conduct, the defense may argue that openness and oversight are inconsistent with corrupt intent.  We also note that the reports are business records (which could be established by stipulation or testimony) and that the information they contain about the Bank's lending activity is admissible for its truth pursuant to Fed. R. Evid. 803(6).  Although we do not yet know what arguments the Government will seek to make at trial, the defense believes that the information in these reports would rebut assertions the Government may make at trial about the Manafort loans and about the Bank's lending practices more generally.

### B.  Out-of-Court Statements Concerning Dennis Raico

**1.  Government Argument:**  The Government objects to 14 emails containing out-of-court statements by or about Dennis Raico, who served as the Bank's loan officer on the Manafort loans and is expected to testify during the Government's case.  (*See* DXs 130, 143, 144, 150, 163, 168, 170, 175, 194, 195, 198, 205, 206, 209, 212).  The material portions of these exhibits generally contain one or more levels of hearsay not subject to an exception when offered by the defendant.  (*E.g.*, DX 130 ("We need major help with the appraisal!"); DX 143 ("According to both, if we receive approval, this could possibly close this week.")).

The defendant has disclaimed offering these exhibits for their truth, and acknowledges that he cannot at this time offer them as prior inconsistent statements under Rule 613(b).[11]  Instead, the defendant again punts, claiming only that these emails "may" explain Raico's future conduct in some unspecified way.  As above, unless Calk is willing to proffer something sufficiently concrete for the Court to apply Rules 402 and 403 now, he cannot reasonably ask the Court to pre-admit his exhibits.

**2.  Defense Response:**  As we have said many times to the Government, the defense is not offering Raico's emails, or any other emails, for an improper hearsay purpose.  What Raico said or was told in the course of the Bank's review and processing of the Manafort loans, is not being offered for the truth (if any) of the statement in question.  Rather, these emails are being offered for the standard non-hearsay reasons that emails are offered in evidence:  for the fact that someone wrote it or the fact that someone received it – that is, for the fact that it was said.  *See Clinton v. Brown & Williamson Holdings, Inc.*, 652 F. Supp. 2d 528, 535 n.6 (S.D.N.Y. 2009) ("The statements thus have evidentiary significance not because of the truth of the matters asserted therein, but from the mere fact that they were said.").  Like many Government exhibits to which the defense has not objected, some of these emails may contain incidental hearsay statements.  If that is the Government's objection, the defense would be amenable to a limiting instruction.

---

[11]  To the extent the defense believes these exhibits reveal inconsistencies that render them admissible under Rule 613(b), it has not identified those inconsistencies to the Government.  And to be clear, it must do so in advance of seeking to offer them.  Before any of these exhibits could be admitted, Rule 613 requires that statement be shown to the Government, that the Court rule on whether an inconsistency in fact exists, that the witness be offered an opportunity to explain or deny the statement, and that the Government be allowed to question Raico about it.  *See generally United States v. Trzaska*, 111 F.3d 1019, 1024–25 (2d Cir. 1997); *United States v. Ghailani*, 761 F. Supp. 2d 114, 118 (S.D.N.Y. 2011).  Thus, especially in order to avoid the need for sidebars, the time to litigate any alleged inconsistencies that these exhibits demonstrate is now.

Moreover, we expect that Raico and others will testify about the facts in dispute so that any such incidental hearsay would be immaterial.

The relevance of emails for a non-hearsay purpose is, of course, distinct from the admissibility of prior inconsistent statements under Fed. R. Evid. 613(b), which is based on inconsistencies between the witness's trial testimony and a prior statement and permits the introduction of the prior statement to prove the inconsistency. Since no witnesses have testified yet, it is not possible to apply Rule 613 at this time. But the admissibility of documents that are themselves evidence of relevant events or communications does not depend on whether a party calls a witness who would testify in a manner inconsistent with what the evidence shows. Thus, what Raico was told about an appraisal or other aspects of the underwriting process may explain his subsequent conduct. *See, e.g.*, DX 130 ("We need major help with the appraisal.")). Similarly, emails from Raico to Mr. Calk are admissible to show what Mr. Calk was told and when. *See, e.g.*, DX 143 ("Steve, Just keeping you updated….").

