L6NMCAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          19 CR 366 (LGS)

STEPHEN M. CALK,

         Defendant.

------------------------------x

                         New York, N.Y.
                         June 23, 2021
                         12:50 p.m.

Before:

              HON. LORNA G. SCHOFIELD,

                         District Judge
                         And A Jury

                  APPEARANCES

AUDREY STRAUSS
    United States Attorney for the
    Southern District of New York
PAUL MONTELEONI
HAGAN SCOTTEN
ALEXANDRA ROTHMAN

KRAMER LEVIN NAFTALIS & FRANKEL
    Attorneys for Defendant
BY:  PAUL SCHOEMAN
    DARREN LaVERNE
    MICHELLE BEN-DAVID

LOEB & LOEB
    Attorneys for Defendant
BY:  JEREMY MARGOLIS

L6NMCAL1

1        THE COURT:  I understand that the parties had

2   something to raise before the jury arrives.

3        MR. SCOTTEN:  I'll say what it is, your Honor.  The

4   defense says they are not doing anything with it yet so it can

5   wait.

6        But in docket 225, our second issue, your Honor, was

7   that we didn't think it was appropriate to bring in the

8   evidence or make an argument about the sort of post hoc

9   performance of the loans, the sort of odyssey that the Manafort

10  loans went through after issuance of nonpayment, default,

11  seizure by the government, Manafort's pardon and so on.  And

12  the defense response, as I understood it, was --

13       THE COURT:  I'll hear from them.

14       MR. SCOTTEN:  Our point is, it doesn't really matter

15  what the defense response is.  From our point of view, if it

16  happened after the loan issued, it can't be borne upon the

17  defendant's state of mind.  And I think the Court has rather

18  consistently excluded evidence that was post hoc, whether it

19  was military developments they wanted in or the OCC's later

20  evaluation, so we have been consistent with that, because it

21  has no relevance and particularly because it's a particularly

22  confusing saga that has no probative value, it need not come

23  in.

24       THE COURT:  I recall reading your submission.  But I

25  would like to have my recollection refreshed, so I'll hear from

L6NMCAL1

1     the defense.

2               MR. LaVERNE:  I said to Mr. Scotten I thought we could

3     work this out in two minutes in a conversation.

4               THE COURT:  Why don't you just talk to each other.

5               The mics are working now.

6               MR. LaVERNE:  Your Honor, as I suspected, we worked it

7     out.  The government is not going to reference the writeoff of

8     the loans or what happened in the loans after they were

9     extended.  If they do not do that, we are not going to bring

10    into evidence, similarly, the history of the loans after they

11    were issued.

12              THE COURT:  Thank you.

13              MR. SCHOEMAN:  I just want to say, I will refer to the

14    loans as loans that were intended to be profitable.  I won't

15    say what happened after that, but at the time that they were

16    being made they were intended to be profitable loans.

17              THE COURT:  I assume.

18              MR. SCOTTEN:  We have always understood that was part

19    of the defense case.

20              THE COURT:  The jury will be here momentarily.

21              MR. MONTELEONI:  Could I inquire if there is a dial-in

22    active and, if so, what the number is.  My understanding from

23    talking to the Court's deputy is there would be the Court's

24    normal dial-in line, but there wasn't an official notice on the

25    docket.  We have just gotten a lot of questions about whether

L6NMCAL1

1    there is a dial-in.

2              THE COURT:  I don't know.  I can tell you what that

3    dial-in line is.

4              MR. MONTELEONI:  If it's the same number that was

5    published for the final pretrial conference, then we have that

6    number.  That's what I have provisionally provided to people.

7              THE COURT:  I am not sure.  I think Mr. Street has to

8    open that line.  I know there is an overflow courtroom with a

9    video and audio feed, and I know there is a direct feed into

10   the press room, but I don't know if there is a separate

11   dial-in.

12             MR. MONTELEONI:  Understood.  If there is not going to

13   be a dial-in line, we can inform people.  I thought that I saw

14   a reference to it in the Court's trial procedures.  So if there

15   was one, I wanted to make sure I give people the correct

16   information.

17             THE COURT:  I'll defer to Mr. Street on that.  So you

18   can ask him when he arrives.

19             MR. MONTELEONI:  Thank you, your Honor.

20             (Recess)

21             (Jury present)

22             THE COURT:  Members of the jury, now that you have

23   been sworn in, and you took the oath across the street, I'll

24   tell you about your duty as jurors and give you instructions to

25   help you understand what will be presented during the trial.

L6NMCAL1

1          At the end of the trial I'll give you instructions

2    again and those instructions will control your deliberations.

3    At the end of the presentation of the evidence and after my

4    final charge to you, it will be your duty to decide what to

5    decide from the evidence what the facts are.

6          You and you alone are the judges of the facts.  You

7    will hear the evidence, decide what the facts are, and then

8    apply those facts to the law which I will give to you, and

9    that's how you will reach your verdict.

10          My duty is to instruct you as to the law and it is

11    your duty to accept my instructions and apply them to the facts

12    as you determine them.  On these legal issues you must take the

13    law as it give it to you, whether you agree with it or not.  If

14    any attorney states that the law is different from what I state

15    to you in my instructions, it is my instructions you must

16    follow.

17          You must not take anything I say or do during the

18    trial as indicating a view of mine on any issue, including what

19    your verdict should be.  I will not express or imply any

20    opinions about whether you should believe or disbelieve any

21    witnesses or what facts are established or what inferences

22    should be drawn from the evidence or lack of evidence.  You are

23    the sole judges of all of the questions of facts submitted to

24    you and, as the sole judges of the facts, you must determine

25    which of the witnesses you will believe, what portion of their

L6NMCAL1

testimony you will accept, and what weight you will attach to
it.

The burden is on the government to prove guilt beyond
a reasonable doubt and, as I'll instruct you in more detail
after the lawyers have presented their cases, reasonable doubt
is based on reason and common sense.  It's a doubt that a
reasonable person has after carefully weighing all of the
evidence or a doubt that would make a renal person hesitate to
act in a manner of importance in his or her own life.

The burden to prove guilt beyond a reasonable doubt
never shifts to Mr. Calk because the law never imposes on a
defendant in a criminal case the burden or duty of calling any
witness or producing any evidence.  The law presumes Mr. Calk
to be innocent of all the charges against him.

If, after careful consideration of all the evidence or
lack of evidence at the end of the trial and following the
rules of law as I will explain to you, you have a reasonable
doubt about Mr. Calk's guilt, then you must acquit him.  Then
you must find him not guilty.  If, however, after careful
consideration of all the evidence presented and following the
rules of law that I will explain, you are convinced that the
prosecution has proven the elements of the offense beyond a
reasonable doubt, then you must convict him; that is, find him
guilty.

You will decide what the facts are from the evidence

L6NMCAL1

that will be presented in court and that evidence will consist

of the testimony of witnesses, documents, and other things

received into evidence as exhibits and any fact that the

lawyers agreed to or admit or that I may instruct you to find.

The fact that a particular exhibit may be labeled as a

government exhibit or, alternatively, as a defense exhibit is

not important.  It's just a label.  It does not tell you

anything about the substance of the exhibit itself.

There are two kinds of evidence:  Direct and

circumstantial.  Direct evidence is testimony by a witness

about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence, that is, proof of

one or more facts from which you can find another fact.  So

there is a simple example of circumstantial evidence that's

often used in the courthouse.

Assume when you came into the courthouse this morning

the sun was shining, as it is, and it was a nice day, and

assume that the curtains here were all shut, so you couldn't

see outside.  And as you were sitting here, someone walked in

with an umbrella that was dripping wet and then a few minutes

later someone else came in with an umbrella that was dripping

wet.  Now, you can't look outside and see with your own eyes

that it's raining, but you could reasonably infer from what

you've seen in all the circumstances that it's raining, and

that's really all there is to circumstantial evidence.  You

infer on the basis of reason and experience and common sense
from one established fact, that is, the dripping umbrellas, the
existence or nonexistence of some other fact, and that is the
fact that it's raining outside.

You may consider both direct and circumstantial
evidence in deciding the case.  The law permits you to give
equal weight to either one or weight to neither and it's up to
you to decide how much weight, if any, to give to any evidence.
There is no magic formula by which you should evaluate
testimony or exhibits.  I will, however, give you some
guidelines for determining the credibility of witnesses at the
end of the case.  Right now I will just say that you bring with
you into the courtroom all of the experience and background of
your lives.  You don't have to leave your common sense outside
the courtroom.

During the trial I may sustain objections to questions
that are asked.  And when that happens, I won't permit the
answer to answer.  Or if the witnesses has already answered, I
will instruct that the answer be stricken from the record and
that you disregard it and dismiss it from your minds.

In reaching your decision you may not draw any
inference from an unanswered question, nor may you consider
testimony that I've stricken from the record and told you to
disregard.  You should not show any bias against any attorney
or the attorney's client because the attorney objected to the

L6NMCAL1

1    admissibility of evidence or ask for a conference outside the

2    hearing of the jury or ask the Court for a ruling on the law.

3    It is the attorney's duty to do all of these things.

4         You should also understand what is not evidence.  What

5    the attorneys say in their opening statements or closing

6    arguments, objections, questions is not evidence.  Neither is

7    testimony that I instruct you to disregard.  Also anything I

8    say is not evidence.  The only oral testimony that is evidence

9    comes from the witnesses who will be sitting in this strangely

10   outfitted witness stand.  What the lawyers say to you in their

11   arguments to you are not evidence.  Their arguments are

12   commentary to help you understand the evidence.  For example,

13   the lawyers may make an opening statement and tell you what

14   they expect the evidence to show, but what they say is not

15   itself evidence and it's only what's actually introduced into

16   evidence that you may consider in reaching your verdict.  If in

17   the course of your deliberations your recollection of the facts

18   differs from what one of the lawyers says, it is your

19   recollection that governs.

20        Further, anything you may see or hear when the Court

21   is not in session, even if what you see or hear or seen done is

22   permitted by the one of the parties or one of the witnesses,

23   anything that happens or that you see outside the courtroom is

24   not evidence.  Only what is admitted into evidence here, when

25   the court is in session and all parties and jurors are present,

L6NMCAL1

may be considered by you as evidence.

You may hear testimony of law enforcement agents and government employees.  The fact that a witness may have been or is employed by the U.S. Government, including a law enforcement official, does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of any other witness.  It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witnesses and government employees.  You should give that testimony whatever weight, if any, you think it deserves.

Everyone, including me, has feelings, assumptions, perceptions, fears, sympathies, generalizations, prejudices, stereotypes that we may not be aware of or that we may be aware of.  The ones we are not aware of are called implicit biases and these biases may concern race, gender, national origin, sexual orientation, class, education, and many other issues. These hidden thoughts can impact what we see and hear and how we remember what we see and hear and how we make important decisions.

Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence or lack of evidence carefully and resist to jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.  The

L6NMCAL1

1    law demands that you return a just verdict based solely on the

2    evidence, your individual evaluation of the evidence, your

3    reason and common sense, and these instructions.  Our system of

4    justice is counting on you to render a fair decision based on

5    the evidence and not on biases.

6            This is a criminal case.  It's brought in the name of

7    the United States against Stephen M. Calk.  The fact that the

8    prosecution is brought in the name of the United States does

9    not entitle the government to any greater consideration than

10   that accorded to Mr. Calk.  All parties stand as equals in this

11   court.

12           Mr. Calk is charged with two crimes:  Financial

13   institution bribery and conspiracy to commit financial

14   institution bribery.  You should each have a screen in front of

15   you with a little slide presentation that summarizes what I am

16   saying.  Each of these is a separate offense or crime and you

17   must, therefore, consider each charge separately and return a

18   separate verdict on each charge.

19           The first charge is financial institution bribery.

20   The government alleges that Mr. Calk, while the chairman and

21   CEO of the Federal Savings Banks and National Bank Corp.,

22   corruptly solicited and received assistance in obtaining a

23   volunteer position with the Donald J. Trump presidential

24   campaign and a senior position with the then incoming Trump

25   Administration intending to be influenced and rewarded in

L6NMCAL1

1    connection with the extension of loans to Paul Manafort.

2            The second charge is a conspiracy charge.  The

3    government alleges that:  From about July 2016 until around

4    January 2017, Mr. Calk conspired to commit financial

5    institution bribery, meaning that he agreed with one or more

6    people to commit the first charge.

7            Mr. Calk has pleaded not guilty to both charges and

8    you must remember that Mr. Calk is presumed innocent unless the

9    government meets its burden of proving that he is guilty beyond

10   a reasonable doubt.

11           I am going to tell you about some of the law that you

12   will have to apply to the facts as you find them.  These are

13   only preliminary and summary instructions.  They are intended

14   to help you evaluate the evidence in light of what you will be

15   asked to do after you have heard all of the evidence.  The

16   final instructions that I give you at the end of the trial will

17   contain more detail about the applicable law.  To the extent

18   there are any differences between these preliminary

19   instructions and the final instructions at the end of trial,

20   the final instructions will be controlling, meaning that those

21   final instructions are the ones that you must follow in your

22   deliberations.

23           I'll tell you again later, perhaps many times during

24   the trial, it's important that you keep an open mind during the

25   duration of the trial until you have a the chance to deliberate

L6NMCAL1

1    with each other at the very end of the trial after you have

2    heard all of the evidence.

3           Now I'll briefly summarize what the government must

4    prove beyond a reasonable doubt for the crimes charged against

5    Mr. Calk.  You will be asked to return a verdict on these

6    alleged crimes.

7           The first charge against Mr. Calk is for financial

8    institution bribery.  In order to find him guilty of this

9    crime, the government must prove four elements beyond a

10   reasonable doubt:

11          First, that at the time of the offense alleged in the

12   indictment, Mr. Calk was an officer, director, employee, or

13   agent of a financial institution.

14          Second, that Mr. Calk, accepted, solicited, or

15   demanded or accepted or agreed to accept, solicit or demand

16   something of value.

17          Third, that Mr. Calk did so corruptly and with the

18   intent to be influenced or rewarded in connection with any

19   business or transaction of a financial institution.

20          Fourth, that the value of the thing accepted by

21   Mr. Calk had a value greater than $1,000.

22          For the first element the government must prove beyond

23   a reasonable doubt is that at the time of the offense alleged,

24   Mr. Calk was an officer, director, employee, or agent of a

25   financial institution.

L6NMCAL1

1        To satisfy this element the government must prove that

2   the financial institution is one whose deposits are insured by

3   the Federal Deposit Insurance Corporation or one that controls

4   an institution whose deposits are insured by the Federal

5   Deposit Insurance Corporation and that Mr. Calk was an officer,

6   director, or agent of that financial institution.

7        The second element that the government must prove

8   beyond a reasonable doubt is that Mr. Calk accepted or agreed

9   to accept or solicited or demanded something of value.  The law

10  makes no distinction between accepting, agreeing to accept, or

11  soliciting or demanding a bribe.  The mere soliciting or

12  demanding of a bribe is just as much a violation of the statute

13  as actually receiving one.

14       The third element the government must prove beyond a

15  reasonable doubt is that Mr. Calk accepted or agreed to accept

16  or solicited or demanded something of value corruptly and with

17  intent to be influenced or rewarded in connection with any

18  business or transaction of the Federal Savings Bank.

19       To act corruptly simply reply means to act voluntarily

20  and intentionally, with an improper motive or purpose to

21  influence or be rewarded.  This involves conscious wrongdoing

22  or, as it is sometimes expressed, a bad or evil state of mind.

23  The government must prove that a bribe is sought or received by

24  Mr. Calk directly or indirectly in exchange for the promise or

25  performance of action in connection with the business or

L6NMCAL1

1    transactions of the financial institution.

2          In considering this element remember that it is

3    Mr. Calk's intent to be influenced or rewarded, that is

4    important, not what actually happened later.  So the government

5    does not have to prove that Mr. Calk received the bribe or that

6    the bribe actually influenced the final decision of the bank.

