L6o5cal1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              19 CR 366 (LGS)

 5   STEPHEN M. CALK,

 6              Defendant.

 7   ------------------------------x
                                               New York, N.Y.
 8                                             June 24, 2021
                                               9:55 a.m.
 9

10   Before:

11              HON. LORNA G. SCHOFIELD,

12                                             District Judge
                                                And A Jury
13
                         APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   PAUL MONTELEONI
     HAGAN SCOTTEN
17   ALEXANDRA ROTHMAN

18   KRAMER LEVIN NAFTALIS & FRANKEL
          Attorneys for Defendant
19   BY:  PAUL SCHOEMAN
          DARREN LaVERNE
20        MICHELLE BEN-DAVID

21   LOEB & LOEB
          Attorneys for Defendant
22   BY:  JEREMY MARGOLIS

23

24

25

L6o5cal1

1           (Trial resumed; jury not present)

2           THE COURT:  Is there housekeeping?

3           MR. SCOTTEN:  We have a couple small issues that might

4    come up in the cross/redirect of Mr. Paulson and then

5    Mr. Monteleoni has some other issues that do not have to be

6    done this morning although, if there is time before the jury

7    gets here, we may as well.

8           With respect to Mr. Paulson, just two brief matters.

9    One, as the Court is aware, we agreed not to elicit

10   Mr. Paulson's title or, more generally, his OCC seniority.  On

11   cross yesterday in defense asking questions that seemed geared

12   to sort of limit his competence and basis for testimony -- *Are*

13   *you a lawyer?  Have you ever worked in banking?*  And so on.  I

14   suspect in redirect I am going to have to ask him sort of a bit

15   about how he does know what he knows.  I still don't need to

16   ask him about his title but I would like to ask him, and I

17   might preface it expressly:  *I am not asking your opinion on a*

18   *regulation, but have you become familiar with the understanding*

19   *of these regulations in the industry?*  I assume he will say

20   yes.  And, if he does, I would like to ask him how, which I

21   think is perfectly appropriate.  If your Honor wants me to lead

22   and further say *Now, I am not asking you any titles you may*

23   *have held but how have you become familiar*?

24          THE COURT:  Bring him in and tell him not to tell us

25   his title.

L6o5cal1

| | |
|---|---|
| 1 | MR. SCOTTEN:  He is on cross.  As long as you are OK |
| 2 | with me doing that one thing. |
| 3 | MR. LAVERNE:  I have no issue with that -- |
| 4 | THE COURT:  I can't understand you, I'm sorry. |
| 5 | MR. LAVERNE:  I'm sorry.  I have no issue with that. |
| 6 | He said he has been at the OCC for 34 years.  If you want to |
| 7 | ask him about his experience at OCC dealing with rules and |
| 8 | regulations, that's fine.  I will object if it goes further |
| 9 | than that.  As long as he is instructed not to say what his |
| 10 | position is, his status. |
| 11 | MR. SCOTTEN:  OK.  I understand, your Honor.  I am |
| 12 | happy to tell you that I wanted the Court's blessing since he |
| 13 | is on cross. |
| 14 | Relatedly, I think one of Mr. Paulson's bases for |
| 15 | knowledge is going to be his discussions with many other people |
| 16 | in the banking industry and I think we do have some |
| 17 | disagreement about whether that calls for hearsay.  I don't |
| 18 | think it does because, of course, his basis is not going to be |
| 19 | people, bank CEOs that are coming to him and saying *I am* |
| 20 | *familiar with these regulations.*  That would be a hearsay |
| 21 | statement.  I think his basis is -- |
| 22 | THE COURT:  What he observed is not hearsay. |
| 23 | MR. SCOTTEN:  Right. |
| 24 | THE COURT:  What people told him is hearsay.  So, if |
| 25 | you elicit it in a way to ask what he observed in his |

L6o5cal1

1    interactions.

2                MR. SCOTTEN:  Got it, your Honor.  Perfect.  Thank

3    you, your Honor.  I'm going to go talk to the witness.

4                MR. MONTELEONI:  Your Honor, if I might raise a couple

5    of housekeeping issues?

6                THE COURT:  Sure.

7                MR. MONTELEONI:  As I previewed yesterday afternoon,

8    we have conferred with the defense about a number of new

9    exhibits and we understand that the defense doesn't have an

10   objection to several of them, and to several of the phone

11   records that they previously had a relevance objection they're

12   going to be withdrawing their objection.  So, I would like to

13   propose what we are going to move into evidence, the following

14   exhibits.

15               THE COURT:  Give me one second so I can write it down

16   and find it.  Go ahead.

17               MR. MONTELEONI:  So, the new exhibits that we

18   understand the defense has no objection to are Government's

19   Exhibits 108-A, 109-B, 121-A, 230-A, 231-A, 231-B.

20               THE COURT:  B as in boy?

21               MR. MONTELEONI:  B as in boy, yes.

22               THE COURT:  OK.

23               MR. MONTELEONI:  245-A, 245-B, 245-C, 302-A and 302-B.

24   Then the phone exhibits --

25               THE COURT:  OK.  Right there.  Can someone on the

L6o5cal1

1    defense side confirm there is no objection to the admissibility

2    of those exhibits?

3            MR. LAVERNE:  Confirmed, your Honor.

4            THE COURT:  All right.  I admit them.

5            (Government's Exhibits 108-A, 109-B, 121-A, 230-A,

6    231-A, 231-B, 245-A, 245-B, 245-C, 302-A and 302-B received in

7    evidence)

8            MR. MONTELEONI:  The phone exhibits that the defense

9    is withdrawing its objection to are Government's Exhibits

10   901-2, 901-A1 to 901-A27, 901-A35 to 901-A49, 901-4, 902,

11   903-11 and 903-11A1.

12           THE COURT:  And there is no objection to the

13   admissibility of those exhibits?

14           MR. LAVERNE:  Confirmed, your Honor.

15           THE COURT:  They are admitted.

16           (Government's Exhibits 901-2, 901-A1 to 901-A27,

17   901-A35 to 901-A49, 901-4, 902, 903-11, 903-11A1 received in

18   evidence)

19           MR. MONTELEONI:  Thank you, your Honor.

20           Additionally, we discussed and your Honor ruled

21   substantively on the admissibility of Government Exhibits 701,

22   702, 704 and 719 which were published and examined -- the

23   witness was examined on by both sides but I think that may not

24   have been formally admitted on the transcript, so we ask that

25   they be formalized.

L6o5cal1

1          THE COURT:  They are admitted *nunc pro tunc*.

2          (Government's Exhibits 701, 702, 704, 719 received in

3    evidence)

4          MR. MONTELEONI:  Thank you, your Honor.

5          We also intend to offer one other new exhibit I left

6    off the list.  Initially, we understand the government has no

7    objection to 128.

8          THE COURT:  You understand that the defense.

9          MR. MONTELEONI:  Sorry.  We certainly have no

10   objection to our own exhibits.  We also understand that the

11   defense doesn't either.

12         THE COURT:  128?

13         MR. MONTELEONI:  128.  1-2-8.

14         THE COURT:  Any objection?

15         MR. LAVERNE:  No, your Honor.

16         THE COURT:  128 is admitted.

17         (Government's Exhibit 128 received in evidence)

18         MR. MONTELEONI:  Then, we have gone through and

19   discussed with the defense reconciling the transcript with our

20   understandings of the sets of exhibits.  We think that the

21   transcript says that Government's Exhibits 181 to 191 were

22   admitted, but we believe that that range should have been 188

23   to 191 so that 183, 186-A, and 187 we think should not be

24   admitted so we left them off of the admitted sheet.

25         THE COURT:  183, 186-A and?

L6o5cal1

1          MR. MONTELEONI:  187.

2          THE COURT:  187 should not be so the only correction I

3    have to make is to retract the admission of those three

4    exhibits.

5          MR. MONTELEONI:  Yes, your Honor.

6          THE COURT:  All right.  I do that now.

7          MR. MONTELEONI:  Thank you.

8          Similarly, Government Exhibit 501 has been reserved,

9    it is available for identification, but it should also not be

10   admitted.

11         THE COURT:  Any objection?

12         MR. LAVERNE:  No, your Honor.  We went over this last

13   night with the government, so.

14         THE COURT:  All right.  So I will assume you don't

15   object to anything he is saying unless you stand up and tell

16   me.

17         MR. LAVERNE:  That's fine.

18         THE COURT:  So 501 is admitted.

19         MR. MONTELEONI:  This is almost ministerial but I

20   think one exhibit was referred to "4511-R" and we think that

21   means 451-R is admitted.

22         THE COURT:  451-R is admitted.

23         (Government's Exhibit 451-R received in evidence)

24         MR. MONTELEONI:  For Defendant's Exhibits the

25   transcript reads that Defendant's Exhibits 208-A and 208-D were

L6o5cal1

1    admitted but we believe that it should reflect that 208-A

2    through 208-D were admitted.

3            THE COURT:  208-A through 208-D are admitted.

4            (Government's Exhibits 208-A through 208-D received in

5    evidence)

6            MR. MONTELEONI:  Similarly, the transcript reads that

7    Defendant's Exhibits -- I'm sorry.  Let me just stop because I

8    got a note.  What I meant to say about Government Exhibit 501

9    is that it should not be admitted.  It should be indicated on

10   the list as not admitted.  Maybe I said it the reverse.

11           THE COURT:  OK.  I admitted it.  I understand it is

12   not to be admitted so 501 is not admitted.

13           MR. MONTELEONI:  Great.  Thank you.

14           So, then the transcript reads that 227, 232 are

15   admitted, of Defendant's Exhibits.  We believe that it should

16   be Defendant's Exhibits 227 through 232 are admitted and we

17   have no objection to their admission.

18           THE COURT:  OK.  Defendant's Exhibits 227 through 232

19   are admitted.

20           (Defendant's Exhibits 227 through 232 received in

21   evidence)

22           MR. MONTELEONI:  Then the transcript indicates that

23   for 51-1 through 51-5, the photographs of portions of Dennis

24   Raico's notebooks, it reflects that they're admitted in part

25   but we have conferred with the defense and we agree that those

L6o5cal1

1    photographs don't need to be redacted so those are the parts

2    that are admitted, so we propose to show them to the jury

3    unredacted.

4              THE COURT:  You may do that.

5              Is the jury ready?

6              THE DEPUTY CLERK:  They're here.

7              MR. MONTELEONI:  There are other issues but we can

8    take them up at the break.

9              THE DEPUTY CLERK:  Jury entering.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L6o5cal1                          Paulson – Cross

1           (Jury present)

2           THE COURT:  You may be seated.  Good morning,

3    everyone.

4           THE JURY:  Good morning.

5           THE COURT:  So you see we put notebooks on your

6    chairs.  What you do is you put your juror number on the cover

7    and you may use them to take notes as I instructed yesterday

8    but please don't let it distract you from listening to the

9    testimony.

10          So, I think we were in the middle of the cross of

11   Mr. Paulson.

12          MR. SCOTTEN:  Are we ready for Mr. Paulson, your

13   Honor?

14          THE COURT:  Yes.

15          Good morning.

16          THE WITNESS:  Good morning.

17          THE COURT:  Could we pause for just a minute?  We need

18   to connect the phone line.

19          (pause)

20          THE COURT:  You may proceed.

21          MR. LAVERNE:  Thank you, your Honor.

22   BLAKE PAULSON, resumed.

23   CROSS EXAMINATION (Cont'd)

24   BY MR. LAVERNE:

25   Q.  Good morning to you, Mr. Paulson.

L6o5cal1                          Paulson - Cross

1  A.  You can hear me OK?

2  Q.  I can.

3       Now, Mr. Paulson, on direct examination by the

4  government yesterday you testified about a meeting that you had

5  with a number of the members of The Federal Savings Bank

6  management.

7       Do you recall that testimony?

8  A.  Yes.

9  Q.  And I think you testified that the meeting took place in

10  July of 2018, correct?

11  A.  Correct.

12  Q.  Do you remember the date on which it took place?

13  A.  I believe it was July 10th.

14  Q.  And, Mr. Paulson, at this meeting you and Mr. Lemanski of

15  the OCC were the only people present from the OCC; correct?

16  A.  Correct.

17  Q.  And at this meeting, Mr. Paulson, there were at least six

18  other people present from the bank; true?

19  A.  I believe there were six; yes.

20  Q.  And among those, in addition to Mr. Calk, were the bank's

21  president Mr. Ubarri; true?

22  A.  Right.

23  Q.  Also present was the bank's chief operating officer

24  Mr. Norini; true?

25  A.  I think so, yes.

L6o5cal1                    Paulson - Cross

Q.  Also present was the head of legal and compliance at the

bank Mr. Murphy; true?

A.  I think so.  Yes.

Q.  Also present was the chief financial officer of the bank

Mr. Semenak; true?

A.  Yes.

Q.  And also present was John Calk, Stephen Calk's brother;

true.

A.  True.

Q.  He was also an owner of the bank and executive; true?

A.  Vice chair if I remember correctly; yes.

Q.  Now, this meeting that took place in July of 2018 was about

three years ago; true?

A.  Just about.  Yup.

Q.  And the meeting, as far as you know, was not recorded by

audio; true?

A.  Right.

Q.  It was not recorded by video; true?

A.  Right.

Q.  You did not take contemporaneous notes of the meeting;

true?

A.  Correct.

Q.  During the meeting, you testified, upon questioning by

Mr. Scotten, that Mr. Calk strongly denied media reports that

he directed Federal Savings Bank to make loans to Mr. Manafort

1    in exchange for a position in the new administration, true?

2    A.  True.

3    Q.  Now, you also testified, on direct examination, that

4    Mr. Calk strongly denied -- strongly denied -- wanting a

5    position in the government.  That was your testimony; true?

6    A.  Yes.

7    Q.  Now, Mr. Paulson, you were first interviewed by the

8    government about that meeting back in April of 2019; true?

9    A.  I don't recall the exact month but that sounds

10   approximately right.

11   Q.  Well, why don't we put on the screen, for the witness only,

12   what's been marked as GX- 3500-037-001.  I'm going to ask you

13   if you could, Mr. Paulson, to take a look at the document in

14   the middle or the top and tell us if that refreshes your

15   recollection that that meeting with the government took place

16   in 2018.

17   A.  Yes.  That sounds right.

18   Q.  Now, at that interview you spoke with a number of people

19   from the government, true?

20   A.  Yes.

21   Q.  In fact, you spoke with two prosecutors from the U.S.

22   Attorney's office; true?

23   A.  Yes.

24   Q.  One of whom is with us today -- Mr. Monteleoni -- true?

25   A.  Correct.

L6o5cal1                          Paulson - Cross

1   Q.  And you spoke also at that interview with two federal

2   agents; true?

3   A.  I believe they were present.  I really remember just

4   speaking with Mr. Monteleoni.

5   Q.  You recall them being present at the meeting, true?

6   A.  Yes.

7   Q.  And one of those agents was an FBI agent, Special Agent

8   Hilliard, true?

9           MR. SCOTTEN:  Objection.  Relevance.

10          THE COURT:  Overruled.

11  BY MR. LAVERNE:

12  Q.  True?

13  A.  I don't recall the names of the agents that were at the

14  meeting.

15  Q.  Do you recall there was an agent from the FDIC present?

16  A.  I believe there was someone from the FDIC OIG, yes.

17  Q.  Do you recall that was Agent Greczek?

18  A.  I don't recall that.

19  Q.  You recall that you had an attorney with you from the OCC,

20  Ms. Fee?

21  A.  On the phone, yes.

22  Q.  Now, when you spoke to this group of agents and prosecutors

23  you tried to be truthful, true?

24  A.  Sure.

25  Q.  And you tried to be accurate?

L6o5cal1                              Paulson - Cross

1    A.  Sure.

2    Q.  You tried to be fulsome in your answers?

3    A.  Of course.

4    Q.  And you didn't hold any information back, true?

5    A.  I don't recall holding any information back and it would

6    not have been my intent to.

7    Q.  And, during the interview that you had, Agent Greczek of

8    the FDIC was taking care of the notes; true?

9             MR. SCOTTEN:  Objection.

10            MR. LAVERNE:  I can rephrase, your Honor.

11            THE COURT:  OK.

12   BY MR. LAVERNE:

13   Q.  Did you observe Agent Greczek of the FDIC taking careful

14   notes of the words you were saying?

15   A.  No.  We were all on the phone.

16   Q.  OK.

17            Did the government advise you that Agent Greczek would

18   be taking notes of what you were saying?

19   A.  I honestly I don't recall that.

20   Q.  During that meeting, when you were asked about what

21   Mr. Calk said back in July of 2018, you told the agents that it

22   would not make sense for him financially --

23            MR. SCOTTEN:  Objection.

24            MR. LAVERNE:  -- to take the position.

25            THE COURT:  Wait.

L6o5cal1                         Paulson - Cross

1          MR. SCOTTEN:  Objection.

2          MR. LAVERNE:  Impeachment, your Honor.

3          MR. SCOTTEN:  It has to be shown to be a prior

4    consistent and he has to make the showing to your Honor to try

5    it and he clearly has not.

6          THE COURT:  I heard what he said so if it is on his

7    screen it would be on my screen too so I can see it.

8          MR. LAVERNE:  Would your Honor like me to direct you

9    to a place in the exhibit?

10         THE COURT:  I find it is not inconsistent so you can't

11   impeach.

12   BY MR. LAVERNE:

13   Q.  Well, Mr. Paulson, at that meeting you did not say that

14   Mr. Calk told you that he strongly denied wanting a position in

15   the government.  You did not say that, true?

16   A.  He strongly denied wanting a position in the government.

17   Q.  My question to you is, simply, at this April 2019

18   meeting/interview with these agents, did you not tell the

19   agents that Mr. Calk strongly denied wanting a position in the

20   government?  True?

21   A.  I don't recall my exact words that I gave to the agents.  I

22   believe they were consistent with the testimony I have given

23   here.

24   Q.  Let me direct you to the exhibit, again put it back up on

25   the screen just for the witness, 3500-37-001.  I'm going to

L6o5cal1                           Paulson - Cross

1   direct you to the third page of the exhibit all the way at the
2   bottom, paragraph 11.  Read that to yourself, focusing on the
3   second to last sentence.
4            Do you recall now what it is that you said Mr. Calk
5   told you about a government position?
6   A.  That highlighted sentence is one of the things that he
7   said.
8            THE COURT:  Wait.  Wait.  The question is do you now,
9   based on reading that, recall what he told you?  And the answer
10  would be, *yes, I now recall it*; or *no, I don't recall it.*
11           THE WITNESS:  Yes, I recall saying that.
12  BY MR. LAVERNE:
13  Q.  And do you recall that you did not say that Mr. Calk
14  strongly denied wanting a position in the government?
15  A.  I believe I did say that.
16  Q.  Now, Mr. Paulson, you would agree that it would not make
17  financial sense for Mr. Calk, the CEO of a nationally-chartered
18  bank, to take a position with the U.S. government, true?
19           MR. SCOTTEN:  Objection.
20           MR. LAVERNE:  I'm not asking what he said, I'm just
21  asking whether he agrees.
22           THE COURT:  You are asking his opinion whether it
23  would make financial sense for Mr. Calk to do that?
24           MR. LAVERNE:  Yes.
25           THE COURT:  If you know the answer you can answer.  If

L6o5cal1                    Paulson - Cross

1   you don't, you can express that too.

2           MR. LAVERNE:  I'm happy to lay some more foundation.

3           THE COURT:  Let him try and answer first.

4           THE WITNESS:  I do not, or at that time and today do

5   not know enough about Mr. Calk's financial situation to answer

6   that question accurately.

7   BY MR. LAVERNE:

8   Q.  You know, Mr. Paulson, and knew then, that Mr. Calk is the

9   majority owner of Federal Savings Bank; true?

10  A.  True.

11  Q.  Federal Savings Bank is a bank under the purview of your

12  examination, true?

13  A.  True.

14  Q.  And you know that in 2016 the bank earned over $17 million

15  a year, true?

16  A.  I don't know that exact figure but that sounds roughly

17  accurate.

18          MR. LAVERNE:  One moment, your Honor.

19          (Counsel conferring)

20          MR. LAVERNE:  No further questions.  Thank you.

21          THE COURT:  Redirect.

22          MR. SCOTTEN:  Yes, please, your Honor.

23          THE COURT:  Mr. LaVerne, would you mind removing the

24  mic cover?  Thank you.

25  REDIRECT EXAMINATION

L6o5cal1                        Paulson - Redirect

1    BY MR. SCOTTEN:

2    Q.  Good morning, Mr. Paulson.  Can you hear me?

3    A.  Good morning.

4    Q.  So, just now Mr. LaVerne was asking about this meeting with

5    Mr. Calk.  Did you remember clearly every word Mr. Calk said?

6    A.  No.

7    Q.  Do you remember clearly that conversation?

8    A.  Yes.

9    Q.  Do you remember clearly his denial that he wanted a

10   government position?

11   A.  Yes.

12   Q.  Why is your memory clear on this subject?

13   A.  It was a significant comment to make.  It was un -- we did

14   not ask about it, it was offered voluntarily, it was not the

15   purpose of the meeting, and so it was a bit surprising that he

16   brought the topic up which is probably one of the reasons.  And

17   it was a significant topic so it is something that I remember

18   very clearly.

19   Q.  From the perspective of a bank regulator, why was it a

20   significant topic?

21   A.  Because if it were not true what he said then that would be

22   a significant issue.

23   Q.  Can you explain why it would be a significant issue?

24   A.  Well, it could be potentially a violation of law both under

25   our civil authority and, potentially, criminally.

L6o5cal1                          Paulson - Redirect

1    Q.  And the notes that Mr. LaVerne just showed you --

2              MR. LAVERNE:  Objection, your Honor.  Can't refer to

3    something that is not in evidence.

4              MR. SCOTTEN:  I believe you can when it has been shown

5    to the witness, your Honor.

6              THE COURT:  It depends on what the question is, so.

7              MR. SCOTTEN:  Sure.

8    BY MR. SCHOEMAN:

9    Q.  Right now the notes that you were shown, had you been shown

10   them before?

11   A.  I believe so.

12   Q.  And when do you think you saw them before?

13   A.  I believe it was not --

14             MR. LAVERNE:  Objection, your Honor.

15             THE COURT:  I will allow.

16             THE WITNESS:  I believe it was not long after the

17   interview but I had not reviewed them recently.

18   BY MR. SCOTTEN:

19   Q.  Do you know whether they are an exact transcript of your

20   words?

21             MR. LAVERNE:  Objection, your Honor.  Foundation.

22             THE COURT:  Sustained.

23   BY MR. SCOTTEN:

24   Q.  Do they appear to be?

25             THE COURT:  Sustained and leading.

1              MR. SCOTTEN:  No leading on redirect, your Honor?

2              THE COURT:  Generally not.

3              MR. SCOTTEN:  OK.

4     BY MR. SCOTTEN:

5     Q.  From what you just saw -- withdrawn.

6              Does anything about viewing those notes affect your

7     testimony as to your clear recollection of what the defendant

8     said?

9     A.  No.

10    Q.  I want to turn to a couple topics from yesterday and please

11    let me know if my voice drops.  I know that was an issue

12    yesterday.  Do you recall yesterday afternoon Mr. LaVerne

13    asking you about whether it was difficult for bank CEOs to

14    access the publication stating that they cannot derive any

15    personal benefits --

16             MR. LAVERNE:  Objection.

17    Q.  -- from their own loan?

18             MR. LAVERNE:  Misstates my question.

19             THE COURT:  Overruled.  He is not going to get it

20    verbatim.  He can ask the question and you can try to answer

21    it.

22             Jurors, the question is as you remember it not

23    necessarily as he states it.

24             THE WITNESS:  I'm sorry.  Can you repeat that?

25    BY MR. SCOTTEN:

L6o5cal1                          Paulson - Redirect

1    Q.  Sure.

2              Do you recall yesterday afternoon Mr. LaVerne asking

3    you questions about whether it was difficult for bank CEOs to

4    access publications stating that they cannot derive any

5    personal benefits from their role in a loan?

6    A.  Yes.

7    Q.  Do you recall being asked whether there were also lots of

8    other OCC publications?

9    A.  Yes.

10   Q.  Are all OCC publications equally important to all banks?

11   A.  No.  Absolutely not.

12              MR. LAVERNE:  Objection.  Foundation.

13              THE COURT:  Overruled.

14   BY MR. SCOTTEN:

15   Q.  Can you give me examples of OCC publications that might not

16   be important, for example, to Mr. Calk?

17   A.  So, in the long list of 2013 bulletins that were shown to

18   me quickly yesterday there were clearly many in there that were

19   not relevant to a community bank.  Many of them were only

20   relevant to the largest banks in the United States so many of

21   them would not be relevant at all.

22   Q.  Is the regulation on conflicts of interest inside or

23   outside the set of regulations relevant to a CEO in Mr. Calk's

24   position?

25   A.  They would be very relevant.

L6o5cal1                          Paulson - Redirect

1    Q.  In their examinations and other actions with bank officers

2    such as Mr. Calk, does the OCC place greater or lesser emphasis

3    on this particular regulation, relative to all of the other

4    regulations we have been discussing?

5    A.  Yes.  The regulations around insider activities I would put

6    amongst the highest priority of the regulations that we

7    enforce.

8    Q.  Do you remember being asked about the length of

9    publications about conflicts of interest?

10   A.  Yes.

11   Q.  And you agree that it was nearly 50 pages long?  That's

12   5-0?

13   A.  I believe that's right.

14   Q.  In your experience in the banking industry, are most CEOs

15   capable of reading 50 pages?

16   A.  Yes.

17           MR. LAVERNE:  Objection, your Honor.  Argumentative.

18   Foundation.

19           THE COURT:  Overruled.

20   BY MR. SCOTTEN:

21   Q.  Do you recall being asked whether bank CEOs had to click on

22   a link to see the full publication?

23   A.  Yes.

24   Q.  As of 2016, in your experience, how many bank CEOs knew how

25   to click on a link?

1          MR. LAVERNE:  Objection, your Honor.  Argumentative.

2          THE COURT:  Overruled.

3          If you know the answer you can answer.

4          THE WITNESS:  I don't know specifically.  It is fairly

5     common knowledge of how to click on a link.

6     BY MR. SCOTTEN:

7     Q.  Do banks have measures other than clicking on a link to

8     make sure these publications are available to their officers?

9     A.  Well, the publications are all available to the public so

10    they're available to anyone.  Banks generally have processes in

11    place where various bank officers have responsibility for

12    various areas and they would know which, say, handbook updates

13    or other bulletins relative to them that they should review.

14          And I should also say banks have audit processes and

15    the bank auditors, whether they're internal employees at the

16    bank or external auditors, would obviously be very -- it would

17    be very relevant to them.  So, there would be many people in

18    the bank that all have access to and would have the reason to

19    access the documents.

20    Q.  Are OCC publications and examinations the only way that

21    bank CEOs would learn that they cannot use their position for

22    personal benefit?

23    A.  It is a very fundamental tenet of banking that's been

24    around for decades and hasn't changed materially over those

25    years so it is widely known and understood, based on my

L6o5cal1                    Paulson - Redirect

1   experience in dealing directly with bankers and examining

2   banks.

3   Q.   Do you recall yesterday Mr. LaVerne asking you whether you

4   were a lawyer?

5   A.   Yes.

6   Q.   And you recall him informing you he didn't want your

7   interpretation of a regulation?

8   A.   Yes.

9   Q.   I don't want your interpretation of a regulation but based

10  on what you observed in your 34 years in the banking industry,

11  how well known is the rule that bank CEOs are not permitted to

12  derive any personal benefits from their role in a loan

13  transaction?

14  A.   In my experience as a bank examiner directly examining

15  banks and overseeing others in their examination of banks, it

16  is clearly very well known.

17  Q.   Do you recall being asked by both of us whether the OCC

18  conducted many examinations and whether this was known to

19  bankers?

20  A.   Yes.

21  Q.   Does the fact that banks know the OCC conducts examination

22  mean you never find violations?

