L715cal1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                     19 CR 366 (LGS)

STEPHEN M. CALK,

          Defendant.

------------------------------x

                               New York, N.Y.
                               July 1, 2021
                               9:38 a.m.

Before:

               HON. LORNA G. SCHOFIELD,

                               District Judge
                               And A Jury

                       APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
PAUL MONTELEONI
HAGAN SCOTTEN
ALEXANDRA ROTHMAN

KRAMER LEVIN NAFTALIS & FRANKEL
     Attorneys for Defendant
BY:  PAUL SCHOEMAN
     DARREN LaVERNE
     MICHELLE BEN-DAVID

LOEB & LOEB
     Attorneys for Defendant
BY:  JEREMY MARGOLIS

L715cal1

1          (Trial resumed; Jury not present)

2          THE COURT:  I think there was only one issue I needed

3     to address.

4          I got a letter from defense counsel to preclude

5     certain testimony under 403.  I did read it and very recently,

6     so if I could hear the government's response?  And perhaps you

7     don't intend to elicit what they think that you may.  So, I

8     will let you speak.

9          MR. SCOTTEN:  Yes, your Honor.

10         So, I think the defense submission pertained to a

11    single question you were thinking along the answer -- thinking

12    of asking -- along the lines of:  *Mr. Clayton, in your 38 years*

13    *with the Army, have you heard any soldier refer to the IRR as*

14    *serving or service?*  And we do think that's material.  As the

15    Court may remember, although we didn't mention the defendant's

16    military's service in our opening, the defense opened on it,

17    said he was a soldier and he had served.  He made that a point

18    in his favor.  I would like to just show Government Exhibit 551

19    to the Court, the second page and the second paragraph.  You

20    will see here it says where the defendant acted in both active

21    and reserve status as a combat technical helicopter pilot and

22    commander for over 16 years.  And, in fact, actually he was

23    only in a combat tactical helicopter pilot job for a year or

24    two; he was mostly a supply officer, staff officer, maintenance

25    officer.  But the key point is for the last 10 years he has had

L715cal1

no duty position whatsoever so this is a gross exaggeration of

his service and therefore we think it is important for the jury

to understand not just that it is a gross exaggeration but that

no one will be confused about this.

The defense filing seems to be about the legal status

of service, for example was Mr. Calk subject to military

discipline if he committed a military offense in 1995.  Sure,

he was.  And I can think of several ways that the defense can

bring out the idea that the legal definition of service may or

may not have applied to the status that Mr. Calk was in.  The

point here is when you are representing your credentials in a

résumé which is what this is -- put it this way, your Honor.

If a lawyer passed the bar and then he went to pursue his true

desire as a chef and spent 10 years as a chef with an inactive

bar membership, could he say I have been a lawyer for the last

10 years?  Maybe, because kind of he has.  But if he was

applying for a litigation job and said I have been a litigator

for the last decade, that would be misrepresenting his

qualifications.

THE COURT:  Frankly, I think we are splitting hairs

about the way this is written and I'm not even sure why we

care.  Now, I know that I ruled that you could bring in his

past actual military service because it seemed relevant

background but I'm not sure how this gets us anywhere.  I mean

who cares?

L715cal1

1         MR. SCOTTEN:  Well, I think we care, and the defense

2    clearly cares because they opened on it and I think as your

3    Honor has seen, there has been a fair amount of evidence

4    presented by both sides on this question, Did Mr. Calk think he

5    was going to get this job on the merits without helping the

6    defense teasing the idea that, well, if he was getting it on

7    the merits what did he need Paul Manafort for.  I take your

8    Honor's point that really it might not be true and it still

9    would be a crime and you still want Paul Manafort's help and

10   obviously we will be arguing that, but since this issue of did

11   the man believe he was qualified, did he think he needed to

12   embellish has been joined, putting the actual records before

13   the jury we think is helpful and sort of -- it is more factual

14   than anything the jury has heard and they have heard a bit

15   about this so far.

16        THE COURT:  Could you tell me more about the witness

17   who I gather is not on the list that I got or the defense got

18   at the beginning of the week.

19        MR. SCOTTEN:  To be clear, your Honor, I don't think

20   we are calling him today.  He is our backup witness if

21   everything goes very quickly.  Things are going way so we added

22   one more witness to make sure but I don't think he will be on

23   the stand today.

24        So, Mr. Clayton is the paralegal who handles personnel

25   matters for the Army's litigation branch and, as that, he is a

L715cal1

keeper of records.  That's actually why we got him.  He is

going to enter a single exhibit that is about 32 pages long

that just shows sort of defendant's duty assignments from his

record.  It is not all of his records which are mostly longer

and are mostly medical records, but rather enough to sort of

explain what his military career was.  I expect his testimony

will take about 20 minutes, the gist of which will be Mr. Calk

went to this prep school in 1983, he was commissioned in 1985,

he was a reservist meaning somebody who had a real job in the

reserves from 1985 to 1990, and after that he performed no

further military duties.  He was in IRR status until 2000.  And

you don't perform any military duties or gain military

experience or fly combat tactical helicopters in IRR status.

And that is the entirety of his testimony.

THE COURT:  I will hear from the defense.

MR. SCHOEMAN:  Thank you, your Honor.

So, the specific point that we submitted the letter on

is the government had said they wanted to ask this witness

whether ever, in 38 years, anyone had ever referred to IRR

status as service.  And we objected and said that that was an

opinion.  And the government said they were just going to ask

him about his experience.  And the reason we submitted the

letter is that the Solicitor General of the United States, in

the brief, says it's military service.  So, we think it would

be totally improper for the government to make the argument

L715cal1

1     that no one could consider time in IRR as military service.

2              THE COURT:  And you could, of course, come back and

3     introduce this other document and that would take us down a

4     road that is completely tangential to anything we care very

5     much about.

6              MR. SCHOEMAN:  Correct.  Now, with respect to how we

7     got here, the reason I opened on some of the details of

8     Mr. Calk's military service is that the government prevailed in

9     saying that they were going to introduce evidence and I opened

10    is to say he wasn't a general, he wasn't a war hero, he never

11    saw combat because I knew that was coming.

12             From the defense's point of view, this is all a

13    complete side show.  Nobody is arguing one way or the other

14    whether the details of Mr. Calk's military service would make a

15    difference at all, and in fact three-star General Rigby said

16    the issue is he didn't have Washington experience, and

17    Scaramucci said, well, there were lots of other people in front

18    of him.

19             THE COURT:  Well, can I ask a question?  And that is,

20    is it possible for the parties to stipulate as to what his

21    military service was?  I assume there is no dispute about it.

22    And to have somebody come up here to talk about it I think sort

23    of elevates the issue in a way that is unnecessary and may be

24    confusing to the jury.

25             MR. SCOTTEN:  It is certainly possible, and the

L715cal1

1    witness will be here this afternoon so if there is factual

2    nuance that the defense wants to talk about that will be a

3    possibility it do after court day.  So, we can certainly

4    explore it with the defense.

5             MR. SCHOEMAN:  Certainly, your Honor.  Remember, I

6    opened and said, he was in a military prep school, ROTC in

7    college, he went to flight school, he was in the Army reserves.

8    And, yes, the truthful aspects of -- the factual aspects of the

9    military record are totally fine and we should say that one of

10   the defense witnesses, General Banks, I think was Mr. Calk's

11   roommate back in prep school and knows everything that there is

12   about his background and so we do expect that General Banks

13   will say that he thought Mr. Calk had good qualifications but I

14   think we could certainly work out a stipulation as to the

15   actual facts.

16            THE COURT:  OK.  Why don't you talk to each other and

17   we will see where we are.

18            MR. SCOTTEN:  We will try, your Honor.

19            THE COURT:  Is there anything else?

20            The other thing I wanted to ask, only because I don't

21   have a very good sense of where we are in the government's

22   proof or how long the defense case will be in light of what we

23   have heard, and my main concern is at some point we will have

24   to have a charging conference and I will need to prepare

25   something for that.  So, if I could get an update on where you

L715cal1

1    think we are in terms of the duration of the government's case

2    and perhaps the defense case?

3            MR. SCOTTEN:  We think we are going to be able to rest

4    on Tuesday or Wednesday.

5            THE COURT:  OK.

6            MR. SCOTTEN:  Thursday always possible, of course.

7            THE COURT:  Of course.  And I'm not holding you to it,

8    it is just helpful for me to know.

9            MR. SCHOEMAN:  Yes, your Honor.

10           So, I think the defense case is a day or two and I

11   will say that what I am understanding is going to happen is

12   that two of the last witnesses in the government's batting

13   order are Mr. Raico and Mr. Ubarri, whose names are prominent,

14   and I would expect both the direct and the cross-examination of

15   those witnesses to be the longest in the case.  So, it may be

16   that we got to Wednesday or Thursday before those are completed

17   and my -- one possibility would be that we could plan to have a

18   charge conference on Friday, I think we will be very close to

19   the end at that point.

20           THE COURT:  OK.  Let me look at the calendar.  We were

21   going to sit next week Tuesday to Friday so you are saying it's

22   possible we could be done Thursday or Friday, probably Friday

23   at the latest?

24           MR. SCHOEMAN:  What I think is the wild card here is

25   the last two witnesses are the longest.

L715cal1

1          THE COURT:  In any event, we will plan that you are

2     going to come up the following week because I have had the

3     experience that if I don't say that in advance I get a lot of

4     filibuster so people get the weekend to prepare their

5     summations and I would rather not do that.  So, we will do

6     summations the next week, you don't have to worry about that,

7     and we will plan on having a charging conference probably

8     Thursday or Friday and I will let you know that at the

9     beginning of the week.  OK?

10          MR. SCOTTEN:  Thank you, your Honor.

11          THE COURT:  All right.

12          MR. MONTELEONI:  Your Honor, this is one piece of

13     housekeeping.

14          THE COURT:  Yes.

15          MR. MONTELEONI:  I think that we treated the Brennan

16     immunity order, Government Exhibit 1305 as in evidence, but I

17     think that actually wasn't formally offered and admitted so we

18     would offer it at this time *nunc pro tunc*.

19          THE COURT:  Any objection?

20          MR. LaVERNE:  No objection.

21          THE COURT:  It is admitted.

22          (Government's Exhibit 1305 received in evidence)

23          MS. ROTHMAN:  Your Honor, one additional matter.

24          We took the Court's advice and spoke about the course

25     of Mr. Gongaware's testimony and the parties have agreed not to

L715cal1

1    elicit the fact of any January 2017 review so that entire topic

2    is not going to be covered in the scope of Mr. Gongaware's

3    direct or cross-examination.

4              THE COURT:  OK.

5              MR. LaVERNE:  I have one more small housekeeping

6    issue.

7              THE COURT:  Yes.

8              MR. LaVERNE:  The defense offers, without objection

9    from the government, Defendant's Exhibit 706, 706-A and 706-B.

10             THE COURT:  OK.

11             MR. MONTELEONI:  That's correct, your Honor.  We have

12   no objection.

13             THE COURT:  They're admitted.

14             (Defendant's Exhibits 706, 706-A, 706-B received in

15   evidence)

16             THE COURT:  OK.  You can do whatever would you like

17   for eight minutes.

18             (Recess)

19             (Continued on next page)

20

21

22

23

24

25

L715cal1                    Brennan - Direct

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Nice

3    to see you.  So, we are ready to resume.

4              Mr. Brennan, do you understand you are still under

5    oath?

6              THE WITNESS:  Yeah.

7    JAMES CHARLES BRENNAN, resumed.

8    DIRECT EXAMINATION (Cont'd)

9    BY MR. SCOTTEN:

10   Q.  Good morning, Mr. Brennan?

11   A.  Good morning.

12   Q.  Before we get back in the swing, one quick matter.  Can we

13   please show Government Exhibit 1219?

14             Do you recognize this picture?

15   A.  Yes, I do.

16   Q.  Who is it?

17   A.  Me.

18             MR. SCOTTEN:  The government offers 1219.

19             THE COURT:  It is admitted.

20             MR. SCOTTEN:  Thank you, your Honor.  We can take it

21   down.

22             (Government's Exhibit 1219 received in evidence)

23   BY MR. SCOTTEN:

24   Q.  If we could now just put up Government Exhibit 206, please,

25   and highlight just the top, expand just the top paragraph?

1          So, when we left off yesterday, Mr. Brennan, we were

2     talking about the possible plan to move this loan -- to sell

3     this loan to B of I, the Bank of the Internet?

4     A.  Yes.

5     Q.  And I can't remember if I got to this, were you involved in

6     that aspect of the loan?

7     A.  Tangentially.

8     Q.  In what way?

9     A.  I provided some of the documentation we had already

10    obtained to other people within the bank.

11    Q.  Were you continuing to underwrite the loan or work on it?

12    A.  No.

13    Q.  So you were less involved?

14    A.  Yes.

15    Q.  And can you explain why?

16    A.  Because it would be a residential refinance at that point

17    that we were selling so it would go over to the team that

18    handles those things.

19    Q.  So, your team did not handle loans the bank was going to

20    sell?

21    A.  Correct.

22    Q.  And just to get us situated in time, can you please read

23    the date on this e-mail?

24    A.  October 21st.

25    Q.  We can take that down now.  Thank you.

1          Was there a time that you again became more involved
2     in this loan?
3     A.   Yes; back in November.
4     Q.   And, generally speaking, why did you get back involved?
5     A.   Because it was decided that we were going to put the loan
6     in our portfolio.
7     Q.   And I know you sort of testified about this yesterday, but
8     why does that mean you are involved again?
9     A.   Because we were going to own the loan so it would be in my
10    area of responsibility to manage the loan going forward.
11    Q.   And can we please show the witness, actually show everyone,
12    Government Exhibit 230-A?  And if we can blow up the part that
13    has text?  For this one, let's start at the bottom,
14    Ms. Goldman, can we go to the first e-mail on this chain?
15    That's a good one right there.
16          Mr. Brennan, this e-mail we are looking at here, what
17    are you doing?  What are you writing about?
18    A.   The loan number was assigned through Encompass.  Encompass
19    is a computer system we used to keep track of documents and
20    generate loan documents for the portfolio that we sell -- or
21    the loans we sell to the investor.
22    Q.   Go ahead.
23    A.   Besides giving out the correct loan number I was indicating
24    that there was an underwriting loan decision memo in the file
25    which means underwriting wasn't complete.

1    Q.  And who did you send this e-mail to?

2    A.  Dennis Raico and Javier Ubarri.

3    Q.  If we can scroll up just a little bit so we can see the

4    date?

5    A.  November 10.

6    Q.  And if we can proceed up to the next e-mail?  Can you

7    please explain what is going on in this e-mail, Mr. Brennan?

8    A.  This is an e-mail from Javier Ubarri to myself, Dennis

9    Raico, Eric Buteyn, and Matthew MacDonald -- both Eric and

10   Matthew MacDonald are on the residential underwriting team,

11   Javier is stating that it is going to be a portfolio loan and

12   it is important that Matt and Eric -- Matt or Eric look at it.

13   Q.  So, you said Eric Buteyn and Matthew MacDonald are on the

14   residential underwriting team.  Is that different than your

15   team?

16   A.  Yes, it is.

17   Q.  How is it different?

18   A.  Their main job is underwrite residential loans, mainly for

19   sale.

20   Q.  If you can just compare that to your job?

21   A.  My job was mainly to work on commercial loans and

22   construction loans for sale, houses that would be built and

23   sold.

24   Q.  Can we scroll up a little bit?  Let's give the jury a

25   second to read this before we go to the next one.  And if we

1   can go up from there that's fine for now, we can get the date

2   in a minute; what are we looking at here, Mr. Brennan?

3   A.   It is a summary of what Matthew MacDonald has looking at

4   Manafort's preliminary tax returns, what he had found, and it

5   is also saying his underwriting wasn't complete, he would need

6   another week or at least until next week.

7   Q.   If we can highlight, can I ask you to read the line -- I

8   guess I am reading it:  I do not have the ability to finish the

9   underwrite today but I would feel confident in issuing a term

10  sheet or a commitment to the borrower.

11          Do you see that?

12  A.   I do.

13  Q.   What is a term sheet?

14  A.   It spells out the terms of the loan that we would be

15  willing to offer the borrower but it is -- it has carve-outs in

16  it so the borrower understands so that the loan has not been

17  approved.

18          THE COURT:  Sorry.  Who is this e-mail from?  I

19  can't --

20          MR. SCOTTEN:  If we can go up one line?

21          THE COURT:  OK.  Thank you.

22  BY MR. SCOTTEN:

23  Q.   And remind the jury who Matthew MacDonald is?

24  A.   Matthew MacDonald is an underwriting manager in the

25  residential side of the bank.

1    Q.  And just to loop back quickly to yesterday, did we see a

2    term sheet that you were involved in writing around July 27th

3    or 28 for Mr. Manafort?

4    A.  Yes.

5    Q.  So that's something that is done before underwriting?

6    A.  It is.

7    Q.  And then do you see where it says:  Or a commitment to the

8    borrower?

9    A.  I do.

10   Q.  In this context, what does a commitment to the borrower

11   mean?

12   A.  A commitment letter is usually a stronger letter, memo,

13   saying that a lot of times it's not issued until underwriting

14   is complete but in this case since underwriting isn't complete

15   there would have had to have been a carve-out.

16   Q.  What kind of a carve-out?

17   A.  Saying that until underwriting is complete, the loan is not

18   approved.

19   Q.  If I can ask you to note the date of this e-mail?

20   A.  November 11, 2016.

21   Q.  Can you.

22          Could we please next go to Government Exhibit 231 and

23   we will start at the bottom e-mail?  Scrolling up?  If we can

24   continue up, we are showing the same e-mail chain we saw

25   before.  Now, on this page can I ask, Ms. Goldman, can you

L715cal1                         Brennan - Direct

1    please expand the middle?  Perfect.

2          At the bottom where it says "Dennis," is this the same

3    text we saw from MacDonald about not having done the

4    underwriting but looked at the loan?

5    A.  Correct.

6    Q.  If we go to the e-mail above it, how does Mr. Ubarri

7    respond?

8    A.  Mr. Ubarri is thanking Matthew for his work, telling him to

9    hold off on doing any more work on it until he hears back from

10   Steve.

11   Q.  Who is "Steve" in this e-mail?

12   A.  Steve Calk.

13   Q.  And is Steve Calk copied on this e-mail?

14   A.  Yes, he is.

15   Q.  Can we please go to the top and just expand the top e-mail,

16   please?  And how does MacDonald respond?

17   A.  No problem.  Regards.

18   Q.  And here can I ask you to note both the date and the time?

19   A.  November 11, 2016, 8:38:37 p.m. UTC.

20   Q.  Can we please now go to Government Exhibit 236?  Here I

21   want to look at the top e-mail.  The first question I want to

22   ask you is to note the time.

23   A.  The time is 9:50 p.m. UTC.

24   Q.  So, how long after the e-mail we just saw from

25   Mr. MacDonald?

1   A.   I believe it was a little over an hour.

2   Q.   And now I want to ask you more generally what is going on

3   in this e-mail?  And if you need to see the full e-mail we can

4   zoom out and you can take a look at it.

5   A.   This is discussing the term sheet that I had prepared.  I

6   had written the wrong interest rate in and Steve Calk was going

7   to amend the letter to the correct interest rate and forward it

8   to the customer for their signature.

9   Q.   How often, in your experience at the bank, had you seen the

10  chairman personally amend a term sheet and personally say he

11  would personally send it to a customer?

12  A.   I don't recall seeing it where he amended one before and I

13  don't know that I ever saw him send it directly to a customer,

14  but.

15          THE COURT:  I'm sorry.  I couldn't understand that.

16          THE WITNESS:  I'm sorry.

17          THE COURT:  You can just repeat it.  I just didn't

18  understand it.

19          THE WITNESS:  I don't remember ever seeing Steve send

20  the amended term sheet before, he usually would have one of us

21  fix our mistake; and I don't know that he had forwarded one

22  prior to a customer.

23  BY MR. SCOTTEN:

24  Q.   So you don't remember any instances of this; is that

25  correct?

L715cal1                        Brennan - Direct

1    A.   That is correct.

2    Q.   If we can next go to Government Exhibit 248 and if we can

3    just blow up the top?  First, what is the date?

4    A.   November 14, 2016.

5    Q.   Can I please here just ask you to read what the defendant

6    wrote you?

7    A.   Please ensure this loan is documented perfectly so that our

8    lien on both properties as well as the cash account at The

9    Federal Savings Bank are fully enforceable.  This is critical

10   and you are responsible to ensure this happens.  Please get our

11   wire instructions to Dennis Raico so that he can have the

12   customer wire their origination fee and costs.  Thank you.

13   Stephen M. Calk.

14   Q.   How often, in your time at the bank, had the chairman

15   personally instructed you on documenting a loan with this sort

16   of detail?

17   A.   I believe this was the first time.

18   Q.   And can we please scroll down a bit just to see the next

19   e-mail?  Can you describe what is happening in this e-mail that

20   was forwarded to you?

21   A.   It is an e-mail from Paul Manafort with the attached signed

22   term sheets for the Summerbreeze mortgage which is the property

23   in the Hamptons.

24   Q.   Had any of the facts you found relevant to underwriting

25   changed since Ubarri had rejected the loan on October 20, 2016?

L715cal1                          Brennan - Direct

1    A.  No.

2    Q.  If we could please now go to Government Exhibit 2.

3    Mr. Brennan, this exhibit is several pages but do you recognize

4    it?

5    A.  I do.

6    Q.  What is it?

7    A.  It is a credit approval form, short-term would be a CAF.

8    It is a summary of what we found in underwriting the loan.

9    Q.  And can we go to the next page, please?  And what are we

10   looking at here?

11   A.  This is the credit memo, it's usually called CAM, it is the

12   detail behind the underwriting.

13   Q.  To be clear, you said it is called a CAM?

14   A.  Credit approval memo.

15   Q.  And the prior one is called a CAF?

16   A.  Correct.

17   Q.  What does that stand for?

18   A.  Credit approval form.

19   Q.  Got it.

20         Do you know who prepared these documents?

21   A.  I do.

22   Q.  Who did?

23   A.  Tom Horn.

24   Q.  Did you play any role in creating these documents?

25   A.  I believe I did.

L715cal1                          Brennan - Direct

1   Q.  What role do you believe you played?

2   A.  I was his supervisor and I would have read through it and

3   made corrections.

4   Q.  In the top right-hand corner, can you tell us what the date

5   of this is?

6   A.  November 12th.

7   Q.  And, in the middle of the page, do you see a signature?

8   A.  I do.

9   Q.  Whose signature is that?

10  A.  Mine.

11  Q.  And what is the date there?

12  A.  11/11.

13  Q.  What is the meaning of your signature?  That is to say, why

14  are you signing this and are you indicating anything by signing

15  it?

16  A.  I am signing it as secretary for the loan committee

17  indicating that the loan committee has approved the loan.

18  Q.  The loan committee has approved the loan?

19  A.  That is correct.

20  Q.  Did you approve the loan?

21  A.  I don't have credit approval, so no.

22  Q.  And what is your role -- does your signature signify that

23  you checked anything for the credit committee?

24  A.  No.

25  Q.  Were the Manafort loans conforming home mortgages?  I will

1    ask it a different way.

2    A.  No.

3    Q.  No?

4    A.  I'm not a residential underwriter so I'm not qualified to

5    answer that.

6    Q.  Fair.  I guess what I am asking is do you recall yesterday

7    testifying that underwriters could approve certain forms of

8    residential home mortgages?

9    A.  I do.

10   Q.  Did that happen here?

11   A.  No, that did not.

12   Q.  Now, was the actual date on which this memo was finalized

13   either November 11th, or November 12th, 2016?

14   A.  It was not.

15   Q.  Can we please go to page 5 and if we can blow up the middle

16   of the page?  That's fine.

17         Do you see almost exactly in the middle of the page a

18   date on an $11 million appraisal?

19   A.  I do.

20   Q.  What is the date on that?

21   A.  November 18.

22   Q.  What is the earliest that this memo was in fact finalized?

23   A.  November 18.

24   Q.  Why is it signed November 11 and dated November 12?

25   A.  It would have been signed earlier as -- and then we updated

1   later as we had additional information.

2   Q.  In 2016, at what point in the lending process did the bank

3   prepare these credit memos?

4   A.  They are normally prepared prior to the loan closing.

5   Q.  When was this memo prepared?

6   A.  I don't remember when this loan closed but it would have

7   been prepared probably either at the same time the loan closed

8   or shortly thereafter.

9   Q.  Was it prepared before or after the decision to issue the

10  loan?

11  A.  It was prepared after the decision.

12  Q.  So, if the memo was prepared after the decision to make the

13  loan, what is the purpose of the memo?

14  A.  It was to document what we had found.

15  Q.  Who did you expect to read this memo?

16  A.  I expected regulators and anybody that would pick up the

17  file at a later date.

18  Q.  Did you expect any member of the credit committee to read

19  this memo?

20  A.  At that time I did not expect any member of the loan

21  committee to read the memos.

22  Q.  To your knowledge, did the defendant see this memo at any

23  point prior to the decision to make the loan?

24  A.  I believe he did not.

25  Q.  Does this memo contain mistakes?

1   A.  It does.

2   Q.  Can we please go to page 10?  Can we please blow up summary

3   comments at the very bottom?  Can I ask you to read what you

4   wrote there?

5   A.  Risk rating of 4 (average) is recommended due to the

6   satisfactory debt service coverage ratios and low loan to

7   value.

8   Q.  What does a rating of 4 mean?

9   A.  A rating of 4 is the lowest we would rate the loan and

10  still make the loan.

11  Q.  At that time what was the lowest rating you had ever

12  assigned to a loan that was issued?

13  A.  A 4.

14  Q.  At the time you signed this memo, did you believe the bank

15  should have issued the loan?

16  A.  No.

17  Q.  If you didn't believe the bank should issue the loan, why

18  did you approve rating it a 4?

19  A.  Because the loan was being issued, and the only way a

20  rating that would apply would be a 4 at that point.

21  Q.  Do you remember whether at the time you rated it -- well,

22  you approved the rating of a 4, you believed it should be rated

23  a 4?

24  A.  At the time it was -- the loan was made, I don't believe I

25  would have rated it because I wouldn't have -- if it was my

L715cal1                    Brennan - Direct

1   vote, if I had the ability, I would not have issued the loan so

2   there would have been no rating.

3   Q.  We can take that down.

4           For foundational purposes, just yes or no, did you

5   have an understanding why this loan was issued?

6   A.  Mr. Calk wanted it, the loan, to be made.

7           MR. LaVERNE:  Foundation.  Objection.

8           THE COURT:  Sustained.

9           Just listen to the question.  He wants you to answer

10  yes or no.

11          THE WITNESS:  I'm sorry.

12          THE COURT:  Ladies and gentlemen, you should disregard

13  the prior answer.

14  BY MR. SCOTTEN:

15  Q.  One step at a time, Mr. Brennan.  Just yes or no, did you

16  have an understanding, without telling us what the

17  understanding was, did you have an understanding of why this

18  loan issued?

19  A.  Yes.

20  Q.  And was there one reason or more than one reason for that

21  understanding?

22  A.  One reason.

23  Q.  Sorry.  And I apologize for the awkward way; not one reason

24  the loan issued, but was there one reason or more than one

25  reason you came to understand why it issued?

L715cal1                     Brennan - Direct

1              If I can lead a little bit, your Honor?

2              THE COURT:  Yes.

3  Q.  You testified that you had an understanding of why it

4  issued, right?

5  A.  Correct.

6  Q.  That understanding why it issued, did you have multiple

7  reasons that led you to that?

8  A.  I don't understand.

9              THE COURT:  Can I ask this question?  So, don't tell

10  us the basis for your understanding but there must have been

11  some basis for your understanding; is that right?

12             THE WITNESS:  That is correct.

13             THE COURT:  Was there one basis or were there several?

14             THE WITNESS:  There was one.

15             THE COURT:  OK.

16  BY MR. SCOTTEN:

17  Q.  What was that one basis?

18  A.  That Steve Calk wanted the loan.

19             MR. LaVERNE:  Objection.  Foundation.

20             THE COURT:  Sustained.

21             Was it something somebody said to you?  Something you

22  read?  Something you surmised from all of the circumstances?

23             THE WITNESS:  That there were enough times that this

24  loan should have died and they kept going.

25  BY MR. SCOTTEN:

L715cal1                        Brennan - Direct

1   Q.  Just to back into it now, based on the fact that there were
2   enough times this loan should have died and it kept going, what
3   was your understanding of why it kept going?
4   A.  Because Steve Calk wanted it to go through.
5   Q.  Based on your observations at the bank, could anyone other
6   than Calk have pushed a loan through in these circumstances?
7   A.  Only people on the loan committee have the ability to get a
8   loan through and the only one that seemed, in my experience at
9   the time that wanted this loan to go through, was Mr. Calk.
10  Q.  Well, had Mr. Ubarri already stated his views on the loan?
11  A.  I'm sorry.  I didn't hear the question.
12  Q.  Had Mr. Ubarri already stated his views on the loan?
13  A.  He did.
14  Q.  And who, if anyone, would have been in a position -- a
15  practical position to override Mr. Ubarri?
16  A.  Mr. Calk would have had to persuade the other members of
17  the loan committee to go along with it.
18  Q.  Had you ever seen him fail in persuading the other members
19  of the loan committee to go with him?
20  A.  I have not.
21  Q.  By the way, would Dennis Raico have had the ability to
22  override Javier Ubarri?
23  A.  No, he did not.
24  Q.  Did the Summerbreeze loan ultimately issue?
25  A.  Yes, it did.

L715cal1                    Brennan - Direct

1   Q.   Do you remember about when?

2   A.   Right around the middle of November.

3   Q.   Was the Summerbreeze loan the only loan that the bank made

4   to Manafort?

5   A.   No, it was not.

6   Q.   Can you describe, in general terms, what the other loan or

7   loans were?

8   A.   The other loan -- we made two loans, additional loans to

9   Mr. Manafort on 377 Union Street which is a townhouse in

10  Brooklyn and the loan --

11               THE COURT:  A townhouse where?

12               THE WITNESS:  In Brooklyn.

13               THE COURT:  OK.

14  A.   The loans were made to pay off the prior debt and to

15  complete the renovation on the property.

16  Q.   Do you remember the approximate value of the two loans

17  combined?

18  A.   It wouldn't be the approximate value, but the approximate

19  amount that we committed to lend Mr. Manafort between the two

20  loans was $6.5 million.

21  Q.   What role did you play --

22               MR. LaVERNE:  Your Honor, I am having a very hard time

23  hearing the witness so if he can speak up.

24               THE COURT:  Again, if you can keep your voice up but

25  without blowing air on to the mic?

1    THE WITNESS:  Combined commitment for the two loans on

2    377 Union Street were $6.5 million.

3    BY MR. SCOTTEN:

4    Q.  What role, if any, did you play in the 377 Union Street

5    loans?

6    A.  I underwrote the loan, I was responsible for reviewing

7    construction budget, and after the loan issued I was

8    responsible for the construction disbursements on the loan.

9    Q.  Were you also still the credit committee secretary during

10   this period?

11   A.  Yes, I was.

12   Q.  Can we please show Government Exhibit 286 which is in

13   evidence?  And we can blow up the very top.

14       Mr. Brennan, what is the date of this e-mail?

15   A.  December 9, 2016.

16   Q.  And what is the general subject of this e-mail?

17   A.  It's a discussion on 377 Union Street, Brooklyn, New York.

18   Q.  And what information are you imparting to Mr. Raico?

19   A.  That the budget for the construction we were provided with

20   was far in excess of what we were committing to complete

21   construction.

