L76Qcal1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4                v.                        19 CR 366 (LGS)

5  STEPHEN M. CALK,

6                Defendant.

7  ------------------------------x
                                          New York, N.Y.
8                                         July 6, 2021
                                          9:45 a.m.
9

10 Before:

11                 HON. LORNA G. SCHOFIELD,

12                                         District Judge
                                           – and a Jury–
13
                         APPEARANCES
14
   AUDREY STRAUSS
15      United States Attorney for the
        Southern District of New York
16 PAUL MONTELEONI
   HAGAN SCOTTEN
17 ALEXANDRA ROTHMAN

18 KRAMER LEVIN NAFTALIS & FRANKEL
        Attorneys for Defendant
19 BY:  PAUL SCHOEMAN
        DARREN LaVERNE
20      MICHELLE BEN-DAVID

21 LOEB & LOEB
        Attorneys for Defendant
22 BY:  JEREMY MARGOLIS

23

24

25

L76Qcal1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  You may be seated.

3           MR. SCOTTEN:  Good morning.

4           MR. SCHOEMAN:  Good morning.

5           THE COURT:  I haven't counted, but I've received, I

6   think, about ten letters from you all since yesterday

7   afternoon, and I have looked at all of them.

8           Some of them I understand are pursuant to my rule that

9   you should raise evidentiary issues at least two days before

10  they come up in the trial, and so I appreciate that, and those

11  primarily relate to defense exhibits and defense testimony.

12  And I know there are letters from both sides regarding those

13  issues.

14          There are also some issues though that relate to the

15  government's case, and I looked at the letter from the

16  government with the order of witnesses, and it looks like most

17  of them are not critical because we're not going to get to any

18  of those witnesses in the next hour and a half, or even perhaps

19  today.  But there were some things that I wanted to deal with

20  just so that they're dealt with.

21          There is a letter from the defense which is Docket 243

22  and dated July 5 by which the defense offers a number of

23  exhibits without objection from the government.  So I'm going

24  to admit those now, and they are Defense Exhibits 116, 118,

25  128, 130, 132, 143, 144, 168, 171, 171-A and 171-B and 171-C,

L76Qcal1

1  175, 176, 177, 201, 205, 205-A, 212, 212-A, 221, and Government

2  Exhibits 109, 187, 207, 210, 220, 238 and 243.  There was also

3  a note from the defense that it seeks to introduce into

4  evidence Government Exhibit 177, and in particular the top

5  email in the chain for non-hearsay purpose.

6          MR. LaVERNE:  Your Honor, excuse me for interrupting.

7  We've just spoken with the government a few minutes ago, and

8  they've agreed no objection to GX-177 subject to a limiting

9  instruction on hearsay.

10         THE COURT:  So 177 is admitted.  If you just remind me

11 to give a limiting instruction at that time.

12         MR. LaVERNE:  Thank you.

13         THE COURT:  I just realized as I heard your muffled

14 voice with your mask on that I have not brought my mask in, so

15 I'm going to ask if somebody could go get my mask.  Thank you.

16 I thought it was remarkably comfortable up here.

17         (Off the record)

18         (Defendant's Exhibits Defense Exhibits 116, 118, 128,

19 130, 132, 143, 144, 168, 171, 171-A and 171-B and 171-C, 175,

20 176, 177, 201, 205, 205-A, 212, 212-A, 221 received in

21 evidence)

22         (Government's Exhibits 109, 187, 207, 210, 220, 238

23 and 243 received in evidence)

24         (Government's Exhibit 177 received in evidence)

25         THE COURT:  So the next thing we need to deal with

L76Qcal1

1    that arose in the past rather than in the future, that is the

2    testimony of Mr. Gongaware and his testimony about the

3    conversation with Mr. Calk at the beginning of his,

4    Mr. Gongaware's, visit at the bank.

5              MR. SCOTTEN:  Your Honor, sorry.  Two things on that.

6    If we could punt that one, Ms. Rothman was hoping to argue.

7    That is her witness and she is not here.

8              Two, the parties would view the next thing we need to

9    do before we start trial day is immunize Mr. Raico, who is

10   waiting outside to be immunized.  He's our first witness so he

11   will go on immediately.

12             THE COURT:  That's fine.  If someone could pull up the

13   order I signed regarding Mr. Raico, I'd appreciate that.

14             While we're waiting on Mr. Gongaware, I don't intend

15   to hear argument, so I'm going to rule anyway.  I have already

16   ruled -- there was an objection made at trial.  I overruled it.

17   I think the testimony is fine for the reasons the government

18   states, specifically that it goes to Mr. Calk's state of mind,

19   and an inference can be drawn about what was happening in that

20   exchange that the government argues; namely, that it goes to

21   his state of mind and consciousness of guilt, and efforts to

22   discourage the OCC from investigating the loans and perhaps

23   thereby discovering the issues with the Manafort loan.  There

24   are obviously other inferences that can be drawn, but it seems

25   to me that is a fair one and a fair argument, and so I am not

L76Qcal1

 1     going to strike it or change my ruling.

 2               All right.  So Mr. Raico.

 3               MR. SCOTTEN:  He's right outside, your Honor.

 4               THE COURT:  Mr. Raico, I'm going to ask the government

 5     to find you another mask before you testify in front of the

 6     jury.  It's fine here and now, the jury is not here.  But my

 7     general rule is nothing symbolic on your mask, and obviously

 8     there's a depiction of some sort on your mask.  It's fine here,

 9     but if you exchange it for the other one when the jury comes

10     in, you can come in, step into the witness box, you can take

11     off your mask since there's a HEPA filter inside the box.

12      DENNIS RAICO, sworn.

13     BY MR. MONTELEONI:

14     Q.  Good morning.  What is your name?

15     A.  Dennis Raico.

16     Q.  Mr. Raico, were you involved in the extension of loans from

17     The Federal Savings Bank to Paul Manafort?

18     A.  Yes -- excuse me.  On advice of counsel, I would like to

19     invoke my Fifth Right Amendment not to testify.

20     Q.  If I keep asking you questions about your involvement in

21     extending loans to Paul Manafort, would you continue to follow

22     the advice of counsel and invoke your privilege against

23     self-incrimination?

24     A.  Yes, sir.

25               MR. MONTELEONI:  Your Honor, given the witness has

L76Qcal1

1    refused to testify, we ask the Court give effect to Raico's

2    immunity order which is currently marked for identification as

3    Government Exhibit 1302 and then admitted in evidence.

4            THE COURT:  I'm going to order that that previously

5    signed order is effective because you've invoked your privilege

6    against self-incrimination.  And specifically what the order

7    says is that you're required to give testimony under oath in

8    this trial, and that none of that testimony or any information

9    that is derived directly or indirectly from it may be used

10   against you in this or any other proceeding, except a separate

11   action for perjury or making a false statement.  All right.  Do

12   you understand?

13           THE WITNESS:  Yes, your Honor.

14           THE COURT:  You may be excused until you're called.

15           (Witness not present)

16           MR. MONTELEONI:  We ask that Government Exhibit 1302

17   be admitted in evidence.

18           THE COURT:  It's admitted.

19           MR. SCHOEMAN:  No objection.

20           (Government's Exhibit 1302 received in evidence)

21           THE COURT:  I think there is nothing else that is

22   pressing.  Is that right?

23           MR. MONTELEONI:  That's right, your Honor.  We think

24   that the next one that's been the subject of letters that's

25   likely to come up concerns Mr. Lemanski.  I think it is

L76Qcal1

1    possible we will get to that today, but it's likely there will

2    be an intervening break before we do.

3            THE COURT:  I had just one question about that, which

4    is more of a logistical question.  I, as we all know, that was

5    not -- the request from the defense was not filed on the docket

6    but rather was submitted under seal, and I received it by

7    email, and the government's response is not under seal and is

8    filed on the docket at Docket No. 244.  So my question is, why

9    is it under seal and are there things -- and remember we're on

10   a public line -- but are there things I should avoid saying

11   when we discuss it?

12           MR. MONTELEONI:  No, your Honor.  The defense

13   proceeded pursuant to the confidentiality order under which the

14   witness statements are designated as confidential, and there

15   has to be either a conferral between the parties or some action

16   by the Court before they can be filed publicly.

17           I think just due to the time of the filing it, we

18   didn't confer before it was filed, but as we indicated in

19   footnote three, we have no objection to the public filing of

20   the defense letter.  So from our perspective, it can be

21   docketed.

22           THE COURT:  Would you mind just filing it?

23           MR. LaVERNE:  Of course, your Honor.

24           THE COURT:  That's helpful for me to know also.  Thank

25   you.

L76Qcal1                    Raico - Direct

1          So, Mr. Raico is the next witness and there is no one
2     or nothing before him.  Is that right?
3          MR. MONTELEONI:  That's exactly right.
4          THE COURT:  So if you want to bring him back in, and
5     then you will get the jury and swear him again in front of the
6     jury.  Thank you.
7          (Jury present)
8          THE COURT:  Good morning, everyone.  You may be
9     seated.  Welcome back.  Hope you're refreshed and you had a
10    great holiday weekend.  We're ready to begin the trial again.
11         I'm going to ask the witness, you can take your mask
12    off.  You're in an enclosed booth with a HEPA filter.  If you
13    could, pull the mic up very close so we can all hear you.  You
14    can adjust it so it is as close as possible.
15              Mr. Street, swear the witness, please.
16    DENNIS RAICO,
17         called as a witness by the Government,
18         having been duly sworn, testified as follows:
19    DIRECT EXAMINATION
20    BY MR. MONTELEONI:
21         DEPUTY CLERK:  Please state and spell your full name.
22         THE WITNESS:  Dennis Raico.  D-E-N-N-I-S.  R-A-I-C-O.
23    BY MR. MONTELEONI:
24    Q.  Good morning, Mr. Raico.
25    A.  Good morning.

L76Qcal1                        Raico - Direct

1    Q.   In 2016 were you employed?

2    A.   Yes.

3    Q.   Where did you work?

4    A.   The Federal Savings Bank.

5    Q.   Where was your office located?

6    A.   120 Broadway here in Manhattan.

7    Q.   What did you do at The Federal Savings Bank's Manhattan

8    office?

9    A.   I was a loan officer.

10   Q.   What does a loan officer do?

11   A.   Looks to secure new business for the bank to make loans.

12   Q.   How is a loan officer at The Federal Savings Bank paid?

13   A.   A hundred percent commission.

14   Q.   Did there come a time that you were involved in the bank

15   making loans to Paul Manafort?

16   A.   Yes.

17   Q.   Ms. Drescher, could you please publish what's in evidence

18   as Government Exhibit 1302.

19           Mr. Raico, do you recognize this document?

20           Could we turn to the second page, Ms. Drescher,

21   please.

22   A.   Yes.

23   Q.   What is this document, to your understanding?

24   A.   This looks like an immunity offer.

25   Q.   Is this an order granting you immunity for your testimony

1   here today?

2   A.  Yes.

3   Q.  What's your understanding of the purpose of this immunity

4   order?

5   A.  That as long as I tell the truth, nothing can be held

6   against me.

7   Q.  And even with this order compelling you to testify, can you

8   still be prosecuted for any crimes you may have committed?

9   A.  No.

10  Q.  Well, let's break that down.  Can you be prosecuted based

11  on your testimony for any crime you may have committed?

12  A.  Not on my testimony.

13  Q.  Could you theoretically be prosecuted for other reasons?

14  A.  Yes.

15  Q.  Based on -- for crimes you may have committed?

16  A.  Yes.

17  Q.  Has anyone made you any promises about whether or not you

18  will be prosecuted?

19  A.  No.

20  Q.  If you were not to tell the truth today, would this order

21  protect you?

22  A.  No.

23  Q.  What could happen to you if you don't testify truthfully

24  today?

25  A.  I believe I could be prosecuted.

L76Qcal1                         Raico - Direct

1    Q.  Now, were you involved in the bank making two loans to Paul

2    Manafort?

3    A.  Yes.

4    Q.  What was your role in those loans?

5    A.  I was the loan officer.

6    Q.  How big were those loans in comparison to the other loans

7    that you closed during the course of your time at The Federal

8    Savings Bank?

9    A.  They were fairly large.

10   Q.  Were they the biggest?

11   A.  Yes.

12   Q.  In absolute terms, about how big were your commissions for

13   these loans in comparison to your other commissions you

14   received at The Federal Savings Bank?

15   A.  They were large.

16   Q.  Ms. Drescher, could you please publish Government Exhibit

17   102.

18          Mr. Raico, directing your attention to the bottom

19   email on the first page, who wrote this email?

20   A.  I did.

21   Q.  Where did the information that you're writing in this email

22   come from?

23   A.  Felix Katz.

24   Q.  Where did it come from ultimately to your understanding?

25   A.  The 1003 that was provided by the borrower.

1    Q.  Let's back up for a moment.  Who is Felix Katz?

2    A.  Pardon me, sir?

3    Q.  Let's back up for a moment.  Who is Felix Katz?

4    A.  He is an individual that was referred to me through the

5    Bank of Internet.

6    Q.  Is he a mortgage broker?

7    A.  Yes, he is.

8    Q.  And how did you -- who from Bank of Internet put Mr. Katz

9    in touch with you?

10   A.  Anne DiCola.

11   Q.  Who is Anne DiCola?

12   A.  She was our account executive -- account representative.

13   Q.  Now, you said that the information in this email ultimately

14   you believe came from the 1003 prepared by the borrower.

15   What's a 1003?

16   A.  It's a mortgage application.

17   Q.  And in this case, who were -- who were the borrowers?

18   A.  Mr. and Mrs. Manafort.

19   Q.  So, directing your attention to the last sentence of the

20   first paragraph, who is listed as the co-borrower here?

21   A.  Mr. Manafort's son-in-law, Jeffrey Yohai.

22   Q.  In this initial portfolio loan scenario that you're

23   emailing here, was Mrs. Manafort involved in that?

24   A.  No, I'm sorry, it was Mr. Manafort and Mr. Yohai.

25   Q.  Scrolling down to the second page, if we could,

L76Qcal1                    Raico - Direct

1   Ms. Drescher.

2            What do these indications of files indicate was

3   attached to your email?

4   A.   A portfolio loan summary, which is a brief summary of the

5   information given to me that I provide to Chicago; it looks

6   like a mortgage application from Paul and Jeff -- Paul Manafort

7   and Jeff Yohai; a credit report provided by Paul Manafort; and

8   the summary of the initial project located at 391 Broadway.

9   Q.   Ms. Drescher, could you please publish Government Exhibit

10  103.

11           Mr. Raico, what is this document?

12  A.   Looks like a meeting request for the Capital Grill meeting.

13  Q.   Where it says "location -- Capital Grill near Steve's

14  office," what is that?

15  A.   That is the restaurant downstairs in the lobby.

16  Q.   Downstairs in the lobby of what building?

17  A.   I'm sorry, of our office building 120 Broadway.

18  Q.   What's the date listed here?

19  A.   May 10, 2016.

20  Q.   So, if UTC was four hours ahead, would that act -- ahead of

21  New York time, would that actually be May 9 in New York time?

22  A.   Yes.

23  Q.   Now, what loan does this meeting -- withdrawn.

24           What, if any, relationship does this calendar

25  invitation have to the portfolio scenario we were just looking

L76Qcal1                         Raico - Direct

1    at?

2    A.   This was pertaining to the initial portfolio scenario at

3    391 Broadway.

4    Q.   The one we just saw?

5    A.   Correct.

6    Q.   Who does it say had accepted the invitation in the subject

7    line?

8    A.   Mr. Calk, myself, Mr. Yohai and Mr. Manafort.

9    Q.   In your time at The Federal Savings Bank, about how common

10   was it for Mr. Calk to attend dinners with prospective

11   borrowers in your experience?

12   A.   Very rare in my experience.

13   Q.   Had it ever happened before this?

14   A.   No.

15   Q.   Why was he invited to this one?

16   A.   I'm not certain.

17   Q.   Now, did Mr. Calk, in fact, end up attending the dinner?

18   A.   Yes.

19   Q.   Where did he sit at the dinner, at the Capital Grill?

20   A.   At the head of the table.

21   Q.   Who else was near him, if anyone?

22   A.   Mr. Manafort.

23   Q.   What happened at the dinner?

24   A.   A lot of conversation.

25   Q.   To what extent were you involved in any conversation

L76Qcal1                          Raico - Direct

1   Mr. Calk had at the dinner?

2   A.  I was sitting too far away.

3   Q.  What did you observe with respect to Mr. Calk at the

4   dinner?

5   A.  Mr. Calk and Mr. Manafort were sitting together at the head

6   of the table and exchanged conversation.

7   Q.  Now, besides the dinner, did you learn if anyone at the

8   bank did anything to inspect this 3918 Broadway project that

9   you had provided the loan scenario for?

10  A.  Yes.

11  Q.  What did you learn about that?

12  A.  I believe Mr. Calk and Robert Jones went to inspect the

13  property prior to dinner.

14  Q.  What, if anything, did Mr. Calk say about that inspection?

15  A.  I believe it was unfavorable.  We were led to believe that

16  the property was more than 50 percent complete, and it was my

17  understanding that it was not close to 50 percent complete.

18  Q.  And so what happened with this 391 Broadway project?

19  A.  That project eventually fell through.

20  Q.  How were things left with Mr. Manafort?

21  A.  He had multiple properties in different stages of

22  construction, and the idea was to take a look at some of the

23  additional properties and see if there was potential financing

24  for the future.

25  Q.  This further look, that happened after the dinner over

1   time?

2   A.  Over time, yes.

3   Q.  Would you have earned a commission had the bank made the

4   391 Broadway loan?

5   A.  Yes.

6   Q.  How large would that commission have been approximately?

7   A.  It would have been one percentage point.

8   Q.  Do you remember about how big the 391 Broadway loan project

9   was?

10  A.  I don't offhand.

11  Q.  Who made the decision not to make the loan when you say it

12  fell through?

13  A.  Eventually Mr. Calk.

14  Q.  Ms. Drescher, could you please publish Government Exhibit

15  105.

16          Mr. Raico, what does this document refer to?

17  A.  This is a meeting that we had at 120 Broadway between

18  myself, Mr. Manafort, Mr. Yohai in one of the conference rooms

19  at 120 Broadway, and Mr. Calk videoconferenced in from Chicago,

20  I believe.

21  Q.  What is the date of this meeting?

22  A.  July 27, 2016.

23  Q.  In your experience at The Federal Savings Bank, about how

24  common was it for Mr. Calk to attend meetings with borrowers?

25  A.  It wasn't very common.

(212) 805-0300

L76Qcal1                    Raico - Direct

1   Q.   Apart from the dinner we just talked about, had it ever

2   happened before?

3   A.   No.

4   Q.   Why was Mr. Calk invited to this meeting?

5   A.   I don't recall.

6   Q.   So did this meeting concern a loan proposal?

7   A.   Yes.

8   Q.   What was discussed about the loan proposal at this meeting?

9   A.   This was another property located out in California.

10  Q.   What happened at the end of the meeting?

11  A.   So, at the end of the meeting, Mr. Calk had approached

12  Mr. Manafort and said that he had served his country before and

13  that he was interested in serving the Trump campaign, and if

14  there is any room for him to do so, he would be honored.

15  Q.   When you say that he approached Mr. Manafort, how did he do

16  so if he was participating by videoconference?

17  A.   He asked him directly through the video.

18  Q.   What happened after Mr. Calk said that?

19  A.   Mr. Manafort paused, looked around the room and said there

20  may be a possibility of something coming up on the national

21  economic advisory committee, and that he would get back to him.

22  Q.   What did you observe about Mr. Calk's reaction to that?

23  A.   He seemed to be happy.

24  Q.   Ms. Drescher, could you please publish Government Exhibit

25  111.

1           Mr. Raico, directing your attention to the bottom

2     email on the page where Mr. Manafort writes, "Need Steve Calk

3     résumé, and could you please send me Steve's curriculum vitae."

4           Mr. Raico, what did you do upon receiving this

5     request?

6     A.   I reached out to Mr. Calk and told him that Mr. Manafort

7     was looking for his résumé.

8     Q.   Could I ask one of my colleagues to present to the witness

9     the documents marked for identification as Government Exhibits

10    51-A and 51-B, portions of which are in evidence.

11          Mr. Raico, in front of you are Government Exhibits

12    51-A and B.  Do you recognize these items?

13    A.   Yes.

14    Q.   What are they?

15    A.   They're my notebooks.

16    Q.   How are they marked on the outside?

17    A.   The Federal Savings Bank embossed in the leather logo.

18    Q.   How did you get these notebooks with The Federal Savings

19    Bank embossed logo?

20    A.   I ordered them through the marketing department.

21    Q.   Where did you keep them?

22    A.   On me or in my briefcase.

23    Q.   What did you use these notebooks for?

24    A.   Taking notes.

25    Q.   What types of things would you typically take notes on in

L76Qcal1                        Raico - Direct

1    these notebooks?

2    A.   Business occurrences on a daily basis.

3    Q.   Ms. Drescher, could you please publish what's in evidence

4    as Government Exhibit 51-1.

5            Mr. Raico, what is this document?

6    A.   This is an excerpt from my notebook.

7    Q.   Now, on the left side could you please read in the middle

8    of the page the line with the date?

9    A.   Wednesday, August 3, 2016.

10   Q.   Please read the entry on the right about four lines down

11   starting with "Paul."

12   A.   "Paul Manafort requesting Steve's curriculum vitae résumé."

13   Q.   When did you write this down Mr. Raico?

14   A.   On August 3, 2016.

15   Q.   Why did you write it down?

16   A.   Because it was something that happened on that day that I

17   believe I needed to follow up with.

18   Q.   About how many times had a borrower ever asked you for

19   Mr. Calk's résumé before?

20   A.   Never.

21   Q.   Ms. Drescher, could you please publish Government Exhibit

22   112.

23           Mr. Raico, you mentioned a moment ago that you made

24   that notebook entry on August 3.  Directing your attention to

25   the bottom of the page, what's the date on that email?

L76Qcal1                        Raico - Direct

1    A.   August 4, 2016.

2    Q.   What did you understand Mr. Manafort to be doing in this

3    bottom email?

4    A.   Looking to see if I had sent Steve's résumé.

5    Q.   Turning to the top of the page, what did you tell him about

6    Mr. Calk's résumé?

7    A.   I'm apologizing for the delay and letting him know that it

8    should be coming shortly.

9    Q.   What, if any, conversation did you have with Mr. Calk

10   leading up to you sending this?

11   A.   I spoke with Mr. Calk, and he said that he would send it

12   directly.

13   Q.   Do you know whether Mr. Calk ever sent Mr. Manafort his

14   résumé?

15   A.   I don't.

16   Q.   Now, Mr. Raico, we looked a few minutes ago at a calendar

17   invite for a meeting on a loan which you described about a

18   California property in late July.  What happened with that

19   proposed loan in August and September in general terms?

20   A.   I'm sorry.  Can you say that again?

21   Q.   In late July, you just testified there was a meeting about

22   a loan on a California property.  What happened with that loan

23   in August and September?  What was the next stage?

24   A.   It was approved.

25   Q.   What happens after the loan is approved?

L76Qcal1                          Raico - Direct

1    A.  Certain documentation is gathered.

2    Q.  What's the name for that process?

3    A.  Gathering documentation?

4    Q.  What's the documentation used for?

5         THE COURT:  Could you just keep your voice up?  I had

6    trouble hearing that.

7    A.  Could you say that again, sir?

8    Q.  What, to your information, is the document gathered used

9    for?

10   A.  Documentation is sent in to Chicago, and the credit

11   committee evaluates and makes a decision on the loan.

12   Q.  Do underwriters look at it before it goes to the credit

13   committee?

14   A.  Yes.

15   Q.  In general terms, how did the underwriting process of this

16   proposed loan go to your memory?

17   A.  It was long, confusing, convoluted, quite labor intensive.

18   Q.  Why?

19   A.  Lot of documentation, lot of hurdles, just a lot of

20   activity that I hadn't seen quite so much in other portfolio

21   loans.

22   Q.  What kind of hurdles?

23   A.  Income, appraisals, just many issues came to surface.

24   Q.  Ms. Drescher, could you please publish Government Exhibit

25   181, second page.

1              Directing your attention to this bottom email on this

2    chain, who did Paul Manafort write this email to?

3    A.   It appears to be Mr. Calk.

4    Q.   Did you ultimately get included on this chain, do you

5    recall?  We can -- Ms. Drescher, if you can just go to the top

6    email.

7    A.   Yes.

8    Q.   All right.  So going back down to the bottom email on this

9    chain, when did Mr. Manafort send this email?

10   A.   On October 7, 2016.

11   Q.   In this bottom email from Mr. Manafort to Mr. Calk, where

12   Mr. Manafort writes, "We are getting close to closing the loan

13   but there is a major issue.  I don't know how to resolve this

14   problem.  When we had lunch, I must have had a blackout.  I

15   told you that there is a 2.5 M first on the Bridgehampton

16   property.  I meant to say a 3.5 M first."

17             I have a couple questions about that.  First of all,

18   do you have any understanding what he was talking about when he

19   said "when we had lunch"?

20   A.   No, I didn't.  No.

21   Q.   Did you understand that Mr. Manafort and Mr. Calk had had

22   lunch on this loan?

23   A.   I did after the fact, yes.

24   Q.   All right.  Now, when he says, "I must have had a blackout.

25   I told you that there was a 2.58 M first on the Bridgehampton

1 property, I meant to say a 3.5 M first."

2          First, what did you understand him to mean?

3 A.  When we were looking to get the payoff on the existing

4 loan, we were told it was $2 and a half million, when in

5 reality there was an extra million dollars outstanding on the

6 balance.

7 Q.  So, about how common an issue has this been in your

8 experience for a borrower to understate the amount of a recent

9 prior loan by a million dollars?

10 A.  That's uncommon.

11 Q.  Had that ever happened before you to you?

12 A.  Not to me.

13 Q.  Now, in this email, what is Mr. Manafort requesting to

14 address the problem?

15 A.  He is -- it appears as he is looking to Steve to, he says,

16 "I look to your cleverness on how to manage the underwriting."

17 Q.  First of all, about how common in your experience was it

18 for a borrower to tell you or to tell bank people that the

19 borrower is looking to their cleverness to manage the

20 underwriting?

21 A.  Not very common.

22 Q.  At the top of that paragraph where he says, "If we can do

23 the loan for 3.5 M", what does that reflect about his request

24 for the loan amount?

25 A.  It appears as though he's saying that he could repay the

1   difference in six months.

2   Q.  But before those six months, is he asking for the extra

3   million?

4   A.  Yes.

5   Q.  Ms. Drescher, could you please take us to the first page.

6   Directing your attention to the bottom of the first page, who

7   did Mr. Calk write this email to?

8   A.  Mr. Manafort.

9   Q.  All right.  You are not listed in the to or the cc. line,

10  but you appear later in the chain.  How did you get this, do

11  you think?

12  A.  I believe I was blind copied on this at a later date.

13  Q.  So when he writes, "If I can do this, we will be required

14  to take the Virginia property due to the increase in loan

15  amount and the low appraisal on the Hampton property," what did

16  you understand him to mean?

17  A.  That we were looking to take additional collateral.

18  Q.  Now, could you please note the date, first of all, of

19  Mr. Calk's email?

20  A.  October 7, 2016.

21  Q.  And could we go to the top email, please.  So where you

22  respond, what's the date of your response?

23  A.  October 7, 2016.

24  Q.  So where you write, "We are already positioned to take the

25  VA property as the Hampton property just appraised for

L76Qcal1                    Raico - Direct

1    14 million," what did you mean?

2    A.   We already had the Virginia property in the transaction as

3    a piece of collateral already.

4    Q.   So would including it in the next transaction be adding any

5    collateral to deal with this extra million dollars?

6    A.   I'm sorry, say that again.

7    Q.   So, according to what you're telling him, the Virginia

8    property is already in the transaction, would including it in

9    the transaction add any collateral to deal with the extra

10   million dollars request?

