

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 24, 2021

**BY ECF**

The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

  Re: *United States v. Stephen M. Calk*, S1 19 Cr. 366 (LGS)

Dear Judge Schofield:

  The Government respectfully writes in opposition to the defendant's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c) (Dkt. 284). As the defendant was convicted on sufficient, indeed overwhelming, evidence, this motion should be denied.

  **I.** **Legal Standard**

  "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *See United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

  Under this standard, a jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Persico*, 645 F.3d at 105 (internal quotation marks omitted, emphasis in original). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and brackets omitted). Accordingly, a "court may enter a judgment of acquittal only if the evidence" of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks

omitted). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.[1]

The weight accorded to a jury's verdict is considerable. The Court must "credit[ ] every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136-37 (internal quotation and citation omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). As a result, "[t]he government's case need not exclude 'every possible hypothesis of innocence.'" *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *accord, e.g.*, *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *id.*). Thus, even in the presence of defense evidence supporting its preferred set of inferences and where the Government's evidence is "not overwhelming" and "the evidence would certainly have permitted a juror to entertain reasonable doubt," the jury's verdict must stand if the evidence in its totality makes the jury's inference reasonable. *Facen*, 812 F.3d at 288 (reversing district court's grant of Rule 29 motion).

Accordingly, the Second Circuit has repeatedly clarified that the "equipoise rule" derived from *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002),[2] is "of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. White*, 7 F.4th 90, 103 (2d Cir. 2021) (internal quotation marks omitted). Rather, that rule applies "only where evidence is nonexistent or so meager as to *preclude the inferences necessary* to a finding favorable to the government," *id.* (internal quotation marks omitted, emphasis added).

## II. The Evidence Overwhelmingly Proved the Defendant's Corrupt Intent

The evidence at trial proved beyond any reasonable doubt that the defendant acted with corrupt intent when he solicited and accepted things of value from Paul Manafort. The defendant's intent was proved many times over by the timing of key actions he took to cause The Federal Savings Bank to issue $16 million in loans to Manafort; by the special treatment he extended to Manafort and the personal benefits he demanded and received in exchange; by his breach of his duties as a bank CEO and chairman; by his false and misleading statements to cover up his actions; by his deliberate intermingling of the loans and personal benefits; and by his contemporaneous admissions.

Among the most compelling pieces of evidence of the defendant's corrupt intent were his tellingly-timed reversals in extending each of the loans. The first loan, totaling $9.5 million, had been rejected by the Bank before the November 8, 2016 presidential election (GX 203), but the defendant caused the Bank to approve it just days after election day (Tr. 795-96 (Brennan); GXs 237, 901-A-37), and personally sent Manafort an extravagant wish list of desired positions days

---

[1] With respect to a conspiracy verdict, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted).

[2] *See* Dkt. 284 at 2 & n.1 (defense citing this rule).

after that (GX 244). Similarly, on December 21, 2016, the defendant wrote to Manafort's lawyer that "we are in no way scheduling a closing" on the $6.5 million second loan (GX 295), but then reversed himself and, the very next day, personally sent Manafort the term sheet and an offer to close the loan (GX 299). This reversal came just after the defendant had an eleven-minute phone conversation with Manafort in which, the documents showed, he had both confirmed that he would be willing to serve as Under Secretary of the Army and discussed the term sheet for the second loan (GXs 299, 611, 901-A-14).[3] The timing of these reversals alone was sufficient for the jury to infer the defendant's corrupt intent. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 571 (2d Cir. 2020) (relying on timing of events to conclude that properly instructed jury would have found requisite quid pro quo); *United States v. Bruno*, 661 F.3d 733, 745 (2d Cir. 2011) ("The government's evidence of the timing of the payments in relation to the actions taken by [the public official] could also be accepted by a rational jury in support of the conclusion that [the official] understood that the consulting payments were made in return for official action."); *see also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. . . . As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.").

Beyond these reversals, there was ample additional evidence of the defendant's corrupt intent. The jury heard evidence that the defendant was personally involved in giving these loans special favorable treatment (*see, e.g.*, Tr. 795-96, 799-800, 813-14 (Brennan); GXs 182, 236, 285-1, 298, 299, 308, 326), despite being aware of numerous flaws in Manafort's creditworthiness (*see, e.g.*, GXs 182, 184, 279, 281, 295, 298, 501-1), and the defendant made multiple extravagant demands for personal benefits from Manafort (*see, e.g.*, GXs 190, 244, 261, 266, 278). The defendant also acted to intermingle his actions advancing the loans with his requests for personal benefits, including by repeatedly raising these requests simultaneously with critical steps in the lending process (*see, e.g.*, GXs 182, 254) and by asking Manafort's loan officer to ask Manafort if Calk was in consideration for Secretary of the Treasury (GX 51-2). *See Bruno*, 661 F.3d at 744 (jury may "infer guilt from evidence of benefits received and subsequent favorable treatment").

