UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
  UNITED STATES OF AMERICA,                   :
                                              :        Case No. 19 Cr. 366 (LGS)
          - against -                         :
                                              :
  STEPHEN M. CALK,                            :
                                              :
                          *Defendant*.        :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**SENTENCING MEMORANDUM OF STEPHEN M. CALK**

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ..................................................................................... iii

**BACKGROUND** ...................................................................................................... 3

**I.**   **Personal History and Letters** ........................................................................ 3

    A.   Steve's Military Service................................................................................ 4

    B.   Steve's Successful Banking Career ............................................................. 5

    C.   Steve's Commitment to Family .................................................................... 8

    D.   Steve's Commitment to Others .................................................................. 10

        1.   Service to his Community.................................................................. 10

        2.   Service to Soldiers ............................................................................ 13

        3.   Charitable Causes .............................................................................. 15

**II.**   **Offense Conduct** .......................................................................................... 16

    A.   Evidence at Trial ........................................................................................ 16

        1.   The Manafort Loans.......................................................................... 16

        2.   Manafort's Assistance to Mr. Calk ................................................... 22

        3.   The OCC False Statement Allegations .............................................. 24

    B.   Additional Information Relevant to Sentencing ........................................ 25

        1.   Dr. Carron's Declaration................................................................... 25

        2.   Semenak Declaration ........................................................................ 27

**III.**   **Presentence Investigation Report** ............................................................... 28

**ARGUMENT** ......................................................................................................... 30

**I.**   **Incarceration Is Not Necessary to Achieve the Purposes of 18 U.S.C. § 3553(a)** ...... 30

    A.   Legal Standard ........................................................................................... 31

    B.   As A First-Time Offender Who Has Led A Productive Life Dedicated To Service, Mr. Calk Poses No Risk Of Recidivism ................................................. 32

C.      The Offense Conduct Does Not Warrant A Prison Term ...................................... 32

      1.      The Bribe ................................................................................................. 32

            (a)      NEAC Appointment ....................................................................... 33

            (b)      Manafort's Assistance in Applying for a Job ................................ 35

      2.      No Financial Motive ................................................................................. 37

      3.      Nature and Characteristics of the Loans .................................................. 38

      4.      Impact on the Bank .................................................................................. 39

D.      "General Deterrence" Does Not Require Incarceration ....................................... 41

E.      Sentencing Alternatives to Incarceration ............................................................ 42

II.      **The Correct Advisory Guidelines Range is 0 to 6 Months** ............................... 42

A.      Valuation of the Bribe/Benefit Conferred ............................................................ 43

B.      Obstruction of Justice ......................................................................................... 46

C.      Abuse of Trust ..................................................................................................... 49

D.      The Adjusted Offense Level ................................................................................ 50

**CONCLUSION** ....................................................................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)................................................................................................31, 32

*Rita v. United States*,
  551 U.S. 338 (2007).....................................................................................................31

*United States v. Arnone*,
  973 F. Supp. 206 (D. Mass. 1997) .........................................................................39, 43

*United States v. August*,
  984 F.2d 705 (6th Cir. 1992) .......................................................................................48

*United States v. Booker*,
  543 U.S. 220 (2005).....................................................................................................31

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012).........................................................................50

*United States v. Heffner*,
  85 F.3d 435 (9th Cir. 1996) ....................................................................................33 n.8

*United States v. Johnson*,
  No. 16-Cr-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ...........50, 51

*United States v. Kaufman*,
  No. 19-Cr-504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021) .............35 n.11

*United States v. Khan*,
  No. 08-Cr-67, 2008 WL 2079954 (E.D.N.Y. May 14, 2008)...........................42 n.14

*United States v. Lahey*,
  186 F.3d 272 (2d Cir. 1999)..............................................................................42 n.14

*United States v. Lebedev*,
  932 F.3d 40 (2d Cir. 2019).................................................................................35 n.11

*United States v. Malone*,
  No. 1:11-Cr-00031 (M.D. Ga. Sept. 22, 2011), ECF No. 4................................34 n.8

*United States v. McElroy*,
  910 F.2d 1016 (2d Cir. 1990).............................................................33 n.8, 35 n.11

*United States v. Newton*,
    207 F. App'x 22 (2d Cir. 2006) ........................................................................47

*United States v. Newton*,
    No. 06-Cr-0714, 2006 WL 4847074 (2d Cir. June 19, 2006)................................47

*United States v. Rodrigues*,
    159 F.3d 439 (9th Cir. 1998) .....................................................................35 n.11

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017)............................................................................37

*United States v. Stewart*,
    590 F.3d 93 (2d. Cir. 2009)............................................................................41

*United States v. Stoecker*,
    920 F. Supp. 867 (N.D. Ill. 1996) ..............................................................34 n.8

*United States v. Wester*,
    90 F.3d 592 (1st Cir. 1996)........................................................................33 n.8

**Statutes**

12 U.S.C. § 1829.......................................................................................................8

18 U.S.C. § 215......................................................................................................34 n.9

18 U.S.C. § 3553(a) ..................................................................................... *passim*

U.S.S.G. § 2B4.1 ......................................................................................... *passim*

U.S.S.G. § 3B1.3..........................................................................................29, 42, 49

U.S.S.G. § 3C1.1.....................................................................................29, 42, 46, 48

**Court Documents**

*United States v. Manafort*,
    No. 18-Cr-83 (TSE) (E.D. Va. Mar. 12, 2019), ECF No. 325, Corrected
    Restitution Order........................................................................................40

*United States v. Manafort,*
    No. 18-MC-167 (ABJ) (D.D.C. Nov. 15, 2018), ECF No. 8), Petition, In re
    Petitions for Relief Concerning Consent Order of Forfeiture .................40

*United States v. Manafort,*
    No. 18-MC-167 (ABJ) (D.D.C. Feb. 26, 2021), ECF No. 131), Order, In re
    Petitions for Relief Concerning Consent Order of Forfeiture................41

*United States v.* Manafort,
No. 18-MC-167 (ABJ) (D.D.C. Apr. 21, 2021), ECF No. 137), Order, In re
Petitions for Relief Concerning Consent Order of Forfeiture...................................................41

**Other Authorities**

Charlotte Alter, *Donald Trump Just Added 8 Women Advisors, No Steves*, Time
(Aug. 11, 2016), https://time.com/4449044/trump-women-economic-advisers/.............34 n.10

Kyle Cheney, *Bannon, tormentor of establishment GOP, gains foothold in West
Wing*, Politico (Nov. 13, 2016),
https://www.politico.com/story/2016/11/bannon-breitbart-trump-white-house-
231316..................................................................................................................................36 n.13

Shane Goldmacher, *Trump adds diversity to economic adviser list – and more big
donors*, Politico (Aug. 11, 2016),
https://www.politico.com/story/2016/08/trump-economic-adviser-list-donors-
226921..................................................................................................................................34 n.10

Jim Zarroli, *After Criticism, Trump Adds Women To His Economic Advisory
Team*, NPR (Aug. 11, 2016),
https://www.npr.org/2016/08/11/489672573/after-criticism-trump-adds-
women-to-his-economic-advisory-team ..........................................................................33 n.10

U.S. Dep't of Justice, Crim. Resource Manual § 831, Updated Jan. 21, 2020,
https://www.justice.gov/archives/jm/criminal-resource-manual-831-corrupt-
bank-officer-18-usc-215a2..................................................................................................33 n.8

USO of Illinois, https://illinois.uso.org/about/about-the-uso.......................................................13

## INTRODUCTION

We respectfully submit this memorandum on behalf of Stephen M. Calk, who is scheduled to be sentenced by this Court on February 7, 2022.  We address in this submission the relevant sentencing considerations and provide the Court with a broader and deeper understanding of who Mr. Calk is and how he has led his life.  We will also discuss the offense conduct, not to dispute the jury's verdict, but to highlight the many ways in which this case differs from the typical bank bribery prosecution and which weighs heavily in favor of a non-custodial sentence for Mr. Calk.

Mr. Calk has led a thoroughly decent and law-abiding life.  From humble beginnings and through hard work he built a successful business with 1,800 employees and tens of thousands of satisfied customers.  He served honorably in the military.  He is a committed and generous supporter of military causes and military families, providing mentorship, job opportunities and financial support.  He is a dedicated and loving father of three children.  Mr. Calk is also a devoted son and he enjoys close relationships with his siblings.  He has never before been in trouble with the law and there is no reason to think that he ever will be again.  He has spent the last two and a half years on pre-trial and post-trial release without any incident of any kind.

The conduct that brings Mr. Calk before the Court for sentencing occurred five years ago.  At its center is a confluence of events that will never occur again.  Paul Manafort, a skilled con artist who pleaded guilty to defrauding Mr. Calk's bank, presented Mr. Calk with the opportunity to pursue two objectives that were extraordinarily compelling to Mr. Calk at that moment of his life:  1) making large, profitable loans for his bank's portfolio loan program, and 2) serving the U.S. military in a high-level government position.  Each of these objectives, if

pursued separately, would be perfectly lawful, and indeed laudable.  Pursuing them

simultaneously – and with Manafort – has been disastrous for Mr. Calk.  By virtue of his

indictment, and now his conviction, Mr. Calk has been effectively barred from participating in

the affairs of the two things, apart from his family, that he loves above all else:  his bank and the

U.S. military.  There has thus already been substantial punishment and there is no possible risk

of recidivism.

　　　　　　This case is truly unique in the annals of bank bribery prosecutions.  In critical

ways, it is far different from the heartland case of a bank official taking a personal payment in

return for "buddy" loans or some other action that is obviously intended to be detrimental to the

bank.  This is true whether measured by the value of the "bribe" offered by Manafort (a

volunteer position Mr. Calk worked hard at, and a job reference which the government's own

witnesses testified had no market value), Mr. Calk's motive in seeking a position in government

(not a financial motive, but a desire to serve and a long-standing interest in the military), the

terms of the loans provided to Manafort (the bank's standard portfolio terms, secured by

collateral worth far in excess of the loans themselves), or the impact of those loans on the bank

(which will show a profit given the value of the collateral securing the loans).  Add to this the

fact that Mr. Calk, as the majority owner of the bank, had the most to lose if the loans failed, and

that Manafort was separately indicted for defrauding the bank by providing it with false

information in connection with the loans.  Particularly when taken together with Mr. Calk's

personal circumstances, these facts do not warrant imprisonment – the most serious of the many

tools, including supervision, home detention, community service and financial penalties, that the

Court has at its disposal to craft an individualized sentence addressing the goals of the sentencing

statute.

For these reasons, we respectfully submit that when weighing Mr. Calk's offense conduct against his entire life, and considering all of the relevant sentencing factors under 18 U.S.C. § 3553(a), the Court should impose a sentence that does not include incarceration. Such a sentence, we submit, would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing in this case.

## BACKGROUND

### I.      Personal History and Letters

By its nature, a criminal trial often presents a distorted, caricatured picture of the defendant. That was particularly true in this case. This section of our submission presents a more complete and accurate picture of the real Steve Calk.

Stephen Matthew Calk was born on ████, 1964, in Pontiac, Michigan, his twin sister Margaret minutes behind. Along with their older brother Rick and their younger brother John, theirs was a happy, middle-class home. His mother was a Catholic school teacher; his father served in the Navy Reserves and pursued jobs in various businesses. As his father changed jobs, the family moved from Michigan to Texas to New Jersey to England to Florida and finally to Illinois, where Steve finished high school and began his career. (*See* September 30, 2021 Presentence Investigation Report, Dkt. No. 286 ("PSR") ¶¶ 89-91). Along the way, Steve made many childhood friends who remain close with him to this day. Tracy Gruber describes the bold 8th grader who approached her on her first day at a new school in Cobham, England and asked her to serve with him on student council, which she did. (Gruber Ltr.).[1] Forty years later, when Steve's mother passed away, Tracy stood beside him at the funeral, a

---

[1]     The letters in support of Mr. Calk are attached to this memorandum and designated as Exhibits A-1 to A-67. An Exhibit Table of Contents is included listing the letters in alphabetical order by last name and indicating the corresponding exhibit number.

lifetime of friendship between them.  Like Tracy, one after the next, friends have come forward

in support of a man they have loved and relied on for twenty, thirty, even forty years, as he faces

the most trying moment of his own life.  (J. Aldeguer Ltr.; Banks Ltr.; Bogna Ltr.; Bogusz Ltr.;

Bryant Ltr.; Burling Ltr.; Coffman Ltr.; Darley Ltr.; Fay Ltr.; Gentile Ltr.; Gleichenhaus Ltr.; D.

