UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                     :

UNITED STATES OF AMERICA          :
                                     :

       -v.-                     :        S1 19 Cr. 366 (LGS)
                                     :

STEPHEN M. CALK,               :
                                     :

                        Defendant.     :
                                     :
-------------------------------------------------------------x

## SENTENCING MEMORANDUM OF THE
## UNITED STATES OF AMERICA

DAMIAN WILLIAMS
United States Attorney
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Hagan C. Scotten
Alexandra N. Rothman
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

    1.    The California Refinance and the Economic Advisory Council ................ 1

    2.    Calk's Awareness of Manafort's Poor Creditworthiness............................ 3

    3.    The Summerbreeze Loan and Calk's Candidacy for Trump Administration Positions ...................................................................................................... 6

    4.    The Union Street Loan and Calk's Interview with the Presidential Transition Team ...................................................................................... 8

    5.    Calk's False and Misleading Statements to the OCC .............................. 12

    6.    The Aftermath of the Manafort Loans ..................................................... 14

ARGUMENT ................................................................................................................ 15

I.     THE SENTENCING GUIDELINES RANGE IS 51-63 MONTHS ........................... 15

    A.    The Value of the Improper Benefit Conferred Was More than $550,000 ............ 15

        1.    Applicable Law ............................................................................... 16

        2.    Discussion ....................................................................................... 16

    B.    The Defendant Abused His Position of Trust ....................................................... 21

    C.    The Defendant's Obstruction of Justice Should Be Considered under 18 U.S.C. § 3553(a) ................................................................................ 24

II.    A GUIDELINES SENTENCE IS APPROPRIATE .................................................. 28

    A.    Applicable Law .................................................................................................... 28

    B.    A Guidelines Sentence Is Appropriate to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Provide Just Punishment for the Defendant's Crimes ............................................................. 28

CONCLUSION ............................................................................................................. 43

# **TABLE OF AUTHORITIES**

## **Cases**

*Gall* v. *United States*, 552 U.S. 38, 49 (2007) .................................................... 28

*Kaley v. United States*, 571 U.S. 320 (2014) ........................................................ 36

*United States* v. *Ali*, 508 F.3d 136 (3d Cir. 2007) ............................................... 38

*United States v. Binday*, 12 Cr. 152 (CM) .......................................................... 33

*United States* v. *Booker*, 543 U.S. 220 (2005) ..................................................... 27

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) .................................... 38, 40

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005) ......................................... 27

*United States v. Denny*, 939 F.2d 1449 (10th Cir. 1991) ...................................... 34

*United States* v. *Fagans*, 406 F.3d 138, 142 (2d Cir. 2005) ................................ 27

*United States v. Fishman*, 631 F. Supp. 2d 399 (S.D.N.Y. 2009) ......................... 39

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................... 32, 33, 34

*United States v. Irabor*, 894 F.2d 554 (2d Cir. 1990) .......................................... 26

*United States v. Jackson*, 862 F.3d 365 (3d Cir. 2017) ........................................ 40

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) .......................................... 21

*United States v. McClatchey,* 316 F.3d 1122 (10th Cir. 2003) .............................. 39

*United States v. McKay*, 183 F.3d 89 (2d Cir. 1999) ............................................ 26

*United States v. Morken,*133 F.3d 628 (8th Cir. 1998) ..................................... 39, 40

*United States v. Newton*, 207 F. App'x 22 (2d Cir. 2006) ..................................... 25

*United States v. Purdy*, 144 F.3d 241 (2d Cir. 1998)........................................ 16, 19

*United States v. Repking*, 467 F.3d 1091 (7th Cir. 2006) .............................. 38, 39, 40

*United States v. Scruggs*, 916 F. Supp. 2d 670  (N.D. Miss. 2012) ....................... 32

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...................................... 32, 33

*United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010)............................... 38, 39, 40

## **Statutes**

18 U.S.C. § 215........................................................................................... 1

18 U.S.C. § 3553(a) ............................................................................... passim

18 U.S.C. § 3553(a)(1)................................................................................ 28

18 U.S.C. § 3553(a)(2).................................................................... 28, 31, 33

18 U.S.C. § 3553(a)(2)(A) ................................................................................ 28, 33

18 U.S.C. § 371 ............................................................................................... 1

## **Other Authorities**

U.S.S.G. § 2B1.1(b)(1)(G) ............................................................................... 19

U.S.S.G. § 2B1.1(b)(1)(H) ......................................................................... 15, 19

U.S.S.G. § 2B4.1 ...................................................................................... 15, 37

U.S.S.G. § 2B4.1 cmt. background ............................................................ 16, 19

U.S.S.G. § 2B4.1 cmt. n.2 ............................................................................. 16

U.S.S.G. § 2B4.1(b)(1)(B) ............................................................................. 16

U.S.S.G. § 3C1.1 cmt. n.2 ............................................................................. 26

U.S.S.G. § 3C1.1 cmt. n.3 ................................................................... 24, 25, 26

U.S.S.G. § 3C1.1 cmt. n.4(G), ....................................................................... 25

U.S.S.G. § 3C1.1 cmt. n.4(H) ........................................................................ 27

U.S.S.G. § 3C1.1 cmt. n.5 ............................................................................. 25

U.S.S.G. § 3C1.1 cmt. n.5(B) .................................................................. 25, 26

U.S.S.G. § 3C1.1 cmt. n.5(C) ........................................................................ 27

U.S.S.G. § 5E1.2 ........................................................................................... 27

U.S.S.G. § 5H1.11 ........................................................................................ 38

U.S.S.G. Ch. 5 Pt A (Sentencing Table) ....................................................... 27

## **Regulations**

12 C.F.R. § 225.4(a) ..................................................................................... 11

**INTRODUCTION**

The Government respectfully submits this memorandum in advance of the sentencing of defendant Stephen M. Calk and in response to the arguments raised by the defendant in his sentencing memorandum dated December 6, 2021.  In July 2021, after a three-week trial before this Court, the defendant was convicted by a jury of one count each of financial institution bribery and conspiracy to commit financial institution bribery, in violation of 18 U.S.C. §§ 215 and 371.  For the reasons set forth below, the Government respectfully submits that the recommended sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") is 51 to 63 months' imprisonment—a slight reduction from the Guidelines range calculated by the Probation Department in the Presentence Investigation Report—and that a sentence within that Guidelines range is sufficient but no greater than necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

**BACKGROUND**

The evidence at trial proved that the defendant corruptly abused his position as Chairman and CEO of a federally insured bank by causing the bank to make $16 million of unsound loans to Paul J. Manafort, Jr. in exchange for Manafort helping the defendant's attempt to obtain political power.  The loans that the defendant forced through for Manafort were flawed, as the defendant well knew, and the assistance that Manafort provided the defendant increased his status and public profile considerably and yielded an interview with the Presidential Transition Team for positions at the highest levels of the Department of Defense.

1.    *The California Refinance and the Economic Advisory Council*

In July 2016, Manafort and his son-in-law Jeffrey Yohai approached the Federal Savings Bank (the "Bank") seeking to refinance a loan from the hard-money lender Genesis Capital on a

construction project in California.  (GX 107).  Manafort was at the time the chairman of then-candidate Donald J. Trump's 2016 presidential campaign, and his loan proposal received unusual consideration from the start—it was presented in a July 27, 2016 meeting in New York that the defendant attended by videoconference, a deviation from his ordinary practice of not meeting with borrowers on individual loans.  (GX 105).[1]  The defendant also made an unusual request at the end of the meeting, offering—by videoconference at the end of the meeting at which everyone else attended in person—to assist in the Trump presidential campaign.  (GX 113; Tr. 1020 (Raico)).

The day after this meeting, the defendant caused the Bank to conditionally approve the California refinance proposal.  (GX 108).  Although this conditional approval was a preliminary step, its speed was so unusual that the loan officer Dennis Raico remarked on it in an email at the time.  (GX 108 ("Please let me know when I can anticipate a Term Sheet, as I'm sure Paul and Jeff will be highly impressed to receive within 24 hours of our meeting.")).  Within a week, Manafort offered to the defendant a position on the Trump campaign's national economic advisory council, a prestigious body of prominent businessmen that included, among others, the future Secretary of the Treasury and the future Secretary of Commerce.[2]

The economic advisory council position was intended as a bribe to the defendant.

---

[1] The Bank had previously rejected an earlier loan proposal that was first made in April 2016, for a loan that would have greatly exceeded the Bank's legal lending limit.  (GX 102; Tr. 714 (Brennan)).  At the time, Manafort had been affiliated with the Trump campaign but—unlike in July 2016—was not yet in charge of the entire campaign.  (Tr. 291 (Scaramucci)).

[2] The council was recognized as prestigious by its members.  Wilbur Ross, a wealthy businessman who would go on to be Secretary of Commerce, complained immediately when he was erroneously left off the initial press release announcing the council's members.  (*See* GX 654 at 1).

