# Exhibit A

2020 IL App (1st) 182512-U

FIRST DIVISION
October 19, 2020

No. 1-18-2512

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>STEPHEN A. CALK, | ) ) ) | Appeal from the<br>Circuit Court of<br>Cook County |
| Petitioner-Appellant/Cross-Appellee, | ) ) | |
| and | ) ) | No. 14 D 1626 |
| DONNA L. CALK, | ) ) ) | The Honorable<br>Debra A. Walker,<br>Judge Presiding. |
| Respondent-Appellee/Cross-Appellant. | ) | |

---

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

## ORDER

¶ 1   *Held:*   The judgment of the circuit court is affirmed in part and reversed in part. The circuit court did not err by classifying Stephen's interest in NBHI as marital property and did not abuse its discretion by valuing that interest as of a date closer to trial. Nor did the circuit court err by classifying Stephen's Schwab accounts as marital property, or by finding that the Truckee Property house was marital property. The circuit court erred in finding that certain of Donna's dissipation claims were time-barred. Finally, the parties agree that a portion of the circuit court's judgment contained a miscalculation, which the circuit court is instructed to correct following the additional proceedings on remand.

¶ 2   After a bench trial on a petition for dissolution of marriage, the circuit court of Cook County determined that certain assets of petitioner, Stephen A. Calk, and respondent, Donna L.

No. 1-18-2512

Calk, were marital property, determined the value of those assets, and allocated the assets between the parties. The circuit court also found that Donna's claims that Stephen dissipated $2.6 million in marital assets were time-barred.

¶ 3     Stephen and Donna cross-appeal from the circuit court's judgment. Stephen contends that the circuit court erred in finding that certain assets were marital property, or, in the alternative, that the circuit court's valuation of one of those assets was erroneous. He also argues that the circuit court erred by calculating the reimbursement amount to his nonmarital estate for another one of the assets. Donna argues that her dissipation claims were timely and should not have been dismissed. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this order.

¶ 4                              I. BACKGROUND

¶ 5     The primary assets at issue in Stephen's appeal are his ownership interest in National Bancorp Holdings, Inc. (NBHI), real property improved with a vacation home in Truckee, California (the Truckee Property), and two Charles Schwab investment accounts opened during the marriage in Stephen's name. The primary assets underlying Donna's cross-appeal are three checking accounts. An explanation of several other assets and various transactions is necessary to understand the circuit court's judgment and the parties' arguments on appeal. The following facts are established by the pleadings and the evidence admitted during the bench trial.

¶ 6                         A. The Pleadings and the Parties' Assets

¶ 7     Stephen and Donna were married on October 6, 2001. In 1995, Stephen founded—and acquired a 65% ownership in—Chicago Bancorp, Inc., a state-licensed nonbank residential mortgage company. In 1999, Stephen purchased the Truckee Property—which at the time was undeveloped land—for $271,000 by paying $54,000 in cash and obtaining a $217,000 mortgage

No. 1-18-2512

loan.[1] In 2002, after the marriage, Stephen paid off the mortgage on the Truckee Property and began building a vacation home on the property. Construction was completed in 2004. The property was always titled in Stephen's name only.

¶ 8     In 2003, Stephen opened an account at Charles Schwab (Schwab x6122). He opened Schwab x6122 with $711,000 in cash, securities, and money market funds from two premarital investment accounts he owned: an account at Deutsche Bank and an account at William Blair. Over the course of the marriage, Stephen deposited $152,000 to the William Blair account, and $144,000 to the Deutsche Bank account. After June 2004,[2] Stephen deposited $183,000 to Schwab x6112 from the parties joint checking account at Midwest Bank; a $49,000 check from Michael Crossett; and a $1 million cashier's check. In 2007, Stephen opened a second account at Charles Schwab (Schwab x8402) with assets from Schwab x6122.

¶ 9     In 2007, Stephen acquired an additional 5% interest in Chicago Bancorp. In June 2010, Stephen, and his brother John Calk—who owned the remaining 30% interest of Chicago Bancorp—formed NBHI, a bank holding company, to facilitate the purchase of Generations Bank, a federal savings bank. Although Stephen asserts that there is no evidence in the record establishing what, if any, contributions were made at the time NBHI was formed, Donna directs our attention to a document in the record titled "[NBHI] Consent in Lieu of a Meeting of the Board of Directors," dated August 19, 2010, reflecting that Stephen paid $700 for 700 shares of NHBI. Stephen owned a 70% interest in NBHI and John owned the remaining 30% interest. In April 2011, NBHI acquired Generations Bank, and Generations Bank was subsequently renamed The Federal Savings Bank (TFSB).

---

[1]For our purposes, all sums over $10,000 have been rounded to the nearest $1000, and all sums over $1 million have been rounded to the nearest $100,000.
[2]Stephen could not obtain statements predating June 2004 for Schwab x6122 account.

No. 1-18-2512

¶ 10    Stephen filed a petition for dissolution of marriage in February 2014 and Donna filed a counterpetition for dissolution of marriage in March 2014. On September 2, 2014, Donna, through counsel, requested records from Stephen as to the destination of over $3.7 million from a checking account at Northern Trust (Northern Trust x7803)—which was opened during the marriage and held in Stephen's name—that was closed in January 2014. She requested a tracing of a $64,000 difference between a $3.7 million withdrawal from Northern Trust x7803, and deposits into two new Northern Trust checking accounts (Northern Trust x0590 and x3752) that were opened in July 2014. On September 3, 2014, Stephen, through counsel, responded that he did not have any records as to the destination of the $3.7 million withdrawn from Northern Trust x7803 "as [the] funds were in the possession of [Stephen's brother] John Calk," and that the money was subsequently redeposited into joint checking accounts—Northern Trust x0590 and x3752—titled in Stephen's and John's names. Stephen subsequently amended his response, stating that $64,000 was used by John to purchase a car in March 2014. In June 2015, Stephen disclosed that John held $3 million for Stephen between May 2014 and July 2014, and that $700,000 was held in a safety deposit box from January 2014 to July 2014.

¶ 11    On September 7, 2017, Donna filed a notice of intent to claim dissipation, identifying numerous alleged acts of dissipation. Relevant to this appeal, Donna alleged that Stephen dissipated $2.6 million in marital assets through a series of transactions occurring between April 2016 and January 2017 involving Northern Trust x7803, x0590, and x3752.

¶ 12        B. Bench Trial and the Circuit Court's Judgment Regarding Assets

¶ 13    A bench trial commenced on September 27, 2017. The parties presented evidence as to the ownership and valuation of the disputed assets. On May 25, 2018, after hearing argument and considering all the pleadings and evidence at trial, the circuit court entered a written judgment for

No. 1-18-2512

dissolution of marriage and distribution of property. The following is a summary of that evidence and the circuit court's findings relevant to this appeal.

¶ 14                                      1. NBHI

¶ 15    The parties dispute whether Stephen's interest in NBHI was marital property. It was undisputed that NBHI was a savings and loan holding company formed in June 2010, during the marriage, by Stephen and his brother. To rebut the presumption that Stephen's 70% ownership of NBHI was marital property, it was Stephen's burden establish by clear and convincing evidence that his interest in NBHI derived from a nonmarital source. Stephen sought to establish that his 70% stock ownership in NBHI was synonymous with his nonmarital interest in Chicago Bancorp. Stephen's argument was that the money he used to acquire 70% of NBHI common stock was from nonmarital shareholder distributions from Chicago Bancorp that he deposited with Chicago Bancorp that in turn were paid out to complete the Generations Bank transaction.

