# Kramer Levin

Paul H. Schoeman
Partner
T 212.715.9264
F 212.715.8064
PSchoeman@kramerlevin.com

1177 Avenue of the Americas
New York, NY 10036
T 212.715.9100
F 212.715.8000

January 28, 2022

**Via ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    <u>United States v. Stephen M. Calk</u>, S1 19 Cr. 366 (LGS)

Dear Judge Schofield:

    On behalf of Mr. Calk, we respectfully submit this letter to update the Court and to respond to the government's sentencing brief, (Dkt. No. 292 (hereinafter "Gov't Br.")). We are also attaching three additional letters in support of Mr. Calk (Exhibits A-68 to A-70), which we received subsequent to filing our initial memorandum.

    **I.**    **<u>Recovery of Collateral by The Federal Savings Bank</u>**

    In our initial sentencing submission, we informed the Court that The Federal Savings Bank expected to recover the full amount of the outstanding principal on the Manafort loans plus an additional $3.6 million. This was based on the amount of collateral already recovered and the anticipated net proceeds from the sale of the Union Street property. At the time of our prior submission, the foreclosure proceedings with respect to the Union Street property were in process in the Eastern District of New York. Subsequently, on December 21, 2021, a Judgement of Foreclosure and Sale was entered in the Eastern District of New York. We are advised that The Federal Savings Bank has received an appraisal valuing the property at $5 million and expects to recover net proceeds of approximately $4.5 million. This is higher than the $4.75 million valuation and estimated $4.275 million in net proceeds included in the Semenak Declaration that accompanied our sentencing submission, (*see* Dkt. No. 289 at 28 & Exhibit C). Based on the new estimate, total recovery by TFSB from the collateral for the Manafort loans is expected to be approximately $19,224.130.13, which is approximately $3,836,000 more than the aggregate principal owed.

    The government wrongly contends that the recovery of the collateral and the full repayment of the loans was a "stroke of luck," attributable to the "fortuity of a presidential pardon." (Gov't Br. 35). This is simply untrue. The facts are undisputed. The loans, by all accounts, were extremely well collateralized, with property and cash valued at over $25 million securing $16 million in loans. But for the government's actions, that collateral would easily have permitted TFSB to be made whole once Manafort was indicted and stopped making payment on the loans. However, the government froze and later required Manafort to consent to the forfeiture of certain assets in connection with his plea of guilty in the District of Columbia. The consent forfeiture order included, in addition to millions of dollars of other assets, the Water

The Honorable Lorna G. Schofield
January 28, 2022



Mill and Union Street properties and the two cash accounts at TFSB.  (Consent Order of Forfeiture, *United States v. Manafort*, No. 17 Cr. 201 (ABJ) (D.D.C. Oct. 10, 2018), ECF No. 443).  Manafort consented to the forfeiture knowing that he would be required to pay restitution to TFSB and others as part of his sentencing in his Eastern District of Virginia case.  The amount of restitution in that case was calculated at $25.5 million, of which approximately $15.4 million was payable to TFSB.  (Corrected Restitution Order, *United States v. Manafort*, No. 18 Cr. 83 (TSE) (E.D. Va. Mar. 21, 2019), ECF No. 325).

It was obviously the understanding of the government and Manafort that the forfeited TFSB collateral would be liquidated by the government and used to repay TFSB.  This can most clearly be seen from the government's responses to questions from Judge Ellis at the time of Manafort's sentencing in the Virginia case.  Specifically, in the colloquy set forth below the government assured the court that the forfeited collateral would be applied toward the Bank's losses and that Manafort had enough remaining assets to cover any potential shortfall and also pay a substantial fine.

> THE COURT: Because I think the Government would agree that victims should be paid before the Government gets its fine money, right?
>
> MR. ASONYE: We do agree with that, Your Honor. I would note that although the forfeiture proceedings are ongoing in the District of Columbia, and I hesitate to say how things will turn out, because we still are negotiating with Mr. Manafort and the various banks.
>
> If things go according to plan, we have some sense, if you look at paragraph 64 of the PSR, of where -- how much the banks will receive based on estimates of the value. And so if you look at the Citizens Bank loan, the $3.2 million, the estimate fair market value of that property, as estimated in the PSR, is $3.8 million. So if things go according to plan, Citizens Bank may be made whole.
>
> Banc of California, there was no collateral, so we are looking at a $685,000 loss at least there. **And then with respect to the Federal Savings Bank, again, the PSR has calculated at approximately, after the collateral, if it's disposed appropriately in the District of Columbia, approximately $200,000 loss.**
>
> **So in truth, if the -- if things go as we project, then actually the banks will be out -- Mr. Manafort will still owe $1 million on a restitution order after the properties are forfeited and paid. So he still would have – that's actually a restitution amount that he should be able to pay,** particularly in light of the fact that he has $4 million in equity in his homes. That doesn't include the additional securities that are listed in the PSR of approximately $5.6 million, which is listed in paragraph 131.

