1

2

3    UNITED STATES GRAND JURY

4    SOUTHERN DISTRICT OF NEW YORK

5    - - - - - - - - - - - - - - --x
     UNITED STATES OF AMERICA      :

6
              -v-                  :  November 8, 2018, Special

7
     STEPHEN M. CALK               :

8    (2017R00368)
     - - - - - - - - - - - - - - - x

9

10                                      United States Courthouse
                                        Foley Square

11                                      New York, New York

12                                      March 4, 2021
                                        2:04 p.m.

13

14   A P P E A R A N C E S:

15                               BENET KEARNEY
                                 Assistant United States Attorney

16
                                 PAUL MONTELEONI

17                               Assistant United States Attorney

18                               HAGAN SCOTTEN
                                 Assistant United States Attorney

19

20

21

22

23

24                               JENNIFER MYRIE
                                 Acting Grand Jury Reporter

25

1                (Colloquy Precedes)

2                (Witness Enters Room)

3                (Time Noted:  2:15 p.m.)

4    RANDALL L. RIGBY called as a witness, having been duly sworn

5                by the Foreperson of the Grand Jury, was examined

6                and testified as follows:

7    BY MS. KEARNEY:

8         Q.   Good afternoon, sir.  Would you please state and

9    spell your name for the record?

10        A.   My name is Randall L. Rigby.  R-a-n-d-a-l-l.  L.

11   Rigby, R-i-g-b-y.

12        Q.   Thank you.  As I explained a moment ago, my name

13   is Benet Kearney.  I'm an Assistant United States Attorney

14   with the U.S. Attorney's Office in the Southern District of

15   New York.  Until about a half an hour ago, we had never

16   spoken before, is that right?

17        A.   That's correct.

18        Q.   In fact, you were subpoenaed to appear remotely

19   today, is that right?

20        A.   That's correct.

21        Q.   So I want to advise you of certain rights that you

22   have and make sure you understand them before we proceed,

23   all right?

24        A.   Yes.

25        Q.   So first, do you have a copy of the subpoena that

1    was served on you?

2         A.    I do.

3         Q.    Is it in the room with you?

4         A.    It's right here.

5         Q.    Great.

6               MS. KEARNEY.   Let me see if I can -- this is

7    going to require an advanced technological maneuver, but let

8    me see if I can pull up a copy; that is

9    Grand Jury Exhibit 45.

10   BY MS. KEARNEY:

11        Q.    General Rigby, can you see the document I'm

12   showing you on my screen?

13        A.    Yes, I can.

14        Q.    Great.  And is that a copy of the subpoena that

15   you received?

16        A.    It is, including the supplemental information.

17        Q.    Thank you.

18              MS. KEARNEY.   For the grand jury, that's

19   Grand Jury Exhibit 45.

20   BY MS. KEARNEY:

21        Q.    If we look at Page 2, is that the supplemental

22   information you're referring to?

23        A.    Yes.

24        Q.    Okay.  Are you represented by an attorney in

25   connection with this proceeding?

Randall Rigby                                          03/04/2021    4

1      A.    Yes, I am.

2      Q.    In fact, Terrence Campbell (ph)?

3      A.    Yes.

4      Q.    Have you reviewed this supplemental information,

5  this Advice of Rights form, with Mr. Campbell?

6      A.    Yes, we have.

7      Q.    Do you understand this document?

8      A.    I do.

9      Q.    So I want to go through your rights and make sure

10  you understand.  First, do you understand that you may

11  refuse to answer any questions if a truthful answer to the

12  question would tend to incriminate you?

13     A.    Yes.

14     Q.    Do you understand that anything you do or say may

15  be used against you by the grand jury or in a subsequent

16  legal proceedings?

17     A.    Yes.

18     Q.    And that when you have a lawyer, the grand jury

19  will permit you a reasonable opportunity to step outside the

20  grand jury room to consult with your lawyer if you so

21  desire.  Do you understand that?

22     A.    Yes.

23     Q.    So for our purposes, since you are appearing by a

24  video conference today, that means that if you want to

25  consult with Mr. Campbell, then you should step outside of

1    the room that you are currently in and consult with him from

2    another room whether by telephone or in person, okay?

3         A.   I do understand, yes.

4         Q.   If for some reason you would like a lawyer but you

5    don't have the funds to continue to retain Mr. Campbell, you

6    can make an application to a United States Magistrate judge

7    who will decide whether or not to appoint a lawyer to

8    represent you.  Do you understand that?

9         A.   Yes.

10        Q.   Do you also understand that lying to the grand

11   jury is a federal offense and can subject you to criminal

12   penalties?

13        A.   Yes.

14        Q.   Do you also understand that grand jury proceedings

15   are conducted in secret so that no one but yourself, the

16   grand jurors, the attorneys for the government, the court

17   reporter, and an interpreter if necessary, may be present

18   while the grand jury is in session?

19        A.   Yes.

20        Q.   So as we explained before, we are conducting this

21   by a video conference.  Where are you currently located sir?

22        A.   I'm in my house.  I'm in the basement in my

23   office.  I'm alone.

24        Q.   Okay.  Is there anyone else in the room with you?

25        A.   No.

1       Q.   To the best of your knowledge, can anyone

2    other -- is anyone other than you and I connected to the

3    video conference?

