```
 1
 2
 3  UNITED STATES GRAND JURY
 4  SOUTHERN DISTRICT OF NEW YORK
 5  - - - - - - - - - - - - - - --x
    UNITED STATES OF AMERICA      :
 6
              -V-                 :  November 8, 2018, Special
 7
    STEPHEN M. CALK,              :
 8  (2017R00368)
    - - - - - - - - - - - - - - - x
 9
10                                      United States Courthouse
                                        Foley Square
11                                      New York, New York

12                                      March 4, 2021
                                        3:26 p.m.
13
14  A P P E A R A N C E S:

15                           PAUL MONTELEONI
                             Assistant United States Attorney
16
                             BENET KEARNEY
17                           Assistant United States Attorney

18                           HAGAN SCOTTEN
                             Assistant United States Attorney
19
20
21
22
23
24                           JENNIFER MYRIE
                             Acting Grand Jury Reporter
25
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3500-022-049

1                    (Colloquy Precedes)

2                    (Witness Enters Room)

3                    (Time Noted:  3:50 p.m.)

4    JAMES HILLIARD called as a witness, having been duly sworn

5            by the Foreperson of the Grand Jury, was examined

6            and testified as follows:

7    BY MR. MONTELEONI:

8        Q.   Good afternoon, Special Agent Hilliard.  Do you

9    remember testifying before this grand jury back in 2019

10   about your investigation of an individual named

11   Stephen Calk?

12       A.   Yes.

13       Q.   During the course of that investigation have you

14   spoken with other people, including other law enforcement

15   agents?

16       A.   I have.

17       Q.   Have you reviewed reports and documents prepared

18   by others?

19       A.   Yes, I have.

20       Q.   Will your testimony today, like last time, be

21   based in part on those conversations with other people and

22   documents you reviewed?

23       A.   Yes, it will.

24            MR. MONTELEONI.  Ladies and gentlemen of the

25   grand jury, some of the testimony you're going to hear from

1    Special Agent Hilliard will include hearsay which means he's
2    not going to testify solely about his own personal
3    observations but will also be testifying about what others
4    have told him and what he has read in reports and documents
5    prepared by people.
6              As you certainly know, hearsay evidence is
7    admissible and proper in these grand jury proceedings.  You
8    are permitted to rely on it in determining whether there is
9    probable cause to indict the defendant.  But if you want to
10   hear the testimony of any other witnesses, you have a right
11   to request it, and we'll make reasonable efforts to bring
12   that witness before you.
13   BY MR. MONTELEONI:
14        Q.   Now Special Agent Hilliard, the last time, do you
15   recall using a slide deck as part of your testimony?
16        A.   I do.
17        Q.   That slide deck is in evidence already as
18   Grand Jury Exhibit 2, but in front of you should be a copy
19   of a new slide deck marked Grand Jury Exhibit 31 which is
20   also up on the screen.
21             Is this a document that you've reviewed prior to
22   testifying?
23        A.   It is.
24        Q.   Is that a PowerPoint presentation about the case?
25        A.   Yes, it is.

```
 1        Q.   Does it contain excerpts of other Grand Jury
 2   Exhibits that we're going to be presenting today?
 3        A.   It does.
 4        Q.   As well as some slides from the previous slide
 5   deck for context?
 6        A.   Yes.
 7        Q.   Back when you testified in 2019 was Calk the CEO
 8   of the Federal Savings Bank?
 9        A.   He was.
10        Q.   Chairman of its board?
11        A.   Yes.
12        Q.   CEO of the holding company?
13        A.   Yes.
14        Q.   Chairman of the holding company's board?
15        A.   Yes.
16        Q.   Following your testimony was Calk indicted by this
17   grand jury?
18        A.   He was.
19        Q.   After his indictment did he continue being
20   chairman or CEO of the bank or holding company?
21        A.   No.
22             MR. MONTELEONI.  Ladies and gentlemen of the
23   grand jury, please don't consider the fact that he's no
24   longer the chairman or CEO of the bank or holding company as
25   a reason to return, or not to return, a superseding
```

1  indictment against him.  We're telling you this as

2  background for the changes in the superseding indictment

3  which is just updating its description of Calk's employment

4  status; not because it's evidence that he committed any of

5  the offenses.