### C.  Out-of-Court Statements Offered to Show Alternative Support for Calk

**1.  Government Argument:**  Sixteen defense exhibits, and their attachments, consist of messages between Calk and people who may have appeared able to influence his appointment to Secretary of the Army, or another position in the Trump Administration. *See* DXs 222-227, 229-238. The Government understands that these exhibits are offered to show that Calk believed he had backers other than Manafort, and thus had less motive to corruptly secure Manafort's support. These exhibits should be excluded for multiple reasons:

*First*, the timing of these exhibits deprives them of relevance. The earliest of these exhibits are dated November 26, 2016—ten days after the Bank closed the first loan to Manafort and twelve days after Calk sent his first wish list of administration positions to Manafort, not to mention months after Manafort secured Calk's appointment to the Trump campaign's economic advisory council and Calk "recommended" conditional approval of a loan to Manafort. That Calk began receiving messages of support *after* he purchased Manafort's backing offers no relevant evidence on his motive to purchase it. Put another way, this evidence cannot bear on Calk's intent in engaging in the charged conduct, because he learned of this evidence *after* deciding to engage in that conduct. *See, e.g.*, *Holloway v. United States*, 526 U.S. 1, 12, (1999) (statute's intent requirement is satisfied at moment defendant commits charged crime); *Lewis v. City of Albany Police Dep't*, 332 Fed. App'x. 641, 643 (2d Cir. 2009) ("Allegations concerning after-the-fact events are immaterial to . . . state of mind." (citation omitted)).[12]

*Second*, several of these exhibits appear to offer the defendant's own out-of-court statements for their truth. Specifically:

---

[12]   To the extent these exhibits predate further corrupt acts that Calk would go on to take, they remain irrelevant, because Calk had already begun the charged conduct and thus already formed the relevant intent. *See, e.g.*, *United States* v. *Polytarides*, 584 F.2d 1350, 1352 (4th Cir. 1978) (legal advice received after defendant "had already manifested his intent" to commit crime was irrelevant).

- DX 223: the defendant emails former Secretary of Defense Robert Gates and claims several connections to Gates.
- DX 224: the defendant claims that he has been told that he will shortly receive a meeting with the President-elect.
- DX 226: the defendant touts his qualifications to a potential supporter.
- DX 231: the defendant claims he is about to conduct a call with a potential supporter.
- DX 232: the defendant emails Steve Bannon, claiming connections to many influential figures in the defense community and forwarding his supposed qualifications.
- DX 237: the defendant claims "I spoke to [former Secretary of Defense] Robert Gates today at length" and makes further statements to the effect that Gates supports him.

"When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). And—again—the defendant cannot circumvent this rule simply by claiming a non-hearsay purpose. *See, e.g.*, *United States v. Gupta*, 747 F. 3d 111, 139 (2d Cir. 2013) (defendant's statements, offered for purported non-hearsay purpose, properly excluded). Calk's out-of-court statements that he had contact with or endorsements from various senior officials—often unsubstantiated by any proof this actually occurred—plainly fail the Rule 403 test: "The mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." *United States v. Grecco*, 728 F. App'x 32, 35 (2d Cir. 2018) (quoting *Reyes*, 18 F.3d at 70). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

*Third*, the remaining content consists materially of out-of-court statements by other parties, subject to the prohibition on hearsay. For example, DX 236 features an email exchange between Calk and retired Admiral Kevin Sweeney, then the chief of staff for Secretary of Defense Mattis, in early February 2017. In that exchange Admiral Sweeney tells Calk he is "on our short list of candidates for Sec Army." The defense offers this statement not for its truth, but rather for the purported effect on Calk. But that does not show that "the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *Reyes*, 18 F.3d at 70. The danger that the jury would accept Admiral Sweeney's statement for its truth—in effect, as an assertion that Calk was a strong candidate for Secretary of the Army—far outweighs whatever probative value might possibly arise from the statement's effect on Calk's mind. That is especially so given that the statement was made weeks after the final Manafort loan was extended, meaning the charged quid pro quo was complete and Calk's state of mind on that date was entirely irrelevant.[13]

---

[13]   Were these defense exhibits admitted, the Government would introduce exhibits and witnesses from this period showing that influential parties made statements to Calk that would have led him to believe he was not viewed as qualified to be Secretary of the Army. For example, the Government understands that Admiral Sweeney would testify that Calk was viewed as a "nuisance" and a self-promoter who was on the "short list" solely because the administration had