7    It is not even necessary that Mr. Calk had the authority to

8    prove the acts charged.

9          Also, if you find that Mr. Calk accepted or agreed to

10   accept or solicited or demanded something of value with the

11   intent to be rewarded for a decision already made, it does not

12   matter that the bribe was not accepted until after the

13   financial institution business or transaction occurred.

14         Fourth and final element the government must prove

15   beyond a reasonable doubt is that the thing of value accepted

16   or agreed to be accepted was solicited or demanded by Mr. Calk

17   had a value greater than $1,000.  The government need not prove

18   the exact value of the thing as long as there is proof beyond a

19   reasonable doubt that the value exceeded a thousand dollars.

20   The value of the thing may be measured by its value to the

21   defendant, the value of what is exchanged for, or its market

22   value.

23         I want to turn now to the second count.  Count Two

24   charges Mr. Calk with conspiracy to commit financial

25   institution bribery, meaning that he agreed with at least one

L6NMCAL1

other person to commit the crime I just described, which is
financial institution bribery.

          What is a conspiracy?  A conspiracy is a kind of
criminal partnership, a combination or agreement of two or more
persons to join together to accomplish some unlawful purpose.
A conspiracy to violate a federal law is itself a criminal
offense.  It does not matter if the conspiracy succeeds.  A
conspiracy is a separate and distinct crime from the actual
violation of any specific federal laws which the law refers to
as substantive crimes.

          So conspiracy to commit financial institution bribery
is an entirely distinct and separate crime from the substantive
crime financial institution bribery.  Under the law, an
unlawful conspiracy can exist even if it fails to accomplish
its purpose.

          To prove the conspiracy charge, the second count, the
government must prove each of the following three elements
beyond a reasonable doubt:  First, that two or more persons
agreed to violate the federal law prohibiting financial
institution bribery; second, that Mr. Calk knowingly and
willfully became a member of this conspiracy; and, third, that
any member of the conspiracy committed an overt act in
furtherance of the conspiracy.

          The first element that the government must prove
beyond a reasonable doubt is that a conspiracy to violate

L6NMCAL1

federal law existed.  In this case that means that there was an
agreement or understanding between two or more people to
violate the law that makes it illegal to commit financial
institution bribery, the crime I previously defined as the
first charge.

The essence of the crime of conspiracy is the unlawful
combination or agreement to violate the law.  The success or
failure of the conspiracy is not material to the question of
guilt or innocence of the conspirator because a conspiracy is a
crime entirely separate and distinct from the substantive crime
that may be the goal of the conspiracy.  That is, a criminal
agreement standing alone is a separate crime and the crime of
conspiracy is complete once the unlawful agreement is made.

To establish the existence of a conspiracy, the
government is not required to show that two or more persons sat
around a table and entered into a solemn pact.  Conspirators do
not usually reduce their agreements to writing, nor do they
publicly broadcast their plans.  Your common sense will tell
you that when people undertake to enter into a criminal
conspiracy, much is left to unexpressed understanding.  Express
language or specific words are not required to indicate a
consent or attachment to a conspiracy.  It is sufficient if two
or more persons in some way or manner impliedly or tacitly come
to a common understanding to violate the law.

If upon consideration of all the evidence, direct and

L6NMCAL1

circumstantial, you find that the government has proved beyond a reasonable doubt that there was an agreement by two or more persons to commit financial institution bribery, then proof of the existence of the conspiracy is established.  But mere discussions about crimes or mere knowledge of crimes, without an agreement to commit them, is not a conspiracy and an agreement to achieve a lawful goal is not the same as a criminal conspiracy.  Two or more individuals must have agreed to commit a crime which here is financial institution bribery.

The second element the government must prove beyond a reasonable doubt is that the defendant knowingly and willfully became a member of the conspiracy; in other words, that he knowingly and willfully associated himself with the conspiracy and participated in the conspiracy with knowledge of its unlawful purpose and with an intent to aid in the accomplishment of its unlawful objective.  However, a person's mere association with a member of a conspiracy does not make that person a member of the conspiracy.  Even when the association is coupled with knowledge that a conspiracy exists. Knowledge without agreement and participating is not sufficient.

The terms knowingly and willfully mean that you must be satisfied beyond a reasonable doubt that in joining the conspiracy, if you find that Mr. Calk did join the conspiracy, that Mr. Calk knew what he was doing and that he took actions

L6NMCAL1

in question deliberately and voluntarily rather than by
mistake, accident, mere negligence or some other innocent
reason.  It is not necessary that Mr. Calk be fully informed as
to all the details of the conspiracy to justify an inference of
knowledge on his part.  To have guilty knowledge, Mr. Calk need
not have known the full extent of the conspiracy or all of its
activities or participants.

         The third and final element that the government must
prove beyond a reasonable doubt is that at least one member of
the conspiracy, not necessarily Mr. Calk, committed at least
one overt act in furtherance of the conspiracy.  In other
words, there must have been something more than a simple
agreement.  There has to have been at least one overt step or
action by at least one of the conspirators to further the
conspiracy.  To put it another way, the law requires that the
agreement was reached and that it went simply beyond talking.
The government must show that at least one of the conspirators
actually did something in furtherance of the agreement.

         Although you must find unanimously that an overt act
in furtherance of the conspiracy has been proved, you don't
have to be unanimous as to what that act was.  It's not
necessary that the government prove that all members of the
conspiracy or Mr. Calk himself participated in an overt act.
It suffices if any member of the conspiracy performed an overt
act in its furtherance.  The overt act standing alone may be

L6NMCAL1

1   totally innocent and a lawful act.

2           Frequently, however, an innocent act sheds its

3   harmless character if it is a step in carrying out or promoting

4   or aiding or assisting a conspiratorial agreement.  You are

5   therefore instructed that the overt act does not have to be an

6   act which in and of itself is criminal or constitutes an

7   objective of the conspiracy.

8           That's it for the two charges.

9           The one thing I will add, in addition to the elements

10  of those two charges, as I have just described them, you must

11  consider the issue of venue, namely, whether any act in

12  furtherance of the unlawful activity occurred here within the

13  Southern District of New York, which includes Manhattan.  The

14  government must prove venue by a preponderance of the evidence,

15  unlike the elements I have just described, which all must be

16  proved beyond a reasonable doubt.  I'll explain burden of proof

17  to you at the end of the trial.

18          I think probably tomorrow we will provide each of you

19  with blank paper so you can take notes.  Please don't write

20  anything on the front page except your juror number so we know

21  whose it is.

22          You don't have to take notes, but you may, if you

23  wish.  Please be sure, though, that any note taking doesn't

24  interfere with your listening and considering all the evidence.

25  Also, if you take notes, you must not show them to anyone or

L6NMCAL1

discuss them with anyone, even other jurors, even when you are
deliberating.  Any notes you take are to be used solely by you
to assist you and your notes are not a substitute for what you
remember.  The fact that a particular juror takes notes
entitles that juror's views to no greater weight than any other
juror.

       If during your deliberations you have any doubts as to
any of the testimony, you will be permitted to ask for the
official transcript which is being made by our court reporter
be read back.  As I said, when you get the paper, put your
juror number on the front page.  Whenever you leave the
courtroom, leave the paper on your chair.  When you are not in
a courtroom, we will be sure that no one looks at or tampers
with your notes, and we will lock the courtroom at night to be
sure that no one looks at or tampers with your notes.  At the
end, when you deliberate, you will be entitled to take the
notes with you into the jury room to deliberate, and then we
will destroy them at the end of your deliberations.

       I also want to caution you about certain principles
about your conduct as jurors.  I told you a little bit about
this when we were sitting in the larger group.

       First, you must not talk to each other about the case
or about anyone who has anything to do with the case until the
very end, when you go into the jury room to deliberate and
decide on your verdict.

1          Second, you must not talk with anyone else about the

2     case or anyone who has anything to do with it until the trial

3     ends and you've been discharged.  What I mean here is not only

4     shouldn't you talk to each other, you shouldn't talk to anyone

5     else.  That means your family, your friends, your employer.

6     You may tell them you're a juror in a case, you can tell them

7     it's a criminal case, but don't tell them anything about it

8     until you've been discharged by me.

9          Third, don't let anyone talk to you about the case or

10    anyone who has anything to do with it.  If someone should try

11    to talk to you, please report that to me immediately by telling

12    Mr. Street, who is my courtroom deputy.  You should not,

13    however, discuss with your fellow jurors either that fact or

14    any other fact that you think is necessary to bring to my

15    attention.  In other words, don't talk among yourselves about

16    it.  Just go straight to Mr. Street and he will report it to me

17    and I'll deal with it.

18         Fourth, don't converse, whether in or out of the

19    courtroom, with any of the parties or attorneys or witnesses.

20    I have already told you about that.  By this I mean, not only

21    don't talk about the case, but don't talk about anything with

22    any of the lawyers or the parties.  In no other way can

23    everyone be assured of the absolute impartiality they are

24    entitled to expect from you as jurors.  As I said, I've told

25    the lawyers and the parties that they are not to talk to you.

L6NMCAL1

They are not even supposed to say hello or good morning outside

the courtroom, so please don't hold it against them.  They are

not being rude.  They are just following my instructions.

Fifth, do not read any news stories or articles or

listen to any radio or television reports about the case or

about anyone who has anything to do with it.

Sixth, do not do any research or investigation on your

own.  You must decide the case based solely on the evidence

presented here in court, and that means that you must not

conduct any independent research.  What that means is don't go

home and start Googling things about the case.  Save that for

after the trial is completely over and you've rendered your

verdict, and then you can do that to your heart's desire, but

during the trial you must not let yourself be exposed to

anything about the case or anyone having anything to do with

it.

Just to be clear, that means don't use the Internet,

don't go to any websites, don't go to any blogs, don't post on

any social media anything about the case or your involvement in

it.  Don't use any electronic tools to get information or to

help you think about anything in the case.  Everything you

learn about the case, as I said, should come from within these

four walls.

Seventh, do not communicate about the case or research

it using any electronic device.  Don't use your cell phone or

L6NMCAL1

1   text or e-mail or the Internet or websites or Twitter or

2   Facebook or LinkedIn or YouTube or any social media or

3   networking sites for any tools of technology to communicate or

4   research the case.

5         Until you retire to deliberate, you may not discuss

6   the case with anyone, even your fellow jurors, and after you

7   retire you may begin discussing the case with each other, your

8   fellow jurors, but you cannot discuss it with anyone else until

9   after you return a verdict.  The parties are entitled to have

10  you personally render a verdict in the case on the basis of

11  your independent evaluation of the evidence, the Lack of

12  evidence presented here.

13        Obviously, talking to others, including your family or

14  anyone else, before you deliberate, exposing yourself to

15  information outside the courtroom would compromise your service

16  and your fairness to the parties.  If you become aware that

17  anyone in the jury is violating this instruction, don't talk

18  about it among yourselves.  Please just come immediately to

19  Mr. Street, who will bring it to my attention and I'll deal

20  with it.

21        Let me summarize the stages of the trial for you so

22  you know what to expect.

23        First, there will be opening statements.  The

24  government will make an opening statement.  They will do that

25  today in just a minute.  After that, the defense counsel may,

L6NMCAL1

1    but doesn't have to, make an opening statement.  Just a

2    reminder, the opening statement is not evidence.  It is just an

3    outline of what the parties intend to prove.

4              After the opening statements, the government will

5    present its case.  It will call witnesses.  After each witness

6    has testified on direct examination, defense counsel will have

7    the opportunity to cross-examine.

8              Following the government's case, the defense may

9    present a defense case.  But because of the presumption of

10   innocence, Mr. Calk is not required to offer any proof, and you

11   may not draw any negative inference or hold it against him in

12   any way if the defense chooses not to put on a case.  The only

13   question is whether the government has proved its case beyond a

14   reasonable doubt.

15             After the evidence is completed and before the closing

16   arguments, I'll give you final instructions on the law.  Then,

17   finally, attorneys will give you their closing arguments and

18   it's their opportunity to summarize the evidence or lack of

19   evidence in light of the law.

20             After the closing arguments, I'll give you very brief

21   instructions and then you will get the case.  You will retire

22   to deliberate on your verdict.

23             Your verdict must be unanimous.  Please don't make up

24   your mind about what the verdict should be or sort of

25   hypothetically what you think it might be until the very end,

L6NMCAL1

1    after I have instructed you on the law, you had an opportunity

2    to talk to each other in the jury room and discuss the

3    evidence.  Please keep an open mind until then.  The parties

4    deserve and the law requires that you give them an opportunity

5    to be fully heard.

6            I'll repeat this at the end of the day, but the

7    general plan is for you to get here by 9:45, in the jury room

8    by 9:45.  I'll come out on the bench promptly at 10 and you

9    will come out promptly at 10.  If anyone is not here, we will

10   all come out anyway.  And I don't mean to be harsh, but we will

11   come out and stare at your empty chair until you arrive.  So

12   please, everyone, be on time.  You can be early if you like.

13   But please be here by 9:45 so that so you can line up and come

14   in by 10.

15           There are certain days we won't sit.  We won't sit on

16   Friday, June 25.  We are not sitting this Friday.  We are not

17   sitting the following Monday, June 28.  For the next weekend,

18   which is the July 4 weekend, we are not sitting Friday, July 2

19   or Monday, July 5.  You'll have a four-day weekend.  We are not

20   sitting Wednesday, July 14.  That means this week we will sit

21   three days and the next three weeks we will sit four days.

22           The schedule for the day is that we will take a lunch

23   break around 1:00 for around 45 minutes.  We will take a

24   ten-minute break in the middle of the morning and a ten-minute

25   break in the middle of the afternoon, so please plan

1    accordingly because those are the breaks we will take.

2         Enough from me.  Sorry for all the preliminaries.

3    It's important that I tell you all that.  Now we will hear the

4    parties' opening statements, or at least the government's and

5    the defense may, if they like.

6         MS. ROTHMAN:  This is a case about greed, but not

7    greed for money.  Greed for power.

8         THE COURT:  I'm sorry.  I am going to interrupt.  You

9    need to pull the mic way up close or we are not going to hear a

10   word.  You can start over, if you'd like, because I didn't hear

11   you.

12        MS. ROTHMAN:  This is a case about greed.  But not

13   greed for money.  Greed for power, for prestige, for

14   importance.  It's about this man, Stephen Calk, who wanted a

15   powerful government title and gave out millions of dollars in

16   bank loans to try and get it.

17        Calk was the chairman and CEO of a bank called the

18   Federal Savings Bank.  He pushed his bank to lend $16 million

19   to Paul Manafort, a political lobbyist.  Why did he do it?

20   Calk gave out millions because Manafort gave him things that

21   were even more valuable, a high-profile spot on the

22   presidential campaign and Manafort's help in getting Calk a top

23   government job.  In other words, Stephen Calk took a bribe from

24   Paul Manafort.  Manafort gave him political favor and Calk gave

25   him bank loans.  This for that, loans for influence.

1    Ladies and gentlemen, that is what this case is about
2    and that is why you are here today.  Because Stephen Calk, the
3    head of a bank, took a bribe from Paul Manafort because Calk
4    used the federally insured bank that he oversaw as his personal
5    piggy bank to try and buy himself prestige and power.

6    You are going to learn in this trial that in July of
7    2016, Paul Manafort came to the bank and asked for a loan.  At
8    the time, Manafort was running the presidential campaign for
9    Donald Trump.  The bank had agreed to make the loan and
10   Manafort put Calk on the campaign.  You are going to learn that
11   the Manafort loan had all sorts of red flags at the bank.  But
12   Calk didn't care.  He pushed the loan forward.

13   You are going to learn that the bank made two loans to
14   Paul Manafort.  The first loan closed shortly after election
15   night once it became clear that Manafort can help Calk because
16   Trump had won the election.  And the second loan was approved
17   five weeks later once Calk knew that Manafort could try and
18   help him get that top government job.