23  A.   I wish that were the case but that's not at all true.

24  Q.   Do you recall Mr. LaVerne asking you about a regulation on,

25  I believe, loan procurement fees?

1   A.  Yes.

2   Q.  Had I asked you about that?

3   A.  No.

4   Q.  Will you please pull up the second page of Government

5   Exhibit 702?  Can you highlight the very bottom of the page?

6              THE COURT:  Now I can't hear you.

7              MR. SCOTTEN:  Sorry, your Honor.

8   Q.  Just do the bottom paragraph, that should be big enough.

9              Do you see in the second line on the bottom where it

10  refers to a director or officer having a conflicting interest

11  if they derive any personal benefit?

12  A.  Yes.

13  Q.  Did we discuss this yesterday?

14  A.  Yes.

15  Q.  And then do you recall Mr. LaVerne asking you about whether

16  there were various updates and other pages to this regulation?

17  A.  Yes.

18  Q.  Did any of those other publications or updates suggest that

19  bank officers can derive personal benefit from their role in a

20  loan?

21  A.  No.

22  Q.  How can you be certain?

23  A.  The -- in this paragraph, this page of the handbook

24  discusses the general topic of their fiduciary duty of loyalty.

25  The regulation just goes further in creating a specific

L6o5cal1                    Paulson - Redirect

1   regulation That Federal Savings Association is subject to.

2   That does not, in any way, change the overall responsibility

3   and expectations under the fiduciary duty of loyalty.

4            MR. SCOTTEN:  One second, your Honor?

5            THE COURT:  Yes.

6            (counsel conferring)

7            MR. SCOTTEN:  No further questions, your Honor.

8            THE COURT:  OK.

9            MR. SCOTTEN:  I gather I need to wipe this down?

10   Well, I guess it matters if there is recross.

11            MR. LAVERNE:  Your Honor, I have nothing further of

12   this witness.

13            MR. SCOTTEN:  Then we don't need to change it because

14   I have the next witness.

15            THE COURT:  In general I don't allow recross, so.

16            MR. SCOTTEN:  Nothing further for this witness, your

17   Honor.

18            THE COURT:  You may be excused.

19            THE WITNESS:  Thank you.

20            (Witness excused)

21            MR. SCOTTEN:  The government calls Anna Ivakhnik.

22            THE COURT:  Can you spell that for the court reporter,

23   please?

24            MR. SCOTTEN:  I-V-A-K-H-N-I-K.  First name Anna,

25   A-N-N-A.

L6o5cal1                        Ivakhnik - Direct

1    ANNA IVAKHNIK,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4          THE DEPUTY CLERK:  Can you please state and spell your

5    first and last name, please?

6          THE WITNESS:  It is Anna Ivakhnik.  I-V-A-K-H-N-I-K,

7    and that is Anna with two Ns.

8          THE DEPUTY CLERK:  Thank you.

9          THE COURT:  Could you move the mic, pull it up close

10   and stand it up straighter so you don't have to lean into it

11   and we can all hear you?

12         THE WITNESS:  Like that.

13         THE COURT:  If you can get it closer, that would be

14   great.

15         THE WITNESS:  There is nowhere to place it.  Is this

16   better?

17         THE COURT:  Yes.

18         THE WITNESS:  OK.

19         MR. SCOTTEN:  May I proceed, your Honor?

20         THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MR. SCOTTEN:

23   Q.  Good morning, Ms. Ivakhnik.

24   A.  Good morning.

25   Q.  If you have any trouble hearing me you will let me know?

L6o5cal1                      Ivakhnik – Direct

1    A.  OK.

2    Q.  Ms. Ivakhnik, what city and state do you live in?

3    A.  I live in New York City, New York.

4    Q.  How far did you go in school?

5    A.  I have a bachelor of science in business administration --

6            THE COURT:  Could you repeat that for the court

7    reporter?

8    A.  Yes.  I have a bachelor of science in business

9    administration in real estate.

10   Q.  Where did you go to school?

11   A.  The University of Denver.

12   Q.  After completing your degree, did you go to work?

13   A.  Yes.

14   Q.  And, in the summer of 2016, where did you work?

15   A.  I worked at The Federal Savings Bank.

16   Q.  If we can please show Government Exhibit 1201?  Do you

17   recognize this picture?

18   A.  Yes.

19   Q.  Who is it?

20   A.  This is Steve Calk.

21   Q.  How do you know Steve Calk?

22   A.  Steve Calk was the CEO of the bank.

23   Q.  We can take that down.  Thank you.

24           When did you start at The Federal Savings Bank?

25   A.  Sometime in November of 2015.

L6o5cal1                         Ivakhnik - Direct

```
 1    Q.  What was your position?
 2    A.  I was a sales assistant to Mordy Husarsky.
 3    Q.  Can we please show 1208?
 4             Do you recognize this picture?
 5    A.  Yes.
 6    Q.  Who is that a picture of?
 7    A.  That is me.
 8    Q.  We can take that down.
 9             Where do you work for TFSB, physically?
10    A.  I worked at the New York office at 120 Broadway.
11    Q.  And about how far from here is that?
12    A.  It is a short walk from here.
13    Q.  Can you please show Government Exhibit 1203?
14             Do you recognize this?
15    A.  Yes.
16    Q.  What is it?
17    A.  It is the building where I worked.
18    Q.  Where you worked for The Federal Savings Bank?
19    A.  Correct.
20    Q.  We can take that down.
21             What was your job at The Federal Savings Bank?
22    A.  I was the sales assistant to Mordy Husarsky.
23    Q.  And who was Mordy Husarsky?
24    A.  He was the vice president of the bank.
25    Q.  And as his sales assistant, what did you do for
```

1    Mr. Husarsky?

2    A.  I assisted with the loan origination process.

3    Q.  And in non-banking industry terms, what does loan

4    origination process mean?

5    A.  I helped complete loan applications and collect

6    documentation from customers.

7    Q.  And customers here mean borrowers or possible borrowers?

8    A.  Correct.

9    Q.  What type of loans did you work on with Husarsky?

10   A.  Mostly conforming loans.

11   Q.  What is a conforming loan?

12   A.  It is a loan that was under a set dollar amount.

13   Q.  And, are conforming loans, loans for any particular

14   purpose?

15   A.  They're typically for owner-occupied residential use.

16   Q.  Does that mean these are often what is referred to as

17   mortgages?

18   A.  Yes.

19   Q.  How was your pay determined when you were working with

20   Husarsky?

21   A.  I received a salary and I received commission income from

22   the volume closed.

23   Q.  From the number of loans that were issued?

24   A.  Yes.

25   Q.  Did you work with anyone other than Husarsky?

L6o5cal1                          Ivakhnik - Direct

```
 1   A.  Yes.

 2   Q.  Who else did you work with?

 3   A.  I worked with Dennis Raico.

 4   Q.  And what did Raico do?

 5   A.  Dennis Raico was a vice president of the bank and a loan

 6   originator.

 7   Q.  Who is a loan originator?

 8   A.  A loan originator meets with the customer, completes the

 9   loan application, collects documentation.

10   Q.  How would you compare a loan originator to a salesman?

11   A.  I don't understand the question.

12   Q.  Is the process -- did a loan originator do similar things

13   to a salesman in terms of selling loans, as it were?

14   A.  The loan originator advises the borrower on the kind of

15   loan to take and the type of documentation that would be

16   needed.

17   Q.  Can I show Government Exhibit 1218?

18          Do you recognize this picture?

19   A.  Yes.

20   Q.  Who is it?

21   A.  Dennis Raico.

22   Q.  What sort of loans did Mr. Raico work on?

23   A.  Dennis Raico worked on portfolio loans.

24   Q.  What is a portfolio loan?

25   A.  They're loans that the bank does not sell to other
```

L6o5cal1                          Ivakhnik - Direct

1  institutions.

2  Q.  So, what does the bank do with a portfolio loan?

3  A.  The bank holds on to a portfolio loan until -- and collects

4  the interest on it.

5  Q.  Did Raico work on the same number of loans as Husarsky?

6  A.  Not really.

7  Q.  Were the loans Raico worked on smaller or larger than

8  Husarsky's loans?

9  A.  They were a lot larger.

10 Q.  Can you give a ballpark range of their size?

11 A.  The smallest loan I worked on with Dennis Raico was about

12 $1.2 million and the largest was about $23 million.

13 Q.  And how is your pay supposed to be determined when you

14 worked for Raico?

15 A.  I was to receive a commission from the closed loans.

16 Q.  Was the percentage supposed to be larger or smaller than

17 when you worked with Husarsky?

18 A.  Larger.

19 Q.  Who were some of the borrowers that you worked on with

20 Raico?

21 A.  Paul Manafort is one of the borrowers.

22 Q.  When did you learn about the possibility of Paul Manafort

23 being one of the borrowers?

24 A.  I think sometime in July of 2016.

25 Q.  Can you describe the basics of this loan as you remember it

L6o5cal1                        Ivakhnik - Direct

1   in the summer of 2016?

2   A.   Yes.  It was a loan for the purposes of construction of a

3   property in California.

4   Q.   And who were the borrowers supposed to be on this loan?

5   A.   It was Paul Manafort and Jeffrey Yohai.

6   Q.   Do you know what connection, if any, Manafort and Yohai

7   had?

8   A.   Jeffrey Yohai was Paul Manafort's son-in-law.

9   Q.   And, just again, in sort of round numbers, what was the

10  general amount of the loan being contemplated in the summer of

11  2016?

12  A.   I think somewhere around $6 million.  $6 million or

13  $7 million.

14  Q.   Now, you said it was a loan for the purpose of

15  construction.  Can you briefly explain how that works?

16  A.   Yes.

17  Q.   Please do.

18  A.   The bank would give the funds to the borrower to build the

19  property.  Once the property is complete, the borrower would

20  repay the bank.

21  Q.   Can you please review what should be in your binder -- I

22  hope you can see the binder, as Government Exhibit 110?

23          And if we can just put this up for the Court and the

24  jury?  Everyone.  And really for this we can leave it on the

25  top for now.

1          Ms. Ivakhnik, what is the date of this e-mail?

2     A.  It is Monday, August 1st, 2016.

3     Q.  And can you describe, generally, what is going on in this

4     e-mail chain?  I can make the question more specific if that

5     would help.

6     A.  Please.

7     Q.  What is the subject of the e-mails?  I don't want you to

8     read it but, generally, what is being discussed in the e-mails?

9     A.  What is being discussed is Paul Manafort's credit scores

10    and Jeffrey Yohai's credit scores.

11    Q.  How did their credit scores come to your attention?

12    A.  I believe the credit was pulled and the scores came in at

13    whatever number they came in at.

14    Q.  When you say the credit was pulled, who would pull a credit

15    score?

16    A.  I could pull it or Dennis could have pulled it.  A variety

17    of people at the bank could have pulled it.  I don't remember

18    who pulled this particular credit.

19    Q.  I'm sure many jurors know but just for a clear record, what

20    is a credit score?

21    A.  A credit score is determined by the Fair Isaac Corporation

22    and together with the three credit bureaus, and it determines

23    the creditworthiness of a customer based on an algorithm they

24    use.

25    Q.  Why would you be checking the creditworthiness of Paul

1    Manafort and Jeffrey Yohai at this time?

2    A.   This is a standard process that lenders use to establish

3    the likelihood that this person pays their debts.

4    Q.   To be clear, at this point had any loans been made to

5    Manafort or Yohai?

6    A.   Not that I know of.

7    Q.   I'm not going to ask you to read the e-mail since it has

8    been up for a while now but based on your involvement in this

9    process, did you understand what Raico was saying to you?

10   A.   Yes.

11   Q.   Can you explain that?

12   A.   He was telling me that Paul Manafort's score has dropped

13   from the mid-700s to the 500s and that Jeffrey Yohai's score

14   had increased.

15   Q.   Now, for Paul Manafort, is the mid-700s considered a good

16   or bad score?  What kind of score is that?

17   A.   In my experience, most lenders would lend based off of that

18   credit score.

19   Q.   What about the 500s?

20   A.   That, not conventional lenders.  There possibly could be

21   like -- most lenders would not lend to the 500 scores.

22   Q.   And just for clarity, do you see where you refer to putting

23   both -- or refer to putting both -- We need to put both on one

24   1003?

25   A.   Yes.

L6o5cal1                    Ivakhnik - Direct

1  Q.  What is a 1003?

2  A.  A 1003 is a uniform universal loan application.  It is a

3  form that lenders use to collect the information from the

4  borrower.

5  Q.  Thank you.

6          If we can now please put up 116, it is going to be the

7  front page, and if we can blow up the top half to make it

8  easier to read?

9          Ms. Ivakhnik, what is the date?

10  A.  It is Monday, August 8, 2016.

11  Q.  And who is this e-mail between?

12  A.  This is from myself to Dennis Raico.

13  Q.  Now, if we look down in the main body with the six numbered

14  paragraphs, whose writing is in that paragraph?

15  A.  So, Dennis Raico is writing, and my responses are the ones

16  that are a little bit grayer.

17  Q.  So, for example, in paragraph no. 1, can you just tell the

18  jury what your responses are so they can see?

19  A.  Yes.  Dennis Raico is speaking about the commission

20  breakdown and asking me to have a meeting regarding it to

21  finalize it and my response is:  *Thanks - Wednesday will be*

22  *good.*

23  Q.  Do you see where Raico wrote that had he a few deals coming

24  this week which would be good for both of us?

25  A.  Yes.

1    Q.  Did you understand what he meant by that?

2    A.  Yes.

3    Q.  Please explain.

4    A.  I believe he meant that he has new potential customers

5    coming this week.

6    Q.  And why would that be good for both of you?

7    A.  It would mean that we have things to work on, that

8    production would be good.

9    Q.  Would it have any effect on your pay?

10   A.  Yes.

11   Q.  How?

12   A.  I would receive commission if the deals close.

13   Q.  Do you know if Raico would receive any commission?

14   A.  I assume so but I do not know.

15   Q.  Now, if we can go to paragraph no. 2, can you please

16   explain the contents of this paragraph?  Just generally, what

17   is the subject?

18   A.  Looks like Dennis Raico is telling me that the deal needs

19   to be done very quickly, that there are four more to follow, he

20   will be speaking with Steve later today.

21   Q.  So, to be clear, when you say the deal -- and I know it is

22   there but just for the record, what deal is he referring to?

23   A.  I believe he is referring to the California property.

24   Q.  With which borrower?

25   A.  With Paul Manafort.

1   Q.  Do you see where it refers to Steve who Raico will be

2   connecting with?

3   A.  Yes.

4   Q.  Who is Steve?

5   A.  I believe he is referring to Steve Calk.

6   Q.  Why do you believe that?

7   A.  In the context of this conversation there would be no other

8   Steve that it would matter to.

9   Q.  And, just briefly, do you see the other paragraphs, no. 3

10  through 6?

11  A.  Yes.

12  Q.  What are they generally about?

13  A.  They are about other loans that Dennis and I are working

14  on.

15  Q.  To your knowledge, did it have anything to do with the

16  Manafort loans?

17  A.  Not to my knowledge.

18  Q.  In your time at the bank, how often did you learn that

19  someone in Raico's position was personally briefing the

20  defendant on a specific loan?

21  A.  Not very often.

22  Q.  Do you recall any other occasions?

23  A.  I don't remember.

24  Q.  And do you see where in that second paragraph Raico wrote:

25  *This is a bit of a unique deal.*

1   A.  Yes.

2   Q.  At the time you read that, did you understand what he meant

3   by that?

4   A.  I figured because it was Paul Manafort.

5   Q.  Can I ask you to note the date of this e-mail before we

6   leave it?

7   A.  It is Monday, August 8, 2016.

8   Q.  Can we please now put up Defendant's Exhibit 100?

9           THE WITNESS:  Your Honor, may I ask for a water,

10  please?

11  Q.  Ms. Ivakhnik, what is the date of this e-mail?

12  A.  This is Tuesday, August 9, 2016.

13  Q.  So, how long after the e-mail we just looked at?

14  A.  It is the next day.

15  Q.  And who is it from?

16  A.  It is from Steve Calk.

17  Q.  And can I ask you to read the subject?

18  A.  The subject is:  A message from the chairman:  Steve Calk

19  named to Trump's economic team.

20  Q.  Can we now please, Ms. Drescher, blow up the body?  Great.

21  Thank you.

22          I am going to ask you to read the first sentence, if

23  you could, Ms. Ivakhnik.

24  A.  Yes.  *As many of you might have heard, Donald Trump,*

25  *Republican Presidential Nominee, has named me to his economic*

1    *team.*

2    Q.  Now, I am going to give you a minute to look at the whole

3    e-mail and what I am going to ask you is whether this e-mail

4    says anything about whether Paul Manafort was involved in the

5    defendant getting onto the economic team.

6             MR. SCHOEMAN:  Your Honor, we stipulate it doesn't.

7             THE COURT:  Sorry.  I couldn't make that out what you

8    said.

9             MR. SCHOEMAN:  I stipulate it doesn't say that.

10            THE COURT:  All right.

11            MR. SCOTTEN:  So we will take it down, please.

12            THE COURT:  OK.

13   BY MR. SCOTTEN:

14   Q.  Can we now take a look at Government Exhibit 128?  And,

15   Ms. Ivakhnik, if you want to look at both pages in your

16   notebook?  Do you remember what we are looking at here?

17   A.  I think so.

18   Q.  And best you recall, what is this exhibit?

19   A.  This is an e-mail from Paul Manafort to myself that he is

20   sending the explanation that I had requested.

21   Q.  And what is the explanation you had requested?

22   A.  I requested the explanation for a credit card that is on

23   his credit report that was not being paid.

24   Q.  Do you remember how large the unpaid balance on the credit

25   card was?

L6o5cal1                    Ivakhnik - Direct

1    A.  I think $300,000, but I don't remember for sure.

2    Q.  Was it in that area but you don't remember the exact

3    number?

4    A.  Correct.

5    Q.  And the second page, do you see where it is signed by

6    someone named Rick Gates?

7    A.  Yes.

8    Q.  At the time, did you know who Rick Gates was?

9    A.  No.

10   Q.  Why did you request this letter from Manafort?

11   A.  Because I needed an explanation for why the debt on the

12   credit report was not being paid.

13   Q.  And, do you remember how the bank learned about this

14   $300,000-approximate debt on the credit card?

15   A.  I don't know for sure but I am assuming when the credit

16   report was pulled.

17   Q.  I don't want to ask you to assume but I guess I can be more

18   specific.  Did you learn it because Manafort brought it to your

19   attention?

20   A.  No.  Not to my knowledge.

21   Q.  In your experience with the bank, have you seen other

22   borrowers with undisclosed credit card balances this large?

23   A.  No.

24   Q.  Can we please next go to Government Exhibit 136?

25          And, Ms. Ivakhnik, what is the date of this e-mail and

L6o5cal1                          Ivakhnik – Direct

1    who is it to and from?

2    A.   The date is Wednesday, August 24th, 2016.  It is from

3    Dennis Raico to myself.

4    Q.   Can I just ask you to read first two sentences?

5    A.   Yes.  *Just a heads up.  Jim and Tom called late last night*

6    *and were in a state of panic on Paul's margin account.*

7    Q.   Do you know who the "Jim" and "Tom" are that Raico said

8    were in a state of panic?

9    A.   I believe they're the underwriters in the bank, James

10   Brennan and Thomas Horn.

11   Q.   And why do you believe that?

12   A.   From my memory.

13   Q.   And you described them as underwriters.  What do you mean

14   by underwriter?

15   A.   The underwriter analyzes the documents in the loan package

16   and approves the financing.

17   Q.   So, what is the underwriter attempting to determine in this

18   process?

19   A.   The underwriter is attempting to determine if the borrower

20   has the ability to repay the loan and the willingness to repay

21   the loan.

22   Q.   And where did Jim Brennan and Tom Horn work?

23   A.   Chicago.

24   Q.   Were they in New York?

25   A.   No.

L6o5cal1                          Ivakhnik - Direct

1   Q.   How did you communicate with them?

2   A.   I communicated with them via e-mail and via phone.

3         THE COURT:  You were in New York and they were in

4   Chicago; is that it?

5         THE WITNESS:  I'm sorry.  Can you please repeat that?

6         THE COURT:  I was clarifying for myself.  So, you were

7   in New York and they were in Chicago?

8         THE WITNESS:  Correct; I worked in New York and they

9   worked in Chicago.

10        THE COURT:  OK.

11  BY MR. SCOTTEN:

12  Q.   And do you see where they refer to the state of panic being

13  about Paul's margin account?

14  A.   Yes.

15  Q.   Who is Paul?

16  A.   I believe he is speaking about Paul Manafort.

17  Q.   Well, can we highlight the subject?

18  A.   Manafort Liquid Assets.

19  Q.   And did you have an understanding of why Manafort's margin

20  account would be a cause for the underwriters to panic?

21  A.   Because it would affect Paul Manafort's ability to repay

22  the loan.

23  Q.   Could we please go to Government Exhibit 137?  And for this

24  one I want to sort of scroll down a bit so we capture the full

25  e-mail on the seam of the pages.  Thank you.

1            Ms. Ivakhnik, on this part of the screen, who are you

2    writing to?  Do you see where it says:  *Thanks Jeff*.

3    A.   Yes.  I'm sorry.  To Jeffrey Yohai.

4    Q.   Can you remind the jury who Jeffrey Yohai is?

5    A.   Jeffrey Yohai was Paul Manafort's son-in-law and partner.

6    Q.   And why are you dealing with him at this time?

7    A.   I'm not sure, but maybe Paul was busy.

8    Q.   I am asking generally, what was the reason that you

9    interacted with Yohai.

10   A.   Sure.  Jeffrey Yohai was a borrower, along with Paul, on

11   the loan for the California property.

12   Q.   Got it.

13            And there is some lending terms in here.  Can you

14   generally explain what you are saying to Jeffrey Yohai?

15   A.   Basically it looks like the appraiser is having a hard time

16   coming to value on the property, meaning establishing a value

17   in the current marketplace, and I am asking Jeffrey Yohai for

18   additional comparables that would justify the value that they

19   have -- that Jeff and Paul -- I'm sorry, that Jeff and Paul

20   have told the bank the property is worth.

21   Q.   And why is it important that the value that Manafort and

22   Yohai told the bank be justified, as you put it?

23   A.   It is important because there needs to be room between the

24   value of the property and the loan amount in the event of

25   non-payment of the loan that the bank is able to foreclose and

1   recoup some of their costs.

2   Q.  Can we please go up to the next e-mail and include the

3   subject header when you blow it up please, Ms. Drescher?

4           Here I want to ask you to read the subject.

5   A.  Los Feliz comps for 2401 Nottingham Avenue.

6   Q.  What is Los Feliz?

7   A.  I believe that is the area where the property was located.

8   Q.  And what are comps?

9   A.  Comparable sales.

10  Q.  Comparable sales to what?  I'm sorry.

11  A.  Comparable sales of the property that we are doing the loan

12  for.

13  Q.  So, does this relate to the prior paragraph when you said

14  you needed comparatives to establish value?

15  A.  Yes.

16  Q.  And what is 2401 Nottingham Avenue?

17  A.  I believe that was the address of the property.

18  Q.  And I am sorry again; which property?

19  A.  The property that we are doing the loan on.

20  Q.  Did you ever see 2401 Nottingham Avenue in person?

21  A.  No.

22          MR. SCOTTEN:  Your Honor, with the Court's permission,

23  I am going to read a single paragraph from Government Exhibit

24  2210 which is a stipulation.

25          THE COURT:  OK.

L6o5cal1                          Ivakhnik - Direct

1              MR. SCOTTEN:  Government Exhibit 1207 is a photograph

2      of 2401 Nottingham Avenue, Los Angeles, California.

3              May we please show Government Exhibit --

4              MR. SCHOEMAN:  I'm sorry, your Honor.  I apologize.

5              Would you read the full stipulation, please?  The full

6      text.

7              MR. SCOTTEN:  You want the top and this one?

8              MR. SCHOEMAN:  Yes.

9              MR. SCOTTEN:  So, defense counsel has asked that I

10     read the full stipulation.

11             THE COURT:  Go ahead.

12             MR. SCOTTEN:  It is hereby stipulated and agreed, by

13     and among United States of America, by Audrey Strauss, United

14     States Attorney for the Southern District of New York, Paul M.

15     Monteleoni, Hagan C. Scotten and Alexandra Rothman, Assistant

16     United States Attorneys, of counsel; Stephen M. Calk, the

17     defendant, by his attorneys Paul Schoeman, Esq., Darren A.

18     LaVerne, Esq., and Jeremy Margolis, Esq., that -- and I am

19     skipping down to paragraph 4 -- Government Exhibit 1207 is a

20     photograph of 2401 Nottingham Avenue, Los Angeles, California.

21     Q.  Now we can go back to the e-mail we were just looking at

22     and if we can just go ahead and go to the top?  Can I ask you

23     what you wrote here?

24     A.  I wrote:  *We literally have to pull bunnies out of hats.*

25     Q.  What did you mean by that?

1    A.  I believe I meant that the appraiser was not coming to

2    value and, like, it would be hard to get other comparables that

3    would justify the value.

4    Q.  Just to be clear, the phrase you are using "coming to

5    value," what does that mean?

6    A.  That means for an appraiser to establish the value that

7    Paul and Jeff represented that the property is worth in

8    California.

9    Q.  Why was it necessary for you to establish that value?

10   A.  To know what -- to know what the bank is lending on.

11   Q.  If you were not able to establish that value, how would it

12   affect the possibility of lending to Manafort and Yohai?

13   A.  Possibly the loan amount would be decreased depending on

14   the value that was established.

15   Q.  And next can we please look at Government Exhibit 139?

16   Here I will start on the very bottom of the first page and the

17   rest of the second page so that the jury can see that, pulling

18   it out.  Thank you.

19        Ms. Ivakhnik, do you recognize this e-mail?

20   A.  I think so.

21   Q.  And do you see where it says it is from Stephen H. Zidell?

22   A.  Yes.

23   Q.  Do you remember, in general terms, who Steve Zidell was?

24   A.  I believe he was a lawyer.

25   Q.  And, as a lawyer, what was his role in the Manafort loans?

L6o5cal1                    Ivakhnik - Direct

1  A.  He was the lawyer for the bank.  He would put together the

2  legal documents.

3  Q.  And can I ask you to read the subject of Zidell's e-mail?

4  A.  Yes.  It is 2401 Nottingham, LLC.

5  Q.  And do you see where there is a list of 1 through 12?

6  A.  Yes.

7  Q.  What are those things, just generally?

8  A.  Those are the documents that the attorney was putting

9  together.

10 Q.  Do you see -- and if we can zoom out and then zoom into a

11 smaller part, Ms. Drescher, can we please zoom in on the

12 paragraph beginning:  The lawsuit to foreclose...  Thank you.

13         Drawing your attention to this paragraph,

14 Ms. Ivakhnik, did you understand what the lawyer meant when he

15 said the first mechanic's lien was troubling?

16 A.  I believe so.

17 Q.  What did you understand it to mean?

18 A.  I believe that the discovery of the lien, meaning that Paul

19 Manafort and Jeffrey Yohai did not pay for labor or materials

20 that was performed on the property, he found that troubling.

21 Q.  And you understand why it would be troubling, from your

22 perspective, as a lender?

23 A.  Because a lien is not allowed for a clean title.  The lien

24 has to be paid before there is a clean title to the property.

25 Q.  Sorry.  What do you mean by clean title?

L6o5cal1                          Ivakhnik - Direct

1   A.  Clean title meaning that there are no claims to the title

2   of the property.

3   Q.  If there is a claim to the title of the property, what is

4   that?  What is the kind of claim we are dealing with here?

5   A.  Here we are dealing with a lien for materials or for labor

6   that was performed for the improvement of the property but was

7   not paid which means that if this property was to ever be sold,

8   this lien would have to be paid.

9   Q.  And then we can go to the next paragraph, please.  Thanks.

10          Do you see where it says there are currently deeds of

11  trust for $3,737,100 and $1 million encumbering the Nottingham

12  property?

13  A.  Yes.

14  Q.  What does it mean to be encumbering the Nottingham

15  property?