22   Q.  And why does that matter?

23   A.  There wouldn't be enough funds in the loan to complete the

24   construction so we would have to look to the borrower's

25   financials to make sure the project got completed.

1    Q.  And, just to be clear, why is it a concern for the bank

2    that the construction project be completed?

3    A.  The purpose of this loan was to complete the renovations so

4    the house could be sold.  If the construction isn't complete,

5    you can't sell the house.

6    Q.  Can we next please go to Government Exhibit 285?  Do you

7    recognize this type of e-mail?

8    A.  Yes; it's issued when you receive a voicemail.

9    Q.  Can we please play what is in evidence as Government

10   Exhibit 285-1?

11           MR. LaVERNE:  Noting prior objection, your Honor.

12           THE COURT:  Yes.  Overruled.

13           (Audio played)

14           THE COURT:  If you know what that said, could you just

15   read it into the record?

16           MR. SCOTTEN:  Unfortunately I don't have a verbatim

17   transcript in front of me but let me ask if I am accurately

18   summarizing it for the witness.

19           THE COURT:  All right.

20   BY MR. SCOTTEN:

21   Q.  Mr. Brennan, does that message say, in effect:  Hello,

22   Javier.  This is Jim.  Please give me a call at -- and then you

23   leave your extension.  I need to talk to you about the Manafort

24   loans and I'm also going to try to call Jim Norini, the other

25   member of the loan committee, who is apparently not party to

1    these conversations.

2    A.   That is an accurate summary of the voicemail I left.

3    Q.   And when you referred to Javier Ubarri to the other member

4    of the loan committee who is not party to these conversations,

5    who is the one member of loan committee you did not mention

6    during that call?

7    A.   Steve Calk.

8    Q.   So, what type of conversations were you and Steve Calk

9    party to that Ubarri and Norini were not?

10   A.   I don't recollect the exact nature of those conversations

11   but it would have been conversations directly related to 377

12   Union Street.

13   Q.   If you would please next show Government Exhibit 306, and

14   for this one can we please start at the lowest e-mail, let's

15   say first e-mail at the bottom of this?  I think there is going

16   to be more pages, Ms. Goldman.  Great.  And if you can split

17   the pages to capture it?  Great.

18            Mr. Brennan what is the date of this e-mail?

19   A.   December 22, 2016.

20   Q.   And who sends it?

21   A.   Steve Calk.

22   Q.   Who does he send it to?

23   A.   Sends it to Paul Manafort, carbon copying Javier Ubarri,

24   myself, Dennis Raico, and himself.

25   Q.   And what is the substance of the e-mail?

1   A.  The term sheet for 377 Union Street has been sent to

2   Mr. Manafort asking him and his wife to sign it and to e-mail

3   back the authorization to set up a new pledge account that

4   would contain $2.5 million and deduct the fees for the loan

5   from an existing checking account at the bank.

6   Q.  In your experience, how often did the bank's chairman

7   personally e-mail borrowers with instructions on where to sign

8   documents?

9   A.  This would have been the second time I have seen it.

10  Q.  Can you briefly describe the first time?

11  A.  The Bridgehampton loan.

12  Q.  If we can please scroll up?  And to be clear, when you say

13  the "Bridgehampton" loan, is that the same as the Summerbreeze

14  loan?

15  A.  Yes, it is.

16  Q.  If we can now please blow that up?  And what is the date?

17  A.  December 22nd.

18  Q.  And what is the substance of the defendant's e-mail here?

19  A.  We had received the signed term sheet but we did not

20  receive the authorization to set up the $2.5 million pledge

21  account or to deduct the fees.

22  Q.  Can we please scroll up a bit more?  We skipped one, just

23  real quick:  Does Mr. Manafort respond in the affirmative?

24  A.  Yes, he does.

25  Q.  And now if we can scroll up to the next e-mail, a little

1    more so we can actually capture the text of the e-mail, if we
2    can scroll up about half the page?  Great.
3            Can you describe this e-mail, Mr. Brennan; date, who
4    it is to and from, and what it says?
5    A.  December 22nd, 2016, it is from Steve Calk to Javier
6    Ubarri, asking that he get together with the Lake Forest team
7    in the morning.
8    Q.  Where he says "can you get on this with the Lake Forest
9    team," do you understand what he meant?
10   A.  On getting the underwriting and closing of the loan.
11   Q.  Can we please scroll up?  Ms. Goldman, maybe we can zoom
12   out and scroll to the top.
13           Did Mr. Ubarri forward this e-mail to you without
14   comment?  Looking in the bottom third.
15   A.  Yes.
16   Q.  And when you received this from Mr. Ubarri, what did you do
17   with it?
18   A.  In the bottom third I can't tell you what I did with it.
19   Q.  I understand.
20           Can we see the top third please, now?
21   A.  I instructed my staff members to move $135,000 from the DDA
22   account and put it in our loan settlement general ledger
23   account and I explained to them what the breakdown of the
24   $135,000 and the fees was.
25   Q.  So, in more general terms, you received an e-mail from the

1  defendant forwarded by Ubarri.  How did you perceive that

2  e-mail from the defendant?

3  A.  That we were moving forward with the loan.

4  Q.  If we could please take that down?

5         So, I'm just going to ask you about some of the issues

6  you described with the first loan, and would you tell me if

7  there was any issue with that as regards to these loans, the

8  377 Union loans?  Concerns about Manafort's income, were they

9  relevant here?

10  A.  Yes.

11  Q.  About the sufficiency of his income?

12  A.  Yes.

13  Q.  About ability to verify his income?

14  A.  Yes.

15  Q.  What about the concerns about Manafort's lack of track

16  record in renovating properties?

17  A.  Yes.

18  Q.  What about the concerns about Manafort's lack of cash on

19  hand?

20  A.  Yes.

21  Q.  What about the concerns about Manafort's foreign consulting

22  possibly being investigated?

23  A.  Yes.

24  Q.  What about the concerns about Manafort's large recent

25  delinquencies, defaults, and properties in foreclosure?

1    A.  Yes.

2    Q.  What about the concerns --

3            MR. LaVERNE:  Your Honor, I'm just going to object to

4    the leading.

5            MR. SCOTTEN:  I am trying to compare.

6            THE COURT:  I didn't hear the objection or whatever it

7    is you said, Mr. LaVerne.

8            MR. LaVERNE:  Leading, your Honor.  Leading the

9    witness.

10           THE COURT:  Sustained.

11           MR. SCOTTEN:  This is actually the last one.

12           THE COURT:  All right.

13   BY MR. SCOTTEN:

14   Q.  Do you recall testifying yesterday that you had concerns

15   that Manafort had made inaccurate statements to the bank about

16   things like his income and debts?

17   A.  I do.

18   Q.  To what extent, if any, did those concerns apply on the 377

19   Union Street loan?

20   A.  They were the same concerns.

21   Q.  In the period between the closing of the Summerbreeze loan

22   and where we are at now with the 377 Union Street loan what, if

23   anything, did you learn about additional debts Manafort may

24   have had?

25   A.  We learned that some of the properties in California were

1    being foreclosed.

2    Q.  Do you remember whether you learned anything about the --

3    just do you remember, yes or no, whether you learned anything

4    about the debt on the Union Street property?

5    A.  Without looking at the exhibit I don't know.

6              THE COURT:  Yes or no.  He said please answer yes or

7    no.

8              THE WITNESS:  No.

9    BY MR. SCOTTEN:

10   Q.  Would it refresh your recollection to look at your prior

11   testimony on this matter?

12   A.  I believe so.

13   Q.  Can we please show the witness 3500-008-16?  Going to page

14   16, please, of the pdf.

15             THE COURT:  I can't see it.  Can I see it too?

16   Q.  If we can blow up essentially the top half so it is big

17   enough for the witness to read?  And then if we can scroll

18   down?

19             Does this refresh your recollection as to what, if

20   anything, you may have learned about the Union Street property?

21   A.  No, it does not.

22   Q.  We can take that down.  Can we please show Government

23   Exhibit 309?  And this one is in evidence so if we can show it

24   to the jury?

25             What are we looking at here, Mr. Brennan?

1   A.   It's the e-mail from Tom Horn discussing the news story

2   concerning Paul Manafort's son-in-law Jeffrey Yohai, who was a

3   business partner of Mr. Manafort's, and that he owned -- that

4   Mr. Manafort had a claim against one of the --

5              THE COURT:  I'm sorry.  I can't hear you.

6              THE WITNESS:  I'm sorry.

7              It's a news article that Mr. Horn, who worked for me,

8   had discovered about Jeffrey Yohai, Mr. Manafort's son-in-law,

9   concerning his going into bankruptcy and that Mr. Manafort had

10  a $2.5 million claim against an LLC of Mr. Yohai's.

11  BY MR. SCOTTEN:

12  Q.   Do you see where Raico writes to you and Horn:  Expected,

13  but still disappointing?

14  A.   Yes.

15  Q.   Why was this both expected and disappointing?

16  A.   Well, it was expected because we were on -- we knew that

17  the properties in California that they had invested in were in

18  trouble, and disappointing that they hadn't found a way to

19  restructure them so he could avoid bankruptcy.

20  Q.   Why is that relevant to the bank?

21  A.   It goes to the ability of the borrower to handle the debt.

22  Q.   We can take this down, please.  Thank you.

23             For the 377 Union loan, was there collateral?

24  A.   There was.

25  Q.   Do you remember what the collateral was?

1    A.   I do.

2    Q.   What was it?

3    A.   It was the row house or townhouse at 377 Union Street,

4    Brooklyn, and $2.5 million cash account at the bank.

5    Q.   And the $2.5 million cash account at the bank, do you know

6    where those funds came from?

7    A.   They came from another account at the bank.

8    Q.   And, ultimately, do you know what the source of those funds

9    was?

10   A.   They came from the cash out refinance at Summerbreeze.

11   Q.   So part of the collateral for 377 Union was the money the

12   bank lent in Summerbreeze?

13   A.   Correct.

14   Q.   With respect to the property collateral, how did the bank

15   establish the value for that collateral?

16   A.   We ordered appraisals.

17   Q.   And what is the appraisal supposed to assess?

18   A.   The market value of the property.

19   Q.   And is it the market value of the property at the time or

20   after the construction is completed?

21   A.   The appraisals were supposed to indicate both an as-is

22   value, which would be at the time we made the loan, and a

23   market value when the construction would be complete.

24   Q.   And how can you be certain that a borrower will in fact

25   complete the property?

1  A.  That is a risk that you take when you do a construction

2  loan.

3  Q.  Can we please show Government Exhibit 312?  Can we please

4  just expand the top e-mail?

5       What are we looking at here, Mr. Brennan?

6  A.  We are looking at an e-mail I wrote to Robert Wisnicki --

7  who is our outside counsel on preparing the documents -- Dennis

8  Raico, dated January 3rd, 2017, explaining the uses of the loan

9  proceeds and that there were not enough loan proceeds to

10 complete construction.

11 Q.  Why is that a concern?

12 A.  Because we wanted to make sure there were enough funds

13 available to complete the construction so the house could be

14 sold and the bank could be paid.

15 Q.  Can we now turn to Government Exhibit 3 very quickly?

16      Mr. Brennan, do you recognize this?

17 A.  I do.

18 Q.  And what is it?

19 A.  This is the project loan note that the bank issued on 377

20 Union Street.

21 Q.  And looking at the upper left-hand corner, can I ask you

22 what the date is?

23 A.  January 4, 2017.

24 Q.  If we could please take that down and now show Government

25 Exhibit 316-A?  And if we could expand the top?

1          And Mr. Brennan, what are we look being at in this

2     exhibit?

3     A.   It's an e-mail saying that we had -- we were allowing the

4     loan documents to be signed at Manafort's house in Florida and

5     once we have a copy of the loan documents we would fund.

6     Q.   And in the last sentence where you say, "sorry for the fire

7     drill," what are you conveying?

8     A.   That we will to rush to get the documents done.

9     Q.   Why did you have to rush to get the documents done?

10    A.   The previous -- one of the previous exhibits was that the

11    chairman of the board, Steve Calk, wanted the loan to close

12    within a week.

13    Q.   Can we please take that down and put up Government Exhibit

14    4?

15          What are we looking at here, Mr. Brennan?

16    A.   We are looking at the credit memo for 377 Union, Brooklyn,

17    New York.

18    Q.   So, is this the same type of form we saw before for

19    Summerbreeze?

20    A.   Yes, it is.

21    Q.   Who wrote this memo?

22    A.   I did.

23    Q.   And, looking at the upper right corner, what is the date?

24    A.   January 5, 2017.

25    Q.   So, was this memo created before or after the decision to

1    make the 377 Union Street loan?

2    A.   It was after.

3    Q.   And, for what purpose did you write this memo?

4    A.   To document what our findings were for the loan.

5    Q.   To your knowledge, did any of the credit committee members

6    read it?

7    A.   No.

8    Q.   Could it have played a role in the credit committee's

9    decision to make the 377 Union Street loan?

10   A.   Are you asking if they would have read it?

11   Q.   Or otherwise considered its contents before making the loan

12   decision.

13   A.   Without looking at the memo in depth, I can't answer that.

14   Q.   I am just asking timing-wise.

15   A.   No, because it was done after the loan was already

16   approved.

17   Q.   Are you aware of any mistakes in this memo?

18   A.   Yes.

19   Q.   Do you remember what any of those mistakes are?

20   A.   Off the top of my head, no.

21   Q.   Can we please turn to page 7, and can I ask you,

22   Ms. Goldman, to please blow up the top half, or so, of this

23   e-mail?

24            Is that big enough for you to read it, Mr. Brennan?

25   A.   It is.

L715cal1                              Brennan – Direct

1    Q.  So, in general terms, what are we looking at here?

2    A.  We are looking at a summary of the borrower's income

3    statement, cash flow for the years 2015, '14, and '13.

4                 (Continued on next page)

L71Qcal2                        Brennan - Direct

1    BY MR. SCOTTEN:   (Continued)

2    Q.  Do you see right in the middle of the page on the left

3    where it says global DSCR?

4    A.  I do.

5    Q.  What is a DSCR?

6    A.  It's debt service coverage ratio.

7    Q.  What does that mean, and what's the purpose?

8    A.  The purpose is to take the borrower's cash flow, divide it

9    by his debt service to see what kind of coverage it is.  The

10   larger the number, the better the cash flow -- or the better it

11   is for the bank because there's more cash available to cover

12   their debt service.

13   Q.  And turning to the rows under expenses, do you see where it

14   says TFSB proposed loan?

15   A.  I do.

16   Q.  What does that refer to?

17   A.  It would have referred to the 377 Union.

18   Q.  At the time this was issued, did Paul Manafort have another

19   loan already out from TFSB?

20   A.  He did.

21   Q.  What was that?

22   A.  The Bridgehampton Summerbreeze loan.

23   Q.  Do you remember what his payments were ballpark on that

24   loan?

25   A.  I believe they were roughly $70,000 -- or no, off the top

L71Qcal2                          Brennan - Direct

1    of my head, no.

2    Q.  That's OK, we can take this down for a second and put back

3    up Government Exhibit 2 and go to page 8, please.  And do you

4    see here -- so, first off, is this the Summerbreeze loan memo?

5    A.  Yes, it is.

6    Q.  So near the middle of the screen, where it says TFSB

7    proposed loan, on this form, does that refer to the

8    Summerbreeze loan?

9    A.  It does.

10   Q.  So, what were Manafort's expenses on the Summerbreeze loan?

11   A.  Annual payments of $827,000.

12   Q.  Thank you.  Can we now go back to Government Exhibit 4, the

13   377 Union Street, and back to that same page, which I believe

14   is on 7.

15            So, is the Summerbreeze loan listed anywhere?

16   A.  It is not.

17   Q.  And I believe you just testified his expenses on that were

18   projected to be $827,000 a year?

19   A.  Correct.

20   Q.  If it was listed, would that have a significant effect on

21   the debt service coverage ratios listed there?

22   A.  Yes, it would.

23   Q.  Would it be a positive or a negative effect?

24   A.  A negative effect.

25   Q.  Should it have been listed?

1    A.  It should have been.

2    Q.  Could we please now go to -- I believe this is going to be

3    on the bottom page.

4           Do you see -- if we can do summary comments at the

5    very bottom.

6           Mr. Brennan, what are we looking at here?

7    A.  You're looking at the risk rating that was issued with the

8    377 Union Street.

9    Q.  Who wrote that rating?

10   A.  I did.

11   Q.  Why did you rate it a 4?

12   A.  Because the loan was being issued, and you don't rate a new

13   loan lower than a 4.

14   Q.  Did you believe the loan should issue?

15   A.  I did not.

16   Q.  And did you have an understanding as to why it was issuing?

17   A.  Yes.

18   Q.  What was that understanding?

19           MR. LaVERNE:  Objection.  Foundation.

20           MR. SCOTTEN:  I think the foundation is the prior two

21   hours of testimony.

22           THE COURT:  I'll allow it.

23           MR. LaVERNE:  Objection to that.

24   Q.  What was your understanding, Mr. Brennan?

25   A.  That the chairman of the board wanted the loan to be

L71Qcal2                        Brennan - Direct

1    issued.

2    Q.  And in this case, had you seen an email from the chairman

3    of the board on that subject?

4    A.  I did.

5    Q.  Was that one of the exhibits we saw earlier?

6    A.  Yes, it is.

7    Q.  Can we go back to the very first page of the memo.  If we

8    can blow up the very bottom paragraph.

9           Can you explain the meaning of this paragraph,

10   Mr. Brennan?

11   A.  Yes.

12   Q.  Would you please do so.

13   A.  Banks are subject to legal lending limits for -- in order

14   for The Federal Savings Bank to stay within its legal lending

15   limit with our relationship with Manaforts, we had to sell

16   parts of the loans.  The project loan, we had to sell

17   $3 million of it.  In the construction loan, we had to sell a

18   hundred percent of it.

19   Q.  And who did you sell it to?

20   A.  National Bancorp Holdings.

21   Q.  What is National Bancorp Holdings?

22   A.  It's the holding company for The Federal Savings Bank.

23   Q.  What does the term holding company mean?

24   A.  It's the corporate entity that owns the bank.

25   Q.  A couple questions about that.  Paragraph one, do you know

1   who owned National Bancorp?

2   A.  I know -- I knew some of who owned some of it, yes.

3   Q.  Who are some of the owners?

4   A.  Steve Calk, John Calk, a couple other -- three other

5   individuals that I know of.

6   Q.  Do you know who had the largest share of the ownership?

7   A.  Steve Calk did.

8   Q.  Do you know where the offices of National Bancorp are?

9   A.  I don't.

10  Q.  Have you ever met an employee of National Bancorp?

11  A.  I have not.

12  Q.  To your knowledge, did National Bancorp do any other

13  business other than owning a bank, to your knowledge?

14  A.  To my knowledge, I don't have any knowledge.

15  Q.  Are you aware of any other instances where National Bancorp

16  had purchased part of the bank's loan?

17  A.  No.

18  Q.  From an underwriting perspective, what effect did having

19  the holding company purchase the loan have on the borrower's

20  ability to repay?

21  A.  None.

22  Q.  Could we please show Government Exhibit 317.  And if we can

23  just blow up the top third or so to capture the -- great.

24  Thank you.

25          Mr. Brennan, what is the date of this email?

L71Qcal2                    Brennan - Direct

1   A.  January 5.

2   Q.  And who sent it?

3   A.  I did.

4   Q.  Who did you send it to?

5   A.  I sent it to Steve Calk, Javier Ubarri and Jim Norini and

6   Dan Semenak.

7   Q.  I think you might have left one out.  Who is actually the

8   very first person on the To line?

9   A.  John Calk, I'm sorry.

10  Q.  Why did you include John Calk on this?

11  A.  Because as part of the ownership of National Bancorp.

12  Q.  What is the substance of your email?  What are you telling

13  John Calk and Steve Calk?

14  A.  How the participation agreement and amounts had to work.

15  Q.  Just in case it's not clear, what is the connection between

16  the participation agreement and the bank selling part of the

17  loan to National Bancorp?

18  A.  Participation agreement is the agreement to sell the loans

19  and also defines the rights and responsibilities of both the

20  seller and the buyer.

21  Q.  And just for clarity, is the phrase here that National

22  Bancorp is participating in the loan?  Is that the idea?

23  A.  Yes, it is.

24  Q.  Did there come a time when you went to see John Calk in

25  person about this?

L71Qcal2                          Brennan - Direct

1     A.  Yes.

2     Q.  For what purpose did you go to see him?

3     A.  I was asking him to sign the participation agreement for

4     National Bancorp.

5     Q.  Did you have the document with you when you met with him?

6     A.  I did.

7     Q.  Did John Calk sign the document?

8     A.  No.

9     Q.  Did anyone sign the document?

10    A.  Yes.

11    Q.  Who signed the document?

12    A.  Steve Calk.

13    Q.  Can we please pull up Government Exhibit 5.

14              What are we looking at here, Mr. Brennan?

15    A.  We're looking at the loan participation agreement, it looks

16    like for the project loan.

17    Q.  So, this is one of two agreements selling part of the 377

18    Union loan to National Bancorp?

19    A.  Yes.

20    Q.  Can we please go to page 10.  Whose signature do you see

21    here under buyer participant name?

22    A.  Stephen Calk.

23    Q.  We can pull out of that, please.

24              After the closing documents for a loan are complete,

25    when does a bank typically send the money to the borrower?

L71Qcal2                     Brennan - Direct

A.  When all the open conditions for the closing are met.

Q.  And can we show just the witness, the parties and the Court

Government Exhibit 326.  Can we blow up just the very top so

that Mr. Brennan can read it?

        Mr. Brennan, can you just describe in general terms

without saying what the email says what it is?

A.  It's an email from myself to Robert Wisnicki and Dennis

Raico.

Q.  What is the general subject of the email?

A.  Legal fees being paid to the borrower's outside counsel.

Q.  From what loan?

A.  377 Union.

        MR. SCOTTEN:  Your Honor the government offers 326

prior to the prior discussion -- pursuant to the prior

discussion with the Court.

        MR. LaVERNE:  Prior objection.

        THE COURT:  It's admitted.

        MR. SCOTTEN:  If we can now show it to the jury.

        (Government's Exhibit 326 received in evidence)

Q.  Can I just ask you to read the email?  It's pretty short.

A.  Per our chairman's discussion with Paul Manafort, the

disbursement statement can only show $40,000 in legal fees to

Bruce.  We will not fund until we know what -- we will not fund

until we know that the $300,000 second lien on the Genesis

payoff.

L71Qcal2                        Brennan - Direct

1   Q.  Who his "Bruce" in this sentence?

2   A.  Bruce Baldinger is the transaction attorney for Paul

3   Manafort.

4   Q.  Who is "our chairman" in this sentence?

5   A.  Steve Calk.

6   Q.  And can you explain the substance of what you are relaying

7   that Steve Calk is saying about Baldinger's legal fees?

8   A.  Yes.  That we were limiting the amount -- actually,

9   Mr. Manafort was limiting the amount of legal fees that

10  Mr. Baldinger could receive out of the closing of the loans.

11  Q.  So, to be clear, did this affect the size of the loan?

12  A.  No, it did not.

13  Q.  Who benefited from limiting Baldinger's legal fees?

14  A.  The borrower.

15  Q.  Who's the borrower?

16  A.  Paul Manafort.

17  Q.  Did the 377 Union Street loan in fact issue?

18  A.  It did.

19  Q.  We can take that down, please.

20          Mr. Brennan, you've testified that the bank uncovered

21  certain things Manafort had not revealed during the

22  underwriting process.  Do you recall that?

23  A.  I do.

24  Q.  Do you know whether you uncovered everything?

25  A.  How do you know -- how do you answer that question?  I

1    don't know.  You don't know what you don't know.

2    Q.  Let me put it the other way.  Were you confident you had

3    found everything?

4    A.  No.

5    Q.  Did you have any particular reasons with respect to this

6    borrower to suspect whether you had or had not?

7    A.  Because we hadn't received satisfactory answers on what we

8    had uncovered.

9    Q.  One last area, although if you want to take a break now,

10   your Honor, it's a brief segment, but we can do it after the

11   break.

12            THE COURT:  No, let's go on for about 15 minutes.

13            MR. SCOTTEN:  Okay, great.

14   Q.  Mr. Brennan, after the loan issued -- this is a yes-or-no

15   question -- after the loans issued, did you read anything about

16   them in the news?  Just a yes-or-no question.

17   A.  Yes.

18   Q.  Did you ever discuss any of those news reports with the

19   defendant?

20   A.  I don't recall.

21   Q.  Did you ever discuss the loans with the defendant after

22   they issued?

23   A.  Yes.

24   Q.  Where did you discuss them with him?

25   A.  I discussed it in his office.  I don't know where else.

L71Qcal2                       Brennan - Direct

1  Q.  Let me ask you about when you were in his office.  How did
2  you end up in his office?
3  A.  He would have called me in.
4  Q.  What was the general substance of what Mr. Calk discussed
5  with you?
6  A.  That he thought they were good loans.
7  Q.  And was this in the context of news reports?
8            MR. LaVERNE:  Objection to the asked and answered and
9  leading question.
10           MR. SCOTTEN:  He said he didn't remember.  I'm trying
11 to get to a point where he remembers.
12           THE COURT:  I didn't hear him say that.  I heard him
13 say that they discussed the loans, and he thought they were
14 good loans.
15 Q.  Let me put it another way.  Did you ever discuss with the
16 defendant whether he had one or more reasons for extending
17 these loans?
18 A.  I did not.
19           MR. SCOTTEN:  One moment, your Honor.
20           THE COURT:  OK.
21           (Pause)
22 BY MR. SCOTTEN:
23 Q.  Do you recall every instance upon which you spoke with the
24 defendant about these loans?
25 A.  No, I don't.

L71Qcal2                        Brennan - Direct

1    Q.  Would looking at notes of times you discussed your

2    discussions with the defendant possibly refresh your

3    recollection?

4    A.  Yes.

5    Q.  Can we please show the witness Government Exhibit

6    3500-008-046.  If we could please go to the next page.  We are

7    going to need to go to one earlier set 3500-008-044.

8             If we could go to the next page, please, and if we

9    could blow up that paragraph and highlight the first two

10   sentences.

11            My first question is, just administratively, is that

12   big enough for you to be able to read it?

13   A.  Yes, it is.

14   Q.  Yes or no, Mr. Brennan, does this refresh your

15   recollection --

16            MR. LaVERNE:  Your Honor, objection to anything beyond

17   that.

18            THE COURT:  All I heard was objection and not your

19   last few words.

20            MR. LaVERNE:  Sorry.  I ask that he be asked if it

21   refreshes his recollection yes or no, and then Mr. Scotten can

22   proceed.

23            THE COURT:  And that is what he asked.

24            Just answer yes or no.  Does this document refresh

25   your recollection?

1        THE WITNESS:  Yes.

2   Q.  If we could take the document down.  What does this

3   document -- what did this document refresh your recollection

4   about?

5   A.  Discussions that I had with Mr. Calk.

6   Q.  In those discussions, did Mr. Calk say anything about what

7   his motives to extend the loans might have been?

8   A.  He said he wasn't looking for an appointment within the

9   Trump administration.

10        MR. SCOTTEN:  Nothing further, your Honor.

11        THE COURT:  OK.

12        Why don't we go ahead and start cross.

13  CROSS-EXAMINATION

14  BY MR. LaVERNE:

15        MR. LaVERNE:  Your Honor, should we take our break

16  before I start?

17        THE COURT:  Let's go for 15 or 20 minutes.

18        MR. LaVERNE:  OK.

19  Q.  Good morning, Mr. Brennan.

20  A.  Good morning.

21  Q.  Mr. Brennan, we've never met or spoken before, correct?

22  A.  That is correct.

23  Q.  Just to be clear, you have spoken and met many times at

24  length with the prosecution, correct?

25  A.  I've met prior -- a couple times with the prosecution, yes.

L71Qcal2                    Brennan - Cross

1    Q.  Couple times, OK.  Well, isn't it true, Mr. Brennan, that

2    in fact you have met with the government and been interviewed

3    about these loans at least seven times prior to testifying here

4    today?

5    A.  If you're talking about these loans in this trial, no.

6    Q.  I'm talking -- I'm asking you about the Manafort loans.

7    And isn't it true, Mr. Brennan, that you first talked to the

8    FBI, two FBI agents about the Manafort loans on June 27, 2017?

9    A.  That is correct.

10   Q.  Didn't you next talk to two prosecutors and the FBI about

11   the Manafort loans on December 4, 2017?

12   A.  That would be correct.

13   Q.  For several hours, correct?

14   A.  I believe that would be correct.

15   Q.  Didn't you talk to a prosecutor and the FBI again about the

16   Manafort loans on June 5, 2018?

17   A.  That would be probably correct, yes.

18   Q.  Probably correct or correct?

19   A.  I don't know exactly the date.

20   Q.  Do you recall meeting with the FBI and the prosecutor again

21   on June -- I'm sorry -- on July 10, 2018?

22   A.  Again, I don't remember the exact date, but that would be

23   probably correct.

24   Q.  Do you recall meeting again with the prosecutors and the

25   FBI for an extended period of time on May 14, 2021 of this

L71Qcal2                    Brennan - Cross

1   year?

2   A.  Yes.

3   Q.  Do you recall meeting again with the prosecutors and the

4   FBI for several hours on June 9, 2021?

5   A.  Correct.

6   Q.  Do you recall meeting again with the FBI and the

7   prosecutors on June 23, 2021?

8   A.  Yes.

9   Q.  Do you recall meeting again with the FBI and the

10  prosecutors speaking with them yesterday on this matter?

11  A.  Yes.

12  Q.  After you started your testimony, correct?

13  A.  I don't believe so.

14  Q.  Was it just prior to starting your testimony?

15  A.  I believe that would be more accurate.

16  Q.  And in these sessions, the three plus sessions you've had

17  in the last couple months alone, you went over the types of

18  questions the prosecutor was going to ask you today at this

19  trial, correct?

20  A.  Yes.

21  Q.  And you went over those over and over again, true?

22  A.  Yes.

23  Q.  Now, because we haven't spoken before, I'd like to start

24  back at the beginning, and I think Mr. Scotten started asking

25  you in his examination, he took you back to April 2016, which

1   is when the bank was first approached about a loan to Paul

2   Manafort.  Do you remember that?

3   A.  Yes.

4   Q.  And do you recall that on April 20 of 2016, you received an

5   email from Dennis Raico regarding Mr. Manafort?

6   A.  I -- I don't under -- I don't know.

7   Q.  No recollection of receiving an email on April 20 of 2016

8   from Mr. Raico about Mr. Manafort?

9   A.  It may have happened.  I don't recall.

10  Q.  Your mind is blank on the issue?

11  A.  You're asking me about a specific email on a specific date,

12  and I'm saying I don't recall.

13  Q.  Do you recall that Mr. Scotten showed you this email

14  yesterday?

15  A.  I saw an email yesterday about that time, yes.

16  Q.  Can we put on the screen what's in evidence as Defense

17  Exhibit 210.  If we could just blow up the bottom part of the

18  email and on to the next page.  Thank you.

19          This is an email that Mr. Scotten asked you very

20  briefly a couple questions about yesterday, true?