11   A.   No, it was already there.

12   Q.   Who did you send this to?

13   A.   Who did I send it to?

14   Q.   Who did you send that top email to?

15   A.   Mr. Calk.

16   Q.   Did there come a time when this California property that

17   was the subject of the July meeting got removed from the loan?

18   A.   Yes.

19   Q.   Ms. Drescher, could you please publish Government Exhibit

20   206.

21           Directing your attention to the bottom of the first

22   page, top of the second page, this bottom email from Javier

23   Ubarri, when did Mr. Ubarri send this to you?

24   A.   On October 20, 2016.

25   Q.   Could you please summarize what you understood Mr. Ubarri

L76Qcal1                    Raico - Direct

1   to be saying to you, in essence?

2   A.  To my recollection, I believe Mr. Ubarri, after going

3   through the loan, he was looking to potentially take a pass.

4   Q.  When you say going through the loan, was this a new request

5   for Mr. Manafort?

6   A.  Yes.

7   Q.  So what was your reaction to this email in which Mr. Ubarri

8   said that he was going to take a pass on this new requested

9   loan?

10  A.  I believe I had already talked with Mr. Calk, and that he

11  was looking to move forward.

12  Q.  Before your conversation with Mr. Calk though, if --

13  leaving aside -- leaving that aside, if the bank had taken a

14  pass on this loan, what effect would that have had on your

15  commission?

16  A.  I wouldn't have got a commission.

17  Q.  So now directing your attention to the top email, you write

18  in the second sentence, "I'm not sure if Jim mentioned, but I

19  engaged our friends over with B of I, and they seem to have

20  some significant interest in Paul's proposal."  What did you

21  mean?

22  A.  We spoke with some of the contact people over at Bank of

23  Internet, and they had some interest in looking at the

24  transaction.

25  Q.  If they had engaged in the transaction, what would their

1    role have been?

2    A.   Broker.

3    Q.   So who would be the broker in this situation?  If you're

4    passing it to B of I, who is acting as the broker?

5    A.   We would broker it out to Bank of Internet.

6    Q.   So if you brokered the loan to Bank of Internet and Bank of

7    Internet accepted, who would bear the risk of the loan?

8    A.   Bank of Internet.

9    Q.   If you brokered the loan out to Bank of Internet and Bank

10   of Internet accepted, what, if any, compensation would you

11   make?

12   A.   The smaller compensation.

13   Q.   But you would have gotten some compensation for that?

14   A.   Yes.

15   Q.   Now, where you write, "Steve had called earlier this

16   morning, and I informed him as well.  He seemed to be

17   relatively pleased considering the process we have endured thus

18   far."  What did you mean?

19   A.   That we made contact with Bank of Internet, and the

20   transaction still kept moving along.

21   Q.   Is this the conversation with Mr. Calk you were referring

22   to a minute or two ago?

23   A.   Yes.

24   Q.   Ms. Drescher, could you please publish Government Exhibit

25   213.

L76Qcal1                    Raico - Direct

1           Mr. Raico, directing your attention to the bottom

2     email where you write, "pursuant to your message, thought you

3     may want a quick reference regarding the meeting we had with

4     Paul/Jeff, regarding their requested properties for financing."

5     Why were you writing Mr. Calk this update?

6     A.  A number of transactions had come up during the meeting,

7     and I was trying to give a brief summation.

8     Q.  Now, going up to the top email, directing your attention to

9     Mr. Calk's response where he writes, "Can you call me over the

10    weekend to review?"  In general for loans, other than the

11    Manafort loans, about how common was it for you to talk to

12    Mr. Calk outside of business hours?

13    A.  Not very common.

14    Q.  About how common was it for you to talk to Mr. Calk about

15    the Manafort loans outside of business hours?

16    A.  Much more common.

17    Q.  Ms. Drescher, could you please publish Government Exhibit

18    218.

19          Mr. Raico, directing your attention to this email at

20    the top of the page were you writing to Amanda Sparks, Vanessa

21    Bartholomew and Erin Devaney.  Who is Amanda Sparks?

22    A.  They were part of the operations team in Maryland.

23    Q.  Have you heard of the term pre-underwriting?

24    A.  Yes.

25    Q.  What is pre-underwriting?

L76Qcal1                        Raico - Direct

1   A.  Well, for a loan to go over to Bank of Internet, they were

2   going to do their own full due diligence on their own accord,

3   but we still needed to do some pre-underwriting beforehand and

4   send it over.

5   Q.  And who was in charge of the pre-underwriting in the case

6   of the Manafort loans?  Was that Amanda Sparks?

7   A.  Actually, all -- a combination of the three of them, the

8   Maryland team.

9   Q.  All right.  So where you write -- backing up, is this

10  conversation in the context of getting the pre-underwriting

11  done for this loan?

12  A.  Yes.

13  Q.  So where you write, "I'm just getting a little pressure

14  from Steve Calk as we flipped this out of portfolio into a

15  potential submission to B of I."  Why did you write that?

16  A.  Because he was thoroughly involved with these files, and

17  when he called, you needed to move.

18  Q.  Do you recall specifically whether you had actually gotten

19  any pressure from Mr. Calk on this stage?

20  A.  Directly I'm not sure of this particular email.

21  Q.  Why would you have said this to them if you hadn't actually

22  gotten pressure from Mr. Calk about this?

23  A.  To move this file along.

24  Q.  So about how often would you tell other staffers at the

25  bank that you might be getting pressure from Mr. Calk to move

L76Qcal1                      Raico - Direct

1   the file along if it hadn't happened?

2   A.   On occasion.

3   Q.   Ms. Drescher, could you please publish Defense Exhibit 175,

4   which is in evidence?  Could we please publish the fifth page.

5            Looking at the fifth page to Mr. Brennan's email in

6   about the top half of the page where Mr. Brennan asks, "Get me

7   the field review, and see if there is enough information, but

8   when will the full appraisal be completed?"  What property was

9   he asking for the appraisal on?

10  A.   I believe this one was the Hamptons property.

11  Q.   Do you recall how many appraisals there were on the

12  Hamptons property?

13  A.   Eventually three.

14  Q.   At this time, do you remember what number appraisal he was

15  asking about?

16  A.   I think there was -- this was -- I believe this may have

17  been the second appraisal.

18  Q.   So now turning to the next page, where you responded to

19  Mr. Brennan, and others, and wrote "It appears as though my

20  former MBA (Anna) ordered the second appraisal through a

21  different AMC."  First of all, what does MBA stand for?

22  A.   Mortgage banker assistant.

23  Q.   When you say Anna, what is the name of that mortgage

24  assistant you're referring to?

25  A.   Anna Ivakhnik.

L76Qcal1                        Raico - Direct

1    Q.  When you wrote that Anna Ivakhnik ordered a second

2    appraisal through a different AMC, what does that stand for?

3    A.  Appraisal management company.

4    Q.  You were saying here that she had ordered the second

5    appraisal through a different company than the first?

6    A.  Yes.

7    Q.  Where you write, "We couldn't find appraisal she ordered,

8    thus scrambled for Sam Heskel at Nadlan to have another

9    appraiser perform the second."  Mr. Raico, was that true?

10   A.  No.

11   Q.  Was it true that Anna Ivakhnik had actually ordered the

12   second appraisal through a different appraisal management

13   company?

14   A.  No.

15   Q.  Directing your attention to the third page, bottom of the

16   page where you wrote, "Anna was terminated a few weeks ago.

17   The mishandling of this second appraisal was one of the several

18   reasons corporate decided to terminate."

19           Mr. Raico, was that true?

20   A.  That was not accurate.

21   Q.  Ms. Drescher, could you please publish Government Exhibit

22   273.  So you previously described trying to broker the loan to

23   B of I.  In this email, around the middle of the email, where

24   you wrote, "That said, Steve Calk stepped in and we ended up

25   closing this in portfolio on November 16 or on 11/16/16."

L76Qcal1                    Raico - Direct

1      Q.   What did it mean to close the loan in portfolio?

2      A.   I'm sorry, sir?

3      Q.   What did it mean we closed the loan in portfolio?

4      A.   It was on the bank's books.  It was not a brokered out

5      transaction.

6           THE COURT:  It was not a what?  I'm having trouble

7      hearing you.  If you could pull the mic up and stand it up a

8      little bit.  It bends, so bend it so it is close to you.  Thank

9      you.

10     A.   It was not a brokered out transaction.  It was a bank loan.

11     Q.   So which bank bore the risk of the Bridgehampton loan?

12     A.   The Federal Savings Bank.

13     Q.   When you wrote, "Steve then hopped on a plane and sat with

14     the CEO of B of I the next day.  They agreed that B of I would

15     take this loan out of our portfolio and on to their books."

16          Who did you mean by Steve?

17     A.   Mr. Calk.

18     Q.   How did you know that he sat with the CEO of B of I about

19     this loan?

20     A.   He told me he was doing so.

21     Q.   I want to talk about something that happened a few days

22     before you ended up closing this in portfolio on 11/16/16.

23          Ms. Drescher, could you please publish Government

24     Exhibit 51-2.

25          Mr. Raico, directing your attention to the top right,

L76Qcal1                     Raico - Direct

1    under the date Friday, 11/11/16, could you please read the next

2    bullet point.

3    A.  Sure.  "Steve:  Trump executive council, secretary of the

4    treasury.  Check with Paul."

5    Q.  What led up to your writing that?

6    A.  Steve had placed a phone call to me and said that he had

7    not heard from Mr. Manafort in a day or two and had asked if I

8    would reach out to Paul and see if he was up for secretary of

9    the treasury or secretary of HUD.

10   Q.  So what exactly did Mr. Calk want you to ask Mr. Manafort?

11   A.  If he was in the running for one of those positions.

12   Q.  If who was in the running for --

13   A.  I'm sorry, if Mr. Calk was in the running for one of those

14   positions.

15   Q.  What did you do in reaction to Mr. Calk asking you to ask

16   Mr. Manafort if Mr. Calk was in consideration for secretary of

17   the treasury or secretary of HUD?

18   A.  I did not make that phone call.

19   Q.  By the way, prior to Mr. Calk making this request, were you

20   aware of whether or not he had had any direct contact with

21   Mr. Manafort himself?

22   A.  No.

23   Q.  Well, had he told you that he was meeting with Mr. Manafort

24   in the past?

25   A.  I know that they had meetings on their own accord, but I

L76Qcal1                    Raico - Direct

1    didn't have an exact schedule.

2    Q.  Now, where were you when you wrote this down?

3    A.  I don't recall specifically.

4    Q.  You said that Mr. Calk made this request during a phone

5    call.  When did you write this compared to when the phone call

6    happened?

7    A.  I believe shortly after the phone call occurred.

8    Q.  Why did you write this down in your journal?

9    A.  It was bizarre, unique.  I hadn't seen a request like this

10   before.

11   Q.  You said you didn't make the call.  Why didn't you make the

12   call?

13   A.  It made me uncomfortable.

14   Q.  Now, did the $9.5 million loan ultimately close?

15   A.  Yes.

16   Q.  After that, did Manafort seek more loans?

17   A.  Yes.

18   Q.  Ms. Drescher, could you please publish what's in evidence

19   as Defense Exhibit 205.

20        Mr. Raico, when did you send this top email?

21   A.  November 21, 2016.

22   Q.  Who were you sending this to?

23   A.  Anne DiCola at the Bank of Internet and Vanessa

24   Bartholomew.

25   Q.  So what were you sending to Anne DiCola?

L76Qcal1                        Raico - Direct

1   A.  A revision of the portfolio loan summary.

2   Q.  Is this -- were this described as a cover sheet, is that

3   the same thing as the portfolio loan summary for Federal

4   Savings Bank loan?

5   A.  Yes, it's just a synopsis.

6   Q.  Is it the same form as Federal Savings Bank uses or is it a

7   Bank of Internet form?

8   A.  I believe there's an actual form that the Bank of Internet

9   uses on their letterhead.

10  Q.  Now, if this loan had already closed by this point, why are

11  you sending things about it to B of I?

12  A.  Because I was asked to.

13  Q.  What were you seeking to have B of I do?

14  A.  From what I understand, take it off the books of The

15  Federal Savings Bank and sell it to Bank of Internet.

16  Q.  When you say you were asked to, who were you asked to do

17  this by?

18  A.  Steve, Mr. Calk.

19  Q.  And what did you understand was the purpose of selling it

20  to Bank of Internet?

21  A.  To alleviate risk.

22  Q.  Mr. Raico, have you heard of the term legal lending limit?

23  A.  Yes.

24  Q.  What is a legal lending limit?

25  A.  I believe it's a bank's capacity to extend a single loan

1    amount.

2    Q.  When you say extend a single loan amount, what does that

3    refer to?

4    A.  The loan amount, the maximum loan amount that you can

5    extend to a single borrower.

6    Q.  So what, if any, significance would it have for the legal

7    lending limit if you were able to sell this loan to B of I?

8    A.  I believe if they took it off our books, we would have a

9    greater capacity to lend loans.

10   Q.  Were you at this time considering extending a second loan

11   to Manafort?

12   A.  Yes.

13   Q.  Ms. Drescher, could you please publish the attachment to

14   this email, Government Exhibit 205-A or Defense Exhibit rather

15   205-A, Mr. Raico what is this document?

16   A.  It's a submission summary.

17   Q.  Is this a cover sheet for Bank of Internet we were just

18   talking about?

19   A.  Yes.

20   Q.  Now, directing your attention to item 4, explanation for

21   any credit weaknesses.  When you write excellent credit, who

22   were you telling Bank of Internet had excellent credit?

23   A.  Mr. Manafort.

24   Q.  Was that true?

25   A.  I don't believe so.

L76Qcal1                        Raico - Direct

1   Q.  Ms. Drescher, could you please publish Government Exhibit

2   282.

3         Directing your attention to the bottom half of the

4   first page, the email that you sent to Steve Calk, what day did

5   you send this?

6   A.  December 7, 2016.

7   Q.  Where you write, "I spent some time speaking with Anne,

8   Darren and Kevin (underwriter) this evening."  What company do

9   those individuals all work for?

10   A.  Bank of Internet.

11   Q.  When you write, "Their senior credit officer still wants to

12   consider an asset pledge," what did you mean?

13   A.  They wanted Mr. Manafort to pledge assets to the bank as

14   well.

15   Q.  What does pledging assets mean?

16   A.  Putting a lump sum of money into the bank.

17   Q.  And in this case, which bank did the Bank of Internet

18   people want him to put assets into?

19   A.  Into their bank, the Bank of Internet.

20   Q.  Where you write, "Darren's suggestion was for you and Greg

21   to have a CEO-to-CEO conversation as there isn't anyone in the

22   B of I chain of command that has the power to move the needle."

23         What did you mean?

24   A.  Well, their executive vice-president had said in order for

25   us to consider this transaction and to keep moving it, that

L76Qcal1                        Raico - Direct

1    probably the CEO of his bank and the CEO of my bank should have

2    a conversation.

3    Q.  Who was Greg?

4    A.  I believe Greg Garrabrants was the CEO of Bank of Internet.

5    Q.  And just to recap something that we said before, what

6    impact would Bank of Internet buying this first loan have on

7    your ability to extend a second loan?

8    A.  I believe it would have cleared a little bit of way for us

9    to extend more money to Mr. Manafort.

10   Q.  Turning to the top email where Mr. Calk writes to you, "I

11   still do not understand your plan to get Manafort's next loan

12   approved and closed.  What is your plan?"  Who had the

13   authority to approve portfolio loans?

14   A.  The credit committee.

15   Q.  Were you on the credit committee?

16   A.  No.

17   Q.  Was Mr. Calk?

18   A.  Yes.

19   Q.  Now, you've testified just now about trying to sell this

20   $9.5 million to B of I.  Did B of I ultimately agree to buy

21   that loan?

22   A.  No.

23   Q.  Did the $6.5 million second loan ultimately close?

24   A.  Yes.

25   Q.  Ms. Drescher, could you please publish Government Exhibit

1   51-4.

2              So, on the left side of this page, looking at the

3   bullet starting "Steve on the bottom left," what date was that

4   entry made?

5   A.   December 22, 2016.

6   Q.   Could you please read the first line starting with the

7   Steve?

8   A.   "Steve, we are doing $6.5 million reference to Steve saying

9   we are doing 6.5 million construction to perm. loan in Carroll

10  Gardens for Mr. Manafort."

11  Q.   Who did you mean when you wrote "Steve"?

12  A.   Mr. Calk.

13  Q.   What did you mean by writing a colon after the word Steve

14  there?

15  A.   That's what he was saying.

16  Q.   And so what did it -- what did what Mr. Calk telling you

17  mean?

18  A.   That we were moving forward with the loan in Carroll

19  Gardens.

20  Q.   When did you write this down compared to when Mr. Calk said

21  that?

22  A.   Shortly thereafter.

23  Q.   Could you please read the last three bullets under the

24  Steve heading starting with "issued"?

25  A.   "Issued new term sheet.  Received permission from Paul to

L76Qcal1                          Raico - Direct

1    withdraw the app. fee two points.  Steve said we are moving

2    capital around the holding company."

3    Q.  Who told you the information that led to you writing this

4    down?

5    A.  Mr. Calk.

6    Q.  What did "issued new term sheet" mean?

7    A.  I believe Steve was issuing a new term sheet.

8    Q.  Does Mr. Calk typically personally issue term sheets for

9    loans in your experience?

10   A.  Not in my experience.

11   Q.  What did "received permission from Paul to w/d the app. fee

12   two points" mean?

13   A.  I believe that Mr. Manafort must have told Mr. Calk that he

14   could take the two points app. fee out of the money that he

15   already had with the bank.

16   Q.  So, first of all, is Mr. Calk usually involved in your

17   experience in securing a borrower's permission to withdraw fees

18   from an account?

19   A.  Not to my knowledge.

20   Q.  All right.  Now, what were the standard application fees

21   that The Federal Savings Bank charged on portfolio loans

22   typically?

23   A.  Either two or three points.

24   Q.  About how many of your loans have two point fees versus

25   three point fees?

L76Qcal1                          Raico - Direct

1   A.  My loans personally are almost all three points.

2   Q.  So, if two points were paid in fees on this second loan,

3   how does that compare to the usual amount of fees that your

4   loans collect from the borrower?

5   A.  Like I said, I generally collect three points on my loans.

6   This looks like it's starting to be a two point loan.

7   Q.  And what did you understand -- when Steve said, "We are

8   moving capital around the holding company," what did you

9   understand him to mean?

10  A.  I simply wrote down what he said.  I didn't quite

11  understand what he was talking about.

12  Q.  Ms. Drescher, could you please publish Defense Exhibit 118,

13  which is in evidence.

14          Directing your attention to the email at the bottom of

15  the first page where Thomas Horn writes, "Financial?  Any

16  updates?"  What did you understand Mr. Horn to be asking for?

17  A.  I believe he was looking for an updated P and L.

18  Q.  What is a P and L?

19  A.  Profit and loss statement.

20  Q.  For who?

21  A.  Mr. Manafort.

22  Q.  Turning to your response at the top of the page, directing

23  your attention to where you say, "I will check again with Cindy

24  and Heather on the financials."  Mr. Raico, by that point did

25  you already have the financials?

L76Qcal1                    Raico - Direct

1   A.  I had.

2   Q.  If you already had the financials, why didn't you tell

3   Mr. Horn?

4   A.  I wasn't being forthcoming with Mr. Horn at that point.

5   Q.  Did there ultimately come a time when you were approached

6   by the FBI?

7   A.  Yes.

8   Q.  About when was that?

9   A.  That was, I believe, June of 2017.

10  Q.  When they showed up, what, if anything, did you think that

11  they were there for?

12  A.  I could only assume they were there for something regarding

13  Mr. Manafort.

14  Q.  Why was that?

15          MR. SCHOEMAN:  Objection.  Relevance.

16          THE COURT:  Sustained.

17  Q.  Where were you working at the time that the FBI approached

18  you?

19  A.  The Federal Savings Bank.

20  Q.  Who was the chairman The Federal Savings Bank at that time?

21  A.  Mr. Calk.

22  Q.  When the FBI asked you questions, do you remember exactly

23  what you told them?

24  A.  Not specifically.

25  Q.  Do you think you were entirely candid and forthcoming in

L76Qcal1                          Raico - Direct

1    your answers to the FBI?

2    A.  Not completely.

3    Q.  Why not?

4    A.  I was attempting to tread a line between answering the

5    agent's questions and attempting to protect my boss's boss's

6    boss, Mr. Calk.

7    Q.  Were you also trying to protect yourself?

8    A.  Yes.

9    Q.  I want to go back to the loans.  Did this $6.5 million loan

10   eventually close?

11   A.  Yes.

12   Q.  Did you get a commission?

13   A.  Yes.

14   Q.  Did you get a commission on the first one, by the way?

15   A.  Yes.

16   Q.  I want to go back in time to right before the loans closed.

17            Ms. Drescher, could you please publish Government

18   Exhibit 51-5.

19            Directing your attention first to the first page,

20   what's the date on this first page of Government Exhibit 51-5?

21   A.  December 28, 2016.

22   Q.  Now, directing your attention to page 2 of Government

23   Exhibit 51-5, is this the next page in the journal?

24   A.  I believe so.

25   Q.  So what -- if the last date on the previous page was

1    December 28, what day did you make the notes that appear on

2    this page in red ink?

3    A.  Either the same day or shortly thereafter.

4    Q.  Mr. Raico, could you please read the second bullet on the

5    left side of the page starting "Steve on Paul"?

6    A.  "Steve on Paul.  He is influential with other people and a

7    few other situations at hand."

8    Q.  Sir, when you write that, who is Steve?

9    A.  Mr. Calk.

10   Q.  Who was Paul?

11   A.  Mr. Manafort.

12   Q.  Where you have quotation marks around the phrase "He is

13   influential w/ other people and a few other situations at

14   hand," what do those quotation marks mean?

15   A.  That's what he said verbatim.

16   Q.  When did you write this down compared to when Mr. Calk said

17   that?

18   A.  I would believe shortly thereafter.

19   Q.  How closely does -- withdrawn.

20        Why did you write this down?

21   A.  It was unique.

22   Q.  Did you know what Mr. Calk meant when he said Manafort was

23   influential with other people and a few other situations at

24   hand?

25   A.  No.

L76Qcal1                    Raico - Cross

1    Q.  Did you ask Mr. Calk what he meant when he said that?

2    A.  No.  No, I did not.

3    Q.  Why not?

4    A.  I didn't want to know.

5    Q.  In your time at The Federal Savings Bank, apart from the

6    Manafort loans, about how many times was Mr. Calk personally

7    involved in advancing a loan of yours?

8    A.  I'm sorry.  In advancing?

9    Q.  In moving a loan of yours forward?

10   A.  Not common.

11   Q.  In your time at The Federal Savings Bank, apart from the

12   Manafort loans, about how many times did Mr. Calk ask you to

13   ask a borrower if Mr. Calk was being considered for another

14   job?

15   A.  Never.

16            MR. MONTELEONI:  No further questions.

17            THE COURT:  Mr. Schoeman, you may proceed whenever

18   you're ready.

19            MR. SCHOEMAN:  Thank you, your Honor.

20   CROSS-EXAMINATION

21   BY MR. SCHOEMAN:

22   Q.  Mr. Raico, can you hear me?

23   A.  Yes.

24   Q.  We've never met before.  Is that right?

25   A.  That is correct.

L76Qcal1                          Raico - Cross

1    Q.  When you were working on the Manafort loans at The Federal

2    Savings Bank, was Anna Ivakhnik assisting you?

3    A.  At one point, yes.

4    Q.  She have an opportunity to observe you in action?

5    A.  I believe so.

6    Q.  Isn't it true, Mr. Raico that you did everything you could

7    to push the Manafort loans forward.  Isn't that true?

8    A.  Within reason.

9    Q.  Well, you altered emails in order to push the Manafort

10   loans through, right?

11   A.  I altered emails?

12   Q.  You altered emails.  Is that true?

13   A.  Can you show me a specific email?

14   Q.  Yes or no, did you alter emails?

15   A.  Is there a specific email you could show me?

16   Q.  Mr. Raico, I'm just asking you yes or no, did you alter

17   emails in order to push the Manafort loans through?

18   A.  I don't recall.

19   Q.  Did you hide documents from the underwriting department in

20   order to push the Manafort loans through?

21   A.  I don't believe so.

22   Q.  Did you lie to Mr. Calk in order to push the Manafort loans

23   through?

24   A.  I don't believe I was lying to Mr. Calk.

25   Q.  Did you assist Mr. Manafort purposely in defrauding The

L76Qcal1                    Raico - Cross

1  Federal Savings Bank in order to get your commission on the

2  Manafort loans?

3  A.  No.

4  Q.  Mr. Raico, you testified already on direct that you would

5  sometimes -- you would sometimes say in emails that Mr. Calk

6  was pressuring you when that was false, right?

7  A.  I may have embellished in order to move the file forward or

8  to get my point across.

9  Q.  I'm asking you whether you just said five minutes ago that

10  you would sometimes say in emails that Mr. Calk had pressured

11  you when it wasn't true.  Did you testify to that?

12  A.  I do believe I was pressured in those loans, yes.

13  Q.  I'm sorry.  You did write false things in emails in order

14  to move the loans forward, right?

15  A.  I don't believe I wrote false things in emails.

16  Q.  Did you just testify five or ten minutes ago in response to

17  an email that was on the screen that you said that Mr. Calk

18  pressured you even though he had not pressured you.  Didn't you

19  just testify to that?

20  A.  Can you show me the email, please?

21  Q.  No.  You were shown a different email, Government Exhibit

22  175, regarding Ms. Ivakhnik's ordering of appraisals.  Do you

23  remember testifying about that ten minutes ago?

24  A.  Yes.

25  Q.  And you lied throughout that email, correct?

L76Qcal1                    Raico - Cross

1    A.  Can you show me the email?

2    Q.  No.  All right.  Let's -- Government Exhibit 175, please.

3    Defense Exhibit 175, I'm sorry.  Could we go to the first page,

4    the bottom page, last page.  At the bottom of the page, didn't

5    you just testify ten minutes ago that when you wrote "It

6    appears as though my former MBA (Anna) ordered the second

7    appraisal through a different AMC," didn't you testify a few

8    minutes ago that that was a lie?

9    A.  It was not accurate.

10   Q.  It was a lie, sir, wasn't it?

11   A.  It was not accurate.

12   Q.  The next sentence, "We couldn't find the appraisal she

13   ordered, thus scrambled for Sam Heskel at Nadlan to have

14   another appraisal perform the second."  That was a lie, wasn't

15   it?

16   A.  We were waiting for another appraisal to come.

17   Q.  But it's not true that you couldn't find the appraisal; you

18   had the appraisal, right?

19   A.  We were waiting for a third to come.

20   Q.  But when you wrote that "we couldn't find the appraisal she

21   ordered," that was a lie, sir, wasn't it?

22   A.  I was not being forthcoming at that moment, but we did have

23   another appraisal that was coming that was going to make a

24   difference.

25   Q.  When you say not forthcoming, true or false, you knew that

L76Qcal1                    Raico - Cross

1    she had ordered an appraisal that came back at 7.2 million, and

2    you were hiding it from the underwriting department.  True or

3    false?

4    A.  I wasn't hiding it.  I was holding on to it in anticipation

5    of another appraisal coming.

6    Q.  When you said, "We couldn't find the appraisal," that was

7    absolutely false, right, Mr. Raico?

8    A.  That was not accurate.

9    Q.  Can we go up one more email.  Do you see that Mr. Brennan

10   asked you, "Have you reached out to Anna?  How many AMCs do you

11   guys use, and what did the other AMC have to say?"  Do you see

12   he asked you that?

13   A.  Yes.

14   Q.  Do you remember off the top of your head that your response

15   was a lie?