The inference of corrupt intent was evident not just to the jury in retrospect but to the defendant's subordinates at the time. The defendant's unusual solicitude for the loans and decisive role in causing the Bank to extend them was noticed by Bank employees (*see, e.g.*, Tr. 795-96, 813-14 (Brennan)), and one explicitly testified as to her belief, based on her observations in the course of her work on the Manafort loans, that the defendant's behavior was explained by corrupt intent (*see* Tr. 188-89 (Ivakhnik) ("I believed that this – the bank making this loan would result in Steve Calk receiving some kind of an appointment or advantage with the Trump Administration."),

---

[3] The documentary evidence showed that, on the evening of December 21, 2016, Scaramucci texted Manafort "Would he [i.e., the defendant] take under. Secretary of the Army? Are we double sure" and "If so I think we can get it done[.]" (GX 611 at 3). Three minutes later the defendant and Manafort had an 11 minute and 25 second call. (GX 901-A-14). Minutes after that, Manafort responded "Yes he will def take it[.]" (GX 611 at 3). The defendant himself also stated that the term sheet was discussed on the very same call. (GX 299 ("Attached is the term sheet we discussed last evening.")).

Tr. 189 (Ivakhnik) ("I believed there was no way that Steve Calk would not make this loan, because that would mean he would not get a position with the Trump Administration.")). Underscoring this obvious fact, the defendant also made a startling admission of his mental state, remarking to the loan officer—during the pendency of the second loan—that Manafort was "influential" with "other people and a few other situations at hand." (GX 51-5).

As further proof of the defendant's intent, the evidence showed that the defendant breached his duties under Office of the Comptroller of the Currency ("OCC") regulations and the Bank's own policies, which required him to recuse himself from the consideration of the loans. (*See, e.g.*, GXs 451-H, 452, 702). The jury also heard that the defendant made false and misleading statements to a reporter asking about how he was appointed to the Trump campaign's advisory council (GX 121), to an OCC bank examiner concealing his knowledge of defaults and foreclosures on Manafort properties (*see, e.g.*, Tr. 978-79 (Gongaware)), and to OCC supervisors falsely denying that he had wanted a position in the government (*see, e.g.*, Tr. 91 (Paulson), Tr. 1254 (Lemanski)). *See Bruno*, 661 F.3d at 744 (jury may "infer guilt from . . . behavior indicating consciousness of guilt").

The evidence also amply proved the intent necessary for the conspiracy charge. Manafort was well aware of the defendant's reversals (*see, e.g.*, GXs 295, 611, 901-A-14, 299), special treatment of his shaky lending application (*see, e.g.*, GXs 279, 281, 299), expectation of personal benefit (*see, e.g.*, GXs 190, 244, 261, 266, 955), and intermingling of the loans and the personal benefits (*see, e.g.*, GXs 182, 186). Indeed, Manafort and his son-in-law joked together about the connection between the economic advisory council and the defendant's willingness to lend to them (GX 655), and Manafort sought to convey an impression of his own influence with the presidential transition to the defendant (*see, e.g.*, GX 245-B ("Total background but involved directly")).[4]

Accordingly, the evidence of corrupt intent, far from being "nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government," *White*, 7 F.4th at 103 (internal quotation marks omitted, emphasis added), was overwhelming. The defendant's

---

[4] The Court need not rule on the defendant's undeveloped reference to Wharton's Rule, which was raised in two conclusory sentences in a footnote. *See, e.g.*, *New York v. Trump*, 485 F. Supp. 3d 422, 479 n.19 (S.D.N.Y. 2020) (declining to consider argument briefly made in footnote in opening brief and then expanded upon in reply, noting "A party may not raise an argument in a footnote or for the first time in reply, so we deem the argument to be waived"), *vacated sub nom. Trump v. New York*, 141 S. Ct. 530 (2020); *Ball v. City of N.Y.*, 2018 WL 4625625, at *3 n.3 (S.D.N.Y. Sep. 26, 2018) (declining to consider arguments raised in footnotes or in reply); *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017) ("Courts have routinely declined to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised. Merely mentioning or simply stating an issue is insufficient because a litigant must advance an argument, and courts generally will decline to consider issues that are not sufficiently argued." (citation and internal quotation marks omitted)); *see generally Levine v. Lawrence*, 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[T]he failure to adequately brief an argument constitutes waiver of that argument[.]"); *accord, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2021 WL 1415121, at *3 (S.D.N.Y. Apr. 14, 2021).

competing inferences supposedly consistent with his innocence (Dkt. 284 at 3-4) were rejected by the jury and do not justify the grant of a Rule 29 motion. *See, e.g.*, *Autuori*, 212 F.3d at 114.