Lierly Ltr.; M. Lierly Ltr.; Lombardo Ltr.; Moher Ltr.; Moore Ltr.; Oney Ltr.; Oweimrin Ltr.;

Reynolds Ltr.; Ricciardi Ltr.; Ryan Ltr.; Silverman Ltr.; Sinton Ltr.; Smith Ltr.).  They

universally describe his quiet devotion to faith, his proud devotion to country, and his

unwavering devotion to family and friends.

      A.    <u>Steve's Military Service</u>

      In 1982, at the age of 18, Steve set out to pursue a calling to which he has in some

form or another dedicated much of his adult life:  service to the U.S. military.  He attended the

United States Military Academy Preparatory School in Fort Monmouth, New Jersey from

August 1982 to May 1983 and was a model cadet, the kind of soldier who helped his classmates

practice their shoe-shining technique, and who his commanding officers would later laud as a

"true team player."  (Gleichenhaus Ltr.; PSR ¶¶ 114, 116).  Graduates of "West Point Prep," as

the school is known, are offered placements at West Point, but only if there is sufficient

availability.  Steve graduated from the program but just missed being awarded a spot at the

Academy.  He was honorably discharged as a Private First Class on May 13, 1983.  His

then-commanding officer, Charles Gleichenhaus had to break the news to Steve.  Four decades

later, Mr. Gleichenhaus, now a close friend, recalls how impressed he was with Steve's dignity

and resolve in the face of what was for him a crushing blow.  (Gleichenhaus Ltr.).

      Rather than give up on his goal of becoming a military officer, Steve found

another path.  He enrolled in the Reserve Officer Training Corps as a student at the University of

Illinois at Urbana-Champaign, from which he graduated in May 1988.  While an undergraduate, he was commissioned early as a Second Lieutenant on May 25, 1985 and later assessed as an officer with "limitless potential," whose "constant desire to excel was reflected by the fact that his peers voted him as the most motivated officer in the platoon."  (PSR ¶¶ 114, 116).  He also completed a year-long officer and helicopter pilot training program between June 1986 and July 1987.

After college, Steve served in various positions in the Army Reserves including as a Liaison Officer in a reserve Army helicopter unit in Los Alamitos, California and as a Platoon Leader for an aviation company.  His military records report that he was "well thought of by his supervisors, peers, and subordinates."  (PSR ¶ 118).  William Sinton recounts that he arrived at flight school expecting to be treated with little respect, only to find that his commanding officer, Stephen Calk, approached his new charges as equals, readily "receptive to learning" from them and encouraging them to succeed.  (Sinton Ltr.).  Sinton admired in the young Lieutenant, now a close friend, his "constant planning and attention to detail" and, in his estimation, Steve's greatest personality trait, living up to his word.  (*Id.*).

In 1990, Steve transferred to the Individual Ready Reserves, a status that did not include any duties but in which he remained subject to involuntary call up should his service be required in a national emergency.  On February 1, 2001, Steve was honorably discharged from the United States Army with the rank of Captain.  (PSR ¶ 118).

B.    Steve's Successful Banking Career

Steve has worked hard his entire life.  As a teen he worked bagging groceries, paving driveways, painting houses, and waiting tables.  (PSR ¶ 125; *see also* Sauser Ltr.).  After finishing college, he started out in sales before trying his hand at banking.  Tom Reynolds recalls

how the young loan officer he hired "quickly became the star of the whole operation," working sixteen-hour days and motivating the other loan officers to excel.  Just as Steve's commanding officer at West Point Prep had observed in Steve a natural leader, Mr. Reynolds recognized the same in his star banker.  (Reynolds Ltr.; Gleichenhaus Ltr.).

In 1995, Steve and a business partner founded Chicago Bancorp Inc., which would eventually become one of the largest privately held mortgage companies in America. (PSR ¶ 123).  At the same time, Steve enrolled in an MBA program at Northwestern University, successfully graduating in 1998.  A year later, Steve recruited his younger brother John to join the company.  Erin Ahern recalls the weekly sales meetings Steve held with his loan officers as a way of fostering their success, unique among the mortgage banks in their industry, while Gary Silverman remembers Steve's decision to give his employees at Chicago Bancorp equity in the bank, something he need not have done.  (Ahern Ltr.; Silverman Ltr.).

In April 2011, Steve and John purchased Generations Bank and their business became known as The Federal Savings Bank ("the Bank" or TFSB"), as it remains today.  Until his indictment in May 2019, Steve served as the Bank's Chairman and Chief Executive Officer. In a matter of years, TFSB grew to include 39 offices nationwide with 1,800 employees.  In both its recruiting efforts and in its lending services, TFSB has focused on veterans as a top priority. TFSB board member William Markel, who previously worked on the purchase of Generations Bank, recalls asking Steve (who already owned a successful mortgage company) why he wanted to own a bank.  Mr. Markel recalls that Steve's clear focus from the beginning was on "his desire to serve active-duty and retired military personnel," whom Steve saw as underserved.  (Markel Ltr.).  Many veterans face challenges integrating into civilian society after their discharge.  (*See*

Kerr Ltr.; Streetman Ltr.).  In addition to offering VA loans and other targeted products, Steve

made it a priority to hire and train veterans.

            In their letters, TFSB employees describe a business leader who took time to

encourage their own development and help them through personal struggles.  They write fondly

of a boss whose "door was always open" to them, (Moher Ltr.), who celebrated their

engagements, weddings, and newborns (Patino Ltr.; Smartt Ltr.), supported them in times of

illness or loss (Gentile Ltr.; Moher Ltr.), saw them through the challenges of addiction (Banks

Ltr.), and who encouraged them to dream big (Almodovar Ltr.; Gentile Ltr.; Katz Ltr.; Patino

Ltr.).  "Steve never thought an idea was silly or unimportant."  (Katz Ltr.).

            "Steve is th[e] type of person that doesn't just talk, he acts."  (Coffman Ltr.).

When Epifanio Almodovar felt the "big four" lenders lacked "interest in serving the Latino and

Hispanic community," he went out in search of a new financial institution to call home.  He

found in Steve a careful listener who encouraged his vision and "successfully made the dream of

owning a home come true for many minority families."  (Almodovar Ltr.).  After Jacqui

Coffman complained to her friend of her frustration with the lack of employment opportunities

as a military spouse, Steve "imagined, developed, created, and designed the Spousal Patriot

Division in the Federal Savings Bank."  (Coffman Ltr.).  A new tour of duty for a solider means

a new city and a new job for his or her spouse, but with TFSB's "online training program for

military spouses to become mortgage bankers," Steve sought to create a "remote working

environment" long before the COVID-19 pandemic made it a norm.  When Jason Smartt

envisioned a way to protect military service-members from predatory lenders he went in search

of investors and mentors to get his idea off the ground.  He was referred to Steve, who instantly

supported the idea and offered to take the concept in-house at TFSB.  (Smartt Ltr.).  The program

has now "helped thousands of veterans get much lower cost of capital and improved their lives in

the process. While this did not have a big impact on the bottom line of TFSB, it did make an

impact for thousands of veterans." (*Id.*). Jackie Katz approached Steve about a fellow TFSB

employee hoping to be the first in her family to graduate from college. A young, single mother,

the employee lacked the resources to complete her degree. Within a week or so, on Steve's

recommendation, the Bank provided this employee with the "necessary means to complete her

education through an employer sponsored program." (Katz Ltr.). And when she successfully

completed her degree, Steve was invited to celebrate. (*Id.*).

   For years, Steve has put his heart, soul, and resources into TFSB – not simply

building it into a successful bank with offices around the country, but developing deep

relationships with the many employees he has encouraged, mentored, and led. The indictment in

this case ended his career as a banker, forcing Steve to step down and disassociate himself from

the operations of the Bank. As a result of his conviction here, Section 19 of the Federal Deposit

Insurance Act, 12 U.S.C. § 1829, will bar him from the banking industry.

  C. <u>Steve's Commitment to Family</u>

   Steve has been a fully engaged and devoted father to three children. He was

married in 2001 and his son, Stephen Jr., was born a year later in 2002, his daughter, M⬛, in

2004, and his youngest, K⬛, in 2007. Stephen Jr., now a freshman at West Point, describes

his father as his hero and his best friend, who made it clear to his son and daughters from a very

early age that they were "his number one priority." (S. Calk Jr. Ltr.). Both Stephen Jr. and many

of Steve's friends recount how work commitments, social obligations, and campaign

appearances, all took a back seat to Steve's time with his kids. (Banks Ltr.; S. Calk Jr. Ltr.;

Cortes Ltr.; Husarsky Ltr.; Moore Ltr.; Ricciardi Ltr.).

As a father, Steve instilled in his children the obligation that they each serve their country for a minimum of one year, in any capacity, military or otherwise. When his son enrolled at West Point, Steve wrote to him every day of basic training. The lessons Stephen Jr. has taken from his father are that "failure is okay if you do not quit" and to "treat others how you would like to be treated," not as platitudes his father bandied around, but as drawn from his lived experience. (S. Calk Jr. Ltr.). Steve's friends speak glowingly of his three respectful, service-oriented children, ever eager to lend a hand to those in need. (Burling Ltr.; Caldero Ltr.; Demirjian Ltr.; Dold Ltr.; Downing Ltr.; Gruber Ltr.; Hsu Ltr.; Reynolds Ltr.; Ricciardi Ltr.; Sinton Ltr.).

In 2014, Steve's life changed dramatically. He was in a horrific accident that resulted in years of ███████████████. At the same time, he had to face his wife's infidelity and their subsequent painful and protracted divorce. He ultimately moved out of his marital home in the summer of 2016 and their marriage was officially dissolved in 2018. (PSR ¶ 94). He began the process of stitching his life back together in the years between. As always, and no matter what, his children came first. (Banks Ltr.; Moore Ltr.).

Steve has been as equally devoted a son as he has been a father. He travelled regularly to see his parents and supported them financially while his mother ██████████ ██████████████████, his "congenial spirit" a salve to his siblings and his fervent support "the spark that kept [his family's] hopes for [her] recovery alive." (R. Calk Jr. Ltr.). Richard Sr. describes a son who in his own hour of achievement—his first salute as a Lieutenant—presented his father "with a silver dollar," as is customary, "but rather than just giving [his father] the coin, he had it affixed to a plaque thanking [him] for [his] love and encouragement." (R. Calk Sr. Ltr.). Steve's younger brother John followed him into military

service because of the example Steve set.  (J. Calk Ltr.).  And both of his brothers remember how even in their youth Steve was a champion of the underdog who now as an adult regularly displays quiet, simple acts of grace.  (J. Calk Ltr.; R. Calk Jr. Ltr.; *see also* Lombardo Ltr.; Parks Ltr.; Perry Ltr.; Shah Ltr.; Smith Ltr.).  Steve's sister similarly speaks of her twin as the sibling who most took to heart the importance of service to others—from delivering food to the VA Hospital at Christmas, to helping friends who have lost their jobs find their footing, to funding a scholarship at their alma mater, or paying tuition for the children of friends who have passed away.  (Sauser Ltr.).

       D.     <u>Steve's Commitment to Others</u>

Even as a young loan officer, Steve looked for ways to give back to the community by offering his own time and effort, first through the Big Brother program, (Reynolds Ltr.), and later as a Certified Leader in the Boy Scouts of America, (PSR ¶ 112).  In the decades since then, Steve has been a mentor to many, both formally and informally, from his peers, to young entrepreneurs, to soldiers reentering society.  "Whether it was the boards of the USO of Illinois or the Special Operations Warrior Foundation," Steve has "consistently sought out opportunities to undergird the structural integrity of his community."  (Banks Ltr.).