Shortly afterward, Manafort emailed his son-in-law and putative co-borrower Yohai, dryly noting how often the defendant was making television appearances for the campaign (*see* GX 655 at 1 ("Steve Calk is now our busist surrogate on TV.")), prompting Yohai to reply "That's hilarious and brilliant." Yohai then proceeded to discuss plans to pay back Genesis—making clear the intended role of the council position in inducing financing from the defendant. (*See* GX 655 at 1).[3]

The defendant, for his part, was well aware of the improper reason for the appointment, as he communicated to a reporter, through his public relations representative, a misleading if not outright false explanation for his installation on the council. Instead of mentioning Manafort in any way, the defendant claimed that he had been placed on the council because he had personally met Trump at multiple charity events and Trump had appreciated his status as a single father. (GX 121 at 1). Whether or not the defendant had ever met Trump prior to receiving this appointment, he plainly could not have believed that Trump's views on his family circumstances were what caused his appointment. The defendant knew that his appointment was due to Manafort, and he knew at that early stage that this was a fact worth lying or misleading to conceal.

    2.    *Calk's Awareness of Manafort's Poor Creditworthiness*

Throughout the course of underwriting the proposed California refinance, the

---

[3] The defendant made clear how much he valued the prominence the campaign position gave to him. He objected vehemently when he was not permitted to appear on television in the "spin room" following the third presidential debate. (*See* GX 955). And after the election he used the fact of his appointment as a credential to try to parlay into a high-ranking Defense Department position. (*See* DX 249, 249-A (Calk sending screenshot of TV news reporting on his appointment to Scaramucci in support of his application for government jobs)).

underwriters uncovered troubling facts regarding Manafort's creditworthiness as a borrower, and the defendant was aware of many of them—including at least one that he did not share with the underwriters.

As of mid-August 2016, or weeks after the initial meeting, the defendant was aware that Manafort resigned from the Trump campaign in disgrace due to reported investigations of Manafort's consulting work in Ukraine.  (Tr. 292 (Scaramucci)).  This development, which was widely reported and also reflected in campaign talking points that were emailed directly to the defendant (*see* GXs 360-A to 360-D), was not only concerning for Manafort's future income stream as a consultant—which would be impacted by negative developments to his public reputation—but prefigured the risk, which indeed eventually came to pass, that the investigations would lead to criminal charges against Manafort and his default on the loans.  *See* Background Section 6, *infra*.[4]  Indeed, it also prefigured the risk that Manafort's assets could be seized and forfeited in the event of any charges, a course of events that prosecutors in the District of Columbia pursued until their efforts were terminated by a presidential pardon.  *See id.*

The defendant was aware of other defects in Manafort's creditworthiness.  He was aware of issues with the developer Manafort proposed to use for the construction (GX 184), aware that the properties were repeatedly appraising for lower than Manafort and Yohai had forecast (GX

---

[4] The relevance of this fact to the eventual underwriting decision was apparent at the time.  The credit approval memoranda recognized exactly this risk.  (GX 2 at 3; GX 4 at 2).  And an apparent friend of the underwriter Thomas Horn emailed Horn immediately after the news broke, with the underwriter stating it was "surreal" to be proceeding with the loan in the light of this news, but that the Bank was "charging ahead."  (GX 129 (not admitted)).  Although this document was excluded from trial as hearsay (Dkt. 240 at 44), it can be considered by the Court at sentencing as bearing on the defendant's arguments tending to suggest that the loans were apparently good, or that the Government's actions to forfeit Manafort's properties were unforeseeable.

163), and eventually became aware, at least prior to closing the Union Street Loan, that Manafort was deep in default to Genesis (GX 501-1).

In October 2016, the defendant became aware of a particularly unusual issue.  In order to address the low appraisals on his collateral, Manafort had agreed to offer his Bridgehampton house as additional collateral, but needed to refinance an existing loan on that property.  (GX 156).  In a meeting with the defendant in September, Manafort had understated the amount of the existing loan by $1 million, a striking misstatement given that he had just obtained the loan in question the month before.  (GX 172).  After Raico refused to increase the loan amount, Manafort went straight to the defendant asking for a $1 million increase in the loan amount.  In addition to requesting special treatment from the defendant (*see* GX 182 at 2 ("I look to your cleverness on how to manage the underwriting.")), Manafort also admitted that he was unable to provide the missing $1 milion (*see* GX 182 at 2 ("At this time, I am not able to do so.")).  The defendant was thus aware that Manafort lacked $1 million in liquid assets—but the defendant did not communicate this fact to the underwriters, who proceeded on the mistaken premise that Manafort had larger amounts of liquid assets available.  (*See* GX 2 at 9, GX 4 at 8).

Throughout this process, the personnel working on the California refinance were aware of additional flaws in the loan, such as a multimillion-dollar discrepancy between Manafort's stated income and his tax returns, but believed that approval of the loan was a foregone conclusion because the defendant was determined to extend the loan no matter what.  Indeed, even before some of the most derogatory information surfaced, the loan officer's assistant Anna Ivakhnik had concluded that "The bank making this loan would result in Steve Calk receiving some kind of an appointment or advantage with the Trump Administration," and that "there was

no way that Steve Calk would not make this loan, because that would mean he would not get a

position with the Trump Administration."  (Tr. 189 (Ivakhnik)).

        3.     *The Summerbreeze Loan and Calk's Candidacy for Trump Administration Positions*

In mid-October 2016, at the eve of closing, Manafort unexpectedly abandoned the

California refinance, replacing it with a larger proposal that was even worse for the Bank—one

that the Bank initially balked at but that the defendant, shortly after Trump's election, reversed

course and caused the Bank to accept.  This loan, which was made out to the Manafort-controlled

Summerbreeze LLC, was for $9.5 million (the "Summerbreeze Loan").

On October 19, 2016, Manafort requested substituting the Summerbreeze Loan for the

California refinance, to the surprise of Bank employees.  (*See* GX 201 (Brennan: "WTF  I am

recalling the wires")).  The Summerbreeze Loan was worse for the Bank than the California

refinance.  (Tr. 760 (Brennan)).  It was larger than the California refinance,[5] it had no co-

borrower, it had less collateral, and instead of anticipating repayment from the sale of the

California project, the loan was "totally dependent on" Manafort's income—the same income

that was difficult to verify and that the defendant knew would necessarily be affected by

Manafort's negative reputation.  (GX 202; Tr. 760-61 (Brennan)).

The Summerbreeze Loan was so objectionable to the Bank that Ubarri, the Bank's

president, unilaterally rejected it, first informing Raico and then telling the defendant. (*See* GX

203).  Immediately thereafter, Raico—with the defendant's consent—attempted to shop the loan

---

[5] The then-pending California refinance proposal itself was for millions of dollars more than the original July proposal, as a result of modifications made to address the low appraisals on Manafort's property and Manafort's extensive prior indebtedness.

to BofI Federal Bank.  (*See* GX 206, 209).  Had BofI agreed to extend the loan, Manafort would

have gotten his funding and the Bank (and Raico) would have obtained some payments without

bearing any of Manafort's credit risk—a win-win proposition for Manafort and the Bank (though

not, due to the flaws in the loan, for BofI).  BofI considered the loan but, as of election night

2016, had not agreed to extend it.

Trump's election on November 8, 2016 prompted the defendant to change the Bank's

position, starting on election night.  That very night, in a series of messages, the defendant all but

committed the Bank to extend the loan, despite the fact that approval from BofI was not in hand.

The defendant wrote:

> "Paul, I hope you're having a great night.  We should have your
> approval all wrapped up by tomorrow I am being told.  Enjoy the
> rest of the evening and I'll speak to you then.
>
> Paul, I've got press all day tomorrow.  When can we speak to
> schedule a closing?  Do you need me in New York?  I'm ready to
> support in any way."

(GX 1152).  The defendant's assurance about wrapping up the loan approval the next day was

already beyond what BofI had offered, and thus itself bespoke the defendant's willingness to

offer the loan, but his offer to "schedule a closing" was a far greater commitment than that.  The

defendant's willingness to schedule a closing was telling evidence that the defendant

(unilaterally, prior to action by the credit committee), the very night of the election, made the

determination to extend the Summerbreeze Loan whether or not BofI would do so.  The fact that

the defendant was willing to make this pronouncement despite Ubarri's previous rejection of the

loan just weeks before (GX 203), shows not just the defendant's corrupt intent, but his awareness

that the other credit committee members would not pose an obstacle to his decision to extend the

loans.

7

In the days following election night, the defendant caused the Bank to approve the Summerbreeze Loan—resulting in sending a term sheet two days after the election and ultimately closing the loan the following week—and also sought from Manafort assistance in applying to jobs at the highest levels of the federal government.  Perhaps the most telling document was his December 14, 2016 ranked "wish list" of senior positions and ambassadorships, listing Secretary of the Treasury first and Secretary of Defense in an astonishing fourth place.  (GX 244).[6]  Similarly, the defendant asked Raico to ask Manafort if the defendant was in consideration for Treasury Secretary—both an extraordinary request to route through Manafort's loan officer and an indication of the type of assistance he felt entitled to from Manafort.  (GX 51-2).  But even the slightly lower ranking positions the defendant pursued were still highly placed and notably beyond his qualifications in ways that were surely obvious to him.  The very day after the election, the defendant sought to perform background research on the Secretary of the Army—the first position Manafort ended up promoting the defendant for—by asking his public relations assistant to gather the most basic background details on the role, including a link to the Wikipedia page for the position.  (GX 228).