¶ 16    Evidence at trial established that, in April 2011, NBHI paid $1 million purchase Generations Bank. The initial plan was for Chicago Bancorp, a nonmarital asset of Stephen's, to purchase Generations Bank. However, in the opinion of Stephen's bank's counsel, the Office of Thrift Supervision's position was that Chicago Bancorp would not be able to purchase Generations Bank. It was counsel's position, however, that a sufficiently capitalized bank holding company might get the job done. Stephen and John formed NBHI. The Generations Bank purchase was for $3 million: $2 million in capital contributions required by the Office of Thrift Supervision and another $1 million to complete the purchase. In total, Stephen contributed $2.5 million and John contributed $500,000 to acquire Generations Bank. Stephen transferred $2.5 million on March 31, 2011, from Northern Trust x7803 (which, as noted above, was opened during the marriage, and titled in Stephen's name (*supra* ¶ 10)) to Chicago Bancorp's operating account. Similarly, John

No. 1-18-2512

transferred $500,000 to Chicago Bancorp's operating account. Chicago Bancorp's 2011 general ledger booked Stephen's and John's payments as "Paid in Cap Generations Bank." On April 4, 2011, Chicago Bancorp wired $2 million to NBHI and wired a total of $1 million to two entities and an individual to complete the purchase of Generations Bank. It is Stephen's contention that the $2.5 million that was transferred into and from Chicago Bancorp to complete the purchase was a $2.5 million shareholder distribution he received from his nonmarital Chicago Bancorp stock and, therefore, his NBHI interest was acquired with nonmarital funds.

¶ 17    The circuit court concluded that Stephen failed to meet his burden of tracing the $2.5 million payment he made to Chicago Bancorp to a nonmarital source. Stephen's expert, Brian Potter, did not trace the source of the funds Stephen withdrew from Northern Trust x7803. Instead, Potter testified that a "significant" portion of the historical deposits to Northern Trust x7803 were "most likely" from Chicago Bancorp shareholder distributions. The circuit court also considered evidence presented by Donna that Northern Trust x7803 was opened with deposits that came from a variety of sources, including joint accounts. There was also evidence that immediately before Stephen withdrew the $2.5 million from Northern Trust x7803, he deposited $500,000 into that account from Schwab x6122, which the circuit court—for reasons explained below—also found to be marital property. The circuit court rejected Stephen's argument that the $2.5 million he transferred from Northern Trust x7803 to Chicago Bancorp became Chicago Bancorp's property, finding that the $2.5 million were "clearly identifiable and traceable throughout" the Generations Bank transaction. The circuit court also observed that it was undisputed that no Chicago Bancorp assets were used to purchase Generations Bank; the entire purpose of forming NBHI was to facilitate the Generations Bank purchase because Chicago Bancorp, a state regulated entity, could not purchase a federal savings bank. The circuit court found that Stephen's interest in NBHI was

No. 1-18-2512

marital property. The circuit court concluded that Stephen failed to meet his burden of tracing the money in Northern Trust x7803 to a nonmarital source, and therefore had failed to rebut the presumption that Stephen's interest in NBHI was marital property.

¶ 18    The parties disagreed as to Stephen's ownership interest in NBHI, but after trial it was determined that Stephen owned a 66.2% interest in NBHI. Donna does not challenge that finding on appeal. Stephen's expert, Potter, testified that Stephen's interest in NBHI as of December 31, 2013, had a fair market value of $15.3 million. Potter also opined that Stephen's interest in NBHI had a fair market value of $75.8 million on December 31, 2016, after a 10% discount for lack of marketability. Donna's expert, James Godbout, opined that Stephen's 67.2% interest in NBHI as of December 31, 2016, was $94.1 million, after a 5% discount for lack of marketability.[3]

¶ 19    The circuit court concluded that the appropriate valuation date was December 31, 2016, based on a reference to an agreement between the parties, another reference in one of Stephen's motions *in limine* to the use of December 31, 2016, "as the current valuation date" for TFSB and NBHI, and the other evidence at trial. The circuit court agreed with Potter's valuation and agreed with Godbout's 5% discount for lack of marketability. The circuit court concluded that the value of Stephen's interest in NBHI was $80 million. After considering the factors set forth in section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 2016)), the circuit court concluded that Donna was entitled to 30% of Stephen's interest in NBHI.

¶ 20                                    2. Truckee Property

¶ 21    It was undisputed that, prior to the marriage, Stephen purchased the undeveloped Truckee Property for $54,000 in cash and a $217,000 mortgage from Ohio Bank. During the marriage,

---

[3]Godbout's valuation was based on Stephen having a 67.2% interest in NBHI. He determined that NBHI had an adjusted book value of $140 million, and that Stephen's interest was valued at $94.1 million ($140,000,000 x 0.672 = $94,080,000). Adjusting Godbout's valuation to account for Stephen's actual interest of 66.2% yields a valuation of $92.7 million ($140,000,000 x 0.662 = $92,680,000).

No. 1-18-2512

Stephen paid off the balance on the Ohio Bank mortgage. The circuit court found that Stephen did

not present any evidence that the mortgage was paid off with nonmarital funds.

¶ 22      During the marriage, the parties improved the Truckee Property with a vacation home.

Stephen testified that the vacation home was built with money from his nonmarital Chicago

Bancorp distributions and that he paid the contractors working on the home in cash from his

Chicago Bancorp distributions. He testified that he searched for, but could not find, any documents

related to the construction of the vacation home. The circuit court found that Stephen's testimony

that he paid the contractors in cash was not credible, given that he was "a well-educated and

intelligent financial person." The circuit court also observed that Stephen "gave conflicting

testimony regarding the characterization of the Truckee residence," and referenced Stephen's

response to a petition for rule to show cause, where Stephen asserted "expenses incurred on behalf

of the [Truckee Property] were for necessary, routine, and historical maintenance to preserve one

of the largest assets of the marital estate." Additionally, the record shows that during the

dissolution proceedings, the parties agreed to pay expenses for the Truckee Property from their

joint accounts into which the parties deposited their paychecks. The circuit court concluded that

the Truckee Property was marital property, and that Stephen was entitled to a $250,000

reimbursement for the purchase price and retirement of the mortgage.

¶ 23                                  3. Schwab x6612

¶ 24      Schwab x6612 was opened, in Stephen's name only, during the marriage in January 2003.

There was evidence that during the marriage, in December 2001, Stephen deposited $152,000 in a

William Blair account (William Blair x2296), and $144,000 in a Deutsche Bank account (Deutsche

Bank x7560) in December 2002. Stephen did not present any evidence as to the source of those

two deposits. Stephen testified that in February 2003, he transferred a total of $711,000 from

No. 1-18-2512

William Blair x2296 ($413,000) and Deutsche Bank x7560 ($298,000) to Schwab x6612. He could

not obtain any account statements for Schwab x6612 prior to June 2004. Stephen testified that he

did not make any other deposits to Schwab x6612 between February 2003 and June 2004. The

Schwab x6612 opening balance on the June 2004 account statement was $1.07 million, an increase

of $359,000 from February 2003.

¶ 25    The circuit court found that Stephen failed to rebut the presumption that Schwab x6612

was marital property. The circuit court found that

> "Stephen's testimony alone is insufficient to establish a non-marital source for the
>
> cash and assets in Schwab [x]6612, particularly given the unexplained and untraced
>
> sources of the deposits to both William Blair [x2296] and Deutsche Bank [x7560]
>
> during the marriage and before the transfer to Schwab [x]6612 and the approximate
>
> 50% increase in the value of Schwab [x]6612 between January 2003 and June
>
> 2004."

¶ 26    The circuit court also observed that Stephen deposited $1.23 million to Schwab x6612

during the marriage, including $183,000 from the parties' joint checking account at Midwest Bank

(Midwest x8403) in 2008, a June 2007 check for $49,000 from Michael Crossett to purchase part

of Stephen's equity in Chicago Bancorp, and a $1 million cashier's check in November 2004 that

Stephen testified was a distribution from Chicago Bancorp. Stephen's friend and investment

advisor/relationship manager, Kelly Goalby, testified that he believed the cashier's check was a

distribution from Chicago Bancorp, although he did not have any records to verify his belief. The

circuit court concluded that Goalby's testimony was influenced by Stephen, who e-mailed Goalby

in October 2014 and August 2015 and expressed a need to show that the cashier's check came

from a Chicago Bancorp distribution. The circuit court also found that Stephen had failed to

No. 1-18-2512

provide a clear tracing to a nonmarital source of the cash and securities purchased during the marriage that were held in William Blair x2996, Deutsche Bank x7560, and Schwab x6612.