The Honorable Lorna G. Schofield
January 28, 2022



> ….
>
> THE COURT: …. I'm still -- Mr. Asonye, I'm still puzzled a bit by imposing a fine when I don't know what the total amount of restitution is going to be in the end and how that will affect his ability to pay. **I think your -- the argument you've made is that the predictions on the dispositions of the property and the restitution to the other victims is such that even after all that's paid, plus the $6 million in tax liability, would leave him with two homes.** Is that your view?
>
> MR. ASONYE: Two homes and millions of dollars in securities, Your Honor.

(Sentencing Transcript, *Manafort*, No. 18 Cr. 83, ECF No. 328 at Tr. 51:6-52:10, 54:22-55:7 (full transcript attached hereto as Exhibit B)).  In these exchanges, and elsewhere in the sentencing transcript, the government promised Judge Ellis that it would use the forfeited collateral to repay the Bank.  The government predicted that the sale of the properties and the return of cash collateral would leave a $200,000 shortfall for TFSB that Manafort could pay out of other assets.  Critically, one of those other assets was the Virginia apartment, which was pledged to TFSB, and which netted $2.29 million for the Bank when it was sold.  (*See* Dkt. No. 289, Exhibit C ¶ 18).  In other words, the government predicted that the TFSB collateral seized by the government, plus the Virginia property, would be worth approximately $18 million and would be more than sufficient to repay the loans.  The government was not far off, only slightly underestimating the recovered value of the collateral but correctly calculating that it was sufficient to pay back the principal with millions of dollars left over.

Based on the government's representations to Judge Ellis, the repayment of the Manafort loans was, as we have said, a foregone conclusion from the outset.  The government attempted to delay the inevitable while the case against Mr. Calk was pending.  But, as we have said, the pardon of Manafort foreclosed that tactic.  We respectfully submit that the time has come for the prosecution in this case to dispense with the false claim that the Manafort loans created any significant risk to TFSB that it would not be repaid.

### II.    The Unprecedented Criminal Prosecution of Mr. Calk

We believe that no one has ever been criminally prosecuted, much less sentenced to incarceration, for conduct that is even plausibly analogous to the facts of this case.  After reading the government's 43-page submission, we are even more confident that this belief is correct.  Indeed, the government concedes that the facts of this case are "unique." (Gov't Br. 32).[1]  Those facts include the absence of any intended, actual or potential financial harm to

---

[1] In this section of its brief, the government cites to and quotes from *United States v. Scruggs*, 916 F. Supp. 2d 670 (N.D. Miss. 2012), without describing the facts.  This may create the misimpression that there is at least one other criminal prosecution in history with similar facts at issue.  That is not the case.  *Scruggs* was the infamous prosecution of Dickie Scruggs, the

The Honorable Lorna G. Schofield
January 28, 2022



TFSB or taxpayers, and the absence of any intended, actual or potential financial benefit to Mr. Calk. They also include the fact that Mr. Calk and his bank were the victims of Paul Manafort's bank fraud. Lacking the hallmarks of prosecution-worthy conduct, the events of this case could have been left to non-criminal regulatory agencies to address. Mr. Calk's felony criminal conviction, with all of the devastating collateral consequences to his career and life that a conviction entails, means that he has already been treated far more severely and punitively than any other similarly situated banker. We respectfully submit that satisfying the objectives of criminal sentencing, including general deterrence, does not require more.

### III. The Government's Distortions of the Facts

The defense's sentencing submission attempted to set forth the facts most relevant to sentencing without trying to score or defend against the many contested but less relevant points and counterpoints that fill the record of the trial. The government's submission, however, is heavily laced with contentions not supported by the evidence and inferences that are inconsistent with real-world experience. The effect of this stratagem is to give the government's narrative of this case an overwrought quality that it does not otherwise possess, and inject sinister overtones into benign and insignificant events. As the Court presided over the trial and knows the record, we will not catalog all of the government's distortions here. A few examples, however, are set forth below.