4       A.   Not that I know of.

5       Q.   To the best of your knowledge, can anyone other

6    than you, the grand jurors, the court reporter, and the

7    government attorneys see, hear, or observe any part of this

8    proceeding?

9       A.   Not that I'm aware of.

10      Q.   Okay.  If you do become aware that anyone else

11   besides those people comes into the room or is, otherwise,

12   in a position to see or hear the proceedings, can you let us

13   know immediately?

14      A.   I will.

15      Q.   Thank you.  Could you tell us a little bit about

16   your professional background?

17      A.   I spent 32 years in the regular Army.  I was a

18   combat arms officer.  I retired 20 years ago.

19           I began to work for Sandia National Laboratories

20   in Albuquerque, New Mexico working on Class 5 projects for

21   the Department of Defense and other agencies.  I left Sandia

22   in 2013 and intended to retire, but I received several

23   consulting positions.  I continued to do that until as

24   recently as this year.  One of the things that I did was I

25   was the director of the Federal Savings Bank between January

1   2014 and May 2017.  But now I am fully retired.

2        Q.    What was the last employment that you had, sir?

3        A.    I was a director for the Federal Savings Bank.

4        Q.    Okay.  And that ended in May 2017?

5        A.    That's correct.

6        Q.    What was the last consulting position you had?

7        A.    Oh, I did have a consulting position with a group

8   called (video skip) Solutions and that sort of terminated in

9   December of last year.

10       Q.    Can you say the name of the company one more time?

11  The video feed broke up.

12       A.    Heartland (ph) Solutions Group.  It was a

13  consulting firm that serviced with Zebra Corporation here in

14  the Chicago area.

15       Q.    When you retired from the military what was your

16  rank?

17       A.    I was a Lieutenant General.

18       Q.    While in the military, in the Army, did your

19  responsibilities include management?

20       A.    Yes.

21       Q.    In your experience in management, how important is

22  the culture of an institution?

23       A.    Very important.

24       Q.    How important is the tone at the top?

25       A.    Very important.

1      Q.   In what way?

2      A.   They set the tone for the organization whether

3  it's a vibrant organization or one that you just wait till

4  the boss tells you what to do.  I've been in both kind of

5  units.

6      Q.   Understood.  How important is the presence or

7  absence of favoritism in an organization?

8      A.   Well, when you're in a leadership position you

9  should always be fair.

10     Q.   Okay.  So you mentioned that you served as a

11  director at the Federal Savings Bank?

12     A.   That's correct.

13     Q.   Do you mean on the Board of Directors?

14     A.   Yes.  I was an outside director.

15     Q.   What does it mean to be an outside director?

16     A.   That means I was an (audio skip) to the bank

17  board.  I was a member of the board and an advisor to the

18  bank board on the -- in the bank.

19     Q.   Any particular subject areas or topics that you

20  were asked to advise on?

21     A.   Not particularly, no.

22     Q.   How did you come to be a board member?

23     A.   I was asked by Steve (audio skip).

24     Q.   And who is Steve Calk?

25     A.   He was the owner and chairman of the board of the

1  Federal Savings Bank.

2       Q.   How did you know Steve Calk?

3       A.   I had met him at a funeral a few months before

4  that for a father of a mutual friend, and several months

5  later he called me and asked me if I'd like to have lunch or

6  breakfast with him.  And (audio skip) we met, and he asked

7  me if I'd be interested in joining his (audio skip) as a

8  board member.

9       Q.   All right.  Just give me one second.

10           MS. KEARNEY.   Did the grand jurors catch all

11  that?  I know the audio broke up a little bit.

12           GRAND JURORS.   Yes.

13  BY MS. KEARNEY:

14       Q.   Had you spoken to Mr. Calk between meeting him at

15  the funeral and then called you to ask if you would join the

16  board?

17       A.   No.

18       Q.   What, if anything, did you know about him prior to

19  joining the board?

20       A.   Not much.  I never heard of the bank.  I didn't

21  know anything about him until he called and we began to

22  talk.

23       Q.   In general terms what did you learn during that

24  conversation?

25       A.   Well, I learned he ran a bank.  His brother John

Randall Rigby                                    03/04/2021    10

1   was with us.  We had breakfast, and it was a nice

2   conversation.  At the end of the conversation he asked if

3   I'd be interested.  I told him let me think it over a day or

4   two, and I decided well, this -- another life experience;

5   let's try this.

6        Q.    Had you ever been in the banking industry before?

7        A.    Absolutely not.  No.

8        Q.    Who were the other board members when you joined?

9        A.    Gee.  Ken Harris.  And then the officers were in

10  the bank.  Let me see, I don't know that there were -- well,

11  within a month or two or three, I'm not sure.

12  George Gilmore (ph) joined; Ken Harris was there;

13  Bernard Banks (ph) joined as well.

14       Q.    Did the composition of the board change prior to

15  you leaving in 2017?

16       A.    I understand that there had been someone who had

17  "aged out."  He had gotten old and wanted to retire.  So I

18  think that's -- I'm not sure -- but I think that's what

19  precipitated Steve asking me to -- when that vacancy opened.

20       Q.    When you were on the board from January 2014

21  through May of 2017, what were your duties and

22  responsibilities as a member of the Board of Directors?