6  BY MR. MONTELEONI:

7      Q.   Is Mr. Calk still a majority owner of the bank

8  Special Agent Hilliard?

9      A.   He is.

10     Q.   Now I want to ask you about something that

11 happened around the time of the 2016 election.  For that, I

12 would like to briefly go back to a slide from the previous

13 slide deck describing the phases of the alleged offense.

14     Showing you Slide 2 from Grand Jury Exhibit 31,

15 just taken from the previous slide deck, does this describe

16 the phases of the events?

17     A.   It does.

18     Q.   One of these phases is a 9.5 million dollar loan

19 phase.  The first thing I want to ask you about relates to

20 this 9.5 million dollar loan phase, so I'd like to show you

21 another slide from the previous deck, Slide 3.  Could you

22 please read to the grand jury the bullet in blue,

23 summarizing the 9.5 million dollar loan, on Slide 3?

24     A.   Sure.  Bullet point number 1) Manafort abandons

25 California refinance and instead seeks 9.5 million dollar

1    loan.  Bullet point number 2) 9.5 million dollar loan

2    rejected by bank, then approved after Presidential election.

3    Bullet point number 3) Court seeks Manafort's assistance

4    getting a senior administration job through loan officer and

5    directly.

6         Q.   Thank you.  So drilling down on the Presidential

7    election part of the timeline, I'd like to show you another

8    slide from that first deck, Slide 4, showing that leading up

9    to the Presidential election, and were asked for the

10   9.5 million dollar loan, the bank has rejected that loan and

11   tried to get another bank to extend it.

12        Now, what date is this Presidential election?

13        A.   It's November 8, 2016.

14        Q.   Turning to Slide 5, which is a new addition to

15   this timeline, can you please read the bulleted item for

16   November 9, 2016?

17        A.   Yes.  Manafort forwards Calk election night text

18   to son-in-law and real estate lawyer.

19        Q.   And drawing your attention to the email that's

20   excerpted here, is that an excerpt of Grand Jury Exhibit 32?

21        A.   Yes, it is.

22        Q.   Who is the sender of the email?

23        A.   Mr. Paul Manafort.

24        Q.   Directing your attention to the two Exhibits; is

25   bbaldinger@baldingerlaw.com an email from Bruce Baldinger?

1    A.    Yes, it is.

2    Q.    Is that Manafort's real estate lawyer?

3    A.    Yes, he was.

4    Q.    As a real estate lawyer was he going to be
5  involved in closing the 9.5 million dollar loan?

6    A.    Yes, he was.

7    Q.    Is the other recipient Jeff Yohai, Manafort's
8  son-in-law?

9    A.    Yes.

10   Q.    Jeff Yohai hoping to get some of his expenses paid
11 from the 9.5 million dollar loan with his father-in-law?

12   A.    Yes, he was.

13   Q.    Please read the subject line that you have.

14   A.    Update.

15   Q.    What's the date of this email with the subject
16 "Update"?

17   A.    November 9, 2016.

18   Q.    What time?

19   A.    9:20:57 a.m.

20   Q.    Please read the first line of the email.

21   A.    Got this from Steve last night.

22   Q.    So when this email says last night, what night
23 would that be?

24   A.    That would be the night of November 8, 2016.

25   Q.    Election night?

1           A.   Yes.

2           Q.   After "got this from Steve last night" there are

3    two paragraphs with quotation marks around them.  I'm going

4    to read these briefly.

5                It says: Paul, I hope you're having a great night.

6    We should have your approval all wrapped up by tomorrow at

7    12.  Enjoy the rest of your evening.  I'll speak to you

8    then.  Paul, I've got press all day tomorrow.  When can we

9    speak to schedule a closing?  Do you need me in New York?

10   Ready to support in any way.

11               So directing your attention to those paragraphs,

12   referring back to where it says, we should have your

13   approval all wrapped up by tomorrow at 12, is it fair to say

14   that as of election night Manafort was still waiting for

15   approval of the 9.5 million dollar loan?