**2.  Defense Response:**  As with its other objections, the Government seeks to exclude evidence that bears directly on the core issue in this case and to prevent the defense from apprising the jury of evidence that contradicts the Government's theory of guilt.  These emails show Mr. Calk networking with numerous contacts in military and political circles – some of them very senior, including General Mattis (at the time Trump's nominee for Defense Secretary) and Steve Bannon – with the purpose of obtaining an appointment to serve in the Trump administration.  The fact that Mr. Calk was reaching out to, and receiving encouraging responses from, these contacts provides critical evidence of his state of mind, a non-hearsay purpose.  It corroborates that Mr. Calk did not place great value on the "assistance" offered by Manafort (who had been fired by Trump in August 2016), and certainly not enough value to permit that offer of assistance to influence his decision on whether to approve, with the two other members of the Bank's loan committee, $16 million in loans to Manafort.  The exhibits place Manafort's purported assistance in context and show that Mr. Calk was having the same kinds of interactions with many other members of the Trump administration and transition team at the same time he was speaking with Manafort.  Moreover, the fact that Mr. Calk was receiving assistance from other people without providing them with any compensation is relevant to whether the assistance received from Manafort had a value of at least $1,000, which is now an element that the Government is required to prove beyond a reasonable doubt.

The Government is incorrect that the timing of these emails "deprives them of relevance."  All but three were sent in November or December 2016, i.e., the same period that the Government alleges Mr. Calk was in touch with Manafort for purposes of obtaining a presidential appointment (*see, e.g.*, Superseding Indictment ¶ 23.j (citing November 19, 2016 Calk email to Manafort); ¶ 24.d (citing December 5, 2016 Calk email to Manafort)).  The second Manafort loan did not close until January 2017, and the indictment alleges that Mr. Calk approved that loan, as well as the first, in exchange for Manafort's assistance during the November 2016-January 2017 time period.  (S1 Ind. ¶¶ 24-25).  Accordingly, documents tending to show that Manafort was just one of many contacts Mr. Calk reached out to during this period of time are directly relevant to Mr. Calk's state of mind and the value of the assistance offered by Manafort.

The three emails that post-date this period are from early February 2017.  These emails (DX 235, 236, and 238) reflect messages Mr. Calk exchanged with Defense Secretary Mattis' staff about interviewing for the position of Secretary of the Army.  These emails are simply a continuation of the outreach to Secretary Mattis reflected in emails beginning on December 1, 2016 (DX 222), when Ret. Lieutenant General Dell Dailey, who knew Mr. Calk, reached out to recommend Mr. Calk to Mattis.  As is reflected in DX 224, on December 11, 2016, Secretary Mattis left a voicemail for Mr. Calk confirming that he had received the recommendation and would consider Mr. Calk for a position.  The emails in early February 2017 show that Mr. Calk was contacted by Mattis' chief of staff and advised that he was on Mattis' shortlist for Secretary of the Army.  The emails thus complete the narrative of the outreach to Mattis in December and

---

very few candidates, and that the totality of his interactions with Calk would not have led Calk to believe that he was a serious contender.  Avoiding such a "mini-trial" on Calk's beliefs about alternative supporters *after* the charged quid pro quo is another reason to exclude these exhibits. *See* Fed. R. Evid. 403.

corroborate that Mr. Calk believed that, quite apart from Manafort's "assistance," he was well-positioned to serve in the Trump administration. Notably, the Government itself intends to argue that statements that Mr. Calk made to the OCC as late as July 2018 are probative of his intent 18 months earlier. (*See* S1 Ind. ¶ 29). Under the Government's theory of relevance, this evidence should similarly be precluded – a ruling we are sure the Government would resist.

The Government also points to certain statements in these exhibits that it considers hearsay. As noted, the defense is not offering these exhibits to establish the truth of what is asserted in them. We are offering them to show that Mr. Calk in fact was in close and continuous touch with these contacts during the same period he spoke with Manafort, and that, in his mind, he had a path to appointment without help from Manafort. We have no objection to the jury being instructed to consider these exhibits only for this purpose, as the parties have agreed with regard to many other exhibits. *See United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) ("[A]ny impermissible effect [of the admission of an out-of-court statement] was addressed by the district court's appropriate limiting instruction, which directed the jury to consider the complaints only for purposes of assessing Moseley's state of mind.").

### D. Fraud by Manafort Not Known to the Bank

**1. Government Argument:** DX 121-A to DX 121-F, which are various documents Manafort and his agents sent to the Bank, contain misrepresentations about Manafort's creditworthiness, some of which were not uncovered until well after the loans were extended. To the extent Calk offers these exhibits merely to show what data the Bank had on hand when considering the loans, the Government has no objection. But to the extent Calk offers these documents as evidence of deceptions which were unknown to the Bank when it issued the loans, they are irrelevant and thus inadmissible. The Government made this point in its motions *in limine*. (*See* Dkt. 125 at 41-42). The defendant's response argued that Manafort's deceptions would be relevant to Calk's state of mind (*see* Dkt. 130 at 25-26), an argument that could apply only to those deceptions known to Calk during the relevant time. Calk now claims, erroneously, that he can offer evidence or argument about fraud that remained hidden throughout the charged conduct.