19   You are going to learn that Calk interviewed for the
20   top government job at Trump Tower, the campaign headquarters.
21   He didn't get the job.  He couldn't seal the deal, but Manafort
22   got him in.

23   You are going to learn that Calk tried to hide his
24   crimes.  When a reporter asked him how he got put on the
25   campaign, he didn't say one word about Paul Manafort.  He even

L6NMCAL1                         Opening – Ms. Rothman

1    kept this a secret from members of his boards of directors.

2              Ladies and gentlemen, Stephen Calk thought he had

3    gotten away with it.  He thought he could have traded bank

4    loans for political favor and no one would have found out.  But

5    he got caught and now he is here in this courtroom in front of

6    all of you to account for what he has done and that is what

7    this trial is about.

8              This opening statement is the government's opportunity

9    to explain what we expect the evidence will show in this trial.

10   I am going to do that in three parts.

11             First, I am going to explain in more detail what do I

12   expect the evidence to show.  Then I am going to discuss the

13   different types of evidence that you'll see in this trial.

14   And, third, I'll talk briefly about the charges.

15             What will the evidence show?  You will learn that Calk

16   ran the Federal Savings Bank.  The bank's money was FDIC

17   insured.  If you wanted to get a home, you could go to the bank

18   and get a loan or a mortgage, for that matter, or if you wanted

19   to finish construction on a project, you could go to the bank

20   and get a construction loan to finish that project.

21             Sometimes people who came to the bank already had

22   loans and they wanted new loans.  In that case the bank would

23   pay off the old loan and give them a new loan.

24             You will learn the bank had loan officers.  These were

25   the salespeople for the bank.  They worked to close the loan

L6NMCAL1                         Opening - Ms. Rothman

1    and they were paid on commission.  You will learn the bank also

2    had a credit committee that approved certain loans.  There were

3    three people on the committee, including Calk, but Calk always

4    got his way.  Again, he owned most of the bank and he was the

5    boss.

6            In July of 2016, Paul Manafort came to the bank and

7    asked for $5.7 million to pay off an old loan and finish

8    construction on a property in California.  There was a meeting

9    in New York just blocks from this courthouse.  Manafort, his

10   son-in-law, and the loan officer were there in person.  Calk

11   joined by video from Chicago.  At the end of this business

12   meeting Calk offered to help with the campaign.

13           Now, ladies and gentlemen, this was not the first time

14   that Paul Manafort came to the bank for a loan.  He had tried

15   once before and the bank said no.  But now Manafort was running

16   the presidential campaign and things were different.

17           The very next day after that meeting the bank agreed

18   to do the loan and a few days later Manafort asked the loan

19   officer for a copy of Calk's resumé, and shortly after that

20   Manafort asked Calk to join what was called the economic

21   advisory council, a position on the campaign.

22           Ladies and gentlemen, this council was a big deal.  It

23   was filled with successful high-profile businessmen who were

24   advising President Trump.  It gave Calk status.  It got him on

25   TV making media appearances a lot.  Of course he said yes.

L6NMCAL1                          Opening – Ms. Rothman

1          Meanwhile, back in the bank the loan was going through

2     what's called underwriting.  That just means the bank had to

3     review the loan and the borrower and make sure it wasn't too

4     risky for the bank.

5          What did the bank find out?  Problems after problems

6     after problems with Paul Manafort.  Manafort's credit score had

7     dropped.  Manafort had earned zero income in 2016.  Manafort

8     had an unpaid credit card bill of $300,000.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. ROTHMAN:  (Continuing)  Manafort was in default.

2     He wasn't paying his old lender and facing foreclosure on the

3     California property.  And if that wasn't enough, news stories

4     reported that Manafort had suspicious dealings with foreign

5     politicians and was stepping down from the campaign.

6          Big picture:  The underwriters said that the loan had

7     all sorts of problems that typically would cause a bank not to

8     make the loan.  About the only thing the loan had going for it

9     was something called collateral.  That meant that Manafort was

10    willing to put up properties that he owned to secure the loan.

11    But, ladies and gentlemen, as you'll learn in this trial, banks

12    don't — in fact, they can't — make loans to a borrower who

13    can't pay just because there's collateral.  You could think of

14    collateral like an insurance policy.  The bank expects to make

15    money on the loan by collecting monthly interest payments.  If

16    the borrower doesn't make those payments, the bank can go

17    after, try to take, the property, and that's called

18    foreclosure.  But, ladies and gentlemen, foreclosure, it's

19    expensive, it's risky, it takes time.  So, for all of those

20    reasons, the underwriters told the bank, collateral or no

21    collateral, Paul Manafort was a bad man.

22          You will learn that only two people at the bank were

23    pushing this loan forward — the loan officer, who was getting a

24    commission, and Stephen Calk.  And by the end of this trial,

25    you will know exactly what Stephen Calk was getting from Paul

L6NKCAL2                          Opening – Ms. Rothman

1    Manafort to push that loan forward.

2           You'll learn there was a meeting in September 2016;

3    Paul Manafort and Steve Calk had lunch in New York.  At that

4    lunch, Manafort said there was a mortgage on one of the

5    properties that was going to be used as collateral for the

6    loan.  No problem, said Calk, the bank would pay off the

7    mortgage.  But, then, Manafort emailed with the correction:  He

8    needed another million dollars from the bank.  Less than two

9    hours later, Calk responded and told the loan officer to do

10   what Manafort needed.

11          Now, you will learn that at the closing table for the

12   first loan, Manafort came in and proposed a totally new loan,

13   and the bank couldn't agree to those terms.  Remember, Stephen

14   Calk is a businessman, after all.  He's not going to give away

15   the store.  He's trying to buy Paul Manafort's influence, but

16   wants to pay as little as possible, and the bank couldn't agree

17   to the terms of this new loan.

18          The bank tried to pass the loan off to another lender,

19   but they wouldn't commit, and Calk wouldn't either.  For a

20   while, it looked like the loan was dead.

21          But then came election night 2016.  You will learn

22   that election night is an important moment in this case.  As it

23   became clear that Donald Trump would win the election, Calk saw

24   his chance.  That night, he texted Manafort that the loan

25   would, quote, "be wrapped up," the approval would be wrapped

up, the next day.  Think about that.  The bank had rejected the

loan, it was trying to pass it off to another lender, but now,

when it seemed like Manafort could help Calk, Calk was willing

to commit to the loan whether or not the other lender was

onboard.

Calk also asked if he was needed in New York, the

campaign headquarters, and said he was ready to support in any

way.

What happened next?  Well, the bank worked to close

the loan, and Calk wanted to send a message to Manafort, so he

asked his loan officer to call Manafort and see if he was in

the running for Secretary of the Treasury.  The loan officer

didn't make that call, so the next day, Calk picked up the

phone and called Manafort himself, and then they were off to

the races.  Calk emailed Manafort a list numbered one to ten of

all the jobs he wanted in the new administration, and, ladies

and gentlemen, Stephen Calk was not shy.  The top of the list,

Secretary of the Treasury, followed by Secretary of Commerce,

followed by Secretary of Defense.  Calk ultimately set his eyes

on Secretary of the Army, the highest ranking civilian position

in the U.S. Army.  He emailed Manafort a memo of his supposed

qualifications to serve and followed with an email in which he

wrote:  "As you know, my number one desire is to serve as

Secretary of the Army."

The first loan closed about a week after the election.

1    Manafort got $9.5 million that he desperately needed, and Calk

2    got a well-placed recommendation for Secretary of the Army.

3            Now, as I mentioned, there were two loans that the

4    bank made to Manafort.  After the first loan closed, Manafort

5    was still desperate for money, and Calk still wanted that job.

6    Manafort needed $6.5 million to finish construction on a

7    brownstone in Brooklyn and to stop foreclosure.  Manafort

8    needed money, and Calk knew it.  Manafort emailed Calk that,

9    quote, "The clock is ticking."  That same day, Manafort sent

10   Calk's name with a recommendation for Secretary of the Army.

11   Calk's name was added to a list, and right to the right was

12   Paul Manafort.

13           Now, you will learn at trial that banks are limited by

14   law in how much money they can lend to any one lender.

15   Basically, the bank can't put all of its eggs in one basket.

16   The problem was the bank still had that first $9.5 million loan

17   on its books to Paul Manafort; another 6.5 million would put

18   the bank over that legal limit.  Calk tried to get another bank

19   to take the loan off its books, but it wouldn't do it, and for

20   a while, it looked like the second loan was stopped.  But then

21   something changed, and this, too, is an important moment in the

22   story.

23           Manafort reached out to a person who was managing the

24   interviews for the jobs in the administration at Trump Tower.

25   Manafort pressed him for an update on Calk's application, and

1    that person told Manafort would he take Under Secretary of the

2    Army; if so, I think we can get it done.  Within minutes, Calk

3    and Manafort were on the phone.  They spoke for 11-1/2 minutes,

4    and once that call was done, Manafort told his contact that

5    Calk would take the job.

6           And what happened next is important.  The very next

7    day, after the loan had been stalled, after Manafort had been

8    begging for updates and getting nowhere, Calk personally

9    emailed the loan documents to Manafort and said, the bank was

10   ready to close.  The bank had agreed to do something it had

11   never done before, to get around that lending limit and to make

12   the loan to Manafort.  Calk later told the loan officer that

13   Manafort was, quote, "influential with other people and a few

14   other situations on hand."

15          In January 2017, the second loan closed, and Calk flew

16   to New York for an interview at Trump Tower for the job of

17   Under Secretary of the Army, a top job in the government.  In

18   total, Stephen Calk gave $16 million in loans to Paul Manafort

19   in exchange for Manafort's influence, his political favor, and

20   that interview at Trump Tower.

21          So, how did this all end?  Well, as I mentioned, Calk

22   didn't get the job.  He went back to the bank, and there,

23   things started to unravel.  A news article came out raising

24   questions about the loan, the bank's regulator called for an

25   emergency meeting.  At that meeting, Calk lied.  He said he

1    didn't know about the foreclosures on the properties.  He later

2    said he never wanted the government job in the first place.

3            Ladies and gentlemen, that is what the evidence will

4    show.  So, how are we going to prove it to you?  You're going

5    to hear from a number of witnesses, including people who worked

6    at the bank's regulator.  They're going to tell you that bank

7    CEOs like Calk know they are not allowed to trade bank loans in

8    exchange for personal benefits, like being considered for a top

9    government job.  They'll tell you about the lies from Stephen

10   Calk, the meeting where he denied knowing about the foreclosure

11   and said he didn't want the job in the first place.

12           You'll hear from the person whom Manafort called to

13   get Calk that interview.  He will tell you that Calk wasn't

14   qualified for the job, that he only got the interview because

15   of Manafort, and that Calk never said anything about lending

16   millions of dollars to Manafort.

17           You'll hear from bank employees who worked on the

18   loan.  They'll tell you that these loans were different than

19   any other loan at the bank, that no matter what went wrong, no

20   matter the problem, they kept going because they knew that

21   Calk, the CEO of the bank, wanted these loans to close no

22   matter what.

23           Now, some of these banker witnesses have court-ordered

24   immunity.  That means they can testify here about what they did

25   as part of the defendant's crimes, and they can't be prosecuted

1   as long as they tell the truth.  So, listen carefully to their

2   testimony.

3          Ask yourself if it lines up with the other evidence

4   that you're going to see in this trial, evidence like the

5   defendant's own words in emails and text messages.  You'll see

6   the email where Calk agreed to give Manafort that extra million

7   dollars and told the loan officer, quote, "We will close on

8   time."  You'll see an email where Calk, the CEO of a bank, was

9   literally checking to make sure Manafort has signed his name on

10  all the right lines so the loan can close.  You'll see lists,

11  upon lists, upon lists of government jobs that Calk wanted.

12  You'll see those text messages from election night that I

13  already described.

14         These emails and text messages will make clear to you

15  that Calk was pushing these loans forward and was getting

16  benefits from Manafort in return.  You'll see a record of the

17  defendant's phone calls at key critical moments — calls with

18  Manafort, calls with the loan officer, calls with a person on

19  the transition team getting him that interview at Trump Tower.

20  The pattern and timing of these calls will make it clear to you

21  this was a corrupt exchange, a quid pro quo, between Manafort

22  and Calk.  You'll see the actual notebooks the loan officer

23  kept at the time.  These notebooks track the life of the loan

24  from Manafort's first ask for Calk's resume, to Calk's request

25  that the loan officer contact Manafort and see if he was in the

1    running for Secretary of the Treasury, to those words from Calk

2    that Manafort was, quote, "influential with other people and a

3    few other situations on hand."

4         Now, ladies and gentlemen, the evidence will come in

5    piece by piece.  No single email or witness can tell you the

6    full story.  As I mentioned, you're going to hear from someone

7    who worked at the bank's regulator, and they'll tell you about

8    the meeting they had with Calk when Calk said he didn't want

9    the job in the first place.  Now, that person isn't going to

10   tell you that Calk was lying because that person doesn't know.

11   He didn't read the emails in which Calk says his number one

12   desire is to be Secretary of the Army, so he couldn't know.

13   But you'll have these emails, you'll have all the evidence, and

14   once all the evidence comes in, Calk's lies and, more

15   importantly, his guilt will be clear.

16        Let me finally say a word about the charges in this

17   case.  Calk has been charged with bank bribery and conspiracy.

18   The Court has given you instructions on the law, and I'm not

19   going to repeat those elements here.  I just want to highlight

20   what is at the core of these crimes — a corrupt exchange, a

21   quid pro quo, that Calk solicited and accepted something of

22   value with the intent to be influenced in connection with bank

23   loans.  You'll be asked to decide whether there was a

24   connection between the loans that Calk was giving out and the

25   benefits and favors he was getting from Manafort.  And as you

L6NKCAL2

1    listen to the evidence, as you see it all come in, you will

2    know that that is exactly what happened here — that this was

3    loans for influence, this for that.

4          Ladies and gentlemen, this is an important case.  It's

5    important to the defendant for obvious reasons.  It's important

6    to the government, too, because it is a crime when bank CEOs

7    take bribes and try to buy themselves fame, prestige, and

8    power.

9          At the end of this trial, you will see there is

10   overwhelming evidence that the defendant is guilty.  Between

11   now and then, I'm going to ask you to do three things:  First,

12   pay careful attention to the evidence; second, follow Judge

13   Schofield's instructions on the law; and, third, use your

14   common sense, the same common sense you use in your everyday

15   lives as New Yorkers.  If you do those three things, you will

16   reach the only verdict that is consistent with the evidence and

17   the law — that the defendant is guilty.

18          THE COURT:  Okay.  Thank you.

19          So, ladies and gentlemen, we're going to take our

20   ten-minute break now, and then we'll have the defense opening.

21   I'll just remind you not to talk about the case.  Mr. Street

22   can direct you back to the jury room.

23          (Jury not present)

24          THE COURT:  We're adjourned for ten minutes.

25          (Recess)

L6NKCAL2

1          THE COURT:  There's something that I should have done

2     earlier, but I'm going to do it now.  I wanted to allocute

3     Mr. Calk on the plea offer, if there was one.

4          So, my question to the government is:  Was there an

5     offer, a plea offer, made?

6          MR. MONTELEONI:  No, your Honor, the government has

7     never made a plea offer to Mr. Calk.

8          THE COURT:  All right.  I didn't neglect to do

9     anything.

10          (Pause)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may be seated.

3           Ladies and gentlemen, there's one thing I wanted to

4    explain to you.  Everybody is standing up when you come in, and

5    the reason is out of respect for you, the jury.  And so that's

6    why we're standing, not for any other reason.

7           If the defense would like to do an opening statement,

8    now would be the time.

9           MR. SCHOEMAN:  Yes, your Honor.  Thank you.

10          Good afternoon.  The question in this case is whether

11   Steve Calk thought that he was doing anything wrong by making

12   loans to Paul Manafort, and based on the evidence that you're

13   going to hear in this case, the answer, in this case, is going

14   to be no.  No, he didn't think he was doing anything wrong.  So

15   let's talk about the evidence in this case.