16  A.  Deeds of trust means that Paul Manafort and Jeffrey Yohai

17  took out loans and used the property as collateral for those

18  loans.

19  Q.  And would those debts be remaining on the Nottingham

20  property?

21  A.  Those debts would have to be paid by the new loan in order

22  to have clear title, as before.

23  Q.  Now that we can scroll all the way to the top of the first

24  page and just highlight the bottom?

25          Ms. Ivakhnik, can I ask you to read this?  It is

L6o5cal1                    Ivakhnik - Direct

1    fairly brief.

2    A.  Yes.  *Can we please have a class for the attorneys we use*

3    *that outlines unhelpful language:  The lawsuit to foreclose the*

4    *mechanic's lien is troubling.  (see below)  He sounds like a*

5    *sufficient attorney but can the personal opinions be*

6    *eliminated?  We just want the facts.*

7    Q.  Why is it that you did not want the attorney to express his

8    personal opinions?

9    A.  Part of the sales process is presenting the loan to the

10   underwriters in the best possible light and a word like

11   "troubling" may have maybe muddied the water a little bit.

12   Q.  Would it make it possibly harder for you to get the

13   underwriters to approve the loan?

14   A.  Not harder.  It is just the underwriters approve the loan

15   based on the documentation, not based on someone's opinion.  It

16   is just -- it is like cosmetic in a sense.  We want the loan to

17   look as appealing as possible to the underwriter.

18   Q.  Ms. Ivakhnik, what is the date in this e-mail?

19   A.  It is September 1, 2016.

20   Q.  Can we please next go to Government Exhibit 141 and just

21   publish the first page to the jury?  Here would you highlight

22   the very top?

23           I will ask you, Ms. Ivakhnik, for the date and the

24   e-mails in between.

25   A.  Yes; it is Thursday, September 8, 2016.
                         (Continued on next page)

L6OKCAL2                          Ivakhnik – Direct

1    BY MR. SCOTTEN:

2    Q.  Can I ask you to read what Raico wrote to you?

3    A.  He wrote, "Just a FYI — looks like these guys are on

4    default to Genesis."

5    Q.  Let's start with Genesis.

6            Did you know who Genesis was at the time?

7    A.  I believed it was another lender.

8    Q.  Did you understand what Raico meant by "these guys"?

9    A.  I believe he was referring to Paul Manafort and Jeffrey

10   Yohai.

11   Q.  And do you see right below subject where it says 2401

12   Nottingham?

13   A.  Yes.

14   Q.  And that's the property Manafort and Yohai were involved

15   with?

16   A.  Yes.

17   Q.  What does it mean that Yohai and Manafort were in default

18   to Genesis?

19   A.  It means they took out a loan from this lender and they did

20   not pay.

21   Q.  Why is it relevant to your bank that Manafort and Yohai

22   failed to pay a loan to a prior lender?

23   A.  Because if they did not pay a loan to another lender, that

24   makes us believe that they will not pay our loan.

25            MR. SCOTTEN:  If we could now please look at

Government Exhibit 142.

Q.  Now, focusing on the very top part, what are we looking at,
Ms. Ivakhnik?

A.  This is an email from myself to Dennis Raico.

Q.  Are you responding to the previous email we just saw?

A.  I believe so, yes.

Q.  Can I ask you to read what you wrote?

A.  "It is what it is.  Let's send it off to Chicago and have
it be part of the file.  Ultimately, Steve will make the call."

Q.  What did you mean by "send it off to Chicago"?

A.  The underwriters were in Chicago.

Q.  What does it mean for a default to Genesis be part of the
file?

A.  It's part of the file -- it's part of the documentation
that the underwriters will review to establish whether Paul and
Jeff can repay the loan and whether they're willing to repay
the loan.

Q.  When you say, "Ultimately, Steve will make the call," who
were you referring to?

A.  Steve Calk.

Q.  And what is the call that you said Steve Calk would make?

A.  Final say.

Q.  Now, Ms. Ivakhnik, do you know whether the bank had an
official process for approving a portfolio loan?

A.  I believe so.

L6OKCAL2                        Ivakhnik - Direct

1    Q.   And as best you recall, what did you know about it?

2    A.   I believe the underwriters would meet with Steve Calk and

3    go over the facts of the file and decide if this is something

4    the bank wants to lend on.

5    Q.   Do you know if anyone spoke with Calk in making that

6    decision?

7                MR. SCHOEMAN:   Objection to form of the question.

8                THE COURT:   Sustained.

9    BY MR. SCOTTEN:

10   Q.   Were Steve Calk and the underwriters the only people you

11   knew of who were involved in the decision you just described?

12   A.   I think there were other people.

13   Q.   Do you have any sense of who they were?

14   A.   I don't remember.

15   Q.   In the process of considering the Manafort loans, do you

16   recall anyone suggesting to you that someone other than Steve

17   Calk would make the call, as you put it?

18               MR. SCHOEMAN:   Objection.

19               THE COURT:   Sustained.

20   Q.   What is the basis for your belief that Steve Calk would

21   make the call?

22               MR. SCHOEMAN:   Objection.

23               THE COURT:   I'll allow it.

24               Go ahead.

25               THE WITNESS:   This is something I understood to be

L6OKCAL2                          Ivakhnik - Direct

1   true.

2   BY MR. SCOTTEN:

3   Q.  I'm just asking if you have the ability to explain to the

4   jury why you understood that to be true?

5   A.  From the moment that Dennis told me about this loan, he was

6   so excited, not about the loan, but about the prospect of what

7   this means for Steve Calk, and I understood with my life

8   experience that no matter what, this loan will be made.

9          MR. SCHOEMAN:  Objection.  Move to strike.

10         MR. SCOTTEN:  I believe there's a prior ruling on

11  Mr. Raico's statements in this area.

12         THE COURT:  I think perhaps the answer was

13  nonresponsive.  Do you want him to ask the question again and

14  elicit the answer?

15         MR. SCHOEMAN:  Yes, your Honor.

16         THE COURT:  All right.

17         Ladies and gentlemen, you should disregard that

18  answer.  It wasn't really responsive to the question.

19  BY MR. SCOTTEN:

20  Q.  So I want to ask again what the basis was for your belief

21  that Steve Calk would make the call on this loan.  And if you

22  could just confine your answer to that question, I may ask you

23  more after it.

24  A.  The basis was that I believed that this -- the bank making

25  this loan would result in Steve Calk receiving some kind of an

L6OKCAL2                    Ivakhnik - Direct

1    appointment or advantage with the Trump Administration.

2    Q.  And why?

3           MR. SCHOEMAN:  Objection.  Same objection.

4           THE COURT:  I'll allow it.

5           So why did that belief lead you to think that Steve

6    Calk would make the call on whether to give the loan or not?

7           THE WITNESS:  Because I believed there was no way that

8    Steve Calk would not make this loan, because that would mean he

9    would not get a position with the Trump Administration.

10          THE COURT:  Okay.

11   BY MR. SCOTTEN:

12   Q.  Before we move off this email, can I ask you to again note

13   the date?

14   A.  It is September -- Thursday, September 8th, 2016.

15          MR. SCOTTEN:  If we could now please take a look at

16   Government Exhibit 143.

17   Q.  What is the date of this email?

18   A.  It is Friday, September 9, 2016.

19   Q.  So, how long after the last email we looked at?

20   A.  One day.

21   Q.  Now, if you could please start with the bottom email --

22   really, Ms. Ivakhnik -- perfect, thank you.

23          Okay.  Can I please ask you to read what Raico wrote

24   at the bottom of this page?

25   A.  "Okay!  Did we get an explanation as to the 3-mil in

L6OKCAL2                         Ivakhnik - Direct

1    receivables, now 3-mil in payables?  Thanks."

2    Q.  What are receivables?

3    A.  Receivables are money that is owed to a company.

4    Q.  Do you recall who it would have been owed to in this email?

5    A.  I believe it was Paul Manafort and Jeff Yohai.

6    Q.  What are payables?

7    A.  Payables are the money that they would owe to someone.

8    Q.  "They" being Paul Manafort and Jeff Yohai?

9    A.  Yes.

10   Q.  So what effect does having $3 million move from receivables

11   to payables have for the borrower's credit risk?

12   A.  It means that instead of $3 million in assets, they now owe

13   $3 million.

14   Q.  Just looking at your email, where you state that he put it

15   in the wrong place, what do you mean to communicate there?

16   A.  I believe I was saying, like, it's a clerical error.

17   Q.  That they listed the 3 million in one column and it

18   belonged in the other?

19   A.  Correct.

20   Q.  How would the dollar difference in terms of the borrower's

21   assets would that have?

22   A.  Enormous.

23   Q.  Could you please just read the rest of what you wrote,

24   avoid distraction?

25   A.  "That is the money they owe Dustin Hoffman for his

1    investment in Blue Jay Properties."

2    Q.  And, to your knowledge, is that Dustin Hoffman the Dustin

3    Hoffman a lot of people are familiar with?

4    A.  I believe so.

5    Q.  Going to the very top, how did Raico respond to this

6    information about the borrower's error?

7    A.  He said, "Oh, boy."

8              MR. SCOTTEN:  If we could please now go to Government

9    Exhibit 160.  We're going to start here at the bottom, at the

10   earliest email, if we can.  And if we can highlight

11   Ms. Ivakhnik's email here, please.

12   Q.  Just in general terms here, Ms. Ivakhnik, what are you

13   doing in this email?

14   A.  I am asking the title representative to provide a title

15   commitment for a property.

16   Q.  What is a title commitment?

17   A.  A title commitment is basically the -- it's a commitment to

18   ensure the title of the property against any claims.

19   Q.  Why would you need that?

20   A.  Because we were looking to use this property as collateral

21   for the loan.

22   Q.  And so when you say you're adding a property to the

23   Manafort deal, what does that mean?

24   A.  That means that instead of one property being as

25   collateral, the California property, we will now have two

L6OKCAL2                          Ivakhnik - Direct

1  properties, the California property and the Bridgehampton

2  property, as collateral for one loan.

3  Q.   What is the address of the property?

4  A.   174 Jobs Lane.

5  Q.   I'm sorry, can I ask you to read the whole thing?

6  A.   Sure.

7            Bridgehampton, New York 11932.

8  Q.   Have you ever personally been to this property?

9  A.   No.

10           MR. SCOTTEN:  With the Court's permission, I'd like to

11  read a different line from the same stipulation I read earlier.

12           THE COURT:  That's fine.  Could you just put the

13  exhibit number on the record.

14           MR. SCOTTEN:  Sure.

15           The number of the stipulation is Government

16  Exhibit 2210, and I'm reading paragraph 1.

17           "Government Exhibit 1204 is a photograph of 174 Jobs

18  Lane, here listed as Water Mill, New York."

19           Can we please publish -- thank you.

20  Q.   What are listed as Water Mill and Bridgehampton, do you

21  know what region of New York this property was located in?

22  A.   It is the Hamptons.

23           MR. SCOTTEN:  If we can please take that down and go

24  down to the email.  And if we could now scroll up to the next

25  email in this chain.

L6OKCAL2                      Ivakhnik - Direct

1   Q.  So who is this email from?

2   A.  It is from Dennis Raico.

3   Q.  Where Raico says that Manafort has agreed -- well, I should

4   back up.

5            Where Raico refers to Paul and Jeff, do you know who

6   he is referring to?

7   A.  I believe he is referring to Paul Manafort and Jeff Yohai.

8   Q.  Where it states that, "Paul has agreed to cross the Hampton

9   property, and only that property," what does "cross" mean?

10  A.  I believe this is referring to cross-collateralization,

11  which means you take two properties as security for one loan.

12  Q.  When Raico writes, "I will speak with Steve about it," do

13  you know who "Steve" refers to?

14  A.  I believe it is Steve Calk.

15  Q.  Why do you believe that?

16  A.  Because in the context of all our conversations, it would

17  always be Steve Calk.

18  Q.  Do you see where Raico writes, "The property actually has a

19  2.5-mil mortgage against it, which he would like us to take

20  out"?

21  A.  Yes.

22  Q.  Which property is Raico referring to?

23  A.  He is referring -- I believe he is referring to the

24  Hamptons property.

25  Q.  What does it mean for us to take out a mortgage?

1   A.   That means that we would pay off the $2.5 million to

2   whatever bank Paul owes the money to.

3   Q.   Do you understand why the bank would want to pay off

4   Manafort's earlier mortgage?

5   A.   Yes.

6   Q.   Please explain.

7   A.   The bank would want to pay it off because the bank would

8   want to be in a first-position lien on the property, meaning

9   that if this loan was to remain in place, this $2.5 million,

10  and there was a default of payment, that means this loan would

11  be paid first and then the new loan would be paid second, and

12  that's -- lenders do not do that in these types of instances.

13  Q.   Just to be clear, why would a lender not want to come in as

14  a second position lender?

15  A.   Because the lender wants to make sure that they get paid.

16  So, in this instance, they would lend enough money, that the

17  borrower can pay off this loan and then just have one loan with

18  the lender.

19  Q.   And so does paying off this mortgage have any effect on the

20  size of the loan that your bank was going to make to Manafort?

21  A.   Yes.

22  Q.   How does it affect the size of the loan?

23  A.   The loan amount would have to be increased by this amount.

24          MR. SCOTTEN:   If we could please scroll up to the next

25  email.

1   Q.  Who is it from and to?

2   A.  It is from myself; it is to Jim Brennan.

3   Q.  And what did you write to Brennan?

4   A.  "Apparently there is a mortgage against the Hamptons home."

5   Q.  Why did you bring this information to Brennan's attention?

6   A.  I believe we were initially working under the assumption

7   that the home was owned free and clear, meaning there are no

8   mortgages on the home.

9   Q.  And so is learning that there is a mortgage on the home a

10  positive or negative development for the borrower's credit?

11  A.  It is a negative development, because now there is an

12  additional debt that we have to take into account.

13          MR. SCOTTEN:  If we could please scroll up and -- let

14  me just do the whole bottom half.

15  Q.  First, so starting with the bottom one, how does Brennan

16  respond to you?

17  A.  He says, "Thanks.  Why am I not shocked!"

18  Q.  What is your reply to Mr. Brennan?

19  A.  "We'll deal with it Monday."

20          MR. SCOTTEN:  And if we can scroll up from there,

21  please.

22  Q.  How did Mr. Brennan reply to you?

23  A.  Capital letters:  "OR NOT."

24  Q.  Did you understand what Brennan meant by "OR NOT"?

25  A.  I believe it was the equivalent of throwing hands up in the

L6OKCAL2                          Ivakhnik - Direct

1    care and being like, nope, not doing the loan.

2    Q.  Before we move off this email, can I just ask you to note

3    the date?

4    A.  It is Friday, September 23rd, 2016.

5           MR. SCOTTEN:  If we could now go to Government

6    Exhibit 173.

7    Q.  So this one, we're going to do the whole chain, so if you

8    could please, again, start at the bottom.

9           What is the date of this email?

10   A.  Tuesday, September 27, 2016.

11   Q.  And who wrote it?

12   A.  I did.

13   Q.  And who did you write to?

14   A.  Jim Brennan, Thomas Horn, Dennis Raico, Steve Calk.

15   Q.  And how often did you speak or write to the defendant about

16   loans while at the bank?

17   A.  Almost never.

18   Q.  Other than this email, do you recall any other

19   communications you had with him about this loan?

20   A.  I believe I sent a text.

21   Q.  And what was the general subject of that text?

22   A.  The general subject -- I believe the text was a few days --

23   it was right when I learned that there is a mortgage -- or, I'm

24   sorry, I learned that Paul Manafort's wife does not want to use

25   the Hamptons home as collateral for this loan.

1    Q.  And why did you text Calk about this?

2    A.  Because I thought -- I thought it was a very big -- I

3    thought it was very important that the Hamptons home be a part

4    of this deal, because it is the only -- like, I thought it was

5    necessary for the Hamptons home to be part of this deal.

6    Q.  Why?

7    A.  Because I did not believe that the borrowers had the

8    ability or the will to repay the loan.

9    Q.  And so why would that make it important to add the Hamptons

10   property?

11   A.  Because I believed the bank would eventually have to

12   foreclose, and the only way to recoup the money would be from

13   the sale of -- from the foreclosure of this property.

14   Q.  Did you understand that having this additional

15   collateral -- did you understand whether having this additional

16   collateral would solve all the problems with the loan?

17   A.  Having this collateral does not solve the problems with the

18   loan.

19   Q.  Why not?

20   A.  Because foreclosure is not the end goal when a loan is

21   originated.

22   Q.  Sorry, what do you mean by that?

23   A.  Adding this property would only mitigate the risk for the

24   bank, not solve the problems with the loan.

25   Q.  And why does it only mitigate risk as opposed to solving

1    problems?

2    A.   Because the equity in this home would not give Paul

3    Manafort or Jeffrey Yohai the ability to pay the monthly

4    payments on the loan.

5    Q.   So, if adding this collateral would not fix all of the

6    problems, why did you choose to text the defendant about it?

7    A.   It was the least amount of protection the bank could have.

8    Q.   How did Calk reply to your message?

9    A.   He did not reply to the text message.

10   Q.   All right.  Returning to --

11              THE COURT:  I'm going to interrupt right here.  It's

12   around time for our morning break.  I don't know if this is a

13   good breaking point for you.

14              MR. SCOTTEN:  It's fine, your Honor.

15              THE COURT:  All right.

16              Ladies and gentlemen, we're going to break for ten

17   minutes.  Please remember not to talk about the case.

18              (Continued on next page)

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Is there anything pressing we need to deal

3    with?

4           MR. SCOTTEN:  No.  Thank you, your Honor.

5           THE COURT:  Okay.  See you in ten minutes.

6           (Recess)

7           MR. SCOTTEN:  Your Honor, I think we have a very brief

8    matter before we bring the witness in.

9           THE COURT:  Okay.

10          MR. SCOTTEN:   I inquired with Mr. Schoeman on the

11   break about whether he intended to attack the credibility of

12   Dennis Raico through Ms. Ivakhnik.  He informed me he did.

13   It's my understanding that a Rule 608, you can attack a

14   witness' credibility, but Raico is not the witness here, or you

15   can attack -- you can bring up specific instances, but only in

16   circumstances not applicable here.  Generally speaking, it's

17   not applicable.  So, I understand that there may be some areas

18   where a sort of the narration, Mr. Schoeman will have to ask

19   questions and suggest Ms. Ivakhnik relied on Raico or maybe

20   even that she heard his statements, but that wasn't her basis,

21   but I do not think you can do an attack on somebody who's not

22   yet on the stand through another witness.  It's the classic

23   asking one witness to opine on another's witness' credibility,

24   which invades the province of the jury and isn't otherwise

25   permitted under the rules of evidence.

L6OKCAL2                        Ivakhnik - Direct

1           MR. SCHOEMAN:  Your Honor, Rule 608 says you can

2      elicit from a witness an opinion about a witness who will

3      testify for the other side.  You can say --

4           THE COURT:  Show me.  I'm looking at it.

5           MR. SCHOEMAN:  608.

6           THE COURT:  "The witness' credibility may be attacked

7      or supported by testimony about the witness' reputation for

8      having a character for truthfulness or untruthfulness, or by

9      testimony in the form of an opinion about that character.  The

10     evidence of truthful character is admissible only after the

11     witness' character for truthfulness has been attacked."

12          MR. SCOTTEN:  So my understanding, your Honor, is that

13     applies if Mr. Raico gets on the stand, and they attack him,

14     and, frankly, I suppose, depending on how things shake out,

15     they may be able to make a case that they need to recall

16     Ms. Ivakhnik in their case as their witness to say whatever she

17     would opine about, but as of now, it's neither within the scope

18     of her examination or the rules to use her to pre-rebut a

19     witness who's not even appeared before the jury.

20          MR. SCHOEMAN:  And that would be true if the

21     government had not introduced Mr. Raico's statements under

22     801(d)(2) because Rule 806 permits me to impeach the

23     credibility of a witness whose statements were introduced under

24     801(d)(2) as if they had taken the stand.  And since those

25     exhibits are already in evidence, and some of them have been

L6OKCAL2                      Ivakhnik - Direct

1    relied upon by the government, I can impeach Mr. Raico's

2    credibility under Rule 608.

3         THE COURT:  But, wait a minute.  608 -- let me just

4    tell you what my -- I will, of course, follow whatever the rule

5    says, but in terms of efficiency, and efficiency is always

6    primary in my mind consistent with rules, I'm not a fan of

7    recalling witnesses.

8         But, having said that, 608(a), the last sentence says,

9    "Only after the witness' character for truthfulness has been

10   attacked," and I don't believe Mr. Raico's character for

11   truthfulness has been attacked, so I don't know how --

12        MR. SCHOEMAN:  Your Honor, I'm sorry, I think you're

13   misreading the rule.  The evidence of truthful character can

14   only come in after I do what I plan to do.

15        THE COURT:  Okay.  And you're not going to --

16        MR. SCHOEMAN:  I'm going to say, so the Court is

17   aware, Ms. Ivakhnik has told the agents that Mr. Raico, in her

18   opinion, is a pathological liar.  The government has offered --

19   first, I want to call Raico as a witness; under Rule 611, we

20   can spare us the trouble of having to call Ms. Ivakhnik back.

21   But, in addition, the government — and we thought about this —

22   introduced evidence of Raico's out-of-court statements under

23   801(d)(2), and under Rule 806, even if Mr. Raico does not

24   testify, I can impeach his credibility.

25        THE COURT:  I understand.  Because, in effect, he has

L6OKCAL2                    Ivakhnik - Direct

 1   given testimony, he has presented evidence in the form of a

 2   writing as an agent, and, therefore, you're saying you can

 3   attack his credibility.

 4              MR. SCHOEMAN:  Yes, your Honor.

 5              MR. SCOTTEN:  If the Court is not inclined to force

 6   the recall in this instance, we're not going to fight about it;

 7   if it can be done, we prefer to do it now.  I do think it's

 8   important that 608(b) be adhered to, that there's no specific

 9   instances of dishonesty, but I agree -- Mr. Schoeman will get

10   this in sooner or later whether we agree or not.  So if the

11   Court wants to let him do it now, that's fine with me.

12              THE COURT:  Okay, good.

13              Get the jury.

14              THE DEPUTY CLERK:  And the witness?

15              THE COURT:  Why don't we do both, just to be

16   efficient.

17              You can take the witness stand again.

18              (Continued on next page)

19

20

21

22

23

24

25

L6OKCAL2                         Ivakhnik - Direct

1            (Jury present)

2            THE COURT:  You may be seated.

3            MR. SCOTTEN:  If we could please put back up

4     Government Exhibit 173.

5     BY MR. SCOTTEN:

6     Q.  I believe at the break, we talked about a text you sent,

7     Ms. Ivakhnik, and I want to ask you --

8            THE COURT:  I'm having trouble hearing you.  I'm

9     sorry.

10           MR. SCOTTEN:  I'm sorry, your Honor.  How is this?

11           THE COURT:  Good.

12    BY MR. SCOTTEN:

13    Q.  We had talked about a text you sent the defendant.  I now

14    ask you why you included him on this email?

15    A.  What is the question?

16    Q.  Why did you include the defendant on this email?

17    A.  I believe I was -- I believe I wanted to make a big

18    statement with this email.

19    Q.  For what reason?

20    A.  Because I believe, like, there were so many problems with

21    the loan, and I wanted to bring it to light that everybody is

22    in on the conversation.

23    Q.  Do you see -- well, withdrawn.

24           What is the actual subject of this email?  What

25    information are you actually sending to the recipients?

L6OKCAL2                    Ivakhnik – Direct

1  A.  I'm sending them information that the -- the recent

2  mortgage statement on the Hamptons property.

3  Q.  And what was the significance of that statement, if you

4  remember?

5  A.  I believe it was -- I don't remember.

6          MR. SCOTTEN:  Let's scroll up to the next email.  And

7  if you can highlight that.  Thank you.

8  Q.  Can I ask you to read what Brennan wrote in response?

9  A.  "What the hell.  He just took the loan out at the end of

10 August.  How can he be $1 million off!"

11 Q.  Does that help you remember the general subject of the

12 information you brought out?

13 A.  Yes.

14 Q.  And what was it, generally?

15 A.  I believe the loan on the property was not 2.5 million,

16 but, rather, 3.5 million.

17 Q.  And, just to be clear, which property?

18 A.  The Hamptons property.

19 Q.  And why did you originally believe it was 2.5 million?

20 A.  Originally I believed that because I was told that by

21 someone.

22 Q.  Where -- I guess what I'm getting at is where did that

23 information originally come from to the bank?

24          MR. SCHOEMAN:  Objection.

25 Q.  As far as you know?

1              THE COURT:  Overruled.

2              THE WITNESS:  I don't know.

3     BY MR. SCOTTEN:

4     Q.  Do you know whether the bank learned it or whether it was

5     provided by the borrowers?

6     A.  I believe the bank learned it because the borrowers told us

7     that they owned the property free and clear.

8     Q.  And after the bank learned that the borrowers did not own

9     the property free and clear, do you remember where the

10    $2.5 million figure came from?

11    A.  It probably would have shown up on the title search.

12    Q.  Okay.  And how did you then learn there was, in fact,

13    $3.5 million in mortgage debt?

14    A.  Because I believe we asked for the mortgage statement.  I'm

15    not sure.  I don't know, sorry.

16    Q.  Do you understand what he's saying here when he says, "What

17    the hell.  He just look out the loan," skipping some space,

18    "how can he be a million dollars off"?

19    A.  Yes.

20    Q.  What is he saying?

21    A.  He's saying that how can he have mistaken 2.5 million

22    for -- and, instead, it would be 3.5 million.

23    Q.  When you say "he," who is the "he" who made the

24    million-dollar mistake?

25    A.  I believe it would be Paul Manafort.

L6OKCAL2                        Ivakhnik - Direct

1           MR. SCOTTEN:  Can you please scroll up -- well,

2      actually, I'm sorry, if we can go back.

3      Q.  Who does Brennan send this email to?

4      A.  Brennan -- Jim Brennan is sending this email to myself,

5      Thomas Horn, Dennis Raico, Steve Calk.

6           MR. SCOTTEN:  If we can please now scroll up.

7      Q.  Can you please read what you wrote?

8      A.  "He is so in debt."

9      Q.  And who did you write this to?

10     A.  Jim Brennan.

11     Q.  Can you remind me what Brennan's job was?

12     A.  He was the head underwriter.

13     Q.  Do you remember earlier this morning when we discussed an

14     email you sent on September 1st, 2016, where you were annoyed

15     that a lawyer was making negative comments about these loans

16     that could reach the underwriters?

17     A.  Yes.

18     Q.  In this email, is your comment to the head underwriter

19     positive or negative about the loans?

20          Are you saying a good thing or a bad thing about the

21     loans to the head underwriter?

22     A.  I'm saying a bad thing.

23     Q.  So what had changed between September 1st and the date of

24     this email?

25     A.  More information came in, and it became very obvious that

1   this was a bad loan.

2          MR. SCOTTEN:  Can we now please take a look at

3   Government Exhibit 172.  Now, if we can scroll to the prior

4   page and briefly highlight Mr. Brennan's email.

5   Q.  Is this "what the hell" email the same one we saw a minute

6   ago?

7   A.  Yes.

8          MR. SCOTTEN:  And now we can scroll up.

9   Q.  What are we looking at here, Ms. Ivakhnik?

10  A.  I am replying just to Jim Brennan.

11  Q.  So this is a different reply than the "He is so in debt"

12  reply we looked at a minute ago?

13  A.  Yes.

14  Q.  And what did you write?

15  A.  "Was that satisfying?"

16  Q.  Why did you write that to Mr. Brennan?

17  A.  I believe it was in the spirit of camaraderie, like, I

18  believed that both Jim Brennan and myself were exasperated by

19  the amount of negative information coming in about the loan,

20  documents.

21  Q.  Did you have any basis for knowing Brennan's views other

22  than these emails that we've seen?

23  A.  Jim Brennan and I spoke on the phone.

24  Q.  Do you remember anything he told you about the loans?

25  A.  I don't remember specifically.  We were both in agreement

L6OKCAL2                          Ivakhnik - Direct

1    that this loan was not good.