21  A.  I don't recall seeing this email yesterday.

22  Q.  No recollection of it?

23  A.  No.

24  Q.  Well, this is an email that Mr. Raico sent to you, Jim

25  Brennan, right?

L71Qcal2                         Brennan - Cross

1   A.  Yes.

2   Q.  And Javier Ubarri, true?

3   A.  Correct.

4   Q.  He was the president of the bank at the time?

5   A.  Correct.

6   Q.  And its subject is three new potential portfolio

7   transactions, correct?

8   A.  That is correct.

9   Q.  And in the email on the first line, Mr. Raico says that he

10  wants to give you a heads-up and hopefully receive some

11  feedback prior to sending over portfolio loan scenario sheets

12  and providing Encompass files, true?

13  A.  Yes.

14  Q.  And, Mr. Brennan, this is the email in which Dennis Raico

15  first introduced Mr. Manafort to the bank, true?

16  A.  I believe so.

17  Q.  And in this email, he told you that he was working on

18  putting together information for a transaction with

19  Mr. Manafort, true?

20  A.  Yes.

21  Q.  Actually, three new potential transactions, correct?

22  A.  Correct.

23  Q.  And he gave you and Mr. Ubarri a bunch of information about

24  who Mr. Manafort was, correct?

25  A.  Yes.

L71Qcal2                    Brennan - Cross

1   Q.  And he gave you information about who Mr. Raico said --
2   what Mr. Raico said Mr. Manafort's financial circumstances
3   were, correct?
4   A.  Yes.
5   Q.  And he said, among other things, that Mr. Manafort was a
6   current presidential campaign manager for Mr. Trump, right?
7   A.  Yes.
8   Q.  If we could just highlight that.
9          And he said in an email that he had previously been a
10  manager and advisor for President Ford, correct?
11  A.  Yes.
12  Q.  And President Reagan, correct?
13  A.  Yes.
14  Q.  President Bush, correct?
15  A.  Yes.
16  Q.  And Mr. Dole, who some of us may remember ran for president
17  back in the Nineties, correct?
18  A.  Yes.
19  Q.  And he told you that Mr. Manafort had a business, a
20  political business, true?
21  A.  Yes.
22  Q.  And he told you that that business earned Mr. Manafort on
23  average of $3.3 million per year over the past three years,
24  true?
25  A.  Yes.

L71Qcal2                      Brennan - Cross

1   Q.   And he told you that in 2015 alone, Mr. Manafort's profit

2   and loss statement shows $5 million, correct?

3   A.   Correct.

4   Q.   That's what he told you, true?

5   A.   Correct.

6   Q.   And he told you that Mr. Manafort had over $10 million in

7   liquid assets, true?

8   A.   Yes.

9   Q.   And another $1.4 million in an IRA, right?

10  A.   Yes.

11  Q.   And he told you that Mr. Manafort had an extensive array of

12  real estate holdings, true?

13  A.   Yes.

14  Q.   Which included $50 million of real estate, right?

15  A.   Yes.

16  Q.   And less than $10 million in mortgage debt, correct?

17  A.   Yes.

18  Q.   And he went through Mr. Manafort's credit scores, right?

19  A.   Yes.

20  Q.   Which were all good credit scores, correct?

21  A.   Yes.

22  Q.   Now -- and the three loan scenarios that he proposed are

23  listed below, correct?

24  A.   Yes.

25  Q.   And the first one was with a project at 391 Broadway here

1  in New York, correct?

2  A.  Correct.

3  Q.  And that was an $18 million potential loan against

4  $31 million in collateral, true?

5  A.  Correct.

6  Q.  And then he listed two others for $5 million and

7  $5.5 million, true?

8  A.  Yes.

9  Q.  And at the bottom of the email, he told you that the

10  borrowers; that is, Mr. Manafort and his co-borrower,

11  correct -- if we can highlight the bottom paragraph -- were

12  open to cross-collateralizing their primary residences worth

13  $6.2 million free and clear, right?

14  A.  Yes.

15  Q.  And Virginia properties, another $6 million free and clear,

16  right?

17  A.  Yes.

18  Q.  And Mr. Raico said that he was estimating a loan of

19  $28.5 million against $58.7 million in value, right?

20  A.  Yes.

21  Q.  And that would give you a 48 percent LTV, right?

22  A.  Correct.

23  Q.  And LTV, just so we understand it because it may come up

24  later, stands for loan to value, right?

25  A.  Yes.

Q.  And to get it, you divide the loan amount by the amount of

collateral that's being put up for the loan, correct?

A.  Yes.

Q.  And the lower the LTV, the better for the bank, true?

A.  Yes.

Q.  And that's an important metric when you're looking at

underwriting loans, correct?

A.  Yes.

Q.  And 48 percent, Mr. Brennan, in your experience was a very

strong loan to value for the bank, true?

A.  Yes.

Q.  Now, I'd also like to just pause here so we all understand

what a portfolio loan is.  What Mr. Raico was proposing here,

and what in fact happened with the Manafort loans, was a

so-called portfolio loan, true?

A.  Yes.

Q.  And portfolio loans are loans that are held on the bank's

books for some period of time, correct?

A.  Correct.

Q.  And the bank, Federal Savings Bank, makes portfolio loans

as a regular part of its business, true?

A.  Yes.

Q.  But these portfolio loans are relatively small part of the

bank's business, true?

A.  Yes.

L71Qcal2                    Brennan - Cross

Q.   It's like something like less than 10 percent of the bank's
business are portfolio loans, right?

A.   That would be correct.

Q.   And more than 90 percent of the bank's business are what
they would call conforming loans, true.

A.   Loans held -- loans for sale, yes.

Q.   Have you heard the term conforming loans also used for
that?

A.   Conforming has one meaning.  We also do non-conforming
loans for sale.

Q.   Both for sale, true?

A.   Right.

Q.   And conforming loans and loans for sale, they don't stay on
the bank's books; they get sold right away, correct?

A.   Correct.

Q.   And these conforming loans, they have to meet certain
industry standards, correct?

A.   Yes.

Q.   And they're considered to be relatively low risk for the
bank, true?

A.   Yes.

Q.   And the terms of the conforming loans reflect that fact,
true?

A.   Correct.

Q.   For example, back in 2016, the average interest rate on a

L71Qcal2                    Brennan – Cross

1   conforming loan was roughly in the neighborhood of 3 to

2   4 percent, true?

3   A.  I don't remember.

4   Q.  But it was substantially lower than the interest rate for a

5   portfolio loan, true?

6   A.  That would be correct.

7   Q.  And conforming loans back in 2016 were only for a

8   relatively smaller amounts of money, true?

9   A.  Yes.

10  Q.  There was actually a threshold under the law as to how much

11  a conforming loan could be for, true?

12  A.  True.

13  Q.  Now, but portfolio loans are different, right, Mr. Brennan?

14  A.  Yes.

15  Q.  Portfolio loans, they don't need all the criteria that

16  conforming loans have to meet, right?

17  A.  That is correct.

18  Q.  And portfolio loans can be for substantially more money

19  than a conforming loan, true?

20  A.  True.

21  Q.  For example, the bank, The Federal Savings Bank, just the

22  year prior to these loans made a $7 million loan to a borrower

23  named Hinson.  Do you recall that?

24  A.  I do.

25  Q.  And the bank -- and because these portfolio loans don't

1    need to meet all of these criteria, they're sometimes,

2    sometimes with borrowers who present greater risk to the bank,

3    true?

4    A.  Yes.

5    Q.  For example, Mr. Brennan, the bank, The Federal Savings

6    Bank, has conditionally approved portfolio loans to borrowers

7    who have declared bankruptcy, true?

8    A.  Yes.

9    Q.  And The Federal Savings Bank in the past has approved

10   portfolio loans to borrowers who have had prior foreclosures on

11   property, true?

12   A.  Yes.

13   Q.  And at around the same time that these loans were approved

14   in 2016, the bank had approved, conditionally approved

15   portfolio loans to other borrowers who had prior foreclosures

16   in bankruptcy, true?

17   A.  Yes.

18   Q.  Now, because of this, because there's typically more risk

19   attached to borrowers for portfolio loans, the bank has loan

20   terms that reflect that, true?

21   A.  Yes.

22   Q.  For example, in 2016, one of the years we're talking about

23   here, the standard interest rate on a portfolio loan of the

24   bank was about 7.25 percent, true?

25   A.  Correct.

L71Qcal2                        Brennan - Cross

1   Q.  Which I think you just testified, is very substantially

2   higher than what the standard interest rate would have been on

3   a conforming loan at the time, true?

4   A.  I believe my testimony was that it was higher.

5   Q.  OK, higher.

6           And the loan to value ratio that we just talked about

7   a minute ago for portfolio loans needed to be lower than it was

8   for conforming loans, true?  In general.

9   A.  Not necessarily.

10  Q.  In general?

11  A.  Not necessarily.

12  Q.  Well, it is true, is it not, Mr. Brennan, that in 2016 for

13  the bank, the standard loan to value for a portfolio loan was

14  roughly 70 percent?

15  A.  I don't recall.

16  Q.  You don't recall that in 2016 the standard terms for a

17  portfolio loan had, again, generally speaking, had a loan to

18  value of approximately 70 percent?

19          MR. SCOTTEN:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21  A.  I -- you're asking me what they were five years ago, I

22  don't recall.

23  Q.  Well, do you deny that in 2016 the standard portfolio loan

24  to value rate was approximately 70 percent?

25  A.  Once again, I don't recall.

L71Qcal2                    Brennan - Cross

1  Q.  I understand, Mr. Brennan.  I'm just asking you, you don't

2  deny it; you just don't remember?

3  A.  I don't -- all I can say is I don't recall.

4  Q.  OK.  I'm just trying to understand from you, Mr. Brennan,

5  if in your -- based on the best of your recollection it was

6  possible that in 2017 the standard loan to value rate for a

7  portfolio loan was approximately 70 percent, just whether that

8  was possible or not.  I understand you don't recall exactly.

9  A.  It could have been possible.

10  Q.  Now, for portfolio loans, the bank also collected something

11  called points upfront, generally speaking, true?

12  A.  Yes.

13  Q.  And typically the bank on a portfolio loan would collect

14  one or two percentage points upfront on the loan, true?

15  A.  Or more, yes.

16  Q.  Well, do you recall, Mr. Brennan, 2016 what the standard

17  amount of percentage points at the bank would typically collect

18  on a portfolio loan?

19  A.  I don't remember what the typical amount was, but it would

20  have been between two and three percent, I believe.

21  Q.  OK.  Well, let me ask you, if we could put on the screen

22  for the witness only what's been marked for identification

23  purposes as 603-A.

24          THE COURT:  Defense Exhibit or government?

25          MR. LaVERNE:  I'm sorry, Defense Exhibit.

L71Qcal2                      Brennan - Cross

1   Q.  And I would ask you, Mr. Brennan, to look at the top of
2   this document.
3   A.  OK.
4   Q.  If we could highlight where it says points?
5   A.  One point would be collected --
6   Q.  No need to read, it and if we could look at the bottom of
7   the document?
8           THE COURT:  Just read it to yourself.
9   Q.  All the way at the bottom.  The date at the bottom.
10  A.  December 28.
11  Q.  Don't read it out loud.  We have rules of evidence here.
12  We have to abide by them.
13          I have a simple question for you, Mr. Brennan.  Does
14  this document refresh your recollection that in 2016 for a
15  construction portfolio loan, the standard amount of points
16  collected at closing was one percent?
17          THE COURT:  The answer is yes or no.
18  A.  Yes.
19  Q.  Could we put on the screen --
20          THE COURT:  Wait.  Do you want to ask him what his
21  recollection is now?
22  Q.  I'm sorry, I thought your response, tell me if I'm wrong,
23  was that you now recall that in 2016 the standard amount of
24  points collected on a portfolio construction loan was
25  one percent.  Is that correct?

L71Qcal2                          Brennan - Cross

1    A.   Correct.

2    Q.   Now, I'd like to now put on the screen, again for the

3    witness only, what's been marked for identification purposes as

4    603-D.

5            Could you just again look at the first page so

6    Mr. Brennan understands what it is.  Could we turn to page 3..

7    At the top.

8            Again, just asking very simply, Mr. Brennan, does this

9    refresh your recollection as to --

10           THE COURT:  Can I just ask a question on the prior

11   page at the top, what's the heading?  Don't say it.  I just

12   want to see it.  OK.  Thank you.  And then on the next page.

13   You can go ahead.

14   Q.   So, my question to you, Mr. Brennan, is, again, having

15   looked at this document, does it refresh your recollection as

16   to my question about the standard rate amount of points charged

17   in 2016?

18   A.   No.

19   Q.   I want to go back now to April of 2020.  We just looked at

20   defense -- I'm sorry -- April of 2016.  We just looked at

21   Defense Exhibit 210, which was that email that Mr. Raico sent

22   to you about Mr. Manafort, true?

23   A.   Yes.

24   Q.   And the next day, one day later, Mr. Raico sends another

25   email about Mr. Manafort.  Do you recall that?

L71Qcal2                    Brennan - Cross

1   A.  No, I don't.

2   Q.  OK.  Well, let's put on the screen Defense Exhibit 208 in

3   evidence.  Do you see this email, Mr. Brennan?

4   A.  Yes.

5   Q.  Have you seen this email recently?

6   A.  No.

7   Q.  Has it been shown to you by the government in those

8   meetings --

9   A.  I don't believe so.

10  Q.  And this is dated April 21, 2016, true?

11  A.  Yes.

12  Q.  And this time, Mr. Raico wrote:  "Gentlemen, pursuant our

13  conversation, attached you will find the portfolio loan

14  scenario, executed 1003, credit reports and condo project

15  specifics."

16         Do you see that?

17  A.  I do.

18  Q.  And then -- so, again, Mr. Brennan, I understand you don't

19  remember this email, but looking at it, do you see that it

20  suggests that you spoke in fact to Mr. Raico about this

21  transaction prior to this email?

22  A.  Yes.

23  Q.  And the email is To, at the top, you and Mr. Ubarri, true?

24  A.  Yes.

25  Q.  But this time, Mr. Brennan, unlike Exhibit 210, Defense

1    Exhibit 210, Mr. Raico copied Mr. Calk, true?

2    A.  Yes.

3    Q.  And in this email it's with regard to one of the proposals

4    that Mr. Raico had put forward in the prior email, true?  If

5    you look at the subject line.

6    A.  Yes.

7    Q.  That's the one for 391 Broadway, right?  Just if you look

8    at the subject line, you'll see.

9    A.  Yes.

10   Q.  OK.  And I'm not going to bore the jury here and go through

11   every single part of the first paragraph again, but is it fair

12   to say that all of the information about who Mr. Manafort was,

13   the fact that he was earning a lot of money over the prior

14   years, the fact that he had over $10 million in liquid assets,

15   the fact that he had $9.2 in real estate free and clear that

16   was all put in this email again by Mr. Raico, true?

17   A.  Yes.

18   Q.  And in this email all the way back in April 2016, Mr. Raico

19   sent you some actual information about Mr. Manafort.  He

20   attached it to the email, true?

21   A.  He attached -- yes.

22   Q.  For example, the 1003 form, correct?

23   A.  Correct.

24   Q.  Can you tell the jury what the 1003 form is?

25   A.  It's the standard application used on the residential side

L71Qcal2                    Brennan - Cross

1    of the bank.

2              MR. SCOTTEN:  Your Honor, before we move off this

3    email, can we get an instruction on not for the truth of the

4    matter asserted with respect to all of these emails we have

5    been looking at about Mr. Manafort's financial status.

6              MR. LaVERNE:  I'm not offering it for the truth; just

7    what Mr. Calk was informed of.

8              THE COURT:  OK.  So ladies and gentlemen, first I will

9    tell you and then I will tell you what I mean.  So, the

10   statements about Mr. Manafort's financial situation are not

11   offered for the truth of the matter asserted.

12             So what that means is they are offered for some other

13   reason, not to show what Mr. Manafort's financial situation

14   actually was, but instead perhaps what someone was informed it

15   was, OK?

16   BY MR. LaVERNE:

17   Q.  Now, the proposal that Mr. Manafort was putting forward in

18   this email on 391 Broadway contained particular terms, correct?

19   A.  Yes.

20   Q.  If we could just highlight for everyone in the second

21   paragraph the third line down halfway through where it says,

22   "the borrowers are well aware."

23   A.  Yes.

24   Q.  We'll just highlight it so everyone can see it.  So the

25   terms that Mr. Raico was putting forward all the way back in

L71Qcal2                        Brennan - Cross

1   April of 2016 were $7.25 percent interest rate, correct?

2   A.  Yes.

3   Q.  Which I believe you just testified that one you do recall

4   was standard for portfolio loans at the time, true?

5   A.  Yes.

6   Q.  Two points, correct?

7   A.  Yes.

8   Q.  And can I ask you was that within the range of the standard

9   for the time for portfolio loans?

10  A.  Yes.

11  Q.  And at least 12 months of a PITI deposit into the bank's

12  account, correct?

13  A.  Yes.

14  Q.  And I believe that you testified yesterday that what PITI

15  means, it stands for principal, interest, tax and insurance.

16  Is that right?

17  A.  That is correct.

18  Q.  OK.  So what the terms are, is that the borrower has to pay

19  the entire first year of interest payments, any principal

20  amounts he owes, tax and insurance to the bank ahead of time,

21  true?

22  A.  Correct.

23  Q.  OK.  And that was the proposal that Mr. Raico was making,

24  true?

25  A.  Correct.

L71Qcal2                    Brennan – Cross

1   Q.  Now, if we could put -- let me ask you:  Do you recall that

2   a few days after this, Mr. Calk, who we just saw was a

3   recipient of this email, replied to it?

4   A.  I believe so.

5           THE COURT:  If when you finish this line of

6   questioning, if we could take a break, just let me know when a

7   convenient time is.

8           MR. LaVERNE:  Just a couple more questions on this

9   would be perfect.

10          THE COURT:  Fine.

11  BY MR. LaVERNE:

12  Q.  If we could put Government Exhibit 102 in evidence on the

13  screen, please.  So this is an email dated April 26, 2016,

14  true?

15  A.  Yes.

16  Q.  Which is five days after the email we just looked at, true?

17  A.  Yes.

18  Q.  It's from Mr. Calk, right?

19  A.  Yes.

20  Q.  And it's to you and Mr. Ubarri and Mr. Norini, correct?

21  A.  Yes.

22  Q.  By the way, Mr. Ubarri was the president of the bank, true?

23  A.  Yes.

24  Q.  Mr. Norini was the chief operating officer, right?

25  A.  Correct.

1   Q.  And you testified with Mr. Calk, they composed the loan

2   committee at the bank, true?

3   A.  Correct.

4   Q.  Mr. Ubarri and Mr. Norini, Mr. Brennan, you know to be

5   long-standing executives in the bank lending industry, correct?

6   A.  Yes.

7   Q.  In fact, you worked with them years ago at another account,

8   true?

9   A.  True.

10  Q.  That's called Banco Popular, true?

11  A.  Correct.

12  Q.  Which is a very substantial, reputable bank which has

13  offices around the world, true?

14  A.  I believe so.

15  Q.  Now, in this email, Mr. Calk said, "Guys, this looks like a

16  great deal," true?

17  A.  Yes.

18  Q.  And he notified you that he had a meeting scheduled with

19  Goldman Sachs the next day to see if they might participate,

20  true?

21  A.  Yes.

22  Q.  And he asked you to print out a package of the papers and

23  bring them down to him, true?

24  A.  Yes.

25  Q.  And he also asked Mr. -- at the bottom, he asked the bank's

L71Qcal2                         Brennan - Cross

1     president Mr. Ubarri and Mr Norini if they could come up with

2     any other candidates who might participate in the loan, true?

3     A.  Yes.

4     Q.  And he asked them for their thoughts, true?

5     A.  Yes.

6     Q.  Now, between April 2016, this email, and July 2016, this

7     loan deal, this proposed loan deal with Mr. Manafort continued

8     to he evolve, true?

9              Let me back up for a second, 391 Broadway never

10    happens, true?

11    A.  That is correct.

12    Q.  That deal didn't happen?

13    A.  Right.

14    Q.  Right.  But there were an eventual deal with Mr. Manafort

15    that was agreed on, true?

16    A.  Yes.

17    Q.  So, between April of 2016 and late July of 2016, is the

18    time frame in which this other proposed deal came together,

19    true?

20    A.  It -- my knowledge is it came together at the end of July.

21    Q.  End of July, correct.

22             Why don't we stop there, your Honor, and we'll pick up

23    in late July of 2016.

24             THE COURT:  Ladies and gentlemen, we will take our

25    morning break.  Ten minutes.  Please don't talk about the case.

L71Qcal2                      Brennan – Cross

1              (Recess; jury not present)

2              THE COURT:  I assume nothing.

3              MR. SCOTTEN:  One question.  I apologize for seemingly

4    trying to rush the break.  When is the Court's time to take the

5    break?

6              THE COURT:  My preferred time is 11:25.

7              MR. SCOTTEN:  11:25.

8              THE COURT:  Right.  I'm shooting for the middle

9    between when we start and when we break for lunch.

10             MR. SCOTTEN:  Got it.  Thank you, your Honor.

11             (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L715cal3                     Brennan - Cross

1            (Jury present)

2                 THE COURT:  You may proceed, Mr. LaVerne.

3                 MR. LaVERNE:  Thank you, your Honor.

4    BY MR. LaVERNE:

5    Q.  Mr. Brennan, before we broke we had just started to talk

6    about a transaction that Mr. Raico proposed to the bank in late

7    July of 2016, correct?

8    A.  Correct.

9    Q.  And we are going to talk about that transaction in a bit

10   more detail, but that was a transaction that was the so called

11   Nottingham transaction; true?

12   A.  Yes.

13   Q.  And we call it the Nottingham transaction because one of

14   the properties that was being proposed as collateral was 2401

15   Nottingham, Los Angeles, California?

16   A.  Correct.

17   Q.  I know this is a bit confusing but Nottingham is the

18   transaction that never happened, right?  Never was issued?  The

19   loan on the Nottingham deal did not end up going forward

20   because Mr. Manafort walked away, correct?

21   A.  Correct.

22   Q.  So, perhaps to remember this:  N, Nottingham; N, never

23   closed; never happened.  OK?

24            Now, on July 27, 2016, Mr. Raico sent a revised loan

25   portfolio scenario and summary to you and the members of the

1    loan committee; true?

2    A.  Yes.

3    Q.  If we could put on the screen what is in evidence as DX 146

4    and, Mr. Brennan, I will give you a chance to read it, but this

5    is the e-mail in which Mr. Raico transmitted to Mr. Calk,

6    Mr. Ubarri, yourself, and Mr. Norini, the revised Manafort loan

7    scenario; true?

8    A.  Yes.

9    Q.  And the subject, it says:  Revised Portfolio Summary, Paul

10   Manafort and Jeffrey Yohai; correct?

11   A.  Yes.

12   Q.  Mr. Yohai -- Jeffrey Yohai -- was Mr. Manafort's

13   son-in-law; true?

14   A.  Correct.

15   Q.  And, at the outset, in connection with the Nottingham

16   transaction, he was one of the proposed borrowers; true?

17   A.  Yes.

18   Q.  But, as we will see, after Mr. Manafort walked away from

19   the Nottingham deal, Mr. Yohai was no longer a borrower on the

20   loans that actually were issued by the bank; true?

21   A.  Correct.

22   Q.  Now, Mr. Raico said in his e-mail that pursuant to our

23   earlier meeting -- he addressed it to Steve -- to Mr. Calk --

24   right, and he refers to an earlier meeting that they had, that

25   is, Mr. Raico and Mr. Calk had, with Paul Manafort and Jeffrey

L715cal3                          Brennan - Cross

1  Yohai in July of 2016; correct?

2  A.  As a prior meeting or earlier meeting with Paul Manafort

3  and Jeffrey Yohai.  It doesn't say a date.

4  Q.  OK, but it refers to a prior meeting prior to this date.

5  And Mr. Raico goes on to say that:  It is my understanding that

6  we are considering moving forward on our own accord with this

7  particular property in California.

8          That's Nottingham, true?

9  A.  Yes.

10 Q.  And then he says:  Moving forward with future transactions,

11 and coinciding with at least the $9 million UBS transfer, we

12 will potentially consider the three additional California

13 properties with TFSB lending participants at a later date.

14          True?

15 A.  Yes.

16 Q.  So, when Mr. Raico was proposing this deal he was

17 suggesting a number of things, one is that there would be a

18 $9 million UBS bank transfer by Mr. Manafort into the bank;

19 true?

20 A.  That's not the way I remember it.

21 Q.  I'm just asking you, based on this e-mail -- whether it

22 happened or not we will get to -- but based on this e-mail, he

23 is saying there is going to be a $9 million transfer; correct?

24 A.  Correct.

25 Q.  And he also says that we are potentially considering future

L715cal3                    Brennan - Cross

1  transactions with Mr. Manafort; true?

2  A.  Correct.

3  Q.  Now, let's look at the attachment to this document which is

4  146-A.  This is the portfolio loan scenario that Mr. Raico was

5  proposing at the very end of July 2016; correct?  Do you see

6  that?

7  A.  Correct.

8  Q.  It says that the loan program is 7.25 percent and two

9  points; correct?

10 A.  Correct.

11 Q.  Again, that's standard; right?

12 A.  Yes.

13 Q.  And the property value that Mr. Raico was saying here is

14 $8.25 million; correct?

15 A.  Yes.

16 Q.  And the amount of loan requested is less than that; true?

17 A.  True.

18 Q.  $5.7 million, right?

19 A.  Yes.

20 Q.  And it lists the address on Nottingham, right?

21 A.  My screen went blank -- yes.

22 Q.  And then it says LTV which we talked about, right?

23 A.  Yes.

24 Q.  LTV is loan to value at 70 percent, right?

25 A.  Yes.

L715cal3                         Brennan - Cross

1    Q.  And I think we agreed that's within the range of what was

2    standard for portfolio loans at the time?

3    A.  Yes.

4    Q.  It goes on and gives the credit scores?

5    A.  Again, my screen -- yes.

6    Q.  We had this issue yesterday.  I think we will try to manage

7    as best we can until we can fix it.

8            It goes on to say:  Income History.  Do you see that?

9    A.  Yes.

10   Q.  And for income history it gives what it says is a three

11   year average; right?

12   A.  Yes.

13   Q.  And it says $3.3 million; right?

14   A.  Correct.

15   Q.  And then it says:  Liquid Assets.  Right?

16   A.  Yes.

17   Q.  And it says $9 million at UBS?

18   A.  Right.

19   Q.  And then it says:  Real estate assets, $15 million net

20   equity on four California properties.  Right?

21   A.  Again -- yes.

22   Q.  See it?

23           It goes on to say:  Credit History.  Do you see that?

24   A.  Yes.

25   Q.  It says:  Paul.  Right?

L715cal3                       Brennan - Cross

1   A.   Correct.

2   Q.   Which you took to be a reference to Paul Manafort, correct?

3   A.   Yes.

4   Q.   It says:   Excellent.

5   A.   Yes.

6   Q.   And then it says:   Deposit:   TFSB deposit one-year PITI,

7   right?

8   A.   Yes.

9   Q.   That's what we talked about before that was standard,

10  right?

11  A.   Yes.

12  Q.   And so, under this deal, Mr. Manafort was to deposit

13  $1.5 million to pay for the interest payments the first year;

14  true?

15  A.   Make the payments, yes.

16  Q.   And it says cross-collateralize, right?

17  A.   Yes.

18  Q.   And that means that in addition to the Nottingham property,

19  Mr. Manafort is going to put up another property in Virginia;

20  right?

21  A.   Yes.

22  Q.   And it says $3 million free and clear, right?

23  A.   Yes.

24  Q.   Which you took to mean that that property in Virginia was

25  worth $3 million free and clear; right?

L715cal3                          Brennan - Cross

1    A.  Yes.

2    Q.  And then it says:  Revised LTV.  Right?

3    A.  Yes.

4    Q.  And that means if you take the LTV -- remember, loan to

5    value -- adding together the Nottingham property and the

6    Virginia property, it goes down to 50 percent; right?

7    A.  Correct.

8    Q.  Which is below the standard portfolio LTV, right?

9    A.  Right.

10   Q.  Which is good for the bank, right?

11   A.  Yes.

12   Q.  If we can look at the Comments section, in the comment

13   section again:  Again, what they're reviewing or seeking right

14   now is a $5.7 million construction takeout refinance.  Right?

15   A.  Yes.

16   Q.  And then it says:  Discussions occurred for Paul and Jeff

17   to bulk finance several California properties in anticipation

18   of establishing a significant depository relationship.  Right?

19   A.  Yes.

20   Q.  So, what Mr. Raico was saying in this loan proposal is,

21   look, we would like to do this deal and then there is an

22   opportunity for significant bank business going forward with

23   Mr. Manafort; true?

24   A.  Yes.

25   Q.  Now, I would like to just, again, take a minute just so we

L715cal3                    Brennan - Cross

1    all understand where we are in the process.  OK?  Mr. Raico, by
2    sending this loan portfolio scenario to you was seeking
3    something called conditional approval; correct?
4    A.  Correct.
5    Q.  And the loan approval process at The Federal Savings Bank
6    has different phases, true?
7    A.  Yes.
8    Q.  First the loan officer -- here Mr. Raico -- comes up with a
9    proposal; right?
10   A.  Correct.
11   Q.  And he pulls together some basic information about the
12   borrower, correct?
13   A.  Yes.
14   Q.  And we saw him sending that to you back in April, true?
15   A.  Yes.
16   Q.  And then the loan officer writes up a loan proposal, right?
17   A.  This was a new loan proposal; yes.
18   Q.  Writes up a new loan proposal, right, and it gives all the
19   details we just went through on that document, right?
20   A.  Yes.
21   Q.  The proposed interest, right?  Proposed collateral?  All
22   that other stuff, right?
23   A.  Yes.
24   Q.  And he writes up that stuff and he sends it to the
25   portfolio scenario desk; true?

L715cal3                         Brennan - Cross

1    A.   I would have to look at the e-mail again but, yes, that

2    would be normal.

3    Q.   And you take a look at it, right?

4    A.   Yes.

5    Q.   Make sure everything is in order, right?

6    A.   Yes.

7    Q.   And then the proposal next goes to the loan committee,

8    right?

9    A.   Yes.

10   Q.   And the loan committee, again, three people:  Mr. Calk,

11   Mr. Ubarri, and Mr. Norini; true?

12   A.   Yes.

13   Q.   And the loan committee then makes a decision; true?

14   A.   Yes.

15   Q.   They decide whether it will conditionally approve the terms

16   of the loan, correct?

17   A.   Correct.

18   Q.   Subject to underwriting, correct?

19   A.   Correct.

20   Q.   And the loan committee has to be unanimous in order to

21   approve the condition of the loan?

22   A.   Yes.

23   Q.   All three members have to vote for it, true?

24   A.   Yes.

25   Q.   And when it does that, this is called the loan receiving

L715cal3                    Brennan - Cross

1    conditional approval; right?

2    A.   Yes.

3    Q.   And it's conditional because it's not -- the loan cannot

4    become final until your department -- which is the underwriting

5    department -- has had an opportunity to underwrite the loan;

6    true?

7    A.   True.

8    Q.   And it is not until after you get the conditional approval

9    that your department -- the underwriting department -- digs in

10   and collects further information about the borrower; right?

11   A.   That is true.

12   Q.   And you get all of this information about the borrower

13   after conditional approval and you evaluate it; right?