16   A.  No, I don't.

17   Q.  Let's show you that.  Did you write:  "Hi, Jim.  Anna was

18   terminated a few weeks ago.  The mishandling of this second

19   appraisal was one of several reasons corporation decided to

20   terminate her."  That was a lie, wasn't it?

21   A.  That was not accurate.

22   Q.  It was not accurate because you said something that was

23   literally false.  Is that right?

24   A.  That was not accurate.

25   Q.  You knew it was not accurate at the time that you wrote it?

L76Qcal1                    Raico - Cross

1    A.  Knowing that we had another appraisal coming.

2    Q.  She wasn't fired for the mishandling of the appraisal

3    because she didn't mishandle the appraisal, right?

4    A.  I don't know.

5    Q.  All right.  We'll get to that later.  Could we go up one

6    more email.  You see Mr. Brennan says, "Did you reach out to

7    her or not, and who might she have used?  I doubt the field

8    review will be sufficient to close."  Do you see that?

9    A.  I do.

10   Q.  Can we see your response then?

11          When you wrote to Mr. Brennan, "Anna was terminated by

12   Mordy and certainly not going out of her way and help TFSB, we

13   discovered that some of the tasks she was supposedly working on

14   were not getting accomplished."

15          You were in that email deliberately smearing

16   Ms. Ivakhnik to cover up for the fact that you had a second

17   appraisal.  Isn't that true?

18   A.  No.

19   Q.  Well, you did have a second appraisal?

20   A.  We were waiting for a third appraisal to come.

21   Q.  Mr. Raico, could you just answer my question?  Did you have

22   a second appraisal that had come in low that you were not

23   forwarding to the people in Chicago.  Isn't that true?

24   A.  At that time I was holding on to the second appraisal, yes.

25   Q.  All right.  Do you remember that you ten minutes ago

L76Qcal1                    Raico - Cross

1    testified about Defense Exhibit 205-A, a submission you made to

2    Bank of the Internet.  Do you remember testifying about that?

3    A.  Yes.

4    Q.  And do you remember testifying that you lied in that

5    submission when you said Mr. Manafort had excellent credit?

6    A.  I was passing on information from the 1003.

7    Q.  But did you testify ten minutes ago that the information

8    you passed on you knew to be false?

9    A.  Not all of the information was a hundred percent accurate.

10   Q.  Mr. Raico, simple question.  Do you remember testifying ten

11   minutes ago that the document you provided to B of I said

12   Manafort's credit was excellent, and you knew it to be false at

13   the time?

14   A.  Yes.

15   Q.  Do you remember that ten minutes ago you testified about

16   Defense Exhibit 118 and exchanged with Mr. Horn about

17   Mr. Manafort's financials.  Do you remember that?

18   A.  Yes.

19   Q.  And you told Mr. Horn -- you testified that you were not

20   forthcoming with Mr. Horn.  Is that right?

21   A.  Yes.

22   Q.  Because you actually had received financials, right?

23   A.  Yes.

24   Q.  And you knew those financials were fraudulent, right?

25   A.  No, I did not.

L76Qcal1                         Raico - Cross

1   Q.   Well, you didn't provide them to Mr. Horn, right?

2   A.   I did not.

3   Q.   You were not forthcoming, meaning he asked you whether you

4   had them and you pretended you didn't.  Is that right?

5   A.   Can you say that again?

6   Q.   When you testified earlier that you were not forthcoming

7   with Mr. Horn, were you not forthcoming in that you had the

8   financials he was asking for, but you pretended you didn't?

9   A.   I did not, sir.

10  Q.   Were you pretending that you didn't have them?

11  A.   I didn't have them -- could you say that again?

12  Q.   When you asked the question -- when Mr. Horn asked you for

13  the financials, you were not forthcoming, right?

14  A.   That is true.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

L76MCAL2                         Raico - Cross

1   Q.  Because you didn't provide him with the financials that you

2   had received, right?

3   A.  Correct.

4   Q.  And you were pretending to Mr. Horn that you did not have

5   them?

6   A.  I don't know if I was pretending.  I was pretending that I

7   did not have them.

8   Q.  Mr. Raico, you had the financial statement that you had

9   received from Mr. Manafort's accountant, right?

10  A.  Yes.

11  Q.  Mr. Horn asked you for it?

12  A.  Yes.

13  Q.  And you didn't give it to him?

14  A.  Correct.

15  Q.  And you pretended that you didn't have it and that's why

16  you didn't give it to him?

17  A.  I simply didn't pass them on.

18  Q.  We will come back to that.

19          Mr. Raico, you have met a number of times with

20  prosecutors for the government, not always with this group of

21  prosecutors, right?

22  A.  Correct.

23  Q.  About maybe seven times?

24  A.  Approximately.

25  Q.  And you now have immunity, as you sit here today, right?

L76MCAL2                          Raico - Cross

1    A.   Yes.

2    Q.   But in the seven times that you met with the government,

3    this group or another group, you didn't tell them about all the

4    lies that are in your e-mails, right?

5    A.   What do you mean?

6    Q.   Did you tell them, the representatives of the government,

7    in interviews to prepare for testimony about all of the lies

8    that are in your e-mails?

9    A.   I wouldn't necessarily say they were lies.  I was not

10   forthcoming with some information.

11   Q.   Did you tell them about all the information you hid from

12   Mr. Calk?

13   A.   I didn't necessarily hide information from Mr. Calk.  I

14   didn't send on some of the information, knowing that we were

15   waiting for additional information because the one that I had

16   didn't matter.

17   Q.   Did you tell the prosecution either, this group or another,

18   that you had violated the federal bank bribery statute by

19   accepting $35,000 from Igor Shabanets?

20   A.   No.

21   Q.   You didn't tell them that?

22   A.   No.

23   Q.   You did receive $35,000 in July of 2016 from Igor

24   Shabanets?

25   A.   I don't remember the exact amount.

L76MCAL2                              Raico - Cross

1    Q.  Did you receive money from Igor Shabanets in the summer of

2    2016?

3    A.  I received a loan that was completely paid back.

4    Q.  When was it paid back?

5    A.  Over the course of a couple of months.

6    Q.  Isn't it true, Mr. Raico, that the notebooks that you have

7    presented in evidence are filled with references to

8    Mr. Shabanets and his associate, Yan Yeaves, trying to collect

9    that loan from you?

10   A.  I don't believe so.

11   Q.  Isn't it true that you got $35,000 from Igor Shabanets in

12   July of 2016?

13   A.  I don't remember the exact date.

14   Q.  Isn't it true that you got a loan for thousands of dollars

15   in the summer of 2016 from Igor Shabanets?

16   A.  That is possible, yes.

17   Q.  Isn't it true that you did not disclose that to the

18   government in the seven or so sessions that you spent being

19   debriefed?

20   A.  I wasn't asked about it.

21   Q.  Did you know at the time that that it was illegal for you

22   to accept money from a customer of the bank who was applying

23   for loans at the time?  Did you know that?

24   A.  No.

25   Q.  You had no idea?

L76MCAL2                         Raico - Cross

```
1    A.  No.

2    Q.  And the government didn't ask you?

3    A.  No.

4    Q.  I'd like to show you what's been marked for identification

5    as Government Exhibit 109 in evidence.

6            Let's look at the bottom to see how this chain starts.

7    Look at the second page.  That's the attachment.

8            We are looking at the second page of Government

9    Exhibit 109.  Do you see that that includes an e-mail from

10   Mr. Calk providing you with the terms that were approved for

11   the Nottingham loan on July 28, 2016?  Do you see that?

12   A.  Yes.

13   Q.  If we could go up to the bottom of the previous page, do

14   you see that you asked Mr. Brennan if he would mind putting

15   those terms on "official letterhead."  You see that?

16   A.  Yes.

17   Q.  You say, I think it's been giving a professional touch.

18   You see that?

19   A.  Yes.

20   Q.  And then on the top e-mail of the chain Mr. Brennan

21   provides that to you.  Do you see that?  You see the

22   attachment?

23   A.  Yes.

24   Q.  If we could look at the attachment on Government Exhibit

25   109, do you see that that is the term sheet that Mr. Brennan
```

L76MCAL2                        Raico - Cross

1    provided to you on July 28, 2016 on his letterhead?

2    A.  Yes, I believe so.

3    Q.  Do you see at the bottom of the second page of the term

4    sheet there is a paragraph that says, if the terms are agreed

5    to, then the customer must pay the application and appraisal

6    fee as well as the two points.  Do you see that?

7    A.  I do.

8    Q.  It says:  Once the fees are received and an account is set

9    up at the bank, we will have the attorney prepare the loan

10   documents at the client's expense and close the loan.  You see

11   that?

12   A.  Yes.

13   Q.  That was on the term sheet that you asked Mr. Brennan to

14   send to you?

15   A.  Yes.

16   Q.  But you didn't send that term sheet to Paul Manafort, did

17   you?

18   A.  I don't know.

19   Q.  You doctored that term sheet, right?

20   A.  I don't believe so.

21   Q.  Let me show you Defense Exhibit 148 in evidence.  You see

22   that Defense Exhibit 148 is the e-mail in which you mailed the

23   term sheet for Manafort and Yohai.  You see that?

24   A.  Yes.

25   Q.  Is that on July 29, 2016?

1    A.  Yes.

2            MR. SCHOEMAN:  Could we look at the attachment,

3    Defense Exhibit 148A in evidence.

4    Q.  You see that?

5    A.  Yes.

6    Q.  Mr. Raico, that's not the term sheet that Mr. Brennan sent

7    you, right?

8    A.  No.

9    Q.  It's not on Mr. Brennan's letterhead anymore, right?

10   A.  No.

11   Q.  You created this on your own letterhead, correct?

12   A.  I don't know.  This is the first time I'm seeing this.

13   Q.  It's not the first time you saw it.  You sent it to Paul

14   Manafort, correct?

15   A.  I don't remember.  I haven't seen this.

16           MR. SCHOEMAN:  Can we go back to Defense Exhibit 148.

17   Q.  Mr. Raico, yes or no, is this the term sheet that you sent

18   to Paul Manafort?

19   A.  I don't know if it was the second term sheet or third term

20   sheet.  I don't remember this.

21   Q.  Let's compare Defense Exhibit 148-A with the attachment on

22   Government Exhibit 109.  That's probably the third page.

23           Mr. Raico, on the left of the screen is Government

24   Exhibit 109, the first page of the term sheet prepared by

25   Mr. Brennan, and the one on the right is the first page of the

L76MCAL2                        Raico - Cross

1    term sheet prepared by you.  Do you see that?

2    A.  I don't know if this was prepared by me.  I haven't seen

3    this before.

4    Q.  Are you denying that the attachment to the e-mail that was

5    sent to Mr. Manafort saying here is the term sheet is the term

6    sheet that you sent to him?

7    A.  I don't know when this term sheet was sent.  I don't know

8    if my assistant prepared the term sheet.  I have no idea.

9    Q.  Let's look at it.

10            First of all, do you see that on, for example, under

11   origination fees on Mr. Brennan's term sheet it says 2 percent

12   of the loan amount plus application fee of $5,000.  You see

13   that?

14   A.  I do.

15   Q.  Do you see that does not appear in the term sheet that has

16   your name on it?

17   A.  I can see that, yes.

18   Q.  Let's look at the second to last page of the next page of

19   Mr. Brennan's term sheet.

20            Do you see that that has a paragraph that says, if the

21   terms are agreed to, then the customer must pay the application

22   and appraisal fee?  You see that?

23   A.  I see that.

24   Q.  And that says:  Once the fees are received, an account is

25   set up, we will have the attorney prepare the loan documents at

L76MCAL2                      Raico - Cross

1    the client's expense and close the loan.  You see that?

2    A.  I see that.

3          MR. SCHOEMAN:  Could we look at 148-A on the right,

4    full screen.

5    Q.  That paragraph in Mr. Brennan's term sheet does not appear

6    in the one that has your letterhead, is that right?

7    A.  I don't see it.

8    Q.  You know that that paragraph from Mr. Brennan's term sheet

9    was specifically directed to be included by Mr. Calk, right?

10   A.  Could have been.

11         MR. SCHOEMAN:  Let's go to Government Exhibit 109,

12   page 2, the e-mail from Mr. Calk.

13   Q.  Do you see where he writes:  Dennis, this is the term

14   sheet.  You see that?

15   A.  Yes.

16   Q.  Then he writes at the bottom, you see that language at the

17   bottom, if the terms are agreed to?

18   A.  Yes.

19   Q.  Those are terms related to the payment of fees that

20   Mr. Calk specifically directed be included.  Do you see that?

21   A.  I do.

22   Q.  Do you see that those were specifically included in what

23   Mr. Brennan prepared, right?

24   A.  I saw that, yes.

25   Q.  And they do not appear in the term sheet that was sent to

L76MCAL2                              Raico - Cross

1    Mr. Manafort on your letterhead.

2    A.  It doesn't appear to be there.

3              MR. SCHOEMAN:  Let's look back at Government Exhibit

4    109, the first page of the term sheet, probably page 6.

5    Q.  Do you see that at the bottom of the term sheet that has

6    Mr. Brennan's letterhead it says at the bottom under additional

7    conditions:  Prior to the ordering of the appraisal, the bank

8    must receive.  You see all of that?

9    A.  Yes.

10   Q.  Does that appear on Defense Exhibit 146-A?

11   A.  I don't see it.

12   Q.  Do you see that under third-party costs, Government Exhibit

13   109-7, it says the borrower will be responsible to reimburse

14   TFSB for all third-party costs incurred, including, but not

15   limited to, appraisal, contractor review and attorney's fees.

16   Do you see that?

17   A.  I do.

18   Q.  Third-party costs on 148-A says -- does it say responsible

19   for all appraisal and title costs?

20   A.  It does.

21   Q.  So it doesn't say contract review and attorneys' fees,

22   right?

23   A.  It does not.

24   Q.  So the term sheet that Mr. Brennan prepared at your request

25   as a nice personal touch is different from the term sheet that

1    has your name at the top that was sent to Mr. Manafort the next

2    day?

3    A.  It appears that way.

4    Q.  And which you claim you can't remember creating?

5    A.  I do not remember creating that and it could have been

6    created by anybody in my office.

7    Q.  Mr. Raico, is it your testimony that Anna Ivakhnik created

8    a phony term sheet and handed to you to send to Mr. Manafort?

9    Is that your testimony?

10   A.  I didn't say that.

11   Q.  Is there anyone in your office that you would think would

12   deliberately alter Mr. Brennan's version of the term sheet to

13   take out all the fees and costs and provide it on your

14   letterhead to Mr. Manafort?  Is there anyone else who would do

15   that?

16   A.  No.  Quite frankly, if this -- all of my portfolio loans

17   are three points.  This should have been three points rather

18   than two points.

19   Q.  Mr. Raico, that's a lie, isn't it?

20   A.  That my portfolio loans are not three points?

21   Q.  Yes.  Isn't that a lie?

22   A.  The majority of my portfolio loans were done at three

23   points.

24   Q.  Mr. Raico, isn't it true that when you first met Paul

25   Manafort in April of 2016, you proposed the terms as two

L76MCAL2                        Raico - Cross

1    points, right?  Isn't that true in April of 2016?

2    A.  I don't believe so.

3         MR. SCHOEMAN:  Could we see Defense Exhibit, I'm

4    thinking it's 210.

5         I'm sorry.  It's 208.

6    Q.  This is an e-mail from you on April 21, 2016.

7    A.  Yes.

8    Q.  Do you see that in the middle of the second paragraph it

9    says:  The borrowers are well aware of the initial proposed

10   terms, 7.25, two points.  Do you see that?

11   A.  I do.

12   Q.  And you put that in there before you had even spoken to

13   Mr. Calk about the loan, right?

14   A.  Looks like I did.

15   Q.  So the Manafort loans from the very beginning were two

16   points, right?

17   A.  All portfolio loans done through me at the end of the day

18   were done at three points.  So his could have been a mistake,

19   but it was a three-point loan.

20   Q.  I'm just asking you, did you write in an e-mail, before you

21   had even spoken to Mr. Calk, the borrowers are well aware of

22   the initial proposed terms, 7.25 percent, two points?  Did you

23   write it in an e-mail, yes or no?

24   A.  Yes, I did.

25        MR. SCHOEMAN:  Let's go back to August 2016.

L76MCAL2                    Raico - Cross

1            Could we look at Defense Exhibit 151.  Could we look

2       at the top of page 2.  This is in evidence.

3       Q.  Do you see on August 9, 2016 Mr. Brennan asked you:

4       Dennis, has he returned the signed term sheet and applicable

5       deposit?  You see that?

6       A.  I do.

7       Q.  Let's look at your response on the next page.

8            Mr. Raico, would you read what you wrote.

9       A.  Hi, Jim.  Yes.  They did return the executed term sheet.  I

10      did not push the issue of an application fee, considering they

11      should have $2 million wired into TFSB account tomorrow.

12      Appraisals and title has already been ordered.  I will push

13      them on the contractor profile, budget, plans, specs, etc.

14      Steve indicated that he wanted this to close on or before the

15      15th.  I'm hopeful we can close this next week.

16      Q.  How many lies are in that e-mail?  That's a question for

17      you.

18      A.  Is there a specific question?

19      Q.  Yes.  How many lies are in that e-mail?

20      A.  I don't know if they returned the term sheet.  What

21      specifically are you asking?

22      Q.  Mr. Raico, when you wrote, yes, they did return the

23      executed term sheet, that was false, is that right?

24      A.  I don't know.

25      Q.  Well, Mr. Raico, isn't it true that you did not receive a

L76MCAL2                        Raico - Cross

1   copy of the executed term sheet from anyone until October 27,

2   2016?

3   A.  I do not know.

4   Q.  Isn't it true that you, on October 26, because you didn't

5   have the term sheet, you asked Mr. Yohai to send you a copy of

6   the term sheet that's signed, right?

7   A.  I don't remember.

8   Q.  Let me show you what's in evidence, Defense Exhibit 164.

9          MR. SCHOEMAN:  Let's just enlarge it so we can read

10  it.

11  Q.  You see that the bottom e-mail is from Mr. Yohai on October

12  27, 2016.  You see that?

13  A.  Yes.

14  Q.  The subject is executed term sheet.  You see that?

15  A.  I do.

16  Q.  It says:  See attached.  You see that?

17  A.  I do.

18  Q.  And that was sent to Mr. Katz, right, on the bottom?  You

19  see that?

20  A.  Yes.

21  Q.  Mr. Katz was the mortgage broker who was working with

22  Manafort and Yohai, right?

23  A.  Correct.

24  Q.  That was provided to you on October 27, right?

25  A.  Correct.

L76MCAL2                           Raico - Cross

1          MR. SCHOEMAN:  Can we look at the attachment, 164-A, I

2     guess.

3     Q.  Mr. Raico, do you recognize the term sheet on your

4     letterhead for the Nottingham loan?

5     A.  Yes.

6     Q.  Do you see that that was signed by Mr. Yohai on October 27,

7     2016?

8     A.  I do.

9     Q.  Are you aware of any version of that document that was

10    actually signed by Paul Manafort?

11    A.  I don't know.

12         MR. SCHOEMAN:  Let's go back to Defense Exhibit 151.

13    Q.  We just did:  Yes, they did return the executed term sheet.

14    But let me ask you, Mr. Raico, do you now agree that on August

15    9, 2016, you did not actually have an executed term sheet?  Do

16    you remember that?

17    A.  I don't know because the one that you just showed me had

18    one signature.  He could have sent an earlier one with another

19    signature.  There was so many documents going back and forth, I

20    don't remember today when I was sent an executed term sheet

21    five years ago.

22    Q.  Are you aware of any version of the term sheet earlier than

23    the one that I just showed you October 27?

24    A.  I don't know.

25    Q.  You said they did return the executed term sheet.  Do you

L76MCAL2                         Raico - Cross

1    think that when you wrote that, Mr. Brennan thought you would

2    be referring to the term sheet he prepared at your request?  Do

3    you think so?

4    A.  I am not sure.

5    Q.  You didn't tell Mr. Brennan that you had changed his term

6    sheet, did you?

7    A.  I don't know.

8    Q.  You say, I did not push the issue of the application fee.

9    Do you see that?

10   A.  I do.

11   Q.  That was kind of a false statement, right?

12   A.  I know they were looking to put a large deposit into the

13   Federal Savings Bank.  I could have said that.

14   Q.  Isn't the truth that you just removed the $5,000

15   application fee from the Dennis Raico version of the term

16   sheet, you just removed it?

17   A.  I just said to you, I don't know who provided that term

18   sheet.

19   Q.  That you e-mailed to Paul Manafort?

20   A.  Right.

21           MR. SCHOEMAN:  Let's look at Defense Exhibit 147 just

22   to see if this helps.  This is in evidence, Defense Exhibit

23   147.

24   Q.  Do you see on July 29 Mr. Manafort asked you, Dennis,

25   please send me a copy of the term sheet for Nottingham that you

L76MCAL2                         Raico - Cross

1    sent to Jeff.

2              You see that?

3    A.  I do.

4              MR. SCHOEMAN:  And then can we look back at Defense

5    Exhibit 148, top e-mail.

6    Q.  Would you read what you wrote.

7    A.  Hi, Paul.  Please see the attached and the comments below.

8    I didn't want to inundate you and assumed that Jeff would

9    forward.  I will include you in our pertinent communication

10   moving forward.  As stated below, we are committed to making

11   you and Jeff a priority.  We will need some essential updated

12   information and would like to target a closing date of 8/15/16.

13   Q.  Let's stop there.  Having seen that Mr. Manafort asked you

14   for a copy of the term sheet and that you provided a copy of

15   the term sheet and that you said, please see the attached and

16   the comments below, is it your testimony to the jury that you

17   did not provide the term sheet to Mr. Manafort?

18   A.  I don't know.  This was -- I do not remember.

19             MR. SCHOEMAN:  Let's go back to Defense Exhibit 151.

20   Q.  Do you see where you wrote:  Appraisals and title has

21   already been ordered.  Do you see that?

22   A.  Yes.

23   Q.  That was not true either, was it?

24   A.  I don't know exactly when the appraisals and titles were

25   ordered.

L76MCAL2                     Raico - Cross

1   Q.  Isn't it true that the appraisals were ordered on August
2   12?
3   A.  They could have been.
4   Q.  Don't remember?
5   A.  I don't remember when the exact appraisals were ordered.
6   Q.  So this e-mail says appraisals have already been ordered
7   and it's August 9.  You see that?
8   A.  I do.
9   Q.  You say you don't remember when the appraisals were
10  ordered.  Is that fair?
11  A.  Fair enough.
12  Q.  Would it refresh your recollection to look at the
13  electronic e-mail confirmations of the appraisal orders?
14  A.  Sure.
15  Q.  Just for the witness let me show you what's been marked for
16  identification as Defense Exhibit 775.  Just look at that.  I
17  am going to ask you whether that refreshes your recollection.
18  A.  I see the date, yes.
19  Q.  I am just asking you whether it refreshes your
20  recollection.
21  A.  Again, I see the date.  I don't remember exactly when it
22  was ordered.  If this is saying that the order date is on
23  August 12, then I have to take it as that.
24          MR. SCHOEMAN:  Let's go back to Defense Exhibit 151.
25  Q.  You see on the bottom of this e-mail that you wrote:  Steve

L76MCAL2                        Raico - Cross

```
 1  │ indicated that he wanted this closed on or before the 15th.
 2  │ You see that?
 3  │ A.  I do.
 4  │ Q.  Mr. Raico, that is one of those instances where you invoked
 5  │ Mr. Calk's name as putting pressure on you when it never
 6  │ actually happened, right?
 7  │ A.  It could have been.
 8  │ Q.  That could be an instance in which in order to move things
 9  │ along you said, Mr. Calk wants it, but he hadn't actually told
10  │ you that?
11  │ A.  There were many instances when Steve had pressure to move
12  │ this along.  If this was one of the occasions where I wanted
13  │ everybody to move the file along and used his name to invoke
14  │ people rushing it, it could have been.
15  │ Q.  Just so the jury understands, you are saying that sometimes
16  │ you would try to push the file forward by invoking Mr. Calk's
17  │ name, right?
18  │ A.  Knowing that he wanted the file to move forward, yes.
19  │ Q.  But sometimes you did it, as you testified on direct,
20  │ without him telling you to do it; you just did it on your own?
21  │ A.  On occasion.
22  │ Q.  And there is nothing in the term sheet that was approved
23  │ that said that this loan has to close by August 15, right?
24  │ A.  I'm sorry.  What did you say?
25  │ Q.  Is there anything -- withdrawn.
```

L76MCAL2                         Raico - Cross

1              Mr. Raico, is there anything in the terms of the term

2      sheet that was approved by the loan committee that said this

3      loan needs to close by August 15?

4      A.  I don't believe it stated that on the term sheet.

5      Q.  Are you aware of any e-mail that Mr. Calk sent to you

6      saying, I want this to close by the 15th?

7      A.  I don't recall.

8      Q.  In fact, it would have been incredibly quick for that loan

9      to close by August 15.

10     A.  Possibly.

11     Q.  And the significance of August 15 is that if the loan

12     closed by August 15, then you would be able to get your

13     commission in the August -- the second August pay cycle, right?

14     A.  Could have been.

15     Q.  So if the loan closes by the 15th, it just means you get

16     your check before the end of the month, right?

17     A.  It could be.

18     Q.  Let me show you Government Exhibit 197.  Let's just look at

19     this e-mail.  This is an e-mail, Government Exhibit 197.

20             You see it?  It includes you in the middle of the

21     first page e-mailing Mr. Calk and giving him an update on the

22     Manafort loan.  You see that?

23     A.  I'm sorry.  What date was this?

24     Q.  The top e-mail is on October 13.  You see that?

25     A.  Yes.  Thank you.

1    MR. SCHOEMAN:  Could we look at the second page of the

2    exhibit.

3    Q.  You see one of the things that you forwarded to Mr. Calk in

4    the chain was an e-mail you received from Mr. Manafort.  You

5    see that?

6    A.  I see that, yes.

7    Q.  You see that in this e-mail it says:  This transaction is

8    penciled in to close next Thursday.  You see that?

9    A.  Yes.

10    MR. SCHOEMAN:  Can we highlight that, this

11    transaction, just the phrase, this transaction.  Then it says:

12    Let's get this one successfully closed.

13    Q.  You see that e-mail?

14    A.  Yes.

15    Q.  So this is an e-mail down in the chain of e-mails that you

16    forwarded to Mr. Calk, true?

17    A.  I guess so.

18    MR. SCHOEMAN:  Could we compare that to what's in

19    evidence -- this piece of this e-mail is in evidence,

20    Government Exhibit 185.

21    Can we put those versions --

22    Q.  Do you see on the top of your screen, from Government

23    Exhibit 185, the e-mail that Mr. Manafort sent to you in a

24    different version of the chain?  Do you see that?  It's an

25    e-mail on the same day.  It's basically the same e-mail.  You

L76MCAL2                          Raico - Cross

1   see that?

2   A.  Yes.

3   Q.  But you see that the one on the top is slightly different

4   from the one you forwarded to Mr. Calk.  You see that?  You see

5   that in the one on the top it says the first transaction is

6   penciled in to close.  Do you see that?  And the one on the

7   bottom, it just says this transaction.

8   A.  OK.

9   Q.  Mr. Raico, isn't it true that before forwarding this e-mail

10  from Mr. Manafort, before forwarding it to Mr. Calk, you

11  doctored it a little bit?

12  A.  I have no idea.

13  Q.  Let's just look.  At the e-mail on the top it says, let's

14  get this one successfully closed and on to the next.  Do you

15  see that?

16  A.  Yes.

17  Q.  Do you see on the bottom one it doesn't say and on to the

18  next, right?