### III. The Evidence Firmly Established the Value of the Bribe

The evidence proved that the defendant solicited, accepted, and agreed to accept a thing of value exceeding $1,000 in value, and that he conspired to do so.

The evidence showed that the thing of value—Manafort's assistance to the defendant—was exchanged for $16 million in risky loans. *See, e.g.*, *United States v. Marmolejo*, 89 F.3d 1185, 1194 (5th Cir. 1996) (in federal program bribery under 18 U.S.C. § 666(a)(1)(B), using "traditional valuation methods," valuing conjugal visits by the amount that defendant received in exchange for facilitating them); *United States v. Townsend*, 630 F.3d 1003, 1012 (11th Cir. 2011) ("[T]he value of an intangible in the black market of corruption is set at the monetary value of what a willing bribe-giver gives and what a willing bribe-taker takes in exchange for the intangible."). As shown by the timing of the defendant's reversals discussed above, these loans would not have been made absent the defendant's personal intervention, and the defendant was the only member of the Bank affirmatively in favor of lending to Manafort (besides the loan officer, who was receiving a commission but who did not have the authority to cause the Bank to extend the loan). (Tr. 795-96, 813-14 (Brennan); Tr. 189 (Ivakhnik)). The evidence amply showed that these valuable loans were exchanged for this assistance, and thus that the value of the loans to the Bank can be used as a measure of the thing of value under "traditional valuation methods." *See Marmolejo*, 89 F.3d at 1194. The Government did not contend that the entire $16 million face value of the loans was the measure of the bribe, as the Bank was hoping to be repaid, but a risky loan of $16 million dollars that Manafort desperately needed and could not have obtained elsewhere was plainly worth well over $1,000. The Court need not now itself determine the exact value of these loans in order to recognize that the jury was well within its rights to conclude that $16 million of risky loans that other bank personnel were uniformly opposed to were worth well over $1,000.[5]

Even more straightforwardly, the evidence showed that the defendant valued Manafort's assistance at over $1,000 because he spent more than that on his travel costs to attend the Tiger Team interview Manafort obtained for him. As the evidence showed, the defendant eagerly sought Manafort's influential recommendation with Anthony Scaramucci and then, from Scaramucci, an interview for Under Secretary of the Army. (GXs 244, 261, 266, 609, 2101 at 6). On January 9, 2017—after numerous contacts from the defendant—Scaramucci informed him that he would be interviewed by the Tiger Team at Trump Tower the next day. (GX 609 at 7). The defendant immediately booked travel to New York on that day (GX 609 at 7 ("Got it. Will fly in tonight")), a hotel stay that evening, and then a return trip after the interview the next day, spending over $1,800 on the combined airfare and hotel bill. (GXs 851, 852, 853, 854). This evidence overwhelmingly supports the jury's finding that Manafort's assistance was worth over $1,000 to

---

[5] At sentencing, the Court will be called upon to estimate the value of the loans, which, as the Government will explain in its sentencing submission, is hundreds of thousands of dollars under the most conservative assumptions.

the defendant, because he would otherwise not have spent more than that amount simply to attend the interview.  *See Marmolejo*, 89 F.3d at 1194.

The defendant's arguments to the contrary—claiming that Manafort's assistance was not valuable to the defendant (Dkt. 284 at 5), or that the defendant's willingness to pay over $1,800 to attend the interview should somehow not be attributed to the bribe (*id.* at 6)—were for the jury and have no bearing on the Rule 29 analysis.  *See, e.g.*, *McDermott*, 245 F.3d at 137 ("the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court").[6]

Accordingly, the defendant's Rule 29 motion should be denied in its entirety.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: /s/  Paul M. Monteleoni
    Paul M. Monteleoni
    Hagan Scotten
    Alexandra N. Rothman
    Assistant United States Attorneys
    (212) 637-2219/2410/2580

---

[6] The defendant's citation to *United States v. Tillmon*, 954 F.3d 628, 644-45 (10th Cir. 2019); *see* Dkt. 284 at 6 (citing *id.*), is a non sequitur, as that case accepted the principle that an intangible could be valued by what it was corruptly exchanged for, but simply involved a failure of proof as to the amount to be attributed to the defendant compared to coconspirators on his team.  *See Tillmon*, 954 F.3d at 645 ("The record does not permit the conclusion that [the defendant] single-handedly provided services equal to the amount paid to the team as a whole.").