       1.     Service to his Community

For almost 20 years, Steve has been a member of the Young Presidents Organization (YPO), whose mission is to "Better Leaders through Lifelong Learning and Idea Exchange."  (Kerr Ltr.).  This has been no small commitment.  In addition to having served on the Board of Directors for one of YPO's Chicago chapters, Steve has met once a month in a small group forum with other business leaders for decades, encouraging them in their business ventures, supporting them in times of personal triumph and adversity, and sharing with them his

own.  (Cabrera Ltr.; Darley Ltr.; Demirjian Ltr.; Downing Ltr.; Moore Ltr.; Shah Ltr.; Tobon

Ltr.; Vasquez Ltr.).  Steve has championed diversity within their ranks, (Darley Ltr.); has made

space for newer entrepreneurs to grow up among them, (Downing Ltr.; Shah Ltr.); and has

extended their fellowship to support of others, including young veterans making their way into

the workforce, (Demirjian Ltr.).

      Many letters recount Steve's support of friends, colleagues, and new

acquaintances starting out in business or taking a leap of faith in their careers.  He provided

encouragement and advice, answered questions and reviewed business plans, all in order to help

others succeed.  (Bogusz Ltr.; Burden Ltr.; Fay Ltr.; Hsu Ltr.; Moore Ltr.; Oweimrin Ltr.; Shah

Ltr.).  Steve is not only willing to share "sage counsel" but also his wide network of contacts.

(Hutmacher Ltr.; Ahern Ltr.; *see also* Caldero Ltr. ("As a Latina woman, Steve has continuously

mentored me, made business introductions that could further my career, and provided guidance

when making personal life decisions.")).

      Steve has also lifted friends out of unemployment by inviting them to come work

with him and personally taking the time to encourage, guide and train them.  (Parks Ltr.; J.

Aldeguer Ltr.; *see also* Bogna Ltr.; Ricciardi Ltr.; Ryan Ltr.).  After Joseph Aldeguer lost

everything in the 2008 recession—his mortgage business, his house, and almost his marriage—

he tried to break back into the industry only to be turned away.  Then he answered a "help

wanted" ad from TFSB.  During the interview he mentioned he knew Steve and asked the

manager to pass along his regards.  Thirty minutes later Steve called him back, "welcomed [him]

with open arms," and asked how to help get him back in "success mode."  Mr. Aldeguer turned

his life around and believes that "without Steve's help, wisdom, and empathy," his life would

totally be different. "I can never thank him enough for the belief he had in me to be successful and productive again." (J. Aldeguer Ltr.).

Many letters describe Steve Calk as the friend you call in an emergency, when in need of immediate personal, emotional, or financial support. When a friend's home was vandalized in a racial hate crime, Steve was first on hand to help; when his friend's daughter was attacked by a pit bull, Steve was ready in minutes with a plan; when his friend's wife got glass in her eye while he was out of town, Steve was there to check on her throughout; when a stranger's car flipped over, Steve held her hand and kept her conscious. (Demirjian Ltr.; Moore Ltr.; Smith Ltr.; Tobon Ltr.). Steve is the friend who will show up, time and again. (Banks Ltr.; Ricciardi Ltr. ("In my father's last days, Steve would regularly drive to Indiana to be with my family, grieving alongside us.")).

All those present for the tragic accident in 2014, resulting in Steve's █████████ ████████████████, recall Steve's compassionate and commanding response. Steve was a passenger in a four-person ATV when it rolled over in a Bolivian desert on a YPO forum group trip principally organized around their friend's adoption of a child, during which time they helped volunteer at her orphanage. Medevac'd to safety, his first question when he regained consciousness was about the others in the vehicle. In the turmoil following this tragedy, Steve was organized and disciplined in helping their group respond. And after life returned to normal, Steve "made it a point over the years – and especially in the critical phase after the accident," to check in regularly with their friend who ████████ "to make sure ██████████ was on track," and notifying the others whenever he seemed to be "███████████████████ so that [they] could make an extra effort to touch base" with him and offer their "love and support." (Demirjian Ltr.; *see also* Cabrera Ltr.; Shah Ltr.; Tobon Ltr.; Vasquez Ltr.).

2.      Service to Soldiers

Between 2012 and 2020, Steve was on the Board of Directors of the USO of
Illinois, whose mission "is to strengthen America's military service members by keeping them
connected to family, home and country, throughout their service to the nation."  (*See* About,
USO of Illinois, https://illinois.uso.org/about/about-the-uso).  Many are familiar, for example,
with USO airport lounges, places of comfort to our soldiers during their travels.  Other services
the USO provides include "no-dough dinners" and a "diaper division," which help feed service
members and their families and provide support to new parents and their young children.  In
addition, Steve has been an avid supporter of the Special Operations Warrior Foundation
("SOWF"), a charitable organization that pays for the education of the children of special
operations soldiers who died in the line of duty.  (Hutmacher Ltr.).

For 16 years, Steve has hosted an annual retreat, informally known among its
participants as "Warrior Weekend."  (*See, e.g.*, D. Lierly Ltr.; Kassim Ltr.; Sinton Ltr.; Smartt
Ltr.).  Steve invites younger and older military veterans to participate in "roundtable discussions
around personal challenges, business challenges, community involvement, and the importance of
an ongoing lifetime of service after leaving the uniformed military."  (Streetman Ltr.).  One of its
more seasoned participants, Dan Streetman, reflects on the "many hours-long discussions where
Steve has facilitated deep insights about the best ways to continue our service and serve our
communities and our country."  (*Id*.).  While a younger veteran, Adam Yaari, described his
initial feeling of being "out of [his] depth in an environment full of business executives and
senior military officers," and Steve's efforts to go "out of his way to speak with [Adam] and to
extoll [his] military experience to the other attendees."  (Yaari Ltr.).

13

Steve has taken many young soldiers under his wing.  This started when Steve was himself just a young officer, encouraging his friend Darin Lierly to finish his degree and to become a Marine Corps aviator, which he did.  (D. Lierly Ltr.).  Since then, Steve has made mentoring young members of the military a core part of his life.  As the letters demonstrate, he has offered business opportunities, lent out his home, and devoted his time and resources to helping these young people build their professional and personal lives.  (Hsu Ltr.; Kassim Ltr.; Lekowski Ltr.; Merritt Ltr.; Molaro Ltr.; Smartt Ltr.; Yaari Ltr.).

 Steve has also played a more formal role in helping to develop the next generation of military officers.  In 2015, Everett Spain was assigned to the U.S. Army Special Operations Command where he developed a Leaders in Training ("LIT") program to embed special operations soldiers in civilian organizations for two to six weeks alongside a senior executive.  The first call he made was to Steve, "who enthusiastically volunteered," and who, along with his team "hosted the most special operations mentees of any LIT host" in the first several years, and were "routinely cited as a best-in-class professional mentor."  (Spain Ltr.).

From 2011 to 2013 and again between 2015 and 2017, Steve served as head of Illinois Congressman Robert Dold's nomination committee for the military academies.  This required "a significant amount of time, to not only work with a diverse committee but interview" the applicants "and make recommendations."  (Dold Ltr.)  "The applicants are always an exceptional group," and there are only so many spots available.  "Steve made everyone feel special and praised these young people for what they were doing.  More importantly, he took as much time" to encourage even "those whom he knew would not be recommended."  And he would advocate for the candidates that were.  (*Id.*).  This inclination to mentor everyone whose

14

resume came before him, to encourage them in their future plans whether they would pan out the way they hoped or not, is consistent with the way Steve has lived his life.

3.      Charitable Causes

Steve's engagement with charitable causes extends beyond mere financial contributions. Many might "show up for a gala or give money, but Steve will take on a high level of personal leadership, opening his home and investing his time." (Silverman Ltr.; Van Embden Ltr. (recalling the time she joined her Uncle Steve for one of his Thanksgiving traditions, volunteering to feed soldiers); Oney Ltr. (describing Steve efforts to help her structure an auction package for a retreat in Alaska for wounded warriors)). Many describe how Steve engaged them in his efforts to support community. (*See, e.g.*, Cabrera Ltr.; Cortes Ltr.; De Felice Ltr.; Harris Ltr.; Ryan Ltr.; Sinton Ltr.; Vasquez Ltr.; *see also* Demirjian Ltr. (describing his participation in Steve's efforts to embed soldiers with company executives)). Steve has also supported many causes upon the request of others. (Cabrera Ltr.; Husarsky Ltr.; Vasquez Ltr.; *see also* Traxler Ltr. (describing how on a visit to community advocacy program that uses a retail bike shop to support and engage youth, Steve was "down on his knees talking and conversing with the students," three hours later, the last one to leave)). In countless small ways, Steve has demonstrated that his financial charity is personal and heartfelt: he has bid on an item at an auction and then donated it back, doubling the contribution; he has donated his furniture to a family in need; and he quietly belongs to a church group where he has pledged to financially support anyone struggling in his parish. (Bogna Ltr.; Burling Ltr.; Streetman Ltr.).

*   *   *

While the years since his indictment have been particularly trying for Mr. Calk, he has continued to show up for the people in his life who need help. He organized a successful

fundraiser for the children of fallen soldiers, (Hutmacher Ltr.); he mentored a young entrepreneur through the pandemic, encouraging him to think of his legacy and his community and not of profit, (Merritt Ltr.); he shepherded his children through major milestones, (S. Calk Jr. Ltr.); and he was by the side of a friend battling ████████, (Vasquez Ltr.; *see also* Cabrera Ltr.). Despite his own personal circumstances, Steve continues to give "his most precious resource (i.e. time) in prodigious amounts." (Banks Ltr.). "Over the last 2 years, [his friends have] seen first-hand, [Steve] struggle with this case, but not once did his optimism and zest for life fade. [Steve] continued to be the first one to call for support even when [one's] own issues seemed so minor in comparison." (Downing Ltr.). "Steve has a tremendous capacity for love, empathy and the desire to make life better for all." (M. Lierly Ltr.).

## II.     Offense Conduct

### A.     Evidence at Trial

We summarize below the facts adduced at trial that bear most substantially on sentencing. We do not endeavor to catalog all of the points and counterpoints that were elicited by the parties. Instead, we focus on what the record shows Mr. Calk did and did not do for Manafort, and what Manafort did and did not do for Mr. Calk. We also review the facts relevant to a fair assessment of the significance, and lack of significance, to sentencing of Mr. Calk's after-the-fact statements to the OCC.

#### 1.     The Manafort Loans

TFSB Loan Officer Dennis Raico first introduced Manafort to the Bank in April 2016. (*See* DX 208; DX 210; *see also* Tr. 863:3-6). At that time, Raico advised Mr. Calk, along with Javier Ubarri (the Bank's president) and James Brennan (the Bank's head commercial underwriter), that Manafort was a wealthy and successful man who was seeking to do substantial, and potentially very profitable, business with the Bank. (*See* DX 208; DX 210). Raico presented

a proposed loan that included standard terms for the Bank's portfolio lending program, including an interest rate of 7.25% and a 2% up-front fee (*i.e.*, 2 "points."). (DX 208-A). Notably, the amount of the proposed loan, $18 million, was substantially larger than the loans that the Bank ended up making to Manafort. Based on Raico's description of Manafort and the terms of the proposal, Mr. Calk was enthusiastic about taking on Manafort as a customer. (GX 102). However, the particular proposal, for a project in lower Manhattan that Manafort was developing with his son-in-law, Jeffrey Yohai, did not move forward.

In late July 2016, Raico presented the Bank's loan committee—which included the Bank's president, Ubarri, the Bank's chief operating officer, James Norini, and Mr. Calk—with a new proposal for a $5.7 million loan to Manafort and Yohai, this time for the construction of a residential property at 2401 Nottingham Avenue in Los Angeles, California. The Nottingham loan proposal again included the Bank's standard terms for its portfolio loan program: 7.25% interest and 2 points. (GX 108; Tr. 862:18-863:2; *see also* Tr. 850:3-856:19). The proposal also included collateral substantially exceeding the amount of the loan, consisting of the Nottingham property itself and a luxury apartment that Manafort owned in Alexandria, Virginia. (*See* DX 146-A; GX 108). Based on Raico's proposal, on July 28, 2016, the loan committee unanimously approved the terms of the loan subject to full underwriting by the Bank's underwriting department. (GX 108). Mr. Calk specifically insisted that Manafort pay all of the fees and costs associated with the loan. (*Id*.; Tr. 864:10-866:22). It was the Bank's standard practice to conditionally approve loans prior to any underwriting, and no negative information about Manafort's creditworthiness had come to light at this point in the process. (*See* Tr. 856:8-11; Tr. 862:3-8).