4.    *The Union Street Loan and Calk's Interview with the Presidential Transition Team*

After receiving $9.5 million from the Summerbreeze Loan, Manafort needed additional financing to avoid the foreclosure of his Brooklyn townhouse by Genesis Capital.  The defendant worked to give Manafort that financing while at the very same time seeking Manafort's aid in his

---

[6] The extravagance of this list simply cannot be fully explained by the advice of his friend General Banks to "think big."  (Def. Mem. 22).  Whatever General Banks did or did not advise the defendant, the fact that this list was what the defendant came up with when he thought big says volumes about the assistance he felt entitled to from Manafort.

candidacy for senior Defense Department positions.

In November and December of 2016, the defendant received increasingly urgent requests for financing from Manafort—typically coming directly from Manafort to the defendant by email or phone—referencing Manafort's defaults to Genesis and desperate need for cash.  (*See, e.g.*, GXs 279, 281, 295).  The defendant, meanwhile, attempted to navigate the obstacle posed by the Bank's legal lending limit, which would bar the Bank from extending the requested $6.5 million while the $9.5 million exposure to Manafort was still on its books.  Indeed, the combined $16 million in exposure to Manafort would have been the largest set of loans in the Bank's history to that date.  Since BofI continued to refuse to purchase the loan, the situation approached an impasse in late December.

While the defendant was working to attempt to extend the financing, Manafort—at the defendant's urging—was promoting the defendant at the highest levels of the Presidential Transition Team.  In addition to seeking the assistance of Manafort, the defendant also sought recommendations from several other persons with connections to the military, but the evidence showed that Manafort's assistance was the first and the most influential.  The defendant's requests for recommendations to Manafort preceded his requests to his other recommenders.  (*Compare* GX 244 (Manafort, Nov. 14, 2016) *with* DX-225 (Smith, Nov. 26, 2016) *and* DX-227 (Dailey, Nov. 27, 2016) *and* DX-231 (Gallagher, Nov. 26, 2016) *and* DX-232 (Bannon, Dec. 19, 2016) *and* DX-234 (Silverman, Jan. 9, 2017) *and* DX-239 (Banks, Nov. 15, 2016) *and* DX-241 (Rigby, Nov. 27, 2016)).  It also appears Manafort was the one who suggested to the defendant that he seek some support from individuals connected to the military, which he did in large part by soliciting introductions to high-ranking individuals to whom he had no previous connection.

9

(*See* GX 269 (Calk to Gilmore, Nov. 27, 2016, writing "I am buttoned up on the political side, however on the advice from those folks, they would like me to meet the proposed SECDEF (Mattis) and a few others in advance," asking for introductions)).

By contrast to the other recommenders, Manafort caused significant progress on the defendant's candidacy for jobs at the highest levels of the Defense Department.  On November 30, 2016, Manafort recommended the defendant for Secretary of the Army to Jared Kushner, who was at the highest levels of the transition team.  Kushner passed Manafort's recommendation along without himself additionally advocating for the defendant, but the recommendation itself was known to transition team staff to be extremely influential since it came from Manafort.  (Tr. 1236 (Moorhead) ("Manafort was a powerful person within the organization, and we were told that if a request came from Manafort that we had to honor it.")).

Manafort made more extensive efforts to promote the defendant to Anthony Scaramucci, a senior member of the Presidential Transition Team.  Scaramucci served on the "Tiger Team" responsible for selecting candidates for sub-Cabinet level positions such as the defendant was by that point pursuing.  Manafort called Scaramucci and asked him to recommend the defendant for Secretary of the Army.  Although Scaramucci was supporting another candidate for that position—a candidate who was in fact announced as Secretary of the Army-designate—he agreed to attempt to get the defendant an interview for Under Secretary of the Army.  (Tr. 287, 306-07 (Scaramucci)).  Throughout the second half of December, Manafort repeatedly reached out to Scaramucci by text message (in each case preceded by a telephone call with the defendant that day) seeking to advance the defendant's nomination.  (GXs 611, 2103)).

Manafort's advocacy to Scaramucci ultimately bore fruit for the defendant's candidacy,

10

and thereby for Manafort's loans.  On December 21, 2016, BofI had effectively refused to buy the Summerbreeze Loan, leaving the Bank faced with the need to take unusual steps to extend the Union Street Loan.  Though the Bank was working to consider this proposal, the defendant was noticeably hesitant that day, angrily informing Manafort's real estate lawyer that the Bank was "in no way scheduling a closing until this loan is fully structured, underwritten and approved."  (GX 295).  But that evening, Scaramucci responded to Manafort's texts following up on progress on the defendant, writing "Would he take under. Secretary of the Army?  Are we double sure" and then "If so I think we can get it done."  (GX 611 at 3).  Within three minutes, Manafort and the defendant were on the phone.  (*Id.*).  After an eleven minute call with the defendant, Manafort informed Scaramucci "yes he will def take it."  (*Id.*).  That call also cemented the defendant's willingness to extend the Union Street Loan; the next day the defendant personally sent Manafort a term sheet that he described as having been discussed on that very same call, along with an offer to close the next week.  (GX 299).

 The Union Street Loan closed in January, during the same time period that Scaramucci, at Manafort's request, arranged for the defendant to be interviewed at Trump Tower for Under Secretary of the Army.  In order to close another loan while keeping the first on the Bank's books, the defendant used an unusual maneuver that the Bank had never performed before— selling the bulk of the Union Street Loan to the Bank's holding company National Bancorp Holdings, Inc. (the "Holding Company").[7]  The defendant sought Manafort's advice prior to the interview (GX 2103 lines 44-47), and referred to Manafort by name in a thank-you email to one

---

[7] The Bank had previously sold portions of loans to the defendant and his younger brother personally, but not to the Holding Company, which—unlike the defendant—has a specific regulatory mandate to be a source of financial strength to the Bank.  12 C.F.R. § 225.4(a).

of his interviewers afterwards (GX 330).  The Union Street Loan funded a week later,

terminating the foreclosure action on Manafort's townhouse.

          5.      *Calk's False and Misleading Statements to the OCC*

On March 29, 2017, regulators for the Office of the Comptroller of the Currency

("OCC") read news reports remarking on the size of the Bank's loans to Manafort and

speculating that they may have violated the Bank's legal lending limit, as well as noting the

pattern of foreclosures on Manafort's properties.  The OCC convened an emergency same-day

on-site meeting to address this reporting.[8]  The defendant attended the meeting, and began by

accusing the OCC examiners of political bias for even investigating the issue.[9]  When the

examiners were not deterred, the defendant explained the use of the Holding Company to avoid

violating the legal lending limit.[10]   When asked about his awareness of the foreclosures on

Manafort's properties, the defendant claimed to have been unaware of them.  At best, this

explanation was highly misleading:  If the defendant had understood the regulators to be asking

only about foreclosures on properties the Bank ultimately used as collateral, and if the defendant

was not aware of the pending foreclosure lawsuit on the Brooklyn townhouse, then the answer

---

[8] As of that date, this Office had already opened its investigation and sent the Bank a grand jury subpoena, though the Government does not know whether the defendant personally was aware of the subpoena.

[9] He also sought sympathy from the OCC examiners based on his military record.

[10] The OCC concluded that this maneuver was legal, though it was in tension with the Holding Company's regulatory directive to be a source of financial strength for the Bank and to avoid concentrations of credit risk. (Dkt. 122-3 at 4 (Paulson disclosure)).  The news reporting was thus "false" (Def. Mem. 24), only in the very narrow sense that it correctly reported the facts but failed to intuit that the Bank and Holding Company had secretly engaged in this unusual maneuver.

may have been literally true.[11]  But even on these favorable assumptions, his failure to mention (a) his awareness that the Brooklyn townhouse was subject to a loan that was in default and had accrued hundreds of thousands of dollars of penalties,[12] or (b) his awareness that other Manafort properties were in advanced stages of foreclosure and about to be auctioned imminently,[13] were both inappropriate and inconsistent with the expectations of the regulators that the defendant would answer questions in a forthcoming fashion.  These statements, moreover, had their desired effect on the OCC, which erroneously concluded that there was in fact no foreclosure on the properties.  (GX 709 (non-admitted email from Gongaware: "Based on meeting discussion and presentations, the properties do not appear to have been in foreclosure at the time of loan originations.")).

In July 2018, the Bank asked for a meeting with senior OCC executives Blake Paulson and Ben Lemanski.  Although this meeting was intended to be a "meet and greet" to allow for informal discussion of the supervisory relationship between the Bank and the OCC, the

---

[11] There is reason to doubt whether either of these favorable assumptions are true.  The Wall Street Journal article the regulators inquired about reported the foreclosures on all of Manafort's properties, not just the townhouse that was used as collateral, and any of those foreclosures would have been relevant to the obvious credit risks posed by the loans, so the OCC's question likely included those other foreclosures as well, which the defendant was undoubtedly aware of. And although there is not documentary evidence of the defendant's awareness of the foreclosure lawsuit on the Brooklyn townhouse (as distinct from the default and penalties on that property), it is natural to infer that Manafort made the defendant aware of this, as it drove the need for Manafort's funding and Manafort openly discussed the foreclosures on the other properties.

[12] The defendant was well aware of this fact, having not only received but corrected perceived typographical errors on a payoff notice showing these penalties (GX 298), and having made a note in his phone regarding "600 penalties"—i.e., the approximately $600,000 in penalties— accruing on that property (GX 501-1).