¶ 27    Finally, the circuit court found that Stephen's nonmarital estate was entitled to reimbursement of $493,000, comprising the combined premarital balances of William Blair x2296 and Deutsche Bank x7560, and the $49,000 check from Crossett.

¶ 28                                4. Schwab x8402

¶ 29    Schwab x8402 was opened, in Stephen's name only, during the marriage in May 2007. Stephen opened the account with $200,000 in cash and $291,000 in securities that he transferred from Schwab x6612. The circuit court found that Stephen provided no evidence "regarding the source of the funds and assets transferred to Schwab [x]8402 other than that the same cash came from Schwab [x]6612, which this [c]ourt has found to be marital property." The circuit court rejected Stephen's argument that his contributions of marital property to his nonmarital estate transmuted the marital property to nonmarital property.

¶ 30                          C. Donna's Dissipation Claims

¶ 31    On September 7, 2017, Donna filed a notice of intent to claim dissipation identifying numerous alleged acts of dissipation, only one of which is relevant on appeal. The trial court found that Donna knew or should have known of the claimed dissipation as of September 3, 2014, so that her claim was untimely.

¶ 32    Donna alleged that on January 22, 2014, Stephen withdrew $3.7 million from Northern Trust x7803, a marital checking account held in Stephen's name, and used the funds in a series of specified, individual transactions involving Northern Trust x3752 and x0590, evidencing dissipation of martial assets during the breakdown of the marriage. On June 5, 2015, Stephen answered Donna's interrogatories stating that his brother John held $3 million for him between

No. 1-18-2512

May 9, 2014 and July 7, 2014, that Stephen held $700,000 in a safety deposit box from January 22, 2014, to July 7, 2014, and that on July 7, 2014, Stephen deposited $3.7 million to Northern Trust x3752 and x0590, accounts that were titled in Stephen's and John's names. Prior to trial, Stephen moved for summary judgment on Donna's dissipation claims, arguing that they were barred by the three-year statute of limitation in section 503(d)(2)(iv) of the Act (750 ILCS 5/503(d)(iv) (West 2016)). Finding there were genuine issues of material fact, the circuit court denied Stephen's summary judgment motion.

¶ 33     At trial, on the issue of when Donna knew or reasonably should have known the facts underlying her dissipation claims, Donna testified that she called Northern Trust in February 2014 to inquire about a $3.7 million withdrawal from Northern Trust x7803 on January 22, 2014, which was prior to the initiation of these proceedings. Donna also testified that Stephen had "intermittently" added John to Northern Trust x7803. On June 20, 2014, during discovery, Donna received a statement for Northern Trust x7803 reflecting a $3.7 million withdrawal. On September 2, 2014, Donna's counsel sent a letter to Stephen requesting records as to the destination of the $3.7 million withdrawal and a tracing of a $64,000 difference between the withdrawal from Northern Trust x7803 and deposits to Northern Trust x0590 and x3752, which were opened in July 2014. Stephen's counsel responded on September 3, 2014, that Stephen did not have any records regarding the destination of the withdrawal "as the funds were in the possession of John Calk. Funds were re-deposited into Northern Trust [x]0590 and [x]3752." Stephen supplemented his response on September 18, 2014, with records showing that John used the questioned $64,000 to purchase a new Tesla car in March 2014.

¶ 34     The circuit court concluded that Donna knew or should have known by, at the latest, September 3, 2014, that Stephen transferred $3.7 million from Northern Trust x7803 to joint

accounts he held with John, and therefore her dissipation claims filed on September 7, 2017, were untimely under the three-year statute of limitations in section 503(d)(2)(iv) of the Act. The circuit court rejected Donna's argument that she did not know that the funds were used for an improper purpose before the statute of limitations began to run, observing that Donna could have asserted a dissipation claim when she learned that the money was transferred to an account held by John and Stephen, and it would then be Stephen's burden to show that the marital funds were used for a marital purpose. The circuit court also rejected Donna's argument that her dissipation claims were timely asserted within 30 days after the close of discovery (see *id.* § 503(d)(2)(ii)), finding that Donna's dissipation claims were still subject to section 503(d)(2)(iv) of the Act.

¶ 35    The circuit court's written order addressed all the remaining issues between the parties. The parties filed postjudgment motions directed at various portions of the circuit court's judgment, which the circuit court disposed of on November 27, 2018. Stephen filed a timely notice of appeal, and Donna filed a timely notice of cross-appeal.

¶ 36                                    II. ANALYSIS

¶ 37                                 A. Stephen's Appeal

¶ 38    In his appeal, Stephen first argues that, with respect the circuit court's finding that his interest in NBHI was marital property, the circuit court either erred as a matter of law or that its judgment was against the manifest weight of the evidence. Alternatively, if his interest in NBHI was properly classified as marital property, he argues that the circuit court erred when it valued that interest as of December 31, 2016, instead of a date closer to the filing of the dissolution proceedings. Second, he argues that circuit court erred by determining that the Truckee Property was marital property, asserting that the property was his nonmarital property that had been improved with marital assets. Third, he contends that circuit court erred by determining that his

No. 1-18-2512

Schwab accounts were marital property, asserting that the accounts were opened with nonmarital property. Alternatively, he argues that if his Schwab accounts were properly classified as marital property, the circuit court erred by using a 1999 account balance, rather than a 2001 account balance, when determining the amount to reimburse his nonmarital estate. We address these arguments in turn.

¶ 39                              1. Stephen's Interest in NBHI

¶ 40     The first issue we must resolve is whether the circuit court properly classified Stephen's interest in NBHI as marital property.

¶ 41     Section 503(a) of the Act provides that " 'marital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," subject to numerous exceptions. 750 ILCS 5/503(a) (West 2016). Relevant to this issue, the Act defines nonmarital property as "property acquired in exchange for property acquired before marriage" (*id.* § 503(a)(2)), and "income from property acquired by a method listed in paragraphs (1) through (7) of his subsection if the income is not attributable to the personal effort of a spouse" (*id.* § 503(a)(7)).

¶ 42     Section 503(b)(1) of the Act provides

> "For purposes of distribution of property, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property. This presumption includes non-marital property transferred into some form of co-ownership between the spouses, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property. The presumption of marital property is overcome

by showing through clear and convincing evidence that the property was acquired by a method listed in subsection (a) of this Section or was done for estate or tax planning purposes or for other reasons that establish that a transfer between spouses was not intended to be a gift."

¶ 43    Here, it is undisputed that Stephen acquired a 70% interest in NBHI in June 2010, which was during the parties' marriage. Stephen's interest in NBHI was presumptively marital property, and it was his burden to show by clear and convincing evidence that his interest in NBHI was nonmarital. The circuit court concluded that Stephen did not meet his burden of showing that his interest in NBHI was nonmarital. We find no error in the circuit court's judgment.

¶ 44    Stephen argues that these issues are subject to *de novo* review because the resolution of these arguments involves "determining the application of the Act to undisputed facts." He relies on *In re Marriage of Wendt*, 2013 IL App (1st) 123261, ¶ 15, and *In re Marriage of Asta & Pappas*, 2016 IL App (2d) 150160, ¶ 17, to support his contention that *de novo* review is appropriate. Donna contends that because "the facts relative to the classification" were disputed, we should review the circuit court's judgment under the manifest weight of the evidence standard—the ordinary standard when reviewing a circuit court's classification of an asset as marital or nonmarital (*Wendt*, 2013 IL App (1st) 123261, ¶ 15). We conclude that under either standard, the circuit court's judgment was correct.