The government points to the one-day turnaround of the conditional approval of the Nottingham loan as unusually speedy. (Gov't Br. 2). The evidence cited is Raico's email saying that Manafort would be impressed to receive conditional approval within 24 hours. (*Id.* (citing GX 108)). But the fact that Manafort would be impressed does not mean the approval time was unusual for TFSB. It wasn't, as Brennan clearly testified. (Tr. 863:25-864:4 ("Q. And you, yourself, have seen other loans get conditionally approved within a day; correct? A. Yes. Q. That's not unusual; correct? A. No")).

The government likes to say, over and over again, that Ubarri, the Bank's president, "rejected" the Summerbreeze loan. (Gov't Br. 6, 7, 22, 23). This is not based on any testimony, as the government chose not to call Ubarri as a witness. Instead, it is based on Ubarri's reaction to Manafort's last-minute attempt to renegotiate the Nottingham deal. (*See* GX 203 ("We are not changing the deal…we cannot put any more time on this loan.")). The government conveniently, but misleadingly, does not mention that three weeks later, Ubarri is the person who obtained from the underwriting department confirmation that Manafort appeared to have sufficient income to support making the Summerbreeze loan in the Bank's portfolio. (GX 230-A ("I would feel confident in issuing a term sheet or commitment to the borrower.")).

---

brother-in-law of Senator Trent Lott of Mississippi. Scruggs hired a friend of the state court judge presiding over a civil case in which Scruggs was a party to convey to the judge that if he ruled in Scruggs' favor, Lott would appoint the judge to the federal bench. In denying Scruggs' section 2255 petition, the court noted that Scruggs had conceded that the scheme to corrupt the judge was "'reprehensibly unethical,' and the type of contact that 'threatens the very heart of the judicial system.'" *Id.* at 674. Nothing about the *Scruggs* case provides a rationale for prosecuting Mr. Calk or seeking his incarceration.

The Honorable Lorna G. Schofield
January 28, 2022



After receiving that information and having a telephone call with Raico, it was Ubarri who presented three options to Mr. Calk, including making the Summerbreeze loan in portfolio, and said "[w]e can do any of these options." (GX 234). The government's "rejection" rhetoric also ignores the fact that Mr. Calk could not have approved the Manafort loans, or any other loans, by himself, and that Ubarri, as a member of the loan committee, approved each and every iteration of the Manafort loans (as did James Norini, the Bank's COO).

The government artfully misreads Mr. Calk's email on November 8, 2016, (GX 1152), which states, "We should have your approval all wrapped up by tomorrow I am being told." The government contends that this shows "not just the defendant's corrupt intent, but his awareness that the other credit committee members would not pose an obstacle." (Gov't Br. 7). But this interpretation is contradicted by the words of the email itself. The phrase "*I am being told*" is clearly referring to the email Mr. Calk received on November 7 from Raico telling Mr. Calk that BofI would approve the Summerbreeze loan the next day. (GX 223). The government ignores this context to cast Mr. Calk's truthful email about what he was being told as evidence of a nefarious (and fictional) intent to somehow override the loan committee.

The government ignores real-world context when it makes arguments based on campaign activity. For example, the government casts aspersions based on the responses that Mr. Calk's public relations consultant gave to a reporter asking questions about Mr. Calk's appointment to the NEAC. (Gov't Br. 3). No one familiar with political campaigns would find fault with the pablum that the PR person drafted for Mr. Calk. (*See* GX 121). Certainly the government has not demonstrated that the responses given by other council members were any less insipid. We can be confident that no one said they were appointed to the council because they wrote big checks to a super PAC in order to get their names in a press release, even though that was surely the case for some.

The government also implies that Mr. Calk subjectively believed that Manafort would likely be indicted for crimes relating to activities in Ukraine. (Gov't Br. 4, 36-37). There is, of course, no evidence of this. Although the government points to the campaign's blast emails noting that Manafort had left the campaign amid various allegations, the government fails to mention that those same emails insist that Manafort did nothing wrong. (*See* GX 360-A ("Manafort does campaigns for a living. He has never taken any 'off-the-books' cash payments, he's never worked for the Ukrainian or Russian governments, this is all just a distraction.")). We are confident that the Court understands that in the politically polarized world in which we live, each side of the political aisle often believes that allegations against their own side are false and allegations against the other side are true.

These are only some of the many examples that comprise the government's overarching effort to present the least objective and most unflattering version of the facts of this case in a way that is misleading.