23       A.    Come to the meetings and advise on things that

24  were going on.  It was usually pretty open discussions we

25  had about what was happening, so I would just do

1   participating.  Later on I was asked to join the audit

2   committee, and so George (audio skip), Ken Harris, and

3   myself became the -- directors on the audit committee.

4        Q.   What's the audit committee do?

5        A.   Our primary function was to advise them in the

6   internet technology to the bank.

7        Q.   That was the audit committee's responsibility?

8        A.   As you know that's a very rapidly moving area, so

9   we brought in some new personnel -- and began to upgrade the

10  IT capability.

11       Q.   As a member of the audit committee?

12       A.   Yes.

13       Q.   Or as far as a member of the board in general?

14       A.   That's right.

15       Q.   Both?

16       A.   Yep.  Well, both.  Audit committee was part of the

17  board.

18       Q.   Understood.  Other than the audit committee, did

19  you have a specific focus or area of advice or oversight?

20       A.   No.

21       Q.   Were you on any other committees?

22       A.   No.

23       Q.   What were your duties and responsibilities, other

24  than the audit committee, as a member of the board?

25       A.   As I said, attend the meetings which were once a

1  month; and give advice as issues came up; primarily was to

2  listen how the bank was doing and which was -- I think all

3  of us did that.

4      Q.   You said give advice as issues came up.  What

5  kinds of issues would come to the board level?

6      A.   That's kind of -- you know, someone would make a

7  comment and then I'd be asked, what do you think about that?

8  And I'd give a response.

9      Q.   Were there particular topics or subject areas that

10 required the board's attention?

11     A.   Well, in the banking industry they are all

12 important.  So you always look at your profit and cost, you

13 always look at the number of -- this is a mortgage bank with

14 a federal charter -- so you look at the number of loans and

15 how many loans -- home loans -- are being -- mostly home

16 loans -- are being placed.  And that's sort of what we did

17 plus all the legal requirements that (audio skip)

18     Q.   Could you repeat that last sentence?  The audio

19 just broke up a little bit.

20     A.   In addition to all the requirements that are

21 required to do that; in order to make the loans, in order to

22 remain a viable banking institution.

23     Q.   Let me know if I'm summarizing this incorrectly,

24 just because the audio broke up.  So I want to make sure I

25 understood the gist of your sentence.

1          Part of your responsibility as the director was to

2    keep tabs on the amounts and kinds of loans that the bank

3    was making to insure that it remained a viable lending

4    institution?

5         A.   No.  I didn't keep tabs.  We had a staff that

6    could do it.  We had accountants and comptrollers that -- by

7    the way, our comptroller was a member of the board.  And

8    they were the ones that would brief us or tell us at the

9    meetings how they were doing, and we would discuss it.

10        Q.   I see.  So you would receive information from

11   accountants, the comptroller, other employees of the bank,

12   about the loan portfolio of the bank?

13        A.   That's correct.  Yes.

14        Q.   Okay.  Was there anyone in particular, or a set of

15   people, who compiles that information for you?

16        A.   Well it was -- the comptroller's office is the

17   primary that did that, but you also had all the other sales

18   personnel from all over the bank, you had all of the

19   underwriters that were with the bank -- underwriting all

20   those loans that were active -- so yeah, it was a whole

21   banking effort to do that.

22        Q.   Who was the comptroller?

23        A.   Mr. Semenac, I believe is his name; Dan Semenac.

24   I'm not sure about how to spell it.  I know his (audio skip)

25   was Dan -- I believe it was Semenac.

Randall Rigby                         03/04/2021    14

1        Q.   Okay.  In what format or formats did Mr. Semenac

2    and similar people present the information for you; was it

3    written, was it oral?

4        A.   We were given briefing (audio skip).  Yeah, we

5    were given briefing charts.

6        Q.   Was that distributed by email, in hard copy, in

7    person?

8        A.   Yes, usually a day or so before -- maybe two days

9    before the meeting we would get an email with what's

10   probably called a board book -- or what I called a board

11   book -- with all that data compiled.

12       Q.   When you received these briefings from the board

13   books, or similar information, did they contain information

14   about individual loans or particular loans?

15       A.   Some of them, yes.

16       Q.   When would an individual loan be included?

17       A.   Well, the normal way we looked -- the normal way I

18   looked at -- and what was presented to the board, to the

19   best of my knowledge, was loans that were out of (audio

20   skip) sequence in payments that were behind payments, 30,

21   60, or 90 days, which is not unusual on home loans.  And for

22   those that were out of date, the operating officer would

23   discuss it with us and what they were doing about getting

24   these loans paid.

25       Q.   Did you ever receive information about loans prior

Randall Rigby                    05/04/2021      15

1    to them being extended by the bank?

2         A.   No.  There were typically -- there were hundreds

3    of them.

4         Q.   What about loans that were large in comparison to

5    the rest of the loans at the bank, did you receive briefings

6    on those?

7         A.   No.  I didn't.  And to my -- I don't know.  But I

8    didn't get any of those that I know of, that I can remember.

9         Q.   Did you receive -- I know you said you received

10   information on the loans that were out of date, meaning that

11   they were not being paid on time?

12        A.   Yes.

13        Q.   Did you receive any information on loans that, for

14   some other reason, might pose a risk to a bank; to the bank?

15        A.   Not that I can recall, no.

16        Q.   For example, reputational risk based on the

17   identity of the borrower?