16          A.   Yes, he was.

17          Q.   And where it says, do you need me in New York?

18   I'm ready to support in any way, where was the headquarters

19   of the Trump Presidential Campaign in 2016?

20          A.   It was located in New York.

21          Q.   Was it in the Trump Tower?

22          A.   Yes.

23          Q.   An office building in Manhattan?

24          A.   Yes, it is.

25          Q.   Was that also where the Presidential transition

1   was subsequently --
2       A.   Yes, it was.
3       Q.   Was this email found from Manafort's son-in-law's
4   account?
5       A.   Yes, it was.
6       Q.   Did you ever locate the original text through
7   other messages within these quotation marks?
8       A.   No, we did not.
9       Q.   Turning to Slide 6, directing your attention to
10  this excerpt of Grand Jury Exhibit 33, is this a contact
11  entry found on Calk's phone?
12      A.   Yes, it was.
13      Q.   What type of application does this contact entry
14  come from?
15      A.   WhatsApp application.
16      Q.   Is WhatsApp an encrypted messaging system?
17      A.   Yes, it is.
18      Q.   So does this entry reflect that there was a
19  contact item in the WhatsApp app that was stored on Calk's
20  phone, containing the WhatsApp details for Paul Manafort?
21      A.   Yes.
22      Q.   Is law enforcement always able to recover WhatsApp
23  messages when it executes a warrant on a phone?
24      A.   No we are not.
25      Q.   So if Calk and Manafort had exchanged messages

Case 1:19-cr-00366-LGS Document 306-2 Filed 05/04/22 Page 10 of 13

1   with WhatsApp, could law enforcement necessarily have been
2   able to get them?
3        A.   No.
4        Q.   Just for context, directing your attention to
5   Slide 7, the November 9, 2016 email we just looked at is in
6   blue, is everything in black, after it, the rest of the
7   timeline of the 9.5 million dollar loan phase that we
8   discussed the last time we testified about this
9   investigation?
10       A.   Yes, it is.
11       Q.   All right.  As a reminder, you previously
12  testified about the charges that the Special Council's
13  office brought against Manafort; that testimony is in
14  Grand Jury Exhibit 43.  But is it fair to say that among the
15  things he was charged with was fraud against the Federal
16  Savings Bank in connection with his application of these
17  loans?
18       A.   Yes, he was.
19       Q.   You also testified to the grand jury previously
20  about Manafort proffering with the investigators in some
21  statements he made there; that testimony is also in the
22  transcript Grand Jury Exhibit 43.  But is it fair to say
23  that in his proffers Manafort claimed there was no --
24  protocol with Calk?
25       A.   Yes, he did.

1    Q.   Is it also fair to say that there are a number of
2  facts suggesting that Manafort has made a number of false
3  statements?
4    A.   Yes.
5    Q.   False statements to government investigators and
6  also committed a number of acts involving deception in his
7  life?
8    A.   Yes.
9    Q.   Have you told the grand jury everything that you
10 know about this case, or have you merely answered the
11 questions that we've asked?
12   A.   Just merely answered the questions.
13   Q.   When you testified about conversations that you've
14 had with others or documents you reviewed, did you testify
15 to the exact words or just the substance?
16   A.   Just the substance.
17   Q.   Willing to return to the grand jury if the grand
18 jurors have any questions for you?
19   A.   Absolutely.
20        MR. MONTELEONI.  With the Foreperson's permission
21 I'll ask that Special Agent Hilliard be excused.
22        THE FOREPERSON.  Sure.
23        WITNESS.  Thank you.
24        (Witness Excused)
25        (Time Noted: 4:00 p.m.)

James Hilliard                                              03/04/2021    12

1                    (Colloquy Follows)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# *C E R T I F I C A T E*

I hereby certify that the foregoing is a true and accurate transcription, to the best of my skill and ability, from my electronic notes of this proceeding.

March 18, 2021          _____
Date                                   Jennifer Myrie
                                          Acting Grand Jury Reporter
                                          Free State Reporting, Inc.