With respect to Count One—the substantive bank bribery count—any deceptions that Manafort successfully concealed during the charged conduct lack relevance, because it is only the defendant's state of mind that matters in that count. (*See* Dkt. 186 at 42). With respect to Count Two—the conspiracy count—Manafort's intent to conspire with Calk is also relevant. (*Id.* 48-49). But that Manafort lied about his credit has no bearing on whether he also conspired with Calk to commit bank bribery, because trying to make himself appealing to Calk's underwriters is entirely consistent with bribing Calk to influence the loans:

> As suggested by the age-old maxim "no honor among thieves," coconspirators may reach some basic agreements among themselves but also engage in self-interested lying to each other on other points. It is commonplace, for example, for coconspirators to agree in principle to equally share proceeds of their illegal acts and yet, in practice, to try to cheat each other out of parts of the proceeds; but they are still guilty of having conspired to commit the illegal acts.

*United States v. Gohari*, 227 F. Supp. 3d 313, 316 (S.D.N.Y. 2017).[14]  Because this evidence does not bear on the existence of the conspiracy, it would instead be received for the improper purpose of suggesting the defendant was a victim of the wily Manafort, and thus deserves the jury's sympathy.  This evidence—which, again, solely concerns facts unknown to the defendant during the charged conduct—should thus be excluded under Rules 402 and 403.

Calk also should not be allowed to get this evidence in through the backdoor, by claiming it is needed to impeach Manafort's statements under Rule 806.  Offering the exhibits for that purpose would be cumulative, waste time, and confuse the issues. Fed. R. Evid. 403.  During trial, there will be ample evidence of deceptions by Manafort that *were* known during the relevant period, and the Government has offered to enter a stipulation as to Manafort's penchant for untruthfulness, rendering voluminous extrinsic evidence unnecessary.

**2. Defense Response:**  The Government misconstrues the reasons for which the defense seeks to introduce these exhibits.  The defense does not seek to introduce these exhibits to prove that Manafort defrauded the Bank.  Rather, the defense will simply use these exhibits in questioning Bank witnesses about the kinds of information they collected, analyzed, and relied on in the course of underwriting the loans.  As reflected in DX 121 (the email to which these exhibits were attached), on August 11, 2016, TFSB underwriter Thomas Horn requested and received these documents from Anna Ivakhnik, assistant to Loan Officer Dennis Raico.  They are part of the core narrative of the case, and thus admissible for the same reasons set forth above in Section I.A.2.

While it has no bearing on the admissibility of this exhibit, the defense disputes the Government's argument regarding the relevance of Manafort's fraud on the Bank.  To begin with, what was and was not known to the Bank is yet to be established at trial and we fail to see how the very financial information that was provided to the Bank could be characterized as irrelevant on the grounds that it was "not known to the Bank."  Moreover, that Manafort was actively working to deceive the Bank, which is owned by Mr. Calk (who, under the Government's theory, had the ability to cause the Bank to issue loans notwithstanding Manafort's lack of creditworthiness), tends to make it less probable that Mr. Calk had an agreement with Manafort to push his loans through regardless of Manafort's creditworthiness.  This is true regardless of whether Manafort's deceptions became known to the Bank or to Mr. Calk during the underwriting process.  The Government's position on this point is just a jury argument, not an evidentiary objection, which is clear from the very case the Government cites.  *See Gohari*, 227 F. Supp. 3d at 316 ("The jury could readily have found here that all the conspirators….").

Finally, we note that pursuant to Rule 806, Manafort's deceptions are admissible as impeachment of any hearsay statements by Manafort that the Government intends to offer.  Because those deceptions relate specifically to the Bank and occurred during the time period of the loans, they are particularly relevant to the jury's consideration of truthfulness of the purported co-conspirator statements the Government intends to offer.

---

[14]   In fact, in the prosecution of Manafort for defrauding the Bank with these statements, the Special Counsel's Office identified Calk as conspiring with Manafort to commit this fraud.  *See United States v. Manafort*, Tr. 2039-43 (E.D. Va. Aug. 10, 2018).

### E. Out-of-Court Statements where the Prejudicial Effect of the Hearsay Statement Outweighs the Non-Hearsay Purpose

**1. Government Argument:** In DX 100, Calk emails Bank employees, informing them of his appointment to the Trump campaign's "economic team," and receives adulatory responses from his employees (e.g., "You are truly amazing"). The Government does not object to offering the first paragraph of this exhibit, to show that the defendant informed the Bank of his appointment. The bulk of the remaining 71 pages, however, consists of the defendant's own improper hearsay statements (e.g., "Historically, I have partnered with politicians, both Republican and Democratic, to give them first-hand information that helps them to architect their economic strategy."), hearsay statements of his employees (e.g., "We know you always have the bank[']s best interest at heart."), and comments that, whether offered for their truth or otherwise, lack relevance and confuse the issues (e.g., "Democrats victimize Veterans and use them as trophies").