16          The evidence will show that Mr. Calk's bank made loans

17   to Paul Manafort.  Those loans were unanimously approved by the

18   bank's loan committee, the loan committee's approval was

19   subject to the approval of the underwriting department, and the

20   underwriting department approved the loans.  Those are facts

21   that you will see in this case.

22          The evidence in this case will also show that Steve

23   Calk volunteered for a position on the 2016 Trump Campaign, he

24   volunteered for an unpaid position, and he applied for a

25   government job that he did not get.  And those are facts that

1    you're going to see in this case.

2              Now, the prosecution in this case is going to spend a

3    lot of time running away from those basic facts, distracting

4    from those basic facts, and they will try to substitute

5    hindsight, speculation, and other people's opinions for the

6    facts.  But the facts in this case will show that Steve Calk

7    believed that the loans to Paul Manafort were great loans for

8    his bank, big, profitable loans, with tons of collateral to

9    protect the bank's interests.  And the facts will show that

10   Mr. Calk sincerely wanted to serve his country, to do public

11   service, and, yes, yes, he got some help and some advice from

12   Paul Manafort.  But what matters in this case is that the facts

13   will show that Steve Calk didn't think he was doing anything

14   wrong.  He didn't think he was doing anything corrupt because

15   he thought these were great loans for his bank.  And for Steve

16   Calk, making great loans for your bank, it's not bad, it's not

17   wrong, it's not corrupt, it's not evil, it's not a crime.

18             As you've heard, my name is Paul Schoeman.  Together

19   with my colleagues, Darren LaVerne, Jeremy Margolis, Ray

20   McLeod, Michelle Ben-David, we have the great privilege and

21   responsibility of representing Mr. Calk in this case.  And like

22   all of you, he's got to wear a mask during the trial, but

23   please, please don't forget that underneath that mask, there's

24   a real human being.

25             Now I'm going to spend a few minutes talking to you

1    about what the evidence in this case is going to show.  It's

2    going to show that Mr. Calk is a self-made man, he's totally

3    dedicated to the success of his bank.  The bank is called the

4    Federal Savings Bank.  The bank is Mr. Calk's brainchild and

5    his baby.  Mr. Calk and his brother, they bought a small bank,

6    and they renamed it the Federal Savings Bank, and they grew it

7    from next to nothing into a big profitable business worth

8    millions of dollars.

9         Now, look, it's a small bank, but it's one of the most

10   profitable banks for its size in the country, and Mr. Calk was

11   the chairman of the bank, and he was the CEO, and he owned the

12   majority stake in the holding company that owned the bank, and

13   his brother, John, owned most of the rest of the holding

14   company.  So, together, the Calk brothers owned 97 percent of

15   the holding company that owned the bank.

16        Now, you're also going to see in this case that

17   Mr. Calk, not only does he love his bank, he loves the U.S.

18   military.  He went to a military prep school, he was an ROTC in

19   college, training to be an army reserve officer, he went to

20   flight school to learn to fly combat helicopters, and he was in

21   the army reserves, and he was honorably discharged with the

22   rank of captain.

23        Now, let's be clear — he was not a general, he was not

24   a war hero, nothing like that, he never saw combat, but he

25   learned to love the military, and he made the military a part

1  of his life.  So how did he do that?  Well, one thing he did is
2  he focused his bank on helping veterans.  Mr. Calk and his
3  brother, John, are both veterans, and they asked former
4  generals, retired generals, from the military to serve on their
5  board of directors, and they gave jobs to veterans in the bank,
6  and they focused some of the bank's lending programs on helping
7  veterans and their families get mortgages, and he even served
8  on the board of a charity in the Chicago area that supports
9  military families.
10              So, how did we wind up here, here?  Here's what you're
11  going to learn from the evidence in this case:
12              In April, not July, as the prosecution said, but in
13  April, Paul Manafort was introduced to a mortgage salesman in
14  Mr. Calk's bank named Dennis Raico, and Manafort and his
15  son-in-law were looking for a construction loan on a big
16  project in lower Manhattan not too far from here.  And as a
17  salesman, as you heard, Raico worked on commission, so a big
18  customer with a big project would mean a big commission for
19  Raico.  So Raico described Manafort in the most glowing terms.
20  And at that time, to all appearances, Manafort was a rock star
21  in the world of politics.  He appeared to be a very wealthy and
22  successful man, and he had lots of real estate that he wanted
23  to refinance with the bank and do lots of deals that would make
24  Mr. Calk's bank a lot of money.  That's the picture that the
25  salesman, Dennis Raico, painted of Paul Manafort back in April

1    of 2016.

2              Now, you all know, or you're going to see, that Paul

3    Manafort was committing fraud on the bank.  He submitted false

4    financial statements.  He was not nearly as wealthy or

5    successful as he pretended to be.  But Steve Calk didn't know

6    that, not based on what he was told.

7              So here's the email in April that Mr. Raico sent to

8    Mr. Calk and others at the bank describing Mr. Manafort.  He

9    writes:  "Paul Manafort" —— this is in April.  "Paul Manafort

10   is the most recent presidential campaign manager for Donald

11   Trump.  Previously, he was the campaign manager and advisor for

12   Ford," President Ford, "Reagan," President Reagan, "Bush,"

13   President Bush, "and Dole," who was someone who ran for

14   president.  "Paul's self-employed consulting business over the

15   past 30 years has served him well.  His income average over the

16   past three years has been 3.3 million dollars annually and his

17   2015 P&L stipulates $5 million.  Paul has in excess of

18   $10 million in liquid assets, another 1 point plus million in

19   an IRA, and a middle credit score of 729," which you'll come to

20   learn is a good credit score, "and Paul's personal real estate

21   holdings listed on the application are approximately

22   $9.2 million owned free and clear."

23             And that's the way that Dennis Raico introduced Paul

24   Manafort to Steve Calk, and that's exactly the kind of big

25   wealthy customer that Steve Calk would want for his bank.  Now,

1    that first project in April, that did not progress, but the

2    salesman, Dennis Raico, he kept in touch with Manafort and

3    Manafort's son-in-law, and they came back with a new proposal

4    in July.  That's the one you heard about.  It was for a house

5    in Los Angeles.  It was a much smaller, simpler project than

6    the Manhattan project, and as far as Mr. Calk knew,

7    Mr. Manafort was still a super star, still super wealthy, still

8    super successful, still rich, and still had excellent credit.

9    And the bank's loan committee, the bank's loan committee,

10   conditionally approved, in July, the loan.

11        Now, there are two critical things that you need to

12   understand about that conditional approval in July.  First, the

13   approval of the loan committee was, and must be, unanimous; all

14   three members of the committee have to agree.  There are three

15   members — Mr. Calk, who's the CEO, the president of the bank,

16   and the chief operating officer of the bank.  They have to

17   agree.  Mr. Calk cannot approve a loan by himself.

18        Now, the second thing you have to understand about the

19   conditional approval is that it is subject to underwriting.

20   And underwriting isn't just some formality, as the prosecution

21   suggested.  Underwriting is the work that the bank does to see

22   whether somebody qualifies for a loan.  It's where they look at

23   all of the tax returns and paperwork and bank records and

24   appraisals.  So the loan committee's approval takes place

25   before the underwriting.  Mr. Calk and the rest of the loan

1    committee, they just approve the structure of the deal, but

2    they approve it subject to underwriting.  And I'll show you

3    what that approval looks like.

4            This is an email from the president of the bank,

5    Mr. Ubarri, who's a member of the loan committee.  It includes

6    Mr. Calk and Mr. Norini, the other member of the loan

7    committee, the salesman, Raico, and the top members of the

8    underwriting department, and it says:  "Dennis" — this is from

9    the bank's president — "the credit committee approved this loan

10   subject to underwriting," and then it lays out the terms of the

11   loan.

12           And you're going to learn that these are the bank's

13   standard terms for a loan of this type.  It's a special kind of

14   loan program that they had at the bank — 7-1/4 percent

15   interest, 2 percent origination points, meaning a 2 percent fee

16   upfront.  You're going to learn that these are very favorable

17   terms for the bank.  This is not a sweetheart deal.  They

18   didn't go easy on Paul Manafort at all.  They made him pay all

19   kinds of fees and expenses throughout his entire time taking

20   out loans from the bank.

21           But the key provision here is the one on the bottom,

22   which is that the bank, in addition, in addition to using the

23   Los Angeles property as collateral, the bank was going to put a

24   lien on Mr. Manafort's primary residence, a luxury condo in

25   Virginia, and, that way, if Manafort didn't pay back the loans,

1  then the bank would be able to take the California property and

2  his home in Virginia, and sell them to pay off the loans.

3  That's how the bank protected itself.

4          Now, that conditional approval that we've just looked

5  at, that happens at the end of July 2016.  And then two and a

6  half months go by, two and a half months, and during that time,

7  the underwriting department and the sales department, they

8  gather up all the information that you need to have to decide

9  whether Paul Manafort is creditworthy with respect to a loan.

10 They gather up tax returns and bank statements and real estate

11 appraisals and profit and loss statements, all this paperwork

12 that they gather up and they review for the underwriting.  And

13 there's a lot that goes on in this time period, there's a lot

14 of back-and-forth, a lot.  But Mr. Calk is not involved with

15 most of that because he is not an underwriter.  That's going on

16 amongst the underwriters.

17         Now, you're going to see that there are issues that

18 come up during the course of the underwriting.  But, for the

19 most part, they're not shared with Mr. Calk.  There's a lot

20 that actually goes on behind his back.  There's a lot he isn't

21 told.  You're going to see a lot of emails about underwriting

22 issues that are not forwarded to Mr. Calk, they're not sent to

23 Mr. Calk.  There are memos that are written; they are not

24 forwarded to Mr. Calk, they are not sent to Mr. Calk.

25         And, in particular, you're going to see in the course

L6NKCAL2                        Opening - Mr. Schoeman

1   of this case that the salesman, Dennis Raico, who you heard

2   works on commission, he's highly motivated to push these loans

3   through.  He wants the loans to go through so he can get a

4   commission, so he does not share with Mr. Calk, and sometimes

5   he doesn't even share with the underwriting department, any

6   negative information about Paul Manafort.  He always, always,

7   always, puts a positive spin on Manafort and Manafort's

8   finances because he wants the loan to go through and he wants

9   his commission.

10          Now, one thing you will see, one thing you will see is

11  that Mr. Calk, for his part, he repeatedly, repeatedly denies

12  requests to lighten up on the terms of the loan, to go easy.

13  He never goes easy on Paul Manafort.  In fact, he consistently

14  makes the loan terms tougher.

15          One thing he does is he requires at one point, you'll

16  see, he requires Manafort to post as additional property a

17  mansion that Mr. and Mrs. Manafort owned in the Hamptons on

18  Long Island.  It's a big beautiful property with swimming

19  pools, tennis courts, and Mrs. Manafort's -- Mr. Calk is told

20  that Mr. Manafort's wife considers this her treasure.  She does

21  not want to post the mansion in the Hamptons as collateral, but

22  Mr. Calk insists on it, and it gets posted as collateral,

23  collateral meaning it's what the bank will take if the

24  Manaforts don't pay back the loan.

25          So then what happens?  Well, the bank does so much, so

L6NKCAL2                          Opening – Mr. Schoeman

1   much underwriting and due diligence on this loan, that the loan

2   isn't even ready to close until October, October 19th.  The

3   conditional approval was back at the end of July.  It's two and

4   a half months before they can even schedule the closing.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. SCHOEMAN:  Then what?  When that day comes, when

2   October 19 comes and it's time to close the loan, the one that

3   Mr. Calk approves, subject to the underwriting, Mr. Manafort

4   takes a close look at the terms of that loan and he says, no

5   thank you.  He says no thank you.  I don't want that loan.  He

6   looks at the loan that requires the mansion that's the wife's

7   treasure in Long Island, the Virginia condo, the L.A. property,

8   and he says that's too expensive and fees and taxes alone are

9   too high and he says no thank you to that.  He doesn't want it.

10      So Mr. Manafort proposes a new deal, a new structure.

11   Then what happens?  You are going to see that the salesman, the

12   salesman, that proposal was made to the salesman.  The

13   salesman, Dennis Raico, has an idea.  He thinks that another

14   bank, a bank called the Bank of the Internet, B of I, Bank of

15   the Internet, would be interested in exactly that kind of thing

16   that Manafort was proposing.

17      The idea that Raico has is that the Federal Savings

18   Bank, Mr. Calk's bank, will originate the loan, get a fee, a

19   commission from Manafort, and then sell it immediately to Bank

20   of the Internet and get another fee and commission.  Just make

21   a bunch of money on the fees and have Bank of the Internet own

22   the loan.  That's Raico's idea.

23      And this is good.  It's good for the bank because they

24   get the fees.  It's great for Raico because he gets commission

25   based on the fees.

1    So For the next few weeks Mr. Raico, he works like a

2    mad man furiously trying to package up this deal for Bank of

3    the Internet and he tells everyone, he says Bank of the

4    Internet will approve it.  Don't worry.

5    That's critical of Steve Calk's state of mind.

6    Because Raico is saying -- he is putting a positive spin on

7    anything.  He is saying Bank of the Internet is going to

8    approve it and this is great.  One of the things that Raico

9    says is, Bank of the Internet, they are on the verge, they are

10   going to approve it any day now.

11   So the loan, the loan is actually supposed to close

12   before Election Day.  The only reason -- first of all, there is

13   the loan in October, it doesn't -- Manafort says no.  The

14   second loan -- the new proposal is supposed to close before

15   Election Day but Bank of the Internet, they don't get the

16   approval done in time.

17   So, yes, Election Day comes, but it doesn't matter.

18   They didn't change anything.  They are still trying to sell

19   this loan to Bank of the Internet.  They are still -- let me

20   show you another exhibit.  This is an e-mail from Javier

21   Ubarri, president of the bank, to Steve Calk -- it's to Raico,

22   copy to Calk, but it's addressed Steve.  Here is where we are

23   with Manafort.  This is Friday, November 11, a few days after

24   the election.

25   He says here we are and he lays out three options.

L6NMCAL3                          Opening – Mr. Schoeman

1   This is coming from the president of the bank.

2           1, Bank of the Internet.  I think this is the

3   preferred route.  Supposedly, the deal is in the desk of the

4   senior credit officer for signature since Wednesday.  Signature

5   since Wednesday because Raico has been telling everyone, any

6   day now, any day now, any day now.  Option 2, the original deal

7   that Manafort said no to.  And option 3 is that the bank would

8   do the loan in its own portfolio.  It would do the loan itself

9   before getting approval from Bank of the Internet.

10          Mr. Ubarri, president of the bank, updating Steve Calk

11  says, we can do any of these options.  That's what Mr. Calk was

12  told.  And what they end up doing, what they end up doing is

13  option 3.  But the plan is the same.  Do the loan in the bank's

14  portfolio and then package it up, sell it to Bank of the

15  Internet so they can do another big profitable loan for

16  Manafort.

17          And that second loan, that second loan is not for a

18  brownstone in Brooklyn.  For Steve Calk, you will see that this

19  looks like another great profitable loan.  I'll show you the

20  term sheet for the loan.  This is the bank's term sheet.  The

21  borrowers are Mr. and Mrs. Manafort.  You see the same high

22  interest rate, 7 and a quarter percent.  The 2 percent fee up

23  front.  $5,000 application fee because they never go easy on

24  Manafort on the fee.  At the bottom you see the borrowers were

25  pledged a deposit account with the Federal Savings Bank that

L6NMCAL3                      Opening - Mr. Schoeman

must maintain a minimum balance of $2.5 million.  You will see

that that's collateral for the loan.  If the Manaforts don't

pay on that loan, not only does the bank take the Brooklyn

property through foreclosure, but they can take the cash.  No

foreclosure, no complicating proceedings, no risk.  Just take

the cash.  So cash collateral is the best kind of collateral

that a bank can have and it is the collateral that they took in

this loan.