2    Q.  Did he provide you any advice on what to do?

3    A.  Yes.

4    Q.  What advice did Brennan provide you?

5    A.  He told me to hold onto all emails or to save all emails

6    because the FBI will be looking into this.

7              MR. SCHOEMAN:  Objection.

8              THE COURT:  Sustained.

9              And, ladies and gentlemen, you should disregard that

10   answer.

11   BY MR. SCOTTEN:

12   Q.  Ms. Ivakhnik, how did you respond -- sorry.  How did

13   Brennan respond when you asked him, "Was that satisfying"?

14   A.  Jim Brennan responded, "Not enough."

15   Q.  What did you understand that to mean?

16   A.  I believe that was in the spirit of this understanding that

17   him and I had, that this was a bad loan, and there's just

18   nothing to do to stop it.

19   Q.  Well, let me ask you this:  Why would that link directly to

20   Brennan's comment to you, Raico, Horn, and Calk about the

21   borrower being a million dollars off?  Why would that be

22   satisfying, but not satisfying enough?

23   A.  Because in that comment, Jim Brennan was making an opinion

24   statement.

25   Q.  Ms. Ivakhnik, what is the date on this email that we're

L6OKCAL2                    Ivakhnik – Cross

1   looking at?

2   A.  Tuesday, September 27th, 2016.

3   Q.  How much longer after this email did you work at the bank?

4   A.  This was my last day at the bank.

5   Q.  So, do you know, just from your personal experience, what

6   ultimately happened with the Manafort loans?

7   A.  I do not.

8            MR. SCOTTEN:  One second, your Honor?  If I can find

9   my mask.

10           (Pause)

11           MR. SCOTTEN:  Nothing further, your Honor.

12           THE COURT:  Okay.

13           Cross?

14  CROSS-EXAMINATION

15  BY MR. SCHOEMAN:

16  Q.  Good afternoon, Ms. Ivakhnik.

17  A.  Good afternoon.

18           THE COURT:  You can take your mask off, Mr. Schoeman.

19           MR. SCHOEMAN:  I'm sorry.

20  BY MR. SCHOEMAN:

21  Q.  Can you hear me okay?

22  A.  Yes.

23  Q.  Okay.

24           You were testifying about a loan that you worked on

25  while you were still at the Federal Savings Bank for Manafort.

Ivakhnik - Cross

1   There was one loan that you worked on for Manafort?

2   A.  Yes.

3   Q.  And you said that there was no way that that loan was not

4   going to go through.

5           Did you testify to that effect earlier?

6   A.  Yes.

7   Q.  And that Mr. Brennan thought there was no way that that

8   loan was not going to go through?

9   A.  I don't know what he thought.

10  Q.  And, in fact, that loan did not go through.

11          Do you know that?

12  A.  I do not.

13  Q.  Because you weren't there on October 19th, when

14  Mr. Manafort said no to that loan?

15          MR. SCOTTEN:  Objection.  Outside the scope.

16          THE COURT:  Overruled, overruled.

17          THE WITNESS:  What is the question?

18  BY MR. SCOTTEN:

19  Q.  You testified earlier that there was no way that the bank

20  was not going to do the Manafort loan that you worked on, and

21  I'm asking you:  Are you aware that on October 19th, Paul

22  Manafort turned down that loan?  Are you aware of that?

23          MR. SCOTTEN:  Objection.

24          THE COURT:  Overruled.

25          THE WITNESS:  There are many statements.

L6OKCAL2                          Ivakhnik - Cross

1    BY MR. SCOTTEN:

2    Q.  Let me ask it this way:  Ms. Ivakhnik, you said a couple of

3    times that there was no way that the loan you worked on was not

4    going to go through.  My question to you is:  Weren't you wrong

5    about that?

6               MR. SCOTTEN:  How would she know, your Honor?  No

7    basis.

8               THE COURT:  Overruled.

9               THE WITNESS:  Your Honor?

10              THE COURT:  Yes.

11              THE WITNESS:  I'm confused because there's a statement

12   and a question together.

13              THE COURT:  All right.  So, if I could just ask you to

14   please say isn't it correct or true, so she's clear on what the

15   question is.

16   BY MR. SCHOEMAN:

17   Q.  Two questions, please:  Didn't you testify earlier that

18   there was no way that the loan you worked on would not go

19   through; yes or no?

20   A.  Yes.

21   Q.  And isn't it true that you were wrong?

22   A.  I don't know.

23   Q.  Okay.  But you're not aware of the Federal Savings Bank

24   making any loans, closing any loans, on the Nottingham

25   property, which is the property that you were involved with?

L6OKCAL2                          Ivakhnik – Cross

1   A.  I do not know.

2   Q.  And you are not aware of the Federal Savings Bank making

3   any loans where Jeff Yohai was the borrower?

4   A.  I do not know.

5   Q.  And you're not aware of the Federal Savings Bank making any

6   loans to Paul Manafort involving properties in California?

7   A.  I do not know.

8   Q.  And you had left the bank by the time the Bridgehampton

9   loan was restructured and ultimately closed in November?

10  A.  There are many statements.  Can --

11          THE COURT:  The question is:  Were you aware of that

12  or not?  And if your answer is I don't know, like the other

13  answers, you can just say the same thing.

14          THE WITNESS:  I don't know.

15  BY MR. SCOTTEN:

16  Q.  And, just to be clear, you were not at the bank when the

17  loan on the Brooklyn brownstone was underwritten, true?

18  A.  That did not happen while I was at the bank.

19  Q.  Or when it was closed?

20  A.  I don't know when it closed.

21          THE COURT:  I'm just going to remind the jury that the

22  lawyer's questions are not evidence; it's the witness' answers

23  that are evidence.

24          You may proceed.

25          MR. SCHOEMAN:  Thank you.

L6OKCAL2                              Ivakhnik – Cross

BY MR. SCHOEMAN:

Q.   So, you began working in the Federal Savings Bank in
November 2015; is that right?

A.   I believe so.

Q.   And you stopped working at the end of September 2016?

A.   Yes.

Q.   And before that period that you worked at the Federal
Savings Bank, how were you employed?

A.   I was -- I did various jobs.  I was working on a business
that I was starting.

Q.   What business was that?

A.   It was a lingerie line for curvy women.

Q.   And were you working at a bank in any capacity for the five
years before you started working at the Federal Savings Bank?

A.   No, not for the five years before.

Q.   And, Ms. Ivakhnik, you were not an underwriter?

A.   No.

Q.   Mr. Brennan and his team were the underwriters at the
Federal Savings Bank, right?

A.   Yes.

Q.   And the underwriting department, as you said, is
responsible for approving the financing for loans; is that
right?

A.   Yes.

Q.   And, Ms. Ivakhnik, you were not on the bank's loan

1    committee?

2    A.   No.

3    Q.   You never attended a loan committee meeting; is that

4    correct?

5    A.   No.

6    Q.   And although you worked on loans, it was not your job to

7    determine whether a loan should be approved or not?

8    A.   Can you repeat the question?

9    Q.   It was not your job, as a sales assistant to Mr. Raico, to

10   determine whether the bank should make a loan?

11   A.   I was -- there are statements in that question that aren't

12   correct.

13   Q.   I'm just asking whether it was your job to be the decider

14   on whether a loan should or should not be made by the bank?

15   A.   No, it was not my job.

16   Q.   And I think you said that you started working with

17   Mr. Raico over the summer of 2016?

18   A.   Yes.

19   Q.   You were not working for him in April of 2016?

20   A.   I don't remember.

21   Q.   Well, let me show you Defense Exhibit, in evidence, 208.

22          MR. SCHOEMAN:   If we can just enlarge sort of the top

23   part.

24   Q.   Do you see that this is an email relating to a portfolio

25   loan for 391 Broadway?  Do you see that?

L6OKCAL2                       Ivakhnik - Cross

1   A.  Yes.

2   Q.  And do you see that the email references Paul Manafort?  Do

3   you see that?

4   A.  Yes.

5   Q.  But you were not working for Mr. Raico at the time that he

6   presented this information to Mr. Calk, Mr. Brennan, Mr. Ubarri

7   and Mr. Jones, right?

8   A.  I don't believe so.

9         MR. SCHOEMAN:  We can take that down.

10         THE WITNESS:  May I make a correction to what I said?

11   Q.  Yes, you can make -- sure.  Please correct what you said.

12   A.  I believe you just asked me if I said that I started

13   working with Mr. Raico in the summer.  I believe the question

14   that I answered that to was if I started to work on the Paul

15   Manafort deal in the summer.

16   Q.  When did you begin working as Mr. Raico's assistant?

17   A.  I never -- I wasn't -- that wasn't my title -- I wasn't his

18   assistant.

19   Q.  When did you begin working closely with Mr. Raico on

20   Mr. Raico's portfolio loans?

21   A.  I think maybe, like, June, maybe.

22   Q.  Okay.  So, you were shown a number of exhibits by the

23   government, emails that you were on.

24         Do you remember seeing those this morning?

25   A.  Yes.

1  Q.  And there's only one email of all the ones -- well, sorry.

2          Most of those emails, Mr. Calk is not copied on,

3  correct?

4  A.  Correct.

5  Q.  In fact, there's only one email relating to the Manafort

6  loans that Mr. Calk was copied on that you were also on?

7  A.  I believe so.

8  Q.  So, if we look, for example --

9          MR. SCHOEMAN:  Can we have Government Exhibit 110.

10 Q.  And you remember being shown this this morning?

11 A.  Yes.

12 Q.  This is an email talking about Mr. Manafort's credit score

13 going down.  Do you see that?

14 A.  Yes.

15 Q.  And Mr. Calk is not copied on that email, correct?

16 A.  Correct.

17 Q.  And you didn't forward that email to Mr. Calk?

18 A.  Not that I remember.

19 Q.  I don't know if you remember in the previous exhibit,

20 DX 208, it said that Mr. Manafort's credit score was 729.  Do

21 you see that?  It's five lines down.

22          Are you aware of any email that you were on telling

23 Mr. Calk that Mr. Manafort's credit score was not 729?

24 A.  No.

25 Q.  Okay.

1            Let's look at -- you were shown Government

2    Exhibit 116.  You remember seeing this exhibit?

3    A.  Yes.

4    Q.  This is another email between you and Mr. Raico that

5    Mr. Calk is not on; is that correct?

6    A.  Yes.

7    Q.  And you did not forward it to Mr. Calk?

8    A.  No.

9            MR. SCHOEMAN:  Let's look at Government Exhibit 120.

10           That is not what I thought it was.  Did we use 120?

11   128?  Yes, thank you.

12   Q.  That was an exhibit you were asked about earlier today?

13   A.  Yes.

14   Q.  And that's directly from Mr. Manafort to you; is that

15   correct?

16   A.  Correct.

17   Q.  And that's another one you did not forward to Mr. Calk?

18   A.  Correct.

19   Q.  Okay.

20           MR. SCHOEMAN:  Let's look at Government Exhibit 136.

21   Q.  This is an email that you were shown earlier today from

22   Mr. Raico; is that right?

23   A.  Yes.

24   Q.  And it talks about Jim and Tom called late last night.  Do

25   you see that?

L6OKCAL2                         Ivakhnik - Cross

1    A.  Yes.

2    Q.  And that's another email that Mr. Calk was not copied on?

3    A.  Not that I know of.

4    Q.  And that you did not forward to him?

5    A.  Correct.

6    Q.  And you see that this email talks about Paul's margin

7    account and Mr. -- it says, "Manafort's liquid assets."  Do you

8    see that?

9    A.  Yes.

10        MR. SCHOEMAN:  Can we see Defense Exhibit 208 again?

11   Q.  Do you see on the end of the fourth line, and it starts on

12   the fifth line, where it says, "Paul has in excess of

13   $10 million in liquid assets and another 1-plus million in an

14   IRA"?

15        Do you see that?

16   A.  Yes.

17   Q.  Are you aware of an email that was sent to Mr. Calk telling

18   Mr. Calk that Mr. Manafort did not have $10 million in liquid

19   assets and another 1-plus million in an IRA?

20   A.  Not that I'm aware of.

21        MR. SCHOEMAN:  Can we see Government Exhibit 107 in

22   evidence.

23   Q.  I believe this is an email from Mr. Calk to Mr. Ubarri with

24   an attachment.  Do you see that?

25   A.  Yes.

1              MR. SCHOEMAN:  Can we look at the attachment, please.

2    Q.  And you recognize this as a portfolio loan scenario?

3    A.  Yes.

4    Q.  Is that something that -- well, do you know who prepares

5    that?

6    A.  It looks like the mortgage banker, Dennis Raico.

7    Q.  Did you assist Mr. Raico in preparing this portfolio loan

8    summary?

9    A.  No.

10   Q.  But is this a form that was used while you worked at the

11   bank to summarize proposed portfolio loans?

12   A.  I do not know.

13   Q.  Well, do you see, on Government Exhibit 107, the portfolio

14   loan summary, there's a line halfway down for liquid assets?

15   Do you see that?

16   A.  Yes.

17   Q.  And does it say $9 million in UBS?  Do you see that?

18   A.  Yes.

19   Q.  Are you aware of any communications to Mr. Calk telling him

20   that Mr. Manafort did not have $9 million in liquid assets at

21   UBS?

22   A.  No.

23   Q.  Let's go one line up, income history.

24              Do you see that the portfolio loan scenario for

25   Mr. Raico said that Mr. Manafort's income was $3.3 million per

L6OKCAL2                         Ivakhnik – Cross

1    year, a three-year average?  Do you see that?

2    A.  Yes.

3    Q.  And that Mr. Manafort's credit score, in the line above,

4    was 764?  Do you see that?

5    A.  Yes.

6    Q.  And that's a little bit higher than the 729 back in April?

7    A.  764 is higher than 729.

8    Q.  And I think you said earlier that a credit score of 729

9    would be one that banks would usually be happy to lend to?

10   A.  I believe so.

11   Q.  Do you see --

12            MR. SCHOEMAN:  Well, let's go to GX 137.  And we can

13   enlarge the top, I think you testified about.

14   Q.  You see your email where you say, "We literally have to

15   pull bunnies out of hats"?  Do you see that?

16   A.  Yes.

17   Q.  And that was in reference to the appraisal of

18   2401 Nottingham Avenue, correct?

19   A.  Correct.

20   Q.  Because you had received information that the property was

21   appraising at a lower value than expected; is that right?

22   A.  I believe so.

23            (Continued on next page)

24

25

1   BY MR. SCHOEMAN:   (continuing)

2   Q.  So, let me now show you Government Exhibit 107 again, the

3   second page, the loan summary.  Under the line "property value"

4   could you read what is written there?

5   A.  $8.25 million.

6   Q.  And that indicates, in the portfolio loan summary, the

7   value that Mr. Raico is communicating about the 2401 Nottingham

8   property?

9   A.  Can you repeat the question?

10  Q.  Just that number that is listed in the portfolio loan

11  summary, $8.25 million property value.  Is that indicating that

12  the 2401 Nottingham property had a value of $8.25 million?

13  A.  I believe.

14  Q.  So, can we look at Government Exhibit 108?  Do you see at

15  the top of the chain is an e-mail from Steve Calk to others at

16  the bank and you are not copied on that?  Do you see that?

17  A.  Yes.

18  Q.  Can we go to page 3 in the top e-mail?  Do you see that

19  e-mail from Dennis Raico?  Do you see that?

20  A.  Yes.

21  Q.  To Jim Brennan, one of the people?

22  A.  Yes.

23  Q.  He is the head underwriter?

24  A.  Yes.  I believe so.

25  Q.  Responsible for approving the loans?

L6o5cal3                          Ivakhnik - Cross

1    A.  I believe he was part of the committee.

2    Q.  And the underwriter -- you see it is to Steve Calk?

3    A.  Yes.

4    Q.  And also Javier Ubarri?

5    A.  Yes.

6    Q.  And Jim Norini.  Do you see that?

7    A.  Yes.

8    Q.  And do you know whether Steve Calk, Javier Ubarri, and Jim

9    Norini are the voting members of the loan committee?

10   A.  I do not know for sure.

11   Q.  And this e-mail from Mr. Raico, did you help him with this

12   e-mail at all?

13   A.  No.

14   Q.  But do you understand what he means here when he writes:

15   *Jim, here are the specifics that should answer your questions.*

16   And then he has a few bullet points on that.  Are you able to

17   understand what Mr. Raico was saying in those bullet points?

18   A.  This is the first time I am seeing the e-mail but I believe

19   I understand it.

20   Q.  This is Mr. Raico describing the condition of the

21   Nottingham property, correct?

22   A.  No.  That's not correct.

23   Q.  Well, this is information that Mr. Raico provided to the

24   members of the loan committee, correct?

25   A.  Correct.

L6o5cal3                          Ivakhnik - Cross

1    Q.  And he says the property is 70 percent complete and the

2    project completion is less than six months.

3              Do you see that?

4    A.  Yes.

5    Q.  And then he says -- we can skip to the fifth bullet point,

6    it says:  *Listing the property for $9 million but 100 percent*

7    *confident the minimum sales price will be no less than*

8    *$8.25 million.*

9              Do you see that?

10   A.  Yes.

11   Q.  And that, you understand, is Mr. Raico telling the loan

12   committee that the Nottingham property construction, when

13   complete, will allow for the sale of the property for at least

14   $8.25 million?

15   A.  Yes.

16   Q.  And when you received e-mails that we looked at earlier

17   saying that the property appraised at a lower value than that,

18   you did not bring those e-mails to the attention of Mr. Calk?

19   A.  No.

20   Q.  You barely spoke to Mr. Calk about the Manafort loans?

21   A.  Correct.

22   Q.  Most of your interaction was either with Mr. Raico or

23   Mr. Brennan?

24   A.  Correct.

25   Q.  Let's go back to Government Exhibit 139.  You looked at

L6o5cal3                          Ivakhnik – Cross

1    this earlier and you were drawn to the first sentence:  *Can we*

2    *please have a class for the attorneys we use that outlines*

3    *unhelpful language.*

4            Do you see that?

5    A.  Yes.

6    Q.  And that was you trying to -- you and Mr. Raico talking

7    about the fact that the attorneys' unhelpful language would not

8    be helpful if it was provided to the underwriters?

9    A.  That was me saying it.

10   Q.  And Mr. Calk is not copied on this e-mail.

11   A.  No, he is not.

12   Q.  And you did not take any steps to inform Mr. Calk that

13   there was a mechanic's lien that was troubling to someone.  Did

14   you?

15   A.  That wasn't my job.

16   Q.  Let me show you Government Exhibit 141.  Do you remember

17   looking at this earlier?

18   A.  Yes.

19   Q.  And Mr. Raico says:  *Looks like these guys are in default*

20   *to Genesis.*  My question is, is this another e-mail that

21   Mr. Calk is not on and that you did not forward to him?

22   A.  Can you repeat the question?

23   Q.  Two questions.  Is this another e-mail that Mr. Calk was

24   not copied on?

25   A.  I am not -- or doesn't look like Dennis copied Mr. Calk on

L6o5cal3                    Ivakhnik - Cross

1   this e-mail.

2   Q.  Can we see Government Exhibit 143?  This is one you looked

3   at earlier as well.

4   A.  Yes.

5   Q.  Where Mr. Raico says "oh boy" to you?

6   A.  Yes.

7   Q.  Another e-mail that you and Mr. Raico exchanged without

8   informing Mr. Calk, correct?

9   A.  Can you please repeat the question?

10  Q.  It will be the last one.  This is another e-mail that you

11  did not forward to Mr. Calk, correct?

12  A.  I did not forward this e-mail to Mr. Calk.

13  Q.  And there is only one e-mail, I think it is Government

14  Exhibit 173, in the entire time that you worked on the Manafort

15  loans, that you sent that Mr. Calk was on; is that right?

16  A.  Correct.  To the best of my recollection.

17  Q.  And can we go on Exhibit 173 to the second page and this is

18  your e-mail to Mr. Calk, and Mr. Brennan, Mr. Horn, and

19  Mr. Raico.  Do you see that?

20  A.  Yes.

21  Q.  And Mr. Horn is another person in the underwriting

22  department in Chicago?

23  A.  Yes.

24  Q.  And this e-mail you forwarded and you included Steve Calk,

25  correct?

L6o5cal3                     Ivakhnik - Cross

1    A.  Yes.

2    Q.  Can we see the first page?

3           Mr. Brennan responds and says:  *What the hell.  He*

4    *just took the loan out at the end of August.  How can he be*

5    *$1 million off.*

6           Do you see that?

7    A.  Yes.

8    Q.  And then do you see at the top you responded but you

9    actually removed Mr. Calk from the chain?  Do you see that?

10   A.  I removed Tom Horn, Dennis Raico, and Mr. Calk from the

11   chain.

12   Q.  So you didn't just hit "reply all" when you sent that

13   e-mail?

14   A.  I did not.

15   Q.  So, you purposefully did not send an e-mail that said he is

16   so in debt to Mr. Calk?

17   A.  It is not my job to make that judgment call.

18   Q.  But you did it on purpose?

19   A.  I did it because I'm a human being.  I -- this is what I --

20          THE COURT:  I am going to stop you a second.  I think

21   there is confusion about "it."  Do you want to rephrase your

22   question.

23   BY MR. SCHOEMAN:

24   Q.  Sure.  I am asking you, Ms. Ivakhnik, can you see from your

25   e-mail here that you intentionally removed Mr. Calk from the

L6o5cal3                    Ivakhnik - Cross

1   e-mail chain before you wrote, "he is so in debt," to

2   Mr. Brennan?

3   A.  I removed Mr. Calk, Mr. Horn, and Mr. Raico.

4   Q.  And you did not do that by accident?

5   A.  No.

6   Q.  And can we look at Government Exhibit 172?  Can we go to

7   the second page of that?  Do you see the second page of that?

8   You were shown this earlier, it is again Mr. Brennan's e-mail:

9   *What the hell.  He just took the loan out at the end of August.*

10  *How can he be $1 million off.*

11          Do you see that?

12  A.  Yes.

13  Q.  Can we go up to the next e-mail in the chain?

14          That is your e-mail to Mr. Brennan where you write:

15  *Was that satisfying?*

16  A.  Yes.

17  Q.  And this is another e-mail where you intentionally removed

18  Mr. Calk from the chain?

19  A.  I removed Mr. Calk, Mr. Horn, and Mr. Raico from the chain.

20  Q.  So that you could have your own e-mail exchange with

21  Mr. Brennan?

22  A.  Because Mr. Brennan and I had a relationship established

23  and this was between -- this was an opinion.

24  Q.  That you and Mr. Brennan shared?

25  A.  Correct.

L6o5cal3                    Ivakhnik - Cross

1   Q.  But that you did not share with Mr. Calk?

2   A.  That was not my place to do so.

3   Q.  And just let's finish with the top e-mail in the chain.

4   You see that Mr. Brennan responded to your e-mail where you

5   said: *Was that satisfying.*  And he says:  *Not enough.*

6   A.  Yes.

7   Q.  And again, that was just between you and Mr. Brennan?

8   A.  Yes.

9   Q.  You testified earlier about the difference between

10  conventional loans and portfolio loans.

11            Do you remember that?

12  A.  I testified what a conforming loan is and what a portfolio

13  loan is.

14  Q.  Yes.  And the portfolio loans are the bigger loans that the

15  bank does in its own portfolio?

16  A.  Yes.

17  Q.  And you were not aware of any guidelines for approving or

18  funding portfolio loans; is that right?

19  A.  There were -- we did have guidelines.

20  Q.  But -- well, Ms. Ivakhnik, do you remember being

21  interviewed by the Federal Bureau of Investigation in this

22  matter?

23  A.  I remember that I was interviewed.

24  Q.  And did you tell agents of the Federal Bureau of

25  Investigation --

L6o5cal3                         Ivakhnik - Cross

1        MR. SCOTTEN:  Objection.  There has to be some finding

2   before hearsay is elicited.

3        MR. SCHOEMAN:  Your Honor, I am relying under Rule

4   613(a).  I believe Mr. Scotten is looking under 613(b).

5        THE COURT:  You may proceed.

6        MR. SCHOEMAN:  I'm sorry, your Honor?

7        THE COURT:  You may proceed.

8   BY MR. SCHOEMAN:

9   Q.  I am just asking you when you were interviewed by agents of

10  the Federal Bureau of Investigation, did you say that there

11  were no guidelines for approving or funding portfolio loans?

12       MR. SCOTTEN:  Objection.  That is not what 613(a)

13  says.

14       MR. SCHOEMAN:  I'm not introducing extrinsic evidence,

15  I am just asking.

16       THE COURT:  Well, OK.  Go ahead.

17  BY MR. SCHOEMAN:

18  Q.  Did you say, when you were interviewed by the Federal

19  Bureau of Investigation, that there were no guidelines for

20  approving or funding portfolio loans?  Did you say that?

21  A.  I do not remember.

22  Q.  Now, you testified earlier that when the bank does

23  portfolio loans they are held in the bank's own portfolio or

24  words to that effect I think you said.

25  A.  I believe so.

L6o5cal3                           Ivakhnik - Cross

1    Q.  But isn't it true that loans that are originated in

2    portfolio are often sold to another bank?

3    A.  They could be.

4    Q.  Like Bank of the Internet?

5    A.  They could be.

6    Q.  So, if we could look at Government Exhibit 116, please?

7           Do you remember looking at this one earlier?

8    A.  Yes.

9    Q.  And I think we probably focused on the second point which

10   says Manafort, but if I could direct you to the third point it

11   says:  Bello, disclosures should be signed shortly.  Let me

12   know if it is in the hands of B of I.  Will submit to B of I by

13   3:00 p.m.

14          Do you see that?

15   A.  Yes.

16   Q.  Do you know what that means?

17   A.  That means that the loan will be submitted to Bank of

18   Internet by 3:00 p.m.

19   Q.  And that's a portfolio loan that is going to get submitted

20   to the Bank of the Internet to see if they'll buy the loan?

21   A.  They would actually originate the loan.

22   Q.  So one way to do that is Federal Savings Bank could be the

23   broker originating the loan for the Bank of the Internet?

24   A.  Essentially yes.

25   Q.  And The Federal Savings Bank would make a commission for

L6o5cal3                    Ivakhnik – Cross

1    brokering the loan but the loan itself would be owned by Bank

2    of the Internet?

3    A.  I believe so but I do not know the details.

4    Q.  And do you remember the Bello loan?

5    A.  It rings a bell.

6    Q.  OK.  What about do you see the Shabanets loan.  *It says let*

7    *me know if it is in the hands of B of I.*  It says:  *It is in*

8    *their queue.  I will talk to Anna today regarding how to*

9    *proceed.  We submitted it without appraisals*... it goes on.

10          Asking you, based on your time at the bank, it was not

11   unusual for Mr. Raico to be working on loans that were also to

12   be submitted to B of I; is that fair?

13   A.  I believe so.

14   Q.  Mr. Raico worked basically on big loans, right?

15   A.  I believe so, but I don't know exactly everything he worked

16   on.

17   Q.  Well, in your experience the smallest loan he worked on was

18   a $1.2 million loan?

19   A.  I believe so.

20   Q.  And based on what you observed at the bank, you thought

21   that Mr. Calk was involved in all of Mr. Raico's loans?

22   A.  I'm sorry.  Can you repeat the question?

23   Q.  Just based on your experience at the bank, didn't you

24   observe that Mr. Calk was involved in all of Mr. Raico's

25   portfolio loans?

L6o5cal3                        Ivakhnik - Cross

1   A.  I did not observe that.

2   Q.  Well, did you believe that to be the case based on your

3   experience?

4   A.  I don't believe -- I don't know.  I never thought about it.

5   Q.  Well, Ms. Ivakhnik, do you remember you were interviewed by

6   the Federal Bureau of Investigation on June 26, 2017?  Do you

7   remember that?

8   A.  I remember being interviewed.

9   Q.  Did you tell the agent of the FBI --

10          THE COURT:  Wait.  I think she said she didn't recall

11  so you can refresh her recollection.