14   A.   Yes.

15   Q.   You analyze it, right?

16   A.   Yes.

17   Q.   And you are trained, right, Mr. Brennan?  You are the lead

18   underwriter for commercial portfolio loans, right?

19   A.   Correct.

20   Q.   And you are trained in analyzing and underwriting loans,

21   true?

22   A.   Yes.

23   Q.   As is Mr. Horn who works under you, right?

24   A.   Yes.

25   Q.   And it isn't until after you and Mr. Horn have done all

L715cal3                    Brennan - Cross

1    your work and all your diligence and analysis that the loan

2    actually can move forward into closing, true?

3    A.   Typically.

4    Q.   Now let's go back to July 2016.  After you got that loan

5    portfolio summary you asked Mr. Raico some follow-up questions

6    about the status of a construction on the property; true?

7    A.   Probably.

8    Q.   Let's put up what is in evidence as Government Exhibit 108.

9    This is an e-mail chain that we are going to go through but

10   first I would like to scroll down to the third page, bottom

11   e-mail, and that's an e-mail from you to Mr. Raico, right?

12   A.   Yes.

13   Q.   As well as Mr. Calk and Mr. Ubarri and Mr. Norini, right?

14   A.   Correct.

15   Q.   And you ask:  Dennis, has the construction started?  If so,

16   how far along are they?  What is the breakdown between

17   construction costs and land?  Is there a projected completion

18   date?  Who is managing the project?

19              Right?

20   A.   Yes.

21   Q.   These are all questions that you, as the underwriter,

22   wanted answers to, right?

23   A.   Yes.

24   Q.   And Mr. Raico responded to you, right -- scroll up on the

25   next e-mail chain -- and he says Jim -- he responded, right?

L715cal3                        Brennan - Cross

1    A.  Yes.

2    Q.  He said here are the specifics that should answer your

3    questions, right?  He said the property is 70 percent complete,

4    projected completion is less than six months.

5          That's what Mr. Raico told you, true?

6    A.  Correct.

7    Q.  And Mr. Raico told you that the land was purchased for

8    $3.2 million, right?

9    A.  Correct.

10   Q.  And he told you that there is $4.7 million of outstanding

11   debt on this Nottingham property, true?

12   A.  Correct.

13   Q.  And he told you that another million dollars is needed to

14   complete it so there is a total loan request of $5.7 million,

15   right?

16   A.  Correct.

17   Q.  And then he says they're going to list the property for

18   $9 million but a hundred percent -- Mr. Raico said -- a hundred

19   percent confident that the minimum sales price will be no less

20   than $8.25 million?

21   A.  I have a blank screen.

22   Q.  As do I.  We will give it a sec.

23          Do you see what Mr. Raico told you?  Do you see that?

24   A.  Yes.

25   Q.  And you see that Mr. Calk was also on that e-mail?

L715cal3                     Brennan - Cross

1    A.  I do.

2    Q.  And Mr. Raico said:  Let me know if you have any further

3    questions.  Right?

4    A.  Yes.

5    Q.  OK.  Mr. Calk then had a question, right?

6    A.  I don't see that.

7    Q.  Let's scroll up.  Actually, lets go to Defendant's Exhibit

8    104 -- we will give Mr. McCleod a second to get back to his

9    computer, he is running the show back there -- if we can scroll

10   down a bit further?  Okay.

11          So, this is a little confusing because these e-mail

12   chains are separate e-mail chains, but this is the e-mail that

13   we looked at earlier where Mr. Raico had emailed on July 27 the

14   proposed deal for Nottingham; correct?

15   A.  Yes.

16   Q.  Now let's scroll up in this chain.  Mr. Calk responded to

17   Mr. Raico, right?

18   A.  Yes.

19   Q.  And you were copied on this, true?

20   A.  Yes.

21   Q.  And he said:  Dennis, is the Virginia property owned free

22   and clear?  He asked him, right?  True?

23   A.  Yes.

24   Q.  If we can scroll up to the next one and Mr. Raico told him:

25   Yes, that's correct.  Right?

L715cal3                    Brennan - Cross

1    A.  Yes, he did.

2    Q.  Now, Mr. Calk then sends an e-mail, after looking at these

3    terms and asking the question, sent an e-mail saying that he

4    recommended the deal to be approved subject to full

5    underwriting; correct?

6            Asking for your memory right now.

7    A.  I would have to see the e-mail.

8    Q.  You don't remember?

9    A.  I don't know if that was the only thing on that e-mail or

10   not.

11   Q.  So, let's put up GX- 107.  Mr. Calk, this is on July 28, we

12   talked about UTC -- I can't remember if Mr. Scotten talked

13   about it but it is Universal-something-Time and it is basically

14   four or five hours ahead so this would be late in the evening

15   on July 27th Chicago time; true?

16   A.  I believe it would be, like, 6:38.

17   Q.  OK.  Your math is better than mine, in the evening sometime

18   Mr. Calk says to the loan committee:  Gentlemen, please review

19   the following scenario sheet.  I recommend we approve this deal

20   subject to full underwrite and cross-collateralization.

21           Right?

22   A.  Yes.

23   Q.  And when he said "subject to full underwrite," what you

24   understood him to be saying was he was recommending the deal

25   subject to having you do your work, right?

L715cal3                    Brennan - Cross

1    A.  Correct.

2    Q.  Subject to having your department look through all of the

3    finances and the documents that Mr. Manafort provided and

4    analyze the loan, correct?

5    A.  Correct.

6    Q.  Because he was recommending at this point, simply for

7    conditional approval based on those terms and what he had been

8    told by Mr. Raico, true?

9    A.  Correct.

10   Q.  And then Mr. Calk asked for feedback, true?

11   A.  Yes.

12   Q.  He said:  Please provide feedback to Dennis Raico and I

13   today.  Right?

14   A.  Correct.

15   Q.  And as far as you know, Mr. Brennan, Mr. Calk didn't say,

16   Let's approve this deal conditionally no matter what.  Right?

17   A.  At this point, no.

18   Q.  And he didn't say, Let's lower the interest rate for

19   Mr. Manafort on this deal.  Right?

20   A.  No.

21   Q.  He didn't say, Let's lower the amount of collateral he has

22   to post?

23   A.  No.

24   Q.  He didn't say, let's even -- let's waive the fees, let's

25   lower the amount of fees we are charging Mr. Manafort.  He

L715cal3                    Brennan - Cross

1    didn't say that, right?

2    A.   No.

3    Q.   And, in none of the e-mails, leading up to conditional

4    approval in late July of 2016, did you raise any issue with

5    these loans, right?  With this loan?

6    A.   Correct.

7    Q.   Because you hadn't done any underwriting yet, right?

8    A.   That is correct.

9    Q.   You just had basic information on the borrower, right?  All

10   that stuff you just talked about came later, right?

11   A.   Yes.

12   Q.   Now, on July 28, Mr. Ubarri responded on behalf of the loan

13   committee that the committee had approved the loan subject to

14   underwriting; true?

15   A.   I have a blank screen.  I can't answer that.

16   Q.   Asking for your memory?

17   A.   I don't remember.

18   Q.   Let's put it on, GX- 108.  Here Mr. Ubarri says:  Dennis,

19   the credit committee approved this loan subject -- again,

20   subject to underwriting; right?

21   A.   Correct.

22   Q.   And he went over the terms of the loan; right?

23   A.   Yes.

24   Q.   And I'm not going to go through all of them again but

25   they're the terms we just talked about what Mr. Raico had

L715cal3                      Brennan - Cross

1   proposed which are basically standard for the bank; right?

2   A.  Correct.

3   Q.  Now, we saw before Mr. Brennan that Mr. Raico had first

4   introduced Mr. Manafort to the bank some three months earlier

5   in April; true?

6   A.  Correct.

7   Q.  And we saw that back then in April he had provided some

8   limited information about Mr. Manafort's finances and what he

9   was looking for; true?

10  A.  Yes.

11  Q.  And we know we saw at least in one e-mail that Mr. Calk and

12  Mr. Raico and Mr. Manafort had actually had a meeting at some

13  time prior, right?

14  A.  Correct.

15  Q.  Do you know if they met any time prior to that?  Do you

16  recall whether there was a meeting with regard to 391 Broadway?

17  A.  I only know of one meeting.

18  Q.  So, you remember there was this meeting prior to late July

19  of 2016?

20  A.  Correct.

21  Q.  And Mr. Brennan, at the bank it's not -- whether a loan was

22  approved, conditionally approved slowly or quickly was not an

23  indication of anything in particular; true?

24  A.  No.

25  Q.  And you, yourself, have seen other loans get conditionally

L715cal3                     Brennan - Cross

1    approved within a day; correct?

2    A.  Yes.

3    Q.  That's not unusual; correct?

4    A.  No.

5    Q.  Now, after Mr. Ubarri sent his e-mail advising everybody

6    that the loan committee unanimously had conditionally approved

7    this Nottingham loan Mr. Calk emailed everyone again.  Do you

8    recall that?

9    A.  I believe the e-mail was the preceding exhibit.

10   Q.  Let's put on the screen GX- 108.  Let's go back down to

11   Mr. Ubarri's e-mail first so we can see his e-mail again, the

12   next page.

13          That's the e-mail we just looked at where he

14   communicates the loan committee has approved subject to

15   underwriting; right?

16   A.  Yes.

17   Q.  Let's go up to the next e-mail.  Mr. Raico asks or says:

18   Excellent.  Please let me know when I can anticipate a term

19   sheet as I'm sure Paul and Jeff will be highly impressed to

20   receive within 24 hours of our meeting.

21          Do you see that?

22   A.  Yes.

23   Q.  Let's go up to the next, Mr. Calk then responded, right?

24   A.  Yes.

25   Q.  And he said that's the term sheet, right?  Those are the

L715cal3                           Brennan - Cross

1   terms?

2   A.   Right.

3   Q.   And he listed them again the terms, right?

4   A.   Correct.

5   Q.   He didn't lower the interest rate, right?

6   A.   No.

7   Q.   He didn't ask to waive the fees, right?

8   A.   Correct.

9   Q.   And, in fact, Mr. Calk added terms.  Didn't he add terms at

10  that stage, Mr. Brennan?

11  A.   The appraisal fee and points.

12  Q.   Let's look at the bottom paragraph.  First he lists the

13  terms that were on the term sheet, right?

14  A.   Yes.

15  Q.   And then Mr. Calk said if the terms are agreed to, then the

16  customer -- the customer is Mr. Manafort and Mr. Yohai, right?

17  A.   Correct.

18  Q.   The customer must pay the application and the appraisal

19  fees, right?

20  A.   Correct.

21  Q.   As well as the two points, right?

22  A.   Correct.

23  Q.   And then he says:  If the appraisal doesn't come in, the

24  deal falls apart, the origination points will be sent back to

25  the client, there is no deal.  Right?

L715cal3                              Brennan - Cross

1    A.   Right.

2    Q.   And then he says:  Once the fees are received, once we get

3    the fees and they're in an account set up at the bank, we will

4    have an attorney prepare the loan documents at the client's

5    expense.  Right?

6    A.   Correct.

7    Q.   And the clients are Mr. Manafort and Mr.Yohai, right?

8    A.   Correct.

9    Q.   So Mr. Calk was telling everyone, look, we have got these

10   terms, standard terms, but I want to make sure that the

11   customer pays the application and appraisal fee up front;

12   right?

13   A.   Correct.

14   Q.   How much was that application and appraisal fee?  Can you

15   estimate?

16   A.   Probably $10,000 to $20,000.

17   Q.   And he wasn't even waiving that, right?

18   A.   No.

19   Q.   He was saying that the customer, Mr. Manafort, had to pay

20   for the attorney to prepare the loan documents, the bank wasn't

21   going to do that; right?

22   A.   Correct.

23   Q.   Now, so the loan got conditionally approved, right?

24   A.   Correct.

25   Q.   And at this point you had no issue with this loan, right?

1    A.  Correct.

2    Q.  It looked like a great deal, right?

3    A.  I don't believe I formed an opinion at that time.

4    Q.  Well, the terms were all standard terms; right?

5    A.  Correct.

6    Q.  The bank was going to profit if the loan performed on these

7    terms, it was going to profit tremendously on this loan; true?

8    A.  It was going to profit, yes.

9    Q.  Well, not just profit, this would have been one of the

10   biggest loans the bank ever made, right?

11   A.  It was smaller than one of the other ones and may have been

12   smaller than one other one that we collected, yes.

13   Q.  So top three loans that the bank ever made, right?

14   A.  Yes.

15   Q.  And you were collectings points, percentage points on that

16   amount, right?

17   A.  Correct.

18   Q.  And interest on that $5.7 million, right?

19   A.  Correct.

20   Q.  So, this is the, late July of 2016, Mr. Scotten asked you

21   the other day if you recalled when you learned that Mr. Calk

22   was appointed to the Trump Economic Advisory Council.

23        Do you recall that?

24   A.  I believe so.

25   Q.  Let's put on what Mr. Scotten showed you which is

L715cal3                        Brennan - Cross

1    Defendant's Exhibit 100, and this e-mail is dated August 9th,

2    2016; right?

3    A.   Correct.

4    Q.   So this is right after, within a couple weeks after that

5    this loan was conditionally approved; right?

6    A.   Correct.

7    Q.   And this is an e-mail that Mr. Calk sent to the whole bank,

8    right?

9    A.   Correct.

10   Q.   Letting the whole bank know, hey, I've been appointed to

11   the Trump National Economic Advisory Council; right?

12   A.   Correct.

13   Q.   And he said, if we can go to the bottom of that e-mail, one

14   of the things Mr. Calk said in his e-mail at the paragraph

15   starting, "As a member."  As a member of the economic team, I'm

16   thrilled to bring national exposure to The Federal Savings Bank

17   and the important work that we all do?

18   A.   Right.

19           MR. SCOTTEN:  Your Honor, can we get instruction on

20   the not for the truth of the matter there?

21           MR. LaVERNE:  Well, it goes to state of mind; 8306.

22           MR. SCOTTEN:  Not arguing objection.

23           THE COURT:  This document is not being offered for the

24   truth of what is stated in the document.  For other reasons.

25   BY MR. LaVERNE:

L715cal3                          Brennan - Cross

1   Q.   Now, after the loan was conditionally approved, as we said,

2   the loan needs to be underwritten; right?

3   A.   Correct.

4   Q.   That's when you and your people in the underwriting

5   department get to work, right?

6   A.   Yes.

7   Q.   And, as part of that process, the loan officer -- the loan

8   officer here, the bank, something called loan officer, that was

9   someone called Dennis Raico; right?

10  A.   Correct.

11  Q.   He was the assigned loan officer to this loan, right?

12  A.   Yes.

13  Q.   And, as part of the underwriting process, the loan officer

14  is the guy who is supposed to be getting all of the information

15  from the client, Mr. Manafort, and giving it to you; right?

16  A.   Correct.

17  Q.   That's his job, right?

18  A.   Correct.

19  Q.   And, in fact, the loan -- the bank has a loan policy;

20  right?

21  A.   Correct.

22  Q.   And under that loan policy the loan officer is responsible

23  for documenting and maintaining the appropriate records for

24  each credit application; true?

25  A.   Correct.

L715cal3                          Brennan - Cross

Q.  And under that loan policy the loan officer is responsible
for ensuring that all information required for sound lending
decisions is obtained and thoroughly analyzed, right?

A.  Correct.

Q.  And the loan officer -- the bank's loan policy requires
that the loan officer is responsible for keeping his superiors
advised of all pertinent information relating to borrowing
customers; true?

A.  I believe that's true.

Q.  Well, let's put the loan policy on the screen, it is in
evidence, Government Exhibit 452.  This is the loan policy,
right?

A.  Correct.

Q.  And if we go to page 6, third paragraph, the second
sentence -- well, the first sentence says the president is
responsible for the actions of his or her subordinates.  The
president was Mr. Ubarri, right?

A.  Correct.

Q.  And the president bears responsibility for the relationship
between individual customers and the bank; right?

A.  Correct.

Q.  And then it says each:  Loan officer has the responsibility
to keep his or her immediate superiors advised of all pertinent
information relating to the borrowing customers.  Right?

A.  Correct.

L715cal3                          Brennan - Cross

Q.   And then it requires, particularly, any information that
might have an adverse effect on the borrower's ability to
repay; correct?

A.   Correct.

Q.   That's what the loan policy requires?

A.   Correct.

Q.   And, Mr. Brennan, as the head underwriter on these loans,
you are responsible for analyzing the information that Raico
gives you?

A.   Correct.

Q.   But your analysis is only as good as what Mr. Raico gives
you; right?

A.   Correct.

Q.   So, if you don't get the right information, you can't do
the right analysis; correct?

A.   Correct.

Q.   Now, after you've analyzed the financial information of the
customer you are responsible for communicating your findings
clearly to the loan committee; true?

A.   True.

Q.   And if you believe, Mr. Brennan, that a borrower is lying
about his financial condition, you are not supposed to keep
that to yourself, are you?

A.   Correct.

Q.   It is your job to tell the loan committee, in no uncertain

L715cal3                    Brennan - Cross

1   terms, that you think the borrower is lying; true?

2   A.  It's our job to present what we believe the facts are,

3   true.

4   Q.  Simple question.  If you believe that a borrower is

5   actually lying about something you are required, it is your

6   responsibility, to tell the loan committee that in no uncertain

7   terms; true?

8   A.  True.

9   Q.  And if you learn that it is your job to recommend to the

10  loan committee, in no uncertain terms, not to make this loan;

11  true?

12  A.  True.

13  Q.  And, I think Mr. Scotten asked you about this yesterday, it

14  is your job to file what is called a suspicious activity

15  report?

16  A.  Correct.

17  Q.  And if you think a borrower is actually lying or committing

18  fraud, or if you think there is some funny business going on,

19  something illegal going on, you are supposed to file one of

20  those reports; right?

21  A.  Yes.  The bank is.

22  Q.  If you think that there is bank bribery going on you are

23  supposed to file one of those reports, right?

24  A.  Correct.

25  Q.  You have filed suspicious activity reports in connection

L715cal3                    Brennan - Cross

1    with other loans, true?

2    A.  Not at this bank.

3    Q.  At other banks you have filed suspicious activity reports?

4    A.  I believe so.

5    Q.  You are familiar with what that is, right?

6    A.  Correct.

7    Q.  You are familiar with what it was in 2016, right?

8    A.  Yes.

9    Q.  And you didn't file any such reports in connection with the

10   Manafort loans while you were underwriting the transaction,

11   true?

12   A.  Correct.

13   Q.  Nor did Mr. Horn who worked under you, true?

14   A.  True.

15   Q.  I would like to turn now and talk about conditional

16   approval.  We talked about general concepts of underwriting,

17   let's turn to the actual underwriting in this case.  OK?

18          The loan committee gave its conditional approval for

19   Nottingham July 28, 2016; true?

20   A.  True.

21   Q.  Thomas Horn was the primary person on your staff who worked

22   for the underwriting for the deal; true.

23   A.  True.

24   Q.  You reviewed his work, true?

25   A.  True.

1   Q.   You were his supervisor, true?

2   A.   True.

3   Q.   You relied -- you relied -- on Dennis Raico and his

4   assistant Ms. Ivakhnik to provide the information necessary for

5   underwriting; true?

6   A.   True.

7   Q.   And, by the way, Ivakhnik was Mr. Raico's assistant, true?

8   A.   She was his and another individual's, yes.

9   Q.   So she was assistant to Raico and assistant to someone

10   else?

11   A.   Correct.

12   Q.   Now, the underwriting process on this Nottingham loan

13   started right after conditional approval in July of 2016;

14   right?  Correct?

15   A.   I believe so.

16   Q.   And it ran for about two and a half months until

17   Mr. Manafort walked away from the deal in mid or late October

18   of 2016; true?

19   A.   Correct.

20   Q.   The underwriting process for Nottingham took at least two

21   and a half months, true?

22   A.   Correct.

23   Q.   And you took the underwriting process seriously, right,

24   Mr. Brennan?

25   A.   Yes.

L715cal3                          Brennan - Cross

1    Q.  No one told you you did a poor job on the underwriting, did
2    they?
3    A.  No.
4    Q.  Mr. Calk certainly didn't tell you you did a poor job on
5    the underwriting, right?
6    A.  No.
7    Q.  Mr. Calk didn't tell you to falsify information, right?
8    A.  No.
9    Q.  He didn't tell you to leave out information, right?
10   A.  He did not.
11   Q.  He didn't tell to you make mistakes, right?
12   A.  No.
13   Q.  And the underwriting, Mr. Brennan, of this loan, was
14   complex.  Fair to say?
15   A.  Yes.
16   Q.  Mr. Manafort had a lot of different entities that he was
17   involved in, true?
18   A.  Correct.
19   Q.  And you came to learn, as the underwriter, he had a lot of
20   real estate holdings; right?
21   A.  Yes.
22   Q.  And you looked at a number of different documents regarding
23   Mr. Manafort's financial condition, true?
24   A.  True.
25   Q.  You looked at his, what we saw, his 1003 loan application,

L715cal3                              Brennan - Cross

1    right?

2    A.  Correct.

3    Q.  And you looked at a profit and loss statement for 2015 for

4    his consulting business, right?

5    A.  Right.

6    Q.  And Mr. Manafort, you came to learn, had this political

7    consulting business, right, which had, on paper, what you were

8    told had been very successful in the past; true?

9    A.  Correct.

10   Q.  And you came to learn that that business that Mr. Manafort

11   had was called DMP International, LLC; true?

12   A.  I believe that's true, yes.

13   Q.  And you also looked at Mr. Manafort's tax returns, right?

14   A.  Correct.

15   Q.  2014 Mr. Manafort's tax returns, right?

16   A.  I believe so.

17   Q.  And you looked at his 2015 draft tax returns, correct?

18   A.  Correct.

19   Q.  And you looked at his bank statements, right?

20   A.  Correct.

21   Q.  And you looked at his credit report, correct?

22   A.  Correct.

23   Q.  And you looked at his schedule of real estate holdings he

24   had, correct?

25   A.  Correct.

L715cal3                    Brennan - Cross

1    Q.  And you also reviewed a lot of documents relating to

2    Mr. Yohai, if you remember was Mr. Manafort's son-in-law who

3    was the co-borrower on Nottingham; right?

4    A.  Correct.

5    Q.  And you looked at documents related to Mr. Yohai's

6    financial condition; true?

7    A.  Correct.

8    Q.  And you even had Mr. Horn go out and run what we call

9    litigation searches on Mr. Manafort and Mr. Yohai; true?

10   A.  Correct.

11   Q.  That is, you had him, Mr. Horn, go out and search to see if

12   they had been involved in any litigation; right?

13   A.  Yes.

14   Q.  And on this Nottingham property that they were putting up

15   you had not just one, you had two appraisals done on that

16   property; right?

17   A.  That is correct.

18   Q.  And after you had two appraisals done you had a third

19   appraisal, you had a reviewer come in, an independent party to

20   look at those two appraisals and give you a neutral opinion of

21   what he thought; right?

22   A.  Correct.

23   Q.  And you found that the first appraisal came in low at

24   around $6 million; true?

25   A.  I believe that's correct.

L715cal3                    Brennan - Cross

1   Q.  And the second appraisal came in higher, it was like

2   $8.5 million; true?

3   A.  I believe that may be correct, yes.

4   Q.  But, to be conservative, you went with the $6 million,

5   true?

6   A.  I believe that's correct.

7   Q.  And the bank also had appraisals done for the other

8   property being put up, that Virginia property that Mr. Raico

9   said was free and clear.

10          Do you remember that?

11  A.  Yes.

12  Q.  And you had an appraisal done on that property that

13  confirmed -- this was an independent appraisal, right?

14  A.  Yes.

15  Q.  It wasn't some inside job.  This was like an independent,

16  legitimate appraiser who looked at these things, right?

17  A.  Correct.

18  Q.  And that appraiser said $2.7 million, that's what that

19  Virginia property was worth; right?

20  A.  Correct.

21  Q.  And then we will get to this later but later there was

22  another one, out in the Hamptons, right?

23  A.  Correct.

24  Q.  And that property, again, you had multiple appraisals done,

25  right?

L715cal3                        Brennan - Cross

1   A.   Correct.

2   Q.   And Mr. Calk didn't tell you which appraisal to get, right?

3   A.   No.

4   Q.   He didn't tell you how to do your business, right?

5   A.   Correct.

6   Q.   He didn't tell you which appraisal to select, right?

7   A.   Correct.

8   Q.   And this, I think we have mentioned this before, this

9   Nottingham loan, again this first one that we are still talking

10  about was a so-called construction loan; right?

11  A.   Correct.

12  Q.   That means the property was still being built out in

13  California; right?

14  A.   Correct.

15  Q.   And you reviewed multiple drafts of a construction budget

16  that Mr. Manafort and Mr. Yohai sent you, right?

17  A.   Correct.

18  Q.   And you actually went into the details and even reviewed

19  the construction contract for that property, right?

20  A.   Correct.

21  Q.   OK.  Now, along the way you testified yesterday that you

22  had certain issues, certain issues arose in this underwriting

23  phase with respect to the Nottingham loan; true?

24  A.   Correct.

25  Q.   And I believe that your testimony yesterday was that in

L715cal3                    Brennan - Cross

1    September -- September -- you asked Mr. Horn:  *Mr. Horn, can*

2    *you write up a memo that raises the issues that we are running*

3    *into with this loan?*  Right?

4    A.  Correct.

5    Q.  And you reviewed that memo; right?

6    A.  Correct.

7    Q.  And I think you even said yesterday that you made some

8    edits to this?

9    A.  I may have.

10   Q.  And you looked at it and you made sure that were the issues

11   you were having with the loan, correct?

12   A.  Correct.

13   Q.  And on September 13th, 2016, you asked Mr. Horn to send his

14   memo to Mr. Ubarri and Mr. Norini; true?

15   A.  Correct.

16   Q.  Let's put it on the screen, we looked at it yesterday, it

17   is GX- 146 in evidence.  So, we see at the top that Mr. Horn

18   sent it to Ubarri and Norini, right?

19   A.  I have a blank screen.

20   Q.  Mine is working.  I know Mr. Brennan has a binder up there

21   and this is Government Exhibit 146, so if it is in there he can

22   work from that.  My screen is working?

23            THE COURT:  Mine is as well.  Your screen is not?

24            THE WITNESS:  It is now, just came up.

25   BY MR. LaVERNE:

L715cal3                         Brennan - Cross

1    Q.  See it now?

2    A.  Yes.

3    Q.  This is the memo that we talked about yesterday, the gmail

4    transmitting the memo; true?

5    A.  Correct.

6    Q.  And Mr. Horn sent it to Mr. Ubarri and Mr. Norini, correct?

7    A.  Correct.

8    Q.  He copied you, right?

9    A.  Correct.

10   Q.  But he did not send this memo with these issues to

11   Mr. Calk, true?

12   A.  True.

13   Q.  And at no point, I believe you testified yesterday, you

14   don't recall ever bringing these issues to the attention of

15   Mr. Calk directly; true?

16   A.  True.

17   Q.  Now, the e-mail transmitting the memo says we have got some

18   issues that underwriting is having with the loan; right?

19   A.  Yes.

20   Q.  And he says:  Please see attached to the terms of deal what

21   the minimum value was to be and what the first appraisal came

22   in at.  Right?

23   A.  Yes.

24   Q.  And then he attaches the actual memo; right?

25   A.  Correct.

1   Q.  And let's go down to the actual memo.  This is the memo

2   that Mr. Horn sent in September to Mr. Norini, Mr. Ubarri, but

3   not Mr. Calk; right?

4   A.  Correct.

5   Q.  And the title of the memo is:  Issues on Manafort/Yohai

6   Deal for the Completion of 2401 Nottingham.  Right?

7   A.  Correct.

8   Q.  And Nottingham, we know, is the deal -- again, N -- that

9   never happened, right?

10  A.  Correct.

11  Q.  And these were his issues with that deal, right?

12  A.  Correct.

13  Q.  Now, it says -- we can take that off the screen -- the

14  first paragraph says:  During the underwriting of the

15  transaction, the following issues have arisen that need to be

16  brought to the credit committee's attention.

17          Do you see that?

18  A.  Yes.

19  Q.  And then it says:  While these issues need to be addressed,

20  they haven't stalled the funding process.  Right?

21  A.  Yes.

22  Q.  That is, you were going forward with title and

23  documentation and such, right?

24  A.  Correct.

25  Q.  And it doesn't say, in that paragraph or anywhere in this

L715cal3                     Brennan - Cross

1    memorandum -- take your time to read it if you have to -- it

2    doesn't say anywhere in this memorandum that the bank should

3    not make this loan; true?

4    A.  Can you please scroll down?  Scroll down further?

5          No, it does not.

6    Q.  And you, Mr. Brennan, never told Mr. Calk that the bank

7    shouldn't make the loan to Mr. Manafort; true?

8    A.  I believe that's true.

9    Q.  That's with regard to this loan or any other loan to

10   Mr. Manafort, true?

11   A.  I believe that's true.

12   Q.  Now, this memo doesn't say anywhere that you thought

13   Mr. Manafort was lying on his application, true?

14   A.  True.

15   Q.  This memo doesn't even mention inconsistencies in the

16   documents that Mr. Manafort was providing to you, true?

17   A.  I would ask you to scroll up again.  This is true.

18   Q.  This memo, there was testimony and Mr. Scotten was asking

19   you yesterday about defaults that Mr. Manafort had from a prior

20   lender.  Do you recall that?

21   A.  Yes.

22   Q.  And he was asking you about the fact that Mr. Manafort, it

23   turned out you learned, had actually defaulted on loans to a

24   prior lender called Genesis.  Do you remember that?

25   A.  Yes.

L715cal3                    Brennan - Cross

1    Q.  This memo doesn't even mention the default, does it?

2    A.  No.

3              MR. SCOTTEN:  Objection to "even."  Argumentative.

4              THE COURT:  I will allow it.

5    BY MR. LaVERNE:

6    Q.  At the time though, Mr. Brennan, you knew about the default

7    on the Nottingham property, right?

8    A.  I believe not.

9    Q.  Well, September 8th was a week before this memo September

10   13th; right?

11   A.  OK.

12   Q.  On September 8th you were sent an e-mail that indicated

13   that Mr. Manafort had defaulted on his loan payments to

14   Genesis; true?

15   A.  I would have to see the exhibit.

16   Q.  Let's put it on the screen, it is in evidence as

17   Defendant's Exhibit 706.  This is an e-mail you got on

18   September 8 before the Horn memo was written, correct?

19   A.  Yes.

20   Q.  And it says Payoff Letters, right?

21   A.  Correct.

22   Q.  It has an attachment the Nottingham payoff letter.  What is

23   a payoff letter?

24   A.  It is an amount the lender is saying they need to release

25   the loan.

L715cal3                    Brennan - Cross

1    Q.  OK.  And that -- those payoff letters show if the borrower

2    is late on interest payments; correct?

3    A.  Yes.

4    Q.  Because they show that if a borrower hasn't paid his

5    interest he is accumulating charges and fees for that; right?

6    A.  Yes.

7    Q.  And this was from someone named Steve Zidell?

8    A.  Correct.

9    Q.  Who is Steve Zidell?

10   A.  He was our transaction attorney in California.

11   Q.  And he attached the payoff letter, true?

12   A.  Yes.

13   Q.  Let's put on the screen Defendant's Exhibit 706-A.

14           This shows the balance of that loan, right?

15   A.  Yes.

16   Q.  It shows the principal and then it shows the interest

17   that's been collected from September 1 and September 9th,

18   right?