19  A.  It does not.

20  Q.  Otherwise, same e-mail, right?

21  A.  OK.

22  Q.  Isn't it true that what happened is, you doctored the

23  e-mail that you sent to Mr. Calk so that he could not see that

24  you had been promising Mr. Manafort that there were going to be

25  a bunch of loans closing right after this.  Isn't that true?

L76MCAL2                          Raico - Cross

1   Isn't that what happened?

2   A.  I don't know.  I don't know how long -- I'm not promising

3   Mr. Manafort any loans.

4   Q.  But just so we are clear what happened, Mr. Manafort said

5   the first transaction is penciled in to close next Thursday and

6   he says, let's get this one successfully closed and on to the

7   next, right?

8   A.  Yes.

9   Q.  He sent that e-mail to you, right?

10  A.  It appears he did.

11  Q.  Because you had been telling him that after you closed the

12  first transaction, you were going to then move on to the next

13  one very quickly, right?

14  A.  He had multiple transactions that he wanted us to take a

15  look at that.

16  Q.  When you forwarded that e-mail from Mr. Manafort to

17  Mr. Calk, you doctored it, yes or no?

18  A.  I don't recall doing that.

19  Q.  Let me show you --

20       MR. SCHOEMAN:  Your Honor, I don't know if your Honor

21  would like to take a break, but I can keep going.

22       THE COURT:  Now is a good time for our morning break.

23       Ladies and gentlemen, let's break for ten minutes.

24  Please remember not to talk about the case or anything

25  happening in the courtroom.

1       (Jury not present)

2       THE COURT:  Mr. Raico, you may step down.  A reminder

3   not to talk to the government attorneys.

4       MR. SCHOEMAN:  Your Honor, I would ask that maybe

5   Mr. Raico just wait right outside while I make an application.

6       THE COURT:  Sure.

7       Mr. Raico.

8       MR. SCHOEMAN:  My application is that Mr. Raico be

9   instructed not to speak to his own counsel while he is on

10  cross-examination.  The authority for that is the Supreme

11  Court's decision --

12      THE COURT:  No.  You had asked for this before, and

13  I'm happy to give that instruction.

14      MR. SCHOEMAN:  It's that he not speak to his own

15  counsel, which is provided for by the Supreme Court in *Perry v.*

16  *Leeke*, 109 S. Ct. 594, which basically says your Honor has

17  discretion into further the truth-seeking function to tell a

18  witness -- a defendant or a witness who is on cross-examination

19  not to consult with counsel during breaks.

20      MR. SCOTTEN:  My only concern is, he's at a different

21  point than last time.  We shouldn't be sort of passing notes

22  through to his counsel.  It's certainly proper.  If I can just

23  take a quick look at *Perry*.

24      THE COURT:  Where is his counsel right now?

25      MR. SCOTTEN:  He's still in the courtroom.

L76MCAL2                     Raico - Cross

1              THE COURT:  Why don't you ask the lawyer to come in.

2              MR. SCOTTEN:  Frankly, maybe I should let the lawyer

3    address it.  It's not really the government's interest.  His

4    attorney may have some interest in speaking to him.

5              THE COURT:  If you want to look at *Perry* for a minute.

6              MR. SCOTTEN:  Sure.

7              THE COURT:  Please give me the cite for that.

8              MR. SCOTTEN:  109 S. Ct. 594, your Honor.  And counsel

9    has pointed me to what I believe is probably 601 in Supreme

10   Court Reporter.

11             MR. SCHOEMAN:  Let's call it 282.

12             MR. SCOTTEN:  In U.S. reports.

13             THE COURT:  It's *Perry v. Leeke*.

14             MR. SCOTTEN:  Yes, your Honor.

15             I agree with counsel's reading of the case.  I have no

16   objection.  Mr. Andalman may want to object.

17             THE COURT:  Could you spell his name for the record.

18             MR. SCOTTEN:  A-n-d-a-l-m-a-n.

19             THE COURT:  Mr. Andalman, I understand you represent

20   Mr. Raico.

21             MR. ANDALMAN:  I just do.

22             THE COURT:  I just ask you to refrain from talking to

23   him during the break.

24             MR. ANDALMAN:  On any subject.

25             THE COURT:  No.  On anything related to this case.  If

L76MCAL2                          Raico - Cross

1     he wants to ask for the bathroom, you can tell him, but nothing

2     related to the case.

3              MR. ANDALMAN:  That's fine, your Honor.

4              THE COURT:  We are adjourned.

5              (Recess)

6              MR. SCHOEMAN:  May I inquire?

7              THE COURT:  You may.

8     Q.  I think when we broke we were looking at Government Exhibit

9     185.  I just want to put that back up for a second.

10             I think when I asked you a question I might have said

11    that that was an e-mail from Manafort to you.  That's actually

12    an e-mail from you to Mr. Manafort, is that right?

13    A.  Yes.

14    Q.  That said:  Let's get this one successfully closed and on

15    to the next.

16    A.  Yes.

17    Q.  You did this a lot, Mr. Raico, making alterations to

18    e-mails that you forwarded, right?

19    A.  I don't believe so.

20    Q.  Let me show you Government Exhibit 210.  Do you see that

21    the top of that e-mail is an e-mail that you forwarded to

22    Vanessa Bartholomew?  Do you see that?  That's the top e-mail.

23    A.  Yes.

24    Q.  Ms. Bartholomew worked in the Maryland ops center?

25    A.  Correct.

L76MCAL2                        Raico - Cross

1   Q.  And she was putting together the Encompass file for

2   submission to B of I, right?

3   A.  Yes.

4   Q.  The bottom e-mail, can we look at that.  You see that

5   that's an e-mail from Thomas Horn to you and Mr. Brennan?

6   A.  Yes.

7   Q.  It says:  Good morning, Dennis.  It starts:  We did receive

8   for 2015 and most recent 2016 interims for his consulting

9   business, DMP International, Inc., which I have attached.  Do

10  you see that?

11  A.  Yes.

12  Q.  That e-mail that you forwarded to Ms. Bartholomew you

13  doctored from its original, correct?

14  A.  The e-mail?

15  Q.  This e-mail from Mr. Horn that you forwarded to

16  Ms. Bartholomew is doctored, correct?

17  A.  Can I see that again, please?

18  Q.  I'm showing you the e-mail that you forwarded.  I'm just

19  asking you whether you remember doctoring this e-mail.

20  A.  I don't remember.

21          MR. SCHOEMAN:  Let's look at Defense Exhibit 162 side

22  by side in evidence.  Let's enlarge Mr. Horn's e-mail at the

23  bottom of the one on the left, Government Exhibit 210.  We lost

24  it.  I want to see if we can compare that to the top e-mail on

25  Defense Exhibit 162.

L76MCAL2                           Raico - Cross

1           Mr. Raico, do you see that on Defense Exhibit 162, the

2       e-mail that you received from Horn, starts:  Although asked --

3       let's look at the top one.  It starts:  Although asked, we did

4       only receive the personal income tax returns for Paul and 2015

5       being a draft.

6           Do you see that that's what Mr. Horn wrote in the top

7       e-mail?

8       A.  Yes.

9       Q.  You see that in the version below that you forwarded to

10      Ms. Bartholomew, you took out that sentence?

11      A.  I don't remember doing that.

12      Q.  But there is no one else who could have done that, right?

13      A.  I don't believe so.  I could have.  I don't remember doing

14      that.

15      Q.  But you are not denying that you did it?

16      A.  As it looks here today, I can't deny it.

17      Q.  And the reason you did it was because Mr. Bartholomew was

18      asking about Mr. Manafort's tax returns and you didn't want her

19      to know that they had been asked for and not received, is that

20      right?

21      A.  I don't know.

22          MR. SCHOEMAN:  Well, let's look at Defense Exhibit

23      162, which we had up.  Let's just look at the page 2 at the

24      bottom of that e-mail.

25      Q.  Isn't it true that what Ms. Bartholomew was specifically

L76MCAL2                         Raico - Cross

1    asking you about was income tax documents to confirm

2    Mr. Manafort's eligibility?  That's why she was asking you,

3    right?

4    A.  Could be.

5    Q.  And you deleted a sentence of Mr. Horn's e-mail that said

6    you had asked for them and hadn't received them, right?

7    A.  Again, I don't remember.  This was five years ago.  If you

8    are showing me this today, it could be, but I don't remember

9    doing this.

10   Q.  How many e-mails do you think you might have done this to

11   but can't remember?

12   A.  It wasn't my practice.

13   Q.  Let me show you Defense Exhibit 143.

14        Do you see page 2 at the bottom, you see that that

15   starts with, I have a note into my director of credit?  Do you

16   see that?

17   A.  Yes.

18   Q.  And that was an e-mail that Raymond Marquez at Bank of the

19   Internet sent to you on September 7.

20   A.  OK.

21   Q.  And you forwarded that e-mail.

22        MR. SCHOEMAN:  Could we just go up in the chain.

23   Q.  Do you see that you forwarded that e-mail to Mr. Calk on

24   November 7?

25   A.  I see that, yes.

L76MCAL2                         Raico - Cross

1   Q.   Which was the day before the 2016 election?

2   A.   OK.

3   Q.   Well, it's Monday, November 7.  You see that it's Monday

4   November 7?

5   A.   I do, yes.

6   Q.   You write:  Steve, just keeping you updated.  You see that?

7   A.   Yes.

8   Q.   And you write:  Although the file was in underwriting all

9   day, it will get conditional approval tomorrow.  You see that?

10  A.   I do.

11  Q.   What you were telling Mr. Calk is that the file for the 9.5

12  million dollar Manafort loan had been in underwriting at B of I

13  all day, is that right?

14  A.   It appears to be.

15  Q.   You were expecting it to get approval on November 8, right?

16  A.   I believe so.

17  Q.   Now, let's go back to the e-mail that you forwarded, which

18  is on the bottom of that page.  If we could put that on the

19  left side.  Just the top.  I have a note.  That's fine.  On the

20  right could we have Defense Exhibit 168.

21           MR. SCHOEMAN:  Could we enlarge the top e-mail.

22  Q.   On the top of the screen you have the version that's in

23  Defense Exhibit 143 that was forwarded, and on the bottom you

24  have Defense Exhibit 168.  You see that?

25  A.   Yes.

L76MCAL2                          Raico - Cross

1    Q.  Do you see that on the bottom, Defense Exhibit 168, it

2    starts with the phrase:  The file was submitted to underwriting

3    just after 12 p.m.  You see that?

4    A.  I do.

5    Q.  Bank of the Internet is located in California, right?

6    A.  Correct.

7    Q.  So 12 p.m. there would be 2 p.m. in Chicago.

8    A.  OK.

9    Q.  And you deleted from the version that you forwarded to

10   Mr. Calk the phrase, the file was submitted to underwriting

11   just after 12 p.m.  You see that?

12   A.  I do.

13   Q.  What this was saying was, the file went to underwriting at

14   2 p.m. central time, correct, the bottom e-mail?

15   A.  Yes.

16          MR. SCHOEMAN:  If we could just go back then to

17   Defense Exhibit 143 and your e-mail to Mr. Calk.  A little

18   higher.  Right there.  We can take down the one on the right.

19   Q.  143 on the second page, just keeping you updated, although

20   the file was in underwriting all day, that was not true.

21   A.  I'm sure I just put a different spin on things.

22   Q.  By putting a different spin on things, you mean you deleted

23   from the e-mail you forwarded the sentence that said it was

24   submitted at 2 p.m. central time and then you wrote an e-mail

25   that said it was there all day.

L76MCAL2                          Raico - Cross

1           Is that what you mean by a different spin?

2      A.  I don't remember doing that, but I could have.

3      Q.  You did this kind of thing to a lot of e-mails, right?

4           THE COURT:  That was a question.

5      A.  I'm sorry.

6      Q.  You did this kind of thing to a lot of e-mails during your

7      time at the Federal Savings Bank, right?

8      A.  I don't believe it was a regular practice.

9      Q.  How many would it have to be to be a regular practice?

10     A.  I don't remember doing this.

11     Q.  Let me show you Government Exhibit 207.

12          You see that at the top of this e-mail it says -- it's

13     from Paul Manafort to you on October 21.  It says:  Dennis, I

14     have attached the last item you requested, the DMP P&L as of

15     2016.  Please confirm that you now have everything.

16          You see that?

17     A.  I do.

18          MR. SCHOEMAN:  Let's put that on the left-hand side of

19     the screen and we will look at Government Exhibit 2008.

20     Q.  Do you see at the bottom of the screen you forward the same

21     e-mail to -- on the top you forwarded it to Elizabeth Cholakis,

22     right?

23     A.  Correct.

24     Q.  You forward that same e-mail that we see in Government

25     Exhibit 207 is at the bottom of Government Exhibit 208.  You

L76MCAL2                          Raico - Cross

1    see that?

2    A.  Yes.

3         MR. SCHOEMAN:  Zoom out of all of it.  We can do it

4    ourselves.  Just zoom out.

5    Q.  Do you see that here it says:  Please confirm that you now

6    have everything.  That's Government Exhibit 207.  And here,

7    when you forwarded it, you just took that sentence out.  You

8    see that?

9    A.  I do.

10   Q.  For no reason.  Is that true?

11   A.  Again, I don't recall doing that.

12   Q.  Isn't it true that you just routinely doctor e-mails before

13   you forward them?

14   A.  I wouldn't say that's a common practice.

15   Q.  Let's go on.

16        Mr. Raico, isn't it true that you figured out that

17   Mr. Manafort was defrauding the Federal Savings Bank and you

18   helped him do it?

19   A.  No.

20   Q.  Well, the Nottingham loan did not go forward because

21   Mr. Manafort walked away at the closing table, right?

22   A.  Yes.  He wanted to restructure it.

23   Q.  And the restructured loan was a cashout refinance of the

24   Jobs Lane property, right?

25   A.  Correct.

L76MCAL2                        Raico - Cross

1    Q.  And you knew that when that loan was restructured that the

2    loan underwriting would be then based on Mr. Manafort's income

3    and earnings, right?

4    A.  Yes.

5    Q.  So you asked Mr. Manafort to send you an updated version of

6    his profit-and-loss statement, correct?

7    A.  Yes.

8    Q.  And that's what we were just looking at, Government Exhibit

9    207.  You see that?

10   A.  Yes.

11   Q.  That's Mr. Manafort providing you with -- it says, a DMP

12   P&L as of September 2016, right?

13   A.  Yes.

14   Q.  Let's just look at the attachment for a second.  You see

15   that attachment?

16   A.  I do.

17   Q.  Now, you received that attachment and you reviewed it,

18   right?

19   A.  Briefly.

20   Q.  You reviewed it, right?

21   A.  Briefly.

22   Q.  Did you previously testify in a different proceeding to a

23   different jury that you played no role in reviewing it?

24   A.  Again, I would get information.  If I would look at it,

25   great.  Otherwise, I would pass it on.

L76MCAL2                          Raico - Cross

Q.   You previously said under oath to a different jury in a
different proceeding that you received this document, but you
did not play any role in reviewing it.  Did you do that?

A.   I might have.

Q.   But that wouldn't have been true?

A.   Correct.

Q.   Because let me show you Government Exhibit 208 now.

     Could you read the e-mail at the top from yourself to
Elizabeth Cholakis.

A.   Attached is the 2016 year to date P&L for Paul.  I would
use a three-year average, 2.985 million, 1.25 million, 3.012
million, for an annual income of 2.415 million.  Let me know
how the debt income looks if you're still in the office.
Thanks again.

Q.   That 3.012 million is the information from the 2016 P&L
that Paul Manafort sent you?

A.   I believe so.

Q.   The one you testified to a different jury under oath you
did not review.

A.   OK.

Q.   Do you have a clear recollection of how many things you
said under oath to a different jury that were not true?

A.   No.

                (Continued on next page)

L76Qcal3                          Raico – Cross

1    BY MR. SCHOEMAN:   (Continued)

2    Q.   Different juries, same oath, right?

3    A.   Excuse me?

4    Q.   Previously testified to a different jury but you took the

5    same oath to tell the truth that you took today, right?

6    A.   Yes.

7    Q.   Now, the document that's attached here, DMP P & L 9/31/16,

8    you never sent that to the underwriters in Chicago, right?

9    A.   I believe I sent it to my assistant.

10   Q.   Well, you knew they didn't have it, right?

11   A.   I don't believe so.

12   Q.   Let me show you what's in evidence as Government Exhibit

13   210.  So, in this email, Government Exhibit 210, you -- let's

14   go down -- let's look at the whole email.

15          At the bottom of the page, we looked at this one

16   earlier, this is from Mr. Horn.  He said, "We did receive for

17   2015 and most recent 2016 interims for his consulting business

18   DMP International, which I have attached."  Do you see that?

19   A.   Yes.

20   Q.   Let's look at the top email.  And you see that you

21   forwarded this to Ms. Bartholomew, and you said, "I just

22   reached out to Paul and requested the six items that we

23   discussed a few minutes ago.  In addition, Tom has sent the

24   P & Ls."

25          Do you see that?

L76Qcal3                          Raico - Cross

1    A.  Yes.

2    Q.  Attached to that is something called the 2016 year to date

3    P & L PDF.  Do you see that?

4    A.  I do.

5    Q.  Can we go to the attachment, that particular attachment?

6    No, next page.  Next page.  Next page.  One more.  And one

7    more.  And one more.

8             You see what was attached was a P & L for the seven

9    months ended July 31, 2016.  Do you see that?

10   A.  I see that now, yes.

11   Q.  Let's go back to Government Exhibit 207.  Do you see on

12   Government Exhibit 207 that on Friday, the 21st, you had

13   actually already received the P & Ls as of September 2016.  Do

14   you see that?

15   A.  I do.

16   Q.  But if we looked -- just put that on the left side and go

17   back to 210, Government Exhibit 210 on the right, first page.

18   Do you see that Government Exhibit 210 your email to Vanessa

19   Bartholomew is dated October 26?  Do you see that?

20   A.  Okay.

21   Q.  And you sent her the file 2016 year to date P & L which was

22   the P & L through July, right?

23   A.  Okay.

24   Q.  And you had received five days earlier from Mr. Manafort

25   personally a P & L through September.  It said September 31,

L76Qcal3                       Raico - Cross

1   2016.  Do you see that?

2   A.  I do.

3   Q.  So you did not forward that version to Ms. Bartholomew?

4   A.  I'm not sure.  I may not have.

5   Q.  And the reason you did that is that the version you got

6   from Paul Manafort was a very suspicious document, right?

7   A.  Look, there were so many documents back and forth with

8   Mr. Manafort, I couldn't make heads or tails of it.

9   Q.  Let's look at Defense Exhibit 121 in evidence.  Do you see

10  that back on August 11 of 2016, Ms. Ivakhnik had gathered up

11  the document 2016 year to date P & L.  Do you see that?

12  A.  I see that, yes.

13  Q.  And let's display just that attachment, which I think is

14  Exhibit F -- I mean, 121-F.  Put that on the left.  Go to

15  Government Exhibit 207 attaching the other P & L you received

16  directly from Manafort and put it on the right.  So on the left

17  is the one that Ms. Ivakhnik obtained in August through

18  July 31, 2016.  Do you see that?

19  A.  The one on the left is through July.

20  Q.  Yes.

21  A.  And the one on the right is through September.

22  Q.  Right.  Can we highlight the date on the one on the right?

23  A.  Thank you.

24  Q.  And the one on the right is the one that you personally

25  received from Mr. Manafort in Government Exhibit 207, right?

L76Qcal3                          Raico - Cross

1    A.   Okay.

2    Q.   Do you see that on the one on the left shows income from

3    operations zero?

4    A.   Yes.

5    Q.   Do you see the one on the right says income from operations

6    $3,650,000?

7    A.   I do.

8    Q.   Which results after expenses in income before taxes of

9    $3,011,952?

10   A.   Yes, I see that.

11   Q.   And it's that number that you rounded up to $3,012,000 that

12   you directed your assistant to use as Mr. Manafort's 2016

13   income, right?

14   A.   I made a suggestion, yes.

15   Q.   So you told her to use the one from the P & L statement on

16   the right which suddenly shows $3,650,000 of income, right?

17   A.   It does.

18   Q.   Without a penny more of expense, right?

19   A.   I see that.

20   Q.   Well, comparing these documents, you're able to see that

21   what Mr. Manafort provided you is a statement that said he now

22   made $3,650,000 of income, although his expenses did not change

23   at all, right?

24   A.   I see that.

25   Q.   And it -- if you look at the one on the right, it's kind of

L76Qcal3                          Raico – Cross

1    shoddy, don't you think?

2    A.  Looking at it today and having the opportunity to review

3    it, it looks like there's different fonts, yes.

4    Q.  Yes.  On the top, the date line, the date is kind of

5    smudged.  Do you see that?

6    A.  Yes.

7    Q.  And let's zoom out to the bottom of both emails.  Do you

8    see on the bottom right email where it says:  "Subject to final

9    rev mw."  Do you see that?

10   A.  I do.

11   Q.  Which seems to be a doctoring of what was on the left,

12   which says subject to final review.  Right?

13   A.  I'm not sure I really looked at the fine print.

14   Q.  But just to be clear, you got this document from

15   Mr. Manafort personally?

16   A.  Okay.

17   Q.  And you directed your assistant to use the number in the

18   document 3,012,000 as Mr. Manafort's income, right?

19   A.  Yes.

20   Q.  And you did that because in order for the Summerbreeze loan

21   to go forward, Mr. Manafort now had to show income in 2016,

22   right?

23   A.  He did.

24   Q.  But you did not forward the document to the underwriting

25   department to Vanessa Bartholomew on October 26, right?

L76Qcal3                          Raico - Cross

1   A.  For the September?

2   Q.  You didn't forward the September one you'd received five

3   days earlier to Ms. Bartholomew, right?

4   A.  I don't believe so.

5   Q.  You sent her the old one, correct?

6   A.  Okay.

7   Q.  All right.  This issue came up again in December 2016.  Do

8   you recall that?

9   A.  I believe so.

10  Q.  Do you remember that Mr. Horn -- let me just show you.  Let

11  me show you Defense Exhibit 116.  I want to start on page 3 at

12  the bottom.

13          Do you see that Mr. Horn wrote an email to you and

14  Mr. Brennan, and he says:  "Dennis" and then he lists some

15  things that he needs to receive.  Do you see that?

16  A.  I do.

17  Q.  And he asks for the most recent financials for DPM

18  International?

19  A.  Okay.

20  Q.  He says, "As you know, the last ones from July show a

21  $2.4 million receivable."  Do you see that?

22  A.  Yes.

23  Q.  He told you in this email that the last ones he had were

24  from July, right?

25  A.  Yes.

L76Qcal3                        Raico - Cross

1    Q.  Now let me show you Government Exhibit 311.  You see on the

2    top again it's an email, this time on December 30, from

3    Mr. Horn to you and Mr. Brennan.  Do you see that?

4    A.  Yes.

5    Q.  Mr. Brennan is the chief underwriter.  Is that right?

6    A.  Yes.

7    Q.  And Mr. Horn works for him?

8    A.  Correct.

9    Q.  So let's go on this email Government Exhibit 311 to page 6.

10   I don't know why the bottom part is in gray, but just ignore

11   that for now.  It's on the original.

12          Do you see that Mr. Horn is asking you the bottom of

13   this email now on the 28th, he says, "Per your earlier email, I

14   need the following," and he again asks for the most recent

15   financials for DPM International.  Do you see that?

16   A.  Yes.

17   Q.  In response to that, you did not provide the financials

18   that you had received from Mr. Manafort that were through

19   September, right?

20   A.  I don't believe I did.

21   Q.  Let's go up to the next email.  Mr. Raico, this is an email

22   from you to Cindy Laporta, correct?

23   A.  Yes.

24   Q.  Ms. Laporta was a bookkeeper who worked for Mr. Manafort,

25   right?

L76Qcal3                         Raico - Cross

1    A.  Yes.

2    Q.  Or an accountant.  Do you know what her role was?

3    A.  I know she worked for the accounting firm that Mr. Manafort

4    did business with.

5    Q.  So you asked her to comply with Mr. Horn's request below?

6    A.  Yes.

7    Q.  And then let's go up to -- we can just let you see the

8    whole thing.  She responds, "I will work on the questions

9    below."  Do you see that?

10   A.  Yes.

11   Q.  And we will keep going up.  Do you see that Heather

12   Washkuhn -- do you remember who Heather Washkuhn is?

13   A.  I believe she worked with the same firm.

14   Q.  Let's open that wider so we can see her signature block.

15   Heather Washkuhn is managing director at the firm.  Is that an

16   accounting firm?

17   A.  I believe so.

18   Q.  And you see that Heather Washkuhn tells you and

19   Ms. Laporta, "Thanks Cindy.  Dennis, the latest financials we

20   have for DMP are dated 7/31/16."  Do you see that?

21   A.  I do see that.

22   Q.  On December 29, you were being told by the accounting firm

23   that the latest ones they had were the July 31 version?

24   A.  Okay.

25   Q.  Not the version that Paul Manafort sent you through

L76Qcal3                         Raico - Cross

1    September, right?

2    A.  Okay.

3    Q.  Let's go up.  And you say "Tom" -- meaning Tom Horn --

4    "please read below on DMP.  Please let me know."  Do you see

5    that?

6    A.  Yes.

7    Q.  Scroll up.  "Dennis, I think they would be helpful.  Thank

8    you for following up."  Do you see that?

9    A.  Yes.

10   Q.  So you say, "Okay, I will ask for the updated financials,"

11   right?

12            And Mr. Horn says," Dennis, 2014, and the most recent

13   interims."  Do you see that?

14   A.  He's going back asking for 2014?

15   Q.  I think he's asking for -- do you read that to say he wants

16   the most recent interim financials for DMP International?

17   A.  Correct.

18   Q.  Let's scroll up.  Would you read what you wrote?

19   A.  "Tom, don't we have the financials updated to 7/31/16.  I

20   just requested an update year-to-date or at least more recent

21   than July."

22   Q.  In your email to Mr. Horn and Mr. Brennan, you mention the

23   July financials and you don't mention the September financials

24   you received personally from Mr. Manafort?

25   A.  I guess I didn't.

Q.  Okay.  Let me scroll up.  And Mr. Horn responds, "Correct,
we need something since July."

        At this point, Mr. Raico, you did not tell the
underwriters that you had interim financials from September
that showed $3 million of income, right?

A.  I didn't.

Q.  So let me show you now what's in evidence Government
Exhibit 316.  Let's go to page 1, the bottom email.  Do you see
that on January 3, you wrote, "Hello Heather."  That was to
Heather Washkuhn, right?

A.  Yes.

Q.  And you wrote, "I was just checking to see when we will be
receiving the updated financials for DMP."  Do you see that?

A.  Yes.

Q.  And that was because the Union Street transaction was
actually about to close, right?

A.  Correct.

Q.  And then let's go up in the chain.  She says, "Will send
over this week.  Thank you."

        And then on the top email, she writes, "Hi Dennis,
draft financials for DMP as of November 30, 2016 are attached."
Do you see that?

A.  Yes.

Q.  And she attaches a file 10/30/16 FS PDF, right?

A.  Okay.

L76Qcal3                      Raico - Cross

Q.   Let's look at that attachment.  Page 13 of the document.

Do you see that page 13 of this document is the interim

financials for DMP International now through November 30.  Do

you see that?

A.   I do.

Q.   And how much income does the financial statement prepared

by the accountants show?

A.   Zero.

Q.   And how much less than what Mr. Manafort would that be?

A.   I don't remember what the last one said.

Q.   3,011,900 something?  I'm sorry, 3,650,000 in income?

A.   Okay.

Q.   Okay?  And do you see that the operating expenses have gone

up from in the 600 thousands to the 1.16 million.  Do you see

that?

A.   I do.

Q.   So the document that the accountant sent you showed

Mr. Manafort actually had no income and his expenses had almost

doubled, correct?