Based on the work done by the underwriting department and the receipt of an appraisal for the Nottingham property that was lower than expected, in September 2016 the Bank amended the Nottingham loan terms, increasing the up-front fee from 2 to 3% and requiring more collateral.  (DX 127; GX 156; Tr. 908:8-12).  Under the new, tougher terms, Manafort was required to pledge a property at 174 Jobs Lane in Water Mill, New York (near Bridgehampton) – which his wife considered her "treasure" – to secure the loan.  (Tr. 889:21-890:4; Tr. 908:8-12; GX 163).  In order to provide TFSB with a first lien on the Water Mill property, the amount of the loan was increased to $9.2 million, with $3.5 million used to pay off the existing mortgage.  The loan was set to close in mid-October but Manafort backed away from the arrangement at the last minute, proposing as an alternative a "cash-out" refinance of the equity in the Water Mill home.  (Tr. 915:22-916:7).  Ubarri reacted negatively to Manafort's 11th-hour change of heart and indicated to Raico that the Bank would not renegotiate under those circumstances.  (GX 206).

To salvage the deal, Raico immediately turned to Bank of the Internet ("BofI"), with the idea that BofI would make the loan and TFSB would earn a commission for serving as the broker.  Raico then reported to Mr. Calk, Ubarri and Brennan that BofI was very interested in the proposal.  (GX 206).  On November 7, 2016, Raico informed Mr. Calk that he expected conditional approval from BofI the following day, which, incidentally, was Election Day.  (GX 223).  When the BofI process was delayed, Raico approached Ubarri about reconsidering making the loan in-house.  (GX 234).  Ubarri weighed three options, one of which was for TFSB to extend the loan to Manafort, and then informed Mr. Calk that "[w]e can do any of these options." (*Id.*).  In mid-November, the Bank agreed to extend Manafort a $9.5 million loan under the now-familiar economic terms: a 7.25% interest rate and an upfront payment of 3%.  The collateral for

the loan included the Water Mill mansion, the Virginia condo and $630,000 in a so-called "PITI" account at TFSB.  The purpose of the PITI account was to protect the bank in the event of a default by the borrower because the funds on deposit would cover principal, interest, taxes and insurance for one year while the property was being foreclosed upon and sold.  With an expected appraised value of the properties totaling $16.2 million and cash of $630,000, the total collateral for the $9.5 million loan was $16.83 million.  (GX 237).[2]

After closing the first loan (known as the "Summerbreeze Loan"), the Bank's intention was to sell it to BofI and proceed to make a second loan to Manafort to fund the completion of a renovation of a brownstone at 377 Union Street in Brooklyn, New York (the "Union Street Loan").  On December 13, 2016, BofI communicated its intention to buy the Summerbreeze Loan, (*see* DX 183 & DX 183-A), but the process stalled again.  The principal reason given by BofI at that time, was the Summerbreeze Loan had been made to an LLC guaranteed by Manafort and his wife, rather than to the Manaforts personally.  (GX 293).  BofI, as a matter of its own policy, would have to refinance the loan and reissue it to the individual borrowers, rather than purchase the closed loan as is.  (*Id.*).  Given that Manafort was expressing the need to move quickly, TFSB decided to make the Union Street Loan itself.  With the unanimous consent of the loan committee and without any objections made to Mr. Calk by the underwriters (or anyone else), on December 22, 2016, TFSB provided Manafort with a term sheet.  (DX 251 & DX 251-A; GX 299).  As before, standard portfolio terms applied: a 7.25% interest rate, an upfront payment of 2%, and substantial collateral in both cash and real property,

---

[2]     Unknown to Mr. Calk, Raico concealed a lower appraisal for the Water Mill property from the Bank's underwriting department and ultimately obtained a "Field Review" appraisal post-closing that valued the property at $11 million.  (*See* DX 176; GX 260).  Without notifying Mr. Calk, the underwriting department averaged the two appraisals, thus using a value of $12.25 million in its loan memorandum.  (*See* GX 2).

totaling $8.8 million on a $6.5 million loan.  In order to avoid exceeding the Bank's limit on

loans to the same borrower, TFSB sold $4.2 million of the Union Street Loan to its holding

company, National Bancorp Holdings.  (GX 5).  As Jack Gongaware from the OCC testified,

there was nothing at all improper about this arrangement.  (Tr. 988:16-989:15).  Since the

holding company was owned almost entirely by Mr. Calk and his brother – approximately 66%

and 29%, respectively (GX 454) – the participation of the holding company transferred a

majority of the economic risk of the loan to the Calks personally and away from their FDIC-

insured Bank.

Apart from the fact that the Manafort loans were issued on standard terms and

with adequate collateral, three aspects of the loan process stand out.  First, Mr. Calk consistently

sought to ensure that Manafort paid all applicable fees and costs.  (*See* July 28, 2016, GX 108

("customer must pay the application and appraisal fee"); November 14, 2016, GX 248 ("have the

customer wire their origination fee and costs"); December 21, 2016, DX 251-A (customer must

pay the "application fee" and "all Third Party costs"); *see also* Tr. 861:18-862:2; Tr.

865:15-866:13)).  He even insisted that Manafort cover $60,000 in costs associated with the

original Nottingham loan, which never closed.  (DX 110).  Despite ample opportunity to do so,

Mr. Calk never reduced by even one dollar the cost to Manafort of obtaining a portfolio loan at

TFSB.

Second, the Bank's governance processes for the issuance of portfolio loans were

followed.  Under those procedures, Mr. Calk could not approve a loan by himself and he did not

do so here.  The loan committee unanimously approved the terms of each of the loans.  The

approval was subject to underwriting.  The underwriters, after an underwriting process spanning

many months, assigned the loans an average rating, which was memorialized in detailed loan

memos that were duly signed by the Bank's chief underwriting officer.  (GX 2; GX 4).  The

Bank openly disclosed the Manafort loan relationship in its regularly kept records, including in

reports that were distributed monthly to the board and made available to regulators.  (*See* DX 10;

DX 13 to DX 18).

   Third, the evidence showed that, in practice, the Bank's underwriting department,

in ways that had nothing to do with Mr. Calk, made errors and was deceived by Manafort.

Critically, the underwriters had personal reservations about the loans, but they never

communicated those concerns directly to Mr. Calk.  (*See, e.g.*, Tr. 883:6-11; Tr. 881:13-16).

Instead, they decided for themselves to give the loans a passing grade even though, according to

James Brennan's testimony, he did not think the loans should be made.  In addition, the

underwriters were hindered in their assessment of the Manafort loans by Raico's lies and deceits,

especially his concealment of Manafort's fraudulent "P&L Statement."  And the underwriters

made mistakes.  For example, Underwriting Manager Matthew McDonald erred in his analysis

of Manafort's tax returns, leading him to overstate Manafort's income and write an email, which

Mr. Calk and Ubarri received, saying he "would feel confident in issuing a term sheet or a

commitment to" Manafort for the Summerbreeze loan.  (GX 230-A).  Similar errors were made

by the operations team in Maryland as it assembled a file to present to BofI.  (*See* DX 200 & DX

200-A).[3]  And Mr. Brennan acknowledged at trial that he and underwriter Thomas Horn had

made errors in their analysis of the Manafort loans.  (Tr. 791:25-792:1; Tr. 809:17-18; Tr.

874:20-875:12).

---

[3]  While not a part of the record at trial, but as discussed in our motion in limine, the OCC's
July 19, 2017, Supervisory Letter reclassifying a portion of the Manafort loans as Substandard
describes the underwriters' inadequate financial analysis, which lead to an inaccurate assessment
of Manafort's cash flow.  (*See* Dkt. No. 123 at 8-9).

2.      Manafort's Assistance to Mr. Calk

At the time Manafort became a potential customer of the Bank, he was a senior member of then-candidate Trump's campaign.  Although Mr. Calk was eager to lend his support to the campaign, it was Manafort who pursued Mr. Calk on August 3 and 4, 2016, in an effort to add him to Trump's National Economic Advisory Council ("NEAC"), which was officially announced on August 5, 2016.  (GX 111; GX 112; GX 113; GX 654).  Mr. Calk enthusiastically and openly embraced this voluntary position, informing all Bank employees of his appointment in a "Message From The Chairman," and subsequently engaging in at least thirty television and radio interviews on behalf of an underdog candidate no one expected to win.  (DX 100; Tr. 1311:18-1312:1).  As General Banks testified, Mr. Calk viewed his obligations to the campaign as a form of service and an opportunity to speak out on issues of importance to him, while also elevating the profile of his Bank.  (Tr. 1309:6-24; Tr. 1310:21-24; Tr. 1312:11-15).

Following Trump's surprising win on November 8, 2016, Mr. Calk, like many who had been involved in the campaign, considered seeking a position in the new administration. General Banks advised his friend to think big and come up with a wish list as if there were no constraints (see Tr. 1316:19-1317:1), but Mr. Calk quickly focused on the possibility of serving as Secretary of the Army.  In pursuit of that objective, Mr. Calk's sought advice and assistance not only from Manafort, but also from many other members of his network, amongst them a former Secretary of Defense (Robert Gates), the nominee to be Secretary of Defense (James Mattis), three members of TFSB's board of directors, numerous current and former military officers, and another senior member of the transition team, Steve Bannon.  He was directly recommended to individuals on the transition team, including staff member John Gallagher and committee member Ambassador Martin Silverstein.  (See DX 222-227; DX 230-232; DX 234; DX 237; DX 239-241).  None of these connections were accomplished by or through Manafort.

Both Anthony Scaramucci and General Rigby testified based on their own experience that these kinds of references were commonplace courtesies, lacking in any monetary or market value.  (Tr. 368:25-372:6; Tr. 672:14-673:3).  Scaramucci had personally recommended other candidates for positions in the Trump administration, including Vincent Viola for Secretary of the Army, without any expectation of a fee.  (Tr. 396:19-397:13).

As for Manafort's assistance, the sum total of his efforts included a single email to Jared Kushner, and a few calls and text messages with Scaramucci.  (GX 601; GX 610-612; GX 2103; *see also* Tr. 383:1-385:15).  In his outreach to both Kushner and Scaramucci, Manafort also recommended other candidates besides Mr. Calk.  (GX 601; GX 611; Tr. 383:16-18).  Mr. Kushner forwarded the email from Manafort to others but with no other follow up.[4]  (GX 601).  Mr. Calk's name was entered into a vast spreadsheet maintained by the transition team, with certain versions showing Manafort as the referral source, (*see, e.g.*, GX 602), but this was not enough to prompt any outreach to Mr. Calk.  For his part, Scaramucci did nothing to respond to Manafort's request until he received an email from Steve Cortes, on which Mr. Calk was copied.  (DX 245; Tr. 391:3-25).  Scaramucci replied to that email and from there Mr. Calk communicated with Scaramucci directly, advocating on his own behalf.  (*See* DX 245; DX 246; DX 247; DX 249).  Moreover, Mr. Calk understood from Cortes that Manafort had very little influence with the transition team, and Scaramucci tempered Mr. Calk's expectations during their calls about the prospect of obtaining a position.  (Tr. 326:16-327:3; Tr. 1407:5-22).  In January, Scaramucci was ultimately able to arrange a "courtesy" interview with the screening

---

[4]    While Kushner was not called to testify at trial, as discussed in our pretrial motions, in a 2018 interview with the government he explained that he did not consider Manafort's email a priority; it was merely one he forwarded along without any recommendation or follow-up.  (*See* Dkt. No. 37 at 15).  There is also no evidence Mr. Calk was even aware of this exchange.

committee, but only for the position of Undersecretary of the Army.  (Tr. 309:16-310:1; Tr. 1247:1-6).  For the interview at Trump Tower, which occurred on January 10, 2017, Mr. Calk flew to New York and stayed overnight at the Four Seasons, incurring expenses of approximately $1,800, for which he was not reimbursed by the campaign.  (GX 854).  He did not receive a job offer or any follow-up from the transition's Tiger Team.