[13] The defendant was well aware of this fact as well, given the number of emails he received and sent referencing these auction dates as driving the urgency of extending the Union Street Loan. (*See, e.g.*, GXs 279, 281, 295).

defendant led off by strongly denying the news reports that he had wanted a position in the government.  (Tr. 91 (Paulson); Tr. 1254 (Lemanski)).  This denial was flatly false.  (*See, e.g.*, GXs 244, 261, 266).

6.     *The Aftermath of the Manafort Loans*

In July 2017, the OCC reviewed the Manafort loans and concluded that, apart from the portion secured by cash collateral, they should have been classified as substandard at origination.  (GX 712 (non-admitted supervisory letter downgrading loans)).  A substandard classification is an adverse classification that signifies "the distinct possibility that the institution will sustain some loss if the deficiencies are not corrected."  (*Id.* at 9).  The examiner who downgraded these loans had never before downgraded a loan to substandard at origination.  (Dkt. 122-2 at 3 (Aguirre disclosure)).  As explained by the OCC, Manafort's cash flow in 2015 was "negative $1.15 million and after current debt service requirements of $1.6 million, resulted in a total cash flow shortfall of $2.7 million."  (GX 712 at 10).[14]  At the time of the downgrade, Manafort was making payments on the loan but only by using the loaned funds, an inherently unsustainable situation.  (GX 712 at 10).

On October 27, 2017, Manafort was charged with a number of offenses by the Special Counsel's Office.  He thereafter defaulted on both the Union Street Loan and the Summerbreeze Loan.  The Special Counsel's Office sought forfeiture of most of the collateral for the Union

---

[14] Formally, the deficiencies noted by the OCC were inadequate financial analysis, stale financial information, and non-existent, weak and waived financial reporting covenants.  (*See* GX 712 at 11).  The examiner concluded that the loans also exhibited poorly documented collateral, an overly aggressive advance rate on the Union Street Loan, an indefinite or speculative purpose, and a liberal repayment structure, but did not include these conclusions in the letter as they were superfluous (Dkt. 122-2 at 3 (Aguirre disclosure); GX 718 (non-admitted worksheet)).

Street and Summerbreeze Loans, and the Bank then charged off the remaining balance of the

loans, or approximately $12 million, as a loss.  The Bank attempted to contest the forfeiture of

the collateral following Manafort's conviction and 2019 sentencing.  Ultimately, Manafort was

pardoned in December 2020, terminating the forfeiture efforts (which had been pursued by other

Justice Department prosecutors in the District of Columbia following the dissolution of the

Special Counsel's Office) and allowing the Bank to recover the collateral.  Had the Government

instead been able to forfeit the properties, the Bank would have sustained a multimillion dollar

loss.

## **ARGUMENT**

### I.   **THE SENTENCING GUIDELINES RANGE IS 51-63 MONTHS**

For the reasons set forth below, the Government believes that the applicable Guidelines

sentencing range is 51 to 63 months' imprisonment.  In short: (1) even under an extremely

defense-friendly estimate, the value of the $16 million in loans Calk caused to be extended to

Manafort was at least $550,000; and (2) Calk plainly abused his position as chairman of the bank

in pushing through those loans; but (3) because the applicability of the Guidelines to the Calk's

lies to the OCC is uncertain, the Government believes that misconduct is better accounted for

under 18 U.S.C. § 3553(a).

### A.   **The Value of the Improper Benefit Conferred Was More than $550,000**

The Probation Office correctly calculated the value of the improper benefit conferred in

the bribe scheme by estimating, under extremely conservative assumptions, the savings in

interest over the life of the loans as compared to alternative loan terms.  This methodology—

which is found in the Guidelines commentary for just this sort of offense—produces a value of

over $550,000, resulting in a 14-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(H).

1.    *Applicable Law*

The Guideline applicable to the bank bribery charge in Count One is U.S.S.G. § 2B4.1. That Guideline provides an upward adjustment based on the value of "the greater of the bribe or the improper benefit to be conferred."  U.S.S.G. § 2B4.1(b)(1)(B).  The value of the improper benefit to be conferred "refers to the value of the action to be taken or effected in return for the bribe."  U.S.S.G. § 2B4.1 cmt. n.2.  Under this section, "the 'improper benefit conferred' need not be determined with perfect accuracy."  *United States v. Purdy*, 144 F.3d 241, 248 (2d Cir. 1998); *see also id.* (citing commentary "noting that the amount may be 'estimated'").

The Guidelines recognize that "[o]ne of the more commonly prosecuted offenses to which this guideline applies is offering or accepting a fee in connection with procurement of a loan from a financial institution in violation of 18 U.S.C. § 215."  U.S.S.G. § 2B4.1 cmt. background.  The Guidelines commentary, in this example, recognizes that in these circumstances the offense level should be increased based on "the greater of the . . . bribe, and the savings in interest over the life of the loan compared with alternative loan terms."  *Id.*

2.    *Discussion*

Even the most conservative calculation of the "savings in interest over the life of the loan compared with alternative loan terms," U.S.S.G.§ 2B4.1 cmt. background, shows that the value of the improper benefit to be conferred was more than $550,000.  The evidence at trial showed that the loans would not have been issued by the Bank without the bribe.  (*See* PSR at 42).  It also showed that hard-money lenders sometimes fashion loans of the structure that Manafort needed—based principally on the collateral, instead of Manafort's uncertain future income stream—albeit at a higher interest rate.  (Tr. 735-36 (Brennan)).  Accordingly, since the evidence at trial showed that the defendant corruptly caused his regulated bank to act like a hard-money

16

lender but with a lower interest rate, the reasonable "alternative loan terms" are those of a hard-money lender.

The defendant's claim that the loans cannot be attributed to the bribes is unsustainable. The defendant's reversals around the election and December 22, 2016 alone show the effect of the bribes in causing the loans to move forward:  In both instances, Manafort's prospects for obtaining a loan from the Bank were stalled and uncertain, until Manafort showed his ability to help the defendant, at which point the loans suddenly moved forward.  (*See* PSR at 42).  And from the entire sequence of events, the defendant's unusual determination to issue the loans was remarked on by the Bank staff.  (*See, e.g.*, Tr. 754 (Brennan) ("[I]n my mind the only reason it wouldn't die was because Mr. Calk wanted it to continue to live."); Tr. 795 (Brennan) (Summerbreeze Loan kept going "Because Steve Calk wanted it to go through"); Tr. 813-14 (Brennan) (Union Street Loan issued because "the chairman of the board wanted the loan to be issued.")).  One employee explicitly drew the connection between the loans and Manafort's use of his political influence as a bribe.  (*See* Tr. 188-89 (Ivakhnik) ("I believed that this—the bank making this loan would result in Steve Calk receiving some kind of an appointment or advantage with the Trump Administration."); Tr. 189 (Ivakhnik) ("I believed that there was no way that Steve Calk would not make this loan, because that would mean he would not get a position with the Trump Administration.")).

The defendant's claim that "alternative loan terms" may only be measured by loan terms that could be offered by the same institution is contrary to the Guidelines commentary and to common sense.  The Guidelines, in speaking of "alternative loan terms," nowhere specify what institution those alternative terms must have come from.  For good reason—plainly the defendant

17

should not be treated *more leniently* because he approved a loan that his institution would ordinarily not have entertained at all, instead of one his institution may have extended under slightly less favorable terms. Where, as here, there was trial evidence about the type of institution that entertains this type of loan, and about what sort of terms they offer as a general matter, they are an obvious source of appropriate "alternative loan terms" to value the improper benefit received by the defendant.

The defendant's objections to the use of Genesis as a comparison are unavailing. The defendant's contention that the Bank required Manafort to post "significantly more collateral for its loans than a hard money lender would typically require" (Def. Mem. 45), finds no support in the evidence. To the contrary, the evidence showed that it is banks such as the defendant's that are prohibited from lending based on collateral alone (*see* Tr. 737, 747, 787-88, 802-03 (Brennan); Tr. 197-98 (Ivakhnik); Tr. 100 (Paulson)), and hard-money lenders such as Genesis that can lend solely on the strength of collateral (*see* Tr. 736 (Brennan)). There is no evidence supporting the defense's counterintuitive conclusion that hard-money lenders, which lend based on collateral alone, typically require *less* collateral than banks.[15]

The defense's claim that origination points, closing fees and costs, and the like are not comparable between Genesis and the Bank (Def. Mem. 45), is unpersuasive. First of all, even if each of the costs the defense urges were subtracted out, that would simply reduce the offense

---

[15] To the extent that the defense is pointing out that Genesis's original loans to Manafort had less collateral than the Bank's loans ultimately did, that comparison is inapt is because the Bank was aware that Manafort had defaulted on those Genesis loans, which Genesis obviously did not predict at the time of lending. Given that Genesis in fact refused to make any loans to Manafort after that default (*see* Tr. 969 (Day)), it is hardly an unfair assumption that if they softened their position somewhat and decided to lend to the defendant, they would require similar collateral to that the Bank ultimately did.

level by two levels, not render the entire comparison invalid or undercut the "clearly more favorable economic terms for the borrower" (Def. Mem. 45).[16] But there is no reason to subtract these costs. The defense provides no citation for the proposition that the appropriate comparison is 2 origination points rather than 3. Given that origination points are typically based on the size and complexity of the loan, and that Genesis's loans to Manafort were each substantially smaller than the Bank's Summerbreeze Loan, there is every reason to think that if Genesis had made a loan as big as the Summerbreeze Loan it would also have charged 3 or more origination points, rendering it no more favorable to Manafort.[17] And the $60,000 in closing fees and costs related to extra work performed during the pursuit of the financing, under various proposals, through the Bank. There is no reason to assume that a Genesis loan would not have involved commensurate amounts of work, and would not have generated similar fees. There is thus no reason to assume that the costs incurred at the Bank would not also have been incurred under hypothetical loans from Genesis.