¶ 45    Stephen raises a host of arguments as to why his interest in NHBI is nonmarital. We observe, however, that Stephen's arguments focus almost entirely on the funding of the acquisition of Generations Bank by NBHI in April 2011, while barely acknowledging that he acquired a 70% interest in NBHI in June 2010, when NBHI was formed. The circuit court's judgment order stated that Stephen did not advance any argument addressing the fact that his interest in NBHI was

No. 1-18-2512

acquired during the marriage and was presumptively marital property. On appeal, Stephen contends that NBHI was formed to acquire Generations Bank, and that its formation "was an administrative step in the lengthy regulatory process, and, until the acquisition closed in 2011, NBHI was simply a dormant shell company." He insists that we must view the formation of NBHI in its proper context, namely "the reason it was created and the source of the funds contributed to it[.]" He does not, however, cite any authority suggesting that his acquisition of an interest in NBHI in June 2010 during the parties' marriage was not presumptively marital property. We therefore find that Stephen's interest in NBHI was presumptively marital property under sections 503(a) and 503(b)(1) of the Act.

¶ 46    Stephen would have this court view his interest in NBHI solely through the lens of NBHI's acquisition of Generations Bank. Stated differently, his arguments on appeal presume that his interest in NBHI was acquired when NBHI purchased its primary asset, Generations Bank. But Stephen does not advance any argument or cite any authority to support such a presumption. It is undisputed that Stephen obtained a 70% interest in NBHI in June 2010 when NBHI was formed, and not in April 2011 when NBHI purchased Generations Bank. The circuit court properly concluded that Stephen's interest in NBHI was acquired during the marriage and was presumptively marital property.

¶ 47    Stephen makes various arguments related to the circumstances and funding of the Generations Bank acquisition. We find, however that the context of the purchase does little to change the analysis of whether Stephen's interest in NBHI was marital or nonmarital property. The evidence at trial showed that Stephen and John were transitioning away from the nonbank residential mortgage lending industry and into the banking or savings and loan business. Stephen argues that the formation of NBHI was just one administrative step in a lengthy process for

No. 1-18-2512

Chicago Bancorp, a nonmarital asset of Stephen's, to acquire a national bank charter. The evidence at trial clearly established that Stephen obtained legal advice that Chicago Bancorp would not obtain regulatory approval to purchase Generations Bank because Chicago Bancorp, a nonbank residential mortgage lender, had too high of a debt-to-equity ratio to satisfy federal banking regulations. Stephen acknowledges that NBHI was formed for the express purpose of acquiring Generations Bank because Chicago Bancorp could not acquire it. In other words, the evidence at trial established that Chicago Bancorp could not purchase Generations Bank, so in June 2010, during the parties' marriage, Stephen and John formed a savings and loan holding company, NBHI, to acquire Generations Bank. In short, Chicago Bancorp had no equity interest in either NBHI or Generations Bank.

¶ 48    Stephen advances various arguments regarding his $2.5 million deposit with Chicago Bancorp that was used to complete NBHI's purchase of Generations Bank. These arguments do not persuade us that Stephen's interest in NBHI is nonmarital property, and do not rebut the presumption that his interest in NBHI is marital property.

¶ 49    First, he argues that the $2.5 million he deposited with Chicago Bancorp on March 31, 2011, was a capital contribution to Chicago Bancorp, a part of his nonmarital estate,[4] and that, upon deposit into Chicago Bancorp's operating account, the $2.5 million became Chicago Bancorp's property and lost its marital identity. He argues that, "to the extent Stephen's $2.5 million capital contribution is deemed to have transmuted to his non-marital estate because he contributed those funds to Chicago Bancorp ***, Donna would have the right to seek reimbursement pursuant to section 503(c)(2)(A) [of the Act (750 ILCS 5/305(c)(2)(A) (West 2016))]." But this argument loses its attraction where the evidence shows that Chicago Bancorp's

---

[4]We note that Chicago Bancorp's ledger treated John's and Stephen's March 31, 2011, capital contributions as "Paid In Cap Generations Bank."

No. 1-18-2512

ledger reflects that it treated John's and Stephen's March 31, 2011, deposits as "Paid In Cap Generations Bank." Thus, considering the evidence that the federal regulators required NBHI to have a $2 million capital account, the Chicago Bancorp ledger entry indicating the deposits were paid in capital for Generations Bank, and the close-in-time deposits by Stephen and John and the corresponding disbursements by Chicago Bancorp to complete the Generations Bank purchase by NBHI supports, rather than rebut, the presumption that Stephen's 70 % interest in NBHI is marital property. The circuit court was not required to blindly accept Stephen's uncorroborated analysis of this transaction.

¶ 50    Stephen next argues that the wire transfers from Chicago Bancorp's operating account to purchase Generations Bank and to capitalize NBHI were treated by Chicago Bancorp as shareholder distributions to Stephen and John.[5] Stephen offers only his statement that the $2.5 million he deposited into Chicago Bancorp was a shareholder distribution without any supporting testimony or records from Chicago Bancorp or its officers or agents. Although Stephen argues that Chicago Bancorp had enough cash to make a $3 million shareholder distribution, there is no corroborating evidence that it did make such a distribution. Absent any credible evidence that Chicago Bancorp made a $3 million shareholder distribution as evidenced by banking records or other credible contemporaneous records, Stephen's argument ignores the objective reality of the NBHI purchase. We "are not required to ignore the reality of the situation." *Asta*, 2016 IL App (2d) 150160, ¶ 25. Here, Stephen transferred $2.5 million, and John transferred $500,000, to Chicago Bancorp on March 31, 2011, and Chicago Bancorp paid out $3 million to capitalize NBHI and purchase Generations Bank on April 4 and 5. As Stephen repeatedly asserted throughout trial,

---

[5]We note that Chicago Bancorp's ledger did not reflect that the amounts wired out on April 4 and 5, 2011, were individual distributions to John or Stephen, but instead reflect distributions to "Generations Bank Recap" ($2 million), "Armed Forces Bank" ($937,000), "Cole Taylor Bank" ($55,434.50), "David Zeglis Generations Bank" ($10,000) and "Thomas Franklin Generations Bank" ($3779).

and repeatedly asserts on appeal, the entire purpose of forming NBHI was for it to acquire Generations Bank because Chicago Bancorp would not obtain regulatory approval. It is clear that even if Stephen intended to make a capital contribution to Chicago Bancorp and immediately receive a shareholder distribution in an identical amount in order to avoid regulatory problems during the purchase of Generations Bank, neither this court nor the circuit court are required to accept Stephen's contention that his deposit was a contribution to a nonmarital asset, since the entire purpose of the money transfers was to capitalize NBHI and purchase Generations Bank. Stephen claims that his version of the Generations Bank purchase is correct and that it was Chicago Bancorp's accountants that elected to treat Stephen's deposits to and the distributions from Chicago Bancorp between March 31 and April 5, 2011, as paid in capital for Generations Bank. But that does not control how this court or the circuit court should view the purpose of those transactions. Furthermore, there is nothing to reasonably suggest that the $2.5 million Stephen transferred to Chicago Bancorp from a marital account lost its identity in any manner, as the transfers in and out of Chicago Bancorp are readily identifiable, and thus cannot be said to have transmuted to Chicago Bancorp, a part of Stephen's nonmarital estate.