IV. **Gratuitous Attacks on Mr. Calk's Character**

With our opening memorandum, we submitted over 65 letters from friends, family and associates to give the Court a fuller picture of how Mr. Calk has lived his life, and to

The Honorable Lorna G. Schofield
January 28, 2022



counter the unfair attacks on Mr. Calk's character that the government made at trial, including by disparaging his military record and his commitment to those who serve. The picture of Mr. Calk that emerges from these letters is fully consistent with the findings of the Presentence Investigation Report with respect to Mr. Calk's upbringing, family and personal life. In response, the government chooses to pursue its inflammatory and unfair attacks against Mr. Calk with renewed vigor, even dredging up irrelevant information from Mr. Calk's bitter and prolonged divorce proceedings and making unsubstantiated and false insinuations.

The government also attacks a strawman, suggesting incorrectly that the defense contends that Mr. Calk is entitled to a lower sentence simply because he has given away large sums of money, or because he has good references from business contacts. (Gov't Br. 38-41). The many supporting letters with our submission speak to qualities of Mr. Calk's character that have nothing to do with his financial success. Rather than simply concede that Mr. Calk has done much good in his life, the government cannot restrain itself from taking the most crabbed, jaundiced view possible, arguing that Mr. Calk "grew wealthy" by exploiting a "distinct opportunity" in lending to veterans, and that he found "his civilian career more important than the soldiers whose training and welfare he had agreed to oversee," and thus abandoned them when he elected to leave active duty. (Gov't Br. 40-41). While the government is of course entitled to advocate for its position, this sort of hyperbole and distortion, consistent with its approach on the merits, suggests that it has lost all perspective and sense of justice in prosecuting Mr. Calk.

## V. The Guidelines Calculation

### A. The Government Concedes No Obstruction of Justice Enhancement is Warranted

The government spends three pages of its brief walking back and ultimately reversing course on its prior claim to Probation that an obstruction of justice enhancement is warranted pursuant to U.S.S.G. § 3C1.1. (Gov't Br. 24-27). Even the government could not ultimately pursue this argument, which was never supported by the facts or the law. As set forth in our opening memorandum, there is no basis for increasing Mr. Calk's sentence, under any analysis, based on these statements, which, even crediting the recollections of the government's witnesses, were hardly "lies" designed to cover up criminal activity or obstruct a criminal investigation.

### B. The Government's Analysis Regarding the Improper Benefit Conferred is Speculative and Ignores the Facts of this Case

As now appears undisputed, this case is without precedent as measured by either the nature of the "bribe" offered by Manafort, or the "benefit" conferred by Mr. Calk. The best argument that the government can muster about the value of the bribe is that it can be measured by the $1,850 Mr. Calk paid to travel to and stay at The Four Seasons Hotel the night before he received a "courtesy" interview with members of the Trump transition team. This is the argument the government made to the jury and which the Court accepted in denying the defense's Rule 29 motion. (Dkt. No. 285 at 5-6; Dkt. No. 293 at 6-7). While we dispute that this is a fair or accurate measure of the alleged bribe's value (or that Mr. Calk's subjective valuation

The Honorable Lorna G. Schofield
January 28, 2022



is relevant under § 215), it is at least tied to something that actually occurred and is not based on counter-factual speculation.

The value of the benefit conferred, as calculated by the government, has no such basis in reality and, illogically, produces a result that dwarfs the value of Manafort's "bribe." The government's methodology – based on a comparison with the Genesis loans – is a hypothetical thought experiment with many unknown variables (the collateral, the points, the underwriting requirements, etc.). It does not produce a reliable estimate, which it is the government's burden to provide. *See United States v. Arnone*, 973 F. Supp. 206, 211-12 (D. Mass. 1997). The Court should not use it to increase Mr. Calk's sentence by the 14 levels proposed by the government (*i.e.*, nearly three times the base offense level, and 14 levels higher than would be the case if the value of the bribe were used). U.S.S.G. § 2B4.1 cmt. background (If the amount of the benefit conferred cannot be estimated, "the amount of the bribe would be used to determine the appropriate increase in offense level.").