18        A.   No.  That I could recall, I do not remember that.

19        Q.   Okay.  Have you ever heard of the Bank Bribery

20   Act?

21        A.   I have now.

22        Q.   When you were on the board had you heard of the

23   Bank Bribery Act?

24        A.   No.

25        Q.   Do you know if the Federal Savings Bank has a

Randall Rigby                                     05/04/2021    16

1   policy to insure compliance with the Bank Bribery Act or

2   something similar?

3        A.   I don't know.

4        Q.   I'm going to attempt to show you another document,

5   sir.  This is going to be Grand Jury Exhibit 46.  Can you

6   see that?

7        A.   No.  Oh, I can now.

8        Q.   Okay.  So this is the Bank Bribery Act/Conflict of

9   Interest Policy for the Federal Savings Bank.

10       A.   I do see it, and I'm looking at the dates.

11       Q.   Yes.  And now that you've seen it, do you remember

12   the board approving this?

13       A.   I don't remember that.  We saw things like this,

14   you know, almost every meeting or every other meeting, so I

15   don't remember that one specifically.

16       Q.   So you just don't remember either way, is what

17   you're saying?

18       A.   No.

19       Q.   Okay.  Let me show you one more document.  This is

20   going to be Grand Jury Exhibit 47.  Are you able to see

21   that?

22       A.   I am, yes.

23       Q.   Are these the minutes of the meeting of the Board

24   of Directors of the Federal Savings Bank from April 21,

25   2016?

 1     A.   Okay.

 2     Q.   I'm going to direct you to page -- the bottom of

 3   Page 2 and the top of Page 3.

 4     A.   Okay.

 5     Q.   Beginning with: Policies were presented with

 6   updates/amendments.  And then the second bullet point is the

 7   Bank Bribery Act/Conflict of Interest Policy, do you see

 8   that?

 9     A.   I see.

10     Q.   Then the top of Page 3 reads: After review and

11   discussion of the policies, Mr. Gilmore made a motion to

12   approve the policies as presented which General Rigby

13   seconded.  The policies were adopted by a unanimous vote of

14   the members of the Board.

15     A.   I see that, yes.

16     Q.   So fair to say that they were adopted unanimously,

17   the Board voted to adopt them without objection?

18     A.   I see that, yes.

19     Q.   Do you recall doing that?

20     A.   No.  I don't recall it, but obviously it happened,

21   I just don't remember it.

22     Q.   Do you recall seconding the motion?

23     A.   I seconded a lot of them, so not this

24   specifically.  No.

25     Q.   Okay.

Randall Rigby                                          03/04/2021    18

1        A.    Obviously I did, but I don't remember it.

2        Q.    At this meeting of the Board of Directors, was

3   Mr. Calk present?

4        A.    He was usually present so -- yeah, the minutes

5   say -- I see the minutes; they say he was, so obviously he

6   was.  I don't recall him -- he had been (audio skip) time,

7   calling in from home, but he participated in meetings.  I

8   don't remember him missing a meeting, so I assume he was

9   there.

10       Q.    Okay.  And to get a unanimous vote, it's the case

11  that the entire board voted yes?

12       A.    Yes.

13       Q.    And that would include Mr. Calk; Stephen Calk?

14       A.    I presume; I don't know for sure, but I would say

15  yes, you know?  My guess would be yes.

16       Q.    Now you told us you resigned from the Federal

17  Savings Bank Board of Directors in May 2017?  Is that right?

18       A.    That is correct, yes.

19       Q.    Why did you resign?

20       A.    I fairly pointed out a month before that that

21  Steve had made a loan to a prominent political figure, and

22  it was my feeling, based on my reputation and the reputation

23  of the bank, I should have known about that loan.  So I

24  resigned.

25       Q.    Who was that figure?

Randall Rigby                                          03/04/2021    19

1        A.    His name was Manafort.

2        Q.    Why did you feel you should have known about that

3   loan?

4        A.    Because it would be drawing at the entire bank's

5   reputation, and that added the board and the employees of

6   the bank into a political situation that a lot of people

7   didn't want to get involved -- and I know -- I'm a military

8   person, have been, and I've always been -- politically.  And

9   I didn't want to be associated with any politician,

10  regardless of party -- I just didn't feel that I was a fit

11  with the bank anymore.  I think Steve should have been -- or

12  someone from the bank should have informed us.  I don't

13  recall him ever discussing that at all and so it was time

14  for me to leave.

15       Q.    I think what you're saying, the reason you were

16  uncomfortable, because the borrower was a political

17  individual?

18       A.    I was uncomfortable because a loan like that was

19  made, and the board wasn't consulted beforehand.  And that's

20  why I resigned.

21       Q.    How did you first learn that that loan had been

22  extended?

23       A.    I was eating breakfast one morning, and I read it

24  on my iPad.

25       Q.    In the news?

1          A.   Yes -- on the paper -- one of the -- I believe it

2     was one of the financial papers.  It was Financial Times or

3     Wall Street Journal that I was reading when I saw it.

4          Q.   Do you remember when you saw it?

5          A.   It seems that it was in the -- first part of April

6     2017.

7          Q.   What was your reaction when you read that news

8     story?

9          A.   First of all, I was surprised and disappointed

10    that I didn't know about this.  I felt I should have shown.

11         Q.   Did you discuss either that article or the fact of

12    the loan with Mr. Calk?