Contrary to Calk's claims, the contested statements do not prove that he announced his membership in the economic council to the Bank's employees, because that is accomplished by the first, less objectionable paragraph to which the Government consents. Rule 803(3) also cannot save the remainder of Calk's own statements. That rule applies only to statements of future intent, and Calk's statements make claims about his past intent—why he joined the "economic team" *before* sending this email, and other things he "mentioned" or did "[h]istorically." *See United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002); *see generally Shepard v. United States*, 290 U.S. 96, 105-06 (1933) ("There would be an end, or nearly that, to the rule against hearsay if the distinction [between past and future intent] were ignored."). *Second*, even if Rule 803(3) did apply, Calk cannot seriously claim that his self-serving statements ("I am a businessman, not a politician.") pass muster under Rule 403. Nor can he reasonably assert that his employees' claims to love their boss or hate his political opponents bore on his state of mind regarding the charged conduct, because (among many other reasons) there is no evidence that the commenting employees either knew of or were commenting on Calk's role in lending to Manafort.

**2. Defense Response:** The Government discounts the import of the non-hearsay purpose of this exhibit and exaggerates impact of any undue prejudice, the latter of which can be easily addressed by a limiting instruction of the kind the Government frequently seeks for its own exhibits. The indictment alleges that on August 5, 2016, Manafort caused Mr. Calk to be appointed to the Trump campaign's National Economic Advisory Council, and that this appointment came as a part of a plot hatched by the two men a week earlier, when the Bank gave conditional approval for a loan to Manafort. (S1 Ind. ¶¶ 9, 13-16). Shortly thereafter, on August 9, 2016, Mr. Calk sent an email to the Bank's employees advising them of the appointment and that he hoped to both share his expertise with the campaign and bring national exposure to the Bank. This email, which is reflected on the first page of DX-100, is admissible to show that, far from hiding his participation in the Trump campaign, Mr. Calk affirmatively announced it to the Bank's officers and employees. The defense will show at trial that Mr. Calk made no effort either to hide his involvement in the Trump campaign or the loans to Manafort. Just as the Government intends to argue that Mr. Calk sought to conceal his interest in serving in the Trump administration (*see* S1 Ind. ¶ 29) and that this is evidence of a guilty conscience, the defense should be permitted to demonstrate the contrary. The substance of the exhibit is also admissible under Federal Rule of Evidence 803(3), which provides a hearsay exception for a "statement of the declarant's then existing state of mind (such

as motive, intent, or plan)," insofar as Mr. Calk expresses his motives for joining the campaign. Mr. Calk had been appointed to the Council just four days earlier and was about to embark on three months of work for the campaign, appearing on CNN, Fox, MSNBC, and other news networks more than thirty times. The government's argument that this is a "statement of past intent" should thus be rejected, and the cases it cites are inapposite. In *Taubman*, the court simply found no abuse of discretion where the trial court excluded a hearsay statement about a prior meeting that had already concluded. 297 F.3d at 164-65. *Shepard*, the other case cited by the government, involved "declarations of memory," there a victim's claim that her husband, on a prior date, had poisoned her. 290 U.S. at 97-98, 105-106.

We have included in the exhibit several of the responses to Mr. Calk's email to show that the email was in fact received and read by Bank employees. The fact that many of those employees applauded and encouraged Mr. Calk is also relevant to Mr. Calk's state of mind going forward since it supports an inference that Mr. Calk did not believe what he was doing was wrongful, and in fact believed that working for the Trump campaign would benefit the Bank by raising its profile.

<div style="margin-left: 3em;">

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: s/   Hagan Scotten
    Paul M. Monteleoni
    Hagan Scotten
    Alexandra N. Rothman
    Assistant United States Attorneys
    (212) 637-2219/2410/2580

STEPHEN M. CALK
Defendant

by: s/   Paul H. Schoeman
    Paul H. Schoeman
    Darren A. LaVerne
    Kramer Levin Naftalis & Frankel LLP
    1177 Avenue of the Americas
    New York, NY 10036
    (212) 715-9100

Jeremy Margolis
Loeb & Loeb LLP
321 N. Clark Street
Chicago, IL 60654
(312) 464-3100

</div>