         Once again, this loan was unanimously approved by the

bank's underwriting -- by the bank's loan committee, subject to

underwriting, and the underwriters approved the loan.  Because

the underwriting department gets to decide whether a loan goes

through.  So the underwriting is done, the underwriting

department approves the loan.  The loan gets made in January of

2017.

         By the middle of 2017, January 2017, Mr. Calk's bank

has made two loans to Paul Manafort.  The second loan actually

has two pieces.  Think of it as two loans that are unanimously

approved by the loan committee.  The terms of the loan are very

favorable to the bank.  The value of the collateral far exceeds

the amount of the loans.  They never go easy on the fees.  And

the underwriting department approves the loans.

         The underwriting department spent months.  Remember,

they first meet Manafort back in April.  The loan proposal that

they first approve is in July.  The first loan doesn't goes

1    until November.  The second loan doesn't close until January.

2    They spent a lot of time underwriting these loans.  And no one,

3    no one tells Steve Calk these aren't good loans for the bank.

4    No one tells him.  So there is no reason that Steve Calk

5    wouldn't think that these are great loans for his bank.  There

6    is no reason he wouldn't want to do big, profitable high

7    interest rate loans like these.

8         Let's be clear about something.  The prosecution is

9    going to call some witnesses who were involved with the

10   underwriting of the loans, and they are going to get deep in

11   the weeds of underwriting.  You may hear about regulations

12   relating to underwriting.  You'll see that the underwriters

13   raised questions about these loans, no doubt about it.  And

14   some people may say now that they never liked those loans.

15        But the issues that were raised by the underwriters in

16   e-mails and memos that were not forwarded to Steve Calk don't

17   tell you anything about what Mr. Calk did.  There are e-mails

18   and memos.  But look to see what's forwarded to Steve Calk.

19   Look to see what he receives.  You are going to learn in this

20   case that none of the underwriters even talked to Steve Calk

21   about these loans.  So, yes, look.  Definitely, Mr. Calk was

22   involved with these loans.  The evidence will show that these

23   were going to be the biggest loans, the most profitable loans

24   that the bank had done up to this point in time.  And Paul

25   Manafort seemed like a superstar.  He seemed like a very

1    important customer.  He was the kind of high-profile customer

2    that Mr. Calk would want to give personal attention to.

3            Mr. Calk wanted to make big profitable loans to Paul

4    Manafort.  As long as those loans are approved by the loan

5    committee and the underwriting department signs off, there is

6    no reason why he wouldn't want to make those loans.  The

7    evidence in this case will show a cold hard fact that the

8    underwriting department approved both of these loans and that's

9    a very inconvenient truth for the prosecution in this case.

10   These are the loan memos.  These are the loan memos from the

11   underwriting department and you are going to see these memos

12   later in the case, but these memos are signed by the lead

13   underwriter for the bank.  The one on the left is for the first

14   loan and the one on the right is for the second loan and that

15   is the signature of the chief underwriter of the bank approving

16   the loans.

17           Let me tell you right now, in hindsight, in hindsight,

18   looking back on it, the underwriting on these loans was not

19   great.  In hindsight, the underwriters made mistakes and they

20   overlooked things.  And Manafort, remember Manafort committed

21   fraud.  He is providing false statements and false financial

22   documents that the underwriters didn't pick up on.  More than

23   that, Raico, the salesman, the salesman Raico, he is feeding

24   everybody this positive information, but he's hiding facts from

25   the underwriting department.  He is hiding facts from Steve

Calk.  You are going to see this from the evidence.  You are

going see a lot of things that Steve Calk did not know at the

time.

        We talked about the loans.  As I said earlier, trying

to make big profitable loans was one of the things that the

evidence in this case will show Steve Calk did.

        What was the other?  It involves the presidential

election.  As you all remember, 2016 was a presidential

election year and Steve Calk, like a lot of people, was

interested in the election and in the issues and he wanted to

be involved.  And Paul Manafort asked Steve Calk whether he

would be willing to serve, whether Mr. Calk would have been

willing to volunteer as a member of Donald Trump's national

economic advisory council.  It's a volunteer position.  No

salary.  No expenses paid.  No reimbursement for anything of

any kind.  Would you be willing to serve as a volunteer on the

campaign?

        And Mr. Calk said yes, he would be willing to serve,

and he worked hard.  He worked hard in the campaign of 2016 in

the fall doing television appearances and serving as a

surrogate for the Trump campaign.  He did that without being

paid, without any reimbursement for expenses.  He talked about

the issues that he cared about, like the economy.  He was a

campaign surrogate in the fall of 2016.

        And then, as you know, and you were reminded,

1    something surprising happened on Election Day 2016.  Donald

2    Trump won the 2016 election and the evidence will show that

3    Mr. Calk wanted to serve his country.  He was excited.  He had

4    worked hard on the campaign.  He had been loyal to Donald Trump

5    and he made up a wish list, a wish list of jobs that he wanted,

6    that he would be thrilled.  He would be thrilled and honored to

7    have these jobs.

8            But what he was most interested in, as you heard, was

9    a job that would help him support the troops.  It was a job

10   that would him support the U.S. military, the job of secretary

11   of the army, which may not be a job you have heard a lot about

12   before, but it's not a military position.  It's a civilian

13   position.  You don't wear a uniform.  But you're a senior

14   person in the Pentagon looking out for the welfare of the

15   people in the army.

16           Mr. Calk, based on his background, really loves the

17   military, and he knows how to run a big organization because he

18   runs a bank.  He didn't certainly didn't need a government job

19   for the money.  His bank was a very profitable bank.  But he

20   wanted to serve his country.

21           So he reached out.  He reached out to lots of people

22   that he knew for advice and help, for connections and

23   networking about how to get involved with the Trump

24   Administration.  He reached out to generals, including the

25   generals who served on his board of directors at the bank.  He

1    reached out to other people.  He reached out to people that he

2    had met on the campaign.

3            And one of the people that he reached out to was Paul

4    Manafort.  Absolutely he did.  He reached out to Paul Manafort

5    because Paul Manafort had become a friend and the two men liked

6    each other and they talked on the phone all the time, and Steve

7    Calk sought out Paul Manafort's advice.

8            Now, Manafort wasn't even part of the campaign at that

9    time.  As you heard, he had left the campaign a couple of

10   months earlier.  He wasn't part of the transition team.  But

11   Paul Manafort, as you saw from the e-mail, had served on

12   campaigns for numerous people who went on to become President

13   of the United States, and he knew of something about how to get

14   a job in the administration.  Mr. Calk sought his advice,

15   absolutely.  He sought Mr. Manafort's advice in applying for a

16   job in the administration.  And Manafort put in a good word for

17   Mr. Calk, and Mr. Calk prepared an application and he was given

18   an interview.  Not even for secretary of the army, but actually

19   for under secretary of the army, not secretary of the army;

20   under secretary of the army.  He flew to New York, went to

21   Trump Tower, interviewed to be under secretary of the army and

22   did not get the job.  Didn't get any job.  Got nothing.  So

23   Mr. Calk volunteered on a political campaign, worked hard,

24   applied for a job that he did not get.

25           So one thing this case is definitely not about is

Steve Calk getting any money personally.  He didn't get a penny

for himself.  He didn't get a salary.  Didn't get his expenses

reimbursed.  Spent his own money.  Steve Calk did not receive

anything that he would ever think was a bribe.

What matters in this case is Steve Calk's intent and

whether he thought, whether he thought he was doing anything

wrong.  The evidence in this case will show that he thought

what he was doing was right.  He was doing the right thing by

making big profitable loans for his bank and trying, trying to

get a job in government service.

Every time the prosecution in this case starts asking

witnesses about what they thought about the loans or what they

thought about Mr. Calk applying for the job or what they

thought about anything else, listen to whether those thoughts

were shared with Mr. Calk.  If they weren't shared with

Mr. Calk, if it's just something that somebody says behind his

back or thinks behind his back, then it won't tell you anything

about what Steve Calk knew, what he intended.

You will see, from the evidence in this case, that

Steve Calk never intended to take a bribe.  Remember, you are

going to see the evidence in this case that the bribery theory

doesn't even make any sense because remember what the bribe is

supposed to be.  The bribe is what Mr. Manafort gave Mr. Calk.

What did Manafort give Calk?  A volunteer position on a

campaign and help and advice applying for a job that he did not

get.

And the prosecution theory in this case is that was so valuable to Mr. Calk that he put $16 million of his own bank's money at risk on a corrupt loan.  The evidence in this case, when you hear more about these loans, is going to show you that that doesn't make any sense.

What you will see from the evidence in this case is that Steve Calk loved these loans.  He thought they were good for his bank based on what he was told and what he knew.

Let me say one more thing about what this case is not about.  This case is not about partisan politics.  The name Donald Trump is going to come up during this trial.  Some people like him, some people don't.  Don't let that influence you in this case.  Don't let it influence you as you listen to the evidence.  Yes.  In 2016, that seems like such a long time ago, Mr. Calk supported Donald Trump.

But don't let political partisanship matter in this case.  It doesn't matter.  We are asking you to put politics aside.  Focus on the facts of this case and we trust that you will do that.

We also trust that you understand Judge Schofield's instructions that Mr. Calk is presumed innocent.  He doesn't have to prove anything.  We don't have to prove anything.  In the United States of America it's the prosecution's burden to prove its case by competent evidence beyond a reasonable doubt.

1    That's the protection that all of us have in this country.  And

2    anything less than proof beyond a reasonable doubt is not going

3    to be good enough, not in this courtroom, not in this trial,

4    not in this country, not in a criminal case.

5            At the end of the case, I am going to have one last

6    chance to speak with you like this.  I am going to show you

7    from the evidence and the lack of evidence that the prosecution

8    has not met its burden.

9            I will show you that what they have is a theory, a

10   theory that is based on hindsight, other people's opinions, and

11   speculation, but not the facts.

12           Then you will have an extraordinary responsibility.

13   You will have to review the evidence carefully and hold the

14   prosecution to its burden.

15           I'm confident that if we do our jobs, you will see

16   from the evidence and from the lack of evidence that Mr. Calk

17   did not commit a crime.  He did not make a corrupt deal.  You

18   will see that he is not guilty of these charges and you will

19   return a verdict of not guilty.  Thank you.

20           THE COURT:  The government will call its first

21   witness.

22           MR. SCOTTEN:  Thank you, your Honor.  The government

23   calls Blake Paulson.

24           THE COURT:  Ladies and gentlemen, I wanted to give you

25   a limiting instruction.  You are about to hear testimony about

1    an employee of the Office of the Comptroller of Currency, or

2    the OCC, regarding the OCC and its regulation of the banking

3    industry.

4           This testimony is admissible to provide you with

5    background, to allow you to understand this witness' role in

6    the events at issue, and to allow you to interpret other

7    evidence in the case.

8           You are not to infer from this testimony that the OCC

9    does or does not have any particular view of the loans in

10   question or of Mr. Calk, and I further instruct you that any

11   such view would not be relevant in this case.

12          You may proceed.

13   BLAKE PAULSON,

14        called as a witness by the government,

15        having been duly sworn, testified as follows:

16          THE COURT:  Would you talk right into the mic as

17   closely as possible, just because it's very hard to hear in

18   here.

19          THE WITNESS:  Is that better?

20          THE COURT:  Yes.

21   DIRECT EXAMINATION

22   BY MR. SCOTTEN:

23   Q.  Good afternoon.  Can you hear me OK?

24   A.  Yes, I can.

25   Q.  Mr. Paulson, how old are you?

L6NMCAL3                          Paulson - Direct

1    A.  Fifty-six.

2    Q.  How far did you go in school?

3    A.  I have a bachelor's degree, college.

4    Q.  In what?  Where did you go to school?

5    A.  Business administration from the University of South

6    Dakota.

7    Q.  I know the instruction gave it away, but where do you work?

8    A.  The comptroller currency, also known as the OCC.

9    Q.  Just briefly, what is the OCC?

10   A.  The OCC is a bureau of the U.S. Treasury department

11   responsible for overseeing the supervision of the federal

12   banking system.

13   Q.  Some of the jurors may have heard of the FDIC.  Is there a

14   relationship between these two agencies?

15   A.  Yes.  The OCC is responsible for federally chartered banks.

16   That's the OCC.  The FDIC is responsible for some state charter

17   banks.  The FDIC also is responsible for the Deposit Insurance

18   Fund, which insures deposits in all insured banks.

19   Q.  Including the banks that the OCC regulates?

20   A.  Yes.

21           THE COURT:  Mr. Scotten, apologies for the

22   interruption, but I'm having a little trouble hearing you.  If

23   there is any way -- I don't know if you can stand it up more or

24   get closer somehow.  I can't turn the volume up any higher on

25   your mic.

1          MR. SCOTTEN:  How is this, your Honor?

2          THE COURT:  Much better, your Honor.

3          MR. SCOTTEN:  Feels oddly loud in here.

4          THE COURT:  I'm sure.  In that little box it does.

5   Q.  Mr. Paulson, what does the OCC do in terms of regulation?

6   What are the goals of its regulation?

7   A.  So our mission is to ensure the safety and soundness of the

8   federal banking system and ensure fair access to credit and

9   fair treatment of customers.

10  Q.  Can you explain what you mean by safety and soundness.

11  A.  Right.  I will put it in two kind of categories.  One is

12  evaluating the conditions of the banks that we supervise in

13  determining that they are in at least satisfactory condition,

14  and the other significant piece is ensuring to have appropriate

15  risk management to manage the risks of their bank.

16  Q.  How long have you been at the OCC?

17  A.  Thirty-four years.

18  Q.  How did you start at the OCC?

19  A.  I started as an entry-level bank examiner examining

20  community banks in the Midwest.

21  Q.  As an examiner, how do you know what to look for?

22  A.  So the OCC has an extensive set of handbooks that provide

23  background guidance, information about appropriate bank

24  practices.  And included in those handbooks are also

25  examination procedures that examiners follow when they are

1    examining a bank.

2    Q.  Do those handbooks also contain regulations that are put in

3    the banks?

4    A.  Yes.  They would address the regulation appropriate or

5    relevant to that section of the handbook.  So that handbook was

6    talking about liquidity.  It would include relevant regulations

7    or references to relevant regulations about liquidity.

8    Q.  Are these handbooks published?

9    A.  Yes, they are published, available to the public on the OCC

10   website.

11   Q.  Does the OCC do anything in particular to make sure the

12   bank and bank officers have them?

13   A.  Yes.  Any time we update a handbook, we issue a bulletin.

14   Think of it as a kind of a cover letter that explains whatever

15   has changed since the last update, and that would include a

16   link to the full handbook.

17   Q.  I'm informed that if you are not in this echoing box, it's

18   hard to hear you, Mr. Paulson.  If you could speak even closer

19   to the mic.

20            My next question is, 2016 to 2018, what did you do for

21   the OCC?

22   A.  So during that time I managed our Chicago office.

23   Q.  I want to show you a picture.

24            MR. SCOTTEN:  Can you please show 1201.

25   Q.  Mr. Paulson, do you recognize this picture?

1   A.  Yes.  That's Mr. Calk.

2   Q.  How do you recognize Mr. Calk?

3   A.  So I met with him one time in July of 2018.

4   Q.  At the time you met with him what was the defendant's

5   position?

6   A.  He was the CEO and chairman of the board of the Federal

7   Savings Bank.

8   Q.  What is the Federal Savings Bank?

9   A.  So the Federal Savings Bank is a bank.  The OCC supervises

10  generally two kinds of banks, national banks and federal

11  savings associations, also commonly known as savings and loans,

12  and the Federal Savings Bank is a federal savings association.

13  Again, we refer to all of them generally as banks.

14  Q.  This meeting, when did it occur?

15  A.  It was July of 2018.

16  Q.  Where was the meeting held?

17  A.  At the Federal Savings Bank headquarters in Chicago.

18          MR. SCOTTEN:  Can we please show Government Exhibit

19  1216.