12  Q.  Showing the witness 3500-024-010.  Can we show her the top

13  of the first page?

14          Ms. Ivakhnik, I am asking you just to look at that and

15  see if it refreshes your recollection that you were interviewed

16  by the Federal Bureau of Investigation in June of 2017.  You

17  can scroll down for more context.  At this point I am just

18  asking whether that reminds you that sometime around June 2017

19  you were interviewed by federal agents.

20  A.  Yes.

21  Q.  And now, my question is simply, didn't you tell the federal

22  agents that you believed Calk was involved in all of Raico's

23  loans?

24  A.  I don't remember.

25  Q.  Let me show you now what's on the screen, just take a look

1   at it and I am going to ask you whether looking at that

2   refreshes your recollection that you told the agents that you

3   believed that Calk was involved in all of Raico's loans.

4   A.  It does not.

5   Q.  Ms. Ivakhnik, you talked about, I think you said earlier,

6   that when Manafort became a customer of the bank people were

7   excited.  Is that true?

8   A.  I remember Dennis being excited.

9   Q.  Well, wasn't there a general perception at the bank that

10  having Manafort as a client would legitimize the company?

11  A.  I don't remember that.

12  Q.  Well, do you remember saying when you were interviewed --

13          MR. SCOTTEN:  Objection.  Refreshing is not supposed

14  to put the statement into evidence.

15          THE COURT:  Yes.  That's true.

16          MR. SCHOEMAN:  I'm not putting it into evidence.  I am

17  asking first do you --

18          THE COURT:  Why don't you just ask the question.  Just

19  ask the question.

20  BY MR. SCHOEMAN:

21  Q.  Do you remember that when Manafort became a customer of the

22  bank there was some anticipation at the bank when Manafort came

23  along and that everyone was excited because it would legitimize

24  the company.  Do you remember that?

25  A.  I remember Dennis being excited but I believe it was for a

L6o5cal3                        Ivakhnik – Cross

1    different reason.

2    Q.  Isn't it true that everyone was excited because it would

3    legitimize the company?

4    A.  While at the bank I never spoke to anybody at the company

5    about Manafort.

6    Q.  I'm just asking you isn't it true that you perceived

7    everyone was excited because it would legitimize the company.

8    A.  I don't remember anyone talking about it.

9    Q.  Well, let me show you the same thing we were looking at

10   earlier and my question is does that refresh your recollection

11   that everyone was excited --

12          THE COURT:  Does that refresh your recollection?

13          MR. SCHOEMAN:  OK.

14          THE WITNESS:  It does not.

15   BY MR. SCHOEMAN:

16   Q.  You were shown Defendant's Exhibit 100 earlier.  Do you

17   have that on the screen?

18   A.  Yes.

19   Q.  Can you go up, I think there is a date on that, that date

20   is August 9, 2016; that was a couple weeks into you working on

21   the Manafort loans, right?

22   A.  I don't remember for certain.

23   Q.  But you knew, in the summer of 2016, that Paul Manafort was

24   a high-ranking official on the Trump campaign?

25   A.  Yes.

L6o5cal3                    Ivakhnik - Cross

1    Q.  Do you remember also learning, in the summer of 2016, that

2    Mr. Calk was a member of President Trump's National Economic

3    Advisory Council?

4    A.  Can you repeat the question?

5    Q.  Asking if you also remember learning, in the summer of

6    2016, that Mr. Calk was named to Trump's economic team?

7    A.  Yes.

8    Q.  And do you remember that this e-mail was sent to you and

9    every other person at the bank?

10   A.  I believe so.

11   Q.  Mr. Calk did not hide that he was going to work on the

12   campaign?

13   A.  I don't think so.

14   Q.  Now, I think you said earlier you have very limited

15   interaction with Mr. Calk about the Manafort loans?

16   A.  Correct.

17   Q.  And, in fact, you worked directly on the Manafort loans for

18   Dennis Raico?

19   A.  Can you please repeat the question?

20   Q.  For the Manafort loans you worked directly for Mr. Raico?

21   A.  I did not work for Mr. Raico, I worked for the bank.

22   Q.  But you assisted Mr. Raico in his work on the Manafort

23   loans?

24   A.  Correct.

25   Q.  And many other portfolio loans?

L6o5cal3                        Ivakhnik – Cross

1   A.  Yes.

2   Q.  OK.  And based on that work, you were able to form an

3   opinion about Mr. Raico's truthfulness; isn't that right?

4   A.  I believe so.

5   Q.  Ms. Ivakhnik, in your opinion, isn't it true that Mr. Raico

6   is a pathological liar?

7   A.  I believe he is a liar.

8   Q.  You believe he is a pathological liar?

9   A.  I don't know if I'm qualified to make that kind of an

10   assertion.

11          MR. SCOTTEN:  The government will stipulate that it is

12   not a psychological diagnosis.  It might just be a matter of

13   phrase, if that's what Mr. Schoeman is trying to ask.

14   BY MR. SCHOEMAN:

15   Q.  Ms. Ivakhnik, when you were interviewed by the FBI, did you

16   feel you were in a position to determine whether Mr. Raico was

17   just a liar or a pathological liar?

18   A.  I don't remember.

19   Q.  Let me show you what's been marked as 3500-024-10, the same

20   document.  Does this refresh your recollection that you believe

21   yourself qualified to determine that Mr. Raico is a

22   pathological liar?

23          THE COURT:  A yes or no question:  Does it refresh

24   your recollection?

25          THE WITNESS:  No.

L6o5cal3                          Ivakhnik — Cross

1   Q.  Let me just ask you, do you believe Mr. Raico is a

2   pathological liar?  Yes or no.

3   A.  Yes.

4   Q.  But you liked Mr. Brennan?

5            MR. SCOTTEN:  Objection.  Relevance to "like."

6            THE COURT:  Overruled.

7            THE WITNESS:  I had very limited interaction with

8   Mr. Brennan.  I thought he was prudent.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L6OKCAL4                      Ivakhnik - Cross

1   BY MR. SCHOEMAN:

2   Q.  And from your time working at the bank, were you able to

3   observe that Mr. Brennan disliked working with Mr. Raico?

4   A.  No.

5   Q.  Well, let me ask it this way:  Did you observe that

6   Mr. Brennan hated working with Raico?

7   A.  I think it's ringing a bell.  I don't remember.

8   Q.  Well, let me show you the same thing, 3500-24-10.  Just

9   take a look at that.

10          Ms. Ivakhnik, does that refresh your recollection that

11  Brennan hated working with Raico?

12  A.  One moment.

13          Yes.

14  Q.  I want to talk now about the appraisals that you testified

15  about earlier for the Nottingham property.

16          Isn't it true that one of those appraisals came in

17  much lower than expected, right?

18  A.  I believe so.

19  Q.  And isn't it true that Mr. Raico told you to hide that

20  appraisal from Mr. Brennan?

21  A.  It's ringing a bell, but I don't remember.

22  Q.  All right.  Can I show you --

23          MR. SCHOEMAN:  This is just for the witness.

24  Q.  -- 3500-24-10.

25          THE COURT:  The question is:  Does this refresh your

L6OKCAL4                    Ivakhnik – Cross

1    recollection?

2              THE WITNESS:  Yes.

3    BY MR. SCHOEMAN:

4    Q.  And is it now your refreshed recollection that Mr. Raico

5    tried to hide an appraisal from Brennan about the California

6    property?

7    A.  I don't think the appraisal was ever done.

8    Q.  Does this refresh your recollection that Mr. Raico told you

9    not to tell Mr. Brennan about an appraisal?

10   A.  I believe this was a reference to a value that was going to

11   come in.

12   Q.  So --

13   A.  It does, yes.

14   Q.  So, the bank had ordered an appraisal, but the official

15   report had not come in?

16   A.  I don't remember.

17   Q.  Well, when you said they had ordered a value, just explain

18   what you meant there.

19   A.  I don't remember seeing the actual appraisal.  So, I'm

20   assuming this was in reference to an appraiser's -- letting

21   Dennis know that he's deriving a certain value, and that's what

22   the conversation is about.

23   Q.  So the appraiser had gotten a certain value, and Mr. Raico

24   told you not to tell Brennan; is that right?

25   A.  I really don't remember, but it's ringing a bell.

1    Q.  Well, let's just show you again the same exhibit.  Just

2    read that to yourself.

3              THE COURT:  And the question is?

4    Q.  The question is:  Does this refresh your recollection that

5    Mr. Raico told you to hide information about the appraisal from

6    Mr. Brennan?

7    A.  That's not a yes-or-no question.

8    Q.  I'm going to withdraw the question.  I'm just going to ask

9    one more time.

10             Having looked at this, do you now remember that

11   Mr. Raico told you not to tell Mr. Brennan about the

12   information from the appraisal?

13   A.  I believe so.

14   Q.  Ms. Ivakhnik, did you ever mishandle appraisals on the

15   Manafort loans?  Is that something you ever did?

16   A.  I don't understand the question.

17   Q.  Well, are you aware that after you left the bank, do you

18   know whether you were ever blamed for mishandling an appraisal?

19   Do you know?

20   A.  I do not.

21   Q.  Do you have any recollection of ordering an appraisal from

22   the wrong appraisal company in connection with the Manafort

23   loan?

24   A.  I do not.

25   Q.  All right.  I want to talk about that American Express

1   issue you talked about earlier with Mr. Manafort's overdue

2   American Express card.

3            Do you remember that issue?

4   A.  I do.

5   Q.  And you remember you were the one who reached out to Paul

6   Manafort to get an explanation?

7   A.  Yes.

8   Q.  And that's when he provided you the letter from Rick Gates

9   about the explanation for the AmEx charge?

10  A.  I believe so.

11  Q.  You remember that the explanation was something like Rick

12  Gates used the card to buy Yankee tickets?

13  A.  I believe so.

14  Q.  And you sent that explanation to the underwriters in

15  Chicago; is that right?

16  A.  I don't remember.

17  Q.  All right.  Well, let me show you what's in evidence as

18  Defense Exhibit 122.

19           You see that that's an email from you to Thomas Horn,

20  copying Dennis Raico?  You see that?

21  A.  Correct.

22  Q.  And Thomas Horn is in the underwriting department in

23  Chicago; is that right?

24  A.  Yes.

25  Q.  And this is your email -- looking at this, isn't this your

L6OKCAL4                        Ivakhnik - Cross

1    email forwarding the explanation that you received about the

2    AmEx card to Thomas Horn?

3              MR. SCHOEMAN:  Maybe we can highlight the numbers to

4    the second point, the second numbered point.

5              THE WITNESS:  I see that.

6    BY MR. SCHOEMAN:

7    Q.  Okay.  And then the underwriting department informed you

8    that that explanation was sufficient?  It's not in this email.

9              MR. SCHOEMAN:  You can take the email down.

10             THE WITNESS:  Oh.

11   Q.  The question is:  Do you remember that the underwriting

12   department informed you that the explanation you provided was

13   sufficient?

14   A.  I don't remember.

15   Q.  Well, let me show you Defense Exhibit 696.

16             Does that refresh your recollection that the

17   underwriting department told you that the information that

18   Mr. Manafort provided about the AmEx was sufficient?

19   A.  Yes.

20   Q.  And you relayed that -- you told Mr. Manafort that it was

21   sufficient, based on what the underwriters had told you?

22   A.  Yes.

23   Q.  I want to show you Government Exhibit 142.

24             You remember that this is an email that the government

25   showed you earlier?

1   A.  Yes.

2   Q.  And you write, "It is what it is.  Let's send it off to

3   Chicago and have it be part of the file.  Ultimately, Steve

4   will make the call."

5          That's what you wrote?

6   A.  It looks like it, yes.

7   Q.  Let's scroll down a couple of emails to Mr. Zidell's email.

8   We've got that one.

9          Do you know who Mr. Zidell is?

10  A.  He looks like the attorney.

11  Q.  And he's the one who forwarded --

12         MR. SCHOEMAN:  You can zoom out again, just so we can

13  see the whole chain.

14  Q.  He's the one who forwarded the payoff letter information on

15  this -- earlier in this chain; is that right?

16  A.  I believe so.

17  Q.  And you see from Mr. Zidell's email, that he had actually

18  already sent that information to Mr. Brennan in Chicago?

19  A.  Sorry, can you repeat the question?

20  Q.  Do you see, from this email, that before you were added to

21  the chain, Mr. Zidell had sent the payoff letter to

22  Mr. Brennan?

23  A.  Yes.

24  Q.  And going back to your email, isn't it true that when you

25  wrote, "Let's send it off to Chicago," you had not read the

1    part where Mr. Zidell had already provided it to Chicago?

2    A.  I did not see that email, no.

3    Q.  Right.

4          So, when you're writing "Let's send it off to

5    Chicago," you did not know that it already had gone to Chicago?

6    A.  I think the "let's send it off to Chicago" wasn't just

7    pertaining to this specific statement; I think it was speaking

8    about the file in general.

9    Q.  Isn't it true, Ms. Ivakhnik, that three minutes after you

10   sent this email, you realized that Mr. Zidell had already beat

11   you to it, and he had sent the information to Chicago?  Isn't

12   that true?

13   A.  I do not know.

14   Q.  Well, let me show you --

15         MR. SCHOEMAN:  Just for the witness.

16   Q.  -- Defense Exhibit 814.

17         THE COURT:  It's not in evidence?

18         MR. SCHOEMAN:  It's not in evidence.

19         Can we just enlarge the -- are we able to show side by

20   side to the witness?

21   BY MR. SCHOEMAN:

22   Q.  So you see -- just take a look at Exhibit 814 and then read

23   the top email or the top thing to yourself.

24   A.  To myself?

25   Q.  Yes.  Just read it to yourself.

1          Does reading that refresh your recollection that what

2      happened was that you wrote your email, "Let's send it to

3      Chicago," without realizing that Steve Zidell had already done

4      that?

5      A.  It does not refresh my recollection.

6      Q.  Okay.

7          Is Exhibit 814 an email that you sent?  Is that an

8      email that you sent?

9      A.  It looks like it.

10          MR. SCHOEMAN:  The defense offers Exhibit 814.

11          MR. SCOTTEN:  I just need to take a look at it, your

12      Honor.  We turned off our screen since he was showing it --

13          THE COURT:  It looks like it's admissible.

14          MR. SCOTTEN:  No objection, your Honor.

15          THE COURT:  Okay.  It's admitted, Defense 814.

16          (Defendant's Exhibit 814 received in evidence)

17          MR. SCHOEMAN:  May we just show -- is that now on

18      everybody's screen?

19          THE COURT:  I can't understand what you just said.

20          MR. SCHOEMAN:  I'm sorry.  I just want to know if

21      we're now publishing to everybody's screens.

22          THE COURT:  Okay.

23          THE WITNESS:  I'm sorry.  Your Honor?

24          THE COURT:  Yes.

25          THE WITNESS:  After this questioning, can we take a

 1    break?

 2              THE COURT:  Yes.  We're actually going to break for

 3    lunch any minute.

 4              THE WITNESS:  Okay.

 5              THE COURT:  I just wanted to let him finish this line

 6    of questioning.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Sure.

 9    BY MR. SCHOEMAN:

10    Q.  I'm just going to say:  Isn't it true that you wrote an

11    email at 4:47 UTC time, saying, "I keep replying before reading

12    the email...looks like Steve Z beat you to deliver the news."

13              Isn't that the email you wrote?

14    A.  It looks like it, yes.

15              MR. SCHOEMAN:  We can break.

16              THE COURT:  Shall we break for lunch?

17              MR. SCHOEMAN:  Thank you, your Honor.

18              THE COURT:  Ladies and gentlemen, we are going to

19    break for 45 minutes for lunch, you're provided lunch, and

20    we'll reconvene here at 1:45.

21              (Continued on next page)

22

23

24

25

1              (Jury not present)

2              THE COURT:  Anything we need to discuss?

3              MR. MONTELEONI:  Yes, your Honor, briefly.  I think

4    it's very possible that these issues, that we won't even get to

5    them, just depending on the pace, but just in case we start

6    moving more quickly.

7              THE COURT:  Yes.

8              MR. MONTELEONI:  So, your Honor, in case we get to

9    Special Agent Baccari today, there are three government

10   exhibits that are -- as Ms. Rothman previewed yesterday, the

11   custodian has to be away today — was here yesterday — and we

12   would seek to offer them subject to connection if Special Agent

13   Baccari can take the stand today.  If not, if we're starting

14   Tuesday, this issue might go away, but in case there would be

15   an issue about that, we wanted to tee it up now.

16             And then, also, what we previewed at the pretrial

17   conference regarding the publishing of Dennis Raico's physical

18   journals, that might also come up relatively early in Special

19   Agent Baccari's testimony as well.

20             THE COURT:  Okay.

21             So, as far as publishing the actual journals, as I

22   recall, you said you would just hold them and present them to

23   the jury.

24             Is there any objection?

25             MR. SCHOEMAN:  No.  I think, based on all the activity

L6OKCAL4                      Ivakhnik - Cross

1    in the last couple of days, I think we've straightened that

2    out, and we don't -- subject to our earlier objection about

3    their admissibility, but given your Honor's ruling, we don't

4    object to the publishing of the pages.

5              THE COURT:  Okay.  We can do that.

6              MR. MONTELEONI:  Thank you, your Honor.

7              And then if there is -- we would, I guess, wish to

8    know whether the Court would admit these particular exhibits

9    subject to connection that are the subject of the custodian.

10             THE COURT:  Is there any objection?

11             MR. SCHOEMAN:  Yes, Judge, and I will just tell you

12   what the issue is.

13             These are three emails.  The witness is somebody from

14   Deloitte who's going to say that he came into --

15             I'm sorry, it's the Deloitte person, right?

16             -- that he came into possession of a whole bunch of

17   data, and somewhere in this data, there are these three

18   emails — I don't know if he's going to say anything more than

19   that — and that he came into that possession many months after

20   the emails might have been created.  So, we have a basic

21   authenticity as to whether that is a sufficient foundation,

22   just to say I got a hard drive, these things were on it, and I

23   don't know if he's going to say anything other than that.

24             I also think that before the summary witness starts

25   making arguments or summarizing these exhibits, the jury should

1    be told what the foundation for their admissibility is.  If the

2    foundation for their admissibility is merely that a Deloitte

3    person says these were on a hard drive I've got, then I think

4    the jury should know that before they're being introduced into

5    evidence.

6              MS. ROTHMAN:  Your Honor, I can respond and give a bit

7    of a proffer about what the custodians will say with respect to

8    those documents, and it might be prudent to tee this up now

9    what the custodian will say today for the presidential

10   transition team documents.

11             So, with respect to the Deloitte issue — and this is

12   Mr. Weil who would be testifying next week, but there are three

13   emails that Special Agent Baccari may testify about today,

14   although, candidly, giving the timing, I'm not sure we're going

15   to get to that.  But here is what Mr. Weil will say:  He would

16   say that Deloitte was retained by two law firms on behalf of

17   the Donald J. Trump for President Organization, and that in May

18   or June of 2017, Deloitte went to Trump Tower, where they met

19   with individuals who were employed by the Donald J. Trump for

20   President Organization.  That entity had taken the content of

21   the Donald J. Trump for President electronic servers and kind

22   of segregated them into an area on a computer.  There were

23   70-plus PST files that had been segregated.  Mr. Weil and his

24   team from Deloitte then took out their hardware and collected

25   that information, put it onto a hard drive -- put it onto two

hard drives, actually, kept one as the original copy that was
stored at the Donald J. Trump for President Organization, and
the second was brought back to Deloitte and then ultimately
transferred to the law firms, where that content was loaded
into a relativity database.  That custodian will explain the
process he went through to confirm that the three documents the
government intends to offer into evidence are from that
original data extraction or copying process from the Donald J.
Trump for President servers.

        The Court is undoubtedly aware of the low hurdle that
authentication is under Rule 901.  The question is simply, is
the evidence sufficient to support a finding that the matter in
question is what its proponent claims?  These are three emails.
Mr. Weil will explain how he got his hands on them, where they
came from, and I think, at a base level, that satisfies
Rule 901.  I can go into additional properties of these emails
that prove they are, in fact, what they purport to be; for
example, the email address of Paul Manafort is the same email
address that's already entered in evidence in other documents,
the phone number of Mr. Calk is contained in these documents,
that's the same phone number that's in other evidence on the
record.

        So, I recognize the question, but I think, from a
practical matter, the government is going to satisfy its burden
here with respect to these documents and with respect to the

L6OKCAL4                        Ivakhnik - Cross

1    presidential transition team documents that are coming in this

2    afternoon.

3              THE COURT:  Okay.  I will admit them subject to

4    connection and without any instruction to the jury.  If, for

5    some reason — it seems unlikely — but if for some unlikely

6    reason, they are excluded after the testimony of Mr. Weil, I

7    will give a detailed instruction to the jury that they are to

8    disregard them, but I don't anticipate that that will happen

9    based on the proffer I just heard.

10             MS. ROTHMAN:  Thank you, your Honor.

11             THE COURT:  Let's go to lunch.

12             MR. MONTELEONI:  Your Honor, can we put on the record

13   the exhibit numbers?

14             THE COURT:  Yes.

15             MR. MONTELEONI:  Government Exhibits --

16             MS. ROTHMAN:  It's 651, 652, and 654, your Honor.

17             THE COURT:  They're admitted subject to connection.

18             (Government's Exhibits 651, 652, and 654 received in

19   evidence)

20             (Luncheon recess)

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                              1:51 PM

 3              (Trial resume; jury present)

 4              MR. SCHOEMAN:  May I inquire?

 5              THE COURT:  Yes, you may.

 6    ANNA IVAKHNIK,

 7   CROSS-EXAMINATION CONTINUED

 8   BY MR. SCHOEMAN:

 9   Q.  Good afternoon, Ms. Ivakhnik.

10   A.  Good afternoon.

11   Q.  My mask is off.  Can you hear me okay?

12   A.  Yes.

13   Q.  Okay.

14              Just a couple of things:  When you were testifying

15   earlier, you mentioned a number of issues that you said were of

16   concern to you about the Manafort loan that you worked on,

17   right?

18   A.  Yes.

19   Q.  And you said Mr. Brennan shared those concerns with you,

20   or -- did Mr. Brennan share those concerns with you?