19   A.  Yes.

20   Q.  Gives an exit fee and some other information, right?

21   A.  Correct.

22   Q.  Let's go to the next page -- I'm sorry, 706-B.

23           This is the demand for payoff, right?

24   A.  Correct.

25   Q.  And this shows that Mr. Manafort had been missing his

L715cal3                    Brennan - Cross

1   interest payments since at least June; right?  If we can

2   highlight under interest information?

3   A.  Yes.

4   Q.  And he had interest payments running sixty-two thousand

5   bucks in June alone, right?  And he got a late charge?

6   A.  Yes.

7   Q.  And then, starting in July, he racked up another $141,000;

8   right?

9   A.  Correct.

10  Q.  And another late charge, right?

11  A.  Correct.

12  Q.  And he had a total accrued interest, since May, of

13  $203,000; right?

14  A.  Correct.

15  Q.  And if we can just go back now to the original document?

16  At the bottom there is a line that says:  Total Foreclosure

17  Fees and Cost.  Do you see that?

18  A.  Yes.

19  Q.  So, having looked at this document, Mr. Brennan, do you

20  acknowledge that you are aware, prior to Mr. Horn sending his

21  memorandum, that Mr. Manafort was in default on his loan

22  payments on the Nottingham property?

23  A.  Correct.

24  Q.  And, in fact, you have been asked about this many times by

25  the prosecutors in those eight or so meetings we talked about,

L715cal3                     Brennan - Cross

1   you have been asked about this before, right?

2   A.  Yes.

3   Q.  And they've asked you, like, why didn't you -- you saw that

4   the property was in default, why didn't you put that in any of

5   the documents you were putting together in underwriting?

6   They've asked you that, right?

7   A.  I believe it was in a government exhibit yesterday.

8   Q.  Well, I'm just asking you if the government has asked you

9   about that before.

10         MR. SCOTTEN:  Objection.  Relevance to what the

11   government has asked him.

12         THE COURT:  I will allow it.

13   BY MR. LaVERNE:

14   Q.  Has the government asked you about that before?

15   A.  I -- I don't remember exactly what the government has asked

16   me over the last four years.

17   Q.  Well, tell me if you agree with this statement or not:

18   Genesis, that is the former lender, was a hard money lender.

19   Is that correct?

20   A.  Correct.

21   Q.  Hard money lenders are short-term lenders so defaults are

22   common.  True?

23   A.  I don't know that for a fact.

24   Q.  Do you deny that you said that to the government at a

25   meeting on June 27, 2017?

L715cal3                    Brennan - Cross

A.  Once again, I don't remember exactly what I said four years

ago.

Q.  Is it possible you said that?

A.  May well be.

Q.  And is it also possible that you told the government that

you knew the Nottingham loan was in default because

construction had stopped and that was not an issue to the bank?

Is it possible you said that?

A.  It is possible.

Q.  So, is it possible, Mr. Brennan, that the reason you didn't

put that issue in the Horn memo is because at that time -- at

that time -- you didn't think this was a big deal?

A.  We knew we were taking the borrower out of a hard money

loan so it wouldn't be surprising that there were issues.

Q.  Wouldn't be surprising that he had defaulted; true?

A.  Not necessarily.

Q.  Well, my question to you again is, is it possible that the

reason you didn't ask Mr. Horn to put the issue -- that issue

in this memorandum -- is because defaults were not uncommon on

hard money loans?

A.  Again, I don't know what the -- how common defaults are for

hard money lenders.  I don't know why it wasn't included in

this memo.  I believe it was corrected the next day.

Q.  You believe the Horn memo was corrected the next day?

A.  No.  I believe this is a Government Exhibit that we talked

L715cal3                     Brennan - Cross

1   about yesterday showing that.

2   Q.  OK.  I'm not sure what you are referring to but I am sure

3   Mr. Scotten will remind us on redirect.

4              MR. SCOTTEN:  Objection.  I might not redirect.

5              THE COURT:  Well, no commentary.

6              And you can ignore commentary by the lawyers.

7   BY MR. LaVERNE:

8   Q.  Now let's turn back to the memo.  The first issue in the

9   memo that's described here -- let's go back.  I'm sorry, not

10  the one labeled no. 1 but in the intro paragraph, it says, "in

11  the last two days," that paragraph.  And it says, basically,

12  that the conditional approval was conditioned on the property

13  being valued as completed at $8.25 million; right?

14  A.  Correct.

15  Q.  And it says we got an appraisal which gave a value of

16  $6.5 million; right?

17  A.  Correct.

18  Q.  And so you are raising that issue, it came in below the

19  value; right?

20  A.  Correct.

21  Q.  Now, am I correct, Mr. Brennan, that the bank, after you

22  sent this e-mail to Ubarri and Norini, the bank restructured

23  the deal?

24  A.  Correct.

25  Q.  And added more collateral; true?

L715cal3                         Brennan - Cross

1   A.   Correct.

2   Q.   And, in fact, they required Mr. Manafort to post his house

3   in the Hamptons as collateral; true?

4   A.   Correct.

5   Q.   And I think we saw an e-mail the other day where he

6   described that -- I'm not sure if you saw it, frankly, but do

7   you recall an e-mail where that property was described as

8   Mr. Manafort's wife's treasure?  Do you recall seeing that?

9   A.   I don't.

10  Q.   And that Hamptons home you got two appraisals on, right?

11  A.   Yes.

12  Q.   One was for $11 million; true?

13  A.   I believe so.

14  Q.   And one was for about $13 million; is that true?

15  A.   I believe so.

16  Q.   And you decided as the underwriter to average those two

17  appraisals, right?

18  A.   Correct.

19  Q.   What you did is you said that Hamptons property has a value

20  of $12.25 million, right?

21  A.   Correct.

22  Q.   And the bank required Mr. Manafort to post that as

23  collateral on his loan, true?

24  A.   Correct.

25  Q.   Now, let's look at your list of points below.  OK?  You

L715cal3                         Brennan - Cross

1     have a whole bunch of points listed here and I want to look

2     first at the points on the right side of the screen under

3     Mr. Yohai.  Do you see that?

4     A.  Yes.

5     Q.  You had all of these problems with Mr. Yohai, the

6     son-in-law; right?

7     A.  Correct.

8     Q.  And you raised them all here, right?  Mr. Yohai was

9     involved in the Nottingham transaction, right?

10    A.  Correct.

11    Q.  And the Nottingham transaction is the one that never

12    happened, right?

13    A.  Correct.

14    Q.  Mr. Yohai got cut out of the rest of the deals with

15    Mr. Manafort, right?

16    A.  Correct.

17    Q.  So, he wasn't a factor going forward, right?

18    A.  Correct.

19    Q.  And then the rest of your points on this page, going down

20    to those, relate to 2401 Nottingham, correct?

21    A.  Correct.

22    Q.  That's the property at Nottingham, correct?

23    A.  Correct.

24    Q.  And this one never happened, right, so they cut that out of

25    the deal.  Right?

L715cal3                          Brennan - Cross

1   A.  Correct.

2   Q.  So, really there is four points relating to Manafort on the

3   first page, right?

4   A.  First and second.

5   Q.  First and second pages, right?

6            And the first page, point one relates to the lack of

7   income that Mr. Manafort had in 2016; correct?

8   A.  Correct.

9   Q.  And you came to learn, Mr. Brennan, that in 2016

10  Mr. Manafort left his consulting company to act as a volunteer

11  running Mr. Trump's campaign.  True?

12  A.  True.

13  Q.  And you came to learn that the reason why -- at least this

14  is what you were told by Mr. Raico -- the reason why

15  Mr. Manafort wasn't earning anything in 2016 is because he was

16  busy running the Trump campaign, correct?

17           MR. SCOTTEN:  Objection.  Hearsay.

18           MR. LaVERNE:  His state of mind.

19           THE COURT:  Sustained.

20  BY MR. LaVERNE:

21  Q.  Well, did you understand, Mr. Brennan, that the reason why

22  Mr. Manafort wasn't making money in 2016 is because he was

23  running the Trump campaign?

24  A.  At one point, yes.

25  Q.  And where did you get that understanding from?

L715cal3                         Brennan – Cross

1                MR. SCOTTEN:  Objection.

2                THE COURT:  I will allow it.

3                THE WITNESS:  From the media.

4                THE COURT:  In that case it is hearsay.

5                MR. LaVERNE:  Whatever you want to do, your Honor.

6       I'm happy to strike it.

7                THE COURT:  I'm sorry?

8                MR. LaVERNE:  I am happy to have it stricken.

9                THE COURT:  OK.

10               Ladies and gentlemen, we have this rule called hearsay

11      so please disregard that testimony.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. LaVERNE:   (Continued)

2   Q.  Now, you did understand though, Mr. Brennan, that although

3   his income had dropped in 2016, you understood that he had this

4   long-standing political consulting business that earned

5   substantial income back in the years leading up to 2016, true?

6   A.  True.

7   Q.  And, in fact, Mr. Brennan, we talked about the bank's loan

8   policy before, right?

9   A.  Yes.

10  Q.  And the bank's loan policy requires that in assessing

11  profitability, income or cash flow, the trend of the past three

12  to five years should be emphasized over the latest years in

13  most situations.  Do you recall that from the loan policy?

14  A.  Yes.

15  Q.  And ultimately you wrote up a loan memorandum, right?  Let

16  me clarify that.  Mr. Scotten asked you about loan memoranda

17  that were generated in connection with what we called the

18  Summerbreeze transaction and the Union Street transaction,

19  right?

20  A.  Correct.

21  Q.  And Mr. Horn, I believe you testified, actually did the

22  work in writing Summerbreeze loan memo, correct?

23  A.  Correct.

24  Q.  But you reviewed it, made some changes and you approved it,

25  correct?

1  A.  Correct.

2  Q.  And you did the work on the Union Street loan memo, true?

3  A.  Correct.

4  Q.  In fact, although Mr. Scotten didn't ask you about this,

5  there was a loan memo actually drafted for this Nottingham

6  transaction as well, true?

7  A.  True.

8  Q.  And in both the Nottingham and the Summerbreeze loan memos,

9  the underwriting department wrote that prior to the most recent

10  interim, Mr. Manafort has shown a steady source of income from

11  his job as a political consultant, true?

12  A.  I believe that's true.

13  Q.  Okay.  And let's -- so let's put on the screen so you have

14  in front of you the loan memorandum that you oversaw for the

15  Summerbreeze transaction, GX-2.  And if we could turn to

16  page 3.

17       And we are going to get into this a little bit more

18  this afternoon, but for present purposes, it says key risks and

19  credit issues.  Do you see that?

20  A.  Yes.

21  Q.  And you identified a couple of risks with these loans,

22  right?

23  A.  Correct.

24  Q.  But then it identities something called mitigants, right?

25  A.  Correct.

L71Qcal4                        Brennan - Cross

1    Q.  And mitigants are things that offset the risk?

2    A.  Correct.

3    Q.  These are things that in your view as the underwriter

4    offset the risks that you write down above it, correct?

5    A.  Correct.

6    Q.  And the first one you wrote was that Paul Manafort had a

7    solid net worth, right?

8    A.  Correct.

9    Q.  And the second one you wrote is that the proposed LTV for

10   the loan is 61 percent, right?

11   A.  Correct.

12   Q.  And the third one you wrote, prior to the most recent

13   interims, Mr. Manafort has shown a steady source of income from

14   his job as a political consultant, right?

15   A.  Right.

16   Q.  You can take that down.

17           Now, you also believed in 2016 that Mr. Manafort had

18   good liquid assets, true?

19   A.  True.

20   Q.  And let's go back to the Horn memo.  I think that was

21   GX-146.  Let's go to point two.  This is the one about the Amex

22   bill.  Do you remember Mr. Scotten asked you some questions

23   about this?

24   A.  Yes.

25   Q.  You found out that Mr. Manafort had a $300,000 balance on

1   his bill, right?  And you got an explanation from Mr. Manafort

2   that he had basically -- he or his friend had purchased season

3   Yankees tickets on that credit card, and that's why that amount

4   was outstanding, right?

5   A.  Correct.

6   Q.  And, in fact, you as the underwriter asked for and received

7   a letter from Mr. Manafort representing that, correct?

8   A.  Correct.

9   Q.  Which he sent to you, right?

10  A.  Correct.

11  Q.  And then didn't you require Mr. Manafort to send you the

12  actual American Express account statements showing that he had

13  paid that back?

14  A.  Correct.

15  Q.  And you got that on -- well, let's put up Defense Exhibit

16  193.  So this is October 5, 2016, true?

17  A.  Correct.

18  Q.  This is after you raised these issues with Mr. Ubarri and

19  Mr. Norini about the Amex, right?

20  A.  Correct.

21  Q.  And Mr. Raico sends you and Mr. Horn a document, right?

22  A.  Correct.

23  Q.  And he says here you go, right?  True?

24  A.  Yes.

25  Q.  And, by the way, when you had questions about

1    Mr. Manafort's finances, who would you generally get the

2    information from?

3    A.  We would go back to the loan officer.

4    Q.  Which was who?

5    A.  Dennis Raico.

6    Q.  Let's look at the attachment.  Actually, let's look at the

7    bottom of this email.  This is the email that Mr. Manafort sent

8    to Mr. Raico, right?

9    A.  Correct.

10   Q.  On October 5, right?

11   A.  Yes.

12   Q.  And Mr. Manafort represented to Mr. Raico this is the Amex

13   statement showing that that 312,000 debt was paid, right?

14   A.  Yes.

15   Q.  You will see it reflects the payment and shows a zero

16   balance, right?

17   A.  Correct.

18   Q.  Let's look at the attachment now.  This is the Amex bill,

19   right?

20   A.  Correct.

21   Q.  And what's the balance on the Amex bill?

22   A.  Zero.

23   Q.  And does it show a previous balance and what was credited?

24   A.  Correct.

25   Q.  And you looked at that, and you saw that, and you put it in

L71Qcal4                         Brennan - Cross

1    the file, true?

2    A.  Correct.

3    Q.  So that issue from your memo was addressed, right?

4    A.  No.

5    Q.  Well, the amount that was outstanding was paid off, true?

6    A.  Correct.

7    Q.  And you were advised of the reason as to why it was

8    outstanding, true?

9    A.  Correct.

10   Q.  Now, let's go back to the Horn memo.  Let's go to point 3.

11   This is a concern that you raised or Mr. Horn raised about the

12   amount yet available on his line with UBS, right?

13   A.  Correct.

14   Q.  And you don't have clarification on where $500,000 came

15   from, right?

16   A.  Correct.

17   Q.  And you're concerned about how much cash Mr. Manafort

18   actually has, right?

19   A.  Correct.

20   Q.  After you sent this memo, you got some further information,

21   you did some further digging, correct?

22   A.  I'm not sure.

23   Q.  Well, let's put again on the screen the loan memorandum for

24   the Summerbreeze transaction, GX-2.  And, again, this loan

25   memorandum reflects the -- it's sort of a summary of the work

L71Qcal4                        Brennan - Cross

1   that you've done on this loan as an underwriter, true?

2   A.  Yes.

3   Q.  And this is done after you sent that memo, right?

4   A.  Correct.

5   Q.  Let's turn to page 9.  This is the personal financial

6   statement that you included in the loan memo, right?

7   A.  Correct.

8   Q.  And this is for Paul Manafort, right?

9   A.  Correct.

10  Q.  And it shows what you wrote in this memo is that

11  Mr. Manafort had $11.9 million in cash in other financial

12  institutions, true?

13  A.  That is what it says, yes.

14  Q.  And it says at the bottom that he had total assets of

15  $38.9 million, correct?

16  A.  Correct.

17  Q.  And then it gives his liabilities on the other side, right?

18  A.  Correct.

19  Q.  And it shows his adjusted net worth at the bottom, right?

20  A.  Correct.

21  Q.  Which you said in this memo was $25.8 million, right?

22  A.  Correct.

23  Q.  Now, if we can go down on the document a little bit.  Here

24  it describes, it gives some more information about what you

25  believed at the time about Mr. Manafort's assets, true?

1    A.  Correct.

2    Q.  And the first bullet point says he has various liquid

3    accounts at UBS totaling $11.9 million gross, right?

4    A.  Correct.

5    Q.  Then he had liabilities, $5.6 million, right?

6    A.  Correct.

7    Q.  And so you later found, again, based on the information you

8    were given, okay, that Mr. Manafort had a net of $6.5 million

9    in his accounts, true?

10   A.  True.

11   Q.  Let's go back to the Horn memo.  Point 4.  You were

12   concerned because you couldn't figure out the properties that

13   these two outstanding mortgages were associated with, right?

14   A.  Correct.

15   Q.  And you did some later digging and some work, right?

16   A.  I believe so.

17   Q.  And ultimately you determined that these two mortgages were

18   secured by two single-family residences, right?

19   A.  I believe that's true.

20   Q.  And you learned further what the monthly payments were on

21   those mortgages, right?

22   A.  I believe so.

23            MR. LaVERNE:  Is that clock right, your Honor?  I'm

24   not sure if that clock is fast or slow.

25            THE COURT:  That clock is off by an hour, but you're

1    right, it is 1:00.  And now would be a good time for lunch if

2    that was your question.

3              MR. LaVERNE:  It would be great.  Thank you.

4              THE COURT:  Let's break for an hour.  No, 45 minutes.

5    Sorry.

6              Please don't talk about the case.  Enjoy your lunch.

7              Let me say one thing.  I know it's hard to stay awake

8    in the afternoon.  That actually has to do with carbs.  I know

9    we are providing lunch, but the more carbs or sugar you have

10   during lunch, the sleepier one is after lunch.  So, just noting

11   that.

12             (Jury not present)

13             THE COURT:  Anything to talk about?

14             MR. SCOTTEN:  Very briefly, your Honor.  If your Honor

15   wants to do it on the backside, just so that we don't have to

16   wait for Mr. Brennan to leave, but it will take 30 seconds.

17             THE COURT:  30 seconds?  Okay.  I think we can do it

18   later.  See you in 45 minutes.

19             (Luncheon recess)

20          (Continued on next page)

21

22

23

24

25

1      A F T E R N O O N   S E S S I O N

2                        1:50 p.m.

3                     (Jury not present)

4           MR. SCOTTEN:  I think I can do this with the witness

5      on the stand.  I think the Court has already mentioned the --

6      put it this way, I have no objection to Mr. LaVerne's

7      "Mr. Scotten asked you."  That's a standard way to remind the

8      witness what you're talking about.

9           THE COURT:  And to show it's within the scope.

10          MR. SCOTTEN:  Absolutely.  Whether because it's out of

11     scope or just generally inappropriate, I do object to the

12     "Mr. Scotten didn't show you this," which we had at least one

13     of, maybe two.  So I think that should be out, along the same

14     lines as whether I will redirect the witness on something.

15          THE COURT:  Along the same lines as --

16          MR. SCOTTEN:  Whether I will redirect the witness on

17     something.

18          MR. LaVERNE:  I don't think it's inappropriate to

19     highlight documents or issues that were not brought to the

20     witness's attention on direct.  If the objection is using

21     Mr. Scotten's name, I'm happy to say the government.

22          THE COURT:  Or you can say "You haven't seen this, you

23     haven't been shown this."

24          MR. LaVERNE:  Okay.

25          MR. SCOTTEN:  Thank you, your Honor.  1:55 p.m.

L71Qcal4                        Brennan - Cross

```
 1              (Jury present)
 2              THE COURT:  Welcome back, everyone.
 3   Mr. LaVerne you may proceed.
 4              MR. LaVERNE:  Thank you, your Honor.
 5   JAMES CHARLES BRENNAN, resumed.
 6   CROSS-EXAMINATION CONTINUED:
 7   BY MR. LaVERNE
 8   Q.  Mr. Brennan, before we broke for lunch, we were discussing
 9   that September 13, 2016 memorandum that you had instructed or
10   asked Mr. Horn to send to Mr. Norini and Mr. Ubarri.  Do you
11   recall that?
12   A.  Yes.
13   Q.  And, again, that related to the Nottingham transaction,
14   true?
15   A.  True.
16   Q.  Which is the transaction that was never closed, never, a
17   loan never extended true?
18   A.  The loan was extended; it was not accepted.
19   Q.  The loan was not made; it was not closed; and the monies
20   were not sent to Mr. Manafort, true?
21   A.  True.
22   Q.  Now, I believe you testified on direct examination that
23   about a week after that, you sent -- you had Mr. Horn write up
24   another email that had his "boil down" concerns on it.  Do you
25   recall that?
```

L71Qcal4                      Brennan - Cross

1   A.  Yes.

2   Q.  Let's put on the screen what's in evidence as Government

3   Exhibit 152.

4             So, if we look at the lower half of the document here,

5   you can see that this is the email that Mr. Horn sent to you on

6   September 19, 2016, right?

7   A.  Correct.

8   Q.  And that's about six days after the first memo, correct?

9   A.  Correct.

10  Q.  And he lists his concerns there, right?

11  A.  Correct.

12  Q.  And it basically summarizes and condenses what was in that

13  September 13 memo, true?

14  A.  Correct.

15  Q.  Again, this email, like the memo, doesn't say the bank

16  should not make the loan to Manafort, true?

17  A.  True.

18  Q.  And you then forwarded this email to Mr. Ubarri.  If you go

19  to the top.

20  A.  Correct.

21  Q.  The next day, correct?

22  A.  Correct.

23  Q.  And in the email you didn't say to Mr. Ubarri, the bank

24  should not make this loan, true?

25  A.  True.

L71Qcal4                        Brennan - Cross

Q.  And you only sent the email to Mr. Ubarri, right?

A.  Correct.

Q.  You didn't even send this email to Mr. Norini who was also

on the loan committee, right?

A.  Correct.

Q.  And you didn't send it to Mr. Calk, right?

A.  Correct.

Q.  You had Mr. Calk's email address at the time, right?

A.  I did.

Q.  But you only sent it to Mr. Ubarri, correct?

A.  Correct.

Q.  Now, I think you also testified on direct that your hope

was after sending your memorandum and -- or Mr. Horn's

memorandum and this email, your hope was that the deal would be

I think you said "killed or at least restructured."  That's

what you testified to, right?

A.  Yes.

Q.  After this email was sent, the deal was revised, right?

A.  It was restructured.

Q.  It was restructured, right, which is what you had hoped

for, correct?

A.  Correct.

Q.  And the loan committee in fact on September 21, approved

the new loan with new terms in connection with this

transaction, right?

L71Qcal4                          Brennan - Cross

1    A.  I'd have to see the dates.

2    Q.  Let's put on the screen GX-156, Mr. McCloud.  Not 155.

3    156, this is in evidence.

4            Now, this is an email from Mr. Ubarri on September 21,

5    right?

6    A.  Correct.

7    Q.  And he sent it to the other members of the loan committee,

8    yourself and Mr. Horn, right?

9    A.  Yes.

10   Q.  And it sets out the new terms of this loan, right?

11   A.  Yes.

12   Q.  And it has a loan term of three years, 12 months interest

13   only, right?

14   A.  Correct.

15   Q.  And it has an interest rate of 7.25 percent, right?

16   A.  Correct.

17   Q.  Which was the same interest rate as before, right?

18   A.  Correct.

19   Q.  Which you testified was the standard interest rate for

20   portfolio loan product, right?

21   A.  Correct.

22   Q.  Interest rate didn't go down, right?

23   A.  Did not.

24   Q.  And the origination fee is now 3 percent, right?

25   A.  Correct.

L71Qcal4                          Brennan - Cross

1    Q.  That's higher than it was before, right?

2    A.  Correct.

3    Q.  It went up a point so the bank was now going to make more

4    money off the transaction, correct?

5    A.  Yes.

6    Q.  And then it says additional collateral, right?

7    A.  Yes.

8    Q.  So, as a result of these discussions and the issues you

9    were raised, the loan committee decided let's add more

10   collateral, let's require Mr. Manafort to post his home in

11   Water Mill, right?

12   A.  Correct.

13   Q.  And that's the property, it says 174 Jobs Lane, right?

14   A.  Correct.

15   Q.  And Water Mill is in Bridgehampton or right near it, right?

16   A.  I believe that's right.

17   Q.  These the property we've been talking about out in the

18   Hamptons, right?

19   A.  Correct.

20   Q.  It says it should have an assigned value of at least

21   $10 million, right?

22   A.  Correct.

23   Q.  And that is a requirement that Mr. Manafort post this in

24   order for the transaction to go forward, right?

25   A.  Correct.

L71Qcal4                          Brennan – Cross

1   Q.   Now, it also goes on to list more terms, right?  See the

2   rest of the terms?

3   A.   Yes.

4   Q.   And it says, for example, at the bottom, it says:  We will

5   put a lien on the property located at 601 North Fairfax Street,

6   Alexandria for the full loan amount, right?

7   A.   Correct.

8   Q.   That's the property that had already been posted as part of

9   the initial proposal on the Nottingham loan, right?

10  A.   Correct.

11  Q.   That was the one that you got appraised at $2.7 million,

12  right?

13  A.   Correct.

14  Q.   Which was owned free and clear by Mr. Manafort, right?

15  A.   Correct.

16  Q.   So, that's being posted along with the Nottingham property,

17  correct?

18  A.   Correct.

19  Q.   Which had appraised at $6 million, right?

20  A.   Correct.

21  Q.   Along with the Bridgehampton property, right?

22  A.   Correct.

23  Q.   Now, after these new terms were issued, you sent an email

24  to a number of folks at the bank, including Mr. Horn and

25  Ms. Ivakhnik to let them know the new terms, do you recall

L71Qcal4                         Brennan - Cross

1    that?

2    A.  I -- no.

3    Q.  Let's put on the screen what's been marked in evidence as

4    Defense Exhibit 127.  This was sent on September 23, 2016,

5    right?

6    A.  Yes.

7    Q.  This is just after the loan term was restructured after you

8    sent your memo, right?

9    A.  Correct.

10   Q.  And the very first sentence that you wrote to everyone

11   says:  "To overcome underwriting issues, Paul Manafort has

12   agreed to allow the bank to put a first mortgage on the amount

13   of the loan on the following property," and it lists the

14   Bridgehampton property, right?

15   A.  Correct.

16   Q.  And it lists all the other properties we just talked about

17   as also securing the loan, right?

18   A.  Yes.

19   Q.  So, later after this, you learned that Mr. Manafort had not

20   told you that he actually had mortgaged -- he had a mortgage on

21   that Bridgehampton property, right?

22   A.  That is correct.

23   Q.  And you learned that the mortgage was in fact 2.5 million,

24   correct?

25   A.  Correct.

L71Qcal4                     Brennan - Cross

Q.  And then you learned that after Mr. Manafort told you and

Mr. Calk that it was 2.5 million, he suddenly remembered, you

know, it's actually 3.5 million, right?

A.  Correct.

Q.  So the loan was revised yet again, correct?

A.  Correct.

Q.  And in order to get first position on that Hamptons'

property, the bank then needed to buy out that other mortgage,

correct?

A.  Pay off.

Q.  Pay off the other mortgage, correct?

A.  Correct.

Q.  So the loan amount was increased from 5.7 up to 9.2,

correct?

A.  Correct.

Q.  And by extending more money on the loan, the bank could be

in first position to take that Hamptons property, correct?

A.  Correct.

Q.  And you went on, I think as we said before, to get that

Hamptons property appraised, right?

A.  Correct.

Q.  To make sure it was worth what you thought it was, right?

A.  Correct.

Q.  And these appraisals you got showed you that it was worth,

one said 11 million, one said 13 million, right?

L71Qcal4                          Brennan - Cross

1     A.   Approximately.

2     Q.   And you averaged those two and came up with an appraised

3     value just on that Bridgehampton property of $12.25 million,

4     right?

5     A.   Correct.

6     Q.   So this was a $9.2 million loan, correct?  Secured by a

7     $12.25 million property, correct?

8     A.   Correct.

9     Q.   A $2.7 million property in Virginia, correct?

10    A.   Correct.

11    Q.   And the $6 million property in Nottingham, correct?

12    A.   Correct.

13    Q.   Now, I think as we -- you testified a bit this morning,

14    this was still called the Nottingham transaction, correct?

15    A.   That is correct.

16    Q.   And in October you had Mr. Horn draft a loan memorandum for

17    that transaction, correct?

18    A.   Correct.

19    Q.   And Mr. Horn did a whole workup on Mr. Manafort's income,

20    his property, his finances, etc., correct?

21    A.   Correct.

22    Q.   And he wrote that all down and put it all down in his loan

23    memorandum, correct?

24    A.   Correct.

25    Q.   And you reviewed it; you looked at it, right?

L71Qcal4                          Brennan - Cross

1    A.  Correct.

2    Q.  And among the things that you concluded in that loan

3    memorandum was that Mr. Manafort had a solid net worth,

4    correct?

5    A.  Correct.

6    Q.  $21.2 million.  That's what you concluded, right?

7    A.  I believe that's correct.

8    Q.  And no one told you to put a false number down there,

9    right?

10   A.  No.

11   Q.  And that the -- the loan to value ratio was about

12   38 percent, right?

13   A.  I believe that was the number.

14   Q.  And you and Mr. Horn, assigned this Nottingham transaction

15   a loan rating of 4, correct?

16   A.  Can you restate?  I don't understand the question.

17   Q.  You and Mr. Horn in that Nottingham loan memorandum

18   assigned this transaction a risk rating of 4, correct?

19   A.  You said assigned, right?

20   Q.  Yes.

21   A.  Yes.

22   Q.  And a 4 risk rating is a loan to be approved, correct?

23   A.  Correct.

24   Q.  And in fact -- and that's also called an average loan,

25   correct?

L71Qcal4                      Brennan - Cross

1  A.  Average risk rating.

2  Q.  Average risk rating.  And the bank's loan policy which

3  we've discussed today defines what an average risk rated loan

4  is, correct?

5  A.  It does.

6  Q.  And the bank's loan policy, in fact, defines an average

7  loan as a strong-rated loan which is collateralized by soft

8  assets or hard assets which are within the policy advanced

9  guidelines, right?

10  A.  Without seeing the loan policy for that period, I can't

11  answer that.

12  Q.  Let's put it on the screen, Government Exhibit 452 in

13  evidence.  This is the loan policy, right?

14  A.  It's the loan policy as of January 13, 2016.

15  Q.  We're talking about 2016 right now, right?

16  A.  That's correct.

17  Q.  So let's go page 31.  Do you see at the top -- I'm sorry,

18  in Section 5.2, it says loan ratings, rating descriptions,

19  right?

20  A.  Correct.

21  Q.  If you go down to average risk rated loan.  It says:

22  basically a strong-rated loan which is collateralized by soft

23  assets or by hard assets which are within policy guidelines,

24  correct?

25  A.  Yes.

1   Q.  It says:  Average risk loans are supported by current

2   financial information which shows adequate cash flow to service

3   debt, right?

4   A.  Correct.

5   Q.  And average liquidity, right?

6   A.  Correct.

7   Q.  And an acceptable leverage position, right?

8   A.  Correct.

9   Q.  Although slightly more leveraged than strong-rated loans,

10  right?

11  A.  Yes.

12  Q.  And a four is a higher rating than a three, right?

13  A.  No.

14  Q.  Well, a four is a -- just doing this numerically, there's a

15  three, what is a three rated loan?

16  A.  A higher rated.  It's better rated.

17  Q.  Three is better than a four rated?

18  A.  Yes.

19  Q.  But a four rating is an average loan as defined here,

20  correct?