A.   Correct.

Q.   Now, that was a red flag, right?

A.   I guess.

Q.   Yeah, I mean, you had received a document from Paul

Manafort that you had used as the basis for his income

calculation showing he had $3.3 million of -- over $3 million

L76Qcal3                         Raico - Cross

1    of income, and now you learn that he actually had a loss of

2    1.16 million, right?

3    A.   On this document, yes.

4    Q.   So who did you tell about that?

5    A.   I don't know.

6    Q.   Nobody, right?

7    A.   I don't believe so.

8    Q.   You hid that, correct?

9    A.   There were P & Ls, K-1s, there were multiple documents and

10   variations of income for this gentleman.  Again, I'm on the

11   sales side of the business.  I don't completely analyze this.

12   If I see something at face value, I'll try to make sense of it,

13   but, you know, one minute he has income, the next minute he

14   doesn't have income, and everybody knew about it.

15   Q.   All right.  When you say everyone knew about it, let me

16   show you what's in evidence as Defense Exhibit 118.  Let's go

17   to page 2 of this document.  I think it's page 2, second

18   paragraph.  So now we're on January 5.  Do you see that?

19   A.   I do.

20   Q.   And this is an email from Mr. Horn again to you and

21   Mr. Brennan.  Do you see that?

22   A.   Yes.

23   Q.   And you see that Mr. Horn says, "How are the financials

24   that I requested over a week ago coming?"  Do you see that?

25   A.   I do.

L76Qcal3                        Raico - Cross

1   Q.  All right.  And do you remember how you responded.  Will

2   you read your email at the top on January -- well, you know

3   what?  Let's do one more.  Let's go to the bottom of this page

4   before we get there.

5           Isn't it true that on Friday, January 6, Mr. Horn

6   followed up with you and said, "Dennis, Jim, any thoughts on

7   this, Dennis?  Financials?  Any updates?"

8   A.  Yes.

9   Q.  And then you responded at the top, would you read what you

10  said?

11  A.  "I will check again with Cindy and Heather on the

12  financials.  Thanks."

13  Q.  But you had already received the financials, correct?

14  A.  I did.

15  Q.  So when Mr. Horn and Mr. Brennan were asking for the

16  updated financials, you had hid them from the underwriting

17  department?

18  A.  I didn't think it mattered at this point.  We had so much

19  information of variation of income from Mr. Manafort.  Up,

20  down; up, down; up, down, I couldn't make heads or tails of it.

21  Q.  Mr. Raico, Mr. Manafort submitted a financial statement of

22  July that said he had zero income, right?

23  A.  I think so.

24  Q.  Then when he restructured the loan, you told him you need

25  to have income if we're going to do a cashout re-fi on the Jobs

L76Qcal3                        Raico - Cross

1    Lane property, right?

2    A.  The loan's now focused more on his income than additional

3    collateral.

4    Q.  So he sent you financials through September that suddenly

5    showed he had 3,650,000 of operating income, right?

6    A.  Yes.

7    Q.  Which you told your assistant to enter into the system for

8    the underwriting, right?

9    A.  I believe I did.

10   Q.  And you did not provide a copy of that document to the

11   underwriters who continued to ask you for it?

12   A.  I don't believe I did.

13   Q.  And then you were asked to obtain an updated copy in

14   December from Mr. Manafort's accounting professionals, right?

15   A.  Yes.

16   Q.  And that document showed that again Mr. Manafort was back

17   to zero and not the 3 million he had showed you based on the

18   September financials, right?

19   A.  I believe so.

20   Q.  And that was clear on its face, wasn't it, that

21   Mr. Manafort was using you to defraud The Federal Savings Bank?

22   A.  I wouldn't say that.

23   Q.  And, Mr. Raico, I think we've established that you get paid

24   on commission, right?

25   A.  I do.

L76Qcal3                          Raico - Cross

1    Q.   So if the Jobs Lane Summerbreeze property loan had not gone

2    through, you would not have gotten a commission?

3    A.   Not on that particular transaction.

4    Q.   So you needed Mr. Manafort to show income, and he provided

5    it to you, right?

6    A.   We needed the borrower to show realistic income on the file

7    as opposed to just simply collateral, yes.

8    Q.   So that loan closed, and you got a $95,000 commission,

9    right?

10   A.   Less, paying for my own benefits and paying for my

11   assistant.

12   Q.   Mr. Calk's bank gave you $95,000 less expense?

13   A.   Less significant expenses.

14   Q.   Largest commission you'd ever received in your life?

15   A.   At The Federal Savings Bank, yes.

16   Q.   And then you wanted to get a commission on the second loan,

17   which was the Union Street loan, right?

18   A.   Sure.

19   Q.   And you received a financial statement that was directly

20   contrary to what Mr. Manafort had said his income was, and you

21   didn't provide it to the underwriting department?

22   A.   Sir, there were a ton of documents going back and forth at

23   this juncture.

24   Q.   And the Union Street loan closed, right?

25   A.   Yes, sir.

1   Q.  And you got a $65,000 commission less expenses?

2   A.  Less paying for my own benefits and for my assistant.

3   Q.  Yes.  And Mr. Calk's bank paid you a commission?

4   A.  They did, yes.

5   Q.  And in the seven meetings that you had with different

6   members of the government, not necessarily these people, did

7   you ever tell them that you had deliberately withheld Paul

8   Manafort's fraudulent financial statement in order to make sure

9   you would get your commission?

10  A.  No, because that's not what I believe I did.

11  Q.  But you held the financial statement, right?

12  A.  There were so many documents --

13  Q.  Mr. Raico, my question is:  Did you withhold the fraudulent

14  financial statement from the underwriting department?  Yes or

15  no.

16  A.  I don't believe I passed it on.

17  Q.  And you got your commission, right?

18  A.  I did.

19  Q.  Mr. Raico, do you recall that there was another issue with

20  Manafort's income in that he said that he was expecting a

21  $2.4 million notes receivable, right?

22  A.  I recall that, yes.

23  Q.  And you told Javier Ubarri, the president of the bank, that

24  Mr. Manafort received that $2.4 million receivable, right?

25  A.  Which is what I was told.

L76Qcal3                    Raico - Cross

1    Q.  But there's no evidence that he did receive it, right?

2    A.  I don't believe so.

3    Q.  And there's no email telling you that he received it?

4    A.  I don't believe so.

5    Q.  So you told Mr. Ubarri -- you don't deny you told

6    Mr. Ubarri that Mr. Manafort received the $2.4 million in

7    receivables, right?

8    A.  Again, at that time that was the information that was given

9    to me.

10   Q.  The information -- let me show you what is in evidence as

11   Government Exhibit 177.  This is not for the truth of what's in

12   here.  This is just for what you are saying to Mr. Ubarri.

13            MR. MONTELEONI:  Your Honor, if we could just have

14   that as an instruction to the jury.

15            THE COURT:  Ladies and gentlemen, the document that is

16   being shown to you, is similar to other documents you have

17   seen.  It is not to suggest that what's in it is true, but to

18   show what Mr. Ubarri was told.

19   Q.  Mr. Raico, this is an email from you to Mr. Ubarri, right?

20   A.  Yes.

21   Q.  By the way, it's about the Manafort/Yohai loan, and you

22   also reference the Bello loan, right?

23   A.  Correct.

24   Q.  Mr. Calk was talking to you also about the Bello loan,

25   right?

L76Qcal3                         Raico - Cross

1    A.  Yes.

2    Q.  The Bello loan was actually at that time for $14 million?

3    A.  Yes.

4    Q.  It would be misleading to suggest that Mr. Calk didn't talk

5    to you about other loans you were working on?

6    A.  I didn't say he didn't talk to me about other loans.

7    Q.  He talked to you about other loans that you were working

8    on, right?

9    A.  Yes.

10   Q.  And the Bello loan was actually bigger than either of the

11   Manafort loans, proposed loans?

12   A.  Initially, yes.

13   Q.  The Bello loan did not go through, right?

14   A.  Correct.

15   Q.  But you talked to Mr. Calk a bunch of times about it,

16   right?

17   A.  I've spoken with him before about it, yes.

18   Q.  And in this email you provide an update to Mr. Ubarri, and

19   you told him that the gross income for Jeff -- is that

20   Mr. Yohai, Jeff?

21   A.  Correct.

22   Q.  -- is almost $4 million, and for Paul is in excess of

23   $5 million.  Do you see that?

24   A.  Correct.

25   Q.  You told Mr. Ubarri you were told that, right?

L76Qcal3                          Raico - Cross

1    A.  Yes.

2    Q.  But it's not true.  I mean, it isn't actually true; you've

3    never seen a document that supports that claim?

4    A.  No, but I was definitely told that.

5    Q.  And the P & L that you received a couple weeks later --

6    well, strike that.  And you also write, "One of the questions

7    from Jim and Tom was did Paul collect the $2.4 million in

8    receivables, and he did."  Do you see that?

9    A.  Yes.

10   Q.  In terms of what Mr. Ubarri knew about the loan, that was

11   information you provided to him?

12   A.  Yes, which was passed on to me.

13   Q.  Did you ever correct that?

14   A.  I don't know.

15   Q.  Did you ever get written documentation that any of the

16   things you wrote in this email are correct?

17   A.  I don't know.

18   Q.  Do you remember that one of the pages of your notebook

19   includes a reference to someone named Alan Bachman?

20   A.  Yes.

21   Q.  It was on one of the pages we looked at earlier, right?

22   A.  Yes.

23   Q.  Who is Alan Bachman?

24   A.  He is the president of a Amerifund.

25   Q.  What is Amerifund?

L76Qcal3                         Raico - Cross

1   A.  It's a mortgage bank, mortgage broker.

2   Q.  And isn't it true that in the fall of 2016 as you were

3   trying to get commission for yourself to refinance Manafort's

4   and Yohai's properties that you engaged in an elaborate fraud

5   on Alan Bachman?

6   A.  What -- no, I don't believe so.

7   Q.  You don't recall that you fabricated a series of documents

8   in order to defraud Mr. Bachman into making loan -- trying to

9   get him to make loans to Mr. Yohai and Mr. Manafort?

10  A.  No.

11  Q.  All right.  And the government never asked you about that?

12  A.  No.

13  Q.  Okay.  Well, do you remember that in October of 2016 you

14  met with Mr. Bachman to see if he was interested in essentially

15  funding loans to Yohai and Manafort?

16  A.  I could have, yes.

17  Q.  All right.  Well, let me fresh your recollection.  Defense

18  Exhibit 841 just for the witness, identification only.  Just

19  look at this for a second.  You can take it down.

20          I just wanted to ask you whether you remembered in

21  October of 2016 trying to get Mr. Bachman interested in

22  financing a loan for 2521 Nottingham?

23  A.  Say that again, sir?

24  Q.  Do you remember that after -- well, do you remember that in

25  October 2016, you were talking to Mr. Bachman at Amerifund

L76Qcal3                        Raico - Cross

1   about whether he would finance loans for some of the

2   Yohai/Manafort properties.  Do you remember that?

3   A.  Briefly.

4   Q.  And do you remember that you actually met with Mr. Bachman

5   in Boston in late October?

6   A.  I don't remember meeting with him in Boston, no.

7   Q.  Well, let me show you Defense Exhibit 974 for

8   identification.  Just take a look at that.  And I wanted to

9   show you the bottom email too.  Asking whether that refresh

10  your recollection about meeting Mr. Bachman in Boston?

11  A.  Looks like he made the request --

12  Q.  Not asking you what it looks like.  Just asking if it

13  refreshes your memory.  Does it refresh your memory?

14  A.  It does.

15  Q.  It does?

16  A.  Yes.

17  Q.  So, you remember meeting Mr. Bachman in Boston in late --

18  A.  No.  No.  I said it looks like he invited me to meet with

19  him.

20          THE COURT:  So don't read from the document.  The

21  question is:  Having looked at the document and now putting it

22  aside, do you now remember meeting with Mr. Bachman in Boston?

23  A.  I don't remember a meeting with Mr. Bachman in Boston.

24  Q.  Do you remember talking to him about something called a

25  wrap loan from The Federal Savings Bank that would refinance a

L76Qcal3                          Raico - Cross

1   bunch of Mr. Yohai and Manafort's California properties?

2   A.   Vaguely.

3   Q.   Isn't it true that in your effort to broker a deal with

4   Mr. Bachman that would refinance Mr. Manafort and Mr. Yohai's

5   property, you fabricated a completely bogus term sheet.  Isn't

6   that true?

7   A.   I don't recall.

8   Q.   Well, let me show you what has been marked for

9   identification only as Defense Exhibit 818.  Take a look at

10  that.

11  A.   I don't remember that.

12  Q.   Isn't it true, sir, that what you did was, you took a

13  legitimate email from -- take it down -- isn't it true that you

14  took a legitimate email from Javier Ubarri, and you doctored it

15  so that it would appear that the bank's credit committee had

16  approved a wrap loan to Mr. Yohai covering a bunch of

17  California properties.  Isn't it true that you did that?

18  A.   I don't even know what a wrap loan is.

19            MR. SCHOEMAN:  I'd like to offer Defense Exhibit 818

20  which I just showed for identification, I'd like to offer it in

21  evidence?

22            THE COURT:  Any objection?

23            MR. MONTELEONI:  Your Honor, we are not --

24            THE COURT:  Just yes or no, please.

25            MR. MONTELEONI:  Yes.

```
1              THE COURT:  Overruled.
2              (Defendant's Exhibit 818 received in evidence)
3    Q.  Could we display Defense Exhibit 818 in evidence.  And
4    could we put it side by side with Government Exhibit 156 in
5    evidence?
6              Do you see Defense Exhibit 818 purports to be an email
7    from Mr. Ubarri on Wednesday, September 21, 2016 at 5:09 p.m.?
8    Do you see that?
9    A.  I do.
10   Q.  And to Mr. Brennan, Mr. Calk, Mr. Horn, also to Mr. Ubarri
11   and cc'd to Mr. Norini.  Do you see that?
12   A.  I do.
13   Q.  Do you see that the same email header at the same date and
14   time appears on Government Exhibit 156.  Do you see that?
15   A.  I do.
16   Q.  And do you see that the text on Government Exhibit 156
17   says, "Jim, the committee approved this loan with this terms."
18   Do you see that?
19   A.  Yes.
20   Q.  And that is the credit committee approval of the
21   restructured Nottingham loan back on September 21, right?
22   A.  Yes.
23   Q.  And if we could highlight on Defense Exhibit 818 the first
24   paragraph, Mr. Raico, could you read that out loud, please?
25   A.  "The credit committee approved this wrap loan with terms
```

1   and forward commitments from Bank United, Blackstone,

2   Gibraltar, and Goldman Sachs.  As always, we are the lead

3   participant assuming 65 percent of the risk, and the secondary

4   participant will be assuming 35 percent."

5   Q.  Mr. Raico, isn't it true that you fabricated the one on the

6   left by doctoring Government Exhibit 156 on the right?

7   A.  I don't believe so.

8   Q.  Do you think Ms. Ivakhnik did it?

9   A.  What am I fabricating here though?  I don't follow.

10  Q.  Mr. Raico, did the credit committee of The Federal Savings

11  Bank ever approve a wrap loan with forward commitments from

12  Bank United, Blackstone, Gibraltar, and Goldman Sachs?  Did

13  that ever happen?

14  A.  No, I don't who know who half those banks are.

15  Q.  Below, it says, specific properties.  It's blue Jay Way

16  Stradella Road, Union Street.  Do you see that?

17  A.  Yes.

18  Q.  The Federal Savings Bank credit committee never approved

19  any kind of loan for Blue Jay Way or Stradella Road, correct?

20  A.  Correct.

21  Q.  But you told Mr. Bachman, am I right, that your bank, The

22  Federal Savings Bank, had approved a wrap loan for Mr. Yohai

23  for these properties.  Didn't you do that?

24  A.  I don't know.  I don't believe so.

25          MR. SCOTTEN:  Your Honor, could we take a pause.

L76Qcal3                              Raico - Cross

1    They've offered something in evidence, and they haven't given

2    it to us, and we just want to look at what they're looking at.

3              THE COURT:  Let's just pause a minute so they can look

4    at it.

5              (Pause)

6    Q.  Defense Exhibit 818, could I see the full document?

7              THE COURT:  Sorry.  What did you just say?

8              MR. SCHOEMAN:  Defense Exhibit 818.  I just want to

9    see the full document.

10   Q.  Do you see, Mr. Raico, that on the top part of this email,

11   this is actually the version that Mr. Ubarri forwarded to you

12   on September 21 of his original email.  Do you see that?

13   A.  I see that.

14   Q.  And just the full top of the email, just to be clear, does

15   not indicate that you sent it to anyone, right?

16   A.  Okay.

17   Q.  But you created this, right?

18   A.  I don't -- I don't remember ever seeing this.

19   Q.  Okay.  Didn't you in your discussions with Mr. Bachman at

20   Amerifund, didn't you tell him that exactly this loan that is

21   set forth in Defense Exhibit 818 had been approved by The

22   Federal Savings Bank?

23   A.  I don't remember having that conversation.

24   Q.  All right.  You could take that down.  Let me show you

25   Defense Exhibit 831, just for the witness in identification.

L76Qcal3                         Raico - Cross

1    Sorry.  I am going to do this in order.

2              Let me show you Defense Exhibit 857.  Let's look at

3    857-A.  We could take it all down.  I'm just going to ask

4    Mr. Raico.  Do you remember having an extensive series of

5    conversations and emails with Mr. Bachman promising him that

6    The Federal Savings Bank was going to refinance Yohai's

7    California properties, Yohai and Manafort's California

8    properties?

9    A.  I do not recall having that conversation with Mr. Bachman.

10   Q.  If you had had that conversation, that would be false

11   because that never happened, right?

12   A.  Again, I don't recall having that conversation.

13   Q.  Okay.  Well, isn't it true that you told Mr. Bachman that

14   the 2401 Nottingham loan was supposed to close on November 15?

15   Didn't you tell that to Mr. Bachman?

16   A.  I don't know.  I don't remember.

17   Q.  Just to be clear, the Nottingham loan, Mr. Manafort walked

18   away from the Nottingham loan on October 19, right?

19   A.  Correct.

20   Q.  So if you had told Mr. Bachman on November 15 that -- if

21   you had told him that it was going to close on November 15,

22   that would be false?

23   A.  I could see that logic.

24   Q.  So, let me show you Defense Exhibit 831.  Just for the

25   witness, it's identification.  I'm just asking you whether you

L76Qcal3                         Raico - Cross

1   told Mr. Bachman on October 25 that The Federal Savings Bank

2   was going to fund a loan for 2401 Nottingham on November 15.

3   Did you do that?

4   A.   Looking at this email, I could have.

5   Q.   I'm just asking whether you remember that you did it?

6   A.   I don't remember.

7   Q.   But if you had done it, it would be a lie?

8   A.   Pardon me?

9   Q.   If you had said it, it would be a lie?

10  A.   I don't know the crux behind this email.

11  Q.   Let just be clear.  The 241 Nottingham loan was dead in the

12  water on October 19, right?

13  A.   Yes, but there were four or five other California

14  properties that were continually trying to get back into the

15  mix.

16          MR. SCHOEMAN:   I offer for impeachment purposes

17  Defense Exhibit 831 and 831-A.  If we just go up.  I offer 831

18  and its attachment 831-A.

19          MR. MONTELEONI:   No objection.

20          THE COURT:   It's admitted.

21          (Defendant's Exhibits 831 and 831-A received in

22  evidence)

23  Q.   This is your email to Mr. Bachman on October 25, right?

24  A.   Correct.

25  Q.   And you write, "Attached is the appraisal for 2401

L76Qcal3                        Raico - Cross

1    Nottingham.  The project is approximately 75 percent complete."

2    Do you see that?

3    A.  I do.

4    Q.  By the way, that wasn't true either, was it?

5    A.  I don't know.  I've never been to the property, and that's

6    the information I was being told.

7    Q.  But you had the appraisals, right?  Yes?

8    A.  I -- I can't see it.

9    Q.  You say, "I will send you our approval term sheet under

10   separate cover.  Our anticipated timing to fund is by

11   November 15."  Do you see that?

12   A.  I do.

13   Q.  But you were not going to fund a loan for 2401 Nottingham

14   on the 15th, right, because that deal died on October 19?

15   A.  That did, as -- yes.

16   Q.  Now, Mr. Bachman caught up with you and asked you for

17   that -- Mr. Bachman -- you were trying to get Mr. Bachman

18   interested in refinancing The Federal Savings Bank's loans to

19   Yohai and Manafort, right?

20   A.  No.  They were outstanding loans in California that we

21   didn't know whether or not we had an interest in, and they --

22   Felix Katz, Jeff Yohai kept coming back to me asking me if

23   there was any way there was life left in these loans.  That's

24   why I was approaching Alan Bachman to see if there was any

25   interest on his side.

L76Qcal3                              Raico - Cross

1    Q.  What you were telling Mr. Bachman was that The Federal

2    Savings Bank was going to take out the existing debt on those

3    loans and Mr. Bachman would then take out The Federal Savings

4    Bank.  That's what you were discussing, right?

5    A.  I don't know if we got that detailed.

6                THE COURT:  Can you speak into the mic?

7    A.  I'm not sure we got into that much detail.

8    Q.  Well, he asked you for a version of the 2401 Nottingham

9    term sheet, and you sent it to him, right?

10   A.  I don't know.

11   Q.  Well, let me show you what's been marked for identification

12   as DX-840.  Let's show the witness 840-A.  My question for you,

13   take it down, is whether in late October, you sent Mr. Bachman

14   the term sheet for the 2401 Nottingham loan?

15   A.  I don't remember.

16   Q.  And the reason that you were sending it -- were asked to

17   send it to him was to show that The Federal Savings Bank was on

18   track to make a loan in November that you knew was not actually

19   going to happen, right?

20   A.  I don't know.

21   Q.  Well, isn't it true that you lied to Mr. Bachman and told

22   him that the loan had been delayed because Paul Manafort was

23   traveling.  Isn't that what you did?

24   A.  I'm not sure.

25   Q.  Well, let's go back to Defense Exhibit 840.  Let me ask you

1  this:  The 2401 Nottingham loan was not delayed because Paul

2  Manafort was traveling, right?

3  A.  I don't remember my conversations with Alan Bachman back

4  five years ago on a loan that was about to fund, got pulled at

5  the closing table, then there were additional properties in

6  California that they had so much interest in moving forward.

7  Ultimately confusing.

8           MR. SCHOEMAN:  Yes.  Defense offers Defense Exhibit

9  840 and 840-A.

10          MR. MONTELEONI:  No objection.

11          THE COURT:  Admitted.

12          (Defendant's Exhibit 840 and 840-A received in

13  evidence)

14  Q.  Mr. Raico -- can we publish to the jury?  Is this your

15  email in which you tell Mr. Bachman, "Attached is the approval

16  term sheet for Jeff and Paul."  Do you see that?

17  A.  I see that.

18  Q.  You say, "Look at the last paragraph as we had initially

19  approved this back in August."  Do you see that?

20  A.  I see that.

21  Q.  And you wrote, "Due to Paul's travels it has been delayed."

22  Do you see that?

23  A.  I see that.

24  Q.  You say, "we are set for closing right after the election,"

25  right?

L76Qcal3                        Raico - Cross

1    A.  I see that.

2    Q.  Let's see what it is you attached.  Can we see the whole

3    thing?  Okay.  That is the term sheet from July that you --

4    well, that has your name on it, right?

5    A.  Yes.

6    Q.  Still not signed, by the way, right?

7    A.  Correct.

8    Q.  And you sent Mr. Bachman this email on October 27 to say

9    "This is the term sheet for a loan we're going to close,"

10   right?

11   A.  I could have.

12   Q.  But that loan was not going to close because Mr. Manafort

13   had walked away on October 19, right?

14   A.  Yes.

15   Q.  And it wasn't even the latest version of the term sheet

16   because the terms had been restructured in September to add the

17   Jobs Lane property, right?

18   A.  Yes.

19   Q.  So when you sent Mr. Bachman, we go back to Defense Exhibit

20   840, and you said, "This is the approval term sheet for Jeff

21   and Paul," look at the last paragraph, "we had initially

22   approved back in August and due to Paul's travels, it has been

23   delayed," that was a lie?

24   A.  This could have simply been trying to upsell the file to

25   see if Mr. Bachman had interest in it.

1   Q.  You -- all right.  Well, Mr. Bachman actually asked you,

2   you said let me know if you need an executed copy, and he asked

3   you for an executed copy, right?

4   A.  He did.

5   Q.  All right.  And it's at that point that you obtained the

6   executed copy from Mr. Yohai, right, on October 27?

7   A.  I don't remember.

8   Q.  Well, we showed you this earlier.  Let's go back real quick

9   to Defense Exhibit 164.  Do you remember this exhibit?  And the

10  attachment is 164-A that has Mr. Yohai's signature on the 27th,

11  right?

12  A.  Yes.

13  Q.  Isn't it true, Mr. Raico, that the reason that you

14  ultimately obtained a signature on this term sheet on

15  October 27 is so you could use it to defraud Mr. Bachman?

16  A.  No, I was not looking to defraud anyone.

17  Q.  Then he asked you, didn't he, for a term sheet for a

18  different property, the 2521 Nottingham property.  Do you

19  remember he asked you for that?

20  A.  No, again, there were multiple California properties.

21  Q.  Well, do you remember for the multiple California

22  properties that you created one of your multiple fake term

23  sheets?

24  A.  No.

25  Q.  Okay.  Let me show you Defense Exhibit 857.

1           THE COURT:  I don't know if this line of questioning
2      is ending any time soon, but we're nearing lunchtime or we're
3      past nearing lunch time.  So you can ask a couple more
4      questions or we could break now, whichever you prefer.
5           MR. SCHOEMAN:  I will just do this document, your
6      Honor.
7           THE COURT:  All right.
8           MR. SCHOEMAN:  Thank you.
9      Q.  Just take a look at this, and let's show the witness
10     Defense Exhibit 857-A.
11          THE COURT:  Are these for identification?
12          MR. SCHOEMAN:  Just for identification.
13     Q.  The question is, Mr. Raico, did you create a -- you could
14     take it down.
15          Just out of your recollection, isn't it true you
16     created a bogus term sheet for 2521 Nottingham to provide to
17     Mr. Bachman in an effort to defraud him?
18     A.  No.
19          MR. SCHOEMAN:  Defense offers Defense Exhibit 857,
20     857-A.
21          MR. MONTELEONI:  Objection.  Can we take this up on
22     the break?
23          THE COURT:  We can.
24          MR. SCHOEMAN:  Okay, we'll take a break.
25          THE COURT:  Ladies and gentlemen, we are going to

L76Qcal3                          Raico - Cross

1   break for lunch, and we will break until 2:00.  And please

2   don't talk about the case or anything related to it, and enjoy

3   your lunch.  And go light on carbs, please.

4              (Jury not present)

5              THE COURT:  Mr. Raico, you can be excused.

6              (Witness not present)

7              MR. MONTELEONI:  Your Honor, with respect to

8   Government Exhibit 857, we don't think this is --

9              MR. ANDALMAN:  Robert Andalman, counsel for the

10  witness.

11             Your Honor, if I could have your leave to explain to

12  Mr. Raico why it is I can't speak to him.

13             THE COURT:  Yes, you may explain to him why you can't

14  speak to him about his testimony or the case.

15             MR. ANDALMAN:  I appreciate that.  It just was awkward

16  at the last break.

17             THE COURT:  I understand.  You can eat lunch with him.

18  You can talk about anything else.

19             MR. ANDALMAN:  Totally understood.

20             THE COURT:  All right.

21             MR. ANDALMAN:  Thank you, your Honor.

22             THE COURT:  So do you want to talk about this exhibit.

23             MR. MONTELEONI:  Yes, your Honor.  Our concern with

24  this exhibit is that it's being offered to impeach his

25  statement but his statement no was in response to lengthy

L76Qcal3                    Raico - Cross

1    compound question with legal conclusions about whether this was

2    offered in a scheme to defraud or something.  So we don't think

3    that the fact that this email was sent is directly inconsistent

4    with that.