3.     The OCC False Statement Allegations

The government attempted to present evidence at trial that Mr. Calk made a false statement to OCC commercial credit examiner Jack Gongaware at a meeting called to discuss a *Wall Street Journal* article on March 29, 2017.  The OCC had called the meeting in haste the same day that the article appeared for the purpose of discussing the article's allegation that the Bank had violated its legal lending limit; an allegation that was simply false.  (Tr. 973:5-975:8; Tr. 989:7-15; *see also* Tr. 997:16-998:4).  Gongaware testified that it was as a "secondary" matter that he asked during the meeting whether the Bank was aware that certain Manafort properties were in foreclosure.  (Tr. 990:17-18).  Gongaware testified that Mr. Calk said that he was not aware.  Gongaware could not remember, however, which properties in particular he asked about, and did not ask whether the properties were in default (as opposed to foreclosure). The OCC did not follow up on this issue at all and Mr. Gongaware was not interviewed by the government about the meeting until nearly a year later, in January 2018.  (Tr. 991:15-25; 992:19-993:1).

The government also attempted to show that Mr. Calk made a false statement to OCC officials Blake Paulson and Benjamin Lemanski during a meeting on July 10, 2018.  The meeting was intended merely as a "meet-and-greet" with Paulson.  (Tr. 1253:15-17).  According to their testimony, Paulson and Lemanski did not question Mr. Calk about the Manafort loans. Instead, at the outset of the meeting, Mr. Calk reportedly said, without prompting, that recent

media reports about him were untrue, and in that context denied wanting a government position. (Tr. 1258:16-23).  By their own admission, the OCC examiners made no notes or other record of the alleged statement, did not follow up in any way, and were not interviewed by the government regarding the meeting until nine months later, in April 2019.  (*See* Tr. 145:15-22; Tr. 146:7-17; Tr. 1257:2-9; Tr. 1257:24-1258:15).

 B. <u>Additional Information Relevant to Sentencing</u>

  As part of this submission, we provide the Court with additional information that we respectfully submit is highly relevant to sentencing because it permits the Court to assess the impact of the Manafort loans on the Bank.  The information is contained in separate declarations of Dr. Andrew Carron and TFSB Chief Operating Officer Daniel Semenak, which are submitted herewith as Exhibits B ("Carron Decl.") and C ("Semenak Decl."), respectively.

  1. Dr. Carron's Declaration

  Dr. Carron, a financial economist, is the expert whose testimony was noticed by the defense during pre-trial proceedings.  His declaration sets forth analyses of the interest rate and the collateral for the Manafort loans.[5]  These analyses provide greater context for the evidence at trial that the Manafort loans carried an above-market interest rate, (Tr. 832:25-833:6; Tr. 834:22-835:4), and were more than adequately collateralized, (*see* GX 2; GX 4).

  In his first analysis, Dr. Carron used market data to determine a benchmark interest rate for residential loans during the relevant time period.  He started with a base rate for 30-year fixed rate loans to prime borrowers.  He then applied adjustments based on the data, to account for numerous factors that, as observed in the data, impact the interest rate.  These include, the borrower's credit score, the size of the loan, the purpose of the loan, and whether the

---

[5] The substance of the analyses set forth in Dr. Carron's declaration was disclosed to the government on June 22, 2020 as part of pre-trial proceedings.

interest rate was fixed or adjustable.[6]  By combining the maximum upward adjustments for the

relevant factors, Dr. Carron calculated a maximum adjusted rate, which provides a benchmark

for the highest prevailing rate in the marketplace for loans with the characteristics of each of the

Manafort loans.  Dr. Carron concludes based on this analysis that the maximum adjusted

benchmark rate for the Summerbreeze and Union Street loans was 5.63% and 5.43%,

respectively.[7]  (*See* Carron Decl. ¶¶ 5-7).  From an economic perspective, the difference between

these rates and the actual 7.25% interest rates charged by TFSB on the Manafort loans represents

a combination of added compensation for risk and incremental profit for the Bank.  (*Id*. ¶¶ 4, 7).

       In his second analysis, Dr. Carron assessed the adequacy of the collateral for the

Manafort loans.  To do this, he calculated the maximum "price drop" that the real estate posted

as collateral could sustain (net of transaction costs) and still permit the Bank, in the event of

default, to recover 100% of the principal of the loans and the associated cost of funds.  That

amount varies depending on when the default occurs because prior to any default the borrower

would be making payments on the loans.  Dr. Carron then compared those "price drops" to the

historical movement of home prices in the relevant localities.  He concludes that home prices

would have to decline by levels even greater than those seen during the so-called Great

---

[6]       Like Mr. Calk, Dr. Carron is not an underwriter.  His analysis is based on the terms of the
loans and other objective characteristics.  The borrower's creditworthiness is taken into
consideration only via the credit score, and the value of the collateral is based on the appraised
values reflected in TFSB's loan memoranda.

[7]       As Dr. Carron notes, the benchmarks are based on aggregate data for loans with loan-to-
value ("LTV") ratios of 80% or less.  Dr. Carron further observes that the addition of collateral
that reduces the LTV significantly below 80% would generally lead a bank to offer a lower
interest rate than it otherwise would.  (Carron Decl. ¶ 9).  This observation is particularly
relevant to the Summerbreeze loan, which had an LTV of 61%, and therefore presented
significantly less risk to a lender than it otherwise would if the LTV had been the standard 80%.

Recession of 2008 to put the Bank at risk of losing money on the Manafort loans in the event of default.  (*Id*. ¶¶ 10-17).

        2.      Semenak Declaration

      Mr. Semenak is currently the Chief Operating Officer of TFSB.  At the time of the Manafort loans he was the Chief Financial Officer.  His declaration addresses two issues. First, he describes the Bank's capital position at the time of the Manafort loans, which indicates both that the Bank had sufficient capital to absorb a complete default of the Manafort loans and that that capital (and much more) could have been sent as a dividend to the holding company, of which Mr. Calk owned 66%.  Second, Mr. Semenak describes the Bank's efforts to recover the collateral for the Manafort loans after the federal government seized much of that collateral in connection with the prosecution of Manafort.  Mr. Semenak reports that the Bank is about to complete this process.  Once it is complete, the Bank expects to recover all of the principal from Manafort loans and an additional $3.6 million.

      With respect to capital, Mr. Semenak explains that at all times in 2016 and 2017, TFSB had more than sufficient capital to be considered "well-capitalized" by every regulatory measure.  Even under the most stringent standard, the Bank had a capital surplus of $47,154,000 and $56,814,000 at year-end in 2016 and 2017, respectively.  The nearly $57 million surplus at the end of 2017 is *after* reserving for 100% of the Manafort loans (*i.e.*, after assuming no future recoveries).  Mr. Semenak further calculates that TFSB would have been able to, had it chosen, distribute $41,439,000 and $43,408,000 to its holding company at year-end 2016 and 2017, respectively.  At time of these events, Mr. Calk's personal ownership interest in the holding company was 66%.  (Semenak Decl. ¶¶ 3-11).

      With respect to the recovery of the collateral for the Manafort loans, Mr. Semenak explains that TFSB is on track to recover an amount significantly greater than the total amount of

the Manafort loans.  Mr. Semenak recounts that the Bank has already recovered $3,142,874,41 in

cash collateral, $9,290,419 net proceeds from the sale of 174 Jobs Lane, and $2,290,836.72 net

proceeds from the sale of the Virginia condominium.  In addition, the Bank is in the final stages

of the process of foreclosing on the Union Street brownstone, for which the Bank expects to

receive approximately $4,275,000 (based on a broker valuation and net of expected fees).  Mr.

Semenak therefore calculates that TFSB will recover at least $18,999,130.13.  As he further

notes, this is approximately $3,611,000 *more* than the aggregate principal owed based on the

amounts actually disbursed to Manafort (which only included about half of the $1.2 million

construction loan for Union Street).  (Semenak Decl. ¶¶ 12-22).

## III.    Presentence Investigation Report

The September 30, 2021 Presentence Investigation Report observes that, apart

from the conduct at issue in this case, Mr. Calk has "led a law-abiding life and his lack of

criminal history leaves us with the belief that his risk of recidivism is low."  (PSR at 49).  It

further finds Mr. Calk has been regularly employed, served honorably in the military, has shown

a "sense of duty to his close friends, family, and the country," and has complied with all aspects

of his pre-trial supervision.  (*Id.* at 49-50).  And, the PSR acknowledges that TFSB "did not

necessarily suffer a long-term financial loss and the safety and soundness of the bank were not

jeopardized" by Mr. Calk's conduct.  (*Id*. at 50).  Based on these mitigating factors, the PSR

properly concludes that a "significant variance" below the applicable Guideline range is

warranted.  (*Id.*).

However, because the Probation Department applied certain enhancements in its

Guidelines calculation, the starting point for this analysis was artificially and unreasonably high,

such that it proposes a sentence that is far too harsh for the facts of this case.  The PSR finds that

the base offense level under U.S.S.G. § 2B4.1 is 8, which, absent further enhancement and given

that Mr. Calk has no criminal history, would result in an advisory range of 0 to 6 months.

Probation applied three enhancements adding 18 levels, yielding a total offense level of 26, and

resulting in an advisory sentencing range of 63 to 78 months' imprisonment.  As summarized

below and further set forth in Argument Section II *infra*, the defense objects to these

enhancements.

First, there is an enhancement pursuant to U.S.S.G. § 2B4.1(b)(1) that is intended

to correspond to the value of the bribe paid or the benefit received if in excess of $2,500.

Probation relied on the "benefit" to Manafort, which it determined was $553,731.36.  (*See* PSR

¶¶ 62-65, 73).  This was based on an inapposite comparison of the Manafort loans to loans issued

by a "hard money lender" with different collateral, at a different time, with different economic

terms, under circumstances that were not the subject of any scrutiny in this case.  This

adjustment alone carries a 14-level enhancement.

Second, Probation added a 2-point enhancement for obstruction of justice under

U.S.S.G. § 3C1.1 based on Mr. Calk's purported after-the-fact statements to the OCC, (*see* PSR

¶¶ 68, 76), notwithstanding the fact that those statements had no nexus to, or impact on, the

criminal investigation.

Third, Probation applied another 2-point enhancement under U.S.S.G. § 3B1.3 for

"abuse of trust," based only on the fact that Mr. Calk was acting as an officer of the Bank when

he engaged in the conduct that resulted in his conviction – as would be the case for any bank

officer convicted of bank bribery.  (*See* PSR ¶¶ 66, 75).

Taken together, these 18 levels of enhancements treat Mr. Calk the same as if he

were a non-owner executive who had accepted a $550,000 cash kickback to make "buddy loans"

with someone else's capital, then lied to his boss to conceal his crime and shredded the evidence

in response to a grand jury subpoena.  That is a far cry from the unusual facts of this case and the result cannot plausibly be what the Sentencing Commission intended.

## ARGUMENT

### I.      Incarceration Is Not Necessary to Achieve the Purposes of 18 U.S.C. § 3553(a)

Mr. Calk has led an admirable life, built on hard work, a desire to give back, and an ethic of service.  This case is Mr. Calk's first run-in with the law.  It has ended the banking career he spent decades building, destroyed his reputation, and changed the course of his life.  The conviction in this case will bar him from working in the banking industry.  There is no risk that Mr. Calk will offend again and he presents no danger to society.  Clearly, Mr. Calk's personal history and characteristics support a non-custodial sentence.

The nature and circumstances of the offense do not require imprisonment either.  To the contrary, the facts of this case make it far different from any bribery case the government has ever pursued, and warrant a sentence far below what the Guidelines prescribe.  First, the "bribe" itself – a volunteer campaign position that Mr. Calk worked hard at, and a reference for a job that he did not get – had no market value, and indeed no monetary value at all.  Second, Mr. Calk had no financial motive in seeking a position in the Trump administration, a job that would have paid him a small fraction of what he was earning as the owner and CEO of the Bank.  Rather, as is further substantiated by the many letters submitted on his behalf, Mr. Calk's interest in the position grew out of his long history of service and commitment to the military.  Third, the loans to Manafort had none of the hallmarks of a corrupt deal – the Bank made the loans on its standard terms, required substantial collateral, and never even reduced the fees that Manafort was required to pay.  Fourth, because of the collateral that Mr. Calk and the Bank demanded, the Bank will suffer no economic loss.  Had there been a loss, Mr. Calk, as the Bank's majority shareholder, would have had the most to lose.  All of these highly unusual aspects of this

prosecution distinguish it from the typical bribery case in ways that are directly related to the concerns of sentencing.