The defense's other claims that these are not apples-to-apples comparisons overlooks, first, the appropriateness of "estimating" the value of a benefit for purposes of the guideline, *see Purdy*, 144 F.3d at 248 (quoting U.S.S.G. § 2B4.1 cmt. background), and second, the number of

---

[16] As the Probation Office calculated, the savings in interest under extremely favorable assumptions is $553,731.36. (PSR ¶ 62). The defendant urges that this disregards $95,000 of savings from origination points and $60,000 of savings in closing fees and expenses. But even if these were appropriate to subtract, that would still result in a savings in interest of $398,731.36, which is more than $250,000 but not more than $550,000, resulting in a 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G) instead of a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H).

[17] Indeed, for the Union Street Loan, the Bank charged 2 origination points. (GX 299 at 2). Given that the Union Street Loan was roughly comparable in size (though still greater) than the Genesis loans, the fact that the Bank charged the same 2 origination points as Genesis did fatally undermines the argument that the Bank was somehow more harsh than Genesis regarding origination points.

assumptions that these comparisons make in the defendant's *favor*.  These loan terms assume that Genesis: (a) would have lent to Manafort again at all (when in fact it would not have, Tr. 969 (Day)), (b) would have lent at the most favorable interest rate it offered Manafort and Yohai (when in fact its loans based on the Union Street property and the Nottingham property were at an even higher interest rate), and (c) that the Bank's adjustable rate mortgage would have reset after three years—i.e., as soon as it was eligible—from 7.25% all the way to 9%, negating any further savings (when in fact such a huge increase in interest rates would be highly unlikely ex ante and does not appear to have happened historically ex post).

The defendant's claim that BofI—which *did not make* the loan—should supply the appropriate alternative loan terms (Def. Mem. 45), is off base.  The evidence at trial did not provide all the internal reasons BofI did not purchase the loan, and the evidence the defense points to as showing "approval" in fact does not.  (*See* PSR at 38 (Government response noting errors and inconsistencies in preliminary BofI internal document)).  Indeed, the statements of BofI's CEO make clear that BofI would have rejected the loan even more firmly based on Manafort's income problems if it had not first rejected the loan based on the problems with the collateral and the legal issues with the borrower's LLC.  (*See* PSR at 38-39 (Government response); *see also id.* at 39 (noting CEO's statements that deal would have been "dead at the door" if BofI had learned of defaults)).  This is consistent with the statements of Ubarri, the Bank's president, who did not believe that Manafort would likely have been able to get the loans on similar terms from any bank.  (*See* PSR at 43 (Government response citing Ubarri stating

"Most likely he wouldn't have been able to get the loan anywhere else.")).[18]  BofI's rejection of

these loans thus in no way supports the defendant's facially implausible claims that the $16

million in desperately needed financing had "at most, a non-monetary value."  (Def. Mem. 45-

46).

### B.    The Defendant Abused His Position of Trust

The defendant's claim that he did not abuse his position as chairman and chief executive

officer of the Bank to approve these loans is simply frivolous.  There was ample evidence that

the defendant used his position to cause these loans to issue.  (*See, e.g.*, Tr. 718-19, 795-96

(Brennan); *see also* Tr. 813-14 (Brennan) ("Q. And did you have an understanding as to why it

was issuing? A. Yes. . . . Q. What was your understanding, Mr. Brennan? A. That the chairman

of the board wanted the loan to be issued.")).  In this circumstance, the abuse of trust adjustment

plainly applies, as the Second Circuit has held.  *See United States v. Lebedev*, 932 F.3d 40, 56-57

(2d Cir. 2019) (affirming adjustment where chairman of credit union accepted bribes to influence

credit union decisions).

The defendant's argument that other people participated in the lending decisions (Def.

Mem. 50), is legally beside the point—all that is required is that the defendant's position

*contributed* in some significant way to the offense, not that the defendant acted alone.  But this

argument is also factually baseless.  Contrary to the defendant's contention that the Bank's

governance processes were followed (Def. Mem. 20-21, 50), the evidence was that the defendant

grossly breached his duty as a director to recuse himself from the consideration of these loans

---

[18] Although Ubarri did not testify, his statements are worthy of particular weight because he was
involved in the approval of the loans and still works at the Bank, both of which would give him
an incentive, if anything, to minimize the flaws in the loans.

due to his interest in them.  (GX 451-H at 4).  Beyond this direct breach of his duties and violation of the Bank's policies, the defendant so dominated the process as to completely distort the results.  The credit committee invariably deferred to the defendant (Tr. 719, 795 (Brennan)), as he was well aware given his election-night willingness to schedule a closing despite Ubarri's previous rejection of the loan (*compare* GX 1152 *with* GX 203).  The underwriters were not informed of all of the negative facts the defendant knew (*see* GX 182),[19] and indeed the loans were extended before the underwriting was complete, with the underwriters' work product simply serving to paper over decisions that had already been made (Tr. 791, 808-09 (Brennan)).[20]

> To the extent the defense attempts to suggest that the loans were good for the Bank or that the defendant believed them to be, this argument is both irrelevant and factually incorrect.  It is irrelevant because the abuse of trust enhancement concerns the connection between the defendant's position and the offense, not the defendant's intent or lack of intent to harm the bank.  *See* U.S.S.G. § 3B1.3 cmt. n.1 ("For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense.").  It is factually incorrect because the loans were unsound and the defendant was well aware that they posed a significant risk to the Bank.

> There can be no dispute that the loans to Manafort were in fact deeply flawed.  Manafort did not in fact have the income necessary to make his payments on them—indeed he had

---

[19] Indeed, the defendant had more information on the loan than the rest of the credit committee. (*See* Tr. 798-99).

[20] In addition, one underwriter, Matthew MacDonald, was asked to provide a limited opinion on one aspect of the loans (despite not usually examining commercial loans) and then told to stand down instead of doing a full underwrite.  (GX 231).

*negative* cash flow—and was only able to obscure this fact temporarily by making payments from the loan proceeds themselves.  (*See* GX 712 at 10).  The OCC's analysis adversely classifying the loans was agreed to by the Bank's management (*id.* at 11), and in any event is not subject to real dispute.  The defendant argues that he was not aware of the specific flaws in the underwriters' analysis that concealed Manafort's insufficient income.  The principal flaw was characterizing a $3 million distribution that Manafort paid to himself from one of his LLCs as income, when in fact it was a one-time event.  (*See id.*).  But whether or not the defendant knew of this precise misclassification, he knew of numerous flaws in the loans indicating Manafort's lack of income and desperate need for cash, all of which he ignored in favor of pushing the loan through anyway.

In particular, the defendant was aware of the following negative features of the loans, at a minimum:

- Manafort had resigned from the Trump campaign following a series of news stories shedding suspicion on his overseas consulting work (GX 360-A to 360-D);

- A number of Manafort's properties were in payment default to Genesis (GX 280);

- Genesis was pursuing foreclosure, and the Bank's financing was urgently needed to avoid the imminent foreclosure auctions (GXs 279, 281, 295);

- Manafort's Brooklyn townhouse, which was collateral for the Bank, secured another loan that was in payment default and had accumulated approximately $600,000 in penalties (GXs 297, 298, 501-1);

- Manafort had erroneously understated the amount of prior financing on his Bridgehampton house and was "not able to" cover the difference himself (GX 182);

- Ubarri had previously unilaterally rejected the Summerbreeze Loan (GX 203);

- A residential underwriter had been asked to examine Manafort's income in 2015 but performed only a superficial analysis, after which he was told to stand down rather than completing his analysis (GX 231); and

- Manafort had no demonstrated track record as a developer, and the contractor for one of his proposed projects had previously declared bankruptcy (GX 184).

The defendant's awareness of these flaws in the loans is damning, and belies any suggestion that he was misled by rosy statements by the loan officer (who the defendant knew was paid 100% on commission and who in any event did not supply any information that could possibly negate these derogatory facts), or by the honest mistakes of the underwriters. Indeed, as the Court knows, an expert was prepared to testify, if the door was opened, that the defendant's awareness of certain of those above facts alone rendered his decision to proceed a clear departure from prudent lending practices. (*See* Dkt. 122-1 ¶¶ 81-91).

Thus, although the Government emphasized to the jury that the defendant *could* be convicted if the jury found that "these were the best loans in the world" (Def. Mem. 49), they were in fact not, and the defendant knew they were not.

### C.   The Defendant's Obstruction of Justice Should Be Considered under 18 U.S.C. § 3553(a)

The PSR further assesses a two-level upward adjustment for obstruction of justice, based on the defendant's lies to the OCC to cover up the crimes at issue here. (PSR ¶¶ 68, 76). The defendant resists this enhancement on both factual and legal grounds. (Def. Mem. 46-49). Because the defendant's factual arguments are meritless, but his legal arguments are colorable, the defendant's obstruction "can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guideline range," rather than an adjustment to the Guidelines. U.S.S.G. § 3C1.1 cmt. n.3.