¶ 51    Finally, Stephen argues the circuit court erred when it found that he failed to meet his burden of proving by clear and convincing evidence that the $2.5 million contribution came from a nonmarital source. We find no error in the circuit court's judgment. The circuit court heard competing expert tracing testimony of the $2.5 million Stephen withdrew from Northern Trust x7803. Stephen's expert, Potter, did not perform a direct tracing of the funds in Northern Trust x7803 and testified that the funds were "most likely distributions from Chicago Bancorp." Stephen's primary contention on appeal is that, based on Potter's analysis, from 2001 to 2010, $14 million of the $18.3 million earned by the parties was attributable to Stephen's Chicago Bancorp

No. 1-18-2512

distributions with the difference attributed to marital earnings and expenses. Stephen's argument is consistent with Potter's testimony but is not a substitute for a clear and convincing tracing analysis. Donna's expert, Godbout, traced the funds in Northern Trust x7803 to a mix of marital and nonmarital sources. The circuit court was in the best position to weigh the competing evidence and could reasonably conclude that Stephen failed to meet his burden of showing a nonmarital source of the NBHI and Generations Bank under section 503(a) of the Act.

¶ 52    Based on the foregoing reasons, we find that the circuit court did not err when it classified Stephen's interest in NBHI as marital property.

¶ 53                                2. The Value of Stephen's Interest in NBHI

¶ 54    Next, Stephen argues that the circuit court abused its discretion when it valued his interest in NBHI as of December 31, 2016, rather than December 31, 2013. He contends that the circuit court chose the valuation date based on a nonexistent "stipulation" between the parties, and that the circuit court's decision is outside the bounds of reason. We find no abuse of discretion.

¶ 55    Section 503(f) of the Act provides

> "In a proceeding for dissolution of marriage *** , the court, in determining the value of the marital and non-marital property for purposes of dividing the property, has the discretion to use the date of the trial or such other date as agreed upon by the parties, or ordered by the court within its discretion, for purposes of determining the value of assets or property." 750 ILCS 5/503(f) (West 2016).[6]

---

[6]Prior to January 1, 2016, section 503(f) of the Act provided that the circuit court, "in determining the value of the marital and non-marital property for purposes of dividing the property, shall value the property as of the date of trial or some other date as close to the date of trial as is practicable." See 750 ILCS 5/503(f) (West 2014); see also *In re Marriage of Mathis*, 2012 IL 113496, ¶ 21 (quoting 750 ILCS 5/503(f) (West 2010) and observing "Thus, in any dissolution proceeding the valuation date for marital property is the date of trial or another date near it.").

No. 1-18-2512

¶ 56    Section 503(f) of the Act expressly vests the circuit court with discretion to determine the valuation date in a dissolution proceeding. "[A]n abuse of discretion occurs only where no reasonable person would take the view adopted by the court." *In re Marriage of DeRossett*, 173 Ill. 2d 416, 422 (1996).

¶ 57    The parties presented expert testimony regarding the value of Stephen's interest in NBHI as of December 31, 2013, and December 31, 2016. During closing argument, Stephen's counsel urged the circuit court to use the December 31, 2013, valuation date, while Donna's counsel argued for the December 31, 2016, valuation date. Stephen's counsel argued in the circuit court that section 503 of the Act "one, give[s] the [c]ourt discretion to determine the valuation date, and two, require[s] the [c]ourt to consider the parties' post-filing contributions." The circuit court concluded after hearing all of the evidence, including that Stephen's motion served on September 18, 2017, "makes reference to 'the 'parties' recent agreement to use December 31, 2016 as the current valuation date for TFSB and NBHI," and argument from counsel, that it would use the December 31, 2016, valuation, and made specific factual findings to support its decision to allocate 70% of the value of Stephen's interest in NBHI to Stephen and 30% to Donna.

¶ 58    Stephen first argues that there was no binding stipulation to use the December 31, 2016, as the valuation date of Stephen's interest in NBHI. He contends that the parties knew how to enter stipulations and did so for other matters. Prior to trial, Stephen filed a motion *in limine* to exclude certain evidence related to loans that TFSB allegedly made in 2017. Stephen asserted that Donna had previously sought discovery related to those loans on the theory that the loans were relevant to the value of TFSB and NBHI. Stephen asserted in his motion, "However, the parties' recent agreement to use December 31, 2016[,] as the current valuation date for TFSB and NBHI renders this argument moot." In her written response to Stephen's motion, Donna "acknowledge[d] and

No. 1-18-2512

agree[d] that the parties stipulated to a valuation date for TFSB and NBHI of December 31, 2016, and the parties' respective experts valued the entities as of that date."

¶ 59    We find that the parties' representations relative to Stephen's motion *in limine* do not constitute a stipulation. "A stipulation is an agreement and the court will look to the actual intention of the parties; like a contract, it must be clear, certain and definite in its material provisions." *West v. H.P.H., Inc.*, 231 Ill. App. 3d 1, 6 (1992) (citing *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, (1975)). Here, both parties represented that December 31, 2016, would be used as the current valuation of Stephen's interest in NHBI and TFSB. But Stephen contends that his use of the word "current" suggests that the parties would forego valuing Stephen's interests as of a date closer to the September 2017 trial, and that his motion *in limine* "cannot be construed as a representation that the parties had agreed not to provide the trial court with valuations as of earlier dates." Because the terms of the parties' agreement to use valuations as of December 31, 2016, do not flesh out a clear, certain, or definite agreement that the circuit court should use December 31, 2016, for the purposes of valuing Stephen's interest, we cannot say that there was an actual agreement by the parties.

¶ 60    Stephen next argues that the circuit court's decision to use the later valuation date was outside the bounds of reason. He primarily relies on the fact that the value of Stephen's interest in NBHI grew from $15.3 million to $80 million during the dissolution proceedings due to the passage of time and Stephen's postfiling contributions. He argues that Donna will receive nearly three times what she would have had the circuit court instead allocated her 50% of Stephen's interest as of December 31, 2013.[7]

---

[7]The circuit court concluded that Donna would only receive 30% of the value of Stephen's interest in NBHI because it "believe[d] that Donna should not doubly benefit by obtaining a 50/50 allocation," presumably because Donna received a benefit as a result of the circuit court's use of a valuation date closer to trial. No party challenges the circuit court's allocation on this point.

No. 1-18-2512

¶ 61    Stephen cites no authority to suggest that the circuit court's decision to select the valuation date of December 31, 2016, was an abuse of discretion. Section 503(f) of the Act gives the circuit court the discretion to select either the date of trial, a date agreed upon by the parties, or some other appropriate date when valuing a marital asset. Here, the circuit court presided over a lengthy trial involving substantial assets, heard the evidence, and concluded that the date closest to trial was the most appropriate valuation date for this asset. At most, the circuit court misspoke in using the term "stipulation," however, that does not mean a thoughtful exercise of discretion is absent. A review of the record does not persuade us that the selection of the December 31, 2016, valuation date was arbitrary or otherwise inappropriate, especially where both parties were prepared to, and did, present valuation evidence for that date.

¶ 62    Stephen's argument is really that he thinks Donna is getting more than he wants her to. The circuit court's judgment, however, apportioned the largest share of Stephen's interest in NBHI to Stephen, with a value of $56 million, and noted that Stephen was well-positioned to continue earning a substantial income. In view of the pleadings indicating that the parties were in agreement that a December 31, 2016, valuation date was appropriate, and the evidence offered by the parties as to the value of Stephen's interest in NBHI as of December 31, 2013 and December 31, 2016, the circuit court's decision to use a valuation date closer to trial was authorized by statute and not outside the bounds of reason. We affirm the circuit court's December 31, 2016, date of valuation of Stephen's interest in NBHI.

¶ 63    In sum, the circuit court did not err when it classified Stephen's interest in NBHI as marital property, and it did not abuse it discretion when it valued his interest as of a date closer to trial.

No. 1-18-2512

¶ 64                                    2. The Truckee Property

¶ 65    Next, Stephen argues that the circuit court erred when it classified the Truckee Property as marital property. He argues that he had no duty to trace the repayment of the premarital mortgage or the funds used to improve the Truckee Property to a nonmarital source. He contends that he owned the Truckee Property lot prior to the marriage and that the circuit court erroneously treated the land and improvements as separate assets. We disagree.