The government attempts to justify its argument by pointing to the example in the Guidelines commentary that refers to the case of "a bank officer [who] agreed to the offer of a $25,000 bribe to approve a $250,000 loan under terms for which the applicant would not otherwise qualify." U.S.S.G. § 2B4.1 cmt. background; Gov't Br. 16. In that case, the commentary counsels that the court should use the greater of the value of the bribe or the "savings in interest over the life of the loan compared with alternative loan terms." U.S.S.G. § 2B4.1 cmt. background. Implicit in the example is that the bank officer is, in return for a cash bribe, giving the applicant a better interest rate than he would otherwise be entitled to at the bank. The example does not, by its terms, apply to a scenario where the borrower has sought loans at two separate financial institutions, much less institutions that engaged in different forms of lending, on different terms, with different collateral, different costs and fees, and at different times. The government cites no case where the cited commentary has been applied in this circumstance, or anything even close.

Nor can this commentary sensibly be applied where there are numerous intervening factors, other than the bribe, that played a role in the issuance of a loan. Here, there is no dispute the borrower falsified information provided to the lender, and the lender's underwriters made material errors in calculating the borrower's income such that it appeared much greater than it actually was. (*See* Dkt. No. 289 at 21). Finally, it is undisputed that The Federal Savings Bank made $285,000 in points on the first loan, $130,000 in points on the second loan, collected costs and fees from the unclosed-Nottingham loan, and, having secured the loans with collateral worth far in excess of the value of the loans, including substantial cash on deposit, extended the loans to Manafort on terms that ultimately made these loans the most profitable in the Bank's history. The notion that Mr. Calk conferred a $550,000 benefit on Manafort in this context is inconsistent with the facts and common sense.

C. <u>The Abuse of Trust Enhancement Does Not Apply</u>

As the government itself recognizes, the *sine qua non* of the abuse of trust enhancement is that "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." (Gov't Br. 22

The Honorable Lorna G. Schofield
January 28, 2022



(citing U.S.S.G. § 3B1.3 cmt. n.1)).  Merely occupying a position of trust is not sufficient. *United States v. Nuzzo*, 385 F.3d 109, 115-116 (2d Cir. 2004).  Similarly, the enhancement does not apply whenever a bank executive takes a bribe – the executive "must have capitalized on [his or her] superior position in committing the offense conduct." *Id*. at 116.  To meet this standard, the government points to testimony by Brennan that his "understanding" was that the loans were made because Mr. Calk wanted them to be made, suggesting that Mr. Calk simply imposed his will on the Bank in order to benefit himself.  (Gov't Br. 21).  But Mr. Brennan's "understanding" ignores the fact that the Bank conducted months of due diligence, including by Brennan himself, free from any interference from Mr. Calk, and that all three members of the loan committee, not just Mr. Calk, voted to approve the loans, as was a requirement for all portfolio loans.  Moreover, Mr. Brennan testified that he never told Mr. Calk that the Bank should not make the loans to Manafort, and could not recall ever even raising an issue regarding the loans with Mr. Calk.  (Tr. 883:6-11; Tr. 881:13-16).  The government says that Mr. Calk "so dominated the process as to completely distort the results," (Gov't Br. 22), but this claim is not borne out by Brennan's testimony or any of the other evidence cited by the government.[2]  Nor is there any evidence in this case, as in *United States v. Lebedev* (cited by the government), that Mr. Calk's decisions "jeopardized the [bank's] financial health."  932 F.3d 40, 57 (2d Cir. 2019).  As we have previously noted, there is no evidence that Mr. Calk concealed the loans or his relationship with Manafort from the Bank's board; to the contrary, both were disclosed.  (Tr. 679:2-688:9; Tr. 1343:3-1345:4).  In sum, the facts of this case are a far cry from those that would typically warrant application of an enhancement that distinguishes between the status of being a bank executive and the conduct of abusing the position to facilitate or conceal a crime.

\*      \*      \*

For the foregoing reasons, as well as those described in our December 6, 2021 sentencing submission, we respectfully reiterate our request that the Court impose a non-custodial sentence.

Respectfully submitted,

/s/ Paul H. Schoeman

Paul H. Schoeman
Darren A. LaVerne

cc:     All counsel (via ECF)

---

[2]     Brennan testified that in his experience, when Mr. Calk disagreed with the two other committee members, "[t]hey would discuss it and the terms of the loan maybe changed or the loan would be declined."  (Tr. 719:11-12).  Elsewhere, Brennan testified that in order to override Ubarri, "Mr. Calk would have to persuade the other members of the loan committee to go along with it."  (Tr. 795:16-17).  This is hardly evidence that Mr. Calk abused his position as Bank Chairman and a member of the loan committee.