13         A.   I called him a few days later and asked him, on

14    behalf of the other directors, to -- if we could meet and

15    discuss it.  And he asked -- so I said, it's about the

16    Manafort loan.  And he said that loan was

17    well-collateralized.  I said that may be so, but I -- we'd

18    like to talk about it.  We didn't talk about it until the

19    next board meeting.

20         Q.   When was that board meeting?

21         A.   That was in the middle of April I believe;

22    sometime around mid-April.

23         Q.   Okay.  Before that board meeting had you talked to

24    any other board members about that loan?

25         A.   We (audio skip) meeting -- talk -- and they asked

1   me to call Steve and (audio skip) talk to him in see if he

2   would meet with us.  So that's how that conversation came

3   about.  I called him on behalf of the other board members.

4        Q.   All of them, or particular board members?

5        A.   Well, just four; Ken Harris, me, George Gilmore

6   and Bernie Banks.

7        Q.   Did they share your concerns?

8        A.   The impression I had was they were surprised like

9   I was, but you'd have to talk with them for sure.  I don't

10  know for sure.

11       Q.   Did you talk to anyone else at the bank; any

12  employees or officers of the bank about the loans, before

13  the April board meeting?

14       A.   No.  Not about that, no.

15       Q.   What was it about the loans that you read that

16  made you want to have this discussion with Mr. Calk?

17       A.   Just that they -- first of all, the size of the

18  loans; it was a big loan.  I believe it was -- I can't

19  remember -- it was in the 16 million dollar range and it was

20  to a person that was very -- a political campaign, and I was

21  bothered by that (audio skip)

22       Q.   I'm sorry?  What about the timing bothered you?

23       A.   It had occurred months before, and I don't have a

24  recollection of hearing anything about those loans.

25       Q.   How many loans do you recall learning the bank had

1    made to Manafort?

2         A.    From what I read I think it was two.

3         Q.    Were you aware that during the Presidential

4    Campaign Mr. Calk had made television appearances on behalf

5    of the Donald Trump Presidential Campaign?

6         A.    Yes.  In fact -- yes, I knew that.

7         Q.    Were you aware that -- go ahead.

8         A.    I'd seen him.  I'd seen him on TV.

9         Q.    Were you aware that Mr. Manafort was, for a time,

10   Donald Trump's campaign manager?

11        A.    I knew that.  Yes.

12        Q.    Do you know how Mr. Calk came to appear on

13   television on behalf of the campaign?

14        A.    Well he, I believe he was -- it was because he was

15   appointed to Economic Advisory Council for one of the

16   candidates.

17        Q.    For Mr. Trump?

18        A.    Yes.

19        Q.    Were you aware that while Mr. Calk was serving on

20   the Economic Advisory Council one of the Manafort loans was

21   under consideration by the bank?

22        A.    I was not aware of that.  To my knowledge I don't

23   remember that being discussed, reading about it, anything.

24        Q.    If you had known that, what would your reaction

25   have been?

1     A.   You know I thought about that.  I would have

2   resigned then.

3     Q.   Why?

4     A.   Because it didn't fit with the way I think

5   about -- the optics -- situation like that.  It just

6   didn't -- didn't feel right to me.  And I think as director

7   I should have known about that -- I should have known.

8     Q.   What about the optics bothered you?

9     A.   Well the appearance of being part of a political

10   campaign and making a loan to a senior member of the

11   campaign.  Maybe -- but I didn't feel it was the right thing

12   to do.

13     Q.   Were you aware that Mr. Calk was seeking a

14   position in the Trump Presidential Administration?

15     A.   I did.

16     Q.   How did you become aware of that?

17     A.   He told me.

18     Q.   In what context?

19     A.   We were at a board meeting and it was in December

20   of 2016, and he told me he was a candidate to be the

21   Secretary of the Army.

22     Q.   Did he tell you how far along in the process he

23   was?

24     A.   That's all he told me.

25     Q.   Did he ask for your assistance?

Randall Rigby                                  03/04/2021      24

 1          A.    He asked if I could get a copy of his resume to

 2     General Mattis who had just been designated the Secretary of

 3     Defense.

 4          Q.    Did you agree to do that?

 5          A.    I did it.  Yes.

 6          Q.    You agreed to it or you forwarded it to

 7     General Mattis?

 8          A.    I forwarded it to General Mattis -- it's a -- for

 9     a senior officer like myself you get asked to do things like

10     that quite often -- speaking engagements, endorsements,

11     referrals, those kinds of things -- so it wasn't an unusual

12     thing.  I still get them.

13          Q.    So other people have asked you to do something

14     similar?

15          A.    Yes, several.

16          Q.    Did General Mattis respond?

17          A.    The only thing I got back was that he wasn't sure

18     that he would be able to play a role in the selection.

19          Q.    That General Mattis didn't know if General Mattis

20     would be able to play a role in the selection?

21          A.    Yes.  He didn't know that he would be part of that

22     decision on who was going to be the next Secretary.  And the

23     next month someone else was -- and I didn't hear anything

24     else about it.

25          Q.    Did you talk to anyone other than General Mattis

1   about Mr. Calk's interest in being Secretary of the Army?

2        A.   I didn't know him personally.  I sent it to a

3   friend of mine who did know him, and he forwarded it for me.