20  Q.  Mr. Paulson, do you recognize this picture?

21  A.  Yes.  This is the building that the meeting was held in.

22  Q.  Do you remember where in the building the meeting was held?

23  A.  A conference room within the federal savings banks leased

24  space within the building.

25  Q.  Who else was present?

1   A.   In addition to CEO Calk, his brother John, who was

2   vice-chairman, President Ubarri, and I believe there are three

3   other members of the senior management team of the bank.  That

4   was for the bank.  For the OCC it was myself and Ben Lemanski

5   who reported to me at that time.

6              MR. SCOTTEN:  Can we please show the witness

7   Government Exhibit 1212.

8   Q.   Mr. Paulson, do you recognize this picture?

9   A.   Yes.  That's President Ubarri.

10  Q.   In bank hierarchy, is the president above or below CEO?

11  A.   The president would be below the CEO.

12  Q.   So Mr. Calk's brother, did they both outrank Mr. Ubarri?

13  A.   I believe that is true, yes.

14  Q.   At this meeting did some members of the bank side speak

15  more than others?

16  A.   So, as I recall, the meeting started out with some comments

17  by Mr. Calk, and then Mr. Ubarri did a fair amount of speaking

18  for the bank, and John Calk made some comments as well.  But I

19  don't remember the other members of the management team doing

20  much of the speaking during the meeting.

21  Q.   What was the first topic the defendant discussed?

22  A.   So the first topic was Mr. Calk strongly denying media

23  reports that he had directed Federal Savings Bank to make loans

24  to Mr. Manafort in exchange for a position in the new

25  administration.

1   Q.  When you spoke with the defendant, did you know whether the

2   bank had in fact made loans to Mr. Manafort?

3   A.  I did know that, yes.

4   Q.  How did you know that the bank had made loans to

5   Mr. Manafort?

6   A.  So the purpose of the meeting was to discuss the

7   conclusions of a recent examination that our examiners had

8   conducted.  Within the report of that examination was some

9   discussion of the Manafort-related loans.

10  Q.  Did the defendant deny making loans to Paul Manafort?

11  A.  No.

12  Q.  When you had this meeting, did you know whether the

13  defendant had in fact tried to get a government position?

14  A.  I did not know.  All I was aware of was the media reports

15  that I did not know what was true and not true.

16  Q.  Did the defendant make any statements about whether he had

17  wanted the government position?

18          MR. LaVERNE:  Objection to the leading.

19          THE COURT:  I'm sorry.  Was there an objection?  Why

20  hear it.

21          MR. LaVERNE:  Yes.  Objection to the leading.

22          THE COURT:  Sustained.

23  Q.  What, if anything, did the defendant say about whether he

24  wanted a government position?

25  A.  He strongly denied wanting a position in the government.

Q.  Mr. Paulson, would you please take a look at Government

Exhibit 701 and 702, which I think you have a binder up there.

        Mr. Paulson, do you recognize these exhibits?

A.  Yes.

Q.  Just in general terms, what are Government Exhibits 701 and

702?

A.  So 701 is the bulletin or, as I referred to earlier, the

cover letter communicating update to a handbook, and the

handbook is Exhibit 702, which is our handbook on insider

activities.

        MR. SCOTTEN:  Can we please show the jury 701.  If we

could blow up the upper right-hand corner.

Q.  Mr. Paulson, who is this bulletin sent?

A.  As all our bulletins are, this is sent to CEOs of the

various types of banks that we supervise, as well as the bank

department division heads, and then all OCC examining personnel

and any other interested parties.

Q.  How is this guidance sent to bank CEOs?

A.  So bank CEOs and other senior bank officials are

responsible for being up to date on any changes in our guidance

and regulations, so they generally subscribe to an e-mailing

list, and they would get an e-mail that would include the

bulletin and, again, the bulletin would have a link to the

handbook.

Q.  Are there any other steps that the OCC takes to make sure

1    bank officers are aware of this kind of regulation?

2    A.  Yes.  We also send quarterly letters to bank CEOs, and

3    those letters would include a list of any guidance that we had

4    issued in the previous quarter, again, with links to all of

5    those guidance.  And then through our examination process, when

6    we are examining a bank for those topics, through the process

7    of examining them we would ascertain whether or not the

8    managers in the bank are familiar with any recent guidance.

9              MR. SCOTTEN:  Can we please publish Government Exhibit

10   702.

11   Q.  Mr. Paulson, what are we looking at here?

12   A.  Yes.  This is the comptroller's handbook on insider

13   activities.

14   Q.  How does it relate to the cover letter we just saw?

15   A.  Again, the cover letter would announce that we made updates

16   to this handbook, would provide a summary of what some of those

17   changes were, and then this would be the entire handbook.

18   Q.  Are you familiar with a term insider activities?

19   A.  Yes.

20   Q.  What does it mean?

21   A.  So an insider would be an officer of the bank, a director,

22   which is a member of the board of directors.  In some cases

23   shareholders of the bank would all be considered insiders.

24   Insider activity would be when those insiders, either

25   personally or their business interests, would have some

1  business with the bank, loans or deposit accounts or something

2  like that.  Those would be considered insider activities.

3  Q.  What approach does the OCC take toward insider activities?

4  A.  We scrutinize insider activities very closely.  While we do

5  risk based supervision of our banks, meaning we don't look at

6  every area of the bank every year, insider activities is

7  something that we look at very regularly in all the banks we

8  supervise.

9  Q.  Why did the OCC scrutinize insiders activities closely?

10 A.  It's very important that there are not inappropriate

11 insider activities happening that can undermine confidence in

12 the bank if the public believes that insiders are getting

13 beneficial treatment or somehow taking advantage of their

14 position within the bank to the bank's detriment.

15         MR. SCOTTEN:  Ms. Coleman, can we please turn to the

16 next page and blow up the very bottom paragraph.

17 Q.  Mr. Paulson, I am just going to give the jury a second to

18 read that, and I am going to ask you to summarize it.

19         Mr. Paulson, I believe you testified a moment ago that

20 the defendant was a chairman and CEO at the time you met him?

21 A.  Correct.

22 Q.  Can you summarize what guidance this paragraph gives to

23 someone in the defendant's position?

24 A.  So there is two fiduciary duties that an officer or

25 director owes to the bank.  One is the duty of care.  This one

1    is the second one, which is the duty of loyalty, which,

2    briefly, requires that insider of the bank, an officer or

3    director of the bank does not benefit personally from their

4    position in the bank at the bank's expense.  In essence, they

5    have to put the bank's interest above their own personal

6    interest.

7           MR. SCOTTEN:  Can we please turn to the next page and

8    then blow up the top paragraph there.

9    Q.  Again I'll just give the jury a brief moment and then ask

10   you to summarize.

11          Mr. Paulson, what does this tell someone in the

12   defendant's position?

13   A.  So it starts out in the sentence that carries over from the

14   previous page and continues on this page about not letting

15   personal interest cloud their judgment with respect to bank

16   business, and then it also talks about conflicts of interest

17   arising from personal business interests and provides direction

18   on their responsibilities, if they have either an actual

19   conflict of interest or an apparent conflict of interest.

20   Q.  What is the responsibility of the bank officer who has an

21   actual or apparent conflict of interest?

22   A.  So, first of all, they would be required to disclose that

23   conflict to the board of directors, including any relevant

24   information about that conflict, and, secondly, they would need

25   to abstain from any -- taking part in any way or fashion in

1    that transaction.  So it could involve improving it or any of

2    the conditions and would have to completely separate themselves

3    from any decisions that the bank makes regarding a transaction

4    where there is a conflict of interest or an apparent conflict.

5          MR. SCOTTEN:  Just going one last paragraph, if you

6    can blow up the next paragraph.

7    Q.  I'm not going to ask you about this entire paragraph, but

8    do you see the sentence reading, directors and management must

9    fully disclose any personal interest that they have in matters

10   affecting the banks and must ensure that these business and

11   personal relationships with the bank are always at arm's

12   length?

13   A.  Yes.

14   Q.  What does the term arm's length mean?

15   A.  Arm's length essentially means an insider cannot get terms

16   on any transaction that are better than they would get if they

17   were not an insider.  So a similarly situated noninsider, they

18   should get the same terms that the noninsider would get.  They

19   could not get any better terms than that.

20         MR. SCOTTEN:  We can pull that down and go to the next

21   page, please.  If we could highlight the second paragraph

22   beginning 12 C.F.R. 163.200.

23   Q.  Mr. Paulson, I am going to ask you to summarize this

24   paragraph.

25   A.  Yes.  This is a regulation that applies to federal savings

L6NMCAL3                          Paulson - Direct

1   associations that essentially covers the things that we have

2   already talked about about owing a fiduciary duty to the

3   association.  In this case the association is synonymous with

4   bank and they must not advance their own interests or their own

5   business, personal or business interests above those of the

6   bank.

7   Q.  Do you see anything in this paragraph discussing whether

8   the bank officer or director owns part of the bank?

9   A.  No, it does not address that.

10  Q.  How, if at all, does it matter if the officer or manager

11  owns part of the bank?

12  A.  It does not matter at all.

13  Q.  Regardless of who owns the bank, who insures a bank's

14  deposit?

15  A.  That's the FDIC, the Federal Deposit Insurance Corporation.

16  Q.  Are insider activities the only issue on which the OCC

17  provides guidance to banks?

18  A.  No.  We provide guidance on all issues that are relevant to

19  banks.

20  Q.  Could you please take a look at Government Exhibit 704 and

21  719 in your binder.  Tell me if you recognize that.

22  A.  Yes, I do.

23  Q.  In general terms, what are they?

24  A.  So 719 is the bulletin.  Again, the cover letter that

25  explains that we had recently updated our comptroller's

1    handbook on commercial real estate lending, and then Exhibit

2    704 is that handbook on commercial real estate lending.

3            MR. SCOTTEN:  Can we please publish 719.  If we could

4    blow up the smaller text in the upper right, please.

5    Q.  Mr. Paulson, who is this sent to?

6    A.  Again, as all our bulletins are, CEOs of all the different

7    types of banks that we supervise, including federal savings

8    associations, their CEOs, department and division heads, all

9    OCC examining personnel and other interested parties

10   essentially to the public.

11   Q.  Is there a difference between the other steps OCC takes to

12   ensure CEOs know about this and the steps you've already been

13   discussing today?

14   A.  No.  They would be the same.

15           MR. SCOTTEN:  If we could take that down and please

16   put up 704.

17   Q.  What are we looking at here, Mr. Paulson?

18   A.  So this is the updated comptroller's handbook on commercial

19   real estate lending.

20   Q.  How does this relate to the exhibit we just saw, that cover

21   letter?

22   A.  That cover letter is what announces and summarizes the

23   changes that have been made since the previous update to the

24   handbook.

25   Q.  What is commercial real estate lending?

1    A.  So commercial real estate lending is a type of commercial

2    lending.  It specifically involves various types of commercial

3    real estate.  So it could be for the construction of commercial

4    real estate, it could be for long-term investor holding and

5    leasing out commercial real estate, which would include

6    construction of residential real estate, apartment buildings,

7    office buildings, warehouses and those types of properties.

8    Q.  Are there circumstances under which a single-family

9    residence construction could qualify as a commercial real

10   estate loan?

11   A.  Yes.  The construction of a single-family home or a

12   residential real estate property for sale would be a type of

13   commercial real estate loan.

14        MR. SCOTTEN:  Can we please turn to the next page.

15   Actually, one more page.

16   Q.  Under the bullet analyzing repayment capacity of the

17   borrower, I am going to give the jury a second to take a look

18   at it and then ask you a couple of questions, Mr. Paulson.

19        Mr. Paulson, first question I am going to ask you is,

20   what did this guidance tell someone in defendant's position are

21   the main factors in determining a borrower's ability to repay?

22   A.  Yes.  So it really does focus on the importance of when

23   evaluating a commercial real estate loan, the bank evaluating

24   that borrower's ability to repay the loan, either through cash

25   flow, essentially lease income, if it's going to be a leased

1    property, or from the sale of the property, if that's the

2    intended source to repay the loan.

3    Q.  Now, you see where it says collateral?  It's towards the

4    bottom.  There is reference to collateral.

5    A.  Yes.

6    Q.  I am sure most jurors know what this means.  Just for

7    clarity, in banking terms, what does that term collateral mean?

8    A.  Yes.  So collateral is whatever secures the loan.  So if we

9    are talking about commercial real estate, it is that real

10   estate property that the borrower pledges to the bank as

11   collateral in case the borrower is not able to repay the loan.

12   Q.  Is strong real estate collateral alone reason enough to

13   extend a commercial real estate loan?

14   A.  No.  The first and foremost thing that should be considered

15   is the borrower's ability to repay the loan.  Collateral is

16   typically considered a secondary source of repayment in case

17   the borrower is not able to repay the loan.

18   Q.  Are the reasons that commercial real estate collateral

19   cannot be the primary factor in making commercial real estate

20   loans?

21   A.  So we have been through a number of cycles.  I have in my

22   career.  Commercial real estate property values will fluctuate.

23   They will go up and they will go down.  And at the time a bank

24   makes a loan secured by commercial real estate, they don't know

25   when they may need to repossess that collateral and sell it.

So they don't know if that would be a good time in the market
or a bad time.  And typically it's in a down cycle when banks
end up repossessing commercial real estate property and needing
to sell it.  In that case it may no longer be of sufficient
value to repay the loan.

Q.  Are there any concerns with the process and recovery of
collateral?

A.  Yes.  So foreclosing on commercial real estate can be
timely -- time consuming.  Excuse me.  It can take two, three,
even four years and it's a legal process that a bank has to go
through and the bank is not always successful in that legal
process in being able to take control of that commercial real
estate property and sell it to repay the loan.  So there are a
number of risks involved with relying on collateral.

Q.  Mr. Paulson, in your personal experience, how many bank
CEOs and chairmen have you met with?

A.  Well over a hundred.

Q.  How widespread is the understanding that a commercial real
estate collateral loan cannot justify a loan?

          MR. LaVERNE:  Objection, your Honor.  Hearsay.

          THE COURT:  Sustained.

Q.  In your experience, are the OCC's measures to ensure this
information is disseminated effective?

A.  Yes.

          MR. SCOTTEN:  One second, your Honor.

1              Nothing further, your Honor.

2              THE COURT:  Cross.

3    CROSS-EXAMINATION

4    BY MR. LaVERNE:

5    Q.  Good afternoon, Mr. Paulson.

6    A.  Good afternoon.

7    Q.  My name is Darren LaVerne.  I'm one of the lawyers for

8    Mr. Calk.  If you can't hear me at any time, please just say so

9    and I'll restate the question.

10   A.  Sounds good so far.

11   Q.  I think on direct I heard you testify that you've been with

12   the OCC for 33 years, is that correct?

13   A.  Thirty-four.

14   Q.  The OCC is an agency of the U.S. Government, true?

15   A.  Correct.

16   Q.  Mr. Paulson, you have never actually worked at a bank,

17   true?

18   A.  I have never worked for a bank.  I have worked in many

19   banks.

20   Q.  That's what I mean.  Never been employed by a bank?

21   A.  Correct.

22   Q.  You've never, for example, served on a bank's credit

23   committee, true?

24   A.  True.

25   Q.  You never served in a bank's underwriting department, true?

L6NMCAL3                         Paulson – Cross

1   A.  Correct.

2   Q.  You have never worked in the private sector at all, true?

3   A.  Not true.

4   Q.  Sorry.

5   A.  Not in the financial services industry, but prior to, I had

6   a number of jobs as a youth and while I was in college and

7   those kinds of things.  But my entire professional career has

8   been with the OCC.

9   Q.  Thank you for clarifying.

10          Now, you testified, Mr. Paulson, about a number of

11  rules and regulations when you were being asked questions by

12  Mr. Scotten.

13          Do you remember that?

14  A.  Yup.

15  Q.  The OCC issues these rules and regulations, true?

16  A.  Correct.

17  Q.  And they are issued in fact in something called Code of

18  Federal Regulations, true?

19  A.  Right.

20  Q.  And all of these regulations that Mr. Scotten was asking

21  you about are what we call civil regulations, true?