21   A.  I don't remember specifically.

22   Q.  I'd like to show you what is in evidence as Defense

23   Exhibit 127.

24              Do you see that that's an email from Mr. Brennan on

25   Friday, September 23rd, 2016?
```

1              THE COURT:  Is this in evidence?

2              MR. SCHOEMAN:  I believe it's admitted.

3              MR. SCOTTEN:  I have no reason to doubt counsel.

4              THE COURT:  All right.  Okay.  Go ahead.

5              MR. SCOTTEN:  Okay.  I hope everyone can see it.

6   BY MR. SCHOEMAN:

7   Q.  You see this email from Mr. Brennan, you see that you're in

8   the "To" line?

9   A.  Yes.

10  Q.  And the subject matter is 2401 Nottingham, Manafort and

11  Yohai.  You see that?

12  A.  Yes.

13  Q.  And do you see that on September 23rd, Mr. Brennan wrote to

14  you and others:  "Everyone, to overcome underwriting issues,

15  Paul Manafort (guarantor and half owner) has agreed to allow

16  TFSB to put a first mortgage in the amount of 5,700,000 on the

17  following property."

18              Do you see that?

19  A.  Yes.

20  Q.  And Mr. Brennan wrote "to overcome underwriting issues" was

21  the bank's chief underwriter; is that right?

22  A.  What is the question?

23  Q.  Well, Mr. Brennan was the chief underwriter?

24  A.  I believe so.

25  Q.  And he wrote, "To overcome underwriting issues" in this

L6OKCAL4                         Ivakhnik - Cross

1    email?  He wrote that?

2    A.  Yes.

3    Q.  It says, "On the following property, 174 Jobs Lane, Water

4    Mill, New York."

5           Is that the Hamptons property that we discussed

6    earlier?

7    A.  I believe so.

8    Q.  And it was your understanding that Mrs. Manafort did not

9    want to post that property as collateral?

10   A.  Correct.

11   Q.  And you said you texted Mr. Calk to make sure that he

12   required that property to be used as collateral?

13   A.  Yes.

14   Q.  And it was added, you can see from this email; is that

15   right?

16   A.  I don't remember if my text was before this email or after.

17   I believe my text was after this email.

18   Q.  So, if it was after this email, then this had already

19   happened, the Jobs Lane property had already been added?

20   A.  Well, I believe the information about the wife not wanting

21   to use that property in this loan came to me a few -- like, a

22   few days before my last day of the bank, and I believed that if

23   Paul Manafort had put -- had refused to use that property, then

24   Steve would agree to those terms, and that's what I was afraid

25   of.

1  Q.  But you know from this email that you received on Friday,

2  September 23rd, that Mr. Calk required the Manaforts to post

3  the 174 Jobs Lane property as collateral, right?

4  A.  Well, this email is from Jim Brennan, and I believe Steve

5  Calk had the last say.  So I do believe that Steve would

6  override this email.  That's why I was concerned.

7  Q.  And you have no knowledge that that happened?

8  A.  No.

9  Q.  And Mr. Brennan writes:  "The loan is now secured by 2401

10  Nottingham."

11          Is that the California property?

12  A.  Yes.

13  Q.  "The condo in Alexandria, Virginia."

14          Is that Mr. Manafort's apartment in Virginia?

15  A.  I believe so.

16  Q.  "And the estate in Water Mill."

17          Is that the Jobs Lane property?

18  A.  I believe so.

19  Q.  And this email, you received from Mr. Brennan on the 23rd

20  of September?

21  A.  Yes.

22  Q.  And you left the bank the following week?

23  A.  On the 27th.

24          MR. SCHOEMAN:  No further questions.

25          THE COURT:  Redirect?

1          MR. SCOTTEN:  No, thank you, your Honor.

2          THE COURT:  Okay.  You may be excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  You're so welcome.

5          (Witness excused)

6          MS. ROTHMAN:  Your Honor, the government calls Kory

7     Langhofer.

8          THE WITNESS:  My first name is Kory K-o-r-y --

9          THE DEPUTY CLERK:  Can you just speak directly into

10    the microphone.

11         THE WITNESS:  My first name is Kory K-o-r-y, and my

12    last name is Langhofer.

13         THE COURT:  You need to be about this close to it.

14         THE WITNESS:  Hopefully, this works better.

15         THE COURT:  Okay.

16         THE WITNESS:  My first name is Kory K-o-r-y, and my

17    last name is Langhofer L-a-n-g-h-o-f-e-r.

18         THE DEPUTY CLERK:  Thank you.

19         MS. ROTHMAN:  May I proceed, your Honor?

20         THE COURT:  You may.

21    DIRECT EXAMINATION

22    BY MS. ROTHMAN:

23    Q.  Good afternoon, Mr. Langhofer.

24    A.  Good afternoon.

25    Q.  How far did you go in school?

1    A.   I went to the University of Illinois for my undergraduate,

2    and I went to Yale Law School for my law degree.  That was --

3            THE COURT:  We're not hearing you at all, sorry.  You

4    have to keep your voice up and speak into the mic.  I know you

5    may not be able to tell because you're in a little box, but we

6    can't hear you.

7            THE WITNESS:  I'll do my best to speak up.

8            THE COURT:  That's better.  Thanks.

9            THE WITNESS:  I went to the University of Illinois for

10   my undergraduate degree, and I went to Yale Law School for my

11   law degree.

12   BY MS. ROTHMAN:

13   Q.   Where do you work at present?

14   A.   I have two positions.  I'm the managing attorney of a small

15   law firm that focuses on political law, and I'm a cofounder of

16   a political tech firm that focuses on primarily ballot access.

17   Q.   What's the name of your law firm?

18   A.   Statecraft.

19   Q.   As part of your work at Statecraft, do you represent an

20   entity called Trump for America for the presidential transition

21   team?

22   A.   We do.  The legal name is Trump for America Incorporated,

23   but it's more commonly known as the presidential transition

24   team from 2016 to 2017.

25   Q.   Can you describe what that entity is?

1    A.   Sure.

2              Whenever someone receives the nomination for the

3    presidency from one of the major parties, so the Republican

4    Party or the Democratic party, if they're not already the

5    president, then they form a transition team.  The idea is that

6    the transition team will be sort of a White House in waiting,

7    like a shadow White House, to make sure that when the president

8    gets sworn in on January 20th, they're not starting from zero,

9    that they have policies in place, they have a list of potential

10   nominees, and there's kind of a ramp-up period that usually

11   goes from the summer of the presidential election year — in our

12   case, 2016 — to a little bit after January 20th — Inauguration

13   Day — after the election — so 2017, in our case.

14             This whole process is governed by the Presidential

15   Transition Act.  Over many years, Congress has seen fit to

16   regulate this process and fund it, just to make sure that you

17   don't have really abrupt transitions between presidents, and

18   you don't, for example, have a foreign policy crisis on day one

19   and the president isn't ready to deal with it.

20   Q.   Are you aware of something called the General Services

21   Administration, or the GSA?

22   A.   I sure am.

23   Q.   What is that?

24   A.   The GSA is a federal agency, and they handle a lot of

25   administrative tasks for the federal government.  They do a lot

1    of procurement and administration of buildings.

2              With respect to the presidential transition team, they

3    have very specific legal obligations.  They provide housing to

4    the transition team and IT services, including housing of its

5    email, most importantly.

6    Q.  And specifically, what role, if any, did GSA have in

7    maintaining the emails for the 2016 Donald Trump Campaign and

8    then in the time period following the election?

9    A.  So, the campaign for Donald Trump and Hillary Clinton, they

10   each had their own separate email, but each of them also had a

11   transition team, and the GSA provided email services to the

12   transition team for both Donald Trump and Hillary Clinton, but

13   not for the campaigns.  The GSA didn't do that directly; it

14   contracted that out to Google through Gmail, and I understand

15   that's their custom for quite a few federal agencies, not just

16   for the transition teams.

17   Q.  Did there come a time when the GSA transferred that content

18   to another entity?

19   A.  Yes.  The standard practice for transition teams is not to

20   preserve all the records in perpetuity, but to dispose them as

21   part of winding down the transition team.  In the case of

22   former President Trump's transition team, our organization, we

23   asked the GSA to transfer all of the emails from Google servers

24   to the transition team, so basically to my office.

25   Q.  What role did you play in that process?

1    A.  I was on the -- I think it's fair to say that I'm the lead

2    lawyer for the transition post inauguration.  So I was on all

3    the phone calls where we discussed this, the logistics of the

4    transition or the transfer of data with the GSA, and ultimately

5    received the data set from the GSA.

6    Q.  What did you receive?

7    A.  We received a number of flash drives that contained the

8    email for all of the transition team members.

9    Q.  Approximately when was this?

10   A.  I believe it was June of 2017.

11   Q.  What did you do with the flash drives when you received

12   them?

13   A.  The first thing that I did with those flash drives was I

14   made a copy of them and saved them to my own computer, just in

15   case they were damaged.  Subsequently, I'd have a backup copy.

16   And then eventually, we took that data and gave it to a data

17   vendor so that we could search for emails in that very large

18   set of email that would be responsive to records requests we

19   received from Congress and your office.

20   Q.  Have you reviewed that local copy of those files in advance

21   of your testimony here today?

22   A.  I have, yes.

23   Q.  Mr. Langhofer, in front of you, there should be a binder,

24   and it contains three documents that have been marked for

25   identification as Government Exhibits 601, 601A, and 602.  Can

1    you take a moment and just look through those documents.

2              MS. ROTHMAN:  And if you'd like -- Ms. Drescher, can

3    you pull them up for defense counsel and the Court as well.

4              (Pause)

5              THE WITNESS:  Okay.

6    BY MS. ROTHMAN:

7    Q.  Do you recognize those documents, Mr. Langhofer?

8    A.  I do.  These are records that we received from the GSA as

9    part -- on those flash drives that I described.  We ultimately

10   produced these records to your office with redactions, and then

11   I confirmed that these were, in fact, from the GSA by going

12   through the files on my computer to make sure they tracked the

13   initial copy I made from those flash drives.

14   Q.  Did they track the initial copy?

15   A.  Yes, they match.

16             MS. ROTHMAN:  Your Honor, at this time, the government

17   would offer into evidence Government Exhibits 601, 601A, and

18   602.

19             THE COURT:  Any objection?

20             MR. SCHOEMAN:  Same objection.

21             THE COURT:  Overruled.  They're admitted.

22             (Government's Exhibits 601, 601A, and 602 received in

23   evidence)

24             MS. ROTHMAN:  Ms. Drescher, can you please pull up,

25   for the government and the jury, Government Exhibit 601.  If

1    you can scroll down to the bottom email and zoom in on that.

2    If you can highlight from Paul Manafort.  And highlight to

3    Jared Kushner.  And highlight the date, Wednesday,

4    November 30th.  Highlight the subject, please, three

5    recommendations for major appointments.

6              And if you can scroll down, Ms. Drescher.  And if you

7    can highlight Stephen Calk.  And if you can highlight,

8    recommended position, Secretary of the Army.

9              You can take that down.

10             If you can now pull up Government Exhibit 601A and go

11   to page 6.  If you can zoom in on the text.  Thank you.

12             If you can highlight Steve Calk, highlight the word

13   referral and the name Paul Manafort.

14             You can take that down.

15             Can you please pull up Government Exhibit 602.  If you

16   can zoom in on the row 1.  And then if you can zoom in on the

17   name in row 21, Stephen Calk.

18             You can take that down.

19             You can then zoom in on the column to the right of

20   Calk.  Thank you.

21             His background, you can highlight this.  Strong in

22   defense issues, management, and finance.

23             THE COURT:  Is it possible to just blow up the first

24   blowup, which is the column for that one line?  Make it a

25   little bigger, or is that not possible?

1           MS. ROTHMAN:  Your Honor, it's difficult.  We can go

2      kind of half by half, I think.

3           Is that better, your Honor?

4           THE COURT:  Yes.  It's really the first –– the line up

5      above that, I was ––

6           MS. ROTHMAN:  Ms. Drescher, if you can zoom in on C.

7           THE COURT:  Okay.  Thank you.

8           MS. ROTHMAN:  I only have one more question.

9           Ms. Drescher, you can zoom out on this and go to

10     column G., referred by.  Thank you.

11          And then highlight Paul Manafort.

12          We can take this down.

13          Your Honor, I have no further questions of

14     Mr. Langhofer.

15          THE COURT:  Any cross?

16          MR. SCHOEMAN:  Yes, your Honor.

17     CROSS–EXAMINATION

18     BY MR. SCHOEMAN:

19     Q.  Good afternoon, Mr. Langhofer.

20     A.  Good afternoon.

21     Q.  You produced documents in this case that have an

22     identification stamp on the lower right–hand corner of

23     TFA_Calk; is that right?

24     A.  That's correct.

25     Q.  And I think you produced documents numbered TFA_Calk 1

1    through 4,325; is that right?

2    A.  I don't remember the upper -- the highest number that we

3    produced, but I don't have any reason to doubt that that number

4    is correct.  It sounds roughly correct.

5    Q.  Okay.  Well, let's just get it straight.  Let's show you

6    3500-28-08.

7              MR. SCHOEMAN:  Go to the next page.  Next page.

8              Can we enlarge that for the witness?  I just want to

9    know if that -- and if we can highlight the numbers in the

10   first paragraph and the third paragraph.

11   BY MR. SCHOEMAN:

12   Q.  And I ask you if that refreshes your recollection that the

13   documents you produced in this case are numbered TFA_Calk 1

14   through 4,325?

15   A.  Yes, that looks correct.  And our practice is to itemize

16   the Bates numbers in the cover letter so that they're more

17   easily referenced.

18             MR. SCHOEMAN:  Okay.  We can take that down.

19   Q.  There is a story that's longer than what you told the

20   government about how you got these documents in your

21   possession, right?

22   A.  I think we've covered it before, but I don't think we've

23   not covered it all today.  It's quite a long story, actually.

24   Q.  But in terms of for the jury, they didn't hear the whole

25   story of how the documents from the transition team --

1          THE COURT:  Can we just have the question?

2          MR. SCHOEMAN:  Okay.

3   BY MR. SCHOEMAN:

4   Q.  Mr. Langhofer, isn't it true that you received those

5   documents from the GSA in approximately June of 2017?

6   A.  That's correct.

7   Q.  Which was well after the campaign had ended?

8   A.  Yes.

9   Q.  And it had been your expectation that the GSA was actually

10  going to delete all of the documents that were on the

11  transition team's servers pursuant to the normal practice?

12  A.  That's correct.  That was the custom of, as far as I know,

13  every other transition team before and since.

14  Q.  The custom for transition teams is when the transition is

15  over and the candidate is sworn in, the electronics from GSA

16  are returned; is that right?

17  A.  That's fair.  There has been subsequent legislation on this

18  issue that now obligates the GSA to turn the materials over to

19  the transition team, if necessary.

20  Q.  But at the time of the 2016-2017 transition, there was a

21  memorandum of understanding that the GSA was going to wipe

22  these servers and hard drives once they were returned; is that

23  correct?

24  A.  I want to be precise here.  I'm not sure that that was in

25  the MOU.

L6OKCAL4                    Langhofer - Cross

Q.  Well, let me be clear.  It was your understanding, based on customary practice, that when the servers were returned to the GSA after the inauguration, that the data would be wiped; is that right?

A.  Yes, that was the expectation.

Q.  And you learned that that didn't happen, right?

A.  That's correct.

Q.  What you learned is that 80 percent of the transition team data was erased?

A.  No, I don't believe that's correct.

Q.  You learned that a portion of it was erased?

A.  The emails that were on the server were all preserved.

Q.  Well, you fought with the GSA for the return of the documents for approximately three, four months, right?

A.  That's right.  What -- the data that -- the only thing that may have been lost would have been documents that were stored to local hard drives and not on the servers anywhere on some number of laptops and cell phones, but all of the email was preserved.

Q.  Got it.

     The email servers were preserved, but the laptops and other devices may have been wiped clean?

A.  Some of them, not all of them.

Q.  So, what you received in June of 2017 was only what the GSA still had?

1    A.  Yes, of course.

2    Q.  And you don't know exactly what it is they deleted or

3    didn't delete before you got it?

4    A.  Yes, I think that's correct.

5    Q.  Or whether they maintained what they had for those months

6    accurately and precisely, you don't know that?

7    A.  I want to make sure I understand that.  Maintain it

8    accurately and precisely, what do you mean by that?

9    Q.  Withdrawn.

10        You got a bunch of stuff in June 2017, right?

11   A.  Correct.

12   Q.  And it was the stuff that the GSA had at the time?

13   A.  On the email servers.

14   Q.  And then you took possession of it?

15   A.  We did.

16   Q.  And that was about 1.3 terabytes of data?

17   A.  That sounds correct to me, but I --

18   Q.  You know, I'm sorry, I withdraw that.  I withdraw that.

19        You got a bunch of data?

20   A.  A lot.

21   Q.  Okay.

22        And the three documents that the government showed you

23   are just -- you can attest are three pieces of paper that were

24   electronically stored on what you got?

25   A.  That's correct.  There were hundreds of thousands of

1   records.  These are three of them.

2   Q.  And the three that the government showed you are not

3   actually the originals because you redacted them?

4   A.  Well, I think we redacted two of the ones that we're

5   looking at here.

6   Q.  And explain to the jury what redaction is.

7   A.  You take part of the document, and you make it black so you

8   can't read the writing on it.  We have reasons for that, which

9   I'm happy to discuss, if you like.

10  Q.  Well, let's just show an example.

11          MR. SCHOEMAN:  Government Exhibit 608.

12          THE COURT:  Is that in evidence?

13          MR. SCHOEMAN:  That was just offered -- I'm sorry, no.

14          Well, let's do it with 602.

15  BY MR. SCHOEMAN:

16  Q.  Just as an example of redactions, the black stuff, that's

17  an example of redactions?

18  A.  That's correct.  The document we received from the GSA,

19  that was not black.  It's a spreadsheet where every line is,

20  you know, white background with black text.

21  Q.  And what you did was you blacked out all the information

22  where it referenced people other than Mr. Calk?

23  A.  That's correct.

24  Q.  And, to be clear, what you're able to say is that the

25  versions of these documents, before they were blacked out by

1   you, if they were blacked out by you, existed in materials that

2   you got from the GSA in 2017?

3   A.  That's correct.

4   Q.  But you were not present for -- you didn't personally

5   create these documents?

6   A.  No.

7   Q.  And you don't know how they were used by the people who

8   received them?

9   A.  Yes, I think that's fair.  I had never seen these documents

10   until they came up in the course of our document review and

11   production to the Southern District of New York.

12          MR. SCHOEMAN:  Okay.  I believe one of the emails that

13   you've introduced was 601.

14          Excuse me.  I'm sorry, your Honor.

15          (Pause)

16          MR. SCHOEMAN:  So let's look at 601.  Let's go to the

17   top.  Let's display it like that.  Yes, the bottom of page 1.

18   I'm sorry, the bottom of page 1.

19   BY MR. SCHOEMAN:

20   Q.  It starts with an email from Mr. Manafort to Mr. Kushner.

21   Do you see that?

22   A.  I do.

23          MR. SCHOEMAN:  And then let's go up.

24   Q.  You see that Mr. Kushner forwarded to Mr. Liddell, Abe

25   Goldschmidt, and Jim Donovan, whose email, apparently, is

1    buckyrusty@aol.com.  Do you see that?

2    A.  I do.

3    Q.  Do you know those people?

4    A.  I believe I know Chris Liddell.  And Abe Goldschmidt, I've

5    talked to on the phone a couple of times, if memory serves.

6    Q.  And then Mr. Kushner referred emails further to Mr. --

7    Mr. Liddell sends it to William Hagerty, John Rader, and Rick

8    Dearborn.  Do you see that?

9    A.  I do.

10   Q.  Are those all people who worked on the transition team?

11   A.  Hagerty and Dearborn, yes.

12        Rader, I can surmise from this that he did because

13   he's got a PTT.gov email address, presidential transition team,

14   but apart from seeing this email, I can't say that I have any

15   knowledge of who he is.

16   Q.  And the top email, John Rader, the person that you don't

17   know who he is, sends something to something called referrals?

18   A.  That's correct.

19   Q.  And do you know what happened after that?

20   A.  I do not.

21   Q.  Do you know -- this email refers to, I think --

22        MR. SCHOEMAN:  You can take down the enlargement and

23   show the whole email.

24   Q.  -- Stephen Calk, Pat Sink, and if we go to page 3, Vernon

25   Parker.  And I'm just asking whether you know whether any of

L6OKCAL4                    Langhofer - Cross

1   those people received any position in the Trump Administration?

2   A.  I have -- my understanding is that neither Mr. Calk, nor

3   Mr. Parker did.  I don't know who Mr. Sink is.  I couldn't say.

4   Q.  I'm sorry, your understanding is Mr. Calk did?

5   A.  Did not.  Neither of the two that I'm familiar with

6   received appointments.

7            MR. SCHOEMAN:  Let's look at 601A.

8            Right, that's in evidence?

9   Q.  And this is some kind of a document with the names Rick

10  Dearborn, Chris Liddell, and Bill Hagerty on the cover.  Do you

11  see that?

12  A.  I do.

13  Q.  And you didn't create this document?

14  A.  No.

15  Q.  And you don't know how it was used?  Personally, personally

16  know.

17  A.  No, I do not.

18  Q.  Do you know whether this was a draft?

19  A.  Well, I believe --

20  Q.  I'm just asking what you know.

21  A.  I do not have personal knowledge of whether it's a draft.

22            MR. SCHOEMAN:  I don't know whether we can enlarge it.

23  Q.  There's a date sort of black on black on the lower right.

24            MR. SCHOEMAN:  Circle that.  And if we can enlarge

25  that.

1           THE WITNESS:  I believe it says December 13th, 2016.

2    BY MR. SCHOEMAN:

3    Q.  Do you know, as you sit here today, whether that document

4    really was created on that day?

5    A.  No.

6    Q.  Or whether it was modified after that date?

7    A.  No, I do not.  If we're limiting it to personal knowledge,

8    I will say I do not know.

9           THE COURT:  I'm sorry, I can't hear you.

10          THE WITNESS:  I'm sorry, your Honor?

11          THE COURT:  What did you say?  I couldn't hear you.

12          THE WITNESS:  If we're limiting my answers to personal

13   knowledge, I do not know.

14          THE COURT:  Okay.

15   BY MR. SCHOEMAN:

16   Q.  And then let's look at -- I believe Mr. Calk's name appears

17   on page 257 of that document, which is, I think, page 6 of this

18   PDF.

19          Just so we understand, the black boxes are things you

20   added to conceal -- to cover up other people's names and

21   information; is that right?

22   A.  That is correct.

23   Q.  So we can see Mr. Calk, but we can't see who else would

24   have been listed on this page?

25   A.  That's correct.

L6OKCAL4                          Langhofer - Cross

1   Q.  Or what would have been under the title "Secretary of the
2   Army"?
3   A.  Correct.
4   Q.  And this says, "Referral:  Paul Manafort."  Do you see
5   that?
6   A.  I do.
7   Q.  Do you have any personal knowledge of how Paul Manafort's
8   name was added to this spreadsheet?
9   A.  No, sir.
10  Q.  Or when?
11  A.  No, sir.
12  Q.  Or by whom?
13  A.  No.
14  Q.  Or how it was used once it was added?
15  A.  No.
16  Q.  Okay.
17          MR. SCHOEMAN:  Let's look at Government Exhibit 602.
18  Q.  Do you know how this spreadsheet -- who created this
19  spreadsheet?
20  A.  I can tell you my understanding of the process this went
21  through, but I have no personal knowledge of who authored this.
22  Q.  And do you know whether this was the final version or a
23  draft version of this?
24  A.  No, sir.
25  Q.  And you see Mr. Calk's name appears on line 21?

L6OKCAL4                          Langhofer - Cross

1   A.  I do.

2   Q.  Do you know who put his name there?

3   A.  No, sir.

4   Q.  Do you know how long this spreadsheet is?

5   A.  I believe this one is 146 lines.  So if the first one is

6   just headers, probably 145 lines.

7            MR. SCHOEMAN:  May we just flip through the pages.

8   Q.  I think they may all be black?

9   A.  Correct, everything except line 21 for Mr. Calk.

10  Q.  So you don't know who else appeared on this spreadsheet?

11  A.  Correct.

12  Q.  So you were shown one email and two spreadsheets by the

13  government.  As we said earlier, there were 4,325 pages that

14  you produced?

15  A.  That's correct.

16  Q.  And some of those pages are spreadsheets that mention

17  Mr. Calk, but they don't mention Paul Manafort; isn't that

18  right?

19  A.  I would have to check, but that sounds correct to me.

20  Q.  Spreadsheets that don't mention Mr. Kushner; isn't that

21  right?

22  A.  Same.  I really would have to check to answer with

23  certainty, but that does sound correct to me.

24  Q.  And there are emails in the documents produced that you

25  weren't shown by the government with letters of reference for

1   Mr. Calk that are not from Mr. Manafort; isn't that right?

2   A.  I'm sorry, I don't recall that.

3   Q.  Well, let me show you what's been marked for identification

4   as Defense Exhibit 1036.

5        MR. SCHOEMAN:  Just for the witness and counsel.

6   Q.  Let's take a look at that.

7   A.  Okay.  Thank you.

8   Q.  My question is simply:  Does that refresh your recollection

9   that there are letters of reference on behalf of Mr. Calk that

10  the government did not show you in their exhibits?

11  A.  That does appear to be correct.

12  Q.  And do you now recall that there is a letter of

13  recommendation that Sandy Luff sent to Rick Dearborn?  Do you

14  now recall that?

15  A.  Yes, there is at least one such letter from Sandy Luff.

16  Q.  And do you recall that there is the letter from Mr. Luff to

17  Mr. Dearborn forwarding a recommendation from Mr. Smith?  Do

18  you recall that?

19  A.  No, sir, I do not.

20  Q.  You don't recall it?

21  A.  That's right.

22  Q.  Okay.

23        Do you know who Steve Smith is?

24  A.  No.

25  Q.  I think you did say -- well, do you recall that there's a

1    spreadsheet that the government didn't show you with Rick

2    Dearborn and Bill Hagerty's name on the cover that listed Steve

3    Calk, but does not reference Manafort?

4            Do you recall specifically that that is true?

5    A.  I do not.

6    Q.  Well, let me show you DX 1038.  Take a look at that first

7    page.

8            MR. SCHOEMAN:  Can we go to page 10 of the PDF.

9    Q.  I'm just asking you whether looking at that refreshes your

10   recollection that there was a presentation deck on December 2nd

11   referencing Steve Calk as a candidate for Secretary of the Army

12   that did not mention Manafort?

13   A.  I believe you initially said it was a spreadsheet.  I think

14   your characterization now of slide show or a deck is a better

15   description of this.

16   Q.  And you now recall that that's in the documents that you

17   produced?

18   A.  This appears to be something we produced.  The Bates

19   numbers track ours.  It looks like it's from our collection,

20   yes.

21   Q.  Well, do you recall that there is specifically in the

22   documents that you produced, not one of the exhibits shown to

23   you by the government, a spreadsheet that lists Sandy Luff and

24   Steve Smith as the recommenders for Mr. Calk?

25           Do you remember that?

L6OKCAL4                        Langhofer - Cross

1   A.   I'm sorry, I don't.  What I was asked to review and, you

2   know, be prepared to testify about didn't include the document

3   you're describing.

4   Q.   So let's show you Defense Exhibit 1039.

5            MR. SCHOEMAN:  Just for the witness and counsel.

6   Q.   Just take a look at that.

7            MR. SCHOEMAN:  Maybe we can --

8            THE COURT:  I assume this is in evidence, too; is that

9   right?

10            MR. SCHOEMAN:  I don't believe so, your Honor.

11            THE COURT:  Okay.  So are you showing it --

12            MR. SCHOEMAN:  Just to refresh recollection.

13            THE COURT:  To the witness?

14            MR. SCHOEMAN:  Yes.

15            THE COURT:  Okay.

16            MR. SCHOEMAN:  Although this one is a little

17   complicated.

18            Can we look at page 484?

19            And then just for the witness, 487.

20            And just for the witness and counsel, 490.

21            And 493.

22   BY MR. SCHOEMAN:

23   Q.   The question is:  Does this refresh your recollection that

24   among the documents that you produced to the government, but

25   which you were not shown earlier, there is a spreadsheet

1   showing Mr. Calk as a candidate where the recommenders are

2   Sandy Luff and Steve Smith?

3          Does that refresh your recollection?

4   A.  Yes, that does appear to be correct.

5   Q.  Isn't it true that some of the documents that you provided

6   to the government, that you received relating to the transition

7   team, indicate that Mr. Calk was vetted by the transition team

8   on or about September 20, 2016?

9   A.  Again, I'm sorry, I wasn't asked to review that document

10  today.

11  Q.  Let me show you, just for you and counsel, Defense

12  Exhibit 1035.  And just look at the columns on the top.

13  A.  Okay.

14         MR. SCHOEMAN:  And then let's go to the third and

15  fourth pages, please.  Blow it up.  Okay.

16  Q.  And does this refresh your recollection that included among

17  these documents relating to Mr. Calk you produced to the

18  government were spreadsheets indicating that he had been vetted

19  in or about September 2016 by the transition team?

20  A.  That's correct.

21  Q.  Isn't it true that --

22         THE COURT:  The question, though, is, did it refresh

23  your recollection?

24         THE WITNESS:  So, I'm glad we're dialing in on those

25  words.  I mean, to say that I have a recollection of it that's

L6OKCAL4                         Langhofer - Cross

1   been refreshed is probably not quite right because I can't say

2   that I was familiar with that document before.  I can say that

3   we, you know, produced it, it's in the documents that went out

4   from us.  I don't know that I've ever personally laid eyes on

5   that document until today.

6          We have -- you know, we follow standard protocols for

7   reviewing, redacting, and producing, but the volume that we

8   went through on the transition team were literally hundreds of

9   thousands of records.  I can't say I've looked at all them

10  before.

11         THE COURT:  Okay.  Thank you.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L6o5cal5                          Langhofer - Cross

1    BY MR. SCHOEMAN:

2    Q.  I am going to ask you one more of these, just to see.  Do

3    you recall that among the documents that you produced to the

4    government is a spreadsheet that indicates Mr. Calk had been

5    interviewed for a position as an ambassador?  Do you recall

6    that?

7    A.  Yes.  I do recall that.

8    Q.  OK.

9    A.  My recollection is there were multiple ambassadorial

10   possibilities to discuss.

11   Q.  And do you recall the date of that document?  That list?

12   A.  No, sir.

13   Q.  Let's show the witness Exhibit 1034 and let's look at the

14   first page.  Does this refresh your recollection of the date of

15   the document reflecting Mr. Calk being vetted for an

16   ambassadorship?

17   A.  This actually is the document that I remember about this

18   interview but the date range seems roughly correct.

19            MR. SCHOEMAN:  I offer Defendant's Exhibit 1034.

20            MS. ROTHMAN:  Objection, your Honor.

21            THE COURT:  Can you give me a one-word reason why?

22            MS. ROTHMAN:  Foundation.  This witness hasn't seen it

23   before.

24            THE COURT:  So how is this document different from the

25   document we admitted through the government, if it is, and its

1  character, and your familiarity with it?

2          THE WITNESS:  I don't believe it is except for the

3  government showed me the exhibits they asked me about on direct

4  previously, and I compared those to ones on my hard drive.  But

5  I believe that everything we produced to the government came

6  from those flash drives.

7          THE COURT:  OK.  So all you can really say about this

8  document and the other documents is that they came from the GSA

9  and you produced them.

10         THE WITNESS:  Yes, ma'am.

11         THE COURT:  OK.  I will admit it.

12         (Defendant's Exhibit 1034 received in evidence)

13  BY MR. SCHOEMAN:

14  Q.  May we publish it, please, the first page, and then to the

15  page with Mr. Calk's name?  So, just to be clear, I think it is

16  a combination of the first page and the page where Mr. Calk

17  appears.

18         Do you see that?

19  A.  I do.

20  Q.  One more topic here.  There are documents in the collection

21  that you received from the GSA that refer to Mr. Calk that you

22  did not produce to the government because they were privileged;

23  is that right?

24  A.  I don't know if that is correct.  There may have been --

25  I'm certainly aware of the redactions which are based on an

L6o5cal5                      Langhofer – Cross

1    idea of executive privilege and we will call it executive

2    interests.  I would have to look at a privilege log, if you

3    produce one, to be certain that we withheld materials

4    concerning Mr. Calk.

5    Q.  I'm definitely not going to ask you about the subject of

6    any privilege but let me show you 3500-028-6 and we will show

7    Mr. Langhofer the various pages.

8    A.  So, is there a question?

9    Q.  Yes.  I am asking you to look at that and ask if that

10   refreshes your recollection that there were documents that were

11   not produced to the document because they were privileged.

12   A.  Yes.

13   Q.  And I'm not going to ask you about privileged documents.

14   To be clear, is it true that you didn't produce them because

15   legally you are not allowed to produce privileged documents

16   because of legal rules; is that right?

17   A.  That's correct.

18          So, the transition team received a number of document

19   requests from Congressional committees and other governmental

20   agencies or entities and we applied the customary privileges,

21   in some cases spousal; most usually it was attorney-client

22   privilege and Executive privilege.

23   Q.  And you are not allowed to disclose the content but you can

24   say that they exist?

25   A.  That's correct.

L6o5cal5                    Langhofer - Cross

Q.  And that's what you would do on what we call a privilege

log?

A.  That's correct.  What the privilege log say, it will

itemize the documents that are withheld and describe usually

the date, the sender, the recipient, and generally the nature

of the document without giving, really, into the substance of

what is in the document.

Q.  And do you recall that there were privileged documents

referencing Mr. Calk's vetting of potential --

        Well, do you recall that there were e-mails that were

not produced because they were privileged that were regarding

the vetting of potential administration appointees and

referenced Mr. Calk.

        Do you recall that?

A.  Yes.  Vetting records we regard as very sensitive records

and generally within the Executive prerogative for

confidentiality.

Q.  And do you recall that there were vetting records dating

back to September 14th relating to the vetting of potential

administration appointees that mentioned Mr. Calk?

A.  I'm not sure that they go back to September 14th but that

is consistent with the interview date that we -- or the vetting

spreadsheet that we looked at before so that sounds roughly

correct to me.

Q.  Do you know that whether Mr. John Rader was on those

L6o5cal5

1    vetting e-mails?

2    A.  He was on quite a few of the personnel e-mails so I

3    wouldn't be surprised about that at all.

4    Q.  And what about John Gallagher?

5    A.  I don't know about that one.

6    Q.  Do you know who John Gallagher is?

7    A.  No, sir.

8    Q.  Let me just show you back to 3500-28-6, page 3, at the

9    bottom.  Just asking whether this refreshes your recollection

10   about whether John Gallagher was a member of the presidential

11   transition team.

12   A.  He was.  He had a PTT.gov e-mail address which means he was

13   onboarded and operating as part of the transition team and he

14   received e-mails that were privileged concerning personnel

15   issues.

16            MR. SCHOEMAN:  No further questions.

17            MS. ROTHMAN:  No redirect, your Honor.

18            THE COURT:  You are excused.  Thank you.

19            (Witness excused)

20            MS. ROTHMAN:  Your Honor, the government calls Anthony

21   Scaramucci.

22   ANTHONY SCARAMUCCI,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25            THE DEPUTY CLERK:  Please state and spell your first

1   and last name for the record.

2            THE WITNESS:  My first name is Anthony.  My last name

3   is Scaramucci.  So, it's A-N-T-H-O-N-Y.  Scaramucci is

4   S-C-A-R-A-M-U-C-C-I.

5            THE DEPUTY CLERK:  Thank you.

6            MS. ROTHMAN:  May I proceed, your Honor?

7            THE COURT:  You may.

8   DIRECT EXAMINATION

9   BY MS. ROTHMAN:

10  Q.  How old are you?

11  A.  57.

12  Q.  Where do you work?

13  A.  I'm the managing partner of SkyBridge Capital, a New York

14  investment firm.

15  Q.  For how long have you worked there?

16  A.  I started the firm in March of 2005, so approximately 16

17  and a half years.

18  Q.  Can you just briefly describe your educational background?

19  A.  I went to public high school in Port Washington.  I'm a

20  graduate of Tufts University in Boston, and the Harvard law

21  School in 1989.

22  Q.  Have you also been involved in politics?

23  A.  Yes.

24  Q.  When did you first get involved in politics?

25  A.  Very early in my career as a volunteer fundraiser, and I

L6o5cal5                          Scaramucci - Direct

1   would say that was probably at the age of 28 or 29.

2   Q.  What were you doing then?

3   A.  I was raising money for political candidates.  At that time

4   they were mostly local candidates.

5   Q.  Were you involved in Donald Trump's 2016 presidential

6   campaign?

7   A.  I was.

8   Q.  Did you later hold any positions in President Trump's

9   administration?

10  A.  I did, yes.

11  Q.  What positions did you hold?

12  A.  I had two positions.  I was -- for June of 2017 I was the

13  chief strategy officer at the XM event, and then for 11 short

14  days I was the White House Communications Director in July of

15  2017.

16  Q.  Mr. Scaramucci, are you familiar with someone named Stephen

17  Calk?

18  A.  I am.

19  Q.  Have you ever met him in person?

20  A.  I have not.

21  Q.  You have you spoken with him by phone?

22  A.  Yes.

23  Q.  Who introduced you to Stephen Calk?

24  A.  The introduction was made by Paul Manafort.

25  Q.  Approximately when was that?

L6o5cal5                          Scaramucci - Direct

1    A.   Approximately when?  That would be mid-December of 2016.

2    Q.   What, if anything, did Mr. Manafort ask you to do with

3    respect to Mr. Calk?

4    A.   I was on the president-elect's transition team and we were

5    interviewing different candidates for different jobs, and he

6    suggested and recommended Mr. Calk and he wanted us to

7    interview him.

8    Q.   For which position?

9    A.   The original position was Secretary of the Army but it then

10   fell over into other positions because that one wasn't

11   available.

12   Q.   Did you agree to get Mr. Calk an interview at

13   Mr. Manafort's request?

14   A.   Yes.

15   Q.   Why did you agree to it?

16   A.   Well, I had a relationship with Paul Manafort that dated

17   back to the campaign.  He was a campaign manager for a period

18   of time in 2016 and I was working on the campaign in finance

19   and so he was good to me on the campaign, I was on the

20   president-elect's transition team and I wanted to be helpful to

21   him.

22   Q.   Ms. Goldman, can you please pull up for the Court

23   Government Exhibit 1202?

24          Do you recognize this photograph?

25   A.   Yes.

1    Q.  Who is this?

2    A.  That's Paul Manafort.

3    Q.  Mr. Scaramucci, there is a binder at the desk, you can use

4    the binder or the screen in front of you.  Either is fine.

5    A.  OK.

6    Q.  So, who is 1202?

7    A.  That's Paul Manafort.

8    Q.  Can we please pull up Government Exhibit 1209?

9            Who is that?

10   A.  That's me.

11   Q.  Mr. Scaramucci, you testified that you were involved in

12   Donald Trump's 2016 presidential campaign.  Approximately when

13   did you get involved in the campaign?

14   A.  Approximately mid to late May of 2016.

15   Q.  What were you asked to do for the campaign?

16   A.  What I was doing in prior campaigns, which was political

17   fundraising.

18   Q.  Who asked you to join the campaign?

19   A.  Donald Trump.

20   Q.  Where did that meeting take place?

21   A.  It took place in Trump Tower in Mr. Trump's offices on the

22   26th floor.

23   Q.  What role did Trump Tower have in the presidential

24   campaign?

25   A.  It was the principal location for the campaign.  It was the

1   campaign headquarters on floors 5 and 14, we used that as the

2   national campaign headquarters.

3   Q.   Ms. Goldman, can you please pull up Government Exhibit

4   1217?

5        What is this a photo of?

6   A.   That's Trump Tower.

7   Q.   We can take that down.

8        Mr. Scaramucci, do you recall the first time that you

9   met Paul Manafort?

10  A.   I do.

11  Q.   When was that?

12  A.   So that would be late -- mid-May, and I am giving you a

13  rough approximation, I don't remember the exact date, and I had

14  gone in to see Mr. Trump and when I came off the elevator bank

15  Mr. Manafort was in the lobby on the 26th floor, and I walked

16  over and introduced myself.

17  Q.   And the purpose of this meeting at Trump Tower was again?

18  A.   I was meeting with Mr. Trump to discuss joining the

19  campaign.  Governor Jeb Bush, who I was working for, dropped

20  out of the race and Mr. Trump asked me to join his campaign.

21  Q.   Can you briefly describe your interaction with Paul

22  Manafort?

23  A.   It was a cordial interaction with Mr. Manafort.  I had not

24  met him before.  I went over to shake his hand, we talked

25  briefly, and I mentioned to him that I was going to be meeting

with Mr. Trump to talk about potentially joining the campaign.

Q.  At the time of that meeting in May 2016, did you have an understanding of what role, if any, Mr. Manafort was playing in the presidential campaign?

A.  Yes.

Q.  What was that role?

A.  At that time he was hired to be part of the process to help during the Republican National Convention.  He was known as somebody, from an early age, that was good at delegate counting and good at keeping a quorum of delegates together for a potential nominee, so Mr. Trump brought him in as a strategic advisor to do that.

Q.  During your time spent on campaigns, are you familiar with the campaign manager position?

A.  Yes.

Q.  What are the responsibilities of the campaign manager?

A.  Well, to use a metaphor, they're more or less the quarterback of the campaign.  They're responsible for managing the candidate's time, helping the candidate accept the strategy, organizing the fundraising, looking at things like advertising by the field work that would need to be done in a campaign, in terms of knocking on people's doors and soliciting support on behalf of the candidate.

THE COURT:  Could you just keep your voice up?

THE WITNESS:  I'm sorry.

1          THE COURT:  That's fine.

2          THE WITNESS:  Yes.

3    BY MS. ROTHMAN:

4    Q.  When you joined the campaign in May 2016, who was the

5    campaign manager?

6    A.  Corey Lewandowski.

7    Q.  What, if anything, happened to Mr. Lewandowski in June

8    2016?

9    A.  He was let go by the campaign in June of 2016.

10   Q.  At that point who took on the responsibilities of campaign

11   manager of Donald Trump's campaign in 2016?

12   A.  Paul Manafort.

13   Q.  For approximately how long did Mr. Manafort stay in that

14   role?

15   A.  I would say five weeks.  It was probably from mid-June of

16   2016 to the first or second week of August of 2016.

17   Q.  So, in late July 2016 was he -- was Mr. Manafort acting as

18   the campaign manager?

19   A.  I believe he was, yes.

20   Q.  And the first few days of August 2016 was Mr. Manafort

21   acting as the campaign manager?

22   A.  Yes.

23   Q.  Did there come a time when Mr. Manafort's role on the

24   campaign changed again?

25   A.  Yes, it did.

L6o5cal5                          Scaramucci – Direct

1   Q.   What happened?

2   A.   Again, I don't have the exact dates but I would say it was

3   the second or perhaps the first week of August Mr. Trump made a

4   decision to replace Mr. Manafort with Kellyanne Conway who

5   became the campaign manager, but then he also designated Steve

6   Bannon to be the CEO of the campaign.

7   Q.   Even after Mr. Manafort officially left the campaign, did

8   he stay involved with the campaign?

9   A.   He did.  Yes.

10  Q.   Do you have an understanding of why that was?

11  A.   Well, he had a long-standing relationship with Mr. Trump

12  and some of Mr. Trump's business associates, so even though he

13  was stepping down from the campaign, I think he was close

14  enough to the campaign to be considered an adjunct advisor or

15  an informal advisor.

16  Q.   Mr. Scaramucci, around the time that Mr. Manafort left the

17  campaign, do you recall there being any other developments

18  regarding Mr. Manafort's public reputation?

19  A.   Yes, I do.

20  Q.   What were those developments?

21  A.   Well, there was speculation in the press that he was

22  involved with Eastern European political officials, I think

23  they were in the Ukraine or perhaps other Eastern European

24  nations where he was either being paid as a lobbyist or