21  A.  Correct.

22  Q.  Now, we are in October of 2016, right?  Time came to close

23  on the Nottingham transaction, right?

24  A.  I'm sorry?

25  Q.  The time came to close on the Nottingham transaction,

L71Qcal4                        Brennan - Cross

1   correct?

2   A.  Correct.

3   Q.  That was supposed to happen on October 19, 2016, true?

4   A.  I believe so.

5   Q.  And everyone was ready to go, but your understanding is

6   Mr. Manafort walked away from the deal, true?

7   A.  Correct.

8   Q.  That's Nottingham.

9       I want to talk now about what we call the Summerbreeze

10  loan.  Do you recall the Summerbreeze loan?

11  A.  I do.

12  Q.  Okay.  And the Summerbreeze loan is one of the loans that

13  was eventually made by the bank, correct?

14  A.  Correct.

15  Q.  And it came right after the Nottingham loan, right?

16  A.  Correct.

17  Q.  And the Summerbreeze loan was made sometime in November of

18  2016, correct?

19  A.  Correct.

20  Q.  Now, by November of 2016, you had just spent the past few

21  months underwriting the Nottingham transaction, right?

22  A.  Correct.

23  Q.  And you and the underwriting department had dug into

24  Mr. Manafort's financials, correct?

25  A.  Yes, Mr. Horn and I had.

L71Qcal4                          Brennan - Cross

1   Q.  And you had spent those months, among other things,

2   obtaining appraisals on the Bridgehampton property and the

3   Virginia property, correct?  Some of them, at least.

4   A.  At some point, yes.

5   Q.  And Mr. Horn, we saw, had drafted a loan memorandum on the

6   Nottingham transaction, right?

7   A.  Correct.

8   Q.  And he had done a whole financial analysis of

9   Mr. Manafort's income at that point, correct?

10  A.  He did.

11  Q.  So when it came time to do the Summerbreeze loan, you had

12  all that information and analysis, correct?

13  A.  Correct.

14  Q.  In fact, you testified that at that point, there was some

15  idea that the bank might sell the loan, the Summerbreeze loan,

16  to the Bank of the Internet, correct?

17  A.  That is correct.

18  Q.  And you testified that because of that, there was

19  additional analysis done on the Manafort loan, correct?

20  A.  That is correct.

21  Q.  And you testified that the bank's office out in Maryland

22  set up an Encompass file for this loan?

23  A.  I did not testify to that.

24  Q.  Okay.  Did the Maryland office set up an Encompass file for

25  the loan?

L71Qcal4                         Brennan - Cross

1   A.  Yes.

2   Q.  And, in fact, Mr. Brennan, the Maryland operations team did

3   another income analysis on this loan, correct?

4              MR. SCOTTEN:  Objection.  Beyond the scope.

5              MR. LaVERNE:  Subject matter, your Honor.

6              MR. SCOTTEN:  No objection is proceeding as if on

7   direct.

8              THE COURT:  Okay.  Sustained.

9   Q.  Did the Maryland office do another income analysis on the

10  loan?

11             MR. SCOTTEN:  Objection.  Leading.

12             MR. LaVERNE:  I'm just asking the question in a

13  non-leading fashion.

14             THE COURT:  You can ask the question.

15  Q.  Did they do an analysis on the loan?

16  A.  I know they did an analysis.

17  Q.  Okay.  Let's put on the screen what's in evidence as

18  Defense Exhibit 200.  Let's go down to the bottom.  Is there a

19  second page to this document?  I can't recall.  I want to make

20  sure we have the whole thing.

21             So down at the bottom, Mr. Raico on November 10 sends

22  an email to you and Mr. Ubarri, correct?

23  A.  Correct.

24             MR. SCOTTEN:  Objection.  Leading.

25  Q.  Did he send you an email on that date?

L71Qcal4                          Brennan - Cross

1    A.  Did who send me an email?

2    Q.  Mr. Raico.

3    A.  Yes.

4    Q.  Okay.  And we can scroll up now.  Did you give him the

5    Encompass number?

6    A.  Yes.

7    Q.  Let's scroll up to the next one.  What, if anything, did

8    Mr. Ubarri respond to that?

9    A.  His response was that -- Javier responded that Matt and

10   Eric need to look at it.

11   Q.  And who was Matt?

12   A.  Matt is an underwriting manager.

13   Q.  Was Matt, Matt McDonald?

14   A.  Yes.

15   Q.  Was he the regional underwriting manager at the bank?

16   A.  He was one of them.

17   Q.  Who was Eric?

18   A.  Eric worked for Matt.

19   Q.  Okay.  Now, if we can go up to the top of this email chain.

20   What does that email say?

21   A.  Sounds good.  Let me know if you received my last email to

22   you and Jim which included the income analysis from Maryland

23   ops.

24   Q.  The income analysis from Maryland ops.  Is that what it

25   says?

L71Qcal4                        Brennan - Cross

1    A.  Yes.

2    Q.  Was there an attachment to this email?

3    A.  Yes.

4    Q.  What is does the attachment say?

5    A.  Manafort 2015 income breakdown.

6    Q.  Let's go to the attachment.  What does it say at the top of

7    this document?

8    A.  Manafort income 2015.

9    Q.  I think you testified that DPM International was Manafort's

10   consulting company?

11   A.  Correct.

12   Q.  And you see where it says Paul?

13   A.  I do.

14   Q.  What does it say for total income next to Paul?

15   A.  $556,598.

16   Q.  Half a million bucks, right?

17   A.  Correct.

18          MR. SCOTTEN:  Objection.  Leading.

19          THE COURT:  I'll allow it.

20   Q.  What does it say for Kathleen's total income?

21   A.  Total income $525,718.

22   Q.  So together, how much does it say from DPM International

23   alone Mr. and Mrs. Manafort earned in 2015?

24   A.  A little less than a million one.

25   Q.  Now, on the rest of this page are a number of other

L71Qcal4                    Brennan - Cross

1    entities.  Do you see that?

2    A.  I do.

3    Q.  And you did the underwriting analysis on Mr. and Mrs.

4    Manafort, right?

5    A.  At points, yes.

6    Q.  These are lists of other companies that they owned,

7    correct?

8    A.  Correct.

9    Q.  Can you read to the jury what it lists under John Hannah,

10   LLC for Paul's income in 2015?

11   A.  $1,531,023.

12   Q.  Does it list the same for Mrs. Manafort?

13   A.  It's one dollar less.

14   Q.  So another $3 million for the Manaforts in 2015 from that

15   company, true?

16   A.  That's what it's saying.

17   Q.  I'm just asking what this document sent to you says.  Is it

18   correct that the income at the Maryland operations seemed

19   worked up for the Manafort?

20   A.  Yes.

21   Q.  Does it refresh your recollection, Mr. Brennan, that there

22   was an analysis done by the Maryland operations center?

23   A.  Yes.

24   Q.  Now, let's go back to -- let's put on the screen Government

25   Exhibit 238 in evidence.  This is a document that you were

L71Qcal4                    Brennan - Cross

1    asked about on direct examination, so with your Honor's

2    permission, I will go back to it.

3            THE COURT:  Yes, that's fine.

4            MR. SCOTTEN:  No objection.

5            THE COURT:  If I can just -- I can hear you, but it's

6    kind of muffled.  So if you can do something with the mic to

7    just try to make it more distinct.

8            MR. LaVERNE:  I'll do my best.

9    Q.  Mr. MacDonald, you just testified, was a regional

10   underwriting manager at the bank, correct?

11   A.  Yes.

12   Q.  And in response to Mr. Ubarri's request, Mr. -- and we just

13   talked about Mr. Horn had done an analysis on the Manaforts

14   back in October for the Nottingham loan, correct?

15   A.  Correct.

16   Q.  On the request of Mr. Ubarri, the Maryland operations

17   center did another analysis after that, correct?

18   A.  I don't believe that's correct.

19   Q.  I'm not sure which part of my question you're quarreling

20   with.

21          Do you acknowledge that the Maryland operation center

22   did another analysis of Mr. Manafort's income?

23   A.  I am.

24   Q.  This is a third analysis of Mr. Manafort's income based on

25   his tax returns that is requested by Mr. Ubarri, correct?

1    A.  It's a partial analysis, yes.

2    Q.  And Mr. McDonald indicates in this email on November 11

3    that he was able to review their tax returns, correct?

4    A.  Correct.

5    Q.  And he says that he added up all the distributions from

6    each K-1, and that that shows $4.6 million for 2015, correct?

7    A.  Correct.

8    Q.  So what Mr. McDonald was telling you in this email is that

9    he looked at the tax returns, and the tax returns showed that

10   the Manaforts earned $4.6 million in K-1 income in 2015,

11   correct?

12   A.  Actually, he's saying they had distributions from K-1 of

13   4.6.

14   Q.  So if we're going to be technical about it, it's not income

15   it's distributions it's money they received from companies that

16   they had ownership in?

17   A.  That is correct.

18   Q.  Okay.  He goes on to say that Manafort might have capital

19   calls.  He might have capital calls, right, in the amount of

20   2.4 million that might need to be deducted from that income,

21   correct?

22   A.  Correct.

23   Q.  4.6 minus 2.4 is 2.2, I believe, correct?

24   A.  I believe your math is correct.

25   Q.  Good.  So under that analysis, the Manaforts still had,

L71Qcal4                         Brennan – Cross

1    according to their tax returns, $2.2 million in income in 2015

2    alone, correct?

3    A.  Again, he describes the 4.6 million as distributions.

4    Q.  Fair enough.  Fair enough.  Distributions.  That amount of

5    money $2.2 million in distributions alone in 2015, true?

6    A.  Rephrase your question, please?

7    Q.  You testified and you just based on what's in this email

8    that Mr. McDonald told you in this email that the Manaforts had

9    $4.6 million in distribution income reflected on –– in

10   distributions reflected on their tax returns in 2015, true?

11   A.  Correct.

12   Q.  And he also noted they might have capital calls in the

13   amount of $2.4 million, true?

14   A.  Correct.

15   Q.  Which left them with $2.2 million in distributions as

16   reflected on their tax returns for 2015, correct?

17   A.  That would be correct.

18   Q.  Okay.  And in this email where Mr. MacDonald shared that

19   will analysis, he copied Mr. Calk, correct?

20   A.  Correct.

21   Q.  And that is on November 11, 2016, correct?

22   A.  That is correct.

23   Q.  Now, November 11, 2016, the date that Mr. Calk received

24   this email, is the same date that the term sheet was issued for

25   the Summerbreeze transaction, true?

1   A.  True.

2   Q.  This is again the second transaction we're talking about

3   now, Summerbreeze, right?

4   A.  True.

5   Q.  Can we put on the screen GX-248 in evidence.

6           Let's go down to the bottom.  I'm sorry.  Let's come

7   back for a second.

8           There is an attachment to this document, right?

9   A.  Yes.

10  Q.  This is the Summerbreeze term sheet, right?

11  A.  Correct.

12  Q.  This sets out the terms of that loan, the Summerbreeze loan

13  that closed November of 2016, correct?

14  A.  Correct.

15  Q.  And it shows that the loan was for $9.5 million, correct?

16  A.  It does.

17  Q.  Then it gives all the collateral posted for that loan,

18  right?

19  A.  Yes.

20  Q.  The collateral posted, if you go up to the maximum LTV row,

21  it indicates the collateral value is $16.2 million on that $9.5

22  million loan, correct?

23  A.  Correct.

24  Q.  And that the LTV is 59 percent, correct?

25  A.  Correct.

L71Qcal4                          Brennan - Cross

1    Q.  Mr. Brennan, the loan to value on this transaction

2    Summerbreeze, was well within the standard guidelines for a

3    portfolio loan at the bank, true?

4    A.  Correct.

5    Q.  And we can go back just to the document.  The interest rate

6    his 7.25 percent, correct?

7    A.  Correct.

8    Q.  And that's the interest rate that was proposed all the way

9    back in April 2016 on the first transaction, right?

10   A.  Correct.

11   Q.  It's standard at the bank, correct, for portfolio loans?

12   A.  Correct.

13   Q.  Now, we can take that off.

14        The third-party cost column, do you see that?

15   A.  Yes.

16   Q.  That says the borrower, that's Mr. Manafort, right?

17   A.  Yes.

18   Q.  He will be responsible to reimburse the bank for all

19   third-party costs, right?

20   A.  Correct.

21   Q.  Including, but not limited to, appraisal and attorneys'

22   fees, correct?

23   A.  Correct.

24   Q.  Again, the bank was requiring that Mr. Manafort pay the

25   appraisal and attorneys' fees, correct?

L71Qcal4                          Brennan - Cross

1   A.  Correct.

2   Q.  Now -- we can take this off.

3         After the term sheet was issued and the terms were

4   agreed to, Mr. Calk sent you an email instructing you to make

5   sure that the bank's interests were fully protected, correct?

6   A.  Correct.

7   Q.  Let's put on the screen GX-248 in evidence.  And he said to

8   you, Jim -- this is dated November 14, correct?

9   A.  Correct.

10  Q.  This is two days before the loan actually closed, correct?

11  A.  I believe that's correct.

12  Q.  He said, "Jim, please ensure this loan is documented

13  perfectly so that our lien on both properties, as well as the

14  cash account at The Federal Savings Bank, are fully

15  enforceable," right?

16  A.  Correct.

17  Q.  And the cash account was a reference to another $630,000

18  that the bank required Mr. Manafort to post on the loan, true?

19  A.  True.

20  Q.  Mr. Calk told you this is critical; you need to make sure

21  that it happens, correct?

22  A.  Yes.

23  Q.  Okay.  You can take that down.

24        I want to turn now to the Summerbreeze loan

25  memorandum.  We talked about the Nottingham loan memorandum

L71Qcal4                    Brennan - Cross

1   where you rated the loan an average risk rating, correct?

2   A.  Correct.

3   Q.  You did another loan memorandum for the Summerbreeze loan,

4   correct?

5   A.  Correct.

6   Q.  And you did another or Mr. Horn did another whole workup

7   and writeup of Mr. Manafort's finances and income in that

8   document, true?

9   A.  True.

10  Q.  And he did it under your supervision, true?

11  A.  True.

12  Q.  You reviewed the loan memo, correct?

13  A.  I believe so.

14  Q.  You signed their loan memorandum, correct?

15  A.  As loan committee secretary, yes.

16  Q.  Yes.  But you signed off on what's in the loan memorandum,

17  true?

18  A.  As loan committee secretary.

19  Q.  Whether you did it as loan committee secretary or as Jim

20  Brennan, you, Jim Brennan, signed and approved that loan

21  memorandum, true?

22  A.  I signed it as the position, yes.

23  Q.  And you didn't send that memorandum to Mr. Calk ahead of

24  time?

25  A.  No.

L71Qcal4                         Brennan - Cross

1    Q.  Mr. Calk did not edit the loan memo, true?

2    A.  He did not.

3    Q.  And Mr. Calk didn't tell you what to put in the loan memo,

4    did he?

5    A.  He did not.

6    Q.  Mr. Calk didn't tell you to leave anything out of the loan

7    memo, did he?

8    A.  He did not.

9    Q.  And you were aware -- I think you testified about this on

10   direct, you were aware, Mr. Brennan, that this loan memo goes

11   into the bank's files, correct?

12   A.  That is correct.

13   Q.  I believe you testified one of the purposes is to document

14   the loans so that regulators have that information, true?

15   A.  That is true.

16   Q.  And you, Mr. Brennan, would not knowingly include false

17   information on a document you know is going to regulators,

18   true?

19   A.  That is true.

20   Q.  Or in any other document, right?

21   A.  True.

22   Q.  And you wouldn't knowingly include an erroneous financial

23   analysis in a loan memorandum, true?

24   A.  True.

25   Q.  And in your view, you didn't do any of those things when

L71Qcal4                        Brennan - Cross

1    you oversaw the creation of that memorandum, true?

2    A.  Didn't do what things?

3    Q.  Didn't knowingly put false information or make false

4    statements in the loan memo?

5    A.  I did not.

6    Q.  And the loan memo, among other things, evaluated the risks

7    and mitigants of the loan, correct?

8    A.  It did.

9    Q.  And the loan memo -- we looked at a little before, I don't

10   want to go over it again -- concluded that Mr. Manafort had a

11   solid net worth, true?

12   A.  It did.

13   Q.  And it included that as a mitigant, right?

14   A.  I believe that's correct.

15   Q.  And one of the mitigants was that prior to this year,

16   Mr. Manafort has shown a steady source of income in his job as

17   a political consultant, correct?

18   A.  Correct.

19   Q.  And ultimately your recommendation, the risk rating that

20   you included on this loan was a four, correct?

21   A.  That is correct.

22   Q.  And that is a risk rating of average?

23        MR. SCOTTEN:  Objection to the form on the prior

24   question.  Compound.  I just want to make sure we get that in

25   for the record.

1          THE COURT:  Overruled.

2     Q.  And Mr. Calk, he didn't tell you to rate it a four, right?

3     A.  No, he did not.

4     Q.  No one told you to rate it a four, right?

5     A.  Correct.

6     Q.  You had all this information, you reviewed it, you talked

7     it over with Mr. Horn, and you decided to rate it a four,

8     correct?

9     A.  Correct.

10    Q.  Now, I'd like to turn now to the third loan that the bank

11    considered, which we will call the Union Street loan.  Do you

12    remember that loan?

13    A.  I do.

14    Q.  We just did Summerbreeze.  Now we're turning to Union

15    Street.  We call it Union Street, Mr. Brennan, because the

16    collateral for that loan was a property in the Cobble Hill

17    neighborhood of Brooklyn at 377 Union Street, correct?

18    A.  Correct.

19    Q.  And you learned, Mr. Brennan, as early as December 9, 2017

20    that the bank was contemplating making this loan, correct?

21    A.  I believe that's correct.

22    Q.  Which is almost a month before the loan actually closed,

23    correct?

24    A.  It was about three weeks, yes.

25    Q.  And it's actually longer before the loan actually funded,

L71Qcal4                         Brennan - Cross

1   correct?

2   A.  That is correct.

3   Q.  And on December 21, 2016, you sent the term sheet to

4   Mr. Ubarri, correct, for this loan?

5   A.  I don't recollect.

6   Q.  Let's put on the screen -- let me ask you, was it around

7   that time?

8   A.  I believe so.

9   Q.  And the next day, Mr. Calk sent the term sheet copying you

10  to Mr. Ubarri and Mr. Raico, right?

11  A.  I believe so.

12  Q.  And unlike the Summerbreeze loan, this Union Street loan is

13  what's called a construction loan, correct?

14  A.  It is.

15  Q.  And a construction loan is a loan used to help fund the

16  construction of a property, correct?

17  A.  Correct.

18  Q.  And the whole idea of a construction loan is that once the

19  property is completed, it will be sold and the proceeds of that

20  sale be used to repay the loan, correct?

21  A.  Correct.

22  Q.  Let's put on the screen what's in evidence as Government

23  Exhibit 299.  Take a look at this email.  You were served on

24  it, right?

25  A.  Correct.

1  Q.  This is the term sheet that Mr. Calk sent to Mr. Manafort,

2  correct?

3  A.  The term sheet is attached to it.

4  Q.  The term sheet is attached, correct?

5  A.  Yes.

6  Q.  And he indicates he talked this term sheet over with

7  Mr. Manafort the prior evening, correct?

8  A.  Correct.

9  Q.  And he talks about setting up a new pledge account for

10  $2.5 million, correct?

11  A.  Correct.

12  Q.  Let's look at the attachment.  This is the term sheet,

13  correct?

14  A.  Yes.

15  Q.  The loan amount is $6.5 million, correct?

16  A.  Correct.

17  Q.  And the requirement is that it must appraise for no less

18  than 6.3 -- that's the property at Union Street -- on an

19  as-completed basis, correct?

20  A.  Correct.

21  Q.  Now, in addition to that collateral, the bank required

22  additional collateral, true?

23  A.  True.

24  Q.  And in fact if you go under collateral, it indicates the

25  bank required that in addition to his Union Street property, he

1   post another $2.5 million in cash, true?

2   A.  Yes.

3   Q.  And, Mr. Brennan, $2.5 million in cash -- cash,

4   Mr. Brennan, is the best kind of collateral, right?

5   A.  Yes.

6   Q.  Because it's liquid, right?

7   A.  Yes.

8   Q.  And it can be seized by the bank very easily, correct?

9   A.  Yes.

10  Q.  Now, go back to the entire document, please, and scroll

11  back a little bit.  Just the full document.  This term sheet,

12  by the way, Mr. Brennan, was on your letterhead, correct?

13  A.  Correct.

14  Q.  The interest rate on this loan again was 7.25 percent,

15  correct?

16  A.  Correct.

17  Q.  Again, Mr. Brennan, that's a standard interest rate for the

18  portfolio product at the bank, correct?

19  A.  It is.

20  Q.  And the bank is making two percentage points in origination

21  fees, correct?

22  A.  It is.

23  Q.  And it's also charging Manafort an application fee,

24  correct?

25  A.  It is.

L71Qcal4                    Brennan - Cross

1    Q.  Of $5,000?

2    A.  Correct.

3    Q.  The bank did not waive that application fee, did it?

4    A.  It did not.

5    Q.  There is a whole bunch of additional conditions, correct?

6    A.  Correct.

7    Q.  Now, you went ahead -- by the way, I think there were some

8    questions on direct about the 2.5 million in cash which you

9    testified was in an account with the bank, correct?

10   A.  That is correct.

11   Q.  And you were asked questions about your understanding as to

12   where that money came from, and it came from the Summerbreeze

13   loan, correct?

14   A.  That is my understanding.

15   Q.  And there's no requirement against using money from one

16   loan as collateral for another loan, correct?

17   A.  It was his money at that point, so no.

18   Q.  He could do whatever he wanted with it, correct?

19   A.  Exactly.

20   Q.  And have you ever heard the expression, Mr. Brennan, cash

21   is fungible?

22   A.  It is.

23   Q.  And, in fact, you believed at the time that Mr. Manafort,

24   we saw earlier, had millions of dollars of other money in

25   another bank account, correct?

L71Qcal4                    Brennan - Cross

1    A.   We did.

2    Q.   What cash is fungible means is whether you take it from one

3    account or another account, it's all coming out of the same

4    place, correct?

5    A.   I don't know that that's what it means.

6    Q.   Okay.  But if you believe that Mr. Manafort had at least

7    $2.5 million in cash in another bank account, that's money he

8    could have used to post his collateral, correct?

9    A.   When you say another bank account, at our bank or another

10   bank?

11   Q.   We went over it earlier, I wasn't going to go over it

12   again, but at UBS, you showed that he had after backing out his

13   liabilities, had at least $6 million in a UBS account.  Do you

14   recall that?

15   A.   Yes.

16   Q.   So, again, based on what you knew, at least, that money was

17   available to use to secure this loan as well, correct?

18   A.   It was.

19   Q.   Now, after the loan terms on this loan were agreed to, you

20   were in charge of doing underwriting on the loan, correct?

21   A.   Correct.

22   Q.   And you had the benefit of many, many months of work that

23   had already been done, multiple analysis that had been done on

24   Mr. Manafort's income, correct?

25   A.   Correct.

L71Qcal4                        Brennan - Cross

1    Q.   And on his properties and finances, correct?

2    A.   Correct.

3    Q.   And you took your job seriously in doing that underwriting,

4    correct?

5    A.   Correct.

6    Q.   Mr. Calk never told you to do a poor job on the

7    underwriting, did he?

8    A.   No.

9    Q.   Mr. Calk never told you to make mistakes on the

10   underwriting, did he?

11   A.   No.

12   Q.   You went out and you had two appraisals done on this Union

13   Street property, correct?

14   A.   That is correct.

15   Q.   And both of those appraisals gave you an as-complete value

16   for the property, correct?

17   A.   Correct.

18   Q.   I think you testified on direct that you didn't do an as-is

19   appraisal?

20   A.   We did not receive an as-is appraisal.

21   Q.   But you were the one in charge of deciding which appraisals

22   you had to do for the underwriting, correct?

23   A.   I believe the appraisals were actually ordered in the New

24   York office.

25   Q.   Who ordered those appraisals?

L71Qcal4                          Brennan - Cross

1   A.   I believe the appraisal management company that the New

2   York region uses.

3   Q.   Do you know if someone at the bank received those

4   appraisals?

5   A.   Yes, we did.

6   Q.   Who received them?

7   A.   The initial copies?  Or -- I received them eventually, yes.

8   Q.   The initial copies, who received them?

9   A.   I don't know.

10  Q.   Do you know whether Mr. Raico received them?

11  A.   I just said I don't know.

12  Q.   But they were not sent to you until months later?

13  A.   I didn't say months later.

14  Q.   When were they sent to you?

15  A.   I would have to look at the email history.

16  Q.   My point is, Mr. Brennan, Mr. Calk did not tell you what

17  appraisals to get or to not get, true?

18  A.   He did not.

19  Q.   You got these two appraisals that show an as-complete

20  value, correct?

21  A.   Correct.

22  Q.   And you -- from that, you, the lead underwriter, decided to

23  calculate your own as-is value from that, correct?

24  A.   I did.

25  Q.   Now, you went on to do another loan memorandum for the

1  Union Street property, correct?

2  A.  Correct.

3  Q.  And let's put on the screen GX-4.  And as with the other

4  loan memos or the other Summerbreeze loan memo, you signed this

5  loan memo, correct?

6  A.  Correct.

7  Q.  And you actually drafted this loan memo, correct?

8  A.  I did.

9  Q.  And you read through and approved it, correct?

10  A.  I did.

11  Q.  And this loan memorandum, like the other loan memorandums,

12  concluded that the Union Street loan had a risk rating of four,

13  correct?

14  A.  Correct.

15  Q.  Which is an average rated loan, correct?

16  A.  Correct.

17  Q.  And you didn't knowingly put false information in this

18  document, true?

19  A.  Correct.

20  Q.  Everything you put in this document you believed at the

21  time, correct?

22  A.  Correct.

23  Q.  Mr. Calk didn't tell you what to put in this memo, correct?

24  A.  Correct.

25  Q.  Now, there came a time, Mr. Brennan, in late December when

L71Qcal4                         Brennan - Cross

1    Mr. Manafort actually asked the bank that that $5,000

2    application fee be waived, correct?

3    A.   I don't know.

4    Q.   Let's put on the screen Defendant's Exhibit 207.  Let's go

5    down to the bottom.  The bottom email is from Mr. Baldinger to

6    Mr. Raico and Mr. Wisnicki, right?

7    A.   Yes.

8    Q.   Mr. Baldinger, we learned, was Mr. Manafort's lawyer in

9    this deal, correct?

10   A.   Correct.

11   Q.   And he has a bunch of questions, correct?

12   A.   Correct.

13   Q.   And among them, he says, "Dennis, have you had a chance to

14   inquire about the waiving of the $5,000 application fee as was

15   waived in the prior transaction?"  Do you see that?

16   A.   Correct.

17   Q.   Let's go up to the next one.  Well, there is one more

18   before that.  Mr. Wisnicki, who is the lawyer representing the

19   bank, right?

20   A.   Yes.

21   Q.   He said, "Good morning.  Hope you had a nice holiday.  Did

22   you guys see this request," right?

23   A.   Yes.

24   Q.   Scroll to the top.  Mr. Raico responded on this email,

25   "Robert, I can only comment on the request for waiving the

L71Qcal4                    Brennan - Cross

1    application fee.  No, nothing can be altered from the term

2    sheet."  Do you see that?

3    A.  Yes.

4    Q.  Now, Mr. Manafort also asked if the bank would release

5    $150,000 from construction funds to help cover the

6    out-of-pocket closing costs.  Do you remember that?

7    A.  I believe so.

8    Q.  And, Mr. Brennan, the bank denied that request, true?

9    A.  True.

10   Q.  I would like to ask you now some questions about the

11   holding company issue you testified about on direct.  Do you

12   recall those questions?

13   A.  Yes.

14   Q.  I think it was brought out on direct examination that the

15   bank decided to sell part of the Manafort loan to the bank's

16   holding company.  Do you recall that?

17   A.  Yes.

18   Q.  And as a result of that doing that, the bank was able to

19   make the loan to Mr. Manafort because it would come under its

20   legal lending limit.  Do you recall that?

21   A.  Yes.

22   Q.  Now, the holding company we're talking about is owned, in

23   substantial, part by Mr. Calk and his brother, John Calk, true?

24   A.  That is my understanding.

25   Q.  In fact, Mr. Calk alone owns something like 67 percent of

1    that holding company, correct?

2    A.  I don't know that for sure.

3    Q.  A substantial amount of it though he owns, correct?

4    A.  Correct.

5    Q.  And when the holding company bought part of this loan, the

6    holding company was taking on the risk and the responsibility

7    for that portion of the loan proceeds, right?

8    A.  That is correct.

9    Q.  So, if the loan had defaulted, the holding company and the

10   people who owned the holding company would stuck for that

11   amount of the loan, correct?

12   A.  That is correct.

13   Q.  And you know, Mr. Brennan, that there's nothing, well, that

14   selling a participation in a loan to a holding company does not

15   violate any rule or regulation, correct?

16   A.  Not at all.

17   Q.  It's perfectly lawful, correct?

18   A.  Correct.

19   Q.  I would like to ask you, Mr. Brennan, a couple questions

20   about Mr. Raico, the loan officer in this transaction.  You

21   dealt with Mr. Raico, I take it, quite a bit in the course of

22   this transaction, correct?

23   A.  Correct.

24   Q.  And you testified, among other things, that he was the guy

25   who was getting information from Mr. Manafort and then

1    supplying it to you in the bank, true?

2    A.   That is correct.

3    Q.   And he was the guy, you testified, who was responsible for

4    ensuring that all the information required for sound lending

5    decisions was obtained from the prospective borrower under the

6    loan policy, correct?

7    A.   Correct.

8    Q.   Am I correct though, Mr. Brennan, that you found it very

9    difficult to get straight information out of Mr. Raico?

10   A.   This is true.

11   Q.   Am I correct, Mr. Brennan, in fact, that you did not trust

12   the veracity of the information that was provided to you by

13   Mr. Raico?

14   A.   It was more of a question were we getting all the

15   information.

16   Q.   So you were concerned you weren't getting all the

17   information from Mr. Raico?

18   A.   True.

19   Q.   Did you tell the prosecutors when you met with them in

20   December 4, 2017 that you didn't always trust the veracity of

21   the information provided by Raico?

22   A.   I would have to look at the notes that were taken of that

23   meeting to see what my exact words were.

24   Q.   Let's put on the screen just for the witness what's marked

25   as 3500-8-018.  This is page 20.  Ask you to read what's on the

1    screen in front of you and simply tell me whether or not it

2    refreshes your recollection.

3    A.  It does.

4    Q.  I will ask you again.  Do you recall --

5    A.  Yes.

6    Q.  -- that you did not trust the veracity of the information

7    that Mr. Raico was providing to you?

8    A.  Yes.

9             MR. LaVERNE:  No further questions, thank you.

10            THE COURT:  Any redirect?

11            MR. SCOTTEN:  Please, your Honor.

12   REDIRECT EXAMINATION

13   BY MR. SCOTTEN:

14   Q.  Mr. Brennan, I want to pick up where Mr. LaVerne left off.

15   Do you recall him just now asking you questions about trusting

16   Mr. Raico?

17   A.  I do.

18   Q.  Can you remind the jury how loan officers are paid.

19   A.  They're paid by commission.

20   Q.  I'm not asking how much.  I don't mean it personally, but

21   how are you paid?  Are you paid in commission?