5         You know, we also would note we didn't want to get

6    into a bunch of speaking objections, but defense counsel has

7    been showing documents such as the I think 818, which defense

8    counsel presented as something that passed through Mr. Raico's

9    hands, but there's no indication whatsoever on the document,

10   and we weren't even shown the entirety of the document at the

11   time of making the objection -- of being able to object or not.

12   So it came in without us having even seen it.

13        So, I think we would request that we be given the

14   documents and given an opportunity to review them and to make

15   any objections, and we think that defense counsel should, you

16   know, he's made a lot of headway, he's done what he's done, but

17   we think that in order to have a clear record, we should get

18   clear, you know, questions with clear inconsistencies before

19   there's going to be admission and we don't think the last

20   question was that.

21        MR. SCHOEMAN:  Your Honor, just to be clear, what I'm

22   doing, I'm showing -- I'm impeaching the witness not through

23   prior false statement but through acts that impact on his

24   credibility by showing he's dishonest by creating false

25   documents.  So I'm not trying to show inconsistency.  If he

L76Qcal3                        Raico - Cross

1   were just to remember, frankly, and say, "I did all of this,"

2   then I'd do it much faster and, we'd be done.

3        THE COURT:  And you would still offer the document, I

4   presume?

5        MR. SCHOEMAN:  I can still offer the documents not as

6   an inconsistent statement but as evidence of deceitful conduct

7   which impeaches his credibility.  Now that we're on cross, I'm

8   happy to actually go through and hand some documents to the

9   government.  I obviously didn't want to provide them --

10        THE COURT:  I understand.

11        MR. SCHOEMAN:  And that's what I'm doing, and then

12   I'll stop doing that, and I'll do something else.

13        THE COURT:  All right.  Let's break.

14        MR. SCOTTEN:  I would suggest, and this would expedite

15   it.  It's been my practice once the witness gets up on cross,

16   you just walk over and hand over your exhibits because he is

17   now no longer getting prepped on them and that would allow us

18   to quickly respond to objections.

19        MR. SCHOEMAN:  I will try to do that.  So, just to be

20   clear, I've got a lot of things and I'm only using some small

21   fraction of it.  So I will try to give you what I think I'm

22   going to use.

23        MS. ROTHMAN:  Your Honor, one issue to raise.  I don't

24   know if the Court wanted to take up the question of

25   Mr. Lemanski's testimony.  I don't know how much longer

L76Qcal3                     Raico - Cross

1   Mr. Schoeman has, but if it's less than an hour, I think it's

2   likely we will get to Mr. Lemanski today, and there was a

3   motion by the defense to preclude at least two aspects of his

4   testimony.  I don't know if the Court wants argument or intends

5   to rule, but I'm happy to address the Court if there are any

6   questions.

7           THE COURT:  Do you have less than an hour, do you

8   think.

9           MR. SCHOEMAN:  I don't think it's -- no, I don't think

10  it's less than an hour.  We are not going fast.

11          THE COURT:  So, here is what we're going to do.  I

12  have looked at the letters, but I want to look at them again.

13  I'll come back and rule quickly based on the letters and not

14  hear argument, and that way we can just keep moving.

15          MS. ROTHMAN:  Thank you, your Honor.

16          MR. SCOTTEN:  On that subject then, your Honor, at

17  some point I do think there is a cumulativeness objection.

18  Mr. Raico had a 45 minute direct.  I think Mr. Schoeman has

19  done an admirable job shooting the fish in a barrel.  At some

20  point we're talking about the Alan Bachman fraud now, which is

21  collateral.  It is not about his interaction with defendant.

22          Look, we all get there's plenty of leeway here.  At

23  some point the cross should be some reasonable ratio to the

24  length of the direct and the importance of Mr. Raico to the

25  case.  You don't like speaking objections, so I put that out

L76MCAL4                        Raico - Cross

1      there now.

2              THE COURT:  I understand and I don't think we've

3      reached that point yet.  If you go on for days I think we will

4      have reached that point.

5              MR. LaVERNE:  I think I will object at that point.

6              THE COURT:  I will leave that to you then.  Let's take

7      a break.

8              (Luncheon recess)

9                            AFTERNOON SESSION

10                              2:00 p.m.

11             THE COURT:  I wanted to rule on the application

12     concerning Mr. Lemanski.

13             The defendant had requested to preclude OCC witness

14     Benjamin Lemanski from testifying about a statement that

15     Mr. Calk made saying that --

16             MS. ROTHMAN:  Your Honor, the witness is on the stand.

17             THE COURT:  I don't think -- it doesn't relate to his

18     testimony.

19             Basically to preclude a statement that Mr. Calk made

20     during the November 15, 2016 meeting and, also, another

21     statement that Mr. Calk had made during a May 2017 meeting.

22             I am going to grant the defendant's motion to

23     preclude, based on Rule 403.

24             With respect to the first statement, its probative

25     value, I think, is slight at best.  The defense admits that

Mr. Calk was interested in a government job.  What is denied is
that there was any *quid pro quo*.  I don't think there is
anything about the statement in issue that bears on the *quid
pro quo*.  To the extent that it does, it is slight and is
outweighed by the prejudice of the jury coming away from that
statement with a view that the defendant is a self-important
bully, which is obviously not the issue in the trial and would,
therefore, be prejudicial and inappropriately so.

          My analysis is similar as to the second statement.
The government offers it because the government claims it bears
on the value of the assistance Mr. Manafort had offered to
Mr. Calk.  I don't actually see that, particularly because
there is about the position that Mr. Calk had that is
referenced in that statement, at least not as it was presented
to me.

          As to those two applications, the defense motion is
granted.

          The defense motion is denied as to eliciting
Mr. Lemanski's title, particularly since he's not a high-level
person at the OCC, and since the defense is perfectly entitled,
if they wish to, to elicit from him on cross that he's
basically a mid-level person in the rank or hierarchy.

          I will give the instruction that the defendant
requested and that the government agrees to, which is similar
to the instruction I gave for Mr. Paulson and the other OCC

L76MCAL4                     Raico - Cross

1    witness.

2              MR. MONTELEONI:  Thank you, your Honor.

3              THE COURT:  You may get the jury.

4              (Jury present)

5    BY MR. SCHOEMAN:

6    Q.  Mr. Raico, I believe where we left off, I had marked for

7    identification as Government Exhibit 857 and 857-A.

8              MR. SCHOEMAN:  I think I offered it and I'm not sure

9    it was admitted yet.

10             THE COURT:  As I recall, there was no objection.

11             MR. MONTELEONI:  I believe there is an objection that

12   the Court overruled.

13             THE COURT:  They are admitted.

14             (Government Exhibits 857 and 857-A received in

15   evidence)

16   Q.  Mr. Raico, is 857-A on the right side a phony term sheet

17   that you created with respect to the 2521 Nottingham property?

18   A.  It looks like a term sheet.

19   Q.  But is it a phony one in that the loan committee never

20   actually approved this?

21   A.  I do not believe the loan committee actually approved that.

22   Q.  So is this one that you created in order to send to

23   Mr. Bachman?

24   A.  Again, I don't know exactly when and how it was created,

25   but, yes.  I believe this is the one that was sent to

L76MCAL4                          Raico - Cross

1   Mr. Bachman.

2   Q.   Just to go back one step, do you remember that all of your

3   dealings with Mr. Bachman at this time were with respect to a

4   wrap loan that you had told Mr. Bachman the Federal Savings

5   Bank was going to make?

6   A.   I don't remember.  I know Mr. Bachman and I were discussing

7   several different loans.

8   Q.   Let me just go back to Defense Exhibit 974, which is not

9   yet in evidence, for identification.  I just ask you to look at

10  the top e-mail and the question is, is this an e-mail from

11  Mr. Bachman to you discussing a wrap loan from the Federal

12  Savings Bank?

13  A.   Yes.

14              MR. SCHOEMAN:  Defense offers Defense Exhibit 974.

15              MR. MONTELEONI:  No objection.

16              THE COURT:  It's admitted.

17              (Defendant's Exhibit 974 received in evidence)

18              MR. SCHOEMAN:  Show the whole e-mail, please,

19  Mr. McCloud.

20  Q.   You see at the bottom this is an e-mail in which you asked

21  Mr. Bachman whether we could meet for lunch.

22  A.   Yes.

23              MR. SCHOEMAN:  If we can go to the next page, the

24  second page.

25  Q.   You see that he had previously told you that he's in Boston

1    now and he's telling you where he is staying?

2    A.  Correct.

3    Q.  Again, does this refresh your memory that you actually had

4    a lunch with Mr. Bachman to discuss these matters?

5    A.  This is the lunch we are referring to in Boston?

6    Q.  Yes.  Do you remember that?

7    A.  I do not recall having lunch with him in Boston.

8    Q.  What about in New York?

9    A.  I've had lunch with Mr. Bachman before in New York.

10             MR. SCHOEMAN:  Let's go to the top e-mail.

11   Q.  Do you see that in No. 2 he says:  We would like to know

12   the approximate timing of the wrap loan from the Federal

13   Savings Bank.  Do you see that?

14   A.  I see that, yes.

15   Q.  Do you see that he says:  As previously mentioned, it would

16   be helpful to obtain the commitment for the wrap loan with all

17   the conditions as well as the appraisal for 2401 Nottingham.

18   You see that?

19   A.  I see that.

20   Q.  My question for you, sir, is, isn't it a fact that after

21   this, you engaged in a series of e-mail exchanges with

22   Mr. Bachman in which you pretended that the Federal Savings

23   Bank was going to make a wrap loan for Mr -- for the California

24   properties.  Isn't that what happened?

25   A.  I can't answer accurately on that.  I have to see the

L76MCAL4                         Raico - Cross

1    e-mails.

2    Q.  You don't remember sending a lot of e-mails to Mr. Bachman

3    pretending that there was going to be a wrap loan?

4    A.  Mr. Bachman and I were talking about multiple loans,

5    several different clientele over the course of many years.  So

6    I don't remember this one in particular as far as a wrap loan.

7    Q.  Were all of those based on lies and bogus term sheets?

8    A.  No, sir.

9    Q.  Was this one based on lies and bogus term sheets?

10   A.  I don't know.

11   Q.  You couldn't say one way or the other?

12   A.  I would say that I was looking to make sure that I would

13   have Alan's interest.

14   Q.  Isn't it a fact that you sent Mr. Bachman a term sheet for

15   2521 Nottingham that was not approved by the loan committee,

16   right?

17   A.  I -- was that the term sheet that you were referring to,

18   sir?

19   Q.  I'm just asking you whether you remember doing that.

20   A.  I don't remember doing that.

21   Q.  I'm asking you whether he asked you whether it was a valid

22   term sheet and you assured him that it was.  Do you remember

23   doing that?

24   A.  I do not remember doing that.

25   Q.  Let me show you what's in evidence -- not in evidence --

1    for identification, Defense Exhibit 978.

2              Is this an e-mail from you to Mr. Bachman in which you

3    tell him that a term sheet for 2521 Nottingham is a valid term

4    sheet, even though it isn't?

5    A.  That's what it says, yes.

6              MR. SCHOEMAN:  The defense offers Defense Exhibit 978.

7              MR. MONTELEONI:  No objection.

8              THE COURT:  It's admitted.

9              (Defendant's Exhibit 978 received in evidence)

10             MR. SCHOEMAN:  Let's look at the second page of that

11   e-mail for a second.

12   Q.  You see that on this e-mail Mr. Bachman has e-mailed you

13   and in the middle paragraph he said in bold:  None of them

14   still contain the term sheet you mentioned you would send.  You

15   see that?

16   A.  I see that.

17   Q.  And then going up to the e-mail we were just looking at,

18   would you read your response to Mr. Bachman.

19   A.  Hi, Alan, I made the request from Jeff to receive the link

20   files via scanned PDF, and I'm sure that we will receive them

21   shortly.  Regarding the DOCS from me, you have received the

22   2521 term sheet from me.  It appears that the only way to

23   retrieve the original dated term sheet is when I am available

24   in my Manhattan office.  I will be in Connecticut tomorrow and

25   not able to retrieve.  That said, regardless of the date, it is

L76MCAL4                          Raico - Cross

1    a valid term sheet coming directly from an officer of the bank.

2    Q.  Could you point out any part of that e-mail that's true?

3    A.  I am not sure.

4    Q.  When you say that regardless of the date, it is a valid

5    term sheet coming directly from an officer of the bank, it's

6    true you were an officer of the bank, right?

7    A.  I believe so.

8    Q.  But it was not a valid term sheet, right?

9    A.  I don't believe so.

10   Q.  Do you remember then that after this Mr. Bachman kept

11   asking you for a valid term sheet and you kept deceiving him?

12   A.  I don't remember specifically.

13   Q.  Well, let me show you what's marked for identification

14   Defense Exhibit 979.  Is this an e-mail where Mr. Bachman asked

15   you again for 2521 term sheet?

16   A.  Yes.

17              MR. SCHOEMAN:  Defense offers Defense Exhibit 979.

18              MR. MONTELEONI:  No objection.

19              THE COURT:  It's admitted.

20              (Defendant's Exhibit 979 received in evidence)

21   Q.  Mr. Raico, we can look at the date of that.  That's October

22   31, 2016.  You see that?

23   A.  Yes.

24   Q.  When you responded to that you created another fake term

25   sheet, right?

L76MCAL4                          Raico - Cross

1    A.  I don't know.

2    Q.  Don't remember one way or the other?

3    A.  I haven't seen one.

4    Q.  Let me show you Defense Exhibit 862.

5              THE COURT:  For identification?

6              MR. SCHOEMAN:  For identification.

7    Q.  Just look at the date and the question is, is this your

8    response to Mr. Bachman in closing a term sheet?

9    A.  Yes, it appears to be.

10             MR. SCHOEMAN:  I offer Defense Exhibit 862 and 862-A

11   as the attachment.

12             MR. MONTELEONI:  No objection.

13             THE COURT:  They are admitted.

14             (Defendant's Exhibits 862 and 862-A received in

15   evidence)

16   Q.  Mr. Raico, you see the subject of that is 2521 original

17   term sheet?

18   A.  I do.

19   Q.  Can we look at the attachment, 262-A.  You see that this is

20   a term sheet for 2521 Nottingham, dated September 1.  Do you

21   see that?

22   A.  Yes.

23   Q.  That's another false term sheet because it was never

24   approved by the loan committee at bank, right?

25   A.  I don't believe it was.

1  Q.  Never even discussed.

2  A.  I don't know.

3  Q.  Mr. Raico, do you believe, sitting here now, that over the

4  next few weeks you continued to send false fraudulent documents

5  to Mr. Bachman to try to get him to do a deal with you?

6  A.  No, I don't believe so.

7  Q.  Do you remember that you forwarded Mr. Bachman's e-mails to

8  Mr. Yohai and you doctored those extensively?

9  A.  No, I don't remember that.

10 Q.  Could have happened, right?

11 A.  I didn't say that.

12 Q.  Do you remember that you didn't doctor them?

13 A.  I don't remember that I did either.

14 Q.  Let me show you what's been marked for identification

15 Defense Exhibit 980, just for identification.

16         Is that an e-mail from Mr. Bachman to you on November

17 3?

18 A.  Yes.

19         MR. SCHOEMAN:  Without publishing it yet to the jury,

20 can we also put side by side Defense Exhibit 981.

21 Q.  Look at the bottom e-mail.  Let me ask you this, just for

22 you, because you're the only one who can see this.  Is this

23 Defense Exhibit 981 an altered version of Defense Exhibit 980,

24 the bottom e-mail?

25 A.  These are both e-mails that are sent to me?

L76MCAL4                          Raico - Cross

1    Q.  No.  The one on the left is one from Alan Bachman and the

2    one on the right is something you forwarded.  I'm asking you,

3    sir, did you doctor the e-mail you got from Alan Bachman before

4    you forwarded it to Mr. Yohai?

5    A.  I don't remember.

6              MR. SCHOEMAN:  Defense offers DX-980 and 981.

7              MR. MONTELEONI:  No objection.

8              THE COURT:  They are admitted.

9              (Defendant's Exhibits 980 and 981 received in

10   evidence)

11   Q.  Let's look at them side by side.  981 on the top.  That's

12   an e-mail from you -- let's get the full top for the one on the

13   right.  No.  Not that one.  That one.

14             This is an e-mail from you to Mr. Yohai and Mr. Katz,

15   right?

16   A.  Yes.

17   Q.  It says:  Gents, this is directly from the hedge fund.  You

18   see that?

19   A.  I do.

20             MR. SCHOEMAN:  And then let's look at the bottom.

21   Q.  Do you see that that's what you forwarded under -- after

22   you wrote, this is directly from the hedge fund, right?

23   A.  I see that.

24   Q.  And that was doctored because it is actually very far from

25   what the hedge fund actually sent you, isn't it?

L76MCAL4                          Raico - Cross

A.   Could be.

Q.   The one on the right says:  Dennis, waiting to approve.  I
need ASAP.  Do you see that?

A.   I do.

Q.   Then it has a few things below that.  Do you see that?

A.   I do.

Q.   Let go to the one on the left.  That one says:  Dennis, we
have interest, I need ASAP, right?

A.   Yes.

Q.   Then there are other changes as well.

          Let's look at the sentence at the bottom of the one of
the left.  It says:  Getting certainty that Federal Savings
will most likely be taking them out is very important, so we
need signed agreements applications.  You see that?

A.   I do.

Q.   That was Mr. Bachman saying to you that in order for him to
consider the loan that you wanted him to do, he would need
proof that the Federal Savings Bank was going to do a takeout
of these loans, right?

A.   That's what he's saying, yes.

Q.   When you forwarded that and says this is directly from the
hedge fund, let's look at that e-mail, the one on the right.

          MR. SCHOEMAN:  Scroll up a little bit so we see the
bottom.  981.  Scroll up so we can see the next page.

Q.   So you took that out, right?

L76MCAL4                    Raico - Cross

1   A.  Looks like that.

2   Q.  Again, what you were doing is trying to convince

3   Mr. Bachman that you were going to be in some imminent deal

4   with Yohai and Manafort on the California properties and you

5   sent a lot of false e-mails to do that, right?

6   A.  Again, there were multiple California properties, multiple

7   different variations.  Just looking to see if one of our

8   brokers had any level of interest on any of them, all of them,

9   some of them.

10  Q.  Mr. Raico, when you say you are looking to see whether

11  there was any level of interest, isn't it a fact that you sent

12  numerous false, bogus, and edited e-mails in order to drum up

13  business so you could get a commission?  Is that what happened?

14  A.  I don't believe so.

15  Q.  Mr. Raico, do you know how many more of these e-mails with

16  Mr. Bachman you had?

17  A.  I don't.

18  Q.  Can you tell this jury that you didn't doctor or alter any

19  more e-mails involving Mr. Bachman?

20  A.  I am not quite sure.  I don't know.

21  Q.  You couldn't tell them that there is not a lot more

22  e-mails, right?

23  A.  I don't know.

24  Q.  Why don't you know, Mr. Raico?

25  A.  It was five and a half years ago, sir.

L76MCAL4                           Raico - Cross

1   Q.  Have you committed so much bank fraud in the last five and

2   a half years that this one doesn't stick out?

3   A.  No.

4   Q.  You are under oath and you have immunity.  Are there other

5   bank frauds that you have committed that cause you not to

6   remember this one?

7   A.  No, I don't so.

8   Q.  But this one doesn't stick out?

9   A.  This one in particular, no.

10         THE COURT:  Could you keep your voice up, please.

11   Q.  Let's do something else.

12         Mr. Raico, when you were interviewed in June of 2017,

13   you told the FBI that you had an MBA from NYU, right?

14   A.  I am not sure what I exactly said, but I do not have an MBA

15   from NYU.

16   Q.  But didn't you tell the FBI on June 27 that you have an MBA

17   from NYU Stern School of Business?

18   A.  I don't recall making this statement, but that is not a

19   true statement.

20   Q.  One of the reasons you recall it is that you had to testify

21   about that statement in front of a grand jury later that year,

22   is that right?

23   A.  Correct.

24   Q.  In front of the grand jury you had to say that if you had

25   made that statement it would not be true.

L76MCAL4                         Raico - Cross

1    A.  Correct.

2    Q.  So you were interviewed by the FBI, you say you don't

3    remember, but later that year you told the grand jury under

4    oath that if you had made that statement it would not be true,

5    right?

6    A.  Correct.

7    Q.  Doesn't your current LinkedIn page currently say that you

8    have an MBA from NYU?

9    A.  That was created by our marketing department.

10   Q.  So it does say it, right?

11   A.  I believe so.

12   Q.  So you were interviewed by the FBI, you don't remember

13   whether you said that you have an MBA from NYU, right?  You

14   don't remember that, right?

15   A.  Correct.

16   Q.  When you were in the grand jury the government had you

17   explain that if that was true it would be -- if you had said

18   it, it would be false, right?

19   A.  That's what I said.

20   Q.  Because you know you don't have an MBA from NYU?

21   A.  I don't.

22   Q.  After seven meetings with the government, testifying in

23   front of a grand jury and a trial jury in other matters, you

24   still have on your LinkedIn page that you have an MBA from NYU?

25   A.  Sir, I haven't created that LinkedIn page.

L76MCAL4                        Raico - Cross

1    Q.  It's your LinkedIn page, right?

2    A.  Yes.

3    Q.  Why did you lie about it?

4    A.  I just said I didn't create that LinkedIn page.

5    Q.  Did Anna Ivakhnik create it?

6    A.  No.

7    Q.  Elizabeth Cholakis?

8    A.  No.

9    Q.  Mr. Raico, you worked in the mortgage industry for over 20

10   years?

11   A.  Yes, sir.

12   Q.  And during your meetings with government prosecutors, not

13   necessarily these, they asked you about all of the places you

14   worked, right?

15   A.  Yes.

16   Q.  And you told them you worked at JP Morgan Chase Bank,

17   right?

18   A.  Correct.

19   Q.  You told them you worked at New York Mortgage Company,

20   right?

21   A.  Correct.

22   Q.  You told them you worked at Countrywide Home Loans, right?

23   A.  Correct.

24   Q.  You told them you worked at Guaranteed Rate Mortgage,

25   right?

L76MCAL4                       Raico - Cross

1   A.  Yes.

2   Q.  And you told him you worked at Sunwest Bank, right?

3   A.  Yes.

4   Q.  At that time you were working at the Federal Savings Bank,

5   right?

6   A.  Yes.

7   Q.  You never mentioned, when you were interviewed by the FBI

8   about your background -- by the government about your

9   background, that you had also worked at a place called Contour

10  Mortgage, right?

11  A.  Yes.

12  Q.  You did work at Contour Mortgage?

13  A.  Briefly.

14  Q.  You didn't mention that when you were interviewed by the

15  government about your job history.

16  A.  It was 6:00 in the morning.  I was taken a little off

17  guard, sir.

18  Q.  I'm talking about the interview on November 28, 2017.  Do

19  you remember that interview?

20  A.  Not specifically.

21  Q.  Let me see if I can refresh your recollection.

22          MR. SCHOEMAN:  I would like to show just the witness

23  what's been marked for identification as 3504-1, 037.  Show him

24  the whole thing so he sees what it is.

25  A.  Yes.

L76MCAL4                    Raico - Cross

1    Q.  Does this refresh your recollection that you were

2    interviewed by a prosecution team in November of 2017?

3    A.  Yes.

4    Q.  That was not the interview by the FBI at 6:00 in the

5    morning, right?

6    A.  Yes.

7    Q.  At that interview you did not disclose that you worked at

8    Contour Mortgage?

9    A.  I believe I didn't.

10   Q.  I'm sorry.  Say it again.

11   A.  I guess I didn't.

12   Q.  And the reason that you didn't disclose it is that there

13   was actually a judgment against you from Contour Mortgage at

14   that time, right?

15   A.  At that time.  I am not sure.

16   Q.  There is a $69,000 judgment against you from Contour

17   Mortgage, right?

18   A.  I don't have a judgment that I have seen for $69,000 from

19   Contour Mortgage.

20   Q.  Let me show you Defense Exhibit 641 for identification

21   only.

22            MR. SCHOEMAN:  I am just going to show him the first

23   page.

24   Q.  I am going to ask you whether that refreshes your

25   recollection.

L76MCAL4                    Raico - Cross

1   A.  I was hired by Contour Mortgage for one position.  They

2   actually gave me a different position.  And there has been zero

3   action on this since 2014.

4   Q.  The point is, Mr. Raico, there is a judgment against you

5   for $69,000 from Contour Mortgage, right?

6   A.  I don't see them making an attempt to collect it.

7   Q.  I'm just asking whether there is a judgment.

8   A.  According to the document that you just showed me, it looks

9   like there is.

10  Q.  I'm just asking you, isn't it true that you worked at

11  Contour Mortgage, right?

12  A.  Briefly, yes.

13  Q.  And they sued you, right?

14  A.  Yes.

15  Q.  And they got a judgment of some amount against you.

16  A.  It looks that way.

17  Q.  And Contour Mortgage is one of the places you worked and

18  you left out of your job history when you were interviewed by

19  the government on November 28.

20  A.  I believe so.

21  Q.  Another one that you didn't mention when you were asked

22  about it by the government in November 2017 is E Mortgage

23  Management.  Do you remember that one?

24  A.  Yes.

25  Q.  Did you work there?

L76MCAL4                          Raico - Cross

1   A.  I did.

2   Q.  Did you not mention that one to the government?

3   A.  I neglected to mention EMM.

4   Q.  Is that because you were fired from EMM?

5   A.  They actually shut down their retail division, and we

6   parted amicably.

7   Q.  By amicably, did you mean to say that they actually put out

8   a press release that very day making public that you were

9   separated immediately from them?  Is that what you meant by

10  amicably?

11  A.  I walked away, and they were not happy with that.

12  Q.  You remember that they put out a press release saying

13  effectively immediately Dennis Raico does not work here?

14  A.  I do recall that, yes.

15  Q.  And that was E Mortgage Management?

16  A.  Yes.

17  Q.  That's one that you didn't mention to the government?

18  A.  Yes.

19  Q.  Mr. Raico, you worked, as we just established, 20 years in

20  the mortgage industry, right?

21  A.  Yes.

22  Q.  And you are familiar with the obligations of loan officers?

23  A.  Say that again.

24  Q.  You are familiar with the obligations of loan officers,

25  correct?

L76MCAL4                          Raico - Cross

1   A.  Yes.

2   Q.  For example, the Federal Savings Bank had a loan policy

3   that spelled out the obligations of loan officers, right?

4   A.  I believe so.

5           MR. SCHOEMAN:  It's in evidence.  Just briefly,

6   Government Exhibit 652.  We will just look at the second page

7   of that so we see what it is.  That's not it.  Government

8   Exhibit 452.  That's what it is.  The Federal Savings Bank loan

9   policy.

10  Q.  You see that?

11  A.  Yes.

12  Q.  That's the version approved on January 13, 2016.

13          MR. SCHOEMAN:  If we could go to page 5 of the

14  document, please.

15  Q.  Would you read the first sentence of the second paragraph.

16  A.  The loan officer is also responsible for documenting and

17  maintaining the appropriate records for each credit

18  application.

19  Q.  Let's look at page 6, behalf 3.  What does that say?

20  A.  Credit and legal file documentation is the responsibility

21  of the borrower's loan officer.

22  Q.  Let's look at page 15, Section 3.2, fourth paragraph, each

23  loan officer.  Could you read the first sentence.

24  A.  Each loan officer has the responsibility to ensure that all

25  information required for sound lending decisions is obtained

L76MCAL4                        Raico - Cross

1   and thoroughly analyzed.