We recognize that we must accept the jury's verdict for present purposes and we do not seek to re-litigate that verdict here.  But we respectfully submit that the nature of the offense, taken together with Mr. Calk's otherwise exemplary personal history, warrants imposition of a sentence that does not include incarceration.

A.    Legal Standard

In *United States v. Booker*, the Supreme Court rendered advisory the once-binding Sentencing Guidelines and empowered district courts to take full account of the sentencing factors provided in 18 U.S.C. § 3553(a).  543 U.S. 220, 259 (2005).  While the sentencing court should use the Guidelines as its "starting point and the initial benchmark," it must also consider all of the § 3553(a) factors to determine whether they support the imposition of the Guidelines sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

The statute's overarching requirement is that the Court "impose a sentence sufficient but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," to "provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(A) – (C).  In weighing the § 3553(a) factors, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  *Rita v. United States*, 551 U.S. 338, 351 (2007) (citing *Booker*, 543 U.S. at 259-60).  The Court need not find "'extraordinary' circumstances" to justify

a sentence outside of the Guidelines range.  *Gall*, 522 U.S. at 47.  Instead, the sentencing court

"must make an individualized assessment based on the facts presented."  *Id.* at 50.

B.  <u>As a First-Time Offender Who Has Led a Productive Life Dedicated to Service,
Mr. Calk Poses No Risk of Recidivism</u>

As the PSR makes clear, Mr. Calk's conviction in this case is entirely out of

keeping with his otherwise law-abiding life.  The letters submitted on Mr. Calk's behalf confirm

that as father, a businessman, a soldier and a member of his community, he has sought to do

good and to set a positive example for others.  He has been deeply humbled by the events of this

case, which have left him a convicted felon who can never work in banking again.  There is

nothing in Mr. Calk's background, or in his conduct since the indictment, that raises any concern

that he will ever again be in this position.  A sentence of incarceration is totally unnecessary to

protect the public from "further crimes of the defendant."

C.  <u>The Offense Conduct Does Not Warrant a Prison Term</u>

1.  The Bribe

As charged, the bribe in this case had two components:  1) a position on the

Trump campaign's economic advisory council, and 2) assistance applying for a job in the

administration.  We have argued that neither had a quantifiable monetary value so as to

constitute a bribe under the bank bribery statute.  But whether or not one accepts that

proposition, it is clear that the nature of the bribe alleged in this case is *sui generis*,

distinguishable from the allegations in any other bank bribery prosecution of which we are

aware.  What Manafort offered to Mr. Calk was not a bribe in the traditional sense; and even if,

in the jury's eyes, it served as a basis for a conviction, it was far too ephemeral and insubstantial

to justify a prison sentence in this case.

(a)     NEAC Appointment

Two features of Mr. Calk's appointment to the NEAC are of particular relevance. First, the timing.  The appointment on August 5, 2016 came long before the Manafort loans were underwritten and Manafort's financial issues became apparent to the underwriting staff, much less to Mr. Calk.  Indeed, the appointment followed within days of the loan committee's unanimous conditional approval (*i.e.*, subject to underwriting) of the Nottingham loan terms. The evidence established that at that time Mr. Calk had been advised that Manafort was an extraordinarily wealthy and successful man, who had every prospect of repaying the loans, with interest.  Mr. Calk, along with the two other members of the committee, voted to conditionally approve a loan to Manafort carrying the Bank's standard terms for portfolio loans.  Mr. Calk sought no special treatment for Manafort, and in fact added terms, insisting that Manafort pay all of the applicable fees and costs.  No one raised any issue with those terms at that point.  Thus, at the time Mr. Calk received the NEAC appointment, he had every reason to believe that the loan to Manafort would be among the most profitable loans in the Bank's history, and no reason to believe that the Bank was taking on an inappropriate amount of risk.  For purposes of sentencing, this fact surely distinguishes this case from the typical bribery case where a bank official is paid a bribe to take some action that the bribe recipient knows will harm the bank and would not otherwise have taken.[8]

Second, the nature of the NEAC appointment sets this case apart from the standard bribery case.  While the government has cast it as a "bribe," the appointment to the

---

[8]     *Cf., e.g.*, *United States v. McElroy*, 910 F.2d 1016, 1021-22 (2d Cir. 1990) (defendant officers from two banks each took "large unsecured loans from the other's bank" to avoid their own banks' board approval processes); *United States v. Wester*, 90 F.3d 592, 593-94 (1st Cir. 1996) (bank officer who had previously held an interest in a real estate project lent money to the real estate company in part to fund his own buyout payment, without informing the bank board of the purpose of the loan); *United States v. Heffner*, 85 F.3d 435, 438 (9th Cir. 1996) (bank

NEAC carried with it no prospect of personal financial reward and certainly no financial reward

at the expense of the Bank.  The only foreseeable monetary benefit from the campaign service

was the potential benefit *to the Bank* of Mr. Calk's media appearances.  Nor was it a no-show

job; to the contrary, Mr. Calk made more than 30 television and radio appearances, with no

compensation for his time and no reimbursement of his expenses.  As the Court will recall from

the video compilation that the defense prepared (DX 50) but ultimately did not introduce (after

the Court imposed certain limitations on its content, (Tr. 1200:2-17), Mr. Calk touted TFSB

during interviews and discussed its lending programs.  Although the government may focus on

the potential "intangible" benefit that Mr. Calk may have reaped from the accolades he received,

the only potential financial benefit to Mr. Calk was based on his participation in economic

benefits to the Bank from the free publicity.[9]  The role was not prestigious or significant enough

for Anthony Scaramucci to have remembered that he himself was later appointed to the NEAC,[10]

---

officer paid a cash bribe to change the terms of a loan that "materially impaired the Bank's
security" without disclosing the change to the bank); *United States v. Malone,* No.
1:11-Cr-00031 (M.D. Ga. Sept. 22, 2011), ECF No. 4 (lending officer accepted cash bribes in
exchange for approving millions of dollars in loans that he knew the borrowers had no intent to
repay); *see also United States v. Stoecker,* 920 F. Supp. 867, 872 (N.D. Ill. 1996) ("Congress's
intent in enacting Section 215 was to remove from the path of bank officials the temptation of
self-enrichment *at the expense of the borrower or bank.*" (emphasis added)).

[9]     A bank executive who agrees to cause the bank to extend a loan in return for a benefit to
the bank does not commit bank bribery.  It is the job of a banker to extend loans that benefit the
bank.  Indeed, the Justice Department's Criminal Resource Manual section on 18 U.S.C. § 215
advises prosecutors that the bribe "can be for the benefit of the official or of any other persons or
entity (*other than the financial institution*)."  (U.S. Dep't of Justice, Crim. Resource Manual §
831, Updated Jan. 21, 2020, https://www.justice.gov/archives/jm/criminal-resource-manual-831-
corrupt-bank-officer-18-usc-215a2 (emphasis added)).

[10]     *See* Tr. 375:6-376:10; Shane Goldmacher, *Trump adds diversity to economic adviser list
– and more big donors*, Politico (Aug. 11, 2016), https://www.politico.com/story/2016/08/trump-
economic-adviser-list-donors-226921; Charlotte Alter, *Donald Trump Just Added 8 Women
Advisors, No Steves*, Time (Aug. 11, 2016), https://time.com/4449044/trump-women-economic-
advisers/; Jim Zarroli, *After Criticism, Trump Adds Women To His Economic Advisory Team*,

and as Scaramucci further testified, in August 2016 Trump was trailing in the polls and was not

expected to beat Hillary Clinton in the general election, (Tr. 378:3-15).  Mr. Scaramucci's

testimony confirmed what all of us remember:  until late on election night itself, Trump was not

expected to win.  Under these circumstances, Mr. Calk's work on behalf of the campaign was not

unambiguously a benefit conferred *on* Mr. Calk as opposed to *by* Mr. Calk, notwithstanding the

fact that Mr. Calk welcomed the opportunity to serve.  It was certainly not a "bribe" of the kind

that has ever formed the basis of a criminal case.[11]

(b)   Manafort's Assistance in Applying for a Job

The second component of the bribe – Manafort's assistance applying for a

government position after Trump was elected in November 2016 – was similarly not typical of

the kind of payoff that forms the basis of a criminal prosecution.  The evidence was undisputed

(and common knowledge confirms) that the assistance that Manafort provided is the kind of

favor that is invariably given without charge or expectation of payment.  It is the kind of

assistance Mr. Calk received from numerous other contacts, including those with high-level

military connections, during the same period, without any expectation of recompense.  Manafort

himself recommended two candidates in addition to Mr. Calk in the email he sent to Trump's

son-in-law Jared Kushner and discussed one of those additional candidates with Scaramucci on

---

NPR (Aug. 11, 2016), https://www.npr.org/2016/08/11/489672573/after-criticism-trump-adds-women-to-his-economic-advisory-team.

[11]    *Cf. United States v. Lebedev*, 932 F.3d 40, 46 (2d Cir. 2019) (bribers made $150,000 in charitable donations to credit union chairman's church in exchange for a majority of the credit union board seats); *McElroy*, 910 F.2d at 1021-22 (officers from two different banks bribed each other with reciprocal bank loans); *United States v. Kaufman*, No. 19-Cr-504 (LAK), 2021 WL 4084523, at *3-4 (S.D.N.Y. Sept. 8, 2021) (credit union officer received rent-free housing as a bribe for approving favorable loans); *United States v. Rodrigues*, 159 F.3d 439, 444-45 (9th Cir. 1998) (loan officer received a one-third interest in the project that was the purpose of making the loan).

the same call in which Manafort recommended Mr. Calk.  Scaramucci testified that he personally

recommended other candidates for positions, including Vincent Viola for Secretary of the Army,

without any expectation of a fee.  General Rigby assisted Mr. Calk for free and testified that he

often provided references for job seekers but never charged a fee.  Clearly, the assistance to Mr.

Calk had no monetary value or market price.  And Manafort, as the giver of the assistance, was

not worse off, financially or otherwise, for having given it.[12]

Manafort's "assistance" in this case is an even more unusual basis for a criminal

prosecution in light of the fact that it was totally ineffective and, at the end of the day, worthless.

The truth is that following the 2016 election, Manafort was hardly in a position to assist Mr.

Calk.  Manafort had been fired from the Trump campaign well before the election and was

distrusted by Steve Bannon, who was extremely close to the President-elect at that time.  As both

Scaramucci and Steven Cortes alluded to in their testimony, Manafort was no longer

well-regarded in Trump's inner circle.  (Tr. 374:9-21; Tr. 1407:5-22).  Bannon, who was

appointed chief strategist following the election, was well known to have viewed establishment

Republicans with disdain.[13]  Manafort's email to Kushner on November 30, 2016 was largely

ignored.  Apart from Kushner's forwarding email, there were no other emails in the entire

transition team database – not from Kushner or anyone else – that even mentioned Manafort's

recommendation of Mr. Calk.  It was not until late December 2016, after Viola's nomination for

Secretary of the Army had been announced, that Manafort mentioned Mr. Calk to Scaramucci

---

[12]     As discussed in our pretrial motions, in October 2018, Manafort testified under oath
before a grand jury in the District of Columbia that he genuinely believed that Mr. Calk qualified
for the position for which he was recommended on his own merits.  (*See* Dkt. No. 37 at 14-15).

[13]     *See* Kyle Cheney, *Bannon, tormentor of establishment GOP, gains foothold in West
Wing*, Politico (Nov. 13, 2016), https://www.politico.com/story/2016/11/bannon-breitbart-trump-
white-house-231316.

during a three-minute phone call, a conversation in which Manafort also recommended another

person.  Eventually, Mr. Calk received a "courtesy" interview at Trump Tower for the position of

Undersecretary of the Army.  But nothing Manafort did, or could have done, was ever going to

get Mr. Calk an actual job in the administration.