To start with the facts, it is crystal clear that the defendant lied to OCC personnel in a bid to prevent them from uncovering that bribery at issue here: Two OCC witnesses testified that the defendant denied wanting a position with the Trump administration. (Tr. 91 (Paulson), 1254

24

(Lemanski)).  Both further explained that they clearly remembered the defendant's denial, given its obvious significance.  (Tr. 152 (Paulson), 1259 (Lemanski)).  And that denial was plainly false: Even the defendant admitted as much in his opening statement to the jury, acknowledging in court that he sought a Trump administration position.  (Tr. 63-64).  The defendant's feeble argument that the OCC witnesses did not take contemporaneous notes (Def. Mem. 25) provides no grounds to doubt the sworn testimony of two professional bank examiners with no stake in this case.

Legally, however, the defendant's submission contains the germ of a more reasonable argument.  He cites "Application Note 5(G)" and "Note 4(G)" to U.S.S.G. § 3C1.1.  (Def. Mem. 46).  Section § 3C1.1 does not in fact contain an Application Note 5(G).  *See* U.S.S.G. § 3C1.1 cmt. n.5 (containing only subsections A through E).  But from context it appears clear that he intended to reference Notes 4(G) and 5(B).  Those two notes work in tandem to provide that "false statements, not under oath, to law enforcement officers" do not trigger a Guidelines increase for obstruction unless those lies "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  *Id.* cmt. nn.4(G), 5(B).

As a matter of text, the Notes on which the defendant relies do not apply:  Application Notes 4(G) and 5(B) by their plain terms apply only to statements "to law enforcement officers." *Id*.  The OCC examiners here are indisputably *not* law enforcement officers, and so Application Notes 4(G) and 5(B) have no direct bearing.  *See, e.g.*, *United States v. Newton*, 207 F. App'x 22, 25 (2d Cir. 2006).[21]

---

[21] The defendant tries to distinguish *Newton*'s facts based on, among other things, his reading of the briefs in that appeal.  (Mot. 47).  But *Newton* is simply an example of the Circuit applying the text of the Note on which the defendant relies, and it need only illustrate the obvious point that an Application Note which expressly applies to statements "to law enforcement officers" cannot apply to statements not made to law enforcement officers.

The defendant could, however, have pointed out that the items in Application Notes 4 and 5 are merely examples, and that the Sentencing Commission intended that "comparison of the examples set forth in Application Notes 4 and 5 should assist the court in determining whether application of this adjustment is warranted in a particular case." U.S.S.G. § 3C1.1 cmt. n.3. From there, it could be argued that the OCC examiners here are generally analogous to law enforcement officers, in that they were not court officers and were in the position of responding to initial reports of the defendant's crimes. To be sure, that analogy is imprecise. A young man who tells a hasty lie when confronted by police seems more entitled to the safe harbor of Note 5(B) than a bank chairman who made calculated lies to senior bank examiners. But the other elements of Note 5(B) are present: The defendant's lies to the OCC examiners were unsworn, and the Government agrees that they did not meaningfully hinder its investigation. Because the Government has found no precedent governing these facts, to avoid any procedural uncertainty regarding the Court's sentence, the Government submits that the more cautious course is to weigh the defendant's obstruction under Section 3553(a), rather than by adjusting his Guidelines. *See* U.S.S.G. § 3C1.1 cmt. n.3 (obstructive conduct that does not satisfy the requirements for a Section 3C1.1 enhancement can be sanctioned through a within-Guidelines sentence).[22]

---

[22] It should be briefly noted that the defendant's other legal objections are incorrect. His lies to Paulson and Lemanski were not "essentially a denial of guilt," that would be exempt from the obstruction enhancement under U.S.S.G. § 3C1.1 cmt. n.2. Had the defendant admitted to the OCC that he sought a position in the Trump administration he would not have admitted guilt; the defendant's trial strategy in this case was to admit that he wanted a position in the Trump administration and to deny only that he made the loans in exchange for help obtaining it. Thus, when the defendant lied to the OCC he was not denying guilt of any offense, but rather lying about a predicate fact in order to impede the OCC's understanding of the crime here. Moreover, the defendant lied of his own initiative. No bank examiner asked him if he wanted a position in the administration; he affirmatively offered this lie. (*See* Tr. 90). That sort of intentional and

The defendant's lies to Paulson and Lemanski were not his only effort at deceiving the OCC.  As discussed in Background Section 5, above, the defendant also made false or misleading statements to Jack Gongaware and others during his first meeting with the OCC about the Manafort loans.  Because the Government does not seek the Section 3C1.1 Guidelines enhancement here, the Court not need resolve whether the distinction between outright lies and artful deception bears on the Guidelines.  *Compare, e.g.*, U.S.S.G. § 3C1.1 cmt. n.4(H) (providing material false information to for use in a presentence report triggers enhancement) *with id.* Note 5(C) (providing incomplete or misleading information does not).  But the Court should further weigh in its Section 3553(a) analysis the clear fact that the defendant, a bank chairman, at the very least chose to give a misleading answer to Gongaware in order to avoid alerting him to facts plainly relevant to the OCC's examination of the loans.

* * *

Because the Presentence Investigation Report correctly calculates the value of the improper benefit conferred and correctly imposes the enhancement for the defendant's abuse of his position, but the Government agrees to forego the enhancement for obstruction of justice, the offense level should be 24 (two levels lower than the PSR calculates).  At Criminal History Category One, the applicable sentencing range is thus 51 to 63 months' imprisonment.  *See* U.S.S.G. Ch. 5 Pt A (Sentencing Table).  In addition, the applicable fine—which Calk is plainly able to pay—is

---

affirmative deceit about relevant facts falls outside the safe harbor for denial of criminal guilt created by Application Note 2.  *See generally United States v. McKay*, 183 F.3d 89, 96 (2d Cir. 1999).  And contrary to the implication of the defendant's arguments, the obstruction enhancement is not generally reserved for successful obstruction.  Lies that would have obstructed the investigation, had they succeeded in deceiving the investigators, will typically also merit higher Guidelines.  *See generally United States v. Irabor*, 894 F.2d 554, 556 (2d Cir. 1990).

$20,000 to $200,000.  *Id.* § 5E1.2.

## II.   A GUIDELINES SENTENCE IS APPROPRIATE

### A.   Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, however, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a).  *See Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a)(2).

### B.   A Guidelines Sentence Is Appropriate to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Provide Just Punishment for the Defendant's Crimes

As set forth above, and as the evidence overwhelmingly established at trial, the defendant abused his position as the head of the Bank to corruptly trade $16 million dollars in bank loans for the political influence offered by Manafort.  The defendant's greedy and self-interested actions corrupted the process by which bank loans are supposed to be made in this country, regardless whether the defendant obtained the government position he wanted, and even though

28

the Bank may not have lost money on these loans.  For his reprehensible conduct, and in light of

the Section 3553(a) factors discussed below, a Guidelines sentence is fair, appropriate and

necessary in this case.

1.    *The Need For the Sentence to Reflect the Nature and Seriousness of the Offense*

Section 3553(a) provides that the sentence imposed should reflect the nature and

seriousness of the offense.  18 U.S.C. § 3553(a)(1), (a)(2)(A).  Here, the defendant's crime—

trading bank loans for political influence—was extraordinarily serious and warrants a Guidelines

sentence.

In considering the nature of the crime, it is important to recognize the size of these loans.

The defendant caused $16 million dollars in loans to be issued to Manafort, even though

Manafort was an unsuitable borrower.  The size of the loans matters because the greater the

loans, the more of the bank's assets were being influenced by bribes.  In turn, such conduct is

more threatening to the actual and perceived integrity of the banking system whether or not the

loans turn a profit.  The larger the portion of a bank's loans are influenced by bribes, the more

the public will rightly consider lending to be preferentially available to the corrupt.  This is a

disastrous result even if all of the corrupt loans pay off.  Here, where the offense involved $16

million in loans, an amount so large the Bank could not legally extend them to a single borrower,

the sentence imposed by the Court cannot convey a message that this conduct is tolerated.

The value of Manafort's political influence was also substantial, further reflecting the

serious nature of this conduct.  Though the defendant attempts to trivialize Manafort's assistance

by tabulating the duration of the calls he made or the number of text messages he sent (Def.

Mem. 23), what Manafort offered and provided to the defendant was rare and valuable—an

29

influential recommendation that opened doors for the defendant, even if it did not singlehandedly get him a job at the highest levels of the federal government.  Contrary to the defense's suggestion, it is deeply troubling for a bank chairman to be corrupted by political influence and this Court should impose a sentence that deters such conduct.

Manafort's placement of the defendant on the Trump campaign's economic advisory council significantly elevated his status and political influence.  Although Scaramucci—already a prominent figure and eventually appointed to a senior White House position—did not recall his own placement on the council, the defendant certainly did.  The defendant's words and actions show that he saw the position as a means to enhance his own profile, sending a screenshot of his placement on the council to Scaramucci as a credential for his own application for Defense Department appointments.  (*See* DX-249, 249-A).[23]  The defendant also plainly valued the opportunity to act as a surrogate for the campaign on television, objecting strongly when he was not given the opportunity to give interviews in the "spin room" after the third debate and prompting Manafort to attempt to rectify the situation.  (*See* GX 955).  Nor was the defendant's view of the council's importance idiosyncratic—even a wealthy and prominent businessman such as Wilbur Ross, who was later appointed Secretary of Commerce, objected when he was erroneously left off an initial press release for the council.  (*See* GX 654 at 1).