¶ 66    Here, it is undisputed that Stephen purchased the Truckee Property as a vacant lot prior to the marriage, the property was always titled in Stephen's name only, the parties built a vacation home on the property during the marriage, and during the marriage the parties paid related property expenses with marital funds. The issue before us is whether the trial court properly classified the Truckee Property as marital property with reimbursement to Stephen. This issue requires us to determine the legal effect of undisputed facts, which we review *de novo*. *Wendt*, 2013 IL App (1st) 123261, ¶ 15.

¶ 67    Section 503(a)(6) of the Act provides that "property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics" is considered nonmarital property. 750 ILCS 5/503(a)(6) (West 2016). Section 503(b) provides in part that "[f]or purposes of distribution of property, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property." *Id.* § 503(b). The presumption of marital property may be overcome by clear and convincing evidence that the property was acquired through a method listed in section 503(a) of the Act, was done for estate or tax planning purposes, or for reasons that would establish that any transfer between spouses was not intended as a gift. *Id.*

No. 1-18-2512

¶ 68    The Truckee Property lot was Stephen's nonmarital property because he acquired the lot before the marriage. *Id.* § 503(a)(6). Donna does not dispute the circuit court's finding that the lot was Stephen's nonmarital property and does not challenge the circuit court's finding that Stephen was entitled to $250,000 as reimbursement for purchasing the lot. The only issue before us is whether the circuit court correctly found that the house built on the Truckee Property lot during the marriage was marital property. Donna argues that the presumption of martial property applies to the house because it was constructed during the parties' marriage, and that Stephen failed to trace the cost of construction of the home to a nonmarital source. We agree.

¶ 69    In *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 704 (2006), the petitioner, Rod, acquired a lot prior to the marriage and built the marital home on the lot during the marriage. *Id.* The property was always titled in Rod's name only. *Id.* The circuit court found that the property was Rod's nonmarital property but ordered him to reimburse the marital estate for part of the property's value. *Id.* at 705. We reversed the circuit court's judgment, applying the presumption that all property acquired by the parties during the marriage is marital property (*id.* (citing 750 ILCS 5/503(a) (West 2004))), and that property acquired during the marriage is presumptively marital regardless of how title to the property is held (*id.* (citing 750 ILCS 5/503(b)(1) (West 2004))). The *Samardzija* court also cited the portion of the Act that provides "if marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estate, the commingled property shall be deemed transmuted to marital property." *Id.* at 705-06 (citing 750 ILCS 5/503(c)(1) (West 2004)[8]).

¶ 70    The situation before us is indistinguishable from the factual situation in *Samardzija*. Stephen acquired the Truckee Property lot prior to the marriage and during the marriage the parties

_____

[8]This portion of the Act currently set forth in section 503(c)(1)(B) of the Act (750 ILCS 5/503(c)(1)(B) (West 2018)).

constructed a home on the property. Title to the property remained in Stephen's name only. Here, the house on the Truckee Property was newly acquired property, as it was constructed during the marriage. There was no showing at trial that the construction of the house was funded exclusively with Stephen's nonmarital property, and the circuit court found that Stephen's testimony that he paid the contractors in cash was not credible, given that he was "a well-educated and intelligent financial person." Because Stephen could not identify a nonmarital source of the funds used to construct the house, the circuit court presumed that the house was acquired with marital funds and was therefore martial property. In other words, Stephen contributed the lot and the marital estate contributed the funds used to build the house, a commingling of property from two estates, resulting in the Truckee Property as whole. Stephen's nonmarital contribution of the lot lost its separate identity, resulting in the transmutation of the of the lot to the marital estate, subject to Stephen's right to reimbursement. 750 ILCS 5/503(c)(1(a)(i) (West 2016). The circuit court found that the lot was purchased by Stephen prior to the marriage and his nonmarital estate was entitled to reimbursement of $250,000, an amount that neither party challenges on appeal. This was consistent with section 503(c)(2)(A) of the Act, which provides that "[w]hen one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. *Id.* § 503(c)(2)(A) (West 2016).

¶ 71    Stephen contends that the house was an improvement to his nonmarital property, and that any improvements to the property during the marriage did not convert Stephen's nonmarital property to marital property. He contends that section 503(a)(7) of the Act controls, which provides that nonmarital property includes "the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the

No. 1-18-2512

personal effort of a spouse, or otherwise, subject to the right of reimbursement[.]" 750 ILCS 5/503(a)(7) (West 2016). But the construction of the house was more than just an increase in value to the Truckee Property lot; the house was property acquired during the marriage by the parties through the use of marital funds, and the construction of the house resulted in the loss of the separate identity of the lot.

¶ 72    Stephen relies on *In re Marriage of Henke*, 313 Ill. App. 3d 159 (2000) to argue that structures built on nonmarital property with marital funds are nonmarital property, subject to reimbursement to the marital estate. His reliance on *Henke* is misplaced. There, the petitioner, Marvin Jr., argued that the marital estate was not entitled to reimbursement for money contributed by the marital estate toward the construction of grains bins and a Morton building—which were used in farming operations—on a piece of nonmarital real property, referred to as the Home Farm. *Id.* at 173. The Home Farm was located on a larger farm, title to which was held in a trust by Marvin Jr.'s parents. *Id.* at 162. Marvin Jr.'s parents had assigned their beneficial interest in the Home Farm to Marvin Jr. *Id.* at 173. Significantly, the respondent, Adele, did not dispute that the parties' home on the Home Farm was nonmarital property. *Id.* at 163. Instead, she sought reimbursement to the martial estate of marital funds used to build the grain bins and the Morton building and presented clear and convincing evidence that marital funds were used to improve nonmarital property. *Id.* at 174. We affirmed the circuit court's judgment requiring reimbursement to the marital estate for the construction of the grain bins and Morton building. *Id.* at 173-74.

¶ 73    Here, unlike in *Henke*, the parties disputed whether the Truckee Property home was marital or nonmarital property, an issue not contested by the parties in *Henke*. Furthermore, here, during the marriage, the parties constructed a marital residence on the Truckee Property lot, held in Stephen's name only, with marital funds, unlike improving nonmarital property with commercial

No. 1-18-2512

structures. We find that *Henke* is distinguishable from the case before us and we are not persuaded that the circuit court erred by concluding that the Truckee Property house was marital property.

¶ 74     Given our conclusion that the circuit court did not err by classifying the Truckee Property house as marital property, we need not address Donna's alternative argument that Stephen gifted the Truckee Property to the marital estate.

¶ 75     In sum, the circuit court did not err when it classified the Truckee Property house as marital property. The Truckee Property house was marital property because it was acquired during the marriage with marital funds.

¶ 76                              3. The Schwab Accounts

¶ 77     Stephen's last remaining argument is that the circuit court erred when it classified his Schwab accounts as marital property. He argues that he opened Schwab x6612 with assets from his premarital accounts at William Blair and Deutsche Bank, and that he opened Schwab x8402 with assets from Schwab x6612. He asserts that, under section 503(a)(2) of the Act, property acquired in exchange for property acquired before the marriage is nonmarital property. He primarily contends that the circuit court erred by requiring him to perform a tracing of the individual securities in the investment accounts, which he argues is inconsistent with the Act. Stephen argues that we should review this issue *de novo* because there are no disputed facts.

¶ 78     We find no error in the circuit court's judgment on this issue, and our decision is the same regardless of whether we apply *de novo* review or the deferential manifest weight of the evidence standard. There is no dispute that William Blair x2996 and Deutsche Bank x7560 were Stephen's nonmarital property because those accounts were opened before the parties' marriage. There is also no dispute that Stephen made deposits to William Blair x2996 ($152,000) and Deutsche Bank x7560 ($144,000) during the marriage and before he opened Schwab x6612. Stephen did not trace

27

No. 1-18-2512

the source of those deposits to a nonmarital source. There is no dispute that Schwab x6612 was presumptively marital property because it was opened during the parties' marriage. For Stephen to overcome the presumption that Schwab x6612 was marital property, he had to show by clear and convincing evidence that Schwab x6612 was acquired under a provision listed in section 503(a) of the Act. The circuit court found that he failed to meet his burden of demonstrating that he acquired Schwab x6612 in exchange for property he acquired before the marriage because of the untraced contributions during the marriage to William Blair x2996 ($152,000) and Deutsche Bank x7560 ($144,000).