4        Q.   Who was that friend?

5        A.   It was name, John Sheehan.  He was a retired

6   Marine.  General Mattis was a Marine; they knew -- I didn't

7   know Mattis -- he's a young -- he's younger than I am, and

8   our paths never crossed.

9        Q.   Okay.  So you sent Mr. Calk's resume to

10  General Sheehan who forwarded it to General Mattis?

11       A.   That's correct.

12       Q.   Did you and General Sheehan discuss Mr. Calk's

13  interest?

14       A.   Not at all, no.

15       Q.   Did you review Mr. Calk's resume or any of the

16  materials that he gave you?

17       A.   I glanced through it, yes.

18       Q.   What did you think of his qualifications?

19       A.   I thought his becoming the Secretary of the (audio

20  skip).

21       Q.   I'm sorry, could you repeat that last line?

22       A.   I heard that the -- a longshot.

23       Q.   Okay.  Keep going.

24       A.   Because I worked with several secretaries of the

25  Army, and they had a lot of Washington experience.  And so I

1   just thought, well, I can do this for Steve, but I thinking

2   to myself, I don't think he's really a strong candidate for

3   that position.  But I didn't know for sure.  But that was my

4   personal opinion.

5        Q.   Other than General Sheehan did you talk to anyone

6   about Calk's interest or application?

7        A.   No.

8        Q.   Anyone on the transition team?

9        A.   No.  I didn't talk to (audio skip) transition

10   team.

11        Q.   Do you know if Mr. Calk was talking to anyone else

12   in order to get their assistance or advice in becoming

13   Secretary of the Army or another administration role?

14        A.   No.

15        Q.   Did you and Mr. Calk ever discuss whether

16   Paul Manafort could be helpful in his efforts?

17        A.   No.

18        Q.   Do you know whether he -- Mr. Calk asked for

19   Manafort's assistance?

20        A.   I read (audio speak) that.  I didn't know it at

21   the time.

22        Q.   You read that after the fact?

23        A.   Yes.  After this all came out.

24        Q.   If you had known that Paul Manafort was assisting

25   Mr. Calk, how would you have reacted?

1     A.   Well, I would have approached -- you know, I've

2  thought about this one too -- I would have asked to talk to

3  Steve and talked to him about -- this is probably not a real

4  good idea of yours.  He was a bright guy, but -- I would

5  have told him, Steve, this is not a good idea.  You don't

6  really want to do this.  And that's what I would've told

7  him; this is way -- Steve (audio skip) believed he told

8  me -- collateral-wise.  And that was enough for him, but it

9  wasn't enough for me.  So he's a -- I'm not.

10     Q.   Did you learn about Manafort's involvement with

11  Mr. Calk's administration position in the same news article

12  that you read at that breakfast in mid-March, early April?

13     A.   Yes.  That news article was the first time I made

14  that association.  Yes.

15     Q.   Did you discuss Mr. Manafort's assistance with any

16  of the other board members?

17     A.   No.  Not beforehand.  Now, afterwards we talked

18  about it.

19     Q.   Did you raise -- I'm sorry go ahead.  Did you

20  raise it with Mr. Calk when you requested the meeting?

21     A.   It was a pretty short conversation.  I just said

22  we need to talk with you.  And he says is this about the

23  Manafort loan?  And I said, yes, that's the big part of it.

24  He said, well, that loan is -- so, like I said, he was the

25  banker.  So I guess -- that's all I knew.

1      Q.   You mentioned earlier that you resigned because of

2   the optics of the loans to Manafort.  Was part of that

3   consideration that Manafort was providing assistance to

4   Mr. Calk?

5      A.   After he told me he was a candidate to be the

6   Secretary of the Army, I thought to myself, lookey (ph)

7   here, here's what's going on, perhaps he made this loan

8   because Manafort could help him get a position.  And it

9   didn't look good to me.  I just didn't want to be a part of

10   that.

11      Q.   Did you ever exclusively talk to Mr. Calk about

12   that?

13      A.   That's about as in-depth of conversation as we

14   had.

15      Q.   Is that one of the reasons you resigned?

16      A.   What's one of the reasons I resigned?  Didn't

17   understand the question.

18      Q.   Sure.  That it appeared to you that Mr. Manafort

19   had provided assistance to Mr. Calk in being considered for

20   Secretary of the Army?

21      A.   And I would say the optics of that didn't look

22   very good.  Yes.

23      Q.   And that's one of the reasons you resigned?

24      A.   That's one of the reasons I resigned, yes.

25      Q.   Do you know if Mr. Calk was actually interviewed

1    to be Secretary of the Army or any other position?

2        A.   I subsequently read he got an interview to be the

3    Under Secretary.

4        Q.   Did he ever tell you he was being interviewed?

5        A.   Never discussed any of that after that

6    meeting -- after he talked to me December -- he was a

7    candidate to be the Secretary of the Army; that was never

8    mentioned again as far as I know.  He didn't talk about it

9    at the next -- at the board meetings.

10       Q.   You said there was eventually a board meeting

11   where the Manafort loans were discussed?

12       A.   I wasn't there.

13       Q.   You weren't --

14       A.   I don't (audio skip).

15       Q.   I'm sorry, maybe I misunderstood.  I thought you

16   said that after you requested a meeting with Mr. Calk, a

17   board meeting was setup for April?