22  A.  Correct.

23  Q.  That is, they are not criminal laws, correct?

24  A.  Correct.

25  Q.  The OCC, Mr. Paulson, doesn't issue criminal rules, true?

1   A.  Correct.

2   Q.  Just to be clear, Mr. Paulson, while you were answering Mr.

3   Scotten's questions about some rules and regulations, you,

4   Mr. Paulson, are not a lawyer, correct?

5   A.  That's true.

6   Q.  Mr. Scotten asked you some questions about something that

7   you testified is called the OCC handbook, right?

8   A.  Right.

9   Q.  The handbook, as you testified, contains OCC guidance in a

10  number of different matters, true?

11  A.  True.

12  Q.  And the handbook is published in different sections,

13  correct?

14  A.  Correct.

15  Q.  Each addressed to a different topic, correct?

16  A.  Correct.  Yup.

17  Q.  I think I heard you testify on direct and say that the

18  number of sections is extensive, true?

19  A.  Yes, that's true.

20  Q.  Mr. Scotten showed you excerpts, couple of pages from just

21  two of those handbooks, true?

22  A.  Right.

23  Q.  In fact, Mr. Paulson, by my count, there is something like

24  91 different sections of his handbook, true?

25  A.  I have not counted them, but that sounds like a reasonable

1    number.

2    Q.  The handbooks, I think you testified, on liquidity,

3    correct?

4    A.  Yes.

5    Q.  There is a whole handbook on community bank supervision,

6    correct?

7    A.  Correct.

8    Q.  There is a handbook on interest rate, correct?

9    A.  Yes.

10   Q.  Handbook on internal controls, correct?

11   A.  Right.

12   Q.  Handbook on mortgage banking, correct?

13   A.  There is.

14   Q.  Many, many more, correct?

15   A.  True.

16   Q.  Each of these handbooks, Mr. Paulson, can be hundreds of

17   single-spaced pages long, true?

18   A.  I believe many of them are over a hundred pages, including

19   the exam or procedures, yes.

20   Q.  The government, for example, showed you their Exhibit 704,

21   you recall, which was a two-page excerpt from the commercial

22   real estate lending handbook, true?

23   A.  Yes.

24   Q.  In fact, that handbook that they showed you the excerpt

25   from is actually over 130 pages long, true?

L6NMCAL3                         Paulson - Cross

1    A.  That sounds true, but I have not counted the pages in quite

2    a while.

3    Q.  The handbook of insider activities that Mr. Scotten showed

4    you is about 50 pages long, correct?

5    A.  I'll take your word for it.  I don't know.

6    Q.  Now, as you testified, Mr. Paulson, from time to time the

7    OCC issues what are called bulletins relating to these

8    handbooks, true?

9    A.  Right.

10   Q.  You testified about two bulletins, both of which were

11   issued in 2013, correct?

12   A.  Right.

13   Q.  That's Government Exhibit 701 and 719, true?

14   A.  Yes.

15   Q.  Now, those weren't the only two bulletins that were issued

16   in 2013, right?

17   A.  That's right.

18   Q.  In fact, Mr. Paulson, the OCC in 2013 alone issued

19   something like 20 bulletins, correct?

20   A.  I don't know the answer to that, but it seems reasonable.

21   At that time we had recently integrated with the Office of

22   Thrift Supervision, or OTS, who had previously supervised the

23   federal savings associations.  We were merging a lot of that

24   guidance together and doing updates to many of our handbooks,

25   so it sounds reasonable that we would have issued that number

1   during that period of time.

2   Q.  You knew back then how many bulletins you were issuing,

3   obviously, correct?

4   A.  Sure.

5   Q.  Let me show you what I have marked -- this is just for the

6   witness -- Defense Exhibit 1029.  Take a look at 1029 just for

7   the witness.  See if it refreshes your recollection as to how

8   many bulletins were actually issued in 2013.

9           MR. LaVERNE:  We can scroll through the pages or even

10  hand it up to Mr. Paulson, if that's easier, your Honor.

11  Q.  You can go more slowly, if you want.  I don't want to put

12  you on the spot.

13  A.  You can go to the last one and that will tell me how many

14  there were.  This is the last one.  This is OCC bulletin

15  2013-41, which would indicate we issued 41 bulletins during

16  2013, not all of which would be relevant to every bank that we

17  supervised.

18  Q.  And these are on a wide array of topics, true?

19  A.  Right.

20  Q.  When Mr. Scotten showed you those two bulletins, 701 and

21  719 focused in on the top right corner.

22          MR. LaVERNE:  Why don't we put Government Exhibit 719

23  on the screen, just to refresh Mr. Paulson's recollection.

24  Q.  Look on the right side of the page.  He focused you on the

25  fact that it's addressed to chief executive officers of all

1   national banks and federal savings associations.

2            You see that?

3   A.  Yes.

4   Q.  As well as department and division heads and all examining

5   personnel and other interested parties.

6   A.  Right.

7   Q.  Mr. Paulson, in fact, every single one of the bulletins

8   issued that year was addressed to those same parties, true?

9   A.  I believe so, yes.

10  Q.  Not just those two?

11  A.  Right.

12  Q.  Now, one other thing about 719 while we have it on the

13  screen.  On the top left it says 5/20/2021.

14           You see that?

15  A.  Yup.

16  Q.  That's the date that you printed it off the Internet, true?

17  A.  I assume that is the case.  I didn't print it myself, so I

18  don't know that.

19  Q.  But that's last month, correct?

20  A.  Right.

21  Q.  This isn't the actual e-mail that you say went to Mr. Calk

22  back in 2013, true?

23  A.  It does not appear to be that.

24  Q.  Mr. Scotten didn't show you any actual e-mails with this

25  information that was sent to Mr. Calk, true?

L6NMCAL3                          Paulson - Cross

1   A.  True.

2   Q.  You don't have that e-mail with you, do you?

3   A.  I don't.

4   Q.  Now, with respect to 719 there is some information listed

5   in this bulletin, correct?

6   A.  Yes.

7   Q.  It's a summary of some of the latest developments and

8   updates to the handbook, true?

9   A.  Yes.

10  Q.  What's in this bulletin does not contain the information

11  about collateral that Mr. Scotten showed you in Exhibit 704,

12  true?

13  A.  The bulletin wouldn't unless there was new information in

14  the handbook.  So that would suggest the information in the

15  handbook on collateral was existing information prior to this

16  update.

17  Q.  To get to that handbook, this is my point, that information

18  that Mr. Scotten showed you in 704, you have to receive this

19  bulletin, true?

20  A.  You don't have to.  You can go find the handbook on the OCC

21  website.

22  Q.  So you have to go to the website and look it up?

23  A.  Yes.

24  Q.  Once you get this bulletin you have to scroll down to the

25  bottom, true?

1   A.  Yes.

2          MR. LaVERNE:  We can scroll down.

3   Q.  There is something that says related link at the bottom.

4   You see that?

5   A.  Correct.

6   Q.  Under related link the recipient of any e-mail containing

7   this bulletin would have to actually click on that link, true?

8   A.  Again, they could click on the link.  They could go

9   directly to our website.

10  Q.  If they clicked on the link they wouldn't go right to those

11  two pages that Mr. Scotten showed you, true?

12  A.  Correct.  They would go to the cover page.

13  Q.  They would go to the 136-page handbook, true?

14  A.  Correct.

15  Q.  You don't have, Mr. Paulson, any records showing who

16  clicked through that link, true?

17  A.  If we did, I have never seen.

18  Q.  You don't have a record showing that Mr. Calk clicked

19  through the link on Government Exhibit 719?

20  A.  Correct.

21  Q.  Mr. Paulson, if you read the bulletin, nowhere in this

22  bulletin does it say that the recipients of it are required to

23  click through the link, true?

24  A.  That's true.  They are required to understand the contents

25  of the handbook.

L6NMCAL3                          Paulson - Cross

1   Q.  My question is simply whether or not this bulletin tells

2   the recipient that they are required to click through the link.

3   A.  It does not say that.

4   Q.  Now, this bulletin on commercial real estate lending was

5   issued, as you said, back in 2013, true?

6   A.  True.

7   Q.  August of 2013, true?

8   A.  Right.

9   Q.  Which is some three years before the events in question in

10  this case, true?

11  A.  Right.

12  Q.  And did you check to see if there have been bulletins on

13  the subject issued in 2014?

14  A.  I did not.

15  Q.  Did you check to see if there had been bulletins issued in

16  2015?

17  A.  I didn't.

18  Q.  In 2016.

19  A.  No.

20  Q.  Sitting here today, you are not aware of any such bulletins

21  being issued in those three years, true?

22  A.  I am not aware of updates to the commercial real estate

23  lending handbook, no.

24          MR. LaVERNE:  Let's put on the screen now, if we

25  could, Government Exhibit 701.

1  Q.  701 is the bulletin on insider activities, updates to the

2  insider activities handbook that Mr. Scotten showed you, true?

3  A.  Right.

4  Q.  Again, this is the same format where if you received the

5  bulletin, to access the handbook you got to scroll all the way

6  down and click on related links, true?

7  A.  True.

8  Q.  Nothing in this bulletin tells the recipients that they are

9  required to click on the link, true?

10 A.  True.

11 Q.  And you have no record that Mr. Calk ever clicked through

12 that link, true?

13 A.  True.

14 Q.  You have no record that Mr. Calk ever went to those couple

15 of pages you were shown, correct?

16 A.  That's true.  That doesn't change their responsibility for

17 knowing the regulation and knowing the guidance that's in the

18 handbook.

19 Q.  This booklet Mr. Paulson was also issued in November of

20 2013, true?

21 A.  Yes.

22 Q.  Which was three years before the events in question, true?

23 A.  Right.

24 Q.  You don't know whether or not there are any updates to this

25 handbook issued in 2014, true?

1   A.   I have not looked to see if there is, no.

2   Q.   2015, true?

3   A.   Right.

4   Q.   2016, true?

5   A.   Same.

6            MR. LaVERNE:   I'd like now to turn to Government

7   Exhibit 702.  Put that on the screen.

8   Q.   This, Mr. Paulson, is the two-page excerpt of 50-page

9   handbook that Mr. Scotten showed you on direct, true?

10  A.   Yes.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L6NKCAL4                          Paulson - Cross

1    BY MR. LaVERNE:

2    Q.  Now, Mr. Scotten asked you a number of questions about the

3    regulations and concepts that are in this excerpt, true?

4    A.  True.

5    Q.  Now, if we could turn to page 13 of this exhibit, numbered

6    page 13 — it's on the screen there in front of you —

7    Mr. Scotten asked you, in particular, about the regulation in

8    the middle of the screen, 12 CFR 163.200, conflicts of

9    interest, true?

10   A.  Yes.

11   Q.  And I believe when Mr. Scotten asked you about it, he asked

12   if you could just summarize it, true?

13   A.  Yes.

14   Q.  Now, if you read this -- let's read it.  It says,

15   "directors, officers, employees, federal savings associations,"

16   right?

17   A.  Yep.

18   Q.  "Or persons having the power to direct the savings --"

19              MR. SCOTTEN:  Objection to reading the entire exhibit.

20              MR. LaVERNE:  It's just a paragraph.

21              THE COURT:  Overruled.

22   BY MR. LaVERNE:

23   Q.  "Or persons having the power to direct the savings

24   association's management or policies," true?

25   A.  Yes.

1   Q.   "Or otherwise owe a fiduciary duty to the association must

2   not advance their own personal business interests or those of

3   others with whom they have a personal business relationship at

4   the expense of the savings association."

5          That's what it says, correct?

6   A.   Yes.

7   Q.   And that's what the rule provides, right?

8   A.   Yes.

9   Q.   And the rule goes on to say they also must, if they have an

10  interest in a matter or transaction, before the board of

11  directors, right?

12  A.   Yes.

13  Q.   Disclose certain information and refrain from participating

14  in board discussions on the matter or voting on the matter,

15  true?

16  A.   True.

17  Q.   This regulation governs matters that are before the board

18  of directors, true?

19  A.   Yes.

20  Q.   There is no further guidance in this rule as to what

21  advancing your own personal interests at the expense of the

22  savings association means, correct?

23  A.   Not in this paragraph, no.  I don't see anything relevant

24  to that.

25          THE COURT:  I'm sorry, I can't hear you.

1          THE WITNESS:  I don't see anything in this paragraph

2     to that effect.

3     BY MR. LaVERNE:

4     Q.  And there's no further guidance in this rule as to what

5     having a matter or transaction before the board of directors

6     means, true?

7     A.  I believe that's true relative to the rule, but that

8     doesn't change the duty of loyalty.

9     Q.  The question simply is:  What is in the rule that you say

10    was sent to bank CEOs, that's what the rule says, true?

11    A.  True.

12    Q.  Now, if we look at above that, on Government Exhibit 719,

13    there's another rule Mr. Scotten asked you about, 12 CFR

14    160.130, true?

15    A.  I don't believe he asked me about that rule, no.

16    Q.  I seem to recall him asking, but I'll ask you some

17    questions about it anyway.

18    A.  Okay.

19    Q.  Now --

20          MR. SCOTTEN:  Objection; beyond the scope.

21          MR. LaVERNE:  It's in an exhibit that the government

22    introduced.

23          THE COURT:  I'll allow it.

24    BY MR. LaVERNE:

25    Q.  The title of the rule is called, "Prohibition on Loan

1   Procurement Fees," correct?

2   A.  Yes.

3   Q.  And the regulation says:  "This regulation prohibits

4   directors, officers, or other persons having the power to

5   direct the management or the policies of the federal savings

6   association from receiving, directly or indirectly, any

7   commission, fee, or other compensation in connection with the

8   procurement of any loan made by the savings association or

9   subsidiary," true?

10  A.  Yes.

11  Q.  So, the rule is entitled, "Prohibition on Loan Procurement

12  Fees," true?

13  A.  Yes.

14  Q.  And it says it applies to commissions, fees, or other

15  compensation, true?

16  A.  Yes.

17  Q.  The rule provides no definition to those you say who

18  received it of what a commission, fee, or other compensation

19  is, true?

20  A.  The rule itself does not, no.

21  Q.  And the rule does not discuss, for example, whether or not

22  it applies to the receipt of a voluntary job on a political

23  campaign, true?

24  A.  It doesn't say that.  I would interpret other compensation

25  broadly.

L6NKCAL4                          Paulson - Cross

```
 1   Q.  I'm not interested in your interpretation; I'm interested
 2   in what the rule says.
 3            Does the rule say that?
 4   A.  It does not say that.
 5   Q.  And it doesn't say anything about this rule applying to
 6   providing a referral for a government job, true?
 7   A.  It does not.
 8   Q.  I'd like to turn now to another topic.
 9            You testified, Mr. Paulson, about the various
10   handbooks that the OCC issues, true?
11   A.  Yes.
12   Q.  And you testified about the OCC's regulatory mission, true?
13   A.  Yes.
14   Q.  And you testified there's various ways that the OCC
15   enforces that mission, true?
16   A.  Right.
17   Q.  And one of the ways that the OCC enforces its mission is to
18   conduct regular examinations of the banks under its
19   supervision, true?
20   A.  Yes.
21   Q.  And, Mr. Paulson, it's no secret that the bank conducts
22   these examinations, true?
23   A.  That the OCC conducts the examination?
24   Q.  Yes.
25   A.  You said "the bank."
```

1    Q.   I'm sorry.  Thank you for correcting me.

2    A.   Okay.

3    Q.   It's no secret that the OCC conducts these examinations of

4    banks, true?

5    A.   Correct.

6    Q.   In fact, the OCC advises bankers that they will be examined

7    on a regular basis, true?

8    A.   True.

9    Q.   There's something the OCC has called the supervisory cycle,

10   true?