25  campaign organizer, and it was portrayed as somewhat nefarious.

1    Q.  After Mr. Manafort left the campaign officially, did you

2    maintain a relationship with him?

3    A.  I did.  Yes.

4    Q.  I now want to jump ahead and talk about election night

5    2016.  Do you recall the date of the presidential election?

6    A.  I do.

7    Q.  When was it?

8    A.  It was November 8, 2016.

9    Q.  As part of your work on the campaign, had you been

10   following the polls in the weeks leading up to the election?

11   A.  I was, yes.

12   Q.  And, generally, what do you recall the polls reporting

13   about the likely success of candidate Trump?

14   A.  Well, the polls had Mr. Trump down anywhere from 3 percent

15   to 7 percent.  They tightened towards the end so he was close

16   inside the margin of error but the prediction marketplace,

17   places like 538, had him losing the election.  It was higher

18   percentages against him winning the election than him winning.

19   Q.  Did you have plans on election night?

20   A.  I did.  Yes.

21   Q.  What were your plans?

22   A.  I had three different locations that I was at.  I was at my

23   restaurant The Hunt and Fish Club with my wife and Steve

24   Mnuchin's fiancee, Louise Linton.  I went from there to speak

25   at the New York Times where they had a 200-ish person seminar

1   on the election and I was interviewed there by Nick Confessore

2   who was the front page editor -- or one of the front page

3   editors for the New York Times.  And then, after that, I went

4   back to the restaurant and got Louise and my wife Deidre and

5   went up to the Hilton where we were having a VIP party for the

6   larger donors.

7   Q.  When you say the Hilton, what Hilton are you referring to?

8   A.  I'm sorry.  That would be the New York Hilton.  I don't

9   remember the exact address but it was on Sixth Avenue, I

10  believe, at 54th Street.

11  Q.  Do you recall approximately what time it was when you

12  arrived at the Hilton that night?

13  A.  Yes.  Approximately 9:15, 9:30.

14  Q.  Had the election been called when you arrived at the Hilton

15  that night?

16  A.  Not yet.

17  Q.  Can you generally describe the mood in the room when you

18  arrived at the Hilton?

19  A.  I would say cautious optimism.  I think there were some

20  polling data that had come in that was favorable to Mr. Trump

21  in some of the swing states.  It really looked like at that

22  time it was going to fall to Florida as to whether or not the

23  candidate was going to win the election and those polls weren't

24  quite in yet, those polls closed at 9:00 p.m.

25  Q.  Do you recall what time the polls for Florida started to

L6o5cal5                               Scaramucci - Direct

1    come in?

2    A.   Yes.

3    Q.   What time was that?

4    A.   Approximately 10:30.

5    Q.   Can you describe how, if at all, the mood changed in the

6    room once the Florida polls began coming in after 10:30 at

7    night?

8    A.   Yes.

9          I was sitting on a couch with Mayor Giuliani looking

10   at the flat screen television, and the Mayor turned to me and

11   said those precincts that are about to report are usually

12   republican precincts and it is very likely now that Mr. Trump

13   is going to win the election.   The New York Times had these,

14   like, polling dials, you get an app on your phone and those

15   dials were now moving towards the percentage being greater for

16   Mr. Trump that he was going to win.   And I would say by 10:30,

17   11:00 the mood in the room changed from one of cautious

18   optimism to lots of optimism and it was a happier place.

19   Q.   Do you recall what time the election was called for

20   President Trump?

21   A.   Well, I can recall when he came to speak because Secretary

22   Clinton did not concede on that evening and so there was some

23   vagary about that.   But, it seemed like well after midnight,

24   1:00 in the morning they were calling it for Mr. Trump and he

25   came down into the ballroom to speak at approximately 2:00 a.m.

L6o5cal5                          Scaramucci - Direct

1    Q.  Now let's talk about what happened after the election.  Did

2    you stay involved with then President-Elect Donald Trump?

3    A.  Yes.

4    Q.  Did you have a position on the transition team?

5    A.  I did.

6    Q.  What was that position?

7    A.  I was one of the Executive Committee members of the

8    President's transition that was announced the Friday after the

9    election.

10   Q.  Ms. Goldman, can you please pull up what is in evidence as

11   Government Exhibit 245?  If you can go to the bottom of the

12   second page?  Can you zoom in on -- that's perfect.  Thank you.

13   Let's zoom out and just do the fight for that.  Thank you.

14        What are we looking at Mr. Scaramucci?

15   A.  That's a press release from now the Office of the

16   President-Elect Donald J. Trump.  We are looking at a press

17   release from the now office of the President-Elect Donald J.

18   Trump and the subject of that press release is the

19   implementation of the Presidential Transition Team, the

20   Executive Committee of that Presidential Transition Team.

21   Q.  What is the date of the press release?

22   A.  November 11th, 2016.

23   Q.  If you can zoom down to the names that are listed?  What

24   are these names, Mr. Scaramucci?

25   A.  Well, that's the 16-person members of the executive

1    transition team.

2    Q.  I am going to ask you a few questions about the names on

3    this list.  Do you see your name on the list?

4    A.  I do.

5    Q.  Can you highlight Anthony Scaramucci, please?

6            And then the second name from the bottom is RNC

7    Chairman Reince Priebus.  What position did he have in the

8    administration?

9    A.  So, he was named prior to that, I believe my memory serves

10   me or right after that, he was the White House Chief of Staff,

11   he was the designee for that job.

12   Q.  Ms. Goldman, can you highlight Jared Kushner's name,

13   please?

14           What role did Mr. Kushner have on the executive

15   committee?

16   A.  I don't know the exact title but he was a very senior

17   person so I'm going to say it was a senior advisory role.  He

18   was one of the top three people alongside of Mr. Priebus.

19   Q.  What, if any role, did he have with respect to hiring for

20   new roles in the administration?

21   A.  I would say he had a very consequential roll.  Obviously

22   all of those decisions went to the president-elect and it was

23   ultimately his decision, but I would say Jared Kushner and

24   Reince Priebus were principals helping to make the decisions,

25   they were in the top two or three seats.

1   Q.  You can take this down and pull up Government Exhibit 1211.

2          Do you recognize this photograph?

3   A.  I do.

4   Q.  Who is this?

5   A.  That's Jared Kushner.

6   Q.  You can take that down.

7          Mr. Scaramucci, what if any job, were you given on the

8   executive committee for the Presidential Transition Team?

9   A.  So, in addition to being a committee member on that

10  executive transition team I was asked to join something that

11  was known as the Tiger Team which was an interviewing body.

12  Jared Kushner I think came up with the idea, he had designated

13  a few people to help to screen the process of undersecretary

14  positions and deputy secretary positions just below, what I

15  would say, the top cabinet level positions.

16  Q.  Who else was on the Tiger Team with you?

17  A.  At that time the first two people in addition to myself was

18  Ambassador Martin Silverstein and Ira Greenstein.

19  Q.  Was anyone else on the committee?

20  A.  Later on they were adding other members to that committee

21  so weeks later John Sweeney, who was an elected official in

22  Upstate New York, was added to that team, and I think there may

23  have been one or two others.

24  Q.  Where did the Tiger Team conduct its interviews?

25  A.  Those interviews were conducted at Trump Tower on the 14th

L6o5cal5                         Scaramucci - Direct

1   or 15th floor.

2   Q.  Now, did you personally recommend anyone for any roles in

3   the new administration?

4   A.  I did.  Yes.

5   Q.  Who did you personally recommend?

6   A.  Vincent Viola, who was the CEO and founder of Virtu and a

7   West Point graduate; I recommended him to the President-Elect

8   to be the designee for Secretary of Army.

9   Q.  What happened with that recommendation?

10  A.  Well, after Mr. Trump interviewed him and others

11  interviewed him -- and I might also add there were other people

12  that were making that recommendation -- he was announced as the

13  designee -- Secretary of Army designee by the president-elect.

14  Q.  Did he ultimately assume that role?

15  A.  He did not.

16  Q.  Why not?

17  A.  It had to do with financial entanglements.  He was owner of

18  the Florida Panthers and he had thoroughbred race horses and it

19  became impossible for him and his family to sever those

20  financial relationships.  So, he volunteered to withdraw.

21  Q.  Now I want to switch gears and talk about Mr. Manafort's

22  request that you get Mr. Calk an interview at Trump Tower.

23  First, I want to ask you to look at what is in your binder as

24  Government's Exhibits 609, 610, 611 and 612.

25              THE COURT:  Before we start this new topic we need to

L6o5cal5                              Scaramucci – Direct

1    take a short afternoon break.  So, if you don't mind?

2            MS. ROTHMAN:  Yes, your Honor.

3            THE COURT:  We will take our afternoon break for just

4    10 minutes and we will be back.

5            (Jury not present)

6            THE COURT:  We are adjourned for 10 minutes.

7            (recess)

8            (Jury present)

9            THE COURT:  You may continue.

10           MS. ROTHMAN:  Thank you, your Honor.

11   BY MS. ROTHMAN:

12   Q.  Mr. Scaramucci, before we took a break I was going to ask

13   you questions about Mr. Manafort's request that you get Steve

14   Calk interviewed at Trump Tower.  Do you remember that?

15   A.  I do.

16   Q.  I ask you to look at the binder in front of you and

17   specifically at Government's Exhibits 609, 610, 611 and 612.

18   Once have you reviewed those, please, let me know.

19   A.  OK.  I'm ready.

20   Q.  Do you recognize what's been marked for identification as

21   Government Exhibits 609, 610, 611, 612?

22   A.  I do.

23   Q.  What are they?

24   A.  They are screenshots of text messages on my cellular

25   telephone.

L6o5cal5                          Scaramucci - Direct

1    Q.  With whom are those communications?

2    A.  On 609, the first page, the top of the page is, it's from

3    Stephen Calk.

4    Q.  And then 610, who is that?

5              THE COURT:  Can I see them on my screen?

6              THE WITNESS:  Should I continue?

7              MS. ROTHMAN:  One moment.

8              THE WITNESS:  OK.

9              THE COURT:  All right.

10   BY MS. ROTHMAN:

11   Q.  We can go to 610.

12   A.  Yes; 610, these are screenshotted pictures, again from my

13   cellular telephone, from Paul Manafort.

14   Q.  And then?

15             THE COURT:  I don't have anything on 610 except a

16   redacted file.

17             MS. ROTHMAN:  Is that better, your Honor?

18             THE COURT:  OK.

19   BY MS. ROTHMAN:

20   Q.  Now 611, please?

21   A.  611 is Paul Manafort at the top of the page.

22   Q.  Can you just scroll down?

23   A.  Those are text messages from my -- screenshots of my

24   cellular telephone.

25   Q.  And then, finally, Government Exhibit 612.

1   A.   That is screenshots from my cell phone from Paul Manafort

2   on 612.

3   Q.   Are Government's Exhibits 609, 610, 611, and 612 fair and

4   accurate pictures of screenshots from your cell phone of

5   communications that you had either with Mr. Manafort or

6   Mr. Calk?

7   A.   Yes.

8            MS. ROTHMAN:   Your Honor, at this time the government

9   would offer into evidence Government's Exhibits 609, 610, 611,

10  and 612.

11           MR. SCHOEMAN:   No objection.

12           THE COURT:   They're admitted.

13           (Government's Exhibits 609, 610, 611, 612 received in

14  evidence)

15  BY MS. ROTHMAN:

16  Q.   Let's start with Government Exhibit 611.   You can put that

17  on the screen, Ms. Goldman, and let's orient everybody.   So,

18  what are we looking at, Mr. Scaramucci?

19  A.   This is a screenshot of text messages from Mr. Manafort

20  into my cell phone, and the gray bubbles are text messages from

21  Paul Manafort.

22           THE COURT:   I am going to interrupt for a second and

23  tell the jury about redactions.

24           Ladies and gentlemen, there are rules of evidence that

25  govern what is appropriate to introduce into evidence and what

1   is not, and before the trial -- or during the trial outside

2   your presence we discuss some of these matters and I make

3   rulings on what is permissible under the rules to be put into

4   evidence.  And, if something is not permissible, rather than

5   keep the whole document out of evidence, I would order that it

6   be redacted, which is why certain parts of these documents are

7   blacked out.  There is nothing inappropriate about it pursuant

8   to my order.

9           Go ahead.

10          MR. SCHOEMAN:  I'm sorry.  Your Honor, would you

11  clarify that the previous witnesses' redactions were not the

12  Court's redactions?

13          THE COURT:  Yes.  I will clarify that.

14          Previous redactions were not the Court's redactions.

15          Go ahead.

16          MS. ROTHMAN:  Thank you, your Honor.

17          THE COURT:  By previous redactions I mean of the

18  previous witness who I think was Mr. Langhofer.

19          Go ahead, Ms. Rothman.

20          MS. ROTHMAN:  Thank you, your Honor.

21  BY MS. ROTHMAN:

22  Q.  Looking at the first page of Government Exhibit 611 and

23  there is a bubble at the top with "PM" in it.  What do those

24  initials refer to?

25  A.  That's Paul Manafort.

1   Q.  Have you reviewed this document before, Mr. Scaramucci?

2   A.  Yes.

3   Q.  Are there also blue bubbles on this document?

4   A.  There are blue bubbles on document as well.

5   Q.  You can scroll down Ms. Goldman.

6           Who is communicating in the blue bubbles that we see

7   right there?

8   A.  That would be me, back to Paul Manafort.

9   Q.  Let's go back to the first page of Government Exhibit 611

10  and I'm going to ask you some questions about the messages and

11  ask you to read them.  Can you read the date and the time of

12  the first message on the top of the page?

13  A.  It is November 15, 2016, at 12:46 p.m.

14  Q.  What is the message?

15  A.  How is 2:00 p.m. today?

16  Q.  What do you understand Mr. Manafort to be referring to in

17  this message?

18  A.  Yes.  He has asked to meet with me face to face and I

19  suggested a meeting location, and then he is saying:  How is

20  2:00 p.m. today?

21  Q.  Do you recall having a meeting with Mr. Manafort on that

22  date?

23  A.  I do.

24  Q.  Do you recall any discussion of Stephen Calk at that lunch?

25  A.  There was no discussion of Steve Calk at that lunch.

Q.   If we can now go to the message at the bottom of Government

Exhibit 611?  If you can read the date, time, and content of

that message?

A.   So, the date and time, December 14, 2016; 9:12 p.m., and

the message is:  Give me a call when you get a chance.  Hope

you are clicking.  Paul.

Q.   And I won't ask you every time, but who is this message

from?

A.   That's from Paul Manafort.

Q.   Thank you.

        If we can now go to the next page of Government

Exhibit 611, and focusing on the top message, if you can read

the date, the time, and the content of the message?

A.   December 15, 2016, at 11:01 a.m.:  Call me on this number

917-562-0567.  This is my second cell.

Q.   And if you can now read the next message down the page, the

date, time, and message?

A.   December 19th, 2016, 8:05 p.m.  Pls call me tonight at

703-624-4678, Paul.

Q.   Do you recall having a phone conversation with Mr. Manafort

after receiving this text message?

A.   I do.  Yes.

Q.   At that time what telephone numbers were you using?

A.   I was using two different telephone numbers, one was area

code 917-439-3646, and the other telephone number was area code

L6o5cal5                          Scaramucci – Direct

1   917-291-0555.

2   Q.  What do you recall about what Mr. Manafort told you during

3   that phone call?

4   A.  He was making some recommendations to two recommendations

5   for new potential positions in the newly forming Trump

6   Administration.

7   Q.  Who did he recommend to you?

8   A.  He recommended Stephen Calk, and there is another gentleman

9   by the name of Vernon Parker were his recommendations.

10  Q.  What did he say about Stephen Calk?

11  A.  Just that he was a friend of his and that Mr. Calk had

12  worked on the campaign and had been an early supporter of the

13  president-elect, and he wanted him to be considered for the

14  Undersecretary of Army position.

15  Q.  Was the request at the time that Mr. Calk be considered for

16  Undersecretary or Secretary of the Army?

17  A.  I am going off of the text message.  The original request

18  was Secretary of the Army.  I then told Mr. Manafort that we

19  had already had somebody in the queue, Viola, and that was

20  somebody that I had recommended to the President, and it was

21  either at that time or shortly thereafter that Mr. Viola was

22  being designated the Secretary of Army designee, subject to

23  confirmation.

24  Q.  So, when Mr. Manafort asked you to help get Mr. Calk an

25  interview for Secretary of the Army and you responded that that

1   position already had someone in mind, what did you then

2   propose?

3   A.  Well, I didn't propose anything, actually.  Mr. Manafort

4   made the proposal of these other positions.  I then said to

5   Mr. Manafort could you text me the information?  Because at

6   that time I was being inundated with a tremendous amount of

7   personnel requests and I wanted to make sure that I could keep

8   track of them.

9   Q.  Now, you testified that Mr. Manafort passed along two names

10  during that phone call.  Did you and Mr. Manafort discuss those

11  two names equally during the call?  Or did one name take up

12  more of the substance of the conversation?

13  A.  No.  We did not discuss the names equally.  We spent the

14  preponderance of the time talking about Stephen Calk.

15  Q.  In that phone call with Mr. Manafort, did Mr. Manafort tell

16  you that he had received millions of dollars in loans from

17  Steve Calk's bank?

18  A.  No.

19  Q.  Did he mention that he was in the process of getting

20  additional millions of dollars in loans?

21  A.  No.

22  Q.  If he had said either of those things to you would you have

23  passed along Mr. Calk's name?

24  A.  No.

25  Q.  How did that phone call with Mr. Manafort end?

L6o5cal5                         Scaramucci - Direct

1    A.  I had suggested to Mr. Manafort that we were super busy

2    with the transition and interviewing people, could he please

3    text me the names of the people that he was referencing and

4    recommending, as well as the positions that he thought that

5    they were qualified candidates for.

6    Q.  So, let's look back at Government Exhibit 611 at the next

7    bubble down.  Can you read the time of that message and the

8    content, Mr. Scaramucci?

9    A.  To give you the date and time it is December 21st, 2016;

10   6:41 p.m.

11   Q.  I am going to stop you, Mr. Scaramucci.  Let's go back to

12   September 19, 2016.

13   A.  OK.

14   Q.  You already read the message at 8:05 p.m.  You can read the

15   message right under that, please.

16   A.  The message right below that is time-stamped 8:41, so that

17   would also be December 19, 2016, 8:41 p.m.:  Stephen Calk cell

18   312-961-7064 Undersecretary of Army or Undersecretary of

19   Personnel and Management, DOD.

20           The next bubble is time-stamped 8:42 p.m., Vernon

21   Parker DOJ dep -- which is shorthand for deputy -- AG

22   positions.

23   Q.  Approximately how long after Mr. Manafort sent you that

24   first message at 8:05 p.m. did he send you the text message

25   that included contact information for Stephen Calk?

1    A.   36 minutes.

2    Q.   Thank you, Mr. Scaramucci.  If we can go to the next

3    message, zoom down, if you can read the date, the time, and the

4    content of the top message on this page of Government Exhibit

5    611?

6    A.   December 21, 2016; 6:41 p.m.:  A, any progress on Stephen

7    Calk?  Did you speak with him?

8    Q.   If you can now read the following message which is in the

9    blue bubble?  Can you remind the jury who is sending the

10   message seen in blue?

11   A.   So, in the gray bubbles Mr. Manafort is sending messages to

12   my cell phone.  In the blue bubbles I am responding to him.  I

13   respond, December 21st, 2016 at 7:46 p.m.:  Would he take

14   Undersecretary of the Army?  Are we double sure?  Then he

15   followed that up:  If so, I think we can get it done.

16   Q.   Mr. Scaramucci, when you wrote "would he take

17   Undersecretary of the Army," who are you referring to?

18   A.   Stephen Calk.

19   Q.   And when you wrote:  "If so, I think we can get it done,"

20   what did you mean by that?

21   A.   Well, I thought we could get done the interview request.  I

22   was not in a position to make decisions with that level of

23   authority, that went to the president-elect or, in the case of

24   the Army -- Department of Defense and Secretary of the Army

25   that would have gone to general James Mattis I was referring

1   to, if so, we can get to the interview request.

2   Q.  If you can now read the response from Mr. Manafort starting

3   with the time and then the message?

4   A.  So, December 21st, 2016; 8:15 p.m.:  Yes, he will def take

5   it.

6   Q.  When Mr. Manafort goes, "yes, he will def take it," Who did

7   you understand him to be referring to?

8   A.  Stephen Calk.

9   Q.  Approximately how long after you sent your text message to

10  Mr. Manafort did he respond "yes, he will def take it"?

11  A.  29 minutes.

12  Q.  Do you know what happened in the 29 minutes?

13  A.  I don't know.

14  Q.  Now, Mr. Scaramucci, do you recall being contacted by

15  someone named Steve Cortes regarding Stephen Calk?

16  A.  I do, yes.

17  Q.  Do you believe that that contact was before or after

18  Mr. Manafort first reached out to you about Stephen Calk?

19  A.  I believe it was after.

20  Q.  Who was Steve Cortes?

21  A.  Steve Cortes had worked on the campaign originally with

22  Governor Perry of Texas, switched over to President-Elect

23  Trump's campaign, and he was doing Latin outreach for the

24  campaign but I had a prior relationship with Steve Cortes, I

25  had worked with him at CNBC when we were both contributors to

L6o5cal5                              Scaramucci – Direct

1    the cable news channel CNBC.  So, I knew who Steve Cortes was

2    and I had a relationship with him.

3                 (Continued on next page)

L6OKCAL6                         Scaramucci - Direct

1    BY MS. ROTHMAN:

2    Q.  As part of your work on the presidential transition team,

3    was it common or uncommon for people to ask you to get their

4    friends interviews for positions into the administration?

5    A.  I would say it wasn't common, but I'm not going to go as

6    far to say that it was uncommon; we were getting requests.

7          A lot of the requests were from, frankly, prior

8    transitions, meaning other Republican campaigns where people

9    were slotted for different jobs, and there were some friend

10   requests.

11   Q.  How would you typically handle those requests?

12   A.  Well, in most cases, we would say, unfortunately, the

13   person isn't qualified or we would say we can't handle the

14   interview or the throughput of the interview, the volume of

15   things that we were doing.

16         Remember, you have a very short period of time between

17   the day of the election and the inauguration of the new

18   president.

19   Q.  Do you recall if Steve Cortes followed up with you about

20   Steve Calk after his initial outreach?

21   A.  He did not.

22   Q.  Do you recall if Paul Manafort followed up with you about

23   Steve Calk after his initial outreach?

24   A.  He did, yes.

25   Q.  Why did you pass -- withdrawn.

1          MS. ROTHMAN:  Let's go on to Government Exhibit 610.

2    We can take this down and put up 610.

3    Q.  Just to orient the jury chronologically, do these messages

4    precede or come after the messages that we just saw in

5    Government Exhibit 611?

6    A.  They come after.

7          MS. ROTHMAN:  So if we can go back up a little bit.

8    Q.  What is the date and time of that first message that we see

9    on Government Exhibit 610?

10   A.  That's going to be December 27th, 2016, at 1:32 a.m.

11   Q.  Can you read the message, please?

12   A.  Yes.

13         This message is:  "A, TY so much.  Let me know if I

14   need to do anything on him.  P."

15   Q.  When Mr. Manafort wrote, "Let me know if I need to do

16   anything on him," who did you understand "him" to be referring

17   to?

18   A.  Stephen Calk.

19         MS. ROTHMAN:  We can zoom out and go to the next

20   message.

21   Q.  You can read the date, the time, and then the message,

22   Mr. Scaramucci.

23   A.  Yes.

24         This is dated December 27, 2016, at 5:36 p.m.

25         "Is Steve GUG to be called in to meet?"

1    Q.  Now, when Mr. Manafort wrote this to you, who did you

2    understand him to be referring to?

3    A.  Stephen Calk.

4    Q.  And when Mr. Manafort wrote "called in to meet," what did

5    you understand that to be in reference to?

6    A.  The requested interview.

7    Q.  Do you recall speaking by phone with Mr. Calk on the

8    morning of December 27th, 2016?

9    A.  I do.  I'm pretty sure it was that morning, yes.

10   Q.  What do you recall Mr. Calk telling you during that phone

11   call?

12   A.  It was a friendly call, it was a cordial call.  It was an

13   attempt by Mr. Calk to reference some people that we could

14   potentially have in common.  Obviously, with the reference

15   being Paul Manafort, Steve Cortes could have also perhaps come

16   up in the call.  But it was a friendly call, and it was him

17   looking to follow up related to getting the interview for the

18   potential jobs that we were discussing.

19   Q.  What, if anything, did Mr. Calk say about Mr. Manafort?

20   A.  He indicated that they were friends, and he indicated that

21   he had a longstanding relationship with him, but he had also

22   been an earlier supporter of the president.

23        You'll recall there was a battle going on between

24   people that were with Mr. Trump early versus people that joined

25   Mr. Trump's campaign later on when it became obvious that he

1     was going to be the nominee.

2     Q.  During that phone call, did Steve Calk mention that his

3     bank had made millions of dollars of loans to Paul Manafort?

4     A.  No, he did not.

5     Q.  Did he mention that his bank was in the process of making

6     another multimillion dollar loan to Paul Manafort?

7     A.  He did not.

8     Q.  If he had said any of those things, would you have gotten

9     Steve Calk an interview?

10    A.  No.

11    Q.  What, if anything, did you ask Mr. Calk to send you during

12    that phone call?

13    A.  Well, in order to get him into the queue for our interview

14    team, known as the Tiger Team, I needed his CV or a paragraph

15    of his bio and some reasons why he was potentially qualified

16    for the jobs that he was looking for.

17    Q.  Do you recall receiving those materials from Mr. Calk?

18    A.  I do, yes.

19    Q.  What do you think you did with them?

20    A.  Well, I read them at that time.  I was overwhelmed, and I

21    probably didn't act on them at that time, but I did read

22    through them.

23          MS. ROTHMAN:  Ms. Goldman, can you please pull up

24    Defense Exhibit 249, please.

25          I want to focus on the top chain here.  We can zoom

1    in.  Thank you.

2    BY MS. ROTHMAN:

3    Q.  Now, after you received Mr. Calk's application materials,

4    do you recall receiving additional emails from him?

5    A.  I do, yes.

6    Q.  Looking at Defense Exhibit 249, who is this email from?

7    A.  This is from Steve Calk.

8    Q.  And what was the date of it?

9    A.  Wednesday, December 28th, 2016, at 5:29 p.m.

10   Q.  Who is the email to?

11   A.  To me, Anthony Scaramucci.

12   Q.  Can you read the subject, please?

13   A.  The subject is "Re:  Steve Calk — Under Sec Army."

14   Q.  How many attachments do there appear to be to this email?

15   A.  There are two attachments to the email.

16   Q.  If you can read the subject body of the email,

17   Mr. Scaramucci?

18   A.  "Hey, Anthony.  I thought I would give you the link to some

19   of my work on the President Elect's behalf spanning the last

20   year," and then there's a link to a coveragebook.com indicating

21   that work.

22   Q.  Now, at the time that you received this email from Steve

23   Calk, had you gotten him an interview at Trump Tower yet?

24   A.  I did not, no.

25        MS. ROTHMAN:  If we can go to DX 429A, please.

L6OKCAL6                          Scaramucci - Direct

1    Q.  Do you know what we're looking at here?

2    A.  Yes.

3    Q.  What is this?

4    A.  That is a screenshot from CNBC.  I don't know the exact

5    date, but it's a screenshot of a group of people that were

6    named to President and then Candidate Trump's economic team.

7    Q.  If we can ask, just to be clear, do you have an

8    understanding that this photograph was attached to the email

9    that we just saw?

10   A.  Yes.

11   Q.  Thank you, Mr. Scaramucci.

12           So you were testifying that this is a photograph of

13   individuals who were named to an economic advisory committee

14   for Mr. Trump?

15   A.  An economic team, yes.

16   Q.  And what do you know about the creation of that team?

17   A.  Well, that team was created by the campaign, and it's very

18   consistent with other campaigns that I worked on, presidential

19   campaigns, like Governor Romney's campaign, where friends of

20   the candidate, or potential fundraisers of the candidate, or

21   economic advisors would be added to a team.

22   Q.  What was the purpose of creating this type of team?

23   A.  Well, there were multiple different purposes.  It usually

24   fell into three different buckets.  Bucket number one would be

25   the actual advisors.  That would include people like Stephen

Moore, Peter Navarro, who were writing position papers and

helping the candidate write speeches related to the economic

plans.

          Bucket number two would be friends of the candidate,

people that the candidate relied on or knew for multiple

periods of time.  That would be somebody like Steven Roth or

Howard Lorber.

          And then the third bucket would be people that were

raising money for the campaign, and then and what the campaign

tries to do is give them some level of gravitas by adding them

to an economic team or advisory council, which helps with the

fundraising efforts.

Q.  Can you explain how adding somebody to a committee like

this would help with fundraising efforts?

A.  Well, the implication would be that the person was close to

the campaign, and, therefore, they could -- you know, they had

access to the candidate or his senior people, and I think when

you're soliciting -- at that time, frankly, we were having a

hard time raising money from the core traditional Republican

establishment, and I think this idea was to create some

influence centers, if you will, to get some of those higher

ticket donations in the campaign.

Q.  Would it be seen as a positive or a negative thing for your

reputation to be added to the committee list?

          MR. SCHOEMAN:  Objection.

1    THE COURT:  Sustained.  But you can lay a foundation.

2    THE WITNESS:  I can answer the question?

3    THE COURT:  No.  She'll ask a different question, or

4    she may reask that one.

5    THE WITNESS:  I'm sorry.

6    BY MS. ROTHMAN:

7    Q.  So you testified that this was created when you were

8    working on the campaign; is that correct?

9    A.  Yes.

10   Q.  And at the time, what were you doing for the campaign?

11   A.  Well, I was -- my official capacity, I was on Steven

12   Mnuchin's finance committee, but I was also doing some media

13   surrogacy for the campaign.

14   Q.  What is your understanding of why this committee was

15   created?

16   A.  The committee was created -- we had discussed a need to

17   bolster our large-ticket donors, and so the committee was

18   created to help create an incentive for the people that were

19   put on the committee to go out there and reach out to their

20   friends to raise money on behalf of the candidate.

21   Q.  How would this incentivize people to go out and raise money

22   for the candidate?

23   A.  Well, you know, it's a prestigious thing.  If you believe

24   in the candidate, you believe in the candidate's message,

25   you're now on a team like that, it would be a sign of

1    encouragement or an inducement to get those people to work on

2    behalf of the campaign.

3    Q.   Now, you testified that some of the individuals on this

4    team had a background in economics?

5    A.   That's correct.

6    Q.   Who would those individuals be?

7    A.   David Malpass on the far left, Peter Navarro sort of on the

8    center of the bottom of the panel, Stephen Moore, right next to

9    Peter Navarro, and Stephen Miller.  Those are the ones I

10   recognize here that I would call policy people that were

11   helping the president formulate the then -- to formulate

12   economic policy.

13   Q.   Did Mr. Malpass go on to have a role in the administration?

14   A.   Yes, he did.

15   Q.   What role was that?

16   A.   He originally started as the Under Secretary of the

17   Treasury Department for International Affairs, and he went on

18   to be nominated and was ultimately at the World Bank as its

19   president.

20   Q.   Did Mr. Navarro go on to have a role in the administration?

21   A.   Yes, he did.

22   Q.   What role was that?

23   A.   So he was part of a newly-formed industrial policy council,

24   and he had an office in the Executive Branch in the White

25   House.

1   Q.  Did Mr. Miller go on to have a role in the administration?

2   A.  He did.  He was a domestic policy advisor; also a member of

3   the West Wing of the White House.

4          MS. ROTHMAN:  If you can highlight Mr. Mnuchin,

5   Ms. Goldman.

6   Q.  Did he go on to have a role in the administration?

7   A.  He did.  He was the Secretary of Treasury during the entire

8   administration.

9   Q.  Do you recall if someone named Wilbur Ross went on to have

10  a role in the administration?

11  A.  I do, yes.

12  Q.  What role did he have?

13  A.  He was Secretary of Commerce.

14  Q.  I think you testified that another way that people could

15  get on this council is if they were friends with the president.

16          Who would those individuals be, to the best of your

17  knowledge, from your time spent on the campaign?

18  A.  To the best of my knowledge, it would be Steven Roth, who's

19  right -- on my right to Mr. Malpass, now highlighted, Howard

20  Lorber, L-o-r-b-e-r, to the left -- my left of Steven Mnuchin.

21  He's right there, Lorber.  And to the right of Steven Mnuchin,

22  those were good friends of President Elect Trump, or then

23  Candidate Trump.

24  Q.  And then the third category were individuals who would be

25  considered to be able to raise money for the candidate; is that

1   right?

2   A.  That would be correct.

3   Q.  How many individuals would there be that fell into that

4   category?

5   A.  Yes.  And so that would be the remaining individuals, but I

6   want to point out that I don't recognize Beale, D'Amico or

7   Kowalski, but the other individuals, they would fall into the

8   category, the fundraising bucket that I described.

9            MS. ROTHMAN:  You can go on, Ms. Goldman.

10  Q.  Prior to Mr. Manafort passing you Steve Calk's name, did

11  you know who he was?

12  A.  I did not, no.

13  Q.  Had you ever known him to associate with then Candidate

14  Trump?

15  A.  No.

16           MS. ROTHMAN:  You can take this down and go back to

17  Government Exhibit 610.

18  Q.  Before we do that, let me ask one more question,

19  Mr. Scaramucci.  Would Steve Calk fall into the fundraising

20  category, to the best of your knowledge?

21  A.  To the best of my knowledge, he would, yes.

22  Q.  Do you know what was expected of individuals who were put

23  onto this council?

24  A.  Well, again, I would say there were three buckets.  You

25  know, in the case of the economic policy people, the economist

that was writing speeches and offering advice in the campaign,

the second bucket was sort of friends of the president that he

would lean on for what I would say their opinions about things

that were going on related to business and the economy, and

then the third bucket would be the people that were being given

that title to help boost their ability to raise funds for the

president elect, the candidate, if you will.

Q.   Do you know if Steve Calk did, in fact, raise funds for

then Candidate Trump?

A.   Well, I believe he did, based on the information that he

had given me after my conversation with him, but I was not

aware of it prior to that.

Q.   What information are you referring to?

A.   So, after I had the telephone call with Mr. Calk, and as

referenced in the email that we were discussing in that case

book, he articulated there that he was part of the fundraising

efforts.

Q.   Do you know, one way or another, if that was true?

A.   I don't know, one way or another, if that is true.

Mr. Calk and Mr. Manafort asserted that it was.  I didn't look

it up or verify it.

Q.   Okay.

     MS. ROTHMAN:  We can take this down and go to

Government Exhibit 612.

Q.   What are we looking at here?

1    A.  That is, again, a screenshot of text messages into my cell

2    phone with Paul Manafort.

3    Q.  And, chronologically, does this come before or after the

4    messages we just saw in Government Exhibit 610?

5    A.  They come after.

6    Q.  If you can read the middle message?

7    A.  Yes.  This was --

8    Q.  The date, the time, and the three messages that you see?

9    A.  This would be dated January 4, 2017, 9:32 a.m.

10          "Great job on MSNBC.  Any news on Calk?  Your mailbox

11   is full."

12   Q.  When Mr. Manafort wrote do you have any news on Calk, what

13   did you understand him to be asking you?

14   A.  Well, I think, again, he requested that he get an

15   interview.  He's asking me for an update as to whether or not

16   that interview has been scheduled.

17   Q.  If you can then read the message that is on January 5th,

18   2017, at 3:50 p.m.?

19   A.  Yes.  January 5, 2017, at 3:50 p.m.:  "Anthony, pls called

20   me today.  I can't get through to you."

21          MS. ROTHMAN:  You can take that down.

22          Your Honor, I'm about to go into a new section.  I can

23   begin, as there's about ten minutes left, or I can wait until

24   Tuesday, whatever the Court prefers.

25          I can start.

1          THE COURT:  Why don't we start; every minute is

2     precious.  But we should break at 4:00.

3          MS. ROTHMAN:  That's fine.

4          Let's pull up Government Exhibit 609, please.

5     BY MS. ROTHMAN:

6     Q.  What are we looking at here, Mr. Scaramucci?

7     A.  I'm sorry, give me one second.

8          Yeah, this is a text message, a screenshot again, from

9     my cell phone, and it's dated December 30, 2016, 2:33 p.m.

10    Q.  Who is this text message exchange with?

11    A.  It's with Stephen Calk.

12    Q.  What's the date of the first message that we see at the top

13    of the page?

14    A.  December 30th, 2016, 2:33 p.m.

15    Q.  Can you please read the message?

16    A.  So, Stephen M. Calk, and that looks like a vCard, which is

17    effectively an electronic contact information.  If you open

18    that up, you can add it to your phone, the person's contact.

19    So that's the first bubble.

20         The second bubble is:  "Hey, Anthony, just making sure

21    you have my cell number and contact details.  Will we be

22    speaking today?"

23    Q.  Based upon your communications with Mr. Manafort and Steve

24    Calk, what did you understand Mr. Calk wanted to speak with you

25    about?

A.   The interview, the potentiality of getting the interview

scheduled that was requested.

Q.   You can now read the next message down in the middle of the

page?

A.   December 31, 2016, 6:41 p.m.:  "Happy New Year!  Hope to

hear from you soon."

Q.   And, again, based upon your conversations with Mr. Manafort

and Steve Calk, what did you understand Mr. Calk was hoping to

hear from you about?

A.   He wanted to hear about the scheduling of the interview.

            MS. ROTHMAN:  We can go down, Ms. Goldman, to the next

page, please.  Stop right there.

Q.   Can you read the date, the time, and the message?

A.   "Thanks for the call tonight, Anthony.  It really means a

lot to me to have you in my corner."

Q.   Do you recall speaking with Mr. Calk on or about

December 31st, 2016?

A.   I do, yes.

Q.   What, if anything, do you recall about the substance of

that conversation?

A.   Well, I indicated to him that I was doing my best to get

him the interview that was requested, but I did also indicate

to him that the jobs that he was looking for, there seemed to

be other people in position for those jobs that were

recommended to the president elect, and obviously the president

elect himself would be making that decision, and I was trying

to be realistic with Mr. Calk about the potentiality of those

jobs he was looking for actually surfacing.

Q.  If you can read the next message, January 3rd, 2017?

A.  January 3rd, 2017, 3:06 p.m.:  "Hi Anthony.  I have sent

you the list of preferred roles and ambassadorships that I

would like to discuss with you.  Please give me a call at

(312)961-7064.  Many thanks, Steve Calk."

          MS. ROTHMAN:  Ms. Goldman, can you please pull up

Government Exhibit 314 side by side with 609.  If you can zoom

in on the top third of the page.

Q.  What does this email appear to be?

A.  So this email is dated January 3rd, 2017, at 1:59 p.m.,

and, basically, it is the list of preferred roles.  So the

subject matter says, again, "Steve Calk - Under Sec Army," and

then he has some attachments, and the attachments are titled

"Stephen M. Calk - Perspective Roles in the Trump

Administration.docs," which is the attached document.

"Anthony, as promised, here is the list of preferred roles.  I

would prefer to speak to you live to discuss today, if

possible.  (312)961-7065."

          MS. ROTHMAN:  If we can zoom out and scroll down to

the second page of 314, please.  You can zoom in on the top

third of the page.

Q.  What is this?

1   A.   This is the list of potential jobs.  After my conversation

2   with Mr. Calk expressing that other people were potentially

3   filling the roles he originally requested, he had sent me this

4   list, which were additional roles that he would like to be

5   considered for.

6         MS. ROTHMAN:  I'll just give the jury a moment to read

7   those roles.

8         (Pause)

9         MS. ROTHMAN:  We can take that down.

10         And just have 609 on the screen, please.  We can go

11   down to the next message.

12   BY MS. ROTHMAN:

13   Q.   If you can read the date, the time, and the message that

14   appears?

15   A.   This would be January 3rd, 2017, at 8:41 p.m.:  "Hi

16   Anthony.  Any movement today?  Can we speak for a minute?

17   Steve Calk."

18         The next --

19   Q.   Is that the same or a different day that Mr. Calk sent you

20   that list of roles?

21   A.   It's the same day.

22         MS. ROTHMAN:  If we can go down to the bottom message

23   on this page.

24   Q.   Can you read the date, the time, and the message?

25   A.   This would be January 4th, 2017, 6:35 p.m.:  "Hi Anthony.

L6OKCAL6                              Scaramucci - Direct

1    Just following up to see if I'm still in the game.  Please call

2    if able.  Steve Calk."

3    Q.  When Steve Calk asked you if he was still in the game, what

4    did you understand him to be referring to?

5    A.  Well, he had sent me that list of preferred roles, and he

6    wanted to know if he was still in the game to be interviewed to

7    be potentially considered for any of those roles that he had

8    sent me.

9             MS. ROTHMAN:  We can go down to the next page,

10   Ms. Goldman.  Stop right there.

11   Q.  If you can read the message on January 6, 2017?

12   A.  January 6, 2017, 8:43 p.m.:  "Hi Anthony.  Any word at

13   all?"

14             You want me to keep going?

15             MS. ROTHMAN:  I think now might be a good time to

16   stop, your Honor.

17             THE COURT:  Okay, that's fine.

18             So, we're going to resume on Tuesday, same time, so

19   please be here and ready to go at 9:45.  I'll bring everyone

20   out at 10:00.  Thank you for being prompt this morning.  I

21   really appreciate it.

22             Remember, over the weekend, please don't talk about

23   the case with anyone, please don't read anything about the case

24   or anything you've heard mentioned, don't do any research, and

25   we'll see you all on Tuesday.  Have a great weekend, everyone.

1              (Jury not present)

2              THE COURT:  You're excused until Tuesday morning.

3              THE WITNESS:  Yes, your Honor.

4              (Witness temporarily excused)

5              THE COURT:  Yes or no, is there anything we need to

6     discuss now?

7              MR. SCHOEMAN:  Not from the defense, your Honor.

8              MS. ROTHMAN:  Not for the government, your Honor.

9              THE COURT:  All right.  We are adjourned.

10             MR. MONTELEONI:  Well, there's just one thing, your

11    Honor, I apologize.

12             THE COURT:  Let the witness leave, then.

13             MR. MONTELEONI:  Sure.  It's a very minor logistical

14    thing, but we can wait.

15             (Pause)

16             THE COURT:  Okay.

17             MR. MONTELEONI:  This just concerns scheduling.  I

18    know that the Court had said that we were doing four-day weeks

19    from now on, but, as we understand it, if next week, we're not

20    sitting Monday, and then Friday is July 2nd, that's another

21    three-day week.

22             THE COURT:  Oh, you're absolutely right, we're sitting

23    three days next week.

24             MR. MONTELEONI:  All right.

25             And then the week after that, the Monday is July 5th.

L6OKCAL6                          Scaramucci – Direct

1   I think we had talked about the possibility of sitting on

2   July 9th, even though that's a Friday, just to make that one a

3   four-day week.  I didn't know if that was finalized.

4              THE COURT:  Yes.

5              MR. MONTELEONI:  All right.  That's great.  I just

6   wanted to confirm that.  Thank you.

7              THE COURT:  Okay.  Thank you for the correction.

8              Can you tell me who the witnesses will be on Tuesday,

9   as long as I have you?

10             MR. MONTELEONI:  Just because of the scheduling, it

11  has not proceeded at the pace we anticipated, we might juggle

12  things around a little bit, so we'll send you an email within

13  the hour.

14             THE COURT:  Okay.  Thank you.

15             We are adjourned.

16             MR. SCOTTEN:  Thank you, your Honor.  Have a good

17  weekend.

18             MR. SCHOEMAN:  Thank you, your Honor.  Have a good

19  weekend.

20             THE COURT:  You, too.

21             (Adjourned to June 29, 2021 at 9:45 a.m.)

22                            *  *  *

23

24

25