22   A.  I receive a small commission, but mostly salary.

23   Q.  Is your commission based on the number of loans you extend

24   or the number of loans you work on?

25   A.  The number of loans that -- my commission is based on the

L71Qcal4                         Brennan - Redirect

number of construction loans that pay off and also the number

of new commercial loans that close, the dollar amount.

Q.  And approximately what percentage of your salary is

commission?

A.  Maybe 10 percent, 10 to 15 percent in any year.

Q.  And you just said that's based partly on whether loans pay

off?

A.  That is correct.

Q.  What is the difference between your incentives and an

underwriter -- sorry -- a loan officer's incentives?

A.  A loan officer's incentive is bring the loan in and get it

closed.

Q.  And what are your incentives?

A.  To get the loan paid off.

Q.  So, in every loan, where do the documents typically come

from?

A.  Loan officer.

Q.  Do you trust a loan officer in every loan?

A.  Not every loan.

Q.  What is the general purpose of underwriting?

A.  Is to determine the accuracy of the documents that we have

been provided from the loan officer and the borrower.

Q.  Now, have you -- other than these loans, have you found

loans where the loan officer wanted a loan, but you did not

feel it was good risk?

L71Qcal4                    Brennan - Redirect

1    A.  I have.

2    Q.  What has typically happened with those loans?

3    A.  I'm usually able to talk the loan officer out of submitting

4    the loan to the loan committee for initial approval or to

5    restructure in a way that the loan committee will have a more

6    favorable view of it.

7    Q.  So, have those loans ultimately issued?

8    A.  If they've been restructured, yes.

9    Q.  And if not?

10   A.  No.

11   Q.  In this case, were you able to find enough information to

12   determine whether in your view these loans were a good credit

13   risk?

14   A.  Over the course of the underwriting, yes.

15   Q.  And what did you determine?

16   A.  We risk rated it as a 4, an average rating.

17   Q.  I'm asking what you determined though, what your view was.

18   A.  My actual view was the loan shouldn't have been made.

19   Q.  What happened to the loan?

20   A.  They were made.

21   Q.  Did you have any incentive to get the loan issued?

22   A.  I did.

23   Q.  What was that?

24   A.  I would receive ten basis points capped at, I think,

25   $3,000.

1    Q.  And how much -- well, I don't want to ask your salary.

2    That seems rude.  Was that a significant motivator for you?

3    A.  No.

4    Q.  And you testified on direct that you believed your chairman

5    wanted the loan to issue.  Is that right?

6    A.  That is true.

7    Q.  Which of the two was a more relevant factor to you in these

8    loans?

9    A.  Since I don't have loan approval --

10                            (Reporter inquires)

11            THE COURT:  We didn't understand what you said.

12   A.  The more relevant answer would be the chairman of the

13   board.

14            THE COURT:  The more relevant answer would be?

15            THE WITNESS:  The chairman of the board.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

L715cal5                    Brennan - Redirect

1    BY MR. SCOTTEN:   (Continuing)

2    Q.   Remind the jury who the chairman of the board is?

3    A.   Steve Calk.

4    Q.   Do you recall Mr. LaVerne repeatedly referring to Manafort

5    walking away from the Nottingham loan?

6    A.   I do.

7    Q.   Did he walk away from the bank?

8    A.   No.

9    Q.   What did he do?

10   A.   He submitted revised loan terms on what he would close on.

11   Q.   Do you recall being asked whether Nottingham ever happened?

12   A.   I did.

13   Q.   And whether the issues in Nottingham went away?

14   A.   Yes.

15   Q.   Did the defaults you had uncovered in the process of

16   underwriting the Nottingham loans go away?

17   A.   They did not.

18   Q.   Did the issues with the borrower's candor that you had

19   uncovered in underwriting the Nottingham loans go away?

20   A.   They did not.

21   Q.   Did the issues with undisclosed credit card delinquencies

22   go away?

23   A.   The credit card was paid but the explanation wasn't

24   satisfactory.

25   Q.   And the issue of the borrower's income being very different

L715cal5                          Brennan - Redirect

1    from what he told the IRS, did that go away?

2    A.  It did not.

3    Q.  Do you remember being asked if Yohai was cut out -- I'm not

4    sure that was the phrase but effectively cut out of the later

5    loan?

6    A.  Yes.

7    Q.  Did Yohai remain Paul Manafort's business partner?

8    A.  I don't know that.

9    Q.  If other evidence showed that he did, would that be

10   relevant?

11           MR. LaVERNE:  Objection, your Honor.  Speculation.

12   Q.  I will ask a direct question.

13           Do you recall seeing an e-mail after Nottingham had

14   gone away in which Thomas Horn brought to your and Raico's

15   attention that Yohai was going into bankruptcy and having

16   issues?

17   A.  I do.

18   Q.  Do you recall the response being disappointing but not

19   unexpected?

20   A.  I do.

21   Q.  That was after Nottingham supposedly went away, right?

22   A.  That is true.

23   Q.  Why did you continue to care what happened to Yohai?

24   A.  Part of that e-mail also stated that Paul Manafort was --

25   had $2.5 million owed to him by one of the entities.

L715cal5                        Brennan - Redirect

1   Q.  So, did you understand at least in some way that Yohai and

2   Manafort's finances remained connected?

3   A.  Yes.

4   Q.  So, with all of those many issues you identified that Yohai

5   still had relevance in the next loan?

6   A.  Correct.

7   Q.  Can we put up Government Exhibit 202, please?  And if we

8   can blow up the top two thirds of the screen?

9          Now, when Paul Manafort -- and I am quoting here --

10  "walked away from Nottingham," you said he proposed a new loan?

11  A.  Correct.

12  Q.  Was that loan more favorable or less favorable to the bank?

13  A.  It was less favorable.

14  Q.  And what does this comparison you are doing between the

15  loans here at the bottom of the screen show?

16  A.  It is showing the amount of collateral that we had

17  initially versus what collateral of the new loan would be, the

18  amount of the loan was being increased.  We no longer had the

19  short-term loan for Nottingham that would have paid off a

20  substantial part of the loan.

21  Q.  So, my overall question is, would someone familiar with

22  these loans -- withdrawn.

23          For someone familiar with these loans in the banking

24  industry, what would this indicate about which of the two loans

25  is better for the bank?

L715cal5                    Brennan - Redirect

1    A.  The initial loan was better for the bank.

2    Q.  And who was this e-mail forwarded to, looking at the top?

3    A.  Stephen Calk.

4    Q.  What did Javier Ubarri do with respect to this loan?

5    Initially?  Did he accept it or reject it?

6    A.  He rejected it.

7    Q.  And who, if anyone at the bank, would have the practical

8    ability to override Javier Ubarri's decision?

9    A.  Stephen Calk.

10   Q.  We can take that down.

11        Do you recall being asked whether Mr. Horn's memo and

12   Mr. Horn's e-mail said, in so many words, don't make these

13   loans?

14   A.  I remember that question.

15   Q.  How often, in your time at the bank, do you recall memos

16   like this being done?

17   A.  The memo you are talking about --

18   Q.  Mr. Horn's memo of 13 problems with the loan.

19   A.  That was the first time I remember.

20   Q.  And how often at the bank do you remember boiling down

21   those sorts of things into an e-mail that could be sent to

22   Mr. Calk?

23   A.  It is the first time I remember.

24   Q.  How did you believe the people reading about these problems

25   would perceive them?  Were you worried they were perceived as a

1    recommendation to make the loan?

2    A.   Definitely not.

3    Q.   How did you believe they would perceive it?

4    A.   That there were a number of negatives that needed to be

5    addressed on the loan before it would go forward.

6    Q.   Do you recall seeing an e-mail where you later specifically

7    asked Mr. Ubarri to brief the defendant on those issues?

8    A.   I do.

9    Q.   That was with respect to the Nottingham loan, correct?

10   A.   That is correct.

11   Q.   And you testified a minute ago the actual loan that issued

12   was worse for the bank, correct?

13   A.   Correct.

14   Q.   Do you recall being asked whether you directly told

15   Mr. Calk about your concerns with the loans?

16   A.   I do remember.

17   Q.   How did you attempt to get your concerns to Mr. Calk?

18   A.   Through the two loan committee members that were available

19   in Chicago to meet personally.

20   Q.   In your experience, were those loan committee members able

21   to talk to Mr. Calk?

22   A.   I believe Mr. Ubarri would have conference calls or calls

23   with Mr. Calk.

24   Q.   And who was closer in rank to the defendant; you or

25   Mr. Ubarri?

L715cal5                        Brennan - Redirect

1    A.  Mr. Ubarri.

2    Q.  And, in your experience, how did Mr. Calk respond when you

3    criticized him?

4    A.  Not favorable.

5    Q.  Can you add a bit to that?

6    A.  He would have a little bit of a temper that he would allow

7    to come forward.

8    Q.  And what about these loans caused you to think that

9    criticizing the loans would be criticizing him?

10   A.  Because, in my mind, it was apparent that Mr. Calk wanted

11   them to go through.

12   Q.  Small question here:  Do you remember being asked a lot

13   about LTV or loan to value?

14   A.  Correct.

15   Q.  And that's calculated based on collateral?

16   A.  Yes.

17   Q.  So, does a strong LTV address issues with the borrower's

18   income?

19   A.  It does not.

20   Q.  Does it address issues of character?

21   A.  It does not.

22   Q.  Do you recall being asked a lot of questions about what

23   assets Mr. Manafort may or may not have had?

24   A.  I do.

25   Q.  At the time you were looking at these assets, were you

L715cal5                          Brennan - Redirect

1    aware of defaults that he had made?

2    A.  At various times we were.

3    Q.  Before the loan was issued, did you become aware of

4    defaults he had?

5    A.  Which loan?

6    Q.  Either loan.

7    A.  We found out, prior to I believe it was prior to the loan

8    on 377 that it was in default.

9    Q.  OK, let's also look at -- let's start with Government

10   Exhibit 146, the Horn memo.  And if we can go to the bottom, I

11   think it is going to be page 5 -- actually, continuing on, it

12   is going to be the bottom of that memo which is going to be --

13   can you please highlight the last bullet, no. 13?  Do you see

14   at the very end where it says:  Current on loans?

15   A.  Yes.

16   Q.  Do you recall being asked during cross-examination whether

17   this memo pointed out any defaults?

18   A.  I did.

19   Q.  And here, according to this bullet, do you know whether he

20   is in default or not in default?

21   A.  From this memo, no.

22   Q.  Are you raising the question whether he might be in

23   default.

24   A.  We are raising questions on how the other loans in

25   California are performing; yes.

L715cal5                    Brennan - Redirect

1   Q.  Do you remember the date of this memo?  If not we can go to

2   the top.

3   A.  I believe it was September 13th.

4   Q.  Could we now go to Government Exhibit 149?  So, what is the

5   date of this?

6   A.  September 14th.

7   Q.  And what are you advising Mr. Ubarri and Mr. Norini here?

8   A.  That the loan from Genesis on Nottingham is in foreclosure.

9   Q.  And how long is it after you sent the memo asking whether

10  you had concerns about whether they were current?

11  A.  One day.

12  Q.  If we could take that down, please?  Could we please put up

13  Defendant's Exhibit 129?  And I believe we want to scroll down.

14          MR. SCOTTEN:  One second, your Honor?

15          (counsel conferring)

16  Q.  We will come back to that.

17          Do you recall being asked on direct whether property

18  was added to the Nottingham deal to overcome underwriting

19  issues?

20  A.  Yes.

21  Q.  And I don't want to go back into it.  Do you recall

22  testifying on direct that it did not overcome the underwriting

23  issues, in your view?

24  A.  Correct.

25  Q.  Can we put back up DX 172?

L715cal5                        Brennan – Redirect

1              THE COURT:  It is time for a break.

2              MR. SCOTTEN:  This would be great, your Honor.  Thank

3    you.

4              THE COURT:  We will take our afternoon break now.  10

5    minutes.  Please, don't talk about the case.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L715cal5                         Brennan – Redirect

1              (Jury not present)

2              THE COURT:  10 minutes.

3              MS. ROTHMAN:  Your Honor, just one very quick matter.

4         I think it is likely, I am optimistic that we will get

5    to the testimony of Mr. Gongaware this afternoon.  He is

6    employed by the OCC.  It may make sense for the Court to give a

7    similar instruction that it gave before Mr. Paulson's testimony

8    that essentially we are not –– the OCC is not offering an

9    opinion one way or the other on these loans and, rather, is

10   here testify to factual situations that they were part of as

11   part of their involvement in this case.  I think the Court's

12   language was fine with respect to Mr. Paulson.  It may make

13   sense to give a similar instruction.

14             THE COURT:  Any objection?

15             MR. LaVERNE:  I have no objection, your Honor, to the

16   same instruction you gave before.

17             THE COURT:  OK.

18             (recess)

19             (Continued on next page)

20

21

22

23

24

25

1              (Jury present)

2      BY MR. SCOTTEN:

3      Q.  Just a couple more things real quick, Mr. Brennan.  Do you

4      remember being asked about MacDonald's analysis of the 2015 tax

5      year?

6      A.  Yes.

7      Q.  And you kept making the distinction between income and

8      distributions?

9      A.  Yes.

10     Q.  Why does that matter?

11     A.  Because distributions can be either returned off-income

12     from either that year or prior years or it could be

13     distributing money from new loans.

14     Q.  So, does a distribution necessarily mean the borrower has

15     recurrent income?

16     A.  No, it does not.

17     Q.  Could it be a one-time event?

18     A.  It could be.

19     Q.  What was Mr. Manafort's income in 2016?

20     A.  For PJM?

21     Q.  Yes.

22     A.  I believe it was, between Mr. Manafort and his wife, about

23     $670,000.

24     Q.  Sorry.  According to what he filed -- in 2016, not 2015.

25     A.  I'm sorry.

L715cal5                          Brennan - Redirect

1    Q.  2016.

2    A.  2016 he had expenses of six-hundred-and-some thousand.

3    Q.  So, negative income?

4    A.  Correct.

5    Q.  Does that make it more or less important to know whether

6    the 2015 distributions were a one-time event?

7    A.  More important.

8    Q.  Why?

9    A.  Because if they're not recurring you can't count them.

10   Q.  Mr. Brennan, do you recall being asked on cross whether you

11   believed everything in the 377 Union Street memo at the time?

12   A.  I didn't understand the question.

13   Q.  Do you remember Mr. LaVerne asking you whether you believed

14   everything in the 377 Union Street CAM at the time you wrote

15   it?

16   A.  I don't believe that's the question he asked, but.

17   Q.  Can we have a quick read back?

18          THE COURT:  You don't want the question Mr. LaVerne

19   asked.

20          MR. SCOTTEN:  I want the answer.  But if he doesn't

21   believe the question happened I can't ask him for the answer I

22   think, your Honor.

23          Let me ask it this way.

24          THE COURT:  OK.

25   BY MR. SCOTTEN:

L715cal5                      Brennan - Redirect

1    Q.  Did you believe everything in the 377 Union Street credit

2    memo at the time?

3    A.  I did not.

4    Q.  What did you not believe?

5    A.  I didn't believe that we had a full understanding of

6    Mr. Manafort's income or his liabilities.

7    Q.  Did you believe that it should be rated a 4?

8    A.  4 is broad enough rating that it would cover this loan,

9    yes.

10   Q.  Did you believe at the time that it should be rated a 4?

11              MR. LaVERNE:  Objection.  Asked and answered.

12              THE COURT:  Sustained.

13   BY MR. SCOTTEN:

14   Q.  Mr. Brennan, do you recall being asked by a federal judge

15   about this memorandum in the past?

16   A.  I do.

17   Q.  Do you recall him asking:  And you prepared it and you gave

18   it a 4?

19   A.  I do.

20   Q.  Do you recall replying:  I did.

21   A.  Yes.

22   Q.  Do you recall being asked --

23              MR. LaVERNE:  Objection to the readback.

24              THE COURT:  Sustained.

25              MR. SCOTTEN:  Sorry.  I don't mean to read it back.

L715cal5                        Brennan - Redirect

1    BY MR. SCOTTEN:

2    Q.  Do you recall being asked whether you were then telling the

3    Court, under oath, that you didn't believe --

4              THE COURT:  Sustained.

5              MR. SCOTTEN:  I'm impeaching with a prior

6    inconsistent, your Honor.

7              THE COURT:  He is your witness.

8              MR. SCOTTEN:  I am allowed to impeach my own witness,

9    your Honor.

10             THE COURT:  I don't remember it that way so why don't

11   you move on.

12             MR. SCOTTEN:  We may need to recall the witness, your

13   Honor.

14             MR. LaVERNE:  I don't object to him impeaching his own

15   witness if that's what he wants to do.

16             THE COURT:  That's not the basis for your objection?

17   OK.

18             MR. LaVERNE:  My objection was reading back all of

19   this testimony.  If there is one statement to impeach him on --

20   BY MR. SCOTTEN:

21   Q.  This is it, this is the statement and the answer:  But now

22   you are telling us under oath that you don't believe it was a

23   4?

24             And do you recall responding:  I didn't at the time.

25   A.  Correct.

L715cal5                    Brennan - Redirect

1    Q.  And that was under oath?

2    A.  Yes, it was.

3    Q.  Finally, Mr. Brennan, do you recall being asked about SARs

4    or suspicious activity reports?

5    A.  I do.

6    Q.  And Mr. LaVerne asked you whether you would file them if

7    you thought certain things were going on?

8    A.  Yes.

9    Q.  And do you recall one of the things he asked you was would

10   you file one if you thought bank bribery was going on?

11   A.  Correct.

12   Q.  At the time of these loans, did you know Manafort had put

13   Calk on Trump's economic team?

14   A.  I did.

15   Q.  Sorry, did you know that Manafort had put him on the team,

16   not that he was on it?

17   A.  I was under the belief that Mr. Manafort helped Mr. Calk

18   get on the economic council.

19   Q.  Did you know that --

20          MR. LaVERNE:  Objection.  Asked and answered.

21   Q.  I understand he was under the belief.  Did you know it or

22   believe it?

23   A.  I believed it.

24   Q.  Did you know that Manafort was helping Calk to become

25   Secretary of the Army?

L715cal5                         Day - Direct

1   A.  I had no knowledge of that.

2   Q.  So, at the time of the loans, did you know whether bank

3   bribery was being committed?

4   A.  I did not.

5            MR. SCOTTEN:  Nothing further, your Honor.

6            THE COURT:  OK.  Thank you.  You may be excused.

7            MR. SCOTTEN:  Your Honor, the government calls John

8   Day.

9            THE COURT:  And I have just found Rule 607.  Thank

10  you.

11           MR. SCOTTEN:  Thank you, your Honor.  I appreciate it.

12           (Witness steps down)

13  JOHN DAY,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16           THE DEPUTY CLERK:  Please state and spell your first

17  and last name for the record, please.

18           THE WITNESS:  John Day.  D-A-Y.

19           THE COURT:  Let me ask the government, is this an OCC

20  witness?

21           MR. SCOTTEN:  No.  The next witness after that, your

22  Honor.

23           THE COURT:  Got it.  Thank you.  Go ahead.

24  DIRECT EXAMINATION

25  BY MR. SCOTTEN:

L715cal5                        Day - Direct

1    Q.  Mr. Day, how far did you go in school?

2    A.  I got my Ph.D and my Juris Doctorate.

3    Q.  What is a Juris Doctorate?

4    A.  It is a law degree.

5    Q.  Where do you work?

6    A.  At Genesis Capital.

7    Q.  How long have you worked at Genesis Capital?

8    A.  For almost seven years.

9    Q.  So, for today, all the questions I'm going to ask you about

10   Genesis are going to refer to the 2016 to 2017 period.  Does

11   that make sense?

12   A.  It does.

13   Q.  In that period, what kind of company was Genesis?

14   A.  We are a lending company so we lend money to people who are

15   building single family and multi-family homes.

16   Q.  And you say you lend money.  Were you a bank?

17   A.  We function similar to a bank.  We will lend money to

18   support the construction of a project and we will take a

19   security interest in the underlying real property to secure

20   that loan so that way it functions similar to a bank.

21   Q.  Are there any differences between Genesis in 2016 and 2017

22   and a bank?

23   A.  Yes.  I mean, Genesis was not considered a bank as it's

24   considered under the regulatory context that banks have to

25   operate with.

1  Q.  So, did bank regulations apply to Genesis?

2  A.  Correct, they did not.

3  Q.  And who owned the bank?  I don't -- sorry.  Who owned

4  Genesis, I don't mean specifically, but what kind of owners?

5  A.  A private equity firm that invested money in a multiple

6  number of ways including financing as a lending operation.

7  Q.  Was any of Genesis' money insured by the FDIC?

8  A.  No.

9  Q.  And are you familiar with the term "hard money lender"?

10  A.  I am.

11  Q.  Would that be applied to Genesis?

12  A.  Effectively, yes.

13  Q.  Fair to say you don't like the label but it is in that

14  category that other people refer to it that way?

15  A.  We refer to it as private money.

16  Q.  In 2016 and 2017, what was your job at Genesis?

17  A.  I led the legal function so I was general counsel and I

18  also ran the credit and risk function of our company, the

19  function that was responsible for evaluating loans, approving

20  loans, and overseeing loans that were in default.

21  Q.  And how long had you been the legal officer?

22  A.  I'm sorry?  How long was I what?

23  Q.  Had you been the legal officer at Genesis as of 2016?

24  A.  For about almost two years.

25  Q.  And how long had you been in charge of risk?

L715cal5                         Day - Direct

1  A.  Just recently, a matter of months, I think.

2  Q.  How did you become Genesis' risk officer?

3  A.  The prior gentleman who was in that role left and I was

4  asked to step into the role.

5  Q.  What was his name?

6  A.  Mitch Solow.

7  Q.  Why did Mr. Solow leave?

8  A.  He was terminated for some irregularities.

9  Q.  And were the irregularities with a borrower?

10  A.  Specifically, yes; Jeffrey Yohai.  He had accepted a check

11  from him which was not something that you would expect from

12  someone in that position.

13  Q.  What can you tell me about Genesis' relationship with

14  Yohai?

15  A.  He was a borrower of ours so we had, prior to my tenure as

16  the chief credit and risk officer, Genesis Capital had lent

17  money to Jeffrey Yohai to reposition four or five single-family

18  assets in Los Angeles and in New York.

19  Q.  Do you remember the names of any of those properties?

20  A.  There were a couple on Nottingham Avenue in Los Angeles,

21  California; and there was one on Union Street or Union Avenue,

22  in New York.

23  Q.  Do you happen to remember the exact addresses?

24  A.  Sitting here I do not.

25  Q.  Would looking at an e-mail from the time possibly refresh

L715cal5                          Day - Direct

1    your recollection?

2    A.  Surely.

3          THE COURT:  You can lead on that question.

4    Q.  Was one of them 2401 Nottingham?

5    A.  Yes.

6    Q.  And was the New York property 377 Union?

7    A.  Yes, it was.

8    Q.  Mr. Day, when you took over as risk officer in 2016, what

9    was the condition of those loans?

10   A.  They were in default.  Payments had -- I forget exactly how

11   long, but for some period of time the monthly debt service

12   payments that were due under our loans weren't being made and

13   so that puts them in default.

14   Q.  Did you take any action with respect to that problem?

15   A.  Yes.  We took the normal actions that we would take on any

16   similar circumstances.  We would engage in a conversation with

17   the borrower, attempt to get the issue resolved, and then,

18   ultimately, if the issue cannot be resolved we will proceed, we

19   will pursue foreclosure of the assets.

20   Q.  And other than Jeffrey Yohai, did you speak with anyone

21   else on the borrowing side?

22   A.  Yes.  We had a couple meetings with his father-in-law Paul

23   Manafort in regards to the pool of loans that were outstanding

24   with Genesis to Mr. Yohai.

25   Q.  Did you have an understanding of what Manafort's role was

L715cal5                          Day - Direct

```
1    in these loans or properties?
2    A.   Well, he was -- the most direct role was that he was a
3    personal guarantor on the Union Avenue or Street property but
4    he was also, when I met him, he was acting at a more global
5    level attempting to negotiate resolution of the issues that
6    Mr. Yohai was having with us by virtue of the fact that the
7    loans were in default.
8    Q.   First, with respect to 377 Union, what does it mean to be a
9    guarantor?
10   A.   Our loans are primarily secured by a first lien on the
11   underlying real estate and our loans are business purpose loans
12   so they're typically to entities, to LLCs.  And a guarantor
13   would be an individual who will effectively stand behind that
14   loan and guarantee, personally, from their balance sheet, that
15   if there is a deficiency on the loan after the property is
16   sold, that they'll stand behind that deficiency.
17   Q.   So, in regular terms, was Mr. Manafort on the hook for the
18   debt at 377 Union if it wasn't paid from foreclosure?
19   A.   He was, indeed.
20   Q.   And, with respect to the other properties, do you know
21   whether he had any kind of interest?
22   A.   I don't know if he had a financial interest.  My clear
23   recollection was that he was not a personal guarantor on the
24   other loans but he may or may not have had a financial interest
25   in those.
```

L715cal5                          Day - Cross

1  Q.  Did you discuss any possible solutions with Manafort?

2  A.  Yes.  I mean, he was clearly getting engaged to try to see

3  if there was a way to get properties sold which, you know,

4  would be one way to get us out because if they get sold there

5  is funds to pay off the debt.  So, yes, we were having

6  conversations with them, trying to see if there was a

7  resolution short of foreclosure that could be resolved.

8  Q.  Do you remember discussing any particular lender that might

9  refinance them out?

10 A.  Yes.  I forget exactly whom on their side but they put us

11 in touch with Federal Savings Bank and I interacted with

12 Federal Savings Bank in an effort to effectuate a refinance of

13 some or all of those loans.

14 Q.  Did you have any understanding of why Federal Savings Bank

15 would want to refinance these loans?

16 A.  I mean, they're in the business of lending but, beyond

17 that, no, I didn't have any specific understanding.

18 Q.  Would Genesis have made new loans to Manafort or Yohai?

19 A.  Not in that particular situation, given the fact that the

20 loans that we had made to them were in default.

21         MR. SCOTTEN:  Nothing further.

22         THE COURT:  Any cross?

23         MR. SCHOEMAN:  Briefly, your Honor.

24 CROSS EXAMINATION

25 BY MR. SCHOEMAN:

L715cal5                        Day – Cross

1    Q.  Good afternoon, Mr. Day.

2    A.  Good afternoon.

3    Q.  I am Paul Schoeman, a lawyer for Stephen Calk.

4              THE COURT:  You may take your mask off.

5              MR. SCHOEMAN:  Great.  Thank you.

6    Q.  You have never met Stephen Calk?

7    A.  No, sir.  I have not.

8    Q.  Never spoke to him?

9    A.  No, sir.  I have not.

10   Q.  Is the person that you spoke with at The Federal Savings

11   Bank Dennis Raico?

12   A.  Yes.

13   Q.  Is he the one that told you that The Federal Savings Bank

14   was going to refinance all of the California properties?

15   A.  He told me that they were looking at a refinance.  It was

16   always unclear if it would be for all or some but, yes, he is

17   the one that I spoke to about the refinance.

18   Q.  And what Mr. Raico said about Federal Savings Bank

19   refinancing the California properties never happened?

20   A.  Correct.  That's my recollection.

21             MR. SCHOEMAN:  No further questions.

22             MR. SCOTTEN:  Nothing further, your Honor.

23             THE COURT:  You may be excused.  Thank you.

24             (witness excused)

25             MS. ROTHMAN:  The government calls Jack Gongaware.

1              THE COURT:  Is he the OCC witness?

2              MS. ROTHMAN:  He is, your Honor.

3              THE COURT:  OK.  Maybe I will instruct the jury now.

4              You are about to hear testimony from another employee

5    from the Office of the Comptroller of Currency, or the OCC, and

6    the testimony is admissible to provide you with background and

7    about factual issues and occurrences in the case.  You

8    shouldn't infer from the testimony that the OCC does or does

9    not have any particular view of the loans in question or of

10   Mr. Calk, or of this case as a whole.  And, I further instruct

11   you, that any such view would not be relevant in this case.

12   JACK GONGAWARE,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:  Please state and spell your first

16   and last name for the record, please.

17             THE WITNESS:  Jack Gongaware.  First name is Jack,

18   J-A-C-K; last name Gongaware, G-O-N-G-A-W-A-R-E.

19             THE COURT:  You may proceed.

20             MS. ROTHMAN:  Thank you, your Honor.

21   DIRECT EXAMINATION

22   BY MS. ROTHMAN:

23   Q.  Good afternoon, Mr. Gongaware.  In what city and state do

24   you live?

25   A.  Sugar Grove, Illinois.

1   Q.  How far did you in school?

2   A.  Masters degrees.

3   Q.  In what?

4   A.  Business administration and accountancy.

5   Q.  Where do you work?

6   A.  The Office of the Comptroller of the Currency.

7   Q.  Do you work out of a particular office?

8   A.  I do.  The Downers Grove office.

9   Q.  How long have you worked there?

10  A.  Eleven years.

11  Q.  What is your position at the OCC?

12  A.  Commercial credit specialist.

13  Q.  Just generally, what do you do as a commercial credit

14  specialist?

15  A.  I am part of an examination team that goes into national

16  banks and federal thrifts and help review commercial credit

17  portfolios.

18  Q.  In 2017, was The Federal Savings Bank one of the banks that

19  was supervised by your office at the OCC?

20  A.  Yes.

21  Q.  Ms. Drescher, can you please pull up what is in evidence as

22  Government Exhibit 1201?

23       Mr. Gongaware, do you recognize that photograph?

24  A.  Yes.

25  Q.  Who is that a photograph of?

1    A.  Stephen Calk.

2    Q.  In 2016 and 2017, what position did Mr. Calk have at The

3    Federal Savings Bank?

4    A.  He was the CEO and chairman of the bank.

5    Q.  Now, I want to direct your attention to March 29, 2017.  Do

6    you recall reading anything in the news about the Federal

7    Savings Bank on that date?

8    A.  I do.

9    Q.  What did you read?

10   A.  There was an article in the Wall Street Journal that

11   mentioned the bank and it mentioned a possible legal lending

12   limit violation, and also some -- the possibility that the

13   origins of the loans in question -- it was questioning the

14   origins of the loans in question.  Sorry.

15   Q.  What loans are you referring to that were referenced in

16   that Wall Street Journal article?

17   A.  Two loans to a company called Summerbreeze, LLC.

18   Q.  Did the article mention who was the owner of that entity?

19   A.  It did.

20   Q.  Who was that?

21   A.  Paul Manafort.

22   Q.  Do you recall that article saying anything about the

23   properties owned by Paul Manafort?

24   A.  The article indicated that they may have been in the

25   foreclosure process.