2   Q.  But you're the loan officer, right?

3   A.  Correct.

4   Q.  Let's look at page 25, Section 4.1.  Let's look at

5   paragraph 2.  I'll read this one.  How about the second

6   sentence:  It is the loan officer's responsibility to

7   accurately communicate an approved transaction to the loan

8   administration department or the approved counsel.  The

9   completeness, accuracy, and proper execution of the documents

10  is the responsibility of the loan officer.  Right?

11  A.  Yes.

12  Q.  Those are all part of the policy for loan officers at the

13  Federal Savings Bank when you worked there, right?

14  A.  Yes.

15  Q.  Now, Mr. Raico, isn't it true that you have previously

16  testified under oath that you've played no role in actually

17  reviewing documents related to the Manafort loans.  Did you

18  testify to that?

19  A.  I may have.

20  Q.  And that was not true?

21  A.  I briefly reviewed some of the documentation on the loans

22  for Manafort.  They were portfolio loans which were handled a

23  little bit differently, as far as credit was concerned, in

24  Chicago.

25  Q.  But just backing up a step, you do recall that on a prior

L76MCAL4                        Raico - Cross

1    occasion, under oath, you testified in a jury that you did not

2    play any role in actually reviewing the documents with respect

3    to the Manafort loans?

4    A.  I believe so.

5    Q.  And you had immunity there, right?

6    A.  I believe so.

7    Q.  The only thing that could get you in trouble was perjury,

8    right?

9    A.  Yes.

10   Q.  And you committed perjury.  Did you commit perjury when you

11   appeared in front of a jury and said under oath -- you were

12   asked this question:  Did you play any role in actually

13   reviewing those documents and you said no.  Were you asked that

14   question?  Did you give that answer?

15   A.  I don't believe I committed perjury.

16   Q.  Were you asked that question and did you give that answer?

17   A.  Can you say that again, sir.

18   Q.  Were you asked, did you play any role in actually reviewing

19   those documents, referring to the Manafort loan documents, and

20   you said no.

21   A.  That may have been my answer, yes.

22   Q.  But you did have a role in reviewing the Manafort loan

23   documents?

24   A.  Somewhat.

25   Q.  Like you got Mr. Manafort's UBS statement, right?

L76MCAL4                         Raico - Cross

1   A.  Yes, I did.

2   Q.  And you saw from the UBS statement that Mr. Manafort

3   actually had -- he had liabilities that reduced the amount of

4   liquidity that he had available, right?

5   A.  Yes.  Which I called to the attention of Chicago.

6   Q.  But you reviewed that and you saw that?

7   A.  I looked at the document and I saw there was a margin

8   account.

9   Q.  Not true that you didn't review the document.  You looked

10  at it and you saw it?

11  A.  I didn't review it early, but I definitely took a quick

12  look at it.

13  Q.  You saw Mr. Manafort's credit report?

14  A.  Yes.  The one that was provided to me.

15  Q.  You saw at one point that his credit had gone down, right?

16  A.  I believe so, yes.

17  Q.  You reviewed the credit report even though you testified

18  under oath that you didn't review documents?

19  A.  I looked at the credit score.

20          MR. SCHOEMAN:  Let's put up Government Exhibit 110.

21  Q.  The top e-mail, is that the e-mail you sent after you

22  looked at the credit report?

23  A.  Yes.  I'm commenting on the credit scores.

24  Q.  No doubt about it, you looked at the documents?

25  A.  Again, I looked at the credit score.

L76MCAL4                          Raico - Cross

1    Q.  It made an impression on you?

2    A.  I commented on it, yes.

3    Q.  By the way, this related to the American Express bill,

4    right?

5    A.  I don't know specifically.

6    Q.  You remember that Mr. Manafort's credit score went down

7    because he had an unpaid American Express bill?

8    A.  Yes.

9    Q.  Then you remember that he provided proof that it was paid?

10   A.  I believe so.

11   Q.  You reviewed a lot of documents that came in from

12   Mr. Manafort, right?

13   A.  I took a look at them.

14   Q.  Mr. Raico, isn't it true that after reviewing documents

15   that you presented the Manafort loan to Mr. Calk without

16   sharing with him all of the issues and problems that you were

17   seeing?

18   A.  No.  I believe Mr. Calk was well aware of the problems that

19   were servicing with the Manafort files.

20   Q.  Let me show you Government Exhibit 163.  You see, sir, that

21   that's an e-mail from you to Mr. Calk on September 26, 2016.

22   You see that?

23   A.  Yes.

24   Q.  The subject is Manafort Yohai most recent update.  You see

25   that?

L76MCAL4                      Raico - Cross

1   A.  Yes.

2   Q.  Right.  At this period of time the loan that's under

3   consideration is the Nottingham loan, the 2401 Nottingham loan?

4   A.  I believe so.

5   Q.  Which is the loan that never happened?

6   A.  Correct.

7   Q.  But you see in this e-mail that you listed three concerns.

8   You see:  Concern, mechanic's lien from former GC on title?

9   A.  I see that.

10  Q.  You see:  Concern, appraisal on Virginia property came in

11  at 2.7?

12  A.  I see that.

13  Q.  And concern appraisal number 1 when the subject property

14  came in at 6 million.  You see that?

15  A.  I do.

16  Q.  Those are the concerns that you shared with Mr. Calk,

17  correct?

18  A.  At that moment, yes.

19  Q.  It says underneath, two lines down:  TFSB requests

20  additional costs of $20 million Hamptons property with 1003 in

21  file indicating free and clear.  Do you see that?

22  A.  Yes.

23  Q.  You see at the bottom you wrote:  I believe that

24  included -- that I included all intrinsic details.  Please let

25  me know if you have any further questions or concerns.  You see

L76MCAL4                        Raico - Cross

1    that?

2    A.  I do.

3    Q.  You did not say anything in this e-mail about defaults or

4    foreclosures on any properties, right?

5    A.  I don't see that difference.

6    Q.  You didn't say anything in this e-mail about overdue Amex

7    balances, right?

8    A.  Not in this e-mail.

9    Q.  You didn't say anything in this e-mail about

10   inconsistencies in Mr. Manafort's documentation, right?

11   A.  Not in this e-mail.

12   Q.  Or any concerns about the status of Jeff Yohai as a

13   borrower, right?

14   A.  Not in this particular e-mail.

15   Q.  You wrote:  I believe that I included all intrinsic

16   details.  Please let me know if you have any further questions

17   or concerns, right?

18   A.  I did.

19   Q.  It was your job as the loan officer to raise all questions

20   and concerns based on the policy, right?

21   A.  I believe those concerns were already raised.

22   Q.  By the way, you write:  I just watched your CNBC interview

23   with Maria Bartholomew.  Phenomenal.  Was that true?

24   A.  It was.  He's a very good speaker.

25   Q.  Mr. Raico, you systematically manipulated the appraisals

L76MCAL4                           Raico - Cross

1    that were obtained for the different Manafort properties that

2    were under consideration, right?

3    A.   No, not necessarily.

4    Q.   One of the conditions for the Nottingham loan was that you

5    get an appraisal for the Nottingham property of 8.25 million.

6    Do you remember that?

7    A.   I don't remember that.

8    Q.   It's in evidence.  Let me show you Government Exhibit 108.

9    You see that in Mr. Ubarri's e-mail of July 28, where he says

10   the credit committee approved this loan subject to

11   underwriting, it says, need an as-completed appraisal with a

12   minimal value of 8.25 million.  You see that?

13   A.   I see that, yes.

14   Q.   So what that says is is that the credit committee required

15   that the property at 2401 Nottingham be appraised as worth at

16   least 8.25 million at completion, right?

17   A.   That's what it says, yes.

18   Q.   The first appraisal that you ordered was being permitted by

19   someone named Steve Lococo.  You remember that?

20   A.   I don't know a Steve Lococo.

21   Q.   Do you remember speaking with a Steve Lococo and he told

22   you that the appraisal was going to come in low?

23   A.   Not specifically.

24   Q.   Isn't it a fact that you told Mr. Lococo not to continue

25   with the appraisal?  Isn't that true?  Did you do that?

1    A.  I don't know.

2    Q.  Didn't you tell Ms. Ivakhnik, who worked for you, not to

3    tell Mr. Brennan that there had been an appraisal that was

4    going to come in low?  Didn't you tell Ms. Ivakhnik that?

5    A.  I may have, and there was another appraisal on its way.

6    Q.  There was a low appraisal and you told her, we are not

7    going to tell the underwriting department about this one,

8    right?

9    A.  I may have said hold on, because we were getting a newer

10   appraisal with updated comparables.

11   Q.  You got an appraisal that came in -- withdrawn.

12          Ms. Ivakhnik ordered another appraisal for you?

13   A.  I am not sure specifically.

14   Q.  Somebody ordered an appraisal for the Nottingham property,

15   right?

16   A.  OK.

17   Q.  Yes, no?

18   A.  I don't remember specifically.  Somebody.

19   Q.  Do you remember that the first appraisal we just saw came

20   in at $6 million?

21   A.  Yes.

22   Q.  That $6 million is $2.25 million less than what the credit

23   committee required?

24   A.  Correct.

25   Q.  And you needed an appraisal that showed that the property

L76MCAL4                      Raico - Cross

1    was worth more than $6 million, right?

2    A.  I believe so.

3    Q.  Now, you are supposed to get appraisals through an approved

4    appraisal management company, right?

5    A.  Correct.

6    Q.  Like Nadlan, right?

7    A.  OK.

8    Q.  Isn't that where Sam Heskel works?

9    A.  Yes.

10   Q.  That's an approved appraisal management company, right?

11   A.  It is.

12   Q.  But you needed an appraisal that was going to show that the

13   California property was worth approximately $8.25 million,

14   right?

15   A.  Yes.

16   Q.  And you didn't get that appraisal from an approved

17   appraisal management company.  You got it from Felix Katz,

18   right?

19   A.  I don't remember.

20   Q.  Let me show you what's in evidence, Defense Exhibit 157.

21   Do you see that this is an e-mail sent to you by Felix Katz at

22   the top on September 18?

23   A.  Yes.

24   Q.  Felix Katz was the mortgage broker who referred Manafort to

25   you, right?

L76MCAL4                    Raico - Cross

1   A.  Correct.

2   Q.  He is not himself an appraiser?

3   A.  Correct.

4   Q.  He forwarded to you an appraisal from someone named Cameron

5   Calabrese.  You see that?

6   A.  Yes.

7   Q.  You realized, didn't you, that Calabrese Appraisal -- you

8   see in his e-mail address it says Calabrese Appraisal?

9   A.  Yes.

10  Q.  You realized that Calabrese Appraisal was on your

11  do-not-use list.  Is that true?

12  A.  I don't remember that.

13  Q.  Let me show you for identification Defense Exhibit 811.

14  Let's go to the middle e-mail that says -- let's get that whole

15  e-mail.  Let's go further down.  I'm sorry.

16          Do you see that on this e-mail, September 19, 2016 at

17  12:47, that's you writing an e-mail.  You see that?

18  A.  I do.

19  Q.  You write -- I'm sorry.  It's not in evidence yet.

20          Isn't it true, Mr. Raico, that you learned that

21  Calabrese's appraisal was on the do-not-use list?

22  A.  That's what this e-mail looks like, yes.

23  Q.  I'm just asking you whether you remember learning it.

24  A.  I don't remember, no.

25          MR. SCHOEMAN:  Defense offers Defense Exhibit 811.

L76MCAL4                          Raico - Cross

1           MR. MONTELEONI:  No objection.

2           THE COURT:  It's admitted.

3           (Defendant's Exhibit 811 received in evidence)

4           MR. SCHOEMAN:  We can all see it now.

5    Q.  You see that this is an e-mail on September 19 from you?

6    You see that?

7    A.  I do.

8    Q.  You write:  There is a slight problem with the appraisal

9    firm.  They appear to be on the do-not-use list with several

10   investors.  Do you see that?

11   A.  Yes.

12   Q.  That said, we are looking to see if we can work around that

13   hurdle, right?

14   A.  Yes.

15   Q.  So the do-not-use list was a list of appraisers that you

16   were not supposed to use, right?

17   A.  Yes.

18   Q.  And you concealed from Mr. Brennan that the appraisal that

19   you got from Mr. Katz came from Calabrese Appraisals, right?

20   A.  I am not sure --

21   Q.  You made it look like the appraisal that you got from

22   Mr. Katz came from Nadlan, which was an approved appraisal

23   management company.  Isn't that what you did?

24   A.  I don't recall doing that.

25   Q.  Let me show you what's in evidence as Defense Exhibit 192.

L76MCAL4                         Raico - Cross

1  Let's look at the whole page for a second.

2          You see that on the bottom of the page is an e-mail

3  from Sam Heskel at Nadlan to you.  You see that?

4  A.  I see that, yes.

5  Q.  Let's look at the whole thing.  You forwarded it to Mr.

6  Brennan and you say:  Attached are the two appraisals for 2401

7  Nottingham.  You see that?

8  A.  I do.

9  Q.  And you attached both appraisals there to the e-mail you

10  forwarded from Mr. Heskel, right?

11  A.  I'm sorry.  Can you scroll up.

12  Q.  Right.

13          The e-mail to Mr. Brennan includes two appraisals

14  from -- two appraisals.  You see that?

15  A.  Two appraisals, correct.

16  Q.  Now, the original e-mail that you got from Mr. Heskel did

17  not include both of those appraisals, right?

18  A.  Can you scroll back down again.

19  Q.  You see that?

20  A.  Yes.

21  Q.  Let me show you what's in evidence as Defense Exhibit 158.

22  You see you would have an e-mail exchange at the bottom with

23  Mr. Heskel.  Did you receive this appraisal on Nottingham?  And

24  he sent you back the 2401 Nottingham avenue appraisal.  You see

25  that?

L76MCAL4                         Raico - Cross

1     A.   Yes.

2               MR. SCHOEMAN:   Let's show that side by side with the

3     previous exhibit, 192.   Show the whole document.

4     Q.   On the right you forwarded Mr. Heskel's e-mail, which had

5     only attached one e-mail, one appraisal.   But when you sent it

6     to Mr. Brennan, you said attached are the two appraisals.   Do

7     you see that?

8     A.   I don't think I said they were both from Mr. Heskel.

9     Q.   One of those appraisals you got from Felix Katz, right?

10    A.   OK.

11    Q.   We just looked at that, right?

12    A.   Yes.

13    Q.   And Mr. Katz got it from Calabrese Appraisals that were on

14    the do-not-use list, right?

15    A.   Correct.

16    Q.   By sending it to Mr. Brennan this way, you did not

17    communicate that one of these appraisals, the higher one, came

18    from Mr. Katz from Mr. Calabrese, who was on the do-not-use

19    list.

20    A.   I may have not have mentioned it came from Mr. Katz.   The

21    only way I knew this was on a do-not-use list was if Chicago

22    told me.

23    Q.   There is no e-mail, is there?

24    A.   I had multiple conversations with Chicago, hundreds

25    throughout these loans.

L76MCAL4                          Raico - Cross

1  Q.  My question is just, did you take an appraisal that didn't
2  come from Mr. Heskel, add it to the e-mail chain, delete the
3  bottom of your chain, and forward it to Mr. Brennan?
4  A.  I forwarded two e-mails to Mr. Brennan.
5  Q.  But you cut off the bottom.
6       By the way, Defense Exhibit 192, does that have a
7  second page?
8  A.  No.
9  Q.  And 158, there was a string before that and you took that
10 out and forwarded Mr. Heskel's and you attached two appraisals,
11 right?
12 A.  Yes.
13 Q.  Now, the next property for the second loan was based on the
14 value of the Jobs Lane property out in the Hamptons, right?
15 A.  Correct.
16 Q.  And that was the appraisal that was subject to the e-mail
17 that we looked at when I first started asking questions about
18 whether Ms. Ivakhnik had mishandled the appraisal.
19 A.  Right.
20 Q.  That was Defense Exhibit 175 that we talked about earlier,
21 right?
22 A.  Yes.
23 Q.  In fact, what happened is that you received one appraisal
24 you got -- the first appraisal you got for the Hampton property
25 came in at 13.5 million, right?

L76MCAL4                         Raico - Cross

1   A.  Correct.

2   Q.  You got a second appraisal and it was only 7.2 million,

3   correct?

4   A.  Yes.

5   Q.  You had 13.5 and 7.2, right?

6   A.  Yes.

7   Q.  That made a big impression on you, the difference in the

8   value?

9   A.  Very big discrepancy.

10  Q.  So you had a conversation with Sam Heskel about that?

11  A.  Several, yes.

12  Q.  You needed two appraisals to close the loan, right?

13  A.  Yes.

14  Q.  And you needed the value to be a lot more than 7.2 million?

15  A.  You needed the average, yes.

16  Q.  You didn't provide the $7.2 million appraisal to Mr.

17  Brennan because that would have reduced the average too low?

18  A.  And we knew we had another appraisal on the way with newer

19  accounts that would be more accurate.

20  Q.  It wasn't a new appraisal; it was a field review, right?

21  A.  I was told it was a newer appraisal, yes.

22  Q.  It was a field review.

23  A.  OK.

24  Q.  Wasn't it?

25  A.  I believe so.

L76MCAL4                         Raico - Cross

1    Q.  Field review is less rigorous than a full appraisal, right?

2    A.  I believe so.

3    Q.  Now, we looked at this earlier.  You told the underwriters

4    that the problem was that Ms. Ivakhnik had failed to order the

5    appraisal, right?

6    A.  Yes.

7    Q.  What you did to order the field review is asked

8    Ms. Cholakis to order it.  She had replaced Ms. Ivakhnik as

9    your assistant, right?

10   A.  Yes.

11   Q.  Let me show you what's in evidence as Defense Exhibit 176,

12   Defense Exhibit 1176 in evidence.  You see that that's an

13   e-mail from Cody Weinberg to you that says, please have your

14   processor place the order for the field review.  You see that?

15   A.  I do.

16   Q.  And that was the forwarding -- that was on an e-mail

17   chain --

18           MR. SCHOEMAN:  Can we look at the next e-mail on the

19   chain.

20   Q.  That was on a document that -- an e-mail that came from

21   Nadlan Appraisals that specifically identified that you had two

22   appraisals, right?

23   A.  Yes.

24           MR. SCHOEMAN:  So now let's look at Defense Exhibit

25   177.  Side by side with 176 would be great.  Let's go to page 4

L76MCAL4                           Raico - Cross

1    of 177, defense exhibit, in evidence.  I think maybe one more

2    page.  Yes.

3    Q.  Do you see that on Defense Exhibit 177 where Mr. Weinberg

4    says:  Hi, Dennis.  Please have your processor place the order

5    for the field review.  You see that?

6    A.  I do.

7    Q.  That is the same e-mail that is on the top of Defense

8    Exhibit 176, right?

9    A.  OK.

10            MR. SCHOEMAN:  Let's get rid of the enlargements.

11   Q.  On Defense Exhibit 176, immediately following the e-mail is

12   the one that said, hey, we have already got two appraisals,

13   right?  176, the second e-mail down.

14   A.  Oh, yes.

15   Q.  But when you forwarded Cody Weinberg's e-mail to your

16   assistant, you deleted that.

17   A.  That appears not to be in here.

18   Q.  So that Ms. Cholakis would not see, hey, we actually

19   already have two appraisals.

20   A.  Ms. Cholakis was my assistant.  She knew we had two

21   appraisals.

22   Q.  You deleted what you sent to Ms. Cholakis, right?

23   A.  It looks that way.

24   Q.  And you blamed Ms. Ivakhnik for not having the second

25   appraisal?

L76MCAL4                          Raico - Cross

1    A.  I believe I did.

2              THE COURT:  When we get to a break in the questioning,

3    it would be a good time for a break for the jury.

4              MR. SCHOEMAN:  Right now is great, your Honor.

5              THE COURT:  Take our afternoon break.

6              (Jury not present)

7              THE COURT:  Anything we need to deal with?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L76Qcal5                          Raico - Cross

1              (Jury present)

2     BY MR. SCHOEMAN:   (Continued)

3     Q.  Mr. Raico, one more question about appraisals -- a few

4     questions about appraisals.

5              For the last loan, the Union Street loan, you also

6     needed appraisals, right?

7     A.  Yes.

8     Q.  And is what happened that you ordered an as-is appraisal

9     that came in low, and you instructed your assistant to take it

10    out of the file?

11    A.  I don't recall doing that.

12    Q.  Well, do you recall instructing your assistant to order an

13    as-is appraisal?

14    A.  Yes.

15    Q.  And do you recall receiving an as-is appraisal?

16    A.  I believe so.

17    Q.  And then after you received the as-is appraisal, did you

18    tell Ms. Cholakis to take it out of the file?

19    A.  I don't believe so.

20    Q.  Let me show what's been marked for identification as

21    Defense Exhibit 891.  In the first bullet point, this is just

22    for identification, didn't you tell Ms. Cholakis, "I need

23    whatever appraisal is in the file to be taken out"?  Just take

24    it down.

25              Mr. Raico, do you remember that you ordered an as-is

L76Qcal5                         Raico - Cross

1    appraisal, and you told your assistant to take it out of the

2    file?

3    A.   That's what it looks like here.

4    Q.   Did you do it or you didn't do it?

5    A.   It appears that I did.

6              MR. SCHOEMAN:  Defense offers Defense Exhibit 891.

7              MR. MONTELEONI:  No objection.

8              THE COURT:  It's admitted.

9              (Defendant's Exhibit 891 received in evidence)

10   Q.   Then did you tell the underwriting department in Chicago

11   later that you didn't have an as-is appraisal?

12   A.   I might have.

13   Q.   Okay.  Let me ask you a quick question:  Bank of the

14   Internet, do you remember that Bank of the Internet was looking

15   to potentially purchase the Summerbreeze loan, the $9.5 million

16   loan?

17   A.   Yes.

18   Q.   And you remember you had some back and forth with

19   Ms. DiCola?

20   A.   Yes.

21   Q.   And you remember that ultimately Bank of the Internet told

22   you that they would purchase the loan for the full amount

23   $9.5 million?

24   A.   I don't recall the specifics.

25   Q.   Let me show you what's in evidence as Defense Exhibit 183.

1    And it's in evidence -- let's just enlarge the:  Is this the

2    email from Bank of the Internet apprizing you that the loan had

3    been approved in the full amount with no cash pledge?

4    A.   That's what it looks like.

5    Q.   I'll just show you the attachment so you see it.  183-A.

6    We can highlight at the top.  So my question for you,

7    Mr. Raico, you recall that after some back and forth with

8    B of I, they told you that they would agree to purchase the

9    full $9.5 million loan?

10   A.   I don't remember specifically.

11   Q.   Is that what this means to you?

12   A.   That's what this condition sheet looks like, yes.

13   Q.   Mr. Raico, is it true that -- withdrawn.

14            You were first introduced to Manafort in approximately

15   April of 2016, right?

16   A.   That is correct.

17   Q.   And at the time you were on the verge of personal

18   bankruptcy, right?

19   A.   I wouldn't say personal bankruptcy.

20   Q.   Well, you were actually consulting with a bankruptcy lawyer

21   about filing for bankruptcy, right?

22   A.   I had done that, yes.

23   Q.   And you were writing notes about it in the journals that we

24   saw earlier?

25   A.   Yes.

L76Qcal5                          Raico - Cross

1    Q.  So you had been on the phone with bankruptcy lawyers to --

2    I don't want you to say what you said with the lawyers, but the

3    topic was whether you -- whether to file for personal

4    bankruptcy?

5    A.  I had spoken with one bankruptcy attorney, yes.

6    Q.  **And at that time, you had a debt to Connecticut Community**

7    **Bank of over $325,000?**

8    A.  Yes.

9    Q.  Because they had foreclosed on a loan a few years earlier?

10   A.  Yes, on my ex-wife's house.

11   Q.  Right, but you were on the hook for that, right?

12   A.  Yes.

13   Q.  You had a loan from Deutsche Bank of $500,000, right?

14   A.  Yes.

15   Q.  And you were delinquent on that?

16   A.  My ex-wife was delinquent on that.

17   Q.  Right, but you owed Deutsche Bank $500,000 plus, right?

18   A.  Yes.

19   Q.  That's in addition to the Connecticut 362,000, right?

20   A.  325,000, I believe.

21   Q.  Plus interest, right?

22   A.  Yes.

23   Q.  And you also had a Contour Mortgage lawsuit with a judgment

24   for $69,000?

25   A.  No, that wasn't a lawsuit.  That was pending.

L76Qcal5                          Raico - Cross

1   Q.  It was, I'm sorry, I didn't hear you.  Wasn't there a

2   judgment in 2014 against you for $69,000 from Contour Mortgage?

3   A.  It appears that way, yes.

4   Q.  And in this time period, did you also have your car

5   repossessed?

6   A.  I don't believe so.

7   Q.  Do you have a bunch of other unpaid debts?

8   A.  Some.

9   Q.  Do you have a car loan from BMW Financial --

10          THE COURT:  Speak into the microphone.

11  Q.  Did you have a car loan with BMW Financial Services that

12  was in repossession?

13  A.  I don't believe so.

14  Q.  Do you owe upwards of $900,000 of debt at that time between

15  the different bank loans and other things?

16  A.  Approximately.

17  Q.  When Manafort was presented to you, did you think that he

18  might have $120 million of loans to refinance with you?

19  A.  When it was presented to me, there were quite a few

20  properties that he was looking to have financed, yes.

21  Q.  Maybe as much as $120 million or more?

22  A.  I don't recall the exact figure.

23  Q.  Let me show you Defense Exhibit 133 in evidence.  Is this

24  an update from you to Robert Jones, your boss, on April 15,

25  2016?

L76Qcal5                      Raico - Cross

1    A.  Correct.

2    Q.  If we could highlight the fourth bullet point.  Do you see

3    that what you said to Mr. Jones, is it says, "They were dealing

4    with a lender in California which holds approximately

5    $120 million in recent takeouts."  Do you see that?

6    A.  I do.

7    Q.  "If this transaction goes as we anticipate, then we have an

8    opportunity to refinance that portfolio as well as two new

9    projects in Brooklyn."  Do you see that?

10   A.  I do.

11   Q.  So Manafort as presented to you was the opportunity for

12   maybe $120 million of loans or more, right?

13   A.  Possible.

14   Q.  And if you had closed on loans like that, you would get a

15   commission of one percent?

16   A.  Yes, less expenses.

17   Q.  So, 1.2 million less expenses, right?

18   A.  Yes.

19   Q.  And now, it was also at that time in the summer of 2016

20   that you obtained a loan from Mr. Shabanets.  Is that right?

21   A.  Yes.

22   Q.  And Mr. Shabanets was applying for a loan at the bank?

23   A.  He was about to.

24   Q.  And you got a loan of about $35,000.  Is that right?

25   A.  Yes, prior to him making application to the bank.

L76Qcal5                          Raico - Cross

1   Q.   But that loan was outstanding when he was making

2   application to the bank?

3   A.   It was being paid.

4   Q.   But it wasn't paid off?

5   A.   It was being paid down.

6   Q.   Isn't it true that in December you were desperately seeking

7   more time because your finances were in disarray?

8   A.   I may have.

9   Q.   Well, do you remember writing about that in your notebook?

10  A.   I could have.

11  Q.   Let me show you what's been marked just for identification

12  as Defense Exhibit 1000-20, which is an excerpt.  And I draw

13  your attention to the lower right.  Maybe we could enlarge

14  that.  We could take that down.  I'm just going to ask you

15  whether that refreshes your recollection that in December 2016

16  the loan was still outstanding?

17  A.   Yes.

18  Q.   And you were negotiating with a gentleman named Yon Yves?

19  A.   Yes.

20  Q.   And you told him that you desperately needed more time to

21  repay the loan?

22  A.   Yes.

23  Q.   Because your finances were in a difficult spot?

24  A.   Yes.

25          MR. MONTELEONI:  Can we offer 1000-20 since he

L76Qcal5                         Raico - Cross

1  testified to its content?

2          MR. SCHOEMAN:  I was just refreshing his recollection.

3  Your Honor, I was using it to refresh recollection.  They can

4  offer it if they want.