        2.      No Financial Motive

       Mr. Calk's motives for accepting Manafort's offer of assistance and pursuing a

government position further distinguish this case from the typical bribery scheme and support a

non-custodial sentence.  At sentencing, motive often provides critical context for offense conduct

and distinguishes one offense from another for purposes of determining fair and just punishment.

*See United States v. Singh*, 877 F.3d 107, 120 (2d Cir. 2017) ("A defendant's motivation for

engaging in criminal conduct is unquestionably a proper consideration at sentencing.").  Here,

the trial record and the many letters submitted on Mr. Calk's behalf substantiate that Mr. Calk

did not seek a position in the Trump administration for financial gain.  Nor, contrary to the

government's rhetoric at trial, was Mr. Calk driven by "greed for power."  Rather, Mr. Calk's

pursuit of a position – which quickly focused on a role at the Department of Defense – was

driven foremost by a desire to contribute to public service, in particular to the military.  Mr. Calk

believed himself to be qualified to serve in such a role, as did many friends and acquaintances

(including those with high-level positions in the military) who knew of his life-long commitment

to the military.

       Given that Mr. Calk already had a lucrative and satisfying career as CEO of a

bank he built virtually from scratch, he did not need a government position as a stepping-stone in

the business world.  Rather than enriching Mr. Calk, government service would have entailed

significant personal and financial sacrifice.  Although prestige and public attention can come

with high-level public service, and an undersecretary may have some "power" over his

subordinates, the record demonstrates that Mr. Calk's motive was the opportunity to become more engaged with issues of importance to him, and to contribute to a larger cause.  This is borne out by General Banks' testimony at trial, the many contemporaneous emails in support of Mr. Calk's application in November and December 2016, and the numerous letters appended to this submission.  (Tr. 1310:21-24; Tr. 1316:21-1317:1; DX 222-227; DX 230-232; DX 234; DX 239-241; DX 245; Exhibits A-1 to A-67).

     3.     Nature and Characteristics of the Loans

The characteristics of the loans – in effect, what Mr. Calk has been convicted of providing to Manafort in return for his assistance – also set this case apart and should inform the Court's sentence.  Where a bank officer substantially discounts the terms of a loan extended in return for a bribe and puts the bank at great risk – for example, by reducing the interest rate or the amount of collateral to be posted – that fact enhances the seriousness of the offense and weighs in favor of increased punishment.  The converse should also be true.  An appropriately tailored sentence should take into consideration a bank officer's refusal to alter his bank's standard terms and the steps he took to protect the bank from financial harm.

 In this case, the evidence showed that the loan terms – an interest rate floor of 7.25%, collateral substantially in excess of the loan amount, and 2-3% in points to be paid up front – were the Bank's standard loan terms for a portfolio loan.  As shown in Dr. Carron's analysis, this was a substantially *higher* rate than a borrower with the same credit score would ordinarily pay for a loan with the same characteristics.  The increased interest rate, along with the up-front points, provided TFSB with added compensation for any risk associated with the borrower and the opportunity to earn enhanced profits.

Ultimately, the government chose not to contend at trial that the terms of the loans were unfavorable to the Bank, arguing instead that "this case is not about whether these were

good or bad loans," and that Mr. Calk should be convicted even if "these were the best loans in the world." (Tr. 1587:23-24; Tr. 1519:1-2). Under the government's "dual intent" theory, Mr. Calk could be convicted even if he would have favored the loans absent the purported bribes. In pursuing this theory, the government implicitly acknowledged that the loans to Manafort were a far cry from the kind of "buddy" or "sweetheart" loans that typically form the basis of a criminal case alleging bribes for loans.

4.       Impact on the Bank

Finally, a just sentence must account for the impact, or lack of impact, Mr. Calk's conduct had on the Bank. *See, e.g.*, *United States v. Arnone*, 973 F. Supp. 206, 211 (D. Mass. 1997) (declining to consider the loan at issue in a bank bribery case an "improper benefit" where, *inter alia*, it "clearly represented a real benefit for the bank"). The simple truth here is the Manafort loans did not put TFSB at risk and that, when all is said and done, the Manafort loans will have been profitable for the Bank.

First, as set forth in Mr. Semenak's declaration, at the time that the Manafort loans were issued, TFSB's balance sheet reflected a very substantial excess of regulatory capital. This meant that the money that funded the Manafort loans was not required to be held at the Bank and could have been sent to the holding company as a dividend. Even if Manafort had defaulted and the Bank had not recovered funds from any of the collateral, the write-off would not have affected the Bank's ability to operate nor impacted the assets of any of the Bank's depositors. What was really at risk was the profits of the Bank, most of which would have flowed to Mr. Calk himself. Thus, the person who stood to lose the most from the Manafort loans was Mr. Calk. We have not identified any other bank bribery case that the government has brought against a bank owner, where the primary victim of the offense, in terms of risk of financial loss, is the defendant himself.

39

Second, the facts set forth in both Dr. Carron's declaration and Mr. Semenak's declaration demonstrate that the collateral that Mr. Calk insisted on, including $25 million in real estate and cash against $16 million in loans, was sufficient to protect the Bank and its beneficial owners from loss in the event of default.  Dr. Carron's analysis shows that, from an *ex ante* perspective, the loans had more than sufficient collateral to protect TFSB from losses under even the extreme conditions seen during the Great Recession.  Mr. Semenak's declaration confirms that – even after an unanticipated and protracted battle with the government during which the properties sat vacant, and even after deducting transaction costs – the properties retained more than sufficient value to pay back the principal *plus* $3.6 million.  Given that the cost of funds to the Bank was minimal (as reflected in Exhibits C2 and C3 to Dr. Carron's Declaration), nearly all of the surplus was profit for the Bank.

It is true that it has taken time for the Bank to recover its collateral, but another extraordinary aspect of this case is that the responsibility for the delay falls on the government. Notwithstanding the fact that TFSB was deemed a victim of Manafort's fraud and notwithstanding the sentencing judge's order after Manafort's trial that entitled TFSB to receive the balance due on the loans – nearly $16 million – as restitution, (*see* Corrected Restitution Order, *United States v. Manafort*, No. 18-Cr-83 (TSE) (E.D. Va. Mar. 12, 2019), ECF No. 325), the government tried to keep the collateral for itself.  The Bank had intervened and challenged the forfeiture in the District of Columbia, (*see* Petition, *In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18-MC-167 (ABJ) (D.D.C. Nov. 15, 2018), ECF No. 8), but the government responded with delay tactics that would have prevented TFSB from recovering its collateral while this case was pending.  However, in early 2021, the government was ultimately forced to abandon its claims after Manafort was pardoned and any theoretical basis for

denying the Bank its collateral evaporated.  (*See* Order, *In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18-MC-167 (ABJ) (D.D.C. Feb. 26, 2021), ECF No. 131; Order, *In re Petitions for Relief Concerning Consent Order of Forfeiture*, No. 18-MC-167 (ABJ) (D.D.C. Apr. 21, 2021), ECF No. 137).  But for the time and expense of litigating with the government over the forfeiture, the loans would be—even with Manafort's default—the most profitable loans in the history of the Bank.

> D.  <u>"General Deterrence" Does Not Require Incarceration</u>

Given the unusual circumstances of this case, there is no need to impose a sentence of incarceration in order to serve an interest in "general deterrence."  To our knowledge, there are no other bank owners making fully collateralized, high-interest-rate loans to further a desire to perform public service.  The fact that Mr. Calk was prosecuted criminally and will have a felony conviction that precludes any future involvement in the banking industry is more than sufficient to deter anyone who finds him or herself in a situation remotely comparable to the one Mr. Calk faced in 2016.  *Cf. United States v. Stewart*, 590 F.3d 93, 141 (2d. Cir. 2009) (agreeing that where conviction prevents defendant from pursuing his career, "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant" (internal quotation marks omitted)).  No one in the banking industry who has witnessed what has already happened to Mr. Calk could ever conclude that whatever "benefits" Mr. Calk received from Manafort were worth the personal, professional and financial costs.  A sentence of incarceration is therefore greater than necessary to provide "adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).

E.      Sentencing Alternatives to Incarceration

We respectfully ask the Court to consider, pursuant to 18 U.S.C. §3553(a)(3), the full range of sentencing options at its disposal that provide alternatives to a custodial sentence.[14] As part of an individualized sentence in this case, Mr. Calk can be required to complete as many hours of community service as the Court finds appropriate.  In particular, Mr. Calk has shown that he is able to make a significant difference in the lives of young soldiers and military families, having acted for many years as a mentor and as a highly engaged supporter of military charities and causes, including the USO and the SOWF.  If the Court deems it necessary, he can be placed on home confinement.  He will pay a significant fine.  And, regardless of the sentence imposed, he will be barred from the banking industry by virtue of his conviction.

## II.     The Correct Advisory Guidelines Range is 0 to 6 Months

For the reasons set forth above, regardless of the Guidelines range calculated by the Court, no prison term is warranted in this case.  In fact, however, the correctly calculated Guidelines range is 0 to 6 months' imprisonment, and a sentence of time served with supervised release would fall within that range.  The Probation Department, which calculated a range of 63 to 78 months' imprisonment, erred in (i) concluding that the value of the bribe and/or benefit to be conferred was more than $500,000 under U.S.S.G. § 2B4.1(b)(1); (ii) applying an obstruction of justice enhancement under § 3C1.1; and (iii) applying an abuse of trust enhancement under § 3B1.3.

---

[14]     Because the charge in Count 1 of the Indictment is a Class B felony, to achieve a non-custodial sentence with conditions of release, the Court could impose a sentence of "time served" in connection with Mr. Calk's arrest and then place him on supervised release, rather than sentence Mr. Calk to probation.  *See United States v. Khan*, No. 08-Cr-67, 2008 WL 2079954 (E.D.N.Y. May 14, 2008).  The Court could also impose a sentence of home confinement.  *See United States v. Lahey*, 186 F.3d 272 (2d Cir. 1999) (remanding so that district court could consider home confinement as a sentence for a Class B felony).

A.      Valuation of the Bribe/Benefit Conferred

Sentencing Guideline § 2B4.1(b)(1) provides that the base offense level for bank

bribery should be increased by the number of levels corresponding to "the greater of the value of

the bribe or the improper benefit to be conferred."  The Application Note defines the latter as

"the value of the action to be taken or effected in return for the bribe."  Over our objection, the

Probation Department concluded that a 14-level enhancement was warranted because the value

of the benefit conferred could be reasonably estimated at $553,731.36.  As a basis for this

conclusion, Probation calculated the differential in the interest that would be paid on the

Manafort loans against the interest that would be paid on a hypothetical loan from a

"hard-money" lender, Genesis Capital, at 9%.  This is a flawed methodology that does not yield

a reasonable estimate of the value of the benefit conferred in this case.  *See Arnone*, 973 F. Supp.

at 209 ("The burden is on the government to prove the [value of an improper benefit] with

sufficient certainty.").

As set forth in our post-trial motion under Rule 29, filed on August 20, 2021, the

defense submits that the alleged bribe that Mr. Calk received – political assistance from

Manafort – has no non-speculative monetary value.  (*See* Dkt. No. 284).  To the extent the Court

accepts the valuation argument put forward by the government at trial, which was based on the

costs incurred by Mr. Calk to interview for a government position, the value would be

approximately $1,800, which would not result in any upward adjustment pursuant to U.S.S.G. §

2B4.1(b)(1).

The alternative methodology set forth in the PSR, which references the purported

value of the benefit received by Manafort, relies on a set of assumptions that are not supported

by the facts of this case.  First, the "benefit" that Manafort received from the TFSB loans cannot

be attributed solely to Mr. Calk's receipt of a "bribe."  There were numerous other intervening

and contributing forces at play.  Most importantly, as his guilty plea demonstrated, Manafort was

committing fraud on TFSB by lying about his financial condition, including by forging a

document to falsely show millions of dollars of income in 2016.  In addition, Raico was aiding

and abetting that fraud by concealing documents, manipulating appraisals and doctoring emails.