Manafort's assistance in the defendant's candidacy for jobs at the highest levels of government was rare and valuable even if it did not result in an actual position.  None of the defendant's other recommenders played a role comparable to Manafort.  The defendant turned to

---

[23] This application was of course for a job for the defendant personally, not some means of "elevating the profile of his Bank."  (Def. Mem. 22).

Manafort first, before the other recommenders, and indeed only solicited many of these recommenders once Manafort had him "buttoned up on the political side." (GX 269); see *supra* Background Section 4. At that point, the defendant reached out through his contacts seeking introductions to other possible recommenders, with whom he had no previous relationship. And of course, the other recommenders did not actually produce the defendant's Trump Tower interview. Manafort did.

The influence Manafort wielded on the defendant's behalf was unusual and unusually valuable. Manafort's recommendation to Kushner, even without any follow-up, was itself significant due to Manafort's influence, as a transition team staffer testified. (Tr. 1236 (Moorhead) ("Manafort was a powerful person within the organization, and we were told that if a request came from Manafort that we had to honor it.")). And Manafort's recommendation to Scaramucci, which involved a telephone call and repeated follow-ups at the defendant's request (*see* GXs 611, 2103), was of even greater importance. As Scaramucci testified, Manafort did not need a large number of words to express his preference—he just needed to choose to deploy his influence, which is what he did. (*See* Tr. 385 (Scaramucci) ("You don't have to have a long call to know what you know someone is looking to do, what someone wants.")). Surely many people across the country would have wished to receive an interview at Trump Tower for the position of Under Secretary of the Army—the second-highest civilian in charge of the United States Army. Manafort could make that happen. The fact that this type of influence is not routinely for sale does not make it valueless—to the contrary, it shows that it was invaluable.[24]

---

[24] The defense's refrain that Scaramucci did not charge fees for the recommendations he made (Def. Mem. 23, 36), makes little sense. Scaramucci did not charge fees for recommendations

2.      *The Need To Afford Adequate Deterrence To Criminal Conduct*

Section 3553(a)(2)(B) provides that the Court, in imposing sentence, should consider the need to deter afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  This factor weighs heavily in favor of a Guidelines sentence in this case.

The unique facts of this case raise, rather than lower, the need for deterrence.  Although the defendant is correct that the specific circumstances of this case are unlikely to recur (Def. Mem. 41), it is far from unusual for bankers to consider loans to persons with political influence. Indeed, sometimes the most valuable thing to offer a professional is a well-placed recommendation for a powerful government position.  *See, e.g.*, *United States v. Scruggs*, 916 F. Supp. 2d 670, 679, 696, 699 (N.D. Miss. 2012) (honest services fraud conviction where bribe was promise to recommend to U.S. Senator that a state judge be nominated to federal bench). Even where this type of offer has little chance of resulting in a position, the mere possibility of being recommended can corrupt the candidate by making him "feel that his ultimate desire [is] within his grasp."  *Id.* at 699; *see also id.* at 696 (evidence that senator had "no intention of actually considering" candidate for judgeship).  The bank bribery laws were intended to keep the national banking system free from this sort of corrupting influence.  To enforce those laws, this Court's sentence cannot send the message that it is tolerable for a banker to trade federally-insured financing for the prospect of power.

Moreover, when trying to achieve general deterrence and respect for the law, there is

---

because he was not corrupt, not because his recommendations were commonplace.  Indeed, they were not.  Scaramucci testified that he did so "[r]arely" (Tr. 372 (Scaramucci)), and his preferred choice for Secretary of the Army was actually nominated.  (Tr. 299 (Scaramucci)).  All manner of valuable things lack a price tag not because they have no value, but because it is illegal to sell them.

simply no substitute for prison time.  As Judge Jed S. Rakoff explained in sentencing an insider trading defendant who the court believed would personally never re-offend to a 24-month term of imprisonment, "[o]thers similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."  *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).  Probation, community service or even a large fine are simply insufficient.  Thus, a sentence of imprisonment—and one within the Guidelines—is appropriate in this case.

The defendant's reliance on *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009), is misplaced.  (Def. Mem. 41).  In *Stewart*, the district court imposed a below-Guidelines sentence on a translator, Mohammed Yousry, who had been convicted of various crimes arising from the performance of legal work for the terrorist Sheikh Omar Ahmad Ali Abdel Rahman.  590 F.3d at 101, 103.  The district court reasoned, and the Circuit affirmed, that because Yousry could no longer work as an "academic or translator" following his conviction, "the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant.'"  *Id.* at 141.  Thus, the issue in *Stewart* was specific deterrence—i.e., the need to deter future misconduct by Yousry.  But the concern here, as in *Gupta*, is general deterrence, and specifically, the need to send a message to other bankers and white-collar criminals that trading federally-insured bank loans for personal favor will land them in prison.

3.      *The Need To Impose A Just Punishment for the Defendant's Crimes*

Section 3553(a)(2)(A) provides that the Court must consider the need for a sentence to "provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In this regard, a term of

imprisonment—and not some form of non-incarceratory punishment like community service—is critical.

The defendant is an affluent and well-educated white-collar criminal.  He should not be treated any more favorably than the countless other defendants that this court routinely sentences to prison for equally self-interested—but less headline-worthy—conduct.  As Judge Colleen McMahon explained in *United States v. Binday*, 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."  *Id.* (ECF No. 349, Sent. Tr., at 46); *see id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *see also Gupta*, 904 F. Supp. 2d at 355 ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose.").  Thus, the need for the sentence to provide just punishment for the offense also weighs heavily in favor of a Guidelines sentence.

    4.    *The Defendant's Arguments To Contrary Are Unpersuasive*

In asking the Court for leniency and for a non-incarceratory sentence, the defendant raises several arguments about his conduct, the lack of harm to the Bank, the purported

soundness of the loans, and his general good character.  None of these arguments justify the type of leniency that the defendant has requested.

a)  <u>The Harm to the Bank and the Unsoundness of the Loans</u>

The defendant goes on at great length that the Bank did not lose any money.  The defendant, however, is wrong to claim that something about the loans he corruptly issued warrants great leniency.  Neither the bank bribery statute nor the Sentencing Guidelines require pecuniary loss to the financial institution, and—contrary to the defendant's suggestion—it is hardly unprecedented for prosecutions to be brought in the absence of such loss.  *See, e.g.*, *United States v. Denny*, 939 F.2d 1449, 1452 (10th Cir. 1991) ("The statute does not require establishing that the bank suffered a loss.  In the case before us, the bank was paid a commission and theoretically made a profit on each trade.  This is legally insignificant.").  This is natural, both because the integrity of the banking system as a whole is undermined when the judgment of bank executives is corrupted by personal payments, and because even meritorious loans should not be more available to those who are willing to bribe their bankers than to those who are not.

More fundamentally, the lack of harm to the Bank in this case was due to a stroke of luck, not to the supposed soundness of the loans or any other factor meriting leniency.  The loans the defendant pushed through were fundamentally unsound and the Bank was only spared millions of dollars in losses through the fortuity of a presidential pardon for Manafort.  As discussed in Background Sections 2-4, *supra*, the defendant well knew that the loans he pushed through were flawed.  Given that they represented the largest loans in the Bank's history, the defendant's willingness to corruptly approve them in order to receive the personal benefit of Manafort's

35

political influence is extremely serious conduct.[25]

The defendant submits a declaration by Dr. Andrew Carron, a mortgage securitization expert, apparently to argue that the loans were wise investments. (Dkt. 289-5). Dr. Carron is not an underwriter (*id.* ¶ 3), and it shows. Rather than rebut the (indisputable) fact that Manafort had *negative cash flow* and could not meet his obligations under the loan, Dr. Carron essentially argues that it would not matter, because the loans were sufficiently collateralized to make it unlikely that the Bank would ultimately lose money. (*Id.* ¶¶ 10-17). But this is just an argument that the loan might have been worth making for a hard-money lender, which can lend based on collateral alone. (Tr. 735-36 (Brennan)). By contrast, actual bank underwriters and lenders, such as the Government's expert Joseph Belanger, many of the Government's witnesses, and surely the defendant, know that regulated institutions such as the Bank cannot do that. (*See* Tr. 100-01 (Paulson); 197-98 (Ivakhnik); Tr. 735-36 (Brennan); Dkt. 122-1 ¶¶ 28-32 (Belanger)). In fact, the OCC considers it an unsafe and unsound practice knowingly to lend to a borrower who, like Manafort, cannot repay, hoping instead to recoup on collateral. (*See* Dkt. 122-3 at 6 (Paulson disclosure) ("The OCC would consider it an unsafe and unsound practice for a bank to make loans knowing the borrower cannot repay, intending instead to be repaid by the collateral.")).