¶ 79    Stephen argues that the deposits to William Blair x2996 ($152,000) and Deutsche Bank x7560 ($144,000) during the marriage—regardless of whether the contributed funds were marital or nonmarital—transmuted to his nonmarital property because those funds lost their identity.

¶ 80    Section 503(c)(1)(A) of the Act provides

> "(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:
>
> > (1)(A) If marital and non-marital property are commingled by one estate being contributed into the other, the following shall apply:
> >
> > > (i) If the contributed property loses its identity, the contributed property transmutes to the estate receiving the property, subject to the provisions of paragraph (2) of this subsection (c).
> > >
> > > (ii) If the contributed property retains its identity, it does not transmute and remains property of the contributing estate." 750 ILCS 5/503(c)(1)(A) (West 2016).

No. 1-18-2512

¶ 81     The problem with Stephen's argument is that there is no evidence of the source of the $152,000 contributed to William Blair x2996 or the $144,000 contributed to Deutsche Bank x7560 during the marriage but before he opened Schwab x6612. Absent any tracing of those funds to a nonmarital source, the presumption is that those funds are marital property, a point that Stephen concedes in his reply brief. Stephen does not direct our attention to anything in the record, or to any relevant authority, suggesting that the funds lost their identity solely by virtue of being deposited into accounts that were opened before the marriage, nor have we been directed to any portion of the record as to what, if any, investments were made with the funds in the accounts; Stephen only directs our attention the fact that "[t]he money market fund shares in William Blair x2996, Deutsche Bank x7560, and the Schwab Accounts were all priced at $1 so were fungible like cash." Therefore, when Stephen deposited $152,000 to William Blair x2996 and $144,000 to Deutsche Bank x7560 during the marriage into an account created during the marriage, those presumptive marital funds did not transmute to his nonmarital property. *Id.* § 503(c)(1)(A)(ii). When Stephen used funds from William Blair x2996 and Deutsche Bank x7560 to open Schwab x6612, it cannot be said, without supporting evidence, that he acquired Schwab x6612 in exchange for property acquired before the marriage. He therefore failed to rebut the presumption that Schwab x6612—which was acquired during the marriage—was marital property.

¶ 82     It is also undisputed that Schwab x8402 was opened during the marriage with cash and securities from Schwab x6612. The circuit court concluded that Schwab x8402 was marital property because it was opened with funds from Schwab x6612, another marital account. Stephen does not advance any argument on appeal that Schwab x8402 could be found to be his nonmarital property even if Schwab x6612 was found to be marital property. Instead, it clear that Schwab x8402 is marital property because it was opened with marital assets.

No. 1-18-2512

¶ 83    As a final matter, Stephen argues that the circuit court miscalculated the amount of reimbursement he should receive for his nonmarital contributions to Schwab x6612. The circuit court reimbursed Stephen's nonmarital estate $493,000: $440,000 attributable to the combined premarital balances in William Blair x2996 and Deutsche Bank x7560, and the $49,000 check from Crossett for equity in Chicago Bancorp. Stephen argues that the $440,000 figure is based on a May 1999 account statement for William Blair x2996 ($104,000) and a September 2001 account statement for Deutsche Bank ($340,000), even though there was evidence of a September 2001 account statement for William Blair x2996 ($292,000). There is nothing in the circuit court's judgment order that would explain why it did not use account statements from the same time when determining the balances of Stephen's premarital account. And, to the credit of counsel for the parties, at oral argument, counsel agreed that this is an error that should be corrected in Stephen's favor. We therefore find that Stephen's nonmarital estate is entitled to additional reimbursement of $188,000 for a total reimbursement of $681,000, comprising $340,000 from Deutsche Bank x7560, $292,000 from William Blair x2996, and $49,000 from Crossett for equity in Chicago Bancorp.[9]

¶ 84                                    B. Donna's Cross-Appeal

¶ 85    We next consider whether the circuit court erred by finding that Donna's dissipation claims were time-barred. The circuit court found that Donna reasonably should have known by September 3, 2014, that she had a dissipation claim against Stephen when he informed her that $3.7 million was withdrawn from Northern Trust x7803 in January 2014 and was redeposited into Stephen's and John's Northern Trust x0590 and x3752 joint checking accounts. Donna filed her notice of intent to claim dissipation on September 7, 2017, identifying numerous specific transactions

---

[9]As we have rounded all these figures for the sake of simplicity, the parties and the circuit court should, on remand, use the actual dollar figures reflected on the account statements.

No. 1-18-2512

involving Northern Trust x0590 and x3752. The final dissipation claim was for approximately $4.5 million, of which the circuit court found approximately $2.7 million was time barred under section 503(d) of the Act.

¶ 86     Donna argues that the circuit court erred by interpreting section 503(d)(2)(iv) as a statute of limitations on dissipation claims and contends that her notice of intent to claim dissipation was timely under section 503(d)(2)(i). Donna also argues that the circuit court erred when it found that by September 3, 2014, Donna had learned of Stephen's transfer of funds from Northern Trust x7803 into Northern Trust x0590 and x3752, joint accounts of Stephen and John, and because John could have withdrawn the funds, she was on notice for the purposes of her dissipation claims. Donna contends that because Stephen had merely transferred monies to the joint accounts and had not spent any money at that time, dissipation did not occur until monies were spent for nonmarital purposes.

¶ 87     It is a fundamental rule of statutory interpretation to determine and give effect to the intent of the legislature, and the best indicator of that intent is the statutory language, which is to be given its plain and ordinary meaning. *Bank of New York Mellon v. Laskowski*, 2018 IL 121995, ¶ 12. We review issues of statutory construction *de novo*. *Id.*

¶ 88     Dissipation claims are governed by section 503(d) of the Act, which provides that, when determining the disposition of marital property, the circuit court should consider all relevant factors, including

> "(2) the dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions:
>
> > (i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;

No. 1-18-2512

> (ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred;
>
> (iii) a certificate or service of the notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules;
>
> (iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage[.]" 750 ILCS 5/503(d)(2) (West 2016).

The legislature's use of the term "shall" in section 503(d)(2) suggests that compliance with the Act is mandatory in order to pursue a dissipation claim.

¶ 89    The circuit court was correct in finding that section 503(d)(iv) operates as a statute of limitations on dissipation claims. The plain language of the Act provides that recovery on a dissipation claim is not available where the party claiming dissipation waited more than three years from the date they knew or reasonably should have known of the dissipation before giving notice of an intent to claim dissipation.

¶ 90    Donna correctly argues that section 503(d)(2)(iv) only addresses "the time period in which dissipation can be deemed to have occurred, not when the dissipation claim must be filed." That view, however, does not read section 503(d)(2) as a whole. Section 503(d)(2)(i) regulates when a notice of intent to claim dissipation must be filed in order to be timely but must be read together with section 503(d)(2)(iv). Section 503(d)(2)(i) sets forth the latest date on which a notice of intent

No. 1-18-2512

to claim dissipation can be filed prior to trial to avoid surprise. Section 503(d)(2)(ii) requires the party claiming dissipation to allege the date of the dissipation claimed. Section 503(d)(iv) limits a party from recovering on stale dissipation claims when the party claiming dissipation knew or reasonably should have known of the dissipation and failed to give notice of an intent to claim dissipation for more than three years. In other words, Donna's notice of intent to claim dissipation had to identify acts of dissipation that occurred within three years of when she filed her claim.