18       A.   Well (audio skip).  A board meeting was not set

19   up.  At that meeting nothing had happened since I had called

20   Steve.  After the board meeting ended he asked the directors

21   to go to lunch.  Two of us went; George Gilmore and I went

22   to -- with Steve.  The other two had other obligations that

23   afternoon.  Harris and Banks had other things to do.  So we

24   went to lunch with Steve.  That's when I told him I was

25   (audio skip) bank.

1        Q.    How did he respond?

2        A.    He looked -- to the best of my memory he looked at

3   George Gilmore and asked him if he was leaving too.  George

4   said he was going to leave.  His brother was dying up in

5   Canada, I believe, and he wanted to spend some time with him

6   and take care of him.  Steve just said, I hate for both of

7   you to leave at once.  And I told him I would stay till the

8   next board meeting -- through the next board

9   meeting -- because we were getting the report of an

10  examination of the bank in the next month.  And George and

11  I, in particular, had worked hard on the IT portion, and we

12  wanted to listen to what the bank examiners thought about

13  the work we had done.  So I came to that meeting, but as

14  soon as the meeting ended Steve said that I would be

15  leaving, and that was it; I left the bank, and that was it.

16       Q.    Did he ever ask you why you were leaving the bank?

17       A.    No.  That I recall, he never asked me.

18       Q.    Did you ever volunteer why?

19       A.    No.

20       Q.    After you called Mr. Calk to request the meeting,

21  did you ever discuss the Manafort loans with him?

22       A.    I told him that we wanted to meet -- all the

23  directors wanted to meet with and discuss the Manafort

24  loans, but as a group we never did.  It was just -- lunch

25  with him at the next board meeting -- that was the annual

1    meeting in 2017 -- when both told him we would be leaving

2    the bank.

3         Q.   At that lunch did you discuss the Manafort loans

4    at all?

5         A.   The only thing he said was the loan was

6    well-collateralized.

7         Q.   You mentioned an examination of the bank.

8         A.   Yes.

9         Q.   Did you ever get a report regarding the OCC's view

10   of the loans?

11        A.   That was not brought up at the two meetings I

12   attended after we found out; it was not discussed by the

13   OCC.

14        Q.   Are you familiar with the concept of a bank's

15   legal lending limit?

16        A.   Generally speaking, yes.

17        Q.   In general terms is that the concept that a bank

18   is not permitted to have too much exposure to any one

19   borrower?

20        A.   Yes, that is correct.

21        Q.   Do you recall discussing or hearing about any

22   implications the Manafort loans may have for the Federal

23   Savings Bank's lending limit?

24        A.   After -- only whenever I read about it.  I don't

25   recall any conversation before it came out in the papers.

Randall Rigby                                    03/04/2021    32

1    No, I don't recall any of that.

2         Q.    What about after it came out of the papers?

3         A.    Not within the board meeting, no.

4         Q.    Do you remember receiving an email from the bank's

5    President about it?

6         A.    No, I do not.  I don't recall it.

7              (ASIDES)

8    BY MS. KEARNEY:

9         Q.    You had mentioned that when you spoke with

10   Mr. Calk about the Manafort loans, his response was they

11   were well-collateralized, right?

12        A.    That was his response, yes.

13        Q.    Did he ever share with you any information about

14   his relationship with Mr. Manafort?

15        A.    Never.

16        Q.    Did he say how they knew each other?

17        A.    No.

18        Q.    Did he ever discuss whether he was or was not

19   involved in the loans?

20        A.    No.  And I remember, no.

21        Q.    And when Mr. Manafort [sic] told you in

22   December of -- I'm sorry, Mr. Calk told you in December of

23   2016 that he was being considered for Secretary of the Army,

24   did he say how that came about?

25        A.    No.

Randall Rigby                                    03/04/2021    33

1    Q.   Did he say, kind of, who got his name in there?

2    A.   No.

3    Q.   Were you aware that the bank's holding company

4    participated in the Manafort loans?

5    A.   I read something about that afterwards.  But I

6    remember a couple of times of discussions (audio skip) the

7    holding company came up, but I don't remember any details

8    about it.  In fact, I can't remember when they were; I don't

9    know if they were in this particular time period of

10   interest.  But I just know that there was a holding company

11   that Steve was the owner of that as well.

12   Q.   Do you recall the holding company participating,

13   or no?

14   A.   No, I don't recall that.

15   Q.   Do you recall them participating in any loans that

16   the bank extended?

17   A.   Not that I can recall, no.

18   Q.   What was your compensation as a board member?

19   A.   For most of the time I was there it was $500 per

20   meeting.  Sometime in 2017 Steve announced he was --

21   correcting that to $1,000 a meeting.

22   Q.   How often does the board meet?

23   A.   Once a month.

24   Q.   What, if anything, did you know about Mr. Calk's

25   military service?

1    A.   Knew very little; I knew he was inducted flight

2    training and that he served in, both, on active-duty for a

3    while and in the Army Reserves as an aviator.

4    Q.   Did you ever -- as both military people -- did you

5    ever talk about that with him?

6    A.   Not really.  He was very interested in military

7    people; he hired veterans and sort of put an emphasis on

8    loans -- VA loans for veterans, but that's about as -- you

9    know, he didn't talk a lot about himself -- during service.

10   Q.   Did Mr. Calk ever tell you how he got appointed to

11   the Trump Campaign; the Economic Advisory Council?