11   A.   Correct.

12   Q.   And under that cycle, there's a presumption that banks are

13   examined on at least a quarterly basis, true?

14   A.   No, that's -- well, they would receive an examination every

15   12 to 18 months, depending on the size of the institution and

16   some other factors.  We contact each institution every quarter,

17   but I would not call that an examination on a quarterly basis.

18   Q.   Okay.  But you make banks aware that they are examined on

19   an annual basis, with some exceptions, every 18 months, true?

20   A.   Correct.

21   Q.   And that annual examination that you tell bankers is going

22   to happen is what's called a full-scope examination, true?

23   A.   Correct.

24   Q.   And that's an examination where you go on-site, true?

25   A.   In most cases, yes.  Obviously, over the last year, not so

1    much.

2    Q.  And sometimes the OCC is on-site for days or weeks, true?

3    A.  Yes.

4    Q.  And these examinations, these full-scope examinations,

5    they're not a surprise, right?

6    A.  They are not a surprise, generally, no.

7    Q.  And you're entitled as the OCC, under federal statute, to

8    prompt and unrestricted access to the bank's books and records,

9    true?

10   A.  Yes.

11   Q.  And bankers know that, true?

12   A.  They do.

13   Q.  And you're entitled to communicate freely with bank

14   personnel during the examination, true?

15   A.  That's true.

16   Q.  And bankers know that, true?

17   A.  They do.

18   Q.  I'd like to ask you a few questions about another topic.

19           As part of this supervision --

20           THE COURT:  I'm going to interrupt for just a second.

21   It's two minutes till 4:00.  So, unless it's a very short

22   topic, what I would do is suggest we just postpone it until

23   tomorrow.

24           MR. LaVERNE:  That's fine.  Thank you, your Honor.

25           THE COURT:  Okay.

1          So, you're excused temporarily.  The jury, because of

2     our COVID procedures, breaks at 4:00, so I would like you to

3     come back and testify tomorrow, please.

4               THE WITNESS:  Okay.

5               THE COURT:  Okay.  You can step down.

6               (Witness temporarily excused)

7               THE COURT:  So, ladies and gentlemen, we're breaking

8     for the day.  We'll resume at 10:00 a.m. tomorrow promptly.

9     I'd like you to be here, as I said, by 9:45.  If you need to

10    get here earlier than that to assure that you aren't late,

11    please do that.

12         We should have notebooks and something to write on

13    tomorrow, and so you'll be able to do that.

14         I would ask you, and instruct you again, to follow all

15    the instructions I gave earlier.  I won't repeat them except to

16    say, please don't communicate with anyone about the case,

17    please don't read anything about the case, or do any research

18    about the case.

19         I wish you all a good evening, and I look forward to

20    seeing you tomorrow.  Thank you.

21              (Continued on next page)

22

23

24

25

L6NKCAL4

1          (Jury not present)

2          THE COURT:  You can sit down.  I wanted to do a little

3     bit of housekeeping.

4          Can the lawyers provide notebooks tomorrow for the

5     jurors, and pens?  We were just going to give them paper, but

6     one of them had asked us for notebooks because they were

7     concerned about having something, a hard surface, to write on,

8     and so if it's possible to come up with notebooks, that would

9     be much appreciated.

10          MR. SCOTTEN:  We have notebooks, your Honor.  We never

11     got the cue to hand them out.  So we can give them to

12     Mr. Street tomorrow morning, if that's what you prefer?

13          THE COURT:  If you have them now, you can give them to

14     him now, but if you don't have them now, tomorrow morning is

15     fine.

16          MR. SCOTTEN:  I'm told we have them now, so we'll work

17     it out with the Court's deputy when your Honor is finished.

18          THE COURT:  That's good.

19          Do you have pens, too?

20          MS. ROTHMAN:  Yes, your Honor.

21          THE COURT:  Even better.

22          Then what I'd be interested in is a comprehensive

23     witness list, with a proposed order of calling them.  I

24     understand that sometimes, because of schedules, the schedule

25     isn't always met, but just so I have some idea, because, as I

L6NKCAL4

1    sit here, I haven't reviewed your 3500 material, I don't really

2    know who's going to testify.  So if you could email that to me,

3    with a copy to defense counsel, I'd appreciate that.

4              MR. SCOTTEN:  Our order gets nebulous as the case goes

5    on, but we've been giving the defense counsel a week, and we

6    can do the same for your Honor.

7              THE COURT:  Okay.  I'd just like an entire list, so I

8    have a sense during the trial of how far we are.  I will not

9    hold you in any way to the order.

10             MR. SCOTTEN:  Got it.

11             THE COURT:  I will ask you every evening who's

12   testifying the next day, and that's my next question.

13             MR. SCOTTEN:  So, Ms. Ivaknik.

14             THE COURT:  Who's that?

15             MR. SCOTTEN:  She's a -- she was a banker's assistant

16   at the Federal Savings Bank who was involved.  She essentially

17   worked for the loan officer for the first five or six weeks of

18   the loan process, and then she left the bank due to reasons

19   that the parties agreed not to inquire about, why she left the

20   bank.

21             THE COURT:  Okay.

22             MR. SCOTTEN:  That's who she is in the case.

23             THE COURT:  All right.

24             MR. SCOTTEN:  I think there's likely, then, to be a

25   custodian, who was a custodian for some of the records related

L6NKCAL4

1    to the campaign -- the transition?

2             MS. ROTHMAN:  Yes.

3             MR. SCOTTEN:  -- the transition to which the defense

4    would not stipulate, so we assume it will be a short witness.

5             MS. ROTHMAN:  Your Honor, his name is Kory Langhofer.

6    He's from the presidential transition team, and he will

7    authenticate a handful of documents that we would offer.

8             And then the next witness would be Anthony Scaramucci,

9    who was part of the transition team, and he will testify to the

10   manner in which Mr. Calk obtained an interview at Trump Tower

11   through Mr. Manafort's reference.

12            And then depending upon timing, the next witness would

13   be Melissa Baccari from the Federal Bureau of Investigation.

14            I'll just note that the government's other custodial

15   witness, Michael Weil, who was here today, is unavailable

16   tomorrow, so we'll likely call him on Tuesday, and that means

17   that we may be offering possibly some documents subject to

18   connection during the testimony of Special Agent Baccari, but

19   we can discuss that depending upon timing tomorrow.

20            THE COURT:  Okay.  That's fine.

21            And I think Mr. Street has already asked the lawyers

22   for a daily exhibit list that's updated to show what has been

23   admitted.  Is there anything that I need to address for

24   tomorrow?  For example, I know — and I could actually address

25   it now — there was a request for a ruling with regard to

L6NKCAL4

Government Exhibits 285 and 285-1, and, principally, what we're talking about is a voicemail from James Brennan, who was vice president of the bank, to Javier Ubarri, and, as I understand it, the statement that is in the voicemail that is offered for the truth is the statement that, "The other members of the loan" -- sorry.  The statement is, "I'll try and reach out to Jim Norini, the other member of the loan committee, that's apparently not party to this conversation."

       And my understanding, from the letter, is that the government is seeking to introduce this statement by Mr. Brennan on the theory that he was acting as an agent of Mr. Calk under Federal Rule of Evidence 801(d)(2)(B) similar to the basis on which I had admitted statements of Mr. Raico.  In that case, however, I found that Mr. Raico was acting as an agent of Mr. Calk personally in furtherance of Mr. Calk's personal interests and not simply acting as an agent of the bank.  And you will recall that, in contrast, I had excluded statements of Thomas Horn because there wasn't any evidence that he was acting as an agent of Mr. Calk personally.

       And based on the submissions, there does not appear to be any evidence — I see you, Mr. Scotten, so I'll finish my sentence, and I will hear from you — but it did not appear that there was evidence that Mr. Brennan was acting as an agent of Mr. Calk in his personal capacity as opposed to acting as an agent of the bank.  So, tell me why you think there may be

L6NKCAL4

other evidence.

MR. SCOTTEN:  So, your Honor is correct that he is not sort of solely and outside the bank personal agent, but I think in accordance with, I think, all of the cases there is, I think the courts are uniform that there is no requirement for personal agency.  The only dispute between the parties seems to be the degree of proximity of the business relationship.  That is to say, most cases, including the Second Circuit, suggest that it's enough that the defendant be the ultimate supervisor of the agent in the business relationship, and the defense has relied on some suggestions in out-of-circuit cases that it must be a direct supervisory relationship.  We had assumed -- although your Honor didn't make express exactly where you were drawing the line, we had assumed that you had excluded Mr. Horn because if you draw the line with Mr. Horn, you would see Mr. Horn works for Mr. Brennan, and so he is at least two steps removed from the defendant.

By contrast, Brennan is the secretary of the credit committee over which Mr. Calk presides, and this statement is obviously about the credit committee business, so we were trying to make the argument in our submission that here, at least, within the confines of credit committee business, there is that proximate relationship.  We certainly don't really think there's any support for the defense's view that it has to be a direct supervisor, but even if there was, within the

L6NKCAL4

1    credit committee business, that would be met.  I know the

2    defense submission is for underwriting purposes --

3              THE COURT:  Let me just interrupt for a second --

4              MR. SCOTTEN:  Yes, your Honor.

5              THE COURT:  -- and ask you a more conceptual question.

6              MR. SCOTTEN:  Yes, your Honor.

7              THE COURT:  My assumption was that we all know that

8    statements by the defendant are admissible, basically, as

9    admissions of a party.  And there is also this additional rule

10   that basically says that if you're an agent on behalf of the

11   party, then those statements are also admissible and within an

12   exception to the hearsay rule, and that makes sense because

13   it's tantamount to an admission by the defendant.  So I guess

14   what I was looking for here was some indicia that the statement

15   was a statement made as an agent of the defendant, Mr. Calk,

16   which would make it admissible.

17             MR. SCOTTEN:  So I think, your Honor, that that is not

18   actually the burden, and then, therefore, it's not the burden

19   we tried to satisfy.  So, for example, what the actual burden

20   is, is the statement must be made on a subject matter within

21   the scope of the person's employment, but, very often, as the

22   Court can imagine, employment --

23             THE COURT:  But within the scope of the agency

24   relationship.  And that assumes that the person for whom the

25   witness is acting as an agent, that their statements would be

L6NKCAL4

1  admissible.  But the bank is not a party or defendant here, or

2  even credit committee statements wouldn't be, it's Mr. Calk's

3  statements.  But let me hear from the defense, and I think I'm

4  going to reserve and go back and look at the cases and review

5  it again, but, conceptually, the way the rule makes sense to me

6  did not fit the theory that you're suggesting to get

7  Mr. Brennan's statement into evidence, but let me hear from

8  Mr. Schoeman.

9          MR. SCHOEMAN:  Thank you, your Honor.

10          All of the cases, including --

11          THE COURT:  Do you mind just picking up the mic and

12  talking into it.

13          MR. SCHOEMAN:  I don't mind.

14          How about that, does that help?

15          THE COURT:  If you just pick it up, it's easier.

16          MR. SCHOEMAN:  All right.  I like this.

17          All of the cases, including the Second Circuit cases,

18  basically look at the nature of the agency relationship.  It's

19  not enough that someone is merely an employee of the

20  organization.  So, the famous Second Circuit cases, the

21  sheriff's office cases, and his deputies are his agents.  But I

22  don't think any case says that just because you're an employee

23  of an organization, your statements are admissible in a

24  criminal case personally against the defendant.  I think, your

25  Honor, with respect to Raico, had made the analysis, as you

1    just articulated.  That does not exist at all with respect to

2    Brennan, who I think the government would have to admit to your

3    Honor will testify that he never spoke to Mr. Calk personally

4    about these loans, and he is merely an employee who, in this

5    particular email, is saying, I'm in the dark, no one is talking

6    to me, and I want to call somebody else, which hardly seems

7    like it could even, under any circumstance, be a statement

8    attributable to Mr. Calk, since he's basically saying nobody

9    told me anything.

10             THE COURT:  Okay.  I understand.

11             MR. SCOTTEN:  I --

12             THE COURT:  I'll take it under advisement.  I'll hear

13   you one last time.

14             MR. SCOTTEN:  Yes, your Honor.

15             I think the cases are the way to go here.  I won't try

16   to put my point across.  I do think it's important that the

17   Court realizes that that's actually not what Brennan is saying,

18   that he will testify about the meaning of this statement.  What

19   he's actually saying is, I am calling you, member of the credit

20   committee, to tell you stuff that I know because the defendant

21   is telling me, Steve Calk is telling me what to do, but he's

22   not telling anyone else on the credit committee, so I am going

23   to relay that information that I have from Calk to you, which I

24   think is likely to be highly relevant towards this analysis.

25             THE COURT:  Okay.

L6NKCAL4

1          So, if he can describe that, why do you care about the

2     voicemail?

3          MR. SCOTTEN:  I assume — and I think that was

4     reinforced by the defense opening — that the defense theory is

5     now everyone at the bank says they thought better of this, they

6     knew better, but back then, no one was telling the defendant

7     these things, so a contemporaneous voicemail in which the

8     underwriter says, Calk isn't telling you guys what's going on,

9     so I'm calling you, you could see, your Honor, why that would

10     be much more probative than him saying it on the stand three

11     years later.

12          THE COURT:  Okay.  I understand.

13          I will take it under advisement.

14          I think that's all the housekeeping.  Is there

15     anything else we need to talk about before we continue with

16     Mr. Paulson tomorrow?

17          MR. SCOTTEN:  I don't think there's anything that has

18     to be done this evening, your Honor.

19          THE COURT:  Or first thing tomorrow morning, because

20     I'd rather do it this evening than hear about it at

21     8:00 tonight.

22          MR. MONTELEONI:  Your Honor, regarding the rulings

23     that you made with the admission of some of the evidence

24     yesterday, we've been going through the list and attempting to

25     incorporate it, we've been talking to defense about some of the

L6NKCAL4

1     new exhibits.

2          We would like a little more opportunity to continue

3     our discussions both with respect to one or two more exhibits,

4     and, also, we think there might be some discrepancies in the

5     transcript and what we think there is, so we anticipate moving

6     into evidence a few more exhibits that the parties agree on and

7     perhaps clarifying a couple of the things on the record.  We're

8     just not in a position to do that this afternoon, but we might

9     be in a position to do that tomorrow morning, so we would hope

10    to do that.

11         THE COURT:  Okay.

12         MR. LaVERNE:  We're always happy to talk to

13    Mr. Monteleoni about exhibits.  We'll do that tonight.

14         THE COURT:  Okay.

15         So, if you need anything done tomorrow morning, we'll

16    plan -- I'll come out on the bench at a quarter till, and we'll

17    do whatever we need to do and can do before 10:00.  I'll bring

18    the jury out promptly at 10:00.  Does that work, or do we need

19    to come earlier?

20         MR. MONTELEONI:  I apologize, I just didn't hear you.

21    A quarter to 10:00, were you proposing?

22         THE COURT:  I was proposing, yes, 9:45.

23         MR. MONTELEONI:  I think that should be fine.  If

24    there's something --

25         THE COURT:  I'm happy to come earlier, for us all to

L6NKCAL4

1    be here earlier, if you just tell me now.

2              MR. MONTELEONI:  I don't think that, right now,

3    there's going to be anything -- I think it will be pretty

4    ministerial.  We just need a little bit of time to get things

5    straight.

6              THE COURT:  That's fine.

7              MR. MONTELEONI:  So I think 9:45 is fine.

8              MR. LaVERNE:  We're fine.

9              THE COURT:  Anything from the defense side?

10             MR. LaVERNE:  No.  Thank you, your Honor.

11             THE COURT:  All right.  Have a good evening.

12             COUNSEL:  You, too, your Honor.

13             (Adjourned to June 24, 2021 at 9:45 a.m.)

14                              * * *

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     BLAKE PAULSON

4     Direct By Mr. Scotten  . . . . . . . . . . . .85

5     Cross By Mr. LaVerne . . . . . . . . . . . . 102

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25