```
                          INDEX OF EXAMINATION

Examination of:                              Page

BLAKE PAULSON

Cross By Mr. Laverne . . . . . . . . . . . . 143

Redirect By Mr. Scotten  . . . . . . . . . . 152

ANNA IVAKHNIK

Direct By Mr. Scotten  . . . . . . . . . . . 161

Cross By Mr. Schoeman  . . . . . . . . . . . 209

Direct By Ms. Rothman  . . . . . . . . . . . 256

Cross By Mr. Schoeman  . . . . . . . . . . . 263

ANTHONY SCARAMUCCI

Direct By Ms. Rothman  . . . . . . . . . . . 285
```

```
 1                    GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3     108-A, 109-B, 121-A, 230-A, 231-A,  . . . . . 138

 4            231-B, 245-A, 245-B, 245-C,

 5            302-A and 302-B

 6    901-2, 901-A1 to 901-A27, 901-A35 to  . . . . 138

 7            901-A49, 901-4, 902, 903-11,

 8            903-11A1

 9    701, 702, 704, 719 . . . . . . . . . . . . . 139

10    128  . . . . . . . . . . . . . . . . . . . . 139

11    451-R  . . . . . . . . . . . . . . . . . . . 140

12    208-A through 208-D  . . . . . . . . . . . . 141

13    651, 652, and 654  . . . . . . . . . . . . . 251

14    601, 601A, and 602 . . . . . . . . . . . . . 261

15    609, 610, 611, 612 . . . . . . . . . . . . . 302

16                    DEFENDANT EXHIBITS

17    Exhibit No.                              Received

18    227 through 232  . . . . . . . . . . . . . . 141

19    814  . . . . . . . . . . . . . . . . . . . . 245

20    1034   . . . . . . . . . . . . . . . . . . . 281

21

22

23

24

25
```