1    Q.  Do you recall the article saying anything about the dates
2    of those loans?
3    A.  November 2016 was one loan and January 2017 was another
4    loan.
5    Q.  Do you recall the article mentioning anything about the
6    amount of those loans?
7    A.  I'm not sure if it stated specifically the loan amounts but
8    I think it did reference $16 million in total.
9    Q.  And, did the article mention anything about Mr. Calk having
10   a position on Donald Trump's presidential campaign?
11   A.  It did.  It mentioned he was part of the campaign.
12   Q.  What did you do after coming across the article?
13   A.  I reached out to Kevin Peters, who was the examiner in
14   charge of a recent exam, and also Nancy Chelovich, who was the
15   loan portfolio manager of that exam.
16   Q.  And what happened when you reached out to Mr. Peters and
17   Ms. Chelovich?
18   A.  The initial contact was via e-mail.  Kevin Peters
19   recommended we talk on the phone.  During the telephone
20   conversation we discussed the possibility of the legal lending
21   limit violation possibly being an issue because we had just
22   been to the bank, and Kevin was also doing some ongoing
23   monitoring of the bank and we were unaware of this possibility
24   that there was this violation.  And so, he and Nancy and I
25   agreed that since I was in the area -- I was working at a bank

1    in the loop -- that I should request a meeting with the bank

2    that day and discuss the possibility of that violation being

3    true.

4    Q.  Did you participate in a meeting with the bank the same

5    day?

6    A.  I did.

7    Q.  In your tenure at the OCC, had that ever happened before?

8    A.  No.

9    Q.  I now want to ask you a few questions about the meeting

10   that you had with the bank.  Do you recall who was present from

11   the Federal Savings Bank?

12   A.  I do.  On the telephone was the president of the bank,

13   Javier Ubarri; and in person was Jim Norini, the Chief

14   Operating Officer; Ryan Murphy, the in-house counsel; and

15   Stephen Calk, CEO and chairman.

16   Q.  Where did the meeting take place?

17   A.  At The Federal Savings Bank.

18   Q.  Had you met Mr. Calk before?

19   A.  Not officially but I do believe maybe in passing.

20   Q.  Who, from the OCC, attended the meeting?

21   A.  Nancy Chelovich was on the telephone and I was in person.

22   Q.  Can you describe how the meeting started?

23   A.  The meeting started -- before I could say anything,

24   Mr. Calk indicated to me that he was either the senior-most

25   economic advisor or a senior economic advisor to the President

1    Donald Trump and that he wanted to know why we were there, that

2    he believed the meeting was politically motivated, and he just

3    was angry, agitated, that we were there.

4    Q.  How did you respond to Mr. Calk's introduction at the

5    meeting?

6    A.  Well, it took me by surprise.  I wasn't expected to be

7    confronted with someone who worked for the President at this

8    meeting so I kind of fumbled over a couple of words.  And I

9    remembered Nancy was on the telephone and she is a much more

10   experienced examiner than I was so I passed it off to Nancy to

11   handle the question.

12   Q.  What did Nancy -- Ms. Chelovich -- say in response?

13   A.  Ms. Chelovich indicated that, you know, we are constantly

14   monitoring banks so, if we see something in the media, it is

15   not unusual for us to follow up on that with meetings or

16   conversations with the bank.

17   Q.  During Mr. Calk's opening to the meeting what, if anything,

18   did he say about his military experience?

19   A.  He indicated that he was a veteran.

20   Q.  And can you explain the context in which that came up?

21   A.  My impression at the time was that he was implying that

22   because he was a veteran that he felt like he was being treated

23   unfairly.

24            MR. LaVERNE:  Object to the relevance of all of this.

25            THE COURT:  I will allow it.

L715cal5                        Gongaware - Direct

1           MS. ROTHMAN:  I only have a few more questions on this

2    point, your Honor.

3           THE COURT:  OK.

4    BY MS. ROTHMAN:

5    Q.  How did you respond when Mr. Calk mentioned his military

6    experience?

7    A.  I responded that I was also a veteran.

8    Q.  And then at that point what, if anything, did Mr. Calk say?

9    A.  He clarified that he was a combat veteran.

10   Q.  What, if anything, did you say in response?

11   A.  I clarified that I was not a combat veteran.

12   Q.  Can you briefly describe your military experience?

13   A.  Six years active duty United States Navy; and two years

14   active reserve duty Illinois National Guard.

15   Q.  Now, you testified that the article in the Journal that you

16   read raised a possible issue with a legal lending limit

17   violation; is that right?

18   A.  That's correct.

19   Q.  What is your understanding of legal lending limits as they

20   apply to bank loans?

21   A.  So, the federal regulatory agencies have decided that it's

22   risky for banks to put too much of their assets in one borrower

23   or related group of borrowers because, if they failed, that

24   could jeopardize the bank's financial integrity.  So, there is

25   a limit that the regulatory agencies impose so that that

L715cal5                        Gongaware – Direct

1    doesn't happen.

2    Q.  And what, if anything, did Mr. Calk say about whether or

3    not the loans to Paul Manafort had violated the legal lending

4    limit?

5    A.  He indicated that they did not.

6    Q.  Did he elaborate on why it was that they did not violate

7    those limits?

8    A.  He did.  He indicated that the bank had sold portions of

9    the loans to the holding company so that they would not violate

10   the legal lending limit.

11   Q.  Now, you also testified that the Journal article raised a

12   possible issue with the properties being in foreclosure; is

13   that right?

14   A.  That's correct.

15   Q.  Why would that foreclosure of properties be concerning to

16   the OCC?

17   A.  It would speak to the borrower's ability to repay the debt.

18          If the borrower is having issues repaying existing

19   debts and they're in foreclosure, that would indicate to a

20   lender that they may have issues repaying the debt that's in

21   question.

22   Q.  What, if anything, did you ask Mr. Calk about those

23   properties at the meeting?

24   A.  I asked if the bank was aware if the properties were in

25   foreclosure or not.

1    Q.  How did Mr. Calk respond to your question?

2    A.  He said that he didn't know if they were -- well, he said

3    that he didn't think they were and he didn't have any

4    information that they were.

5    Q.  Ms. Drescher, can we pull up what is in evidence as

6    Government Exhibit 279, and if you can go to the last page of

7    the document and zoom in on the final e-mail?  I am going to

8    ask you to highlight "from Paul Manafort" and the "cc to Steve

9    Calk."

10              MR. LaVERNE:  Objection to asking the witness about a

11   document he is not on or involved with in any way.

12              THE COURT:  Sorry.  I can't hear you.

13              MR. LaVERNE:  Your Honor, I am objecting per our

14   discussion the other day about asking witnesses about documents

15   they have no personal knowledge of.

16              MS. ROTHMAN:  I am not going to ask the witness about

17   this e-mail, but it is in evidence and I think I'm allowed to

18   put it on the screen when I ask him a question.

19              THE COURT:  Well --

20              MR. LaVERNE:  I object to this.

21              THE COURT:  I outlined certain parameters so if you

22   can do it without the document, that would be great.

23              MR. SCOTTEN:  Your Honor, that was the defense case.

24              MS. ROTHMAN:  Your Honor, with the Court's permission,

25   I'm going to ask the witness a question.  I don't intend to ask

1    him to opine on anything in the document.  I do think it is in

2    evidence.  I would like to put it on the screen, if the Court

3    would permit that.

4              THE COURT:  Are you asking him to look at it and are

5    you asking him questions about it and whether he has seen it or

6    anything like that?

7              MS. ROTHMAN:  I am going to ask the witness one

8    question.

9              THE COURT:  Go ahead.

10   BY MS. ROTHMAN:

11   Q.  Mr. Gongaware, if Mr. Calk had disclosed to you in the

12   meeting that prior to making that second loan to Paul Manafort

13   he had been informed that properties that Manafort owned would

14   go to auction on December 21st, how would you have responded?

15   A.  I would have asked him to clarify because, obviously, there

16   would have been some concerns about the borrower's ability to

17   repay the debt if he is having properties go to auction.

18   Q.  Would you have expected a bank CEO to disclose to you that

19   he knew the properties were going to auction in response to a

20   question about foreclosure?

21   A.  I think, yes, because the root of the question in

22   foreclosures goes back to the borrower's ability to repay.  I

23   think it is material that they were in default or foreclosure

24   or in the process of auction.

25   Q.  And why would you, from your time spent at the OCC, expect

1    a bank CEO to respond in that manner?

2    A.  We expect banks to be forthcoming with information.  It's

3    not possible for us to ask questions covering every angle of

4    the situation we are looking at so we expect the banks to be

5    forthcoming with information.

6    Q.  We can take down Government Exhibit 279.  Ms. Drescher, if

7    you can pull up Government Exhibit 281 and just zoom in on the

8    top half of the page?

9              MR. LaVERNE:  Your Honor, I have to object to this.

10             THE COURT:  I will allow it.  You are not asking the

11   witness about this document, are you?

12             MS. ROTHMAN:  I am asking the witness one question,

13   your Honor.

14             THE COURT:  All right.

15             MS. ROTHMAN:  Thank you.

16   BY MS. ROTHMAN:

17   Q.  Now, if a bank CEO knew that there was a short time until

18   foreclosure, how would you have expected him to respond to your

19   question about foreclosure at the meeting?

20   A.  I would have expected him to say that they were close to

21   foreclosure at the time of refinance.

22   Q.  Why is that, Mr. Gongaware?

23   A.  Because it is relevant to the borrower's ability to repay

24   the debt.

25   Q.  We can take that down.

1          THE COURT:  I am going to ask you to take it down.  I

2    think it is more in the nature of argument rather than part of

3    your question.

4          MS. ROTHMAN:  That's fine.

5    Q.  Now, Mr. Gongaware, if Mr. Calk had told you in this

6    meeting that he knew that Mr. Manafort's property in Brooklyn

7    had $600,000 in penalties accrued, how would you have responded

8    at that meeting?

9          MR. LaVERNE:  Objection to the speculation.

10          THE COURT:  I will allow the question.

11          THE WITNESS:  I would have had a similar line of

12    questioning asking them to explain why they felt comfortable

13    lending money to this borrower who was having issues repaying

14    existing debts especially if they had that much in penalties.

15    BY MS. ROTHMAN:

16    Q.  And, similarly, if Mr. Calk had told you that he knew the

17    properties were in default, how would you have responded?

18    A.  The same.

19    Q.  How did the meeting end, Mr. Gongaware?

20    A.  The meeting ended, it was a little more cordial at the end.

21    Nancy and I had requested some documentation to verify that the

22    legal lending limit violation wasn't something that was a

23    problem.  The bank had agreed to provide those documents.  As I

24    was getting up to leave, Mr. Calk asked me for a business card

25    and I had realized that I had forgot them in the car and so I

L715cal5                        Gongaware – Direct

1    offered to run down to the car and bring some up and drop them

2    off at reception but Mr. Calk insisted that he walk me back to

3    my car.

4    Q.  And what happened next?

5    A.  Mr. Calk and I walked back to the car, it was two blocks,

6    maybe -- block and a half, two blocks.  We had some small talk

7    and we got to the car, I provided him with a couple business

8    cards.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. ROTHMAN:  (Continued)

2   Q.  Had that ever happened to you before?

3   A.  No.

4           MS. ROTHMAN:  Your Honor, I have no further questions.

5           THE COURT:  Cross.

6   CROSS-EXAMINATION

7   BY MR. LaVERNE:

8   Q.  Good afternoon, Mr. Gongaware.

9   A.  Good afternoon.

10  Q.  My name is Dareen LaVerne.  I'm one of the attorneys for

11  Mr. Calk.  I have a few questions for you.  We've never met or

12  spoken before, correct?

13  A.  That's correct.

14  Q.  Now, if I understand your testimony, on March 29, 2017, you

15  were doing whatever you were doing, and you read an article in

16  the newspaper about the loans at issue in this case, true?

17  A.  That's correct.

18  Q.  And the article suggested to you that in making these

19  loans, the bank may have breached what's called its lending

20  limit, correct?

21  A.  That's what the article brought up, yes.

22  Q.  And you were concerned about that, right?

23  A.  I was.

24  Q.  Because banks aren't supposed to breach their lending

25  limit, correct?

L71Qcal6                         Gongaware - Cross

1   A.  Correct.

2   Q.  And so you called up your supervisor, and you all decided

3   that day, that day you would go down to the bank and find out

4   what happened with the lending limit, true?

5   A.  That's correct.

6   Q.  Now, you met down at the bank in Chicago at 1:00 p.m. on

7   that day, correct?

8   A.  Correct.

9   Q.  And you were the only one at the OCC who was physically

10  present at the meeting, correct?

11  A.  That's correct, I was the only one local at the time.

12  Q.  And Ms. Chelovich, your supervisor, she was on the phone,

13  true?

14  A.  That's correct.

15  Q.  Listening to every word that was happening at that meeting

16  too, correct?

17  A.  (No response)

18  Q.  And there was a number of bank executives, high-level bank

19  executives, from the bank at the meeting with you and on the

20  phone?

21  A.  Two other bank executives in person and one on the phone.

22  Q.  Mr. Calk was there, correct?

23  A.  Yes.

24  Q.  And do you recall that Mr. Ubarri, the bank's president,

25  was on the phone?

L71Qcal6                    Gongaware - Cross

1   A.  Yes.

2   Q.  Do you recall that Mr. Norini, the bank's chief operating

3   officer, was there in person?

4   A.  Yes.

5   Q.  And do you recall that Ryan Murphy, the head of compliance

6   at the bank, was also present?

7   A.  Yes.

8   Q.  He's the head of the compliance department and the legal

9   department at the bank, true?

10  A.  To the best of my knowledge, yes.

11  Q.  And as we said, one of the things you wanted to determine

12  at this meeting was whether or not the bank had violated its

13  lending limit, true?

14  A.  Correct.

15  Q.  And when you sat down with the bank executives, they

16  explained to you that the article just got it wrong, right?

17  A.  Correct.

18  Q.  They explained to you that in fact, the bank had sold a

19  participation in one of the loans to the holding company,

20  correct?

21  A.  Correct.

22  Q.  And, Mr. Norini, who was the chief operating officer, is

23  the one who walked you through the truth of what had actually

24  happened, correct?

25  A.  That's correct.

1    Q.  And after you had sat down and listened to them explain

2    what actually happened, you went back to your office, right?

3    A.  (Indicating)

4    Q.  And the next day or two, you and Ms. Chelovich had some

5    email back and forth with the bank, correct?

6    A.  We did.

7    Q.  Ms. Chelovich, in fact, had some followup questions about

8    the legal -- the lending limit issue; she wanted to make sure

9    she had all the details, correct?

10   A.  I don't remember the particulars.  Are you indicating that

11   she had further followup email with the bank or with me?

12   Q.  Yeah, well, best of your recollection, did she have further

13   email followup with the bank on the issue?

14   A.  I believe she did, yes.

15   Q.  And, in fact, on March 31, a couple days later, you

16   yourself emailed the bank, true?

17   A.  I did.

18   Q.  Let's put that on the screen, it's in evidence, as

19   Government Exhibit 349.  Let's go down to your email.  You sent

20   it -- we will get both parts up there on the screen.  You sent

21   it to Mr. Norini, right?

22   A.  I did.

23   Q.  And Mr. Calk, right?

24   A.  Correct.

25   Q.  You copied your supervisors Peters and Chelovich, right?

L71Qcal6                          Gongaware - Cross

1    A.   Yes.

2    Q.   And the subject is legal lending limit, right?

3    A.   Yes.

4    Q.   And you said "thanks for taking time to meet with me,"

5    right?

6         MS. ROTHMAN:   Objection, your Honor.   Can I have a

7    moment with Mr. LaVerne?

8         THE COURT:   Yes.

9         (Counsel confer)

10   Q.   Let's take the email on the screen.   First read it.   Please

11   read it.

12   A.   You would like me to read it?

13   Q.   Yes, please.   Not out loud.   Just to yourself.   Let's just

14   put it on the screen for the witness so he has it in front of

15   him.

16        Mr. Gongaware, in this email, you told the executives

17   that:   Based on the meeting and the documents provided by the

18   bank, Kevin, Nancy, and I agree with the bank there is no legal

19   lending limit violation as suggested in the article dated

20   March 29, 2017 for the relationship in question, right?

21   A.   That's what it says, yes.

22   Q.   And you didn't say there was anything improper about

23   selling participation in a loan to a holding company, right?

24   A.   No.

25   Q.   And you didn't criticize the bank for doing that, right?

1    A.  No.

2    Q.  And, in fact, you don't have any particular view on that

3    issue, true?

4    A.  Ms. Chelovich was expert on the legal lending limit

5    violation.  She told me that it wasn't an issue, so it wasn't

6    an issue in my mind.

7    Q.  Chelovich is the expert on your team on legal lending limit

8    violations right?

9    A.  She researched it, yes.

10   Q.  She did an independent analysis on it, and she told you

11   that in fact the bank had not breached its legal lending limit,

12   true?

13   A.  Correct.

14   Q.  And she concluded that the article was just wrong?

15   A.  In terms of the legal lending limit violation.

16   Q.  And you also testified that the article that you read had

17   brought to your attention that some of Mr. Manafort's

18   properties, at least, some of them, may have been in

19   foreclosure, correct?

20   A.  Correct.

21   Q.  And you had some questions for the bank executives who were

22   assembled there as to their awareness of the foreclosures,

23   correct?

24   A.  Correct.

25   Q.  And do you recall, Mr. Gongaware, that the article talked

L71Qcal6                    Gongaware - Cross

1  about properties in California that were in foreclosure.  Do

2  you recall that?

3  A.  That's true.

4  Q.  And you know, Mr. Gongaware, that those properties in

5  California did not end up serving as the collateral for any

6  loan to Mr. Manafort.  You know that, correct?

7  A.  I do know that, but if a borrower was having problems

8  repaying debt anywhere, he's going to have problems everywhere.

9  Q.  Just want to be clear what properties we're actually

10  talking about.

11  A.  That is true.

12  Q.  And the article also referenced a foreclosure proceeding in

13  Brooklyn, true?

14  A.  To the best of my recollection, yes.

15  Q.  You don't recall really with any clarity as to what the

16  article mentioned?

17  A.  It's been four and a half years.  The foreclosure question

18  was secondary to the questions to the legal lending violation.

19  Q.  Got it.  Got it.

20        You, Mr. Gongaware, have no personal knowledge of

21  whether Mr. Calk in fact was aware of foreclosure proceedings

22  at the same time the loans were made, true?

23  A.  He indicated to me they were not.

24  Q.  But you have no other knowledge about what Mr. Calk knew or

25  didn't know at the time the loans were made, correct?

L71Qcal6                       Gongaware - Cross

1   A.  That's true.

2   Q.  When you were being examined by Ms. Rothman, she put a

3   couple of documents on the screen.  Do you remember that?

4   A.  I do.

5   Q.  You're not listed on those emails, right?

6   A.  I didn't review them in detail, but it didn't appear I was,

7   no.

8   Q.  And you don't know what properties those are referring to,

9   right?

10  A.  Again, I wasn't on the email, and I didn't study the email,

11  so I don't know.

12  Q.  Were you aware, for example, that one of those emails was

13  referring to properties in California?  Were you aware of that?

14  A.  I wasn't.

15  Q.  Now -- and when you were talking to the bank executives and

16  asking them about these -- about foreclosure, which I think you

17  said was a secondary topic to the main event, which was the

18  legal lending limit violation, you asked the bank executives

19  whether they had been aware that the Summerbreeze properties

20  were in foreclosure, was that your testimony?

21  A.  I'm not sure I was specific to the Summerbreeze properties.

22  I may have just asked had the bank been aware that any of these

23  properties were in foreclosure.

24  Q.  But you're not sure sitting here today.

25  A.  I'm not sure.

1    Q.  And with regard to that Brooklyn property, you didn't do

2    any diligence yourself going into the meeting to learn whether,

3    in fact, it was in foreclosure, right?

4    A.  No.  We were relying strictly on are bank for that due

5    diligence.

6    Q.  And being in default is different from being in

7    foreclosure, correct?

8    A.  Correct.

9    Q.  And default means that you've missed some payments on a

10   loan, correct?

11   A.  Default can mean many things, but missing payments is one

12   of the more severe defaults, yes.

13   Q.  You defaulted on the terms of the loan?

14   A.  Correct.

15   Q.  Foreclosure means that after you default, the lender takes

16   an action to try to foreclose and take your collateral, right?

17   A.  Yes, but from a bank's perspective, if a loan is in

18   default, the borrower is having issues paying debt.

19   Q.  Mr. Gongaware, you gave testimony about a meeting several

20   years ago, and your testimony is that you asked the bank

21   executives about foreclosures, correct?

22   A.  That's correct.

23   Q.  And those were the words you used -- foreclosures, correct?

24   A.  Correct.

25   Q.  You didn't ask about defaults, did you?

1   A.  I did not.

2   Q.  And do you know how foreclosure works in the State of New

3   York?

4   A.  I'm sure it's similar to many other states.  Once the bank

5   determines they're not going to get their payments, they file

6   for foreclosure to take the property.

7   Q.  Do you know that there's many stages in the foreclosure

8   process in New York?

9   A.  I don't know the specific stages, no.

10  Q.  Do you know, for example, that after a foreclosure

11  complaint is filed, the action can take many, many months to

12  actually unfold?

13  A.  I understand it takes time, yes.

14  Q.  Do you understand that the borrower who has had the action

15  filed against him can contest it?

16  A.  Yes.

17  Q.  And they can actually dispute it in court and potentially

18  prevail in that action.  Were you aware of that?

19  A.  Not specifically, but it makes sense.

20  Q.  When you were asking about foreclosures in the meeting with

21  the bank executives, did you ask specifically about whether

22  they're aware of any particular stage of the foreclosure

23  process?

24  A.  I remember asking about foreclosure.

25  Q.  Just generally?

1    A.  Just generally.

2    Q.  Okay.  And during this meeting, I noticed you testified

3    that Mr. Calk said he wasn't aware of foreclosures with respect

4    to the properties you asked about.  Did any of the other bank

5    executives say they were aware of foreclosures?

6    A.  I remember the conversation was between me and Mr. Calk.

7    The other executives, I don't believe -- at least I don't

8    remember them mentioning anything.

9    Q.  Wasn't Mr. Norini, the chief operating officer, sitting

10   right next to Mr. Calk?

11   A.  He was.

12   Q.  Wasn't the chief legal officer of the bank, Mr. Murphy,

13   sitting right next to him?

14   A.  He was.  I don't remember either of them saying anything.

15   Q.  Wasn't Mr. Ubarri on the phone?

16   A.  Yes.

17   Q.  And they didn't contradict Mr. Calk?

18   A.  No.

19   Q.  They didn't correct him?

20   A.  No.

21   Q.  They didn't say anything different?

22   A.  (Indicating)

23   Q.  Now, we talked about the followup email that you sent, and

24   we looked at it briefly, right --

25   A.  Yeah.

L71Qcal6                    Gongaware - Cross

1   Q.  -- couple days later.

2         And you had some followup thoughts on the lending

3   violation, correct?

4   A.  Yes.

5   Q.  You didn't do any followup on the foreclosure issue,

6   correct?

7   A.  We had taken Mr. Calk at his word, to the best of his

8   knowledge, they were not in foreclosure.

9   Q.  Did you take them at their word on the lending limit

10  violation issue?

11  A.  We did, and then asked for documentation to support it.

12  Q.  And asked for followup, correct?

13  A.  Correct.

14  Q.  You did not do that with respect to the foreclosure issue,

15  did you?

16  A.  I would have expected, had there been a foreclosure action,

17  if Mr. Calk had inadvertently said he wasn't aware of it but

18  was aware of it, he would have mentioned it.

19  Q.  My question was simply whether you did you do any followup

20  or clarification about what you were asking on the foreclosure

21  issue?  Did you, or not?

22  A.  No, I did not follow up.

23  Q.  In that email, for example, you didn't ask any clarifying

24  questions about which foreclosure -- which properties you were

25  talking about, did you?

1  A.  No.

2  Q.  And you didn't do any further followup on default versus

3  foreclosure, did you?

4  A.  No.

5  Q.  And you didn't give the bank any opportunity to add to or

6  supplement what their answer had been on the foreclosure issue,

7  true?

8  A.  They didn't need an opportunity.  There's an open

9  communication channel between the OCC and the bank.  If they

10  were wrong or inadvertently misspoke, they could have let us

11  know that at any time.

12  Q.  Well, did you write an email to the bank and say:  This is

13  what I asked about, and this is what I heard you say.  Can you

14  please confirm that it's accurate?  Did you do that?

15  A.  I did not.

16  Q.  If we could show the top part of GX-349, which is in

17  evidence, just the top email.

18         Mr. Calk responded to your email, correct?

19  A.  He did.

20  Q.  And he said, "Thank you for the courtesy of your email,"

21  right?

22  A.  That's what it says.

23  Q.  And he told you the bank maintains strict underwriting

24  standards and adheres to safe and sound lending standards,

25  right?

1    A.   That's what the email says, yes.

2    Q.   It says, while offsetting risk with additional collateral,

3    if available, has an abundance of caution on larger loans,

4    right?

5    A.   That's what it says, yes.

6    Q.   And he told you that they understood the importance of

7    adhering to all regulatory guidelines, correct?

8    A.   That's what it says.

9    Q.   And he again put in this email that he was surprised that

10   the OCC based on a news report that turned out to be wrong

11   charged down to the bank that very same day, correct?

12              MS. ROTHMAN:  Objection.  Argumentative.

13              THE COURT:  Overruled.  The jury can see the document.

14   You may continue.

15   A.   Can you repeat the question?

16   Q.   The question is that Mr. Calk in responding to you noted

17   again that he was -- he put it in this email -- surprised at

18   the reactionary nature of the OCC coming down to the office the

19   day you read a newspaper article about allegations on the

20   lending limit that turned out to be one hundred percent wrong,

21   correct?

22   A.   That's what the email says, yes.

23   Q.   Well, they did turn out to be a hundred percent wrong,

24   true?

25   A.   Well, you're implying that it was an overreaction.

1    Q.  I'm just asking you on the lending limit violation issue,

2    the article turned out to be one hundred percent wrong,

3    correct?

4    A.  Yes.

5    Q.  And then Mr. Calk thanked you for your prompt findings and

6    clear communication.  He says, "We welcome open and honest

7    dialogue with our regulator."  Do you see that?

8    A.  Yes.

9    Q.  I noticed while you were testifying, Ms. Rothman asked you

10   upfront about some questions about a dialogue you say you had

11   about Mr. Calk being a veteran?

12   A.  Yes.

13   Q.  And I think you testified that Mr. Calk told you he was a

14   combat veteran?

15   A.  That's what he said.

16   Q.  Now, again, this meeting now was some four years ago, true?

17   A.  Yes.

18   Q.  And you were interviewed about this meeting in detail,

19   right, a lot closer in time to when it happened, true?

20   A.  Yes.

21   Q.  You sat down with the FBI back on January 28, 2018.  Do you

22   recall that?

23   A.  The general time, yes.

24   Q.  Okay.  And they conducted a lengthy interview of you,

25   correct?

L71Qcal6                          Gongaware - Cross

```
1  A.  Correct.

2  Q.  They asked for all the details about what happened during

3  this interaction you had with Mr. Calk, correct?

4  A.  They asked me a lot of details.  I wouldn't say they asked

5  me all details.

6  Q.  And you did not tell them at this meeting that Mr. Calk had

7  said --

8            MS. ROTHMAN:  Objection, your Honor.

9            THE COURT:  Overruled.

10 Q.  You did not tell them at this meeting that Mr. Calk had

11 said to you that he was a -- had been a combat veteran?

12 A.  I did not.  It didn't come up in that conversation.

13 Q.  Well, didn't you tell them in the conversation you talked

14 about your military experience with him?

15 A.  That was at a followup conversation.

16 Q.  Let's put on the screen just for the witness what's been

17 marked for identification as 3500-20-1.  Show Mr. Gongaware

18 first the first paragraph.  And then if we could go to page 5,

19 the paragraph that starts with "Calk asked."

20            I'm just going to ask you a simple question whether or

21 not having looked at this it refreshes your recollection that

22 you were in fact asked at this meeting in 2018 and spoke about

23 the issue of the military experience that Mr. Calk had.  Does

24 that refresh your recollection?

25 A.  We did discuss military experience on the walk, yes.
```

L71Qcal6                         Gongaware - Cross

1   Q.   The question is simple:   At that time you were interviewed

2   by the FBI in 2018, they asked you about, and you spoke about,

3   your interactions with Mr. Calk regarding his military

4   experience, true?

5   A.   True.

6   Q.   And do you know that Mr. Calk in fact did train to fly in

7   combat helicopters?

8              MS. ROTHMAN:   Objection.

9              THE COURT:   Overruled.

10  A.   I didn't know that.   He might have mentioned that, but I

11  don't remember it.

12  Q.   Is it possible that he told you that he was trained to fly

13  in combat helicopters, and you misheard that or are

14  misremembering this four years later as him saying that he was

15  actually in combat?

16  A.   The conversation in question was very out of the ordinary

17  because I did not ask Mr. Calk if he was a veteran within the

18  meeting at the bank.   So I remember it very clearly.   He

19  indicated that he was a veteran.   I followed with "I am also a

20  veteran."   He followed with, "I'm a combat veteran."   I

21  followed with, "I was not a combat veteran" because I did not

22  want him to think that I was a combat veteran or that I wasn't

23  a combat veteran and claiming that I was.

24  Q.   Your testimony is that you remember that better four years

25  ago than you did a year later.

L71Qcal6                        Gongaware - Cross

1  A.  I remember it very clearly, because it was unsolicited by

2  me.

3            MR. LaVERNE:  No further questions.

4            MS. ROTHMAN:  No redirect, your Honor.

5            THE COURT:  You may excused.  Thank you.

6            (Witness excused)

7            THE COURT:  Ladies and gentlemen, it's the end of the

8  week.  There's a holiday weekend coming up.  I wish you a great

9  holiday weekend.  Please don't read about the case.

10            Clear your minds.  Think about other things.  Don't

11  expose yourself to anything in the media.  If somehow something

12  gets thrust on you, then walk away from it.  And we will see

13  you refreshed on Tuesday, which is the day after the federal

14  holiday.  Same time and same place.  Good night.

15            (Jury not present)

16            THE COURT:  You can be seated for one second.  I

17  appreciated the email that you sent me at the beginning of the

18  week outlining who you expected the witnesses to be.  If I

19  could get a similar email that pertains to next week, just so I

20  know what's coming, and I assume you've communicated that to

21  defense counsel.

22            MR. SCOTTEN:  Yes, your Honor.  Do you want a joint

23  email with defense witnesses too or --

24            THE COURT:  If you think we'll get to the defense

25  case, then yes.

L71Qcal6                         Gongaware – Cross

1            MR. SCOTTEN:  We'll talk about them, your Honor, and

2      try to do one email.

3            THE COURT:  That's fine.  Thank you.  We're adjourned.

4            (Adjourned until July 6, 2021 at 9:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       INDEX OF EXAMINATION

2    Examination of:                            Page

3    JAMES CHARLES BRENNAN

4    Direct By Mr. Scotten . . . . . . . . . . . 779

5    Cross By Mr. LaVerne . . . . . . . . . . . . 823

6    Redirect By Mr. Scotten . . . . . . . . . . 944

7    JOHN DAY

8    Direct By Mr. Scotten . . . . . . . . . . . 963

9    Cross By Mr. Schoeman . . . . . . . . . . . 969

10   JACK GONGAWARE

11   Direct By Ms. Rothman . . . . . . . . . . . 971

12   Cross By Mr. LaVerne . . . . . . . . . . . . 984

13                      GOVERNMENT EXHIBITS

14   Exhibit No.                                Received

15    1305    . . . . . . . . . . . . . . . . . 777

16    1219    . . . . . . . . . . . . . . . . . 779

17    326   . . . . . . . . . . . . . . . . . . 818

18                      DEFENDANT EXHIBITS

19   Exhibit No.                                Received

20    706, 706-A, 706-B  . . . . . . . . . . . . 778

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300