5  Q.  Okay.  So you took a loan from Mr. Shabanets at the same

6  time you were trying to get him a $10 million loan from the

7  bank?

8  A.  I took the loan prior to him making application to the

9  bank.

10 Q.  Yes, but it was pending at the time that you were -- you

11 hadn't paid back the balance at the time you were trying to get

12 him some money from Mr. Calk's bank?

13 A.  I had not finished my obligation.

14 Q.  In the many sessions that you had had with the government,

15 did they ever ask you about that?

16 A.  No.

17 Q.  Did you ever volunteer it?

18 A.  I -- no.

19 Q.  I want to talk about your notebook.  We saw earlier today

20 some bound notebooks that you kept.  Do you remember that?

21 Yeah?

22 A.  Yes.  Yes, sir.

23 Q.  And you said that you kept those in your briefcase usually,

24 right?

25 A.  Yes.

L76Qcal5                        Raico - Cross

1    Q.  And when you left The Federal Savings Bank, you kept them

2    with you, right?

3    A.  Yes.

4    Q.  You did not turn those over to the bank?

5    A.  They were both business and some personal notes.

6    Q.  Right.  And so they were continuously in your possession

7    until you gave them to Special Agent Baccari a couple weeks

8    ago?

9    A.  That is correct.

10   Q.  Prior to that, you had given -- you had provided to the

11   prosecution a few pages of those notebooks.  Is that right?

12   A.  Correct.

13   Q.  And in prior meetings and testimony, you had been referred

14   to those selected pages, right?

15   A.  Correct.

16   Q.  But it was not until two weeks ago that the actual

17   notebooks themselves were provided to the government?

18   A.  Correct.

19   Q.  And the copies that you had provided were just

20   black-and-white copies, right?

21   A.  Yes.

22   Q.  And you were the one who selected what pages to give over,

23   right?

24   A.  I was asked to make pages of a certain period of time.

25   Q.  And you were the one who selected which pages to turn over?

L76Qcal5                    Raico - Cross

1    A.  Yes, I believe so.

2    Q.  And when you turned over the photocopy, you actually

3    doctored the photocopies a little bit, didn't you?

4    A.  I blanked out certain personal information.

5    Q.  All right.  Well, did you also doctor them by writing in

6    some dates?

7    A.  I'm sorry, sir?

8    Q.  Did you doctor your notebook by writing in dates?

9    A.  By putting in additional dates?

10   Q.  Yes.

11   A.  I don't believe so.

12   Q.  Okay.  I think this is already a Government Exhibit.  Let

13   me show you what's -- it is, I'm sorry, 51-1.  Is this a color

14   photocopy?

15          THE COURT:  This is Government Exhibit 51-1 in

16   evidence?

17          MR. SCHOEMAN:  Yes, it is.

18          THE COURT:  Okay.

19   Q.  Is this the original -- is this a color copy of the

20   original?

21   A.  I don't know.

22   Q.  Let me now take that down, and show you what's been marked

23   for identification as 1000-5.  Is this a photocopy of the same

24   page of your journal but in the form you provided to the

25   government a few years ago?

L76Qcal5                          Raico - Cross

1    A.  It looks like it, yes.

2               MR. SCHOEMAN:  So I offer Defense Exhibit 1000-05.

3               MR. MONTELEONI:  No objection.

4               THE COURT:  Admitted.

5               (Defendant's Exhibit 1000-05 received in evidence)

6    Q.  Could we put that up side by side with GX-51-1?

7               Do you see the Exhibit 1000-05 is the page on the

8    right of Government Exhibit 51-1.  Do you see that?

9    A.  I do.

10   Q.  Do you see on 1000-05 there's a date at the top?

11   A.  Yes.

12   Q.  But on 51-1 there's no date?

13   A.  That was a continuation of August 3.

14   Q.  So you wrote in the date?

15   A.  I might have.

16   Q.  And you then photocopied it as if it had the date on it and

17   provided it to the government?

18   A.  Okay.

19   Q.  Did you do that?

20   A.  I don't remember specifically.

21   Q.  You didn't tell the government that the copy set that you

22   originally provided had dates that didn't appear in the

23   original, did you?

24   A.  I'm not following you.

25   Q.  Mr. Raico, Defense Exhibit 1000-05 has a date in the upper

1   left-hand corner, right?

2   A.   It does.

3   Q.   And Government Exhibit 51-1, same page, has no date on it,

4   right?

5   A.   That is true.

6   Q.   And if somebody just received the 1000-05, the photocopy on

7   the right, they would not know that you had written it in in

8   your own handwriting and it wasn't in the original, right?

9   A.   Okay.

10   Q.   And you didn't tell anybody that you did that?

11   A.   I don't remember doing it.  Simply putting a date at the

12   top of a page.  I'm not following you.

13   Q.   In response to a grand jury subpoena, you doctored your

14   notebook by adding a date.  Isn't that right?

15   A.   I didn't doctor my notebook.

16   Q.   You wrote in a date and then you produced it to the

17   government that wasn't on the original?

18   A.   I might have.

19   Q.   Okay.  You did that in other places as well, didn't you?

20   A.   I'm not sure.

21   Q.   Well, let me show you what's been marked for identification

22   as Defense Exhibit 1000-18.  Just for identification.  I'm just

23   going to ask you whether that date in the upper left-hand

24   corner you wrote in?

25   A.   I'm not sure.

1    THE COURT:  Just for clarification, all the

2    handwriting in this notebook is his, right?

3    MR. SCHOEMAN:  Yes.

4    THE COURT:  Do you want to clarify your question?

5    MR. SCHOEMAN:  Well, I'm trying to -- I would like to

6    offer this page in evidence, Defendant's Exhibit 1000-18.

7    THE COURT:  Any objection?

8    MR. MONTELEONI:  No, your Honor.

9    THE COURT:  It's admitted.

10    (Defendant's Exhibit 1000-18 received in evidence)

11   Q.  And then could I show you what's marked for identification

12   what's marked for identification as Defense Exhibit 1000-19.

13    Let me ask you is 1000-19 also a photocopy of your

14   notebook?

15   A.  Yes.

16    MR. SCHOEMAN:  So I offer Defense Exhibit 1000-18 and

17   1000-19.

18    MR. MONTELEONI:  No objection.

19    THE COURT:  They're admitted.

20    (Defendant's Exhibit 1000-19 received in evidence)

21   Q.  Now I'd like to display them side by side.

22    My question to you, sir, isn't it true -- is all of

23   the handwriting on both of these pages your handwriting?

24   A.  Yes.

25   Q.  Isn't it true that you wrote in the date on the one on the

L76Qcal5                          Raico - Cross

1    left 5/25/16 when you turned it over to the government the

2    first time?

3    A.  I could have, yes.

4    Q.  And you didn't tell anybody that you did that?

5    A.  Was I supposed to?

6    Q.  I'm just asking whether you told them you wrote in a date

7    on your notebook before you produced it?

8    A.  If that was the date from the previous page, I'm sure I was

9    just trying to make things easier.

10   Q.  But there's no way you could tell because it's all in your

11   handwriting, right?

12   A.  Did you look at the page before?

13   Q.  I'm not asking you that question, sir --

14              MR. MONTELEONI:  We will offer the page before for the

15   rule of completeness.

16              THE COURT:  You can do that on redirect.

17   Q.  I'm just saying, Mr. Raico, you got your notebook, you got

18   a copy of your notebook, and the copy, the photocopy of your

19   notebook has something different on it than the original,

20   right?

21   A.  The date.

22   Q.  Yeah, and I'm asking whether you did that?  Did you do it?

23   A.  It appears like that's my handwriting.

24   Q.  And did you tell anyone in the government in all the

25   meetings that you had that you had done that?

L76Qcal5                         Raico - Cross

1    A.  I don't believe I did, sir.

2    Q.  Okay.  Now, you testified that you, I don't know, redacted

3    or blocked out certain parts of pages when you produced the

4    photocopies the first time?

5    A.  Same that again, please?

6    Q.  Did you testify a few minutes ago that when you produced

7    the photocopies you redacted certain pages or blocked --

8    covered up certain things?

9    A.  It appears that I did on one or two occasions.

10   Q.  And for what purpose?

11   A.  Probably to make things easier.

12   Q.  On who?

13   A.  On the interpretation.

14   Q.  Well, let me show you what's been marked for identification

15   as Defense Exhibit 1000-16.  Is that a page of the photocopy of

16   your notebook as you originally produced it to the government?

17   A.  I believe so.

18            MR. SCHOEMAN:  I offer Defense Exhibit 1000-16.

19            MR. MONTELEONI:  No objection.

20            THE COURT:  It's admitted.

21            (Defendant's Exhibit 1000-16 received in evidence)

22   Q.  Now, if you could take that down.

23            Would you show Defense Exhibit just for identification

24   1000-17.  Do you see that the left side of that is a color copy

25   of the same thing that was in the previous exhibit?

L76Qcal5                          Raico - Cross

1    A.  They're both black-and-white copies.

2    Q.  Yes.  Do you see they're copies of the same page?

3    A.  Yes.

4              MR. SCHOEMAN:  I offer Defense Exhibit 1000-16 and

5    1000-17.

6              MR. MONTELEONI:  No objection.

7              THE COURT:  They're admitted.

8              (Defendant's Exhibit 1000-17 received in evidence)

9    Q.  On the right side of the screen is 1000-16, and it's kind

10   got of a Post-It pad note on the bottom.  Do you see that?

11   A.  Yes.

12   Q.  And is that what you meant by you covered up certain things

13   to make it easier?

14   A.  I covered up certain personal information.

15   Q.  Okay.  Let me now turn you to the other side of the screen

16   1000-17.  Do you see one of the things you covered up says,

17   "According to Felix, Paul is paying all fees, and Jeff is

18   wiring the PITI deposit today."  Do you see that?

19   A.  I do.

20   Q.  And that relates to the Manafort loans that are discussed

21   on the top of the page, right?

22   A.  It does.

23   Q.  And you covered it up?

24   A.  Well, my intention was to cover up the Julia Long (ph),

25   which was personal information.

L76Qcal5                         Raico - Cross

1    Q.  Cover up which?

2    A.  Right below that, from Julia Long.

3    Q.  Well, you covered up the whole bottom of the page so that

4    when you produced it, it left out the part about Paul Manafort

5    is paying all fees and Jeff is wiring PITI deposit today?

6    A.  I'm sure that was a simple mistake.

7    Q.  All right.  Let's leave the 117 up on the left.

8             You have very good handwriting, Mr. Raico, don't you?

9    A.  Most of the time.

10   Q.  And you have nice spacing between the different entries

11   that you wrote?

12   A.  Not all the time.

13   Q.  Well, let's look at, for example, Government Exhibit 151-1.

14   Let's look at 151-2.  Nice clean handwriting, right?

15   A.  Yes.

16   Q.  Nice spacing between the entries.

17            Now, we take that down.

18            Let me show you Defense Exhibit 1000-21.  Is that a

19   page of your notebook?

20   A.  Yes.

21            MR. SCHOEMAN:  I offer 1000-21.

22            MR. MONTELEONI:  No objection.

23            THE COURT:  Admitted.

24            (Defendant's Exhibit 1000-21 received in evidence)

25   Q.  You see on the right side of the page, most of the entries

L76Qcal5                        Raico - Cross

1    are in blue ink and then right in the middle there's one in

2    black ink?

3    A.   Yes.

4    Q.   And that's the one for the meeting, the videoconference

5    meeting about the Manafort loans, right?

6    A.   Yes.

7    Q.   Isn't it true, Mr. Raico, that you just inserted that after

8    the fact?

9    A.   After the meeting?

10   Q.   I mean, months or years later.

11   A.   No.

12   Q.   No, you didn't?  Well, it's in a different ink than what's

13   on the page, right?

14   A.   Same ink that's on the top of the page.

15   Q.   Other than you, anyone know when you wrote either of those

16   things?

17   A.   I don't believe so.

18   Q.   And you see how there's no spacing above the Wednesday, the

19   27th one.  Do you see that?

20   A.   I do.

21   Q.   And you see that the entry immediately below says, Friday,

22   July 27.  Do you see that?

23   A.   I do.

24   Q.   So you have one entry that says Wednesday, July 27, and

25   then right underneath, it says Friday, July 27.  Do you see

L76Qcal5                        Raico - Cross

1     that?

2     A.   It should be 29.

3     Q.   Which could be a 29?

4     A.   Friday.

5     Q.   How could that be a 29?

6     A.   I write small.

7     Q.   Does it look identical to the 7 that's right above?

8     A.   Close.

9     Q.   Mr. Raico, is there any way that you would write Friday,

10    the 27th right beneath an entry that said Wednesday the 27th?

11    Is there any way that you would make that mistake?

12    A.   Unless nothing happened on that Thursday, I would go

13    directly from Wednesday to Friday.

14    Q.   But, Mr. Raico, you know that two days of the week two days

15    apart don't have the same date, right?

16    A.   Right.  But if I write very quickly, that almost looks like

17    a 29 for Friday.  It could.

18    Q.   I'm sorry, that could be 29?

19    A.   I write very small.

20    Q.   Okay.  You're drawing a 7 that looks like that, and you're

21    saying that's how you make your nine?

22             THE COURT:  Talk into the mic, please.

23    Q.   I'm sorry, is that how you make your nines?

24    A.   No.

25    Q.   Clear that out.  Let's go back to the full page.

1        Isn't it true that you wrote in the entry in different

2   ink on Wednesday, the 27th sometime after the fact.  Isn't that

3   what happened?

4   A.  Either that day or the next day.

5   Q.  But there's no way that you would write, do you agree that

6   you know that two days of the same week can't have the same

7   date?

8   A.  Again, I'm sure it's a simple mistake.

9   Q.  Okay.  Let's look at -- you testified -- let's look at

10  51-2, Government Exhibit 51-2.  And over here is the entry you

11  testified about on direct, right?

12  A.  Yes.

13  Q.  And what you said is that that reflected that Steve called,

14  asked you to ask Mr. Manafort to make Steve Calk secretary of

15  the treasury?

16  A.  No, Steve Calk had asked me to place a call to Mr. Manafort

17  to see if he was up for the position of secretary of the

18  treasury or secretary of HUD.

19  Q.  And your testimony is that you were so uncomfortable by

20  that, you did not do it?

21  A.  I did not have that conversation with Mr. Manafort.

22  Q.  You see where it says Trump executive council?

23  A.  Yes.

24  Q.  What is that?

25  A.  A reference to either the Trump campaign, Trump

L76Qcal5                          Raico - Cross

 1   organization.

 2   Q.  But to be clear, Steve Calk was never on the Trump

 3   executive council, right?

 4   A.  I don't believe so.

 5   Q.  And secretary of the treasury -- well, you remember Steve

 6   Mnuchin became secretary of the treasury?

 7   A.  I do.

 8   Q.  And the only thing that we have as evidence that this means

 9   that Steve Calk asked you to ask Manafort is your testimony,

10   right?

11   A.  Yes.

12   Q.  Because there's no call from you to Manafort where you

13   actually do it?

14   A.  That is correct.

15   Q.  And at the time that you first told this to the government,

16   you didn't have access to Mr. Calk's own telephone records,

17   right?

18   A.  No.

19   Q.  So you didn't know that Mr. Calk was in regular contact

20   with Mr. Manafort at the time?

21   A.  Okay.

22   Q.  Is it still your testimony what this means is that Steve

23   Calk didn't want to talk to Paul Manafort and instead wanted a

24   loan officer in New York to make the call.  Is that your

25   testimony?

L76Qcal5                         Raico - Cross

1    A.  That is my testimony.  I was just as surprised as you are.

2    Q.  Is that as truthful as everything else you've testified

3    about?

4    A.  That is one hundred percent truthful.

5    Q.  As everything else you've testified about?

6    A.  That is one hundred percent truthful.

7    Q.  You admit, right, it would make no sense for Mr. Calk to

8    ask you to do this?

9    A.  I was confused about the request.

10   Q.  Okay.  Now, this page 51-2, this is one of the pages that

11   you previously produced in photocopy form to the government,

12   right?

13   A.  I might have.

14   Q.  And I am going to -- I'm going to take this down, and I'm

15   going to show you Exhibit 1000-10 for identification.  Is that

16   the photocopy as you originally produced it?

17   A.  I believe so.

18             MR. SCHOEMAN:  I offer Defense Exhibit 1000-10.

19             MR. MONTELEONI:  No objection.

20             THE COURT:  Admitted.

21             (Defendant's Exhibit 1000-10 received in evidence)

22   Q.  Can we display that side by side with the previous exhibit.

23   You see that those are different copies of the same page?

24   A.  Yes.

25   Q.  But on the bottom of the one on the right 1000-10 is one of

1    your Post-It notes where you covered something up?

2    A.  Yes.

3    Q.  And we can see what you covered up from the version on the

4    left, right?

5    A.  Yes.

6    Q.  Why did you cover that up?

7    A.  Again, I was given a short period of time to make quite a

8    few copies.  I could have simply made a mistake.

9    Q.  The part you covered up said, "Term sheet/portfolio

10   provided to Paul and Bruce," right?

11   A.  Yes.

12   Q.  That's Paul Manafort and Bruce Baldinger, right?

13   A.  Yes, Bruce I believe was his attorney.

14   Q.  This is a note about the Manafort loans, right?

15   A.  Yes.

16   Q.  This isn't some personal thing that you were covering up,

17   right?

18   A.  No.

19   Q.  This is the heart of what you knew the government wanted

20   you to produce, right?

21   A.  Part of it, yes.

22   Q.  But this part you covered up, right?

23   A.  Again, it appears like I made a mistake.

24   Q.  And it says -- do you remember what this refers to?  Take a

25   look at it.

L76Qcal5                        Raico - Cross

1    A.  Not one hundred percent specifically.

2    Q.  Well, looking at it, doesn't this indicate that

3    Mr. Baldinger told you that he didn't want the $60,000 in fees

4    to be charged to Paul Manafort.  Isn't that what the 60,000 is?

5    A.  I don't know.  Talking about an LLC here.

6    Q.  Let's look at Defense Exhibit 172 in evidence.  This is an

7    email from Mr. Baldinger to you.  "I just want to confirm our

8    call of last evening.  In that call you informed me that your

9    bank has established a cost of $60,000 representing the last

10   transaction's counsel and title fees."  Do you see that?

11   A.  I do.

12   Q.  You see that you got that on Saturday November 12, 2016?

13   A.  Yes.

14   Q.  And the day before that would be Friday November 11, right?

15   A.  Yes.

16   Q.  So, let's go back to 51-2, and that is what on the 11th you

17   spoke to Mr. Baldinger about, right?

18   A.  Yes.

19   Q.  And he requested that you not charge the fees, and you told

20   him we are charging the fees, right?

21   A.  I believe so.

22   Q.  And would you read the third line down that says, "Bruce,

23   after stepping," would you read that?

24   A.  "Bruce, after stepping out of the restaurant at 6:30 p.m.

25   while others were working stated 'I will agree to it, and I

L76Qcal5                          Raico - Cross

1    will remember it,' and hung up."

2    Q.  That was a conversation you had with Bruce Baldinger,

3    correct?

4    A.  Correct.

5    Q.  Mr. Manafort's lawyer, correct?

6    A.  Correct.

7    Q.  On the evening of November 11, right?

8    A.  Yes.

9    Q.  Where he was so mad about the fees, he said "I will agree

10   to it, I will remember it and hung up," right?

11   A.  Yes.

12   Q.  And your testimony is on the same day that you infuriated

13   Bruce Baldinger about 60,000 in fees, Mr. Calk asked you to

14   talk to Manafort about becoming secretary of the treasury?

15   A.  Yes.

16   Q.  And you covered up this note so that no one would see that

17   that had happened on the same day?

18   A.  No, not intentionally.

19   Q.  Did Anna Ivakhnik do it?

20   A.  No.

21   Q.  Anybody else do it?

22   A.  No.

23   Q.  All right.  One more note, let's look at 51-4, Government

24   Exhibit.  Do you see that this was the exhibit that you talked

25   about earlier that starts on Thursday 12/22/16.  Do you see

L76Qcal5                          Raico - Cross

1   that?

2   A.  Yes.

3   Q.  And if we turn -- is there a second page of this one?  Oh,

4   no, it's 51-5.  You see in 51-5, this is the part that you

5   testified about "Steve on Paul," right?

6   A.  Yes.

7   Q.  When you originally produced this, you produced two pages

8   consecutively without something in between, right?

9   A.  I don't remember.

10  Q.  Didn't you tell the government a few weeks ago that you

11  made a mistake and that this entry was not on December 22, but

12  was actually on December 28.  Didn't you do that?

13  A.  I don't know.  I don't remember.  I don't remember the

14  exact date.

15  Q.  All right.  Let's go -- let's look at Defense Exhibit

16  1000-13 for identification just for the witness.  And I hope

17  that is two pages.  Is that the photocopy that you originally

18  produced to the government?

19  A.  Yes.

20  Q.  Want to stick with them?  I'm going to offer 1000-13?

21              MR. MONTELEONI:  No objection.

22              THE COURT:  It's admitted.

23              (Defendant's Exhibit 1000-13 received in evidence)

24  Q.  On this page, there's a date Thursday, December 22, 2016.

25  Do you see that?

L76Qcal5                          Raico - Cross

1    A.  Yes.

2    Q.  And you produced that to the government, and the following

3    page?

4    A.  Okay.

5    Q.  Where it says, "Steve on Paul," do you see that?

6    A.  I do.

7    Q.  And you remember that you were interviewed by a team of

8    government lawyers in 2017, and you said that these two pages

9    were the same conversation.  Didn't you do that?

10   A.  I might have.

11   Q.  Yeah.  And then you looked at your notebook more recently,

12   and you saw that in fact there's an intervening page.  Isn't

13   that what happened?

14   A.  I can't tell.  Can you show it to me again?

15   Q.  Well, look at this, page 1 of this Exhibit, Thursday,

16   12/22/16, and it's the left side of the page, right?

17   A.  Correct.

18   Q.  And if you turn to the next page, it's still the left side

19   of the page, right?

20   A.  Okay.

21   Q.  And didn't you tell government investigators in November of

22   2017 that these were part of the same conversation?

23   A.  I could have.

24   Q.  Okay.  Now they're not part of the same conversation,

25   right?

1    A.  I don't know.

2    Q.  Well, let's go look at 51-4, Government Exhibit.  Do you

3    see that on the left side in black ink, it has something that

4    happened on December 22.  Do you see that?

5    A.  Yes.

6    Q.  And below that is the first part of your conversation with

7    Steve.  It says, "Steve, we are doing 6.5 million."  Do you see

8    that?

9    A.  Correct.

10   Q.  And you testified earlier that the colon means that was

11   something Steve said, right?

12   A.  Yes.

13   Q.  Now, can we look at -- now, you see that's in black ink,

14   right?  And then if we go -- I think we have to look at 51-5 is

15   the right side of that page.  We have to look at the second

16   page of that.  You're good, Mr. McCloud.  Okay.

17          The "Steve on Paul" is not the next page, but the page

18   after, and it's in a different ink, right.?  It's in red ink?

19   A.  On the following page, right.

20   Q.  Yeah, it's on the following page, right?

21   A.  Yes.

22   Q.  And you told the government originally it was one

23   conversation, but it's clearly not because it's two different

24   things in two different inks?

25   A.  Okay.

L76Qcal5                        Raico - Cross

1   Q.  All right?  And you've now told the government that that
2   "Steve on Paul" happened on December 28, 2016, right?
3   A.  I don't remember the exact date, but if I'm following
4   chronologically from my notebook, it would appear that it was
5   on the 28th.
6   Q.  Just looking at this now, okay, you got black ink on
7   Thursday, the 22nd, and you got black ink on Tuesday, January 3
8   on the right side.  Do you see that?
9   A.  Correct.
10  Q.  Sorry, Friday, the 23rd, up here you got black ink, right?
11  A.  Yes.
12  Q.  And then there's something in red, right?
13  A.  It was my son's birthday, which is probably why I switched
14  to red.
15  Q.  Other than your word, we have no idea when this actually
16  happened, right?
17  A.  I guess.
18  Q.  And there's no -- you didn't previously produce the red ink
19  version of it until you handed it to Agent Baccari two weeks
20  ago, correct?
21  A.  I believe when you make copies, it's just going to come out
22  in one color.
23  Q.  And isn't it true that there are no telephone calls between
24  you and Mr. Calk between June 23 and January 1.  There's no
25  telephone calls, right?

L76Qcal5                        Raico - Cross

1    A.  I don't know, I don't have phone records.

2    Q.  Right, you haven't seen phone records?

3    A.  No.

4    Q.  And there's no telephone calls between you and Greg

5    Garrabrants between December 23 and January 1, right?

6    A.  I don't know.

7    Q.  So you have testified that what happened is that Mr. Calk

8    said something to you that you thought was weird and wrote down

9    and that he told you to call Garrabrants, right?

10   A.  Yes.

11   Q.  And there's no calls with Mr. Calk or Mr. Garrabrants at

12   any time in that period.  Is that true?

13   A.  I don't know.

14   Q.  All we have is your word that any of this happened.  Is

15   that right?

16   A.  My word and my notebook.

17            MR. SCHOEMAN:  No further questions.

18            THE COURT:  I don't think we can start redirect today.

19            So, ladies and gentlemen, we are going to break for

20   the evening.  Same time and place tomorrow.  Please don't talk

21   about the case or read anything about it and we'll see you

22   then.

23            (Jury not present)

24            THE COURT:  Anything we need to talk about?

25            MR. MONTELEONI:  Nothing from the government that has

L76Qcal5                              Raico - Cross

1    to be dealt with now.

2              THE COURT:  Thank you.

3              From the defense?

4              MR. SCHOEMAN:  No, your Honor.

5              THE COURT:  We're adjourned.

6              (Adjourned to July 8, 2021 at 9:45 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       INDEX OF EXAMINATION
2    Examination of:                           Page
3     DENNIS RAICO
4    Direct By Mr. Monteleoni . . . 1011
5    Cross By Mr. Schoeman  . . . . 1048
6                       GOVERNMENT EXHIBITS
7    Exhibit No.                            Received
8     109, 187, 207, 210, 220, 238 and 243  . . . .1006
9     177  . . . . . . . . . . . . . . . .1006
10    1302   . . . . . . . . . . . . . . .1009
11    857 and 857-A  . . . . . . . . . . . . .1129
12                       DEFENDANT EXHIBITS
13   Exhibit No.                            Received
14    Defense Exhibits 116, 118, 128, 130,  . . . .1006
15             132, 143, 144, 168, 171, 171-A
16             and 171-B and 171-C, 175, 176,
17             177, 201, 205, 205-A, 212,
18             212-A, 221
19    818  . . . . . . . . . . . . . . . . .1112
20    831 and 831-A  . . . . . . . . . . . .1116
21    840 and 840-A  . . . . . . . . . . . .1119
22    974  . . . . . . . . . . . . . . . . .1130
23    978  . . . . . . . . . . . . . . . . .1133
24    979  . . . . . . . . . . . . . . . . .1134
25    862 and 862-A  . . . . . . . . . . . .1135
```

1  980 and 981   . . . . . . . . . . . . . .1137

2  811   . . . . . . . . . . . . . . . . . .1158

3  891   . . . . . . . . . . . . . . . . . .1167

4  1000-05   . . . . . . . . . . . . . . . .1176

5  1000-18   . . . . . . . . . . . . . . . .1178

6  1000-19   . . . . . . . . . . . . . . . .1178

7  1000-16   . . . . . . . . . . . . . . . .1180

8  1000-17   . . . . . . . . . . . . . . . .1181

9  1000-21   . . . . . . . . . . . . . . . .1182

10  1000-10   . . . . . . . . . . . . . . . .1187

11  1000-13   . . . . . . . . . . . . . . . .1191

12

13

14

15

16

17

18

19

20

21

22

23

24

25