On top of that, the Bank's underwriting process was plagued by errors (totally unknown to Mr.

Calk), particularly with respect to various different analyses of Manafort's income that reached

the incorrect conclusion that Manafort was qualified for the loans he received.  Finally, TFSB's

portfolio loan program was specifically designed to make very large unconventional loans to

potentially riskier borrowers provided that the loans were secured by collateral whose value far

exceeded the amount of the loan.  This strategy may or may not have been prudent, but it was not

the product of a bribe.  Given this confluence of circumstances, there is no reliable basis to

conclude that a substantial part, much less the entirety, of the benefit to Manafort from the loans

he received is attributable to the purported bribery in this case.

        In addition, comparing the interest rate offered by Genesis Capital on prior loans

to the rate approved by TFSB for different loans does not provide an accurate result and clearly

overstates the value of the benefit.  Comparing interest rates, which is discussed in the

Guidelines commentary, would make sense if the evidence showed that Manafort obtained a

lower interest rate from TFSB than he otherwise would have received *from TFSB* for the same

loans.  But that is not the case here.  The evidence was clear that TFSB had a standard interest

rate for portfolio loans, but used points and added collateral to respond to issues that arose during

the underwriting process.  Comparing the interest rate on TFSB's loans to Manafort to an interest

rate offered by Genesis Capital on different loans is a classic apples-to-oranges comparison.  An

accurate calculation of benefits and costs to Manafort would have to take into account numerous

other factors that differentiate the loans.  For example, TFSB required Manafort to post

significantly more collateral for its loans than a hard money lender would typically require,

including Manafort's Virginia property and the $630,000 in cash in the PITI account for the first

loan, and $2.5 million in cash for the second loan.  TFSB also charged 3% instead of 2% in

points on the first loan – an added $95,000 paid by Manafort – and recouped a further $60,000 in

fees incurred on the unclosed Nottingham loan.  This is, therefore, not a case in which the

payment of a bribe resulted in clearly more favorable economic terms for the borrower.

      A better indication of what Manafort might have received from another lender

comes not from Genesis Capital, but from Bank of the Internet, whose underwriting department

carefully reviewed and eventually approved the purchase of the Summerbreeze Loan on the same

terms offered by TFSB:  $9.5 million at 7.25% interest.  (Tr. 1167:21-1168:12; DX 183 & DX

183-A).  BofI did not ultimately purchase the Summerbreeze loan because the borrower was an

LLC and for other technical reasons identified by BofI's legal department after its underwriting

department issued an approval.  The government may argue that BofI's senior executives had not

given their approval to purchase the loan, which is true.  But the approval by BofI's underwriting

department of the purchase of the full $9.5 million loan on the same terms offered by TFSB

strongly undermines the argument that no lender would have offered Manafort substantially the

same interest rate as TFSB.[15]

      We respectfully submit that the purported benefit that Manafort received *in*

*exchange for* the "bribes" either cannot be reliably measured, or, like the purported benefit to Mr.

---

[15]    In fact, a search of publicly filed mortgage records for New York State shows that earlier
in 2016 Manafort obtained an adjustable rate mortgage loan of $2.73 million from Citizens Bank
at the much lower initial interest rate of 2.5%.  (*See Recorded Mortgage*, NYC Dep't of Finance
Office of the City Registrar (Mar. 4, 2016) at 16, https://a836-acris.nyc.gov/DS/Document
Search/DocumentImageView?doc_id=2016032201175004).

Calk, had, at most, a non-monetary value.  What the evidence showed in this case was that Mr.

Calk was personally involved in the loans and helped move them forward, including by joining

with the other members of the loan committee in approving the terms.  The government

contended that this conduct was corrupt and we accept for purposes of sentencing that the jury

agreed.  But the exchange of non-monetary benefits does not result in an enhancement under the

Guidelines.

        B.       <u>Obstruction of Justice</u>

        Under U.S.S.G. § 3C1.1, a two-level enhancement applies where a defendant

"willfully obstructed or impeded, or attempted to obstruct or impede, the administration of

justice with respect to the investigation, prosecution, or sentencing of the instant offense of

conviction."  There is no factual or legal basis for this conclusion, and the Court should not

impose this enhancement.

        Here, the enhancement is based on statements allegedly made during two

meetings with OCC officials, in March 2017 and July 2018, respectively.  The evidence was

offered by the government under a theory that evasive or misleading statements to regulators

showed "consciousness of guilt."  Whatever the merits of this argument, it was not tied to any

evidence – of which there is none – that Mr. Calk actually obstructed, or even intended to

obstruct, the criminal investigation in this case.  Tellingly, the government did not include either

a false statement or an obstruction of justice count in its initial Indictment, or the Superseding

Indictment returned in March 2021.

        The inapplicability of the enhancement is clear based on the relevant Application

Notes to § 3C1.1.  Application Note 5(G) provides that false statements to law enforcement

officers that are not under oath do not trigger the enhancement unless Note 4(G) applies.  Note

4(G) provides that materially false statements, not under oath, to law enforcement do trigger the

enhancement if the statements "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  Accordingly, it seems clear that the Sentencing Commission did not intend the enhancement to apply to false statements, not under oath, to civil regulators unless, at the very least, such statements met the higher standard of 4(G).  It would make no sense to hold that statements made to civil regulators that are later relayed to law enforcement officers could trigger the enhancement where the same statements, if made directly to the FBI, would not.

The government's attempt to justify the enhancement to the Probation Department simply misreads the cases that it cites in support of its nonsensical position.  In *United States v. Newton*, 207 F. App'x 22, 25 (2d Cir. 2006), the defendant attempted to persuade a cooperating informant to lie to the FBI, which the defendant knew was conducting an investigation into the defendant's conduct.  The defense made the creative argument at sentencing that the standard set forth in Note 4(G) should apply because the informant was acting at the direction of law enforcement at the time the defendant engaged in this obviously obstructive witness tampering, which is covered by Note 4(A).  In other words, the case is about witness tampering, not unsworn statements to regulators.  This may not be clear form the Second Circuit's unpublished opinion, but it is plain from the government's brief on appeal.  (*See* Brief for the United States of America, *United States v. Newton*, No. 06-Cr-0714, 2006 WL 4847074 (2d Cir. June 19, 2006)).  And the case cited by the court in *Newton* in support of its holding rejecting the defense's argument should have provided the government here with an indication that it was misreading the case.  *See Newton*, 207 F. App'x at 25 (citing *United States v. Phillips*, 367 F.3d 846, 859 (9th Cir. 2004) ("[T]he significant obstruction and materiality requirements of application note 4, subsection (g), do not apply to a defendant's attempt to influence a witness.")).

The other case cited by the government is similarly not on point.  The government contended to Probation that in *United States v. August*, 984 F.2d 705 (6th Cir. 1992), the court upheld the enhancement under § 3C1.1 in part based on "false statements to [a] licensing body." (PSR at 45).  But that description obfuscates the fact the statements in that case were made by the defendant *while testifying at an administrative hearing*.  *August*, 984 F.2d at 709.  There is no doubt that perjury during a civil proceeding warrants an enhancement, as is clearly set forth in Note 4(B).  Nothing in *August* can be read to imply, much less hold, that unsworn statements to regulators trigger the enhancement, and certainly not statements that would not qualify as obstruction under Note 4(G) if made to law enforcement.

Mr. Calk's statements did not actually thwart the government's criminal investigation.  Certainly, there is no basis to argue that they did so "significantly."  With regard to the March 2017 statements, the government has failed even to establish that Mr. Calk lied about his knowledge of Manafort's foreclosures, given that Gongaware could not even recall which of Manafort's properties he asked Mr. Calk about and not all of Manafort's properties were in foreclosure.  Clearly, Mr. Calk's alleged statements to Gongaware had absolutely no actual effect on the criminal investigation.  Gongaware was not interviewed by the government about the meeting until nearly a year later, in January 2018, which was more than six months after the government had obtained the Bank's files related to Manafort (including the emails it relied on at trial to argue that Mr. Calk had knowledge of the foreclosures), executed a search warrant, and interviewed Bank witnesses.

Similarly, the government has not proven that Mr. Calk significantly obstructed or impeded the government's investigation by virtue of his alleged statements to the OCC in July 2018.  First, the guideline is clear that a "defendant's denial of guilt (other than a denial of guilt

under oath that constitutes perjury)" is not a basis for the obstruction enhancement, *see* App.

Note 2, and Mr. Calk's alleged denial of media reports concerning his desire for a government

position was essentially a denial of guilt. Second, the OCC did not advise the U.S. Attorney's

Office of the statements until nine months later, when Paulson and Lemanski were interviewed

and affirmatively asked about the meeting. The government cannot plausibly claim that the

statements in any way impeded its investigation, as it did not learn of the statements until one

month before Mr. Calk was indicted, long after it had obtained the bulk of the documents it has

used to prosecute the case and interviewed relevant witnesses.

      C.    <u>Abuse of Trust</u>

      Finally, Mr. Calk respectfully objects to the application of the two-level

enhancement under U.S.S.G. § 3B1.3 for "abuse of trust." The enhancement does not

necessarily apply to all cases of bank bribery or to all cases involving conduct by high-ranking

executives. On the contrary, as Application Note 1 states, in order "[f]or this adjustment to

apply, the position of public or private trust must have contributed in some significant way to

facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the

offense or the defendant's responsibility for the offense more difficult)."

      In this case, the government's "dual intent" theory was that Mr. Calk could be

convicted even if the jury found that "these were the best loans in the world" and that Mr. Calk

was motivated by trying to make money for the Bank. (Tr. 1518:22-1519:5). There was no

evidence that Mr. Calk failed to obtain loan committee approval for the loans, or directed the

underwriting department not to do its job properly, or hid information about Manafort's financial

condition, or knew that Manafort was committing fraud. Accordingly, this is not a case in which

a senior executive "abused" his position to facilitate or conceal an offense for personal gain. Mr.

Calk's offense conduct is, therefore, fully and adequately addressed by the offense conduct

guideline in U.S.S.G. § 2B4.1 and an additional enhancement for abuse of trust under these circumstances is unwarranted.

      D.     <u>The Adjusted Offense Level</u>

      The cumulative effect of the three enhancements produces an adjusted offense level of 26, which is unreasonably high given the facts of this case.  Mr. Calk gained nothing of monetary value for himself, the Bank will profit from the loans, and he did nothing that was intended to impede or actually impeded the criminal investigation of his conduct.  Yet, he is being treated, under Probation's view of the Guidelines, like a corrupt loan officer who took half a million dollars in cash payoffs to mislead underwriters into approving a sweetheart deal, caused the Bank to suffer real losses, and then destroyed evidence.  Under the facts here, the enhancements for obstruction and abuse of trust, if they were to be applied, are utterly divorced from the kind of culpability-enhancing conduct for which they were obviously intended.  And, most importantly, the substantial enhancement – 14 levels – drawn from the loss table in U.S.S.G. § 2B1.1 suffers from patent arbitrariness and irrationality that has led this "loss" table to be widely criticized in fraud cases.  *See, e.g.*, *United States v. Johnson,* No. 16-Cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.").  Thus, even if the PSR's Guidelines calculation is correct, this is a case in which the Court should "rely more heavily on the § 3553 factors" in determining a reasonable sentence.

*See Johnson*, 2018 WL 1997975, at \*4.  As set forth above, those factors weigh strongly in favor of a non-custodial sentence for Mr. Calk.

## CONCLUSION

For the foregoing reasons, Mr. Calk respectfully requests that the Court fashion a sentence that does not include incarceration.  A non-custodial sentence is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).


Dated:   New York, New York                     Respectfully submitted,
         December 6, 2021

                                                KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                                By:  /s/ Paul H. Schoeman
                                                     Paul H. Schoeman
                                                     Darren A. LaVerne
                                                     1177 Avenue of the Americas
                                                     New York, NY 10036
                                                     Telephone: 212.715.9100

                                                LOEB & LOEB LLP

                                                     Jeremy Margolis
                                                     321 N. Clark Street
                                                     Chicago, IL 60654
                                                     Telephone: 312.464.3100

                                                *Attorneys for Defendant Stephen M. Calk*