The risks of lending based on collateral alone were all too relevant to this case, where the Bank was only spared a multimillion dollar loss to its balance sheet by the fortuity of a presidential pardon. The defendant knew, months before lending to Manafort, of the risk of

---

[25] The defendant's stress on the fact that he did not waive several thousand dollars in bank fees (Def. Mem. 20) is odd. Given that he approved millions of dollars of unsound loans corruptly, collecting several thousand dollars in fees is simply not a persuasive reason for leniency.

government investigations that might put his assets in jeopardy.  And Manafort was charged

within a year of receiving the loans, leading to his default.  Federal prosecutors in the District of

Columbia then sought to forfeit the principal collateral for the Manafort loans—the

Bridgehampton residence and the Brooklyn townhouse—and pursued that forfeiture until an

eleventh-hour presidential pardon terminated those efforts years later.  Had that forfeiture been

successful, the Bank would have lost millions on the loans.[26]  Much as the defense may try to

recast this sequence of events as somehow showing that some sort of fault "falls on the

government" (Def. Mem. 40), forfeiture of criminally-linked property is a longstanding practice

serving important governmental aims, and the District of Columbia prosecutors were in no way

obligated to forgo it for the benefit of the Bank or of the defendant.  *See Kaley v. United States*,

571 U.S. 320, 323 (2014) ("'[T]here is a strong governmental interest in obtaining full recovery

of all forfeited assets.'").  What is "extraordinary" (Def. Mem. 40), is not that the Justice

Department sought to forfeit a federal felon's property, but that a presidential pardon intervened.

The pardon terminated the case against Manafort, but it should not serve as a backdoor form of

leniency for the defendant, who received no grant of clemency.

The defendant's claim that he should receive leniency because the loans could not have

singlehandedly rendered the Bank undercapitalized (Def. Mem. 27), is misguided.  The

Guidelines contain an enhancement that applies where bank bribery could substantially

jeopardize the safety and soundness of a financial institution.  *See* U.S.S.G. § 2B4.1(b)(2)(B).

---

[26] The defendant's argument that he stood to bear a substantial portion of the loss because he was
the majority owner of the Bank cuts both ways.  Owning and operating a federally insured
financial institution is a privilege granting substantial benefits, and it entails the obligation to
comply with the OCC's regulations and the banking laws, not to decide you can pay your way
out of them.

That adjustment was not applied in this case.  No further leniency is required.  But as a factual

matter, it is worth noting that the regulatory threshold for a bank to be "well-capitalized" is

something of a floor that is exceeded by virtually every bank, and the OCC can consider banks to

have significant capital problems even when they exceed this threshold.  (*See* Dkt. 122-3 at 6

(Paulson disclosure) ("In practice, almost all banks meet the well capitalized threshold and the

OCC does not consider the fact that a bank meets the well capitalized threshold to necessarily

mean the bank is sufficiently capitalized.")).  Ultimately the loans would not have

singlehandedly caused the Bank to become undercapitalized, but they represented a significant

risk to the Bank that is worthy of the Court's consideration even though Manafort's pardon

allowed the Bank to recover the collateral.

### b)  The Defendant's Personal Character

The defendant dedicates more of his submission to lauding his own character than to

discussing the offense conduct.  (*Compare* Def. Mem. 3-16 *with id.* 16-28).  The Government

respectfully submits that the focus of sentencing should rest on his crimes, which would merit

serious punishment regardless of the defendant's character.  But it is also true that the defendant

exaggerates his claimed good deeds and sterling character.

Sentencing courts do not typically consider claims of charitable works and standing in the

community, absent an extraordinary showing.  *See* U.S.S.G. § 5H1.11 ("Military, civic, charitable,

or public service; employment-related contributions; and similar prior good works are not

ordinarily relevant in determining whether a sentence should be outside the applicable guideline

range"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (requiring "exceptional

degree of public service and good works" under § 3553(a)).[27]   That is in part because many defendants do not have the resources—in time, money, or social standing—to perform such deeds, and so the law is reticent to show leniency to the few defendants who are fortunate enough to have such options.  *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity.  They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate

---

[27]*Canova* provides guidance whether this Court considers under the Guidelines or Section 3553(a).  In the appeal in that case, the initial question was whether the defendant qualified for a departure under the Guidelines.  *Canova*, 412 F.3d at 358. But because *Booker* had been decided between the defendant's sentencing and appeal, and because the Circuit remanded to the district court on other grounds, the Circuit discussed the propriety of considering the defendant's public service both under the Guidelines and under Section 3553(a). *Id.* at 358-59 & n.29. Similarly, although many of the cases discussed in this section concern U.S.S.G. § 5H1.11, the cases' reasoning—and the reasoning of the Sentencing Commission in enacting Section 5H1.11—bears on the weight that should be accorded to the defendant's claims under § 3553(a).  *See, e.g.*, *United States v. Repking*, 467 F.3d 1091, 1095-96 (7th Cir. 2006) (faulting sentencing analysis under § 3553(a) because defendant's charitable works were not so extraordinary "that they should be given weight despite the contrary view of the Sentencing Commission"), *abrogated on other grounds by Gall*, 552 U.S. at 47.

and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.").

The defendant's claims fall squarely within the category of arguments that fail to show such extraordinary charity or good character as to warrant leniency.  He cites support from other people with whom he did business (Def. Mem. 5-8, 10-12), but "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey,* 316 F.3d 1122, 1135 (10th Cir. 2003).  Similarly, the defendant's charitable work should not discount his sentence, because people who can commit the sort of corrupt acts at issue here often engage in such giving as a matter of course.  *See Vrdolyak*, 593 F.3d at 682 (discounting charitable contributions by defendant who was "by normal standards (not Warren Buffett or Bill Gates standards) wealthy"); *cf. Repking*, 467 F.3d at 1095 ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives … to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." (internal quotation marks omitted)).  That is particularly true given that most of the defendant's charity centers on veterans, and the defendant also grew wealthy by lending to veterans (who represent a distinct opportunity due to their ability to take zero-down-payment mortgages through the Veterans Administration).  A business leader who does good works in the same community where he does business is not acting entirely selflessly, but rather developing a reputation and rolodex that will help enrich him.  *See Repking*, 467 F.3d at 1095-96

40

(discounting "charitable works" that were "entirely consistent with [the defendant's] business development plan"); *Morken*, 133 F.3d at 630 (discounting charitable and public oriented acts of prominent local businessman); *cf. Vrdolyak*, 593 F.3d at 683 (discounting public services of "influential Chicago alderman" because "[p]oliticians are in the business of dispensing favors").

Similarly, the defendant's reserve service in the 1980s should not weigh significantly at sentencing. Typically, courts consider such service only where it was undertaken at personal sacrifice. *See, e.g., Canova*, 412 F.3d at 358-39 (downward departure not error where defendant had served in Marines and Marine reserves for six years; served as firefighter for seven years, engaged in heroic behavior, and sustained injuries in that capacity); *United States v. Jackson*, 862 F.3d 365, 402 (3d Cir. 2017) (district court placed too much emphasis on defendant's military record despite "stellar and admirable record" of service in Iraq). Here, after several years reserve service during peacetime, the defendant apparently found his civilian career more important than the soldiers whose training and welfare he had agreed to oversee; his final evaluation as an officer found it "unfortunate that 1LT Calk's personal professional obligations did not allow him sufficient time to participate to the level he is capable." (PSR ¶ 118). That is not the sort of exceptional service that warrants leniency for the crimes the defendant would go on to commit decades later.

Finally, the Court should not take the defendant's attempt to convey an impression of good character at face value. Although several employees of the bank he still owns have written positive letters about their boss, the sworn testimony of others presented a less flattering picture. (Tr. 188-89 (Ivakhnik), 953 (Brennan)). And this is not the first occasion on which the defendant has put his own interests above his duties to society. On at least two occasions, the defendant has testified

under oath and been found not credible. In the first, during his divorce, the defendant claimed that he had paid for the construction of a vacation home in cash, in a bid to avoid that home being classified as marital property. The trial court found that testimony not credible, especially given the defendant's sophisticated financial background and conflicting testimony, and a contrary record. (*See* Ex. A at ¶¶ 22, 70).[28] More recently, the defendant was sued for defaming one of his employees, after he first fired the man. At the ensuing arbitration, the defendant testified, but his testimony was "riddled with evasion as well as various inconsistencies." (Ex. B at 12). Among other lies, the defendant claimed that he had stepped down from his position at the bank due to his back injury, when in fact he had been barred from the banking industry due to this case. (*Id.* at 12-13). The arbitrators not only found that the defendant had wilfully defamed his former employee, but further awarded punitive damages based on their findings that the defendant's stated reasons for the firing were pretextual. (*Id.* at 24). In short, although the focus of this Court's analysis should be on the crimes of conviction, even cursory inspection of the defendant's behavior elsewhere belies any claim that his conduct here was an aberration.

---

[28] In an apparent bid for sympathy, the defendant attributes his divorce to his wife's infidelity. (Def. Mem. 9). The Government has no information on the validity of that claim. Although the Government understands that a more general examination into the defendant's conduct toward women would not reflect favorably upon him, this entire subject is likely best treated as a collateral matter not relevant to sentencing.

42

## **CONCLUSION**

For the reasons set forth above, the Court should impose a sentence within the Sentencing

Guidelines.

Dated:  New York, New York
        December 22, 2021

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                          By:       /s/
                                    _____
                                    Paul M. Monteleoni
                                    Hagan Scotten
                                    Alexandra N. Rothman
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2219/2410/2580
                                    E-mail: paul.monteleoni@usdoj.gov
                                            hagan.scotten@usdoj.gov
                                            alexandra.rothman@usdoj.gov

43