¶ 91    Donna argues that the circuit court erred when it determined that she knew or should have known of Stephen's alleged dissipation on or before September 3, 2014, when she learned the withdrawn funds were deposited by Stephen in a joint with John. On this point, we agree with Donna.

¶ 92    " '[D]issipation,' as used in section 503(d)(1) of the [Act], refers to the 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990) (quoting *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 886 (1987)). Whether a spouse's acts amount to dissipation depends on the facts of the case. *Petrovich*, 154 Ill. App. 3d at 886.

¶ 93    "The concept of dissipation is premised on waste." *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 67. "An act may constitute dissipation even though a spouse does not necessarily derive a personal benefit from it if the expenditure has some detrimental effect upon the marital estate." *Id.* "If a spouse's actions do not squander the marital estate's value, that spouse's actions cannot constitute dissipation." *In re Marriage of Miller*, 342 Ill. App. 3d 988, 994 (2003).

¶ 94    Here, it is undisputed that by September 3, 2014, Donna learned that Stephen withdrew $3.7 million from Northern Trust x7803 in January 2014, which was then redeposited into joint

No. 1-18-2512

accounts he held with John, Northern Trust x0590 and x3752, in July 2014. The circuit court concluded that Donna was on inquiry notice that she might have a dissipation claim against Stephen no later than September 3, 2014. The circuit court concluded that the $3.7 million withdrawal and the subsequent deposits of the same amount into Stephen's and John's joint accounts served no marital purpose. The circuit court also made specific findings that Donna learned of the January 2014 withdrawal in February 2014, and that Donna was suspicious that Stephen was taking marital funds and putting them in John's name.

¶ 95    The circuit court erred, however, by concluding that Donna's knowledge of the transfer of funds from one account to another account put Donna on inquiry notice that the marital estate might have been injured by Stephen's transfer of funds. A dissipation claim requires a detrimental effect on the marital estate. *Miller*, 342 Ill. App. 3d at 994 ("Although a spouse may not necessarily derive a personal benefit from the acts that constitute dissipation [citation], expenditures that form the basis for dissipation should have some detrimental effect upon the marital estate."). This court has regularly focused on whether a spouse charged with dissipation has used or spent money on nonmarital expenses. A nonexhaustive list of examples of dissipation includes transferring money to an account solely owned by one spouse's mother as an alleged repayment of the transferring spouse's debt (*In re Marriage of Uehlein*, 265 Ill. App. 3d 1080, 1087-88 (1994)); using marital funds to pay child support to an ex-wife (*In re Marriage of Klingberg*, 68 Ill. App. 3d 513, 517-18 (1979)); using marital funds to purchase a truck for a child without the other spouse's consent (*In re Marriage of Frey*, 258 Ill. App. 3d 442, 448 (1994)); and creating a trust, with a reversionary right in favor of the dissipating spouse, for the parties' children's education without the other spouse's knowledge (*Head v. Head*, 168 Ill. App. 3d 697, 702 (1988)). The common thread in the foregoing cases was that marital funds were moved outside the marital estate and used by one

No. 1-18-2512

spouse for a nonmarital purpose or moved beyond the reach of the other spouse for a nonmarital purpose during the breakdown of the marriage. We are not aware of any authority suggesting that a dissipation claim accrues where one spouse merely moves funds from one account to another account that a nonparty also has an interest in. In fact, the circuit court expressly found that Northern Trust x3752 was marital property.[10] In other words, there is nothing to suggest that by merely moving the money from one marital account to another, Stephen had *used* the funds for a nonmarital purpose.

¶ 96    Stephen argues that there was ample evidence at trial to show that Donna was suspicious in February 2014 that Stephen was taking money and putting it in John's name, and that she knew no later than September 3, 2014, that the $3.7 million withdrawn from Northern Trust x7803 had been in John's possession until the funds had been redeposited into Northern Trust x0590 and x3752 in July 2014. He contends that knowledge of a specific transaction is not required to put a party on notice of a potential dissipation claim, and that Donna could have filed a notice of dissipation claim for the whole $3.7 million within three years of when she learned that it had been withdrawn from Northern Trust x7803.

¶ 97    Here, we accept that Donna knew no later than September 3, 2014, that Stephen had moved $3.7 million out of existing marital accounts and into a new joint account with John, Northern Trust x3752. Her dissipation claim asserted in part that Stephen dissipated: (1) $771,000 from Northern Trust x3752 between April 2016 and March 2017 evidenced by a cashier's check payable to John, various withdrawals, and a deposit slip reflecting cash to John; (2) a $500,000 cashier's check payable to John drawn on Northern Trust x0590 in April 2016; (3) $1.05 million from a

---

[10]While the circuit court did not make any express finding as to whether Northern Trust x0590 was marital property, it would seem follow that if x0590 was funded with marital property, Stephen's interest in that account would also be marital property.

35

repaid loan that was transferred to John in January 2017; and (4) $265,000 given to John in November 2016 as proceeds from the sale of Stephen's interest in TurboAppeal. She also asserted there was a $64,000 discrepancy between the amounts withdrawn from Northern Trust x7803 and deposited into Northern Trust x0590 and x3752, and that Stephen acknowledged on September 18, 2014, that he gave John $64,000 to purchase a Tesla.

¶ 98    Under these circumstances, we cannot agree with Stephen or the circuit court that Donna's dissipation claims for the specified transactions occurring between April 2016 and March 2017 were time-barred. Nothing in the record suggests that Donna knew or should have known that the marital estate might have suffered an injury merely from the withdrawal of the $3.7 million that was subsequently deposited into Northern Trust x0590 and x3752. While Donna might have obtained knowledge on September 3, 2014, as to the status and destination of the $3.7 million withdrawn from Northern Trust x7803, we fail to see how knowing of monetary transfers between accounts—all of which were presumably marital accounts—would start the clock on dissipation claims related to the use of those funds in 2016 and 2017. In other words, Donna could not have known in September 2014 that the marital estate had been diminished by expenditures that did not occur until over a year later.

¶ 99    We also find that Donna's dissipation claim regarding the $64,000 that Stephen gave to John for the Tesla was timely. Donna sought an accounting from Stephen on September 2, 2014, for the $64,000 and Stephen responded on September 18, 2014, that the $64,000 had been given to John, thereby putting Donna on notice that the marital estate might have been injured by the withdrawal of the funds from Northern Trust x7803. Even if Donna had a suspicion that the $64,000 had been spent for a nonmarital purpose, it was not until Stephen provided an actual accounting of those funds that she could reasonably have known of an injury to the marital estate.

No. 1-18-2512

¶ 100   In sum, we find that the circuit court erred by finding that Donna's dissipation claims relative to the transactions identified above (*supra* ¶ 97) and the $64,000 given to John were time-barred. We therefore reverse the portion of the circuit court's judgment dismissing those dissipation claims and remand for further proceedings on those claims.

¶ 101                              III. CONCLUSION

¶ 102   For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part. We affirm the circuit court's judgment classifying Stephen's interest in NBHI as marital property and using the valuation date closer to trial. We affirm the circuit court's judgment classifying Stephen's Schwab accounts as marital property, and the judgment that the Truckee Property house was marital property.

¶ 103   The circuit court erred, however, in finding that that Donna's dissipation claims identified in this order (*supra* ¶¶ 97, 100) were untimely. We reverse that aspect of the circuit court's judgment and remand for further proceedings on those claims.

¶ 104   Finally, given the parties' agreement that an error was made in calculating Stephen's nonmarital contributions to the Schwab accounts, we find that the judgment should be modified to reflect that Stephen's nonmarital estate is entitled to a reimbursement of an additional $188,000, for a total reimbursement of $681,000, comprising $340,000 from Deutsche Bank, $292,000 from William Blair x2996, and $49,000 from Crossett for equity in Chicago Bancorp. On remand, the circuit court is instructed to incorporate our finding into any final judgment order it subsequently enters.

¶ 105   Affirmed in part; reversed in part; remanded with instructions.