12   A.   No, he didn't.

13   Q.   Do you know who else was on that council?

14   A.   Well, a selection of billionaires in New York.  I

15   knew that, but I don't know how he got appointed.  I

16   figured -- I thought it was probably through some New York

17   contact.  He spent time in New York from time to time, so I

18   thought that was possibly it.

19   Q.   Have you talked to Mr. Calk since you resigned

20   from the board?

21   A.   I saw him one time -- I was a speaker at a

22   commission in Illinois University.  Steve and Bernard Banks

23   came to the commissioning.  I saw him there; he introduced

24   me to his son who I hadn't seen in a couple of years -- we

25   had been on a trip together -- and his young son Stephen had

1    grown quite a bit, and that was it; no conversation at all.

2         Q.    Approximately when was that?

3         A.    I believe it was in 2018 at the commissioning;

4    yeah, I believe it was 2018 -- would have been May; probably

5    May because that's when the -- graduates.

6         Q.    Have you emailed or texted or anything since then?

7         A.    I've had no contact with him, no.

8         Q.    Have you spoken with anyone who represents him in

9    connection with this matter?

10         A.    The only other contact I've had with anyone at the

11    bank was John Calk called me and told me that Steve had been

12    charged and that, if necessary, the bank would provide a

13    legal -- to me and the other directors.  And that was it.

14         Q.    Did you take him up on that?

15         A.    Yes.  Yeah.  Wouldn't you?

16         Q.    With the mask you can't see my reaction.  And so

17    have you talked to his attorneys or his representatives at

18    all?

19         A.    I did talk to -- I'm trying to -- Margolis?  I

20    can't remember his name; I think it is Jerry,

21    Jeremy Margolis, I believe is his name.  I talked to

22    him -- it's been a couple years ago.  And that was the only

23    conversation I've had with him.

24         Q.    What did you guys talk about?

25         A.    -- same thing you and I are talking about.

1    Q.   Did you tell him substantially the same thing you

2    told us today?

3    A.   Well, I'm sworn to tell the truth, so I told him

4    substantially the same thing I told you.

5    Q.   Since you received your subpoena, have you talked

6    to an attorney or representative for Mr. Calk?

7    A.   No.

8    Q.   Just give us one moment, please.  I'm just going

9    to put us on mute for a second.

10         (PAUSE)

11   BY MS. KEARNEY:

12   Q.   Thanks for your diligence.  You've explained to us

13   that one of the reasons why you resigned from the Board of

14   the Federal Savings Bank, you felt you should have been told

15   about the loans to Manafort and their context.  Did you ever

16   say that to Steve Calk?

17   A.   We did it at lunch, and I mentioned that to

18   Stephen.  Yeah, I think I remember telling him that the main

19   reason I was leaving is because -- I -- we should've -- I

20   should've known about that loan.

21   Q.   Did you explain to him why you felt you should

22   have known about the loan?

23   A.   No, his response was it was well-collateralized,

24   so.

25   Q.   And that was the only response?

1      A.    That's all I got from Steve, yes.

2      Q.    Did that seem odd to you?

3      A.    I don't know.  I hadn't thought about "did it seem

4   odd."  It seemed, you know, to me that was his explanation.

5      Q.    Did you probe any further?

6      A.    No.

7      Q.    Did he ever deny that the loan was connected to

8   any assistance Manafort could provide to him?

9      A.    No.  That subject never came up.

10     Q.    So what -- to Mr. Calk?

11     A.    That primarily as a director of a bank and

12   advisor, -- if you're not going to use me don't -- you know,

13   then I'm not going to hang around.  That was about -- I'm

14   pretty sure he understood that; that that was the reason I

15   was leaving is because I didn't know why (audio speak)

16   didn't participate in the discussion about that and there

17   should have been one, and there should have been one before

18   it's been done, during or after.  So I think he understood

19   that pretty clearly.

20     Q.    And is that because your advice, as I think you

21   already said, would have been don't do it.

22     A.    Don't do it.

23     Q.    Have you ever met Paul Manafort?

24     A.    No.

25     Q.    Have you ever had any contact with him, any

Randall Rigby                                    03/04/2021    38

1   communication with him?

2        A.   No.

3        Q.   All right.  Give us one more second, sir?

4        A.   Sure.

5             MS. KEARNEY.   Grand jurors, do you have any

6   questions?  All right.

7   BY MS. KEARNEY:

8        Q.   All right.  Sir, we have no further questions for

9   you today.  There may come a point where the grand jurors

10   have further questions and we may ask you to appear again.

11             MS. KEARNEY.   But until then, seeing no questions

12   I ask the Foreperson to excuse General Rigby.

13             FOREPERSON.   Sure.

14             MS. KEARNEY.   Sir, I'm going to end our web

15   conference now.  And thank you very much for bearing with us

16   and for your time today.

17             WITNESS.   Thank you.

18             (Witness Excused)

19             (Time Noted:  3:14 p.m.)

20             (Colloquy Follows)

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

1                              *C E R T I F I C A T E*

2

3              I hereby certify that the foregoing is a true and

4    accurate transcription, to the best of my skill and ability,

5    from my electronic notes of this proceeding.

6

7    March 18, 2021_____          _____
     Date                            Jennifer Myrie
8                                    Acting Grand Jury Reporter
                                     Free State Reporting, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25